## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, | Civil No. 16-cv-1702 |
| Plaintiff, | CLASS ACTION |
| vs. | **COMPLAINT** |
| CIGNA CORPORATION and CIGNA HEALTH AND LIFE INSURANCE COMPANY, | DEMAND FOR JURY TRIAL |
| Defendants. | October 13, 2016 |

Plaintiff, Kimberly A. Negron ("Plaintiff"), by her undersigned attorneys, alleges the following based upon her knowledge as set forth herein and upon information and belief. Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.      Defendant Cigna Corporation ("Cigna"), through its wholly-owned subsidiaries, including Defendant Cigna Health and Life Insurance Company ("CHL"), is a fully integrated health insurance company.

2.      Plaintiff, who received prescription drug benefits through a health insurance plan purchased through her employer and administered by Defendants, brings this action on behalf of herself and a class and subclass of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA") and (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").

3.      Defendants and/or their agents required network pharmacies to charge insured patients unauthorized and excessive amounts for prescription drugs — *sometimes more than ten times the actual amount that that insurer pays the pharmacy*. Defendants and/or their agents

"clawed back" these excessive payments by forcing the pharmacies to pay the unauthorized and excessive charges to Defendants and/or their agents after collecting them from the insureds.

4.     As an example, on November 10, 2014, a Class member paid a $20 co-payment to a pharmacy to purchase the prescription drug Amlodipine ***which in fact was a premium of 1,043% over the actual fee paid by Cigna to the pharmacy***.  Specifically, Defendants and/or their agents contracted with the pharmacy to pay the pharmacy only $1.75 for that Amlodipine prescription. Unknown to and hidden from the Class members at the time, Defendants and/or their agents required the pharmacy to (1) collect the $20 "co-payment" from the insured patient and then (2) pay to Defendants the unlawful $18.25 "Spread" between the supposed "co-payment" and Defendants' actual cost of the drug.  The secret payment of the "Spread" to the Defendants and/or their agents is known as a "Clawback."  The transaction is graphically depicted as follows:

| | | |
|---|---|---|
| Contracted fee Cigna pays pharmacy | $ | 1.75 |
| Co-Payment | $ | 20.00 |
| **Difference Pocketed by Defendants** | **$** | **18.25** |

Overcharged by 1,043%

"CLAWBACK"

5.     Under Defendants' scheme as illustrated in this actual example, the prescription "co-payment" is not a "co-" payment for at least two reasons:  (1) a material portion of the payment is not even a payment ***for a prescription drug*** — it is a hidden payment to the insurance company and/or its PBM and (2) it is not a "co-" payment for a prescription drug because the insurer is paying nothing over the "co-payment," but instead is getting a material portion of the insured's payment funneled back to it in secret.  Despite the fact that co-payments are referred to in the policy as cost sharing, there is no sharing of costs between the insured and the insurer when there is a Spread and/or a Clawback.  It is not a "co-payment," it is a "you-payment."

- 2 -

6.      With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce his rights under the terms of the plan. Defendants have violated the terms of the plan by establishing the Spread and taking illegal Clawbacks as alleged below.

7.      Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable. In setting the amount of and taking excessive undisclosed Spread compensation, Defendants received unreasonable compensation.

8.      Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In setting the amount of and taking excessive undisclosed Spread compensation, Defendants received plan assets and consideration for their personal accounts in violation of this provision.

9.      Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. In setting the amount of and taking excessive undisclosed Spread compensation, Defendants have breached their fiduciary duties.

- 3 -

10.     Under Count V, ERISA § 702, 29 U.S.C. § 1182, prohibits Defendants from discrimination and requiring discriminatory premiums and contributions based on health factors. Defendants have unlawfully discriminated against plan participants who utilize prescription drugs subject to the Spreads and Clawbacks for the treatment of their health conditions as compared to other similarly situated plan participants.

11.     Under Count VI, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

12.     Under Count VII, Defendants have violated RICO as alleged below and are liable for all statutory remedies.

### JURISDICTION

13.     This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. §1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States; (b) 29 U.S.C. §1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C § 1962.

### PARTIES AND NON-PARTIES

14.     Plaintiff Negron is a citizen and resident of Massachusetts and was covered by a health plan provided by her employer and administered by CHL.  Negron received prescription drug coverage under a "Cigna Open Access Plus Medical Benefits" group policy purchased through her employer for her benefit.  This policy is a welfare benefit plan subject to ERISA.

- 4 -

Under the policy, Plaintiff was obligated to pay co-payments of $10-$187 per prescription for certain categories of drugs.

15.     Defendant Cigna is a global health services organization, incorporated in Delaware, with its principal place of business in Bloomfield, Connecticut.  In 2015, Cigna reported revenue in excess of $37.9 billion, and the company is currently ranked 79th on the Fortune 500. Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Individuals and Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S; and (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

16.     Defendant CHL, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna with its principal place of business in Bloomfield, Connecticut.  CHL underwrites life and health insurance policies. The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance.

17.     Non-party Optum is a pharmacy benefits manager ("PBM") used by Cigna and its subsidiaries.  Optum provides pharmacy care services to more than 66 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country.  Upon information and belief, Optum provides pharmacy care services to a substantial majority of Cigna members.

18.     Non-party Argus Health Systems, Inc. ("Argus") is a PBM used by Cigna and its subsidiaries.  Argus, headquartered in Kansas City, Missouri, describes itself as being a provider of pharmacy and health management solutions.  Argus purports to offer modular to full-service solutions focused on lowering plan cost and improving patient and provider quality measures. Upon information and belief, Argus provides pharmacy care services to a substantial majority of Cigna members.

