UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Kimberly A. Negron**, Individually and on Behalf of All Others Similarly Situated, | Case No. 16-cv-1702 |
| Plaintiff, | |
| vs. | |
| **Cigna Corporation** and **Cigna Health and Life Insurance Company**, | **RICO Case Statement** |
| Defendants. | |

Pursuant to the Standing Order in Civil RICO Cases, plaintiff, Kimberly A. Negron, submits this RICO Case Statement.

**1.      The alleged unlawful conduct that is claimed to be in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d).**

Defendants Cigna Corporation ("Cigna") and Cigna Health and Life Insurance Company ("CHL") violated 18 U.S.C. § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering. The unlawful conduct consisted of the following: Defendants entered into agreements with their PBMs, including Optum and Argus, which in turn, entered into agreements with participating pharmacies, instructing the pharmacies to overcharge Plaintiff and Class members for prescription drugs; Plaintiff and Class members were in fact overcharged for prescription drugs; and agreements between Cigna's PBMs and pharmacies prohibited the disclosure of the unlawful scheme and/or the sale of prescription drugs to Plaintiff and Class members at prices other than the unlawful prices.

The scheme was to deprive Plaintiff and Class members of money by deceit and false pretenses, and it was characterized by a departure from community standards of fair play and candid dealings.

The scheme to defraud included various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the policy that Class members would pay a certain amount for prescriptions drugs with knowledge and intent that Class members would be charged a higher amount; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for prescription drugs nor were they "co-" payments by the insureds in conjunction with a payment by the insurer for the prescription drugs, as required by the plain language of the policies, but rather were unlawful payments to Defendants and/or their PBM; (c) the failure to disclose that prescription drug payments under deductible portions of health insurance policies were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; (d) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; and (e) the failure to disclose and agreement not to disclose that Class members could pay less for a drug by purchasing it outside of their respective insurance policies.

It was and is reasonably foreseeable by Defendants that mail, interstate carriers and wire transmissions would be used — and mail, interstate carriers and wire transmissions were in fact used — in furtherance of the scheme, including but not limited to the following manner and means: (a) Defendants' send and receive papers via mail, interstate carriers and/or wire transmissions in connection with the scheme to defraud, including, but not limited to, insurance

policies, applications, agreements, Policy Summaries and miscellaneous health insurance documentation; (b) whenever a prescription was or is filled, information is entered into a computer and transmitted via interstate mail or carrier and/or wire transmissions for adjudication; (c) the clawing back of money did and does take place via interstate mail or carrier or wire transmissions; (d) Class members made and make payments at pharmacies using credit or debit cards, which require the use of use of interstate wire transmissions; (e) the payment of premiums were made to Defendants via interstate mail or carrier and/or wire transmissions (f) prescription drugs purchased through the fraudulent scheme were delivered by mail or interstate carrier and (g) representatives of Defendants and their PBMs communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

For example, when Plaintiff purchased prescription drugs, Defendants caused to be transmitted mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

On or about these dates, CVS, located in Burlington, Massachusetts, sent and received mail, interstate messages or deliveries and/or wire transmissions in connection with (a) determining whether the Plaintiff and the prescription drugs were covered under their health insurance policies and how much Plaintiff should pay for the drugs; (b) processing Plaintiff's payments for such prescription drugs; and (c) processing the PBMs' payments to and/or Clawback from the pharmacies.

**2.      The identity of each defendant and the alleged misconduct and basis of liability of each defendant.**

**CHL** is the entity that issued plaintiff's health insurance policy — the terms of which were violated by the charging of unauthorized and excessive fees for prescription drugs. **Cigna** is

the parent corporation of CHL and it controlled the pharmacy benefit managers, Optum and Argus.

The alleged misconduct by Defendants includes, but is not limited to the following: Defendants entered into agreements with their PBMs, including Optum and Argus, which in turn, entered into agreements with participating pharmacies, instructing the pharmacies to overcharge Plaintiff and Class members for prescription drugs; Plaintiff and Class members were in fact overcharged for prescription drugs; and agreements between Cigna's PBMs and pharmacies prohibited the disclosure of the unlawful scheme and/or the sale of prescription drugs to Plaintiff and Class members at prices other than the unlawful prices.

