## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, and ROGER CUROL, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br>  vs.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC.,<br><br>         Defendants. | Civil No. 16-cv-1702<br><br>CLASS ACTION<br><br>**CONSOLIDATED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL<br><br>January 19, 2017 |

Plaintiffs, Kimberly A. Negron, Courtney Gallagher, Daniel Perry, Nina Curol and Roger Curol ("Plaintiffs"), by their undersigned attorneys, allege the following based upon their knowledge as set forth herein and upon information and belief.  Further additional evidence supporting the claims set forth herein can be obtained after a reasonable opportunity for discovery.

## INTRODUCTION

1.    Plaintiffs, who received prescription drug benefits through individual or group health plans issued or administered by Defendants (the "Plans"),[1] bring this action on behalf of

---

[1] Unless otherwise specified, the term "Plans" as used herein includes with respect to group health plans both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendants and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendants to cover medical and prescription drug expenses incurred by the plan.  "Plans" also includes both

themselves and a Class and Subclass of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, resulting from Defendants' common fraudulent and deceptive scheme to artificially inflate prescription costs causing consumers to pay more than they otherwise should have paid for medically necessary prescription drugs.

2.      About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits.  A feature of most of these plans is the shared cost of prescription drugs.  Normally, when a patient[2] fills a prescription for a medically necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or coinsurance or deductible payment.  Pharmacies are required by contract to collect the payment on Defendants' behalf from patients at the time the prescription is filled and are not allowed to waive or reduce the amount collected under the Plans.

3.      Defendant Cigna Corporation through its wholly-owned subsidiaries, including Defendant Cigna Health and Life Insurance Company ("CHL")(collectively "Cigna"), is a fully integrated health insurance company.  Cigna, along with a pharmacy benefit manager ("PBM"), provides and administers health and pharmacy benefits to patients. Cigna has an in-house PBM— Cigna Pharmacy Management, which is a business division of CHL. Cigna Pharmacy Management outsources certain PBM and administrative functions to other PBM service providers, while

---

public and private plans and governmental program plans, such as Affordable Care Act, Medicare Part C and D plans.  "Plans" subject to ERISA are denoted "ERISA Plans."

[2] The term "patient" refers to a plan participant or beneficiary under a prescription drug Plan issued or administered by one or more Defendants who purchases prescription drugs pursuant to that Plan.

retaining other functions with Cigna and its affiliates. These external PBM service providers are retained and directed by Cigna, CHL, and/or Cigna Pharmacy Management to provide pharmacy benefits to patients, which include, *inter alia*: prescription drug procurement and inventory management for mail-order pharmacies; establishing or assisting in the establishment of a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for patients to obtain prescriptions, copayment amounts, coinsurance amounts, and deductibles (if applicable); and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

4. In this instance, Cigna has retained Defendant OptumRx, Inc. ("OptumRx") for some of its PBM services, having previously entered into a 10-year PBM services agreement in mid-2013 with Catamaran Corporation ("Catamaran"), which was acquired in 2015 by OptumRx.[3] According to Cigna's Form 10-K, under the PBM services agreement, Cigna "utilize[s] Optum's technology and service platforms, retail network contracting and claims processing services." *Id.* Cigna also uses Argus Health Systems Inc. ("Argus"), to provide PBM services to the Plans. Argus was the primary external PBM utilized by Cigna and its affiliates prior to the 2013 contract with Catamaran, and Argus remains part of Cigna's pharmacy benefits delivery system, with a new contract put in place in late 2015. Thus, the PBMs have been involved in administering pharmacy benefits for the Plans throughout the relevant time period, but all have been coordinated through and directed by Cigna.

5. As set forth below, Defendants and their co-conspirators have engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary prescription drugs.

---

[3] Cigna Corp., Annual Report at 2 (Form 10-K) (Feb. 25, 2016), https://www.sec.gov/ Archives/edgar/data/701221/000104746916010432/a2227373z10-k.htm (last visited Jan. 9, 2017).

Patients, including Plaintiffs and the Class (defined below), pay excess charges to participating pharmacies in exchange for receiving their prescription drugs. Unbeknownst to the Class members, Defendants misrepresent the purported costs of the prescription drugs in the form of increased charges to patients and then "claw back" from the pharmacies a large portion of the patients' payments.

6. Indeed, the Plans provide that they will pay "Covered Expenses," which are defined as "***charges made by a pharmacy***" for prescription drugs (or in other equivalent terms). A covered patient may be required to pay a portion of such Covered Expenses. The portion of the prescription drug Covered Expense the patient pays is the applicable Copayment, Coinsurance and/or Deductible.

7. Moreover, under the express language of one of the Plans—Plaintiff Negron's plan—for example, "[i]n no event" can a Copayment or Coinsurance "***exceed the amount paid by the plan to the Pharmacy.***" Accordingly, under this plan, a Copayment or Coinsurance may not exceed 50% of the total amount the pharmacy collects for a prescription drug ("50% cap").[4]

---

[4] The 50% cap in Plaintiff Negron's plan comports with the concept of a Copayment or Coinsurance. According to Merriam Webster, the definition of "co" is:

1. with : together : joint : jointly <*coexist*> <*coheir*>
2. in or to the same degree <*coextensive*>
3. *a* : one that is associated in an action with another : fellow : partner <*coauthor*> <*coworker*>
   *b* : having a usually lesser share in duty or responsibility : alternate : deputy <*copilot*>

8.      Merriam-Webster defines a copayment as "a small fixed fee that a health insurer (as an HMO) requires the patient to pay for certain covered medical expenses (as office visits or prescription drugs)."[5]

9.      Contrary to the express language of the Plans, Defendants and/or their agents exercised their unilateral discretion to force network pharmacies to charge patients unauthorized and excessive amounts for prescription drugs that far exceed the charges made by the pharmacy under their agreements—*sometimes overcharging patients by more than 1,000%*—**in violation of the 50% cap.**  Moreover, Defendants and/or their agents "clawed back" some or all of these excessive payments by forcing the pharmacies to pay the unauthorized and excessive charges to Defendants and/or their agents after collecting them from the patients.

10.     As an example, on November 10, 2014, Defendants unilaterally determined that a Class member had to pay a $20 Copayment to a pharmacy to purchase the prescription drug Amlodipine, and required the pharmacy to collect this amount from the patient. Unbeknownst to the Class member, the $20 Copayment Defendants required the pharmacy to collect from the patient was a premium of at least *1,043% over the actual charge* the pharmacy was allowed to collect to fill the prescription under the pharmacy's agreement with Defendants.

11.     Specifically, Defendants and/or their agents agreed to pay only $1.75 for the Amlodipine prescription under their contract with the pharmacy.  Unknown to and hidden from the Class member at the time, Defendants and/or their agents unilaterally directed and required the pharmacy to (1) collect the $20 "copayment" from the patient; (2) force the patient to pay the entire $1.75 contracted cost of the drug, not just a "portion" of that cost; and then (3) pay to Defendants

---

[5]   *See  Co-payment*, MERRIAM-WEBSTER   (2016),   http://www.merriam-webster.com/ dictionary/co%E2%80%93payment (last visited Jan. 9, 2017).

the unlawful $18.25 "Spread" between the required unlawful "copayment" and Defendants' actual cost agreed charge for the drug.  The secret payment of the "Spread" required from the pharmacy to the Defendants and/or their agents is known as a "Clawback."

12.     Had Defendants lived up to their obligations, the patient would not have paid more than the $1.75 charge the pharmacy agreed to be paid by Defendants for this prescription drug. Accordingly, Defendants should and easily could have exercised their unilateral discretion to determine that the pharmacy should charge and collect from the patients, at a maximum, only $1.75 in accordance with the plan terms.  Instead they imposed a premium of 1,043% beyond the total amount the pharmacy should have collected.

13.     Under Plaintiff Negron's plan, since the Copayment *may not exceed the amount paid by the plan to the Pharmacy*, Defendants' conduct was more egregious.  Under that term of her plan, the most the Class member should have paid was 50% of the $1.75 amount paid to the pharmacy. Accordingly, in that scenario, Defendants should and easily could have exercised their unilateral discretion to determine that the pharmacy should charge and collect from the insured a Copayment of $0.87, and that the plan would pay the pharmacy the remaining $0.88, thereby paying the pharmacy the full bill for the prescription drug of $1.75.  Other examples from each the Plaintiffs are described below.

14.     Instead, through this "Clawback Scheme," Defendants overcharged their customers in violation of the Plans and Defendants' fiduciary duties.  Under Defendants' scheme as illustrated in this actual example, the prescription "copayment" is not a "co-" payment for at least two reasons. First, a material portion of the $20 "Copayment" ($18.25) is not even a payment of a prescription drug charge—it is a hidden "Clawback" payment to the insurance company and/or its PBMs. Second, of the remaining $1.75 paid to the pharmacy for filling the prescription, there is no "co-"

payment or "co-" insurance payment because the Plans are not paying *any* share of the drug cost. Instead, Defendants are forcing the patient to pay the *full amount* owed to the pharmacy—it is not a "co-" payment, it is a "you-" payment. The transaction is graphically depicted as follows as a violation of the 50% cap:

| | | |
|---|---|---|
| Drug price set by Defendants | $ | 1.75 |
| Co-Payment | $ | 20.00 |
| **Difference Pocketed by Defendants ($20-$1.75)** | **$** | **18.25** | ← Clawback |
| Cigna should have paid | $ | 0.88 |
| Copayment should have been | $ | 0.87 |
| **Overcharge ($20 – $0.87)** | **$** | **19.13** |

← Clawback

**2199%**

15.     Defendants violated the Plans and breached their fiduciary duties by (1) secretly determining that patients must pay inflated Copayments and Coinsurance and Deductible payments, (2) secretly forcing pharmacies to collect those inflated Copayments and Coinsurance and Deductible payments on their behalf, and (3) secretly forcing pharmacies to remit to Defendants a significant portion of those inflated Copayments and Coinsurance and Deductible payments in the form of illegal "Clawbacks."

16.     Defendants utilized the U.S. Mail and interstate wire facilities to engage in their fraudulent billing scheme in violation of RICO.  Defendants represent to plan participants that their copayment and/or coinsurance amounts are based on some portion of the actual cost for the drug, when, in fact, plan participants pay more than the actual cost of the drug and Defendants simply pocket the overpayment in the form of prescription "Clawback."

17.     In order to implement Defendants' fraudulent scheme, Defendants' contracts with participating pharmacies require the pharmacists not to disclose the existence of the excessive charges or "Clawbacks" or the fact that a patient could, in certain circumstances, be required to

pay more for a prescription drug than if the patient did not have any insurance at all.  As a result of these "gag clauses," the "Clawbacks" remain hidden from participants and beneficiaries.

18.     Defendants' fraudulent scheme to artificially inflate the costs for medically necessary prescription drugs, and then to surreptitiously retain those excess amounts, jeopardizes the entire pharmaceutical delivery system.  For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts.  Therefore, patients believe that they are saving money through the use of their pharmacy benefit, when, in reality, they are charged an excessive amount for prescriptions, beyond what their health plans require them to pay.

19.     Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to receive the purported drug benefits through the insurance company's and PBMs' negotiating and buying power with prescription drug manufacturers, which is supposed to result in *reduced* costs for prescription drugs. That is, patients should pay only the charges by the pharmacies under these agreements, while substantial premiums and other costs and fees cover the other aspects of the prescription drug plans, including their administration.  Moreover, PBMs and plan administrators such as Cigna and its affiliates and the external PBMs they hire are paid significant fees as compensation for their services that are entirely separate from the "Clawbacks" at issue here, making the "Clawbacks" excess, undisclosed profit in exchange for little to nothing.

20.     As a result of Defendants' fraudulent scheme to collect this "spread," Defendants overcharged Plaintiffs and the other Class members for prescription drugs during the Class Period (defined below).  Defendants' misconduct has caused Plaintiffs and the other Class members to suffer significant damages. Plaintiffs seek relief as follows:

- 8 -

21.     With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Defendants have violated the ERISA Plans by establishing the Spread and taking illegal "Clawbacks" as alleged below and should not be allowed to continue to do so.

22.     Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable and prohibits transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Spread compensation and "Clawbacks," Defendants allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including participant contributions at the pharmacy counter and the Plan contracts that provided Defendants with the ability to extract these funds.

23.     Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In setting the amount of and taking Spread compensation and "Clawbacks," Defendants set their own compensation, received plan assets and consideration for their personal accounts in violation of this provision, and were acting under other conflicts of interest.

24.     Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and

beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  In setting the amount of and taking excessive undisclosed "Spread" compensation and "Clawbacks," Defendants have breached their fiduciary duties of loyalty and prudence.

25.     Under Count V, ERISA § 702, 29 U.S.C. § 1182, prohibits Defendants from discrimination and requiring discriminatory premiums and contributions based on health factors. Defendants have required insureds who have medical conditions that require prescription medications that are subject to Defendants' "Spreads" and "Clawbacks" to pay greater premiums and contributions than those patients who do not need prescription medications that are subject to Defendants' "Spreads" and "Clawbacks" for their health benefits.

26.     Under Count VI, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

27.     Under Count VII, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

28.     With regard to RICO, Under Count VIII,  Cigna and/or CHL has engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs alleged below and is liable to Plaintiffs the Class for all statutory remedies.

29.     Under Count IX, OptumRx has engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs as alleged below and is liable to the Class for all statutory remedies.

30.     Under Count X, Defendants have engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(d), by overcharging patients for the cost of medically necessary prescription drugs as alleged below and are liable to the Class for all statutory remedies.

31.     As further alleged below, Plaintiffs seek to represent a nationwide Class of all insureds and plan participants whose health Plans are insured or administered by Cigna, its affiliates, and its PBMs, as well as the ERISA Subclass in which they are also members.

## JURISDICTION

32.     **Subject Matter Jurisdiction.**  This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

33.     **Personal Jurisdiction.**  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.  Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal

jurisdiction over them. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Connecticut. Defendants also reside or may be found in this district or have consented to jurisdiction in this district.  In any event, this Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Consolidated Complaint took place in the State of Connecticut; Defendants are authorized to do business in the State of Connecticut; Defendants conduct business in the State of Connecticut and this District; Defendants have principal executive offices and provide prescription drug services in the State of Connecticut and this District; Defendants advertise and promote their services in the State of Connecticut and this District; Defendants have sufficient minimum contacts with the State of Connecticut; Defendants administer health plans and pharmacy benefits under those plans from the State of Connecticut; and/or Defendants otherwise intentionally avail themselves of the markets in the State of Connecticut through the marketing and sale of insurance and related products and services in this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

34. **Venue.**  Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims herein occurred within this District, at least one Defendant resides in this district, and/or a substantial part of property that is the subject of the action is situated in this District.  Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because most Defendants reside or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965,

because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## PARTIES AND NON-PARTIES

35.     Plaintiff Negron is a citizen and resident of Massachusetts who received prescription drug coverage under a group health plan provided by her employer for her benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Medical Benefits"). This Plan is a welfare benefit plan, as that term is defined in 29 U.S.C. § 1002(1)(A), subject to ERISA ("ERISA Plan.")  This plan at all relevant times has been administered by CHL. Under her plan, Plaintiff Negron was obligated to pay copayments of $10-$187 per prescription for certain categories of drugs.  As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff Negron has been injured by paying inflated patient contribution payments for medically necessary prescriptions.

