# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, and ROGER CUROL, Individually and on Behalf of All Others Similarly Situated, | Civil No. 16-cv-1702<br><br>**AMENDED RICO CASE STATEMENT** |
| Plaintiffs, | |
| vs. | |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC., | |
| Defendants. | |

Pursuant to the Court's Standing Order in Civil RICO Cases, Plaintiffs respectfully submit this Amended RICO Case Statement.

**1.      The alleged unlawful conduct that is claimed to be in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d).**

Defendants Cigna Corporation ("Cigna"), Cigna Health and Life Insurance Company ("CHL"), and OptumRx, Inc. ("OptumRx") (collectively, "Defendants") violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.  Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate Section 1962(c).

The unlawful conduct in violation of RICO consisted of the creation and execution of a scheme to unlawfully and improperly inflate the cost of medically necessary prescription drugs

and to clawback a portion of the payments Plaintiffs and the Class made to receive prescription drugs. In summary, Defendants' clawback scheme worked as follows: Cigna and/or CHL entered into agreements with Plaintiffs and the Class setting forth the amount that Plaintiffs and the Class would pay to receive prescription drugs. Cigna and/or CHL also entered into agreements with pharmacy benefit managers ("PBMs"), including OptumRx and non-party Argus Health Systems, Inc. ("Argus"), which established networks of participating pharmacies that the PBMs controlled through various contracts. The participating pharmacies were those at which Plaintiffs and the Class were authorized to have their prescriptions filled. The contracts between the PBMs and the participating pharmacies required the pharmacies to collect whatever sums the PBMs directed the pharmacies to collect. Cigna and/or CHL executed the clawback scheme through agreements with Argus and OptumRx, directing the PBMs to collect specific amounts from Plaintiffs and the Class. OptumRx executed the clawback scheme through agreements with pharmacies participating in OptumRx's pharmacy network, directing the pharmacies to collect specific amounts from Plaintiffs and the Class. Defendants would direct the pharmacies to collect sums greater than the amount that Plaintiffs and the Class had agreed to pay to receive medically necessary prescription drugs. Defendants would then direct the pharmacies to remit to Defendants the inflated sums collected from Plaintiffs and the Class.

As described more fully below, Plaintiffs have alternatively pled the existence of four separate and distinct enterprises:

1. In Count VIII, against Cigna and/or CHL, a legal entity enterprise consisting of Argus;

2. In Count VIII, against Cigna and/or CHL, a legal entity enterprise consisting of OptumRx;

    3.      In Count IX, against OptumRx, an association-in-fact enterprise consisting of (i) OptumRx and (ii) the pharmacies in OptumRx's pharmacy network; and

    4.      In Count IX, against OptumRx, an association-in-fact enterprise consisting of the pharmacies in OptumRx's network.

In all instances, Defendants' clawback scheme was intended to and did deprive Plaintiffs and the Class of their property by charging them more to receive medically necessary prescription drugs than they had agreed to pay. Defendants conspired amongst themselves and others to create and execute the clawback scheme.

The clawback scheme included various misrepresentations and omissions of material fact, including but not limited to:

    1.      Cigna and/or CHL's misrepresentation to Plaintiffs in the language of the agreements constituting their health insurance plans that Plaintiffs would pay a certain amount to receive prescriptions drugs when Defendants knew that they intended to (and did) cause Plaintiffs to pay more to receive prescription drugs;

    2.      Defendants' failure to disclose that the amounts collected from Plaintiffs to receive medically necessary prescription drugs were not the amounts Plaintiffs had agreed to pay in their agreements with Cigna and/or CHL, but were payments in excess of those amounts and constituted unlawful and improper payments to Defendants; and

    3.      Defendants' misrepresentations to pharmacies, with the intention that the pharmacies would rely on Defendants' statements (which they did), that the amounts the pharmacies were to collect from Plaintiffs to receive medically

necessary prescription drugs were the amounts that Plaintiffs had agreed to pay to receive prescription drugs.

Defendants could reasonably foresee that the U.S. Mails and/or interstate wires would be used – and they were, in fact, used – to facilitate Defendants' clawback scheme in the following ways:

1.  Cigna and/or CHL used the U.S. Mails and/or interstate wires to transmit, *inter alia*, insurance policies, applications, agreements, summaries, and related documents to Plaintiffs, as well as information to Plaintiffs and the Class regarding the adjudication and determination of payments for medically necessary prescription drugs;

2.  Argus and/or OptumRx used the U.S. Mail and/or interstate wires to transmit, *inter alia*, provider manuals and service agreements to pharmacies, as well as information to Plaintiffs and the Class regarding the adjudication and determination of payments for medically necessary prescription drugs.

