**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, and ROGER CUROL, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Civil No. 3:16-cv-1702 (WWE) |
| vs. | |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC., | |
| Defendants. | |

**DEFENDANTS CIGNA CORPORATION AND CIGNA HEALTH
AND LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT**

DB1/ 91113485.8

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 4

I.      CIGNA AND CHLIC ...................................................................................... 4

II.     PHARMACY BENEFIT MANAGEMENT SERVICES ................................ 5

III.    RETAIL PHARMACY CLAIMS ................................................................... 7

IV.    PLAINTIFFS' PHARMACY BENEFITS ...................................................... 8

       A.      Kimberly Negron ........................................................................... 9

       B.      Daniel Perry ................................................................................. 10

       C.      Nina and Roger Curol ................................................................. 10

       D.      Courtney Gallagher ...................................................................... 11

V.      EXHAUSTION ............................................................................................. 12

LEGAL STANDARD ............................................................................................. 12

ARGUMENT ........................................................................................................... 13

I.      COUNT I SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES UNDER THE PLANS THAT APPLY TO THEM ....................................................................................... 13

II.     COUNTS II, III, IV, VI, AND VII SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE BREACH OF FIDUCIARY DUTY OR PROHIBITED TRANSACTION CLAIMS UNDER ERISA ................................. 15

       A.      Cigna, CHLIC, And Optum Are Not Acting As Fiduciaries When Engaging In The Plan Design Decisions And Business Conduct Plaintiffs Challenge ..................................................................................... 15

             1.      The Determination Of A Copayment, Coinsurance Or Deductible Is Not Fiduciary Conduct ................................................ 16

             2.      The Negotiation Of Drug Prices And Payment Terms With Pharmacies Is Not Fiduciary Conduct ...................................... 18

       B.      Even If Plaintiffs Have Made Plausible Allegations Of Fiduciary Conduct As To The Actions They Challenge, Their Prohibited Transaction Claims In Counts II And III Should Be Dismissed For Other Reasons ......................... 22

             1.      Plaintiffs' Claims Under ERISA Sections 406(a)(1)(C), 406(a)(1)(D), And 406(b)(2) Are Not Based On Plan Transactions ....... 22

             2.      Plaintiffs' Claims Under ERISA Sections 406(a)(1)(D), 406(b)(1), And 406(b)(3) Do Not Involve Plan Assets ............................. 23

# TABLE OF CONTENTS
(continued)

Page

C.    Even If Plaintiffs Have Made Plausible Allegations Of Fiduciary Conduct As To The Actions They Challenge, Their Breach Of Fiduciary Duty Claims In Count IV Should Be Dismissed For Other Reasons .......................... 25

    1.    Spread, Or What Plaintiffs Label As "Clawbacks," Is Not Unlawful ................................................................................. 25

    2.    Cigna And CHLIC Do Not Owe Plaintiffs A Duty To Disclose ............ 26

III.    COUNT V SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A PLAUSIBLE CLAIM UNDER ERISA SECTION 702 .......... 28

IV.    COUNT VIII SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A RICO CLAIM AGAINST CIGNA AND/OR CHLIC ............. 30

    A.    Neither Cigna Nor CHLIC "Conducts The Affairs" Of Optum Or Argus ......... 32

    B.    Plaintiffs Fail to Allege Cognizable Predicate Acts of Mail and Wire Fraud ................................................................................. 35

V.    COUNT X SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO STATE A RICO CONSPIRACY CLAIM AGAINST CIGNA AND/OR CHLIC ................................................................................. 38

VI.    CONCLUSION ................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alves v. Harvard Pilgrim Health Care, Inc.,
   204 F. Supp. 2d 198 (D. Mass. 2002), aff'd, 316 F.3d 290 (1st Cir. 2003)...............3, 9, 27, 29

Am. Drug Stores v. Harvard Pilgrim Care,
   973 F. Supp. 60 (D. Mass. 1997) ..................................................................................21

Amatangelo v. Nat'l Grid USA Serv. Co.,
   No. 04-246, 2011 WL 3687563 (W.D.N.Y. Aug. 23, 2011), aff'd sub nom.
   Argay v. Nat'l Grid USA Serv. Co., 503 F. App'x 40 (2d Cir. 2012)..................................28

Ames v. Grp. Health Inc.,
   553 F. Supp. 2d 187 (E.D.N.Y. 2008) ...........................................................................32

Argay v. Nat'l Grid USA Serv. Co.,
   503 F. App'x 40 (2d Cir. 2012) ......................................................................................18

Ashcroft v. Iqbal,
   556 U.S. 662 (2009)......................................................................................................13

Atuaheme v. City of Hartford,
   10 F. App'x 33 (2d Cir. 2001) .......................................................................................16

Azrielli v. Cohen Law Offices,
   21 F.3d 512 (2d Cir. 1994)............................................................................................32

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)......................................................................................................13

Bell v. Pfizer, Inc.,
   626 F.3d 66 (2d Cir. 2010)............................................................................................28

Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,
   98 F.3d 13 (2d Cir. 1996)..............................................................................................38

Burrill v. Stevens,
   73 Me. 395 (1882).........................................................................................................38

Fifth Third Bancorp v. Dudenhoeffer,
   134 S. Ct. 2459 (2014)..................................................................................................23

Caputo v. Pfizer, Inc.,
   267 F.3d 181 (2d Cir. 2001)..........................................................................................39

Chicago District Council of Carpenters Welfare Fund v. Caremark, Inc.,
   474 F.3d 463 (7th Cir. 2007) .........................................................................................20

Cole v. Aetna Life & Cas.,
   70 F. Supp. 2d 106 (D. Conn. 1999)..............................................................................15

Cortec Indus., Inc. v. Sum Holding, L.P.,
    949 F.2d 42 (2d Cir. 1991)...........................................................................................4

Crawford v. Franklin Credit Mgmt. Corp.,
    758 F.3d 473 (2d Cir. 2014)........................................................................................37

DelGreco v. CVS Corp.,
    337 F. Supp. 2d 475 (S.D.N.Y. 2004), aff'd, 164 F. App'x 75 (2d. Cir. 2006)................14, 15

DeLuca v. Blue Cross Blue Shield of Mich.,
    628 F.3d 743 (6th Cir. 2010) ..............................................................................21, 26

DeSilva v. N. Shore-Long Island Jewish Health Sys. Inc.,
    770 F. Supp. 2d 497 (E.D.N.Y. 2011) .........................................................................4

Donovan v. Bierwirth,
    680 F.2d 263 (2d Cir. 1982), cert. denied, 459 U.S. 1069 (1982) ...........................24

Faber v. Metro. Life Ins. Co.,
    648 F.3d 98 (2d Cir. 2011)........................................................................................26

First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,
    385 F.3d 159 (2d Cir. 2004).......................................................................................40

Flanigan v. General Elec. Co.,
    242 F.3d 78 (2d Cir. 2001).........................................................................................16

Gov't Emps. Ins. Co. v. Korn,
    No. 14-5142 (RMB), 2016 WL 1597240 (D.N.J. Apr. 25, 2016) ...........................25

Hannan v. The Hartford Fin. Servs., Inc.,
    No. 3:15-0395 (VLB), 2016 WL 1254195 (D. Conn. Mar. 29, 2016) .......................13, 18, 27

Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,
    530 U.S. 238 (2000)...................................................................................................22

Hughes Aircraft v. Jacobson,
    525 U.S. 432 (1999)...................................................................................................17

In re Citigroup ERISA Litig.,
    662 F.3d 128 (2d Cir. 2011).......................................................................................23

In re WellPoint, Inc. Out-of-Network UCR Rates Litig.,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .....................................................................36

Jander v. Int'l Business Machines Corp.,
    No. 15-3781 (WHP), 2016 WL 4688864 (S.D.N.Y. Sept. 17, 2016)....................23

Kalda v. Sioux Valley Physician Partners, Inc.,
    481 F.3d 639 (8th Cir. 2007) .....................................................................................25

Katzman v. Victoria's Secret Catalogue,
    167 F.R.D. 649 (S.D.N.Y. 1996)...........................................................................13, 32

Kennedy v. Empire Blue Cross & Blue Shield,
    989 F.2d 588 (2d Cir. 1993).......................................................................................15

Larson v. United Healthcare Insurance. Co.,
    723 F.3d 905 (7th Cir. 2013) ........................................................................................18

LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,
    951 F. Supp. 1071 (S.D.N.Y. 1996) ..............................................................................34

Leonelli v. Pennwalt Corp.,
    887 F.2d 1195 (2d Cir. 1989) ........................................................................................13

Lockheed Corp. v. Spink,
    517 U.S. 882 (1996) ......................................................................................................16

Manhattan Telecomm'ns Corp., Inc. v. DialAmerica Mktg., Inc.,
    156 F. Supp. 2d 376 (S.D.N.Y. 2001) ...........................................................................32

Marks v. Independence Blue Cross,
    71 F. Supp. 2d 432 (E.D. Pa. 1999) ..............................................................................23

Medina v. Bauer,
    No. 02-8837 (DC), 2004 WL 136636 (S.D.N.Y. Jan. 27, 2004) ...................................16

Middleton v. Stephenson,
    No. 2:11-313 (TS), 2011 WL 6131334 (D. Utah Dec. 8, 2011) ....................................23

Midwest Grinding Co., Inc. v. Spitz,
    976 F.2d 1016 (7th Cir. 1992) .......................................................................................33

Mills v. Polar Molecular Corp.,
    12 F.3d 1170 (2d Cir. 1993) ..........................................................................................39

Moeckel v. Caremark RX Inc.,
    622 F. Supp. 2d 663 (M.D. Tenn. 2007) ..................................................................20, 22

Neder v. United States,
    527 U.S. 1 (1999) ..........................................................................................................37

Pegram v. Herdrich,
    530 U.S. 211 (2000) ..........................................................................................16, 17, 18

Perlman v. Zell,
    185 F.3d 850 (7th Cir. 1999) .....................................................................................38,39

Reves v. Ernst & Young,
    507 U.S. 170 (1993) ................................................................................................33, 34

Rosen v. Prudential Ret. Ins. & Annuity Co.,
    No. 3:15-1839 (VAB), 2016 WL 7494320 (D. Conn. Dec. 30, 2016) ......................13, 23

Santiago v. Barnes Grp. Inc.,
    No. 3:13-01853 (WWE), 2015 WL 1897350 (D. Conn. Apr. 27, 2015) .........................14

Schmidt v. Fleet Bank,
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) .............................................................................34

Sedima, S.P.R.L. v. Imrex Co., Inc.,
    473 U.S. 479 (1985) ......................................................................................................32

Stahl v. Tony's Bldg. Materials, Inc.,
   875 F.2d 1404 (9th Cir. 1989) ............................................................... 30

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
   551 U.S. 308 (2007) ............................................................................... 4

United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.,
   822 F.3d 650 (2d Cir. 2016) .................................................................. 36

United States v. Porcelli
   865 F.2d 1352 (2d Cir. 1989) ................................................................ 32

Weiss v. CIGNA Healthcare, Inc.,
   972 F. Supp. 748 (S.D.N.Y. 1997) ........................................................ 28

Yellow Bus Lines, Inc. v. Drivers, Chaufffeurs & Helpers Local Union 639,
   913 F.2d 948 (D.C. Cir. 1990) (en banc) .............................................. 34

Zurich Am. Ins. Co. v. O'Hara,
   604 F.3d 1232 (11th Cir. 2010) ............................................................. 32

