**Redacted version of document sought to be filed under seal.**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| IN RE CIGNA CORPORATION PBM LITIGATION | Case No. 3:16-cv-1702-WWE (Consolidated) May 1, 2017 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

— ORAL ARGUMENT REQUESTED —

TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................ 3

III.    STANDARD OF REVIEW .......................................................................... 9

IV.     ARGUMENT ............................................................................................... 10

        A.      THE COMPLAINT ALLEGES VIOLATIONS OF ERISA ............................ 10

                1.      Plaintiffs are entitled to enforce their rights under the plans
                        pursuant to ERISA § 502(a)(1)(B) (Count I) .................................... 12

                        a.      Plaintiffs neither received notice of a denial of benefits
                                nor were aware that they had a claim to appeal ........................ 12

                        b.      Requiring exhaustion would be futile and inequitable ............. 15

                        c.      Exhaustion was futile because the Clawback Scheme was
                                a long-standing, broadly applied policy .................................... 16

                2.      The Complaint alleges that Defendants breached their
                        fiduciary duties ................................................................................ 18

                        a.      Defendants are fiduciaries ......................................................... 19

                                (i)     Defendants are fiduciaries because they were granted
                                        discretionary authority under the contracts ..................... 20

                                (ii)    Defendants exercised discretionary authority or
                                        control over the manangement of the plans ...................... 21

                                (iii)   Defendants are fiduciariaries because they exercised
                                        discretion over their own compensation ........................... 23

                                (iv)    Defendants have and exercised authority or control
                                        respecting the management and disposition of Plan assets .............. 24

                                (v)     Plaintiffs' allegations do not concern plan-design
                                        decisions ........................................................................... 27

                                (vi)    Plaintiffs do not contest negotiation of pharmacy
                                        contracts ............................................................................ 29

                3.      Defendants breached their fiduciary duties .................................... 31

                        a.      Defendants breached their fiduciary duties by violating
                                the terms of the plans (Count IV) .............................................. 31

                        b.      Defendants breached their duty of loyalty by charging
                                Spread and taking Clawbacks (Count IV) .................................. 32

                        c.      Defendants breached their fiduciary duties by
                                misrepresenting cost-sharing amounts. (Count IV) ................... 34

                4.      Defendants engaged in prohibited transactions in violation of
                        ERISA § 406 (Counts II and III) ...................................................... 36

a.    Defendants engaged in prohibited transactions under ERISA § 406(a)(1)(C) (Count II) ............................................................. 36

b.    Defendants engaged in prohibited transactions in violation of ERISA §§ 406(a)(1)(D) (Count II) ......................................... 38

c.    Defendants engaged in prohibited transactions under ERISA § 406(b) (Count III) ......................................................... 38

     (i)    Defendants engaged in prohibited transactions violating ERISA § 406(b)(2) (Count III) ..................................... 39

     (ii)    Defendants engaged in prohibited transactions in violation of ERISA §§ 406 (b)(1) and (3) (Count III) .................... 39

5.    Plaintiffs state discrimination claims under ERISA § 702 (Count V) ............ 40

6.    The Complaint alleges Defendants are liable as co-fiduciaries for others' fiduciary breaches (Count VI) ......................................... 42

7.    Defendants are liable as non-fiduciaries (Count VII) ...................................... 43

8.    Plaintiffs are entitled to all of the relief they seek ............................................ 43

a.    Plaintiffs' ERISA § 502(a)(3) claims are proper ...................................... 44

b.    Plaintiffs state claims on behalf of the plans under ERISA § 502(a)(2) ................................................................................... 46

B.    THE COMPLAINT ALLEGES VIOLATIONS OF RICO .................................... 47

1.    Plaintiffs' allegations satisfy RICO's pleading requirements ......................... 48

2.    Plaintiffs adequately plead the enterprise element and that the Optum Pharmacy Enterprise is an association-in-fact enterprise ................... 49

a.    Plaintiffs adequately plead the Optum Pharmacy Enterprise's common purpose ................................................................. 50

b.    Plaintiffs adequately plead the Optum Pharmacy Enterprise members' "relationship" ...................................................... 53

3.    Plaintiffs adequately plead the conduct element with regard to the Enterprises .............................................................................................. 56

a.    Optum directed the affairs of its participating pharmacies ...................... 57

b.    Cigna directed Optum and Argus to effectuate the Clawback scheme ................................................................................... 59

4.    Plaintiffs adequately plead the racketeering element ................................. 61

5.    Plaintiffs adequately allege conspiracy to violate RICO ................................ 63

a.    Defendants' mail and wire communications furthered the scheme ................................................................................................. 65

b.    Defendants' mail and wire communications were fraudulent *per se* ............................................................................... 65

c. Defendants possessed the requisite scienter in designing and executing the Clawback scheme ........................................................ 66

d. The Complaint alleges violations of RICO ............................................... 68

V. CONCLUSION ........................................................................................................... 69

TABLE OF AUTHORITIES

**CASES**

*131 Main St. Assocs. v. Manko,*
  897 F. Supp. 1507 (S.D.N.Y. 1995) ................................................................58

*Acosta v. Pac. Enterprises,*
  950 F.2d 611 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992)..........................25

*Aghaeepour v. N. Leasing Sys., Inc.,* No. 14 CV 5449 (NSR),
  2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ....................................................62, 65

*Aiu Ins. Co. v. Olmecs Med. Supply, Inc.,* No. CV-042934ERK,
  2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005)................................................56, 60, 61

*Allstate Ins. Co. v. Seigel,*
  312 F. Supp. 2d 260 (D. Conn. 2004)..............................................................59, 61

*Amalg. Clothing & Textile Workers Union v. Murdock,*
  861 F.2d 1406 (9th Cir. 1988) ......................................................................47

*American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.,*
  973 F. Supp. 60 (D. Mass. 1997) ..................................................................31

*Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.,*
  171 F. Supp. 3d 1092 (D. Colo. 2016)..............................................................16

*Argay v. Natl. Grid USA Serv. Co., Inc.,*
  503 Fed. Appx. 40 (2d Cir. 2012)..................................................................28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)....................................................................................9

*Bd. of Trs. of Bricklayers,*
  237 F.3d 270 (3d Cir. 2001)..........................................................................19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)....................................................................................9

*Bickley v. Caremark Rx, Inc.,*
  461 F.3d 1325 (11th Cir. 2006) ....................................................................17

*Biro v. Conde Nast,*
  807 F.3d 541 (2d Cir. 2015)........................................................................9, 10

*Blue Cross of California v. SmithKline Beecham Clinical Laboratories, Inc.,*
  62 F. Supp. 2d 544 (D. Conn. 1998)........................................................16, 18, 52

*Bouton v. Thompson*,
764 F. Supp. 20 (D. Conn. 1991)...............................................................19

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................... passim

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ...........................................................10, 36

*Bristol-Myers Squibb Co. v. Matrix Laboratories Ltd.*,
655 F. App'x 9 (2d Cir. 2016) ...............................................................42

*C.I.R. v. Keystone Consol. Indus., Inc.*,
508 U.S. 152 (1993)...............................................................................36

*Cedar Swamp Holdings, Inc. v. Zaman*,
487 F. Supp. 2d 444 (S.D.N.Y. 2007) ...................................................56

*CF 135 Flat LLC v. Triadou SPY S.A.*, No. 15-CV-5345 (AJN),
2016 WL 5945933 (S.D.N.Y. June 21, 2016) .................................48, 56

*Chao v. Hall Holding Co., Inc.*,
285 F.3d 415 (6th Cir. 2002) ...............................................................36

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006)...................................................................47

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014) ...................................................51

*Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
474 F.3d 463 (7th Cir. 2007) ..........................................................27, 30

*Chudnovsky v. Leviton Mfg. Co.*,
158 F. App'x 312 (2d Cir. 2005) ...........................................................50

*CIGNA Corp. v. Amara*,
563 U.S. 421 (2011).................................................................................44

*City of N.Y. v. Chavez*,
944 F. Supp. 2d 260 (S.D.N.Y. 2013) ...................................................54

*City of N.Y. v. Chavez*, No. 11-CV-2691,
2012 WL 1022283 (S.D.N.Y. Mar. 26, 2012) .......................................52

*City of N.Y. v. Fedex Ground Package System, Inc.*,
175 F. Supp. 3d 351 (S.D.N.Y. 2016) ...................................................57

*Corsini v. United Healthcare Corp.*,
965 F. Supp. 265 (D.R.I. 1997) ..............................................................13, 16, 18

*Crabhouse of Douglaston Inc. v. Newsday Inc.*,
801 F. Supp. 2d 64 (E.D.N.Y. 2011) ..............................................................60

*Curcio v. John Hancock Mut. Life Ins. Co.*,
33 F.3d 226 (3d Cir. 1994)..............................................................................19

*Dabney v. Chase Nat. Bank of City of N.Y.*,
196 F.2d 668 (2d Cir. 1952)............................................................................33

*DeFalco v. Bernas*,
244 F.3d 286 (2d Cir. 2001)............................................................................59

*Del Greco v. CVS Corp.*,
337 F. Supp. 2d 475 (S.D.N.Y. 2004) ......................................................14, 17

*DeLuca v. Blue Cross and Blue Shield of Michigan*,
2007 WL 1500331 (E.D. Mich. May 23, 2007)........................................27, 30

*DePace v. Matsushita Elec. Corp. of Am.*,
257 F. Supp. 2d 543 (E.D.N.Y. 2003) ............................................................16

*DePace v. Matsushita Elec. Corp.*,
257 F. Supp. 2d 543 (E.D.N.Y. 2003) ............................................................15

*DePina v. Gen. Dynamics Corp.*,
674 F. Supp. 46 (D. Mass. 1987) ....................................................................16

*Devlin v. Empire Blue Cross & Blue Shield*,
274 F.3d 76 (2d Cir. 2001)..............................................................................44

*Doe v. Travelers Ins. Co.*,
167 F.3d 53 (1st Cir. 1999)..............................................................................32

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982)............................................................................18

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
805 F.2d 732 (7th Cir. 1986) ..........................................................................24

*Edmonson v. Lincoln Nat. Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013)............................................................................33

*Eversole v. Metropolitan Life Insurance Co.*,
500 F. Supp. 1162 (C.D. Cal. 1980) ...............................................................26

*Everson v. Blue Cross and Blue Shield of Ohio*,
    898 F. Supp. 532 (N.D. Ohio 1994)............................................................ passim

*F.H. Krear & Co. v. Nineteen Named Trustees*,
    810 F.2d 1250 (2d Cir. 1987).........................................................................23, 24

*Faber v. Metropolitan Life Insurance Company*,
    648 F.3d 48 (2d Cir. 2011)..................................................................................26

*Fechter v. Connecticut Gen. Life Ins. Co.*,
    800 F. Supp. 182 (E.D. Pa. 1992)......................................................................26

*First Capital Asset Mgt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)...................................................................53, 57, 68

*Fish v. GreatBanc Trust Co.*,
    749 F.3d 671 (7th Cir. 2014) ..............................................................................36

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987)................................................................................................33

*Fossen v. Blue Cross and Blue Shield of Montana, Inc.*,
    660 F.3d 1106 (9th Cir. 2011) ...........................................................................41

*Freeman v. MetLife Group, Inc.*,
    583 F. Supp. 2d 218 (D. Mass. 2008) ...............................................................18

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (C.D. Cal. 2008) ..............................................................52

*Friedman v. Hartmann*, 91 CIV. 1523 (PKL),
    1994 WL 376058 (S.D.N.Y. July 15, 1994) .....................................................61

*Frommert v. Conkright*,
    433 F.3d 254 (2d Cir. 2006)...............................................................................45

*Glass Dimensions, Inc. v. State Street Bank & Trust Co.*,
    931 F. Supp. 2d 296 (D. Mass. 2013) ...............................................................23

*Glynn v. Bankers Life and Cas. Co.*,
    432 F. Supp. 2d 272 (D. Conn. 2005)................................................................32

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
    22 F. Supp. 3d 72 (D. Mass. 2014) ..............................................................23, 24

*Grindstaff v. Green*,
    133 F.3d 416 (6th Cir. 1998) .............................................................................25

*Grodotzke v. Seaford Av. Corp.*,
    17 F. Supp. 3d 185 (E.D.N.Y Apr.28, 2014) ................................................................36

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)........................................................................................................53

*Haddock v. National Financial Services, Inc.*,
    262 F.R.D. 97 (D. Conn. Nov. 6, 2009)..........................................................................46

*Haddock v. Nationwide Financial Services, Inc.*,
    419 F. Supp. 2d 156 (D. Conn. 2006)...........................................................25, 26, 27

*Hanaan v. Hartford Financial Services, Inc.*,
    2016 WL 1254195 (D. Conn. Mar. 29, 2016) ................................................................32

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000)................................................................................................36, 43

*Harris v. Harvard Pilgrim Health Care*,
    208 F.3d 274 (1st Cir. 2000)..........................................................................................32

*Hemmerdinger Corp. v. Ruocco*,
    976 F. Supp. 2d 401 (E.D.N.Y. 2013) .....................................................................51, 68

*Henry v. Champlain Enters., Inc.*,
    445 F.3d 610 (2d Cir. 2006)...........................................................................................36

*Herman v. Goldstein*,
    224 F.3d 128 (2d Cir. 2000)...........................................................................................25

*Hoffman v. Empire Blue Cross and Blue Shield*, No. 96 Civ. 5448(BSJ),
    1999 WL 782518 (S.D.N.Y. Sept. 30, 1999)..................................................................16

*Howard v. Shay*,
    100 F.3d 1484 (9th Cir. 1996) .......................................................................................36

*Hughes Aircraft v. Jacobson*,
    525 U.S. 432 (1999)........................................................................................................28

*Humana v. Forsyth*,
    525 U.S. 299 (1999)........................................................................................................49

*In re Beacon Assoc. Litig.*,
    818 F. Supp. 2d 697 (S.D.N.Y. 2011) ......................................................................25, 40

*In re Beacon Assocs. Litig.*,
    745 F. Supp. 2d 386 (S.D.N.Y. 2010) .....................................................................10, 25

*In re Blue Cross of W. Pa.*,
   942 F. Supp. 1061 (W.D. Pa. 1996)......................................................13, 16

*In re Luna*,
   406 F.3d 1192 (10th Cir. 2005) .................................................................26

*In re Managed Care Litig.*,
   185 F. Supp. 2d 1310 (S.D. Fla. 2002) .................................................49, 55

*In re Merck & Co., Inc. Sec., Derv. & ERISA Litg.*,
   2006 WL 2050577 (D.N.J. 2006) .............................................................20

*In re Neurontin Mktg., Sales Practices & Prod.*,
   433 F. Supp. 2d 172 (D. Mass. 2006) .......................................................53

*In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Practices Litig.*,
   108 F. Supp. 2d 84 (D. Conn. 1999).........................................................52

*In re Sumitomo Copper Litig.*,
   995 F. Supp. 451 (S.D.N.Y. 1998) .......................................................62, 65

*In re Trilegient Corp.*, Inc.,
   11 F. Supp. 3d 82 (D. Conn. 2014)...........................................................54

*In re Xerox Corp. Erisa Litig.*,
   483 F. Supp. 2d 206 (D. Conn. 2007)........................................................43

*IT Corp. v. Gen. Am. Life Ins. Co.*,
   107 F.3d 1415 (9th Cir. 1997) ..................................................................27

*Jackson v. Segwick Claims Mgmt. Servs., Inc.*,
   699 F.3d 466 (6th Cir. 2012) ....................................................................50

*Jackson v. Truck Drivers' Union Loc. 42 Health & Welfare Fund*,
   933 F.Supp. 1124 (D. Mass. 1996) ...........................................................20

*Jacobson v. Cooper*,
   882 F.2d 717 (2d Cir. 1989)......................................................................51

*John Blair Communications v. Telemundo Group*,
   26 F.3d 360 (2d Cir. 1994).......................................................................18

*Johnson v. KB Home*,
   720 F. Supp. 2d 1109 (D. Ariz. 2010) .......................................................52

*Kalda v. Sioux Valley Physician Partners, Inc.*,
   481 F.3D 639 (8th Cir. 2007)....................................................................26

*Kennedy v. Empire Blue Cross and Blue Shield*,
    989 F.2d 588 (2d Cir. 1993)................................................................18

*Kirkendall v. Halliburton, Inc.*,
    707 F.3d 173 (2d Cir. 2013)............................................................14, 15

*LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*,
    951 F. Supp. 1071 (S.D.N.Y. 1996) ..................................................58

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) .............................................................19

*Libbey-Owens-Ford Co. v. Blue Cross and Blue Shield Mut. of Ohio*,
    982 F.2d 1031,  (6th Cir. 1993), *on reh'g en banc* (Feb. 23, 1993)................22

*Lowen v. Tower Asset Mgmt., Inc.*,
    829 F.2d 1209 (2d Cir. 1987)..........................................................36, 39

*Ludwig v. NYNEX Serv. Co.*,
    838 F. Supp. 769 (S.D.N.Y. 1993) ..................................................15

*Mach. Movers, Riggers and Mach. Erectors, Loc. 136 v. Nationwide Life Ins. Co.*, 2006 WL
    2927607 (N.D. Ill. Oct. 10, 2006)....................................................43

*Marshall v. Snyder*,
    572 F.2d 894 (2d Cir. 1978)..............................................................36

*Masella v. Blue Cross & Blue Shield of Conn.*,
    936 F.2d 98 (2d Cir. 1991).................................................................32

*McConocha v. Blue Cross and Blue Shield of Ohio*,
    898 F. Supp. 545 (N.D. Ohio 1995)...............................................22, 32, 35, 36

*Metzler v. Solidarity of Labor Organizations Health & Welfare Fund*,
    1998 WL 477964 (S.D.N.Y. Aug. 14, 1998), *aff'd sub nom* .........................25

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993).............................................................62, 66

*Moeckel v. Caremark, Inc.*,
    622 F. Supp. 2d 663 (M.D. Tenn. 2007).........................................30

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    823 F.3d 948 (9th Cir. 2016) ............................................................45

*Mulder v. PCS Health Sys., Inc.*,
    432 F. Supp. 450 (D.N.J. 2006) .......................................................30

*N.L.R.B. v. Amax Coal Co., a Div. of Amax*,
   453 U.S. 322 (1981)..................................................................................33

*N.Y. State Psychiatric Ass'n v. UnitedHealth Grp.*("*NYSPA*"),
   798 F.3d 125 (2d Cir. 2015)..............................................................44, 45

*Nat'l Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249 (1994)..................................................................................53

*Nechis v. Oxford Health Plans, Inc.*,
   421 F.3d 96 (2d Cir. 2005)........................................................................17

*Novak v. TRW, Inc.*,
   822 F. Supp. 963 (E.D.N.Y. 1993) ...........................................................17

*Novella v. Empire State Carpenters Pension Fund*,
   2007 U.S. Dist. LEXIS 63540 (S.D.N.Y. Aug. 28, 2007) ...........................18

*O'Rourke v. Pitney Bowes, Inc.*,
   1997 WL 431091 (S.D.N.Y. July 31, 1997) ..............................................32

*Paese v. Hartford Life and Accident Ins.*,
   449 F.3d 435 (2d Cir. 2006)......................................................................12

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)..................................................................................28

*Pharm. Care Mgt. Assoc. v. Rowe*,
   429 F.3d 294 (1st Cir. 2005).....................................................................31

*Powers v. British Vita, P.L.C.*,
   57 F.3d 176 (2d Cir. 1995)............................................................38, 67, 68

*Reich v. Compton*,
   57 F.3d 270 (3d Cir. 1995)........................................................................38

*Reich v. Hall Holding Co.*,
   990 F. Supp. 955 (N.D. Ohio 1998)...........................................................36

