Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

---

Civil Action No. 13-cv-03422

---

ARAPAHOE SURGERY CENTER, LLC, et al.,

     Plaintiffs,

v.

CIGNA HEALTHCARE, INC., et al.,

     Defendants.

---

## <u>CIGNA'S COUNTERCLAIMS</u>

Connecticut General Life Insurance Company, Cigna Health and Life Insurance Company, Cigna Healthcare, Inc., Cigna Healthcare - Mid-Atlantic, Inc., and Cigna Healthcare of Colorado, Inc., (together, "Cigna" or "Counterclaim Plaintiffs") as and for their Counterclaims against Arapahoe Surgery Center, LLC ("Arapahoe"), Cherry Creek Surgery Center, LLC ("Cherry Creek"), Hampden Surgery Center, LLC ("Hampden"), Kissing Camels Surgery Center, LLC ("Kissing Camels"), SurgCenter of Bel Air, LLC ("Bel Air"), Westminster Surgery Center, LLC ("Westminster") (collectively, the "ASCs"), and Surgical Center Development, Inc. d/b/a SurgCenter Development ("SurgCenter" and together, with the ASCs, "Counterclaim Defendants"), hereby allege as follows:

## INTRODUCTION

1.    SurgCenter and each of the ASCs conspired to engage in fraudulent "dual pricing" and "fee forgiving" schemes, whereby the ASCs charge their patients little or nothing for out-of-network medical services while charging exorbitant rates to the patients' health insurance plans administered through Cigna.

2.    Specifically, each ASC—with significant support and assistance from SurgCenter—lured Cigna's plan members in as patients by offering to bill and collect for surgical procedures at the plan members' in-network or lower benefits levels, even though the ASCs knew that, because they are out-of-network facilities, the plan members' out-of-network benefits levels should apply.

3.    The ASCs then each followed an undisclosed dual pricing scheme developed in coordination with SurgCenter, in which each ASC billed Cigna's plan members rates based on Medicare schedules to approximate in-network contract rates, while submitting charges as much as tens of thousands of dollars higher to Cigna.

4.    For example, for one of the patients described below, the ASC submitted "charges" of $90,008.00 to Cigna, which was nearly eighteen times the Medicare-based rate of $5,100.00 that the ASC quoted to the patient. After starting at a baseline of these lower Medicare rates, the ASC then charged the patient his or her ***in-network*** cost-sharing levels (co-insurance, co-payments, and deductibles), rather than the applicable out-of-network cost-sharing levels that the plan member was responsible for under the member's plan. As is the case with all of their patients covered by Cigna plans, the

ASCs excused the patients from paying anything more than the small amounts that the patients paid to the ASCs pursuant to this dual pricing scheme.

5.      Put simply, the inflated "charges" that the ASCs submitted to Cigna bear no relation to the amounts that the ASCs actually charged their patients.

6.      Courts have consistently found that these types of billing practices are improper and have affirmed healthcare plans' right not to cover the artificial, inflated "charges" that providers like the ASCs submit. Indeed, courts, state legislatures, and other governmental bodies have recognized that these schemes victimize health care benefits plans and the clients who sponsor them, members of these plans, and managed care companies like Cigna, by exponentially increasing healthcare costs for employers and employees.

7.      The Colorado General Assembly has declared these types of schemes illegal and has enacted laws to stop them. *See* Colo. Rev. Stat. Ann. § 18-13-119 (West 2011).

8.      The net effect of the Counterclaim Defendants' schemes was, among other things, to mislead Cigna plan members into believing that the ASCs could offer services at Cigna's in-network benefits levels when, in fact, the ASCs could not and to artificially increase the cost of healthcare to Cigna's clients.

9.      The six Counterclaim Defendant ASCs in coordination with SurgCenter alone have fraudulently induced Cigna into paying them nearly $15 million as a result of their schemes.

10.     In this action, Cigna seeks to recover the payments made to the ASCs and to prevent SurgCenter and the ASCs from continuing their fraudulent billing schemes against Cigna. By bringing this action, Cigna is ensuring that its clients and plan members are charged only appropriate amounts for services rendered, thereby helping to maintain the affordability of healthcare coverage for individuals and employers.

## PARTIES

11.     Counterclaim Plaintiff Connecticut General Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Connecticut.

12.     Counterclaim Plaintiff Cigna Health and Life Insurance Company is a corporation organized under the laws of Connecticut, with its principal place of business in Connecticut.

13.     Counterclaim Plaintiff Cigna Healthcare, Inc. is a corporation organized under the laws of Vermont, with its principal place of business in Pennsylvania.

14.     Counterclaim Plaintiff Cigna Healthcare - Mid-Atlantic, Inc. is a corporation organized under the laws of the Maryland, with its principal place of business in Maryland.

15.     Counterclaim Plaintiff Cigna Healthcare of Colorado, Inc. is a corporation organized under the laws of the Colorado, with its principal place of business in Colorado.

16.     Counterclaim Defendant Kissing Camels Surgery Center, LLC is a Colorado limited liability company with its principal place of business in Colorado Springs, Colorado.

17.     Counterclaim Defendant SurgCenter of Bel Air, LLC is a Maryland limited liability company with its principal place of business in Bel Air, Maryland.

18.     Counterclaim Defendant Westminster Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Westminster, Maryland.

19.     Counterclaim Defendant Arapahoe Surgery Center, LLC d/b/a SurgCenter on Dry Creek is a Colorado limited liability company with its principal place of business in Englewood, Colorado.

20.     Counterclaim Defendant Cherry Creek Surgery Center, LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado.

21.     Counterclaim Defendant Hampden Surgery Center, LLC is a Colorado limited liability company with its principal place of business in Denver, Colorado.

22.     Counterclaim Defendant Surgical Center Development, Inc. is a Nevada corporation with its principal place of business in Pismo Beach, California.

### JURISDICTION AND VENUE

23.     This Court has personal jurisdiction over the parties because the ASC Plaintiffs submitted to the jurisdiction of this Court (Compl. ¶ 30).

24.     This Court has personal jurisdiction over SurgCenter because it systematically and continuously conducts business in this State and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction. Further,

this Court has personal jurisdiction over SurgCenter pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1965(a)-(b).

25.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Plaintiffs and Counterclaim Plaintiffs assert claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq., and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has jurisdiction over Cigna's remaining counterclaims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

26.      Venue is proper in the District of Colorado because four of the ASCs may be found in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in the District of Colorado. 29 U.S.C. §§ 1132(e)(2), 1391(b)(1), and 1391(b)(2). Specifically, many of the patients identified in the claims for reimbursement submitted by the ASCs reside in this District, the services provided to Cigna's customers for which certain ASCs obtained payments from Cigna were performed in this District, and four of the ASCs and SurgCenter conduct business within this District. Moreover, the ASCs affirmatively chose this venue to initiate their claims against Cigna.

## **FACTUAL BACKGROUND**

### *Relevant Facts Regarding Managed Care and Cigna-Administered Plans.*

27.     Cigna, among other things, insures and administers employee health and welfare benefit plans.

28.     The vast majority of Cigna-administered plans are ASO plans funded by the employers who sponsor them, and a Cigna entity serves only as the plans' claims administrator.

29.     Certain Cigna entities also offer fully-insured plans, which are funded by the Cigna entity.

30.     Regardless of the type of plan funding, the plan documents authorize Cigna to recover any overpayments made by the plans on the plans' behalf.

31.     The vast majority of the plans under which the ASCs have sought benefits are governed by ERISA.

32.     Most of the plans at issue here offer members the choice of receiving services either from health care providers that contract with Cigna to participate in Cigna's provider network or from providers outside of that network.

33.     Cigna-administered health plans reimburse their members for certain healthcare costs, defined in the plans as "covered expenses." When a Cigna plan member receives medical services, Cigna determines what part of the member's cost is considered for coverage by the plan, known as the "allowed amount."

34.     There are different types of member responsibility, including deductibles, benefit limits, co-payments, and co-insurance.

35.    These patient cost-sharing responsibility amounts are calculated as a percentage or portion of the allowed amount.

36.    If a member receives a service from a provider that contracts to be part of Cigna's network (an "in-network" or "participating" provider), the plan pays the provider the amount that the provider agreed to accept (its contracted network rate), and the member pays any applicable co-insurance, co-payments, and deductibles based on the coverage for in-network services specified in the member's plan.

37.    In exchange for agreeing to accept fixed, network rates for their services, participating providers receive certain benefits, including access to members of Cigna-administered plans as a source of patients.

38.    Just as it benefits participating providers, Cigna's network arrangements benefit employers and plan members by controlling overall health care costs and increasing the quality of medical care. In addition, members benefit from obtaining services from a participating provider because participating providers agree not to bill them for the difference between the plan's reimbursement to the participating provider and the provider's billed charges.

39.    In contrast, if a member receives a service from a provider who does not contract to be part of Cigna's provider network (an "out-of-network" or "non-participating" provider), the provider can charge whatever it likes for its services—and out-of-network rates are generally higher than contracted rates—and the provider may bill the member for any portion of the provider's charges that the plan does not reimburse.

40.     To make out-of-network benefits an affordable option for the employers sponsoring them, Cigna's plans contain various financial incentives for members to choose participating providers and share the increased costs associated with obtaining out-of-network services.

41.     One of the key ways in which Cigna's plans allocate out-of-network costs between employees and employers is through co-insurance—a percentage of the amount that the plan covers (or "allows") that the member is required to pay towards the cost of that service. The co-insurance that members must pay towards out-of-network services is usually much higher than the co-insurance they must pay (if any) towards in-network services.

