Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

|  |  |
|---|---|
| **CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTH AND LIFE INSURANCE COMPANY** | |
| **PLAINTIFFS,** | **Civil Action No.: _____** |
| **V.** | |
| **NORTHWEST REGIONAL SURGERY CENTER, LLC, ADVANCED REGIONAL SURGERY CENTER LLC, CARMEL SPECIALTY SURGERY CENTER LLC, COLUMBUS SPECIALTY SURGERY CENTER LLC, INDIANA SPECIALTY SURGERY CENTER LLC, METRO SPECIALTY SURGERY CENTER LLC, MIDWEST SPECIALTY SURGERY CENTER LLC, MUNSTER SPECIALTY SURGERY CENTER LLC, RIVERVIEW SURGERY CENTER LLC, SOUTH BEND SPECIALTY SURGERY CENTER LLC, SYCAMORE SPRINGS SURGERY CENTER LLC, SURGICAL CENTER DEVELOPMENT, INC. D/B/A SURGCENTER DEVELOPMENT, SURGICAL CENTER DEVELOPMENT #3 LLC** | |
| **DEFENDANTS.** | |

131107238v1 0974595

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Plaintiffs Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively "Cigna") file this Original Complaint against Defendants Northwest Regional Surgery Center LLC, Advanced Regional Surgery Center LLC, Carmel Specialty Surgery Center LLC, Columbus Specialty Surgery Center LLC, Indiana Specialty Surgery Center LLC, Metro Specialty Surgery Center LLC, Midwest Specialty Surgery Center LLC, Munster Specialty Surgery Center LLC, Riverview Surgery Center LLC, South Bend Specialty Surgery Center LLC, Sycamore Springs Surgery Center LLC (collectively, the "ambulatory surgery centers" or "ASCs"), Surgical Center Development, Inc. d/b/a SurgCenter Development, and Surgical Center Development #3 LLC (collectively, "SurgCenter," and together with the ASCs, "Defendants") and allege as follows:

### <u>INTRODUCTION</u>

1.      SurgCenter has entered into separate conspiracies with each of the Defendant ASCs. SurgCenter conspired with each of the ASCs to engage in fraudulent "dual pricing" and "fee forgiving" schemes, whereby the ASCs charge their patients little or nothing for out-of-network medical services while charging exorbitant rates to the patients' health insurance plans administered through Cigna.

2.      Cigna is a Connecticut managed care company that administers employee health and welfare benefit plans (including, but not limited to, plans insured by Cigna). It is part of Cigna's responsibilities to those plans to control overall healthcare costs. One way Cigna discharges that responsibility is by entering into agreements with networks of healthcare providers, under which the providers agree to accept fixed rates for services in consideration of other benefits, including access to plan members. In the plans at issue here, plan members remain

131107238v1 0974595

free to use providers outside these networks, but their plans provide them incentives to remain in the network, and thereby to lower costs for the plan as a whole.

3.     One such incentive involves requiring plan members to bear a portion of the cost (either through co-payment, co-insurance or deductible obligations) of treatment by out-of-network providers, who generally charge higher rates than doctors in the network. Without this obligation, out-of-network providers could submit charges to healthcare plans which have no relation either to the provider's actual costs or to the actual market for medical services, and members would have no incentive to avoid those providers.

4.     The ASCs are "out-of-network" or "non-participating" providers, meaning they do not have contracts with Cigna.

5.     Each ASC—with significant support and assistance from SurgCenter—undermined the above-mentioned safeguards by means of a fraudulent "fee forgiving" scheme. The ASCs lure patients from health plans that are administered and/or insured by Cigna by misrepresenting those patients' responsibilities under the plans, by promising not to collect the patients' required co-payment, co-insurance or deductible obligations, and by further promising not to seek reimbursement from the patient for any other portion of its bill that the plan does not cover.

6.     Specifically, the ASCs lured Cigna's plan members in as patients by offering to bill and collect for surgical procedures at the plan members' "in-network" or lower benefits levels, even though the ASCs knew that, because they are out-of-network facilities, the plan members' out-of-network benefits levels should apply.

7.     The ASCs then each followed an undisclosed dual pricing scheme developed in coordination with SurgCenter.  Under this scheme, the ASCs calculated their patients' cost-

3

131107238v1 0974595

sharing responsibility by applying a 150% multiplier to Medicare rates for services performed by the ASC, and then discounting those rates by the portion that the patients would have paid had they seen an in-network provider.  When calculating how much to charge Cigna for those same services, however, the ASCs did not apply this same 150% multiplier to Medicare rates, and instead applied an 800% multiplier to Medicare rates—resulting in charges to Cigna that were as much as tens of thousands of dollars higher than the rates they used to calculate their patients' responsibility.  The ASCs did not disclose to Cigna that they calculated how much they would collect from their patients based on the 150% of Medicare rate formula.  The ASCs also did not disclose to their patients that they charged Cigna based on the much higher 800% of Medicare rate formula for those same services.  In short, the ASCs never disclosed that they charged Cigna and their patients different prices for the same services.  Cigna did not learn of the details of the ASCs' dual-pricing scheme until after Cigna was induced into overpaying for the ASCs' claims, and until after Cigna conducted its own investigation and analysis of the ASCs' claims.

8.     As is the case with all of their patients covered by Cigna plans, the ASCs excuse the patients from paying anything more than the small amounts that the patients paid to the ASCs pursuant to this dual pricing scheme.

9.     Put simply, the inflated "charges" that the ASCs submitted to Cigna are fraudulent, as these "charges" bear no relation to the amounts the ASCs actually charged their patients. Indeed, courts have referred to the charges submitted by fee-forgiving providers like the ASCs as "phantom" charges.

10.     "Fee forgiving" of this kind has long been recognized as a variety of medical billing fraud. More than two decades ago, the American Medical Association advised its members:  "[P]hysicians should be aware that . . . [r]outine forgiveness of waiver or copayments

4

131107238v1 0974595

may constitute fraud under state and federal law." *See* AMA Ethics Advisory Opinion 6.12 – Forgiveness or Waiver of Insurance Copayments (June 1993) (*available at*  http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion612.page).   In the context of the federal Medicare program, the Department of Health and Human Services reached the same conclusion:  "Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in . . . false claims . . . [and] excessive utilization of items and services paid for by Medicare."   HHS OIG Special Fraud Alerts   (Dec.   19,   1994)   (*available   at*   https://oig.hhs.gov/fraud/docs/alertsandbulletins/ 121994.html).

11.     Likewise, courts have consistently found that these types of billing practices are improper and have affirmed healthcare plans' right not to cover the artificial inflated "charges" that providers like the ASCs submit. Indeed, courts, state legislatures, and other governmental bodies have recognized that these schemes victimize health care benefits plans and the clients who sponsor them, members of these plans, and managed care companies like Cigna, by exponentially increasing healthcare costs for employers and employees.

12.     At least two states, Colorado and Florida, have already declared these types of schemes illegal and have enacted statutes to stop them.  *See* Colo. Rev. Stat. Ann. § 18-13-119; Fla. Stat. Ann. § 817.234(7).

13.     Cigna was only able to confirm the ASCs' fraudulent billing practices through a special investigation of the ASCs, after which Cigna began reducing or denying payment for claims submitted by the ASCs.

14.     The net effect of the Defendants' schemes was, among other things, to mislead Cigna plan members into believing that the ASCs could offer services at Cigna's in-network

131107238v1 0974595

benefits levels when, in fact, the ASCs could not, which artificially increased the cost of healthcare to Cigna and its clients.

15.     SurgCenter-affiliated ASCs in Indiana alone have fraudulently induced Cigna into paying millions of dollars to the ASCs as a result of their fee-forgiving schemes.

16.     In this action, Cigna seeks to recover the payments made to the ASCs and to prevent SurgCenter and the ASCs from continuing their fraudulent billing schemes against Cigna.  By bringing this action, Cigna is ensuring that its clients and plan members are charged only appropriate amounts for services rendered, and thereby helping to maintain the affordability of healthcare coverage for individuals and employers.

## PARTIES

17.     Plaintiff Connecticut General Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

18.     Plaintiff Cigna Health and Life Insurance Company is a company organized under the laws of the State of Connecticut, with its principal place of business in Bloomfield, Connecticut.

19.      Defendant Northwest Regional Surgery Center LLC is an Indiana limited liability company with its principal place of business in Merrillville, Indiana.

20.     Defendant Advanced Regional Surgery Center LLC is an Indiana limited liability company with its principal place of business in Jeffersonville, Indiana.

