Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

_____

Civil Action No. 13-cv-03422
_____

ARAPAHOE SURGERY CENTER, LLC, CHERRY CREEK SURGERY CENTER, LLC, HAMPDEN SURGERY CENTER, LLC, KISSING CAMELS SURGERY CENTER, LLC, SURGCENTER OF BEL AIR, LLC, and WESTMINSTER SURGERY CENTER, LLC,

    Plaintiffs,

v.

CIGNA HEALTHCARE, INC., CONN. GENERAL LIFE INSURANCE CO., CIGNA HEALTHCARE - MID-ATLANTIC, INC., and CIGNA HEALTHCARE OF COLO., INC.,

    Defendants.
_____

**CIGNA'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
_____

**PRELIMINARY STATEMENT**

This case involves fraudulent practices by Counterclaim Defendants designed to bill enormous and unjustified costs to health plans while at the same time virtually eliminating patients' responsibility to pay for their medical care. Specifically, the ASCs sent claim forms to Cigna listing exorbitant "charges" for their services. But unknown to Cigna, the charges on the ASCs' claim forms were not what the ASCs actually billed to patients. Instead, the ASCs quoted the patient a charge based on Medicare rates, which are significantly lower than the rack rates the ASCs submitted to Cigna. (Countercl. ("CC") ¶ 62.) The ASCs then applied the members' lower *in-network* coinsurance, copayment, and deductible rates to this already much lower Medicare rate, ignoring the patients' required *out-of-network* cost-sharing responsibilities. And to be clear,

because the ASCs repeatedly gloss over this point: **the ASCs never disclosed these Medicare-based rates to Cigna**. (*Id.* ¶¶ 66, 77.)

For example, as described in the Counterclaims, an ASC submitted a $90,008 charge to Cigna while only billing the patient based on its Medicare-based rate of $5,100. (CC ¶ 93-96.) Crucially, the only charge Cigna saw was the $90,008 rack rate that the ASC represents is its "total charge" to the patient, even though it was nearly **18 times** higher.[1] (*Id.*; *see also id.* ¶ 4, 78.) Cigna learned about the existence of the ASCs' secret Medicare-based fee schedule only by its own investigation. (*Id.* ¶¶ 66, 77-79.)

After determining that the charges the ASCs submitted to Cigna were fraudulent, Cigna began denying the ASCs' claims. But prior to that, Counterclaim Defendants fraudulently induced Cigna into making approximately $14.8 million in payments to the ASCs. Cigna brings Counterclaims to recover these overpayments. For its fully-insured plans, Cigna brings these claims on its own behalf. For its self-funded plans, Cigna brings its claims as a fiduciary on behalf of the plans, which explicitly authorize Cigna to recover overpayments made by the plan. (*See* CC ¶¶ 30, 198 & Ex. A at 41.)

The central premise of Counterclaim Defendants' motion to dismiss—that they fully disclosed to Cigna the fraud that they were committing—is false. (Mot. at 4-7.) The ASCs attempt to muddle Cigna's clear allegations by pointing out that their claim forms state that "[t]he insured's portion of *this bill* has been reduced in amount so the patient's responsibility for the **deductible and copay amount is billed at in network**

---

[1] Moreover, although the patient's plan required the patient to pay coinsurance of 30 percent for out-of-network services, the ASC based the patient's coinsurance on the patient's in-network rate of 10 percent. (*Id.* ¶¶ 93-100.)

2

***rates***" (*id.* ¶ 78 (emphasis added)), which they claim fully disclosed their fee-forgiving scheme to Cigna. (Mot. at 4-7.) This is false and directly contrary to the allegations in the Counterclaims, which the Court must accept as true at this stage. Using the example above, at most the quoted claim form language falsely suggests that the ASC applied the patient's in-network coinsurance, copay, and deductible rates to the ***$90,008*** charge submitted to Cigna. But when it paid the ASC's claims, Cigna had no way of knowing that the ASC not only used the patient's lower in-network cost-sharing rates, but applied these rates to a much lower Medicare-based charge of ***$5,100***.

