Exhibit F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

---

Civil Action No. 13-cv-03422

---

ARAPAHOE SURGERY CENTER., LLC, CHERRY CREEK SURGERY CENTER, LLC, HAMPDEN SURGERY CENTER, LLC, KISSING CAMELS SURGERY CENTER, LLC, SURGCENTER OF BEL AIR, LLC, WESTMINSTER SURGERY CENTER, LLC, and SURGICAL CENTER DEVELOPMENT, INC.

      Plaintiffs/Counterclaim Defendants,

v.

CIGNA HEALTHCARE, INC., CONN. GENERAL LIFE INSURANCE CO., CIGNA HEALTH AND LIFE INSURANCE CO., CIGNA HEALTHCARE - MID-ATLANTIC, INC., and CIGNA HEALTHCARE OF COLORADO, INC.,

      Defendants/Counterclaim Plaintiffs.

---

## CIGNA'S MOTION FOR SUMMARY JUDGMENT
## AND SUPPORTING MEMORANDUM

## FILED UNDER SEAL–CONTAINS INFORMATION
## SUBJECT TO PROTECTIVE ORDER

---

## TABLE OF CONTENTS

Page

STATEMENT OF MATERIAL FACTS .......................................................................3

I.    CIGNA AND ITS BUSINESS. ..........................................................................3

II.   THE ASCS, SURGCENTER, AND THEIR BUSINESS PRACTICES. ....................7

      A.   SurgCenter's Business of Establishing ASCs. ....................................7
      B.   The ASCs' Fee-Forgiving Policy. ......................................................8
      C.   The ASCs' Dual Pricing Scheme. .....................................................13
      D.   The ASCs' Appeals Process. ............................................................15

III.  CIGNA'S RESPONSE TO THE ASCS' CONDUCT. .........................................15

IV.   CIGNA'S INTERACTIONS WITH OTHER INSURERS AND
      HOSPITALS. ..................................................................................................21

      A.   Cigna Had Independent Reasons for Taking Actions Against In-Network
           Providers Who Referred Patients to the ASCs. .................................21
      B.   There Is No Evidence of a Centura-HCA Conspiracy. ......................23
      C.   There Is No Evidence of a Conspiracy Between Cigna and Other Insurers. .........24
      D.   There Is No Evidence that Cigna Agreed to Join the Alleged HCA-
           Centura Conspiracy. .........................................................................25

V.    THE ASCS HAVE NO EVIDENCE OF AN ANTITRUST INJURY. ......................27

ARGUMENT ...........................................................................................................27

I.    THE COLORADO ASCS CANNOT PREVAIL ON THEIR ANTITRUST
      CLAIMS (COUNTS VI & VII). .....................................................................27

      A.   The ASCs Have No Evidence of a Conspiracy. ................................28

           1.   There Is No Direct Proof of Conspiracy. ...................................28
           2.   The Circumstantial Evidence Does Not Support a Conspiracy. ................29

      B.   The ASCs Cannot Prove an Unlawful Restraint. ..............................33
      C.   The ASCs Cannot Prove an Antitrust Injury. ....................................35

II.   CIGNA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS'
      ERISA CLAIMS (COUNTS I, II & III). ........................................................37

      A.   The ASCs Cannot Prove Their § 502(a)(1)(B) Claim Because They Have
           No Evidence that Cigna Abused Its Discretion. ...............................37

## TABLE OF CONTENTS (CONT'D)

Page

1. Cigna Correctly Interpreted Its Plans as Not Covering "Charges" that the ASCs Did Not Require Its Plan Members to Pay. ........................38

2. Cigna Gathered Substantial Evidence that the ASCs Were Not Collecting Coinsurance from Cigna's Plan Members. ............................40

B. The ASCs Did Not Exhaust their Required Administrative Remedies for Many of the Benefit Claims at Issue....................................................41

C. The ASCs' Remaining ERISA Claims Are Meritless (Counts II & III)...............42

III. THE ASCS' STATE-LAW CLAIMS FAIL (COUNTS IV & V). ...............................43

IV. CIGNA IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIMS.........................................................................................44

A. The ASCs Indisputably Violated Colorado's Fee-Forgiving Statute. ..................45

B. There Can Be No Dispute that the ASCs and SurgCenter Tortiously Interfered with Cigna's Contracts with its Members. ...........................................46

C. There Can Be No Dispute that the ASCs Were Unjustly Enriched by Extracting Payments that Grossly Exceeded the Value of Their Services. ..........47

D. The ASCs' Undisputed Practices Warrant a Permanent Injunction Under ERISA § 502(a)(3) to Prevent Future Violations of Plan Terms...........................48

CONCLUSION ............................................................................................................49

# TABLE OF AUTHORITIES

Page

**Cases**

*Abraham v. Intermountain Health Care Inc.*,
461 F.3d 1249 (10th Cir. 2006) ................................................................. 30, 32, 35

*Am. Family Mut. Ins. Co. v. Centura Health-St. Anthony Cent. Hosp.*,
46 P.3d 490 (Colo. App. 2002) ................................................................... 48

*Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*,
—F. Supp. 3d—, 2015 WL 753954 (D. Colo. Feb. 20, 2015) .................... 28, 29, 33

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ...................................................................................... 37

*Aurora Commercial Corp. v. PMAC Lending Servs., Inc.*,
2014 WL 859253 (D. Colo. Mar. 5, 2014) .................................................. 44

*Barlow & Haun, Inc. v. McPeek*,
215 F.3d 1336 (10th Cir. 2000) ................................................................... 43

*Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*,
522 F. App'x 81 (2d Cir. 2013) ................................................................... 31, 40

*Brown v. Hartford Life Ins. Co.*,
428 F. App'x 817 (10th Cir. 2011) .............................................................. 40

*Callery v. U.S. Life Ins. Co. in City of N.Y.*,
392 F.3d 401 (10th Cir. 2004) ..................................................................... 42

*Campfield v. State Farm Mut. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008) ................................................................... 34

*Carberry v. Metro. Life Ins. Co.*,
2011 WL 2887842 (D. Colo. July 19, 2011) ............................................... 38

*Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.*,
413 F. Supp. 2d 1016 (D. Minn. 2006) ....................................................... 47

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*,
873 F.2d 1357 (10th Cir. 1989) ................................................................... 30

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) ................................................................... 28

## TABLE OF AUTHORITIES (CONT'D)

Page

*Chicago Title Ins. Corp. v. Magnuson*,
   487 F.3d 985 (6th Cir. 2007) ................................................ 47

*CIGNA Healthplan of La., Inc. v. State ex rel. Ieyoub*,
   883 F. Supp. 94 (M.D. La. 1995) ........................................... 35

*Cleary v. Boeing Co. Employee Health & Welfare Ben. Plan (Plan 503)*,
   2013 WL 3943633 (D. Colo. July 31, 2013) ............................. 38

*Coffey v. Healthtrust, Inc.*,
   955 F.2d 1388 (10th Cir. 1992) ............................................ 34

*Cohlmia v. St. John Med. Ctr.*,
   693 F.3d 1269 (10th Cir. 2012) ........................................ 36, 37

*Cosmetic Gallery, Inc. v. Schoeneman Corp.*,
   495 F.3d 46 (3d Cir. 2007) .................................................. 28

*Daily v. Hewlett Packard Co.*,
   2014 WL 5489085 (D. Colo. Oct. 29, 2014) ............................. 38

*Davidowitz v. Delta Dental Plan of Cali., Inc.*,
   946 F.2d 1476 (9th Cir. 1991) ............................................. 31

*Diaz v. Farley*,
   215 F.3d 1175 (10th Cir. 2000) ........................................... 34

*Eagle Sys. & Servs., Inc. v. Exelis Sys. Corp.*,
   2015 WL 59315 (D. Colo. Jan. 2, 2015)................................... 44

*Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co.*,
   407 F.3d 1091 (10th Cir. 2005) ........................................... 35

*Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*,
   663 F.3d 1124 (10th Cir. 2011) ........................................... 37

*Euromodas, Inc. v. Zanella, Ltd.*,
   368 F.3d 11 (1st Cir. 2004)................................................. 32

*Exum v. U.S. Olympics Comm.*,
   389 F.3d 1130 (10th Cir. 2004) ........................................... 43

*Feiler v. N.J. Dental Ass'n*,
   191 N.J. Super. 426 (N.J. Super. 1985) .................................. 31

*Firestone Tire & Rubber Co. v. Baruch*,
   489 U.S. 101 (1989)......................................................... 37

iv

## TABLE OF AUTHORITIES (CONT'D)

Page

*Franco v. Conn. Gen. Life Ins. Co.*,
  818 F. Supp. 2d 792 (D.N.J. 2011) ...................................................................... 35

*GF Gaming Corp. v. Black Hawk Casino Owners Ass'n*,
  326 F. Supp. 2d 1177 (D. Colo. 2004) ................................................................. 37

*Hill v. Cross Country Settlements, LLC*,
  402 Md. 281 (Md. Ct. App. 2007) ........................................................................ 47

*Holmes v. Colo. Coal. for Homeless Long Term Disability Plan*,
  762 F.3d 1195 (10th Cir. 2014) ........................................................................... 41

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999) ................................................................................. 30

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ............................................................................... 28

*Joplin v. Sw. Bell Tel. Co.*,
  753 F.2d 808 (10th Cir. 1983) ............................................................................. 44

*JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*,
  2014 WL 793525 (D. Colo. Feb. 26, 2014) ......................................................... 36

*Kennedy v. Conn. Gen. Life Ins. Co.*,
  924 F.2d 698 (7th Cir. 1991) ................................................................ 6, 31, 39, 40

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*,
  2014 WL 560462 (D. Colo. Feb. 13, 2014) ..................................................... 29, 32

*Law v. NCAA*,
  134 F.3d 1010 (10th Cir. 1998) ........................................................................... 34

*Lewis v. U.F.C.W. Dist. Union Local Two & Employers Pension Fund*,
  273 F. App'x 765 (10th Cir. 2008) ....................................................................... 42

*Liebel v. Aetna Life Ins. Co.*,
  595 F. App'x. 755 (10th Cir. Dec. 3, 2014) .......................................................... 37

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................................. 28

*Mein v. Pool Co. Disabled Int'l Employee Long Term Disability Ben. Plan, Pool Co.*,
  989 F. Supp. 1337 (D. Colo. 1998) ...................................................................... 42

*Meraou v. Williams Co. Long Term Disability Plan*,
  221 F. App'x 696 (10th Cir. 2007) ....................................................................... 41

v

## TABLE OF AUTHORITIES (CONT'D)

Page

*Metro. Life Ins. Co. v. Brown*,
    1998 WL 1084680 (W.D. Pa. Dec. 1, 1998) ............................................... 48

*Mitchael v. Intracorp, Inc.*,
    179 F.3d 847 (10th Cir. 1999) ........................................... 28, 29, 30

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ........................................................... 32

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA, v. Guar. Bank & Trust Co.*,
    2015 WL 1040447 (D. Colo. Mar. 5, 2015) ........................................... 44

*Nat'l Wealth Real Estate, Inc. v. Cohen*,
    2008 WL 511761 (D. Colo. Feb. 21, 2008) ........................................... 44

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ........................................................... 34

*Pell v. E.I. DuPont de Nemours & Co. Inc.*,
    539 F.3d 292 (3d Cir. 2008) .................................................. 49

*Pfenninger v. Exempla, Inc.*,
    116 F. Supp. 2d 1184 (D. Colo. 2000) ........................................... 34

*Salzman v. Bachrach*,
    996 P.2d 1263 (Colo. 2000) .................................................. 47

*Sandoval v. Aetna Life & Cas. Ins. Co.*,
    967 F.2d 377 (10th Cir. 1993) ................................................ 40

*Smilecare Dental Grp. v. Delta Dental Plan of Cali.*,
    88 F.3d 780 (9th Cir. 1996) .................................................. 31

*Spradley v. Owens–Illinois Hourly Emps. Welfare Benefit Plan*,
    686 F.3d 1135 (10th Cir. 2012) ............................................... 40

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F. 3d 57 (1st Cir. 2004) ................................................. 37

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ............................................... 28

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ......................................... 34

