UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

IN RE CIGNA CORPORATION
PBM LITIGATION

No. 3:16-cv-1702-WWE
(Consolidated)

October 5, 2017

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

At the hearing held on September 14, 2017, the Court concluded by stating that "I'm just going to issue a ruling on the administrative exhaustion issue and we'll take it from there."  Tr. at 57.  Accordingly, this supplemental memorandum addresses just two issues.  First, we discuss the relevant language from the Plaintiffs' Plans and demonstrate why that language prohibits the Defendants from collecting copayments or coinsurance amounts that exceed the amount paid by the Defendants to the dispensing pharmacy.  Second, we address why this lawsuit — which seeks to recover the overcharges collected by these Defendants — is not subject to exhaustion of administrative remedies.[1]

### I.      Plaintiffs' Plans Expressly Limit Copayment and Coinsurance Amounts to the Amount Defendants Pay the Pharmacy

During the hearing, the Court correctly summarized Plaintiffs' argument as follows: "[I]n no event will the copayment exceed the amount paid by the plan to the pharmacy." Tr. at 31. That is, in fact, exactly what the Plans say.  For the Plaintiffs with copayment plans — Negron, Perry and Curols — the Plans provide the following:

---

[1] Even if the Court holds that Count I should be stayed pending exhaustion of administrative remedies, Plaintiffs will still be entitled to proceed on the balance of their claims. See pp. 15-16 *infra*.

> In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy.

(Appx. 304 (Negron) and Appx. 438 & 499 (Perry)).[2]

> In no event will the applicable copay or coinsurance paid by you and your covered Dependent(s) for the Prescription Drug or Related Supply exceed the amount paid by the Plan. . . .  If the cost of a Prescription Drug or Related Supply is less than the copay, then you and your covered Dependent(s) pay 100% of the cost.

(Appx. 17 (Curols)).

> For the Plaintiff with a coinsurance Plan — Gallagher — the Plan provides the following:
>
> <u>Coinsurance</u>
>
> The term coinsurance means the percentage of Charges for covered Prescription Drugs and Related Supplies that you or your Dependent are required to pay under this plan.
>
> <u>Charges</u>
>
> The term Charge means the discounted amount that the pharmacy benefits manager makes available to the Insurance Company with respect to Participating Pharmacies.

(Appx. 137 (Gallagher)).

Although the language for coinsurance is necessarily different, the result is the same — coinsurance payments cannot be based on charges that exceed the discounted amount paid to the pharmacy.

The language in all four plans could not be clearer:  copayments cannot exceed the amount paid to the pharmacy and coinsurance payments must be based on the amount paid to the pharmacy. If Defendants were complying with the terms of the plans, Plaintiffs would pay the maximum copayment amount (such as $20) when the amount paid to the pharmacy is greater than the maximum copayment amount, and Plaintiffs would pay only the amount paid to the

---

[2] Citations to Appx. __ are to the exhibits submitted with Cigna's motion to dismiss. *See* ECF Nos. 70-2, 70-3.

pharmacy when the pharmacy is paid less than the maximum copayment amount. But in many instances, Plaintiffs were improperly required to pay the maximum copayment when the pharmacy was paid substantially less. Defendants have no answer to these facts.  In none of their voluminous briefing or at oral argument do they offer any contrary Plan language or a construction of the Plan language quoted above that is contrary to its plain meaning.  At most, Defendants simply say that there is "nothing unlawful about a medical plan" where sometimes cost-share payments may "exceed the amount that a pharmacy has agreed to be paid for the drugs." Tr. at 9.  But this case is not about some other plan offered by some other insurance company. In this case concerning ***Plaintiffs' Plans***, the Plan language indisputably provides that the cost-share amount ***should never*** exceed the amount paid to the pharmacy, and Defendants have breached these clear plan terms in that they have consistently charged Plaintiffs and the Class more than the amounts they paid to the pharmacies.

## II.      Exhaustion of Administrative Remedies Is Not Required

Defendants try to block Plaintiffs' claims through a two-step strategy based on a false premise. First, they wrongly argue that the only ERISA claims Plaintiffs can assert are claims for Plan benefits under ERISA section 502 (a)(1)(B).  They then argue that Plaintiffs cannot assert these claims because they must be resolved through an administrative review process rather than by the Court. *See, e.g.* Optum Opening Br. at 11 (ECF 69) (Optum arguing that Plaintiffs seek benefits which must be resolved through an administrative process for adjudicating claims); Cigna Reply at 7-8 (ECF 103) (Cigna arguing that Plaintiffs seek to "disguise their claim to determine plan benefits"). This strategy fails for four reasons. ***First***, Count I seeks an order clarifying Plaintiffs' rights under the Plans arising out of Defendants' wrongful, hidden overcharges. It is not a claim for prescription drug benefits.  ***Second***, even if Count I alleged a

claim for benefits, whether Defendants can prevail on the factual affirmative defense of exhaustion depends on whether Defendants have met their factual burden of proving that they established and maintained reasonable procedures concerning the filing and administration of benefit claims under governing Department of Labor ("DOL") Regulations. This factual issue should not be resolved on a motion to dismiss. **Third**, exhaustion of administrative remedies would be futile. **Finally**, regardless of whether Plaintiffs must exhaust their claims under Count I, they can proceed with their other ERISA and RICO claims.

### A.  Count I does not allege a claim for prescription drug benefits

Defendants' exhaustion argument is premised on the erroneous notion that Plaintiffs are seeking to recover prescription drug benefits. This argument fails because Plaintiffs received the full drug benefits available under the Plans.  Therefore, Plaintiffs are not suing to recover benefits.

The only "**Prescription Drug Benefits**" available under the Plans are the payment of "**Covered Expenses**," which are expenses for charges made by a pharmacy (emphasis in original).

<div style="border:1px solid">

## Prescription Drug Benefits

**For You and Your Dependents**

### Covered Expenses

If you or any one of your Dependents, while insured for Prescription Drug Benefits, incurs expenses for charges made by a Pharmacy, for Medically Necessary Prescription Drugs or Related Supplies ordered by a Physician, Cigna will provide coverage for those expenses as shown in the Schedule.

</div>

Because the "charges made by" pharmacies have been paid in full and Plaintiffs have received their prescription drugs, Plaintiffs have not been denied any benefit available under the Plans. Instead, Plaintiffs seek to recover secret, unlawful overcharges that were not even used to pay for

the drugs they received and are not subject to benefit claim procedures or administrative

remedies.  *See Smith v. United Healthcare Services, Inc.*, 2000 WL 1198418 *4 (D. Minn. Aug.

18, 2000) ("exhaustion does not apply because plaintiff was never denied a benefit because he

was given his prescription medications upon request, just not at the promised cost."); *Mertz v.*

*Teamsters Local 346 Health Fund* & BCBSM, 1996 U.S. Dist. LEXIS 21701, at *7 (D. Minn.

Dec. 6, 1996) (exhaustion not required where "Plaintiff already filed a claim for benefits and the

claim was allowed, albeit in accordance with the Defendants' practice of no using the discounted

charge when calculating the coinsurance  payment); *Burris v. IASD Health Servs. Corp.,* 1995

WL 843859, at *3-4 (S.D. Iowa. Oct. 2, 1995) ("[P]laintiff is not asserting a claim resulting from

a denial of benefits. Rather, plaintiff asserts that Blue Cross' practice of negotiating "secret"

discounts inflated plaintiff's coinsurance obligation."); *see also In re Blue Cross of W. Pa. Litig.,*

942 F. Supp. 1061, 1064 (W.D. Pa. 1996).  Based on the Plan language and on this well-reasoned

case law, Defendants' administrative exhaustion argument fails.

Because the clear Plan language delineating the scope of "**Prescription Drug Benefits**"

(emphasis in original) demonstrates that Plaintiffs received their benefits in full, Defendants try

to latch on to the Department of Labor ("DOL") Regulation governing reasonable claim

*procedures* in an attempt to override the Plan terms defining the *substantive* scope of benefit

coverage. But the regulation only sets forth the minimum requirements for claim *procedures*. 29

C.F.R.  § 2560-503-1(a) and (b). In no way does it define what is or is not the underlying benefit.

Defendants argue that the Regulation's definition of "adverse benefit determination"

encompasses the fraudulent overcharges that they imposed on Plaintiffs.  Defendants' argument

fails because, under the Regulation, an adverse benefit determination is simply "a failure to

provide or make payment (in whole or in part) for, a benefit." 29 C.F.R.  § 2560-503-1 (m)(4)(i).

Whether a "benefit" was not provided or paid for depends on the benefit as described and defined in the Plans. As set forth above, under the Plans, Plaintiffs received their drugs and the pharmacy charges were paid in full.  Since Plaintiffs do not allege "a failure to provide or make payment (in whole or in part) for, a benefit," there was no, and could be no, "adverse benefit determination."  29 C.F.R.  § 2560-503-1 (m)(4)(i). Rather, Plaintiffs are suing because Defendants imposed an ***additional*** fraudulent overcharge that exceeded the payment of the benefit, the benefit being payment of charges by the pharmacy for prescription drugs. A claim for such a fraudulent overcharge is not encompassed within the DOL Regulation governing benefit claim procedures and does not require exhaustion of administrative remedies.  *See Smith,* 2000 WL 1198418 *4; *Mertz,* 1996 U.S. Dist. LEXIS 21701, at *7; *Burris,* 1995 WL 843859, at *3-4.

**B.  Defendants cannot establish as a matter of law that they established or maintained reasonable claim procedures**

Even if Plaintiffs asserted a claim for benefits, which they do not, Defendants' exhaustion argument here fails because (1) it is a fact-bound affirmative defense that must be proven; (2) is hotly disputed; and (3) is not subject to disposition on a motion to dismiss. In order to prevail on an exhaustion defense, Defendants must meet their burden of proving that, for each Plan, they complied with the same DOL Regulation on which they rely. This Regulation provides that every Plan must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." C.F.R.  § 2560-503-1 (b). To take advantage of an exhaustion defense, Defendants have the burden of proving full compliance with this Regulation. *Halo v. Yale Health Plan, Director of Benefits & Records Yale University*, 819 F.3d 42, 56-58 (2nd Cir. 2016). At trial, Plaintiffs also have the right to rebut that proof. If Defendants fail to meet their burden of proof, the Plaintiffs

6

are "deemed to have exhausted the administrative remedies under the plan and shall be entitled

to pursue any available remedies under section 502 (a)" of ERISA, and the Court should consider

Plaintiffs' claims under a *de novo* standard. 29 C.F.R.  § 2560-503-1 (l)(1). *Halo*, 819 F.3d at 58.