## SUBSTANTIVE ALLEGATIONS

### Health Insurance in General in the United States

19.     Health insurance is paid for by a premium paid to health insurers for medical and prescription drug benefits for a defined period.  Premiums can be paid by individuals, employees, unions, employers or other institutions.

20.     If a health insurance policy covers outpatient prescription drugs, the cost for prescription drugs is often shared between the insured patient and the insurer.  Such cost sharing can take the form of deductible payments, co-insurance payments and co-payments.  In general, deductibles are the dollar amounts the insured pays during the benefit period (usually a year) before the insurer starts to make payments for drug costs.  Co-insurance requires an insured person to pay a stated percentage of drug costs, often after exhausting the deductible limit. Co-payments are fixed dollar payments made by an insured patient toward drug costs.

### The Pharmacy Benefits Industry and Pharmacy Benefits Managers

21.     The pharmaceutical benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers and insureds.

22.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which then in turn sells the drugs to a retail pharmacy.  Payments for

the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer.  The retail pharmacy then distributes drugs to insured patients from its inventory.  Neither the PBM nor the insurer is involved in the distribution of prescription drugs.

23.     The retail payment side of the market for drugs covered by insurance is largely controlled by insurance companies and their contracted or owned PBMs.  In most instances where a health insurance policy provides prescription drug benefits, a PBM is the agent of the insurance company hired to administer the prescription drug component of a health insurance policy.  For example, Optum and Argus acted as the agents of Defendants in administering Defendants' prescription drug plans.

24.     According to the Pharmaceutical Care Management Association, PBMs manage pharmacy benefits for 266 million Americans as of 2016.  They may operate as part of integrated retail pharmacies (*e.g*., CVS Health and Caremark) or as part of health insurance companies (*e.g*., UnitedHealth Group and Optum).

25.     The three largest public PBMs are Express Scripts, CVS Caremark, and Optum. These three companies manage the pharmacy benefits of approximately 75% of the market, and cover 180 million enrollees.

26.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is transmitted via interstate wire to a "switch" that then directs the information to the correct PBM.  The PBM instantaneously processes the claim according to the benefits plan assigned to the patient.  The PBM electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the amount the pharmacy must collect from the patient as a co-payment, co-insurance, or to be paid toward a deductible.

27.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy over the co-payment, co-insurance or deductible amount paid by the patient approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

28.     If the patient's payment is greater than the amount that the insurer or its PBM has negotiated to pay the provider pharmacy, however, there will be a "negative reimbursement" to the pharmacy for the "Spread" between the patient's payment and the actual cost of the drug to the insurer or its PBM.

29.     The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

30.     This payment of a "Spread" to the insurer and/or its PBM — referred to in the industry as a "Clawback" — evidences the overcharge to the insured.

### The Patient–Insurer–PBM–Pharmacy Contractual Relationships

31.     Contractual relationships exist between the employer (or individual) and the health insurance company; the health insurance company and the PBM; and the PBM and the pharmacy. As alleged above, an employer buys a health insurance policy from a health insurance company to provide prescription drug benefits for its employees.  Health insurance companies then hire PBMs to manage the prescription drug benefits offered pursuant to their policies.

32.     The following diagram represents (in simplified form) the contractual relationships existing between the insured patient and the pharmacy:



(a)     **Employer/Individual–Insurer Agreements (*i.e.*, Insurance Policies).** Employers and individuals buy health insurance policies to provide prescription drug benefits.

These policies contain uniform provisions that set forth key plan terms such as the mechanism for and amount of the deductible, co-payment, and/or co-insurance that a patient must pay to obtain prescription drug benefits.   Plaintiff and Class members are intended beneficiaries of such agreements.

(b)   **Insurer–PBM Agreements**.   Health insurance companies, such as Defendants, contract with and/or own PBMs, which act as their agents to administer the prescription drug benefits purchased through the health insurance policies that the insurers issue.

(c)   **PBM–Pharmacy Agreements**.  PBMs in turn, contract with pharmacies, which serve as providers in the insurers' pharmacy network. The pharmacies fill prescriptions that are health benefits covered under the insurers' policies.  Pursuant to these agreements, the PBMs set the amount that a pharmacy will collect from an insured patient for a prescription drug, the amount the PBM (and insurer) will pay the pharmacy for filling the patient's prescription, and the amount of the insured's payment that the pharmacy must send to the PBM as a "Clawback."  On information and belief, the pharmacy has no role in setting the amount of the patient's payment and thus must accept the "Clawback" amount as determined by the PBM.

33.   The relationship among the parties is shown graphically as follows:



34.     Pursuant to the health insurance policies, insurers must ensure that, when they contract with a PBM to act as their agent to manage prescription drug benefits under the health insurance policies, the PBM follows the policies' terms, such that subscribers are not overcharged for their prescription drug benefits.

35.     To the contrary, PBMs, acting as agents and/or in concert with health insurance companies, routinely charge insureds substantially higher prices for prescription drugs than are allowed under the health insurance policies.

### Defendants' Insured Patients Pay Undisclosed, Unauthorized and Excessive Fees for Prescriptions Drugs

36.     The Defendants in this case have taken the general employer-insurer-PBM-pharmacy structure and, through various agreements, created their unlawful scheme.  Under these agreements, the pharmacy charges the insured patients a prescription drug price that is set by the PBM and/or insurer, which price typically is based on a percentage of the so-called average wholesale price or "AWP" (the "Insureds' Price").[1]  Alternatively, the pharmacy charges the insured patients a co-payment, which also is set by the Defendants and/or their agent PBMs.