**3.     The identity of the alleged wrongdoers, other than the defendants listed in response to paragraph 2, and the alleged misconduct of each wrongdoer.**

**Optum**, provides pharmacy care services to a substantial majority of Cigna members.

**Argus Health Systems, Inc. ("Argus")** is another PBM used by Cigna and its subsidiaries. Through Optum and Argus, and perhaps other unidentified PBMs, Defendants effectuated their scheme to defraud. These PBMs were controlled and managed by Defendants in this scheme.

The alleged misconduct by these PBMs includes, but is not limited to the following: Defendants entered into agreements with their agent PBMs, including Optum and Argus, which in turn, entered into agreements with participating pharmacies, instructing the pharmacies to overcharge Plaintiff and Class members for prescription drugs; Plaintiff and Class members were in fact overcharged for prescription drugs; and agreements between Cigna's PBMs and pharmacies prohibited the disclosure of the unlawful scheme and/or the sale of prescription drugs to Plaintiff and Class members at prices other than the unlawful prices.

**4.     The identity of the alleged victims and the manner in which each victim was allegedly injured.**

The victims of Defendants' scheme to defraud include Plaintiff and each member of the Class. Plaintiff and each member of the Class were injured in that they were illegally overcharged for prescription drugs.  Specifically, Plaintiff and the Class were damaged and suffered losses in that they were required to pay more for prescription drugs than Defendants had represented they would pay.

**5.** **A description of the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim, which shall include the following information:**

**(a)** **The alleged predicate acts and the specific statutes which were allegedly violated;**

Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple, related predicate acts within the relevant time period and within the last ten years that are indictable as mail and/or wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343. The predicate acts had a common purpose and similar results on similar victims.

**(b)** **The dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

When Plaintiff purchased prescription drugs, Defendants caused to be transmitted mail, interstate deliveries and/or wire transmissions for the purpose of executing such scheme and artifice on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

On or about these dates, CVS, located in Burlington, Massachusetts, sent and received mail, interstate messages or deliveries and/or wire transmissions in connection with (a) determining whether the Plaintiff and the prescription drugs were covered under their health insurance policies and how much Plaintiff should pay for the drugs; (b) processing Plaintiff's payments for such prescription drugs; and (c) processing the PBMs' payments to and/or Clawback from the pharmacies.

      **(c)     If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made shall be identified;**

      See response to 5(b).  The scheme to defraud includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the policy that Class members would pay a certain amount for prescriptions drugs with knowledge and intent that Class members would be charged a higher amount; (b) the failure to disclose that a material portion of the "co-payments" were neither payments for prescription drugs nor were they "co-" payments by the insureds in conjunction with a payment by the insurer for the prescription drugs, as required by the plain language of the policies, but rather were unlawful payments to Defendants and/or their PBM; (c) the failure to disclose that prescription drug payments under deductible portions of health insurance policies were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; (d) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee between the PBM and the Participating Pharmacies, as required by the plain form language of the policy; and (e) the failure to disclose and agreement not to disclose that Class members could pay less for a drug by purchasing it outside of their respective insurance policies.

      No misrepresentation, however, is required to allege mail or wire fraud. *U.S. v. Trapilo*, 130 F.3d 547, 550 (2d Cir. 1997) ( "The scheme exists although no misrepresentation of fact is made."); *see also Silverman v. U.S.*, 213 F.2d 405, 405 (5th Cir. 1954) ("The scheme need not be fraudulent upon its face, and need not misrepresent any fact, because all that is necessary is that it be a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension . . . ."); *U.S. v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004) (citing *Silverman* and referring to it as

- 6 -

the seminal case); *U.S. v. Baren*, 305 F.2d 527, 533 (2d Cir. 1962) (citing *Silverman*, 213 F.2d at

405); *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 991 (8th Cir. 1989) ("[N]o

misrepresentation of fact is required in order to establish mail fraud."); *U.S. v. McNeive*, 536

F.2d 1245, 1249 n.10 (8th Cir. 1976) ("The types of fraudulent schemes falling within this

classification are limited only by the ingenuity of the perpetrator. No misrepresentation of fact is

required if the scheme is reasonably calculated to deceive persons of ordinary prudence.").

   **(d)**  **Whether there has been a criminal conviction for violation of the predicate acts;**

   There has not been a criminal conviction for violation of the predicate acts.