36.     Plaintiff Gallagher is a citizen and resident of New Jersey and was covered by a health plan provided by an employer and issued and administered by CHL. Plaintiff Gallagher received prescription drug coverage through a Cigna group policy pursuant to a plan established through the employer for her benefit.  This plan is an ERISA Plan.  Under the policy, Plaintiff Gallagher was obligated to pay 10-45 % coinsurance per prescription for certain categories of drugs.  As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff Gallagher has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

37.     Plaintiff Perry is a citizen and resident of Washington who received prescription drug coverage under a group health plan provided by his employer for his benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Medical Benefits").  This plan is an ERISA Plan and at all relevant times has been administered by CHL.  Under the plan, Plaintiff

Perry was obligated to pay copayments of $10-$100 per prescription for certain categories of drugs. As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff Perry has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

38.     Plaintiff N. Curol is a citizen and resident of Louisiana who received prescription drugs under a group health plan provided by her spouse's employer for her benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Standard Plan"). This plan is an ERISA Plan and at all relevant times has been administered by CHL. Under the plan, Plaintiff N. Curol was obligated to pay copayments of $10-$40 per prescription for certain categories of drugs. As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff N. Curol has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

39.     Plaintiff R. Curol is a citizen and resident of Louisiana who received prescription drugs under a group health plan provided by his employer for his benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Standard Plan"). This plan is an ERISA Plan and at all relevant times has been administered by CHL. Under the plan, Plaintiff R. Curol was obligated to pay copayments of $10-$40 per prescription for certain categories of drugs. As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff R. Curol has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

40.     Defendant Cigna is a global health services organization, incorporated in Delaware, with its principal place of business in Bloomfield, Connecticut. In 2015, Cigna reported revenue in excess of $37.9 billion, and the company is currently ranked 79th on the Fortune 500. Cigna

operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Individuals and Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S.; and (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

41.     Defendant CHL, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna with its principal place of business in Bloomfield, Connecticut.  CHL underwrites life and health insurance policies.   The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance.  CHL also administers pharmacy benefits for health insurance policies it sells and health plans it administers through its in-house PBM, Cigna Pharmacy Management, a business division of CHL, which outsources certain PBM and administrative functions to other PBM service providers, while retaining other functions with Cigna and its affiliates.  At relevant times here, these external service providers have included OptumRx, Catamaran, and Argus.

42.     Defendant OptumRx is a California corporation with its principal place of business in Irvine, California.[6]  OptumRx is a PBM currently used by Cigna and its subsidiaries since June

---

[6] OptumRx is a subsidiary of OptumRx Holdings, LLC, a Delaware corporation.  OptumRx Holdings, LLC is a subsidiary of Optum, Inc., a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum, Inc. is a subsidiary of United HealthCare Services, Inc., a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. United HealthCare Services, Inc. is a subsidiary ofUnitedHealth Group Incorporated, a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

11, 2013 when OptumRx's subsequently-acquired Catamaran subsidiary[7] replaced Argus for certain services to CHL-administered plans under a ten-year contract.[8]  OptumRx operates through its Catamaran subsidiary,[9] through which it provides pharmacy care services to more than 66 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country.  Upon information and belief, OptumRx provides pharmacy benefit management services to a substantial number of Cigna customers.  In 2015, OptumRx reported approximately $31.6 billion in revenue; and in 2016, OptumRx reported over $44.5 billion in revenue.

---

[7] In 2015, Defendant OptumRx acquired Catamaran, which reported $21.6 billion in revenue). Health Strategies Group, Research Agenda 2015: Pharmacy Benefit Managers (2014), http://www.healthstrategies.com/sites/default/files//PBM_Research_Agenda_PBM_RA101513.pdf; Optum, OptumRx, Catamaran Complete Combination (July 23, 2015), https://www.optum.com/about/news/optumrx-catamaran-complete-combination.html.

[8] On June 11, 2013, Cigna announced that "Catamaran will replace DST Systems Inc.'s Argus Health unit, which has been managing prescription benefits for Cigna's commercial customers."  According to the disclosures, however:

- Cigna will retain formulary management, clinical and product development, sales and marketing, and will manage "all day-to-day customer- and client-facing functions."
- Catamaran will provide prescription drug procurement and inventory management, order fulfillment for Cigna's home-delivery pharmacy, retail network contracting, and claims processing.
- Catamaran will remain behind the scenes, because the mail pharmacy and all pharmacy-related customer interactions will still have the Cigna brand.
- Cigna will lead the medical-pharmacy benefit integration activities.

Alex Wayne, *Catamaran Gains Cigna's Prescription Drug Business* (June 11, 2013), https://www.bloomberg.com/news/articles/2013-06-10/catamaran-gains-cigna-s-prescription-drug-business.

[9] Catamaran in headquartered in Shaumburg, IL.

43.     Non-party Argus is a PBM and claims processer used by Cigna and its subsidiaries. Argus, headquartered in Kansas City, Missouri, describes itself as being a provider of pharmacy and health management solutions.  Argus purports to offer modular to full-service solutions focused on lowering plan cost and improving patient and provider quality measures.  Upon information and belief, Argus provides pharmacy benefit management and claims processing services to Cigna customers.[10]  Prior to Cigna's 2013 contract, Argus administered pharmacy benefits for participants in plans insured and administered by Cigna and its affiliates and since January 2016 has been retained by Cigna again to provide administrative services to Cigna and its affiliates.

## SUBSTANTIVE ALLEGATIONS

### Health Insurance in General in the United States

44.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

45.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period or through employer plans that either provide benefits by purchasing group insurance policies or are self-funded but administered by health insurance companies and

---

[10] As a result of Cigna's contract with Catamaran in 2013, "Argus already had lost about 40 percent of Cigna's business by Jan. 1[, 2015].  The remaining 60 percent was set to be decommissioned during the next two years."  James Dornbrook, *DST earnings sink but still beat analysts' expectations* (Oct 22, 2015). http://www.bizjournals.com/kansascity/news/2015/10/22/dst-earnings-sink-but-still-beat-analysts.html.  But, on October 21, 2015, Argus "announced it has renewed its relationship with Cigna to provide certain pharmacy solutions services.  The new multi-year contract, which provides administrative management of pharmacy claims for millions of Cigna's commercial plan members currently serviced by Argus, will be effective January 1, 2016."  DST, *Cigna Renews Relationship with Argus Health for pharmacy solutions* (Oct 21, 2015), http://www.dstsystems.com/newsroom/cigna-renews-relationship-with-argus-health-for-pharmacy-solutions/.

their affiliates.[11] Premiums and contributions to coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

46.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is often shared between the patient and the Plan.  Such cost sharing can take the form of deductible payments, coinsurance payments and copayments.  In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs.  Coinsurance generally requires a patient to pay a stated percentage of drug costs. Copayments are generally fixed dollar payments made by a patient toward drug costs.

47.     Consumers purchase health insurance and enroll in employer-sponsored health plans to protect them from unexpected high medical costs, including prescription drug costs. Patients, including Plaintiffs and Class members, at a minimum, expect to pay the same prices or better than uninsured or cash-paying individuals for a prescription.  Otherwise, they not only would receive no benefit from their drug plan, but also would, in fact, be punished for having a health plan.  Therefore, Class members reasonably expect to pay less for prescription drugs than cash-paying customers who do not have prescription drug coverage.

### The Pharmacy Benefits Industry and Pharmacy Benefits Managers

48.     The pharmaceutical benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

---

[11] According to Cigna, over 85% of its market is in ERISA-covered health plans, while 5% is in the individual market and government-related plans like Medicare.  Approximately 83% of Cigna's customers are in "administrative services only" arrangements where Cigna and its affiliates manage and administer self-funded plans, while approximately 17% of plans are insured through CHL policies.  Whatever the plan structure, Cigna and its affiliates administer and manage the Plans and their prescription drug benefits through Cigna Pharmacy Management and external PBMs.

49.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy.  Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer.  The retail pharmacy then distributes drugs to patients from its inventory.   Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs.

50.     The retail payment side of the market for drugs is largely directed and controlled by insurance companies and their contracted or owned PBMs.  In most instances where a health plan provides prescription drug benefits, a PBM is the agent of the insurance company or affiliate hired to administer the prescription drug component of a health plan.  For example, Argus and OptumRx acted as Defendants' agents in administering Defendants' prescription drug plans.

51.     According to the Pharmaceutical Care Management Association, PBMs manage pharmacy benefits for 266 million Americans as of 2016.  They may operate as part of integrated retail pharmacies (*e.g*., CVS Health and Caremark) or as part of health insurance companies (*e.g*., CHL and Cigna Pharmacy Management or UnitedHealth Group and Optum).

52.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is transmitted via interstate wire to a "switch" that then directs the information to the correct PBM.  The PBM instantaneously processes the claim according to the benefits plan assigned to the patient.  The PBM electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the amount the pharmacy must collect from the patient as a copayment, coinsurance, or to be paid toward a deductible.

53.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy over the copayment, coinsurance or deductible amount paid by the patient approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

54.     If the patient's payment is greater than the amount that the insurer/administrator or its PBM has negotiated to pay the provider pharmacy, however, there will be a "negative reimbursement" to the pharmacy for the "Spread" between the patient's payment and the actual cost of the drug to the insurer or its PBM.

55.     The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

56.     This payment of a "Spread" to the insurer and/or its PBM—referred to in the industry as a "Clawback"—evidences the overcharges to the Plans and patients.

### The Patient–Insurer/Administrator–PBM–Pharmacy Contractual Relationships

57.     Contractual relationships exist between the employer or individual and the health insurance company that underwrites and/or administers the plan; the insurer/administrator and the PBM; and the PBM and the pharmacy.  An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a health insurance company to provide prescription drug benefits for its employees under health plans.  Health insurance companies then hire PBMs to manage the prescription drug benefits offered pursuant to their policies and ASO contracts.

58.     The following diagram represents (in simplified form) the contractual relationships among the parties:



(a)    **Employer/Individual–Insurer   Agreements   (*i.e.*,   Health   Plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These policies and plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or coinsurance that a patient must pay to obtain prescription drug benefits.   Plaintiffs and Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

(b)    **Insurer–PBM Agreements**.   Health insurance companies, such as Defendants, contract with and/or own PBMs, which act as their agents to administer the prescription drug benefits purchased through the health insurance plans that the insurers issue or administer.

(c)    **PBM–Pharmacy Agreements**.  PBMs in turn, contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network.  The pharmacies fill prescriptions that are health benefits covered under the plans.  Pursuant to these agreements, the PBMs set the amount that a pharmacy will collect from a patient for a prescription drug, the amount the PBM (and insurer or plan) will pay the pharmacy for filling the patient's prescription, and the amount of the patient's payment that the pharmacy must send to the PBM as a "Clawback."  On information and belief, the pharmacy has no role in setting the amount of the patient's payment and thus must accept the "Clawback" amount as determined by the PBM.

59.    The relationship among the parties is shown graphically as follows:



60.     Pursuant to the health plans, insurers must ensure that, when they contract with and direct a PBM to act as their agent to manage prescription drug benefits, the PBM follows the plans' terms, such that patients are not overcharged for their prescription drug benefits.

61.     To the contrary, PBMs, acting as agents and/or in concert with health insurance companies, routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the plans. Here, Defendants and their non-party PBMs such as Argus engaged in such practices with respect to Class members' Plans.

### Patients, Participants and Beneficiaries in Defendants' Health Plans Pay Undisclosed, Unauthorized and Excessive Fees for Prescriptions Drugs

62.     The Defendants in this case have taken the general employer/individual–insurer–PBM–pharmacy structure and, through various agreements, created their unlawful "Clawback" Scheme.  Under these agreements, the pharmacy charges the patients a prescription drug price (or portion of such a price) that is set by the PBM and/or insurer/administrator, which typically is based on a percentage of the so-called average wholesale price or "AWP" (the "Patients' Price").[12]

---

[12]   Average Wholesale Price is an amount set by the prescription drug manufacturers that rarely, if ever, reflects a true price charged in wholesale transactions.

Alternatively, the pharmacy charges the patients a flat copayment, which also is set by the Defendants and/or their agent PBMs.

63.     The Patients' Price or copayment routinely is higher than the price the PBM agrees to pay the pharmacy for providing the drug to the patients—particularly for many low-cost, high volume generic prescription drugs, although some brand drugs are also subject to "Clawbacks."

64.     Moreover, under the confidentiality provisions of the PBM–Pharmacy Agreements, pharmacies cannot tell patients that they are being overcharged, much less sell drugs to them at a lower price separate and apart from the Plans. If a pharmacy violates the "gag clause," it risks termination from the insurers' network.  As a result, Plaintiffs and the Class have been deprived of the opportunity to purchase their prescription drugs not only at prices their Plans dictate, but also at the retail cash price the pharmacy would charge to someone without insurance.

65.     In summary, the PBM–Pharmacy Agreements:  (1) require pharmacies to charge patients more for drugs than the Defendants and their PBMs have agreed the pharmacies will be paid for the drugs, with the difference between the two amounts known as the "Spread;" (2) require the pharmacies to collect the "Spread" from patients; (3) require payment of Spread or deduction of the "Spread" from future reimbursement to the pharmacy by the PBM as a "Clawback;" (4) prohibit pharmacies from disclosing to patients the existence or amount of the "Spread" and "Clawback;" (5) prohibit pharmacies from disclosing to patients that they can purchase drugs at lower prices; and (6) prohibit pharmacies from selling to patients covered prescription drugs at prices that are lower than the price that the insurer/PBM orders the pharmacies to charge patients. Instead, the "Spread" and "Clawback" overcharges are pocketed secretly and unlawfully by the insurance companies, the PBMs, and/or their agents.

66.     There are several ways in which Defendants operate this "Clawback Scheme."  For example:

(a)     A patient under one of the Plans went to a pharmacy to purchase prescription-strength Vitamin D (50,000 IU).