3.  Plaintiffs paid their premiums to Cigna and/or CHL through the U.S. Mails and/or interstate wires;

4.  Defendants transmitted prescription drugs to pharmacies through the U.S. Mails and/or interstate carriers;

5.  Argus, OptumRx, and pharmacies participating in their networks used the U.S. Mails and/or interstate wires to transmit information about Plaintiffs' health insurance information whenever a prescription was filled and whenever a claim was adjudicated.  Pharmacies participating in Argus' and/or OptumRx's networks would transmit Plaintiffs' health insurance information to Argus and/or OptumRx,

and Argus and/or OptumRx would transmit to the pharmacies the amount that the pharmacies were required to collect from Plaintiffs to receive medically necessary prescription drugs, as well as information to Plaintiffs and the Class regarding the adjudication and determination of payments for medically necessary prescription drugs.  OptumRx, for example, stated in its Provider Manual that it would communicate to pharmacies via a POS System the amount the pharmacies were to collect from Plaintiffs;

6. Following the completion of the adjudication process, Argus and/or OptumRx used the U.S. Mails and/or interstate wires to claw back from pharmacies the inflated amounts they had directed the pharmacies to collect from Plaintiffs. Argus and/or OptumRx would, at Cigna and/or CHL's direction, then use the U.S. Mails and/or interstate wires to remit to Cigna and/or CHL the sums Argus and/or OptumRx had collected from the pharmacies; and

7. Defendants used the U.S. Mails and/or interstate wires to agree to create and execute the clawback scheme and used the U.S. Mails and/or interstate wires in furtherance of the clawback scheme.

Defendants' clawback scheme was executed on the dates and locations described below in Paragraph (5)(b).

**2.  The identity of each defendant and the alleged misconduct and basis of liability of each defendant.**

**Cigna Corporation** is a global health services organization.  The **Cigna Health and Life Insurance Company** is a wholly owned subsidiary of Cigna.  CHL underwrites life and health insurance policies, including those held by Plaintiffs.  Cigna Pharmacy Management, a division

of CHL, outsources certain PBM and administrative functions to other PBM service providers, including Argus and OptumRx.[1]

Plaintiffs allege that Cigna and/or CHL conducted or participated in the conduct of the affairs of Argus and OptumRx as legal entity enterprises through a pattern of racketeering activity.  Specifically, Plaintiffs allege that Cigna and/or CHL entered into agreements with Plaintiffs whereby Plaintiffs agreed to pay a certain amount to receive medically necessary prescription drugs.  In spite of those agreements, Cigna and/or CHL directed Argus and OptumRx to:  (1) engage in mail and/or wire fraud by intentionally misrepresenting to pharmacies participating in Argus' and OptumRx's pharmacy networks the amount that the pharmacies were required to collect from Plaintiffs to purchase medically necessary prescription drugs; (2) direct pharmacies to collect inflated payments from Plaintiffs; (3) collect from pharmacies the inflated payments the pharmacies had collected from Plaintiffs; and (4) remit those sums to Cigna and/or CHL.

**OptumRx, Inc.** is a pharmacy benefit manager and wholly owned subsidiary of UnitedHealth Group Incorporated.  In 2015, OptumRx purchased Catamaran Corporation, which had a contract with Cigna and/or CHL to provide pharmacy benefit management services.  OptumRx assumed the responsibilities under that contract and currently provides pharmacy benefit management services to Cigna and/or CHL.

Plaintiffs allege that OptumRx conducted or participated in the conduct of association-in-fact enterprises consisting alternatively of:  (1) OptumRx and the pharmacies in OptumRx's pharmacy network; or (2) the pharmacies in OptumRx's pharmacy network.  Specifically,

---

[1] Cigna and CHL are referred to interchangeably in this statement and in Plaintiffs' Consolidated Complaint because, without discovery, it is not yet known which entity is responsible for conduct carried out in Cigna's name, including which entity directs the affairs of Argus and OptumRx.

Plaintiffs allege that OptumRx directed the affairs of these enterprises through the use of its Provider Manual, a contractual agreement between OptumRx and pharmacies participating in OptumRx's pharmacy network, which required the pharmacies to adhere to specific practices as directed by OptumRx.  OptumRx directed the affairs of the alleged enterprises by determining and adjudicating pharmacy claims, which resulted in Plaintiffs and the Class paying inflated sums to receive medically necessary prescription drugs.  OptumRx engaged in mail and/or wire fraud by misrepresenting to the pharmacies participating in OptumRx's pharmacy network the amount that the pharmacies were required to collect from Plaintiffs to purchase medically necessary prescription drugs.  OptumRx directed the pharmacies to collect inflated payments from Plaintiffs and to remit those sums to OptumRx.

**3.     The identity of the alleged wrongdoers, other than the defendants listed in response to paragraph 2, and the alleged misconduct of each wrongdoer.**

Plaintiffs allege that Argus is a non-party wrongdoer.  The alleged misconduct Argus engaged in is similar to the misconduct in which OptumRx engaged, described above in Paragraph 2, except that its conduct was directed toward pharmacies participating in Argus' pharmacy network.

**4.     The identity of the alleged victims and the manner in which each victim was allegedly injured.**

Defendants' clawback scheme injured Plaintiffs and the Class by causing them to pay more to receive medically necessary prescription drugs than they had agreed to pay under the terms of their plans with Cigna and/or CHL, in violation of the law.