**STATUTES**

18 U.S.C. § 1341 ............................................................................................. 37

18 U.S.C. § 1343 ............................................................................................. 37

18 U.S.C. § 1961(1) ........................................................................................ 32

18 U.S.C. § 1962(c) .................................................................................. 32, 33

18 U.S.C. §§ 1962(d) ...................................................................................... 40

18 U.S.C. § 1964(c) ................................................................................... 32, 40

29 U.S.C. § 1002(42) ...................................................................................... 23

29 U.S.C. § 1106(a) ........................................................................................ 22

29 U.S.C. §§ 1106(a)(1)(D), (b)(1), and (b)(3) ............................................. 23

29 U.S.C. § 1106(b)(2) ................................................................................... 24

29 U.S.C. § 1182(b)(1) ................................................................................... 30

ERISA § 404, 405 and 406 ...................................................................... 16, 19

ERISA § 404(a) ............................................................................................... 22

ERISA § 405 and 502(a)(3) ............................................................................ 22

ERISA § 406(a) ............................................................................................... 23

ERISA § 406(a)(1) .......................................................................................... 23

ERISA § 406(a)(1)(C), 406(a)(1)(D), 406(b)(2) ........................................... 23

ERISA Section 406(a)(1)(D) .......................................................................... 24

ERISA Sections 406(a)(1)(D), 406(b)(1), 406(b)(3) ............................... 24, 26

ERISA Section 502(a)(1)(B) .................................................................... passim

ERISA § 702 ....................................................................................................30, 31, 32

Pub. L. No. 91-452 (1970) ...........................................................................................32

Racketeer Influenced and Corrupt Organizations Act ........................................ passim

**OTHER AUTHORITIES**

29 C.F.R. § 2510.3-102...............................................................................................25

29 C.F.R. § 2520.102-3 (j)(3) .....................................................................................29

29 C.F.R. § 2590.701–2 ..............................................................................................30

29 C.F.R. § 2590.702(b)(2)(i)(B)................................................................................31

29 C.F.R. § 2590.702(b)(2)(i)(D) ...............................................................................31

DOL Advisory Op. No. 93-14A (May 5, 1993) .........................................................25

Fed.R.Civ. P. 9(b) ..................................................................................................33,39

Fed.R.Civ. P. 8 .......................................................................................................*passim*

Fed.R.Civ. P. 12(b)(6)............................................................................................4, 13

Fed.R.Civ. P. 26(f)........................................................................................................7

Restatement (First) of Torts § 530 (1938) ..................................................................38

## INTRODUCTION

Plaintiffs are participants in various employer-sponsored health plans for which Cigna Corporation's ("Cigna") subsidiary, Cigna Health and Life Insurance Company ("CHLIC"), provides medical claims administration and pharmacy benefit management services. Plaintiffs claim that they wrongfully paid more for certain prescription drugs purchased at retail network pharmacies (e.g., Walgreens, CVS, etc.) than the copayment, coinsurance, and/or deductible amounts (collectively "participant cost-share") set forth in their benefit plans. Their main claim is that, for certain drugs, their participant cost-share exceeded the amount that the pharmacy contractually agreed to accept for that drug. Plaintiffs contend that, under the terms of their plans, the amount that they paid as their participant cost-share should have been based on, and never more than, the rate the dispensing pharmacy agreed to accept for the drug. Plaintiffs, individually and on behalf of a putative class, claim that Cigna and CHLIC violated the terms of their benefit plans as well as the Employee Retirement Income Security Act's ("ERISA") fiduciary and prohibited transaction rules and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

All of Plaintiffs' claims should be dismissed. As an initial matter, evaluating their contentions about how much they should have paid for their participant cost-share requires applying the language in each Plaintiff's plan to his or her circumstances. Benefit determination may be sought via an ERISA Section 502(a)(1)(B) claim for benefits, which Plaintiffs purport to assert in Count I. But, none of the Plaintiffs have pursued their administrative appeal remedies to challenge how CHLIC calculated the cost-share amount for their prescription drugs or how CHLIC interpreted the relevant terms of their particular plan. They are raising these issues for the first time in this lawsuit. Their Section 502(a)(1)(B) claim for benefits therefore must be dismissed for failure to exhaust their administrative remedies.

Plaintiffs also couch their claims as involving various alleged breaches of fiduciary duties, prohibited transactions, and other violations of ERISA (Counts II-VII).  They contend that CHLIC "inflated" cost-share amounts, that CHLIC and/or its vendor contractually required pharmacies to collect the "inflated" cost-share amounts, and that their cost-share amounts are "plan assets" that CHLIC misused.  But, none of these claims involves conduct undertaken as a fiduciary.  Establishing the amount for the participant cost-share is a plan design function, not a discretionary fiduciary function.  Deciding the required participant cost-share amount occurs before CHLIC begins providing service or insurance to the plan sponsor and before any claim-related fiduciary functions begin.  Negotiating contract terms or drug prices with a pharmacy benefits manager ("PBM") or pharmacy is a CHLIC business function, not a discretionary fiduciary act taken with respect to a particular plan or plan participant.  And, participant cost-share amounts are not plan assets because they are not paid to the plan and the plan never has control over those funds.  Participant cost-share dollars are simply amounts that the plan requires the participant to pay to a pharmacy or healthcare provider.  None of the conduct in which Plaintiffs have alleged that Cigna or CHLIC engaged involves discretionary fiduciary functions or control over plan assets and therefore these claims fail as a matter of law.

Plaintiffs also try to dress up their claim for benefits as a purported RICO violation (Counts VIII, X).  They contend that Cigna and/or CHLIC "conducts the affairs" of two completely separate and independent companies that provide services to CHLIC's pharmacy benefit management operations – OptumRx, Inc. ("Optum"), which provides access to Optum's retail pharmacy network for plan participants, and Argus Health Systems, Inc. ("Argus"), which provides retail pharmacy claims processing services – and that these companies constitute alleged RICO "enterprises."  Plaintiffs' allegations, however, show nothing more than arm's-

length contractual relationships between sophisticated independent companies, which are insufficient to create a plausible inference that Cigna or CHLIC operates or manages the affairs of either of these vendors or otherwise operates an "enterprise" in violation of RICO.  Plaintiffs also try to recast their claim for breach of their plan terms as a "scheme to defraud" to fit into a RICO mold.  It is well-established law, however, that a breach of contract does not amount to mail or wire fraud.  Plaintiffs fail to allege any predicate acts with the requisite particularity to support their RICO claims and therefore those claims fail as a matter of law.

The core concept that Plaintiffs' Complaint focuses on – situations where a participant's cost-share obligation exceeds an insurance company's or PBM's negotiated rate with a pharmacy to obtain and dispense that prescription drug – is not new or illegal.  Courts have addressed claims related to this aspect of benefit design for over a decade and have routinely found it to be a reasonable, permissible practice.  Their rationale is often based on the part of the equation that Plaintiffs' Complaint keenly omits – namely that plan participants also routinely pay cost-share amounts that are far *less* than the price of the drug.  For example, in addressing allegations that a plan sponsor "uses the copayment paid by members of the class to reduce its costs on higher-priced subscriptions," one court observed that such "[c]ross-subsidies whereby the insurer's net profit from purchases of low-cost drugs helps to subsidize the large costs incurred from purchases of high-cost medications, are not uncommon in other areas of healthcare" and represent "the sort of reasonable line-drawing that the caselaw clearly permits."  Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198, 210 n.6 (D. Mass. 2002), aff'd, 316 F.3d 290 (1st Cir. 2003).

Alves and similar cases often turn on whether the terms of a participant's benefit plan were interpreted and applied correctly.  Here, Plaintiffs did not raise their benefit determination

3

or plan interpretation issues through the applicable administrative process before asserting their

Section 502(a)(1)(B) claim.  That claim must be dismissed for that reason.  The other claims fail

as a matter of law and should also be dismissed.

## STATEMENT OF FACTS

I.  <u>CIGNA AND CHLIC</u>

Cigna,[1] together with its subsidiaries, is a global health services organization dedicated to

a mission of helping individuals improve their health, well-being, and sense of security.[2]  Compl.

¶ 40; Cigna Corp. Annual Report ("Form 10-K") (Feb. 23, 2017).[3]  As relevant here, Cigna's

commercial operating segment provides health care coverage to employers and other group

health plan sponsors.  Id.  The plan sponsors determine what benefits will be covered under their

respective plans, which can include not only hospital, medical, and surgical benefits, but also

prescription drug benefits.  Compl. ¶ 58(a).  The plan sets forth categories of covered services

and prescription drugs and the out-of-pocket amounts that a participant is responsible for paying.

Id.  This is typically a copayment, coinsurance, and/or deductible (collectively, the participant's

---

[1] Plaintiffs have named Cigna and CHLIC as Defendants.  Cigna is a holding company and general corporation, not an insurance company, and has not entered into contracts with Plaintiffs, their employer-sponsored benefit plans, or any contractor or retail pharmacy relevant to this lawsuit.  See Compl. ¶ 40; Dkt. 61 at IV(5).  CHLIC is an indirect wholly-owned subsidiary of Cigna.  Compl. ¶¶ 3, 41.  CHLIC provides medical benefit plan services to employer-sponsored health plans, groups, and individuals.  CHLIC also underwrites and issues medical insurance policies.  Id. ¶ 41.

[2] In ruling on a Rule 12(b)(6) motion, the Court may consider documents incorporated into the Complaint by reference, those documents integral to the Complaint, and matters subject to judicial notice.  See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  Thus, the Court may rely on plan-related materials and agreements that are referenced in, but not attached to, the Complaint.  See Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991).  The Court may also consider matters subject to judicial notice, which include public disclosure documents filed with governmental agencies, such as the Securities and Exchange Commission and the Department of Treasury.  See, e.g., DeSilva v. N. Shore-Long Island Jewish Health Sys. Inc., 770 F. Supp. 2d 497, 506-07 (E.D.N.Y. 2011).

[3] https://www.sec.gov/Archives/edgar/data/701221/000104746917000899/a2230937z10-k.htm (last visited March 10, 2017).

"cost-share") and is defined and set forth in the plan document and/or summary plan description
("SPD").  See id. ¶¶ 92-94

CHLIC offers two basic funding options to its group health plan clients.  The first is
referred to as an "Administrative Services Only" ("ASO") funding arrangement.  Id. ¶ 1 n.1.  For
ASO plans, CHLIC provides various administrative services, including claims administration
and pharmacy benefit management services to employer-sponsored plans for a fee, but it does
not insure the plan's benefits.  Id.; Cigna's Form 10-K.  The plan sponsor pays for covered
expenses with its own funds.  Id.  The parties' respective rights and obligations under an ASO
arrangement, including CHLIC's role in administering the plan's pharmacy benefits and the
amount that the plan sponsor has agreed to pay for prescription drugs, are set forth in the parties'
ASO Agreement and Disclosure.  Id. ¶ 1 n.1.  The ASO Agreements and/or Disclosures for each
of Plaintiffs' plan sponsors provide that CHLIC may retain any difference between the amount
the pharmacy has agreed to accept and the amount charged to the plan sponsor.  See Ex. 9 at
Appx. 0338 (Negron); Ex. 10 at Appx. 0377(Negron); Ex. 13 at Appx. 0533 (Perry); Ex. 14 at
Appx. 0571 (Perry); Ex. 2 at Appx. 0081-82 (Curols); Ex. 15 at Appx. 0605-06 (Legal Notice to
Plan Sponsors).[4]

The second category is an insured medical plan.  Compl. ¶ 1 n.1.  CHLIC offers the same
range of services to insured plans, but instead of paying the ASO fee and self-paying claims, the
employer or its policyholder (i.e., employer, group, or individual) pays an annual premium to
CHLIC, and CHLIC is responsible, as the insurer, for paying covered claims and related
expenses.  Id.; Cigna's Form 10-K.  The parties' rights and obligations under an insured

---

[4] Cigna and CHLIC attach as exhibits to their motion, documents corresponding to the years of Plaintiffs'
prescription drug coverage as alleged in the Complaint.

arrangement are set forth in a group health insurance policy and other disclosures.  See Ex. 4 (Gallagher); Ex. 6 (Gallagher); Ex. 7 (Gallagher).