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)............................................................................56, 59

*Reynolds v. Condon*,
   908 F. Supp. 1494 (N.D. Iowa 1995).........................................................52

*Ries v. Humana Health Plan, Inc.*,
   1995 WL 669583 (N.D. Ill. Nov. 8, 1995) .............................22, 33, 34, 35

*Rochow v. Life Ins. Co. of N. Am.*,
   780 F.3d 364 (6th Cir.) ............................................................................33

*Schmidt v. Fleet Bank*,
   16 F. Supp. 2d 340 (S.D.N.Y. 1998) .......................................................58

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ....................................................................47, 49, 53

*Serrapica v. Long-Term Disability Plan of the Chase Manhattan Bank*,
   No. 05 CV 2450,
   2007 WL 2262878 (E.D.N.Y. Aug. 3, 2007) ......................................15, 17

*Sibley-Schreiber v. Oxford Health Plans* (N.Y.), Inc.,
   62 F. Supp. 2d 979 (E.D.N.Y. 1999) .................................................12, 16, 18

*Silva v. Metro Life Insurance Co.*,
   762 F.3d 711 (8th Cir. 2014) ..................................................................45

*Sixty-Five Security Plan v. Blue Cross and Blue Shield of Greater New York*,
   583 F. Supp. 380 (S.D.N.Y. 1984) ...................................................20, 21, 34

*Smith v. United HealthCare Servs., Inc.*, No. CIV. 00-1163 ADM/AJB,
   2000 WL 1198418 (D. Minn. Aug. 18, 2000) .......................................14, 16

*Stiso v. Int'l Steel Group*,
   604 F. App'x 494 (6th Cir. 2015) ............................................................45

*Stitt v. Citibank, N.A.*, No. 12-CV-03892-YGR,
   2015 WL 75237 (N.D. Cal. Jan. 6, 2015) ................................................52

*Sun Life Assur. Co. of Canada v. Diaz*,
   2015 WL 1826088 (D. Conn. Apr. 22, 2015) ...........................................20

*Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*,
   783 F. Supp. 899 (D.N.J. 1992) ...............................................................26

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) ...............................................................64, 67

*U1IT4less, Inc. v. FedEx Corp.*,
   896 F. Supp. 2d 275 (S.D.N.Y. 2012) .....................................................57

*United States Fire Ins. Co. v. United Limousine Serv., Inc.*,
   303 F. Supp. 2d 432 (S.D.N.Y. 2004) .....................................................58

*United States v. Applins*,
   637 F.3d 59 (2d Cir. 2011) ................................................................50, 53

*United States v. Autuori,*
　　212 F.3d 105 (2d Cir. 2000)............................................................62

*United States v. Binday,*
　　804 F.3d 558 (2d Cir. 2015)......................................................62, 66

*United States v. Cianci,*
　　378 F.3d 71 (1st Cir. 2004).......................................................51, 52

*United States v. D'Amato,*
　　39 F.3d 1249 (2d Cir. 1994)............................................................66

*United States v. Greenberg,*
　　835 F.3d 295 (2d Cir. 2016)............................................................66

*United States v. Mazzei,*
　　700 F.2d 85 (2d Cir. 1983)..............................................................49

*United States v. Pierce,*
　　224 F.3d 158 (2d Cir. 2000)......................................................25, 63

*United States v. Ragosta,*
　　970 F.2d 1085 (2d Cir. 1992)..........................................................64

*United States v. Ramirez,*
　　586 F. App'x 30 (2d Cir. 2014) ......................................................49

*United States v. Reifler,*
　　446 F.3d 65 (2d Cir. 2006)..............................................................63

*United States v. Turkette,*
　　452 U.S. 576 (1981)..................................................49, 50, 51, 53

*United Teamster Fund v. MagnaCare Admin. Servs., LLC,*
　　39 F. Supp. 3d 461 (S.D.N.Y. 2014) .............................................24

*Varity Corp. v. Howe,*
　　516 U.S. 489 (1996)..................................................................35, 44

*Vickers Stock Research Corp. v. Quotron Systems, Inc.,* No. 96-CV-2269,
　　1997 WL 420265 (S.D.N.Y. July 25, 1997) ..................................60

*Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,*
　　639 F. Supp. 2d 371 (S.D.N.Y. 2009) ...........................................40

*Piacente v. Intl. Union of Bricklayers & Allied Craftworkers,*
　　2015 WL 5730095 (S.D.N.Y. Sept. 30, 2015)...............................31

*Bouboulis v. Transport Workers Union of Am.*,
    442 F.3d 55 (2d Cir. 2006) ........................................................19

*Dardaganis v. Grace Capital Inc.*,
    889 F.2d 1237 (2d Cir. 1989) ....................................................31


**STATUTES**

ERISA § 404(a)(1) ......................................................................42

ERISA § 405(a) ..........................................................................42

ERISA § 406(a)(1)(D) .................................................................38

ERISA § 406(b)(1) ......................................................................39

ERISA § 406(b)(3) ......................................................................39

ERISA § 502(a)(1)(B) .....................................................10, 17, 43

ERISA § 503(2) ..........................................................................12

ERISA § 1191b(d)(2) ..................................................................42

29 U.S.C. § 1002(21)(A) .............................................................19

29 U.S.C. § 1002(21)(A)(i) ..........................................................24

29 U.S.C. § 1103 ........................................................................26

29 U.S.C. § 1104(a)(1)(A) ...........................................................33

29 U.S.C. § 1104(a)(1)(D) ...........................................................31

29 U.S.C. § 1105(a) ....................................................................42

29 U.S.C. § 1106 ........................................................................36

29 U.S.C. § 1106(a)(1)(C) ...........................................................36

29 U.S.C. § 1106(a)(1)(D) ...........................................................38

29 U.S.C. § 1182 .............................................................40, 41, 42

29 U.S.C. § 1182(b)(1) ................................................................40

29 U.S.C. 1132(a) .......................................................................44

29 U.S.C. § 1132(a) ..................................................................................12

29 U.S.C. § 1133 .....................................................................................12

29 U.S.C. § 1133(2) .................................................................................12

**RULES**

Fed. R. Civ. P. 8(a)(2) ............................................................................9

Fed. R. Civ. P. 12(b)(6)..........................................................................9

## I.  INTRODUCTION

Plaintiffs are participants in prescription drug plans insured or administered by Defendants. Under the plans, participants purchasing prescription drugs are to pay pharmacies a portion of the cost of each drug, through either a copayment (a fixed amount, *i.e.*, $20) or coinsurance (a percentage, *i.e.*, 20%). The plans promise that "***in no event***" will the cost-share payment "exceed the amount paid by the plan to the Pharmacy" for a prescription. Defendants not only breached this promise — they purposefully set up a secret, widespread fraudulent scheme through which they overcharged Plaintiffs and other class members.

Unbeknownst to Plaintiffs, Defendants devised and implemented a scheme whereby they had pharmacies charge and collect from patients cost-sharing amounts that greatly exceeded the cost of the drugs. The difference between the lower cost of the drug and the higher amount collected from a patient is known as Spread. Defendants unlawfully required the pharmacies to (1) charge and collect the Spread from Plaintiffs and other class members and (2) secretly pay the Spread to Defendants in what is known as a Clawback.

The Complaint alleges many examples of Defendants' fraudulent scheme. For instance, one patient was required to pay a copayment of $20 for a prescription of Amlodipine Besylate, even though the pharmacy and Defendants agreed that the cost of the drug was only $1.75 — and that was all the pharmacy was paid for the drug. Defendants took a Clawback and pocketed the $18.25 Spread. Under the plain language of the plans, the patient should have paid only $1.75, ***not*** a $20 "copayment," a mark-up of 1,043%. In order to implement and perpetuate the fraudulent scheme in this and every other instance, all of the participants in the scheme agreed ***in writing*** that (1) they would conceal the Clawbacks from patients and (2) they would not deviate from the scheme in order to avoid the Clawbacks. Defendants' knowing, fraudulent and

concealed conduct violates Defendants' plain language promises to Plaintiffs and violates
ERISA and RICO.

Defendants now move to dismiss Plaintiffs' ERISA and RICO claims in an attempt to
evade liability for this unlawful scheme. Importantly, Defendants do not deny that they take
Clawbacks. Instead, they ignore the well-pled facts or attempt to mischaracterize the well-pled
facts to argue that their actions are allowed by the plan terms. Defendants' arguments should be
rejected.

For example, although Cigna attempts to recast the Spread and Clawback payments as
permissible "participant cost-share" (Cigna Br. at 1), and Optum calls them "member
contributions" (Optum Br. at 1), Defendants do not and cannot dispute that the plan language
does not allow them to charge Plaintiffs more than Defendants paid the pharmacies for
prescription drugs. In light of this fact, Cigna effectively acknowledges its wrongdoing —
admitting that when it is divvying up its ill-gotten Clawbacks with Optum "several times a
month," it "include[es] claims for which a participant's cost-share is *more* than the cost of the
drug." Cigna Br. at 8-9 (emphasis in original). It is axiomatic that if the participant is paying
"***more***" than the cost of the drug, there is no "participant cost-***share***" and no "member
***contribution***," as Defendants claim while trying to defend their unlawful Clawbacks. Moreover,
and fundamental to their liability, the "***more***" that Defendants now admit they require Plaintiffs
and all other participants to pay, and that Defendants then secretly collect as a Clawback, is an
intentional, fraudulent violation of Defendants' promise that "[i]n no event" will the Copayment
or Coinsurance "exceed the amount paid by the plan to the Pharmacy."

Optum acknowledges the impact of the fraudulent scheme on millions of consumers. In
its brief, Optum states the obvious purpose of prescription insurance coverage: "a member of a

plan that includes a pharmacy benefit thus is likely to pay a lower price than an uninsured individual who seeks to purchase the same medication at the same pharmacy based on the retail price." Optum Br. at 4. Defendants' concealed, fraudulent scheme turns this basic insurance premise on its head and gouges consumers. In the example above where the pharmacy cost of the prescription drug is $1.75, absent the fraudulent Clawback scheme, the pharmacy could fill the prescription *without* insurance and charge the consumer a whopping ***500% markup*** and still sell the prescription to Plaintiff for $8.75, less than half of the $20 insurance copayment. According to Optum's own memorandum, Defendants' concealed, fraudulent scheme undermines the very purpose of prescription drug coverage by costing the patient more than double the amount the patient would pay if he or she had no insurance and the pharmacy charged a very substantial profit margin.

Plaintiffs bring this lawsuit to recover the amounts unlawfully collected from them and the class and to stop Defendants from secretly charging consumers Spread and taking Clawbacks. The Court should reject Defendants' attempts to recast Plaintiffs' allegations and it should deny the Motions to Dismiss in their entirety.

## II. STATEMENT OF FACTS[1]

Employers often provide health benefit plans to employees and their families, including prescription drug benefits. Employers obtain these plans from various health plan providers such as Aetna, Anthem, Cigna, United Health. ¶¶ 2, 44. In this case, employers hired Cigna to provide prescription drug benefits. Cigna Br. at 6. Cigna's prescription drug plans provide "Prescription Drug Benefits for Prescription Drugs and Related Supplies." App. 137, 435.[2] Cigna offers two

---

[1] Paragraphs in the Consolidated Complaint (as amended at ECF No. 48) are cited herein as " ¶ __".

[2] Pages in the Appendix submitted with Cigna's motion to dismiss are cited herein as "App. __".

products relevant here: administrative services only ("ASO") plans and insured plans. Cigna Br. at 6. Cigna offers the same range of administrative services to both types of plans. *Id.*

When a participant fills a prescription, the plan engages in a transaction pursuant to which the plan provides prescription drug coverage. In connection with providing this coverage, Defendants' network pharmacies receive from patients a "cost-share" payment in the form of a copayment or coinsurance. Cigna Br. at 8, 9. These cost-share payments are set by the terms of Cigna's plans. As Cigna recognizes, all plans share common features. For example, the plans of all five Plaintiffs expressly provide that, "[t]o receive prescription drug benefits," patients "may be required to pay a portion of the Covered Expense for Prescription Drugs and Related Supplies. That portion includes any applicable Copayment, Deductible and/or Coinsurance." Cigna App. at 17, 137, 301, 435, 496. Accordingly, under the express terms of the plans, copayments and coinsurance pay for only ***a portion*** of the cost of a drug. Moreover, patients are entitled to take advantage of the discounts and the negotiated rates that are paid to network pharmacies. (Optum Br. at 4.)

The plans further provide that "[i]n no event will the Copayment or Coinsurance" . . . "exceed the amount paid by the plan to the Pharmacy . . . ."[3] Cigna Br. at 10-12. Nina and Roger Curols' plan further clarifies that "[i]f the cost of a Prescription Drug…is less than the copay,

---

[3] The "relevant terms of the plans insuring Plaintiffs and Class members are substantively the same." ¶¶ 88-89. Cigna's Exhibits confirm as much. *See* ECF No. 70-2, Ex. 1, App. 0017 ("In no event will the applicable copay or coinsurance paid by you and your covered Dependent(s) for the Prescription Drug or Related Supply exceed the amount paid by the Plan….") (Plaintiffs R. Curol and N. Curol); ECF No. 70-2, Ex. 8, App. 0304 ("In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy….") (Plaintiff Negron); ECF No. 70-3, Ex. 11, App. 0438 & Ex. 12, App. 0499 ("In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy….") (Plaintiff Perry).) Plaintiff Gallagher's Insured plan similarly provides that coinsurance charges refers to "the discounted amount that the pharmacy benefits manager makes available to the Insurance Company with respect to Participating Pharmacies…." ECF No. 70-2, Ex. 3, App. 0137.

then you…pay 100% of the cost." App. at 17. In other words, under the plain language of the

plans, the maximum cost-sharing amount that Defendants are allowed to collect is the amount

"the plan" paid to the pharmacy,[4] up to the fixed limit in the plans.[5] The plans do **_not_** allow

Defendants to secretly charge in excess of that amount and then pay itself that excess amount by

way of Clawbacks.

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████

---

[4] Technically, the only payment to the pharmacy, other than the cost-share payment, is from Optum. "The plan" never pays anything directly to the pharmacy. But, even in Defendants' best case scenario, Optum pays the pharmacy with money the plan or employer pays Cigna and Cigna pays Optum. Regardless of the structure, under the plan language, patients should not pay more that the pharmacy is paid.

[5] Under a coinsurance plan, the coinsurance percentage should be calculated based on the negotiated rate or discount paid to the pharmacy, which it was not.

[6] ████████████████████████████████████████████
███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████ The pharmacies in Optum's network operate together as a cohesive unit. Every time they submit a claim to Optum for adjudication, the claim "constitutes [the pharmacy's] . . . acknowledgment of its participation in the applicable network." Provider Manual at 44.

Although Cigna used Optum's pharmacy network, Cigna's Pharmacy Management Program imposed specific requirements on Optum pharmacies, as set forth in Cigna's Participating Pharmacy Manual. ¶ 72. ████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████

Optum and its network of participating pharmacies agreed to provide prescription drugs in accordance with Cigna's plan. ¶ 275. To meet this obligation, Optum issued a Provider Manual to all network pharmacies. ¶ 271. Network pharmacies were required to accept the rules set forth in the Provider Manual to sell prescription drugs to Cigna's customers. Cigna Br. at 7.

───────────────────────

██████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

Under its health plans, Cigna had "discretionary authority," including discretionary authority concerning "the computation of any and all benefit payments." App. 161, 323, 457, 518. Cigna either delegated some of this authority to Optum and/or engaged Optum as its agent in performing these tasks. ¶ 58(c); Cigna Br. at 7. Pursuant to this delegation, Optum "***dictate[d]***" the rates paid to the retail pharmacies for prescription drugs. Cigna Br. at 7 (emphasis added). Optum also dictated in its discretion how much pharmacies would charge and collect from patients. ¶ 271. The Provider Manual specifically states that network pharmacies "***must*** charge" Plaintiffs this amount, "***and only*** this amount." ¶ 271(a) (emphasis added). Accordingly, Optum, dictated the amount of the Spread pharmacies were to collect and the Clawbacks pharmacies were to pay back to Defendants.

Rather than collect from patients the amounts agreed to under the plans, Defendants exercised discretion to, among other things, secretly require their pharmacies to collect unlawful higher cost-sharing payments, *i.e.*, Spread, and require their pharmacies to pay this Spread back to Defendants as Clawbacks. ¶ 106. Indeed, the Complaint alleges eighteen different ways in which Defendants exercised their discretion to collect unlawful Spread, take unlawful Clawbacks, breach their fiduciary duties, and engage in fraud. ¶ 133.

Defendants required pharmacies to charge Spread and take Clawbacks in violation of the plans (and RICO). ¶¶ 66-69. For example, a pharmacy purchased prescription-strength Vitamin D for resale to plan participants for only $.60. Under its agreement with Defendants, the pharmacy agreed to be paid $.96 for the drug, a 60% profit for the pharmacy, plus another $1.40 to fill the prescription and $.21 for tax. Accordingly, the pharmacy in total was paid $2.57. ¶¶ 66-68. The maximum amount that could have been collected as a copay was $2.57 because that was the amount paid to the pharmacy and "the cost of a Prescription Drug."

– 7 –

Rather than follow the plan terms, Defendants exercised their discretion to require the pharmacy to charge a copayment of $7.68 — an almost **300% overcharge**. ¶ 66(c). By forcing the pharmacy to charge and collect this excessive cost-sharing payment amount, Defendants exercised their discretion to violate the plan.[7] Moreover, Defendants denied patients the right to take advantage of discounts negotiated with the pharmacies. Optum Br. at 4.

This example was not an isolated event. Defendants engaged in a widespread, actively concealed scheme to exercise discretion in violation of Plaintiffs' plans and they committed mail and wire fraud. ¶¶ 15-17 Whenever a Plaintiff purchased a prescription drug in accordance with Optum's Provider Manual, the pharmacy communicated with Optum via its "POS System," ¶ 271(b), an "online or real-time [point-of-sale] telecommunication system used to communicate information…." Provider Manual at 19. Defendants, in turn, used the wires to adjudicate Plaintiffs' claim as submitted by the pharmacy. Defendants also used the wires to claw back from pharmacies the Spread the pharmacies collected from Plaintiffs. ¶¶ 253, 285.

Plaintiffs detail eighteen occasions where Optum fraudulently instructed pharmacies to collect secretly inflated copay or coinsurance charges, ¶¶ 287(a)-(r), and thirty occasions where Cigna did the same, ¶¶ 255(a)-(dd). Every time Defendants ordered a pharmacy to collect undisclosed Spread and pay Defendants a Clawback, Defendants exercised their discretion to violate the plans. As to each instance, Plaintiffs identified Defendants' fraudulent statement, explained why the statement was fraudulent, identified the contents of the communication, the date on which Defendants made the communication, the parties involved, and the location of the pharmacy that received Defendants' fraudulent communication.

---

[7] Plaintiffs do **NOT** admit that they "have not paid any more than the copayment or coinsurance identified in their plans." Cigna Br. at 9-10. To the contrary, since Defendants' secret scheme allowed them to charge and collect the Spread and Clawbacks, which was substantially "more than the copayment or coinsurance identified in their plans," Defendants' argument is nonsense.