42.     This co-insurance requirement underlies the entire concept of out-of-network benefits. It sensitizes members to the true costs of out-of-network services, ensuring that, if a member receives such a service, he is willing to pay a greater portion of that expense out of his own pocket. If patients did not share in these costs, then they would have no financial incentive to moderate their demand for out-of-network services or to consider the higher costs of any particular out-of-network provider, leading to increased costs for the plan.

43.     Similarly, without co-insurance requirements, out-of-network providers would have no incentive to not charge the plan astronomical rates, because the patients who choose to see the providers would not bear any more of the inflated cost.

44.     Cigna's plans have several mechanisms to ensure that members receiving out-of-network services pay their required co-insurance and that non-participating providers do not waive it.

45.     For instance, Cigna-administered plans state that they do not cover "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." This language is taken from Exhibit A, the plan covering Westminster Plan Member A, who is one of the patients described below. (*See* Ex. A at 34.) The language is representative of the language found in Cigna-administered plans.

46.     Here, for example, if an ASC submits "charges" of $10,000 to Cigna, but does not bill or require the patient to pay their applicable cost-sharing responsibility, the plan excludes coverage for the phantom charge.

47.     In addition, Cigna-administered plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" for "covered services," which can be no more than the "provider's normal charge for a similar service or supply," and explicitly exclude from coverage providers' charges "to the extent that they are more than Maximum Reimbursable Charges."  (*See* Ex. A at 14, 36.)

48.     Here, the inflated "charges" submitted to Cigna by the ASCs were not their "normal charge" for the services at issue, because these were not the charges that the ASCs actually charged their patients.

49.     Further, Cigna-administered plans do not automatically cover or reimburse a member for every "charge" the provider submits to Cigna; rather, the plans cover a

portion of any "Covered Expenses," which the plans define as "expenses incurred" by or on behalf of the member. Covered Expenses are in turn subject to the applicable co-insurance, co-payments, and deductibles set forth in the plans. (*See* Ex. A at 26.) For example, Cigna-administered plans define co-insurance as "the percentage of charges for Covered Expenses that an insured person is **required** to pay under the plan." (*See* Ex. A at 13.) Cigna-administered plans expressly require members to satisfy their cost-sharing responsibility (i.e. co-insurance, co-payments, and deductibles) in order for charges to be covered under the plans.

50.     As described below, the ASCs did not bill the plan members for the charges that were submitted to Cigna.

51.     Moreover, by promising Cigna plan members that in-network benefits would apply and that they would incur no additional out-of-pocket expenses above and beyond the ASCs' artificial cost share liability quoted to Cigna plan members, the ASCs foreclosed themselves from billing and collecting any additional amount of money.

52.     Courts have repeatedly held in the context of "fee forgiving" or "dual pricing schemes" that healthcare plans do not cover a provider's "charges" when that provider does not collect the patient's applicable cost-sharing responsibilities. *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013).

53.     Any other interpretation would run contrary to the purpose of health insurance, which is to reimburse members for payments they actually make to providers, not to provide windfall payments to providers.

54.     Indeed, the ASCs' practice of forgiving plan members' financial responsibility is exactly the sort of scheme the Colorado General Assembly has declared illegal and enacted laws to stop. *See* Colo. Rev. Stat. Ann. § 18-13-119 (West 2011).

### *SurgCenter and the ASCs' Fraudulent Dual Pricing and Fee Forgiving Schemes*

55.     SurgCenter has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom "charges" to Cigna that do not reflect the actual amount the ASCs bill patients.

56.     SurgCenter implements this fraudulent scheme through each of the ASCs with which it partners.

57.     According to its website, SurgCenter "partners with local surgeons to create physician-owned and operated ambulatory surgical centers (ASC)."

58.     SurgCenter assists surgeons in forming the LLC and in the design and construction of the ambulatory surgical centers, including, upon information and belief, the Counterclaim Defendant ASCs here.

59.     SurgCenter then provides no-fee management and consulting services in managing and running the ambulatory surgical centers, including, upon information and belief, the Counterclaim Defendant ASCs here.

60.     According to its website, SurgCenter becomes "a vested partner that purchases 35% ownership" in each ambulatory surgical center, including, upon information and belief, the Counterclaim Defendant ASCs here.

61.    At the direction of SurgCenter, the ambulatory surgical centers, including the Counterclaim Defendant ASCs, do not join provider networks of major managed care companies, like Cigna.

62.    The ASCs all employ a "dual pricing" and "fee forgiving" scheme. In other words, they entice members to their out-of-network facilities by billing them small amounts (or nothing at all), but charge the member's plan exorbitant, fraudulent amounts that bear no relation to the amounts the patients are charged.

63.    Each ASC then waives, or forgives, the proportion of the charges that the member owes based on the inflated charge that the ASC submits to the member's plan.

64.    Upon information and belief, all aspects of the fraudulent dual pricing schemes used by each ASC were designed and implemented at the direction of SurgCenter.

65.    Indeed, when Cigna sent a letter to Westminster on May 26, 2011, regarding its billing practices, it was SurgCenter who responded on behalf of the ASC.

66.    Specifically, on November 28, 2011, SurgCenter's Vice President of Managed Care and Revenue Cycle sent a letter back to Cigna referring to the dual pricing scheme as "an internal corporate policy" which SurgCenter represented Westminster had followed. SurgCenter did not disclose that Westminster billed Cigna for a much higher charge than it billed Westminster's patients to calculate the patients' cost-sharing responsibility.

67.    The following is a summary of the dual pricing and fee forgiving schemes used by SurgCenter and each of the ASCs.

68. <u>First</u>, each ASC estimates to the Cigna plan members the cost of their outpatient procedures based on Medicare rates to approximate in-network rates.

69. <u>Second</u>, each ASC calculates the Cigna plan members' cost-sharing responsibility (e.g. co-payments, co-insurance, and deductibles) by applying the Cigna plan members' ***in-network*** benefits level to those estimated charges, even though the ASCs are out-of-network providers.

70. <u>Third</u>, each ASC promises the Cigna plan members that they will not have to bear any additional out-of-pocket expenses beyond what the ACSs have artificially calculated as the members' cost share liability based on the members' in-network benefits level using Medicare rates. As a result, each ASC waives the applicable out-of-network co-insurance, co-payment, and deductible amounts that Cigna plan members must pay out-of-network providers like the ASCs under Cigna-administered health benefit plans.

71. <u>Fourth</u>, each ASC submits claims to Cigna based on a separate fee schedule with charges fraudulently inflated by as much as tens of thousands of dollars over the Medicare-based prices that the ASCs quoted to the Cigna plan members. The "charges" submitted to Cigna by the ASCs were phantom charges, as the ASCs do not collect, and never intend to collect, the full amounts that they put on the forms; they intend to collect much less, if anything at all.

72. All of the ASCs use the same "Insurance Verification Sheet" on which the ASC calculates the amount the patient will pay to the ASC. An example of this form is attached hereto as Exhibit B. Upon information and belief, SurgCenter creates the

Insurance Verification Sheet and claim forms submitted to Cigna by the ASCs. These documents are created by SurgCenter and provided to the ASCs for the purpose of defrauding insurers such as Cigna.

73. Consequently, each ASC misrepresented its actual charges for the services rendered to Cigna affirmatively and through omission. As a result, Cigna relied on the amount that the ASCs billed to Cigna in their claim forms when processing and paying the ASCs' claims.

74. The purpose of this scheme was to entice Cigna plan members to use the ASCs' out-of-network surgical centers so that Cigna would reimburse the ASCs for their grossly inflated rates. Given their exorbitant charges, the ASCs and SurgCenter recognized that Cigna's plan members would not use, and likely could not afford to use, the ASCs' facilities if the ASCs billed and collected the applicable out-of-network cost share responsibility from Cigna plan members, which would have required out-of-pocket payments from Cigna plan members that totaled thousands, if not tens of thousands, of dollars. Therefore, the ASCs waived the required out-of-network co-insurance, co-payment, and deductible amounts members were obligated to pay under their plans.

75. Further, each ASC knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs even though the ASCs were out-of-network facilities.

76. The ASCs also never fully disclosed the true nature, extent, and scope of their cost share waiver and dual pricing schemes to Cigna.

77.    Indeed, while the ASCs noted in their claim forms that "[t]he insured's portion of this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates," nothing in the claims forms either revealed or explained how their charges were computed or disclosed that the ASCs had not charged their patients for the same amounts that it submitted to Cigna for reimbursement.

78.    In addition, by stating that "[t]he insured's portion of **this bill** has been reduced," the ASCs and SurgCenter affirmatively sought to mislead Cigna into believing that it charged the patient and Cigna and its client a single, common price.

79.    Only through its own internal investigation did Cigna learn the existence of SurgCenter and the ASCs' dual pricing and fee forgiving schemes.

### *Westminster's Conduct.*

80.    Westminster is an outpatient surgical center located in Westminster, Maryland where physicians perform surgical and related healthcare services.

81.    Westminster has not entered into a provider network agreement with Cigna. Therefore, Cigna processes all claims submitted by Westminster on an out-of-network basis.

82.    Westminster was established in 2008 and began submitting claims for reimbursement to Cigna in 2009.

83.    Thereafter, Cigna began to detect anomalies in claims submitted by Westminster. In light of the number and dollar amount of the claims submitted by Westminster, Cigna inquired with Westminster about its billing practices with respect to

its submission of claims to Cigna and its calculation of patient cost-share responsibilities for Cigna plan members. Cigna's inquiries included a letter to Westminster dated May 26, 2011.

84.     On November 26, 2011, Westminster responded with a letter describing its claims procedures. The response actually came from SurgCenter's Vice President of Managed Care and Revenue Cycle, who wrote the letter on behalf of Westminster and used Westminster letterhead.