21.     Defendant Carmel Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Carmel, Indiana.

131107238v1 0974595

22.     Defendant Columbus Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Columbus, Indiana.

23.     Defendant Indiana Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Bloomington, Indiana.

24.     Defendant Metro Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Jeffersonville, Indiana.

25.     Defendant Midwest Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

26.     Defendant Munster Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in Munster, Indiana.

27.     Defendant Riverview Surgery Center LLC is an Indiana limited liability company with its principal place of business in Rockport, Indiana.

28.     Defendant South Bend Specialty Surgery Center LLC is an Indiana limited liability company with its principal place of business in South Bend, Indiana.

29.     Defendant Sycamore Springs Surgery Center LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

30.     Defendant Surgical Center Development, Inc. is a Nevada corporation with its principal place of business in Pismo Beach, California.  Upon information and belief, Surgical Center Development, Inc. takes an active role developing and managing each Defendant ASC, including assisting ASCs in their formation, advising each ASC regarding fees, billing and collections policies, and responses to inquiries regarding the ASCs' claims and services.

31.     Defendant Surgical Center Development #3 LLC  ("SurgCenter #3") is a Nevada limited liability company with its principal place of business in Carson City, Nevada.  Upon

7

information and belief, SurgCenter #3 takes an active role developing and managing each Defendant ASC, including assisting ASCs in their formation, advising each ASC regarding fees, billing and collections policies, and taking an ownership interest in each ASC.

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over the parties because the ASC Defendants are located in this State and because all Defendants systematically and continuously conduct business in this State and otherwise have minimum contacts with this State sufficient to establish personal jurisdiction.  Further, this Court has personal jurisdiction over Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1965(a)-(b). In addition, this Court has personal jurisdiction over the Defendants pursuant to 29 U.S.C. § 1132(e)(2).

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. Specifically, Plaintiffs assert claims in this case that arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq. and RICO 18 U.S.C. § 1962(c).  The Court has jurisdiction over Cigna's remaining claims pursuant to 28 U.S.C. § 1367 because the state and common law claims alleged herein are so related to the federal claims that they form part of the same case or controversy.

34.     In addition, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiffs and Defendants, and the amount in controversy substantially exceeds $75,000. Plaintiffs are both citizens of Connecticut. The Defendant ASCs are citizens of Indiana and Defendant SurgCenter is a citizen of California and Nevada. With respect to all Defendants, absent injunctive relief, Cigna has suffered or will

131107238v1 0974595

suffer substantially in excess of $75,000 in damages as a result of Defendants' actions described herein.

35.     Venue is proper in the Northern District of Indiana because certain of the ASCs may be found in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this District.   29 U.S.C. §§ 1132(e)(2), 1391(b)(1), and 1391(b)(2). Specifically, many of the patients identified in the claims for reimbursement submitted by the ASCs reside in this District, the services provided to Cigna's customers for which certain ASCs obtained payments from Cigna were performed in this District, and the ASCs and SurgCenter conduct business within this District.

## FACTUAL BACKGROUND

### *Relevant Facts Regarding Managed Care and Cigna-Administered Plans.*

36.     Cigna, among other things, insures and administers employee health and welfare benefit plans.

37.     The majority of Cigna-administered plans are Administrative Services Only ("ASO") plans funded by the employers who sponsor them. Cigna is a fiduciary for these plans in its role as the plans' claims administrator.

38.     Some of the employers who have been victimized by paying the ASCs' exorbitant, fraudulent "charges" are government entities. Thus, some of the funds paid to fraudulent providers like the ASCs are ultimately paid with taxpayer dollars.

39.     Certain Cigna entities also offer fully-insured plans, which are funded by Cigna. Cigna also serves as the plans' claims administrator for fully-insured plans.

40.     Regardless of the type of plan funding, Cigna is a fiduciary of each of the plans at issue, as it exercises discretionary authority over plan assets and plan administration in its

capacity as a claims administrator, by, among other things, making benefits determinations and paying benefit claims. In this fiduciary capacity as a claims administrator, Cigna has processed claims and/or addressed appeals on behalf of all of the plans at issue. The plans at issue explicitly provide Cigna with the discretionary authority to calculate benefits and administer the plans. *See, e.g.*, Ex. 1 at 43 ("**Calculation of Covered Expenses:**  [Cigna], in its discretion, will calculate Covered Expenses following evaluation and validation of all provider billings . . ."); *id.* at 56 ("**Discretionary Authority:**   The Plan Administrator delegates to [Cigna] the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to [Cigna] the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.").

41. Regardless of the type of plan funding, all of the plans at issue authorize Cigna to recover any overpayments made by the plans on the plans' behalves. *See, e.g.*, Ex. 1 at 43 ("Recovery of Overpayment: When an overpayment has been made by [Cigna], [Cigna] will have the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment."). Indeed, Cigna's ASO Agreements with ASO plans require Cigna to recover overpayments made on the plans' behalf—stating that, "[i]n the event that [Cigna] overpays a claim for Plan Benefits

10

or pays Plan Benefits to the wrong party, it shall take all reasonable steps to recover the overpayment," including the potential of litigation.

42.     The overpayment recovery provisions in these plans specifically identify a particular fund, distinct from the recipient's general assets—*i.e.*, payments made by Cigna or the plans to the recipient. These provisions also specifically identify a particular share of that particular fund to which Cigna is entitled—*i.e.*, the amount of the overpayment. Accordingly, these overpayment recovery provisions create an equitable lien by agreement over any overpayments made by Cigna or the plans. The provision puts plan members (and providers, as explained below) on notice that any overpayment made by Cigna will be recoverable (*i.e.*, subject to a lien) as soon as the overpayment is made.

43.     The overpayment plan provisions discussed above apply equally to providers when a plan member assigns his or her claim for reimbursement to the provider. The plans generally allow a member to assign his or her claim for reimbursement to a provider, with Cigna's consent. *See, e.g.*, Ex. 1 at 43. When the provider in turn submits a claim to Cigna, it indicates that the claim for benefits has been assigned. *See, e.g.*, Ex. 2 (representative claim record submitted by ASC indicating benefits have been assigned). When a member assigns a claim to a provider, the provider stands in the shoes of the member and is eligible for reimbursement only to the extent the member would have been in the absence of an assignment. Moreover, the provider is on notice of the provisions governing reimbursement—including cost-share requirements, the exclusions for amounts that would not have been charged in the absence of insurance or that members are not obligated to pay—and the recovery of overpayments.  Upon information and belief, each of the ASCs patients have assigned their claims for reimbursement

131107238v1 0974595

to the respective ASC, as indicated on the claim submission forms that the ASCs submit to Cigna for reimbursement. *See, e.g.*, Ex. 2.

44.     Accordingly, when the ASC accepts assignment of a plan member's claim for imbursement without charging or collecting the member's cost-share requirements, the ASC is not entitled to reimbursement for the claim, just as a plan member would not be entitled to reimbursement if she submitted the claim herself without having satisfied her cost-share obligation.

45.     The majority of the plans under which the ASCs sought benefits are governed by ERISA. Some of the plans at issue are not governed by ERISA, because, for example, they are sponsored by governmental or church employers. The spreadsheets attached as Exs. 3A-3K indicates whether each plan is governed by ERISA. Most of the plans at issue here offer members the choice of receiving services either from health care providers that contract with Cigna to participate in Cigna's provider network or from providers outside of that network.

46.     Cigna-administered health plans reimburse their members for certain healthcare costs, defined in the plans as "covered expenses," which are expenses incurred by the member for services that are covered under the plan and are medically necessary. When a Cigna plan member receives medical services, Cigna determines what part of the provider's billed charges is considered for coverage by the plan, known as the "allowed amount."

47.     There are different types of member responsibility, including deductibles, benefit limits, co-payments, and co-insurance.

48.     These member cost-sharing responsibility amounts are calculated as a percentage or portion of the allowed amount.

131107238v1 0974595

49.     If a member receives a service from a provider that contracts to be part of Cigna's network (an "in-network" or "participating" provider), the plan pays the provider the amount that the provider agreed to accept—its contracted network rate.  The member pays any applicable co-insurance, co-payments, and deductibles toward the allowed amount based on the coverage for in-network services specified in the member's plan, and the plan pays the balance of the allowed amount.

50.     In exchange for agreeing to accept fixed, network rates for their services, participating providers receive certain benefits, including access to members of Cigna-administered plans as a source of patients.