Further, by stating that "the insured's portion of ***this bill*** has been reduced," the ASCs "affirmatively sought to mislead Cigna into believing that it charged the patient and Cigna and its client a single, common price." (CC ¶ 79.) Indeed, the entire concept of health insurance requires that there be a single, fixed charge amount billed to the patient and plan in order to determine both the portion that the plan pays and the portion that the patient is required to pay. As other courts have put it, the charges a fee-forgiving provider submits to insurers like Cigna are a "***phantom number***." *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir. 1991) (emphasis added).

Faced with these allegations that they concealed their dual pricing schemes from Cigna, Counterclaim Defendants have no basis to argue that Cigna has not pled viable claims sounding in fraud, whether under RICO (Count II) or state law (Counts III-XII). For this reason, and the additional reasons described below, Cigna has adequately alleged all of the claims asserted in its Counterclaims, and Counterclaim Defendants' motion to dismiss should be denied.

## I.  CIGNA HAS STANDING TO PURSUE ITS CLAIMS.

Counterclaim Defendants argue that Cigna lacks standing to pursue its Counterclaims because the majority of plans are funded by the employers who sponsor them; therefore "if any injury resulted from overpayments to the ASCs, the plans—rather than Cigna—suffered the injury." (Mot. at 1.) As a threshold matter, this argument addresses only employer-funded plans; there is no dispute that Cigna has standing for the plans that Cigna itself funds. (*See* CC ¶ 29 (fully-insured plans "are funded by the Cigna entity").) But even employer-funded plans authorize Cigna to recover overpayments (*id.* ¶ 30), and ERISA explicitly authorizes a "fiduciary" to bring claims under section 502(a)(3). *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (administrator may bring § 502(a)(3) claim to recover benefits paid by plan). The ASCs concede that Cigna is a fiduciary for all plans at issue (Am. Compl. ¶¶ 48, 132; *see also* CC ¶ 189), giving it standing to raise claims on the injured plans' behalves.

## II.  CIGNA'S RICO CLAIMS ARE PROPERLY PLED.

The elements of a civil RICO claim are "(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity."[2] *Wood v. Wells Fargo Bank, N.A.*, 13-cv-01731, 2013 WL 5763101, at *4 (D. Colo. Oct. 2, 2013). Cigna has pled each one. SurgCenter partnered with and invested in each of the six ASCs so that the ASCs could operate for-profit medical centers outside of Cigna's provider network. (CC ¶¶ 55-66, 201, 282.) Together, each ASC and SurgCenter used those

---

[2] Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. § 18-17-10, has similar pleading requirements. *See FDIC v. First Interstate Bank*, 937 F. Supp. 1461, 1471-72 (D. Colo. 1996).

medical centers to implement "dual pricing" and "fee forgiving" schemes, which they accomplished through the repeated transmission of fraudulent claim forms to Cigna through the mail and wires. (*Id.* ¶¶ 68-78, 80-187, 202-16, 283-99.)

### A. Counterclaim Defendants Committed Mail and Wire Fraud By Submitting Fraudulent Claim Forms to Cigna.

Counterclaim Defendants mistakenly argue that "[t]he lynchpin of Cigna's Counterclaims . . . is the ASCs' alleged failure to collect the full amount of copayments and deductibles . . . required by the terms of [Cigna's] plans." (Mot. at 3.) This was only part of the scheme: Cigna alleges not only that the ASCs, at the direction of SurgCenter, waived the patients' required out-of-network cost-sharing, but also that the ASCs submitted grossly inflated "phantom" charges to Cigna that—unknown to Cigna—the ASCs never intended to collect. (CC ¶ 71.) Cigna relied on these fraudulent claim forms when processing and paying the ASCs' claims. (*Id.* ¶ 73.) As a result, Cigna overpaid the ASCs millions of dollars. (*Id.* ¶ 193.)