*Tri State Adv. Surgery Ctr., LLC v. Health Choice, LLC*,
    2015 WL 1737410 (E.D. Ark. Apr. 16, 2015) .................................... 36

## TABLE OF AUTHORITIES (CONT'D)

Page

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
  964 F.2d 1022 (10th Cir. 1992) ............................................................. 28

*Unum Life Ins. Co. of Am. v. Munoz*,
  2007 WL 628084 (N.D. Tex. Nov. 27, 2007) ........................................ 48

*Utah Gospel Mission v. Salt Lake City Corp.*,
  425 F.3d 1249 (10th Cir. 2005) ............................................................. 33

*Vincent v. Lucent Techs., Inc.*,
  733 F. Supp. 2d 729 (W.D.N.C. 2010) .................................................. 38

*Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan*,
  26 F. App'x 811 (10th Cir. 2001) .......................................................... 38

*World of Sleep, Inc. v. La-Z-Boy Chair Co.*,
  756 F.2d 1467 (10th Cir. 1985) ............................................................. 32

**Statutes**

15 U.S.C. § 1 .......................................................................................... 27, 29, 32

28 U.S.C. § 1367(c)(3) .................................................................................... 43

29 U.S.C. § 1132(a)(1)(B) ......................................................................... 37, 42

29 U.S.C. § 1132(a)(3) ............................................................................... 42, 48

Colo. Rev. Stat. Ann. § 18-13-119(3) ...................................................... 45, 46

Cigna[1] is a managed care company whose primary role is to control costs of healthcare services so that members of the plans it administers can afford healthcare coverage. Two ways that Cigna accomplishes this goal are selective contracting and enforcing plan limits on reimbursement for out-of-network healthcare services, including through increased cost-sharing requirements for such services and capping reimbursement at pre-determined rates or the provider's normal charge. Selective contracting reduces costs because providers (*i.e.*, physicians and medical facilities) accept discounted rates for their services in exchange for increased access to Cigna's members. To help ensure that providers receive increased patient volume, Cigna's contracts with providers prohibit the referral to out-of-network providers absent extenuating circumstances. Increased cost-sharing requirements help control costs by making members pay a larger share of costs for services from providers that do not agree to accept Cigna's discounted rates and therefore often cost Cigna-administered plans significantly more money, thus moderating demand for out-of-network services. And by capping reimbursement at the provider's normal charge, Cigna ensures that the plan will not be responsible for inflated charges that an out-of-network provider submits but does not intend to collect from members. Cigna has various ways in which to enforce these plan requirements, including through a provision that states that the plan will not cover charges that the provider does not obligate members to pay.

SurgCenter and the ASCs set up a business model to intentionally interfere with these cost-control measures. SurgCenter partnered with physicians in Cigna's network to open the

---

[1] "Cigna" refers to Defendants and Counterclaim Plaintiffs. "ASCs" or "Plaintiffs" refers to Arapahoe Surgery Center, LLC (d/b/a SurgCenter on Dry Creek ("Dry Creek")), Kissing Camels Surgery Center, LLC, Cherry Creek Surgery Center, LLC, SurgCenter of Bel Air, LLC, Westminster Surgery Center, LLC, and Hampden Surgery Center, LLC. "Colorado ASCs" refers to Dry Creek; Cherry Creek Surgery Center, LLC; Hampden Surgery Center, LLC; and Kissing Camels Surgery Center, LLC. Finally, "SurgCenter" refers to Surgical Center Development, Inc. d/b/a SurgCenter Development.

ASCs, which remained outside of Cigna's network. The physician-owners would refer their patients to the ASCs for surgery in breach of their network contracts with Cigna. As a result, the ASCs had access to the same volume of Cigna patients as an in-network facility, without agreeing to accept discounted rates. Instead, the ASCs billed Cigna at exorbitant rates. And because the ASCs could never attract patients if they actually collected patients' out-of-network cost-share based on their exorbitant rates, they also adopted SurgCenter's policy of illegally waiving all or the vast majority of patients' out-of-network cost sharing responsibilities. All of this led Cigna to pay millions of dollars for charges that the ASCs never obligated their patients to pay and that were not covered under the terms of Cigna's plans, unjustly enriching the ASCs.

As Cigna began learning the details of the ASCs' scheme, it took two separate steps to protect its provider network and its plans. First, its provider networking team sent out letters to physicians who were referring patients to the ASCs, informing them that they were violating their network contracts, and it eventually terminated providers who continued making referrals. Second, Cigna's Special Investigation Unit ("SIU") sent out letters to both the ASCs and their patients to learn the details of the ASCs' practices, and when SIU had substantial evidence of the ASCs' improper billing policies, Cigna began reducing payments to the ASCs to only those charges that the ASCs obligated members to pay.

The ASCs filed suit to challenge Cigna's protective actions claiming antitrust and ERISA violations; Cigna filed counterclaims based on SurgCenter and the ASCs' bad acts giving rise to those protective measures. Now that fact discovery is closed, it is clear that no material fact is in dispute. The ASCs do not dispute their billing policies, nor do they dispute that their physician-owners referred patients to the ASCs. Just as important, the ASCs do not dispute the plain terms

2

of the benefit plans and network contracts at issue that justify Cigna's protective measures. Because Cigna had ample reasons—both as a matter of economics and the terms of its plans—to curb the ASCs' improper actions, the ASCs' claims fail as a matter of law. And because there is no genuine dispute that the ASCs, at the direction of SurgCenter, engaged in these bad acts, Cigna is likewise entitled to summary judgment on all of its counterclaims. Cigna accordingly moves for summary judgment on liability for all claims in this action.

## STATEMENT OF MATERIAL FACTS

**I.     CIGNA AND ITS BUSINESS.**

1.     Cigna is a managed care company that acts as either the claims administrator of employer-sponsored healthcare benefits plans or as an insurer of various healthcare insurance policies. (D.E. 60, Sec. Am. Compl. ("SAC") ¶¶ 26-30; Ex. 1, May Rep. ¶ 15.)[2]

2.     The vast majority of Cigna's plans are self-funded by employers, who offer plan coverage to employees as a benefit of employment and for which Cigna provides only administrative services. (Ex. 1, May Rep. ¶ 15 (describing Cigna's role for Administrative Service Only ("ASO") plans).)

3.     One of Cigna's primary roles in administering plans is to control costs of healthcare services. (Grohskopf Aff. ¶ 6; Ex. 2 at 28:5-24, 43:25-44:9.)

4.     Cigna has several methods for controlling such costs, including by building and maintaining networks of providers through a process called "selective contracting." (Grohskopf Aff. ¶ 7.)

---

[2] Unless otherwise specified, citations to Ex. __ refer to the numbered exhibits appended to the Declaration of Christian Reigstad in Support of Cigna's Motion for Summary Judgment. Citations to "Grohskopf Aff." refer to the affidavit of Dean Grohskopf. And citations to "Cisar Aff." refer to the affidavit of Mary Ellen Cisar and its accompanying letter exhibits. Each of these supporting documents is being filed contemporaneously herewith.

5.      Provider networks reduce costs for plans because providers who join Cigna's provider network ("in-network providers") agree to accept discounted rates for their services, whereas providers that do not contract with Cigna ("out-of-network providers") do not agree to any discounts. (*See, e.g.*, Ex. 1, May Rep. ¶¶ 29-30; Grohskopf Aff. ¶ 7.)

6.      The cost reductions from these discounted rates are passed on to consumers, resulting in lower service costs and plan premiums. (Ex. 1, May Rep. ¶¶ 37-55.)

7.      The cost reductions are also passed on to employers, either directly to employers who sponsor ASO plans or indirectly to employers who sponsor plans funded by Cigna ("fully funded plans") through reduced premiums. (Ex. 1, May Rep. ¶¶ 49-55; Ex. 2 at 24:4-25:22.)

8.      In exchange for receiving discounts on in-network providers' charges, Cigna encourages plan members to receive services from in-network providers. (*See infra* SMF ¶¶ 9-22; *see also* Ex. 2 at 24:4-25:22; Grohskopf Aff. ¶¶ 7-8.)

9.      One of the ways that Cigna does so is to ensure that in-network providers refer members to other in-network providers, including through a clause in the providers' contracts that prohibits referrals to out-of-network providers absent extenuating circumstances. (*See, e.g.*, Grohskopf Aff. ¶ 8; Ex. 3 § 1.9(d); Ex. 2 at 24:19-25:6; Ex. 1, May Rep. ¶ 35.)

10.     These referral requirements are a standard provision in insurer-provider contracts. (Grohskopf Aff. ¶ 9; *see also, e.g.*, Ex. 4 at 31:7-21; Ex. 5 at 99:20-100:15.)

11.     Cigna's contracts with providers allow it to terminate a provider with or without cause, giving Cigna the ability to terminate a provider that it believed was increasing costs to plans even if those providers were not in express breach of their contract. (Grohskopf Aff. ¶ 10; *see also* Ex. 3 § 4.2.)

12.     Cigna also controls costs through enforcing limitations on how much the plan will pay for out-of-network services. (Ex. 6 at 91:19-92:4; Ex. 1, May Rep. ¶¶ 31-34, 61-62.)

13.     <u>First</u>, the plans at issue in this litigation (the "Plans") generally cover only a portion of any "Covered Expenses" (also referred to as "allowed amounts"), which the Plans define in relevant part as: "the expenses incurred by or on behalf of a person for the charges listed below if they are incurred after he becomes insured for these benefits. . . ." (*See* Cisar Aff. Ex. A at 26; Cisar Aff. ¶ 5.)

14.     Each Plan generally specifies that members are financially responsible for a portion of the Covered Expenses, in the form of copays (fixed amounts the member pays at the time of each service), coinsurance (a percentage of the bill for a service that is shared by the member after the deductible is met), and/or deductibles (amounts the member must pay before Cigna pays for services). (*See* Cisar Aff. Ex. A at 13, 26; Ex. 1, May Rep. ¶ 28 & n.25; Cisar Aff. ¶¶ 5-6.)

15.     To reflect the higher costs of out-of-network services, the Plans generally require members to pay a higher percentage of the covered amount of the service for out-of-network services, through a combination of higher copays, coinsurance, and deductibles. (*See, e.g.*, Cisar Aff. Ex. A at 14-15; Ex. 1, May Rep. ¶ 31; Cisar Aff. ¶¶ 5, 7.)

16.     The Plans also generally provide that reimbursement for out-of-network services is available only after a member has paid their out-of-network deductible in full. (*See, e.g.*, Cisar Aff. ¶ 6 (citing Cisar Aff. Ex. A at 17).)

17.     Because plans generally have higher deductibles for out-of-network services than in-network services, the fact that a patient has satisfied their in-network deductible does not

mean that they have satisfied their out-of-network deductible. (*See, e.g.*, Cisar Aff. ¶ 7 (citing Cisar Aff. Ex. A at 15).)

18.    <u>Second</u>, the "Exclusions, Expenses Not Covered and General Limitations" section of the Plans generally require that "Covered Expenses will not include, and no payment will be made" for "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." (Cisar Aff. Ex. A at 34; Cisar Aff. ¶ 8.)

19.    Cigna has consistently interpreted this clause to mean that the plan is not responsible for any portion of a charge that the provider does not require a member to pay, including any cost-sharing obligations that the member has under the plan. (*See* Ex. 6 at 47:9-48:23, 75:17-23; *Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701 (7th Cir. 1991).)

20.    <u>Third</u>, the Plans generally limit reimbursement for out-of-network services to the "Maximum Reimbursable Charge" (or an equivalent term) for "covered services," which can be no more than the "provider's normal charge for a similar service or supply." (*See* Cisar Aff. Ex. A at 14, 59; Cisar Aff. ¶ 9.)

21.    The Plans generally exclude from coverage providers' charges "to the extent that they are more than Maximum Reimbursable Charges." (*See* Cisar Aff. Ex. A at 14, 36; Cisar Aff. ¶ 9.)

22.    To ensure that Cigna can enforce these provisions, the Plans generally vest Cigna with discretion to determine eligibility for benefits and to construe the terms of the Plans. (*See* Cisar Aff. Ex. A at 54 ("The Plan Administrator delegates to [Cigna] the discretionary authority

to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan."); Cisar Aff. ¶ 4.)