The Plans expressly state the procedure for filing In-Network benefit claims:

> ## How To File Your Claim
> There's no paperwork for In-Network care. Just show your
> identification card and pay your share of the cost, if any; your
> provider will submit a claim to Cigna for reimbursement.

Appx. 110 (Gallagher); Appx. 275 (Negron); Appx. 412 (Perry); Appx. 473 (Perry); PERRY

000008 (Perry). The Plans similarly provide with respect to prescription drug claims specifically:

> ### Reimbursement/Filing a Claim
> When you or your Dependents purchase your Prescription
> Drugs or Related Supplies through a retail Participating
> Pharmacy, you pay any applicable Copayment, Coinsurance or
> Deductible shown in the Schedule at the time of purchase.
> You do not need to file a claim form.

Appx. 140; Appx. 304; Appx. 438; Appx. 499; PERRY 000033. Plaintiffs have plausibly pled

that (1) they complied with this procedure, (2) they received their full benefit and (3) the

pharmacy received full payment of all charges for the prescription drugs.  Consolidated

Complaint, ¶¶ 35-39, 52, 62-69, 87-101, 255, 287 (ECF 41).  Based on these plausible

allegations, a section 502(a)(1)(B) claim cannot be dismissed on exhaustion grounds.

Defendants cannot, *as a matter of law*, establish at this stage of the proceedings that they

created and maintained reasonable claim procedures for at least three reasons.  First, Defendants

failed to provide any, much less detailed, notice of any denial of a claim that the Regulation

requires, including the specific reason for the denial, reference to the plan provisions on which

7

the determination was based, a description of the review procedures and the rules relied upon in making the determination. 29 C.F.R.  § 2560-503-1 (g).  The most Plaintiffs received was a piece of paper stapled to their pharmacy bags that stated only the amount of the copayment:  there was no disclosure of the hidden overcharge. That "notice" does not come close to meeting any of the requirements of the Regulation and it renders the exhaustion defense invalid. *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 107-108 (2d Cir. 2003).

Even to this late date, after voluminous briefing and oral argument, Defendants have not identified any document that meets the notice requirements of the Regulation. In the meet-and-confer after the hearing, Defendants' counsel expressed their views on the review procedures required for an administrative appeal to something called "Cigna's National Appeals Organization." When Plaintiffs' counsel asked Defendants to identify the documents through which those appeal procedures were disclosed to participants, they received no response. *See* emails, attached as Exhibit A. While the Plans reference an "Appeals Committee" that is part of "Cigna's Medical Necessity Appeal procedure," *see* ECF No. 70-2 (Ex. 3 to Cigna's MTD) at Appx. 165 (Gallagher), the allegations in this case having absolutely nothing to do with a medical necessity issue. Therefore, that procedure upon which Defendants attempt to now rely is irrelevant. Accordingly, Defendants even to this date cannot demonstrate that they have described reasonable review procedures to participants.

Second, this case is substantially more egregious than a ***negligent*** failure to provide the required information concerning procedures, which might arguably permit administrative exhaustion.  *See Halo,* 819 F. 3d at 56-58. Once again, far from a claim of negligence, Plaintiffs plausibly allege that Defendants intentionally and fraudulently blocked the pharmacies from disclosing this Spread and Clawback information to Plaintiffs pursuant to the gag clauses.

Consolidated Complaint, ¶¶ 17, 62-69, 148-65 (ECF 41).  Indeed, the pharmacy screen shot alleged in the complaint plausibly establishes that the pharmacies had on their computer screens at the time prescriptions were filled the amounts Plaintiffs should have paid, the Spread that Plaintiffs were unlawfully required to pay, and the Clawbacks that Defendants unlawfully took, but the gag clauses prohibited the pharmacies from disclosing this important information to patients.  *Id*. at 66(f).  Therefore, even if claims to recover overcharges were claims for benefits subject to exhaustion, the gag clauses render Defendants' supposed claim procedures unreasonable as a matter of law because they unduly inhibited and hampered the initiation of claims in violation of 29 C.F.R.  § 2560-503-1 (b)(3).  At a very minimum, this is another factual dispute for trial that cannot be resolved on a motion to dismiss.

Third, Defendants cannot meet their burden of establishing as a matter of law that the Plans include a mandatory pre-suit exhaustion requirement.  *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 179 (2d Cir. 2013). At most, the Plans ambiguously provide that a participant should appeal the denial of a claim prior to bringing suit only "***in most instances***." Appx. 166 (Gallagher); Appx. 319 (Negron); Appx. 453 (Perry); Appx. 514 (Perry); PERRY 000049 (Perry)(emphasis added). While Defendants presented at the hearing their spin on how they want this "appeal" language interpreted, Tr. at 17-18, the Plans do not contain any of that explanation as required specifically by the DOL Regulation. Instead, the Plans contain only "most instances" language which is so vague and ambiguous as to be meaningless. Accordingly, these claim procedures are not reasonable as a matter of law, such that this case should be dismissed.  At a minimum, there is a factual dispute as to whether the Plans provide a full "description of all claims procedures." 29 C.F.R.  § 2560-503-1 (b)(2).

Perhaps because they recognized that they cannot meet their burden of establishing their affirmative defense as a matter of law, Defendants reoriented their position at the hearing to argue that submission of a "claim" for prescription drug benefits to Defendants by a provider pharmacy in accordance with the benefit claim procedures described above is not a claim for benefits under the DOL Regulation. Tr. at 48-49 ("the DOL regs make clear that the purchase of a drug at the point of sale is not a claim for purposes of the claim review regs"). In other words, Cigna makes the remarkable argument that a pharmacy's submission "of a claim to Cigna" pursuant to the "**How To File Your Claim**" (emphasis in original) provision in the Plans is somehow different from a pharmacy's submission "of claim to Cigna" pursuant to the Regulation.  But the DOL expressly considered and rejected Cigna's argument when it stated that "whether, and to what extent, the presentation of a prescription to a pharmacy which exercises no discretion on behalf of the plan will constitute a request for a plan benefit will be determined by reference to the plan's procedures for filing benefit claims." *See* A-11, Benefit Claims Procedure Regulation FAQs, attached as Exhibit B (available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation).[3] Because the Plans clearly state that the provider pharmacy submits the "claim" for benefits, Cigna's argument is meritless.[4]

---

[3] These Benefit Claims Procedure Regulation FAQs have been relied upon by the Second Circuit in interpreting the specific Benefit Claims Procedure Regulation at issue here and this Court should do so as well. *Halo*, 819 F.3d at 57.

[4] Moreover, Cigna has not met, or even attempted to meet, its burden to establish that the pharmacies exercised no discretion in processing claims. And Cigna cannot, because the provider pharmacy is required to process claims and collect Spread as dictated by Optum through its Pharmacy Manual. Complaint ¶ 271. At the very least, Defendants have not met their burden to prove these facts.

If Cigna is correct that a "claim" submitted by a pharmacy on behalf of a participant pursuant to a Plan is not a claim for benefits under the DOL Regulation, then Cigna's "procedure" for filing benefit claims is even more flawed as there is ***no*** other claim procedure in the Plans, and Cigna cannot meet its factual burden of establishing any claims procedures, much less reasonable ones within the meaning of the Regulation and *Halo*.[5] Defendants cited to Plan provisions in their briefs and suggested at argument that Plaintiffs should have called "Customer Service" to make a complaint about the fraudulent overcharge, *see, e.g.*, Cigna Reply at 2 (ECF 103) ("each Plan provides for an administrative process that commences by a participant contacting Customer Service"); *see also* Cigna Opening Br. at 14 (ECF 70-1); OptumRx Opening Br. at 9 (ECF 69). But, contacting customer service is not the procedure for making a claim for benefits, which is the very premise of Defendants' exhaustion argument. This is because a claim for benefits is defined specifically in the DOL Regulation on which Defendants rely as a "request for a plan benefit." 29 C.F.R.  § 2560-503-1 (e). As discussed above, that "request for a plan benefit" is submitted by the pharmacy to Cigna on behalf of the participant without the participant taking any action.

In contrast, the Plan provisions to which Defendants presumably refer state that a participant should "**Start with Member [or Customer] Services**" only "**When You Have A Concern or Complaint**" and want to pursue "**Complaints and Administrative Appeals**

---

[5] Since the hearing, Plaintiffs have scoured the Plans searching for an alternative prescription drug benefit claim procedure and there is none. Using Cigna Exhibit 3, Gallagher's Plan, as an example, filing benefit claims is mentioned only in the two places cited above. Appx. 110, 140. Thereafter, the Plan discusses "**Claim Determination Procedures under ERISA**," Appx. 156, and "**Notice of Adverse Determination**," Appx. 157, and finally, for participants who are not satisfied with a "**Notice of Adverse Determination**," what to do "**When You Have A Concern or Complaint.**" Appx. 163 (emphasis in original). The only provisions concerning "**How To File Your Claim**" within the meaning of the Regulation are the ones cited by Plaintiffs above. See, Appx. 110,140 (emphasis in original).

**Regarding Contractual Benefits, Quality of Care or Services**.” Appx. at 163 (emphasis in original). A “**Complaint**” “**Regarding Contractual Benefits”** is not a request for benefits under the DOL Regulation, which is why “**Complaints**” are addressed in the Plans long after the provisions concerning claims for benefits, Appx. At 110,140, claim determination procedures, Appx. 156, and notices of adverse determinations, Appx. 157.  Moreover, Member Services, presumably a call center somewhere in the world, is only “here to listen and help.” Member Services is not the “administrative process for adjudicating claims for plan benefits” that Optum admits is required. OptumRx Opening Br. at 11 (ECF 69). That adjudicative process is covered under the “**How To File Your Claim**” and “**Claim Determination Procedures under ERISA**” portions of the Plans. (emphasis in original).