37.     The Insureds' Price or co-payment routinely is higher than the price the PBM pays the pharmacy for providing the drug to the insured patients — particularly for many low-cost, high volume generic prescription drugs, although some brand drugs are also subject to "Clawbacks."

38.     Moreover, under the confidentiality provisions of the PBM-Pharmacy Agreements, pharmacies cannot tell patient insureds that they are being overcharged, much less sell drugs to them at a lower price separate and apart from the insurance policies.

---

[1]     Average Wholesale Price is an amount set by the prescription drug manufacturers that rarely, if ever, reflects a true price charged in wholesale transactions.

39.     In summary, the PBM–Pharmacy Agreements:  (1) require pharmacies to charge insureds more for drugs than the Defendants and their PBM pay the pharmacies, with the difference between the two amounts known as the "Spread;" (2) require the pharmacies to collect the "Spread" from patient insureds; (3) require payment of Spread or deduction of the "Spread" from future reimbursement to the pharmacy by the PBM as a "Clawback;" (4) prohibit pharmacies from disclosing to insureds the existence or amount of the "Spread" and "Clawback;" (5) prohibit pharmacies from disclosing to insureds that they can purchase drugs at lower prices; and (6) prohibit pharmacies from selling to insureds covered prescription drugs at prices that are lower than the price that the insurer/PBM orders the pharmacies to charge the insureds. Instead, the "Spread" and "Clawback" overcharges are pocketed secretly and unlawfully by the insurance companies and/or their agents.

40.     There are several ways in which Defendants operate this overcharge scheme.  For example:

(a)     A patient under one of Defendants' health insurance policies went to a pharmacy to purchase prescription-strength Vitamin D (50,000 IU).  According to Defendant's uniform health insurance policy language:  "In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge. Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source."

(b)     In this documented instance, prescription-strength Vitamin D was purchased by the pharmacy from the manufacturer or wholesaler for $0.60.  Pursuant to the PBM–Pharmacy Agreement, the PBM paid the pharmacy $0.96 for the drug, a fulfillment fee of $1.40,

and $0.21 in tax.  Accordingly, pursuant to the PBM–Pharmacy Agreement, the contracted fee between the PBM and the pharmacy was $2.57 for the prescription.

(c)     Despite this, pursuant to the PBM–Pharmacy Agreement, the PBM required the pharmacy to charge the insured a $7.68 "co-payment" for the prescription-strength Vitamin D — ***an almost 200% overcharge*** — even though the contracted fee between the PBM and the pharmacy was only $2.57.

(d)     The PBM–Pharmacy Agreement then required the pharmacy to pay to the PBM/insurer the "Spread" between the contracted fee and the "co-payment" amount collected from the insured — a $5.11 "Clawback."

(e)     On information and belief, the PBM–Pharmacy Agreement further prohibited the pharmacy from disclosing the "Clawback" to the insured or from selling the drug to the insured for less than the "co-payment" separate and apart from the policy.

(f)     The above-described transaction is set forth below in an annotated excerpt of an actual transaction record from an investigation into this scheme.



41.     Alternatively, where the insured patient pays a deductible and/or co-insurance (not a co-payment), the patient is overcharged because his or her payment is based on the inflated amount that the PBM requires the pharmacy to charge the customer, **not** the lower amount that the Defendants and PBM pay to the pharmacy.

42.     As an example, using the contracted fees above, the insurer/PBM could set the amount that the pharmacy must charge the insured patient for Vitamin D at $7.68, but the insurer/PBM would pay the pharmacy only $2.57.  Under the full deductible portion of a plan, the patient insured pays $7.68, the pharmacist keeps $2.57, and the pharmacy is forced to pay the PBM/insurance company a "Clawback" of $5.11.[2]  Under a co-insurance plan, the insured patient would pay a percentage of $7.68 rather than a percentage of $2.57, with the difference being subject to a Clawback.

43.     Upon information and belief, Defendants take Clawbacks and/or Spread payments thousands of time each day from pharmacies all across the country.  Additional examples of Cigna clawing back from pharmacies overcharges to Class members include the following:

(a)     On November 10, 2014, a Class member paid to a pharmacy a $20 copayment for the prescription drug Amlodipine — **greater than ten times (1,043%) more than the actual $1.75 fee** paid to the pharmacist. Without disclosing it to the customer, Cigna clawed back the $18.25 overcharge.

(b)     On November 11, 2014, a Class member paid to a pharmacy a $20 copayment for the prescription drug Clopidogrel — **a 468% premium over the actual $3.52 fee**

---

[2]    This overcharge scheme is contrary to the way that insurer/PBMs charge the government under Medicare Part D, which is consistent with Defendant's uniform policy language and notions of fair dealing and fair trade for co-payments, deductibles and co-insurance.  The prices that Medicare enrollees pay pursuant to Part D are based on the net price actually paid to the pharmacy.  *See* 42 C.F.R. § 423.100 ("the amount such network entity will receive, *in total*, for a particular drug").

paid to the pharmacist. Without disclosing it to the customer, Cigna clawed back the $16.48 overcharge.

(c)     On October 7, 2016, a Class member paid to a pharmacy a $6.63 co-payment for the prescript drug SMZ/TMP — *a 191% premium over the actual $2.28 fee* paid to the pharmacist.  Without disclosing it to the customer, Cigna clawed back the $4.35 overcharge.

(d)     On November 6, 2014, a Class member paid to a pharmacy a $10 copayment for the prescription drug Azithromycin — *a 133% premium over the actual $4.29 fee* paid to the pharmacist.  Without disclosing it to the customer, Cigna clawed back the $5.71 overcharge.