   **(e)**  **Whether civil litigation has resulted in a judgment in regard to the predicate acts;**

   Civil litigation has not yet resulted in a judgment in regard to the predicate acts.

   **(f)**  **The manner in which the predicate acts form a "pattern of racketeering activity"; and**

   Defendants have directly and indirectly conducted and participated in the conduct of the

Enterprise's affairs through an on-going, continuous and related pattern of racketeering activity

that was and is the enterprise's regular way of conducting its business and/or that distinctly

threatens continued criminally indictable activity.  For example, whenever a prescription was or

is filled, (1) information is entered into a computer and transmitted via interstate mail or carrier

and/or wire transmissions for adjudication, (2) the clawing back of money did and does take

place via interstate mail or carrier or wire transmissions; and (3) Class members made and make

payments at pharmacies using credit or debit cards, which require the use of use of interstate

wire transmissions.  Upon information and belief, Defendants take Clawbacks and/or Spread

payments thousands of time each day from pharmacies all across the country.

**(g)    Whether the alleged predicate acts relate to each other as part of a common plan, and if so, a detailed description of the common plan.**

The alleged predicate acts relate to each as part of a common plan in that they were in furtherance of Defendants' plan to overcharge Plaintiff and Class members.  For a detailed description of the common plan, see response to Paragraph 1, above.

**6.    A detailed description of the alleged enterprise for each RICO claim, which shall include:**

**(a)    The names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

The Enterprise is alternatively (a) Optum and/or each pharmacy that participates in the provider network that Optum manages; (b) Argus and/or each pharmacy that participates in the provider network that Argus manages; and/or (c) all other currently unknown PBMs used by Cigna and/or each pharmacy that participates in the provider network that such PBM manages.

**(b)    The structure, purpose, function and course of conduct of the enterprise;**

*Structure*.  In general, the structure of the enterprise or enterprises is that of a PBM and/or the pharmacies that participate in the PBM's provider network.

*Function*. In general, the function of the enterprise or enterprises is to provide pharmacy care services to insureds who purchase prescription drugs from participating pharmacies.

*Course of conduct*.  The legitimate course of conduct of the enterprise is as follows: When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is transmitted via interstate wire to a "switch" that then directs the information to the correct PBM. The PBM instantaneously processes the claim according to the benefits plan assigned to the patient. The PBM electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are

covered and, if so, the amount the pharmacy must collect from the patient as a co-payment, co-insurance, or to be paid toward a deductible.

       **(c)**    **Whether any defendants are employees, officers or directors of the alleged enterprise;**

No Defendant is an employee, officer or director of the alleged enterprise or enterprises.

       **(d)**    **Whether any defendants are associated with the alleged enterprise;**

As described above, the Defendants have agreements with the PBMs that facilitate the fraudulent scheme.

       **(e)**    **Whether plaintiff contends that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise; and**

Defendants are entities separate from the alleged enterprise or enterprises.

       **(f)**    **If any defendants are alleged to be the enterprise itself, or members of the enterprise, an explanation as to whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

Not applicable.

    **7.**    **Whether plaintiff contends that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

Plaintiff contends that the pattern or racketeering activity and the enterprise are separate.

    **8.**    **The alleged relationship between the activities of the enterprise and the pattern of racketeering activity, including a description of the manner in which the racketeering activity differs, if at all, from the usual and daily activities of the enterprise.**

The legitimate purpose of the enterprise(s) is to provide pharmacy care services to insureds who purchase prescription drugs from participating pharmacies. The legitimate activities of the enterprise(s) consist of processing prescription drug coverage and payment information in connection with the sale of prescription drugs by participating pharmacies to insureds.  With a legitimate transaction, the PBM will process the claim according to the benefits plan assigned to the patient, and indicate to the pharmacy whether the drug and patient are

covered and, if so, the ***proper*** amount the pharmacy must collect from the patient as a co-payment, co- insurance, or to be paid toward a deductible.  With an illegitimate transaction (i.e., racketeering activity), the amount that the PBM tells the pharmacy to collect is an amount that exceeds the insured's payment obligation pursuant to her/his health insurance policy — with the excess amount being unlawfully retained by the Defendants and/or the Enterprise.

**9.      The benefits, if any, the alleged enterprise receives or has received from the alleged pattern of racketeering.**

The benefits generally will accrue to the Defendants more than the enterprise(s), although the enterprises receive some of the excess, unlawful charges.