(b)     In this documented instance, prescription-strength Vitamin D was purchased by the pharmacy from the manufacturer or wholesaler for $0.60.  Pursuant to the PBM–Pharmacy Agreement, the PBM paid the pharmacy $0.96 for the drug, a fulfillment fee of $1.40, and $0.21 in tax.  Accordingly, pursuant to the PBM–Pharmacy Agreement, the contracted charge made by the pharmacy was $2.57 for the prescription.

(c)     Despite this, pursuant to the PBM–Pharmacy Agreement, the PBM required the pharmacy to charge the patient a $7.68 "copayment" for the prescription-strength Vitamin D—*an almost 300% overcharge*.

(d)     The PBM–Pharmacy Agreement then required the pharmacy to pay to the PBM/insurer the "Spread" between the contracted fee and the "copayment" amount collected from the patient—a $5.11 "Clawback."

(e)     On information and belief, the PBM–Pharmacy Agreement further prohibited the pharmacy from disclosing to the patient the amount of the payment to the pharmacy or the "Clawback" or from selling the drug to the patient for less than the "copayment" separate and apart from the policy.

(f)     The above-described transaction is set forth below in an annotated excerpt of an actual transaction record from an investigation into this scheme.



67.     Alternatively, where the patient pays a deductible and/or coinsurance (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount that the PBM requires the pharmacy to charge the customer, **_not_** the lower amount that the Defendants and PBM pay to the pharmacy.

68.     As an example, using the contracted fees above, the insurer/PBM could set the amount that the pharmacy must charge the patient for Vitamin D at $7.68, but the insurer/PBM would pay the pharmacy only $2.57.  Under the full deductible portion of a plan, the patient pays $7.68, the pharmacist keeps $2.57, and the pharmacy is forced to pay the PBM/insurance company a "Clawback" of $5.11. Under a coinsurance plan, the patient would pay a percentage of $7.68 rather than a percentage of $2.57, with the difference being subject to a "Clawback."

69.     Upon information and belief, Defendants and/or their agents take "Clawbacks" and/or Spread payments thousands of time each day from pharmacies all across the country. Additional examples of Cigna and its PBMs clawing back from pharmacies overcharges to Class members include the following:

- 25 -

(a)    On October 7, 2014, a Class member paid to a pharmacy a $6.47 copayment for the prescription drug Sertraline—*a 134% premium over the actual $6.47 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $3.71 overcharge.

(b)    On November 6, 2014, a Class member paid to a pharmacy a $10.00 copayment for the prescription drug Azithromycin—*a 233% premium over the actual $4.29 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $5.71 overcharge.

(c)    On November 10, 2014, a Class member paid to a pharmacy a $20 copayment for the prescription drug Amlodipine Besylate—*greater than ten times (1,043%) more than the actual $1.75 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $18.25 overcharge.

(d)    On November 11, 2014, a Class member paid to a pharmacy a $20 copayment for the prescription drug Clopidogrel—*a 468% premium over the actual $3.52 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $16.48 overcharge.

(e)    On September 5, 2015, a Class member paid to a pharmacy a $7.68 copayment for the prescript drug Vitamin D—*a 299% premium over the actual $2.57 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $5.11 overcharge.

(f)    On January 15, 2016, a Class member paid to a pharmacy a $6.99 copayment for the prescript drug Melacoxam—*a 344% premium over the actual $2.03 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $4.96 overcharge.

(g)     On July 22, 2016, a Class member paid to a pharmacy a $10.00 copayment for the prescript drug Atorvastatin—*a 246% premium over the actual $4.06 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $5.94 overcharge.

(h)     On September 5, 2016, a Class member paid to a pharmacy a $5.38 copayment for the prescript drug Prednisolone—*a 131% premium over the actual $4.11 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $1.27 overcharge.

(i)     On October 7, 2016, a Class member paid to a pharmacy a $6.47 copayment for the prescription drug Sertraline—*a 134% premium over the actual $6.47 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $3.71 overcharge.

(j)     On October 7, 2016, a Class member paid to a pharmacy a $6.63 copayment for the prescript drug SMZ/TMP—*a 191% premium over the actual $2.28 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $4.35 overcharge.

(k)     On October 7, 2016, a Class member paid to a pharmacy a $15.00 copayment for the prescription drug Mupirocin—*a 81% premium over the actual $8.27 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $6.73 overcharge.

(l)     On December 2, 2016, a Class member paid to a pharmacy a $10.00 copayment for the prescription drug Bupropion—*a 440% premium over the actual $2.27 fee* paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $7.73 overcharge.On January 19, 2016 and February 17, 2016, Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a 336% premium*

*over the actual $2.97 fee* paid to the pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed back the $7.03 overcharge.

(m)    On March 21, 2016, April 19, 2016, and May 16, 2016, Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed back the $3.81 overcharge.

(n)    On May 9, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $3.81 overcharge.

(o)    On January 19, 2016, March 15, 2016, June 7, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a 311% premium over the actual $3.21 fee* paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $6.79 overcharge.

(p)    On February 22, 2016, April 18, 2016, June 7, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a 245% premium over the actual $4.07 fee* paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $5.93 overcharge.

70.    Upon information and Belief, Cigna developed and directed the "Clawback Scheme" through its Plans. According to a Notice sent on July 2, 2014 by the American Associated Pharmacies ("AAP")—a member-owned cooperative comprised of over 2,000 independent pharmacies—to its members: "Clawbacks" result from the "benefit design of the Cigna plans for

certain patients." "For certain Cigna plans this new benefit design was implemented effective March 1, 2014."

71.     At least some of the "Clawbacks" that the pharmacies are required to pay to Cigna's PBMs, OptumRx and Argus, are sent back to Cigna or its affiliates.  According to the notice, AAP members collect a 100% copayment from patient insureds and then OptumRx, on behalf of Cigna, "pull[s] back the amount that is in excess of the Contacted Rate [paid to the pharmacists.]"

72.     Moreover, Cigna required the pharmacies by contract "to collect the full amount of the Participant's copayment, coinsurance or deductible" and dictated that these patient payments "are not eligible to be discounted or excused/waived…" according to Cigna's Pharmacy Management Program Requirements and Participating Pharmacy Manual.

73.     Defendants even blocked pharmacists from disclosing the existence of Spread and "Clawbacks" and from selling prescription drugs directly to customers for a lower price. According to Doug Hoey ("Hoey") of the National Community Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from OptumRx.  Hoey stated that the letter from "Optum scolded the pharmacist," stating that OptumRx had "'recently discovered that pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance benefits.'"[13]  OptumRx further stated in the letter that "telling customers a cheaper price exists is a 'violation of the agreement,' [with OptumRx]," that OptumRx 'takes these matters very seriously[,]' and that 'failure to timely comply with this notice could result in further disciplinary action, up to and including termination from all Optum pharmacy networks.'"  *Id.*

---

[13] *See* Lee Zurik, *As United overcharges customers, execs earn tens of millions in stock*, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/ zurikasunitedoverchargescustomersexecsearntensofmillionsinstock (last visited Jan. 9, 2017).

74.     Indeed, a June 28, 2016 press release issued by the NCPA described the "Clawback" practice and how it is impacting pharmacists and consumers throughout the United States.[14]  The press release went on to discuss a survey that was conducted by the NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

- "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.

- Two-thirds (67 percent) said the practice is limited to certain PBMs.

- Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.

- Sometimes PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan.  In other words, the patient has to affirmatively ask about pricing.  Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the past month.[15]

75.     Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

***

---

[14] News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited Jan. 9, 2017); *see also Survey of Community Pharmacies*, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Jan. 9, 2017).

[15]     *Id.*

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

***

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

***

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[16]

76.     Clearly, these examples of "Clawbacks" could not be possible if the true cost of the prescription drug was disclosed and the pharmacy was not prohibited by contract and threat of termination from disclosing the lower cash-paying price for these drugs.

77.      "Clawback" programs are becoming more and more commonplace in the insurance industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits." [17]

78.     Lawmakers, PBM customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency with respect to the revenue stream of PBMs, rendering it difficult

---

[16]    *See Community pharmacists describe PBM copay clawbacks on patients*, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Jan. 9, 2017).

[17]    Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM      Compensation      and      Fee      Disclosures      (Aug.      20,      2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.

to assess whether an insurance policy or plan is being administered in compliance with plan or contract terms.[18]

79.     The losses to date and the risk of future losses to the participants and beneficiaries of the Plans is great, particularly given that the bulk of Defendants' market is with ERISA-covered health plans—plans whose participants and beneficiaries are owed the highest duties known to law by the fiduciaries that administer and manage these important employee benefits.

80.     Potential waste and abuse in the administration of these plans has not gone unnoticed by the Department of Labor—which has the authority to enforce ERISA.  As early as 2014, the growing influence of PBMs generated a number of concerns not the least of which was the fact that PBMs engage in direct and confidential negotiations with drug manufacturers and pharmacies like those described above and further below. In response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

81.     At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback'" which takes advantage of the lack of transparency in the PBM industry According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy.  The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug.  The entire prescription is paid for by the patient.  Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "spread" paid for by the patient.[19]

---

[18] National Community Pharmacists Association, *Lawmakers Ask Medicare for More Drug Payment Transparency* (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

[19] Hayes, *supra* note 17 at 7.

**The Fox 8 Investigation**

82.     The New Orleans television station FOX 8 investigated "Clawbacks," including "Clawbacks" by Cigna and other health insurance companies as part of its Medical Waste investigative series. FOX 8's investigative reporter, Lee Zurik, found that insurance companies were "charging co-pays that exceed the customers' costs for the drug," and that insurers were "clawing back" the excess payments from the customers.

83.     FOX 8 published a number of screenshots from a pharmacist's computer system showing, with respect to particular drugs, the amount of the payment that certain health insurance companies (including Defendants) required pharmacists to collect from customers and the amount the pharmacists were required to pay to the health insurance companies as a "Clawback."  The prescription-strength Vitamin D example set out above is taken from one of the screenshots.

84.     In response to the disclosure of the "Clawback" practice, Louisiana Insurance Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more than the drug is worth, it' not a copay – it's a 'you-pay'.  'There's no copay,' our pharmacist says, 'that is an absolute, additional premium being paid, that they're paying, that they don't realize.'"

85.     FOX 8 also found that pharmacists were required to charge customers the amount dictated by the insurer or PBM, and were not allowed to give any discounts.  According to Randal Johnson, president and CEO of the Louisiana Independent Pharmacies Association, "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance."

**"Clawbacks" Are Most Common With Widely Used Drugs**

86.     Defendants impose "Spread" and "Clawbacks" most frequently on widely used, low-cost drugs, and particularly generic drugs, where the cost of the drug is relatively low.  This enables Defendants to impose deductible costs, copayments, and coinsurance costs that are higher

than the cost of the drug, thereby insuring for themselves a "Clawback." These drugs include, but are not limited to the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and

Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

### Defendants' Policies and Plans with Plaintiffs and the Class

87.     Health insurance policies are subject to state regulation.  The policy forms typically must be filed with and approved by the appropriate state regulators.

88.     Because they are approved form plans, the relevant terms of the plans insuring Plaintiffs and Class members are substantively the same.  For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

89.     Further, Cigna uses uniform prescription drug plan terms in their Plan contracts to provide prescription drug coverage.  These terms of the Plans—and more importantly how these Plans are administered by Cigna, its affiliates, and its PBMs—do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class regardless of the funding arrangement underpinning the health plan benefits that Defendants offer and administer.

90.     For instance, Cigna's Plans state that Cigna will provide prescription drug coverage for "Covered Expenses," which are "expenses for charges made by a Pharmacy, for Medically Necessary Prescription Drugs or Related Supplies Ordered by a Physician."

91.     According to the Plans, patients "may be required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies.  That portion is the Copayment, Deductible and/or Coinsurance."  Accordingly, the Copayment, Deductible, and Coinsurance payments must be for a portion of expenses for charges made by a pharmacy for prescription drugs.

### The Copayment Provisions

92.     Pursuant to a typical Class member Plan:

(a)     "Copayments are fixed dollar amounts (for example, $15) you pay for covered health care, usually when you receive the service."

(b)     "Copayments are expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies." Thus, Class members should never pay a Copayment more than the fee paid to the pharmacy.[20]

### The Coinsurance Provisions

93.     Pursuant to a typical Class member's Plan:

(a)     "Coinsurance is *your* share of the costs of a covered service, calculated as a percent of the allowed amount of the service. For example, if the health plan's allowed amount for an overnight hospital stay is $1,000, your coinsurance payment of 20% would be $200."[21]

(b)     "The term Coinsurance means the percentage of Charges for covered Prescription Drugs and Related Supplies that you or your Dependent are required to pay under this plan." Thus, Class members should pay Coinsurance that is a percentage of the fee ultimately paid to the pharmacy.

---

[20] Plaintiff Negron's plan further provides: "***In no event will the Copayment . . . for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge***."  The "Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source." Thus, under this form Plan, Class members should never pay a Copayment more than 50% of the fee ultimately paid to the pharmacy ("50% cap") or the retail cash price ("U&C cap").

[21] "The amount the plan pays for covered services is based on the allowed amount. If an out-of-network provider charges more than the allowed amount, you may have to pay the difference. For example, if an out-of-network hospital charge is $1,500 for an overnight stay and the allowed amount is $1,000, you may have to pay the $500 difference. (This is called balance billing.)"

Plaintiffs Negron and the Gallagher's plans further provide that the term Charges means "the amount charged by the Insurance Company to the plan when the Pharmacy is a Participating Pharmacy, and it means the actual billed charges when the Pharmacy is a non-Participating Pharmacy."[22]  Accordingly, under this language as well, Class members should pay Coinsurance that is a percentage of the fee ultimately paid to the pharmacy.[23]

### The Deductible Provisions

94.     The "deductible" is the amount owed for health care services the health insurance or plan covers before the health insurance or plan begins to pay.

95.     Class members must pay all the costs up to the deductible amount before this plan begins to pay for covered health services.

### Plaintiffs' Purchases

96.     During the time that Plaintiffs were covered by the Plans, Plaintiffs purchased prescription drugs for which they were required to make copayments, coinsurance, and/or deductible payments, including those specifically alleged above.[24]  Upon information and belief

---

[22] The policies for Plaintiffs N. Curol and R. Curol contain substantively similar provisions.

[23] The policies for Plaintiffs Negron, N. Curol, and R. Curol further provide: "***In no event will the . . . Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge***."  The "Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source."

[24] For confidentiality reasons, Plaintiffs have not specified the drugs they purchased, but if relevant, they will disclose such information during discovery after entry of an appropriate protective order.

based on the fact that Plaintiffs purchased drugs for which Defendants overcharge customers, Plaintiffs were charged fees for prescription drugs in excess of the fees permitted by their Plans.