**5.     A description of the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim, which shall include the following information:**

      **a.     The alleged predicate acts and the specific statutes which were allegedly violated;**

Pursuant to and in furtherance of their clawback scheme, Defendants committed multiple, related predicate acts within the relevant time period and within the last ten years that are indictable as mail and/or wire fraud pursuant to 18 U.S.C. §§ 1341 & 1343.

**b.     The dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;**

Plaintiffs identified in their Consolidated Complaint the following predicate acts, participants, and facts surrounding the predicate acts.  The following responses state with particularity the circumstances surrounding Plaintiffs' allegations of mail and/or wire fraud, including by identifying, to the extent currently known, the time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made.

As to Cigna and/or CHL:

1.     On October 7, 2014, Cigna and/or CHL intentionally directed Argus or OptumRx[2] to fraudulently direct a pharmacy to collect from a Class member a $6.47 copayment for the prescription drug Sertraline—a 134% premium over the actual $6.47 fee paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $3.71 overcharge.

---

[2] As explained in Plaintiffs' Consolidated Complaint, due to Defendants' fraudulent concealment of the clawback scheme, including but not limited to gag clauses preventing pharmacies from discussing and disclosing communications with Argus and/or OptumRx, Plaintiffs are not able to determine for all transactions whether OptumRx or Argus served as the PBM.  Despite Defendants' concealment, Plaintiffs have identified some specific OptumRx transactions delineated below.  Plaintiffs believe that the identity of the PBM is known by Defendants and will be revealed in discovery.

2.      On November 6, 2014, Cigna and/or CHL intentionally directed Argus or
OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy
network to collect from a Class member a $10.00 copayment for the prescription
drug Azithromycin—a 233% premium over the actual $4.29 fee paid to the
pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to
deliver was fraudulent because the Class member's plan did not require the Class
member to pay that amount and Cigna and/or CHL knew the same.  Through
Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the
$5.71 overcharge.

3.      On November 10, 2014, Cigna and/or CHL intentionally directed Argus or
OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy
network to collect from a Class member a $20 copayment for the prescription
drug Amlodipine Besylate—greater than ten times (1,043%) more than the actual
$1.75 fee paid to the pharmacist.  The statement Cigna and/or CHL directed
Argus or OptumRx to deliver was fraudulent because the Class member's plan did
not require the Class member to pay that amount and Cigna and/or CHL knew the
same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from
the pharmacy the $18.25 overcharge.

4.      On November 11, 2014, Cigna and/or CHL intentionally directed Argus or
OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy
network to collect from a Class member a $20 copayment for the prescription
drug Clopidogrel—a 468% premium over the actual $3.52 fee paid to the
pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to

deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $16.48 overcharge.

5. On September 5, 2015, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $7.68 copayment for the prescription drug Vitamin D—a 299% premium over the actual $2.57 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $5.11 overcharge.

6. On January 15, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.99 copayment for the prescription drug Melacoxam—a 344% premium over the actual $2.03 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same. Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $4.96 overcharge.

7.    On July 22, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $10.00 copayment for the prescription drug Atorvastatin—a 246% premium over the actual $4.06 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $5.94 overcharge.

8.    On September 5, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $5.38 copayment for the prescription drug Prednisolone—a 131% premium over the actual $4.11 fee paid to the pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $1.27 overcharge.

9.    On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.47 copayment for the prescription drug Sertraline—a 134% premium over the actual $6.47 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was

fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $3.71 overcharge.

10.     On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $6.63 copayment for the prescription drug SMZ/TMP—a 191% premium over the actual $2.28 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $4.35 overcharge.

11.     On October 7, 2016, Cigna and/or CHL intentionally directed Argus or OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy network to collect from a Class member a $15.00 copayment for the prescription drug Mupirocin—an 81% premium over the actual $8.27 fee paid to the pharmacist. The statement Cigna and/or CHL directed Argus or OptumRx to deliver was fraudulent because the Class member's plan did not require the Class member to pay that amount and Cigna and/or CHL knew the same.  Through Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the $6.73 overcharge.

12.    On December 2, 2016, Cigna and/or CHL intentionally directed Argus or

OptumRx to fraudulently direct a pharmacy in Argus or OptumRx's pharmacy

network to collect from a Class member a $10.00 copayment for the prescription

drug Bupropion—a 440% premium over the actual $2.27 fee paid to the

pharmacist.  The statement Cigna and/or CHL directed Argus or OptumRx to

deliver was fraudulent because the Class member's plan did not require the Class

member to pay that amount and Cigna and/or CHL knew the same.  Through

Argus or OptumRx, Cigna and/or CHL later clawed back from the pharmacy the

$7.73 overcharge.

13.    On January 19, 2016 and February 17, 2016, Cigna and/or CHL intentionally

directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport,

Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription

drug—a 336% premium over the actual $2.97 fee paid to Robichaux's Pharmacy.

The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent

because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that

amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or

CHL later clawed back from Robichaux's Pharmacy the $7.03 overcharge.