## II.      PHARMACY BENEFIT MANAGEMENT SERVICES

Pharmacy Benefit Managers ("PBMs") provide prescription drug benefit administration services for plan sponsors and insurers offering prescription drug coverage and facilitate the provision of prescription drug benefits to plan participants.  See Compl. ¶ 3.  PBM services can include, among others, the development of formularies (the list of drugs approved for coverage under a drug benefit) and coverage criteria, the negotiation of discounts and rebates with drug manufacturers, and access to an established network of pharmacies.  See id. ¶¶ 3, 4, 19, 42, 275.

CHLIC provides pharmacy benefits to its employer-sponsored plans (its clients) and the plans' participants through its business division Cigna Pharmacy Management ("CPM").  Id. ¶¶ 41, 45 n.11.  CPM offers a range of PBM services related to the prescription drug coverage provided for plan participants and beneficiaries.  See id. ¶¶ 41, 237.  This case involves one of CPM's many PBM functions – providing access to a contracted network of retail pharmacies and the prescription drug purchases that plan participants make from those retail pharmacies.

CPM also outsources certain PBM functions.  Id. ¶¶ 3, 41.  CPM does not operate its own network of retail pharmacies for commercial medical plans.  Instead, CHLIC contracts with Optum[5] to allow plan participants to access Optum's network of over 70,000 retail pharmacies (the "CHLIC-Optum Contract").  Id. ¶¶ 3-4, 42.  The CHLIC-Optum Contract dictates the terms of CHLIC's (and ultimately the plan participants') access to Optum's network, including the

---

[5] Optum is a subsidiary of UnitedHealth Group Incorporated (a Cigna competitor).  Id. ¶ 42 n.6.  By contrast, Optum's relationship with CHLIC is purely contractual, stemming from Connecticut General Life Insurance Company's June 2013 contract with Catamaran PBM of Illinois, Inc. ("Catamaran") to which Optum is Catamaran's successor by merger in July 2015.  Id. ¶¶ 4, 42.  This contract was assigned to CHLIC in May 2014.

rates that CHLIC must pay to Optum for the prescription drugs that Optum's network pharmacies provide to participants in CHLIC's clients' plans.  See id.

Optum contracts with retail pharmacies in its network (the "Optum-Retail Pharmacy Contracts"), and in so doing, negotiates with the retail pharmacies the contract terms and rates that Optum will pay to the retail pharmacies that agree to participate in the network.  See id. ¶¶ 42, 58(c).  Optum's network pharmacies submit participants' claims for real-time, point of sale ("POS") claims processing based on the terms of the participants' benefit plan.  See id. ¶ 52.

Cigna Corporate Services, LLC contracts with Argus (the "Cigna-Argus Contract"), which Plaintiffs have not named as a party in the Complaint.  Id. ¶ 43; Dkt. 61, Rule 26(f) Report at IV(5) (Undisputed Facts).  Argus processes claims for certain of CHLIC's pharmacy benefit management plan sponsors and plan participants.  Id. ¶ 43.  When an in-network retail pharmacy services a participant, the pharmacy will submit the claim at the POS.  See id. ¶ 52, 241.

## III.    RETAIL PHARMACY CLAIMS

There are four separate and distinct relationships involved when a participant purchases prescription drugs from a retail pharmacy.  Four separate contracts govern these relationships: (1) the health benefit plan between the participant and the plan sponsor (usually the employer); (2) the contract between the plan sponsor and CHLIC (the ASO Agreement or insurance policy, depending on how the plan is funded); (3) the CHLIC-Optum Contract; and (4) the Optum-Retail Pharmacy Contract.  See id. ¶ 57-58.  These four contracts dictate who pays what and to whom. The benefit plan dictates and sets forth how much the participant pays as his or her cost-share. Id. ¶ 58(a).  The plan sponsor-CHLIC contract dictates the rates that the plan sponsor pays CHLIC for prescription drugs.  The CHLIC-Optum Contract dictates the rates that CHLIC pays Optum for prescription drugs.  See id. ¶ 58(b).  The Optum-Retail Pharmacy Contract dictates the rates that Optum pays its network retail pharmacies.  See id. ¶¶ 58(c); 271.

Payments for retail pharmacy claims occur in at least three separate and distinct transactions:  (1) the POS transaction between the participant and the retail pharmacy; (2) the payments CHLIC makes to Optum; and (3) the payments Optum makes to its network pharmacies.[6]

***Point of Sale Transaction***.  The amount that a plan participant pays for a prescription – his or her cost-share obligation – is determined in "real time" at POS at the pharmacy based on the terms of the participant's plan.  See id. ¶¶ 52, 62, 96-101.  This determination requires the pharmacy to provide its usual and customary ("U&C") price for the prescription – the pharmacy's retail cash price for the drug – for the claim to be processed.  See id. ¶ 92(b) n.20.  The pharmacy's U&C price is important because Plaintiffs' plans state that the participant's cost-share will not exceed the retail price (cash price) the pharmacy reports to CHLIC.  See infra at 10-12.  Therefore, if the pharmacy's U&C price is lower than the participant's cost-share, then the amount the participant will pay to the pharmacy at the POS will be the U&C or be based on the U&C.  See Compl. ¶ 93(b) n.23.

***CHLIC-Optum Payments***.  CHLIC's payments to Optum for participants' prescription drug claims are a separate transaction, based on the CHLIC-Optum Contract, and do not occur in real time.  The aggregate amount that CHLIC owes Optum pursuant to the CHLIC-Optum Contract is determined in a separate process several times a month.  This process takes into account *all* involved pharmacy benefit claims – including claims for which a participant's cost-

---

[6] There is a fourth transaction involved – payment from the plan sponsor to CHLIC – when the prescription drug cost to the plan sponsor (set forth in the ASO Agreement) is greater than the participant's cost-share amount. Plaintiffs' Complaint focuses only on claims where their cost-share is more than the price that the retail pharmacy has contractually agreed to accept for a prescription drug.  This fourth transaction does not occur in such circumstances because the plan sponsor would not have any additional payment obligation.

share is *more* than the cost of the drug, as well as claims for which a participant's cost-share is *less* than the cost of the drug.[7]

> ***Optum-Pharmacy Payments***.  Optum pays each of its network pharmacies in accordance with the rates and terms set forth in the Optum-Retail Pharmacy Contracts.  See id. ¶ 53.  This is a separate transaction and is independent of the plan sponsor- CHLIC contract and the CHLIC-Optum Contract.  See id.

## IV.   PLAINTIFFS' PHARMACY BENEFITS

Prescription drug prices can generally run from a few pennies to more than $1,000 per tablet/unit.  Thus, a basic tenet and unremarkable proposition of prescription drug coverage is that, when a participant or beneficiary is required under his or her plan terms to pay a fixed dollar copayment (or other cost-share), that amount will, in some instances, be more than the price of the drug (paid by the wholesaler, the pharmacy, the plan, or the insurer), and in other cases less (and depending on the drug in question, often significantly less).  See Alves, 204 F. Supp. 2d at 203, 210 n.6.  It follows that the participant cost-share may be more or less than the amount that the pharmacy has contractually agreed to accept for a drug.  See Compl. ¶ 63.

Plaintiffs do not purport in the Complaint to set forth their entire prescription drug histories under their plans, see id. ¶¶ 97-101, and do not claim that their copayments (or participant cost-shares) *always* exceeded the amount that the pharmacy contractually agreed to accept for the drugs.  See id. ¶ 63.  And, not surprisingly, Plaintiffs do not take issue with any instances in which the cost-share that they paid for their retail pharmacy claim was *less* than the amount the pharmacy agreed to accept for the drug.  Plaintiffs also appear to admit that they have

---

[7] Plaintiffs refer to the amount of the participant cost-share that exceeds the amount that the pharmacy has agreed to accept as "spread," and the pharmacy's "payment" of this spread to "Defendants" as a "clawback."  Compl. ¶¶ 9, 11, 56.

not paid any more than the copayment or coinsurance identified in their plans.  See Compl. ¶
69(l)-(p).

Plaintiffs each have different employers and different benefit plans, with the exception of
Nina and Roger Curol.  Benefit levels, cost-share amounts, and plan language vary among them
and sometimes from year to year.

### A.    Kimberly Negron

Kimberly Negron alleges that she purchased prescription drugs from retail network
pharmacies in 2015.  Compl. ¶ 97.  In 2015, Ms. Negron was a participant in an employer-
sponsored ASO plan.  Id. ¶ 35.  Ms. Negron's plan provides prescription drug benefits and does
not have a prescription drug deductible for retail network pharmacy drugs, but requires Ms.
Negron to pay a copayment that ranges from $0 to $75 for prescription drugs purchased from a
retail network pharmacy.  See Ex. 8 at Appx. 301-02.  The SPD defines the term copayment as
"expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related
Supplies."  Id. at Appx. 301.  The SPD further states:

> In no event will the Copayment or Coinsurance for the Prescription Drug or
> Related Supply exceed the amount paid by the plan to the Pharmacy, or the
> Pharmacy's Usual and Customary (U&C) charge.  Usual & Customary (U&C)
> means the established Pharmacy retail cash price, less all applicable customer
> discounts that Pharmacy usually applies to its customers regardless of the
> customer's payment source.[8]

Id. at 38.

---

[8] Plaintiffs allege that they could have purchased their prescription drugs for a lower price directly from the
pharmacy if they did not use their benefits.  Compl. ¶ 64.  This plan language shows otherwise.  If the pharmacy's
established retail cash price (U&C) is less than the participant's cost-share amount, then the participant will pay the
pharmacy's retail cash price.  See Ex. 8 at Appx. 304.  For example, in the transaction example in paragraph 66 of
the Complaint, if the copayment was $20 for this drug, the participant would have paid $18.57, which was this
pharmacy's stated U&C price – the retail cash price.  See Compl. ¶ 66.

**B.**   **Daniel Perry**

Daniel Perry alleges that he purchased prescription drugs from retail network pharmacies in 2015 and 2016.  Compl. ¶ 99.  In 2015 and 2016, Mr. Perry was a participant in an employer-sponsored ASO plan.  Id. ¶ 35.  Mr. Perry's 2015 and 2016 plans provide prescription drug benefits and do not have a prescription drug deductible, but require Mr. Perry to pay a copayment in the range of $0 to $50 for prescription drugs purchased from a retail network pharmacy.  Ex. 11 at Appx. 0435; Ex. 12 at Appx. 0496.  The plan defines the term copayment as "expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies."  Id.  The plans also state:

> In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge.  Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source.

Ex. 11 at Appx. 0438; Ex. 12 at Appx. 0499.

**C.**   **Nina and Roger Curol**

Nina and Roger Curol allege that they each purchased prescription drugs from retail network pharmacies in 2016.  Compl. ¶¶ 100-01.  In 2016, Mr. and Mrs. Curol were participants in an employer-sponsored ASO plan.  Id. ¶¶ 38-39.  The Curols' 2016 plan does not have a prescription drug deductible but requires Mr. and Mrs. Curol to pay the greater of a $0-$40 (depending on the type of drug) or "30% of the cost" for a retail network pharmacy prescription.  Ex. 1 at Appx. 0018.  The plan defines the term copayment as "the amount you and your covered Dependent(s) are required to pay for covered Prescription Drugs and Related Supplies charges under this Plan."  Id. at Appx. 0017.  The plan further states that:

> In no event will the applicable copay or coinsurance paid by you and your covered Dependent(s) for the Prescription Drug or Related Supply exceed the

amount paid by the Plan or the Pharmacy's Usual and Customary (U&C) charge. Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts the Pharmacy usually applies to its customers, regardless of the customer's payment source.