– 8 –

Optum's Provider Manual facilitated Cigna and Optum to effectuate the Clawback scheme in secret. Optum prevents pharmacies even from discussing with patients any other retail drug prices. ¶ 271(d). Specifically, the Provider Manual states that pharmacies who disobey the fraudulent directives of Optum's Provider Manual face fines of up to $5,000 and expulsion from Optum's pharmacy network. ¶¶ 271(a)(d). Once expelled, a pharmacy must wait five years before it may petition Optum for re-admission, a request that is within Optum's sole discretion to grant. *Id.*

Cigna could not have implemented the Clawback scheme without either Optum's pharmacy network or Optum's coercive ability to ensure obedient compliance with Optum's directives. Although there is a "dangerous lack of transparency with respect to the revenue stream of PBMs," ¶ 78, on information and belief, to ensure Optum's cooperation and complicity, Cigna allowed Optum and Argus to retain for themselves a portion of the Clawbacks. ¶¶ 71, 242, 250.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8 requires that a complaint present "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint will withstand a Rule 12(b)(6) motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This is not a "probability requirement." *Iqbal*, 556 U.S. at 678. Rather, a complaint states a plausible claim for relief if the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* On a motion to dismiss a court must draw all reasonable inferences in the plaintiff's favor and take the plaintiff's factual allegations as true. *See id.* at 678-79; *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015). Further, for the ERISA

– 9 –

claims, a "holistic evaluation of an ERISA complaint's factual allegations" is counseled by plaintiff-participants' "limited access to crucial information" regarding facts that "tend systemically to be in the sole possession of defendants." *Id.* at 598; *see also In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 419 (S.D.N.Y. 2010). This is because private individuals take the "important role" Congress placed on them to "enforc[e] ERISA's fiduciary duties" and "prevent through private civil litigation misuse and mismanagement of plan assets." *Braden*, 588 F.3d at 597-98 (citations, punctuation omitted).

## IV. ARGUMENT

### A.   THE COMPLAINT ALLEGES VIOLATIONS OF ERISA

Plaintiffs allege numerous violations of ERISA. Count I asserts a claim under ERISA § 502(a)(1)(B), which allows a participant or beneficiary to sue any party — regardless of fiduciary status — to enforce Plaintiffs' rights and to clarify their rights to future benefits under the plan terms. As discussed in section A.1., below, Plaintiffs have been denied their rights to avoid being gouged each time Defendants have charged Spread and taken Clawbacks. Defendants' only response is that Plaintiffs were required to exhaust the remedy of appealing a denial of benefits before suing, even though Defendants never issued a denial of benefits from which Plaintiffs could appeal, and exhaustion would be both inequitable and futile.

Counts II-IV and VI assert claims against Defendants as fiduciaries. Defendants are fiduciaries for essentially four reasons. First, as discussed in section A.2(a)(i) below, under the contracts between Cigna and the plan sponsors, Defendants had discretionary authority concerning the computation of any and all payments under the plans. Second, as discussed in section A.2(a)(ii) below, irrespective of whether they were granted discretionary authority, Defendants exercised discretionary authority and control by setting cost-sharing payments greater than the amounts allowed under the plans and by requiring pharmacies to collect Spread.

– 10 –

Third, as discussed in section A.2(a)(iii), Defendants exercised discretion to set and take their own compensation by dictating the amount of the Spread and taking Clawbacks. Fourth, as discussed in section A.2(a)(iv) below, Defendants exercised authority or control over participant cost-sharing payments and the ASO and insurance policy contracts giving rise to those payments.

Count IV alleges a statutory breach of fiduciary duty claim. As discussed in section A.3 below, Defendants breached their fiduciary duties by, *inter alia*, collecting Spread and taking Clawbacks. Defendants' only response is that the plans or other contracts made them do it. This argument fails because the plans do not allow them to charge Spread or take Clawbacks.

Counts II and III allege numerous violations of ERISA' s prohibited transaction provisions, which are *per se* violations of ERISA. Defendants' principal response is that Plaintiffs do not identify the transactions at issue, or that the transactions do not concern plan assets. As discussed in section A.4 below, these arguments fail.

Count V alleges that Defendants discriminated against Plaintiffs in requiring patients to pay excessive cost-sharing contributions in violation of ERISA Section 702. This Count does not depend on Defendants' fiduciary status. As discussed in section 5 below, Defendants discriminated against Plaintiffs who paid Spread.

Counts VI and VII are derivative of the other Counts. Count VI is derivative of the other fiduciary-based Counts and alleges that Defendants are liable for the breaches committed by their co-fiduciaries. As discussed in section 6 below, this claim should not be dismissed for the same reasons Counts II-IV should not be dismissed.

Count VII alleges that Defendants, to the extent they are not fiduciaries, are nevertheless liable for participating in the breaches of the other fiduciaries. As discussed in section 7 below,

– 11 –

this Count should not be dismissed for the same reasons Defendants' arguments should be rejected concerning the other Counts.

1. **Plaintiffs are entitled to enforce their rights under the plans pursuant to ERISA § 502(a)(1)(B) (Count I)**

Plaintiffs have been denied their rights under the plans because Defendants have charged Spread and taken Clawbacks. ¶¶ 166-170. Accordingly, Plaintiffs have claims under ERISA § 502(a)(1)(B), which allows a participant or beneficiary to sue to enforce his rights or to clarify his rights to future benefits under the terms of a plan. 29 U.S.C. § 1132(a). Defendants' only response is that Plaintiffs were required to exhaust the remedy of appealing a denial of benefits before suing. Optum Br. at 9; Cigna Br. at 14.[8] The Court should reject this argument because (1) there were no claim "denials" to appeal, (2) imposing the exhaustion requirement would be inequitable, and (3) pursuing administrative remedies would be futile.[9] Accordingly, Defendants' argument that Count I (and only Count I) should be dismissed for failure to exhaust fails.

a. **Plaintiffs neither received notice of a denial of benefits nor were aware that they had a claim to appeal**

Defendants' argument that Plaintiffs failed to exhaust their right to appeal presupposes that there was a denial of coverage that could be appealed, and that Plaintiffs were notified of it. 29 U.S.C. § 1133 (requiring plans to provide written notice of denials of claims and afford opportunity for full and fair review of such denials). Here, Plaintiffs were never denied prescription drug coverage. Indeed, if their claims had been denied, Plaintiffs either would not

---

[8] ERISA § 503(2) obligates each plan to provide an internal appeal process "to any participant whose claim for benefits has been denied." *See* 29 U.S.C. § 1133(2). Relying upon this provision, "courts have developed the requirement that a claimant should ordinarily follow internal plan procedures and exhaust internal plan remedies before seeking judicial relief under ERISA." *Sibley-Schreiber v. Oxford Health Plans* (N.Y.), Inc., 62 F. Supp. 2d 979, 985 (E.D.N.Y. 1999) (internal quotation marks omitted).

[9] The exhaustion requirement is "an affirmative defense, subject to waiver, estoppel, futility, and similar equitable considerations." *Paese v. Hartford Life and Accident Ins.*, 449 F.3d 435, 439 (2d Cir. 2006).

have received their prescription drugs or they would not have been charged any copayment and instead would have paid the pharmacy's retail cash price outside of the health plans. *See, e.g.*, ¶ 75. Moreover, because of the gag clause to which Defendants and the pharmacies agreed, Plaintiffs did not know that they even had an opportunity to avoid coverage, much less have a claim for benefits denied. *See*, *e.g.*, ¶ 152. Instead, Plaintiffs were required to make cost-sharing payments in the excessive amounts required by Defendants. ¶ 96. Because there was no denials of Plaintiffs'' claims, neither the appeals process nor the exhaustion requirement were triggered.

In addition to ERISA, the plan documents require notice of denial to invoke an administrative process: "To initiate an appeal you must submit a request for an appeal in writing to Cigna within 180 days of *the date the notice of denial is received*."[10] Since there was no notice of a denial, Defendants did not take the basic steps to trigger an appeal process. Defendants, therefore, have no argument concerning exhaustion of administrative remedies.

In *Corsini v. United Healthcare Corp.*, 965 F. Supp. 265 (D.R.I. 1997), plaintiffs alleged that their copayments should have been reduced by pharmacy discounts. The court held that "even if the co-payment claim is regarded as a claim for 'benefits,'" in the absence of notice of a denial, the exhaustion requirement would not apply. *Id*. at 269. "Because the exhaustion requirement rests on the assumption that notice of denial has been provided, a fiduciary who has not provided notice that benefits have been denied is foreclosed from insisting upon exhaustion of administrative remedies." *Id*.; *In re Blue Cross of W. Pa.*, 942 F. Supp. 1061, 1064 (W.D. Pa. 1996) (claim that plaintiffs unknowingly paid excessive amounts did not subject to exhaustion requirement because not an appeal from a denial of benefits).

---

[10] ECF No. 70-2 at App. 0318; ECF No. 69-2 at ECF 53 (Negron) (emphasis added); *accord* ECF No. 70-2 at App. 0044, ECF No. 69-4 at 45 (Curol) (same); ECF No. 70-3 at App. 0513 (Perry) (same); *accord* ECF No. 69-3 at 49 (Perry) (365 days); ECF No. 70-2 at App. 0163; ECF No. 69-1 at 63 (Gallagher) ("To initiate an Administrative appeal you must submit a request for an appeal in writing within 180 days of receipt of a denial notice.").

Defendants cite *Del Greco v. CVS Corp.*, 337 F. Supp. 2d 475 (S.D.N.Y. 2004), for the proposition that "Plaintiffs cannot circumvent the exhaustion requirement" by arguing that they are not seeking benefits. Optum Br. at 10; *accord* Cigna Br. at 15. But as discussed above, Plaintiffs were not denied a benefit because they received their prescription drugs. *Smith v. United HealthCare Servs., Inc.*, No. CIV. 00-1163 ADM/AJB, 2000 WL 1198418, at *4 (D. Minn. Aug. 18, 2000) (exhaustion doctrine did not apply because plaintiff was not "denied a benefit" but rather "given his prescription medications upon request, just not at the promised premium cost"). Moreover, irrespective of whether Plaintiffs are seeking "benefits," Defendants did not invoke the administrative process and Plaintiffs had no notice that they were being denied any benefits. In contrast, the plaintiff in *Del Greco* knew that she had been charged a generic co-pay and a brand co-pay at different times for the same drug. *Id.* at 479.

Even if Cigna was not required to provide notice of a benefit denial to trigger exhaustion, courts waive the exhaustion requirement when a plaintiff reasonably interprets plan terms as not requiring exhaustion. *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 180-81 (2d Cir. 2013). Here, all of the plans provide for a claims process *after* a claim has been denied, and Defendants do not contend that Plaintiffs received notice of any denial, much less that Defendants denied a claim. In addition, the only appeals process contained in the plan documents concerns denials of prior authorization requests for certain drugs.[11] There is no plan procedure to appeal excessive cost-sharing payments. Finally, the claim forms do not need to be filed to receive prescription drug benefits for prescriptions filled at participating pharmacies.[12] Accordingly, the plans do not

---

[11] ECF No. 70-2 at App. 0036, ECF No. 69-4 at  37 (Curol); ECF No. 70-2 at App. 0139, ECF No. 69-1 at 39 (Gallagher); ECF No. 70-2 at App. 0303, ECF No. 69-2 at 38 (Negron); ECF No. 70-3 at App. 0498, ECF No. 69-3 at 33 (Perry).

[12] "When you or your Dependents purchase your Prescription Drugs or Related Supplies through a retail Participating Pharmacy, you pay any applicable Copayment, Coinsurance or Deductible . . . at the time of purchase. You do not need to file a claim form." ECF No. 70-2 at App. 0140, ECF No. 69-1 at 39 (Gallagher); ECF No. 70-2

reference much less require an internal appeal. Thus, there was no exhaustion requirement, and even if exhaustion was triggered (and it was not), it should be excused. *Kirkendall*, 707 F.3d at 181.

### b.   Requiring exhaustion would be futile and inequitable

Under the doctrine of futility, equitable considerations demand that Plaintiffs' claims be allowed to proceed.[13] *See, e.g.*, *Serrapica v. Long-Term Disability Plan of the Chase Manhattan Bank*, No. 05 CV 2450, 2007 WL 2262878, at *2 (E.D.N.Y. Aug. 3, 2007). Courts consider "whether, in light of both the claimant's and the plan administrator's actions, it is *fair* to require the dismissal of the claimant's suit pending compliance with administrative procedures." *DePace v. Matsushita Elec. Corp.*, 257 F. Supp. 2d 543, 560 (E.D.N.Y. 2003) (quoting *Ludwig v. NYNEX Serv. Co.*, 838 F. Supp. 769, 781 (S.D.N.Y. 1993) (emphasis in original)); *see also Serrapica*, 2007 WL 2262878, at *2-*3 (holding exhaustion requirement waived where policyholder never received notice of her right to appeal). In this case, dismissal would not be fair because, as discussed below, far from notifying Plaintiffs of their right to appeal, Defendants affirmatively prevented Plaintiffs from discovering that their copays were excessive.

Defendants' Clawback scheme was a "secret endeavor," and to this day "remains hidden from most members of the class." ¶ 165. As a result, putative class members have no reason to think they have been overcharged, let alone that the overcharges constitute denials of claims subject to an internal appeals process. *See, e.g.*, ¶¶ 5, 17, 65, 73. Courts recognize it is unfair to

---

at App. 0304, ECF No. 69-2 at 39 (Negron); ECF No. 70-3 at App. 0438, ECF No. 69-3 at 34 (Perry); ECF No. 70-2 at App. 0017, ECF No. 69-4 at 18 (Curol); *accord* ECF No. 70-3 at App. 0499 (Perry) ("You do not need to file a claim form unless you are unable to purchase Prescription Drugs at a Participating Pharmacy for Emergency Services.").

[13] Although Plaintiffs must make a "clear and positive showing" that exhaustion should be waived due to futility or other equitable considerations, the Court is still obligated on a motion to dismiss to draw all reasonable inferences in favor of the Plaintiffs and assume that the allegations of wrongdoing are true. *Engler v. Cendant Corp.*, 434 F. Supp. 2d 119, 128 (E.D.N.Y. 2006).

force a plaintiff who did not know that benefits have been denied to exhaust administrative remedies. *See Corsini*, 965 F. Supp. at 269; *Smith*, 2000 WL 1198418, at *4; *In re Blue Cross of W. Pa.*, 942 F. Supp. at 1064. Defendants' conduct is particularly egregious in that they "actively and effectively concealed" the Clawback scheme through their gag clause with the pharmacies. Where a defendant's own misconduct makes it difficult or impossible for an insured to know of his appeal rights, courts refuse to require the insured to exhaust before bringing a lawsuit. *See, e.g.*, *DePace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 560 (E.D.N.Y. 2003); *Sibley-Schreiber*, 62 F. Supp. 2d at 988. The same is true here.

> c. **Exhaustion was futile because the Clawback Scheme was a long-standing, broadly applied policy**

An administrative appeal would also have been futile because Defendants' Clawback scheme was a long-standing policy, broadly and systematically applied to all insureds regardless of their personal circumstances. As one court explained, "[i]n the face of a company-wide promulgation of limited or no coverage unrelated to the personal circumstances of individual claimants, it is fair to question whether it makes sense to require insureds to jump through procedural hoops on their way to an inevitable denial of coverage." *Sibley-Schreiber*, 62 F. Supp. 2d at 988; *see also DePina v. Gen. Dynamics Corp.*, 674 F. Supp. 46, 51 (D. Mass. 1987). Because the Clawback scheme unfairly applied to all insureds regardless of their personal circumstances, any appeal certainly would have been denied. This inevitability of denial supports a finding of futility. *See, e.g.*, *Hoffman v. Empire Blue Cross and Blue Shield*, No. 96 Civ. 5448(BSJ), 1999 WL 782518, at *13 (S.D.N.Y. Sept. 30, 1999); *Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.*, 171 F. Supp. 3d 1092, 1110 (D. Colo. 2016).

Defendants argue that the futility exception does not apply because Plaintiffs made no efforts to resolve their concerns or demonstrate that such efforts were "ignored, undermined, or

– 16 –

rejected by their employers, the plan administrators, Cigna, or CHLIC." Cigna Br. at 15. The case on which Cigna relies, *Del Greco v. CVS Corp.*, 337 F. Supp. 2d 475 (S.D.N.Y. 2004), does not stand for this proposition. Rather, the court in that case concluded that the plaintiff could not invoke the futility exception because she had never filed a written prescription drug claim in the first place. *See* 337 F. Supp. 2d at 482, 485-86. Here, in contrast, Plaintiffs did not need to file a claim form when they purchased prescription drugs from participating pharmacies.[14] Moreover, Plaintiffs never received notice that any benefits were being denied or that they could appeal their cost-share payments. The futility exception, therefore, applies in this case. *See, e.g.*, *Serrapica*, 2007 WL 2262878, at *3; *Novak v. TRW, Inc.*, 822 F. Supp. 963, 969 (E.D.N.Y. 1993).

Citing *Bickley v. Caremark Rx, Inc.*, 461 F.3d 1325 (11th Cir. 2006), Optum contends that nothing precludes Plaintiffs from giving Cigna the opportunity to pay benefits or reimburse Plaintiffs. Optum Br. at 12. In *Bickley*, however, the issue was whether an administrative remedy was available for the plaintiff's statutory claims for breach of fiduciary duty. *See id.* at 1329. Whereas the Eleventh Circuit requires exhaustion of administrative remedies for claims alleging statutory violations, *see id.* at 1328 n.6, district courts in the Second Circuit do not, *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 102 (2d Cir. 2005), and Defendants here have not challenged Plaintiffs' statutory claims on exhaustion grounds. Instead, Defendants' exhaustion arguments are addressed solely to Plaintiffs' ERISA § 502(a)(1)(B) claim and rely exclusively upon the formal claims appeals process set forth in the plans. *See* Optum Br. at 9; Cigna Br. at 14.

---

[14] *See supra* note 12.

– 17 –

Optum further resists futility on the ground that Cigna should have the opportunity to interpret the plan terms as they apply to each Plaintiff. Optum Br. 9-10. But this argument ignores that the Clawback scheme applies to all Class members based on common plan terms.[15] Optum relies upon *Novella v. Empire State Carpenters Pension Fund*, 2007 U.S. Dist. LEXIS 63540, at *10-11 (S.D.N.Y. Aug. 28, 2007), Optum Br. 11, but in *Novella*, the plaintiff's futility argument was essentially that "they'll do what they've always done." Here, Plaintiffs have alleged a formal, ongoing policy, uniformly and surreptitiously applied and actively concealed from all participants across many plans. *See, e.g.*, ¶¶ 70, 148, 151. Moreover, Defendants continue to vigorously defend the policy, or deny its existence, which supports a finding of futility when the policy is a longstanding, broadly applied policy. *Corsini*, 965 F. Supp. at 269; *Sibley-Schreiber*, 62 F. Supp. 2d at 987; *Freeman v. MetLife Group, Inc.*, 583 F. Supp. 2d 218, 225 (D. Mass. 2008). Consequently, Plaintiffs have demonstrated a "clear and positive showing that pursuing administrative remedies would be futile." *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993).

### 2.   The Complaint alleges that Defendants breached their fiduciary duties

The duties charged to ERISA fiduciaries are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *see also John Blair Communications v. Telemundo Group*, 26 F.3d 360, 367 (2d Cir. 1994). Defendants here are fiduciaries who violated ERISA by breaching these duties.

---

[15] *See, e.g.*, ¶ 70 (describing Clawbacks as "result[ing] from the "benefit design of the Cigna plans for certain patients"); ¶ 148 (describing the Clawback scheme as "nationwide, clandestine, [and] computerized"); ¶ 151 ("The computer systems that Defendants use to process claims often are not able to handle multiple prices for drugs and, rather than charging the client the proper lower price paid to the pharmacy, the claim adjudication system will automatically apply the higher price dictated by the insurer/PBM to charge the patient.").