85.     In the letter, Westminster confirmed that it does not charge Cigna plan members their out-of-network cost share responsibilities as a matter of policy: "With respect to patient accounts where no facility service agreement is in place between the Center and the applicable commercial payor, the Center honors the patient's out-of-network benefits at in-network levels by discounting the patient's out-of-network penalty."

86.     SurgCenter's Vice President of Managed Care and Revenue Cycle referred to this policy as "an internal corporate policy" which SurgCenter represented Westminster had followed.

87.     To verify Westminster's representations about its billing practices and to better understand the manner by which Westminster calculated its charges and billed and collected from Cigna plan members, Cigna also requested that Westminster supply documentation supporting selected claims submitted with respect to healthcare services rendered to selected Cigna plan members. Westminster refused this request.

88. Cigna, therefore, surveyed plan members who received healthcare services at Westminster. Among other things, Cigna sought verification from its plan members of the services provided to them by Westminster, the amounts Westminster told them they would be required to pay, and the amounts Westminster actually required them to pay for those services.

89. Cigna's survey revealed both that Westminster waived the members' applicable out-of-network co-insurance, co-payment, and deductible responsibilities and that Westminster employed a dual pricing scheme under which it billed Cigna at rates much higher than those it quoted to Cigna plan members.

90. The following is an example of how this fraudulent scheme operates.

91. On or about April 29, 2011, Westminster Plan Member A arrived at Westminster for his/her outpatient procedure.

92. Westminster called Cigna and knew that Westminster Plan Member A had an unmet, out-of-network deductible of $800.00, an out-of-network co-insurance of 30%, and an unmet out-of-pocket maximum of $6,000.00.

93. Based on Medicare rates, Westminster quoted the patient an estimated charge of $5,100.00. (*See* Ex. B.)

94. Even though Westminster is an out-of-network provider, it subtracted from the estimated charge of $5,100.00 the patient's ***in-network*** co-payment of $75.00 and an unmet, ***in-network*** deductible of $400.00, leaving a subtotal of $4,625.00. (*Id.*)

95. Westminster then multiplied the subtotal of $4,625.00 by Westminster Plan Member A's ***in-network*** co-insurance of 10%, or $462.50, and quoted

Westminster Plan Member A a total cost share liability of $937.50 ($475.00 plus $462.50), which is only a fraction of the true out-of-network cost share liability of Westminster Plan Member A based on the "charges" Westminster submitted to Cigna.

96.     When Westminster submitted its claim to Cigna, which Cigna received on May 4, 2011, Westminster did not list charges of $5,100.00. Instead, Westminster billed Cigna (and Westminster Plan Member A's employer) a charge of ***$90,008.00, or 1,764% more than Westminster had quoted the member for this outpatient procedure.***

97.     Based on these fraudulent "charges" submitted by Westminster, Cigna calculated the patient responsibility to be $5,572.81, or approximately six times what Westminster actually billed the patient.

98.     Cigna calculated the plan's responsibility to be $66,433.59 based on the charges submitted by Westminster, and Cigna paid this amount to Westminster.

99.     Thus, as a result of the misrepresentations and material omissions contained within its claim, Westminster fraudulently induced Cigna to pay Westminster $66,433.59.

100.    Cigna later learned the Westminster later billed Westminster Plan Member A an additional $82.50.

101.    As two additional examples:

- Westminster Plan Member B received services on May 17, 2011. Westminster submitted a claim form to Cigna listing charges of $18,699.00, which Cigna received on May 26, 2011. Cigna paid $12,394.70 to Westminster, and the member's plan required the member to pay $2,564.50. However, Cigna later learned that pursuant to the dual pricing scheme, Westminster quoted the patient charges of

only $5,362.79 based on Medicare rates and billed the patient only $941.28 based on his or her in-network benefit level. A copy of the "Insurance Verification Sheet" Westminster used to calculate the charges to Westminster Plan Member B is attached hereto as Exhibit C.

- Westminster Plan Member C received services on July 6, 2010. Westminster submitted a claim form to Cigna listing charges of $19,064.00, which Cigna received on August 13, 2010. Cigna paid $10,876.30 to Westminster, and the member's plan required the member to pay $4,374.90; however, Cigna later learned that Westminster billed the patient only $500.00 pursuant to the dual pricing scheme.

102. Upon information and belief, each of the claims that Westminster submitted to Cigna followed this pattern of fee forgiving and dual pricing.

103. As the collective result of Westminster's conduct, Cigna has paid Westminster more than $1.42 million in claims to date.

104. Westminster continues to submit claims to Cigna. Upon information and belief, Westminster continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Westminster's facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

### Kissing Camels' Conduct.

105. Kissing Camels is an outpatient surgical center located in Colorado Springs, Colorado, where physicians perform surgical and related healthcare services.

106. Kissing Camels has not entered into a provider network agreement with Cigna. Therefore, Cigna processes all claims submitted by Kissing Camels on an out-of-network basis.

107.    Kissing Camels was established in 2010 and began submitting claims for reimbursement to Cigna that year.

108.    Thereafter, Cigna began to detect anomalies in claims submitted by Kissing Camels. In light of the number and dollar amount of the claims submitted by Kissing Camels, Cigna inquired with Kissing Camels about its billing practices with respect to its submission of claims to Cigna and its calculation of patient cost-share responsibilities for Cigna plan members. Cigna's inquiries included letters to Kissing Camels dated July 13, 2011, August 19, 2011, and October 6, 2011.

109.    On October 31, 2011, Kissing Camels' counsel responded with a letter stating that "its policy is to adjust the patient's out of pocket costs to match that of their in network benefits schedule." In subsequent correspondence dated January 24, 2012, Kissing Camels admitted "[t]hat Kissing Camels may be willing to forgive portions of the Cigna members' responsibility to it."

110.    Kissing Camels, however, consistently denied Cigna's repeated requests that Kissing Camels provide documentation that would clarify and substantiate its billing practices. Further, Kissing Camels did not disclose that it billed Cigna for a much higher charge than it billed its patients to calculate the patients' cost-sharing responsibility.

111.    To better understand the manner by which Kissing Camels calculates its charges and bills and collects from Cigna plan members, Cigna surveyed plan members who received healthcare services at Kissing Camels. Among other things, Cigna sought verification from its plan members of the services provided to them by Kissing Camels,

the amounts Kissing Camels told them they would be required to pay, and the amounts Kissing Camels actually required them to pay for those services.

112.   Cigna's survey revealed both that Kissing Camels waived the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members and that Kissing Camels employed a dual pricing scheme under which it billed Cigna at rates much higher than those it quoted to Cigna plan members.

113.   In addition, as a regular practice, Kissing Camels issues a notice and brochure to prospective patients, including Cigna members, that advises them that they will be billed as if Kissing Camels was actually an in-network facility, even though Kissing Camels is an out-of-network provider with the patients' plans. Specifically, as demonstrated by Exhibit D, Kissing Camels issued to Cigna plan members a memorandum that states:

> Although Kissing Camels Surgery Center is not a participating provider with your Insurance Plan, please be assured that you will not incur any additional costs or penalties from using our facility. It is the policy of Kissing Camels Surgery Center to extend "in-network benefits" to all of our patients. Someone from Kissing Camels Surgery Center will be calling you prior to surgery to discuss pre-operative orders and what payment, if any, will be due at time of service.

114.   Kissing Camels nonetheless proceeded to submit bills to Cigna for amounts that far exceeded what Cigna plan members were told the services would cost and what Cigna plan members were asked to pay, and that bore no relation to either the in- or out-of-network benefits afforded under the members' applicable health plans.

115.   For example, on or about July 1, 2010, Kissing Camels Plan Member A arrived at Kissing Camels for an outpatient procedure.

116.   Kissing Camels submitted a claim form to Cigna dated July 14, 2010 which Cigna received on July 21, 2010. When Kissing Camels submitted its claim to Cigna, Kissing Camels billed Cigna (and Plan Member A's employer) $12,708.00 for this outpatient procedure. Under the patient's plan, Kissing Camels Plan Member A was responsible for $1,691.37 and Cigna paid Kissing Camels $3,946.53 based on Kissing Camels' representation.

117.   However, Kissing Camels did not charge Plan Member A *anything*, thereby waiving the true out-of-network cost share liability of Plan Member A.

118.   Kissing Camels did not disclose to Cigna the amount it charged the patient.

119.   As a result of the misrepresentation and material omissions contained within its claim, Kissing Camels fraudulently induced Cigna to pay Kissing Camels $3,946.53 for this outpatient procedure.

120.   As additional examples from Kissing Camels:

- Kissing Camels Plan Member B received services on August 18, 2010. Kissing Camels submitted a claim form to Cigna dated August 19, 2010 listing charges of $3,864.00, which Cigna received on August 24, 2010. Cigna paid $1,391.04 to Kissing Camels, and the member's plan required the member to pay $927.36; however, Cigna later learned Kissing Camels only billed the member $90.00 pursuant to the dual pricing scheme. Notably, upon being informed of the amount Cigna was billed by Kissing Camels, Plan Member B commented that "*[i]t looks to me that CIGNA was double-billed, as other providers are 1/2 the cost*."

- Kissing Camels Cigna Plan Member C received services on October 22, 2010. Kissing Camels submitted a claim form to Cigna dated October 27, 2010 listing charges of $34,873.00, which Cigna received on November 5, 2010. Cigna paid $21,542.05 to Kissing Camels, and the member's plan required the member to pay $8,100.00; however, Cigna later learned Kissing Camels did not bill the member ***anything***.

121.   A final example refutes Kissing Camels' false statements that members remain financially responsible for Kissing Camels' full charges.