51.     Just as they benefit participating providers, Cigna's network arrangements benefit employers and plan members by controlling overall health care costs and increasing the quality of medical care. In addition, members benefit from obtaining services from a participating provider because participating providers agree not to bill members for the difference between the allowed amount and the provider's billed charges.

52.     In contrast, if a member receives a service from a provider who does not contract to be part of Cigna's provider network (an "out-of-network" or "non-participating" provider), the provider can charge whatever it likes for its services—and out-of-network rates generally are higher than contracted rates—and the provider may "balance bill" the member for the difference between the allowed amount and the provider's billed charges.

53.     With respect to out-of-network claims, Cigna's plans limit reimbursement to the "Maximum Reimbursable Charge" (MRC) for "covered expenses."  The MRC is the lesser of (a) the provider's normal charge for a similar service, or (b) either a specified percentile of charges made by other providers of such services in the region or a specified percentile of the

131107238v1 0974595

reimbursement rate that Medicare provides for such services, in the same geographic area. *See, e.g.*, Ex. 1 (example of Cigna-administered plan). For a variety of reasons, the billed amount is relevant and material to the determination of the "allowed amount," which is the amount that Cigna determines to be covered by its plan, and which forms the basis for determining Cigna's reimbursement payment and the plan member's cost-share responsibility.

54. To make out-of-network benefits an affordable option for the employers sponsoring them, Cigna's plans contain various financial incentives for members to choose participating providers, by requiring them to share the increased costs associated with obtaining out-of-network services. Most significantly, Cigna's plans require members to pay a higher portion of the cost of out-of-network services through higher cost-share obligations, including deductibles and coinsurance payments. A "deductible" is an amount that must be paid by the member for Covered Expense each calendar year before the plan begins paying its percentage of Covered Expenses. *See* Ex. 1 at 12-22 (examples of deductibles under a representative Cigna plan). "Coinsurance" is a percentage of the allowed amount that the member is required to pay towards the cost of that service. *See id.* at 11. The deductible and co-insurance amounts that members must pay towards out-of-network services are usually much higher than the deductible and co-insurance they must pay (if any) towards in-network services.

55. The deductible and co-insurance requirement underlies the entire concept of out-of-network benefits. It sensitizes members to the true costs of out-of-network services—ensuring that if members receive such a service, they are willing to pay a greater portion of that expense out of their own pockets. If members did not share in these costs, then they would have no financial incentive to moderate their demand for out-of-network services or to consider the higher costs of any particular out-of-network provider, leading to increased costs for the plan.

131107238v1 0974595

56.     Similarly, without deductible and co-insurance requirements, out-of-network providers would lack any incentive to not charge the plan astronomical rates, because the patients who choose to see the providers would not bear any portion of the inflated cost.

57.     Cigna's plans have several mechanisms to ensure that members receiving out-of-network services pay their required deductible and co-insurance and that non-participating providers do not waive it.

58.     For example, Cigna's plans do not automatically cover or reimburse a member for every "charge" the provider submits to Cigna. Rather, for a benefit to be payable, the charge must be a "Covered Expense," which satisfies all terms and condition of the plan, including that the expense is "incurred" by or for a covered person (*i.e.*, a plan member or the member's dependent), that the expense is medically necessary, and that it is included on the list of covered expenses appearing in the summary plan description and is not excluded from coverage. *See, e.g.*, Ex. 1 at 24.  Cigna's obligation to reimburse a plan member is therefore limited to the expenses actually incurred by the member. If the member has no obligation to pay, then Cigna has no obligation to pay.

59.     These Covered Expenses are in turn subject to the applicable cost-share requirements of the plan, including deductible and coinsurance, as described above.  Cigna-administered plans define deductible as "expenses to be paid by you or your Dependent . . . [that] are in addition to any Coinsurance," and define co-insurance as "the percentage of charges for Covered Expenses that an insured person is ***required*** to pay under the plan."  *See* Ex. 1 at 11 (emphasis added).   Thus, Cigna-administered plans expressly require members to satisfy their cost-sharing responsibility (*i.e.*, co-insurance, co-payments, and deductibles) in order for charges

15

131107238v1 0974595

to be covered under the plans.  Indeed, the plan's obligation to reimburse for its share of covered expenses does not even arise until the member has satisfied their full, out-of-network deductible.

60.     Similarly, Cigna-administered plans state that they do not cover "charges which you [the member] are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."  Ex. 1 at 37.  The language is representative of the language found in Cigna-administered plans.  As a recent version of Cigna's plans explains, "[s]ome providers forgive or waive the [patient's] cost share obligation . . . that this plan requires you to pay.  Waiver of your required cost share obligation can jeopardize your coverage under this plan."  Ex. 4 at 13; *see also id.* at 36 (explaining that "charges which you are not obligated to pay" include the "charges of a Non-Participating Provider who has agreed to charge you or charged you at an in-network benefit level or some other benefits level not otherwise applicable to the services received.").

61.     Here, for example, if an ASC submits "charges" of $10,000 to Cigna, but does not bill or require the patient to pay their applicable cost-sharing responsibility, the plan excludes coverage for this phantom charge.

62.     In addition, Cigna-administered plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" for "covered services," which can be no more than the "provider's normal charge for a similar service or supply," and explicitly exclude from coverage providers' charges "to the extent that they are more than Maximum Reimbursable Charges."

63.     Here, the inflated "charges" submitted to Cigna by the ASCs were not their "normal charge" for the services at issue, because these were not the charges that the ASCs actually charged to their patients. Rather, the "charges" submitted to Cigna were "phantom"

131107238v1 0974595

charges, as some courts have referred to the charges submitted by fee-forgiving providers. Cigna was not aware that the ASCs' billed charges were not their "normal charges" until after Cigna conducted its own internal investigation of the ASCs' claims, because the ASCs never disclosed to Cigna that they were engaged in a dual pricing scheme—*i.e.*, charging Cigna and their patients different rates for the same services.  As described below, at the time of service, the ASCs did not quote patients the "charges" submitted to Cigna. Instead, the ASCs based the amounts that they collected as cost-share from their patients on much lower amounts that had no relationship to the amounts that they charged Cigna for the same services.

64.     Moreover, by promising Cigna plan members that in-network benefits would apply and that they would incur no additional out-of-pocket expenses above and beyond the ASCs' artificial cost share liability quoted to Cigna plan members, the ASCs foreclosed themselves from billing and collecting any additional amount of money.

65.     Courts have repeatedly held in the context of "fee forgiving" or "dual pricing schemes" that  healthcare plans do not cover a provider's "charges" when that provider does not collect the patient's applicable cost-sharing responsibilities. *See, e.g.*, *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013).

66.     Any other interpretation would run contrary to the purpose of health insurance, which is to reimburse members for payments they actually make to providers, not to provide windfall payments to providers.

### *SurgCenter and the ASCs' Fraudulent Dual Pricing and Fee Forgiving Schemes*

67.     SurgCenter has developed a business model designed to game the healthcare system by submitting grossly inflated, phantom "charges" to Cigna that do not reflect the actual

131107238v1 0974595

amounts the ASCs bill patients.  SurgCenter implements this fraudulent scheme through each of the ASCs with which it partners.

68.     According to its website, SurgCenter "partners with local surgeons to create physician-owned and operated ambulatory surgical centers (ASC)."

69.     SurgCenter assists surgeons in forming the LLC and in the design and construction of the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

70.     SurgCenter then provides no-fee management and consulting services in managing and running the ambulatory surgical centers, including, upon information and belief, the Defendant ASCs here.

71.     According to its website, SurgCenter becomes "a vested partner that purchases 35% ownership" in each ambulatory surgical center, including, upon information and belief, the Defendant ASCs here.

72.     SurgCenter has an ownership interest in more than 100 ambulatory surgery centers throughout the United States, including the eleven Defendant ASCs.

73.     The Defendant ASCs have not joined Cigna's provider network, and thus are known as "out-of-network" or "non-participating" providers.

74.     The Defendant ASCs all employ "fee forgiving" and "dual pricing" schemes. In other words, they entice members to their out-of-network facilities by billing them small amounts (and sometimes collecting nothing at all from members), but charge the members' plans exorbitant, fraudulent amounts that bear no relation to the amounts the patients are charged.

75.     Each ASC then waives, or forgives, the proportion of the charges that the member owes based on the inflated charge that the ASC submits to the member's plan. None of the ASCs

disclose to Cigna that they charged Cigna and their patients significantly different prices for the same services.