Counterclaim Defendants' contention that Cigna has not properly pled fraud because the ASCs disclosed their scheme to Cigna is incorrect. (*See supra* Prelim. Statement.) Cigna's "real problem with the ASCs" (Mot. at 4) is not that Cigna has to pay them for services rendered to Cigna members—it is that Cigna unknowingly overpaid the ASCs based on its reliance on the ASCs' fraudulent claim forms. These allegations establish the predicate acts of mail and wire fraud. *See, e.g.*, *Dewey v. Lauer*, Civ. 08-cv-01734, 2009 WL 3234276, at *4 (D. Colo. Sept. 30, 2009) (allegations defendants committed mail and wire fraud by over-billing construction jobs satisfied

5

Rule 9(b) requirements where complaint "identif[ied] the purpose of … communications within the fraudulent scheme").[3]

### B. Cigna Paid the ASCs Nearly $15 Million As A Result of Counterclaim Defendants' Fraudulent Schemes.

Counterclaim Defendants' arguments that Cigna did not reasonably rely or suffer injury from their false statements (Mot. at 7) fail for the same reason. Because the ASCs' claim forms do not reflect the amounts that they actually charged patients, Cigna had no way to verify that the amount billed to Cigna was not the ASCs' actual charge. (CC ¶¶ 77-78, 213.) Cigna thus relied on the ASCs' false claim forms when reimbursing the ASCs for their services. (*Id.* ¶ 214.) And contrary to Counterclaim Defendants' contention that "Cigna's only 'injuries' flow from the ASCs' decision to honor patients' in-network benefits" (Mot. at 7), Cigna's claims make clear that its damages, totaling nearly $15 million before Cigna uncovered Counterclaim Defendants' fraud, flow from the ASCs' failure to disclose that they falsely charged Cigna a much higher rate than they billed their patients. (CC ¶ 215.)

### C. SurgCenter Entered into Separate Two-Party Association-in-Fact Enterprises with Each ASC.

In *Boyle v. United States*, 556 U.S. 938 (2009), the Supreme Court established that an association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to

---

[3] Whether the ASCs' initial quote to patients is "simply an estimate" or they "cannot determine final responsibility until Cigna calculates the allowed amount" (Mot. at 5) is irrelevant. Both the "estimate" and the member's "final responsibility" are based on a charge that Cigna never sees and is far lower than what the ASCs bill Cigna. (CC ¶¶ 96, 101, 116, 120, 137-38, 140, 161-64, 179-82.)

6

pursue the enterprise's purpose." *Id.* at 946. The Court noted that "the very concept of an association in fact is expansive" and that RICO broadly defines "enterprise." *Id.* at 944. Simply put, "an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Cigna easily meets this standard. Its Counterclaims detail SurgCenter's agreements with each of the ASCs "to operate for-profit medical centers by luring Cigna plan members to use these out-of-network medical centers through misrepresentations about the centers' costs to plan members, Cigna, and their plans," as well as the mechanics of each enterprise's fraudulent pricing and collection schemes. (CC ¶¶ 55-79, 201.) The Counterclaims provide the dates that each ASC was established and when each began billing Cigna, as well as actual examples of when and how plan members were affected by the association's fraudulent scheme. (*Id.* at ¶¶ 80-187.) There is nothing "conclusory" (Mot. at 8) about these allegations.

Counterclaim Defendants' contention that Cigna does not sufficiently plead a distinction between each Counterclaim Defendant and the RICO enterprise further ignores the substance of Cigna's claims. Cigna alleges that SurgCenter partnered with each ASC to create an enterprise whereby SurgCenter assisted the ASC in operating a for-profit medical center outside of Cigna's provider networks while luring Cigna plan members to use the center by misrepresenting the center's costs to plan members, Cigna, and their plans. (CC ¶ 201.) These RICO enterprises are therefore not just SurgCenter or a particular ASC but rather the entity resulting from the coordinated

7

course of conduct between SurgCenter and each ASC for the common purpose of defrauding Cigna into overpaying claims. (*Id.* ¶¶ 1-5, 55-79, 200-13.)