## II.      THE ASCS, SURGCENTER, AND THEIR BUSINESS PRACTICES.

### A.      SurgCenter's Business of Establishing ASCs.

23.      SurgCenter is a development company that partners with local surgeons to create physician-owned and operated ambulatory surgical centers, including the six Plaintiff ASCs. (D.E. 87, Answer to Counterclaims ¶ 58.)

24.      Each ASC was formed as an LLC, and SurgCenter, ██████████████████ ████████████████████████████████████████████████████ while physician-investors then bought the remaining shares. (Ex. 7 at 50; Ex. 8 at 59; Ex. 9 at 74; Ex. 10; Ex. 11 at 66; Ex. 12 at 72.)

25.      Once each ASC was operational, physician-investors began performing services at the ASCs, including for patients covered by plans administered by Cigna. (*See infra* ¶ 28.)

26.      ████████████████████ the ASCs began operations without contracts with commercial payors, and each ASC continues to be out of network with Cigna. (Ex. 13 at SCD-CIG16829; Ex. 14 at 90:22-91:8; Ex. 15 at 55:2-9; Ex. 16 at 59:5-8; Ex. 17 at 120:20-121:7; Ex. 18; Ex. 19 at 22:17-19.)

27.      But the physicians that invest in the ASCs are generally in-network providers with Cigna and other commercial payors.  (*See, e.g.*, Ex. 20 at 47:15-20; Grohskopf Aff. ¶ 12.)

28.      Despite the fact that the ASCs were out of network with Cigna, these physician-investors referred their patients for surgeries at the ASCs, at SurgCenter's direction and encouragement. (*See, e.g.*, Ex. 17 at 89:22-90:9; Ex. 21; Ex. 22 at KCSC-CIG00234870

("Please be sure to send all eligible cases to the center, especially Commercial Insurance, Aetna and Workman's Comp as those are our best payers!"); Ex. 19 at 205:23-206:4.)

29. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ (Ex. 23 at Advanced Ortho-00032858.)

30. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

31. After each of the ASCs opened, SurgCenter maintained active involvement in the ASCs' operations, ████████████████████████████████████████

████████████████████ (Ex. 25 at 22:7-10, 29:13-31:9; Ex. 15 at 27:8-18.)

32. SurgCenter recommended and provided templates for operations, billings and collections policies to the ASCs. (Ex. 25 at 21:3-14, 21:20-22:1.)

**B.  The ASCs' Fee-Forgiving Policy.**

33. Each ASC adopted a billing policy, ████████████████████ pursuant to which the ASCs would charge patients no more than their in-network cost-sharing responsibility, rather than the out-of-network cost-sharing responsibility the patients would have otherwise owed for the ASCs' services. (SAC ¶ 57; Ex. 26 at SCD-CIG00173422 ████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

34.    The ASCs and SurgCenter were aware that under the terms of most insurance plans—including plans administered by Cigna—patients are required to pay higher cost-sharing responsibility for out-of-network services than in-network services. (Ex. 27 at 164:6-165:2, 169:3-5; Ex. 17 at 217:6-17; Ex. 14 at 201:17-23 (discussing plans administered or underwritten by Cigna); Ex. 28 at 175:17-24; Ex. 16 at 122:2-12; Ex. 25 at 270:23-271:1; Ex. 19 at 153:11-18; Ex. 15 at 76:15-77:17.)

35.    Each ASC (including its physicians) informed patients before their procedures that they would not incur any additional costs by having their procedure performed at the ASC than they would incur at an in-network facility. (Ex. 17 at 124:19-125:6; Ex. 29 at HSC-CIG00242848; Ex. 30 at BASC-CIG00027098; Ex. 14 at 193:16-22 & Ex. 31; Ex. 27 at 73:2-11, 113:9-18; Ex. 32 at SCDC00374828.)

36.    The ASCs' policy was designed to circumvent health plans' requirement that patients pay a higher portion of the costs when visiting out-of-network providers. (*See, e.g.*, Ex. 33 at 42:7-20 (agreeing that the purpose of policy was "so that there will be no difference in out-of-pocket costs for a patient regardless of whether that patient goes to Kissing Camels or goes to an in-network facility" as well as "to attract more patients to Kissing Camels"); Ex. 20 at 254:22-255:15 (same).)

37.    The ASCs' policy accordingly incentivized more patients to choose the ASCs for procedures that could have been performed at an in-network facility. (*See* Ex. 34 at 89:8-18 (stating that a higher patient responsibility is a "barrier" for most people contemplating choosing

Dry Creek; purpose of policy was to remove that "barrier"); Ex. 17 at 153:5-15; Ex. 20 at 254:17-255:1; Ex. 33 at 40:24-41:5, 42:16-20; Ex. 19 at 98:23-99:4.)

38.     When communicating with patients, the ASCs referred to the out-of-network cost-share obligations as "penalties." (*See, e.g.*, Ex. 35 at KCSC-CIG00335065.)

39.     To estimate patient responsibility, the ASCs verified each Cigna member's in-network and out-of-network benefits before treatment. (*See* Ex. 27 at 163:23-164:2; Ex. 28 at 56:8-20; Ex. 17 at 184:13-24; Ex. 15 at 66:23-67:11; Ex. 16 at 122:2-12; Ex. 14 at 271:20-272:14.)

40.     Each ASC would then apply the member's coinsurance and deductibles ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See infra* ¶ 54).

41.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 27 at 161:15-21 (Westminster); Ex. 16 at 174:11-176:5 (Bel Air); Ex. 28 at 56:21-57:23 (Dry Creek); Ex. 17 at 187:14-18 (Cherry Creek); Ex. 15 at 77:18-78:18 (Hampden); Ex. 19 at 333:14-334:2 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

42.     Consistent with their policy to collect no more than their patients' in-network benefits, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



(Ex. 27 at 73:2-15, 139:7-14; Ex. 33 at 35:21-24; Ex. 36 at CO Brain & Spine-00005011 ███████████ ; Ex. 37 at HSC-CIG00189420 (Hampden administrator writes: ███████████ Ex. 19 at 143:17-144:7.)

43. ███████████ (*See, e.g.*, Ex. 38 (Dry Creek email stating that ███████████ Ex. 40; Ex. 41 at BASC-CIG00031349 (Bel Air patient "will not owe anything.").)

44. ███████████ (*See* Ex. 1, May Rep. ¶ 79 & May Rep. Ex. 1.)

45. Moreover, in the situations where the ASCs charged only an in-network deductible or no deductible at all, the majority of their Cigna patients likely never satisfied their out-of-network deductible and therefore the Plans would not have been obligated to reimburse any portion of the Covered Expenses. (*See supra* ¶¶ 16-17.)



46. ████████████████████████████████████████████████

████████████████████████████████████████ (*See* Ex. 1, May Rep. ¶ 9.)

47.    The ASCs knew that Cigna would send an Explanation of Benefits ("EOB") to

patients that would indicate a higher, out-of-network patient responsibility, so ████████

████████████████████████████████████████████████

(Ex. 19 at 221:7-14; *see also* Ex. 35 at KCSC-CIG00335065 (asking personnel to instruct

patients to "ignore that EOB from that insurance."); Ex. 42 at CCSC-CIG00455692 (telling

patient that patient does not need to pay the out-of-network patient responsibility indicated on

EOB); Ex. 16 at 169:15-170:5.)

48. ████████████████████████████████████████████████

████████████████████████ (*See, e.g.*, Ex. 43; Ex. 44 (email from SurgCenter to

Kissing Camels shareholders); *see infra* ¶¶ 49-50.)

49.    The Colorado ASCs sought to conceal the nature of their fee-forgiving practices,

including, for example, in November 2012, ████████████████████████

████████████████████████████████████████████████

████████████████████████████ (Ex. 45 at KCSC00127372.)

50.    In response, the SurgCenter representative explained: ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ex. 47 at SCD-CIG00496392 ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

51. The ASCs regularly received complaints from patients and employers regarding the ASCs' out-of-network status and what their cost responsibility to the ASC was or would be. (Ex. 17 at 169:23-171:22 (Cherry Creek); Ex. 34 at 145:7-17 (Dry Creek); Ex. 33 at 50:10-51:19 (Kissing Camels); Ex. 49 (Bel Air); Ex. 50 at Advanced Ortho-00032943 (Hampden); Ex. 51 (Westminster).)

**C.    The ASCs' Dual Pricing Scheme.**

52. Although the ASCs charged patients as if the ASCs were in-network facilities, they expected Cigna to reimburse them as out-of-network facilities. ████████████████ ████████████; Ex. 25 at 158:21-25 (expectation is that ASC will receive more in out-of-network reimbursement than they would if they were in-network); Ex. 33 at 112:13-113:9.)

53. The ASCs employed a dual pricing scheme, designed and recommended by SurgCenter, pursuant to which the ASCs calculated the patient's cost-sharing responsibility ████████████████████████████████████████████████████████ ████████████████ (Ex. 53 at 142:12-19.)

54. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ (Ex. 17 at 191:18-25 (Cherry Creek); Ex. 16 at 137:21-138:7 (Bel Air); Ex. 15 at 79:20-80:5 (Hampden); Ex. 27 at 175:23-

176:3 (Westminster); Ex. 28 at 49:5-23, 59:12-25 (Dry Creek); Ex. 33 at 67:16-68:5 (Kissing Camels).)

55. ██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ (Ex. 17 at 194:23-195:3; Ex. 15 at 82:5-19; Ex. 14 at 285:8-19; Ex. 27 at 178:20-25; Ex. 16 at 159:19-160:13.)

56. The charges that the ASCs submitted to Cigna were many times higher than the amounts that they collected from the patients. (*See, e.g.*, Answer to Countercl. ¶¶ 93, 96 (admitting Westminster quoted patient an estimated Cigna patient charge of $5,100 and billed Cigna $90,008.00, 1,7684% more than Westminster estimated the patient's responsibility).)

57. The ASCs received complaints from patients, employers, and even their own shareholders about the high billed charges, with at least one employer suggesting it amounted to "unethical price gouging." (*See* Ex. 54 at SCD00399897; *see also* Ex. 55 at KCSC00077273; Ex. 56 at CCSC-CIG00388177; Ex. 16 at 172:5-15; Ex. 41 at BASC-CIG00031349-50; Ex. 57 at WSC-CIG00047813 ████████████████████████████████████████████

████████████████████████████████████████████; Ex. 19 at 122:24-123:8, 218:17-219:20; Ex. 25 at 128:1-14.)

58. ████████████████, a Kissing Camels shareholder and officer, wrote in response to another shareholder's concerns about Kissing Camels' higher-than-average reimbursements: "[W]e deserve it . . . the alternative is to leave that money in the bank account of the insurance company so that their executives can get a bigger bonus at the end of the year." (Ex. 58 at SCD00051079.)

**D.      The ASCs' Appeals Process.**

59.      As a matter of policy, ███████████████████████████████████████

████████████████████████████████████████████████████████████ (Ex. 27

at 186:2-23 (Westminster); Ex. 15 at 83:22-84:9 (Hampden); Ex. 28 at 110:20-112:2 (Dry

Creek); Ex. 16 at 164:9-167:5 (Bel Air); Ex. 17 at 198:20-199:8 (Cherry Creek); Ex. 14 at

288:8:8-12 (Kissing Camels).)

60.      Westminster did not appeal any of the benefit claims at issue at least up until

March 14, 2013. (Ex. 59 at WSC-CIG00137331 ████████████████████████████

████████████████████████████████████████████████████████ )

## III.    CIGNA'S RESPONSE TO THE ASCS' CONDUCT.

61.      As Cigna began to discover the SurgCenter's and ASCs' unlawful actions, it took

measures to protect its provider network and control costs for its plans. (Grohskopf Aff. ¶ 12;

Cisar Aff. ¶¶ 10, 23, 36, 48, 59.)

62.      Cigna began "investigating [physicians'] utilization at the [ASCs]" no later than

2010. (Ex. 60 at 13:14-14:6.)