A further fatal defect in Defendants’ argument is their suggestion that even if a participant files a “complaint” with “Customer Service” about his or her fraudulent overcharge and is dissatisfied with the response, “she may initiate an appeal in accordance with the instructions set forth in the Plan.”  *See, e.g.* Cigna Reply at 2 (ECF 103).  Defendants are wrong because there are *no* instructions for filing any such appeal in any of the Plans.  The *only* appeal concerns appeals of “*coverage decisions*.” Since exhaustion applies “only to those administrative appeals provided for in the relevant plan or policy,” *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F. 2d 588, 594 (2nd Cir. 1993), and Plaintiffs’ claims have absolutely nothing to do with coverage decisions, Defendants’ exhaustion argument should be rejected. The relevant Plan section is reproduced in full below.

## When You Have A Concern Or ==Complaint==

For the purposes of this section, any reference to "you," "your" or "Member" also refers to a representative or provider designated by you to act on your behalf, unless otherwise noted and a "Physician reviewer" is a licensed Physician who is also a Medical Director or his or her designee who rendered the initial adverse determination.

We want you to be completely satisfied with the care you receive. That is why we have established a process for addressing your concerns and solving your problems.

**==Complaints== and Administrative Appeals Regarding ==Contractual Benefits,== Quality of Care and Services**

**Start with Member Services**

We are here to listen and help. If you have a specific concern or complaint regarding a person, a service, the quality of care, choice of or access to providers, provider network adequacy or contractual benefits, you or your designated representative (including your treating Provider) can call our toll-free number and explain your concern to one of our Customer Service representatives. You can also express that concern in writing. Please call or write to us at the following:

> Customer Services Toll-Free Number or address that appears on your Benefit Identification card, explanation of benefits or claim form.

---

We will do our best to resolve the matter on your initial contact. If we need more time to review or investigate your concern, we will get back to you as soon as possible, but in any case within 30 calendar days.

==If you are not satisfied with the results of a coverage decision, you can start the appeals procedure.==

**Administrative Appeals Procedure**

==Cigna has a two step appeals procedure for coverage decisions.== To initiate an Administrative appeal, you must

---

Accordingly, if an appeal is a precursor to litigation under the Plan language and under the DOL Regulation, because Cigna has not included in its Plans *any* appeal process for any "complaint" about any issue other than a "coverage decision," Cigna has not complied with the DOL Regulation upon which it relies and cannot take advantage of an administrative appeal process that does not exist.

13

### C.  Administrative appeals would be futile

Despite the fact that this case has been going on for almost a year, ███████████

████████████████████████████████████████████████████████████████████████

████████████████ *See* Cigna's Answer to Interrogatory 1 (excerpts attached as Exhibit C);

OptumRx's Answers to Interrogatories 1 and 2 (excerpts attached as Exhibit D) (emphasis

added). It is hard to imagine an administrative process that could be more futile than making a

call to a Member Services phone bank to attempt to override a pervasive, high-level corporate

policy ████████████████████████████████████████. Moreover, the

Court should consider futility in light of whether "the purposes behind the requirement of

exhaustion" are served. *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F. 2d 588, 594 (2nd

Cir. 1993). None of the four reasons for exhaustion are satisfied in this case. *Id*. First, the claims

in this case are clearly not frivolous. Second, a class action will ensure consistent treatment

among all Plans and participants whereas individualized participant administrative reviews will

risk the exact opposite result. Third, the notion of a non-adversarial method of resolving claims

related to a pervasive scheme to defraud is not realistic. Finally, exhaustion will only increase,

not decrease costs as it will only add another layer of dispute resolution procedure on top of the

existing court procedure

As Cigna noted, it is important to be practical. Tr. at 16. In that regard, Cigna identified

two reasons to exhaust: establish an administrative record for the Court to review and ensure that

Cigna is not giving up a deferential standard of review to which it claims to be entitled. Tr. at 51-

52. The first argument is specious as the factual record that would be the basis of an

administrative appeal is already before the Court. It consists of only two sets of facts: Plaintiffs'

transaction histories which were produced by Defendants in discovery and presented by

Plaintiffs to the Court at the hearing at Tab 2 of Plaintiffs' binder, and the Plans themselves, which Defendants filed with their motions to dismiss.

Moreover, this is not a case where administrative review will aid the Court. The inquiry on Count I is simply whether the Plaintiffs did or did not pay more than allowed under the Plans. It involves an application of the policy language to Plaintiffs' undisputed payment records. Accordingly, this is not a case where exhaustion makes sense, such as where a medical professional needs to evaluate a medical condition to determine whether one treatment or another is medically necessary or effective, and where review of a voluminous factual record will be necessary. More to the point, the Court is going to have to analyze Plaintiffs' payments under the Plans regardless of whether Cigna issues an administrative decision laying out the analysis that Cigna has already presented in its briefs to the Court on its motion to dismiss. As Cigna conceded, the real issue here is how much deference Cigna's interpretation of the Plans will be accorded. Tr. at 51. That is an issue for the Court, not a Cigna administrator. As the Court noted, the "whole point" of exhaustion is to reduce costs. Tr. at 56-57. Exhaustion in this case would cause the exact opposite result.

### D.  All other ERISA Counts should proceed regardless of exhaustion

At the hearing, Cigna argued that the Supreme Court's decision in *Varity Corp v. Howe*, 516 U.S. 489 (1996), requires the Court to dismiss all of Plaintiffs' claims other than Count I. Tr. at 23. This argument was expressly rejected by the Second Circuit in *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89-90 (2d Cir. 2001).

> The Supreme Court in *Varity Corp.* did not eliminate the possibility of a plaintiff successfully asserting a claim under both § 502(a) (1)(B), to enforce the terms of a plan, and § 502(a)(3) for breach of fiduciary duty; instead, the Court indicated that equitable relief under § 502(a)(3) would "normally" not be appropriate. Ultimately, we believe that the determination of "appropriate equitable relief" rests with the district court *should plaintiffs succeed on both claims*. This determination must be

based on ERISA policy and the "special nature and purpose of employee benefit plans." Id. (internal quotation marks omitted).

(emphasis added and quotation marks in original).

*Devlin* reversed the granting of a motion for summary judgment, not a motion to dismiss, and instructed the district court to consider remedies only if and after the plaintiffs ultimately prevailed. Accordingly, this Court should not consider appropriate remedies and claims at this time particularly since, as the Court noted at the hearing, the contract-based claims under Count I and the fiduciary-duty-based claims under the remaining Counts have substantially different elements and remedies. Tr. at 42-43.   Similarly, exhaustion of administrative remedies has nothing to do with Plaintiffs' RICO claim.

Dated: October 5, 2017

Respectfully submitted,

s/ Robert A. Izard

Robert A. Izard (ct01601)
*Plaintiffs' Interim Co-Lead Class Counsel*
Craig A. Raabe (ct04116)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
860-493-6292
860-493-6290 fax
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com


Joseph P. Guglielmo (ct27481)
*Plaintiffs' Executive Committee Chair*
Carey Alexander, pro hac vice
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
212-223-6444

William H. Narwold (ct00133)
*Plaintiffs' Interim Co-Lead Class Counsel*
Mathew Jasinski (ct27520)
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
860-882-1681
860-882-1682 fax
bnarwold@motleyrice.com
mjasinski@motleyrice.com


Derek W. Loeser, pro hac vice *Plaintiffs' Executive Committee Member* Gretchen S. Obrist, pro hac vice KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
206-623-1900
206-623-3384 fax
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

212-223-6334 fax
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite (ct24886)
SCOTT+SCOTT, ATTORNEYS AT
LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
860-537-5537
860-537-4432 fax
ecomite@scott-scott.com

Ronen Sarraf
*Plaintiffs' Executive Committee Member*
Joseph Gentile
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
516-699-8890
516-699-8968 fax
ronen@sarrafgentile.com
joseph@sarrafgentile.com

Andrew A. Lemmon
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
985-783-6789
985-783-1333 fax
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130

E. Kirk Wood
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
205-908-4906
866-747-3905 fax
ekirkwood1@bellsouth.net

Brian C. Gudmundson, pro hac vice
*Plaintiffs' Executive Committee Member*
ZIMMERMAN REED, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
612-341-0400
612-341-0844 fax
brian.gudmundson@zimmreed.com

Karen Hanson Riebel, pro hac vice
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, pro hac vice pending
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
612-596-4097
612-339-0981 fax
khriebel@locklaw.com
kgmarttila@locklaw.com

Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
206-448-1777
206-728-2131 fax
brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
919-600-5000
919-600-5035 fax
dan@wbmllp.com
jeremy@wbmllp.com
*Additional Counsel for Plaintiffs*

Exhibit A

## Robert Izard

| | |
|---|---|
| **From:** | Shaffer, Brian W. <brian.shaffer@morganlewis.com> |
| **Sent:** | Tuesday, October 3, 2017 10:48 PM |
| **To:** | Robert Izard; Costello, Joseph J. |
| **Cc:** | Narwold, Bill; Craig Raabe; Farrell, Eleanor R. |
| **Subject:** | RE: Cigna Corp. and Exhaustion |
| **Attachments:** | (93867712)_(2)_Cigna - Notice of Dismissal as to Cigna Corp [DRAFT 10.3.....docx |

Thanks Bob. I am attaching a draft notice of voluntary dismissal that you can file to wrap up the Cigna Corp. issue.  Our stipulation on this point is set forth in the email exchange below, so I do not think we need to add that detail into the filing.  Please confirm that you will fill the notice on or before Thursday.

As for your questions regarding exhaustion, the administrative procedures applicable to each of the Plaintiffs are laid out clearly in their respective plans:

- Negron—Motion to Dismiss (MTD) Ex. 8, Appx. 318-19 (note the reference to "Customer Service" and "Appeals")
- Perry—MTD Ex. 11, Appx. 452-53 (same)
- Curols—MTD Ex. 1, Appx. 42-45 (same)
- Gallagher—MTD Ex. 3, Appx. 163-64 (same)

Thus, I am somewhat confused by your note below because, as you can see, "Customer Service" and "Member Services" are both used, interchangeably, in Exhibit 3 (Gallagher's plan).  As for the reference in my email to the "National Appeals Organization," that is how Cigna refers internally to the group that handles the appeals process referenced in the plans.