(e)     On October 7, 2016, a Class member paid to a pharmacy a $6.47 co-payment for the prescription drug Sertraline — *a 134% premium over the actual $6.47 fee* paid to the pharmacist. Without disclosing it to the customer, Cigna clawed back the $3.71 overcharge.

(f)     On October 7, 2016, a Class member paid to a pharmacy a $15.00 co-payment for the prescription drug Mupirocin — *a 81% premium over the actual $8.27 fee* paid to the pharmacist. Without disclosing it to the customer, Cigna clawed back the $6.73 overcharge.

44.     All of the Clawback is taken by Cigna.  According to a Notice sent by American Associated Pharmacies ("AAP") — a member-owned cooperative comprised of over 2,000 independent pharmacies — to its members: the overpayments by customers is caused by Cigna. As explained by the notice, AAP members, pursuant to Cigna's direction, collect 100% co-payment and then Cigna's PBM "pull[s] back the amount that is in excess of the Contacted Rate. *All of the monies pulled by [the PBM] go to Cigna.*"

### The Fox 8 Investigation

45.     The New Orleans television station FOX 8 investigated "Clawbacks," including "Clawbacks" by Cigna, UnitedHealth Group, and other health insurance companies as part of its Medical Waste investigative series. FOX 8 found that insurance companies were "charging co-

pays that exceed the customers' costs for the drug," and that insurers were "clawing back" the excess payments from the customers.

46.     FOX 8 found that pharmacists were required to charge customers the amount dictated by the insurer or PBM, and were not allowed to give any discounts. According to Randal Johnson, president and CEO of the Louisiana Independent Pharmacies Association, "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance."

47.     More egregious, according to FOX 8, pharmacists were barred from disclosing that additional savings could be achieved by purchasing drugs directly and not applying the claims to the insurance coverage.

48.     FOX 8 published a number of "screenshots" from a pharmacist's computer system showing, with respect to particular drugs, the amount of the co-payment that certain health insurance companies (including Defendants) required pharmacists to collect from customers and the amount the pharmacists were required to pay to the health insurance companies as a "Clawback."  The prescription-strength Vitamin D example set out above is taken from one of the screenshots.

**"Clawbacks" Are Most Common With Widely Used Drugs**

49.     Defendants impose "Clawbacks" most frequently on widely used, low-cost drugs, and particularly generic drugs, where the cost of the drug is relatively low. This enables Defendants to impose deductible costs, co-payments and co-insurance costs that are higher than the cost of the drug, thereby insuring for themselves a "Clawback." These commonly used drugs include, but are not limited to the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone,

Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

**Defendants' Policies with Plaintiff and the Class**

50.     Health insurance policies are subject to state regulation. The policy forms typically must be filed with and approved by the appropriate state regulators.

51.     Because they are approved form policies, the relevant terms of the Policies insuring Plaintiff and Class members are substantively the same. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

52.     Defendants provide to their customers a summary of benefits as the primary source of information concerning prescription drug coverage ("Policy").

53.     In exchange for these health benefits, including prescription drug benefits, Defendants are paid a "Premium," a periodic fee.

54.     The Policies stated that they will pay Covered Expenses, which include expenses for charges for medically necessary Prescription Drug Benefits.

55.     According to the Policies, insureds may be required to pay a portion of the Covered Expenses."  In particular, Plaintiff and Class members "may be required to pay a portion of the Covered Expenses for services and supplies. That portion is the Copayment, Deductible or Coinsurance."

**The Co-insurance Provisions**

56.     Pursuant to a typical Policy provided by Defendants to Plaintiff and Class members:

(a)     "The term Coinsurance means the percentage of Charges for covered Prescription Drugs and Related Supplies that you or your Dependent are required to pay under this plan."

(b)     The term Charges means "the amount charged by the Insurance Company to the plan when the Pharmacy is a Participating Pharmacy, and it means the actual billed charges when the Pharmacy is a non-Participating Pharmacy."

(c)      "*In no event will the . . . Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy*, or the Pharmacy's Usual and Customary (U&C) charge."

(d)      The "Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source."

57.      Accordingly, under the Co-insurance provisions, the patient should never pay more than the fee ultimately paid to the pharmacy.

### The Co-payment Provisions

58.      Pursuant to a typical Policy provided by Defendants to Plaintiff and Class members:

(a)      "Copayments are expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies."

(b)      Pursuant to the Policy, "*In no event will the Copayment . . . for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy*, or the Pharmacy's Usual and Customary (U&C) charge."

59.      Thus, Class members should never pay more than the fee ultimately paid to the pharmacy.

### Plaintiff's Purchases

60.      During the time that Plaintiff was covered by the Defendants' policy, Plaintiff purchased prescriptions drugs for which she was required to make co-payments, co-insurance, and/or deductible payments, including those specifically alleged above.[3]  Upon information and

---

[3] For confidentiality reasons, Plaintiff has not specified the drugs she purchased, but if relevant, she will disclose such information during discovery after entry of an appropriate protective order.

belief based on the fact that Plaintiff purchased drugs for which Defendants overcharge customers, Plaintiff was charged fees for prescription drugs in excess of the fees permitted by their health policy.