**10.      The effect of the activities of the enterprise on interstate or foreign commerce.**

Optum (one of the largest PBMs in the United States) and Argus and all of the pharmacies in the provider network that they each manage also are engaged in interstate commerce or in activities that affect interstate commerce. For example, (1) whenever a prescription was or is filled, information is entered into a computer and transmitted via interstate mail or carrier and/or wire transmissions for adjudication; (2) the clawing back of money did and does take place via interstate mail or carrier or wire transmissions; (3) Class members made and make payments at pharmacies using credit or debit cards, which require the use of use of interstate wire transmissions; (4) prescription drugs purchased through the fraudulent scheme were delivered by mail or interstate carrier and (5) representatives of Defendants and their PBMs communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

**11.      If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

**(a)      The identity of the individual(s) who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt; and**

Not applicable.

      **(b)**     **The use or investment of such income.**

Not applicable.

    **12.**    **If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Not applicable.

    **13.**    **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

      **(a)**     **The individuals who are employed by or associated with the enterprise; and**

The entities associated with the enterprise are the Defendants, CIGNA and CHL.

      **(b)**     **Whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The Defendants are not part of the enterprise.

    **14.**    **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Not applicable.

    **15.**    **The alleged injury to business or property.**

The injury to Plaintiff and Class members is that they were overcharged for prescription drugs.

    **16.**    **The direct causal relationship between the alleged injury and the violation of the RICO statute.**

The injury and the RICO violations are related because Defendants conduct and/or participation in the conduct of the enterprise's affairs through a pattern of racketeering activity was the proximate cause of the excessive fees paid by Plaintiff and the Class for prescription drugs.

    **17.**    **The damages sustained for which each defendant is allegedly liable.**

The damages equal the difference between the amount paid for prescription drugs and the amount that Defendants represented would be paid — an amount that is evidenced by the clawbacks taken by the PBMs.

**18.    A description of other federal causes of action alleged in the complaint, if any, and citation to the relevant statutes.**

Plaintiff also alleges violations of the Employee Retirement Income Security Act of 1974 — specifically, violations of (1) ERISA § 406(a)(1)(C) [codified at 29 U.S.C. § 1106(a)(1)(C)] for engaging in prohibited transactions; (2) ERISA § 406(b) [codified at 29 U.S.C. § 1106(b)] for engaging in prohibited transactions; (3) ERISA § 404 [codified at 29 U.S.C. § 1104] for breach of fiduciary duties; (4) ERISA § 702 [codified at 29 U.S.C. § 1182] for discriminating against individual participants and beneficiaries based on health status; and (5) ERISA § 405(a) [codified at 29 U.S.C. § 1105(a)] for breach of a co-fiduciary.

**19.    A description of all pendent state claims alleged in the complaint, if any.**

None.

**20.    Any additional information plaintiff feels would be helpful to the Court in processing the RICO claim.**

Plaintiff does not have any additional information that she wants to provide at this time.

Dated: November 18, 2016                    Respectfully submitted,

                                        *s/ Robert A. Izard*
                                        Robert A. Izard (ct01601)
                                        Craig A. Raabe (ct04116)
                                        Christopher M. Barrett (ct30151)
                                        Izard, Kindall & Raabe, LLP
                                        29 South Main Street, Suite 305
                                        West Hartford, CT 06107
                                        (860) 493-6292
                                        (860) 493-6290 fax
                                        rizard@ikrlaw.com
                                        craabe@ikrlaw.com
                                        cbarrett@ikrlaw.com

Ronen Sarraf
Joseph Gentile
Sarraf Gentile LLP
14 Bond Street, Suite 212
Great Neck, New York 11021
(516) 699-8890
(516) 699-8968 fax
ronen@sarrafgentile.com
joseph@sarrafgentile.com

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I, Robert A. Izard, certify that, on November 18, 2016, I caused a true and correct copy of the foregoing to be served electronically on all counsel of record registered for electronic service for this case.

Executed this 18th day of November 2016 at West Harford, Connecticut.

*/s/ Robert A. Izard*
_____

Robert A. Izard (ct01601)
rizard@ikrlaw.com
IZARD, KINDALL & RAABE LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax

Attorney for Plaintiff