97.     Plaintiff Negron's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from CVS in Burlington, Massachusetts on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

98.     Plaintiff Gallagher's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from CVS in Morristown, New Jersey and Walgreen's in Florham Park, New Jersey on at least the following dates: July 15, 2015, August 9, 2015, September 1, 2015, September 29, 2015, October 27, 2015, November 19, 2015, November 21, 2015, December 16, 2015, January 14, 2016, February 10, 2016, June 13, 2015, September 21, 2016, October 14, 2016, November 12, 2016 and December 5, 2016.

99.     Plaintiff Perry's purchases of such prescription drugs pursuant to his health plan include, but are not limited to, purchases from Coulton Pharmacy in Morton, Washington on at least the following dates: July 18, 2015, August 14, 2015, March 4, 2016, and April 6, 2016.

100.     Plaintiff N. Curol's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from Robichaux's Pharmacy in Lockport, Louisiana, on at least the following dates: January 19, 2016, February 17, 2016, March 21, 2016, April 19, 2016, and May 16, 2016.

101.     Plaintiff R. Curol's purchases of such prescription drugs pursuant to his health plan include, but are not limited to, purchases from Robichaux's Pharmacy in Lockport, Louisiana, on at least the following dates: January 19, 2016, February 22, 2016, March 15, 2016, April 18, 2016, May 9, 2016, and June 7, 2016.

**Defendants Are Fiduciaries and Parties In Interest**

102.     Plaintiffs and the members of the ERISA Subclass (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendants to provide participants with medical care and prescription medications ("ERISA Plans").

103.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

104.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  This is a functional test.  Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

105.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person

holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

106.    Defendants are fiduciaries of all of the ERISA SubClass members' ERISA Plans to which they provided prescription drug benefits or for which they administered prescription drug benefits in that they *exercised* discretionary authority or control respecting the following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they *had* discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of examples, they did and/or could do one or more of the following:

(a)     dictate the amount paid to pharmacies for prescription drugs;

(b)     dictate the amount pharmacies charged patients for prescription drugs;

(c)     require pharmacies to charge patients more for drugs than they should have been charged pursuant to the terms of the ERISA Plans, thereby creating and setting the amount of the "Spread";

(d)     require the pharmacies to collect the "Spread" from patients;

(e)     require pharmacies to pay the "Spread" to Defendants and require the deduction of the "Spread" from future reimbursements to the pharmacy as a "Clawback";

(f)     determine the amount of and require the collection of additional profits and compensation for services provided pursuant to the ERISA Plans;

(g)     set their own compensation for services performed as fiduciaries by dictating "Clawbacks";

(h)      unilaterally collect their own compensation for services performed as fiduciaries by collecting "Clawbacks";

(i)      set and change the compensation of their own affiliates with respect to the ERISA Plans by allocation of the proceeds of "Clawbacks";

(j)      misrepresent and fail to disclose to patients the manner in which they charged for prescription drugs as alleged above;

(k)      prohibit pharmacies from disclosing to patients the existence or amount of the "Spread" and "Clawback";

(l)      prohibit pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants;

(m)      prohibit pharmacies from selling to patients prescription drugs covered by the ERISA Plans at prices that were lower than the prices that the insurer/administrator/PBM ordered the pharmacies to charge the patients;

(n)      select and retain the PBM(s) that will, in the case of Cigna, assist in certain PBM and pharmacy delivery functions, and perform all PBM and pharmacy delivery functions;

(o)      manage the prescription drug benefit program, including processing and paying prescription drug claims received from pharmacies;

(p)      improperly trade off the interests of plan participants and beneficiaries for the benefit of themselves or their affiliates;

(q)      dictate and negotiate whether a particular drug was covered, and if so, in which "tier"[25] it was categorized;

---

[25] Prescription formularies are subject to tiering arrangements that determine the specific cost to the consumer at the pharmacy counter, with some medications requiring greater patient contributions than others.

(r)     choose whether to fill a prescription from a participant, reject it, shift the participant to a different medication, or require the use of a mail order pharmacy; and

(s)     monitor each others' performances, and in particular the performances of the PBMs at issue here—and to take appropriate action to protect plan participants and beneficiaries from other fiduciaries' and service providers' failure to act in the best interests of plan participants and beneficiaries.

107.    The "Spread" and "Clawbacks" were additional compensation for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional payments to receive their covered prescription drugs. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

108.    The "Spread" and "Clawbacks" are additional "premium" within the meaning of ERISA § 702, for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their covered prescription drugs. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

109.    In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries of all of the ERISA SubClass members' ERISA Plans in that they *exercised* authority

or control respecting management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

(a)     The copayments, coinsurance, and deductible payments Defendants required pharmacies to collect from participants and beneficiaries are "plan assets" within the meaning of ERISA;

(b)     The contracts underpinning the plans are "plan assets" within the meaning of ERISA;

(c)     Through their "Clawback Scheme," as described above, Defendants exercised control over both (i) drug payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA Plans.  They successfully leveraged their relationships to the ERISA SubClass members' ERISA Plans to benefit themselves, their affiliates, and third parties, and their *authority or control* over these significant plan assets enabled them to do so.

110.    In addition, any plan-paid amounts that were contributed to participant prescription drug transactions were "plan assets" within the meaning of ERISA.  Incident to their "Clawback Scheme" Defendants also exercised control over these plan assets, making them fiduciaries for purposes of these transactions.

111.    Further to the conduct described herein which establishes the fiduciary status of all Defendants, Defendant CHL and Defendant OptumRx are fiduciaries because they exercise discretion to set the prices that the ERISA Subclass were and are required to pay for their prescription medications. These PBMs are required to act in the best interests of the ERISA Subclass, but by allowing participants and beneficiaries of ERISA plans to be subject to the "Clawback Scheme" described herein and participating in this scheme with Defendant Cigna, these Defendants have breached their fiduciary duties to the ERISA Subclass.

112.    Defendant CHL and Defendant OptumRx are aware of the effect the "Clawback Scheme" is having on the ERISA Subclass. Nevertheless, these Defendants have maximized and continue to maximize their revenues at the expense of the ERISA Subclass by engaging in the illegal conduct described herein.

113.    Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants. In these negotiations and in the contract that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and beneficiaries. To the extent Defendants CHL and OptumRx have negotiated agreements subject to the "Clawback Scheme" described herein, they have breached their fiduciary duties under ERISA. And through these negotiations, CHL and OptumRx have also exercised discretionary authority by setting their own margins and compensation for the sale of prescription medications.

114.    In addition, Defendant Cigna breached its fiduciary duties under ERISA by retaining other PBMs—including Defendant CHL, Argus and Defendant OptumRx—to provide PBM services for the benefit of the ERISA subclass, but failing to take reasonable and prudent action to determine whether these PBMs were fulfilling their own separate fiduciary obligations. For instance, Cigna authorized CHL, Argus and OptumRx to set the prices for prescription medications, and thus permits these PBMs to control what the ERISA subclass pays for their prescription drugs.

115.    When Cigna endowed CHL, Argus and OptumRx with authority and discretion to control prescription medication pricing for the ERISA Subclass, Cigna assumed the duty to monitor CHL, Argus and OptumRx's exercise of that discretionary authority. Cigna further owed and owes the ERISA Subclass the duty to establish policies and procedures to monitor CHL, Argus

and OptumRx's performance of its duties, to monitor their prescription medication pricing, to monitor the effect of the "Clawback Scheme" described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA Subclass, and to provide complete and accurate information to the ERISA Subclass.

116.    But in allowing CHL, Argus and OptumRx to violate ERISA, including permitting the ERISA Subclass to be subject to the "Clawback Scheme," and in failing to correct such breaches of duty in a timely fashion, Cigna has breached its duty to monitor CHL, Argus and OptumRx's illegal conduct.

117.    Defendant Cigna has also the discretionary authority or control to negotiate on behalf of the ERISA Subclass favorable terms when entering into terms with other PBMs, including CHL, Argus and OptumRx. These terms directly impact the prices for prescription medications paid by the ERISA Subclass, but by engaging in the conduct described herein, including by participating in the "Clawback Scheme" with CHL, Argus and OptumRx, Defendant Cigna has breached its fiduciary duties.

118.    Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided insurance, plan administration, and pharmacy benefit management services to Plaintiffs' and the Class members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

119.    As parties in interest, Defendants received direct and indirect compensation for services, some of which was in the form of excess "Clawback" fees that were collected in exchange for few to no services.  Defendants also received and used for their own and their affiliates' benefit "plan assets," including patient copays and ERISA Plan contracts under which they had access to the ERISA Plans and were able to impose their "Clawback Scheme" on the ERISA Subclass.

120.    Finally, even if any Defendant is found not to be a fiduciary, that Defendant is alternatively subject to equitable relief under ERISA, because they had actual or constructive knowledge of the ERISA violations through their role in the "Clawback Scheme."

**Defendants' ERISA Duties**

121.    **The Statutory Requirements:**  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

122.    **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty— that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

123.    **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

124.     **The Duty to Inform.**   The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail:  (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

125.     **Prohibited Transactions.**   ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a).  As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

126.     ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

> (a)  Transactions between plan and party in interest
>
> Except as provided in section 1108 of this title:
>
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
> (B) lending of money or other extension of credit between the plan and a party in interest;
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

127.   ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

128.   **Co-Fiduciary Liability.**  A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

129.   **The Duty to Monitor.**  In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes

the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

130. **The Duty Not To Discriminate.** A health insurer may not discriminate against insureds by charging excessive premiums. ERISA § 702 29 USC §1182, states in pertinent part:

> Prohibiting discrimination against individual participants and beneficiaries based on health status.
>
>> (a) In eligibility to enroll.
>>
>>> (1) In general. Subject to paragraph (2), a group health plan, and a health insurance issuer offering group health insurance coverage in connection with a group health plan, may not establish rules for eligibility (including continued eligibility) of any individual to enroll under the terms of the plan based on any of the following health status-related factors in relation to the individual or a dependent of the individual:
>>>
>>>> (A) Health status.
>>>>
>>>> (B) Medical condition (including both physical and mental illnesses).
>>>>
>>>> (C) Claims experience.
>>>>
>>>> (D) Receipt of health care.
>>>>
>>>> (E) Medical history.
>>>>
>>>> (F) Genetic information.
>>>>
>>>> (G) Evidence of insurability (including conditions arising out of acts of domestic violence).
>>>>
>>>> (H) Disability.
>>>
>>> (2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—
>>>
>>>> (A) to require a group health plan, or group health insurance coverage, to provide particular benefits other

than those provided under the terms of such plan or coverage, or

(B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction. For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

(1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

131.   **Non-Fiduciary Liability.**  Under ERISA, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Accordingly, as to the ERISA claims, even if any Defendant is not found to have fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well established case law. To the extent that any Defendant is not deemed to be a fiduciary or a party-in-interest with regard to any transaction at issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

132.   **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.**  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides

that a participant or beneficiary may bring an action to enforce rights under the terms of the plan

or to clarify his rights to future benefits under the terms of the plan.  Further, ERISA § 502(a)(3),

29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to

enjoin any act or practice which violates any provision of this subchapter or the terms of the plan,

or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce

any provisions of this subchapter or the terms of the plan."  The remedies available pursuant to §

502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C.

§ 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. §

1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary,

or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides,

*inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the

responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable

to make good to the plan any losses to the plan resulting from each such breach and to restore to

the plan any profits the fiduciary made through use of the plan's assets.  ERISA § 409 further

provides that such fiduciaries are subject to such other equitable or remedial relief as a court may

deem appropriate. Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as

well as § 502(a)(1)(B), as further set forth below, because not all the remedies Plaintiffs seek are

available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the

alternative.

### Defendants Breached Their Duties

133.    Defendants breached the terms of the ERISA Plans and legal obligations,

committed breaches of fiduciary duty and prohibited transactions, and harmed Plaintiffs and

ERISA SubClass members in the following ways:

(a)     Plaintiffs and ERISA SubClass members were charged unlawful fees and additional premiums for prescription drugs that substantially exceeded the fees actually paid by or agreed to be paid by Defendants and/or their agent PBMs to the pharmacies for the dispensed drugs;

(b)     Plaintiffs and the ERISA Subclass were charged excessive "copayments" and "coinsurance," a material portion of which were neither payments for prescription drugs nor were they "co-" payments made in conjunction with Defendants' payment for prescription drugs, as required by the plain language of the Plans, but rather were undisclosed and unlawful payments and premiums to Defendants/PBMs;

(c)     Plaintiffs and ERISA SubClass members were overcharged for coinsurance payments in that rather than paying a percentage of the fees that Defendants and/or PBMs with which Defendants have contracted paid (or agreed to pay) to the pharmacies for the dispensed drugs, the coinsurance payments were based on substantially inflated amounts;

(d)     Plaintiffs and ERISA SubClass members were overcharged when making payments toward their deductibles in that rather than paying the lesser of the applicable per occurrence deductible fee or the fee paid to the pharmacy for the dispensed drug, Plaintiffs and ERISA SubClass members were charged deductible fees that were higher;

(e)     Defendants improperly processed and paid prescription drug claims they received from pharmacies;

(f)     Defendants discriminated against patients who were required to pay "Spreads" and "Clawbacks" as compared to those who were not;

(g)     Defendants misrepresented and failed to disclose to patients the manner in which they charged for prescription drugs as alleged above;

(h)     Pharmacies were prohibited from disclosing to patients the existence or amount of the "Spread" and "Clawback";

(i)      Pharmacies were prohibited from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants under the policies and from selling drugs to customers at these lower prices;

(j)      Defendants set their own compensation for services performed as fiduciaries by dictating "Clawbacks";

(k)     Defendants unilaterally collected their own compensation for services performed as fiduciaries by collecting "Clawbacks";

(l)      Defendants set and changed the compensation of their own affiliates and third parties with respect to the ERISA SubClass members' ERISA Plans by allocating the proceeds of "Clawbacks" without heeding the best interests of participants and beneficiaries;

(m)    Defendants maximized their own profits, profits to their affiliates, and profits to third parties, at the expense of the ERISA SubClass members who participated in the ERISA Plans;

(n)     Defendants received improper compensation from entities doing business with the ERISA Plans Defendants administered and managed;

(o)     Defendants knew or reasonably should have known that their actions would injure plan participants and beneficiaries;

(p)     Defendants selected plan service providers and PBMs such as Argus and OptumRx and negotiated their contracts based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

(q)     Defendants failed to stop injuries to plan participants caused by their co-fiduciaries and service providers; and

(r)     Defendants failed to monitor their appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

134.    Plaintiffs and ERISA SubClass members were overcharged for and/or paid unauthorized and excessive copayments, coinsurance and deductible payments in connection with the purchase of numerous prescription drugs, including, but not limited to, the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir, Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole,

Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs brings this action as a class action pursuant to Rule 23 (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class and the ERISA Subclass defined as follows:

> **The Class.**  All individuals residing in the United States and its territories who are enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies, who purchased prescription drugs pursuant to such plans or policies and paid an amount for such drugs that was set by Defendants (or their agents) that was higher than the participant payment amount provided by the health insurance plans or policies.