14.    On March 21, 2016, April 19, 2016, and May 16, 2016, Cigna and/or CHL

intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in

Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a

prescription drug—a 161% premium over the actual $6.19 fee paid to

Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to

deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff

N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

15.      On May 9, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.19 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

16.      On December 28, 2015, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $4.64 copayment for a prescription drug—a 118% premium over the actual $3.91 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $0.73 overcharge.

17.      On January 20, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $7.31 copayment for a prescription drug—a 300% premium over the actual $2.43 fee paid to Robichaux's Pharmacy.  The statement Cigna

and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $4.88 overcharge.

18.     On January 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—a 276% premium over the actual $2.11 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

19.     On January 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.21 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

20.     On January 26, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 135% premium

over the actual $7.37 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $2.63 overcharge.

21.     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—a 276% premium over the actual $2.11 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

22.     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.21 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

23.     On February 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from

Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid to Robichaux's Pharmacy. The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same. Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

24.     On March 15, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 401% premium over the actual $2.49 fee paid to Robichaux's Pharmacy. The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same. Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $7.51 overcharge.

25.     On March 22, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $6.00 copayment for a prescription drug—a 284% premium over the actual $2.11 fee paid to Robichaux's Pharmacy. The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same. Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $3.89 overcharge.

26.    On April 25, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 172% premium over the actual $5.80 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $4.20 overcharge.

27.    On August 1, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $9.98 copayment for a prescription drug—a 459% premium over the actual $2.17 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $7.81 overcharge.

28.    On August 8, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 193% premium over the actual $5.18 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and Cigna

and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $4.82 overcharge.

29.     On January 19, 2016, March 15, 2016, and June 7, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copayment for a prescription drug—a 311% premium over the actual $3.21 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $6.79 overcharge.

30.     On February 22, 2016, April 18, 2016, and June 7, 2016, Cigna and/or CHL intentionally directed OptumRx to fraudulently direct Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid to Robichaux's Pharmacy.  The statement Cigna and/or CHL directed OptumRx to deliver was fraudulent because Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and Cigna and/or CHL knew the same.  Through OptumRx, Cigna and/or CHL later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

As to OptumRx:

1.     On January 19, 2016 and February 17, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect

from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 336%

premium over the actual $2.97 fee paid to Robichaux's Pharmacy.  OptumRx's

statement was fraudulent because Plaintiff N. Curol's plan did not require

Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx

later clawed back from Robichaux's Pharmacy the $7.03 overcharge.

2.     On March 21, 2016, April 19, 2016, and May 16, 2016, OptumRx intentionally

and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect

from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161%

premium over the actual $6.19 fee paid to Robichaux's Pharmacy.  OptumRx's

statement was fraudulent because Plaintiff N. Curol's plan did not require

Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx

later clawed back from Robichaux's Pharmacy the $3.81 overcharge.

3.     On May 9, 2016, OptumRx intentionally and fraudulently directed Robichaux's

Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00

copayment for a prescription drug—a 161% premium over the actual $6.19 fee

paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because

Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and

OptumRx knew the same.  OptumRx later clawed back from Robichaux's

Pharmacy the $3.81 overcharge.

4.     On December 28, 2015, OptumRx intentionally and fraudulently directed

Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a

$4.64 copayment for a prescription drug—a 118% premium over the actual $3.91

fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because

Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $0.73 overcharge.

5.  On January 20, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $7.31 copayment for a prescription drug—a 300% premium over the actual $2.43 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $4.88 overcharge.

6.  On January 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—a 276% premium over the actual $2.11 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

7.  On January 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.21 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that

amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

8.      On January 26, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 135% premium over the actual $7.37 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $2.63 overcharge.

9.      On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $5.84 copayment for a prescription drug—a 276% premium over the actual $2.11 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.73 overcharge.

10.      On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.21 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.79 overcharge.

11.   On February 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

12.   On March 15, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 401% premium over the actual $2.49 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $7.51 overcharge.

13.   On March 22, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $6.00 copayment for a prescription drug—a 284% premium over the actual $2.11 fee paid to Robichaux's Pharmacy.  OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same.  OptumRx later clawed back from Robichaux's Pharmacy the $3.89 overcharge.

14.   On April 25, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00

copayment for a prescription drug—a 172% premium over the actual $5.80 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $4.20 overcharge.

15.     On August 1, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $9.98 copayment for a prescription drug—a 459% premium over the actual $2.17 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $7.81 overcharge.

16.     On August 8, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff N. Curol a $10.00 copayment for a prescription drug—a 193% premium over the actual $5.18 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff N. Curol's plan did not require Plaintiff N. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $4.82 overcharge.

17.     On January 19, 2016, March 15, 2016, and June 7, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copayment for a prescription drug—a 311% premium over the actual $3.21 fee paid to Robichaux's Pharmacy. OptumRx's

statement was fraudulent because Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $6.79 overcharge.

18.     On February 22, 2016, April 18, 2016, and June 7, 2016, OptumRx intentionally and fraudulently directed Robichaux's Pharmacy in Lockport, Louisiana to collect from Plaintiff R. Curol a $10.00 copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid to Robichaux's Pharmacy. OptumRx's statement was fraudulent because Plaintiff R. Curol's plan did not require Plaintiff R. Curol to pay that amount and OptumRx knew the same. OptumRx later clawed back from Robichaux's Pharmacy the $5.93 overcharge.