Id.

### D.     Courtney Gallagher

Courtney Gallagher alleges that she purchased prescription drugs from retail network pharmacies in 2015 and 2016.  Compl. ¶ 98.  In 2015 and 2016, Ms. Gallagher was a participant in an employer-sponsored insured plan.  Id. ¶ 36.  Ms. Gallagher's plan does not have a prescription drug deductible, but requires Ms. Gallagher to pay a 10%-45% coinsurance amount, subject to a minimum of $20-$35 in certain cases, for prescription drugs purchased from a retail network pharmacy.  Ex. 3 at Appx. 0137-138.  The plan defines "Coinsurance" as "the percentage of Charges for covered Prescription Drugs and Related Supplies that you or your Dependent are required to pay under this plan."  Id. at Appx. 0137.  The plan also defines "Charges" as "the discounted amount that the pharmacy benefits manager makes available to the Insurance Company with respect to Participating Pharmacies, and it means the actual billed charges when the Pharmacy is a non-Participating Pharmacy."  Id.

## V.     EXHAUSTION

Each of the plans applicable to Plaintiffs provides for administrative claims procedures prior to legal action and requires appeals to be filed within 180 days of receipt of a denial notice. See Ex. 8 at Appx. 0318-319 (Negron); Ex. 11 at Appx. 0452-453 (Perry); Ex. 12 at Appx. 0513-514 (Perry); Ex. 1 at Appx. 0042-45 (Curols); Ex. 3 at 0163-164 (Gallagher). Plaintiffs admit that they did not avail themselves of these appeal procedures, and therefore have not exhausted the plans' administrative remedies.  Compl. ¶ 148.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The allegations must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the well-pleaded facts must allow the court to infer more than the mere possibility of misconduct.  Id.  Courts in this circuit routinely grant Rule 12(b)(6) dismissals of ERISA breach of fiduciary duty and prohibited transaction claims lodged against defendants that are not fiduciaries with respect to the alleged conduct.  See, e.g., Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-1839 (VAB), 2016 WL 7494320, at *11 (D. Conn. Dec. 30, 2016); Hannan v. The Hartford Fin. Servs., Inc., No. 3:15-0395 (VLB), 2016 WL 1254195, at *6 (D. Conn. Mar. 29, 2016).  And "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."  Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 655-58 (S.D.N.Y. 1996).

## ARGUMENT

### I.   Count I Should Be Dismissed Because Plaintiffs Have Failed To Exhaust Their Administrative Remedies Under The Plans That Apply To Them

Plaintiffs' fundamental claim in this lawsuit is that they are required to pay higher copayments, coinsurance and/or deductibles for certain prescription drugs than provided for under the terms of their respective benefit plans.  ERISA provides a remedy for such claims under Section 502(a)(1)(B). But like most federal courts, the Second Circuit has long required ERISA plan participants "to exhaust the administrative remedies provided for under the plan" before filing such a lawsuit.  Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989).

Plaintiffs admit they have not done so here.  Compl. ¶ 148.  Plaintiffs attempt to justify their failure to exhaust the plan remedies available to them by arguing that (1) "the exhaustion doctrine does not apply . . . because Plaintiffs seek to enforce their rights under the terms of the ERISA Plans and clarify future rights, not recover benefits due," and (2) exhaustion "would be futile and unnecessary."  Id.  Neither excuse has merit.

Plaintiffs' first argument relies on a distinction without a difference.  Whether seeking benefits under the terms of the applicable plan, enforcing their rights under that plan, or clarifying those rights, Plaintiffs raise in Count I the kind of plan interpretation question that should be first addressed through the plan's administrative procedures.  Indeed, the internal appeal procedures for each of the four plans applicable to the five Plaintiffs (Mr. and Mrs. Curol are covered by the same plan) contemplate exactly that.[9]  Moreover, Plaintiffs seek to recover "amounts they have been overcharged" because of allegedly excessive copayments and coinsurance and "payment of all amounts due them in accordance with their rights under the ERISA Plans," which are indistinguishable from "benefits due" under the plans.  Compl. ¶¶ 169, 170(c).  Plaintiffs should not be excused from failing to exhaust their plan remedies based on the non-existent distinction upon which they rely.  See DelGreco v. CVS Corp., 337 F. Supp. 2d 475, 484-85 (S.D.N.Y. 2004), aff'd, 164 F. App'x 75 (2d. Cir. 2006) (finding no difference between "denial of benefits" and "enforcement of the terms of the plan" in dismissing a Section 502(a)(1)(B) claim for failure to exhaust where plaintiff sought "a lower copayment for the 'generic' drug she was given by her pharmacist"); Santiago v. Barnes Grp. Inc., No. 3:13-01853 (WWE), 2015 WL 1897350, at *2 (D. Conn. Apr. 27, 2015) (granting defendant's motion for judgment on pleadings for failure to exhaust where plaintiff sought "[d]eclaratory relief . . . to

---

[9] See Ex. 8 at Appx. 0318-319 (Negron); Ex. 11 at Appx. 0452-453 (Perry); Ex. 12 at Appx. 0513-514 (Perry); Ex. 1 at Appx. 0042-45 (Curols); Ex. 3 at 0163-164 (Gallagher).

recover benefits due to her under the terms of [her husband's] plan, to enforce her rights under the terms of the plan, or to clarify her rights to future benefits under the terms of the plan").[10]

Plaintiffs' second argument – futility – likewise does not excuse their failure to exhaust plan remedies.  Plaintiffs claim that it is "unlikely" that exhaustion "would result in a refund of a copayment or coinsurance," that the process would be "extremely burdensome and inequitable" and could yield "discriminatory" results, and that the plan could not provide remedies like "treble and punitive damages."  Compl. ¶¶ 154-56.  This unsupported speculation about plan outcomes falls far short of a "'clear and positive showing' that pursuing available administrative remedies would be futile."  Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993).  Plaintiffs did not and cannot allege that they made any effort to resolve their concerns through their plans' internal appeal procedures, or that such efforts were ignored, undermined or rejected by their employers, the plan administrators, Cigna, or CHLIC.  See DelGreco, 337 F. Supp. 2d at 485-86 (rejecting futility argument because "existing case law in this Circuit requires a participant to satisfy a Plan's administrative procedures in the first instance, including any time limitations on filing written benefit claims, before she can pursue a claim of futility").  And Plaintiffs' assertion about the limitations on remedies under their plans overlooks the fact that treble and punitive damages are simply not available under ERISA, whether sought through the plan's administrative procedures or in this Court.  See Cole v. Aetna Life & Cas., 70 F. Supp. 2d 106, 113-14 (D. Conn. 1999) (dismissing claim for punitive damages under ERISA based on "overwhelming weight of authority").

---

[10] The plaintiff's prayer for relief in Santiago is set forth in her complaint, the first docket entry in Case No. 3:13-01853 (WWE) (D. Conn.).

Plaintiffs have failed to make the case that they should be excused from exhausting the administrative remedies available to them under their respective plans.  Count I of their Complaint under ERISA Section 502(a)(1)(B) should therefore be dismissed.

II.     **Counts II, III, IV, VI, And VII Should Be Dismissed Because Plaintiffs Have Failed To State Breach Of Fiduciary Duty Or Prohibited Transaction Claims Under ERISA**

    A.     **Cigna, CHLIC, And Optum[11] Are Not Acting As Fiduciaries When Engaging In The Plan Design Decisions And Business Conduct Plaintiffs Challenge**

"In every case charging breach of ERISA fiduciary duty . . . , the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but *whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.*"  Pegram v. Herdrich, 530 U.S. 211, 226 (2000) (emphasis added).  Similarly, a court cannot conclude that someone "violated the prohibited transaction section of ERISA without making the requisite finding of fiduciary status."  Lockheed Corp. v. Spink, 517 U.S. 882, 892 (1996); see also Flanigan v. General Elec. Co., 242 F.3d 78, 87 (2d Cir. 2001) ("Fiduciary duty and prohibited transaction rules apply only to decisions by an employer acting in its fiduciary capacity.").

Plaintiffs ignore these bedrock principles, attacking lawful non-fiduciary plan design decisions and business conduct under Sections 404, 405 and 406 of ERISA.  They summarize

---

[11] Throughout the Complaint, Plaintiffs repeatedly "lump[] all the defendants together and fail to distinguish their conduct."  Medina v. Bauer, No. 02-8837 (DC), 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004).  See Compl. ¶¶ 9-27, 106, 109-10, 133-34, 166-226.  This deficiency provides an independent basis for dismissing Plaintiffs' ERISA and RICO claims under Rule 8.  See Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001) ("By lumping all the defendants together in each claim," plaintiff failed to satisfy requirements of Rule 8).  Plaintiffs exacerbate this flawed "everybody is liable for everything" approach by attempting to impute liability to each Defendant for the alleged misdeeds of the others through claims of agency, co-fiduciary, and conspiracy liability.  See Compl. ¶¶ 50, 215-19, 296-97.  For purposes of this motion, therefore, Cigna and CHLIC largely focus on the *conduct* that Plaintiffs claim constituted a breach of fiduciary duty and otherwise allege, not which of the Defendants, if any, was responsible for it.  With respect to Plaintiffs' ERISA claims, Optum has separately filed its own motion to dismiss in which it argues, as Cigna and CHLIC do here, that it is not acting as a fiduciary when negotiating drug prices and payment terms with pharmacies.

their claims of unlawful fiduciary conduct in paragraph 15 of their Complaint, alleging that Defendants "(1) secretly determin[e] that patients must pay inflated Copayments and Coinsurance and Deductible payments, (2) secretly forc[e] pharmacies to collect those inflated Copayments and Coinsurance and Deductible payments on their behalf, and (3) secretly forc[e] pharmacies to remit to Defendants a significant portion of those inflated Copayments and Coinsurance and Deductible payments in the form of illegal 'Clawbacks.'" Compl. ¶ 15.  As discussed below, however, Defendants are not acting as ERISA fiduciaries when engaging in these plan design decisions and business activities.  Plaintiffs' failure to make a plausible allegation of fiduciary status in connection with the actions they challenge is fatal to their claims in Counts II, III, IV, VI and VII of their Complaint.

### 1.      The Determination Of A Copayment, Coinsurance Or Deductible Is Not Fiduciary Conduct

Plaintiffs assert that a critical component of Defendants' allegedly "fraudulent and deceptive scheme" is the determination of "inflated Copayments and Coinsurance and Deductible payments."  Compl. ¶¶ 1, 15; see also id. ¶¶ 2, 5, 35-39, 58(a), 92-95.  Even if Plaintiffs could plausibly allege that Cigna, CHLIC and/or Optum are responsible for deciding the level of copayments, coinsurance, or deductible under Plaintiffs' respective plans,[12] these are plan design decisions that cannot give rise to a breach of fiduciary duty or prohibited transaction claim.  The Supreme Court has held that ERISA's fiduciary duty requirements do not apply to "a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."  Hughes Aircraft v. Jacobson, 525 U.S. 432, 444 (1999); see also Pegram, 530 U.S. at 226 (determining "specific

---

[12] In attacking the lawful business conduct of Cigna and CHLIC, Plaintiffs make only passing reference to the distinction between CHLIC's insured business and its ASO business.  See Compl. ¶ 1 n.1.  In either case, determining copayments, coinsurance, and deductibles is not fiduciary conduct, as explained above.

payout detail of the plan" triggers no fiduciary duty since "decisions about the content of a plan are not themselves fiduciary acts").