### a.   Defendants are fiduciaries

"The term 'fiduciary' was intended by Congress to be broadly construed." *Bouton v.*

*Thompson*, 764 F. Supp. 20, 22 (D. Conn. 1991) (citation omitted). Regardless of whether

someone is named a fiduciary, a person is a functional fiduciary under ERISA if: (1) "he

*exercises* any *discretionary* authority or discretionary control respecting management of such

plan" *or* (2) he "*exercises any* authority or control respecting management or disposition of its

assets," or (3) "he *has* any *discretionary* authority or discretionary responsibility in the

administration of such plan." 29 U.S.C. § 1002(21)(A) (emphasis added). ERISA imposes

"fiduciary status on those who exercise discretionary authority, regardless of whether such

authority was ever granted" and "those individuals who have actually been granted discretionary

authority, regardless of whether such authority is ever exercised." *Bouboulis v. Transport*

*Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006); *see Curcio v. John Hancock Mut. Life*

*Ins. Co.*, 33 F.3d 226, 233 (3d Cir. 1994). An entity is also a fiduciary if it exercises *any*

"authority or control" over management or disposition of plan assets, regardless of whether such

authority or control is "discretionary." *See, e.g.*, *Bd. of Trs. of Bricklayers*, 237 F.3d 270, 273 (3d

Cir. 2001). *See also Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 912-13 (7th Cir.

2013). Optum blatantly ignores this key statutory distinction. *See* Optum Br. 15.

Defendants are fiduciaries for four reasons. First, under the contracts between Cigna and

the employers, Defendants were specifically granted discretionary authority concerning the

computation of any and all payments under the plans. Second, irrespective of whether they were

granted fiduciary authority, Defendants exercised discretionary authority or control over the plan

management by setting cost-sharing payments greater than the amounts allowed under the plans

and by requiring pharmacies to charge and collect Spread. Third, Defendants exercised discretion

to set and take their own compensation by dictating the amount of the Spread and taking

Clawbacks. Fourth, Defendants exercised authority or control over plan assets — participant cost-sharing payments and the ASO and insurance policy contracts giving rise to those payments.

### (i) Defendants are fiduciaries because they were granted discretionary authority under the contracts

Defendants do not dispute Cigna was granted "discretionary authority" under its contracts, including discretionary authority concerning "the computation of any and all benefit payments" including prescription drug benefits. App. 161, 323, 457, 518. And, as set forth above, Cigna delegated to Optum, or hired Optum to exercise, its fiduciary duties concerning prescription drug benefits to Optum. ¶ 58(c); Cigna Br. at 7.[16]

Rather than even address the authority granted under these documents, Defendants argue that they were somehow not "acting as a fiduciary" when they exercised their discretion to set and collect excessive cost-sharing amounts. *See, e.g.*, Cigna Br. at 16. Defendants are wrong because determining patient cost-sharing payments directly relates to Defendants' contractual "discretionary" duty to "comput[e] … any and all benefit payments." App. 161, 323, 457, 518. Since Defendants had discretion to set the amount of and collect Spread, they were fiduciaries in this respect. *See, e.g.*, *Sun Life Assur. Co. of Canada v. Diaz*, 2015 WL 1826088, at *3 (D. Conn. Apr. 22, 2015) (Bolden, J.) (defendants are fiduciaries because they have discretionary authority to determine "the amount of benefits due" and are "responsible for paying claims under the" plans); *Sixty-Five Security Plan v. Blue Cross and Blue Shield of Greater New York*, 583 F. Supp. 380, 387-88 (S.D.N.Y. 1984) (defendant was fiduciary because it had responsibility for implementing the computerized claims processing system and had total control over information

---

[16] Cigna cannot contest that it is responsible for the acts of Optum in that, at the very least, it had a duty to monitor Optum. *See., e.g.*, *Jackson v. Truck Drivers' Union Loc. 42 Health & Welfare Fund*, 933 F.Supp. 1124, 1141 (D. Mass. 1996); *In re Merck & Co., Inc. Sec., Derv. & ERISA Litg.*, 2006 WL 2050577 at *17 (D.N.J. 2006).

pertinent to the health care program, which Defendants similarly had here concerning cost-sharing payments).[17]

### (ii)   Defendants exercised discretionary authority or control over the management of the plans

Defendants exercised discretionary authority or control over the management of the plans by, among other things, (1) dictating the amount pharmacies charged patients for prescription drugs; (2) secretly requiring pharmacies to charge patients more for drugs than they should have been charged pursuant to the terms of the plans, thereby setting the amount of the Spread; (3) requiring the pharmacies to collect the Spread from patients; (4) requiring pharmacies to pay the "Spread" to Defendants as a Clawback; (5) setting their own compensation for services performed by dictating Spread and taking Clawbacks; and (6) misrepresenting to patients cost-sharing amounts for prescription drugs as alleged above. ¶ 106. Indeed, the Complaint alleges nineteen different ways in which Defendants exercised fiduciary authority and, therefore, are fiduciaries. *Id*.

As in this case, in *Everson v. Blue Cross and Blue Shield of Ohio*, 898 F. Supp. 532 (N.D. Ohio 1994), the plaintiffs alleged that their health insurer, Blue Cross and Blue Shield of Ohio ("Blue Cross"), violated ERISA and breached its fiduciary duties by forcing plaintiffs to pay excessive copayments. The plaintiffs' plans limited copayments to 20% of the provider's reasonable charge, but Blue Cross, rather than charging a copayment equal to 20% of the amount

---

[17] The court in *Sixty-Five Security Plan* explained that "the drafters of ERISA explicitly recognized" that abilities "such as the "power to obtain lower per-diem hospital rates" "might be an indicium of an entity's fiduciary status." 583 F. Supp. at 387–88 (quoting H.R.Rep. No. 1280, 93 Cong., 2nd Sess. 323 (1974) ("consultants and advisors may because of their special expertise, in effect, be exercising discretionary authority or control with respect to management or administration of such plan.")). This rationale further supports the conclusion that Defendants' control over the amounts paid by participants and the amounts clawed back from pharmacies is an exercise of fiduciary discretion.

actually paid to the provider, charged 20% of the billed amount, which did not account for discounts. The court, when denying defendants' motion to dismiss as to the contracts with such terms, held that the complaint alleged that Blue Cross was a fiduciary with respect to administering claims through "defendant's secret discount scheme" "which caused insureds to overpay their contractual share of covered health expenses . . . ." *Id.* at 539-40[18]; *see also McConocha v. Blue Cross and Blue Shield of Ohio*, 898 F. Supp. 545, 550 (N.D. Ohio 1995); *Ries v. Humana Health Plan, Inc.*, , 1995 WL 669583, at *4 (N.D. Ill. Nov. 8, 1995).[19] This case is materially identical to *Everson* in that Defendants likewise exercised their discretion to charge patients excessive cost-sharing payments through a secret scheme. Accordingly, the Court should reach the same result.

Although Optum attempts to deny that Plaintiffs alleged that it too is a fiduciary on the basis that Plaintiffs "lumped" Defendants together in their complaint, Optum Br. at 16 (citing ¶ 106),[20] at a minimum, it acted as an agent or delegatee of Cigna. ¶¶ 50, 58 (c); Cigna Br. at 7. Moreover, Cigna clearly articulates why Optum is a fiduciary concerning Spread and Clawbacks. Cigna Br. at 4-6. Cigna outsources/delegates some of the PBM duties it owes to plans and patients to Optum. *Id.* at 6. Optum, in turn, exercises discretion to "dictate" the rates paid to the retail pharmacies for prescription drugs. *Id.* at 7. Moreover, Optum exercises discretion to dictate

---

[18] The court also found that another contract permitted calculation of the reasonable charge without regard to rebates and discounts. That analysis does not apply here based on the clear terms of the plans.

[19] *See, e.g., Libbey-Owens-Ford Co. v. Blue Cross and Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1035 (6th Cir. 1993), *on reh'g en banc* (Feb. 23, 1993) (in case where a health insurer was serving as an administrator and received refunds and rebates from hospitals, the court held that "[w]hen an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under [ERISA]").

[20] While Cigna notes that Plaintiffs do not distinguish among Defendants, it does not make the argument "[f]or purposes of this motion." To the extent that Cigna improperly raises such an argument in its Reply, Plaintiffs request leave to file a Sur-Reply as to that issue. Cigna Br. at 16 n.11. In any event, as discussed above, Cigna's role is more than clear.

how much pharmacies "must charge" and "shall" collect from patients based on Optum's own pharmacy Provider Manual. ¶ 271(b). Accordingly, Optum dictates the amount of the Spread secretly charged to patients and forces pharmacies to collect the Spread from patients and pay it back to Defendants in the form of Clawbacks. In any event, the Complaint clearly alleges that Cigna and Optum, as Cigna's agent or delegatee, had and exercised discretionary authority or control over the management and administration of the prescription drug plans. *See* ¶ 106.

### (iii) Defendants are fiduciaries because they exercised discretion over their own compensation

Defendants are also fiduciaries because, by determining the amount of the Spread and taking Clawbacks, they exercised discretion in setting and taking their own compensation. *See* ¶¶ 106-107. As the Second Circuit explained, "after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987); a*ccord Golden Star, Inc. v. Mass Mut. Life Ins. Co*., 22 F. Supp. 3d 72, 81 (D. Mass. 2014) ("The caselaw is clear that a service provider's retention of discretion to set compensation can create fiduciary duties under ERISA with respect to its compensation."); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.,* 931 F. Supp. 2d 296, 304 (D. Mass. 2013). Because Defendants have discretion to require the pharmacies to secretly collect cost-sharing payments *in excess* of amounts paid to the pharmacies, and because Defendants have discretion to Clawback the Spread from the pharmacies as additional compensation, Defendants have discretionary control over their compensation, and thus act as fiduciaries.

Even if the agreements between Cigna and the employers authorized Defendants' exercise of discretion in setting their own fees, *see* Cigna Br. at 22, Defendants are fiduciaries

– 23 –

with respect to their exercise of that discretion. *See, e.g.*, *F.H. Krear & Co.*, 810 F.2d at 1259

(entity is fiduciary because "*agreement* may give it such control over factors that determine the

actual amount of its compensation") (emphasis added); *Ed Miniat, Inc. v. Globe Life Ins. Grp.,*

*Inc.*, 805 F.2d 732, 737 (7th Cir. 1986). ████████████████



████ Accordingly, Defendants wrongfully exercised discretion to take as compensation the

difference in the amount paid ***by plan participants*** to the pharmacies and the amount retained by

the pharmacies.[21]

### (iv) Defendants have and exercised authority or control respecting the management and disposition of Plan assets

Defendants are also fiduciaries with respect to the Spread and Clawback scheme because

they exercised "any" authority or control over the management and disposition of plan assets.

*See* 29 U.S.C. § 1002(21)(A)(i). Defendants do not contest the fact that they exercised at least

some authority and control over the management and disposition of both participants' cost-

sharing payments, and the ASO agreements and health insurance policies, each of which were

plan assets. Rather, their only argument is that no plan assets are at issue and they ignore some of

---

[21] *See United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 470-71 (S.D.N.Y. 2014) (holding that allegation that service provider charged fees that were not expressly set by contract was sufficient to defeat a motion to dismiss); *Sixty–Five Security Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387–88 (S.D.N.Y. 1984) (finding plaintiff stated claim that defendant breached its fiduciary duties where its fees were based on a percentage of claims paid and had complete discretion and control over what claims would be paid); *Golden Star*, 22 F. Supp. 3d at 81 ("The caselaw is clear that a service provider's retention of discretion to set compensation can create fiduciary duties under ERISA with respect to its compensation.").

the relevant plan assets here.

"ERISA does not expressly define the term 'assets of the plan.'" *Acosta v. Pac. Enterprises*, 950 F.2d 611, 620 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992). In interpreting the meaning of this term, courts consider "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." *Id; accord Grindstaff v. Green*, 133 F.3d 416, 432 (6th Cir. 1998); *Metzler v. Solidarity of Labor Organizations Health & Welfare Fund*, 1998 WL 477964, at *7 (S.D.N.Y. Aug. 14, 1998), *aff'd sub nom. Herman v. Goldstein*, 224 F.3d 128 (2d Cir. 2000).

In *Haddock v. Nationwide Financial Services, Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006) (Underhill, J.), Judge Underhill applied a two-part functional test for plan assets. A plan asset "includes items a defendant holds or receives: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) at the expense of the plan participants or beneficiaries." *Id.* at 170. In denying defendant's motion for summary judgment, the Court found that defendant received revenue sharing payments from mutual funds as a result of its fiduciary status in controlling the mutual funds available as plan investment options. *Id.* at 166, 170. The Court also determined that the revenue sharing payments were at the expense of participants and beneficiaries because they resulted in higher mutual fund fees. *Id.* at 170; *see also Beacon Assoc.*, 818 F. Supp. 2d at 711 (applying 2-part *Haddock* test).

This case is more egregious than *Haddock*. Here, Defendants received Clawbacks both because of their authority and control over the management of the prescription drug process and the management and disposition of patient cost-sharing payments. But rather than receiving these cost-sharing payments from third-party mutual funds, they received them directly from the participants and beneficiaries they harmed. Accordingly, the injury to participants and

– 25 –

beneficiaries is much more direct than in *Haddock,* and Spread payments are plan assets over which Defendants exercised authority and control.

The insurance policies and ASO agreements between Cigna and the plans are also plan assets. *See, e.g.*, *Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F. Supp. 899, 902 (D.N.J. 1992) ("Nationwide violated its fiduciary duties by breaching the express terms of the [annuity] [c]ontract, which was itself a [p]lan asset."); *Fechter v. Connecticut Gen. Life Ins. Co.*, 800 F. Supp. 182, 200 (E.D. Pa. 1992) ("insurance policy itself is a plan asset"); *Eversole v. Metropolitan Life Insurance Co.*, 500 F. Supp. 1162, 1165 (C.D. Cal. 1980)( insurance company "may also be a fiduciary by virtue of its management or control over the primary asset of this plan, the policy itself"). In erroneously focusing on the Optum contract with pharmacies, Defendants ignore the *plan* contracts, which are plan assets. ¶¶ 109, 180, 188, 190.

In *Everson*, 898 F. Supp. 532, discussed above, plan participants sued for breach of fiduciary duty on the grounds that they were charged excessive copayments. The court determined that plaintiffs' group health insurance policy was a plan asset, and defendant was wrongfully profiting from the misuse of that plan asset. *Id.* at 540. Defendants here are similarly misusing the ASO agreements and health insurance policies, which are plan assets, to profit from their illegal Clawbacks. Accordingly, Defendants exercised authority and control over plan assets. *See also* 29 U.S.C. § 1103 (recognizing insurance policies are plan assets).

Defendants' cases concerning plan assets are not remotely analogous. *Faber v. Metropolitan Life Insurance Company*, 648 F.3d 48 (2d Cir. 2011), concerned a life insurance checking account. *In re Luna*, 406 F.3d 1192 (10th Cir. 2005), concerned unpaid contributions to a pension plan. *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3D 639 (8th Cir. 2007),

concerned unpaid pension plan contributions as well. *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d at 472 n.4, concerned negotiation of prescription drug prices between an employer and pharmacy benefit manager, not imposition of excessive cost-sharing amounts on participants. *DeLuca*, 628 F.3d at 748, concerned negotiation of rates with healthcare providers, not the definition of plan assets. While the lower court in *DeLuca* summarily said that participant cost-sharing payments are not losses to the plan and, therefore, are not plan assets, it performed no analysis of the issue and, in particular, did not consider the *Haddock* test. *DeLuca v. Blue Cross and Blue Shield of Michigan*, 2007 WL 1500331 (E.D. Mich. May 23, 2007). Accordingly, it should not be given any weight by the Court.

### (v)  Plaintiffs' allegations do not concern plan-design decisions

In an effort to avoid having to answer for their exercise of discretion, Defendants rely on the erroneous argument that the plan terms *required* them to charge excessive cost-sharing payments, and they were just blindly following those terms. Cigna Br. at 16-18; Optum Br. at 16. In other words, Defendants claim they are off the hook because "the plans made them do it." Defendants attempt to confuse the issue by arguing the uncontroversial position that settlor decisions about the content or "design" of a plan are not fiduciary acts. *See* Cigna Br. at 17-19. But, Plaintiffs do not allege that Defendants are fiduciaries because they established or designed the terms of the plans (*e.g.*, by setting the maximum amount of co-payments and co-insurance). To the contrary, the unambiguous language of the plans and related contracts confirms that ***Defendants had no right under any plan or contract*** to charge excessive cost-sharing payments (thus creating a Spread) or to take Clawbacks. Because no plan authorized — much less required — Defendants to charge Spread and take Clawbacks, Defendants' deviation from the plan terms was an exercise of fiduciary discretion directly related to the "computation of any and all benefit payments." *See, e.g., IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997)

– 27 –

(service provider determining amount of benefits may be a fiduciary if it acted, "not through clerical error, but because it had considerable discretion and made a misjudgment about plan interpretation").[22] Accordingly, the cases cited by Defendants, *see* Cigna Br. 18, do not apply. *See Larson v. United Healthcare Ins. Inc.*, 723 F.3d 905 (7th Cir. 2013) (claims challenged the express terms of policies that authorized illegal copayments); *Hannan v. Hartford Fin. Servs., Inc.*, 2016 WL 1254195 at *3 (D. Conn. Mar. 29, 2016) ("no discretion is exercised when a fiduciary merely adheres to a specific contract term." (quoting *Harris Trust & Savings Bank v. John Hancock Mut. Life Ins. Co.*, 302 F. 3d 18, 29 (2d Cir. 2002)).).

Defendants repeatedly cite *Alves v. Harvard Pilgrim Healthcare, Inc.,* 204 F. Supp. 2d 198 (D. Mass. 2002). Although that case concerned a claim that co-payments exceeded drug prices negotiated with drug providers, it did *not* concern plan terms that forbade a cost-sharing payment exceeding pharmacy payments. *Id.* at 204; 208-209. To the contrary, the copay in *Alves* was a specific dollar amount, not subject to a limit based on the amount actually paid to the pharmacy, and not subject to change based on an exercise of discretion by the defendant. Since *Larson, Hannan,* and *Alves* all concerned situations where defendants did not exercise discretion but acted in compliance with plan terms, they are irrelevant.

Defendants' factual argument that participants sometimes pay more and sometimes pay less than the cost of a prescription drug is irrelevant, as this case has nothing to do with whether cross-subsidies are proper in the abstract. Cigna Br. at 3,9, 27. Rather, as Defendants admit, Plaintiffs "are entitled only to the prices *set forth in their respective ERISA plans*." (Optum Br. at

---

[22] None of the cases cited by Cigna concerned violations of a plan's express language. *See Hughes Aircraft v. Jacobson*, 525 U.S. 432, 444 (1999) (the fiduciary act was an employer's amendment of a plan); *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000) (the alleged fiduciary act was expressly permitted by the plan); *Argay v. Natl. Grid USA Serv. Co., Inc.*, 503 F. App'x 40, 42 (2d Cir. 2012) (unpublished) (concerning the permissible amendment of copayment terms in the plan rather than violation of copayment terms).

6 (emphasis in original).) The converse is equally true: Defendants "are entitled only to the prices *set forth in their respective ERISA plans*." Defendants simply cannot take more than the plans permit. While it may be true that under some hypothetical policy it "follows that a participant cost-share may be more or less than the amount that the pharmacy has contractually agreed to accept for a drug," Cigna Br. at 9, it does not "follow" in this case, because under the terms of Plaintiffs' plans, patients should never pay more than the pharmacy is paid for a drug. [23]

### (vi) Plaintiffs do not contest negotiation of pharmacy contracts

In a further effort to distract from their clear exercise of fiduciary authority and control over Spread and Clawbacks, Defendants focus their attention on the negotiation of drug prices in unrelated contracts between Optum and various pharmacies. *See* Cigna Br. at 19-22; Optum Br. at 16. According to Cigna, when "Plaintiffs use the term 'forcing' to describe Defendants' interaction with the pharmacies, it is apparent from other allegations in their Complaint that they are referring to the arm's-length negotiation of drug prices and payment terms between Optum, as a PBM network vendor, and the pharmacies in its network." Cigna Br. at 19. In making this erroneous argument, Defendants attempt to confuse two distinct amounts: (1) drug prices paid to pharmacies; and (2) cost-sharing payments paid by participants. Plaintiffs do not argue that Optum was a fiduciary when it negotiated drug prices to be paid to pharmacies. To the contrary, Defendants were fiduciaries when they set excessive cost-sharing payments to be paid by participants. *See supra* section A(2)(a)(ii), at pp. 21-23; *see also* ¶¶ 7, 13.