122.   On October 27, 2011 and September 13, 2012, Kissing Camels Cigna Plan Member D had outpatient procedures performed at Kissing Camels. Kissing Camels told Plan Member D that "prior to [Plan Member D's] procedure," Kissing Camels had "contacted CIGNA . . . and verified that [Plan Member D's] health insurance benefits were in effect and that they covered the expenses of the procedure that [Plan Member D] and [Plan Member D's] doctor decided was medically necessary." Kissing Camels told Plan Member D that the procedures to be performed would be charged as if they were provided in-network. Prior to the procedures performed on September 13, 2012, Kissing Camels accepted from Plan Member D $225.00, an amount it claimed was calculated as due with reference to the in-network benefits available to Plan Member D.

123.   Over one year after the procedure, on September 26, 2013, Kissing Camels sent Plan Member D a letter enclosing a "patient receipt" showing the itemized cost of the services rendered on both October 27, 2011 and September 13, 2012 and total charges of $30,945.96 calculated with reference to the out-of-network benefits provided under Cigna Plan Member D's health plan. The patient receipt Kissing Camels sent to Plan Member D showed an amount due to Kissing Camels of $17,104.96, which

is $225.00 less than the subtotal of the two services rendered to Cigna Plan Member D

on September 13, 2012.

124.    The cover letter Kissing Camels sent Plan Member D stated that Cigna

had "refused to pay for the services" provided to Plan Member D and further stating:

> The only explanation that CIGNA has given for refusing to
> pay for the services is that it wants us to charge you more
> out of pocket, something that is outrageous for a company
> that accepts your health insurance premium or
> administrative charge every month and quite likely owes you
> a fiduciary duty. At no cost to you, we are filing a lawsuit
> against CIGNA to try to require that it pay your bill. However,
> if after all our efforts are exhausted, CIGNA still does not pay
> your bill, your financial agreement with our facility makes you
> responsible for the amount due if your insurer continues to
> withhold payment. Enclosed is your account statement
> reflecting the current balance owed for the services we
> provided.

125.    In response to this letter, Plan Member D contacted Kissing Camels and

spoke with a Kissing Camels representative on October 15, 2013, to confirm that Plan

Member D had no further financial responsibility. On October 15, 2013, Kissing Camels

then sent Plan Member D a further letter that stated in full:

> This letter is in response to our phone conversation today. It
> was determined that you have paid Kissing Camels your
> portion for the 2 surgeries that you had performed there.
> ***This completes your personal financial obligation to the
> Kissing Camels Surgery Center. If you receive any
> additional bills, please disregard.*** I would appreciate your
> help in assisting Kissing Camels in getting Cigna to pay their
> responsibility for your 2 surgeries. If you have any other
> questions give me a call.

126.    Kissing Camels' correspondence with Plan Member D confirms that it

waived Plan Member D's out-of-network cost-sharing responsibility and then proceeded

to collect from Cigna an amount computed based upon an undisclosed, inflated, pricing schedule. Prior to rendering services to Cigna Plan Member D, Kissing Camels obtained information about the benefits available to Plan Member D. Kissing Camels knew that it was an out-of-network provider, but charged Plan Member D only $225.00 based on the in-network benefits available to Plan Member D. Kissing Camels then attempted to collect from Cigna tens of thousands of dollars even though it had no intention of collecting Plan Member D responsibility for this inflated charge under his/her plan.

127.   Upon information and belief, each of the claims that Kissing Camels submitted to Cigna followed this pattern of fee forgiving and dual pricing.

128.   As a result of Kissing Camels' conduct, Cigna has paid Kissing Camels more than $1.5 million in claims to date.

129.   Kissing Camels continues to submit claims to Cigna. Upon information and belief, Kissing Camels continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Kissing Camels' facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

### Bel Air's Conduct.

130.   Bel Air is an outpatient surgical center located in Bel Air, Maryland where physicians perform surgical and related healthcare services. Bel Air has not entered into a provider network agreement with Cigna. Therefore, Cigna processes all claims submitted by Bel Air on an out-of-network basis.

131.   Bel Air was established in 2008 and began submitting claims for reimbursement to Cigna in 2009.

132.   Thereafter, Cigna began to detect anomalies in claims submitted by Bel Air. In light of the number and dollar amount of the claims submitted by Bel Air, Cigna inquired with Bel Air about its billing practices.

133.   Despite Cigna's requests, however, Bel Air refused to provide it with any documentation so that Cigna could verify the manner by which Bel Air calculated its charges and billed and collected from Cigna plan members. For example, in an August 1, 2011, Bel Air stated that Cigna "has no right to conduct an audit of any kind" regarding Bel Air's billing practices.

134.   To verify Bel Air's billing practices, Cigna conducted a survey of plan members who received healthcare services at Bel Air so that Cigna could obtain information regarding the services provided by Bel Air, the amounts Bel Air told these plan members they would be required to pay, and the amounts Bel Air actually required them to pay for those services.

135.   Cigna's survey revealed both that Bel Air waived the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members and that Bel Air employed a dual pricing scheme under which it billed Cigna at rates much higher than those it quoted to Cigna plan members.

136.   In addition, as a regular practice, Bel Air issues a notice to prospective patients, including Cigna members, which advises them that they will be billed as if Bel Air was actually an in-network facility, even though Bel Air is an out-of-network provider

with the patients' plans. Specifically, as demonstrated by Exhibit E, Bel Air issued to Cigna plan members a notice that states:

> ***Although SurgCenter of Bel Air is not a participating provider with your Insurance Plan, please be assured that you will not incur any "out-of-network" costs*** or penalties for using our facility. It is our policy to extend "in-network benefits" to all of our patients.

Notably, much of the language used in Bel Air's notice is identical to the language used in the Kissing Camels notice described above.

137.   As an example of a Bel Air claim, Bel Air Plan Member A received services at Bel Air on January 4, 2011. Bel Air submitted a claim form with charges to Cigna of $23,823.00, which Cigna received on January 11, 2011. Cigna paid $15,058.40 to Bel Air, and the member's plan required the member to pay $4,000.00.

138.   However, Cigna later learned that Bel Air told the patient his or her total charges would be only $1,365.00 (as opposed to the $23,823.00 in "charges" submitted to Cigna), and pursuant to the dual pricing scheme, Bel Air billed the patient only $506.44 based on his or her in-network benefit level.

139.   According to Bel Air Plan Member A, when the member contacted Bel Air regarding the discrepancy between what the member was billed and what Cigna was billed, Bel Air reassured the member that "they would not seek any more charges from [Bel Air Plan Member A] other than what [Bel Air Plan Member A] already paid at the time of service."

140.   As two additional examples:

- Bel Air Plan Member B received services on September 26, 2011. Bel Air submitted a claim form with charges to Cigna of $9,916.00, which

Cigna received on October 5, 2011. Cigna paid Bel Air $6,170.80 and the member's plan required the member to pay $1,762.00. However, upon information and belief, Bel Air first quoted the member a charge based on the Medicare rate for the relevant services, which was approximately $1,042.00 (as opposed to the $9,916.00 in "charges" submitted to Cigna). To this baseline, Bel Air then applied the members' *in-network* co-payment, co-insurance, and deductible levels. As a result, the patient reported that he or she was billed only $312.58, a small fraction of the member's cost-sharing responsibility under his or her plan.

- Bel Air Plan Member C received services on April 5, 2012. Bel Air submitted a claim form to Cigna with charges of $10,627.68, which Cigna received on April 12, 2012. However, upon information and belief, Bel Air first quoted the member a charge based on the Medicare rate for the relevant services, which was approximately $2,303.00 (as opposed to the $10,627.68 in "charges" submitted to Cigna). To this baseline, Bel Air then applied the members' *in-network* co-payment, co-insurance, and deductible levels. As a result, the patient reported that he or she was billed only $45.00, a small fraction of his or her cost-sharing responsibility under the plan.

141. Upon information and belief, each of the claims that Bel Air submitted to Cigna followed this pattern of fee forgiving and dual pricing.

142. As a result of Bel Air's conduct, Cigna has paid Bel Air more than $719,000 in claims to date.

143. Bel Air continues to submit claims to Cigna. Upon information and belief, Bel Air continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Bel Air's facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

### *Cherry Creek's Conduct*

144.   Cherry Creek is an outpatient surgical center located in Denver, Colorado where physicians perform surgical and related healthcare services. Cherry Creek has not entered into a provider agreement with Cigna. Therefore, Cigna processes all claims submitted by Cherry Creek on an out-of-network basis.

145.   Cherry Creek was established in 2012 and began submitting claims for reimbursement to Cigna in 2012.

146.   Upon information and belief, Cherry Creek used the same fee-forgiving and dual pricing schemes described above to entice Cigna plan members to use its out-of-network surgical center.

147.   As an example, Cherry Creek Plan Member A received services from Cherry Creek on September 23, 2013. Cherry Creek submitted a claim form to Cigna, which Cigna received on October 4, 2013, stating that the "charges" for the services were $50,329.52. Under the terms of the member's plan, Cigna paid Cherry Creek $33,059.68. The member's responsibility under the plan was $3,706.33.

148.   Upon information and belief, Cherry Creek did not bill the member $3,706.33 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Cherry Creek first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $4,303.00 (as opposed to the $50,329.52 in "charges" submitted to Cigna). To this baseline, Cherry Creek applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Cherry

Creek waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

149.   As an additional example, Cherry Creek Plan Member B received services from Cherry Creek on February 7, 2013. Cherry Creek submitted a claim form to Cigna, which Cigna received on February 28, 2013, stating that the "charges" for the services were $76,025.04. Under the terms of the member's plan, Cigna paid Cherry Creek $56.992.26. The member's responsibility under the plan was $5,364.62.