76.     Upon information and belief, all aspects of the fraudulent fee forgiving and dual pricing schemes used by each ASC were designed and implemented at the direction of SurgCenter.

77.     For instance, upon information and belief, SurgCenter provided each of the ASCs with a "Coding, Billing and Collections" manual, which, among other things, sets forth SurgCenter's fee-waiving policy, which was followed by the ASCs:

> Patients accessing out-of-network benefits at your Facility are not charged their out-of-network benefit levels for services performed. Patient liability at your Facility should never exceed the amount they would owe at an in-network facility.  Deductible amounts are waived and in-network co-insurance are charged. (Ex. 5 at 25.)

78.     The following is a summary of the fee forgiving and dual pricing schemes used by SurgCenter and each of the ASCs.

79.     First, each ASC promises patients that they will only be billed rates similar to what they would pay at an in-network facility, even though the ASCs are out-of-network facilities. An example of a notice that one of the ASCs provides to patients is attached hereto as Ex. 6.   The ASC then begins by calculating the rates for the services they will provide the patient at 150% of Medicare.

80.     Second, each ASC calculates the Cigna plan members' cost-sharing responsibility (e.g., co-payments, co-insurance, and deductibles) by applying the Cigna plan members' *in-network* benefits level to those 150% Medicare rates, even though the ASCs are out-of-network providers.   According to SurgCenter's "Coding, Billing and Collections" manual, each ASC waives the deductible, thereby negating any obligation by the plans to reimburse for any portion of covered expenses.

131107238v1 0974595

81.     Upon information and belief, SurgCenter created "Insurance Verification" and "Calculation of Patient Responsibility" templates used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, as well as the claim forms submitted to Cigna by the ASCs. These documents are created by SurgCenter and provided to the ASCs as part of the scheme to defraud insurers such as Cigna. An example of a Calculation of Patient Responsibility form used by a non-party SurgCenter-affiliated facility is attached hereto as Ex. 7. Upon information and belief, all SurgCenter-affiliated facilities (including the Defendant ASCs here) use this or a similar Calculation of Patient Responsibility form.  Here, in the attached example, the SurgCenter-affiliated facility charged the patient only $431.88 (*id.*)—a small fraction of the patient's cost-sharing responsibility under the plan—but submitted a charge of $28,606.88 to Cigna for those same services.

82.     Third, each ASC promises Cigna plan members that they will not have to bear any additional out-of-pocket expenses beyond what the ASCs have calculated as the members' cost share liability based on the members' in-network benefits level using 150% of Medicare rates. As a result, each ASC waives the applicable out-of-network co-insurance, co-payment, and deductible amounts that Cigna plan members must pay out-of-network providers like the ASCs under Cigna-administered health benefit plans.

83.     Fourth, each ASC submits claim forms to Cigna based on a separate fee schedule that is calculated based on 800% of Medicare rates.  These charges are fraudulently inflated by as much as tens of thousands of dollars per claim over the 150% Medicare rates that the ASCs used to determine the amounts they collected from the Cigna plan members. The "charges" submitted to Cigna by the ASCs are phantom charges, as the ASCs do not collect, and never

131107238v1 0974595

intend to collect, the full amounts that they put on the forms.  Instead, they intend to collect much less—if anything at all.

84.    Through the scheme described above, each ASC misrepresented its actual charges for the services rendered to Cigna affirmatively and through omission. As a result, Cigna relied on the amount that the ASCs billed to Cigna in their claim forms when processing and paying the ASCs' claims.

85.    The purpose of this scheme was to entice Cigna plan members to use the ASCs' out-of-network surgical centers so that Cigna would reimburse the ASCs for their grossly inflated rates. Given their exorbitant charges, the ASCs and SurgCenter recognized that Cigna's plan members would not use, and likely could not afford to use, the ASCs' facilities if the ASCs billed and collected the applicable out-of-network cost share responsibility from Cigna plan members, which would have required out-of-pocket payments from Cigna plan members that totaled thousands, if not tens of thousands, of dollars. Therefore, the ASCs waived the required out-of-network co-insurance, co-payment, and deductible amounts members were obligated to pay under their plans.

86.    Further, each ASC knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs even though the ASCs were out-of-network facilities.   If Cigna patients had known that the ASCs and SurgCenter in fact have no authority to waive the out-of-network co-insurance, co-payment, and deductible amounts required by the patients' plans with Cigna, those patients likely would not have used the ASCs' facilities, given the exorbitant rates charged by the ASCs.  Accordingly, each of the ASCs' and SurgCenter's misrepresentations to patients were closely related to and were essential to the accomplishment

131107238v1 0974595

of the Defendants' fraudulent scheme—because without those misrepresentations, fewer Cigna plan members would have been enticed to use the ASCs.

87.     Moreover, the ASCs further harmed Cigna patients by leading the patients to believe that their cost-share payments would accumulate toward their in-network cost-share totals (*e.g.*, deductibles), which they did not, as the ASCs were out of network. Thus, due to the ASCs' fraudulent practices, the Cigna patients would potentially pay more out of pocket than they anticipated for future in-network health care services.

88.     The ASCs also never fully disclosed the true nature, extent and scope of their fee forgiving and dual pricing schemes to Cigna.

89.     On information and belief, for electronic claims, the ASCs routinely did not disclose any aspect of their fee forgiving and dual pricing schemes.  And while the paper claims the ASCs submitted to Cigna noted that "[t]he insured's portion of this bill has been reduced in amount so the patient's responsibility for the deductible and copay amount is billed at in network rates," nothing in those claims forms either revealed or explained how their charges were computed or disclosed that the ASCs in fact had not based the amount that they collected from their patients on the same rates that they submitted to Cigna for reimbursement. More specifically, the ASCs never disclosed to Cigna (either in their claim forms or elsewhere) that they were charging Cigna and their patients completely different prices for the same services, or that, contrary to the representation on their claim forms, they routinely waived *any* deductible due and owing, whether in-network or out-of-network.

90.     To the contrary, by stating on the claim forms that "[t]he insured's portion of ***this bill*** has been reduced," the ASCs and SurgCenter affirmatively sought to mislead Cigna into believing that the ASCs charged the patient and Cigna a single, common price, while the ASCs

22

in fact charged the patient and Cigna completely different prices for the same services.  This act of concealment was also closely related and essential to the accomplishment of the Defendants' scheme.

91.    Only through its own internal investigation did Cigna learn of the existence of the ASCs' dual pricing and fee forgiving schemes.

92.    The following are examples of the fraudulent fee-forgiving and dual pricing schemes employed by the ASCs:

- A patient received services from Carmel Specialty Surgery Center on June 3, 2014. The ASC sent a claim form to Cigna listing $25,578.36 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Carmel Specialty Surgery Center did not charge the patient $25,578.36 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Columbus Specialty Surgery Center on April 30, 2014. The ASC sent a claim form to Cigna listing $18,576.48 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Columbus Specialty Surgery Center did not charge the patient $18,576.48 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Indiana Specialty Surgery Center on April 14, 2014. The ASC sent a claim form to Cigna listing $22,668.80 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Indiana Specialty Surgery Center did not charge the patient $22,668.80 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

131107238v1 0974595

- A patient received services from Metro Specialty Surgery Center on June 3, 2014. The ASC sent a claim form to Cigna listing $3,864.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Metro Specialty Surgery Center did not charge the patient $3,864.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Midwest Specialty Surgery Center on April 1, 2014. The ASC sent a claim form to Cigna listing $107,453.64 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Midwest Specialty Surgery Center did not charge the patient $107,453.64 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Munster Specialty Surgery Center on June 18, 2014. The ASC sent a claim form to Cigna listing $110,171.76 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Munster Specialty Surgery Center did not charge the patient $110,171.76 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Northwest Regional Surgery Center on January 8, 2014. The ASC sent a claim form to Cigna listing $6,103.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Northwest Regional Surgery Center did not charge the patient $6,103.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Riverview Surgery Center on August 21, 2014. The ASC sent a claim form to Cigna listing $84,509.08 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Riverview Surgery Center did not charge the patient $84,509.08 for its

131107238v1 0974595

services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from South Bend Specialty Surgery Center on June 9, 2014. The ASC sent a claim form to Cigna listing $22,868.32 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that South Bend Specialty Surgery Center did not charge the patient $22,868.32 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

- A patient received services from Sycamore Springs Surgery Center on April 8, 2014. The ASC sent a claim form to Cigna listing $2,664.00 as its charges for services rendered to a Cigna member. Through an internal investigation, Cigna discovered that Sycamore Springs Surgery Center did not charge the patient $2,664.00 for its services, but instead calculated the patient's cost-sharing responsibility based on 150% of Medicare rates for the services at issue. The ASC then applied the members' *in-network* co-insurance, co-payment, and deductible levels to this already much-lower amount, resulting in the ASC charging the patient only a small fraction of the patient's cost-sharing responsibility under his or her plan.