This is more than enough under *Boyle*. 556 U.S. at 946; *see also Wood*, 2013 WL 5763101, at *5 (plaintiff sufficiently pled association-in-fact enterprise alleging that "defendant was in collusion with various appraisers" to inflate property values and induce plaintiffs into a mortgage loan); *Shepard v. DineEquity, Inc.*, Civ. No. 08-2416, 2009 WL 8518288, at *7 (D. Kan. Sept. 25, 2009) (plaintiffs sufficiently alleged RICO enterprise by pointing to marketing contract between Applebee's and Weight Watchers and joint marketing efforts by both companies).

Moreover, while Counterclaim Defendants claim that Cigna does not sufficiently distinguish between the conduct of the RICO enterprise and each defendant (Mot. at 9), *Boyle* makes clear that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." 556 U.S. at 946.[4] Here, Cigna alleges that SurgCenter and each ASC used each ASC's seemingly legitimate business operations to implement fee forgiving and dual pricing schemes and thereby illegally profit from Cigna's overpayments. (CC ¶¶ 55-79, 200-16.) SurgCenter invested in the ASCs and provided operational support, and the ASCs actually submitted the fraudulent claim

---

[4] The cases Counterclaim Defendants cite are inapposite, because they either involve plaintiffs who alleged that the RICO enterprise was simply the various defendants, *Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Grp*, 965 F.2d 879, 885 (10th Cir. 1992); *Wood v. World Wide Assoc. of Specialty Programs & Sch., Inc.*, 06-cv-708, 2011 WL 3328931, at *1, *5 (D. Utah Aug. 2, 2011), or failed to plead how the members of the RICO enterprise related to the enterprise's affairs. *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1145-46 (10th Cir. 1998); *Apache Tribe of Okla. v. Brown*, 966 F. Supp. 2d 1188, 1194 (W.D. Okla. 2013); *Hall v. Witteman*, 569 F. Supp. 2d 1208, 1226-27 (D. Kan. 2008); *Switzer v. Coan*, 261 F.3d 985, 992 (10th Cir. 2001).

forms to Cigna. (*Id.*) Such two-party association-in-fact enterprises are—as Counterclaim Defendants' own cases suggest—"prototypical RICO case[s]." *See Brannon*, 153 F.3d at 1148 ("prototypical RICO case" involves control of another firm's resources, contacts, and facilities to perpetrate unlawful acts that would otherwise be more difficult without use of the newly formed enterprise).

Finally, Counterclaim Defendants have no support for their suggestion that Cigna has not alleged that the enterprises "were necessary to facilitate the alleged fraud." (Mot. at 9-10 (citing *Brannon*).) The court in *Brannon* required only that an "allegation of RICO liability … indicate how the defendant used the alleged enterprise to facilitate the fraudulent conduct." 153 F.3d at 1148. The Counterclaims explicitly do so. (*See* CC ¶¶ 201, 203-12 (alleging that SurgCenter came to agreements with each of the ASCs and then assisted the ASCs with submitting fraudulent claim forms).)

## III. CIGNA ADEQUATELY PLEADS A CLAIM UNDER ERISA § 502(a)(3).

Counterclaim Defendants state that Cigna cannot recover overpayments under ERISA § 502(a)(3) because it seeks only monetary legal damages. (Mot. at 10.) This is incorrect as a matter of law. A party is entitled to recover overpayments under ERISA § 502(a)(3) if: (1) a fiduciary seeks the restitution of specifically identified funds; (2) the funds belong in good conscience to the plan; and (3) the funds are within the defendant's possession and control. *Sereboff*, 547 U.S. at 362-63.