63.      In January 2011, Cigna began sending notices to physicians and physicians'

groups to remind them of their obligation to refer patients to in-network providers and to warn

them that they would be terminated from Cigna's network or that they will incur financial

penalties if they continued to ignore this obligation. (Ex. 60 at 55:25-56:9 ("the first set of letters

that I'm aware of was sent at the beginning of 2011"); Ex. 61 (Jan. 10, 2011 email to Dr. Elliot,

documenting a call from Cigna representative to discuss ████████████████████████████

████████████████████████████████████████

15

64.     Cigna has sent the same type of warning letters to providers across the country. (Ex. 53 at 309:19-310:13 (acknowledging that SurgCenter was aware of warning letters sent to physician-investors in Colorado, Florida and Arkansas); Ex. 62 (Cigna warning letter sent to physician-investor in Texas).)

65.     They were also the same type of letters that other insurers had sent to providers across the country, including to SurgCenter-affiliated facilities as early as 2002. (Ex. 19 at 250:2-251:3 ("first time that SurgCenter became aware of physician investors receiving termination threats" was in St. Louis "around 2002," and those "threats would happen about every several months . . . between 2002 and 2009"); *id.* at 228:15-229:15, 231:11-20, 268:10-269:3 (identifying insurers United, Cigna, Aetna, Anthem, Providence, Altius, and CareFirst as payors who had "threatened to terminate providers from [their] network based on referrals to ASCs"); Ex. 53 at 310:14-311:2 (acknowledging that SurgCenter-affiliated physicians had received letters across the country from CareFirst and Aetna); *id.* at 316:21:317:18 (same for Blue Cross/Blue Shield).)

66.     SurgCenter expected insurers to start sending these warning letters shortly after each of its ASCs opened. (Ex. 63 at SCDC00003334 (December 2010 minutes for Dry Creek advising that ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

67.     SurgCenter advised the physicians to ignore those notices when they received them. (*See, e.g.*, Ex. 65 (SurgCenter principal instructing ASC and physician to "ignore such calls" from insurers).)

68.     Cigna subsequently terminated certain physicians who refused to stop referring patients to these out-of-network facilities. (Grohskopf Aff. ¶ 12)

69.     Three groups of Cigna providers challenged their terminations in three separate arbitrations. (*Id.* ¶ 25.)

70.     Each arbitration has since ended, and the terminations remain in effect. (*Id.*)

71.     Separately, in 2010 through 2013, Cigna detected anomalies in the claims submitted by the ASCs—specifically, ███████████████████████████████████ ████████████████████████████████ (Cisar Aff. ¶¶ 10, 23, 36, 48, 59.)

72.     In response to these anomalies, Cigna's SIU began sending letters to members requesting information about their experiences with the ASCs. (Cisar Aff. ¶¶ 12, 25, 38, 50, 61.)

73.     Cigna's survey revealed that the ASCs waived the applicable out-of-network co-insurance, co-payment, and deductible responsibilities of Cigna plan members and that they employed a dual pricing scheme ██████████████████████████████ ████████████████████████████ (Cisar Aff. ¶¶ 13, 26, 39, 51, 62.)

74.     Specifically, survey respondents reported that they paid either no money or less than their full out-of-network responsibility for procedures ███████████████████████ ████████████████ and the only bills that the patients reported they received from the ASCs were on the date of service. (Cisar Aff. ¶¶ 13, 26, 39, 51, 62.)

17

75.     During the course of its investigation, Cigna's SIU also examined the claim forms that the ASCs submitted to Cigna for reimbursement, which indicated that the ASCs were not collecting the member's out-of-network responsibility. (Cisar Aff. ¶¶ 15, 29, 42, 55, 64, 71.)

76.     The ASCs' claim forms did not include information sufficient to inform Cigna as to how much Cigna's members paid ASCs for services. (Cisar Aff. ¶¶ 15, 29, 42, 55, 64, 71.)

77.     Based on SIU's investigation and other evidence, Cigna implemented a protocol for processing each of the ASCs' claims (the "fee-forgiving protocol") which reflected Cigna's understanding that the ASCs were not billing Cigna members for the amounts they were required to pay under their plans ("fee-forgiving"). (Cisar Aff. ¶¶ 16, 30, 43, 56, 66, 73.)

78.     Before implementing its fee-forgiving protocol, Cigna had generally paid the ASCs' claims without applying the plan exclusion language identified in paragraph 18. (Cisar Aff. ¶¶ 17, 31, 44, 57, 67, 74.)

79.     Once it implemented the fee-forgiving protocol, Cigna reduced reimbursement to the ASCs to match the amount that the plans owed based on the amount the patient paid the ASCs according to the terms of the patients' plans. (Cisar Aff. ¶¶ 18, 32, 45, 58, 68, 75.)

80.     The fee-forgiving protocol was consistent with the Plans' exclusion of "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." (Cisar Aff. Ex. A, at 34; Ex. 6 Cisar Tr. 52:8-53:14.)

81.     The fee-forgiving protocol was also consistent with the Plans' limitation of Covered Expenses to the provider's "normal charge," given that the ASCs did not intend to

collect a significant portion of the charge it submitted to Cigna, and at times collected nothing at all. (Cisar Aff. Ex. A, at 14, 59; Cisar Aff. ¶¶ 13, 26, 39, 51, 62.)

82.     As part of its fee-forgiving protocol, Cigna stopped routing claims for the ASCs' services to third-party vendors under its "network savings" program. (Cisar Aff. ¶¶ 16, 30, 43, 56, 66, 73.)

83.     Under the network savings program, Cigna would send out-of-network claims to vendors that had negotiated rates with the provider. (Ex. 66 at 19 (providing that "[f]or covered services received from non-Participating Providers, [Cigna] may apply discounts available under agreements with third parties or through negotiation of the billed charges").)



84.     ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████ (Ex. 66 at 19.)

85.     ████████████████████████████████████████████
████████████████████████████████████████████ (Cisar Aff. ¶¶ 16, 30, 43, 56, 66, 73; Ex. 68, at 61:2-15.)

86.     Where Cigna had no information about the amount that the patient paid ASCs, Cigna withheld payment for those plans because ASCs refused to provide Cigna with the amount that those patients had paid Plaintiffs. (Cisar Aff. ¶¶ 18, 32, 45, 58, 68, 75.)

87.     After Cigna first implemented its fee-forgiving protocol, SIU surveyed more members about their experiences with several of the ASCs, which confirmed Cigna's initial findings. (Cisar Aff. ¶¶ 21-22, 33-34, 46-47.)

88.     SIU also discovered disclaimer forms in which the ASCs explicitly told members that the ASCs intended to charge them their "in-network benefits" even though the ASCs were out of network. (Cisar Aff. ¶ 35; Ex K to Cisar Aff., at CIG_KC0000755.)

89.     Several times during its investigation, Cigna sent ASCs letters requesting the details of their billing practices, including how they calculated patient cost-share responsibilities for Cigna plan members. (Cisar Aff. ¶¶ 14, 27, 40, 52, 65, 72.)

90.     At SurgCenter's direction, the ASCs either refused or failed to provide Cigna with any of the requested information. (Cisar Aff. ¶¶ 19-20, 28, 53, 65, 72.)

91.     Where they did respond, the ASCs provided a letter drafted by SurgCenter that confirmed that they charged Cigna's members what the ASCs calculated as the members' in-network cost-sharing responsibility but did not disclose how they calculated that amount, which was information they stated Cigna was not entitled to receive. (Ex. E to Cisar Aff. (Westminster); Ex. I to Cisar Aff. (Bel Air); Ex. 67 at BASC-CIG00028444 (SurgCenter directing Bel Air with language to respond to Cigna request and to not provide information); Ex. N to Cisar Aff. (Kissing Camels); Ex. S to Cisar Aff. (Dry Creek).)

92.     Cigna informed each ASC that it determined the ASC was fee forgiving and that Cigna would deny or reduce payments accordingly. (Cisar Aff. ¶¶ 14, 27, 40, 52, 65, 72.)

93.     Cigna fully reviewed every appeal that the the ASCs submitted once the fee-forgiving protocol was implemented. (Ex. 6 at 177:2-178:16.)

94.     In fall 2014, Cigna changed its payment protocol for all claims submitted by the ASCs that were flagged on or after January 1, 2013 under the fee-forgiving protocol so that such

claims ████████████████████████████████████████████████████████████

████ (Ex. 68 at 103:2-23, 107:2-22.)

## IV.   CIGNA'S INTERACTIONS WITH OTHER INSURERS AND HOSPITALS.

### A.   Cigna Had Independent Reasons for Taking Actions Against In-Network Providers Who Referred Patients to the ASCs.

95.     Cigna took all of the actions to deter referrals to the ASCs for independent business reasons, including to protect its selective contracting model, and not because Cigna entered into an agreement with any alleged conspirator.  (*See infra* SMF ¶¶ 96-111.)

96.     First, by referring patients to the Colorado ASCs, Cigna providers were violating their contracts with Cigna (all of which they had entered into before the Colorado ASCs opened) because the Colorado ASCs have never been in-network providers with Cigna, and Cigna's provider agreements do not allow providers to refer patients to out-of-network facilities absent extenuating circumstances. (Grohskopf Aff. ¶¶ 11, 13.)

97.     Each of the providers who received warnings and termination notices from Cigna referred patients to the Colorado ASCs' out-of-network facilities. (*See, e.g.*, Ex. 2 at 126:10-15 (Cigna "sent letters out to 30-some-odd group of providers" who were "utilizing the Colorado ASCs"); Ex. 69 (Cigna letter to former Cigna provider warning that "[b]y referring Cigna members to [Dry Creek], you are in violation of your Cigna contract.").)

98.     The patients that were referred to these Colorado ASCs could have received the same services at a facility in Cigna's network, which would have cost Cigna's plans less money. (Grohskopf Aff. ¶ 14; Ex. 20 at 61:17-62:2 (agreeing that "there's no reason that [he] couldn't do any surgery that [he does] at Kissing Camels" at other facilities).)

99.     <u>Second</u>, Cigna providers who referred patients to the Colorado ASCs were increasing healthcare costs for Cigna and Cigna's clients and members. (Grohskopf Aff. ¶ 15.)

100.    The charges that the Colorado ASCs submitted to Cigna, and the resulting amounts that Cigna paid the ASCs, were far in excess of rates that Cigna's in-network providers would charge for comparable procedures. (*Id.* ¶ 16.)

101.    The higher costs of the Colorado ASCs' services increased costs to the plans that Cigna administered. (*Id.* ¶ 17.)

102.    For ASO plans, increases in plan expenditures are borne entirely by employers, who must decide whether and how much of those increased expenditures to pass on to members in the form of increased premiums and/or reduced benefits. (Ex. 1, May Rep. ¶ 49.)

103.    For fully funded plans, where Cigna pays claims from premiums it collects or, if claims are in excess of the amount of premiums collected, from Cigna's own funds, increases in plan expenditures cause plan premiums to increase the next plan year. (*Id.* ¶ 50.)

104.    <u>Third</u>, the high charges submitted by the Colorado ASCs prompted significant complaints from Cigna's clients—especially from those employers who self-fund their plans and were responsible for the ASCs' charges. (Grohskopf Aff. ¶ 18; *see also* Ex. 60 at 25:13-23 (ASC issue was "[v]ery important" to Cigna as early as September 2011, because Cigna had "been investigating or looking into these surgery centers for quite some time" and had been "receiving customer and member complaints throughout this time."); *id.* at 89:5-13 ("the complaints that we were receiving from customers were increasing and escalating").

105.    <u>Fourth</u>, Cigna believed, and still believes, that the ASCs' waiver of their patients' out-of-network cost-sharing obligations violates Colorado law. (Grohskopf Aff. ¶ 19.)

106.    Cigna also believed, and continues to believe, that by referring patients to the Colorado ASCs, physicians were promoting and abetting these unlawful practices. (*Id.* ¶ 20.)

107.    For all these reasons, Cigna decided that physicians who ignored Cigna's warnings and persisted in referring patients to the Colorado ASCs were not good business partners, and that Cigna no longer wished to be in business with them. (*Id.* ¶ 21.)

108.    The selective contracting model reduces the cost of healthcare services for consumers (members) and plan sponsors (including employers who fund their plans) through reduced premiums and/or increased benefits, and benefits in-network providers by channeling a higher volume of patients to them in return for discounted rates. (Ex. 1, May Report ¶¶ 6-8.)