As to the information point, we are trying to address your concerns about delay by proposing an approach that would expedite the exhaustion process, and to meet your desire for assurances that exhaustion would include a substantive response on the merits of the appeal.  I am at a loss to understand why the essential information I suggested be provided in the appeal is problematic if those are indeed your concerns.

Please let us know if you want to continue discussing this proposal or just let the chips fall where they may.

Thanks,
Brian

**Brian W. Shaffer**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1 215.963.5103 | Main: 215.963.5000 | Fax: 215.963.5001
brian.shaffer@morganlewis.com | www.morganlewis.com
Assistant: Marlene E. Mackason | +1 215.963.4930 | marlene.mackason@morganlewis.com

**From:** Robert Izard [mailto:rizard@ikrlaw.com]
**Sent:** Friday, September 29, 2017 9:19 AM
**To:** Shaffer, Brian W.; Costello, Joseph J.
**Cc:** Narwold, Bill; Craig Raabe; Farrell, Eleanor R.
**Subject:** RE: Cigna Corp. and Exhaustion

Thanks Brian
Your suggestion re Cigna Corp. is fine with us

On exhaustion, we want to make sure we understand. In point (a), you say we should follow the procedures outlined in the plans. We don't see a reference to "customer service." Using your Exhibit 3 as an example, we do see a reference to starting with "Member Services." Appx. At 163. Just to be clear, is that the procedure you want us to follow? Also, we don't see a reference to "Cigna's National Appeals Organization."   And, regarding your points (b)(i) and (ii), we don't see a reference to the information we must submit for an appeal to be considered. In order that we can evaluate compliance with any procedures, can you provide them to us?

As we continue to discuss this issue, we want to keep the existing deadline for filing the supplemental brief.
Thanks Bob


Robert A. Izard
Izard Kindall & Raabe, LLP
29 South Main St., St. 305
West Hartford, CT 06107
860.493.6295

---

**From:** Shaffer, Brian W. [mailto:brian.shaffer@morganlewis.com]
**Sent:** Thursday, September 28, 2017 5:39 AM
**To:** Robert Izard <rizard@ikrlaw.com>; Costello, Joseph J. <joseph.costello@morganlewis.com>
**Cc:** Narwold, Bill <bnarwold@motleyrice.com>; Craig Raabe <craabe@ikrlaw.com>; Farrell, Eleanor R. <eleanor.farrell@morganlewis.com>
**Subject:** RE: Cigna Corp. and Exhaustion

Bob and Bill,

As a follow up to our call last Friday, we wanted to get back to you with our thoughts on the Cigna Corp. and exhaustion issues.

As to Cigna Corp., we believe that the simplest approach would be to stipulate to a dismissal of Cigna Corp. without prejudice.  In the event that plaintiffs later attempt to add Cigna Corp. back into the case (a move for which we do not believe there would ever be a basis), we agree not to raise any time-related defenses to such an attempt that wouldn't have existed at the time of the filing of the original complaint.  We reserve the right to raise all other defenses or objections.  We'd also want your agreement to a good faith meet-and-confer prior to any such attempt so that we can avoid unnecessary motion practice.  Please let us know if this works.

As to the exhaustion issue, we believe the court is going to order the named plaintiffs to exhaust their 502(a)(1)(B) claims.  We've considered your proposal to stipulate that exhaustion has taken place and plaintiffs' claims have been denied for the reasons discussed in Cigna's motion to dismiss briefing.  We do not believe that proposal is workable for two reasons.  First, plaintiffs did not present a claim to CHLIC or Cigna before your lawsuit was filed, so there has been no denial and our briefing contains no such discussion. Second, your proposal does not allow for a full development of an administrative record.  We have thought about your concern that exhaustion not unduly delay the court's consideration of the key issues in the case or otherwise prevent the matter from being streamlined.  As we told you Friday, we are willing to help facilitate the exhaustion process to be as efficient as possible so long as our facilitation efforts aren't used against us to argue that Cigna or CHLIC failed to comply with the plans' claim and appeal provisions or the DOL claims procedure regulation in the processing of the appeals.

Therefore, we propose that the parties advise the court that (a) notwithstanding plaintiffs' position that exhaustion is not required and/or would be futile, we have reached an agreement to have the named plaintiffs' claims exhausted; (b) the court should stay the litigation of Count I of the complaint pending the parties reporting back to the court on the results of the exhaustion process; and (c) the parties have no objection, and believe it would facilitate the efficient handling of the case, if the court proceeds to decide the rest of the motion to dismiss while the exhaustion process plays out.

In terms of the specific appeal process:

(a) Generally, it will be handled in accordance with the procedures outlined in the named plaintiffs' respective plans. That said, we will agree that the named plaintiffs can skip the initial step of outreach to Cigna customer service. We will provide you with a name and address for Cigna's National Appeals Organization to direct the named plaintiffs' claims for consideration. We will commit to consideration of the appeal as quickly as possible, and in all events within the time provided under your clients' plans, without any extensions of time (unless we mutually agree otherwise). You agree not to use these accommodations against us in arguing the appropriate level of deference to be applied to the appeal determinations.

(b) You now have Rx data and plan documentation for each of the named plaintiffs and their beneficiaries. For each named plaintiff, assuming that the appeal (i) identifies the specific Rx prescription transactions being appealed (e.g., by number and time period), and (ii) identifies the relevant language in each named plaintiff's plan documents and includes plaintiff's position as to why he/she believes the prescription payment was improper, we agree that in addition to any other issues that may be presented by the claim (e.g., timeliness, coverage, etc.), Cigna will provide a substantive response on the merits of plaintiffs' appeal.

Given the deadline for supplemental submissions to the court, we'd appreciate a response no later than noon tomorrow.

Thanks.

Brian

**Brian W. Shaffer**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1 215.963.5103 | Main: 215.963.5000 | Fax: 215.963.5001
brian.shaffer@morganlewis.com | www.morganlewis.com
Assistant: Marlene E. Mackason | +1 215.963.4930 | marlene.mackason@morganlewis.com

**From:** Robert Izard [mailto:rizard@ikrlaw.com]
**Sent:** Wednesday, September 20, 2017 10:57 AM
**To:** Shaffer, Brian W.; Costello, Joseph J.
**Cc:** Narwold, Bill; Craig Raabe
**Subject:** RE:

Friday is good
Let us know

Robert A. Izard
Izard Kindall & Raabe, LLP

29 South Main St., St. 305
West Hartford, CT 06107
860.493.6295

---

**From:** Shaffer, Brian W. [mailto:brian.shaffer@morganlewis.com]
**Sent:** Wednesday, September 20, 2017 10:41 AM
**To:** Robert Izard <rizard@ikrlaw.com>; Costello, Joseph J. <joseph.costello@morganlewis.com>
**Cc:** Narwold, Bill <bnarwold@motleyrice.com>; Craig Raabe <craabe@ikrlaw.com>
**Subject:** RE:

Let me check on tomorrow; I know today doesn't work.  Do you have any availability Friday if tomorrow isn't good?

**Brian W. Shaffer**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1 215.963.5103 | Main: 215.963.5000 | Fax: 215.963.5001
brian.shaffer@morganlewis.com | www.morganlewis.com
Assistant: Marlene E. Mackason | +1 215.963.4930 | marlene.mackason@morganlewis.com

---

**From:** Robert Izard [mailto:rizard@ikrlaw.com]
**Sent:** Wednesday, September 20, 2017 9:03 AM
**To:** Costello, Joseph J.; Shaffer, Brian W.
**Cc:** Narwold, Bill; Craig Raabe
**Subject:**

Joe and Brian
Shall we talk about Cigna Corp. and exhaustion?
Today before 3:30 other than 12:30-2 and tomorrow before 11:15 are good for us
Let us know
Thanks


Robert A. Izard
Izard Kindall & Raabe, LLP
29 South Main St., St. 305
West Hartford, CT 06107
860.493.6295

Exhibit B

# A-1: Does the regulation apply to benefit claims filed by enrollees in federal Medicare and Medicaid, or to federal employees and their families covered Employees Health Benefits Program (FEHBP)?

No. The regulation establishes requirements only for employee benefit plans that are covered under ERISA. See E are typically benefit programs provided by private-sector employers for their employees (or by unions, acting eith employers, for their members). Government programs, whether federal, state, or local, that are not related to emp Medicare, are not covered by these claims procedure rules; neither are government-sponsored benefit programs the FEHBP or benefit plans provided by state or local governments to their own employees. Such plans have thei procedures, which may derive from other federal law (for federal programs) or from state or local law.

# A-2: Does the regulation apply to benefit claims filed by persons who are bo Choice programs and participants in an ERISA plan?

The regulation applies only to benefits provided under an ERISA plan that are outside the scope of what is regula provided under ERISA plans vary from plan to plan based on plan design. When a benefit is provided under an EF arrangement between the Medicare + Choice organization and the employer (or employee organization), even tho enrollees in a Medicare + Choice program, we have been advised by HHS that the benefit would be outside the s Medicare program. Claims for such benefits would be subject to the provisions of the regulation. The primary sou benefits is the summary plan description for the plan, which is available on request from the plan administrator. O covered under a Medicare + Choice contract (whether they are Medicare benefits, additional benefits paid for by for through a premium charged to all enrollees) are subject to the Medicare + Choice rules for organization deterr 42 CFR 422 and not the provisions of the regulation. See question A-1. A person who is covered by a Medicare + information on how these Medicare + Choice rules apply to his or her coverage should call 1.800.Medicare. He or Medicare Regional Office and 1.800.Medicare can assist them in contacting the appropriate office.

# A-3: Does the regulation apply to a request for a determination whether an i coverage under a plan?

The regulation applies to coverage determinations only if they are part of a claim for benefits. The regulation, at § benefits, in part, as a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasor A claim for group health benefits includes pre-service claims (§ 2560.503-1(m)(2)) and post-service claims (§ 2560 question concerning eligibility for coverage under a plan without making a claim for benefits, the eligibility determ procedure rules. If, on the other hand, the individual files a claim for benefits in accordance with the plan's reasor denied because the individual is not eligible for coverage under the plan, the coverage determination is part of a c accordance with the claims procedures of the plan and the requirements of the regulation. See 65 FR at 70255.