61.     Plaintiff Negron's purchases of such prescription drugs pursuant to her health insurance policy include, but are not limited to, purchases from CVS in Burlington, Massachusetts on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

### Defendants Are Fiduciaries And Parties In Interest

62.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

63.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

64.     Defendants are fiduciaries for all of the plans to which they provided prescription drug benefits pursuant to Defendants' health insurance policies in that they exercised discretionary authority or control to:

(a)     dictate the amount paid to pharmacies for prescription drugs;

(b)     dictate the amount pharmacies charged insured patients for prescription drugs;

(c)     require pharmacies to charge insureds more for drugs than they paid the pharmacies, thereby creating and setting the amount of the "Spread;"

(d)     require the pharmacies to collect the "Spread" from patient insureds;

(e)     require pharmacies to pay the "Spread" to Defendants and require the deduction of the "Spread" from future reimbursements to the pharmacy as a "Clawback;"

(f)     determine the amount of and require the collection of additional profits and compensation for services provided pursuant to the policies;

(g)     misrepresent and fail to disclose to patient insureds the manner in which they charged for prescription drugs as alleged above;

(h)     prohibit pharmacies from disclosing to patient insureds the existence or amount of the "Spread" and "Clawback;"

(i)     prohibit pharmacies from disclosing to insureds that they can purchase drugs at a price lower than the amount set by Defendants under the policies;

(j)     prohibit pharmacies from selling to insureds prescription drugs covered by the policies at prices that are lower than the prices that the insurer/PBM orders the pharmacies to charge the insureds; and

(k)     manage the prescription drug benefit program, including processing and paying prescription drug claims.

65.     The Spread is additional compensation for the provision of prescription drug insurance coverage that was collected by Defendants that was not either disclosed or agreed to.

- 20 -

66.     Defendants exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation.

67.     Defendants are also parties in interest under ERISA in that they provided insurance services to Plaintiff's and the Class members' health insurance plans and received direct and indirect compensation therefore. ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

68.     Finally, even if Defendants are not fiduciaries or parties in interest, they are subject to equitable relief under ERISA, including surcharge and disgorgement.

**Defendants ERISA Duties**

69.     **The Statutory Requirements:**  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

70.     **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

- 21 -

71.     **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

72.     **The Duty to Inform.**   The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail:  (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

73.     **Co-Fiduciary Liability.**  A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes  reasonable efforts under the circumstances to remedy the breach.

74.    **The Duty Not To Discriminate.** A health insurer may not discriminate against insureds by charging excessive premiums. ERISA §702 29 USC §1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries based on health status.

(a) In eligibility to enroll.

(1)  In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

(A)  Health status.

(B)  Medical condition (including both physical and mental illnesses).

(C)  Claims experience.

(D)  Receipt of health care.

(E)  Medical history.

(F)  Genetic information.

(G)  Evidence of insurability (including conditions arising out of acts of domestic violence).

(H)  Disability.

(2)  No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A)  to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or

(B)  to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

- 23 -

(3)   Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1)   In general.  A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

75.   **Non-Fiduciary Liability.** Under ERISA, non-fiduciaries such as parties in interest like Defendants who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

### Defendants Breached Their Duties

76.   Defendants breached their insurance policies and legal obligations and harmed Plaintiff and Class members in the following ways:

(a)   Plaintiff and Class members were charged unlawful fees and additional premiums for prescription drugs that substantially exceeded the fees paid by Defendants and/or their agent PBMs to the pharmacies for the dispensed drugs;

(b)    Plaintiff and the Class were charged "co-payments," a material portion of which were neither payments for prescription drugs nor were they "co-" payments made in conjunction with Defendants' payment for prescription drugs, as required by the plain language of the form policy, but rather were undisclosed and unlawful payments and premiums to Defendants and its PBMs;

(c)   Plaintiff and Class members were overcharged for prescription drugs on co-payment plans in that rather than paying the lesser of (1) the applicable co-payment, (2) the fee

- 24 -

that the Defendants or their agent PBMs paid to the pharmacy for the dispensed drug or (3) the "Usual and Customary Charge," Plaintiff and Class members were charged a higher fee;

(d)     Plaintiff and Class members were overcharged for co-insurance payments in that rather than paying a percentage of the fees that Defendants and/or their agent PBMs paid to the pharmacies for the dispensed drugs, the co-insurance payments were based on substantially inflated amounts;

(e)     Plaintiff and Class members were overcharged when making payments toward their deductibles in that rather than paying the lesser of the applicable per occurrence deductible fee or the fee paid to the pharmacy for the dispensed drug, Plaintiff and Class members were charged deductible fees that were higher;

(f)     Defendants improperly processed and paid prescription drug claims;

(g)     Defendants discriminated against patient insureds who were required to pay Spreads and Clawbacks;

(h)     Defendants misrepresented and failed to disclose to patient insureds the manner in which they charged for prescription drugs as alleged above;

(i)      Pharmacies were prohibited from disclosing to patient insureds the existence or amount of the "Spread" and "Clawback;" and

(j)      Pharmacies were prohibited from disclosing to insureds that they could purchase drugs at a price lower than the amount set by Defendants under the policies and from selling drugs to customers at these lower prices.

77.     Plaintiff and Class members were overcharged for and/or paid unauthorized and excessive co-payments, co-insurance and deductible payments in connection with the purchase of numerous prescription drugs, including, but not limited to, the following: Accu-Chek, Acyclovir,

Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa,

Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class and the Subclass defined as follows:

> **The Class.**  All insureds under Defendants' health insurance policies who purchased prescription drugs pursuant to such policies and paid an amount for such drugs that was set by Defendants (or their agents) that was higher than the amount provided by the health insurance policies (the "Class" or "Nationwide Class").

79.     Within the Class there is one subclass:

(a)     **ERISA**.  All participants or beneficiaries of a welfare benefit plan health insurance policy provided by Defendants and subject to ERISA who purchased prescription drugs pursuant to such plan and paid an amount for such drugs that was higher than the amount provided by the health insurance policies (the "ERISA Subclass");

80.     The members of the Class and Subclass are so numerous that joinder of all members is impractical. Upon information and belief, there are tens of thousands of members in the Class and Subclass.