136.    Within the Class there is one subclass:

> **ERISA Subclass.**  All participants or beneficiaries of a health benefit plan health insurance plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies and subject to ERISA who purchased prescription drugs pursuant to such plan and paid an amount for such drugs that was higher than the participant payment amount provided by the health insurance policies.

137.    Plaintiffs reserve the right to redefine the Class prior to certification.

138.    **Class Period.**  Plaintiffs will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, as well as under RICO, 18 U.S.C. 1961, *et seq*. and the doctrine of equitable tolling. Further, Plaintiffs reserve the right to refine the Class Period after they have learned the extent of Defendants' fraud, the length of its concealment, and the time period during which "Clawbacks" were taking place.

139.    Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

140.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

141.    The Class is so numerous that the individual joinder of all of its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class members is in the thousands and that the members of the Class are geographically dispersed across the United States.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

142.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass because Plaintiffs' claims, and the claims of all Class and SubClass members, arise out of the same

conduct, policies and practices of Defendants as alleged herein, and all members of the Class and Subclass are similarly affected by Defendant's wrongful conduct.

143.    There are questions of law and fact common to the Class and Subclass and these questions predominate over questions affecting only individual Class and SubClass members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants are fiduciaries under ERISA;

(b)    Whether Defendants are parties in interest under ERISA;

(c)    Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)    Whether Defendants acts as alleged above breached ERISA's prohibited transaction rules;

(e)    Whether Defendants breached ERISA § 702;

(f)    Whether Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(g)    Whether Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(h)    Whether Defendants conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(i)    Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C §§ 1341 and 1343;

(j)    Whether Defendants engaged in a scheme to defraud;

(k)    Whether each Defendant was a knowing and active participant;

(l)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(m)     Whether Plaintiffs and Class and SubClass members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(n)     Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit "Spread" amounts to them and thereby overcharge subscribers for prescription drugs;

(o)     Whether the members of the Class and/or Subclass have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, damages, and/or unjust enrichment; and

(p)     Whether the members of the Class and/or Subclass are entitled to declaratory and/or injunctive relief.

144.     Plaintiffs will fairly and adequately represent the Class and Subclass and have retained counsel experienced and competent in the prosecution of class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class and Subclass.  Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

145.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class and/or SubClass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

146.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and Subclass as a whole.

147.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and Subclass predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.

**Exhaustion of Administrative Remedies Do Not Apply or Are Futile**

148.    Plaintiffs and the ERISA Subclass are not required to exhaust administrative remedies.  Only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), could concern exhaustion of administrative remedies.  Accordingly, only Count I is arguably implicated by that doctrine.  Moreover, the exhaustion doctrine does not apply under that Count because Plaintiffs seek to enforce their rights under the terms of the ERISA Plans and clarify future rights, not recover benefits due.  Finally, because the injuries to Plaintiffs and the ERISA Subclass are part of a nationwide, clandestine, computerized scheme, any attempt to rectify the harm through administrative means would be futile and unnecessary.

149.    This clawing back of payments (which directly evidences the overcharging of insureds) is pervasive and significantly increases the costs to patients across the country.

150.    Making matters worse, on information and belief, Insurer/PBMs contractually bind pharmacies to keep the "Clawback Scheme" secret and they prevent pharmacies from informing patients that their drugs could cost less if the pharmacy were permitted to process the purchase

outside of the patients' insurance plans.  Put differently, if the patient in the Vitamin D example above directly asked the pharmacist whether he or she could purchase prescription-strength Vitamin D outside of the insurance (*i.e.*, for less than the copayment), the pharmacy would have been contractually prohibited from disclosing a lower available price or from selling it at that lower price—even if the pharmacy could do so at a profit.

151.    Moreover, the overcharging and "Clawback Scheme" is effectuated through nationwide computer systems.  The computer systems that Defendants use to process claims often are not able to handle multiple prices for drugs and, rather than charging the client the proper lower price paid to the pharmacy, the claim adjudication system will automatically apply the higher price dictated by the insurer/PBM to charge the patients.  Patients are never refunded the amount that they overpaid due to the failure of the adjudication system to handle multiple prices.  Rather, that amount is kept by Defendants as a "Clawback."

152.    Due to Defendants' concealment of their "Clawback Scheme" and their requirements, transmitted through the pharmacies or pharmacists, that Plaintiffs and the ERISA Subclass pay contractual copayments or coinsurance at the pharmacy—amounts that are set forth in their Plans—Plaintiffs and the ERISA Subclass did not know and/or did not have reason to know that they were being overcharged for their prescription medications. Due to the "gag clauses," only in the rarest of circumstances would patients have any inkling that they were being overcharged. And even if they had reason to know they were being overcharged, they did not know the exact amount of the "Clawback" they were forced to pay. Thus, Plaintiffs and the ERISA Subclass did not know and did not have reason to know that they could make a claim for reimbursement of part of their copay, much less the specific portion thereof they should request.

153.     Further, Plaintiffs and the ERISA Subclass had no real opportunity to decline to make the overpayments at the pharmacy that allowed Defendants to impose "Clawbacks" on them. To receive their prescription medications, they were required to pay the amount that Defendants prescribed through their computerized and automatic transmission of copayments or coinsurance amounts to the pharmacists or pharmacies involved.   Given Defendants' prohibition on pharmacists disclosing the retail cash price or the negotiated price to patients, without making these required payments dictated by Defendants, Plaintiffs and the ERISA Subclass would not have been able to purchase their prescription medications at all.

154.     It is not clear that Defendants' administrative claims procedures would or could contemplate the return of a portion of a copayment or coinsurance amount. But even if so, making administrative claims should not be required of Plaintiffs and the ERISA Subclass.  Even utilizing Defendants' claims procedures, if they were available or valid under these circumstances, would not make Plaintiffs or the ERISA Subclass whole.  First, it is unlikely this procedure would result in a refund of a copayment or coinsurance, and is therefore futile and/or unnecessary.  Second, even if Defendants' claims procedures could provide a "Clawback" reimbursement of a portion of a given copayment or coinsurance amount, Plaintiffs and the ERISA Subclass are entitled to more, including treble and punitive damages, injunctive relief, and the other remedies described *infra*. In this regard as well, utilizing a claims procedure would be futile and/or unnecessary.

155.     Moreover, under the circumstances alleged here, it would be extremely burdensome and inequitable to require Plaintiffs and the ERISA Subclass to seek redress through Defendants' claims procedures, where Defendants have intentionally misled consumers, omitted material information, and concealed their unlawful practices.  With the proportionately small amount at stake for a given patient relative to the vast profits Defendants are reaping from their "Clawback

Scheme," Defendants' imposition of a claims procedure likely would deter and prevent Plaintiffs and the ERISA Subclass from obtaining any relief at all, while Defendants would be free to retain an unfair, unlawful, and undisclosed windfall profit due to their "Clawback Scheme."

156.    Finally, correcting the prices paid by patients on an individualized basis would inevitably result in further unfair, disparate, and discriminatory treatment among those ERISA SubClass members who have been reimbursed for the overcharges and those who have not.  A far more equitable way to adjudicate overpayments made by the ERISA Subclass is for Defendants to disgorge in full these amounts pursuant to their own records that can track such payments for everyone in the ERISA Subclass.

157.    For all of these reasons, it would be futile for Plaintiffs to demand administratively that Defendants modify the pervasive "Spread" and "Clawback Scheme" that is ingrained in their business.

**Plaintiffs and the Class Are Entitled to Tolling Due to Fraud or Concealment**

158.    By its nature, Defendants' "Clawback Scheme" has hidden their unlawful conduct from injured parties.

159.    Neither Plaintiffs nor Class members knew of the "Clawback Scheme," nor could they have reasonably discovered the existence of the "Clawback Scheme," until shortly before filing this action.

160.    Until recent news broke about Defendants' "Clawback Scheme," their unlawful conduct was hidden from Plaintiffs and the Class and Subclass.

161.    Even today, the "gag clauses" in place between Defendants and providers continue to hide Defendants' unlawful conduct from members of the Class.

162.    To the extent that any of the causes of action alleged *infra* are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein *tolls* those requirements, for a specific amount of time to be determined as the litigation progresses.

163.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

164.    While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct.  *Rotella v. Wood*, 528 U.S. 549 (2000).

165.    The "Clawback Scheme"—by its nature a secret endeavor by Defendants—remains hidden from most members of the Class.  Moreover, during the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the "Clawback Scheme" from Plaintiffs and other members of the Class and Subclass through it "gag clauses" and secrecy policies.  There is no question that Plaintiffs' claims are timely.

## COUNT I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)
### Against All Defendants on Behalf of the ERISA Subclass

166.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

167.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.

168.    As set forth above, as a result of being overcharged for prescription drugs, Plaintiffs and the ERISA Subclass have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for their prescriptions.

169.    Plaintiffs and the ERISA Subclass have been damaged in the amount of the "Spread" compensation, including "Clawbacks," that Defendants took for themselves.  Plaintiffs and the ERISA Subclass are entitled to recover the amounts they have been overcharged.

170.    Plaintiffs and the ERISA Subclass are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)    That they have been overcharged;

(b)    For an accounting of Defendants' charges and overcharges;

(c)    For payment of all amounts due them in accordance with their rights under the ERISA Plans; and

(d)    For an order that they are entitled in the future not to pay "Clawbacks" or any other additional amounts that conflict with their rights under the ERISA Plans.

## COUNT II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)
### Against All Defendants on Behalf of the ERISA Subclass

171.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

172.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

- 64 -

173.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

174.    As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the ERISA Subclass.  Defendants are also parties in interest under ERISA in that they are fiduciaries and/or they provided prescription drug insurance and/or administrative "services" to ERISA SubClass members pursuant to the ERISA Plans.  ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Thus they were engaged on one or both sides of these § 406(a) prohibited transactions.

175.    As fiduciaries, Defendants caused the ERISA Plans to engage in prohibited transactions as alleged herein.

176.    As parties in interest, Defendants received direct and indirect compensation in the form of undisclosed "Spread" compensation, including "Clawbacks," in exchange for the services they provided to Plaintiffs and the ERISA Subclass pursuant to their prescription drug plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

177.    The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable.  ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

178.    While the burden is on Defendants to invoke and establish this exception, the compensation paid to Defendants was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the "Spread" compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendants' compensation exceeded the premiums and other

fees that were agreed upon for fully providing prescription drug benefits.  Further, Defendants as fiduciaries of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses.

179.    Defendants also received transfers of plan assets in that they received excess copayments, coinsurance, or deductible payments through "Clawbacks."  ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

180.    In addition and in the alternative, Defendants used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments, coinsurance, or deductible payments which Defendants could appropriate in their "Clawback Scheme." Further, Defendants used—and misused—for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the ERISA Subclass—to effectuate their "Clawback Scheme."  ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

181.    Plaintiffs and the ERISA Subclass have suffered losses and/or damages and/or Defendants have been unjustly enriched in the amount of the "Spread" compensation Defendants took for themselves.

182.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

183.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the Class, including but not limited to:

(a)      an accounting;

(b)      a surcharge;

(c)      correction of the transactions;

(d)      disgorgement of profits;

(e)      an equitable lien;

(f)      a constructive trust;

(g)      restitution;

(h)      full disclosure of the foregoing acts and practices;

(i)      an injunction against further violations; and/or

(j)      any other remedy the Court deems proper.

## COUNT III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)**
**Against All Defendants on Behalf of the ERISA Subclass**

184.   Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

185.   ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

186.   As alleged above, Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

187.     As alleged above, both (i) drug payments from participants and beneficiaries and (ii) the contracts underpinning the ERISA SubClass members' ERISA Plans are plan assets under ERISA.

188.     First, by setting their own compensation from drug payments from participants and beneficiaries, collecting their own compensation from that same source, and managing contracts in their own interest or for their own account, Defendants violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking excessive undisclosed "Spread" compensation, including "Clawbacks," Defendants received plan assets and consideration for their personal accounts.

189.     Second, by acting on behalf of each other and on behalf of non-parties who also stood to profit from "Clawbacks" at the expense of Plaintiffs and members of the ERISA Subclass—and thus with interests adverse to the affected participants and beneficiaries— Defendants engaged in conflicted transactions each time they facilitated, required, or allowed "Clawbacks," through service provider contracts or in transactions at the pharmacy counter, in violation of ERISA § 406(b)(2).  Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with a plan is enough.

190.     Third, through their "Clawback Scheme," Defendants received consideration for their own personal accounts from other parties—including each other, third parties, and the members of the ERISA Subclass—that were dealing with the ERISA Plans in connection with a transaction involving the assets of the ERISA Plans.

191.     Plaintiffs and the ERISA Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendants took through these prohibited transactions.

192.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

193.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

(a)   an accounting;

(b)   a surcharge;

(c)   correction of the transactions;

(d)   disgorgement of profits;

(e)   an equitable lien;

(f)   a constructive trust;

(g)   restitution;

(h)   full disclosure of the foregoing acts and practices;

(i)   an injunction against further violations; and/or

(j)   any other remedy the Court deems proper.

**COUNT IV**

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA § 404, 29 U.S.C. § 1104**
**Against All Defendants on Behalf of the ERISA Subclass**

194.   Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

195.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying

reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

196.    In setting the amount of and taking excessive undisclosed "Spread" compensation, including "Clawbacks,"Defendants have breached their fiduciary duties of loyalty and prudence.

197.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering pharmacy benefits, Defendants have breached their fiduciary duty of loyalty. And in acting in their own self-interest, Defendants have violated the "exclusive purpose" standard.

198.    The duty to disclose is part of the duty of loyalty.  In concealing and failing to disclose to the ERISA Subclass the fact or amount of the "Clawbacks" they were being charged, and in concealing and failing to disclose to the ERISA Subclass that plan participants were paying more in copayments and coinsurance than the cost of the drug if purchased outside their respective plans—then barring pharmacies from advising ERISA SubClass membersClass member that they could pay less for a drug by purchasing it outside of their respective plans, Defendants breached this duty.  Further, both omissions and misrepresentations are actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements.In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

199.    Defendant Cigna failed to adequately monitor the activities of Defendant CHL and Defendant OptumRx—PBMs they authorized to provide PBM services to Cigna insureds— including *inter alia*, failing to monitor the prices charged by CHL and OptumRx for prescription medications provided to Plaintiffs and the ERISA Subclass and permitting and/or participating in the "Clawback Scheme" described herein. As such, Defendant Cigna failed to monitor its appointees, formal delegees, and informal designees in the performance of its fiduciary duties.