Defendants effectuated each of the acts identified in the preceding paragraphs through the use of the U.S. Mails and/or interstate wires in furtherance of the clawback scheme described in Paragraph 1.

**c.      If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The time, place and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made shall be identified;**

Plaintiffs respectfully direct the Court to Plaintiffs' response in Paragraph 5(b).

**d.      Whether there has been a criminal conviction for violation of the predicate acts;**

Plaintiffs are not aware of any criminal conviction for violation of the predicate acts.

**e.      Whether civil litigation has resulted in a judgment in regard to the predicate acts;**

Plaintiffs are not aware of any civil litigation that has resulted in a judgment in regard to the predicate acts.

**f.     The manner in which the predicate acts form a "pattern of racketeering activity";**

The predicate acts identified in Paragraph 5(b) form a pattern of racketeering activity because they consist of more than two acts of racketeering activity that have occurred within the last ten years.  In Paragraph 5(b), Plaintiffs identified dozens of clawbacks that occurred in the past several years, including between 2014 and 2016.  The clawback scheme identified in Paragraph 1, and the predicate acts identified in Paragraph 5(b), are part of Defendants' regular way of doing business.  Upon information and belief, Defendants' clawback scheme remains ongoing and continues to threaten activity indictable as mail and/or wire fraud pursuant to 18 U.S.C. §§ 1341 & 1343.

**g.     Whether the alleged predicate acts relate to each other as part of a common plan, and if so, a detailed description of the common plan.**

The predicate acts relate to each other as part of a common plan.  The common plan was to defraud Plaintiffs and the Class of their property as described in Paragraph 1.  Each predicate act had the same purpose (to defraud Plaintiffs and the Class of their property); the same result (Plaintiffs and the Class were defrauded of their property); the same participants (Cigna and/or CHL, Argus and/or OptumRx, the pharmacies participating in Argus' and/or OptumRx's pharmacy networks, Plaintiffs, and the Class); the same victims (Plaintiffs and the Class); and the same method of commission as described in Paragraph 1.  The clawback scheme in all instances related to, relied upon, and exploited the existence of the alleged enterprises.

**6.     A detailed description of the alleged enterprise for each RICO claim, which shall include:**

**a.     The names of the individuals, partnerships, corporations, associations, or other legal entities, which allegedly constitute the enterprise;**

Plaintiffs have alternatively pled the existence of four separate and distinct enterprises:

1.  In Count VIII, against Cigna and/or CHL, a legal entity enterprise consisting of Argus (the "Argus Enterprise");

2.  In Count VIII, against Cigna and/or CHL, a legal entity enterprise consisting of OptumRx (the "OptumRx Enterprise");

3.  In Count IX, against OptumRx, an association-in-fact enterprise consisting of (i) OptumRx and (ii) the pharmacies in OptumRx's pharmacy network (the "OptumRx AIF Enterprise"); and

4.  In Count IX, against OptumRx, an association-in-fact enterprise consisting of the pharmacies in OptumRx's network (the "OptumRx Pharmacy Enterprise").

**b.   The structure, purpose, function and course of conduct of the enterprise;**

The structure, purpose, function, and course of conduct of the alleged enterprises are as follows:

1.  The Argus Enterprise

    (a)   Structure:  The Argus Enterprise is a legal entity enterprise consisting of Argus Health Systems, Inc.  Argus is a wholly owned subsidiary of DST Systems, Inc., a provider of technology-based information processing and servicing solutions.

    (b)   Purpose:  Argus contracts with certain pharmacies and uses proprietary software applications, supporting technology and enhanced clinical expertise to provide pharmacy health management solutions supporting commercial, Medicaid and Medicare Part D plans.[3]

---

[3] DST Systems, Inc. (Form 10-K) (Dec. 31, 2015),
http://investors.dstsystems.com/file//Index?KeyFile=33123168&Output=3&OSID=9.

(c)     Function:  Argus' services include pharmacy claims administration, pharmacy network solutions, government programs administration, formulary and rebate management, trend control and quality compliance programs, member services, and discount drug card programs.[4]

(d)     Course of Conduct:  Argus' legitimate course of conduct, like that of most PBMs, is as follows:  When a Plaintiff or Class member presents a prescription at a pharmacy, key information such as the Plaintiff or Class member's name, the drug to be dispensed, and the quantity of the drug to be dispensed is transmitted via interstate wire to a switch that then directs the information to the correct PBM.  When that PBM is Argus, Argus processes the claim according to the benefits plan assigned to the Plaintiff or Class member.  Argus electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and Plaintiff or Class member are covered and, if so, the amount the pharmacy must collect from the Plaintiff or Class member.

2.     The OptumRx Enterprise

(a)     Structure:  The OptumRx Enterprise is a legal entity enterprise consisting of OptumRx, Inc.  OptumRx is a wholly owned subsidiary of UnitedHealth Group Incorporated.