Based on this fundamental distinction, the Seventh Circuit, in a decision that is directly on point, held that a health insurer did not act as a fiduciary in determining the copayments to be made by plan participants under the terms of a group health plan.  In Larson v. United Healthcare Insurance. Co., 723 F.3d 905 (7th Cir. 2013), the plan participants accused the health insurer of a breach of fiduciary duty in establishing "illegal copayments for chiropractic care."  Id. at 917. The plan participants alleged, as Plaintiffs do here, that "the required copayments often approach or exceed the cost of the treatment."  Id. at 909.  In affirming dismissal of the plan participants' claim, the Seventh Circuit was careful to distinguish between the health insurer's fiduciary role as a claims administrator and the non-fiduciary act of determining copayments:

> Cutting through the surplusage, it's clear that these allegations do not attack the discretionary aspects of claims administration as such; the plaintiffs are not challenging individual eligibility and benefits determinations.  Instead, the complaint targets decision making about policy terms.  The alleged fiduciary breach is the issuance of policies that require "illegal copayments for chiropractic care" and the failure to "eliminate" the illegal policy provisions.  In short, this is a challenge to the *content* of the insurance policies; "decisions about the content of a plan are not themselves fiduciary acts."  Pegram, 530 U.S. at 226, 120 S.Ct. 2143. The fiduciary-duty claim fails at the threshold.

Id. at 917 (emphasis in original); see also Argay v. Nat'l Grid USA Serv. Co., 503 F. App'x 40, 42 (2d Cir. 2012) (agreeing with district court that employer "did not act in a fiduciary capacity in setting premiums" that were in excess of what was required to purchase supplemental employee life insurance); Hannan, 2016 WL 1254195, at *3 (dismissing claim that health insurer's negotiation of employee life insurance premium structure with employer gave rise to breach of fiduciary duty by insurer).

Plaintiffs' assertion that the setting of allegedly "inflated" copayments, coinsurance, and deductibles is fiduciary conduct simply cannot be squared with the plan design/fiduciary distinction universally recognized under ERISA.  Counts II, III, IV, VI, and VII, which depend on that assertion, should therefore be dismissed.

### 2.   The Negotiation Of Drug Prices And Payment Terms With Pharmacies Is Not Fiduciary Conduct

Plaintiffs allege that Defendants have advanced their purported scheme by "secretly forcing pharmacies to collect those inflated Copayments and Coinsurance and Deductibles" and "remit to Defendants a significant portion . . . in the form of illegal 'clawbacks.'"  Compl. ¶ 15.  Although Plaintiffs use the term "forcing" to describe Defendants' interaction with the pharmacies, it is apparent from other allegations in their Complaint that they are referring to the arm's-length negotiation of drug prices and payment terms between Optum, as a PBM network vendor, and the pharmacies in its network:

> PBMs in turn, *contract with pharmacies* which serve as providers in the insurers/administrators' pharmacy network.  The pharmacies fill prescriptions that are health benefits covered under the plans.  *Pursuant to these agreements*, the PBMs set the amount the pharmacy will collect from a patient for a prescription drug, the amount the PBM (and insurer or plan) will pay the pharmacy for filling the patient's prescription, and the amount of the patient's payment that the pharmacy must send to the PBM as a "Clawback."  On information and belief, the pharmacy has no role in setting the amount of the patient's payment and thus must accept the "Clawback" amount as determined by the PBM.

Complaint ¶ 58(e) (emphasis added); see also id. ¶¶ 2, 11, 17, 54, 57, 62, 65, 72 (referencing "contracts" or "agreements" negotiated with pharmacies).

In claiming that Optum's negotiation of drug prices and payment terms with pharmacies must be scrutinized under ERISA Sections 404, 405, and 406, Plaintiffs once again blur the distinction between non-fiduciary business conduct and fiduciary acts such as discretionary plan administration and plan investment decisions.  Courts have consistently recognized that

distinction and found it to be dispositive in dismissing breach of fiduciary duty and prohibited transaction claims like those presented here.

For example, in Chicago District Council of Carpenters Welfare Fund v. Caremark, Inc., 474 F.3d 463 (7th Cir. 2007), the Seventh Circuit rejected a self-funded ERISA health and prescription drug plan's breach of fiduciary duty and prohibited transaction claims against a PBM.  Id. at 466-67.  The PBM had contracted with a 55,000-retail-pharmacy network to which the plan participants had access.  The plan claimed that the PBM acted as a fiduciary in "negotiating prices with retail pharmacies and drug manufacturers," and breached its fiduciary duty "by charging [the plan] a higher price than [the PBM] negotiated with retail pharmacies" and not "passing along" all manufacturer rebates to the plan.  Id. at 466, 470-71.

The district court granted the PBM's motion to dismiss the plan's claims and the Seventh Circuit affirmed, holding that the "district court correctly concluded that [the PBM] was not a fiduciary for the purpose of negotiating prices with drug retailers."  Id. at 475.  The Seventh Circuit emphasized that the "contract contained no mechanism for a pass-through of any additional savings [the PBM] managed to negotiate with retailers."  Id. at 473.  The court also noted that the PBM was not representing any one plan in these negotiations:

> [The PBM] had many clients and could use this volume to negotiate better prices with the retailers than a single client could negotiate. [The PBM] could then pass some of those savings on to clients like [the plan] and still make money by keeping the difference for itself. By agreeing to pay a fixed amount to [the PBM], [the plan] forwent its opportunity to garner any additional savings that [the PBM] could extract from retailers.

Id. at 474.

Similarly, in Moeckel v. Caremark RX Inc., 622 F. Supp. 2d 663 (M.D. Tenn. 2007), a participant in a self-funded prescription drug plan brought a putative class action against a PBM, alleging that the PBM acted as a fiduciary when it negotiated drug prices with its network of

retail pharmacies and breached its fiduciary duty "by creating hidden 'pricing spreads' that

yielded significant revenue to [the PBM] that it failed to pass through to the plans."  Id. at 667.

Addressing this allegation, the district court began its analysis with a general comment regarding

the nature of a PBM's non-fiduciary role in negotiating drug prices and payment terms with

retail pharmacies in its network:

> In the absence of evidence to the contrary, however, this role--[the PBM's]
> contracting with retail pharmacies in its proprietary network--is separate and
> distinct from [the PBM's] contractual relationship with [the plan sponsor] or any
> of its other customers. It is part of [the PBM's] administration of its own business
> as a PBM. As such, it is not fiduciary in nature.

Id. at 677.

The court then focused on the undisputed evidence – principally the PBM's agreement

with the plan sponsor – and found no basis to conclude that the PBM's negotiation of drug

pricing and payment terms and its retention of "spread" constituted fiduciary conduct:

> As in the Carpenters case,[13] here there is no provision in the PBM Agreements
> requiring or even authorizing [the PBM] to negotiate with retail pharmacies on
> behalf of or for the benefit of [the plan sponsor], let alone the …Plan. Absent a
> provision in the governing documents requiring or authorizing [the PBM] to
> negotiate with retail pharmacies on behalf of or for the benefit of [the plan
> sponsor] or to share the "spread" or other discounts, the court cannot impose a
> duty on [the PBM] to so act.

Id. at 680.  The court granted summary judgment to the PBM on the plan participant's breach of

fiduciary duty and prohibited transaction claims.  Id. at 693; see also DeLuca v. Blue Cross Blue

Shield of Mich., 628 F.3d 743, 747-48 (6th Cir. 2010) (rejecting beneficiary's breach of

fiduciary duty and prohibited transaction claims where claims administrator for self-insured

health plan did not act as a fiduciary in negotiating system-wide payment schedules and

reimbursement rates with health-care providers); Am. Drug Stores v. Harvard Pilgrim Care, 973

---

[13] This reference is to Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc., 474 F.3d 463 (7th Cir. 2007), described above.

F. Supp. 60, 68 (D. Mass. 1997) ("[T]he organization and offering of restricted pharmacy networks should be seen as part of the carrier's own administration rather than its administration of ERISA plans.").

As in these cases, Plaintiffs' strained claims of unlawful fiduciary conduct by Optum (allegedly as an agent of Cigna and/or CHLIC) in negotiating drug prices and payment terms fall short of the mark.  The Optum-Retail Pharmacy Contracts that Plaintiffs attack are the product of Optum's non-fiduciary efforts to administer its retail pharmacy network, not the discretionary representation of the individual plans in which Plaintiffs participate.  See Compl. ¶¶ 3-4, 17-18, 42, 58(c), 270-79.  The absence of fiduciary conduct is also apparent from the agreements between CHLIC and the employer sponsors of the plans in which each Plaintiff participates.  As in Chicago District Council and Moeckel, these agreements establish that there is no requirement that any spread resulting from negotiations with the pharmacies must be shared with the plan sponsor.  To the contrary, the agreements expressly provide that Cigna will retain any positive differential and absorb any negative differential.[14]

For all of these reasons, Plaintiffs' breach of fiduciary duty and prohibited transaction claims fail for the most basic of reasons – they have not made a plausible allegation that Cigna, CHLIC, and/or Optum have acted as a fiduciary in connection with the conduct that Plaintiffs challenge.[15]  Counts II, III, IV, VI and VII should therefore be dismissed.

---

[14] See Ex. 9 at Appx. 0338 (Negron); Ex. 10 at Appx. 0377 (Negron); Ex. 13 at Appx. 0533 (Perry); Ex. 14 at Appx. 0571 (Perry); Ex. 2 at Appx. 0081-82 (Curols); Ex. 6 at Appx. 0198 (Gallagher); Ex. 7 at Appx. 0237 (Gallagher); Ex. 15 at Appx. 0605-06 (Legal Notice to Plan Sponsors).

[15] Plaintiffs also try to impose co-fiduciary liability and non-fiduciary liability on Defendants under ERISA Sections 405 and 502(a)(3).  Compl. ¶¶ 215-19, 223-25.  But these claims are wholly conclusory and derivative of Plaintiffs' other fiduciary breach and prohibited transaction claims in Counts II, III, and IV.  They depend entirely on Plaintiffs' allegations that Optum acted as a fiduciary when negotiating drug prices and payment terms with pharmacies, thereby making Cigna and/or CHLIC liable as either co-fiduciaries or non-fiduciary parties in interest for any violations of ERISA Sections 404(a) or 406(a).  Because these claims require an antecedent breach of fiduciary duty or trust to be viable, Plaintiffs' failure to plead any underlying fiduciary conduct (or violations) requires dismissal of Counts VI and VII.  See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238,

**B.     Even If Plaintiffs Have Made Plausible Allegations Of Fiduciary Conduct As To The Actions They Challenge, Their Prohibited Transaction Claims In Counts II And III Should Be Dismissed For Other Reasons**

**1.     Plaintiffs' Claims Under ERISA Sections 406(a)(1)(C), 406(a)(1)(D), And 406(b)(2) Are Not Based On Plan Transactions**

ERISA Section 406(a) prohibits a fiduciary from knowingly causing a benefit plan to engage in a transaction with a party in interest unless certain prescribed conditions are satisfied. 29 U.S.C. § 1106(a).  A "party in interest" includes another fiduciary, a plan service provider, or the plan sponsor.  Id. § 1002(14).

Plaintiffs invoke Section 406(a)(1)(C) and (D) in Count II, but they fail to identify the specific *plan* transaction that Defendants purportedly caused.  See Compl. ¶¶ 171-83.  To the extent they are focusing on the Optum-Retail Pharmacy Contracts they attack throughout their Complaint, they do not and cannot allege that the respective plans in which each Plaintiff participates are parties to these agreements.  That deficiency dooms their claims under Sections 406(a)(1)(C) and (D).[16]  See Middleton v. Stephenson, No. 2:11-313 (TS), 2011 WL 6131334, at *3 (D. Utah Dec. 8, 2011) (rejecting prohibited transaction claim under ERISA Section 406(a)(1) because plan trustee's dealings "were not transactions between the Plan and a party in interest").