---

[23] Cigna repeatedly cites a footnote in *Alves* to support a supposed public-policy argument that a plan may allow an insurer to subsidize the cost of high priced drugs by charging more on low cost drugs. Cigna Br. at 3, 9, 27. But *Alves* only stated that cross-subsidies of high priced drugs may not be *per se* improper and were proper under the specific terms of the *Alves* plan which provided for fixed, nondiscretionary copay amounts. They are clearly not proper under Cigna's plans here. Indeed, if Cigna wanted to be able to cross-subsidize prescription drug purchases by keeping the Spread ███████████████████████████████████████████████ allowing Cigna to "retain any difference between the amount the pharmacy has agreed to accept and the amount charged to the plan sponsor." Cigna Br. at 5. It did not do so.

The cases cited by Defendant are not relevant. For example, in *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007), the three PBM contracts "fixed" the prices of prescription drugs paid by the employer pursuant to a formula built into the contract terms and, accordingly, the plaintiff "agreed to pay set prices for the drugs." Any price changes had to be negotiated and agreed to in a contract amendment. *Id.* at 472-73. Accordingly, unlike here, Caremark did not exercise discretion in setting drug prices. Moreover, by agreeing to pay a fixed amount, the plaintiff agreed to let Caremark keep any spread in the difference between the amount the plaintiff paid Caremark and the amount Caremark paid the pharmacies. *Id.* at 473-74. The opposite is true here as the contracts provide that participants should pay no Spread and Defendants exercised discretion to violate the contracts and force participants to pay Spread.

As in *Carpenters* in the Seventh Circuit, *Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663 (M.D. Tenn. 2007), concerned the PBM's negotiation of drug prices. The court did not even consider a claim that the PBM exercised discretion to charge cost-sharing payments greater than the limitations in plan documents. *See id.* at 677-80. Moreover, unlike here, where Defendants exercised discretion to charge more than the cap on cost-sharing payments (*i.e.*, the price Optum negotiates with pharmacies), *Moeckel* concerned the spread between drug prices negotiated with pharmacies and the contractually set drug prices that the plan agreed to pay the PBM. *Id.* [24]

*Deluca v. Blue Cross Blue Shield of Michigan*, 628 F. 3d 743 (6th Cir. 2010), concerned separate plans negotiated with healthcare providers and changes to those plans. *Id.* at 745-46. The *Deluca* court held that the defendant was not acting as a fiduciary because the changes

---

[24] Similarly, *Mulder v. PCS Health Sys., Inc.*, 432 F. Supp. 450 (D.N.J. 2006), cited by Optum (Optum Br. at 17 n.14), plaintiff focused on the drug prices negotiated by the PBM rather their discretion exercised by the PBM over the cost-sharing payments paid by participants. *Id.* at 459-460.

applied to a broad range of consumers and not just the ERISA plans. Here, the issue is not how much Defendants agreed to pay a medical provider, be it a doctor, hospital, or pharmacy, but that Defendants exercised discretion to dictate that pharmacies charge and collect participants cost-sharing payments greater than the amounts paid to the pharmacy providers under the plans. Plaintiffs' claims do not, as Optum argues, focus on the Optum contracts with the pharmacies.[25]

### 3. Defendants breached their fiduciary duties

#### a. Defendants breached their fiduciary duties by violating the terms of the plans (Count IV)

Defendants were obligated to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of . . . subchapter [I] and subchapter III [of Title 29, Chapter 18]." 29 U.S.C. § 1104(a)(1)(D). By charging excessive cost-sharing payments, Defendants violated the express language of the plans and, therefore, breached their fiduciary duties. *See Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1242 (2d Cir. 1989), "[fiduciary]'s disregard for [plan's requirements] made it liable for any losses to the plan resulting from the breach, . . . without regard to whether the investment decisions seemed prudent at the time.").[26] As Defendants acknowledge, Plaintiffs' "claim is for alleged violations of plan terms, *i.e.*, contractual obligations under ERISA." Cigna Br. at 38. Since a breach of a contract by a fiduciary is a

---

[25] *Pharm. Care Mgt. Assoc. v. Rowe*, 429 F.3d 294 (1st Cir. 2005) and *American Drug Stores, Inc. v. Harvard Pilgrim Health Care, Inc.*, 973 F. Supp. 60 (D. Mass. 1997), concerned the preemption of state statutes concerning prescription drug sales. They had nothing to do with ERISA plans and, in particular, the duties of parties under those plans. In particular, the courts did not remotely consider anything like the administration of prescription drug plans or the specific terms of such plans as is the case here.

[26] *See also Piacente v. Intl. Union of Bricklayers & Allied Craftworkers*, 2015 WL 5730095, at *23 (S.D.N.Y. Sept. 30, 2015) (finding that defendant violated "the clear directive of § 1104(a)(1)(D) to act 'in accordance with the documents and instruments governing the plan,'" and granting summary judgment as to liability).

breach of fiduciary duty, Defendants have essentially acknowledged Plaintiffs' claim for breach of fiduciary duty.

Defendants' "plan design" cases again do not apply because none of them involve allegations of cost-sharing payments that exceeded the amounts permissible under plan terms. *See* Cigna Br. at 27. For example, as discussed above, the plan documents in *Alves* expressly stated that the copayment was an amount that was fixed by the plan terms and *did not limit cost-sharing payments to the cost of the drug. See* 204 F. Supp. 2d 198 at 204.[27] Likewise, in *Hanaan v. Hartford Financial Services, Inc.*, the defendant merely followed the terms of the plan. 2016 WL 1254195, at *3 (D. Conn. Mar. 29, 2016). Since Defendants have breached rather than followed the terms of the plans, they have breached their fiduciary duties.[28]

Optum does not even argue that it did not breach the plans, apparently relying on its erroneous argument that it is not a fiduciary. Cigna only responds that there is nothing remarkable about a plan design where participants may pay more or less that the pharmacy is paid. Cigna Br. at 27. As discussed above, this argument is irrelevant because Cigna's plans expressly ***do not*** allow Defendants to charge patients more than the pharmacies are paid.

      **b.   Defendants breached their duty of loyalty by charging Spread and taking Clawbacks (Count IV)**

---

[27] Indeed, *Alves* supports Plaintiffs here. *See also id.* at 207 ("What is 'due' to [a beneficiary] under the policy is, in the first instance, defined by the terms of the policy." (quoting *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 56 (1st Cir. 1999))); *id.* ("[T]he plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." (quoting *Harris v. Harvard Pilgrim Health Care*, 208 F.3d 274, 277–78 (1st Cir. 2000))).

[28] The Plans unambiguously mandate that patients' cost-sharing payments for prescription drugs may not be higher than the amount that the pharmacy is paid for the drugs. To the extent Defendants raise any genuine question concerning the interpretation of the Plans, and they do not, Defendants' arguments should be rejected because any ambiguity should be construed against Defendants. *Glynn v. Bankers Life and Cas. Co.*, 432 F. Supp. 2d 272, 278 (D. Conn. 2005) (Covello, J.) (quoting *Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 107 (2d Cir. 1991); *see also O'Rourke v. Pitney Bowes, Inc.*, 1997 WL 431091, at *6 (S.D.N.Y. July 31, 1997); *see, e.g.*, *Everson*, 898 F. Supp. at 539; *McConocha v. Blue Cross and Blue Shield of Ohio*, 898 F. Supp. 545, 549 (N.D. Ohio 1995).

Section 404(a)(1) of ERISA requires that a fiduciary act "solely in the interest of the participants and beneficiaries" of a plan and for the "exclusive purpose" of providing benefits and "defraying reasonable expenses." 29 U.S.C. § 1104(a)(1). This duty of loyalty is "designed to prevent a [fiduciary] 'from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *N.L.R.B. v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 334 (1981). In particular, the duty of loyalty was intended to "safeguard employees from 'such abuses as self-dealing ….'" *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987) (citations omitted).

Defendants breached their fiduciary duties of loyalty when they charged Spread and took Clawbacks for their own financial benefit. ¶ 133. *See, e.g.*, *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) ("ERISA's duty of loyalty bars a fiduciary from profiting …"); *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 382 (6th Cir.), *cert. denied,* 136 S. Ct. 480, 193 L. Ed. 2d 350 (2015) (a fiduciary that acts to "profit for its own gain" breaches fiduciary duty."); *Dabney v. Chase Nat. Bank of City of N.Y.*, 196 F.2d 668, 670 (2d Cir. 1952) ("[T]he duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee.").

Where a fiduciary requires pharmacies to charge cost-sharing payments in excess of those permitted by the plans and claws-back the Spread for its own financial benefit, it fails to act "solely in the interest of" plan participants and "for the exclusive purpose of … defraying reasonable expenses" 29 U.S.C. § 1104(a)(1)(A). Consequently, by charging excessive Spread and taking Clawbacks, Defendants breached their fiduciary duties of loyalty.

In *Ries v. Humana Health Plan, Inc.*, 1995 WL 669583, at *1 (N.D. Ill. Nov. 8, 1995), defendant breached its fiduciary duties by charging plaintiff amounts exceeding the insurer's

actual costs. The plaintiff was billed $10,276 by providers to treat injuries sustained in an

accident. Her insurer, Humana, claimed that, if the plaintiff recovered damages in connection

with the accident, it had the right to recover the benefits it paid on her behalf. *Id.* After the

plaintiff recovered damages, Humana sought to recover the entire $10,276 amount — even

though Humana satisfied those bills for less than $1,929. *Id.* at *1-2. Plaintiff sued Humana,

claiming it breached its ERISA fiduciary duties by obtaining reimbursement substantially in

excess of amount Humana actually paid. *Id.* at *2. The court held that the plaintiff had stated a

fiduciary duty breach claim: "***A fiduciary's covert profiteering at the expense of insureds is***

***inconsistent with its duties of acting 'solely in the interest of the participants and***

***beneficiaries,' and of refraining from engaging in self-dealing***. *Id.* at *7; *see also Everson*, 895

F. Supp. at 538-40; *Sixty-Five Sec. Plan*, 583 F. Supp. at 387-88.

      **c.**   **Defendants breached their fiduciary duties by misrepresenting**
           **cost-sharing amounts. (Count IV)**

      Cigna incorrectly contends it had no duty to inform plan participants that they were being

charged excessive cost-sharing payments. Cigna Br. at 25-30. In addition to the fact that this

argument is directly contrary to Cigna's exhaustion defense, it fails because this case concerns

blatant misrepresentations, not a failure to disclose. Defendants made (or caused to be made)

numerous false and misleading statements concerning the patients' cost-sharing payments. *See,*

*e.g.,* ¶¶ 5, 106(j), 133(g), 198, 242, 251, 283. For example, the plan documents themselves

contain false and misleading statements because they did not reflect Defendants' actual practices

of charging Spread and taking Clawbacks. *See* ¶ 251(a) ("the representation in the plain form

language of the policy that Class members would pay a certain amount for prescription drugs

with knowledge and intent that Class members would be charged a higher amount").

Additionally, every time a Clawback victim filled a prescription, Defendants misrepresented the

true amount of the cost-sharing payment. ¶¶ 17, 242, 250. Moreover, every Explanation of

Benefits ("EOB"), indicating a pharmacy was paid a certain amount when, in fact, the pharmacy

was paid much less, was a false and/or misleading statement because the EOB misrepresented

that cost-sharing payments were based on prescription drug prices that exceeded the amounts

paid to the pharmacies. *See* ¶ 251(b)-(d).

The duty to tell participants the truth is well-settled and flows from the duty of loyalty.

"ERISA requires a 'fiduciary' to 'discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (quoting

ERISA § 404(a)). To knowingly participate in deceiving participants to reap secret profits at the

participants' expense is not to act "solely in the interest of the participants and beneficiaries." *See*

*id*. Put more simply: "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and

codified in section 404(a)(1) of ERISA." *Id*.; *see also Reis*, 1995 WL 669583, at *7 (holding that

a fiduciary's failure to tell a participant the truth about a discount arrangement is a breach of

fiduciary duties).

In *McConocha v. Blue Cross and Blue Shield of Ohio*, 898 F. Supp. 545 (N.D. Ohio

1995), the court considered "whether defendant breached a duty to plaintiffs by not informing

them of its practice of computing copayments before applying the discounts to the hospital

charges." *Id.* at 550 (citation omitted). The court held that a "fiduciary may not materially

mislead those to whom the duties of loyalty and prudence are owed," must "inform participants

of existing benefits . . . and not affirmatively misrepresent potential benefits. *Id.* at 551 (citation

omitted). The court granted plaintiffs' motion for summary judgment because Blue Cross and

Blue Shield of Ohio violated this duty:

> [Blue Cross and Blue Shield] violated its duty not to mislead plaintiffs when it
> failed to inform plaintiffs about the discounts and their impact on the percentage of

the copay obligation. The presence of a discounting scheme which increases the copay percentage is a material fact about which plaintiffs should have been told. [Blue Cross and Blue Shield's] silence was contrary to its fiduciary duty to ensure that its subscribers were informed about the true nature, extent, and significance of their copay obligation.

*Id.* The same is true here as Defendants have blatantly misrepresented cost-sharing payment amounts in connection with prescription drug benefits.

### 4. Defendants engaged in prohibited transactions in violation of ERISA § 406 (Counts II and III)

ERISA § 406 supplements an ERISA fiduciary's general duties of loyalty and prudence "by categorically barring certain transactions likely to injure the pension plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-42 (2002). To enhance protections for plan beneficiaries, Congress enacted *per se* prohibitions against certain transactions. *See* 29 U.S.C. § 1106; *C.I.R. v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993) ("Congress' goal was to bar categorically a transaction that was likely to injure the . . . plan."). ERISA prohibits such transactions because of the high potential for abuse. *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006); *Grodotzke v. Seaford Av. Corp.*, 17 F. Supp. 3d 185, 194 (E.D.N.Y Apr. 28, 2014).[29]

### a. Defendants engaged in prohibited transactions under ERISA § 406(a)(1)(C) (Count II)

ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest

---

[29] Although ERISA provides for exemptions from § 406(a), strict adherence to the conditions and requirements of the exemptions ensures that Congress' goal of preventing abuse is not undermined. *See, e.g.*, *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 966-67 (N.D. Ohio 1998), *aff'd sub nom.*, *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002). The exemptions are affirmative defenses which the defendant must prove. *See Lowen*, 829 F.2d at 1215; *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978); *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 685 (7th Cir. 2014); *Braden*, 588 F.3d at 600-02. ERISA does not provide any exemptions from the relevant portions of § 406(b). *See below.*

to a plan. Defendants engaged in prohibited transactions in violation ERISA § 406(a)(1)(C), 29

U.S.C. § 1106(a)(1)(C), because they took compensation while providing prescription drug

coverage services to the plans. ¶¶ 172-183.

Defendants' plans expressly provide patients with "Prescription Drug Benefits for

Prescription Drugs and Related Supplies." App., 137, 435. Accordingly, each time a patient

filled a prescription, the patient's plan engaged in a transaction pursuant to which the plan

provided prescription drug benefits. Since Defendants were the fiduciaries who managed the

drug plan, Defendants knowingly caused the plan to engage in this prescription drug coverage

transaction. As part of this transaction, the patient paid Spread which Defendants took as a

Clawback as compensation for furnishing services to the plan. Defendants are parties in interest

because, as discussed above, they are fiduciaries and/or they provided prescription drug

insurance and/or administrative "services" to the patient pursuant to the ERISA plan. 29 U.S.C. §

1002 (14)(A) and (B). Defendants, as both parties in interest and fiduciaries, engaged in a

prohibited transaction when they implemented the Clawback scheme to have the pharmacy to

pay them indirect Clawback compensation in the furnishing of prescription drug benefit services

to the plan. Therefore, the payment of the Clawback to Defendants was prohibited.

Optum does not address this claim. Cigna's only response is that Plaintiffs do not identify

the challenged transactions. Cigna Br. at 23. Cigna is wrong as Count II incorporates the

substantive allegations of the Complaint, including the allegations concerning Plaintiffs' drug

purchases and Defendants' corresponding prescription drug coverage transactions through which

Defendants wrongfully charged Spread and took Clawbacks. The Complaint further alleges that

Defendants wrongfully took Clawbacks as improper compensation in violation of ERISA §

406(a)(1)(C). ¶¶ 171, 176. Accordingly, Defendants have ample notice of the transactions that

– 37 –

are the subject of the Count II.

Cigna attempts to deflect the focus from the prohibited transactions by arguing that there are multiple other transactions between and among themselves and the pharmacies. Cigna Br. at 7-9. The fact that Defendants may enter into various other transactions with other parties that are not even disclosed much less agreed to by the plans or employers is not relevant to the plans' prescription drug coverage transactions which are the subject of this claim.

      **b.**   **Defendants engaged in prohibited transactions in violation of ERISA §§ 406(a)(1)(D) (Count II)**

Count II alleges a claim under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), which provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan. ¶ 173. Defendants violated this provision when they caused the plans to engage in prescription drug coverage transactions through which plan assets were transferred in the form of Clawbacks. They also violated this provision when they caused the plans to enter into the ASO and insurance agreements in order to take Clawbacks. *Id.* at ¶ 180. Defendants' only response is that this case does not concern plan assets. As discussed in section A(2)(a)(iv), above at pp. 24-27, Defendants are wrong.

      **c.**   **Defendants engaged in prohibited transactions under ERISA § 406(b) (Count III)**

"Section 406(b) prohibits a plan fiduciary from engaging in various forms of self-dealing." *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995). "Its purpose is to 'prevent[ ] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Id.* (quoting H.R.Conf.Rep. No. 93-1280, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 5038, 5089). The prohibited transaction rules are broadly and strictly construed to ensure the intended

– 38 –

protections to plan beneficiaries. *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987) (citations omitted).

### (i)   Defendants engaged in prohibited transactions violating ERISA § 406(b)(2) (Count III)

ERISA Section 406(b)(2) prohibits fiduciaries from acting on behalf of parties with interests adverse to participants in dealing with a plan. Count III alleges that Defendants acted in conflicted prescription drug coverage transactions involving the plans each time a prescription was filled and Defendants required the pharmacies to charge Spread and pay them Clawbacks. Defendants each had interests that were adverse to those of participants when they charged Spread and took Clawbacks as excessive profits. By acting on each other's behalf to profit from the excessive Spread and Clawbacks, Defendants acted on behalf of parties who had interests adverse to the affected participants. Accordingly, Defendants violated ERISA § 406(b)(2). ¶ 189.

In response, Cigna effectively ignores this claim, arguing only that Plaintiffs are not parties to the pharmacy agreements. Cigna Br. at 23-24. Since the pharmacy agreements are not the alleged prohibited transactions, this argument is irrelevant.

Optum wrongly argues that it did not act as a fiduciary, as discussed above. Optum Br. at 17 n.15. Optum further contends that it did not represent a party in a transaction involving the plan. *Id.* To the contrary, as discussed above, the prescription drug transactions involved the plans, and Optum acted on behalf of Cigna (and Cigna acted on behalf of Optum) in connection with these transactions. Accordingly, this argument should be rejected.