150.   Upon information and belief, Cherry Creek did not bill the member $5,364.62 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Cherry Creek first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $8,435.00 for the services at issue (as opposed to the $76,025.04 in "charges" submitted to Cigna). To this baseline, Cherry Creek then applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Cherry Creek waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

151.   As an additional example, Cherry Creek Plan Member C received services from Cherry Creek on May 20, 2013. Cherry Creek submitted a claim form to Cigna, which Cigna received on June 14, 2013, stating that the "charges" for the services were $48,709.52. Under the terms of the member's plan, Cigna paid Cherry Creek $36,841.65. The member's responsibility under the plan was $2,297.03.

152.   Upon information and belief, Cherry Creek did not bill the member $2,297.03 or anything close to that amount. Instead, pursuant to its dual pricing

scheme, Cherry Creek first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $2,835.00 for the services at issue (as opposed to the $48,709.52 in "charges" submitted to Cigna). To this baseline, Cherry Creek then applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Cherry Creek waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

153.   Upon information and belief, each of the claims that Cherry Creek submitted to Cigna followed this pattern of fee forgiving and dual pricing.

154.   On November 22, 2013, Cigna informed Cherry Creek that "waiver of any portion of a Cigna customer's out-of-network cost share obligation violates the terms and conditions of our health benefits plans and renders your charges non-coverable." Cigna further requested that for future claims, Cherry Creek provide evidence that the member "actually incurred and personally paid the expense" submitted by Cherry Creek to Cigna, "so that Cigna can determine that a coverable loss exists before Cigna will release any reimbursement for submitted claims." Cigna informed Cherry Creek that once it received sufficient evidence for a claim, it would submit reimbursement to Cherry Creek "for allowed charges as calculated under and subject to the full terms and conditions of the applicable plans."

155.   Cherry Creek did not submit documentation to Cigna indicating the actual amounts it was charging Cigna members in response to Cigna's request. Instead, Cherry Creek filed this lawsuit.

156.   As a result of Cherry Creek's conduct, Cigna has paid Cherry Creek more than $2.23 million in claims to date.

157.   Cherry Creek continues to submit claims to Cigna. Upon information and belief, Cherry Creek continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Cherry Creek's facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

### *Hampden's Conduct*

158.   Hampden is an outpatient surgical center located in Denver, Colorado where physicians perform surgical and related healthcare services. Hampden has not entered into a provider network agreement with Cigna. Therefore, Cigna processes all claims submitted by Hampden on an out-of-network basis.

159.   Hampden was established in 2012 and began submitting claims for reimbursement to Cigna in 2012.

160.   Upon information and belief, Hampden used the same fee-forgiving and dual pricing scheme described above to entice Cigna plan members to use its out-of-network surgical center.

161.   As an example, Hampden Plan Member A received services from Hampden on September 19, 2013. Hampden submitted a claim form to Cigna, which Cigna received on September 25, 2013, stating that the "charges" for the services were $46,209.00. Under the terms of the member's plan, Cigna paid Hampden $30,567.20. The member's responsibility under the plan was $6,400.00.

162.   Upon information and belief, Hampden did not bill the member $6,400.00 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Hampden first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $3,441.00 for the services at issue (as opposed to the $46,209.00 in "charges" submitted to Cigna). To this baseline, Hampden then applied the members' ***in-network*** co-payment, co-insurance, and deductible levels. Thus, Hampden waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

163.   As an additional example, Hampden Plan Member B received services from Hampden on September 20, 2013. Hampden submitted a claim form to Cigna, which Cigna received on October 1, 2013, stating that the "charges" for the services were $48,682.81. Under the terms of the member's plan, Cigna paid Hampden $26,246.25. The member's responsibility under the plan was $12,700.00.

164.   Upon information and belief, Hampden did not bill the member $12,700.00 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Hampden first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $3,975.00 for the services at issue (as opposed to the $48,682.81 in "charges" submitted to Cigna). To this baseline, Hampden then applied the members' ***in-network*** co-payment, co-insurance, and deductible levels. Thus, Hampden waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

165.   As an additional example, Hampden Plan Member C received services from Hampden on March 28, 2013. Hampden submitted a claim form to Cigna, which Cigna received on April 18, 2013, stating that the "charges" for the services were $50,182.00. Under the terms of the member's plan, Cigna paid Hampden $25,216.40. The member's responsibility under the plan was $7,027.50.

166.   Upon information and belief, Hampden did not bill the member $7,027.50 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Hampden first quoted the member a charge based on the Medicare rate for the relevant medical services, which was approximately $3,367.00 for the services at issue (as opposed to the $50,182.00 in "charges" submitted to Cigna). To this baseline, Hampden then applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Hampden waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

167.   Upon information and belief, each of the claims that Hampden submitted to Cigna followed this pattern of fee forgiving and dual pricing.

168.   On November 22, 2013, Cigna informed Hampden that "waiver of any portion of a Cigna customer's out-of-network cost share obligation violates the terms and conditions of our health benefits plans and renders your charges non-coverable." Cigna further requested that for future claims, Hampden provide evidence that the member "actually incurred and personally paid the expense" submitted by Hampden to Cigna, "so that Cigna can determine that a coverable loss exists before Cigna will release any reimbursement for submitted claims." Cigna informed Hampden that once it

received sufficient evidence for a claim, it would submit reimbursement to Hampden "for allowed charges as calculated under and subject to the full terms and conditions of the applicable plans."

169.   Hampden did not submit documentation to Cigna indicating the actual amounts it was charging Cigna members in response to Cigna's request. Instead, Hampden filed this lawsuit.

170.   As a result of Hampden's conduct, Cigna has paid Hampden nearly $3 million in claims to date.

171.   Hampden continues to submit claims to Cigna. Upon information and belief, Hampden continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Hampden's facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

### *Arapahoe's Conduct*

172.   Arapahoe is an outpatient surgical center located in Englewood, Colorado where physicians perform surgical and related healthcare services. Arapahoe has not entered into a provider agreement with Cigna. Therefore, Cigna processes all claims submitted by Arapahoe on an out-of-network basis.

173.   Arapahoe was established in 2010 and began submitting claims for reimbursement to Cigna in 2010.

174.   Thereafter, Cigna began to detect anomalies in claims submitted by Arapahoe. In light of the number and dollar amount of the claims submitted by

Arapahoe, Cigna inquired with Arapahoe about its billing practices, including a letter from Cigna to Arapahoe dated January 9, 2012.

175.    Despite Cigna's requests, however, Arapahoe refused to provide it with any documentation so that Cigna could verify the manner by which Arapahoe calculated its charges and billed and collected from Cigna plan members. For example, in a letter dated February 24, 2012, Arapahoe's counsel responded to Cigna, denying that Arapahoe made any misrepresentations to Cigna about charges to its patients, and denying Cigna's authority to conduct an inquiry of any kind regarding Arapahoe's billing practices.

176.    Cigna conducted a survey of plan members who received healthcare services at Arapahoe so that Cigna could obtain information regarding the services provided by Arapahoe, the amounts Arapahoe told these plan members they would be required to pay, and the amounts Arapahoe actually required them to pay for those services.

177.    Cigna's survey revealed both that Arapahoe waived the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members and that Arapahoe employed a dual pricing scheme under which it billed Cigna at rates much higher than those it quoted to Cigna plan members.

178.    Indeed, Cigna's investigation of Arapahoe (d/b/a SurgCenter on Dry Creek) uncovered the notice to patients attached hereto as Exhibit F, which states, among other things:

> I have been informed and I am aware that SurgCenter on Dry Creek [Arapahoe] is a non-participating provider and I

am choosing to have my procedure or surgery done here. SurgCenter on Dry Creek will process my claim with the intention of honoring my *in-network* deductible and co-insurance.

179.    As an example of an Arapahoe claim, Arapahoe Plan Member A received services from Hampden on October 22, 2013. Arapahoe submitted a claim form to Cigna, which Cigna received on November 22, 2013, stating that the "charges" for the services were $67,013.00. Under the terms of the member's plan, Cigna paid Arapahoe $36,145.75. The member's responsibility under the plan was $17,958.04.

180.    Upon information and belief, Arapahoe did not bill the member $17,958.04 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Arapahoe first quoted the member a charge based on the Medicare rate for the relevant medical services, which are approximately $6,540.00 for the services at issue (as opposed to the $67,013.00 in "charges" submitted to Cigna). To this baseline, Arapahoe then applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Arapahoe waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

181.    As an example, Arapahoe Plan Member B received services from Arapahoe on September 25, 2013. Arapahoe submitted a claim form to Cigna, which Cigna received on October 24, 2013, stating that the "charges" for the services were $48,130.00. Under the terms of the member's plan, Cigna paid Arapahoe $36,342.05. The member's responsibility under the plan was $2,161.95.

182.    Upon information and belief, Arapahoe did not bill the member $2,161.95 or anything close to that amount. Instead, pursuant to its dual pricing scheme, Arapahoe

first quoted the member a charge based on the Medicare rate for the relevant medical services, which are approximately $4,000.00 for the services at issue (as opposed to the $48,130.00 in "charges" submitted to Cigna). To this baseline, Arapahoe then applied the members' *in-network* co-payment, co-insurance, and deductible levels. Thus, Arapahoe waived the members' required out-of-network co-insurance, co-payment, and deductible responsibilities.

183.    Upon information and belief, each of the claims that Arapahoe submitted to Cigna followed this pattern of fee forgiving and dual pricing.

184.    On November 22, 2013, Cigna informed Arapahoe that "waiver of any portion of a Cigna customer's out-of-network cost share obligation violates the terms and conditions of our health benefits plans and renders your charges non-coverable." Cigna further requested that for future claims, Arapahoe provide evidence that the member "actually incurred and personally paid the expense" submitted by Arapahoe to Cigna, "so that Cigna can determine that a coverable loss exists before Cigna will release any reimbursement for submitted claims." Cigna informed Arapahoe that once it received sufficient evidence for a claim, it would submit reimbursement to Arapahoe "for allowed charges as calculated under and subject to the full terms and conditions of the applicable plans."