93.     Upon information and belief, every claim submitted to Cigna by the Defendant ASCs follows the fee-forgiving and dual pricing pattern described above.

94.     The ASCs never disclosed the above fee-forgiving and dual-billing practices to Cigna. Cigna was only able to confirm the ASCs' fraudulent billing practices through a special investigation of the ASCs, after which Cigna began denying or reducing payment to 150% of Medicare for claims submitted by the ASCs.

95.      Before Cigna investigated and confirmed the ASCs' fraudulent practices, however, the ASCs and SurgCenter induced Cigna into paying them millions of dollars as a result of their fraudulent billing schemes.

131107238v1 0974595

## CAUSES OF ACTION

### Counts I.A-I.K -- RICO § 1962(c)
### (Against All Defendants)

96.     The preceding paragraphs are incorporated by reference as if set forth fully

herein.

97.     <u>The Enterprises.</u> The following allegations are made upon information and belief.

SurgCenter entered into eleven separate two-party association-in-fact enterprises with each of the

eleven ASCs. SurgCenter came to agreements with each of the ASCs to create the enterprises,

the purpose of which is to operate for-profit medical centers and thereby enrich the enterprises'

members by luring Cigna plan members to use these out-of-network centers through

misrepresentations about the centers' costs to plan members, Cigna, and their plans.

SurgCenter's role in each of the eleven enterprises was to invest in the ASC and provide

operational support to the ASC. Among other things, SurgCenter developed the dual pricing

scheme described above (*see* ¶¶ 67–95), and directed the ASCs to follow the dual pricing

scheme, which each of the Defendant ASCs agreed to do. SurgCenter also provided each ASC

with the sample language to include on claim forms submitted to managed care companies like

Cigna. Each of the ASCs' roles in the eleven enterprises was to, among other things: 1) lure

patients to their facilities by misleading the patients into believing that they would be responsible

for only their "in-network" cost-share for services received at the ASC, 2) treat patients at the

facilities and charge the patients little or nothing for the ASCs' services, and 3) submit

exorbitant, fraudulent charges to managed care companies like Cigna in order to induce Cigna

and other managed care companies into paying the ASCs based on these fraudulent charges.

SurgCenter's and the ASCs' misrepresentations to patients regarding their responsibility for only

their "in-network" cost-share were essential to the accomplishment of the Defendants' fraudulent

131107238v1 0974595

scheme, because, but for those misrepresentations, fewer (if any) Cigna plan members would have used the ASCs.  At the direction of, and in coordination with, SurgCenter, each of the eleven Defendant ASCs followed the practices outlined in Paragraphs 67 through 95 above.

98.     The RICO Schemes. The following allegations are made upon information and belief. SurgCenter and each individual ASC each developed separate fraudulent dual pricing and fee forgiving schemes (the "RICO Schemes") as described above.  (*See* ¶¶ 67–95, 97.)

99.     The Pattern of Racketeering Activity. The following allegations are made upon information and belief. Each of the ASCs and SurgCenter actively participate and participated in the conduct and operation of the respective two-party enterprises by participating in each stage of the RICO Schemes, as described above.  (*See* ¶¶ 67–95, 97.)

100.     SurgCenter partnered with each of the ASCs to develop ambulatory surgical centers, and then provided no-fee management and consulting services in managing and running each of the ASCs, and took a 35% ownership share in each of the ASCs. As described above, as part of this scheme, each of the ASCs, with the assistance and guidance of SurgCenter, submits fraudulent claim forms to insurers like Cigna in order to induce the insurers to make payments to the ASCs.

101.     As part of these schemes, each of the ASCs then funnels a portion of the fraudulently-obtained money paid by insurers like Cigna back to SurgCenter.

102.     Upon information and belief, in furtherance of the RICO Schemes, each ASC has submitted and continues to submit false claims to other insurers as well as Cigna, including those claims described above.

131107238v1 0974595

103.    SurgCenter and each ASC knew that Cigna would reasonably rely on the falsely-stated charges in these forms when Cigna processed benefit payments for the services listed on the forms and therefore pay the ASC its inflated, out-of-network rates.

104.    Each ASC took further steps to conceal the true nature of its fraudulently inflated charges to Cigna by, for instance, misrepresenting to patients that they would be responsible for only their "in-network" benefits at the respective ASC, and by refusing Cigna's requests to provide information regarding the ASCs' billing practices. Only through its extensive investigations did Cigna discover the RICO Schemes. Moreover, as alleged above, these misrepresentations to patients regarding their cost-sharing responsibility were an essential part of the ASCs' and SurgCenter's scheme, because those misrepresentations enticed more patients to use the ASCs, which allowed the ASCs to submit additional fraudulently-inflated charges to Cigna for those services.

105.    Each of the Defendant ASCs has submitted many fraudulent claim forms to Cigna, with some of the Defendant ASCs having submitted hundreds of fraudulent claim forms to Cigna.

106.    Each time the ASC submitted such a form to Cigna by mail, it committed a separate act of mail fraud in violation of 18 U.S.C. § 1341.

107.    Each time each ASC submitted such a form to Cigna using the interstate wires, it committed a separate act of wire fraud in violation of 18 U.S.C. § 1343.

108.    Each ASC committed these acts of mail and wire fraud at the direction of and in coordination with SurgCenter.

109.    By submitting hundreds of these forms over the past several years, SurgCenter and each ASC engaged in a pattern of racketeering activity, and one that continues now.  The

28

direct and intended victims of this pattern of racketeering activity are Cigna and entities that sponsor Cigna's ASO plans.

110.    As a direct result of the ASCs' fraudulent claim submissions, Cigna paid the ASCs millions of dollars from its own funds and the funds of the plans it administers.

111.    Thus, a result of the conduct by SurgCenter and the ASCs, Cigna and its ASO plan sponsors have been injured in an amount to be determined at trial.

112.    Pursuant to 18 U.S.C. § 1964(c), Cigna and its ASO plan sponsors are entitled to recover threefold their damages, costs, and attorneys' fees. In addition, they are entitled to injunctive relief to enjoin SurgCenter and each of the ASCs' ongoing racketeering activity.

### Count I.A. -- RICO § 1962(c)
### (Against SurgCenter and Advanced Regional Surgery Center)

113.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

114.    No later than 2013, SurgCenter and Advanced Regional Surgery Center entered into a two-party enterprise (the "SurgCenter-Advanced Regional Enterprise") to engage in the actions described in Paragraphs 67 through 95.  As part of the RICO Scheme, Advanced Regional Surgery Center, acting on behalf of the SurgCenter-Advanced Regional Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3A.

115.    Upon information and belief, in each instance the SurgCenter-Advanced Regional Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Advanced Regional Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of

131107238v1 0974595

the SurgCenter-Advanced Regional Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

116.    Moreover, each member of the SurgCenter-Advanced Regional Enterprise knowingly misrepresented to SurgCenter-Advanced Regional Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Advanced Regional Surgery Center's services, even though SurgCenter-Advanced Regional Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Advanced Regional Surgery Center's services.

117.    Pursuant to the RICO Scheme described above, the SurgCenter-Advanced Regional Enterprise fraudulently induced Cigna into making over $168,000 in payments to Advanced Regional Surgery Center.

### Count I.B. -- RICO § 1962(c)
### (Against SurgCenter and Carmel Specialty Surgery Center)

118.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

119.    No later than 2012, SurgCenter and Carmel Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Carmel Specialty Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Carmel Specialty Surgery Center, acting on behalf of the SurgCenter-Carmel Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3B.

120.    Upon information and belief, in each instance the SurgCenter-Carmel Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to

131107238v1 0974595

Cigna were not the actual amounts that Carmel Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Carmel Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

121.    Moreover, each member of the SurgCenter-Carmel Specialty Enterprise knowingly misrepresented to SurgCenter-Carmel Specialty Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Carmel Specialty Surgery Center's services, even though SurgCenter-Carmel Specialty Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Carmel Specialty Surgery Center's services.

122.    Pursuant to the RICO Scheme described above, the SurgCenter-Carmel Specialty Enterprise fraudulently induced Cigna into making over $724,000 in payments to Carmel Specialty Surgery Center.