All of these conditions are met here. <u>First</u>, the ASCs concede that Cigna is a fiduciary of all of the plans at issue (Am. Compl. ¶¶ 48, 132; *see also* CC ¶ 189), and Cigna seeks the restitution of specifically identifiable funds that were paid to each of the

9

six ASCs—the exact amounts that Cigna overpaid to the ASCs. (*See* CC ¶¶ 103, 128, 142, 156, 170, 186); *see also Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 901 (8th Cir. 2006). Second, these funds belong in good conscience to the plan, because the ASCs fraudulently induced Cigna to pay amounts that its plans did not cover. (*Id.* ¶¶ 68-79.) Third, Cigna specifically alleges that the funds paid to each of the ASCs are in their possession and control. (*Id.* ¶ 196.) Indeed, courts have repeatedly held that pursuant to ERISA § 502(a)(3), plans and fiduciaries can obtain equitable relief in the form of overpayments made to providers, precisely the relief that Cigna seeks here. *See, e.g.*, *Sereboff*, 547 U.S. at 362-63; *Admin. Comm. of Wal-Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119, 1122 (10th Cir. 2004).[5]

Counterclaim Defendants also state that Cigna's "attempts to recast its ERISA claims as claims for injunctive and declaratory relief are likewise unavailing." (Mot. at 10.) But ERISA § 502(a)(3) explicitly allows fiduciaries to sue to "enjoin" any action that violates ERISA or the plans, and because the plans allow Cigna to offset the amounts of any overpayments from future claim payments (CC ¶ 198 & Ex. A at 41), Cigna is entitled to a declaration that it may enforce these plan provisions against the ASCs.

### IV. CIGNA'S STATE-LAW CLAIMS ARE NOT PREEMPTED BY ERISA.

Counterclaim Defendants argue that Cigna's state-law claims should be dismissed under the complete preemption doctrine articulated in *Aetna v. Davila*, 542

---

[5] At least some courts have held that not only is "strict tracing" unnecessary to recover overpaid funds, but also that the funds need not still be in defendants' possession. *See Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 664 (2d Cir. 2013); *Cusson v. Liberty Life Assurance Co. of Boston,* 592 F.3d 215, 230-31 (1st Cir. 2010) (plan need only identify "the amount of the overpayment," not "a specific account in which the funds are kept.").

U.S. 200 (2004). As a threshold matter, this argument applies only to the Cigna-administered plans that are governed by ERISA, which the ASCs have already pled do not necessarily cover all of their patients. (*See, e.g.,* Am. Compl. ¶¶ 52, 68; *see also* CC ¶ 31.) Moreover, complete preemption is a basis for removal to federal court, not a basis for dismissal. *Schmeling v. NORDAM*, 97 F.3d 1336, 1342 (10th Cir. 1996).

Regardless, Cigna's state-law claims would not be preempted under the *Davila* test, as ERISA preempts a state-law claim only where both "[1] an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and [2] where there is no other independent legal duty that is implicated by a defendant's actions." 542 U.S. at 210. Here, all of Cigna's state-law claims implicate Counterclaim Defendants' independent legal duties not to commit or abet fraud, tortiously interfere with Cigna's business relationships, or unjustly enrich themselves at Cigna's expense. *See Horizon Blue Cross Blue Shield of N.J. v. E. Brunswick Surgery Ctr.*, 623 F. Supp. 2d 568, 575 (D.N.J. 2009) (ERISA did not preempt fraud, negligent misrepresentation, and tortious interference claims against fee-forgiving provider); *Aetna Health Inc. v. Health Goals Chiropractic Ctr., Inc.*, 10-cv-5216, 2011 WL 1343047, at *4 (D.N.J. Apr. 7, 2011) (insurer's state-law claims against fee-forgiving provider were not "a mere billing dispute involving overpayment of benefits, and, therefore governed by ERISA" because the provider's "conduct, not the terms of the ERISA plans, is the focal point of … claims.").