109.    The fact that the Colorado ASCs are not in Cigna's network does not preclude Cigna's members who wish to receive treatment there from doing so. (Grohskopf Aff. ¶ 22.)

110.    Cigna processes all claims under its members' applicable out-of-network benefits, and will approve the out-of-network claims to the extent they are covered by the members' plan. (*Id.* ¶ 23.)

111.    Accordingly, even though Cigna's contracts with in-network providers prohibit referrals to out-of-network providers, Cigna's plan members can still see out-of-network providers on their own accord. (*Id.* ¶ 24.)

**B.    There Is No Evidence of a Centura-HCA Conspiracy.**

112.    There is no evidence that Centura and HCA had any contacts about pressuring insurance companies regarding plaintiffs. (Ex. 70 at 119:19-24; Ex. 71 at 187:6-15.)

113.    There is no evidence that anyone from Centura or on Centura's behalf attended the conference call in May 2012 between CASCA and some payors (the "May 2012 call"), or

23

attended the August 2012 meeting between CASCA and some payors (the "August 2012 meeting"). (Ex. 72 at 200:12-202:4 & Ex. 73; Ex. 74 at 39:7-25 & Ex. 75; Ex. 76 at 260:5-11.)

### C.    There Is No Evidence of a Conspiracy Between Cigna and Other Insurers.

114.    There is no evidence that Cigna conspired with other insurers. (SMF ¶¶ 115-118.)

115.    No one from Cigna participated in the May 2012 call. (Ex. 2 at 32:3-12 (did not participate and does not know of anyone else on his team who did); Ex. 60 at 66:19-67:4 (same); Ex. 77 at 91:20-92:2 (did not attend any meetings at CAHP at which the ASCs were discussed).)

116.    There is no evidence that the participants in the May 2012 call reached any agreement regarding the ASCs. (Ex. 74 at 25:7-11; Ex. 72 at 192:18-193:23; Ex. 78 at 96:20-103:14; Ex. 79 at 111:11-112:10; Ex. 4 at 56:1-62:4.)

117.    There is no evidence that the participants in the August 2012 meeting reached any agreement regarding the ASCs. (Ex. 60 at 74:16-23 (no one at the meeting "suggest[ed] that Cigna" or "any [other] insurer take any specific actions with respect to the [ASCs].").)

118.    While Cigna representatives attended the August 2012 meeting, Cigna's representatives said nothing, as they had been instructed to do by Grohskopf, because Cigna was at that time developing its own strategy for addressing the ASC issue. (Ex. 2 at 34:9-18 ("I instructed [the attendees] . . . 'Don't offer up any opinion. Don't talk about what Cigna's doing. I just want to hear what's being said at the meeting.'"); Ex. 60 at 78:6-11, 68:10-13 ("this meeting was noneventful for us . . . we were developing our own strategy, and we just listened."); *id.* at 80:5-7 (not aware "of any actions anyone at Cigna took as a result of the [August 2012] meeting").)

**D.    There Is No Evidence that Cigna Agreed to Join the Alleged HCA-Centura Conspiracy.**

119.    Cigna never agreed with either Centura or HCA to take any action with respect to the ASCs. (*See* SMF ¶¶ 120-126.)

120.    No one from Cigna discussed the Colorado ASCs with Centura. (Ex. 2 at 113:23-25.)

121.    Likewise, while HCA employees sent several emails to Cigna employees from 2011 to 2012 regarding certain of the ASCs, HCA never asked Cigna to conspire against the ASCs, nor did Cigna agree to do so. (Ex. 80 at CIG-KC0142696 (Apr. 27, 2011 email from HCA forwarding information about Dry Creek and asking Cigna to "give [HCA] a call to discus[s]"); Ex. 81 at CIG_KC0155141-42 (May 10, 2011 email from HCA sending "a list of physicians that we think use that out of network ASC [referring to Dry Creek]"); Ex. 82 (Sept. 15-16, 2011 email chain regarding HCA and Dry Creek); Ex. 83 at CIG_KC0138966 (Mar. 7, 2012 email in which HCA forwarded a list of "[doctors] who have moved some or all of their volume" to the Colorado ASCs); Ex. 84 at CIG_KC0143581 (July 19, 2012 email identifying HCA's concerns about the ASCs to Cigna).)

122.    While HCA made occasional inquiries about the Colorado ASCs, HCA did not pressure Cigna to do anything with respect to physicians who referred patients to the ASCs. (Ex. 2 at 53:14-54:3 ("it was really a very sporadic thing. I meant, it wasn't -- it was typical for them to bring it up and then a couple of months go by and not talk about it. [ . . . ] So it wasn't -- it wasn't something they were, in my mind, very persistent on. They just would check back every once in a while."); *id.* at 64:3-11 (HCA would "check in every few months, see if I had anything

25

different for them. I'd say, 'No, we're still looking into it.' 'Okay.' And then the inquiries just stopped.").)

123.    In response to HCA's inquiries, Grohskopf did not "ever tell anyone at HCA anything more specific than that [he] [was] looking into it." (Ex. 2 at 64:12-14; *see also id.* at 63:24-64:2 (agreeing that up until March 2012, he "had told HCA in substance that [he] [was] looking into it and that was all [he] had told them.").)

124.    In fact, the emails from HCA indicate that, from HCA's perspective, Cigna had not taken any actions in response to HCA's concerns. (Ex. 85 (Mar. 19, 2012 email to Cigna asking "What is CIGNA doing? I know what Anthem and United are doing but have not heard what you are doing?").)

125.    Cigna's decision to send warning and termination letters to some of its providers was not influenced by any communications with HCA (or the supposed conspiracy with other insurers or Centura) but instead was done for the independent reasons outlined in Section IV.A above. (*See* Ex. 2 at 68:18-69:8 (Cigna was "going to do what we needed to do ***regardless*** of how [HCA] felt about it or what their position was"; explaining that he "thought it was important to communicate to HCA that we weren't just blowing them off . . . but quite frankly, anything beyond that is – you know, we need to handle it the way we need to handle it.") (emphasis added).)

126.    Cigna did not even tell "anyone at HCA that some [Cigna] providers have either been terminated or received termination notices." (*Id.* at 157:6-9.)

## V.      THE ASCS HAVE NO EVIDENCE OF AN ANTITRUST INJURY.

127.     Each Colorado ASC is still operating and continues to see patients. (SAC ¶ 63 ("Plaintiff Kissing Camels, an ambulatory surgery center, has treated and continues to treat Cigna subscribers."); *id.* ¶ 109 (Dry Creek); *id.* ¶ 123 (Cherry Creek); *id.* ¶ 137 (Hampden).)

128.     The Colorado ASCs have numerous sources for patients other than Cigna members, including Medicare and Medicaid workers' compensation programs, self-pay patients, and other insurers. (*See* Ex. 1, May Rep. ¶ 20.)

129.     The ASCs continue to be profitable, ███████████████████████████ (*See* Ex. 25 at 90:5-11 ██████████████████████████████████████

██████████████████████████████

130.     The ASCs have no evidence that Cigna's actions adversely affected the price, quantity, or quality of the ASCs' services.

131.     In Colorado, Cigna's network includes approximately 13,500 physicians, 120 ambulatory surgical centers, and 84 hospitals. (Grohskopf Aff. ¶ 4.)

132.     Even though Cigna's contracts prohibit in-network providers from referring patients to out-of-network providers, Cigna's plan members can still receive treatment from the ASCs on their own accord if they wish. (*Id.* ¶¶ 22-24.)

## ARGUMENT

## I.      THE COLORADO ASCS CANNOT PREVAIL ON THEIR ANTITRUST CLAIMS (COUNTS VI & VII).

The Colorado ASCs brought Sherman Act § 1 and Colorado antitrust claims against Cigna.  To survive summary judgment, they must show: (1) a "conspiracy," that (2) "unreasonably restrains trade in the relevant market," and (3) proof of antitrust injury. *See TV*

*Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992); *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006).[3] The evidence shows that the Colorado ASCs can meet none of these elements—let alone all three.

### A.    The ASCs Have No Evidence of a Conspiracy.

"[T]o survive . . . summary judgment, the plaintiffs must first demonstrate the existence of an agreement, whether by direct or by circumstantial evidence." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856-57 (10th Cir. 1999).[4] The ASCs try to conjure up a two-level conspiracy: (1) an agreement between the hospitals HCA and Centura to drive them out of business; and (2) an agreement by insurers, including Cigna, to join the Centura-HCA conspiracy. To show a group boycott, the ASCs must prove both levels of this conspiracy. They can prove neither.

### 1.    There Is No Direct Proof of Conspiracy.

Direct evidence of conspiracy "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006). It "must evince with clarity a concert of illegal action." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2007).[5]

To prove conspiracy directly here, the ASCs must offer unequivocal proof that: (1) Centura and HCA agreed to conspire; (2) Cigna agreed to conspire with other insurers; (3) Centura and HCA asked Cigna to join their conspiracy; (4) Cigna agreed to join; and (5) Cigna agreed to take actions in furtherance of that conspiracy and did so. *See Kissing Camels*

---

[3] As this Court recognized, "[b]ecause federal antitrust law principles apply to both the federal and state antitrust claims, both claims may be analyzed together." *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, —F. Supp. 3d—, 2015 WL 753954, at *3 (D. Colo. Feb. 20, 2015).

[4] Unless otherwise noted, all emphasis has been added and all internal citations, quotations, and alterations omitted.

[5] *See Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("a recorded phone call in which two competitors agreed to fix prices at a certain level" is direct evidence); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

*Surgery Ctr., LLC v. Centura Health Corp.*, 2014 WL 560462, at *7 (D. Colo. Feb. 13, 2014) (dismissing § 1 claim for lack of allegations of conspiracy).

The ASCs only made it over the hurdle at the motion to dismiss stage by pleading that "Cigna *explicitly* agreed with the Hospitals and other insurers to penalize physicians providing referrals to Plaintiffs' facilities." *See Arapahoe*, 2015 WL 753954 at *3. But between two cases, including eighty depositions and over four million pages of produced documents, the ASCs have no evidence to support this allegation. As Centura argued in its related case, the facts of which Cigna incorporates by reference herein, there is no evidence of a conspiracy between Centura and HCA.[6] (*See also* SMF ¶¶ 112-113 (no proof of a Centura-HCA conspiracy).) And there is certainly no direct evidence that Cigna agreed to enter the supposed HCA-Centura conspiracy, conspired with other insurers, or agreed to take actions in furtherance of the conspiracy. (*See* SMF ¶¶ 114-126.) At most, the ASCs can offer inferences. But that is circumstantial, not direct, evidence. And as detailed in Section I.A.2., the circumstantial evidence here further confirms no conspiracy existed.

### 2.    The Circumstantial Evidence Does Not Support a Conspiracy.

With no direct proof, the ASCs must fall back on circumstantial evidence. The ASCs' sole basis that Cigna allegedly conspired with Centura and HCA is that Cigna, like other insurers, sent warning letters to Cigna providers who referred patients to the out-of-network ASCs and terminated several providers who refused to stop that conduct.

That parallel conduct is not enough. Because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case," *Mitchael*, 179 F.3d at 858, the

---

[6] *Kissing Camels Surgery Center, LLC, et al. v. Centura Health Corp.*, Case No. 1:12-cv-03012 (D. Colo.), D.E. 228 at 21-30 & D.E. 252 at 11-17 (no evidence of a Centura-HCA conspiracy).

ASCs "must present evidence that tends to exclude the possibility that the alleged conspirators acted independently," *id.*—that is, the ASCs "must present evidence that [Cigna] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257, 1261 (10th Cir. 2006) (no conspiracy where defendant "provided a legitimate rationale for its decision"); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("the conspiracy allegation will fail if there is an independent business justification which explains the [defendants'] conduct.").[7]

Here, Cigna representatives testified as to the many independent reasons for its actions. First, to protect Cigna's provider network and channel patients to in-network providers, Cigna's contracts with providers require them to refer Cigna members to other in-network providers. (SMF ¶ 96.)[8] By referring patients to Plaintiffs' out-of-network facilities, these physicians—who not coincidentally also owned the ASCs—were violating their contracts, all entered into before any of the ASCs opened.[9] (*Id.* ¶¶ 96-97.) Second, Cigna did not have negotiated rates with the ASCs, so by referring patients to these out-of-network ASCs, the physicians were driving up the cost of healthcare for Cigna, Cigna's clients (employers who fund the plans), and Cigna's plan members themselves. (*Id.* ¶¶ 99-103.) Third, the ASCs' exorbitant charges ██████████████████ █████████████████████████████████ prompted complaints from Cigna's clients, especially from employers

---

[7] *See also Mitchael*, 179 F.3d at 860 (no conspiracy where plaintiffs failed to "exclude the possibility that the defendants acted independently out of a legitimate and reasonable concern to control chiropractic costs."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999) ("no conspiracy . . . when defendants' conduct can be explained by independent business reasons.").