## A-4: Does the regulation apply to a request for prior approval of a benefit or approval is not required under the terms of the plan?

No. If the plan does not require prior approval for the benefit or service with respect to which the approval is being for benefits (§ 2560.503-1(e)) governed by the regulation. The regulation defines pre-service claim by reference to claimant's decision to seek the medical care, nor the doctor's decision to provide care. Thus, in the absence of a mere requests for advance information on the plan's possible coverage of items or services or advance approval constitute pre-service claims under the regulation. See § 2560.503-1(m)(2).

## A-5: Is a plan required to treat all questions regarding benefits as claims for

No. The regulation does not govern casual inquiries about benefits or the circumstances under which benefits mig On the other hand, a group health plan that requires the submission of pre-service claims, such as requests for p ignore pre-service inquiries where there is a basis for concluding that the inquirer is attempting to file or further a compliance with the plan's claim filing procedures. In such a case, the regulation requires the plan to inform the in claim and the proper procedures to be followed. Specifically, this type of notification is required where there is a c authorized representative (e.g., attending physician) that is received by a person or organizational unit customarily matters (e.g., personnel office) and that communication names the specific claimant, specific medical condition o service, or product for which approval is requested. Under the regulation, notice must be furnished as soon as po case of urgent care claims or 5 days in the case of non-urgent claims. Notice may be oral, unless a written notific (1).

## A-6: Do the requirements applicable to group health plans apply to dental b alone plan or as part of a group health plan?

Yes, in both cases. The regulation defines group health plan as an employee welfare benefit plan within the meani that such plan provides medical care within the meaning of section 733(a) of ERISA. See § 2560.503-1(m)(6). Sec part, to mean the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose the body. Accordingly, for purposes of the claims procedure rules, the provision of dental benefits, either as part c alone plan, would be subject to the requirements of the regulation applicable to group health plans.

## A-7: Do the requirements applicable to group health plans apply to prescrip offered as a stand-alone plan or as part of a group health plan?

Yes, in both cases. Prescription drug benefits would, like dental benefits, constitute medical care within the mean 6. Accordingly, the provision of prescription drug benefits, either as a stand-alone plan, or as part of a group heal requirements of the regulation applicable to group health plans. Whether, and under what circumstances, specific such as the submission of a prescription to a pharmacy or pharmacist, will constitute a claim for benefits governe depend on the terms of the plan.

## A-8: Do the requirements applicable to group health plans apply to contract health care providers (e.g., physicians, hospitals) and insurers or managed HMOs)?

No, provided that the contractual dispute will have no effect on a claimant's right to benefits under a plan. The reg benefits. See questions A-3, A-4, A-5. The regulation does not apply to requests by health care providers for payr claimant -- in accordance with contractual arrangements between the provider and an insurer or managed care o recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organizati

The following example illustrates this principle. Under the terms of a group health plan, participants are required t office visit to a preferred provider doctor listed by a managed care organization that contracts with such doctors. between the doctors and the managed care organization, the doctor has no recourse against a claimant for amou request by the doctor to the managed care organization for payment or reimbursement for services rendered to a contract with the managed care organization, not the group health plan; accordingly, the doctor's request is not a regulation.

On the other hand, where a claimant may request payments for medical services from a plan, but the medical pro against the claimant for amounts unpaid by the plan, the request, whether made by the claimant or by the medica assignment of benefits by the claimant) would constitute a claim for benefits by the claimant. For information on a See questions B-1, B-2, B-3.

## A-9: What benefits are disability benefits subject to the special rules applica for disability claims?

A benefit is a disability benefit under the regulation, subject to the special rules for disability claims, if the plan co upon a showing of disability. It does not matter how the benefit is characterized by the plan or whether the plan a plan. If the claims adjudicator must make a determination of disability in order to decide a claim, the claim must b purposes of the regulation. As the department stated in the preamble to the regulation, 65 FR at 70247, n.4, wher type of benefit, it is the department's intention that the nature of the benefit should determine which procedural s than the manner in which the plan itself is characterized. Accordingly, plans, including pension plans, that provide determination of disability must maintain procedures for claims involving such benefits that comply with the requi disability claims, including the requirements for de novo review, the consultation requirement for medical judgmer limits for deciding disability claims, and the disclosure requirements in connection with extensions of time.

However, if a plan provides a benefit the availability of which is conditioned on a finding of disability, and that find plan for purposes other than making a benefit determination under the plan, then the special rules for disability cl such benefits. For example, if a pension plan provides that pension benefits shall be paid to a person who has be Social Security Administration or under the employer's long term disability plan, a claim for pension benefits base claimant is disabled would be subject to the regulation's procedural rules for pension claims, not disability claims

## A-10: Do the time frames in these rules govern the time within which claims

No. While the regulation establishes time frames within which claims must be decided, the regulation does not ad
payments that have been granted must be actually paid or services that have been approved must be actually ren
benefit payments within reasonable periods of time following plan approval, however, may present fiduciary respo
ERISA.

## A-11: When a group health plan participant presents a prescription to a pha to the participant determined by reference to a formula or schedule establis terms of such plan and with respect to which the pharmacy exercises no di plan, does the regulation require that the presentation of the prescription be benefits?

No. As indicated in question A-7, whether, and under what circumstances, specific practices permitted under a p
prescription to a pharmacy, will constitute a claim for benefits governed by the claims procedure rules will depend
a claim for benefits is defined in § 2560.503-1(e) to mean a request for a plan benefit or benefits made by a claim
reasonable procedure for filing benefit claims. Accordingly, whether, and to what extent, the presentation of a pre
no discretion on behalf of the plan will constitute a request for a plan benefit will be determined by reference to th
claims.

It is not uncommon for group health plans to have arrangements with preferred or network providers (e.g., doctor
optometrists) to provide medical care-related services or products at a predetermined cost to covered plan partic
providers exercise no discretion on behalf of the plan. It is the view of the department that neither the statute nor
that a plan treat interactions between participants and preferred or network providers under such circumstances
regulation. Moreover, if the pharmacy refuses to fill the prescription absent payment of the entire cost by the part
that this refusal be treated as an adverse benefit determination under the regulation. It should be noted, however,
benefits the plan must maintain a reasonable procedure, in accordance with the regulation, for processing claims

## A-12: Does the regulation apply to benefit claims filed by participants in top are unfunded and maintained primarily for the purpose of providing deferre select group of management or highly compensated employees?

Yes. The regulation establishes requirements for all employee benefit plans that are covered under Part 5 of ERIS
Certain top hat plans are specifically excluded from parts of ERISA (see, e.g., sections 201(2); 301(a)(3); 401(a)(1))
section 503, under which the regulation was promulgated. In this regard, paragraph (b)(2) of the regulation require
procedures must be included as part of the plan's summary plan description meeting the requirements of 29 CFR
not required to furnish summary plan descriptions, pursuant to 29 CFR §§ 2520.104-23 or 2520.104-24, such pla
paragraph (b)(2) of the regulation by taking steps reasonably designed to ensure that participants in such plans a
plan's claims procedures in conjunction with enrollment in the plan and how to obtain such procedures upon requ

## A-13: Would a determination of disability for purposes of receiving a premium contributory life insurance plan be governed by the special rules applicable the claims procedure regulation?

Yes. A benefit is a disability benefit under the regulation, subject to the special rules for disability claims, if the pla a showing of disability. As noted in question A-9, however, if a plan provides a benefit the availability of which is of that finding is made by a party other than the plan for purposes other than making a benefit determination under disability claims need not be applied to a claim for such benefits. The department notes that the inclusion of a pre otherwise covered by ERISA would not, in and of itself, cause the plan to become subject to the regulation.

## B-1: May a plan require that a claimant complete and file a form identifying act on his or her behalf with respect to a claim?

Yes, with one exception. The regulation provides that a reasonable claims procedure may not preclude an authori acting on behalf of a claimant with respect to a benefit claim or appeal of an adverse benefit determination. The r plan may establish reasonable procedures for determining whether an individual has been authorized to act on be form by the claimant identifying the authorized representative would be one method for making such a determina

The one exception is where a claim involves urgent care. In such instances, a plan must, without regard to the pla representatives, permit a health care professional with knowledge of the claimant's medical condition (e.g., a trea representative of the claimant. This exception is intended to enable a health care professional to pursue a claim o circumstances where, for example, the claimant is unable to act on his or her own behalf. See § 2560.503-1(b)(4).

## B-2: Does an assignment of benefits by a claimant to a health care provider of an authorized representative?

No. An assignment of benefits by a claimant is generally limited to assignment of the claimant's right to receive a plan. Typically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a addition, the validity of a designation of an authorized representative will depend on whether the designation has procedures established by the plan, if any.

## B-3: When a claimant has properly authorized a representative to act on his required to provide benefit determinations and other notifications to the aut claimant, or both?

Nothing in the regulation precludes a plan from communicating with both the claimant and the claimant's authoriz view of the department that, for purposes of the claims procedure rules, when a claimant clearly designates an au receive notices on his or her behalf with respect to a claim, the plan should, in the absence of a contrary direction

and notifications to which the claimant is otherwise entitled to the representative authorized to act on the claimant's behalf with respect to the claim (e.g., initial determination, request for documents, appeal, etc.). In this regard, it is important that both the plan and the claimant make clear the extent to which an authorized representative will be acting on behalf of the claimant.

## B-4: What kind of administrative processes and safeguards must a plan have in order to ensure and verify appropriately consistent decision making?

The department did not intend to prescribe any particular process or safeguard to ensure and verify consistent decision making. Rather, the department intended to preserve the greatest flexibility possible for designing and operating claims processing systems consistent with the prudent administration of a plan. The department believes that prudent plan administration requires ensuring that similarly situated claimants, in similar circumstances, decided in a consistent manner. Consistency in the benefit claims determinations might be ensured by using protocols, guidelines, criteria, rate tables, fee schedules, etc. Consistent decision making might be ensured and verified by periodic examinations and audits of benefit claims to determine whether the appropriate protocols, guidelines, criteria, rate tables, fee schedules, etc. were appropriately applied in the decision making process. See § 2560.503-1(b)(5).