81.     Plaintiff's claims are typical of the claims of the members of the Class and Subclass because Plaintiff's claims, and the claims of all Class and Subclass members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class and Subclass are similarly affected by Defendant's wrongful conduct.

82.     There are questions of law and fact common to the Class and Subclass and these questions predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants are fiduciaries;

(b)     Whether Defendants are parties in interest;

(c)     Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)     Whether Defendants acts as alleged above breached ERISA's prohibited transaction rules;

(e)     Whether Defendants breached ERISA § 702;

(f)     Whether Defendants conducted the affairs of an enterprise through a pattern of racketeering activity;

(g)     Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C § 1341 and 1343;

(h)     Whether Defendants engaged in a scheme to defraud;

(i)     Whether each Defendant was a knowing and active participant;

(j)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(k)     Whether Plaintiff and Class and Subclass members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(l)     Whether Defendants breached their health insurance policies by authorizing or permitting pharmacies to collect and then remit "Spread" amounts to them and thereby overcharge subscribers for prescription drugs; and

(m)     Whether the members of the Class and/or Subclass have sustained damages and the proper measure of damages.

83.     Plaintiff will fairly and adequately represent the Class and Subclass and have retained counsel experienced and competent in the prosecution of class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class and Subclass. Plaintiff is

committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclass to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

85.     Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class and Subclass would create a risk of establishing incompatible standards of conduct for Defendant. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class and Subclass would create a risk of adjudications with respect to individual members of the Class and Subclass that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

86.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendant has acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

87.     In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class and Subclass predominate over any questions

affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**Exhaustion of Administrative Remedies Do Not Apply or Are Futile**

88. Plaintiff and the ERISA Subclass are not required to exhaust administrative remedies. Only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), could concern exhaustion of administrative remedies. Accordingly, only Count I is arguably implicated by that doctrine. Moreover, the exhaustion doctrine does not apply under that Count because Plaintiff seeks to enforce their rights under the terms of the plan not to recover benefits. Finally, because the injuries to Plaintiff and the ERISA Subclass are part of a nationwide, clandestine, computerized scheme, any attempt to rectify the harm through administrative means would be futile and unnecessary.

89. This clawing back of payments (which directly evidences the overcharging of insureds) is pervasive and significantly increases the costs to patients across the country. Indeed, in a survey of community pharmacies conducted in June 2016 ("June 2016 Pharmacy Survey"), 49% of pharmacies surveyed stated that they have seen "Clawbacks" taking place between 10 and 50 times, and 35% of respondents answered that they have seen "Clawbacks" over 50 times in the past month.

90. Making matters worse, on information and belief, Insurer/PBMs contractually bind pharmacies to keep the Clawback scheme secret and they prevent pharmacies from informing patients that their drugs could cost less if the pharmacy were permitted to process the purchase outside of the patients' insurance plans. Put differently, if the patient in the Vitamin D example above directly asked the pharmacist whether he or she could purchase prescription-strength Vitamin D outside of the insurance (*i.e.*, for less than the co-payment), the pharmacy would have

been contractually prohibited from disclosing a lower available price or from selling it at that lower price — even if the pharmacy could do so at a profit. According to the June 2016 Pharmacy Survey, 39% of respondents answered that these gag-clause restrictions prevented them from informing patients about cheaper options between 10 and 50 times; and 19% of respondents answered that they were prevented by gag-clauses over 50 times from disclosing cheaper alternatives to patients.

91.     Moreover, the overcharging and Clawback scheme is effectuated through a nationwide computer system. The computer systems that Defendants use to process claims often are not able to handle multiple prices for drugs and, rather than charging the client the proper lower price paid to the pharmacy, the claim adjudication system will automatically apply the higher price dictated by the insurer/PBM to charge the patient insured. Patients are never refunded the amount that they overpaid due to the failure of the adjudication system to handle multiple prices. Rather, that amount is kept by Defendants as a Clawback.

92.     Finally, correcting the prices paid by patient insureds on an individualized basis would inevitably result in further unfair, disparate, and discriminatory treatment among these ERISA Subclass members who have been reimbursed for the overcharges and those who have not.

93.     For all of these reasons, it would be futile for Plaintiff to demand administratively that Defendants modify the pervasive Spread and Clawback scheme that is ingrained in their business. To the extent that Defendants claim that Plaintiff should exhaust an administrative remedy and the Court agrees, Plaintiff reserves the right to seek a stay of this action while Plaintiff engage in what they believe will be a futile exercise.

## COUNT I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)
### on Behalf of the ERISA Subclass

94.     Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

95.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan.

96.     As set forth above, as a result of being overcharged for prescription drugs, Plaintiff and the ERISA Subclass have been denied their rights under the policies to be charged a lower amount.

97.     Plaintiff and the ERISA Subclass have been damaged in the amount of the Spread compensation Defendants took for itself and are entitled to recover the amounts they have been overcharged.

98.     Plaintiff and the ERISA Subclass are entitled to enforce their rights under the terms of the plans and are entitled to an order providing, among other things:

      (a)     That they have been overcharged;

      (b)     For an accounting of Defendant's charges and overcharges;

      (c)     For payment of all amounts due them in accordance with their rights under the plans.

## COUNT II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C)
### on Behalf of the ERISA Subclass

99.     Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

100.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

101.    Defendants are parties in interest under ERISA in that they provided insurance services to ERISA Subclass members pursuant to their prescription drug plans. ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

102.    Defendants received direct and indirect compensation in the form of undisclosed Spread compensation in exchange for the health insurance services they provided to Plaintiff and the ERISA Subclass pursuant to their prescription drug plans.