200.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan.  In so doing, Defendants violated their duty of prudence.

201.    Plaintiffs and the ERISA Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendant took.

202.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

203.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

204.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

205.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order

equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

      (a)    an accounting;

      (b)    a surcharge;

      (c)    correction of the transactions;

      (d)    disgorgement of profits;

      (e)    an equitable lien;

      (f)    a constructive trust;

      (g)    restitution;

      (h)    full disclosure of the foregoing acts and practices;

      (i)    an injunction against further violations; and/or

      (j)    any other remedy the Court deems proper.

**COUNT V**

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 702, 29 U.S.C. § 1182**
**Against All Defendants on Behalf of the ERISA Subclass**

206.    Plaintiffs incorporate by reference each and every allegation above as if set forth

fully herein.

207.    ERISA § 702, 29 USC § 1182, states in pertinent part:

Prohibiting discrimination against individual participants and beneficiaries
based on health status.

(a) In eligibility to enroll.

(1) In general.  Subject to paragraph (2), a group health plan, and a
health insurance issuer offering group health insurance coverage in
connection with a group health plan, may not establish rules for
eligibility (including continued eligibility) of any individual to
enroll under the terms of the plan based on any of the following

health status-related factors in relation to the individual or a dependent of the individual:

> (A) Health status.

> (B) Medical condition (including both physical and mental illnesses).

> (C) Claims experience.

> (D) Receipt of health care.

> (E) Medical history.

> (F) Genetic information.

> (G) Evidence of insurability (including conditions arising out of acts of domestic violence).

> (H) Disability.

(2) No application to benefits or exclusions. To the extent consistent with section 701, paragraph (1) shall not be construed—

> (A) to require a group health plan, or group health insurance coverage, to provide particular benefits other than those provided under the terms of such plan or coverage, or
> (B) to prevent such a plan or coverage from establishing limitations or restrictions on the amount, level, extent, or nature of the benefits or coverage for similarly situated individuals enrolled in the plan or coverage.

(3) Construction.  For purposes of paragraph (1), rules for eligibility to enroll under a plan include rules defining any applicable waiting periods for such enrollment.

(b) In premium contributions.

> (1) In general. A group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

208.     In setting the amount of and taking excessive undisclosed "Spread" compensation, including "Clawbacks," Defendants have required plan participants and beneficiaries who have medical conditions that require prescription medications that are subject to Defendants' undisclosed excessive "Spreads" and "Clawbacks" to pay greater premiums and contributions than those participants and beneficiaries who do not need prescription medications that are subject to Defendants' undisclosed excessive "Spreads" and "Clawbacks" for their health benefits.

209.     Under Defendants' "Clawback Scheme," Plaintiffs and members of the ERISA Subclass who needed prescription medications that are subject to Defendants' undisclosed excessive "Spreads" and "Clawbacks" were required to pay hidden additional premiums or contributions in the form of "Clawbacks" in order to be able to *use* their benefits as enrollees, thus making the "Clawback" amounts a condition of continued enrollment under the plan.  Without paying inflated copayments, coinsurance, or deductible payments, above and beyond the required participant contributions set forth in their plans, Plaintiffs and members of the ERISA Subclass could not obtain covered prescription medications under the ERISA Plans, the effect of which is that they would not be enrolled in the Plans.

210.     Plaintiffs and the ERISA Subclass have been damaged and suffered losses in the amount of the "Spread" compensation Defendants took.

211.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

212.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

(a)      an accounting;

(b)      surcharge;

(c)      correction of the transactions;

(d)      disgorgement of profits;

(e)      an equitable lien;

(f)      a constructive trust;

(g)      restitution;

(h)      full disclosure of the foregoing acts and practices;

(i)      an injunction against further violations; and/or

(j)      any other remedy the Court deems proper.

### COUNT VI

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)**
**Against All Defendants on Behalf of the ERISA Subclass**

213.     Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

214.     As alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence and they were prohibited from engaging in self-interested and conflicted transactions.

215.     As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

216.   **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

217.   **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Upon information and belief, each Defendant participated in the breaches by the other fiduciaries.

218.   **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled another fiduciary to commit a breach, even without knowledge of the breach.  Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

219.   Plaintiffs and the ERISA Subclass have been damaged in the amount of the "Spread" compensation Defendants took.

220.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

221.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    correction of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

### COUNT VII

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Knowing Participation in Violations of ERISA**
**In the Alternative, Against All Defendants on Behalf of the ERISA Subclass**

222.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

223.    As noted above, fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, Plaintiffs make claims against Defendants even though one or more of them may be found not to have fiduciary status with respect to the ERISA Plans.  As nonfiduciaries, they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

224.     To the extent any one or more of them are not found to be fiduciaries, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and these nonfiduciaries are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Trust*.

225.     As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged in Counts II-V and the participation therein of the Defendants, the members of the ERISA Subclass directly or indirectly lost millions of dollars and/or plan assets (both participant pharmacy payments and Plan contracts) were improperly used to generate profits for the fiduciary Defendants, their affiliates, and third parties.  The fiduciary Defendants collected and/or paid these amounts to themselves, their affiliates, or third parties from plan assets or generated them through improper leveraging of plan assets.

226.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiffs and the ERISA Subclass, including but not limited to:

(a)     an accounting;

(b)     a surcharge;

(c)     correction of the transactions;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

    (i)      an injunction against further violations; and/or

    (j)      any other remedy the Court deems proper.

## COUNT VIII

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against Cigna and/or CHL on Behalf of the Nationwide Class

227.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

### General RICO Allegations

228.    Plaintiffs, the Class members, Cigna, CHL, Argus and OptumRx are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

229.    At all relevant times, Cigna and/or CHL were associated with an enterprise consisting of Argus ("Argus Enterprise").

230.    Argus is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

231.    At all relevant times, Cigna and/or CHL were associated with an enterprise consisting of OptumRx ("OptumRx Enterprise").

232.    OptumRx is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

233.    At all relevant times, Argus and OptumRx have been engaged in, and their activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

234.    Cigna and/or CHL are legally and factually distinct from OptumRx and from Argus.

235.    Cigna and/or CHL and Argus are separate and distinct from the pattern of racketeering acts in which Argus engaged.

236.    Cigna and/or CHL and OptumRx are separate and distinct from the pattern of racketeering acts in which OptumRx engaged.

237.   Cigna and/or CHL created its own in-house Pharmacy Benefit Manager, Cigna Pharmacy Management, to oversee and control the affairs of PBMs such as Argus and OptumRx including by determining the prescription drug formulary, determining the pricing for prescription drugs and determining the copayment amounts to be paid by Plan members.

238.   Cigna and/or CHL agreed to and did conduct and participate in the conduct of the Argus Enterprise and the OptumRx Enterprise.  Cigna and/or CHL operated and managed the affairs of Argus Enterprise and the OptumRx Enterprise through contracts and agreements through which Cigna and/or CHL was able to and did exert control over Argus and OptumRx.

239.   Cigna and/or CHL "utilize Optum[Rx]'s technology and service platforms, retail network contracting and claims processing services."

240.   OptumRx's Provider Manual provides that OptumRx "acting on behalf of applicable Client or Benefit Plan Sponsor," in this case, Cigna and/or CHL, will process claims for medically necessary prescription drugs dispensed to Plaintiffs and Class members.[26]

241.   On information and belief, Argus also has manuals and written policies that describe the manner in which it processes claims for medically necessary prescription drugs dispensed to Plaintiffs and Class members in relation to Cigna and/or CHL.

242.   Cigna and/or CHL had the ability to and did in fact direct the OptumRx Enterprise and the Agus Enterprise to intentionally misrepresent the cost-sharing amount Plaintiffs and Class members were required to pay to receive medically necessary prescription drugs.  Cigna and/or CHL further directed Argus and OptumRx to direct pharmacies to collect a specified cost-sharing amount.  This specified cost-sharing amount exceeded the amount Cigna and/or CHL had promised Plaintiffs and the Class members they would pay for medically necessary prescription

---

[26] OptumRx Provider Manual (2d ed. 2017) at 44.

drugs.  After Plaintiffs and Class members overpaid for the medically necessary prescription drugs, Cigna and/or CHL directed Argus and OptumRx to direct the pharmacies to return to Argus and OptumRx a portion of the cost-sharing amount that Plaintiffs and the Class members had paid to the pharmacies.  Cigna and/or CHL then directed Argus and OptumRx to return some or all of these funds to Cigna and/or CHL.

243.    Cigna Pharmacy Management Senior Vice President Michelle Vancura, in a 2015 presentation "Take Your PBM Contract Negotiation Skills to the Next Level," identified this lucrative and so-called "Zero Balance Claim handling" as one of the "Financial Performance Guarantees" that negotiators needed to focus on to provide long term value.[27]

244.    As described herein, Argus and OptumRx are separate legal entities.  The purpose of Argus and of OptumRx is to provide Plaintiffs and Class members medically necessary prescription drugs in accordance with the terms of their Plans with Cigna and/or CHL.  Argus and OptumRx each provide pharmacy benefit management services to Cigna and/or CHL and other healthcare services companies. These services include retail network contracting and claims processing services.   Argus' and OptumRx's legitimate and lawful activities are not being challenged in this Complaint.

245.    Cigna and/or CHL, however, also direct the Argus Enterprise and OptumRx Enterprise to serve an unlawful purpose; that is, to create a mechanism through which Cigna and/or CHL could obtain additional monies beyond what Plaintiffs and Class members should have paid under their Plans for medically necessary prescription drugs.  This "Clawback Scheme" was not legitimate.

---

[27] Michelle Vancura, Take Your PBM Contract Negotiation Skills to the Next Level, (Aug. 20, 2015) at 10.

246.    Argus and OptumRx have existed for several years and remain in existence.

247.    Cigna and/or CHL agreed to and did conduct and participate in the conduct of Argus Enterprise's and the OptumRx Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and the Class members. Cigna and/or CHL used Argus and OptumRx to facilitate their goals of overcharging for medically necessary prescription drugs and were unjustly enriched by overcharging for medically necessary prescription drugs.

**Predicate Racketeering Acts**

248.    As described herein, Cigna and/or CHL directly and indirectly conducted and participated in the conduct of Argus Enterprise's and the OptumRx Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and Class members.

249.    Pursuant to and in furtherance of its fraudulent "Clawback Scheme," Cigna and/or CHL directed Argus and OptumRx to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their "Clawback Scheme," including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

250.    As alleged herein, Cigna and/or CHL directed Argus and OptumRx to engage in a fraudulent "Clawback Scheme" to defraud Plaintiffs and Class members. The "Clawback Scheme" entails: (a) Cigna and/or CHL representing to Plaintiffs and Class members through form insurance policy language that they would pay a certain amount for prescription drugs; (b) Cigna and/or CHL entering into agreements with Argus, OptumRx, and other PBMs, through which the PBMs agreed to process claims submitted by Plaintiffs and the Class members for

medically necessary prescription drugs in accordance with the terms of a particular Plan; (c) Argus'
and OptumRx's creation of pharmacy networks through which Plaintiffs and Class members could
receive medically necessary prescription drugs by way of agreements requiring pharmacies
participating in the pharmacy networks to charge for medically necessary prescription drugs only
the amounts specified by the PBMs; (d) Argus' and OptumRx's misrepresenting the correct charge
for medically necessary prescription drugs as specified in Plaintiffs and Class members's Plans,
and directing pharmacies participating in the pharmacy networks to collect those improper
amounts; (e) Cigna and/or CHL's retention of a portion of the amounts improperly collected by
pharmacies, in violation of the Plaintiffs and Class members's Plans with Cigna and/or CHL; and
(f) Cigna and/or CHL imposing an agreement (1) barring pharmacies from advising Plaintiffs and
Class members that they could pay less for a drug by purchasing it outside of their respective Plans
and (2) barring pharmacies from selling in a transaction that would avoid the overcharge.

251.     Cigna and/or CHL's "Clawback Scheme" includes various misrepresentations and
omissions of material fact, including, but not limited to: (a) the representation in the plain form
language of the policy that Class members would pay a certain amount for prescriptions drugs with
knowledge and intent that Class members would be charged a higher amount; (b) the failure to
disclose that a material portion of the "co-payments" were neither payments for prescription drugs
nor were they "co-" payments by the insureds in conjunction with a payment by the insurer for the
prescription drugs, as required by the Plans' plain language, but rather were unlawful payments to
Cigna and/or CHL; (c) the failure to disclose that prescription drug payments under deductible
portions of health insurance policies were based on prescription drug prices that exceeded the
contracted fee between Argus and OptumRx and the pharmacies, as required by the Plans' plain
language; (d) the failure to disclose that co-insurance payments were based on prescription drug

prices that exceeded the contracted fee between the Argus and OptumRx and the pharmacies, as required by the Plans' plain language; and (e) the failure to disclose its required agreement (1) barring pharmacies from advising Plaintiffs and Class members that they could pay less for a drug by purchasing it outside of their respective Plans and (2) barring pharmacies from selling in a transaction that would avoid the overcharge.

252.    In sum, Cigna and/or CHL's "Clawback Scheme" took money from Plaintiffs and Class members through deceit and false pretenses. Cigna and/or CHL intentionally devised such a "Clawback Scheme" and were knowing and active participants in the scheme to defraud Plaintiffs and Class members. Cigna and/or CHL knew that they overcharged for medically necessary prescription drugs and that they would claw back such amounts. Cigna and/or CHL specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

253.    It was and is reasonably foreseeable to Cigna and/or CHL that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means:  (a) whenever a Plaintiff or Class member seeks to fill a prescription, the pharmacies participating in Argus' and OptumRx's pharmacy networks enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to Argus and OptumRx for adjudication; (b) Cigna and/or CHL and/or Argus' and/or OptumRx's clawing back of money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiffs and Class members make payments at pharmacies participating in Argus' and OptumRx's pharmacy networks using credit or debit cards, which require the use of use of interstate wire transmissions; (d) prescription drugs that Plaintiffs and Class members purchased through Cigna and/or CHL's fraudulent scheme were delivered by mail or interstate carrier and (e) Cigna and/or CHL's, Argus' and OptumRx's

representatives communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

254.    Cigna and/or CHL knew that Plaintiffs and Class members would reasonably rely on the accuracy, completeness, and integrity of their and Argus' and OptumRx's statements.  The Plaintiffs and Class members participants did so rely, to their detriment, on Cigna and/or CHL's misrepresentations and omissions.