(b)     Purpose:  OptumRx provides a full spectrum of pharmacy care services to more than 66 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country.[5]

---

[4] *Id.*

[5] UnitedHealth Group, Inc. (Form 10-K) (Dec. 31, 2015), http://www.unitedhealthgroup.com/~/media/8C945A8A1C9647A899EE8AE0EC588ADB.ashx.

(c)  Function:  OptumRx contracts with certain pharmacies and provides pharmacy care services to a number of health plans, large national employer plans, unions and trusts and government entities.  These clients rely on OptumRx for components or all of their pharmacy care services.[6]

(d)  Course of Conduct:  OptumRx's legitimate course of conduct, like that of most PBMs, is as follows:  When a Plaintiff or Class member presents a prescription at a pharmacy, key information such as the Plaintiff or Class member's name, the drug to be dispensed, and the quantity of the drug to be dispensed is transmitted via interstate wire to a switch that then directs the information to the correct PBM.  When that PBM is OptumRx, OptumRx processes the claim according to the benefits plan assigned to the Plaintiff or Class member.  OptumRx electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and Plaintiff or Class member are covered and, if so, the amount the pharmacy must collect from the Plaintiff or Class member.

3.  The OptumRx AIF Enterprise

(a)  Structure:  OptumRx AIF Enterprise is an association-in-fact enterprise consisting of (i) OptumRx; and (ii) the pharmacies in OptumRx's pharmacy network.

(b)  Purpose:  The purpose of the OptumRx AIF Enterprise is to provide integrated PBM services to member pharmacies and to provide Plaintiffs and the Class medically necessary prescription drugs in accordance with the terms of their health insurance plans.

---

[6] *Id.*

(c)     Function:  The OptumRx AIF Enterprise provides pharmacy services to Plaintiffs and Class members whose health insurance plans use OptumRx as a PBM.

(d)     Course of Conduct:  The OptumRx AIF Enterprise's legitimate course of conduct is as follows:  When a Plaintiff or Class member presents a prescription at a pharmacy in OptumRx's pharmacy network, the pharmacy collects and transmits key information such as the Plaintiff or Class member's name, the drug to be dispensed, and the quantity of the drug to be dispensed via interstate wire to a switch that then directs the information to OptumRx.  OptumRx processes the claim according to the benefits plan assigned to the Plaintiff or Class member.  OptumRx electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and Plaintiff or Class member are covered and, if so, the amount the pharmacy must collect from the Plaintiff.  The pharmacy then collects that amount from the Plaintiff and dispenses the prescription drug or Class member.

4.      The OptumRx Pharmacy Enterprise

(a)     Structure:  The OptumRx Pharmacy Enterprise is an association-in-fact enterprise consisting of the pharmacies in OptumRx's pharmacy network.

(b)     Purpose:  The purpose of the OptumRx Pharmacy Enterprise is to provide Plaintiffs and the Class medically necessary prescription drugs in accordance with the terms of their health insurance plans.

(c)     Function: The OptumRx Pharmacy Enterprise provides pharmacy services to Plaintiffs and Class members whose health insurance plans use OptumRx as a PBM.

30

(d) Course of Conduct:  The OptumRx Pharmacy Enterprise's legitimate course of conduct is as follows:  When a Plaintiff or Class member presents a prescription at a participating pharmacy in OptumRx's pharmacy network, the pharmacy collects and transmits key information such as the Plaintiff or Class member's name, the drug to be dispensed, and the quantity of the drug to be dispensed via interstate wire to a switch that then directs the information to OptumRx.  OptumRx electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and Plaintiff or Class member are covered and, if so, the amount the pharmacy must collect from the Plaintiff or Class member.  The pharmacy then collects that amount from the Plaintiff or Class member and dispenses the prescription drug.

**c. Whether any defendants are employees, officers or directors of the alleged enterprise;**

To Plaintiffs' knowledge, no Defendant is an employee, officer, or director of the alleged enterprises.

**d. Whether any defendants are associated with the alleged enterprise;**

Defendants are associated with the alleged enterprises as described above in Paragraphs 1 and 5(b) and as follows:

1. Cigna and/or CHL conduct or participate in the conduct of the Argus Enterprise and the OptumRx Enterprise and direct the affairs of those enterprises.  Cigna and/or CHL accomplish this direction and control through contractual agreements that require Argus and OptumRx to execute the clawback scheme on Cigna and/or CHL's behalf.

2. OptumRx conducts or participates in the conduct of the OptumRx AIF Enterprise and OptumRx Pharmacy Enterprise and directs the affairs of those enterprises.