Plaintiffs' prohibited transaction claim in Count III under Section 406(b)(2) suffers from the same problem.  Section 406(b)(2) prohibits a fiduciary from acting "in any transaction

---

245-51 (2000); In re Citigroup ERISA Litig., 662 F.3d 128, 145 (2d Cir. 2011), abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459 (2014) (affirming dismissal of co-fiduciary breach claim where plaintiffs failed to plead underlying breach of fiduciary duty); Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-1839 (VAB), 2016 WL 7494320, at *11 (D. Conn. Dec. 30, 2016) ("Without an underlying breach of fiduciary duty or breach of trust on the part of a Plan fiduciary, Prudential cannot be held liable for a knowing, participation in a breach of trust" for non-fiduciary liability).  Plaintiffs' "duty to monitor" claim against Cigna, Compl. ¶ 199, fails for the same reason.  See Jander v. Int'l Business Machines Corp., No. 15-3781 (WHP), 2016 WL 4688864, at *6 (S.D.N.Y. Sept. 17, 2016) (dismissing duty to monitor claim because "Plaintiffs have failed to allege an underlying breach").

[16] Plaintiffs also do not allege that Cigna, CHLIC, or Optum "knows or should know" that the transactions Plaintiffs challenge are prohibited.  That provides an additional basis for dismissing Count II.  See Marks v. Independence Blue Cross, 71 F. Supp. 2d 432, 438 (E.D. Pa. 1999).

*involving the plan* on behalf of a party…whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries…"  29 U.S.C. § 1106(b)(2) (emphasis added). Plaintiffs once again focus on "clawbacks" in asserting this claim.  See Compl. ¶ 189.  But the plans in which each Plaintiff participates are not parties to the pharmacy agreements upon which Plaintiffs' claim is based.  Plaintiffs' claim under Section 406(b)(2) should therefore be dismissed.  See Donovan v. Bierwirth, 680 F.2d 263, 270 (2d Cir. 1982), cert. denied, 459 U.S. 1069 (1982) ("We read this section of the statute [Section 406(b)(2)] as requiring a transaction between the plan and a party having an adverse interest.").

### 2. Plaintiffs' Claims Under ERISA Sections 406(a)(1)(D), 406(b)(1), And 406(b)(3) Do Not Involve Plan Assets

ERISA Section 406(a)(1)(D) prohibits transfers of "plan assets" to, or use of plan assets for the benefit of, a party in interest, while Sections 406(b)(1) and 406(b)(3) forbid a fiduciary from dealing with plan assets "in his own interest or for his own account" or from receiving consideration "for his own personal account" in connection with a transaction "involving plan assets."  29 U.S.C. §§ 1106(a)(1)(D), (b)(1), and (b)(3).  Plaintiffs attempt to rely on these statutory provisions by mischaracterizing as "plan assets" (1) the copayments, coinsurance, and deductibles they pay to pharmacies for prescription drugs, and (2) "the contracts underpinning these ERISA Plans…."  Compl. ¶¶ 180, 187.  Their expansive definition of "plan assets" finds no support in ERISA, the Department of Labor's regulations and advisory opinions, or the limited caselaw addressing the issue.

Congress deferred to the Department of Labor ("DOL") in defining "plan assets" under ERISA:  "the term 'plan assets' means plan assets as defined by such regulations as the Secretary [of Labor] may prescribe…."  29 U.S.C. § 1002(42).  For situations not specifically addressed in the DOL regulations, the DOL and the courts have repeatedly instructed that "the assets of a plan

generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law," and will include property "in which the plan has a beneficial ownership interest." See, e.g., DOL Advisory Op. No. 93-14A (May 5, 1993); Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647-48 (8th Cir. 2007) (relying on "ordinary notions of property rights" in concluding that unpaid contributions to retirement plan are not plan assets).

Applying that commonsense standard here, there is simply no basis for Plaintiffs' position that the copayments, coinsurance, and deductibles they pay to their pharmacies constitute plan assets. Such payments cannot logically be the property of a plan when they are, by definition, amounts that the plan will not cover. See Compl. ¶¶ 2, 46. The applicable DOL regulations recognize as much, defining as plan assets only those participant payments that are contributed to the plan:

> [T]hat a participant or beneficiary *pays to an employer*, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, as of the earliest date on which said contributions or repayments can reasonably be segregated from the employer's general assets.

29 C.F.R. § 2510.3-102 (emphasis added). As Plaintiffs themselves acknowledge, their copayments, coinsurance, and deductibles are paid to their pharmacies, not the plans or their employer. See Compl. ¶¶ 2, 15. They cannot constitute plan assets, therefore, under Sections 406(a)(1)(D), 406(b)(1), or 406(b)(3).

For the same reason, Plaintiffs are wrong when they describe the contracts "underpinning" their plans as plan assets. Compl. ¶¶ 180, 187. Plaintiffs fail to identify the contracts to which they are referring, and that deficiency alone warrants dismissal of their claim under Rule 8. See Gov't Emps. Ins. Co. v. Korn, No. 14-5142 (RMB), 2016 WL 1597240, at *4 (D.N.J. Apr. 25, 2016) (dismissing breach of contract claims where party failed to identify the

contracts at issue).  But assuming these agreements include the Optum-Retail Pharmacy

Contracts referenced elsewhere in the Complaint, it is nonsensical to consider such agreements to

be property in which the relevant plans have an ownership interest.  Plaintiffs' description of

Optum and its pharmacy agreements belies any suggestion that these contracts are plan assets.

See Compl. ¶¶ 42, 58(c).  These agreements, which create a network of pharmacies for multiple

plans to access, are plainly not an asset of every plan that has access to that network.  Such an

interpretation cannot be reconciled with "ordinary notions of property rights," as the DOL

requires.  See Carpenters, 474 F.3d at 476 n.6 (holding that PBM "was not controlling assets of

the plan but rather was controlling its own assets in making . . . contractual rebate payments" to

plan).

        In light of Plaintiffs' inability to identify plan assets that are involved in the transactions

they challenge, Plaintiffs cannot proceed with their claims under Sections 406(a)(1)(D),

406(b)(1), and 406(b)(3).  Accordingly, those claims should be dismissed.  See Faber v. Metro.

Life Ins. Co., 648 F.3d 98, 106 (2d Cir. 2011) (affirming dismissal of Section 406(b)(1) claim

because retained asset accounts were not plan assets where plans "do not have an ownership

interest -- beneficial or otherwise -- in them"); DeLuca, 628 F.3d at 748 (holding that negotiation

of reimbursement rates with healthcare providers did not constitute control over plan assets).

###    C.    Even If Plaintiffs Have Made Plausible Allegations Of Fiduciary Conduct As To The Actions They Challenge, Their Breach Of Fiduciary Duty Claims In Count IV Should Be Dismissed For Other Reasons

####        1.    Spread, Or What Plaintiffs Label As "Clawbacks," Is Not Unlawful

        Plaintiffs allege that Cigna, CHLIC and Optum have breached the fiduciary duties of

loyalty and prudence "[i]n setting the amount of and taking excessive undisclosed 'Spread'

compensation, including 'Clawbacks.'"  Compl. ¶¶ 196-97.  Their Complaint is replete with

loaded terms such as "inflate," "defraud," "overcharge" and, of course, "clawback," that suggest

there is something inherently evil about the fact that a plan participant's prescription drug copayment may be more than what a pharmacy has agreed to be reimbursed for a drug in arm's-length negotiations with a PBM.  What Plaintiffs conveniently fail to note, however, is that plan participants also routinely make copayments that are *less* than what the pharmacy is owed, particularly in the case of brand-name drugs.  See supra at 9.  There is nothing remarkable about this kind of plan design, and courts faced with similar allegations have held that they do not give rise to a breach of fiduciary duty.

In Alves, the court addressed the question of whether the sponsor of a health plan "may charge its members a 'copayment' for certain prescription drugs that sometimes exceeds its own per-unit cost because of discounting arrangements with prescription drug providers."  Id. at 202-03.  After noting that the plaintiffs had conceded "that the creation of the business terms of an ERISA plan is not a fiduciary act," the court nonetheless proceeded to analyze whether a breach of fiduciary duty occurred and found no breach.  Id. at 210-11.  In addressing the plaintiffs' allegation that the plan sponsor "uses the copayment paid by members of the class to reduce its costs on higher-priced subscriptions," the court observed that such "[c]ross-subsidies whereby the insurer's net profit from purchases of low-cost drugs helps to subsidize the large costs incurred from purchases of high-cost medications, are not uncommon in other areas of health care," and represent "the sort of reasonable line-drawing that the caselaw clearly permits."  Id. at 210; see also Hannan, 2016 WL 1254195, at *1, 4 (dismissing breach of fiduciary duty and prohibited transaction claims related to alleged life insurance "cross-subsidization and kickback scheme" where the "fact that [the insurer] profits from the relationship and does not allocate all of Plaintiffs' premiums to offsetting its liabilities is neither unique nor improper").

Thus, even if Plaintiffs have plausibly alleged that Cigna and CHLIC engaged in fiduciary conduct in connection with their "clawback" claims, the fact that Plaintiffs' cost-sharing obligations may have been different from, and in some cases greater than, the amount the pharmacy contracted to receive for a particular prescription drug does not, by itself, constitute a breach of fiduciary duty.  Count IV can therefore be dismissed on this alternative ground.

### 2.   Cigna And CHLIC Do Not Owe Plaintiffs A Duty To Disclose

Plaintiffs also claim that Defendants have a duty of loyalty to disclose to plan participants "the fact or amount of the 'Clawbacks' they were being charged," and that "plan participants were paying more in copayments and coinsurance than the cost of the drug if purchased outside their respective plans."  Compl.  ¶ 198.  Their Complaint fails to provide a basis for imposing such a duty of disclosure on Cigna or CHLIC.

As a starting point, the Second Circuit has acknowledged that "[f]iduciary liability may also arise from a fiduciary's material omissions, or failure to speak," but only in "a limited number of circumstances."   Bell v. Pfizer, Inc., 626 F.3d 66, 75 n.4 (2d Cir. 2010).  Based on that restricted view, courts in the Second Circuit and elsewhere have refused to find that a fiduciary's failure to disclose information regarding financial arrangements similar to those at issue here can give rise to a breach of fiduciary duty.  See Amatangelo v. Nat'l Grid USA Serv. Co., No. 04-246, 2011 WL 3687563, at *9 (W.D.N.Y. Aug. 23, 2011), aff'd sub nom. Argay v. Nat'l Grid USA Serv. Co., 503 F. App'x 40 (2d Cir. 2012) ("Defendants were not required to disclose [to participants] how the premium liabilities for each benefit structure are paid under the plan."); Weiss v. CIGNA Healthcare, Inc., 972 F. Supp. 748, 755 (S.D.N.Y. 1997) ("ERISA imposes no affirmative obligation upon CIGNA to inform Plan participants about its financial arrangements with participating physicians, and plaintiff's fiduciary duty claim arising from CIGNA's alleged failure to disclose such arrangements is accordingly dismissed.").