### (ii)   Defendants engaged in prohibited transactions in violation of ERISA §§ 406 (b)(1) and (3) (Count III)

Count III alleges violations of ERISA § 406(b)(1) and (3), which prohibit a fiduciary from "(1) deal[ing] with the assets of the plan in his own interest or for his own account . . . or (3) receiv[ing] any consideration for his own personal account from any party dealing with such

– 39 –

plan in connection with a transaction involving the assets of the plan."[30] As discussed above, the Clawbacks and ASO and insurance agreements are plan assets. Defendants violated paragraph (a)(1) by dealing with these plan assets to take Clawbacks for their own interest and accounts. ¶ 188. Defendants violated paragraph (a)(3) in that, through their Clawback scheme, Defendants received consideration for their own personal accounts from other parties — including each other, and the pharmacies, Plaintiffs and Class members — that were dealing with the plans in connection with prescription drug transactions involving the assets of the plans. ¶ 190. Defendants' only response to these claims is that the alleged prohibited transactions do not concern plan assets. Cigna Br. at 24-25; Optum Br. at 17-19. They are wrong as discussed above.

### 5.    Plaintiffs state discrimination claims under ERISA § 702 (Count V)

ERISA § 702, enforced through ERISA § 502(a)(3),[31] prohibits discrimination against participants and beneficiaries of group health plans with regard to, among other things, premium and contribution payments. *See* 29 U.S.C. § 1182. ERISA § 702 provides that "[a] group health plan, and a health insurance issuer offering health insurance coverage in connection with a group health plan, may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual." *See* 29 U.S.C. § 1182(b)(1).

The Complaint alleges that "[i[n setting the amount of and taking excessive undisclosed

---

[30] *See, e.g., also In re Beacon Assoc. Litig.*, 818 F. Supp. 2d 697, 711 (S.D.N.Y. 2011) (holding, in light of the Second Circuit's "command" to broadly construe § 406(b), that paragraph (b)(3) applies to "to any transaction in which an entity that qualifies as a fiduciary under any of the prongs provided in § ERISA 3(21)(A) receives compensation for services it provides in its capacity as plan fiduciary from a party "dealing with such plan" and in connection to a transaction involving plan assets").

[31] *See Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) ("Section 1182 may be enforced by an ERISA participant's claim to enjoin any act or practice which violates any provision of this subchapter.") (internal citations omitted).

'Spread' compensation, including 'Clawbacks,' Defendants have required plan participants and beneficiaries who have medical conditions that require prescription medications that are subject to Defendants' undisclosed excessive 'Spreads' and 'Clawbacks' to pay greater premiums and contributions than those participants and beneficiaries who *do not* need prescription medications. . ." ¶ 208 (emphasis added). In so doing, the Defendants' Clawback scheme rendered certain participants' inflated cost-sharing payments mandatory for continued enrollment in the plans. ¶ 209. In particular, Plaintiffs "were required to pay hidden additional premiums or contributions in the form of 'Clawbacks' in order to be able to *use* their benefits as enrollees, thus making the 'Clawback' amounts a condition of continued enrollment under the plan." *Id*.

Defendants misstate § 702 claim as "alleg[ing] that participants may pay different copays for different drugs." Optum Br. at 14. To the contrary, the claim is that certain plan participants are discriminated against on account of their particular medical conditions, requiring them to purchase prescription medications subject to Defendants' Clawback scheme (as opposed to the plan participants who do not require these condition-specific drugs), "in order to be able to use their benefits as enrollees…,". ¶ 209. The statutory violation is triggered when certain plan members must pay Clawbacks as a result of particular medical conditions requiring them to take particular medications. ¶¶ 208-09.[32] Defendants cannot charge higher premiums and contribution payments to Plaintiffs on the basis of health related factors. 29 U.S.C. § 1182(b)(1); s*ee also Fossen v. Blue Cross and Blue Shield of Montana, Inc.,* 660 F.3d 1102, 1106 (9th Cir. 2011) ("Federal HIPAA, which is part of ERISA (as amended)… [] prohibits 'group health plan[s]'

---

[32] Defendants' contention that "Plaintiffs do not allege that they pay higher member contributions because they have a certain medical condition" (Optum Br. at 14), underscores their misconception of the alleged ERISA Section 702 claims. That is in fact precisely what Plaintiffs allege. *See* ¶¶ 208-09. It is because Plaintiffs and certain other plan members have particular medical conditions that require them to take the medications subject to "Clawbacks" that they have become victims of Defendants' discriminatory "Clawback Scheme." *See id*.

(and insurers offering coverage through group health plans) from charging different 'premium[s] or contribution[s]' to 'similarly situated individual[s]' on account of 'any health status-related factor in relation to the individual [s]....'").[33]

Discovery will show which particular medical conditions require patients to fill prescriptions subject to the Defendants' illegal Clawback scheme.[34] This issue should not be resolved on a motion to dismiss. *See*, *e.g.*, *Bristol-Myers Squibb Co. v. Matrix Laboratories Ltd.*, 655 Fed. App'x 9, at *13 (2d Cir. 2016)

### 6. The Complaint alleges Defendants are liable as co-fiduciaries for others' fiduciary breaches (Count VI)

Under ERISA § 405(a), a fiduciary is liable for the fiduciary breach of another fiduciary "if he . . . participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; . . . by his failure to comply with section [ERISA § 404(a)(1),] . . . enabled such other fiduciary to commit a breach; or . . . has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. 29 U.S.C. § 1105(a). Cigna and Optum violated ERISA § 405(a) by knowing of the others' breaches, yet failing to remedy them, knowingly participating in them or enabling them. *See* ¶ 215; *see also,* ¶¶ 252, 255, 284, 287. Defendants have no response to these claims, other than to rely on their arguments concerning the other Counts. The Court should reject them for the reasons set forth above.

---

[33] ERISA defines "health status-related factor" as including "Health status," "Medical condition (including both physical and mental illnesses)," "Claims experience," "Receipt of health care," "Medical history," "Genetic information," "Evidence of insurability (including conditions arising out of acts of domestic violence)," and "Disability." 29 U.S.C. § 1182(a)(1); *see also id.* § 1191b(d)(2).

[34] The list of examples of the prescription medications for which certain plan participants, including the Plaintiffs, pay the Clawbacks set forth in paragraph 86 of the Complaint is not exhaustive. Because not all drugs subject to the "Clawback Scheme" are known at this time, it is also impossible to ascertain all the medical conditions that cause certain plan participants to be discriminated against in violation of ERISA § 702.

### 7.  Defendants are liable as non-fiduciaries (Count VII)

Defendants are liable as *non*-fiduciaries for the knowing participation in breaches of fiduciary duties under §§ 404 and 406. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000); *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 216 (D. Conn. 2007). "[T]o plead a claim against a nonfiduciary under § 502(a)(3), . . . the plaintiff must allege only that a fiduciary violated a substantive provision of ERISA and the nonfiduciary knowingly participated in the conduct that constituted the violation." *Mach. Movers, Riggers and Mach. Erectors, Loc. 136 v. Nationwide Life Ins. Co.*, 2006 WL 2927607, at *4 (N.D. Ill. Oct. 10, 2006) (applying *Harris Trust* and finding that complaint pled nonfiduciary liability for violations of § 404 and 406). Plaintiff have done this. *See, e.g.*, ¶¶ 252, 255, 284, 287.[35]

### 8.  Plaintiffs are entitled to all of the relief they seek

Incredibly, Optum argues that Plaintiffs have no remedy to redress Defendants' egregious conduct. Optum Br. at 19-22. As discussed above, they first argue that Plaintiffs have no claim under ERISA Section 502 (a)(1)(B) for failure to exhaust administrative remedies. In a classic "Catch-22" argument, they then argue that Plaintiffs have no claim under ERISA Section 502 (a)(2) and (3) because Plaintiffs assert claims under ERISA Section 502 (a)(1)(B). But Optum is not immune from liability for its wrongful acts. As discussed above, Defendants' argument that Plaintiffs cannot seek relief under § 502(a)(1)(B) fails. Optum's argument that Plaintiffs have no claim under §§ 502(a)(2) and (3) fails as well.

---

[35] Although Optum asserts that Count VI must be dismissed if Cigna is not found to be a fiduciary (Optum Br. at 22-23), ERISA § 502(a)(3) "authoriz[es] . . . suit against a nonfiduciary 'party in interest' to a transaction barred by ERISA § 406(a)," regardless of the fiduciary status of a co-defendant. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000). The Court reasoned "that § 502(a)(3) itself imposes certain duties, and therefore liability . . . does not depend on whether ERISA's substantive provisions impose a specific duty on the party being sued." *Id.* at 245; see also id. at 246 (. . . the focus [of §502(a)(3)] . . . is on redressing the 'act or practice which violates any provision of [ERISA Title I].'" (emphasis in original)). Thus, Count VI — as it applies to prohibited transactions claims with a party in interest — does not require that Cigna be deemed a fiduciary; it only requires that the transaction be deemed prohibited.

### a.   Plaintiffs' ERISA § 502(a)(3) claims are proper

Defendants mischaracterize Plaintiffs' ERISA § 502(a)(3) claims in Counts II-VII as duplicative of their § 502(a)(1)(B) claims. *See* Optum Br. at 20-23. Count I asserts claims under § 502(a)(1)(B), pursuant to which Plaintiffs seek to enforce their present rights and clarify their future rights under the plans. *See* ¶ 170. By contrast, in Counts II-VII, Plaintiffs seek *equitable* relief under § 502(a)(3), including, *inter alia*, disgorgement of profits not available under § 502(a)(1)(B), for breach of fiduciary duty and prohibited transactions. *See* ¶¶ 183, 193, 205, 212, 221 and 226.

ERISA authorizes a number of distinct causes of action to remedy violations of the statute, to enforce the terms of a benefit plan or to provide other available relief. *See generally* 29 U.S.C. 1132(a)(1)-(11) (listing civil causes of action under ERISA). In *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001), the Second Circuit held that *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996), does not preclude a private cause of action for breach of fiduciary duty under § 502(a)(3), where a claim is also asserted under another subsection of § 502(a). Rather, both claims should proceed, and at the conclusion of the case, the court can determine whether "appropriate" equitable relief is available on the § 502(a)(3) claim should both succeed. *Id.*

After *Devlin,* the Supreme Court ruled in *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011), that where plaintiffs cannot obtain relief under ERISA § 502(a)(1)(B) for benefits, plaintiffs may be able to obtain equitable relief — including surcharge — under § 502(a)(3). *Id.* at 726-27. Subsequent to *Amara*, the Second Circuit held in *N.Y. State Psychiatric Ass'n v. UnitedHealth Grp.*("*NYSPA*"), 798 F.3d 125, 134 (2d Cir. 2015), that it was not clear at the motion-to-dismiss stage whether monetary benefits under § 502(a)(1)(B) alone would provide a sufficient remedy. Accordingly, the Court determined that to the extent the plaintiff sought

– 44 –

"redress for [Defendants'] past breaches of fiduciary duty or seeks to enjoin [Defendant] from committing future breaches, the relief sought would count as equitable relief under § 502(a)(3)." *Id*. at 135 (*citing Amara*, 563 at 1879-80).

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006), does not support Defendants' argument. In *Frommert*, the Second Circuit *reversed* the district court's dismissal of plaintiff's claim under ERISA § 502(a)(3) as duplicative. Moreover, the Second Circuit in *NYSPA* recognized the consistency in *Devlin* and *Frommert*, in holding that "*Varity Corp.* did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available…[rather if a plaintiff] succeeds on both claims…the district court's remedy is limited to such equitable relief as is considered appropriate." *NYSPA*, 798 F.3d at 134; s*ee also Silva v. Metro Life Insurance Co.*, 762 F.3d 711, 726 (8th Cir. 2014); *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948 (9th Cir. 2016); *Stiso v. Int'l Steel Group*, 604 F. App'x 494, 498 (6th Cir. 2015) [36]

As discussed above, Plaintiffs assert separate claims and seek different relief under § 502(a)(3) than they do under § 502(a)(1)(B). Accordingly, Plaintiffs' ERISA § 502(a)(3) claims should be permitted to proceed.[37] At the very least, the issue should be resolved at the end of the case, not on a motion to dismiss.

---

[36] Other cases cited by Defendants are of no help to them. Many are out of Circuit. Additionally, others were issued prior to *Amara*, when monetary relief was not available under ERISA § 502(a)(3). *See, e.g.*, *NYSPA*, 798 F.3d at 135 (distinguishing *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005)).

[37] *See also* ¶ 132 ("Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B) … because not all the remedies Plaintiffs seek are available under all sections of ERISA and, *alternatively, Plaintiffs are pleading their claims in the alternative*.") (emphasis added).

### b. Plaintiffs state claims on behalf of the plans under ERISA § 502(a)(2)

Defendants' argument that Plaintiffs only seek personal relief (*see* Optum Br. at 19-20) is

wrong. The Complaint seeks relief under § 502(a)(2), including the disgorgement of ill-gotten

profit and injunctive remedies to prevent future occurrences of the Defendants' misconduct. *See*,

*e.g.*, ¶¶ 132, 203. The Complaint alleges:

> ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary,
> or to bring suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109,
> provides, *inter alia*, that any person who is a fiduciary with respect to a plan and
> who breaches any of the responsibilities, obligations, or duties imposed on
> fiduciaries by ERISA shall be personally liable to make good to the plan any losses
> to the plan resulting from each such breach and to ***restore to the plan any profits***
> the fiduciary made through the use of the plan's assets. ERISA § 409 further
> provides that such fiduciaries are subject to such ***other equitable or remedial relief***
> as a court may deem appropriate.

¶ 132 (emphasis added).

As discussed above, each time a prescription was filled, a plan engaged in a prescription

drug coverage transaction. As part of each of these plan transactions, Defendants caused a

pharmacy to pay them a Clawback. *See* ¶¶ 24, 132, 196. Moreover, as discussed above, the

contracts underpinning the plans, including insurance policies and ASO contracts, are "plan

assets" that Defendants misused for their own benefit. *See* section A(2)(a)(iv), at pp. 24-27,

*supra*. Because Defendants, misused the plan's transactions and agreements in order to take

Clawbacks, ¶ 15, they have profited through their misuse of the plan assets. Accordingly,

Defendants are liable to restore their ill-gotten profits for the benefit of the plans at large. *See*

*also* Prayer for Relief, J (seeking "disgorgement of unjust profits," and asking that the Court

"remedy Defendants' windfalls"). Disgorgement of profits is proper pursuant to ERISA § 409

even where a plan (or its participants) has not itself suffered any loss. *See Haddock v. National*

*Financial Services, Inc.*, 262 F.R.D. 97, 128 (D. Conn. Nov. 6, 2009) (Underhill, J.) (vacated and

remanded on other grounds) ("Where a plaintiff seeks disgorgement of ill-gotten profits on behalf of a plan, pursuant to ERISA sections 409 and 502(a)(2), it is not necessary to prove any loss, let alone individualized losses").[38] *See also Amalg. Clothing & Textile Workers Union v. Murdock*, 861 F.2d 1406, 1411-12 (9th Cir. 1988); *Leigh v. Engle*, 727 F.2d 113, 122 (7th Cir. 1984),

Plaintiffs also seek injunctive relief on behalf of the plans to prevent further breaches by, for example, "permanent removal of Defendants from any positions of trust with respect to the ERISA Plans … and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans…." *See* ¶ 202; Prayer for Relief, K. *See also Chao v. Merino*, 452 F.3d 174, 185-86 (2d Cir. 2006); *Beck v. Levering*, 947 F.2d 639, 641 (2d Cir. 1991) *cert. denied*, 504 U.S. 909 (1992).

Plaintiffs further allege that Defendants breached their fiduciary duty of loyalty by making misrepresentations. To remedy these violations, Plaintiffs seek, *inter alia*, equitable relief, such as proper disclosure, to prevent the further misrepresentations that would also apply on a plan-wide basis. *See* ¶ 202.

In *Everson,* 898 F. Supp. at 540, the defendant similarly argued that a plaintiff could not bring a claim over excessive copayment amounts under ERISA § 502(a)(2). In rejecting this argument, the court approved the equitable plan-wide relief that Plaintiffs seek here. This Court should do the same.

---

[38] Furthermore, disgorgement is not a make-whole remedy. In fact, "whether beneficiaries have been financially damaged by the breach is immaterial." *Amalg. Clothing & Textile Workers*, 861 F.2d at 1411-12.

**B.   THE COMPLAINT ALLEGES VIOLATIONS OF RICO**

   **1.   Plaintiffs' allegations satisfy RICO's pleading requirements**

Plaintiffs allege that Defendants (1) conducted the affairs (2) of an enterprise (3) through

a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

Neither Optum nor Cigna dispute that Plaintiffs have satisfied most of Section 1962(c)'s

elements and sub-elements. While both Defendants question whether Plaintiffs plead predicate

acts in accordance with Rule 9(b), as to the specific elements of RICO, Optum only challenges

whether Plaintiffs adequately plead the existence of the Optum Pharmacy Enterprise and whether

Optum controlled that Enterprise. Optum Br. at 24-30. Conceding that they are enterprises,

Cigna only challenges whether there are allegations that it controlled Optum and Argus and

whether Plaintiffs adequately plead the predicate racketeering acts of mail and wire fraud. Cigna

Br. at 33-40. Importantly, Plaintiffs' conduct and enterprise allegations "need satisfy only the

'short and plain statement' standard of Rule 8(a)." *CF 135 Flat LLC v. Triadou SPY S.A.*, No.

15-CV-5345 (AJN), 2016 WL 5945933, at *9 (S.D.N.Y. June 21, 2016) (quoting *D. Penguin

Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014)). The detailed allegations of the

Complaint easily meet this burden.

Defendants cannot avoid Plaintiffs' well-pled RICO allegations by inappropriately

recasting them as nothing more than a breach of "garden-variety 'business relationships,' (Cigna

Br. at 36), and a "'garden variety . . . breach of contract'" (Optum Br. at 23). Beyond thereby

admitting that Plaintiffs have pled a violation of ERISA, Defendants are wrong because the well-

pled allegations establish that Defendants engaged in a widespread, fraudulent scheme that they

concealed from consumers through gag clauses and enforcement provisions. ¶¶ 16-18, 64, 152,

161, 165, 227-99. In an attempt to evade liability, Defendants' arguments (1) ignore the detailed

allegations of the Complaint of a pervasive, continuous, and concealed overcharge scheme, (2)

– 48 –

impermissibly employ Defendants' distorted view of the well-pled facts, and (3) disregard the massive harm their actions have caused to Plaintiffs and to millions of plan participants — harm that has attracted Congress' criticism, ¶ 78, and inspired investigative journalism, ¶¶ 82-85, 272 & n.43.

Cigna also tries to paint this action as an improper extension of RICO, wrongfully claiming that RICO "is primarily a criminal statute." (Cigna Br. at 32). RICO is not "primarily a criminal statute," and the Supreme Court has unambiguously declared that the civil scope of "RICO is to be read broadly," *Sedima,* 473 U.S. at 499, and it has made clear that "the courts are without authority to restrict the application of the statute." *United States v. Turkette*, 452 U.S. 576, 587 (1981). Moreover, the Supreme Court long ago recognized the validity of utilizing RICO against insurance companies that engage in fraudulent activities such as Cigna and Optum do here. *See generally Humana v. Forsyth*, 525 U.S. 299 (1999). In crafting RICO, Congress "self-consciously" deployed "expansive language" along with the command that RICO "be liberally construed to effectuate its remedial purposes." *Id.* (citing Pub.L. 91-452, § 904(a), 84 Stat. 947); *see also United States v. Mazzei*, 700 F.2d 85, 89 (2d Cir. 1983). Notably, Cigna has previously been found to have been engaged in activities constituting violations of RICO. *In re Managed Care Litig.*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002).