185.    Arapahoe did not submit documentation to Cigna indicating the actual amounts it was charging Cigna members in response to Cigna's request. Instead, Arapahoe filed this lawsuit.

186.   As a result of Arapahoe's conduct, Cigna has paid Arapahoe more than $6 million in claims to date.

187.   Arapahoe continues to submit claims to Cigna. Upon information and belief, Arapahoe continues to waive the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members to entice Cigna plan members to use Arapahoe's facilities, while simultaneously submitting exorbitant, fraudulent "charges" to Cigna.

## CAUSES OF ACTION

### Count I – Claim for Overpayments Under ERISA § 502(a)(3)
### (Against All ASCs)

188.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

189.   Cigna is a fiduciary of the ASO and fully-insured plans that it administers and seeks to recover overpayments made by those plans to the ASCs.

190.   The ASCs did not require plan members to pay the full amount of the charges they listed in claims forms submitted to Cigna for reimbursement on behalf of the members' plans.

191.   The ASCs did not require plan members to pay the full amount of the plan members' out-of-network cost sharing responsibility under the terms of their plans.

192.   The ASCs' patients' plans, however, expressly do not cover any portion of the charges that providers like the ASCs do not require plan members to pay, nor do they require the plan to cover anything in excess of the ASCs' normal charges to its patients.

193.    By paying the ASCs amounts that the ASCs did not charge plan members, these plans made overpayments to the ASCs.

194.    These overpayments were made directly by Cigna to the ASCs.

195.    These overpayments belong in good conscience to the plans because the plans managed by Cigna made benefit payments to the ASCs for services provided to plan members based on the charges that the ASCs listed on the claim forms that they submitted to Cigna.

196.    These overpayments are within the possession and control of the ASCs.

197.    These overpayments were made in contravention of plan terms.

198.    Cigna seeks recovery of these overpayments on behalf of the plans. Alternatively, Cigna seeks a declaration that it may offset from future claim payments to the ASCs in the amount of these overpayments.

199.    Additionally, Cigna seeks a permanent injunction directing all of the ASCs to submit to Cigna only charges that the ASC actually charges the plan member as payment in full for the ASCs' services and not to submit charges which include amounts that the ASC does not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts).

### Count II – RICO § 1962(c)
### (Against All Counterclaim Defendants)

200.    The preceding paragraphs are incorporated by reference as if set forth fully herein.

201.   <u>The Enterprise</u>. The following allegations are made upon information and belief. SurgCenter entered into separate two-party association-in-fact enterprises with each of the six ASCs. SurgCenter came to agreements with each of the ASCs to create the enterprises, the purpose of which is to operate operate for-profit medical centers and thereby enrich the enterprise's members by luring Cigna plan members to use these out-of-network centers through misrepresentations about the centers' costs to plan members, Cigna, and their plans.

202.   <u>The RICO Schemes</u>. The following allegations are made upon information and belief. SurgCenter and each individual ASC each agreed to engage in the fraudulent dual pricing and fee forgiving schemes (the "RICO Schemes") as described above. (*See* ¶¶ 55-187.)

203.   <u>The Pattern of Racketeering Activity</u>. The following allegations are made upon information and belief. Each of the ASCs and SurgCenter actively participate and participated in the conduct and operation of the respective two-party enterprises by participating in each stage of the RICO Schemes, as described above. (*See* ¶¶ 55-187.)

204.   SurgCenter partners with each of the ASCs to develop ambulatory surgical centers, and then provides no-fee management and consulting services in managing and running each of the ASCs, and takes a 35% ownership share in each of the ASCs. As described above, as part of this scheme, each of the ASCs, with the assistance and guidance of SurgCenter, submits fraudulent claim forms to insurers like Cigna in order to induce the insurers to make payments to the ASCs.

205.   As part of these schemes, each of the ASCs then funnels a portion of the fraudulently-obtained money paid by insurers like Cigna back to SurgCenter.

206.   Upon information and belief, in furtherance of the RICO Schemes, each ASC has submitted and continues to submit false claims to other insurers as well as Cigna, including those claims described above. (*See* ¶¶ 55-187.)

207.   SurgCenter and each ASC knew that Cigna would reasonably rely on the falsely-stated charges in these forms when Cigna processed benefit payments for the services listed on the forms and therefore pay the ASC its inflated, out-of-network rates.

208.   Each ASC took further steps to conceal the true nature of its fraudulently inflated charges to Cigna by, for instance, misrepresenting to patients that they could use their "in-network" benefits at the respective ASC, and by refusing Cigna's requests to provide information regarding the ASCs' billing practices. Only through its extensive investigations did Cigna discover the RICO Schemes.

209.   Each time the ASC submitted such a form to Cigna by mail, it committed a separate act of mail fraud in violation of 18 U.S.C. § 1341.

210.   Each time each ASC submitted such a form to Cigna electronically, it committed a separate act of wire fraud in violation of 18 U.S.C. § 1343.

211.   Each ASC committed these acts of mail and wire fraud at the direction of, and in coordination with, SurgCenter.

212.   Indeed, when Cigna contacted one of the ASCs, Westminster, regarding its billing practices, SurgCenter responded on the ASC's behalf. SurgCenter's Vice President of Managed Care and Revenue Cycle referred to the dual pricing scheme as

"an internal corporate policy" with which SurgCenter represented Westminster had followed.

213.    By submitting hundreds of these forms over the past several years, SurgCenter and each ASC engaged in a pattern of racketeering activity, one that continues now. The direct and intended victims of this pattern of racketeering activity are Cigna and entities that sponsor Cigna's ASO plans.

214.    As a direct result of the ASCs' fraudulent claim submissions, Cigna paid the ASCs more than $14.8 million.

215.    Thus, as a result of the conduct by SurgCenter and the ASCs, Cigna and its ASO plan sponsors have been injured in an amount to be determined at trial but in no event less than $14.8 million.

216.    Pursuant to 18 U.S.C. § 1964(c), Cigna and its ASO plan sponsors are entitled to recover threefold their damages, costs, and attorneys' fees. In addition, they are entitled to injunctive relief to enjoin SurgCenter and each of the ASCs' ongoing racketeering.

### Count III – Fraud
### (Against All ASCs)

217.    Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

218.    Under both Maryland law (as applied to Bel Air and Westminster (collectively, the "Maryland ASCs")) and Colorado law (as applied to Kissing Camels, Arapahoe, Hampden, and Cherry Creek (collectively, the "Colorado ASCs")), each of the ASCs' conduct constitutes fraud.

219.   At the time the ASCs submitted claims to Cigna for reimbursement, each ASC knew that the material statements and representations about its charges for services were false.

220.   Each ASC knew and intentionally failed to disclose material information regarding the manner, extent and nature by which the ASC waived Cigna members' required out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members.

221.   Each ASC also knew that the claims submitted to Cigna reflected false and inflated charges that the ASC did not charge their patients.

222.   Each ASC submitted the claims to Cigna with the intent to defraud Cigna by inducing Cigna to rely on their false representations and omissions alleged herein to pay these fraudulent charges. The misrepresentations were material.

223.   Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASC, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the ASCs received payments in excess of $14.8 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count IV – Aiding and Abetting Fraud
### (Against SurgCenter)

224.   Paragraphs 1 through 187 and 218 through 223 are incorporated by reference as if set forth fully herein.

225.   Under both Maryland law and Colorado law, SurgCenter's conduct constitutes aiding and abetting fraud.

226.   Each of the ASCs committed fraud against Cigna by knowingly submitting fraudulent claim forms to Cigna in order to receive excessive, unjustified payments from Cigna as part of the fraudulent dual pricing and fee forgiving schemes described above.

227.   As described above, all aspects of the fraudulent dual pricing and fee forgiving schemes were designed and implemented at the direction of SurgCenter. The purpose of these dual pricing schemes was to fraudulently induce insurers like Cigna to make unwarranted payments to the ASCs.

228.   SurgCenter was at all times aware of its role in the illegal and fraudulent schemes, and SurgCenter knowingly and substantially assisted, encouraged, incited, aided, and abetted the fraudulent conduct by each of the ASCs; indeed, SurgCenter developed, implemented, and participated in each of the fraudulent schemes, and it retains a 35% interest in each ASC.

229.   SurgCenter knowingly and substantially assisted in the fraudulent conduct in many ways. For example, upon information and belief, SurgCenter provides each ASC with the "Insurance Verification Sheet" used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, and SurgCenter provides each ASC with the language used on claim forms submitted to Cigna by the ASCs. These documents are provided to the ASCs by SurgCenter for the purpose of defrauding insurers such as Cigna.

230.   In addition, each of the ASCs, at the direction of and in coordination with SurgCenter, refuses to provide insurers like Cigna with information regarding the ASCs' billing practices in order to conceal those fraudulent billing practices. For example, on

November 28, 2011, in response to an inquiry from Cigna regarding Westminster's billing practices, SurgCenter's Vice President of Managed Care and Revenue Cycle sent a letter back to Cigna referring to the dual pricing scheme as "an internal corporate policy" with which SurgCenter represented Westminster had followed.

231. As a direct and proximate result of SurgCenter aiding and abetting the each of the ASCs' fraud, Cigna has suffered injury. Specifically, as result of this the ASCs' conduct, aided and abetted by SurgCenter, the ASCs received unwarranted payments in excess of $14.8 million from Cigna.