### Count I.C. -- RICO § 1962(c)
### (Against SurgCenter and Columbus Specialty Surgery Center)

123.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

124.    No later than 2012, SurgCenter and Columbus Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Columbus Specialty Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Columbus Specialty Surgery Center, acting on behalf of the SurgCenter-Columbus Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343

including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3C.

125.    Upon information and belief, in each instance the SurgCenter-Columbus Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Columbus Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Columbus Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

126.    Moreover, each member of the SurgCenter-Columbus Specialty Enterprise knowingly misrepresented to SurgCenter-Columbus Specialty Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Columbus Specialty Surgery Center's services, even though SurgCenter-Columbus Specialty Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Columbus Specialty Surgery Center's services.

127.    Pursuant to the RICO Scheme described above, the SurgCenter-Columbus Specialty Enterprise fraudulently induced Cigna into making over $500,000 in payments to Columbus Specialty Surgery Center.

### Count I.D. -- RICO § 1962(c)
### (Against SurgCenter and Indiana Specialty Surgery Center)

128.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

129.    No later than 2011, SurgCenter and Indiana Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Specialty Surgery Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Indiana Specialty Surgery

131107238v1 0974595

Center, acting on behalf of the SurgCenter-Indiana Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3D.

130.    Upon information and belief, in each instance the SurgCenter-Specialty Surgery Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Indiana Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Specialty Surgery Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

131.    Moreover, each member of the SurgCenter-Specialty Surgery Enterprise knowingly misrepresented to SurgCenter-Indiana Specialty Surgery's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Indiana Specialty Surgery's services, even though SurgCenter-Indiana Specialty Surgery is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Indiana Specialty Surgery's services.

132.    Pursuant to the RICO Scheme described above, the SurgCenter-Specialty Surgery Enterprise fraudulently induced Cigna into making over $590,000 in payments to Indiana Specialty Surgery Center.

### Count I.E. -- RICO § 1962(c)
### (Against SurgCenter and Metro Specialty Surgery Center)

133.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

134.    No later than 2011, SurgCenter and Metro Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Metro Specialty Enterprise") to engage in the actions

131107238v1 0974595

described in Paragraphs 67 through 95. As part of the RICO Scheme, Metro Specialty Surgery Center, acting on behalf of the SurgCenter-Metro Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3E.

135.   Upon information and belief, in each instance the SurgCenter-Metro Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Metro Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Metro Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

136.   Moreover, each member of the SurgCenter-Metro Specialty Enterprise knowingly misrepresented to SurgCenter-Metro Specialty's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Metro Specialty's services, even though SurgCenter-Metro Specialty is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Metro Specialty's services.

137.   Pursuant to the RICO Scheme described above, the SurgCenter-Metro Specialty Enterprise fraudulently induced Cigna into making over $1.34 million in payments to Metro Specialty Surgery Center.

**Count I.F. -- RICO § 1962(c)**
**(Against SurgCenter and Midwest Specialty Surgery Center)**

138.   Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

131107238v1 0974595

139.    No later than 2013, SurgCenter and Midwest Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Midwest Specialty Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Midwest Specialty Surgery Center, acting on behalf of the SurgCenter-Midwest Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3F.

140.    Upon information and belief, in each instance the SurgCenter-Midwest Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Midwest Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Midwest Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

141.    Moreover, each member of the SurgCenter-Midwest Specialty Enterprise knowingly misrepresented to SurgCenter-Midwest Specialty Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Midwest Specialty Surgery Center's services, even though SurgCenter-Midwest Specialty Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Midwest Specialty Surgery Center's services.

142.    Pursuant to the RICO Scheme described above, the SurgCenter-Midwest Specialty Enterprise fraudulently induced Cigna into making over $554,000 in payments to Midwest Specialty Surgery Center.

131107238v1 0974595

## Count I.G. -- RICO § 1962(c)
### (Against SurgCenter and Munster Specialty Surgery Center)

143.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

144.    No later than 2013, SurgCenter and Munster Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-Munster Specialty Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Munster Specialty Surgery Center, acting on behalf of the SurgCenter-Munster Specialty Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3G.

145.    Upon information and belief, in each instance the SurgCenter-Munster Specialty Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Munster Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Munster Specialty Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

146.    Moreover, each member of the SurgCenter-Munster Enterprise knowingly misrepresented to SurgCenter-Munster Specialty Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Munster Specialty Surgery Center's services, even though SurgCenter-Munster Specialty Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Munster Specialty Surgery Center's services.

131107238v1 0974595

147.    Pursuant to the RICO Scheme described above, the SurgCenter-Munster Specialty Enterprise fraudulently induced Cigna into making over $773,000 in payments to Munster Specialty Surgery Center.

**Count I.H. -- RICO § 1962(c)**
**(Against SurgCenter and Northwest Regional Surgery Center)**

148.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

149.    No later than 2013, SurgCenter and Northwest Regional Surgery Center entered into a two-party enterprise (the "SurgCenter-Northwest Regional Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Northwest Regional Surgery Center, acting on behalf of the SurgCenter-Northwest Regional Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3H.

150.    Upon information and belief, in each instance the SurgCenter-Northwest Regional Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Northwest Regional Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Northwest Regional Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

151.    Moreover, each member of the SurgCenter-Northwest Regional Enterprise knowingly misrepresented to SurgCenter-Northwest Regional Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Northwest Regional Surgery Center's services, even though SurgCenter-Northwest Regional

131107238v1 0974595

Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Northwest Regional Surgery Center's services.

152.    Pursuant to the RICO Scheme described above, the SurgCenter-Northwest Regional Enterprise fraudulently induced Cigna into making over $598,000 in payments to Northwest Regional Surgery Center.

### Count I.I. -- RICO § 1962(c)
### (Against SurgCenter and Riverview Surgery Center)

153.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

154.    No later than 2012, SurgCenter and Riverview Surgery Center entered into a two-party enterprise (the "SurgCenter-Riverview Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Riverview Surgery Center, acting on behalf of the SurgCenter- Riverview Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3I.

155.    Upon information and belief, in each instance the SurgCenter-Riverview Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Riverview Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-Riverview Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

156.    Moreover, each member of the SurgCenter-Riverview Enterprise knowingly misrepresented to SurgCenter-Riverview Surgery Center's patients that they would be

131107238v1 0974595

responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Riverview Surgery Center's services, even though SurgCenter-Riverview Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Riverview Surgery Center's services.

157.    Pursuant to the RICO Scheme described above, the SurgCenter-Riverview Enterprise fraudulently induced Cigna into making over $479,000 in payments to Riverview Surgery Center.

**Count I.J. -- RICO § 1962(c)**
**(Against SurgCenter and South Bend Specialty Surgery Center)**

158.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

159.    No later than 2013, SurgCenter and South Bend Specialty Surgery Center entered into a two-party enterprise (the "SurgCenter-South Bend Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, South Bend Specialty Surgery Center, acting on behalf of the SurgCenter-South Bend Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3J.

160.    Upon information and belief, in each instance the SurgCenter-South Bend Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that South Bend Specialty Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of the SurgCenter-South Bend Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

131107238v1 0974595

161.    Moreover, each member of the SurgCenter-South Bend Enterprise knowingly misrepresented to SurgCenter-South Bend Specialty Surgery Center's patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-South Bend Specialty Surgery Center's services, even though SurgCenter-South Bend Specialty Surgery Center is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-South Bend Specialty Surgery Center's services.

162.    Pursuant to the RICO Scheme described above, the SurgCenter-South Bend Enterprise fraudulently induced Cigna into making over $68,000 in payments to South Bend Specialty Surgery Center.

### Count I.K. -- RICO § 1962(c)
### (Against SurgCenter and Sycamore Springs Surgery Center)

163.    Paragraphs 1 through 112 are incorporated by reference as if set forth fully herein.

164.    No later than 2011, SurgCenter and Sycamore Springs Surgery Center entered into a two-party enterprise (the "SurgCenter-Sycamore Springs Enterprise") to engage in the actions described in Paragraphs 67 through 95. As part of the RICO Scheme, Sycamore Springs Surgery Center, acting on behalf of the SurgCenter-Sycamore Springs Enterprise, submitted false claims forms to Cigna by mail in violation of 18 U.S.C. § 1341 and also submitted false claim forms to Cigna using the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to, claims submitted on or about the dates and in the amounts set forth in Ex. 3K.