Nor are Cigna's claims preempted under the conflict preemption doctrine, which preempts state laws "insofar as they may now or hereafter relate to any employee benefit plan." ERISA § 514(a). Where, as here, the focal point of a state-law claim is the

11

defendant's fraudulent misrepresentations, not the terms of an ERISA plan, courts in this Circuit and others routinely hold that the claims are not preempted. *See, e.g.*, *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 385 (5th Cir. 2011) ("[Plaintiffs' misrepresentation claims do not depend on whether its services were or were not fully covered under the patients' plans" but rather depend on whether defendants' "statements were misleading."); *Hospice of Metro Denver, Inc. v. Grp. Health Ins. of Okla., Inc.*, 944 F.2d 752, 753 (10th Cir. 1991); *W. Pines Psych. Hosp. v. Samsonite Ben. Plan*, 848 F. Supp. 907, 910 (D. Colo. 1994). And while Counterclaim Defendants argue that Cigna's claims relate to the "relations among the principal ERISA entities, the employer, the plan, the plan fiduciaries, and the beneficiaries" (Mot. at 12 (internal quotations omitted)), this is incorrect. Cigna's state-law claims turn on the relations between the ASCs and Cigna, and providers are not one of these "principal" or "traditional" ERISA entities. *See Hospice of Metro Denver*, 944 F.2d at 753.

## V. CIGNA ADEQUATELY PLEADS THE ELEMENTS OF ITS FRAUD, NEGLIGENT MISREPRESENTATION, AND CIVIL THEFT CLAIMS.

Counterclaim Defendants' arguments regarding Cigna's fraud, negligent misrepresentation, and civil theft claims amount to little more than listing the claims' elements and conclusorily stating that Cigna has not adequately pled them. (*See* Mot. at 12, 15.) As described above, Cigna has adequately pled misrepresentations. (*See supra* Prelim. Statement & § II.A; CC ¶¶ 219-21.) Because Cigna cannot know what providers actually charged patients absent conducting its own investigation, it must rely on providers' representations in claim forms when making benefit determinations. Thus,

Cigna also pled that the ASCs' misrepresentations were material and that it reasonably relied on them in paying the ASCs nearly $15 million.

With respect to the civil theft claim, Counterclaim Defendants incorrectly argue that Cigna has not alleged it is the "rightful owner" of the property. For fully-insured plans, Cigna paid the ASCs from its own funds, and Cigna is authorized to recover overpayments made to the ASCs on behalf of self-insured, ASO plans. (*See supra* § I.)

## VI. CIGNA HAS ADEQUATELY PLED A CLAIM FOR UNJUST ENRICHMENT.

Counterclaim Defendants contend that, because Cigna received a benefit (i.e. services provided to its members), it has not pled a claim for unjust enrichment. (Mot. at 13.) Counterclaim Defendants misapprehend the elements of this claim. Unjust enrichment requires Cigna to plead merely that the ASCs received a benefit at Cigna's expense, and under the circumstances it would be unjust for the ASCs to retain the benefit without payment. *See Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008); *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 295 (Md. 2007). Here, Cigna has alleged that the ASCs received a benefit at Cigna's expense by inducing Cigna to make payments to the ASCs based on grossly inflated charges. (CC ¶ 9.)

## VII. CIGNA HAS ADEQUATELY PLED ITS TORTIOUS INTERFERENCE CLAIM.

Counterclaim Defendants argue that the "economic loss rule" bars Cigna's claim for tortious interference because Cigna's plans are "the only possible source of duty for the ASCs to refrain from reducing Cigna insured's patient responsibility amount to in-network levels." (Mot. at 13.) But the economic loss rule provides only that relief in tort, e.g., fraud, does not lie where the party's injury derives **solely** from breach of the

13

express or implied duties arising in contract. *Standard Bank, PLC v. Runge, Inc.*, 443 F. App'x 347, 349-50 (10th Cir. 2011). This rule does not apply here for two reasons.