[8] These in-network referral requirements are a standard provision in insurer-provider contracts. (SMF ¶ 10.)

[9] The ASCs' allegations that Cigna physicians who referred patients to these ASCs were "not in breach of the[ir] agreement," that Cigna "had no cause" to terminate them, or that "such referrals did not violate the terms" of their contracts (*see* SAC ¶¶ 180-93) are false. Three groups of Cigna providers challenged their termination in three separate arbitrations. (SMF ¶ 69.) Each arbitration has since ended, and the terminations remain in effect. (*Id.* ¶ 70.)

who self-funded their plans and were responsible for the ASCs' charges. (*Id.* ¶ 104.) Finally, Cigna believed that the ASCs' billing practices violated Colorado law, and that by referring patients to the ASCs, physicians were promoting and abetting these unlawful practices. (*Id.* ¶¶ 105-106.) Given all this, Cigna decided that these physicians were not good business partners, and Cigna no longer wished to be in business with them. (*Id.* ¶ 107.)

Moreover, courts have repeatedly recognized the legitimate interests in preventing fee-forgiving schemes such as the one promoted by the ASCs' physician-owners. *See, e.g.*, *Kennedy*, 924 F.2d at 698 (the "[patient]'s plan and CIGNA's policy require co-payments in order to maintain incentives that hold down the cost of medical care"); *Biomed Pharms., Inc. v. Oxford Health Plans (NY), Inc.*, 522 F. App'x 81, 81-82 (2d Cir. 2013) (upholding insurer's decision to reduce payment to provider that "routinely" waived patients' "deductible and coinsurance obligations"); *Smilecare Dental Grp. v. Delta Dental Plan of Cali.*, 88 F.3d 780, 786 (9th Cir. 1996) (affirming dismissal of Sherman Act claim; noting that "[plan]'s policy is supported as a matter of law by a legitimate business justification–its interest in protecting the disciplinary effect of its co-payment plan"); *Davidowitz v. Delta Dental Plan of Cali., Inc.*, 946 F.2d 1476, 1479 (9th Cir. 1991) (cost-sharing "waivers annul the benefits of the co-payment system"); *Feiler v. N.J. Dental Ass'n*, 191 N.J. Super. 426, 440 (N.J. Super. 1985) (waiving copayments "shift[s] cost away from the patient and, fraudulently, onto the shoulders of another payer").

The ASCs' only response is to point to a handful of emails between Cigna and HCA from 2011 and 2012 (SMF ¶ 121) that boil down to this: HCA told Cigna about its concerns with the ASCs, and Cigna "told HCA in substance that [it was] looking into it"—which "was all [Cigna] had told them." (*Id.* ¶¶ 122-23.) But a conspiracy cannot "be inferred merely from the existence

of complaints, or even from the fact that [the challenged action] came about 'in response to' complaints." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). Instead, "[e]vidence must be presented both that the [conspirator] communicated its acquiescence or agreement, and that this was sought by [the other conspirator]." *Id.* at 764 n.9. Thus, where the evidence of a supposed conspiracy amounts to "complaints by [an entity] who competes with [plaintiff], and action in response by the [defendant] adverse to the [plaintiff]," the defendant is entitled to summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1475 (10th Cir. 1985) (affirming summary judgment); *Kissing Camels*, 2014 WL 560462, at *9 (dismissing ASCs' § 1 claim against insurers because the complaint provided "independent, non-conspiratorial reasons" for the insurers' actions, including Cigna's reasons above). So even if the ASCs could prove that Cigna acted "in response to" HCA's complaints—and they cannot—such evidence would not prove a conspiracy as a matter of law. *See Monsanto*, 465 U.S. at 763; *Abraham*, 461 F.3d at 1259.[10]

Further undercutting any inference of conspiracy from these emails, the record shows that Cigna began "investigating [physicians'] utilization at the [ASCs]" in 2010 (SMF ¶ 62), ***before*** allegedly joining the supposed conspiracy. Moreover, Cigna began warning its providers not to refer patients to these ASCs in January 2011—before HCA first contacted Cigna about the ASCs. (*Id.* ¶ 63.) And these warning letters were the same type that Cigna sent to providers across the country. (*Id.* ¶ 64.) Indeed, SurgCenter expected insurers to start sending these letters shortly after each of its ASCs opened, as they had in St. Louis as early as 2002. (*Id.* ¶¶ 65-66.)

---

[10] *Accord, e.g.*, *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 19 (1st Cir. 2004) ("[C]ourts consistently have held that the fact that a dealer was terminated in response to complaints from competing dealers is insufficient, without more, to survive a motion for summary judgment.") (collecting cases).

The fact that insurers sent these letters in other markets for at least a decade before this case began undercuts any inference that they did so pursuant to a conspiracy here.

Just as problematic for the ASCs, there is no evidence that Cigna had actually agreed to terminate providers at HCA's request. As Grohskopf explained, Cigna was "going to do what we needed to do *regardless* of how [HCA] felt about it or what their position was." (*Id.* ¶ 125.) Indeed, Cigna did not even tell "anyone at HCA that some providers have . . . been terminated or received termination notices." (*Id.* ¶ 126.) Nor is there any evidence that HCA ever pressured Cigna to do anything with respect to physicians who referred patients to the ASCs. (*Id.* ¶ 122.)

The ASCs likewise have no support for their allegation that Cigna conspired with other insurers. The ASCs' sole basis for this supposed conspiracy is that Cigna representatives attended an August 2012 meeting where representatives from other insurers were present. (SAC ¶ 176.) But no one at that meeting even "suggest[ed] that Cigna" or "any [other] insurer take any specific actions with respect to the [ASCs]." (SMF ¶ 117.) And contrary to the ASCs' allegation that "all of the parties present, including Cigna . . . expressed their mutual desire to destroy the Plaintiffs' business and agreed to implement a strategy to 'stop' the 'flow of dollars' to these facilities" (SAC ¶ 176), Cigna representatives said nothing at that meeting. (SMF ¶ 118.)

### B. The ASCs Cannot Prove an Unlawful Restraint.

In ruling on Cigna's motion to dismiss, the Court found that the ASCs pled "a group boycott that may be considered *per se* illegal under § 1." *Arapahoe*, 2015 WL 753954 at *6. No longer bound by Plaintiffs' allegations, *see Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253 (10th Cir. 2005), the Court can now consider the actual record, which shows that the *per se* rule is improper. Supreme Court "precedent limits the *per se* rule in the boycott

context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). Here, the ASCs allege a two-prong conspiracy: (1) a vertical agreement between the insurers and the hospitals Centura and HCA; and (2) a horizontal agreement between Cigna and other insurers (Aetna, United, Anthem, and Kaiser). (*See* SAC ¶¶ 16, 156.) Because Cigna and Centura or HCA are not direct competitors,[11] and there is no evidence of an agreement between either Centura and HCA or Cigna and any other insurer (*see supra* § I.A.2), the first prong cannot support the *per se* rule as a matter of law. *See, e.g.*, *Campfield v. State Farm Mut. Ins. Co.*, 532 F.3d 1111, 1119-20 (10th Cir. 2008) (affirming dismissal of *per se* claim against insurer and claim processor who were "not competitors," and "their cooperation cannot constitute a . . . group boycott . . . sufficient for a *per se* violation").[12]

Moreover, the many and significant procompetitive effects of Cigna's actions preclude any finding of an unreasonable restraint of trade.[13] *See Pfenninger v. Exempla, Inc.*, 116 F. Supp. 2d 1184, 1193 (D. Colo. 2000) (citing *Diaz v. Farley*, 215 F.3d 1175, 1182-85 (10th Cir. 2000) (declining to apply *per se* rule where "defendants advance[d] a plausible [procompetitive] argument")); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1123 (E.D. Cal. 2002) (under rule of reason, granting summary judgment in light of evidence of "procompetitive justifications."). By enforcing its provider contracts and terminating providers who refused to follow them, Cigna was protecting its selective contracting model. (SMF ¶¶ 61, 95.) The pro-

---

[11] *See* SAC ¶¶ 26-31 (alleging that Cigna acts as administrator of employers' healthcare plans or as insurers of healthcare insurance policies); *id.* ¶¶ 33-34 (alleging that Centura and HCA operate health care facilities).

[12] *See also Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1392 (10th Cir. 1992) ("[T]o establish that a group boycott is *per se* illegal there must be an agreement among conspirators whose market positions are horizontal to each other.").

[13] At a minimum, these justifications prevent the application of the *per se* rule, which "should be applied only in clear cut cases" where restraints are "***entirely*** void of redeeming competitive rationales." *Law v. NCAA*, 134 F.3d 1010, 1016, 1019 (10th Cir. 1998).

competitive benefits of this model are well established: it reduces the cost of healthcare services—which saves money for consumers (the members) and plan sponsors (including employers who fund their plans), and benefits in-network providers by channeling a higher volume of patients to them in return for discounted rates. (*Id.* ¶¶ 5-9, 12.)

Courts have recognized these pro-competitive benefits in the context of similarly overreaching antitrust claims. *See Abraham*, 461 F.3d at 1261 (acknowledging "substantial empirical evidence that selective contracting allows managed care companies to contain health care costs—the more restrictive the panel, the lower the cost of the premium to the subscriber"); *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 838-39 (D.N.J. 2011) ("incentives to use [in-network providers] . . . reduce costs for both the healthcare benefits plan and for the subscriber," and "foster competition among healthcare providers by encouraging [out-of-network] providers to charge fees which compete with the lower negotiated rates charged by in-network providers."); *CIGNA Healthplan of La., Inc. v. State ex rel Ieyoub*, 883 F. Supp. 94, 97 (M.D. La. 1995) (acknowledging arguments that a "provider network also reduces costs and is said to improve services by fostering competition between providers," and enables insurers "to control or reduce costs and assure quality").

### C.  The ASCs Cannot Prove an Antitrust Injury.

The ASCs' antitrust claims fail for the independent reason that they have no proof of antitrust injury. The ASCs allege that they suffered "decreased utilization and/or decreased revenues." (SAC ¶¶ 20-23.) But it is well established that economic losses ***to the ASCs themselves*** are not an antitrust injury. *E.g.*, *Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1125 (10th Cir. 2005). Instead, the ASCs "must prove that challenged conduct

affected the prices, quantity or quality of goods or services, not just [their] own welfare." *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012).[14]

Nothing in the record shows that even the ASCs' exit from the market would meet this standard. Indeed, a federal court just dismissed with prejudice a Sherman Act claim brought by another SurgCenter-affiliated facility in very similar circumstances—finding a lack of "actual detrimental effect on competition" where the facility failed to show that patients could not receive its services absent in-network referrals or obtain those services elsewhere; there was no decline in the number of facilities; and the facility was "still open for business."[15] Just so here: every Plaintiff-ASC is still operating, and there is no evidence that patients who wish to receive treatment at those ASCs cannot do so or cannot obtain comparable services elsewhere. (SMF ¶¶ 127, 131-132.) Indeed, the profits the ASCs have received—around 1000 percent return on equity (*see id.* ¶ 129)—show that they are under no threat of going out of business. Moreover, the ASCs have continuously "treated and continue[] to treat Cigna subscribers" since they opened, despite Cigna's warnings to network providers. (SAC ¶¶ 63, 109, 123, 137); *Tri State*, 2015 WL 1737410, at *4 (no detrimental effects where ASC's "services [are] available to patients").) And far from being shut out of the market, the ASCs have numerous other sources for patients, including Medicare and Medicaid, worker's compensation programs, self-pay patients, and other insurers. (SMF ¶ 128.) Finally, the ASCs' patients can receive the same services at a facility in Cigna's network (which includes 120 ASCs and 84 hospitals in Colorado)—and would cost its plans less. (*Id.* ¶¶ 131-32, 98.)