## B-5: For purposes of furnishing relevant documents to a claimant, what kind of documents must be disclosed to demonstrate compliance with the administrative processes and safeguards required to ensure and verify appropriately consistent decision making in making the benefit determination?

What documents will be required to be disclosed will depend on the particular processes and safeguards that a plan establishes for assuring and verifying appropriately consistent decision making. See 65 FR at 70252. The department does not anticipate that plans will maintain documents solely to comply with this disclosure requirement. Rather, the department anticipates that claimants who request documents to demonstrate what the plan actually used, in the case of the specific claim denial, to satisfy this requirement. The plan could, for example, disclose its specific rules or guidelines governing the application of specific protocols, criteria, rate tables, fee schedules, etc. to claims like the claim at issue, or a checklist or cross-checking document that served to affirm that the plan rules or guidelines were appropriately applied to the claim. The plan would not be required to disclose other claimants' individual records or information specific to the resolution of other claims to comply with this requirement. See § 2560.503-1(m)(8)(iii). See question D-12.

## B-6: Do the regulation's limits on the use of pre-dispute arbitration extend to any claim that a participant or beneficiary might pursue with regard to a health care provider?

No. The regulation is intended to regulate pre-dispute arbitration only with respect to group health and disability benefit claims under ERISA-covered plans. The regulation is not intended to affect the enforceability of a pre-dispute arbitration agreement with respect to other matters. Accordingly, the regulation should not be read to affect the obligation of a participant or beneficiary to arbitrate such matters within the scope of the arbitration agreement. See 29 CFR § 2560.503-1(c)(3)(iii).

## C-1: When does the time period for making an initial decision on a claim begin to run?

The time for making an initial claims decision begins to run when the claim is filed in accordance with a plan's reasonable procedures, without regard to whether the plan has all of the information necessary to decide the claim at the time of the filing.

For purposes of calculating the time period within which a claim must be decided, a plan cannot extend the time claims with respect to which all the information necessary to make a decision has been submitted (often referred (4).

## C-2: May a plan's claims procedures require claimants to submit relevant m information relating to coordination of benefits prior to the plan's making a c

Plans have considerable flexibility in defining the procedures to be followed for the initiation, processing, and app plans may require the submission of specific information necessary to a benefit determination under the terms of coordination of benefit information, the plan may nonetheless have to make a decision on the claim before receiv question C-1, the time periods applicable to deciding claims begin to run on the date a claim is filed in accordanc plan, without regard to whether all the information necessary to make a benefit determination accompanies the fil

## C-3: If the period within which a group health claim must be decided is end yet to furnish all the information necessary to decide the claim, may the plai for deciding the claim and, if so, for how long?

In general, a group health plan may unilaterally extend the decision making on both pre-service and post-service the initial period, if the administrator determines that such an extension is necessary for reasons beyond the cont extensions in the case of claims involving urgent care.

If the reason for taking the extension is the failure of the claimant to provide information necessary to decide the c this fact, the time period for making the decision is suspended (tolled) from the date of the notification to the clair

- The date on which a response from the claimant is received by the plan
- The date established by the plan for the furnishing of the requested information (at least 45 days)

The extension period (15 days) – within which a decision must be made by the plan – will begin to run from the da received by the plan (without regard to whether all of the requested information is provided) or, if earlier, the due d furnishing the requested information (at least 45 days). See §§ 2560.503-1(f)(2)(iii) (A) and (B); 2560.503-1(f)(4); 256 n.21.

## C-4: Many plans, including group health and disability plans, require claima examination by an expert or experts of the plan's choosing in connection w of the claimant's claim. How do the regulation's time limits apply to the com examinations?

The regulation's time limits begin to run when a claim is filed in accordance with the reasonable procedures of the A plan that requires a physical or other examination of the claimant to evaluate a claim must design a process tha the time frames of the regulation.

If necessary, however, in the circumstances of a specific claim, a plan may take an extension of time to enable the
information (including the report of a required examination). The regulation's provisions on extensions of time and
would apply to these situations to determine when an extension is permitted and when an extension would begin
plan takes an extension of time because additional information must be obtained from a claimant, the claimant m
which to provide the information or submit to the requested examination. Plans may, of course, provide claimants

## C-5: May a claimant agree to an extension or further extension of the time p
must decide a claim?

Yes. The only limits on extensions of time established by the regulation are imposed on plans. Claimants may volu
additional time within which to make a decision on a claim, even under circumstances where the plan could not u
period, such as in the case of a claim involving urgent care or a claim on appeal.

See §§ 2560.503-1(f)(2)(i); 2560.503-1(i). Also see 65 FR at 70250, n.21.

## C-6: What responsibility does the plan have for determining whether any sp
care and must therefore be decided on an expedited basis?

A plan has a duty to make this determination on the basis of the information provided by, or on behalf of, the clai
any claim for medical care or treatment with respect to which the application of the time periods for making non-u
seriously jeopardize the life or health of the claimant or the claimant's ability to regain maximum function, or -- in
knowledge of the claimant's medical condition -- would subject the claimant to severe pain that cannot be adequ
treatment that is the subject of the claim.

In determining whether a claim involves urgent care, the plan must apply the judgment of a prudent layperson wh
health and medicine. However, if a physician with knowledge of the claimant's medical condition determines that
must be treated as an urgent care claim. See § 2560.503-1(m)(1).

## C-7: Under the regulation, urgent care claims must be decided as soon as p
account the medical exigencies, but not later than 72 hours after receipt, ar
be decided within a reasonable period of time appropriate to the medical ci
than 15 days after receipt. Can a plan's claims procedures require claimants
whether, and what, medical exigencies or medical circumstances exist?

Yes. While the department has indicated that the time periods for decision making are generally maximum periods
department recognizes that assessments of the appropriate timeframe for making benefit determinations will, in la
information provided by the claimant. Requesting specific information from the claimant regarding whether and w
may give rise to a need for expedited processing of the claim would appear to facilitate claims processing and, th
department, be an unreasonable plan request. If, on the other hand, the plan believes based on its own review of
required, it is the view of the department that the claim must be processed on an expedited basis without regard
information relating to whether expedited processing is necessary.

## C-8: If a claimant requests a plan to extend a previously approved course o increasing the number of treatments or the period of time for treatments, an determined by the claimant's treating physician to be a claim involving urge must the plan approve or deny the claimant's request?

Under the concurrent care provisions of the rule, any request that involves both urgent care and the extension of of time or number of treatments previously approved by the plan must be decided as soon as possible, taking int notification must be provided to the claimant within 24 hours after receipt of the claim, when the request is made of the prescribed period of time or number of treatments. If such a request is not made at least 24 hours prior to t time or number of treatments, the request must be treated as a claim involving urgent care and decided in accord timeframes, i.e., as soon as possible, taking into account the medical exigencies, but not later than 72 hours afte (B).

If a request to extend a course of treatment beyond the period of time or number of treatments previously approv care, the request may be treated as a new benefit claim and decided within the timeframe appropriate to the type post-service claim. § 2560.503-1(f)(2)(iii).

## C-9: In the case of a group health plan's decision to reduce or terminate a of treatment, must claimants be afforded at least 180 days to appeal the pla before the benefit can be reduced or terminated?

No. Under the concurrent care provisions of the rule, any reduction or termination of a course of treatment (other end of the previously approved period or number of treatments is treated as an adverse benefit determination. In plan administrator provide the claimant sufficient advance notice of the reduction or termination to allow the clain determination before the benefit is reduced or terminated. Generally, claimants must be afforded at least 180 day determination to appeal that determination. If the 180 day rule applied to appeals under concurrent care provision reductions or terminations would, in every instance, have to be given at least six months in advance of the termin intention of the department. Accordingly, while the department is of the view that plans must afford claimants a re develop their appeal of a proposed reduction or termination, plans are not required to assume that claimants will appeal before the benefit can be reduced or terminated under the special rules governing concurrent care claims.

## C-10: In what circumstances, if any, would a post-service claim be a claim i

Post-service claims are those claims with respect to which plan approval is not a prerequisite to obtaining medica requested for medical care already rendered to the claimant. Accordingly, a post-service claim would never const the meaning of the regulation.

A post-service claim is defined in the regulation as any claim for a benefit under a group health plan that is not a those claims with respect to which the terms of the plan condition receipt of the benefit, in whole or in part, on ap obtaining medical care. See question C-6, § 2560.503-1(m)(1), (2), and (3).

**C-11: If a claim is determined to involve urgent care when it is initially filed,** continue to be treated as urgent if it is denied and the claimant files an appe at that time, medical services have actually been provided and the only que will pay for such services?

No. The nature of a claim or a request for review of an adverse benefit determination should be judged as of the t processed. If requested services have already been provided between the time the claim was denied and a reque involves urgent care because use of the post-service time frames for deciding the appeal could not jeopardize the regain maximum function, or subject the claimant to severe pain. See § 2560.503-1(m)(1).

**C-12: If a claimant submits medical bills to a plan for reimbursement or pay** applying the plan's limits on co-payment, deductibles, etc., pays less than 1 must the plan treat its decision as an adverse benefit determination?

Under the regulation, an adverse benefit determination generally includes any denial, reduction, or termination of, (in whole or in part) for, a benefit. In any instance where the plan pays less than the total amount of expenses sub plan is paying out the benefits to which the claimant is entitled under its terms, the claimant is nonetheless receiv submitted expenses. Therefore, in order to permit the claimant to challenge the plan's calculation of how much it treated as an adverse benefit determination under the regulation. Providing the claimant with the required notifica give the claimant the information necessary to understand why the plan has not paid the unpaid portion of the ex challenge the denial, e.g., the failure to pay in full. This approach permits claimants to challenge whether, for exa payment requirement or deductible amount. The fact that the plan believes that a claimant's appeal will prove to I claimant is not entitled to the procedural protections of the rule. This approach to informing claimants of their ber claims, further, is consistent with current practice, in which Explanation of Benefits forms routinely describe both claim-related expenses. See § 2560.503-1(m)(4).

**C-13: Under what circumstances is a plan required to notify a claimant of a** is not an adverse benefit determination, i.e., a complete grant of a claim?