103.    The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

104.    The compensation paid to Defendants was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the Spread compensation was excessive and unreasonable in relation to the value of the services provided in that it exceeded the premiums that were agreed upon for providing prescription drug benefits and which is reasonable compensation for such insurance services.  Further, Defendants as fiduciaries of the plans are entitled to receive at most reimbursement for their direct expenses.

105.    Plaintiff and the ERISA Subclass have been damaged in the amount of the Spread compensation Defendants took for themselves.

106.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this

title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

107.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

        (a)    an accounting;

        (b)    a surcharge;

        (c)    correction of the transactions;

        (d)    disgorgement of profits;

        (e)    an equitable lien;

        (f)    a constructive trust;

        (g)    full disclosure of the foregoing acts and practices; or

        (h)    any other remedy the Court deems proper.

### COUNT III

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)**
**on Behalf of the ERISA Subclass**

108.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

109.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

110.    In setting the amount of and taking excessive undisclosed Spread compensation, Defendants received plan assets and consideration for their personal accounts.

111.    Plaintiff  and the ERISA Subclass have been damaged and suffered losses in the amount of the Spread compensation Defendants took.

112.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA is subject to such other equitable or remedial relief as a court may deem appropriate.

113.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan. . . ."

114.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

115.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff  and the ERISA Subclass, including but not limited to:

    (a)    an accounting;

    (b)    a surcharge;

    (c)    correction of the transactions;

    (d)    disgorgement of profits;

    (e)    an equitable lien;

    (f)    a constructive trust;

    (g)    full disclosure of the foregoing acts and practices; or

- 35 -

(h)  any other remedy the Court deems proper.

## COUNT IV

### ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)
### for Violations of ERISA § 404, 29 U.S.C. § 1104
### on Behalf of the ERISA Subclass

116.  Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

117.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

118.  ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA is subject to such other equitable or remedial relief as a court may deem appropriate.

119.  In setting the amount of and taking excessive undisclosed Spread compensation, Defendants have breached their fiduciary duties.

120.  Plaintiff and the ERISA Subclass have been damaged and suffered losses in the amount of the Spread compensation Defendant took.

121.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan. . . ."

122.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

123.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

      (a)    an accounting;

      (b)    a surcharge;

      (c)    correction of the transactions;

      (d)    disgorgement of profits;

      (e)    an equitable lien;

      (f)    a constructive trust;

      (g)    full disclosure of the foregoing acts and practices; or

      (h)    any other remedy the Court deems proper.

**COUNT V**

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 702, 29 U.S.C. § 1182**
**on Behalf of the ERISA Subclass**

124.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

125.    ERISA §702, 29 USC §1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries based on health status.

(a) In eligibility to enroll.

    (1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in

- 37 -

connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:

(A) Health status.

(B) Medical condition (including both physical and mental illnesses).

(C) Claims experience.

(D) Receipt of health care.

(E) Medical history.

(F) Genetic information.

(G) Evidence of insurability (including conditions arising out of acts of domestic violence).

(H) Disability.

2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

(A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or
(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.
(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of

> any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

126.   In setting the amount of and taking excessive undisclosed Spread compensation, Defendants have required patient insureds who have paid excessive Spreads and Clawbacks to pay greater premiums and contributions than those patient insureds who have not paid excessive amounts for their health benefits.

127.   Plaintiff  and the ERISA Subclass have been damaged and suffered losses in the amount of the Spread compensation Defendants took.

128.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

129.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff  and the ERISA Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    full disclosure of the foregoing acts and practices; or

(h)    any other remedy the Court deems proper.

**COUNT VI**

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)**
**on Behalf of the ERISA Subclass**

130.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

131.    As alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

132.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

133.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

134.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Upon information and belief, each Defendant participated in the breaches by the other fiduciaries.

- 40 -

135.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled another fiduciary to commit a breach. Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

136.    Plaintiff and the ERISA Subclass have been damaged in the amount of the Spread compensation Defendants took.

137.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) [ ] enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

138.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the ERISA Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    full disclosure of the foregoing acts and practices; or

(h)    any other remedy the Court deems proper.

## COUNT VII

### For Violating RICO, 18 U.S.C. § 1962(c)
### on Behalf of the Nationwide Class

139.     Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

140.     For the purposes of this Count, and pursuant to Fed. R. Civ. P 8(d), the Enterprise is alternatively (a) Optum and/or each pharmacy that participates in the provider network that Optum manages; (b) Argus and/or each pharmacy that participates in the provider network that Argus manages; and/or (c) all other currently unknown PBMs used by Cigna and/or each pharmacy that participates in the provider network that such PBM manages.

141.     At all relevant times, each Defendant is and was engaged in interstate commerce or its activities affected interstate commerce and is and was a culpable person that has been associated with the Enterprise.

142.     Optum (one of the largest PBMs in the United States) and Argus and all of the pharmacies in the provider network that they each manage ("Participating Pharmacies") also are engaged in interstate commerce or in activities that affect interstate commerce.

143.     While associated with the Enterprise, each Defendant conducts or participates, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.  As alleged herein, Optum and Argus are the agents of Cigna and as such is controlled and managed by Cigna. Through their agent PBMs, including Optum and Argus, Defendants have facilitated and/or authorized relationships with Participating Pharmacies that enable the pattern of racketeering activity.

144.     Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through an on-going, continuous and related pattern of racketeering

activity that was and is the Enterprise's regular way of conducting its business and/or that distinctly threatens continued criminally indictable activity.

145.    As described more fully below, pursuant to and in furtherance of their fraudulent scheme, Defendants have committed multiple, related predicate acts within the relevant time period and within the last ten years that are indictable as mail and/or wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343.  The predicate acts had a common purpose and similar results on similar victims.