255.    Having devised its "Clawback Scheme," and intending to defraud Plaintiffs and Class members, on or about the dates set forth below, Cigna and/or CHL intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

(a)    On October 7, 2014, Cigna and/or CHL intentionally directed Argus or OptumRx[28] to fraudulently direct a pharmacy to collect from a Class member a $6.47 co-payment for the prescription drug Sertraline—*a 134% premium over the actual $6.47 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $3.71 overcharge.

(b)    On November 6, 2014, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect

---

[28] Due to the Defendants' fraudulent concealment of this scheme and the "gag clauses" that threaten pharmacies' participation in the provider networks if they reveal the overcharge scheme, Plaintiffs are not able to determine for all transactions whether OptumRx or Argus served as the PBM.  Despite Defendants' concealment, Plaintiffs have identified some specific OptumRx transactions delineated below.  The identity of the PBM for all transactions will be revealed in discovery.

from a Class member a $10.00 co-payment for the prescription drug Azithromycin—*a 233% premium over the actual $4.29 fee* paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $5.71 overcharge.

        (c)    On November 10, 2014, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $20 copayment for the prescription drug Amlodipine Besylate—*greater than ten times (1,043%) more than the actual $1.75 fee* paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $18.25 overcharge.

        (d)    On November 11, 2014, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $20 copayment for the prescription drug Clopidogrel—*a 468% premium over the actual $3.52 fee* paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $16.48 overcharge.

        (e)    On September 5, 2015, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $7.68 co-payment for the prescription drug Vitamin D—*a 299% premium*

*over the actual $2.57 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $5.11 overcharge.

   (f) On January 15, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.99 co-payment for the prescription drug Melacoxam—*a 344% premium over the actual $2.03 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $4.96 overcharge.

   (g) On July 22, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $10.00 co-payment for the prescription drug Atorvastatin—*a 246% premium over the actual $4.06 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $5.94 overcharge.

   (h) On September 5, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $5.38 co-payment for the prescription drug Prednisolone—*a 131% premium over the actual $4.11 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not

require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $1.27 overcharge.

(i)        On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.47 co-payment for the prescription drug Sertraline—*a 134% premium over the actual $6.47 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $3.71 overcharge.

(j)        On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.63 co-payment for the prescription drug SMZ/TMP—*a 191% premium over the actual $2.28 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $4.35 overcharge.

(k)        On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $15.00 co-payment for the prescription drug Mupirocin—*a 81% premium over the actual $8.27 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $6.73 overcharge.

(l)    On December 2, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $10.00 co-payment for the prescription drug Bupropion—*a 440% premium over the actual $2.27 fee* paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's Plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $7.73 overcharge.

(m)    On January 19, 2016 and February 17, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 336% premium over the actual $2.97 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $7.03 overcharge.

(n)    On March 21, 2016, April 19, 2016, and May 16, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

(o)    On May 9, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol

a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

(p)  On December 28, 2015, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $4.64 copayment for a prescription drug—*a 118% premium over the actual $3.91 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL  later clawed back from Robichaux's Pharmacy the $0.73 overcharge.

(q)  On January 20, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $7.31 copayment for a prescription drug—*a 300% premium over the actual $2.43 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL  later clawed back from Robichaux's Pharmacy the $4.88 overcharge.

(r)  On January 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—*a 276% premium over the actual $2.11 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was

fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL  later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

(s)     On January 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.21 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL  later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

(t)     On January 26, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 135% premium over the actual $7.37 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL  later clawed back from Robichaux's Pharmacy the $2.63 overcharge.

(u)     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—*a 276% premium over the actual $2.11 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount

and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

(v)     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.21 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

(w)     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 245% premium over the actual $4.07 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

(x)     On March 15, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 401% premium over the actual $2.49 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $7.51 overcharge.

(y)      On March 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $6.00 copayment for a prescription drug—*a 284% premium over the actual $2.11 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.89 overcharge.

(z)      On April 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 172% premium over the actual $5.80 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $4.20 overcharge.

(aa)      On August 1, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $9.98 copayment for a prescription drug—*a 459% premium over the actual $2.17 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $7.81 overcharge.

(bb)      On August 8, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol

a $10.00 copayment for a prescription drug—*a 193% premium over the actual $5.18 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $4.82 overcharge.

(cc)    On January 19, 2016, March 15, 2016, June 7, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copyament for a prescription drug—*a 311% premium over the actual $3.21 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $6.79 overcharge.

(dd)    On February 22, 2016, April 18, 2016, June 7, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copyament for a prescription drug—*a 245% premium over the actual $4.07 fee* paid to the Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

256.    On or about these dates OptumRx sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether the Class members and the prescription drugs were covered under their Plans and how much Class members should pay for the drugs; (b)

processing the Class members's payments for such prescription drugs; and (c) processing Cigna and/or CHL's payments to and/or "Clawback" from the pharmacies.

257.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

258.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

259.    The predicate acts were each related to one another in that: (a) Cigna and/or CHL directed Argus and OptumRx to undertake each predicate act with a similar purpose of effectuating its scheme to defraud Plaintiffs and Class members; (b) each predicate act involved the same participants – Cigna and/or CHL, which directed Argus and OptumRx to make the fraudulent statements; and pharmacies within Argus' and OptumRx's pharmacy networks, which received the fraudulent statements and relied upon them in charging Plaintiffs and the Class, and Plaintiffs and Class members, in reliance on them, paid the fraudulent amounts for medically necessary prescription drugs; (c) each predicate act involved similar victims – Plaintiffs and Class members who purchased medically necessary prescription drugs in accordance with the terms of their Plans; and (d) each predicate act was committed the same way – in response to a request from a Plaintiff or Class member to purchase medically necessary prescription drugs, the pharmacy participating in Argus' and OptumRx's pharmacy networks transmitted a request via U.S. Mail or interstate wire to Argus or OptumRx, using the U.S. Mail or interstate wire, responded at Cigna and/or CHL's direction with fraudulent statements directing the pharmacy to execute Cigna and/or CHL's scheme, and Cigna and/or CHL later effectuated its scheme by using the U.S. Mail or interstate wire to claw back the overcharge; and (e) the predicate acts could not have been conducted, nor Cigna and/or CHL's scheme effectuated, without the existence and use of Argus and OptumRx.

260.   On information and belief, Cigna and/or CHL conducts such racketeering activity through Argus and OptumRx as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

261.   As a direct and proximate result of Cigna and/or CH's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property. Plaintiff Class members were injured by reason of Cigna and/or CHL's RICO violations because they directly and immediately overpaid for medically necessary prescription drugs. Their injuries were proximately caused by Cigna and/or CHL's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Cigna and/or CHL's RICO violations (and commission of underlying predicate acts) and, but for Cigna and/or CHL's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

262.   Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Cigna and/or CHL and other appropriate relief.

## COUNT IX

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against OptumRx on Behalf of the Nationwide Class

263.   Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

**General RICO Allegations**

264.   Plaintiffs, Class members, and OptumRx are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

265.    At all relevant times, OptumRx was associated with an enterprise alternatively consisting of OptumRx and pharmacies in OptumRx's pharmacy networks where Plaintiffs and Class members filled prescriptions subject to "Clawbacks" or consisting solely of such pharmacies (collectively, the "OptumRx Pharmacy Enterprise").

266.    The OptumRx Pharmacy Enterprise is an association in fact enterprise within the meaning of 18 U.S.C. §1961(4).

267.    At all relevant times, the OptumRx Pharmacy Enterprise has been engaged in, and its activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

268.    OptumRx is legally and factually distinct from the OptumRx Pharmacy Enterprise.

269.    OptumRx and the OptumRx Pharmacy Enterprise are separate and distinct from the pattern of racketeering acts in which they engaged.

270.    OptumRx agreed to and did conduct and participate in the conduct of the OptumRx Pharmacy Enterprise's affairs.   OptumRx operated and managed the affairs of the OptumRx Pharmacy Enterprise through a series of uniform contracts and agreements with pharmacies through which OptumRx was able to and did exert control over the OptumRx Pharmacy Enterprise.

271.    For example, OptumRx issued a Provider Manual to pharmacies participating in the OptumRx Pharmacy Enterprise.[29]

(a)    The Provider Manual "includes the policies and procedures" applicable to all pharmacies participating in OptumRx's pharmacy network and "is incorporated into and is a part of" the pharmacies' agreements with OptumRx.[30]   If the pharmacies' agreements with

---

[29]    OptumRx   Provider   Manual   (2d   ed.   2017),   *available   at*: https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/2017_pharmacy_manual.pdf.

[30] *Id.*  at 3.

OptumRx conflict with the Provider Manual, the Provider Manual "will supersede" the agreement.[31]  OptumRx "reserves the right to limit [pharmacies'] participation in a network in its sole discretion," and directs that pharmacies "shall not be allowed to opt-out of any networks without the written consent" of OptumRx.[32]  By submitting a claim to OptumRx, the pharmacies agree that they are acknowledging their participation with one another in OptumRx's pharmacy network, and that they accept "all corresponding terms and conditions, including the rates and reimbursements of Claims, for such network."[33]

       (b)    The Provider Manual provides that OptumRx "shall communicate to [pharmacies] (via the POS System) the Cost-Sharing Amounts (e.g. Co-payment and Deductible) applicable to Covered Prescription Services."[34]  OptumRx directs that pharmacies "shall collect the full Cost-Sharing Amounts" from Plaintiffs and Class members purchasing medically necessary prescription drugs.[35]  OptumRx directs that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [OptumRx's] online response and only this amount."[36] Waiving the Cost-Sharing Amount by pharmacies is "strictly prohibited . . . and is considered a material breach of the Agreement."[37]

---

[31] *Id.* at 3.

[32] *Id.*

[33] *Id.* at 44.

[34] *Id.* at 15.

[35] *Id.*

[36] *Id.* at 57.

[37] *Id.*

(c)     The Provider Manual provides that "reimbursement pricing information, as well as prices paid to [pharmacies] . . . are "confidential and proprietary. . . ."[38]

(d)     The Provider Manual provides that "[f]ailure to adhere to any of the provisions . . . which includes this [Provider Manual] . . . will be viewed as a breach of the Agreement."[39]  Pharmacies are "subject to penalties or sanctions" if OptumRx determines that the pharmacies "disclosed confidential information. . . ."[40]  These penalties include "at a minimum . . . $5,000 per incident," and pharmacies "may be subject to additional actions" by OptumRx, "up to termination from participation" in OptumRx's pharmacy network.[41]  Pharmacies terminated from participation in OptumRx's pharmacy network are banned from the pharmacy network for five years and, only after such a period, may apply for reinstatement at OptumRx's "sole discretion."[42]

272.    OptumRx operated and managed the affairs of the OptumRx Pharmacy Enterprise in part by threatening to expel pharmacies that failed to abide by the terms of its Provider Manual from OptumRx's pharmacy network.  In one instance reported by Fox8, OptumRx sent a letter to a pharmacy in which OptumRx stated that it had "recently discovered that [the] pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance

---

[38] *Id.* at 58.

[39] *Id.* at 105.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 106.

benefits."[43]   In the letter, OptumRx characterized the practice of telling Plaintiffs and Class members that they could pay less for medically necessary prescription drugs by paying out of pocket as a "violation of the agreement" pharmacies enter into with OptumRx.[44]   OptumRx explained that it "takes these matters very seriously," and warned the pharmacy that failure to comply with OptumRx's letter, "could result in further disciplinary action, up to and including termination from all Optum pharmacy networks."[45]

273.   In operating and managing the affairs of the OptumRx Pharmacy Enterprise, OptumRx exploited the uniform contracts and agreements it entered into with pharmacies to implement the fraudulent "Clawback Scheme."

274.   In particular, OptumRx directed the affairs of the OptumRx Pharmacy Enterprise by implementing what OptumRx called the "Pharmacy Reimbursement Overpayment" program. Through this program, OptumRx defrauded Plaintiffs and Class members patients by overcharging for the cost of medically necessary prescription drugs.  OptumRx overcharged for medically necessary prescription drugs by intentionally misrepresenting the cost-sharing amount Plaintiffs and Class members were required to pay to receive such drugs.  OptumRx directed the pharmacies to collect specified cost-sharing amount.  This specified cost-sharing amount exceeded the amount the other Defendants had promised Plaintiffs and the Class members they would pay for medically necessary prescription drugs.  After Plaintiffs and Class members overpaid for medically necessary prescription drugs, OptumRx directed the pharmacies to return to OptumRx

---

[43] *See* Lee Zurik, *As United overcharges customers, execs earn tens of millions in stock*, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/ zurikasunitedoverchargescustomersexecsearntensofmillionsinstock (last visited Jan. 9, 2017).

[44] *Id.*

[45] *Id.*

a portion of the cost-sharing amount that Plaintiffs and the Class members had paid to the pharmacies.   At all relevant times, OptumRx directed the affairs of the OptumRx Pharmacy Enterprise by directing pharmacies to return these sums to OptumRx; by enforcing provisions of OptumRx's Provider Manual that prohibited pharmacies from disclosing the "Clawback" practice to Plaintiffs and the Class members or from selling medically necessary prescription drugs at a price that avoided the overcharge; and by threatening pharmacies that attempted to reveal or avoid the "Clawback Scheme" with removal from OptumRx's network of pharmacies.

275.   As described herein, the OptumRx Pharmacy Enterprise has an ascertainable structure and has functioned and continues to function with a common purpose and as a continuous unit.  The purpose of the OptumRx Pharmacy Enterprise is to provide Plaintiffs and Class members medically necessary prescription drugs in accordance with the terms of their Plans.  Through the OptumRx Pharmacy Enterprise, OptumRx provides pharmacy benefit management services to the other Defendants and other healthcare services companies.   These services include creating a pharmacy network and providing administrative services, including claims processing and formulary design and management, as well as rebate management and clinical programs, drug adherence and disease/drug therapy management programs.    These legitimate and lawful activities are not being challenged in this Complaint.

276.   For OptumRx, however, the purpose of the OptumRx Pharmacy Enterprise was also to create an unlawful mechanism through which OptumRx could obtain additional monies beyond what Plaintiffs and Class members should have paid under their Plans for medically necessary prescription drugs.  This "Clawback Scheme" was not legitimate.

277.   To provide its services, the OptumRx Pharmacy Enterprise functions as a continuing, cohesive unit.  OptumRx processes claims received from pharmacies in its pharmacy

- 101 -

network, and designs formularies that specify which medically necessary prescription drugs Plaintiffs and Class members may receive through their Plans.  Pharmacies participating in OptumRx's pharmacy network physically dispense medically necessary prescription drugs to Plaintiffs and Class members, convey their insurance information to OptumRx, and receive and remit payments associated with the medically necessary prescription drugs.