OptumRx accomplishes this direction and control through contractual agreements, including but not limited to OptumRx's Provider Manual, that enable and require the OptumRx AIF Enterprise and OptumRx Pharmacy Enterprise to execute the clawback scheme on OptumRx's behalf.  OptumRx's Provider Manual "includes the policies and procedures" applicable to all pharmacies participating in OptumRx's pharmacy network and "is incorporated into and is a part of" the pharmacies' agreements with OptumRx.[7]  The Provider Manual provides that OptumRx "shall communicate to [pharmacies] (via the POS System) the Cost-Sharing Amounts (e.g. Co-payment and Deductible) applicable to Covered Prescription Services."[8]  OptumRx directs that pharmacies "shall collect the full Cost-Sharing Amounts" from Plaintiffs purchasing medically necessary prescription drugs.[9]  OptumRx directs that pharmacies "must charge . . . the Cost-Sharing Amount indicated in [OptumRx's] online response and only this amount."[10]  Waiving the Cost-Sharing Amount by pharmacies is "strictly prohibited . . . and is considered a material breach" of the Provider Manual.[11]

e.   **Whether plaintiff contends that the defendants are individuals or entities separate from the alleged enterprise, or that the defendants are the enterprise itself, or members of the enterprise;**

Plaintiffs contend that Defendants are entities separate from the alleged enterprises, except as to the OptumRx AIF Enterprise (consisting of (i) OptumRx and (ii) the pharmacies in OptumRx's pharmacy network), of which OptumRx is a member.

---

[7] Consolidated Complaint ¶ 271.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

      **f.**      **If any defendants are alleged to be the enterprise itself, or members of the enterprise, an explanation as to whether such defendants are perpetrators, passive instruments, or victims of the alleged racketeering activity.**

As to the OptumRx AIF Enterprise, of which OptumRx is a member, Plaintiffs allege that OptumRx is the perpetrator of the alleged racketeering activity. To the extent applicable in other instances, the enterprises are conceived of as passive instruments through which Defendants engaged in the alleged racketeering activity.

**7.**      **Whether plaintiff contends that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

Plaintiffs contend that the pattern of racketeering activity is separate from the alleged enterprises. For the reasons discussed in Paragraph 6(b), the enterprises each have a structure, function, and purpose separate from that of the underlying pattern of racketeering activity.

**8.**      **The alleged relationship between the activities of the enterprise and the pattern of racketeering activity, including a description of the manner in which the racketeering activity differs, if at all, from the usual and daily activities of the enterprise.**

The existence of the alleged enterprises is key to Defendants' ability to execute the clawback scheme. The alleged enterprises exist to provide PBM and/or pharmacy services, which they do on a regular basis. For legitimate transactions, Argus and/or OptumRx (either at their own behest or at the behest of Cigna and/or CHL) process a Plaintiff's claim for prescription drugs in accordance with the Plaintiff's health insurance plan and direct the pharmacies participating in Argus' and/or OptumRx's pharmacy networks to collect the proper and lawful amount from the Plaintiff to receive prescription drugs. Defendants exploit this infrastructure, however, to execute the clawback scheme described in Paragraph 1 and to defraud Plaintiffs and the Class of their property. For illegitimate transactions, Argus and/or OptumRx (either at their own behest or at the behest of Cigna and/or CHL) direct the pharmacies participating in Argus' and/or OptumRx's pharmacy networks to collect inflated amounts from

the Plaintiff to receive prescription drugs and to remit that inflated amount to Argus and/or

OptumRx (either for Argus and/or OptumRx to retain or to, in turn, remit to Cigna and/or CHL).

**9.     The benefits, if any, the alleged enterprise receives or has received from the alleged pattern of racketeering.**

The benefits generally accrue to Defendants more than to the alleged enterprises,

although the alleged enterprises may in some instances receive some of the inflated amounts

collected from Plaintiffs and the Class.

**10.    The effect of the activities of the enterprise on interstate or foreign commerce.**

Each of the alleged enterprises has a substantial effect on interstate commerce.  Each of

the enterprises is directly engaged in interstate commerce or in activities that affect interstate

commerce.  For example:  (1) whenever a prescription is filled, information is transmitted via

interstate wires for adjudication; (2) the clawbacks are effectuated via interstate wires; (3) Class

members make payments at pharmacies using credit or debit cards, which require the use of

interstate wires; (4) prescription drug purchases subject to clawbacks are delivered by the U.S.

Mails; and (5) Defendants communicate amongst themselves and with pharmacies via the U.S.

Mails and/or interstate wires to effectuate their clawback scheme.

**11.    If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:**

**a.     The identity of the individual(s) who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;**

Not applicable.

**b.     The use or investment of such income.**

Not applicable.

**12.    If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

Not applicable.

13.     **If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:**

      a.      **The individuals who are employed by or associated with the enterprise;**

Plaintiffs respectfully direct the Court to Plaintiffs' response in Paragraph 6.

      b.      **Whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

Defendants are separate from the alleged enterprises.

14.     **If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe in detail the alleged conspiracy.**

Defendants conspired to conduct or to participate in the conduct of the alleged enterprises' affairs through a pattern of racketeering activity.  Specifically, Defendants conspired amongst themselves and/or with other unnamed health insurance companies that use OptumRx, including but not limited to UnitedHealth Group Incorporated, and/or with other PBMs, including but not limited to Argus, to engage in the clawback scheme described in Paragraph 1.

15.     **The alleged injury to business or property.**

All Plaintiffs suffered an injury to their property because they paid more to receive prescription drugs than they had agreed to pay.