Plaintiffs offer no justification for departing from this caselaw and imposing on Cigna and CHLIC the broad duty of disclosure they advocate here.  The SPDs for the plans in which each Plaintiff participates sets forth the maximum copayment or coinsurance that they can be expected to pay for different categories of drugs,[17] and nothing else is required by the applicable DOL regulations.  See 29 C.F.R. § 2520.102-3 (j)(3) (requiring disclosure in SPD of "[a]ny cost-sharing provisions, including premiums, deductibles, coinsurance, and copayment amounts for which the participant or beneficiary will be responsible").  As Plaintiffs themselves admit, they have not paid any more than the copayment or coinsurance that was disclosed to them.  See Compl. ¶¶ 69(l)-(p), 92-95.  It is the pharmacies that remit the alleged "clawback," not Plaintiffs. See id. ¶¶ 9, 11, 15, 58(c), 65-66, 68, 71.  It makes no sense, therefore, to require Cigna and CHLIC to disclose to Plaintiffs what the pharmacies may pay as part of their contractual arrangement with the PBM.  See Alves, 204 F. Supp. 2d at 213 (finding no duty to disclose to participants the difference between copayments and actual costs or whether discounts are passed on to participants).

There is likewise no fiduciary duty to disclose to Plaintiffs what a particular pharmacy might charge them if they did not use their employer-sponsored healthcare coverage.  Plaintiffs acknowledge that such a duty would only be triggered "in certain circumstances," but they fail to explain what those "circumstances" are or exactly what such a disclosure would include.  See Compl. ¶ 17.  It is simply not reasonable to expect that Cigna and CHLIC would anticipate and flag for Plaintiffs alleged "circumstances," if any exist, in which a pharmacy might accept less than its U&C charge when the U&C charge is supposed to represent "the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its

---

[17] See Ex. 8 at Appx. 301-02 (Negron); Ex. 11 at Appx. 0435 (Perry); Ex. 12 at Appx. 0496 (Perry); Ex. 1 at Appx. 0018 (Curols); Ex. 3 at Appx. 0137-138 (Gallagher).

customers regardless of the customer's payment source."  Id. ¶ 92(b) n.20.  That is particularly

true where, as here, the plan design provides that the pharmacy should never charge more to a

customer (participant) than its U&C.  See supra at 10-12.  See Stahl v. Tony's Bldg. Materials,

Inc., 875 F.2d 1404, 1408 (9th Cir. 1989) (refusing to require plan administrator "to discuss the

application of general rules to a wide range of particular situations and thereby provide specific

advice to employees on how to shape their conduct to fit the rules").

## III.   Count V Should Be Dismissed Because Plaintiffs Have Failed To State A Plausible Claim Under ERISA Section 702

Plaintiffs also allege that Defendants violated ERISA Section 702 – part of the Health

Insurance Portability and Accountability Act of 1996 ("HIPAA") – based on their "medical

conditions."  Compl. ¶¶ 206-12.  Section 702(b) prohibits a group health plan or insurer from

discriminating against an individual by requiring the "individual (as a condition of enrollment or

continued enrollment under the plan) to pay a premium or contribution which is greater than

such premium or contribution for a similarly situated individual enrolled in the plan on the basis

of any health status-related factor," including, among others, a "medical condition."[18]  29 U.S.C.

§ 1182(b)(1).  Plaintiffs claim that "Defendants have required plan participants and beneficiaries

who have medical conditions that require prescription medications that are subject to

Defendants' undisclosed excessive 'Spreads' and 'Clawbacks' to pay greater premiums and

contributions than those participants and beneficiaries who do not need prescription medications

that are subject to Defendants' undisclosed excessive 'Spreads' and 'Clawbacks' for their health

benefits."  Compl. ¶ 208.  Although Plaintiffs try to parrot the language of the statute, it is

---

[18] "Medical condition" is defined under the regulations as "any condition, whether physical or mental, including, but not limited to, any condition resulting from illness, injury (whether or not the injury is accidental), pregnancy, or congenital malformation. However, genetic information is not a condition."  29 C.F.R. § 2590.701–2.

apparent from the Complaint that their claim fails as a matter of law because they challenge conduct that is not proscribed by Section 702.

Critically, Plaintiffs do not and cannot plausibly allege that Defendants orchestrated their purported "clawback scheme" to discriminate against (or single out) Plaintiffs on the basis of their medical conditions (which they do not even disclose in the Complaint). See Compl. ¶¶ 208-09.  In fact, they acknowledge that the cost-share amount required to be paid for prescription drugs under a particular plan is calculated the same way for everyone covered under that plan regardless of an individual's medical condition or the specific drug being purchased.  See id. ¶¶ 88-89.  That is all that Section 702 requires.  See 29 C.F.R. § 2590.702(b)(2)(i)(B) (explaining that Section 702 authorizes a plan to "limit or exclude benefits for certain types of treatments or drugs," so long as "the benefit limitation or exclusion applies uniformly to all similarly situated individuals and is not directed at individual participants or beneficiaries based on any health factor [i.e., medical condition] of the participants or beneficiaries").

Plaintiffs' Section 702 claim is not that they are required to pay more than a "similarly situated" individual enrolled in each of the respective plans, but that they should only pay what the pharmacy has agreed to be reimbursed for a prescription drug.  See Compl. ¶¶ 11, 208-10.  Plaintiffs' allegation that their prescription drug cost-sharing obligations are greater for some drugs than what a particular pharmacy has agreed to accept for obtaining and dispensing that drug does not state a claim under Section 702.  See 29 C.F.R. § 2590.702(b)(2)(i)(D) (concluding, by way of example, that a policy where a prenatal doctor visit, unlike other types of doctor visits, is not subject to an annual deductible and coinsurance requirement is not discriminatory "because a plan may establish different deductibles or coinsurance requirements for different services if the deductible or coinsurance requirement is applied uniformly to all

similarly situated individuals and is not directed at individual participants or beneficiaries"). Plaintiffs do not allege that they were singled out because of their alleged medical conditions under the terms of their respective plans, and Count V should therefore be dismissed.[19]

## IV.   Count VIII Should Be Dismissed Because Plaintiffs Have Failed To State A RICO Claim Against Cigna And/Or CHLIC

RICO was enacted "to seek the eradication of organized crime in the United States." Pub. L. No. 91-452 (1970).  It is primarily a criminal statute, but nonetheless provides that private parties who have been injured "by reason of" a RICO violation may in certain circumstances recover civilly.  18 U.S.C. § 1964(c).  In considering RICO claims, courts should attempt to achieve results "consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime."  United States v. Porcelli, 865 F.2d 1352, 1362 (2d Cir. 1989).  They should also "be mindful of the devastating effect [civil RICO] claims may have on defendants."  Manhattan Telecomm'ns Corp., Inc. v. DialAmerica Mktg., Inc., 156 F. Supp. 2d 376, 380 (S.D.N.Y. 2001).  "Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."  Katzman, 167 F.R.D. at  655.

Plaintiffs frame their RICO claim under 18 U.S.C. § 1962(c).  Such a claim requires allegations of fact that if true would establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering."  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); see Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir. 1994).  "Racketeering activity" is defined with reference to specific predicate acts.  See 18 U.S.C. § 1961(1).

---

[19] See, e.g., Zurich Am. Ins. Co. v. O'Hara, 604 F.3d 1232, 1238-39 (11th Cir. 2010) (dismissing beneficiary's claim because plan's policy of seeking reimbursement "applie[d] uniformly to all participants," so the mere fact that beneficiary was affected while others were not did "not render the Plan discriminatory"); Ames v. Grp. Health Inc., 553 F. Supp. 2d 187, 194 (E.D.N.Y. 2008) (holding that insurer's denial of benefits under group health contract did not violate Section 702 where plaintiff was unable to establish that contract's rules for eligibility were discriminatory even though they "had an adverse impact on an individual with a health factor").

Plaintiffs' RICO claim against Cigna and CHLIC[20] under 18 U.S.C. § 1962(c) fails as a matter of law for two fundamental reasons.  First, neither Cigna nor CHLIC "conducts" the affairs of Optum or Argus, the alleged RICO "enterprises" identified by Plaintiffs in Count VIII.[21]  Arm's-length contractual relationships between sophisticated independent actors – all that the Complaint alleges – do not create an inference that one actor operates or manages the others in violation of RICO.  Second, alleged violations of the terms of Plaintiffs' plans do not amount to mail or wire fraud that could constitute predicate acts in support of a RICO claim.  That Plaintiffs label alleged violations of plan terms as "racketeering" does not change the fact that their claims arise from what amount to contractual obligations enforceable under ERISA and that the alleged violations cannot constitute predicate acts of mail or wire fraud.  Indeed, Plaintiffs fail to allege any predicate acts (i.e., mail or wire fraud) with the particularity required by Rule 9(b).  Count VIII should be dismissed.

### A.    Neither Cigna Nor CHLIC "Conducts The Affairs" Of Optum Or Argus

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Focusing on the first element – "conduct" – the Supreme Court has held that to "conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs," one must "participate in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  In

---

[20] As explained above, Plaintiffs' improper group pleading provides an independent basis for dismissing the Complaint in its entirety under Rule 8.  See supra note 11.

[21] Between Counts VIII and IX, Plaintiffs allege the existence of "four separate and distinct enterprises."  Dkt. 51, Am. RICO Case Stmt. 2.  Under Count IX, Optum – an enterprise supposedly "operated and managed" by Cigna and/or CHLIC (as alleged in Count VIII, see Compl. ¶ 238) – is not an enterprise at all, but rather a RICO "person" conducting the affairs of a separate RICO enterprise.  See Compl. ¶¶ 264–65, 270.  That Plaintiffs are unable to settle on a single RICO theory to fit the allegations of the Complaint is further evidence that they are "trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions."  Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1025 (7th Cir. 1992).

circumstances like those alleged by Plaintiffs, the "operation or management" test is "a very difficult test to satisfy."  LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996).  This is because there is a "substantial difference between actual control over an [alleged] enterprise and association with an [alleged] enterprise in ways that do not involve control; only the former is sufficient under Reves because the test is not involvement but control."  Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998).

Here, Plaintiffs allege that, by virtue of arm's-length vendor contracts, Cigna and/or CHLIC conduct the affairs of Argus and Optum for purposes of RICO.  Compl. ¶¶ 238, 243, 250(b).[22]  But arm's-length business dealings with an alleged enterprise do not satisfy the "operation or management" test because "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Reves, 507 U.S. at 185 (emphasis in original); see id. (explaining that liability does not extend to "complete 'outsiders'"); Yellow Bus Lines, Inc. v. Drivers, Chaufffeurs & Helpers Local Union 639, 913 F.2d 948, 955 (D.C. Cir. 1990) (en banc) (explaining that an "external entity attempting to contract with the putative enterprise" is not "participating in the conduct" of that enterprise's affairs).

For example, in Vickers Stock Research Corp. v. Quotron System, Inc., the plaintiffs agreed to sell financial research information to Quotron, which in turn sold that information to its customers.  No. 96-2269, 1997 WL 420265, at *1 (S.D.N.Y. July 25, 1997).  The plaintiffs claimed that Quotron violated RICO by underreporting its sales and paying the plaintiffs less than they were entitled to under the terms of their agreement.  Id.  The plaintiffs, claiming to be

---

[22] There are no factual allegations in the Complaint that Cigna and/or CHLIC interacted with Argus or Optum (or its predecessor, Catamaran) in any way other than pursuant to the applicable contracts.  Bald and conclusory assertions that Cigna and/or CHLIC "operated and managed" the entities, Compl. ¶ 238, or "exert[ed] control over Argus and OptumRx," id., or "directed" their affairs, id. ¶¶ 242, 245, 249, are insufficient to withstand a motion to dismiss. See Twombly, 550 U.S. at 557.

RICO "enterprises," argued that Quotron participated in the "operation or management" of their affairs by helping them to implement their contractual arrangement.  Id. at *4.  The court granted Quotron's motion to dismiss and ruled that Quotron, as a matter of law, did not "participate in the operation or management" of the alleged RICO enterprises.  The court explained that Quotron's dealings with the alleged enterprises arose "directly from their contractual relationship," and "any persuasive power Quotron may have possessed to induce plaintiffs to take certain actions with respect to its research information [sprang] from their contractual relationship."  Id.  In other words, "theirs was a business relationship pure and simple," and "[t]o hold that Quotron's acts constitute control for RICO purposes would be to 'RICO-ize' contract claims where the parties had worked closely together to realize contractual goals."  Id.