### 2. Plaintiffs adequately plead the enterprise element and that the Optum Pharmacy Enterprise is an association-in-fact enterprise

Plaintiffs have defined the Optum Pharmacy Enterprise as an association-in-fact enterprise "alternatively consisting of OptumRx and pharmacies in OptumRx's pharmacy networks . . . or consisting solely of such pharmacies" that filled Plaintiffs' and Class member' prescriptions. ¶ 265 While RICO "does not specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United States*, 556 U.S. 938, 944 (2009), courts have consistently

– 49 –

recognized that it is "very broad." *United States v. Ramirez*, 586 F. App'x 30, 33 (2d Cir. 2014), as amended (Oct. 6, 2014); *Boyle* at 944 ("the very concept of an association in fact is expansive."). Under RICO, there is "no restriction upon the associations embraced by the definition" of "enterprise." *United States v. Turkette*, 452 U.S. 576, 580 (1981). The statute reaches "***any*** union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added); *see also Boyle*, 556 U.S. at 944 ("The term 'any' ensures that the definition has a wide reach.").

Association-in-fact enterprises share three "structural features": (1) a purpose; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Because the Optum Pharmacy Enterprise satisfies each requirement,[39] the Court should reject Optum's challenge to Plaintiffs' enterprise allegations.

### a. Plaintiffs adequately plead the Optum Pharmacy Enterprise's common purpose

Plaintiffs plead that the "purpose of the Optum[] Pharmacy Enterprise is to provide Plaintiffs and Class members medically necessary prescription drugs in accordance with the terms of their Plans." ¶ 275. These "activities were coordinated to serve common goals, and that is all that is required" to satisfy *Boyle*'s purpose requirement. *United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011) (citing *Boyle*). Optum concedes that Plaintiffs plead a "common purpose,"

---

[39] Optum concedes that Plaintiffs have satisfied the longevity requirement. Both Cigna and Optum, however, take issue with Plaintiffs' pleading that Optum and Cigna controlled alternative enterprises. (Optum Br. at 24 n.24; Cigna Br. at 33 n.21.) "[E]quivocation about the constitution of the enterprise . . . does not undermine the plausibility of the pleadings." *Jackson v. Segwick Claims Mgmt. Servs., Inc.*, 699 F.3d 466, 480 (6th Cir. 2012), *vacated on other grounds*, 731 F.3d 556 (6th Cir. 2013) (endorsing plaintiffs' choice to plead six enterprises in the alternative and noting that "[g]ood lawyering as well as ethical compliance often requires lawyers to plead in the alternative."). To the extent the Court is inclined to accept any of Defendants' arguments, Plaintiffs request leave to amend their Complaint. *Chudnovsky v. Leviton Mfg. Co.*, 158 F. App'x 312, 314 (2d Cir. 2005) ("Plaintiffs whose claims are dismissed pursuant to Rule 8 ordinarily should be granted leave to file an amended pleading.").

Optum Br. at 27 n.27, but argues that Plaintiffs must allege a common purpose "to engage in a particular fraudulent course of conduct," *id.* at 26. RICO contains no such requirement. To hold that an association-in-fact cannot exist unless its members share a common fraudulent purpose would defy binding Supreme Court precedent and undermine RICO's remedial purposes.

In *Turkette* and *Boyle,* the Supreme Court held that the "wide" and "expansive" concept of an association-in-fact enterprise encompasses "any group" that functions as a "continuing unit." *See Turkette,* 452 U.S. at 583; *Boyle,* 556 U.S. at 944-45. The requirement of a "common purpose" serves to ensure that the "group of persons . . . function[s] as a continuing unit." *Turkette,* 452 U.S. at 583; *United States v. Cianci*, 378 F.3d 71, 88 n.9 (1st Cir. 2004). Further, the Supreme Court has unambiguously held that an enterprise is a "group of persons associated together for a common purpose of engaging in ***a*** course of conduct." *Turkette*, 452 U.S. at 583 ("There is no restriction upon the associations embraced by the definition . . . it no more excludes criminal enterprises than it does ***legitimate ones***.") (emphasis added). Pleading a fraudulent purpose is not required because the requirement that an "enterprise" exists merely reflects "the meaning of the term in ordinary usage, *i.e.*, a 'venture,' 'undertaking,' or 'project.'" *Boyle,* 556 U.S. at 946 (quoting Webster's Third New International Dictionary 757 (1976)).

An association-in-fact enterprise can exist to advance purely legitimate purposes. *See, e.g.*, *Jacobson v. Cooper*, 882 F.2d 717, 719 (2d Cir. 1989) (enterprise alleged to be "'plaintiff's real estate enterprise,' a legitimate business formed by plaintiff for real estate investment and development."); *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 576 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016) ("[T]he LAP team and its affiliates were a group of persons associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the

– 51 –

exertion of pressure on Chevron to pay."); *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401,

414 (E.D.N.Y. 2013) (denying motion to dismiss where plaintiff alleged that an enterprise's

"stated purpose" was "to provide customers with soil remediation and site redevelopment

services."); *City of N.Y. v. Chavez*, No. 11-CV-2691, 2012 WL 1022283, at *6 n.5 (S.D.N.Y.

Mar. 26, 2012).[40]

Optum relies heavily on *Blue Cross of California v. SmithKline Beecham Clinical

Laboratories, Inc.*, 62 F. Supp. 2d 544 (D. Conn. 1998). Importantly, the purported enterprise in

*Blue Cross of California* failed not because its members failed to share a common fraudulent

purpose, but because plaintiffs failed to allege any plausible purpose at all. *Id*. at 552. In any

event, the court's *dictum* that the "common purpose" of an enterprise had to be fraudulent was

inconsistent with binding appellate precedent. Indeed, after *Blue Cross of California* was

converted into a multidistrict case, the **same** court assessed an amended complaint and found the

**legitimate** purposes of joining a laboratory network and increasing efficiency and purchasing

power "sufficient, at this stage of the litigation, to satisfy the 'common purpose' requirement

articulated in *United States v. Turkette*." *In re SmithKline Beecham Clinical Labs., Inc. Lab. Test

Billing Practices Litig.*, 108 F. Supp. 2d 84, 94 (D. Conn. 1999).[41]

Accepting Optum's restrictive formulation of the enterprise would contradict the

Supreme Court's directive to give the enterprise an "expansive" interpretation, *Boyle, 566 U.S. at*

---

[40] Authority from outside the Second Circuit similarly confirms that "an enterprise only needs to share a common purpose and that the purpose does not need to be fraudulent." *Stitt v. Citibank, N.A.*, No. 12-CV-03892-YGR, 2015 WL 75237, at *4 (N.D. Cal. Jan. 6, 2015); *United States v. Cianci*, 378 F.3d 71, 88 n.9 (1st Cir. 2004) ("[I]t is not required that each participant have a separate mens rea so long as each can reasonably be said to share in the common purpose…. To require a common fraudulent purpose would essentially require each member of the enterprise to possess a fraudulent intent."); *Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1120 (D. Ariz. 2010); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992 (C.D. Cal. 2008); *Reynolds v. Condon*, 908 F. Supp. 1494, 1510 (N.D. Iowa 1995).

[41] The court dismissed plaintiff's RICO claims after finding that plaintiffs failed to satisfy what, under *Boyle*, would be considered the relationship and longevity requirements.

– 52 –

944, and would ignore the Court's recognition that the enterprise can be conceived of alternatively as a prize, instrument, victim, **or** as a perpetrator. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 & n.1 (1994). Limiting RICO to associations-in-fact where the enterprise is a perpetrator of the fraud would contradict the Supreme Court's declaration that "[t]here is no inconsistency or anomaly in recognizing that § 1962 applies to both ***legitimate*** and illegitimate enterprises." *Turkette*, 452 U.S. at 585 (emphasis added). Optum's narrowing also would contradict the binding directive to construe RICO liberally to effectuate its remedial purposes, *Sedima,* 473 U.S. at 499, and hamstring civil litigants and prosecutors from rooting out infiltration of legitimate enterprises, which is a fundamental purpose of RICO. Finally, accepting Optum's requirement of a fraudulent purpose would improperly conflate the straightforward "purpose" requirement with other freestanding requirements under RICO.[42] More to the point, Plaintiffs plausibly plead that the purpose of the Optum Pharmacy Enterprise is to provide Plaintiffs and Class members with prescription drugs in accordance with the terms of their Plans. "[T]hat is all that is required" to satisfy *Boyle*'s purpose requirement. *Applins*, 637 F.3d at 78.

### b. Plaintiffs adequately plead the Optum Pharmacy Enterprise members' "relationship"

Optum wrongly argues that the Optum Pharmacy Enterprise is nothing more than a rimless hub and spoke enterprise. Incredibly, Optum contends that "Plaintiffs fail to allege ***a***

---

[42] The court in *In re Neurontin Mktg., Sales Practices & Prod.*, 433 F. Supp. 2d 172, 181 (D. Mass. 2006), noted that "a RICO enterprise's common purpose need not be fraudulent in all cases," and cautioned that defendants' contention otherwise "comes dangerously close to conflating the elements of a pattern of racketeering activity and the existence of an enterprise . . . ."; *see also Turkette*, 452 U.S. at 583 ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains ***a separate element*** . . . ." (emphasis added)). The danger of conflation is seen in *First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), where it appears the court conflated the purpose requirement with the separate RICO requirement of relatedness. 385 F.3d at 174 (citing *United States v. Indelicato*, 865 F.2d 1370, 1383–84 (2d Cir. 1989); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Finally, on the danger of conflation, Optum does not dispute and has waived any argument contesting that Plaintiffs have satisfied RICO's longevity, pattern, relatedness, and separateness requirements.

*single fact* suggesting that the pharmacy 'spokes' had *any relationship* with one another."
(Optum Br. at 28)(emphasis added).[43] To the contrary, the pharmacies participating in the Optum
Pharmacy Enterprise have a highly-organized relationship — they joined together as a group and
function as a continuing unit by participating in Optum's pharmacy network. The pharmacy
network is a purpose-built association-in-fact designed to serve Optum's business objectives and
to benefit participating pharmacists as a group. ¶¶ 275-78, 282-87. Indeed, in its brief, Optum
acknowledges that the "*'network' of pharmacies have agreed* to discounted prices in exchange
for the benefit of being included in the plan's network." (Optum Br. at 4)(emphasis added) This
admission directly contradicts Optum's baseless argument premise that "Plaintiffs fail to allege a
single fact suggesting that the pharmacy "spokes" had any relationship with one another."
(Optum Br. at 28)

    Optum's Provider Manual further indisputably confirms that accepting an adjudicated
claim from Optum "constitutes [the pharmacy's] . . . *acknowledgment of its participation in the
applicable network*." Optum Provider Manual at 44. Moreover, the payment and concealment
provisions of the Provider Manual demonstrate the pharmacies' agreement with Optum and their
"symbiotic dependency" on each other to implement the Clawback scheme and to affirmatively
conceal it from consumers. ¶ 271(b)-(d); *City of N.Y. v. Chavez*, 944 F. Supp. 2d 260, 277
(S.D.N.Y. 2013). Without that "symbiotic dependency" among the pharmacies in the enterprise,
the fraudulent Clawback scheme would be exposed. Indeed, due to the courage of a few
pharmacists to breach the "symbiotic dependency" and finally shed light on the fraudulent
Clawback scheme, this lawsuit can put an end to Defendants' unlawful scheme. *cf. In re*

---

[43] Optum does not (and cannot plausibly) dispute its own relationship to the pharmacies participating in its pharmacy
network.

*Trilegient Corp.*, Inc., 11 F. Supp. 3d 82, 99 (D. Conn. 2014) (enterprise not sufficiently alleged where no allegation that members had "mutual expectations of reciprocal behavior" or "even knew the identity of the other[s]")

The well-pled "network" allegations here are nothing like the impermissible enterprise discussed in *Boyle* that consisted of "several individuals" who "***independently and without coordination***, engaged in a pattern of crimes listed as RICO predicates." *Boyle*, 556 U.S. at 947 n.4 (emphasis added). Instead, the Optum Pharmacy Enterprise is highly coordinated through a written manual and every pharmacy is required to and does comply with Optum's mandate to "participat[e] with one another in OptumRx's pharmacy network" and perpetuate and conceal the fraudulent Clawback scheme. ¶ 271(a), (c) & (d).

*In re Managed Care Litig.*, 185 F. Supp. 2d 1310 (S.D. Fla. 2002), is instructive. Plaintiffs there alleged the existence of an enterprise encompassing the defendant health insurer, the defendant's health plans, and the primary physicians, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, home health agencies that contracted with defendant. *Id.* at 1323. Because the plaintiff did not allege a "series of random contractual exchanges, but a *network* . . . through which [the defendants] deliver health care to the subscribers," the plaintiff pleaded sufficient relationships among the enterprise's members. *Id.* at 1323-34 (emphasis in original). Here, Plaintiffs have set forth even greater details than those alleged in *Managed Care* as to the organizational structure and hierarchy of the enterprise. Specifically, as in *In re Managed Care*, the existence of Optum's pharmacy network is not "mere conjecture." Optum "openly celebrates its respective network, acknowledges their creation of it and uses the network as a public relations vehicle." *Id.* at 1334. Plaintiffs further alleged that Optum's corporate parent states that Optum is able to provide "pharmacy care services to more

than 66 million people in the United States through its network of more than 67,000 retail

pharmacies . . . ." (Amd. RICO Case Stmt. § 6(b)(2)(b).) Similarly, Cigna, represents that its

plans include access to "a nationwide network of retail Network Pharmacies." (ECF No. 70-2,

Ex. 1, App. 0017)

At the pleading stage, Plaintiffs' detailed and plausible allegations that members of an

enterprise "operated symbiotically and played necessary roles" are more than sufficient to satisfy

*Boyle*'s requirement that sufficient relationships exist among the enterprise's members. *See*

*Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007); *Aiu Ins. Co.*

*v. Olmecs Med. Supply, Inc.*, No. CV-042934ERK, 2005 WL 3710370, at *7 (E.D.N.Y. Feb. 22,

2005). Because the members of the Optum Pharmacy Enterprise operate together as a symbiotic

and interdependent provider network in which every pharmacy has agreed to charge and collect

for Cigna copayments and coinsurance in exchange for network membership, they have agreed

to keep the Spread amounts secret, and they thereby facilitate the fraudulent Clawback scheme

and maintain the network, its structure and their participation in the group, the Complaint alleges

a plausible relationship among those associated with the Optum Pharmacy Enterprise. *Boyle*, 556

U.S. at 946; *CF 135 Flat LLC v. Triadou SPY S.A.,* 15-CV-5345 (AJN), 2016 WL 5945933, at

*9-11 (S.D.N.Y. June 21, 2016).

### 3.  Plaintiffs adequately plead the conduct element with regard to the Enterprises

Liability under RICO attaches to any person associated with an enterprise who

"conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs

. . . ." 18 U.S.C. § 1962(c). To conduct or participate in the conduct of an enterprise, "one must

participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507

U.S. 170, 185 (1993). This requires that the defendant have "played ***some*** part in directing the

affairs of the RICO enterprise." *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) (citation omitted)(emphasis added). In the Second Circuit, "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *First Capital Asset Mgt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 176 (2d Cir. 2004) (footnote and citations omitted); *cf. United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) (holding the question whether defendant "operated or managed" the affairs of an enterprise to be essentially one of fact).[44]

### a.  Optum directed the affairs of its participating pharmacies

Optum had expansive control over the Optum Pharmacy Enterprise by both directing its affairs and by overseeing the POS System. For example, in Optum's Provider Manual, Optum specifies ***in writing*** many of the controls over the Optum's Pharmacy Enterprise. Pharmacies participating in Optum's pharmacy network "***must*** charge" Class members whatever fraudulently inflated cost sharing amount Optum directs, "***and only*** this amount." ¶ 271(a) (emphasis added). Accordingly, pharmacies are prohibited from collecting amounts less than Optum directs. Moreover, they are not allowed to disclose the Clawback scheme and the fact that the uninsured cash price for prescriptions could be less than the price that Optum imposes to facilitate the Clawback scheme. ¶ 271(d). If a pharmacy does not adhere to Optum's written controls, and thereby threatens the fraudulent Clawback scheme, Optum can fine the pharmacy $5,000, kick the pharmacy out of Optum's network and ban the pharmacy from petitioning for readmission — a request that is within Optum's sole discretion to grant — for five years. ¶¶ 271(a) & (d). These

---

[44] See also *City of N.Y. v. FedEx Ground Package System, Inc*., 175 F. Supp. 3d 351, 372 (S.D.N.Y. 2016) (describing it as a "relatively modest pleading burden"); *U1IT4less, Inc. v. FedEx Corp*., 896 F. Supp. 2d 275, 291 (S.D.N.Y. 2012) (describing it as "a relatively low bar at the pleading stage").

are binding mandates designed to control pharmacies, maintain the network and perpetuate Optum's fraudulent Clawback Scheme, not hypothetical scenarios. ¶ 272 & n. 43.

Optum's Provider Manual does not merely define "garden-variety 'business relationships'" with pharmacies, (Optum Br. at 30), but instead "help[s] determine the enterprise's modus operandi." *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1528 (S.D.N.Y. 1995). Optum's control of the Optum Pharmacy Enterprise through the Provider Manual (1) dictates excessive cost-sharing payments and Spread pricing, (2) requires the participating pharmacies to collect the undisclosed Spread from the consumers, (3) requires their pharmacies to pay Defendants the Clawback of the Spread and (4) maintains the secrecy of and enforces compliance with the fraudulent Clawback Scheme. Accordingly, Optum was "doing more than providing services as part of its routine and legitimate business operations," and was instead the "key participant[]" in the Clawback Scheme, which it effectuated "by making critical misrepresentations." *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004).

The cases that both Optum and Cigna rely on, *see* Optum Br. at n.2 (adopting Cigna's arguments), are inapposite because each involved independent or fringe actors who had no ability to conduct the affairs of the purported enterprises. *See, e.g.*, *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1090-91 (S.D.N.Y. 1996)(independent credit rating agency did not control enterprise of financial institution engaged in Ponzi scheme); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 344-49 (S.D.N.Y. 1998)(bank that processed allegedly fraudulent transactions did not control enterprise consisting of banks and an independent fraudster); *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 955 (D.C. Cir. 1990)(*en banc*)(striking union did not participate in the affairs

of the target company). Here, not only did Optum generally control the Optum Pharmacy Enterprise through the Provider Manual and other means, it ***specifically*** controlled the enterprise to create, implement and conceal Defendants' fraudulent Clawback scheme.

###    b.    Cigna directed Optum and Argus to effectuate the Clawback scheme

Like Optum, Cigna also tries to argue that it does not control the Optum and Argus enterprises. After conceding that Optum and Argus are legal entity enterprises, Cigna argues that "by virtue of arm's-length-vendor contracts," as a matter of law, it could not have operated or managed the affairs of Optum or Argus. Cigna Br. at 34. Despite Cigna's claim, contracts are not paper shields that can defeat well-pled allegations that a defendant had "some part in directing [the] affairs'" of an enterprise. *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001)(quoting *Reves*, 507 U.S. at 179). The mere fact that Cigna's relationship with Optum and Argus have some contractual dimension does not defeat Plaintiffs' well-pled allegations that Cigna operated and managed the affairs of Optum and Argus.