### Count V – Claim for Negligent Misrepresentation
### (Against all ASCs)

232. Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

233. Under both Maryland law (as applied to Bel Air and Westminster) and Colorado law (as applied to Kissing Camels, Arapahoe, Hampden, and Cherry Creek), each of the ASCs' conduct constitutes negligent misrepresentation.

234. Each ASC submitted benefit claim forms to Cigna regarding services that they provided to Cigna plan members; each ASC did so in the course of its business and had a pecuniary interest in the outcome of how Cigna processed benefits for those services, as any benefits for those services were paid directly to each ASC.

235. In submitting benefit claim forms to Cigna, each ASC falsely stated "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services; each ASC supplied this false information to guide Cigna in processing benefits for those services.

236.   In submitting benefit claim forms to Cigna, the ASCs did not identify the actual amounts that the ASCs required Cigna's plan members to pay for those services, only falsely-stated "charges" that were higher than these amounts; in so doing, each ASC failed to exercise reasonable care or competence in communicating information regarding its charges to Cigna.

237.   Based upon the forms submitted by each ASC, Cigna processed benefits for services provided by the ASCs to its members based upon the falsely-stated "charges" stated on the forms submitted by the ASCs; thus, each time Cigna processed a claim based upon a falsely-stated charge, it suffered a pecuniary loss because it justifiably relied on the ASCs' communications.

238.   Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASCs, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the ASCs received payments in excess of $14.8 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count VI – Aiding and Abetting Negligent Misrepresentation
### (Against SurgCenter)

239.   Paragraphs 1 through 187 and 233 through 238 are incorporated by reference as if set forth fully herein.

240.   Under both Maryland law and Colorado law, SurgCenter's conduct constitutes aiding and abetting negligent misrepresentation.

241.   Each of the ASCs committed negligent misrepresentation against Cigna by knowingly submitting fraudulent claim forms to Cigna (or alternatively by failing to

exercise reasonable care or competence in communicating information regarding its charges to Cigna) in order to receive excessive, unjustified payments from Cigna as part of the fraudulent dual pricing schemes described above.

242.   As described above, all aspects of the fraudulent dual pricing and fee forgiving schemes were designed and implemented at the direction of SurgCenter. The purpose of these dual pricing and fee forgiving schemes was to fraudulently induce insurers like Cigna to make unwarranted payments to the ASCs.

243.   SurgCenter was at all times aware of its role in the illegal and fraudulent schemes, and SurgCenter knowingly and substantially assisted, encouraged, incited, aided, and abetted the conduct by the ASCs which resulted in the negligent misrepresentations to Cigna by each of the ASCs; indeed, SurgCenter developed and implemented the fraudulent schemes, and it retains a 35% interest in each ASC.

244.   SurgCenter knowingly and substantially assisted in the negligent misrepresentations in many ways. For example, upon information and belief, SurgCenter provides each ASC with the "Insurance Verification Sheet" used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, and SurgCenter provides each ASC with the language used on claim forms submitted to Cigna by the ASCs. These documents are provided to the ASCs by SurgCenter for the purpose of misrepresenting the ASCs' charges and defrauding insurers such as Cigna.

245.   In addition, the ASCs, at the direction of and in coordination with SurgCenter, refuse to provide insurers like Cigna with information regarding the ASCs' billing practices in order to conceal those fraudulent billing practices. For example, on

November 28, 2011, in response to an inquiry from Cigna regarding Westminster's billing practices, SurgCenter's Vice President of Managed Care and Revenue Cycle sent a letter back to Cigna referring to the dual pricing scheme as "an internal corporate policy" with which SurgCenter represented Westminster had followed.

246.    As a direct and proximate result of SurgCenter aiding and abetting each of the ASCs' negligent misrepresentations, Cigna has suffered injury. Specifically, as result of the ASCs' conduct, aided and abetted by SurgCenter, the ASCs received unwarranted payments in excess of $14.8 million from Cigna.

### Count VII – Claim for Unjust Enrichment
### (Against all ASCs)

247.    Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

248.    Under both Maryland law (as applied to Bel Air and Westminster) and Colorado law (as applied to Kissing Camels, Arapahoe, Hampden, and Cherry Creek), each of the ASCs' conduct gives rise to a claim for unjust enrichment.

249.    Cigna's plans are required to cover some portion of the actual charges for services that plan members receive from out-of-network providers like the ASCs. Cigna's plans are not required to cover amounts that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance. Cigna's plans are also not required to cover amounts that exceed the Maximum Reimbursable Charge, as that term is defined in the plans.

250.    The ASCs submitted benefit claim forms to Cigna falsely stating "charges" for services that were higher than the actual amounts that the ASCs required Cigna's

plan members to pay for those services. Based on these forms, Cigna processed benefits for services provided by the ASCs to Cigna plan members based upon these falsely-stated "charges." Cigna paid these benefits directly to the ASCs.

251.   When Cigna paid benefits to the ASCs that Cigna's plan were not obligated to cover, the ASCs obtained a benefit from Cigna by the ASCs' fraud in falsely stating "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Therefore, it would be inequitable for the ASCs to retain these benefits.

252.   As a result of this conduct, the ASCs received payments in excess of $14.8 million from Cigna as a result of the ASCs' fraudulent conduct.

### Count VIII – Claim for Tortious Interference with Contract
### (Against all Counterclaim Defendants)

253.   Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

254.   Under both Maryland law (as applied to Bel Air, Westminster, and SurgCenter) and Colorado law (as applied to Kissing Camels, Arapahoe, Hampden, Cherry Creek, and SurgCenter), the ASCs' conduct gives rise to a claim for tortious interference with contract.

255.   Each of the members for whom the ASCs submitted benefits claims and received payment from Cigna received health care benefits pursuant to a benefit plan insured or administered by Cigna.

256.   Each of the plans pursuant to which the ASCs submitted claims and received payment contained, among other things, provisions that required the member

to pay their cost-sharing responsibility (e.g. co-payments, co-insurance, and deductibles) in order for the plan to cover a portion of the submitted charges for services. SurgCenter and the ASCs knew that its patients' plans made the patients responsible for payment of the patients' cost-sharing responsibility.

257.   Despite this knowledge, the ASCs, at the direction of and in coordination with SurgCenter, engaged in a fraudulent dual pricing scheme in order to bill Cigna and its ASO clients inflated charges in excess of those actually charged to the patients, to induce the patients to use the ASCs' out-of-network services, and to undermine and circumvent Cigna's provider network system.

258.   Indeed, Section 18-13-119(1)(a) of the Colorado Criminal Code explicitly states that "eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans interfere with contractual obligations entered into between the insured and the insurer relating to such payments."

259.   Further, the ASCs, at the direction of and in coordination with SurgCenter, knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs.

260.   In addition, the ASCs and SurgCenter have intentionally and maliciously misrepresented to Cigna plan members the terms of the members' plans and the nature of the dispute between Cigna and the ASCs in order to damage Cigna's relationship with its members. For instance, the ASCs have sent letters to Cigna members stating the following: "The only explanation that CIGNA has given for refusing to pay for the services is that is wants us to charge you more out of pocket, something that is

outrageous for a company that accepts your health insurance premium or administrative charge every month and quite likely owes you a fiduciary duty."

261.    By these actions, the ASCs, at the direction of and in coordination with SurgCenter, induced the members to breach the terms of their plans.

262.    Further, the ASCs, at the direction of and in coordination with SurgCenter, maliciously and wrongfully interfered with the economic relationships between Cigna and its members.

263.    SurgCenter and the ASCs' tortious interference has caused damages to Cigna by causing it to make overpayments to the ASCs and has caused harm to the relationship between Cigna and its members.

### Count IX – Declaratory Relief Under Section 18-13-119 of the Colorado Criminal Code
### (Against The Colorado ASCs)

264.    Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

265.    Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

266.    Section 18-13-119 of the Colorado Criminal Code states that "[b]usiness practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles . . . interfere with contractual obligations entered into between the insured and the insurer"; such practices are illegal

under Colorado law, and "violation thereof or the advertising thereof shall be grounds for disciplinary actions." Colo. Rev. Stat. Ann. §§18-13-119(1)(a), (2) (West 2011).

267.   Furthermore, Section 18-13-119 states that "if the effect is to eliminate the need for payment by the patient of any required deductible or co-payment applicable in the patient's health benefit plan, a person who provides health care commits abuse of health insurance if the person knowingly (a) [a]ccepts from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers; or (b) [s]ubmits a fee to a third-party payor which is higher than the fee he has arranged to accept from the insured patient with the understanding of waiving the required deductible or co-payment." *Id*. §§ (3)(a)-(b).

268.   An actual controversy exists between the Colorado ASCs and Cigna regarding whether the Colorado ASCs engaged in abuse of health insurance both by: advertising that, for billing purposes, the Colorado ASCs would apply in-network benefits to services rendered to Cigna plan members for whom the Colorado ASCs were out-of-network facilities and from which greater plan member cost sharing was required; accepting from Cigna, as payment in full for services rendered to Cigna plan members, the amount Cigna covers for out-of-network health care services; and by submitting fees to Cigna that are higher than the fees it arranged to accept from insured patients with the understanding of waiving the costs normally associated with out-of-network service.

269.    Because the Colorado ASCs have repeatedly engaged in conduct that directly violates Section 18-13-119 of the Colorado Criminal Code, Cigna seeks a declaration that the Colorado ASCs are in violation of this statute.

270.    Cigna also seeks a declaration that it is entitled to recover from the Colorado ASCs all amounts Cigna unwittingly paid the Colorado ASCs as a consequence of the Colorado ASCs' illegal conduct and that Cigna is entitled to recover its reasonable and necessary attorneys' fees and costs.