165.    Upon information and belief, in each instance the SurgCenter-Sycamore Springs Enterprise, and each of its members, knew that the amounts on the claim forms submitted to Cigna were not the actual amounts that Sycamore Springs Surgery Center charged to patients, but instead the amounts on the claim forms were much higher, inflated amounts. The members of

40

the SurgCenter-Sycamore Springs Enterprise submitted these claims to Cigna intending for Cigna to reimburse the surgery center based on the higher, inflated amounts.

166.    Moreover, each member of the SurgCenter-Sycamore Springs Enterprise knowingly misrepresented to SurgCenter-Sycamore Springs' patients that they would be responsible for only their "in-network" cost-sharing responsibility for SurgCenter-Sycamore Springs' services, even though SurgCenter-Sycamore Springs is an out-of-network provider with Cigna, and these patients' plans require that they pay their out-of-network cost-sharing responsibility for SurgCenter-Sycamore Springs' services.

167.    Pursuant to the RICO Scheme described above, the SurgCenter-Sycamore Springs Enterprise fraudulently induced Cigna into making over $666,000 in payments to Sycamore Springs Surgery Center.

## Count II – Fraud
### (Against All ASCs)

168.    Paragraphs 1 through 95 are incorporated by reference as if set forth fully herein.

169.    Under Indiana law, each of the ASCs' conduct constitutes fraud.

170.    Each of the ASCs have submitted and continue to submit fraudulent claim forms to Cigna, which list "charges" that are not the actual charges that the ASCs bill to their patients, pursuant to the dual pricing and fee-forgiving schemes described above. Specifically, each of the eleven Defendant ASCs followed the practices outlined in paragraphs 67 through 95.

171.    At the time that the ASCs submitted claims to Cigna for reimbursement, each ASC knew that the material statements and representations about its charges for services were false.

172.    Each ASC knew and intentionally failed to disclose material information regarding the manner, extent, and nature by which the ASC waived Cigna members' required

131107238v1 0974595

out-of-network co-payments, deductibles, co-insurance, and other patient cost-sharing responsibility for the services provided to plan members, including that each ASC billed Cigna at a much higher rate than it used to calculate the amount it collected from each Cigna member.

173.    Each ASC also knew that the claims submitted to Cigna reflected false and inflated charges that the ASC did not charge their patients.

174.    Each ASC submitted the claims to Cigna with the intent to defraud Cigna by inducing Cigna to rely on their false representations and omissions alleged herein to pay these fraudulent charges. The misrepresentations were material.

175.    Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASC, resulting in compensable injury to Cigna. Specifically, as result of this conduct, the ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

**Count III – Aiding and Abetting Fraud**
**(Against SurgCenter)**

176.    Paragraphs 1 through 112 and 168 through 175 are incorporated by reference as if set forth fully herein.

177.    Under Indiana law, SurgCenter's conduct constitutes aiding and abetting fraud.

178.    Each of the ASCs committed fraud against Cigna by knowingly submitting fraudulent claim forms to Cigna in order to receive excessive, unjustified payments from Cigna as part of the fraudulent dual pricing and fee forgiving schemes described above. Specifically, each of the eleven Defendant ASCs followed the practices outlined in paragraphs 67 through 95.

179.    As described above, all aspects of the fraudulent dual pricing and fee forgiving schemes were designed and implemented at the direction of SurgCenter. The purpose of these

131107238v1 0974595

dual pricing schemes was to fraudulently induce insurers like Cigna to make unwarranted payments to the ASCs.

180.    SurgCenter was at all times aware of its role in the illegal and fraudulent schemes, and SurgCenter knowingly and substantially assisted, encouraged, incited, aided, and abetted the fraudulent conduct by each of the ASCs. Indeed, SurgCenter developed, implemented, and participated in each of the fraudulent schemes, and it retains a 35% interest in each ASC.

181.    SurgCenter knowingly and substantially assisted in the fraudulent conduct in many ways. For example, upon information and belief, SurgCenter provides each ASC with the "Insurance Verification" and "Calculation of Patient Responsibility" sheets used by the ASCs to calculate the patient's responsibility under the dual pricing scheme, and SurgCenter provides each ASC with the language used on claim forms submitted to Cigna by the ASCs. These documents are provided to the ASCs by SurgCenter for the purpose of defrauding insurers such as Cigna.

182.    In addition, each of the ASCs, at the direction of and in coordination with SurgCenter, refuses to provide insurers like Cigna with information regarding the ASCs' billing practices in order to conceal those fraudulent billing practices.

183.    As a direct and proximate result of SurgCenter aiding and abetting the each of the ASCs' fraud, Cigna has suffered injury. Specifically, as result of this the ASCs' conduct, aided and abetted by SurgCenter, the ASCs received unwarranted payments of millions of dollars from Cigna.

### Count IV – Claim for Negligent Misrepresentation
### (Against all ASCs)

184.    Paragraphs 1 through 95 and 168-183 are incorporated by reference as if set forth fully herein.

43

185.     Under Indiana law, the ASCs' conduct constitutes negligent misrepresentation.

186.     Each of the eleven Defendant ASCs followed the practices outlined in paragraphs 67 through 95.

187.     Each ASC submitted benefit claim forms to Cigna for services that they provided to Cigna plan members; each ASC did so in the course of its business and had a pecuniary interest in the outcome of how Cigna processed benefits for those services, as any benefits for those services were paid directly to each ASC.

188.     In submitting benefit claim forms to Cigna, each ASC falsely stated "charges" for their services that were higher than the actual rates that the ASCs used to calculate amounts that they required Cigna's plan members to pay for those services; each ASC supplied this false information to guide Cigna in processing benefits for those services.

189.     In submitting benefit claim forms to Cigna, the ASCs did not identify the actual amounts that the ASCs required Cigna's plan members to pay for those services or the methodology that the ASCs used to calculate these amounts, and instead identified only falsely-stated "charges" that were higher than these amounts. In so doing, each ASC failed to exercise reasonable care or competence in communicating information regarding its charges to Cigna.

190.     Based upon the forms submitted by each ASC, Cigna processed benefits for services provided by the ASCs to its members based upon the falsely-stated "charges" in the forms submitted by the ASCs; thus, each time Cigna processed a claim based upon a falsely-stated charge, it suffered a pecuniary loss because it justifiably relied on the ASCs' communications.

191.     Cigna reasonably relied on such material false statements and omissions and paid the false and misleading claims submitted by each ASCs, resulting in compensable injury to

44

Cigna. Specifically, the ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

## Count V – Claim for Unjust Enrichment
### (Against all ASCs)

192.    Paragraphs 1 through 95 and 168-191 are incorporated by reference as if set forth fully herein.

193.    Under Indiana law, each of the ASCs' conduct give rise to a claim for unjust enrichment.

194.    Cigna's plans are required to cover some portion of the actual charges for services that plan members receive from out-of-network providers like the ASCs. Cigna's plans are not required to cover amounts that members are not billed, are not obligated to pay, or for which they would not have been billed if they did not have insurance.  Cigna's plans are also not required to cover amounts that exceed the Maximum Reimbursable Charge, as that term is defined in the plans.

195.    Each of the eleven Defendant ASCs followed the practices outlined in Paragraphs 67 through 95.

196.    The ASCs submitted benefit claim forms to Cigna falsely stating "charges" for services that were higher than the actual amounts that the ASCs required Cigna's plan members to pay for those services. Based on these forms, Cigna processed benefits for services provided by the ASCs to Cigna plan members based upon these falsely-stated "charges." Cigna paid these benefits directly to the ASCs.

197.    When Cigna paid benefits to the ASCs that Cigna's plans were not obligated to cover, the ASCs obtained a benefit from Cigna by the ASCs' fraud in falsely stating "charges" for their services that were higher than the actual amounts that the ASCs required Cigna's plan

131107238v1 0974595

members to pay for those services. Therefore, it would be inequitable for the ASCs to retain these benefits.

198.    The ASCs received payments of millions of dollars from Cigna as a result of the ASCs' fraudulent conduct.

## Count VI – Claim for Tortious Interference with Contract
### (Against all Defendants)

199.    Paragraphs 1 through 95 and 168-198 are incorporated by reference as if set forth fully herein.

200.    Under Indiana law, SurgCenter's and each of the ASCs' conduct give rise to a claim for tortious interference with contract.

201.    Each of the eleven Defendant ASCs followed the practices outlined in Paragraphs 67 through 95.

202.    Each of the members for whom the ASCs submitted benefits claims and received payment from Cigna received health care benefits pursuant to a benefit plan insured or administered by Cigna.