First, Cigna's tortious interference claim does not arise solely out of duties owed under its plans; indeed, Counterclaim Defendants are not even parties to those contracts, which form the relationship between Cigna and its members. *See Rhino Fund, LLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. Ct. App. 2008). Second, Cigna has alleged Counterclaim Defendants violated numerous legal duties under state law for which Cigna seeks damages regardless of what Cigna's plans say, including fraud by submitting false charges to Cigna; engaging in dual pricing schemes to induce patients to use the ASCs' out-of-network services and to undermine and circumvent Cigna's provider network system; and deliberately seeking to harm Cigna's relationship with its members by sending those members false and malicious communications. (CC ¶¶ 257-60.) Because these independent legal duties form the basis of Cigna's state-law claims, the economic loss rule does not bar them. *See Rhino Fund*, 215 P.3d at 1195.[6]

## VIII. THE COLORADO ASCS HAVE VIOLATED COLO. REV. STAT. § 18-13-119.

The ASCs have violated the Colorado fee-forgiving statute in two ways. First, the statute bans "practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans," because they "interfere with contractual obligations entered into between the insured and the insurer relating to such payments." Colo. Rev. Stat. § 18-13-119 3(b).

---

[6] *See also Jorgensen v. Colo. Rural Props., LLC*, 226 P.3d 1255, 1258 (Colo. Ct. App. 2010); *Foster v. Bd. of Governors of Colo. State Univ. Sys.*, 13-CA-280, 2014 WL 784854, at *7 (Colo. Ct. App. Feb. 27, 2014).

The ASCs admit that they do not bill patients their required out-of-network copayments and deductibles (Mot. at 3), but argue that they have not violated the statute because they do not completely "eliminate" the patient's cost-sharing responsibility. (*Id.* at 14-15.)

As an initial matter, Cigna alleges that the ASCs ***did*** completely eliminate many patients' cost-sharing responsibility by charging them "nothing." (CC ¶ 1; *see also id.* ¶ 117, 120 (examples).) But the ASCs' argument still fails for all claims because they waived the "required" out-of-network cost-sharing amounts. Waiving those amounts, then billing patients separate, nominal amounts that bear no relation to the patients' required payments, does not allow the ASCs to escape the clear import of the statute. Indeed, by the ASCs' warped logic, if a patient is required to pay $10,000 in cost-sharing responsibility but the ASC bills him a penny, the ASC has not violated the statute.

Second, the ASCs do not even address that they violated the statute by "submit[ing] a fee to a third-party payor which is higher than the fee he has agreed to accept from the insured patient with the understanding of waiving the required deductible or copayment." Colo. Rev. Stat. § 18-13-119 3(b). Again, Cigna alleges that, and the ASCs admit, they quote patient charges based on a lower, Medicare-based fee schedule, then apply the members' in-network cost-sharing responsibilities, while agreeing to waive the required out-of-network cost-sharing responsibilities. (Mot. at 5.)

## CONCLUSION

For the foregoing reasons, Counterclaim Defendants' motion to dismiss should be denied.

15

DATED this 12th day of May, 2014.　　　　Respectfully submitted,

By: */s/ Edwin P. Aro*＿＿＿＿＿＿＿＿＿＿
Edwin P. Aro
ARNOLD & PORTER LLC
370 Seventeenth Street, Suite 4400
Denver, CO 80202
Telephone: 303.863.1000
ed.aro@aporter.com

Joshua B. Simon
Warren Haskel
Ryan D. McEnroe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
Telephone:  212.446.4800
Facsimile:  212.446.4900
joshua.simon@kirkland.com
warren.haskel@kirkland.com
ryan.mcenroe@kirkland.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May, 2014, I filed and served the foregoing via CM-ECF which will send notification of such filing to all counsel of record.

/s/ *Linda J. Teater*