---

[14] *See also, e.g.*, *JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 793525, at *5 (D. Colo. Feb. 26, 2014).

[15] *Tri State Adv. Surgery Ctr., LLC v. Health Choice, LLC*, 2015 WL 1737410, at *4 (E.D. Ark. Apr. 16, 2015).

In any event, the Supreme Court has expressly rejected the notion that "removal of some elements of price competition [necessarily] distorts the market, and harms all the participants," because such a theory "would equate injury in fact with antitrust injury." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 n.8 (1990).[16] So even proof that the ASCs were actually forced out of the market would not suffice to show an antitrust injury.

## II.  CIGNA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' ERISA CLAIMS (COUNTS I, II & III).

### A.  The ASCs Cannot Prove Their § 502(a)(1)(B) Claim Because They Have No Evidence that Cigna Abused Its Discretion.

The ASCs claim that Cigna violated ERISA § 502(a)(1)(B) by reducing and denying benefit payments to its members for services that the ASCs provided. There can be no dispute that all of the Plans explicitly grant Cigna discretionary authority to determine eligibility for benefits and to construe the terms of the plan. (*See* SMF ¶ 22.) This Court therefore reviews Cigna's contested actions for abuse of discretion, which means that Cigna's interpretation of the Plans must be upheld unless it was "arbitrary and capricious." *Liebel v. Aetna Life Ins. Co.*, 595 F. App'x 755, 762 (10th Cir. Dec. 3, 2014); *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.,* 663 F.3d 1124, 1132 (10th Cir. 2011); *see also Firestone Tire & Rubber Co. v. Baruch*, 489 U.S. 101, 115 (1989).

Under the arbitrary and capricious standard, a court "will uphold the decision of the plan administrator so long as it is predicated on a reasoned basis, and there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Eugene S.*, 663 F.3d at 1133-34; *Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan*, 26 F. App'x 811, 815

---

[16] *Accord, e.g.*, *Cohlmia*, 693 F.3d at 1281; *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F. 3d 57, 66 (1st Cir. 2004); *GF Gaming Corp. v. Black Hawk Casino Owners Ass'n*, 326 F. Supp. 2d 1177, 1190 (D. Colo. 2004)), *rev'd in part on other grounds*, 405 F.3d 876 (10th Cir. 2005).

(10th Cir. 2001) (the arbitrary and capricious standard is "very restrictive," and "one which would be difficult for any claimant to overcome."). Given this deferential standard, courts routinely grant summary judgment in favor of defendants challenged under ERISA § 502(a)(1)(B). *See, e.g.*, *Daily v. Hewlett Packard Co.*, 2014 WL 5489085, at *6-8 (D. Colo. Oct. 29, 2014); *Cleary v. Boeing Co. Employee Health & Welfare Ben. Plan (Plan 503)*, 2013 WL 3943633, at *8-11 (D. Colo. July 31, 2013); *Carberry v. Metro. Life Ins. Co.*, 2011 WL 2887842, at *5 (D. Colo. July 19, 2011). "ERISA actions are usually adjudicated on summary judgment rather than at trial." *Vincent v. Lucent Techs., Inc.*, 733 F. Supp. 2d 729, 733-34 (W.D.N.C. 2010), *aff'd*, 440 F. App'x 227 (4th Cir. 2011).

Such should be the case here. There is no dispute that Plaintiffs provide out-of-network services to Cigna's members but collect no more than the in-network cost sharing responsibility from them. (SMF ¶ 33.) Moreover, the ASCs base the members' in-network cost share on a rate substantially less than what the ASCs submit as their charge to Cigna. (*Id.* ¶ 54.) When Cigna confirmed the details of the ASCs' fee-forgiving scheme, Cigna determined that its plans did not cover the amounts that the ASCs submitted to Cigna because the ASCs did not require members to pay these same amounts, including the members' required cost-share under their plans. (*See id.* ¶¶ 71-75, 88.) Cigna therefore reduced payment to the ASCs to reflect the ASCs' actual charges. (*See id.* ¶¶ 77-79.) Cigna's determination was correct and well within its discretion. (*See id.* ¶¶ 80-81.)

### 1. Cigna Correctly Interpreted Its Plans as Not Covering "Charges" that the ASCs Did Not Require Its Plan Members to Pay.

Cigna-administered plans do not automatically reimburse a member for a provider's every charge. Rather, they cover a portion of any "Covered Expenses," which are subject to

"Any applicable Copayments, Deductibles, or limits [that] are shown in the Schedule." (SMF ¶¶ 13-14.) Importantly, the plans expressly state that "Covered Expenses will *not* include, and no payment will be made" for "charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan." (*Id.* ¶ 18.) Moreover, the Plans are not obligated to reimburse any portion of Covered Expenses until the member has paid his or her out-of-network deductible in full. (*Id.* ¶ 16.)

Here, Cigna determined that the ASCs generally charged Cigna ████████████████████ ██████████ but calculated members' cost-sharing responsibility ███████████████████████ █████████████████████████████████████ (*Id.* ¶¶ 54, 74.) Because the ASCs did not bill Cigna members the same charges that they billed Cigna, Cigna interpreted its members' plans not to cover the charges that the ASCs submitted to Cigna—because the ASCs never intended to make the members pay that charge—but rather cover only the charge that they used to calculate the members' in-network cost-sharing responsibility. (*Id.* ¶¶ 73-74, 75, 88.) And because the ASCs charged only an in-network deductible or no deductible at all, many Cigna members never satisfied their out-of-network deductible and therefore the Plans would not have been obligated to reimburse any portion of the Covered Expenses. (*See id.* ¶¶ 16-19, 40-41, 45-46.)

The Seventh Circuit has already upheld Cigna's interpretation. In *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698 (7th Cir. 1991), the court examined a Cigna plan that required the member to pay 20% coinsurance and provided that "[n]o payment will be made for expenses incurred . . . for charges which the Employee or Dependent is not legally required to pay." *Id.* at 701. Similar to what the ASCs did here, the provider plaintiff in *Kennedy* waived the

member's coinsurance. *Id.* And, as here, Cigna interpreted the plan as allowing it to reduce reimbursement; in that case, it reduced the reimbursement to zero because the provider charged the member nothing "and 80% of nothing is nothing." *Id.* The Seventh Circuit upheld Cigna's interpretation, observing that, by waiving coinsurance but submitting a bill to Cigna for his full charges, the provider was misstating his actual charges. *Id.* The plan's provision excluding from coverage charges that the member is not required to pay "helps Cigna combat this tactic," the court continued. *Id.* "It means that the patient must be legally responsible for the whole charge, so that after Cigna pays its 80% the patient still has 20% left to go." *Id.* The Second Circuit has taken a similar position. *See Biomed*, 522 F. App'x at 81-82 (upholding insurer's determination under arbitrary and capricious standard to reduce payments to provider that "routinely" waived "the plan's cost-share obligations").

### 2. Cigna Gathered Substantial Evidence that the ASCs Were Not Collecting Coinsurance from Cigna's Plan Members.

A decision is not arbitrary and capricious if it is supported by "substantial evidence," which is "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1993); *see also Spradley v. Owens–Illinois Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012). In making that determination, the court is limited to considering the evidence that was available to the administrator at the time the benefits determination was made. *Brown v. Hartford Life Ins. Co.*, 428 F. App'x 817, 820 (10th Cir. 2011).

The evidence here was substantial. Before implementing its fee-forgiving protocol, Cigna conducted an extensive investigation into the ASCs' billing practices, included reviewing the ASCs' claim forms and surveying plan members about the ASCs' services. (SMF ¶¶ 72-76.)

Cigna's investigation revealed that the ASCs were not collecting the members' cost-sharing obligations under their plans and, in fact, that the ASCs most often billed members ***nothing***. (*Id.* ¶ 74.) Cigna also uncovered disclaimer forms in which the ASCs explicitly told members that the ASCs intended to charge the members only their "in-network benefits" despite the fact that the ASCs are out of network. (*Id.* ¶ 88.) And while Cigna repeatedly asked the ASCs for details about how they calculated the amounts collected from members and for proof of what their members actually paid (*id.* ¶ 89), SurgCenter directed the ASCs to ignore Cigna's requests and instead SurgCenter provided the ASCs with a letter stating only that the ASCs collected the members' in-network cost-sharing responsibility without disclosing that this responsibility was based on a completely different rate than the one the ASCs submitted to Cigna. (*Id.* ¶¶ 90-91.)[17] Discovery from the ASCs and SurgCenter has confirmed Cigna's conclusion: the ASCs engaged in dual pricing and fee forgiving (*id.* ¶¶ 33-58), and Cigna's decision to reduce payments to the ASCs accordingly was appropriate.

### B.   The ASCs Did Not Exhaust their Required Administrative Remedies for Many of the Benefit Claims at Issue.

Many of the ASCs' claims independently fail because the ASCs failed to exhaust the administrative remedies required before filing an ERISA action. *See Holmes v. Colo. Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1214 (10th Cir. 2014) (affirming dismissal of ERISA claim where "the district court correctly determined that [member] failed to exhaust [the plan's administrative] remedies by not pursuing a second-level review"); *see also Lewis v.*

---

[17] The ASCs' failure to submit the requested information was alone sufficient to support Cigna's determination that their charges were not covered under Cigna's plans. *See, e.g.*, *Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 706 (10th Cir. 2007) (holding that denial of benefits for failure to submit evidence to plan administrator was not arbitrary and capricious).

*U.F.C.W. Dist. Union Local Two & Employers Pension Fund*, 273 F. App'x 765, 767 (10th Cir. 2008). While Cigna's plans require claimants to complete two levels of administrative appeals before bringing suit,[18] each ASC conceded that they do not appeal benefit claims paid by Cigna at all as a matter of policy unless ███████████████████████████████████ ████ (SMF ¶¶ 59.) Moreover, at least one ASC admitted that it did not appeal any benefit claims at issue for extended periods of time. (*Id.* ¶ 60.)

### C.   The ASCs' Remaining ERISA Claims Are Meritless (Counts II & III)

In Count II, the ASCs allege that Cigna breached its fiduciary duty under ERISA § 502(a)(3) "by arbitrarily denying and reducing payments for out-of-network care based on its 'fee-forgiveness' payment policy." But that claim is completely duplicative of their failed claim for benefits under § 502(a)(1)(B), and therefore should be dismissed for that reason alone. *See, e.g.*, *Mein v. Pool Co. Disabled Int'l Employee Long Term Disability Ben. Plan, Pool Co.*, 989 F. Supp. 1337, 1351 (D. Colo. 1998) (granting summary judgment to defendants on plaintiff's 502(a)(3) claim because plaintiff, "as a plan participant, has available the remedy of enforcing the terms of the [] plan"). The ASCs' request for restitution is likewise inappropriate, as it seeks only "monetary compensation for economic or other harm," which is not available under section 502(a)(3). *See Callery v. U.S. Life Ins. Co. in City of N.Y.*, 392 F.3d 401, 405 (10th Cir. 2004).

The ASCs' ERISA § 502(a)(3) claim also fails because there is no evidence to support it. The ASCs premise the fiduciary breach on the allegation that Cigna realized "savings," leading to "increase[d] . . . compensation from [] plan sponsors," by denying the ASCs' claims. (SAC ¶ 208.) But the opposite is true: Cigna does ***not*** receive any portion of the difference between

---

[18] *See* Cisar Aff. Ex. A. at 48 ("CG has a two step appeals procedure for coverage decisions.").

what the plans paid the ASCs under the fee-forgiving protocol and what the plans would have paid without the protocol in place. (SMF ¶¶ 82-85.) In fact, Cigna made less money by implementing the fee forgiving protocol. (*Id.* ¶ 85.) Consequently, the ASCs have no factual support for their fiduciary-duty breach claims.