In the case of urgent care claims and pre-service claims, the regulation requires that claimants be apprised of the the determination is adverse or a complete grant. The rules require that this notification be furnished in accordance applicable to urgent care and pre-service claims. There is no specific notification requirement applicable to post-s § 2560.503-1(f)(2)(i) and (iii).

**C-14: What information is a plan required to provide when giving notice of a** is not adverse (that has been completely granted), in the case of an urgent of

The regulation does not specify the information that must be provided in notices of benefit determinations that are with the regulation's general requirement of reasonableness, the department anticipates that such notices will con apprise the claimant of the plan's decision to approve the requested benefits. See § 2560.503-1(f)(2)(i) and (iii) (A).

## C-15: When a plan has approved a benefit that will be provided over a period of chemotherapy treatments, must the plan notify the claimant when the be

No. Provided that the plan complied with the regulation in adequately notifying the claimant regarding the scope approved (e.g., for how long, how many treatments, etc.) and further provided that the plan has not decided to re treatment that was previously approved, the regulation does not require the plan to provide a formal notification th an end. See § 2560.503-1(f)(2)(ii).

## C-16: May a notice of an adverse benefit determination generally state that protocol may have been relied upon in making the benefit determination and of the regulation?

No. The regulation provides that if an internal rule, guideline, protocol, or similar criterion was relied upon in makir notification of the adverse benefit determination must either set forth the rule, guideline, protocol, or criterion or in will be provided free of charge to the claimant upon request. It would be sufficient, in the view of the department, internal rule, etc., had been relied upon without specifying the identity of the specific rule and that the specific rul claimant upon request. A notice that merely indicates, however, that a rule, guideline, protocol, or similar criterion provide the claimant any specific information about the basis on which his or her claim was decided. Inasmuch as rules, protocols, guidelines, etc. were relied upon in making a determination, providing an indication whether such Moreover, the department is concerned that the routine inclusion of such a statement in all adverse benefit determ significance of the required disclosure. See § 2560.503-1(g)(1)(v) (A). For similar reasons, a general statement in a would not be considered as satisfying the requirements of § 2560.503-1(g)(1)(v) (B). Also see § 2560.503-1(j)(5)(i) a

## C-17: Is a plan required to provide a copy of an internal rule, guideline, prot when the applicable rule, guideline, protocol, or criterion was developed by proprietary reasons, limits the disclosure of that information?

Yes. It is the view of the department that where a rule, guideline, protocol, or similar criterion serves as a basis for at the initial level or upon review, the rule, guideline, protocol, or criterion must be set forth in the notice of advers disclosure of reliance and availability, provided to the claimant upon request. However, the underlying data or inf guideline, protocol, or similar criterion would not be required to be provided in order to satisfy this requirement. T position that internal rules, guidelines, protocols, or similar criteria would constitute instruments under which a pla meaning of section 104(b)(4) of ERISA and, as such, must be disclosed to participants and beneficiaries. See §§ 2 70251. Also see §§ 2560.503-1(h)(2)(iii) and 2560.503-1(m)(8)(i); Advisory Opinion 96-14A (July 31, 1996).

## C-18: If a plan conditions continuation of disability benefit payments on a p claimant's disability and, in conjunction with such a confirmation, determine longer disabled and, accordingly, terminates payment of benefits, must the as an adverse benefit determination under the regulation?

Yes. Under the regulation, an adverse benefit determination includes any denial, reduction, or termination of a ben
terminates the payment of disability benefits under such circumstances, the plan is required to provide the claima
determination and the right to appeal that determination consistent with the regulation. See 29 CFR § 2560.503-1
a plan provides for the payment of disability benefits for a pre-determined, fixed period (e.g., a specified number
date), the termination of benefits at the end of the specified period would not constitute an adverse benefit deter
request by a claimant for payment of disability benefits beyond the specified period, therefore, would constitute a
(3). Also see 29 CFR § 2560.503-1(f)(2)(ii).

## C-19: Does the regulation limit a plan's ability to establish a maximum perio claims for benefits?

No. The regulation does not contain any specific rules governing the period of time that must be given to claiman
claim procedure nonetheless must be reasonable and not contain any provision, or be administered in any way, th
initiation or processing of claims for benefits. Adoption of a period of time for filing claims that serves to unduly lin
efforts to make claims for and obtain benefits under the plan would violate this requirement. See 29 CFR § 2560.5

## C-20: What timeframes apply when an extension of time is required by a pla initial disability benefit determination?

The regulation addresses two situations in which a plan may have an extension of time for making a disability ber
when a decision cannot be rendered due to any matter beyond the control of the administrator other than the nee
claimant. In this situation, the extension period is added to the period within which the determination is required t
end of the initial 45-day period, the administrator determines that, for reasons beyond its control, a decision cann
an additional 30 days (i.e., 30 days in addition to the initial 45-day period). Similarly, if a decision cannot, for simila
extension period, the plan may take up to an additional 30 days (i.e., 30 days in addition to the initial 30-day exter
to decide the pending claim. See 29 CFR § 2560.503-1(f)(3). The second situation is when the plan requires addit
make a benefit determination. This situation is governed by the principles in question C-3.

## C-21: If a plan determines that a claim does not provide sufficient informatio extension of time and request additional information from the claimant?

No. The provisions governing extensions of time are permissive and not mandatory. As such, plans may provide f
plan administrators may be given the discretion to decide whether to take an extension of time in connection with
a general matter, a plan may deny claims at any point in the administrative process on the basis that it does not h
decision would allow the claimant to advance to the next stage of the claims process.

## C-22: If a group health plan determines that an extension of time is necessa additional information from a claimant, may the administrator as part of the the need for the extension of time also include a notice of adverse benefit d

the claimant fails to provide any information within the period prescribed by
days)?

Yes. If the notice clearly states that the claim will be denied if the claimant fails to submit any information in respo
of the department that the furnishing of a combined notice would not be contrary to the regulation, provided that
content requirements applicable to both the extension notice and the notice of adverse benefit determination. In t
determination should make clear that the period for appealing the denied claim begins to run at the end of the pe
submitting the requested information (or such later date as may be provided under the terms of the plan). See 29

## D-1: May a plan require that requests for review of adverse benefit determir

Yes, with one exception. The regulation provides that a plan's claims procedure must provide a claimant with a re
review of a denied claim. A claims procedure that requires requests for reviews of adverse benefit determinations
unreasonable in that regard, except with respect to claims involving urgent care. In the case of urgent care claims
procedures permit requests for expedited appeals to be submitted orally or in writing by the claimant. See § 2560

## D-2: May the direct supervisor of the person(s) who makes initial claim dete
appropriate named fiduciary for purposes of reviewing those claims on app

Yes. The only limitation that the rule imposes on who can serve as the named fiduciary for purposes of reviewing
the named fiduciary cannot be either the individual who made the initial benefit determination that is the subject o
individual. The rule further requires that the reviewer, whoever that individual is, may not afford deference to the ir
must consider the full record of the claim and make an independent decision on whether it should be granted. Se

## D-3: If a group health plan provides for two levels of review, rather than one
benefit determination, what standards, if any, govern the second level of re

Where a plan provides for two levels of review on appeal, it is the view of the department that the second level of
that apply to the first level of review. For example, the second-level reviewer may not afford deference to the deci
reviewer must not be the same person who made the first level review decision on the claim or a subordinate of t
2560.503-1(h)(3)(ii).

## D-4: If a group health plan provides for two levels of review following an adv
determination, within what period must a determination be made at each lev

In the case of pre-service claims, a maximum of 15 days is provided for a benefit determination at each level. In t
maximum of 30 days is provided for a determination at each level. See § 2560.503-1(i)(2)(ii) and (iii).

For example, if a claimant appeals a pre-service adverse benefit determination, and the plan provides for two leve
must make a determination within a reasonable period of time, taking into account the medical circumstances, bu
the appeal. If that claim is again denied at the first level of appeal and the claimant appeals that denial to the sec

again make a determination within a reasonable period of time, taking into account the medical circumstances, b
receipt of the claimant's second level appeal request.

In the case of urgent care claims, the regulation does not prescribe any specific period within which a determinati
level review process for such claims. Given the principles underlying the provisions governing pre- and post-servi
department that each level of review of an urgent care claim would have to be completed in sufficient time to ens
the reviews would not exceed the maximum period otherwise applicable to a process with only one level of review
account the medical exigencies, but not longer than 72 hours. See § 2560.503-1(i)(2)(i).

## D-5: If a group health plan provides for two levels of review following an adv
determination, how much time must a claimant be afforded to appeal the fir
determination to the second level review?

Under the regulation, claimants must be afforded at least 180 days following receipt of an adverse benefit determ
the case of a plan with a two-level review process, the 180-day rule applies to the period to be afforded claimants
the regulation does not specifically address the period of time to be afforded claimants to pursue the second leve
plan's procedures must nonetheless be reasonable and, therefore, it is the view of the department that plans mus
opportunity to pursue a full and fair review at the second review level. See § 2560.503-1(h)(1) and (3)(i).

## D-6: If a group health plan provides for two levels of review following an adv
determination, may the plan use non-binding arbitration as a means for dec

Yes. A plan's procedures may provide for arbitration of benefit disputes at one of the two levels of appeal, provide
arbitration must be conducted in a manner that will ensure that the timeframes and notice requirements otherwise
Second, the arbitration must be non-binding – that is, the arbitration may not limit the claimant's ability to challen
See § 2560.503-1(c)(4). The regulation also permits a plan to offer binding arbitration to a claimant after completio
questions E-1and E-2

## D-7: May the board of trustees or committee of a multi-employer group hea
disability benefit plan that generally reviews appealed benefit claims at their
provide for two levels of appeal consistent with the regulation?