146.    As alleged herein, the plan or scheme to defraud entails:   (a) Defendants representing to Plaintiff and Class members through form insurance policy language that they would pay a certain amount for prescription drugs; (b) Defendants entering into agreements with their agent PBMs, including Optum and Argus, which in turn, enter into agreements with Participating Pharmacies, instructing the Participating Pharmacies to overcharge Plaintiff and Class members for prescription drugs; (c) Plaintiff and Class members in fact being overcharged for prescription drugs; and (d) agreements between Cigna's PBMs and Participating Pharmacies prohibiting the disclosure of the unlawful scheme and/or the sale of prescription drugs to Plaintiff and Class members at prices other than the unlawful prices.  As such, the plan was to deprive Plaintiff and Class members of money by deceit and false pretenses, and it was characterized by a departure from community standards of fair play and candid dealings.

147.    The scheme to defraud includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the policy that Class members would pay a certain amount for prescriptions drugs with knowledge and intent that Class members would be charged a higher amount; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for prescription drugs nor were they

"co-" payments by the insureds in conjunction with a payment by the insurer for the prescription drugs, as required by the plain language of the policies, but rather were unlawful payments to Defendants and/or their PBM; (c) the failure to disclose that prescription drug payments under deductible portions of health insurance policies were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; (d) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; and (e) the failure to disclose and agreement not to disclose that Class members could pay less for a drug by purchasing it outside of their respective insurance policies.

148. The scheme to defraud consists of Defendants' wrongly depriving Plaintiff and Class members in their property rights by dishonest methods or schemes. Such scheme was willfully devised by Defendants, with each being a knowing and active participant in the scheme to defraud. Each Defendant specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

149. The purpose of the scheme was and is to cause Plaintiff and Class members to overpay for their prescription drugs so that the overcharge would be clawed back by Optum and Defendants.

150. It was and is reasonably foreseeable by Defendants that mail, interstate carriers and wire transmissions would be used — and mail, interstate carriers and wire transmissions were in fact used — in furtherance of the scheme, including but not limited to the following manner and means:   (a) Defendants' send and receive papers via mail, interstate carriers and/or wire transmissions in connection with the scheme to defraud, including, but not limited to, insurance

policies, applications, agreements, Policy Summaries and miscellaneous health insurance documentation; (b) whenever a prescription was or is filled, information is entered into a computer and transmitted via interstate mail or carrier and/or wire transmissions for adjudication; (c) the clawing back of money did and does take place via interstate mail or carrier or wire transmissions; (d) Class members made and make payments at pharmacies using credit or debit cards, which require the use of use of interstate wire transmissions; (e) the payment of premiums were made to Defendants via interstate mail or carrier and/or wire transmissions (f) prescription drugs purchased through the fraudulent scheme were delivered by mail or interstate carrier and (g) representatives of Defendants and their PBMs communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

151.   On or about the dates set forth below, Defendants unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud by obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

152.   For example, when Plaintiff purchased prescription drugs, Defendants caused to be transmitted mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

153.   On or about these dates, CVS, located in Burlington, Massachusetts, sent and received mail, interstate messages or deliveries and/or wire transmissions in connection with (a) determining whether the Plaintiff and the prescription drugs were covered under their health

insurance policies and how much Plaintiff should pay for the drugs; (b) processing Plaintiff's payments for such prescription drugs; and (c) processing the PBMs' payments to and/or Clawback from the pharmacies.

154.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their property in that they paid excessive and fraudulent fees for prescription drugs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and Subclass, pray for relief as follows as applicable for the particular claim:

A.     Certifying this action as a class action and appointing Plaintiff and the counsel listed below to represent the Class and Subclass;

B.     Finding that Defendants violated their fiduciary duties to ERISA members and awarding Plaintiff and the ERISA Subclass such relief as the Court deems proper;

C.     Finding that Defendants engaged in prohibited transactions and awarding Plaintiff and the ERISA Subclass such relief as the Court deems proper;

D.     Finding that Defendants denied Plaintiff, the Class, and the Subclass benefits and their rights under the policies and awarding such relief as the Court deems proper;

E.     Finding that Plaintiff, the Class, and the Subclass are entitled to clarification of the rights under the policies and awarding such relief as the Court deems proper;

F.     Awarding Plaintiff, the Class, and the Subclass damages as deemed appropriate by the Court;

G.     Awarding treble damages in favor of Plaintiff and the Class members against all Defendants for all damages sustained as a result of Defendants' violation of RICO, in an amount to be proven at trial, including interest thereon;

H.      Awarding Plaintiff, the Class, and the Subclass equitable relief to the extent permitted by the above claims;

I.      Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

J.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

K.      Awarding Plaintiff, the Class, and the Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

L.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2016                      Respectfully submitted,

                                   *s/ Robert A. Izard*
                                   Robert A. Izard, Bar No. ct01601
                                   Craig A. Raabe, Bar No. ct04116
                                   Christopher M. Barrett
                                   IZARD, KINDALL & RAABE, LLP
                                   29 South Main Street, Suite 305
                                   West Hartford, CT 06107
                                   Telephone:  (860) 493-6292
                                   Fax: (860) 493-6290
                                   rizard@ikrlaw.com
                                   craabe@ikrlaw.com
                                   cbarrett@ikrlaw.com


                                   Ronen Sarraf
                                   Joseph Gentile
                                   SARRAF GENTILE LLP
                                   14 Bond Street, Suite 212
                                   Great Neck, New York 11021

Telephone:  (516) 699-8890
Fax:  (516) 699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

***Attorneys for Plaintiff***