278.   On information and belief, the OptumRx Pharmacy Enterprise has existed for several years and remains in existence.

279.   OptumRx agreed to and did conduct and participate in the conduct of the OptumRx Pharmacy Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and the Class members.  OptumRx used the OptumRx Pharmacy Enterprise to facilitate its goal of overcharging for medically necessary prescription drugs and was unjustly enriched by overcharging for medically necessary prescription drugs.

### Predicate Racketeering Acts

280.   As described herein, OptumRx directly and indirectly conducted and participated in the conduct of the OptumRx Pharmacy Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and Class members.

281.   Pursuant to and in furtherance of its fraudulent "Clawback Scheme," OptumRx has committed multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continues to commit such predicate acts, in furtherance of its "Clawback Scheme," including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

282.    As alleged herein, OptumRx engaged in a fraudulent "Clawback Scheme" to defraud Plaintiffs and Class members.  The "Clawback Scheme" entails: (a) OptumRx's entering into agreements with the other Defendants through which it agreed to process claims submitted by Plaintiffs and the Class members for medically necessary prescription drugs in accordance with the terms of a particular Plan; (b) OptumRx's creation of a pharmacy network through which Plaintiffs and Class members could receive medically necessary prescription drugs and entering into agreements requiring pharmacies participating in the pharmacy network to charge for medically necessary prescription drugs only the amounts specified by OptumRx, and prohibiting pharmacies participating in the pharmacy network from discussing any other amount with Plaintiffs or Class members; (c) OptumRx's misrepresenting the correct charge for medically necessary prescription drugs as specified in Plaintiffs and Class members's Plans, and directing pharmacies participating in the pharmacy network to collect those improper amounts; and (d) OptumRx's retention of a portion of the amounts improperly collected by pharmacies participating in the pharmacy network, in violation of the Plaintiffs and Class members's Plans, and enforcing its agreements with pharmacies participating in the pharmacy network to prevent them from disclosing or avoiding the unlawful and improper plan or scheme.

283.    The "Clawback Scheme" includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the failure to disclose that a material portion of the "co-payments" were neither payments for prescription drugs nor were they "co-" payments by the insureds in conjunction with a payment by the insurer for the prescription drugs, as required by the Plans' plain language, but rather were unlawful payments to OptumRx or other Defendants; (b) the failure to disclose that prescription drug payments under deductible portions of health insurance policies were based on prescription drug prices that exceeded the contracted fee between

OptumRx and pharmacies participating in OptumRx's pharmacy network, as required by the Plans' plain language; (c) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee between the OptumRx and pharmacies participating in OptumRx's pharmacy network, as required by the Plans' plain language; and (d) the failure to disclose its agreement (1) barring pharmacies from advising Plaintiffs and Class members that they could pay less for a drug by purchasing it outside of their respective Plans and (2) barring pharmacies from selling in a transaction that would avoid the overcharge.

284.   In sum, the "Clawback Scheme" took money from Plaintiffs and Class members through deceit and false pretenses.   OptumRx intentionally devised and/or implemented the "Clawback Scheme" and was a knowing and active participant in the "Clawback Scheme" to defraud Plaintiffs and Class members.   OptumRx knew that it overcharged for the costs of medically necessary prescription drugs and that it would claw back such amounts.   OptumRx specifically intended to commit fraud, and such intent can be inferred from the totality of the allegations herein.

285.   It was and is reasonably foreseeable to OptumRx that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the "Clawback Scheme," including but not limited to the following manner and means:   (a) whenever a Plaintiff or Class member seeks to fill a prescription, the pharmacies participating in OptumRx's pharmacy network enter information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to OptumRx for adjudication; (b) OptumRx's clawing back of money takes place via interstate mail or carrier or wire transmissions; (c) Plaintiffs and Class members make payments at pharmacies participating in OptumRx's pharmacy network using credit or debit cards, which require the use of use of interstate wire

transmissions; (d) prescription drugs that Plaintiffs and Class members purchased through OptumRx's fraudulent scheme were delivered by mail or interstate carrier and (e) OptumRx's representatives and pharmacies participating in OptumRx's pharmacy network communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

286.    OptumRx knew that pharmacies participating in OptumRx's pharmacy network and Plaintiffs and Class members would reasonably rely on the accuracy, completeness, and integrity of OptumRx's statements.   The pharmacies participating in OptumRx's pharmacy network and Plaintiffs and Class members participants did so rely, to their detriment, on OptumRx's misrepresentations and omissions.

287.    Having devised and/or implemented the "Clawback Scheme," and intending to defraud Plaintiffs and Class members, on or about the dates set forth below, OptumRx intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.

(a)     On January 19, 2016 and February 17, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—***a 336% premium over the actual $2.97 fee*** paid to the Robichaux's Pharmacy.   OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $7.03 overcharge.

(b)     On March 21, 2016, April 19, 2016, and May 16, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect

from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

(c)    On May 9, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.19 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

(d)    On December 28, 2015, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $4.64 copayment for a prescription drug—*a 118% premium over the actual $3.91 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $0.73 overcharge.

(e)    On January 20, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $7.31 copayment for a prescription drug—*a 300% premium over the actual $2.43 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $4.88 overcharge.

(f)     On January 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—*a 276% premium over the actual $2.11 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

(g)     On January 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.21 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

(h)     On January 26, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 135% premium over the actual $7.37 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $2.63 overcharge.

(i)     On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—*a 276% premium over the actual $2.11 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require

Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

(j)      On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 161% premium over the actual $6.21 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

(k)      On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 245% premium over the actual $4.07 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

(l)      On March 15, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 401% premium over the actual $2.49 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $7.51 overcharge.

(m)      On March 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $6.00 copayment for a prescription drug—*a 284% premium over the actual $2.11 fee* paid to the Robichaux's

Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.89 overcharge.

(n)     On April 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 172% premium over the actual $5.80 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $4.20 overcharge.

(o)     On August 1, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $9.98 copayment for a prescription drug—*a 459% premium over the actual $2.17 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $7.81 overcharge.

(p)     On August 8, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—*a 193% premium over the actual $5.18 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's Plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $4.82 overcharge.

(q)     On January 19, 2016, March 15, 2016, June 7, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff

R. Curol a $10.00 copayment for a prescription drug—*a 311% premium over the actual $3.21 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $6.79 overcharge.

(r)   On February 22, 2016, April 18, 2016, June 7, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copayment for a prescription drug—*a 245% premium over the actual $4.07 fee* paid to the Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff R. Curol's Plan did not require Plaintiff R. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

288.   On or about these dates, pharmacies in OptumRx's pharmacy network, sent and received U.S. Mail or interstate wire transmissions in connection with (a) determining whether the Class members and the prescription drugs were covered under their Plans and how much Class members should pay for the drugs; (b) processing the Class members's payments for such prescription drugs; and (c) processing OptumRx's payments to and/or "Clawback" from the pharmacies.

289.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

290.   Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a separate and distinct predicate act.

291.   The predicate acts were each related to one another and to the OptumRx Pharmacy Enterprise in that: (a) OptumRx undertook each predicate act with a similar purpose of effectuating its "Clawback Scheme" to defraud Plaintiffs and Class members; (b) each predicate act involved

the same participants – OptumRx, which made fraudulent statements; and pharmacies within OptumRx's pharmacy network, which received the fraudulent statements and relied upon them in charging Plaintiffs and the Class, and Plaintiffs and Class members, in reliance on them paid the fraudulent amounts for medically necessary prescription drugs; (c) each predicate act involved similar victims – Plaintiffs and Class members who purchased medically necessary prescription drugs in accordance with the terms of their Plans; and (d) each predicate act was committed the same way – in response to a request from a Plaintiff or Class member to purchase medically necessary prescription drugs, the pharmacy participating in OptumRx's pharmacy network transmitted a request via U.S. Mail or interstate wire to OptumRx, OptumRx, using the U.S. Mail or interstate wire, responded with fraudulent statements directing the pharmacy to execute OptumRx's scheme, and OptumRx later effectuated its "Clawback Scheme" by using the U.S. Mail or interstate wire to claw back the overcharge from the pharmacy; and (e) the predicate acts could not have been conducted, nor OptumRx's scheme effectuated, without the existence and use of the OptumRx Pharmacy Enterprise.

292.    On information and belief, OptumRx conducts such racketeering activity as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

293.    As a direct and proximate result of OptumRx's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property. Plaintiff Class members were injured by reason of OptumRx's RICO violations because they directly and immediately overpaid for medically necessary prescription drugs. Their injuries were proximately caused by OptumRx's violations of 18 U.S.C. §1962(c) because these injuries were

the foreseeable, direct, intended, and natural consequence of OptumRx's RICO violations (and commission of underlying predicate acts) and, but for OptumRx's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

294.     Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from OptumRx and other appropriate relief.

## COUNT X

### Violation of RICO, 18 U.S.C. §1962(d)

### Against All Defendants on Behalf of the Nationwide Class

295.     Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

296.     During the Class Period, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Defendants conspired with themselves and/or with other unnamed health insurance companies, including United Healthcare that use OptumRx to engage in the "Clawback Scheme."  Defendants conspired with themselves and/or with other unnamed PBMs, including Argus to engage in the "Clawback Scheme."  Defendants conduct and participate, directly or indirectly, in the conduct of the affairs of the Argus Enterprise (described above), the OptumRx Enterprise (described above) and/or the OptumRx Pharmacy Enterprise (described above) through a pattern of racketeering activity (described above) which resulted in Plaintiffs and Class members overpaying for medically necessary prescription drugs.  The conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

297.     In furtherance of this conspiracy, Cigna and/or CHL and/or OptumRx and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in

violation of 18 U.S.C. §1343.  Cigna and/or CHL and/or OptumRx agreed to and did engage in a fraudulent "Clawback Scheme" to defraud Plaintiffs and Class members (described above).  Cigna and/or CHL and/or OptumRx intended to defraud Plaintiffs and Class members by overcharging for medically necessary prescription drugs (described above).  Cigna and/or CHL and/or OptumRx reasonably foresaw that the U.S. Mail and/or interstate wire would be used in furthering the "Clawback Scheme."  Cigna and/or CHL and/or OptumRx used the U.S. Mail and/or interstate wire to effectuate the "Clawback Scheme" by transmitting various misrepresentations and omissions of material fact resulting in overcharges for medically necessary prescription drugs (described above).

298.    Cigna and/or CHL and/or OptumRx knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the "Clawback Scheme" (described above).

299.    As a direct and proximate result, and by reason of the activities of Cigna and/or CHL and/or OptumRx and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class have been injured in their business and property within the meaning 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclass, pray for relief as follows as applicable for the particular claim:

A.    Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Class and Subclass;

B.    Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C.      Finding that Defendants violated their fiduciary duties of loyalty and prudence to ERISA SubClass members and awarding Plaintiffs and the ERISA Subclass such relief as the Court deems proper;

D.      Finding that Defendants engaged in prohibited transactions and awarding Plaintiffs and the ERISA Subclass such relief as the Court deems proper;

E.      Finding that Defendants denied Plaintiffs, the Class, and the Subclass benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.      Enjoining Defendants from further such violations;

G.      Finding that Plaintiffs and the ERISA Subclass are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.      Awarding Plaintiffs, the Class, and the Subclass damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.      Ordering Defendants to restore all losses to Plaintiffs and the ERISA Subclass and disgorge unjust profits and/or other assets of the ERISA Plans

J.      Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiffs and the ERISA Subclass to restore Plaintiffs' losses, remedy Defendants' windfalls, and put Plaintiffs in the position that they would have been in if the fiduciaries of the ERISA Plans had not breached their duties or committed prohibited transactions;

K.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Subclass and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the ERISA Subclass, including as pharmacy benefit administrators and managers;

L.       Awarding treble damages in favor of Plaintiffs and the Class members against all Defendants for all damages sustained as a result of Defendants' violations of RICO, in an amount to be proven at trial, including interest thereon;

M.      Awarding Plaintiffs, the Class, and the Subclass equitable relief to the extent permitted by the above claims;

N.       Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

O.      Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

P.       Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18. U.S.C. § 1964(c).

Q.      Awarding Plaintiffs, the Class, and the Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

R.       Finding that Defendants are jointly and severally liable for all claims; and

S.       Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: January 19, 2017                    Respectfully submitted,

                                           /s/ Robert A. Izard
                                           Robert A. Izard (ct01601)
                                           *Plaintiffs' Interim Co-Lead Class Counsel*
                                           Craig A. Raabe (ct04116)
                                           Christopher M. Barrett (ct30151)
                                           **IZARD, KINDALL & RAABE, LLP**
                                           29 South Main Street, Suite 305
                                           West Hartford, CT 06107
                                           Telephone:  860-493-6292
                                           Facsimile: 860-493-6290
                                           rizard@ikrlaw.com
                                           craabe@ikrlaw.com
                                           cbarrett@ikrlaw.com

                                           William H. Narwold (ct00133)
                                           *Plaintiffs' Interim Co-Lead Class Counsel*
                                           Mathew Jasinski, (ct27520)
                                           **MOTLEY RICE LLC**
                                           One Corporate Center
                                           20 Church Street, 17th Floor
                                           Hartford, CT 06103
                                           Telephone:  860-882-1681
                                           Facsimile:   860-882-1682
                                           bnarwold@motleyrice.com
                                           mjasinski@motleyrice.com

                                           Joseph P. Guglielmo (ct27481)
                                           *Plaintiffs' Executive Committee Chair*
                                           Carey Alexander, *pro hac vice*
                                           **SCOTT+SCOTT,**
                                           **ATTORNEYS AT LAW, LLP**
                                           The Helmsley Building
                                           230 Park Avenue, 17th Floor
                                           New York, NY 10169
                                           Telephone:  212-223-6444
                                           Facsimile:   212-223-6334
                                           jguglielmo@scott-scott.com
                                           calexander@scott-scott.com

Erin Green Comite (ct24886)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:   860-537-4432
ecomite@scott-scott.com

Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
**KELLER ROHRBACK, LLP**
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:   206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**ZIMMERMAN REED, LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:   612-341-0844
brian.gudmundson@zimmreed.com

Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**LEMMON LAW FIRM LLC**
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:   985-783-1333
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:   504-581-2156
andrew@lemmonlawfirm.com

Ronen Sarraf (ct_____)
*Plaintiffs' Executive Committee Member*
Joseph Gentile, *pro hac vice pending*
**SARRAF GENTILE LLP**
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:  516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
**LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:  612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

Brad J. Moore
**STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER**
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
**WHITFIELD, BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035
Dan@wbmllp.com
Jeremy@wbmllp.com

Additional Counsel for Plaintiffs