16.     **The direct causal relationship between the alleged injury and the violation of the RICO statute.**

Defendants' actions are the but-for and proximate cause of Plaintiffs' and the Class' injuries.  Defendants' actions are the but-for cause of Plaintiffs' and the Class' injuries because Plaintiffs and the Class would not have paid inflated amounts for medically necessary prescription drugs in the absence of Defendants' clawback scheme.  Similarly, Defendants' actions are the proximate cause of Plaintiffs' and the Class' injuries, and there is a direct relation between the two, because Plaintiffs and the Class were the targets of Defendants' clawback scheme.  There are no independent factors that account for Plaintiffs' and the Class' injuries.

Pharmacies did not (and could not) exercise any independent control over the amount collected from Plaintiffs and the Class to receive medically necessary prescription drugs.

**17.    The damages sustained for which each defendant is allegedly liable.**

Plaintiffs and the Class sustained damages equal to the difference between the inflated amount paid to receive prescription drugs and the amount Plaintiffs and the Class had agreed to pay to receive medically necessary prescription drugs as part of their health insurance plan with Cigna and/or CHL.  The amount of damages can be represented by the following formula:

$$Damages = Amount\ Paid - Sum\ Due\ Under\ Contract$$

This amount is evidenced by and equal to the sums Defendants clawed back from pharmacies.

**18.    A description of other federal causes of action alleged in the complaint, if any, and citation to the relevant statutes.**

In addition to their claims under RICO, described herein, Plaintiffs assert claims under the following provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*:

1.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B);

2.    ERISA § 406(a), 29 U.S.C. § 1106(a);

3.    ERISA § 406(b), 29 U.S.C. § 1106(b);

4.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1);

5.    ERISA § 702, 29 U.S.C. § 1182;

6.    ERISA § 405(a), 29 U.S.C. § 1105(a); and

7.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**19.    A description of all pendent state claims alleged in the complaint, if any.**

Not applicable.

**20.     Any additional information plaintiff feels would be helpful to the Court in processing the RICO claim.**

Plaintiffs do not have any additional information to provide to the Court at this time.

Dated: January 30, 2017                     Respectfully submitted,

                                            */s/ Joseph P. Guglielmo*
                                            Joseph P. Guglielmo (ct27481)
                                            *Plaintiffs' Executive Committee Chair*
                                            Carey Alexander, *pro hac vice*
                                            **SCOTT+SCOTT,**
                                            **ATTORNEYS AT LAW, LLP**
                                            The Helmsley Building
                                            230 Park Avenue, 17th Floor
                                            New York, NY 10169
                                            Telephone:  212-223-6444
                                            Facsimile:  212-223-6334
                                            jguglielmo@scott-scott.com
                                            calexander@scott-scott.com


                                            Erin Green Comite (ct24886)
                                            **SCOTT+SCOTT,**
                                            **ATTORNEYS AT LAW, LLP**
                                            156 South Main Street
                                            P.O. Box 192
                                            Colchester, CT 06415
                                            Telephone:  860-537-5537
                                            Facsimile:  860-537-4432
                                            ecomite@scott-scott.com


                                            Robert A. Izard (ct01601)
                                            *Plaintiffs' Interim Co-Lead Class Counsel*
                                            Craig A. Raabe (ct04116)
                                            Christopher M. Barrett (ct437939)
                                            **IZARD, KINDALL & RAABE, LLP**
                                            29 South Main Street, Suite 305
                                            West Hartford, CT 06107
                                            Telephone:  860-493-6292
                                            Facsimile: 860-493-6290
                                            rizard@ikrlaw.com
                                            craabe@ikrlaw.com
                                            cbarrett@ikrlaw.com

William H. Narwold (ct00133)
*Plaintiffs' Interim Co-Lead Class Counsel*
Mathew Jasinski, *pro hac vice pending*
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:  860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com


Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
**KELLER ROHRBACK, LLP**
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:  206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com


Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**ZIMMERMAN REED, LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844
brian.gudmundson@zimmreed.com


Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**LEMMON LAW FIRM LLC**
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:  985-783-1333
andrew@lemmonlawfirm.com

- and -

650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:  504-581-2156
andrew@lemmonlawfirm.com


Ronen Sarraf
*Plaintiffs' Executive Committee Member*
Joseph Gentile, *pro hac vice pending*
**SARRAF GENTILE LLP**
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:  516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com


E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net


Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
**LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.**
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:  612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

Brad J. Moore
**STRITMATTER KESSLER WHELAN**
**KOEHLER MOORE KAHLER**
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
**WHITFIELD, BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035
Dan@wbmllp.com
Jeremy@wbmllp.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Joseph P. Guglielmo, certify that, on January 30, 2017, I caused a true and correct copy of the foregoing to be served electronically on all counsel of record registered for electronic service for this case.

Executed this 30th day of January, 2017, at New York, New York.

*/s/ Joseph P. Guglielmo*
Joseph P. Guglielmo (ct27481)
**SCOTT+SCOTT,**
**ATTORNEYS AT LAW, LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com