Plaintiffs may argue that their RICO claim should be allowed to proceed because the Complaint contains allegations (albeit conclusory) that Cigna and/or CHLIC provided false information to Argus and Optum in order to defraud Plaintiffs.  See Compl. ¶¶ 237-39, 242, 259.  But the alleged provision of false information to an independent actor in furtherance of an alleged scheme to defraud a third party does not satisfy the test requiring "operation or management" of an "enterprise."  In Crabhouse of Douglaston Inc. v. Newsday Inc., plaintiff-advertisers alleged that defendant-publishers submitted inflated circulation reports to a third-party auditor, thereby causing the auditor to overestimate the publishers' circulations and allowing the publishers to charge advertisers more.  801 F. Supp. 2d 64, 75 (E.D.N.Y. 2011).  The advertisers sued under RICO and alleged, inter alia, that the publishers "conducted" the affairs of the auditor (the alleged enterprise) by providing the false circulation reports.  Id.  The court dismissed the RICO claim because the advertisers failed to plead facts establishing that the publishers operated or managed the third-party auditor.  "Although the false circulation reports

submitted to [the third-party auditor] likely affected the content of the final audit report," the court concluded that "to suggest that this effect is tantamount to participating in or conducting the operation or management of the entity is a bridge too far." Id.  The court explained that the third-party auditor "stood at arm's length" to the publishers, and the publishers' "submission of false information alone would not have changed the tenor of that relationship, or altered the internal processes by which [the third-party auditor] authenticates the information that it receives." Id.

Just as Quotron did not control the affairs of its contracting partners and as the publishers in Crabhouse did not "operate or manage" an independent enterprise simply because they used it to facilitate their business dealings with advertisers, Cigna and CHLIC do not "operate or manage" Optum and Argus by contracting with them to provide specific services to facilitate the provision of benefits to Plaintiffs.  The factual allegations of the Complaint make clear that Optum and Argus are independent actors separate and apart from Cigna and CHLIC, and their relationships are governed by negotiated "contracts and agreements" in which Optum and Argus "agreed to process claims" submitted by plan participants.  See Compl. ¶¶ 238, 243, 250(b).  The contracts with Optum and Argus create garden-variety "business relationships" and, without more, cannot sustain a claim that Cigna and/or CHLIC "conducted the affairs" of the alleged RICO enterprises, Optum or Argus.  In re WellPoint, Inc. Out-of-Network UCR Rates Litig., 865 F. Supp. 2d 1002, 1034–35 (C.D. Cal. 2011).  The Complaint thus fails to state a RICO claim against either Cigna or CHLIC, and Count VIII should be dismissed.

### B.    Plaintiffs Fail to Allege Cognizable Predicate Acts of Mail and Wire Fraud

Plaintiffs rely solely on predicate offenses of mail and wire fraud to support their RICO claim in Count VIII.  Among the "essential elements" of mail and wire fraud is the existence of a "scheme or artifice to defraud . . . by [means] of false or fraudulent pretenses, representations, or

promises."  18 U.S.C. §§ 1341, 1343; see Neder v. United States, 527 U.S. 1, 22–23 (1999)

(holding that only material misrepresentations or omissions violate the mail and wire fraud

statutes).  "Given the routine use of mail and wire communications in business operations," the

Second Circuit has cautioned that "RICO claims premised on mail or wire fraud must be

particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO

pattern from allegations that, upon closer scrutiny, do not support it."  Crawford v. Franklin

Credit Mgmt. Corp., 758 F.3d 473, 489 (2d Cir. 2014).

       Here, Plaintiffs attempt to recast their claim for alleged violations of plan terms – a claim

sounding in contract – as a RICO claim sounding in fraud.  The alleged "scheme to defraud" in

this case arises from Plaintiffs' suggestion that Cigna and/or CHLIC "create[d] a mechanism

through which [Cigna and/or CHLIC] could obtain additional monies beyond what Plaintiffs and

Class members *should have paid under their Plans* for medically necessary prescription drugs."

Compl. ¶ 245 (emphasis added); see id. ¶¶ 5, 18, 61; Dkt. 51, Am. RICO Case Stmt. 2.

       As a threshold matter, Plaintiffs' bald claim that they would have paid less for their

prescription drugs if the contractual arrangements among Cigna, CHLIC, Optum, Argus, and/or

various pharmacies were different[23] is not legally actionable.  Plaintiffs are not entitled to lower

prescription drug prices simply because they expect or want to pay less for prescription drugs,

and it is not unlawful for Plaintiffs' cost-share obligations to differ from the rates pharmacies

have agreed to receive for providing those drugs.  See supra Part 26-28.  Conclusory allegations

---

[23]  See, e.g., Compl. ¶ 19 ("[P]atients should pay only the charges by the pharmacies under these agreements" because "the very purpose" of health insurance is to secure "reduced costs for prescription drugs"); ¶ 47 ("Patients . . . expect to pay the same prices or better than uninsured or cash-paying individuals for a prescription."); ¶ 64 ("Plaintiffs and the Class have been deprived of the opportunity to purchase their prescription drugs not only at prices their Plan dictate, but also at the retail cash price the pharmacy would charge to someone without insurance.").

that Plaintiffs are entitled to lower prescription drug prices do not state a RICO cause of action and are entitled to no weight at the motion-to-dismiss stage.  See Twombly, 550 U.S. at 557.

Second, to the extent Plaintiffs allege that the amounts they should pay for prescription drugs are set by the terms of their plans and that Defendants violated the terms of their plans "by overcharging [Plaintiffs] for the cost of medically necessary prescription drugs," Compl. ¶ 5, their claim is for alleged violations of plan terms, i.e., contractual obligations enforceable under ERISA.  It is not fraud.

The general rule applicable here is that "[a] breach of contract does not amount to mail [or wire] fraud."  United States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 660 (2d Cir. 2016) (quoting United States v. D'Amato, 39 F.3d 1249, 1261 n.8 (2d Cir. 1994)).  Indeed, "proof that a promise was made and that it was not fulfilled" has "never been" sufficient to prove fraud.  Id. at 659.  That principle was universally accepted before Congress passed the mail- and wire-fraud statutes, see, e.g., Burrill v. Stevens, 73 Me. 395, 398 (1882); remained after Congress passed the mail- and wire-fraud statutes, see, e.g., Restatement (First) of Torts § 530 (1938); and is still the law today, see, e.g., O'Donnell, 822 F.3d at 660.  As a result, the allegations that Cigna and/or CHLIC violated the terms of Plaintiffs' plans do not establish "fraud" and cannot support a RICO claim based on predicate acts of mail and wire fraud.  See Perlman v. Zell, 185 F.3d 850, 854 (7th Cir. 1999) ("No fraud, no mail fraud.").[24]

---

[24] The Second Circuit has recognized several limited exceptions to the general rule that a breach of contract is not fraud, but none of those exceptions are pleaded here.  First, Plaintiffs do not "seek special damages that are caused by the [alleged] misrepresentation and unrecoverable as contract damages."  Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996).  Rather, Plaintiffs seek the same actual damages under RICO as they do under their ERISA counts.  See, e.g., Dkt. 51, Am. RICO Case Stmt. 36 ("Damages = Amount Paid – Sum Due Under Contract").  Second, Plaintiffs' mail- and wire-fraud allegations are based on alleged misrepresentations and omissions that are either reflected in the language of the plans or relate to whether Cigna and/or CHLIC performed according to the "Plans' plain language," Compl. ¶ 251; they are not based on matters "collateral or extraneous to the contract."  Bridgestone/Firestone, Inc., 98 F.3d at 20.  Third, and finally, Plaintiffs identify no legal duty separate from the obligation to perform under the ERISA plan documents as a basis for their fraud

Finally, to the extent Plaintiffs premise their allegations of mail and wire fraud on alleged misrepresentations or omissions in the plans themselves, Plaintiffs have not alleged the requisite element of contemporaneous intent to defraud.  The Second Circuit has held that "a fraud claim based on the breach of a contractual promise" requires "fraudulent intent [that] is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it.  Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation."  O'Donnell, 822 F.3d at 662; see Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993) (explaining that "failure to carry out a promise" made in a contract "does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform").  Plaintiffs have not pleaded facts giving rise to a "strong inference" that Cigna and/or CHLIC intended to defraud Plaintiffs in their respective plans.  See Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001) (explaining that Rule 9(b) requires that plaintiffs plead facts giving rise to a "strong inference" that defendants had the requisite intent to defraud); see also Perlman, 185 F.3d at 852 ("When the substance of the promise is fairly debatable . . . and many promises are kept for extended periods before a dispute breaks out, it is hard to see how it could be said that the defendants never intended to keep their bargains.").  Plaintiffs' conclusory reliance on the "totality of the allegations," Compl. ¶ 252, is insufficient to satisfy their pleading obligations.[25]  Count VIII should be dismissed.

---

allegations.  See id.  Nor can they; to treat the alleged failure to fulfill plan terms as mail or wire fraud would transform virtually every case involving the alleged improper denial of benefits into a potential RICO violation.

[25] Plaintiffs' RICO claims also fail to satisfy Rule 9(b) of the Federal Rules of Civil Procedure, requiring the Complaint to "state with particularity the circumstances constituting fraud."  This rule of pleading applies to allegations regarding mail and wire fraud in support of a civil RICO claim.  See, e.g., Mills, 12 F.3d at 1176.  In the Second Circuit, Rule 9(b) requires that plaintiffs "specify the time, place, speaker, and content of the alleged misrepresentations," and that they "explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  Caputo, 267 F.3d at 191.  Here, none of the Plaintiffs offer any specific allegations

**V.      Count X Should Be Dismissed Because Plaintiffs Have Failed To State A RICO Conspiracy Claim Against Cigna And/Or CHLIC**

The Court also should dismiss Plaintiffs' final claim against Cigna and CHLIC, for conspiracy to violate RICO under 18 U.S.C. §§ 1962(d) and 1964(c).  A plaintiff may recover civil penalties for a conspiracy to violate RICO only if he has been injured "by reason of" a RICO violation.  18 U.S.C. § 1964(c).  As explained above and in Optum's Motion to Dismiss, the Complaint does not allege a cognizable violation of RICO.  Plaintiffs thus fail to state a claim under § 1962(d).  See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004).  Count X should be dismissed.

**VI.      CONCLUSION**

For the reasons discussed above, Cigna and CHLIC respectfully request that the Court dismiss the Consolidated Complaint with prejudice.

Dated:  March 10, 2017                              Respectfully submitted,

/s/ Joseph J. Costello
Joseph J. Costello (ct14917)
Brian W. Shaffer (phv08654)
Eleanor R. Farrell (phv08309)
Matthew D. Klayman (phv08656)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone:  215-963-5000
Facsimile:  215-963-5001
joseph.costello@morganlewis.com
brian.shaffer@morganlewis.com
eleanor.farrell@morganlewis.com
matthew.klayman@morganlewis.com

---

regarding which particular drugs they received; nor do they state with any particularity when, where, and how Cigna or CHLIC supposedly made any alleged misstatement to them, and what was supposedly false about the alleged statement.  Further, Negron, Perry, and Gallagher allege neither the particular amounts they claim they should have been charged under their plans for each drug, nor the amounts Plaintiffs were actually charged in each instance.

Michael C. D'Agostino (ct7294)
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103
Telephone:  860-240-2731
Facsimile:  860-240-2800
michael.d'agostino@morganlewis.com

*Attorneys for Defendants Cigna Corporation and
Cigna Health and Life Insurance Company*