Cigna's contract-based relationship with Optum and Argus facilitated the fraudulent Clawback Scheme. Plaintiffs detailed in the Complaint how Cigna designed plans and policies that allowed it to effectuate its Clawback scheme, ¶ 70, and used Cigna Pharmacy Management, Cigna's in-house pharmacy benefit manager, as well as contracts and other agreements, to operate and manage the affairs of Optum and Argus — especially as those affairs related to the Clawback scheme. ¶¶ 237-41. Optum and Argus effectuated Cigna's Clawback scheme at Cigna's direction, ¶ 242, at least in part, because Cigna allowed Optum and Argus to keep a portion of the fraudulent Clawbacks. ¶¶ 71, 242, 250.

In *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260 (D. Conn. 2004), the court denied the motion to dismiss a RICO claim where the plaintiff insurance company alleged that it was an

enterprise operated and managed by the defendant medical practice that received payments after submitting false medical billings and medical reports. *Id.* at 274-76. Plaintiffs' allegations here are stronger than those in *Allstate* because Plaintiffs allege that Cigna operated and managed the affairs of Optum and Argus by requiring them to intentionally misrepresent to Plaintiffs the cost-sharing amounts they were required to pay to receive medically necessary prescription drugs, causing Plaintiffs to overpay for those drugs. ¶¶ 237-42. Moreover, Plaintiffs allege that Cigna directed Optum and Argus to direct the pharmacies to return the Spread to Optum and Argus and allowed those legal entity enterprises to keep a portion of the Clawback. ¶¶ 71, 237-42.

That Cigna allowed Optum and Argus to keep a portion of the Clawbacks distinguishes this action from *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64 (E.D.N.Y. 2011). *Crabhouse* found plaintiff's allegations implausible in part because they would have required the purported enterprise to act against its own interests. 801 F. Supp. 2d at 75-76. In contrast, Optum's and Argus's pocketing a portion of the Clawbacks meant that their interests were perfectly aligned with Cigna's in executing the Clawback scheme.

Cigna also invokes *Vickers Stock Research Corp. v. Quotron Systems, Inc.*, No. 96-CV-2269, 1997 WL 420265 (S.D.N.Y. July 25, 1997), and claims that it is relevant because it was decided "as a matter of law." (Cigna Br. at 35.) It was not. After reviewing affidavits, the court converted defendant's motion to dismiss to a motion for summary judgment, which it then granted. *Id.* at *4-5. The heightened evidentiary burden applied in *Vickers* has no bearing on Plaintiffs' allegations here. *See also Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, No. CV-042934ERK, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005).

Moreover, unlike in *Vickers*, the relationship between Cigna, on the one hand, and Optum and Argus, on the other, is not a "pure and simple" business relationship. To the contrary, the

relationship that allows for the Clawback scheme to occur is based upon pervasive misrepresentations concerning the amounts charged and collected from patients. The relationship is shrouded in secrecy with enforced compliance involving the pharmacies that collect the Spread and pay the Clawbacks. It is not a "pure and simple" relationship, it is a relationship that enables, facilitates, and enforces the fraud.

If anything, *Vickers* illustrates the danger of ignoring Plaintiffs' well-pled allegations and prematurely deciding this issue. As courts have recognized, it is unreasonable "to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise" to plead with specificity the facts of a defendant's operation and control of the enterprise. *Aiu Ins. Co.,.*, 2005 WL 3710370, at *8; *Friedman v. Hartmann*, 91 CIV. 1523 (PKL), 1994 WL 376058, at *2 (S.D.N.Y. July 15, 1994). Thus, if "the role of the particular defendant in the RICO enterprise is unclear," Plaintiffs should be "entitled to take discovery on this question." *Id.*; *Allstate*, 312 F. Supp. 2d at 276 (D. Conn. 2004) (allowing discovery despite expressing "considerable skepticism" as to the plaintiff's averments of control under RICO) (collecting cases). Accordingly, Plaintiffs have sufficiently pleaded that Cigna operated and managed the affairs of Optum and Argus and Defendants' motion to dismiss must be denied.

### 4.   Plaintiffs adequately plead the racketeering element

Defendants argue that Plaintiffs cannot satisfy the racketeering element of their Section 1962(c) claim because Plaintiffs failed to allege that Defendants engaged in the predicate acts of mail and wire fraud in compliance with Rule 9(b). Defendants are wrong. Plaintiffs allege a detailed description of Defendants' Clawback scheme that satisfies both the substantive elements of mail and wire fraud as well as Rule 9(b)'s particularity requirement.

– 61 –

The "essential elements" of both mail and wire fraud are: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). Defendants do not dispute that Plaintiffs have satisfied the second and third elements, arguing only that Plaintiffs have not alleged a "scheme to defraud." Cigna Br. at 36-39. To allege a "scheme to defraud," Plaintiffs must plead: "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (internal citations omitted). Defendants challenge only the first two elements of a scheme to defraud. Plaintiffs adequately have alleged both.

Plaintiffs' allegations regarding Defendants' predicate acts of racketeering more than satisfy Rule 9(b)'s particularity requirement. Plaintiffs may satisfy Rule 9(b) in either of two ways. *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14 CV 5449 (NSR), 2015 WL 7758894, at *4 (S.D.N.Y. Dec. 1, 2015) (collecting cases). First, where plaintiffs allege "that the mails or wires were simply used in furtherance of a master plan to defraud . . . a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) ("In complex civil RICO actions involving multiple defendants . . . Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity."). Second, where plaintiffs allege that mail or wire communications were fraudulent *per se*, plaintiffs must plead "the contents of the [fraudulent] communications, who was involved, where and when they took

– 62 –

place, and explain why they were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993). Plaintiffs have easily satisfied both standards.

### 5.   Plaintiffs adequately allege conspiracy to violate RICO

The Clawback scheme is a scheme to defraud. Defendants fail to cite any authority in support of its argument otherwise, which is understandable given that a scheme to defraud is "construed broadly to encompass everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006); *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("In the context of mail fraud and wire fraud, the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987))).

Plaintiffs alleged a detailed description of Defendants' Clawback scheme. ¶¶ 2, 4-14, 16-20, 44-86, 271-74, 276, 280-92. The Complaint explains how Defendants: entered into agreements to adjudicate Plaintiffs' prescription drug claims; created a pharmacy network to fulfill those claims; required pharmacies in its network to charge only the prices Defendants directed; agreed to gag clauses with pharmacies that keep the Spread and Clawback practices secret from consumers; knowingly and intentionally misrepresented to pharmacies inflated customer payment amounts and directed pharmacies to collect those improper sums; and directed pharmacies to remit those sums to Defendants as Clawbacks. *See, e.g.*, ¶¶ 248-56, 274, 280-89. The well-pled allegations sufficiently allege fraud.

Cigna alone, however, once again tries to recast Plaintiffs' Complaint as an action brought on behalf of disgruntled consumers who wished only that their "contractual

– 63 –

arrangements" with their health insurer "were different."[45] Cigna Br. at 37. Plaintiffs do not merely allege that they "expect or want to pay less for prescription drugs," *id.*, but that Cigna intentionally designed, effectuated and ***actively concealed*** a scheme by which Plaintiffs overpaid for prescription drugs through the use of Spread and Clawbacks. ¶ 242, 250-52. The Clawback scheme is "a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community," *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992), and an actionable scheme to defraud.

Cigna also wrongly claims that Plaintiffs have dressed up a breach of contract claim as a scheme to defraud. As with Cigna's argument regarding RICO's conduct element, the mere fact that Cigna's relationships have a contractual dimension does not immunize Cigna from claims under RICO. For support, however, Cigna relies principally on *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016). *O'Donnell* confirms that contractual misrepresentations ***can*** serve as a scheme to defraud. Whether they do turns on "when the representations were made and the intent of the promisor at that time." *Id.* at 658. "[W]here allegedly fraudulent misrepresentations are promises made in a contract," a plaintiff plausibly pleads the existence of a scheme to defraud by plausibly pleading "fraudulent intent at the time of contract execution." *Id.* Plaintiffs have done so. ¶¶ 244-55. Thus, *O'Donnell*'s relevance here is limited to providing the temporal requirement for Plaintiffs' allegations of scienter, which, as discussed below, Plaintiffs have adequately alleged.

---

[45] Optum's arguments regarding the predicate acts of mail and wire fraud are limited to whether Plaintiffs satisfied Rule 9(b). While Optum incorporates Cigna's arguments by reference, Cigna's argument turns solely on whether breach of contract can serve as a scheme to defraud. Because Optum has no contracts with Plaintiffs to breach, Optum's incorporation of Cigna's argument cannot lead to dismissal on the issue of whether Plaintiffs adequately pleaded a scheme to defraud in Count IX.

### a.    Defendants' mail and wire communications furthered the scheme

Plaintiffs also satisfied Rule 9(b) by alleging how Defendants' mail and wire communications were made in furtherance of and enabled Defendants to effectuate the Clawback scheme. ¶¶ 248-56, 271(b), 280-92. Optum, for example, required pharmacies participating in its pharmacy network to communicate with Optum via the "POS System," ¶ 271(b), which Optum describes as an "online or real-time [point-of-sale] telecommunication system used to communicate information . . . . Optum Provider Manual at 19. Optum required pharmacies participating in its network to use the wires to submit claims to Optum for adjudication. ¶ 285. Defendants effectuated the Clawback scheme through the wires by directing pharmacies to collect inflated amounts from Plaintiffs, and later used the wires to Clawback the improperly collected Spread from the pharmacies. ¶¶ 253, 285. These allegations are more than sufficient to satisfy Rule 9(b). *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14 CV 5449 (NSR), 2015 WL 7758894, at *5 (S.D.N.Y. Dec. 1, 2015) (noting that once plaintiffs have plausibly alleged that the mails or wires were used in furtherance of a scheme, "particularity as to the mailings themselves is unnecessary" (quoting *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F.Supp.2d 153, 177 (E.D.N.Y. 2010))).

### b.    Defendants' mail and wire communications were fraudulent *per se*

Plaintiffs also satisfied Rule 9(b) by plausibly alleging that Defendants' mail and wire communications were fraudulent *per se*. While Optum argues that Plaintiffs "never allege[d] that this copay information was inaccurate, let alone fraudulent," Optum Br. at 25, Optum's argument is contrary to Plaintiffs' well-pled allegations.[46] Plaintiffs specifically allege eighteen times that

---

[46] Even if Optum had a plausible basis from which to argue that it failed to make "any fraudulent statement to any of the other Plaintiffs or to pharmacies in conjunction with their purchases," Optum Br. at 25, Plaintiffs pleaded in detail the mail and wire communications made in furtherance of the Clawback scheme, and "[w]here plaintiff claims that mail and wire fraud took place in furtherance of a larger scheme to defraud, the communications themselves

– 65 –

in adjudicating Plaintiffs' claims for medically necessary prescription drugs, "Optum

intentionally and fraudulently directed" a member of the Optum Pharmacy Enterprise to collect a

fraudulently inflated copay from a Plaintiff. ¶¶ 287 (a)-(r). In each instance, Plaintiffs alleged

that "Optum's statement was fraudulent because [the Plaintiff's plan] did not require [the

Plaintiff] to pay that amount and Optum knew the same." *Id.* Each allegation explained why

Optum's communication was fraudulent, identified the contents of the communication, the date

on which Optum made the communication, the parties involved, the amount of the fraudulent

Clawback, and the location of the pharmacy that received Optum's communication. *Id.* Similarly

detailed allegations were made as to Cigna. ¶¶ 255 (a)-(dd). These allegations are more than

sufficient to satisfy Rule 9(b). *Mills*, 12 F.3d at 1176. Accordingly, Plaintiffs' allegations

regarding Defendants' Clawback scheme satisfy Rule 9(b)'s particularity requirement.

> **c.   Defendants possessed the requisite scienter in designing and executing the Clawback scheme**

Plaintiffs also adequately allege that Defendants acted with scienter in designing and

executing the Clawback scheme. When "the "necessary result" of a scheme is "to injure others,

fraudulent intent may be inferred from the scheme itself." *United States v. D'Amato*, 39 F.3d

1249, 1257 (2d Cir. 1994). Although Plaintiffs have alleged substantial actual harm here, as a

pleading matter a Plaintiff need not even allege that "that the victims of the fraud were *actually*

injured, but only that defendants *contemplated* some actual harm or injury to their victims."

*United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016). Such harm from a scheme is

directly manifested "by increasing the price the victim paid for a good." *United States v. Finazzo*,

850 F.3d 94, 111 (2d Cir. 2017); *see also United States v. Binday*, 804 F.3d 558, 569-70 (2d Cir.

---

need not have contained false or misleading information." *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68,
76 (E.D.N.Y. 2006); *Sumitomo*, 995 F. Supp. at 456.

2015) ("A cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.").

Defendants' fraudulent intent may be inferred here because the necessary result of Defendants' Clawback scheme was to cause Plaintiffs to "pay excess charges to participating pharmacies in exchange for receiving their prescription drugs." ¶¶ 5; 274; Am. RICO Case Stmt. at 3. ***At the outset of its relationship with Plaintiffs***, Cigna misrepresented "in the plain form language of the policy" that Plaintiffs and Class members "would pay a certain amount for prescriptions drugs with knowledge and intent that Class members would be charged a higher amount." ¶ 251. Because Cigna designed the Clawback scheme and entered into contracts knowing that Cigna "overcharged for medically necessary prescription drugs and that they would claw back such amounts," ¶ 252, Cigna possessed the requisite "fraudulent intent at the time of contract execution." *O'Donnell*, 822 F.3d at 658. The fact that Defendants actively concealed the Clawback scheme by gagging the pharmacists that paid the Clawbacks also speaks loudly to its fraudulent intent. The Court need only ask: "If this is legitimate conduct, why do Defendants go to such great lengths to conceal it from the victims?"

Finally, Defendants argue that Plaintiffs' allegations of scienter lack the particularity needed to satisfy Rule 9(b). Unlike allegations of fraud, "intent . . . may be alleged generally." Fed. R. Civ. P. 9(b). A plaintiff needs only to "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995). This can be done, *inter alia*, by alleging "a motive for committing fraud and a clear opportunity for doing so." *Id.*

– 67 –

Defendants' motive for designing and executing the Clawback scheme was specifically alleged: "undisclosed profit in exchange for little to nothing." ¶ 19, 65. Defendants also had a clear opportunity to carry out the Clawback scheme as trusted actors in the health industry with the authority to design and service plans for Plaintiffs and Class members. *See, e.g.*, ¶ 70 & 275. These allegations are sufficient to allege generally Defendants' fraudulent intent. *Powers*, 57 F.3d at 184 ("[T]he usual finding of clear opportunity arises when the defendant is already well positioned to carry out the fraudulent transaction, such as when he possesses the necessary trust and authority.") Accordingly, Plaintiffs have plausibly pleaded that Defendants engaged in the predicate acts of mail and wire fraud.

### d.   The Complaint alleges violations of RICO

Defendants concede that their challenges to Plaintiffs' 1962(d) RICO conspiracy claims are grounded solely upon their flawed contention that Plaintiffs did not plead a "cognizable violation of RICO" under 1962(c), thereby waiving a challenge to Plaintiffs' RICO conspiracy claims on any other basis. Optum Br. at 30; Cigna Br. at 40.[47] Because Defendants' "sole argument" turns on the viability of Plaintiffs' claims under Section 1962(c), and Defendants "do not separately argue that Plaintiff has failed to properly allege an agreement or conspiracy," the Court should sustain Plaintiffs' conspiracy claims after it concludes that Plaintiffs' RICO claims are plausibly pleaded. *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 416-17 (E.D.N.Y. 2013). For the reasons set forth above, Plaintiffs have stated claims under Section 1962(c). Thus, the Court should deny Defendants' motion to dismiss Plaintiffs' claims under Section 1962(d).

---

[47] Courts have held that satisfying 1962(d) is a "relatively low hurdle" and is "even more relaxed" when RICO liability flows, too, from an alleged conspiracy. *Satinwood*, 385 F.3d at 176 & 178 (noting "less demanding" requirements that apply to RICO conspiracy charges under § 1962(d)).

## V. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss should be denied.

Dated: May 1, 2017

_s/ Robert A. Izard_

| | |
|---|---|
| Robert A. Izard (ct01601) | William H. Narwold (ct00133) |
| _Plaintiffs' Interim Co-Lead Class Counsel_ | _Plaintiffs' Interim Co-Lead Class Counsel_ |
| Craig A. Raabe (ct04116) | Mathew Jasinski (ct27520) |
| Christopher M. Barrett (ct30151) | MOTLEY RICE LLC |
| IZARD, KINDALL & RAABE, LLP | One Corporate Center |
| 29 South Main Street, Suite 305 | 20 Church Street, 17th Floor |
| West Hartford, CT 06107 | Hartford, CT 06103 |
| 860-493-6292 | 860-882-1681 |
| 860-493-6290 fax | 860-882-1682 fax |
| rizard@ikrlaw.com | bnarwold@motleyrice.com |
| craabe@ikrlaw.com | mjasinski@motleyrice.com |
| cbarrett@ikrlaw.com | |
| | Derek W. Loeser, pro hac vice |
| | _Plaintiffs' Executive Committee Member_ |
| Joseph P. Guglielmo (ct27481) | Gretchen S. Obrist, pro hac vice |
| _Plaintiffs' Executive Committee Chair_ | KELLER ROHRBACK, LLP |
| Carey Alexander, pro hac vice | 1201 Third Avenue, Suite 3200 |
| SCOTT+SCOTT, | Seattle, WA 98101-3052 |
| ATTORNEYS AT LAW, LLP | 206- 623-1900 |
| The Helmsley Building | 206-623-3384 fax |
| 230 Park Avenue, 17th Floor | dloeser@kellerrohrback.com |
| New York, NY 10169 | gobrist@kellerrohrback.com |
| 212-223-6444 | |
| 212-223-6334 fax | |
| jguglielmo@scott-scott.com | Brian C. Gudmundson, pro hac vice |
| calexander@scott-scott.com | _Plaintiffs' Executive Committee Member_ |
| | ZIMMERMAN REED, LLP |
| | 1100 IDS Center |
| | 80 South 8th Street |
| Erin Green Comite (ct24886) | Minneapolis, MN 55402 |
| SCOTT+SCOTT, ATTORNEYS AT | 612-341-0400 |
| LAW, LLP | 612-341-0844 fax |
| 156 South Main Street | brian.gudmundson@zimmreed.com |
| P.O. Box 192 | |
| Colchester, CT 06415 | |
| 860-537-5537 | |
| 860-537-4432 fax | |
| ecomite@scott-scott.com | |

Ronen Sarraf
*Plaintiffs' Executive Committee Member*
Joseph Gentile
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
516-699-8890
516-699-8968 fax
ronen@sarrafgentile.com
joseph@sarrafgentile.com


Andrew A. Lemmon
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
985-783-6789
985-783-1333 fax
andrew@lemmonlawfirm.com


- and -

650 Poydras Street, Suite 2335
New Orleans, LA 70130
504-581-5644
504-581-2156 fax

Karen Hanson Riebel, pro hac vice
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, pro hac vice pending
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
612-596-4097
612-339-0981 fax
khriebel@locklaw.com
kgmarttila@locklaw.com


Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
206-448-1777
206-728-2131 fax
brad@stritmatter.com


Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
919-600-5000
919-600-5035 fax
dan@wbmllp.com
jeremy@wbmllp.com
*Additional Counsel for Plaintiffs*


E. Kirk Wood
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
205-908-4906
866-747-3905 fax
ekirkwood1@bellsouth.net

CERTIFICATE OF SERVICE

I, Robert A. Izard, certify that, on May 1, 2017, I caused a true and correct copy of the foregoing document to be served on all parties by either filing it on the Court's CM/ECF system or emailing it to counsel for the parties.

Executed this 1st day of May 2017 at West Harford, Connecticut.

*s/ Robert A. Izard*

Robert A. Izard
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
rizard@ikrlaw.com