### Count X – Claim for Civil Theft Under Section 18-4-405 of the Colorado Criminal Code
### (Against The Colorado ASCs and SurgCenter)

271.    Paragraphs 1 through 187 are incorporated by reference as if set forth fully herein.

272.    At the time the Colorado ASCs submitted claims to Cigna for reimbursement, each Colorado ASC and SurgCenter knew that the material statements and representations about the ASCs' charges for services were false.

273.    Each Colorado ASC and SurgCenter knew and intentionally failed to disclose material information regarding the manner, extent and nature by which the Colorado ASC waived Cigna members' required out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members.

274.    Each Colorado ASC and SurgCenter also knew that the claims submitted to Cigna reflected false and inflated charges that the Colorado ASC did not charge their patients.

275. Each Colorado ASC submitted the claims to Cigna with the intent to deceive and defraud Cigna by inducing Cigna to rely on their false representations and omissions alleged herein to pay these fraudulent charges. The misrepresentations were material.

276. Each Colorado ASC and SurgCenter knew that Cigna would reasonably rely on the falsely-stated charges in these forms when Cigna processed benefit payments for the services listed on the forms and therefore pay the Colorado ASC its inflated, out-of-network rates.

277. Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each Colorado ASC, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the Colorado ASCs received payments in excess of $12.5 million from Cigna as a result of the ASCs' fraudulent conduct.

278. Based on its ownership stake in each of the ASCs, SurgCenter is in possession of fraudulently-obtained money paid by Cigna to the ASCs.

279. SurgCenter knows or believes the money it receives to be stolen; indeed, as described above, each of the ASCs operates its dual pricing scheme at the direction of, and in coordination with, SurgCenter.

280. Pursuant to C.R.S. 18-4-405, Cigna and its ASO plan sponsors are entitled to recover threefold their damages, costs, and attorneys' fees.

**Count XI – Violation of Colorado Organized Crime Control Act ("COCCA")
Section 18-17-104
(Against The Colorado ASCs and SurgCenter)**

281.    Paragraphs 1 through 187 and 272 through 280 are incorporated by reference as if set forth fully herein.

282.    <u>The Enterprise</u>. The following allegations are made upon information and belief. SurgCenter entered into separate two-party association-in-fact enterprises with each of the four Colorado ASCs. SurgCenter came to agreements with each of the four Colorado ASCs to enter into enterprises, the purpose of which is operate for-profit medical centers and thereby enrich the enterprise's members by luring Cigna plan members to use these out-of-network centers through misrepresentations about the centers' costs to plan members and their plans.

283.    <u>The COCCA Schemes</u>. The following allegations are made upon information and belief. SurgCenter and each individual Colorado ASC each developed the fraudulent dual pricing and fee forgiving schemes (the "COCCA Schemes") as described above. (*See* ¶¶ 55-187.)

284.    <u>The Pattern of Racketeering Activity</u>. The following allegations are made upon information and belief. Each of the Colorado ASCs and SurgCenter actively participate and participated in the conduct and operation of the enterprise by participating in each stage of the COCCA Schemes, as described above. (*See* ¶¶ 55-187.)

285.    SurgCenter partners with each of the Colorado ASCs to develop ambulatory surgical centers, and then provides no-fee management and consulting

services in managing and running each of the Colorado ASCs, and takes a 35% ownership share in each of the Colorado ASCs. As described above, as part of this scheme, each of the Colorado ASCs, with the assistance and guidance of SurgCenter, submits fraudulent claim forms to insurers like Cigna in order to induce the insurers to make payments to the Colorado ASCs.

286.   As part of this scheme, each of the Colorado ASCs then funnels a portion of the fraudulently-obtained money paid by insurers like Cigna back to SurgCenter.

287.   Upon information and belief, each Colorado ASC has submitted and continues to submit false claims to other insurers as well as Cigna, including those claims described above. (*See* ¶¶ 55-187.)

288.   Each Colorado ASC knew that Cigna would reasonably rely on the falsely-stated charges in these forms when Cigna processed benefit payments for the services listed on the forms and therefore pay the ASC its inflated, out-of-network rates.

289.   Each Colorado ASC took further steps to conceal the true nature of its fraudulently inflated charges to Cigna by, for instance, misrepresenting to patients that they could use their "in-network" benefits at the respective Colorado ASC, and by refusing Cigna's requests to provide information regarding the Colorado ASCs' billing practices. Only through its extensive investigations did Cigna discover the COCCA Schemes.

290.   Each time a Colorado ASC submitted such a form to Cigna by mail, it committed a separate act of mail fraud in violation of 18 U.S.C. § 1341.

291.   Each Colorado ASC committed these acts of mail fraud at the direction of, and in coordination with, SurgCenter.

292.   Each time each Colorado ASC submitted such a form to Cigna electronically, it committed a separate act of wire fraud in violation of 18 U.S.C. § 1343.

293.   Each of the Colorado ASCs committed these acts of wire fraud at the direction of, and in coordination with, SurgCenter.

294.   Each time a Colorado ASC submitted such a form to Cigna by mail or wire, and Cigna relied on such a form to pay a Colorado ASC, it committed a separate act of civil theft by fraud in violation of C.R.S. 18-4-401.

295.   Each Colorado ASC committed these acts of civil theft by fraud at the direction of, and in coordination with, SurgCenter.

296.   By submitting hundreds of these fraudulent claim forms over the past several years, SurgCenter and each Colorado ASC engaged in a pattern of racketeering activity, one that continues now. The direct and intended victims of this pattern of racketeering activity are Cigna and entities that sponsor Cigna's ASO plans.

297.   As a direct result of the Colorado ASCs' fraudulent claim submissions, Cigna paid the Colorado ASCs more than $12.5 million.

298.   Thus, as a result of the conduct by SurgCenter and the Colorado ASCs, Cigna and its ASO plan sponsors have been injured in an amount to be determined at trial but in no event less than $12.5 million.

299.   Pursuant to C.R.S. 18-17-106(7), Cigna and its ASO plan sponsors are entitled to recover threefold their damages, costs, and attorneys' fees. In addition, they

are entitled to injunctive relief to enjoin SurgCenter and each of the Colorado ASCs'
ongoing racketeering.

### Count XII – Declaratory Relief
### (Against all ASCs)

300.    The preceding paragraphs are incorporated by reference as if set forth
fully herein.

301.    Under the Declaratory Judgment Act, the court "may declare the rights
and other legal relations of any interested party seeking such declaration, whether or
not further relief is or could be sought." 28 U.S.C. § 2201(a).

302.    The ASCs provide facilities and related medical services, including
equipment and supplies, to patients receiving medical care who are covered under
employee health and welfare benefit plans that are insured or administered by Cigna.

303.    The claims the ASCs submitted, and continue to submit, are claims for
reimbursement for services provided to patients who are purportedly covered under
employee health and welfare benefit plans that are insured or administered by Cigna.

304.    As described in the preceding paragraphs, the claims the ASCs submitted
are for charges that are not covered under the relevant plans because the claims are
based on false charges submitted to Cigna, the ASCs failed to bill and collect the true
out-of-network cost share responsibility from the Cigna plan members, and the ASCs
did not hold the plan members responsible for the amounts charged to Cigna.

305.    As a result, any claims submitted by the ASCs are not reimbursable, and
any payments the ASCs received under such claims should be returned to Cigna.

306.   An actual controversy exists between the ASCs and Cigna regarding whether claims for reimbursement are covered and payable under employee health and welfare benefit plans that are insured or administered by Cigna.

307.   Cigna seeks a declaration that the claims for reimbursement submitted by the ASCs are not for covered services and are not payable under employee health and welfare benefit plans that are insured or administered by Cigna. Cigna also seeks a declaration that the ASCs must return all sums received from Cigna.

308.   Cigna also seeks recovery of its reasonable and necessary attorneys' fees and costs.

## JURY DEMAND
## (As to Non-ERISA Claims Only)

309.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

310.   With respect to Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

## DISCOVERY RULE

311.   The preceding paragraphs are incorporated by reference as if set forth fully herein.

312.   Cigna did not know and could not have known, despite the exercise of reasonable diligence, of all facts giving rise to its claims prior to the institution of this lawsuit. The ASCs refused to cooperate in Cigna's efforts to understand its billing

practices, thereby hindering its ability to learn of its dual pricing scheme and the extent of its fee-forgiving practices.

## PRAYER FOR RELIEF

Based on the foregoing, Cigna prays that the Court enter a judgment awarding the following:

a.   a declaration that the products and services provided by the ASCs do not constitute covered services under the employee health and welfare benefit plans administered or insured by Cigna and that the ASCs are not entitled to receive any payments on the claims for reimbursement that it has submitted or may submit in the future;

b.   a declaration that the Colorado ASCs are in direct violation of section 18-13-119 of the Colorado Criminal Code;

c.   return of any all monies paid to the ASCs on claims for reimbursement submitted by the ASCs;

d.   monetary damages for all harm suffered as a result of the ASCs' conduct;

e.   exemplary and punitive damages;

f.   pre-judgment and post-judgment interest;

g.   the reasonable and necessary attorneys' fees incurred;

h.   costs of court; and

i.   such other and further relief to which they may show themselves entitled in law or equity.

DATED this 10th day of February, 2014.


Respectfully submitted,

By: */s/ Edwin P. Aro*
Edwin P. Aro
ARNOLD & PORTER LLC
370 Seventeenth Street, Suite 4400
Denver, CO 80202
Telephone: 303.863.1000
ed.aro@aporter.com

Joshua B. Simon
Warren Haskel
Ryan D. McEnroe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
Telephone: 212.446.4800
Facsimile: 212.446.4900

*Counsel for Defendants*
*and Counterclaim Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February, 2014, I filed and served the foregoing **COUNTERCLAIMS** via CM-ECF which will send notification of such filing to all counsel of record.

/s/ , Linda J. Teater