203.    Each of the plans pursuant to which the ASCs submitted claims and received payment contained, among other things, provisions that required the member to pay their cost-sharing responsibility (*e.g.*, co-payments, co-insurance, and deductibles) in order for the plan to cover a portion of the submitted charges for services. SurgCenter and the ASCs knew that the ASCs patients' plans made the patients responsible for payment of the patients' cost-sharing responsibility.

204.    Despite this knowledge, the ASCs, at the direction of and in coordination with SurgCenter, engaged in a fraudulent dual pricing scheme in order to bill Cigna and its ASO clients inflated charges in excess of those actually charged to the patients, to induce the patients

46

to use the ASCs' out-of-network services, and to undermine and circumvent Cigna's provider network system.

205.    Further, the ASCs, at the direction of and in coordination with SurgCenter, knowingly misrepresented to patients that the patients could use their "in-network" benefits at the ASCs.

206.    By these actions, the ASCs, at the direction of and in coordination with SurgCenter, induced the members to breach the terms of their plans.

207.    SurgCenter and the ASCs have also tortiously interfered with Cigna's contracts with Cigna's in-network providers.

208.    Cigna's contracts with its in-network providers require those providers to refer patients to other in-network providers, except in very limited circumstances.  Upon information and belief, SurgCenter and the ASCs were aware of these contractual referral requirements, because Cigna had sent letters to certain of its in-network providers who were referring patients to out-of-network facilities and who had ownership interests in certain of the out-of-network ASCs, and reminded those providers of their contractual obligation to refer patients to in-network providers.

209.    Upon information and belief, SurgCenter and the ASCs encouraged Cigna's in-network providers to refer patients to the ASCs, all of whom are out-of-network facilities, in violation of the in-network providers' contracts with Cigna.  SurgCenter and the ASCs thus induced Cigna's in-network providers to breach the terms of the contracts with Cigna by referring patients to the out-of-network ASCs.

210.    Upon information and belief, after Cigna discovered the fraudulent scheme and began disputing the ASCs' bills, several of the ASCs have made false and malicious statements

47

to Cigna members in an effort to harm Cigna's relationship with its members, mislead Cigna members about the terms of their healthcare plans, and conceal the nature of the ASCs' fraudulent billing schemes.

211.    Thus, the ASCs, at the direction of and in coordination with SurgCenter, maliciously and wrongfully interfered with the economic relationships between Cigna and its members as well as Cigna and its in-network providers, and harmed the relationships between Cigna and its members as well as Cigna and its in-network providers.

212.    SurgCenter and the ASCs' tortious interference has caused damages to Cigna by causing it to make overpayments to the ASCs and has caused harm to the relationship between Cigna and its members, Cigna and its plan sponsor customers, and Cigna and its in-network providers.

### Count VII – Claim for Overpayments Under ERISA § 502(a)(3)
### (Against All ASCs)

213.    Paragraphs 1 through 95 are incorporated by reference as if set forth fully herein.

214.    Cigna is a fiduciary as claims administrator of the ASO and fully-insured plans that it administers and seeks to recover overpayments made by those plans to the ASCs.

215.    The charges that the ASCs listed in claims forms submitted to Cigna for reimbursement on behalf of the members' plans did not represent the amount that the ASCs actually intended to require or accept as payment in full for its services.

216.    Specifically, the ASCs did not require plan members to pay their out-of-network cost sharing responsibility, which is required under the terms of the members' plans.

217.    Moreover, the ASCs' patients' plans expressly do not cover any portion of the charges that providers like the ASCs do not require plan members to pay, nor do these plans require the plan to cover anything in excess of the ASCs' normal charges to their patients.

131107238v1 0974595

218.    The ASCs deceived Cigna into paying (on behalf of the plans) what Cigna believed to be the covered portions of the charges submitted by the ASCs to Cigna.  Unknown to Cigna, however, the ASCs did not bill or collect from patients their full out-of-network cost-sharing responsibility based on these same charges.  As a result of the ASCs' deceptive conduct, the plans overpaid the ASCs.

219.    These overpayments were made directly by Cigna, on behalf of the plans, to the ASCs.  Accordingly, these overpayments represent money that belongs in good conscience to the plans.

220.     The plan documents authorize Cigna to recover any overpayments made by the plans on the plans' behalves.  The overpayment recovery provisions in these plans specifically identify a particular fund, distinct from the recipient's general assets—*i.e.*, payments made by Cigna or the plans to the recipient. These provisions also specifically identify a particular share of that particular fund to which Cigna is entitled—*i.e.*, the amount of the overpayment. Accordingly, these recovery provisions create an equitable lien by agreement over any overpayments made to the ASCs. These provisions put plan members—and the ASCs, as the authorized recipient of these funds and/or their assignee—on notice that any overpayment made by Cigna will be recoverable (*i.e.*, subject to a lien) as soon as the overpayment is made.

221.    These overpayments are within the possession and control of the ASCs and are specifically identifiable.

222.    These overpayments were made in contravention of plan terms.

223.    Cigna seeks recovery of these overpayments on behalf of the plans.

224.    Additionally, Cigna seeks a permanent injunction directing the ASCs to submit to Cigna only charges that the ASCs actually charge the plan member as payment in full for the

131107238v1 0974595

ASCs' services and not to submit charges which include amounts that the ASCs do not actually require the member to pay (including, without limitation, the waiver of any portion of the members' required out-of-network co-insurance, co-payment, and deductible amounts).

### Count VIII – Declaratory Relief
### (Against all ASCs)

225.    Paragraphs 1 through 95 are incorporated by reference as if set forth fully herein.

226.    Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

227.    The ASCs provide facilities and related medical services, including equipment and supplies, to patients receiving medical care who are covered under employee health and welfare benefit plans that are insured or administered by Cigna.

228.    The claims the ASCs submitted, and continue to submit, are claims for reimbursement for services provided to patients who are purportedly covered under employee health and welfare benefit plans that are insured or administered by Cigna.

229.    As described in the preceding paragraphs, the claims the ASCs submitted are for charges that are not covered under the relevant plans because the claims are based on false charges submitted to Cigna, the ASCs failed to bill and collect the true out-of-network cost share responsibility from the Cigna plan members, and the ASCs did not hold the plan members responsible for the amounts charged to Cigna.

230.    As a result, any claims submitted by the ASCs are not reimbursable, and any payments the ASCs received under such claims should be returned to Cigna.

131107238v1 0974595

231.   An actual controversy exists between the ASCs and Cigna regarding whether claims for reimbursement are covered and payable under employee health and welfare benefit plans that are insured or administered by Cigna.

232.   Cigna seeks a declaration that the claims for reimbursement submitted by the ASCs are not for covered services and are not payable under employee health and welfare benefit plans that are insured or administered by Cigna.  Cigna also seeks a declaration that the ASCs must return all sums received from Cigna.

233.   Cigna also seeks recovery of its reasonable and necessary attorneys' fees and costs.

### JURY DEMAND
### (As to Non-ERISA Claims Only)

234.   Paragraph 1 through 212 and 225 through 233 are incorporated by reference as if set forth fully herein.

235.   With respect to Cigna's non-ERISA claims, Cigna hereby demands a trial by jury.

### PRAYER FOR RELIEF

Based on the foregoing, Cigna prays that the Court enter a judgment awarding the following:

a.   a declaration that the products and services provided by the ASCs do not constitute covered services under the employee health and welfare benefit plans administered or insured by Cigna and that the ASCs are not entitled to receive any payments on the claims for reimbursement that they have submitted or may submit in the future;

b.   return of any and all monies paid to the ASCs on claims for reimbursement submitted by the ASCs;

51

c.      monetary damages for all harm suffered as a result of the ASCs' conduct;

d.      exemplary and punitive damages;

e.      pre-judgment and post-judgment interest;

f.      the reasonable and necessary attorneys' fees incurred;

g.      costs of court; and

h.      such other and further relief to which they may show themselves entitled in law or equity.

DATED this 6th day of July, 2015        Respectfully submitted,

HINSHAW & CULBERTSON LLP

/s/ Daniel K. Ryan
Daniel K. Ryan

Daniel K. Ryan
Hinshaw & Culbertson LLP
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081
Telephone: 312-704-3000
Facsimile: 312-704-3001
dryan@hinshawlaw.com

*MOTIONS FOR PRO HAC VICE ADMISSIONS TO BE FILED*
Joshua B. Simon
Warren Haskel
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
jsimon@kirkland.com
whaskel@kirkland.com
Tel:  212-446-4800
Fax  212-446-4900

131107238v1 0974595