Finally, the ASCs' Count III claims that Cigna did not provide a "full and fair review" of the ASCs' appeals, but the record shows that Cigna fully reviewed every appeal that the ASCs submitted once the fee-forgiving protocol was implemented. (*See id.* ¶ 93.) Indeed, it is the ASCs—not Cigna—that did not comply with plan appeals procedures, by refusing to provide Cigna with the information it requested to consider their claims. (*Id.* ¶¶ 90-91.)

## III.   THE ASCS' STATE-LAW CLAIMS FAIL (COUNTS IV & V).

The ASCs' two tack-on state law contract claims are based on the exact same conduct the ASCs challenge through their ERISA claims. (SAC ¶¶ 219-34.) Both claims likewise fail.[19]

<u>Breach of Contract.</u> The ASCs claim that Cigna breached its Plans by "denying or drastically reducing" payments to the ASCs after discovering their fee-forgiving scheme. (*Id.* ¶ 224.) But the Plans do not obligate Cigna to pay "charges" that the ASCs do not require members to pay. (*Supra* § II.A.) Cigna therefore did not breach its contracts by enforcing this contractual term. *See Barlow & Haun, Inc. v. McPeek*, 215 F.3d 1336 (10th Cir. 2000).

The ASCs' breach of contract claim fails for the independent reason that the ASCs have suffered no cognizable damages. The ASCs assert this claim as an assignee of their patients (SAC ¶ 222), and therefore may only recover damages to the extent their patients have suffered

---

[19] Because Cigna is entitled to summary judgment on the ASCs' federal claims, the Court should decline to exercise supplemental jurisdiction over their remaining state-law claims and dismiss them accordingly. *See* 28 U.S.C. § 1367(c)(3); *Exum v. U.S. Olympics Comm.*, 389 F.3d 1130, 1139 (10th Cir. 2004).

damages. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA, v. Guar. Bank & Trust Co.*, 2015 WL 1040447, at *2 (D. Colo. Mar. 5, 2015) (dismissing breach of contract claim brought by assignee where assignor suffered no damages as a result of breach). Because the ASCs collected no more than a fraction of the amounts that their patients were obligated to pay under their plans, their patients suffered no damages. *See Joplin v. Sw. Bell Tel. Co.*, 753 F.2d 808, 809 (10th Cir. 1983); *Nat'l Wealth Real Estate, Inc. v. Cohen*, 2008 WL 511761, at *6 (D. Colo. Feb. 21, 2008).

Implied Covenant. The ASCs' implied covenant claim is based on the exact same conduct as their breach of contract claim (*compare* SAC ¶ 224 *with* ¶ 231), and should therefore be dismissed as duplicative. *Aurora Commercial Corp. v. PMAC Lending Servs., Inc.*, 2014 WL 859253, at *5 (D. Colo. Mar. 5, 2014) (dismissing duplicative implied covenant claim). Moreover, the implied covenant cannot be used to contradict the express terms of a contract, and here plan terms expressly govern the subject matter at issue. *Eagle Sys. & Servs., Inc. v. Exelis Sys. Corp.*, 2015 WL 59315, at *2 (D. Colo. Jan. 2, 2015) (granting summary judgment).

## IV. CIGNA IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIMS.

The same undisputed facts that entitle Cigna to summary judgment on the ASCs' claims entitle Cigna to summary judgment on its counterclaims. There is no dispute that the ASCs— with the active engagement of SurgCenter—purposely induced Cigna's members to get treatment at the ASCs by promising the members that they would pay no more for the ASCs' services than they would at an in-network facility, and then basing the members' cost-sharing obligations on rates much lower than what the ASCs charged Cigna.

The ASCs' indisputable practice of waiving the members' out-of-network cost-sharing responsibility—which often led members to pay nothing at all—violated Colorado's fee-

forgiving statute. (§ IV.A.) And by telling members that they did not owe their out-of-network cost-sharing responsibilities, the ASCs and SurgCenter (who recommended and assisted in implementing this policy) tortiously interfered with the contracts that these members had with Cigna to cover their out-of-network services. (§ IV.B.) Moreover, because the ASCs' policy was to collect from patients no more than their in-network cost-sharing responsibility ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ that rate represented the actual value of the ASCs' services—not the much higher charges that the ASCs submitted to Cigna. (§ IV.C.) Finally, because these same practices violated the terms of Cigna's ERISA-governed plans, Cigna is entitled to an injunction prohibiting the ASCs from continuing their illegal conduct. (§ IV.D.)

### A. The ASCs Indisputably Violated Colorado's Fee-Forgiving Statute.

The Colorado Criminal Code prohibits healthcare providers from knowingly "accept[ing] from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers," or "[s]ubmit[ting] a fee to a third-party payor which is higher than the fee he has arranged to accept from the insured patient with the understanding of waiving the required deductible or co-payment" where the effect is to "eliminate the need for payment by the patient of any required deductible or copayment applicable in the patient's health benefit plan." Colo. Rev. Stat. Ann. § 18-13-119(3)(a)-(b).

There is no dispute that the ASCs' billing model runs afoul of this statute. The ASCs readily admit that they charge Cigna members only their in-network responsibility ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ completely ignoring what the member should have paid for their out-of-network responsibility based on what Cigna actually allowed for the ASCs' services. (SMF ¶¶ 33-36, 41-46, 52-56.) In other words, the ASCs waive their patients' out-of-network

cost-sharing responsibility, in favor of the patients' in-network cost-share based on an amount independent of what the plan actually allows. (*Id.*) And while the ASCs maintain that they are merely reducing, not waiving, the patients' cost-sharing responsibility, their illegal practice often resulted in Cigna members paying ***nothing*** for services that would have cost much more had the ASCs applied the terms of these members' out-of-network benefits. (*Id.* ¶¶ 43-45.)

### B. There Can Be No Dispute that the ASCs and SurgCenter Tortiously Interfered with Cigna's Contracts with its Members.

In enacting section 18-13-119, the Colorado legislature recognized that "[b]usiness practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans ***interfere with contractual obligations*** entered into between the insured and the insurer relating to such payments."

There is no dispute that the ASCs engaged in such practices. (*See supra* § IV.A.) There is also no dispute that SurgCenter created this model and recommended that each ASC adopt it. (SMF ¶¶ 26, 31-33, 53.) Nor is there any question that the ASCs and SurgCenter knew that, in telling patients that they need pay no more than their in-network responsibility for out-of-network services, the patients were not complying with their contractual obligations with Cigna, which the ASCs and SurgCenter derided as "penalties." (*Id.* ¶¶ 34-39.) And the ASCs and SurgCenter cannot dispute that they purposely concealed the details of their billing scheme from Cigna, including the fact that they based the member's cost-sharing responsibility on an amount other than what Cigna allowed, further showing they knew this policy was improper. (*Id.* ¶¶ 48-50, 55-56.) Finally, the record is clear that the ASCs and SurgCenter adopted this policy to induce patients who would otherwise visit a lower-cost in-network facility into having

procedures performed at the ASCs' out-of-network facilities, costing Cigna and its plans more money. (*Id.* ¶¶ 36-37.)

Summary judgment on Cigna's tortious interference claim is therefore warranted. *See, e.g.*, *Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.*, 413 F. Supp. 2d 1016, 1024 (D. Minn. 2006) (applying Minnesota law; granting summary judgment on tortious interference claim where defendant induced hospitals into breaching confidentiality agreements); *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 996 (6th Cir. 2007) (applying Ohio law; affirming district court's grant of summary judgment on tortious interference claim where undisputed evidence showed that defendant intentionally induced executive into breaching non-compete agreement by locating executive in city covered by agreement, notwithstanding the alleged exception of this territory from his responsibilities).

### C. There Can Be No Dispute that the ASCs Were Unjustly Enriched by Extracting Payments that Grossly Exceeded the Value of Their Services.

A defendant is unjustly enriched where, at plaintiff's expense, the defendant received a benefit under circumstances that would make it unjust for the defendant to retain the benefit without paying. *See Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000); *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 294-95 (Md. Ct. App. 2007).

Here, the undisputed evidence shows that the ASCs induced Cigna to make payments to them that exceeded the value of the services that they rendered. The ASCs' policy was to collect from patients no more than their in-network cost-sharing responsibility ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ regardless of what Cigna allowed on those claims. (SMF ¶¶ 33, 39-40, 42, 53-54.) That rate of ▮▮▮▮▮▮▮▮▮▮—which the ASCs did not disclose to Cigna (*id.* ¶ 55)—represented the actual value of the ASCs' services, not the rate of ▮▮▮▮▮▮▮▮▮▮ that

47

the ASCs improperly represented as their charge when submitting claims to Cigna. As an officer of one of the ASCs rationalized the ASC's high reimbursements, "the alternative is to leave that money in the bank account of the insurance company . . . ." (*Id*. ¶ 58.) It would therefore be inequitable for the ASCs to retain the overpayments that Cigna made based on the grossly inflated charges that the ASCs submitted for insurance coverage. *See Metro. Life Ins. Co. v. Brown*, 1998 WL 1084680, at \*5 (W.D. Pa. Dec. 1, 1998) (granting summary judgment under Pennsylvania law on insurance company's unjust enrichment claim seeking overpayment of insurance benefits that resulted from plaintiff's own error); *Unum Life Ins. Co. of Am. v. Munoz*, 2007 WL 628084, at \*4-5 (N.D. Tex. Nov. 27, 2007) (same under Texas law).[20]

### D. The ASCs' Undisputed Practices Warrant a Permanent Injunction Under ERISA § 502(a)(3) to Prevent Future Violations of Plan Terms.

ERISA § 502(a)(3) allows a fiduciary like Cigna to "enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce . . . the terms of the plan." Here, there is no genuine issue of fact that the ASCs' practices violated the terms of Cigna's plans by causing the plans to pay for charges that the ASCs did not obligate members to pay and thus were not covered under the terms of those members' plans. (SMF ¶¶ 13-21, 33-41, 44-46, 54-56.) Nor is there any genuine dispute that, because the ASCs never intended to charge their patients the amounts that they billed Cigna (*id*. ¶ 42), their bills to Cigna did not represent their "normal charge" and thus exceeded the plans' limit of the "Maximum Reimbursable Charge." (*Id*. ¶¶ 20-21.)[21]

---

[20] *Cf. Am. Family Mut. Ins. Co. v. Centura Health-St. Anthony Cent. Hosp.*, 46 P.3d 490, 492-94 (Colo. App. 2002) (finding insurer stated unjust enrichment against hospital that charged insurer more than what worker's compensation carrier ultimately paid hospital for the same services pursuant to a fee schedule).

[21] Based on the same facts, the Court should also grant summary judgment on Cigna's Counterclaim Count XII, seeking a declaratory judgment that the charges that the ASCs submitted are not covered under the relevant plans.

Given the ASCs' undisputed and continued practices, Cigna is entitled to a permanent injunction requiring the ASCs to abide by the terms of Cigna-administered plans by submitting only charges that the ASCs actually charge members as payment in full. *See Vincent v. Lucent Techs., Inc.*, 440 F. App'x 227, 228 (4th Cir. 2011) (per curiam) (holding district court did not abuse discretion by entering permanent injunction enforcing ERISA plan terms on motion for summary judgment); *Pell v. E.I. DuPont de Nemours & Co. Inc.*, 539 F.3d 292, 306 (3d Cir. 2008) (affirming issuance of injunction requiring employer to calculate future pension payments using an earlier adjusted service date).

## <u>CONCLUSION</u>

For these reasons, the Court should enter summary judgment for Cigna, dismissing all of the ASCs' claims, and finding Counterclaim Defendants liable on all of Cigna's counterclaims.

DATED this 23rd day of April, 2015.


Respectfully submitted,

By: */s/ Edwin P. Aro*

Edwin P. Aro
ARNOLD & PORTER LLC
370 Seventeenth Street, Suite 4400
Denver, CO 80202
Telephone: 303.863.1000
ed.aro@aporter.com

Joshua B. Simon
Warren Haskel
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
Telephone: 212.446.4800
Facsimile: 212.446.4900
joshua.simon@kirkland.com
warren.haskel@kirkland.com

*Counsel for Defendants and*
*Counterclaim-Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of April, 2015, I filed and served the foregoing via CM-ECF, which will send notification of such filing to all counsel of record.

/s/ *Linda J. Teater*