Yes, under limited circumstances. In general, the regulation permits plans to maintain two levels of review for adve
establishes special timing rules for making benefit decisions at each level of the review process. See §§ 2560.503
2560.503-1(i)(3). The regulation also provides special timing rules applicable to boards of trustees or committees
and multi-employer disability benefit plans, pursuant to which such plans are excepted from the otherwise applica
rules, such boards or committees generally are permitted to defer the decisions on adverse benefit determination
scheduled meeting of the plan's board or committee. See §§ 2560.503-1(i)(2)(iii) (B), 2560.503-1(i)(3)(ii). It is the vi
employer group health plan or a disability benefit plan could not, in a manner consistent with the regulation, rely o
maintenance of two appeal levels and the special rules for regularly scheduled boards of trustees or committee m
department does not believe a multi-employer plan is foreclosed by the regulation from electing to make appeal c

special rules governing two levels of appeal, rather than in accordance with the quarterly meeting provisions of th
in the regulation that would foreclose a multi-employer plan from making benefit review determinations in accorda
provisions and, following such determinations, providing claimants with an opportunity to voluntarily pursue an ad
See § 2560.503-1(c)(3).

## D-8: Does the regulation's requirement of consultation with appropriate hea
## the discretion of a plan fiduciary reviewing an adverse benefit determination
## the fiduciary may seek in resolving the issues raised by the review?

The regulation requires, for group health and disability claims, that the fiduciary deciding an appeal of an adverse
in part on a medical judgment consult with an appropriate health care professional. This requirement of consultati
fiduciary deciding a claim involving medical issues is adequately informed as to those issues. The consultation re
constrain the fiduciary from consulting any other experts the fiduciary considers appropriate under the circumstan
the appeal of a denied disability claim, a fiduciary may consider it appropriate to consult with vocational or occup
must take appropriate steps to resolve the appeal in a prudent manner, including acquiring necessary information
information so obtained, and making an independent decision on the appeal. The regulation's provision for consu
not intended to alter the fiduciary standards that apply to claims adjudication.

## D-9: Under what circumstances must a group health plan (or disability bene
## identity of experts consulted in the course of deciding a benefit claim?

The regulation provides that, in order to allow claimants a reasonable opportunity for a full and fair review of their
provide for the identification of medical (or vocational) experts whose advice was obtained on behalf of the plan i
determination, without regard to whether the advice was relied upon in making the determination. Under the rules
provide, as part of a notice of an adverse benefit determination or otherwise, the identity of experts consulted dur
Nor are plans required to disclose the name of experts in the absence of an adverse benefit determination. On the
procedural requirements of the regulation, the plan must provide the identity of any such experts when requested
adverse benefit determination. See § 2560.503-1(h)(3)(iv) and (4).

## D-10: Upon receipt of a request from a claimant for the identity of experts c
## connection with an adverse benefit determination, may a plan satisfy the req
## regulation by providing only the name of the company employing the expert
## expert, rather than the name of the expert?

No. The regulation expressly requires that plans provide for the identification of the medical or vocational expert
on behalf of the plan in connection with the claimant's claim. Consequently, merely providing the name of the cor
qualifications of the expert would not, in the department's view, satisfy this requirement of the regulation. See § 2
D-7.

## D-11: Does the regulation require that a group health plan provide a claimant's medical records relating to his or her benefit claim?

Yes. The regulation requires a plan to provide claimants, upon request and free of charge, reasonable access to, and other information relevant to a claimant's claim for benefits. Under the regulation, relevant documents include records relied upon in making a benefit determination and documents and records submitted in the course of ma as a claimant's medical records relating to the benefit claim would be relevant documents, access to, and copies would have to be provided upon the claimant's request. The department notes, however, that if a plan has reaso records contain information that should be explained or disclosed by the physician (or other health professional) not be inconsistent with the regulation to refer the claimant to the physician (or other health professional) for such requested documents directly to the claimant. However, if the physician to whom the claimant was referred failed the claimant in a reasonable period of time and without charge, the plan itself would be required to honor the clai

## D-12: Does the regulation require that a plan provide claimants with access other claimants?

No. The regulation requires that a claimant, have access to, and copies of, documents, records and other informa this purpose, the regulation defines as relevant any document, record, or other information that:

- Was relied upon in making the benefit determination
- Was submitted, considered, or generated in the course of making the benefit determination, without regarc
- Demonstrates compliance with the plan's administrative processes and safeguards for ensuring consistent
- Constitutes a statement of policy or guidance with respect to the group health plan concerning the denied claimant's diagnosis, without regard to whether it was relied upon in making the benefit determination. See 1(m)(8)

While information and data from various claimants' files may have been compiled for purposes of developing a pl policies to be used in ensuring and demonstrating compliance with administrative processes and safeguards rela question B-5); or evaluating or assessing treatment options for benefit determinations, only the criteria, standards would have to be disclosed as information relevant to an individual claimant's claim, not the various claimants' file guidelines, or policies were based.

## D-13: Must a plan include, in every notice of adverse benefit determination apprising claimants that -- You or your plan may have other voluntary dispu as mediation. One way to find out what may be available is to contact your Labor Office and your state insurance regulatory agency?

The regulation, at § 2560.503-1(j)(5)(iii), provides for the inclusion of the statement described above in all notices review involving group health and disability claims. However, the department recognizes that information on the s offered by the plan will be provided, consistent with § 2560.503-1(j)(4), in the notice of adverse benefit determinat

claimant's right to bring a civil action under section 502(a) of ERISA. Pending further review, therefore, the depart
with the requirements of § 2560.503-1(j)(5)(iii).

## E-1: Under what circumstances may a plan afford claimants the ability to ap
beyond the review level required by the regulation?

While the regulation limits a plan's claims procedure to a maximum of two mandatory appeal levels, the regulation
additional levels of appeal, including arbitration or any other form of alternative dispute resolution, provided that o
conditions of the regulation focus on ensuring that the claimant elects the additional appeal voluntarily. Specifical
case of such voluntary levels of appeal, the plan's claims procedure must provide:

- The plan will not assert a failure to exhaust administrative remedies where a claimant elects to pursue a cla
  voluntary level of appeal
- The plan agrees that any statute of limitations applicable to pursuing the claimant's claim in court will be to
  appeal process
- The voluntary level of appeal is available only after the claimant has pursued the appeal(s) required by the r
- The plan provides the claimant with sufficient information to make an informed judgment about whether to
  appeal process, including the specific information delineated in the regulation
- No fees or costs are imposed on the claimant as part of the voluntary appeal process. See § 2560.503-1(c)

## E-2: Can a plan's voluntary level of appeal include binding arbitration as a f
resolution?

Yes. Provided that a plan's claims procedure otherwise complies with the conditions of the regulation applicable t
nothing in the regulation that would preclude a plan from using binding arbitration or any other method of dispute
see 65 FR at 70253.

## E-3: Do the regulation's special rules on voluntary additional levels of appea
apply to pension plans or welfare plans other than group health plans or pla
benefits?

No. The special rules on post-appeal level reviews apply, under the regulation, only to group health plans and pla
other ERISA-covered plans are not required by the regulation to comply with these rules. However, if such other p
additional levels of review, those levels would have to comport with the general requirements for a reasonable pro

## F-1: What are the effective date and applicability dates of the new claims pr

The regulation became effective as of January 20, 2001. The effective date is the date the regulations became leg
Federal Regulations.

The applicability dates are the dates on which plans must begin to comply with the regulation. The applicability d
claims is January 1, 2002. This means that such plans must comply with the regulation beginning with new claims

As amended on July 9, 2001, the regulation contains separate applicability dates for group health claims and all c
amended on July 9, 2001, the applicability date for group health claims was the first day of the first plan year that
later than January 1, 2003. This means that group health plans were required to comply with the regulation begin
first day of the first plan year beginning on or after July 1, 2002, but not later than January 1, 2003. For all calend
applicability date was January 1, 2003.

Claims that were filed under a plan before the relevant applicability date, and that were not yet resolved as of the
accordance with the plan's old benefit claims procedures, or, if the plan so chooses, in accordance with the new

# F-2: What principles are likely to be applied when a claimant elects to aban
administrative claims process in favor of pursuing his or her benefit claim in

Section 503 of ERISA requires plans to set up procedures to provide a full and fair review of denied benefit claims
must exhaust those internal procedures before filing a civil action for benefits under section 502(a)(1)(B). This requ
favoring exhaustion of internal procedures.

Paragraph (l) of § 2560.503-1 provides that where a plan fails to establish or follow claims procedures consistent
a claimant shall be deemed to have exhausted the administrative remedies available under the plan. The claimant
remedies under section 502(a) on the basis that the plan has failed to provide a reasonable claims procedure that

However, the regulation does not undermine the principle that claimants bear the burden of proving to the satisfa
establish or follow claims procedures consistent with the requirements of the regulation. In addition, many of the
plan significant discretion in establishing and following reasonable procedures. For example, paragraph (b)(3) of t
establishing or administering its procedures so as to unduly inhibit or hamper the initiation or processing of claim
accorded significant deference in evaluating whether it failed to follow a procedure consistent with those aspects

Moreover, not every deviation by a plan from the requirements of the regulation justifies proceeding directly to co
full conformity with the regulation might, in processing a particular claim, inadvertently deviate from its procedure
opportunity to effectively remedy the inadvertent deviation without prejudice to the claimant, through the internal
ordinarily will not have been a failure to establish or follow reasonable procedures as contemplated by § 2560.503
issues a notice of adverse benefit determination fully advising the claimant of the right to review and to request ac
be able to correct an inadvertent failure to include in the notice the specific plan provision on which the denial wa
the plan will have provided access to a reasonable claims procedure consistent with the regulations. On the other
plan procedures, or deviations not susceptible to meaningful correction through plan procedures, such as the fail
review procedures in a notice of an adverse benefit determination, would justify a court determination that the pla
procedure.

In addition, filing a lawsuit without exhausting plan procedures could limit claimants' appeal rights and cause clai
otherwise might be entitled. This could be the case when, during the time it takes for a court to dismiss the claim
an appeal expires. In this regard, there is nothing in the regulation that would serve to toll internal plan deadlines
brought under section 502(a)(1)(B).

Exhibit C

Document filed under seal.

Exhibit D

Document filed under seal.

CERTIFICATE OF SERVICE

I, Robert A. Izard, certify that, on October 5, 2017, I caused a true and correct copy of the foregoing document to be served electronically on all counsel of record registered for electronic service for this case.

Executed this 5th day of October 2017 at West Harford, Connecticut.

*s/ Robert A. Izard*

Robert A. Izard
Izard, Kindall & Raabe, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
rizard@ikrlaw.com

18