# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., Individually and on Behalf of All Others Similarly Situated, | No. 16-cv-1702 (JAM) (Consolidated) |
| Plaintiffs, | CLASS ACTION |
| vs. | DEMAND FOR JURY TRIAL |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC., | February 3, 2020 |
| Defendants. | |

**SECOND AMENDED CONSOLIDATED COMPLAINT**

TABLE OF CONTENTS

I.      OVERVIEW ........................................................................................................4
II.     SUMMARY OF FACTS ....................................................................................9

        A.      Cigna's Plans with Plaintiffs and the Class ......................................10
        B.      The Copayment Provisions ................................................................11
        C.      The Deductible Provisions .................................................................12
        D.      The Defendants' Illegal "Clawback Scheme" ...................................13
        E.      Senior Management's Involvement in the "Clawback Scheme" ......17
        F.      Cigna Failed to Determine Whether Its Plans Permitted "Clawbacks"
                Before Taking Them ..........................................................................19

III.    SUMMARY OF THE LEGAL CLAIMS ........................................................22
IV.     JURISDICTION ...............................................................................................25
V.      PARTIES AND NON-PARTIES .....................................................................27
VI.     SUBSTANTIVE ALLEGATIONS ..................................................................31

        A.      The Relevant Relationships ...............................................................31
        B.      Government and Public Scrutiny of "Clawbacks" .............................36
        C.      Cigna's Fiduciary Breaches, Contract Breaches, Lack of Good Faith
                and Reckless Indifference Toward Its Members ................................38
        D.      The Defendants' "Gag Clauses" and Concerted Effort to Conceal
                "Clawbacks" .......................................................................................43
        E.      Defendants breached their fiduciary duty to apply Plan terms to
                claims .................................................................................................46
        F.      Defendants failed to establish or maintain reasonable claim
                procedures ..........................................................................................48
        G.      Defendants Are Fiduciaries and Parties In Interest ..........................50
        H.      Defendants' ERISA Duties ................................................................57
        I.      Defendants Breached Their Duties ....................................................62
        J.      Plaintiffs' Purchases and Sample of Impacted Drugs .......................64

VII.    CLASS ACTION ALLEGATIONS ..................................................................67
VIII.   EXHAUSTION OF ADMINISTRATIVE REMEDIES DO NOT APPLY OR
        ARE FUTILE ....................................................................................................71
IX.     PLAINTIFFS AND THE CLASS ARE ENTITLED TO TOLLING DUE TO
        FRAUD OR CONCEALMENT ........................................................................74
X.      ERISA COUNTS ..............................................................................................75

        COUNT I .......................................................................................75
        COUNT II ......................................................................................76
        COUNT III .....................................................................................79
        COUNT IV .....................................................................................81
        COUNT V .......................................................................................84

   **COUNT VI**..................................................................................................86

**XI.** **RICO Counts**.........................................................................................................88

   **COUNT VII**.................................................................................................88
   **COUNT VIII**...............................................................................................100

**XII.** **STATE LAW COUNTS** .......................................................................................101

   **COUNT IX**..................................................................................................101
   **COUNT X** ...................................................................................................102

**XIII.** **PRAYER FOR RELIEF**......................................................................................103
**XIV.** **JURY TRIAL DEMANDED** ...............................................................................106

Plaintiffs, Kimberly A. Negron, Courtney Gallagher, Daniel Perry, Nina Curol, Roger Curol (collectively, the "ERISA Plaintiffs"), and Billy Ray Blocker, Jr. (collectively with the ERISA Plaintiffs, the "Plaintiffs"), by their undersigned attorneys, allege the following based upon their knowledge as set forth herein and upon information and belief against Cigna Corporation, Cigna Health and Life Insurance Company (collectively "Cigna") and OptumRX, Inc.

## I. OVERVIEW

1.  In 2013, Cigna changed its in-network pharmacy business model.  Under its new model, Cigna outsourced the pharmacy network management to a Pharmacy Benefit Manager ("PBM") called Catamaran, which had its own contracts with participating pharmacies pursuant to which Catamaran operated a Catamaran pharmacy network.

2.  In making this switch, Cigna's "management" saw a huge opportunity to make more money.  Under Catamaran's contracts with participating pharmacies, Cigna was able to collect "spread" (Cigna's term), which was the dollar difference between the amount that it required members to pay for copayments or deductible payments and the amount that Cigna, through Catamaran, actually paid the pharmacy for prescription drugs.  Importantly, unlike its legacy system, Cigna also could secretly take or "claw back" (Cigna's term) from the pharmacies this "spread," or member's "overpayment" (Cigna's term), from the pharmacy for Cigna's own benefit.

3.  Very early in this transition, "senior management" determined that member "overpayments" were "a $100M+ issue for us" and they issued an "urgent request" to capture the member's "overpayments" through "clawbacks."  Indeed, Cigna made the $100,000,000 per year "clawback" issue a "top priority among our group and leadership."  To capture the new-found

"clawback" revenue from the members and pharmacies, Cigna created the "Pharmacy Over Payment" project, which was sponsored by David Cordani, the CEO.  The project succeeded, allowing Cigna to "claw back" almost $280,000,000 in member overpayments during the class period.

4.      Cigna had **no right** under its prescription drug plans to charge "spread" and then "claw back" the member copayment or deductible "overpayments."   According to the unambiguous language of Cigna's Plans, copayments and deductible payments were limited to a "portion" of the "charges made by a Pharmacy."  The "charges made by the Pharmacy" were the amounts that the pharmacy charged Optum and, indirectly, Cigna, to dispense drugs pursuant to the Plan.  By forcing Plan participants and beneficiaries, also known as members, to pay more than the pharmacy charge, often much more, Cigna and OptumRx violated the unambiguous Plan language.

5.      In addition, many Class Members had an additional clause in their Plans that guaranteed, "In no event will the Copayment . . . exceed the amount paid by the plan to the Pharmacy."  By forcing members to pay more than the amount paid to the pharmacy and by secretly "clawing back" the "spread," Cigna and OptumRx violated this unambiguous Plan language as well.

6.      Cigna's illegal "clawbacks" were significant.  In one transaction, Cigna "clawed back" $1,676.78 of the member's $1,684.98 deductible payment because the "charges made by [the] Pharmacy" were only $8.20.  Cigna's "clawback" was ***20,000% more than the actual cost of the drug***.

7.      Highlighting the fact that the secret "clawbacks" violated the unambiguous Plan language, throughout the class period Cigna intentionally and pervasively concealed its "spread"

- 5 -

and "clawbacks" from employers and members through "gag clauses." These "gag clauses" prohibited network pharmacies from telling members about their "overpayments" and "clawbacks," and prohibited network pharmacies from selling prescription medicine to members at any price that would avoid the "spread" and "clawbacks."  When participating pharmacies did discuss the hidden scheme with employers or members, Cigna labeled them "rogue" and threatened to terminate them from the network and cut off their livelihoods.  Internal emails reveal that Cigna consistently required its employees to tell network pharmacies "not to discuss reimbursement matters with members."

8.     During this hidden scheme, knowledgeable Cigna employees described the hidden member "overpayments" as "egregious pricing" and "unreasonable."  One employee wrote, "I don't get this - this is so unfair for this member.  I can't believe we can live with ourselves charging the member 172% more than what this drug costs."

9.     Further, in reckless disregard of the rights of its members, before "clawing back" hundreds of millions of dollars of "spread" from member's copayment or deductible "overpayments," Cigna never checked its Plan language to see if it was permitted to do so.  To the contrary, Cigna's internal documents show that Cigna knew before the Plaintiffs filed this Class Action that a review of its "pharmacy benefit language ha[d] not been conducted since 2010" — years before the implementation of its "Clawback Scheme."

10.    As a result, before Plaintiffs filed this Class Action, Cigna predicted that "[i]f Cigna doesn't update benefit language into customer certificates or coverage booklets . . . [w]e face exposure under ERISA - through a regulatory audit or a lawsuit filed by a customer (or, more likely, *a class action by many customers) - for failure to follow the coverage documents or, worse, breach of fiduciary duty*." (emphasis added)

11.     In addition to the fact that it made no effort to determine if "spread" and "clawbacks" were legal under the plan, Cigna's claim adjudication and processing systems demonstrate reckless indifference toward its members' rights, if not outright fraud. Despite its fiduciary duty to adjudicate claims pursuant to Plan cost-share provisions, Cigna cannot in the ordinary course of business link the prescription drug claims to the relevant Plan terms. So, for example, it cannot on a systematic basis identify which claims should be adjudicated under the Plan terms that limit the cost-share to the amount paid to the pharmacy.

12.     Moreover, Defendants have violated Department of Labor Regulations requiring reasonable claim procedures.  Internal documents show that Cigna knew that it had a legal obligation to include in its Plans an accurate "description of any cost-sharing provisions."  In violation of the Regulations and on a system-wide basis, Cigna knowingly and intentionally failed to disclose "spread" and "clawbacks" that artificially inflated the cost-sharing.

13.     In sum, Defendants' entire prescription drug management system flaunts Defendants' duties under the Plans and the law.

14.     Worse still, internal documents discussing this very lawsuit amplify Cigna's reckless conduct and its breach of fiduciary duty—the highest duty known in law.  In an internal exchange that included the ***Vice President of Pharmacy Management***, an employee remarked, "***members are not as uneducated as we thought***!"  (emphasis added)  In response, and revealing that the "uneducated" remark was more than a flippant comment, the Vice President did not reprimand her fellow employee for her condescending message. Instead, she and her fellow employee questioned "how does this person [Plaintiff Negron] know about 'spread'"?  The Vice President, knowing and recognizing that Cigna had purposefully hidden "spread" and "clawbacks" from employers and members for years, answered, "no clue."

- 7 -

15.     This class action is to remedy the breaches, including the breaches of fiduciary duty, arising from Defendants' years-long scheme of collecting hundreds of millions of dollars of "spread" and "clawbacks" when the unambiguous Plan language did not permit such hidden overcharges.

16.     In addition, RICO liability attaches when a defendant "having entered into contracts that entitled its customers to [certain] pricing, is alleged to have systematically deceived them into believing they were being afforded such pricing when, in fact, they were being overcharged." *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 103, 123 (2013).  This is just such a case, entitling the Class to treble damages.

17.     Plaintiffs, who received prescription drug benefits through individual or group health plans issued or administered by Defendants (the "Plans"),[1] bring this action on behalf of themselves and a Class and Subclasses of similarly situated persons alleging (a) violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., (b) violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., and (c) state law claims for breach of contract and the implied covenant of good faith and fair dealing, resulting from Defendants' common fraudulent and deceptive scheme to artificially inflate prescription costs causing consumers to pay more than they otherwise should have paid for medically necessary prescription drugs.

---

[1] Unless otherwise specified, the term "Plans" as used herein includes with respect to group health plans both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendants and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendants to cover medical and prescription drug expenses incurred by the plan.  "Plans" also includes both public and private plans and governmental program plans, such as Affordable Care Act, Medicare Part C and D plans.  "Plans" subject to ERISA are denoted "ERISA Plans."

## II. SUMMARY OF FACTS

18.     About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits.  A feature of most of these plans is the shared cost of prescription drugs.   Normally, when a patient fills a prescription for a medically necessary prescription drug under his or her health care plan, the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or coinsurance or deductible payment.  The payments are often called "cost-sharing."  Pharmacies are required by contract to collect the payments on Defendants' behalf from patients at the time the prescription is filled and are not allowed to waive or reduce the amount collected under the Plans.

19.     Defendant Cigna Corporation through its wholly-owned subsidiaries, including Defendant Cigna Health and Life Insurance Company ("CHL") (collectively "Cigna"), is a fully integrated health insurance company.  Cigna, along with a pharmacy benefit manager ("PBM"), provides and administers health and pharmacy benefits to patients. Cigna has an in-house PBM— Cigna Pharmacy Management, which is a business division of CHL. Cigna Pharmacy Management outsources certain PBM and administrative functions to other PBM service providers, while retaining other functions with Cigna and its affiliates. These external PBM service providers are retained and directed by Cigna, CHL, and/or Cigna Pharmacy Management to provide pharmacy benefits to patients, which include, inter alia: prescription drug procurement and inventory management for mail-order pharmacies; establishing or assisting in the establishment of a formulary of drugs that will be covered, a network of pharmacies that will serve as participating pharmacies for patients to obtain prescriptions, copayment amounts, coinsurance amounts, and

deductibles (if applicable); and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

20.     In this instance, Cigna retained Defendant OptumRx, Inc. ("OptumRx") for some of its PBM services, having previously entered into a 10-year PBM services agreement in mid-2013 with Catamaran Corporation ("Catamaran"), which OptumRx acquired in 2015. According to Cigna's Form 10-K, under the PBM services agreement, Cigna "utilize[s] Optum's technology and service platforms, retail network contracting and claims processing services."  Cigna also used Argus Health Systems Inc. ("Argus"), to provide PBM services to the Plans. Argus provided claims adjudication services before and after the contract with Catamaran.  Although Cigna intended for Catamaran to replace Argus as claims processor, the deal was renegotiated as part of a litigation settlement in 2015.  Under the settlement, Cigna continued to use Catamaran's network, but also used Argus for claims processing. Thus, the PBMs have been involved in administering pharmacy benefits for the Plans throughout the relevant time period and all have been coordinated through and directed by Cigna.

21.     As set forth below, Defendants and their co-conspirators engaged in a scheme to defraud patients by overcharging patients for the cost of medically necessary prescription drugs. Patients, including Plaintiffs and the Class (defined below), paid excess charges to participating pharmacies in exchange for receiving their prescription drugs.   Unbeknownst to the Class Members, Defendants misrepresented the purported costs of the prescription drugs to patients and then "clawed back" from the pharmacies a large portion of the patients' payments.

### A. Cigna's Plans with Plaintiffs and the Class

22.     Cigna uses uniform prescription drug plan clauses and terms in their Plan contracts to provide prescription drug coverage.  The terms of the Plans and how the Plans were administered

by Cigna, its affiliates, and its PBMs did not differ materially across Plans at issue here. Accordingly, the rights relevant to the claims alleged herein are shared by all members of the Class regardless of the funding arrangement underpinning the health plan benefits that Defendants offer and administer.

23.     Cigna's Plans stated that Cigna would provide prescription drug coverage for "Covered Expenses," which are "expenses for charges made by a Pharmacy, for Medically Necessary Prescription Drugs or Related Supplies Ordered by a Physician."

24.     Under the Plans, patients "may be required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies.  That portion is the Copayment, Deductible and/or Coinsurance."  Accordingly, the copayment or deductible payments are a "portion" of "charges made by a Pharmacy" for prescription drugs.

### B. The Copayment Provisions

25.     Pursuant to a typical Class Member Plan:

(a)     "Copayments are expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies."

(b)     "Copayments are fixed dollar amounts (for example, $15) you pay for covered health care, usually when you receive the service."

(c)     Because the Plans unambiguously stated that a member's copayment would be for only a "portion" of "Covered Expenses," and because "Covered Expenses" are "expenses for charges made by a Pharmacy," Class Members should never have paid a copayment "expense" that was more than the "charges made by a pharmacy."

- 11 -

(d)     Plaintiff Negron's plan and Plaintiff Blocker's plan further provided: "In no event will the Copayment . . . for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge."[2] Thus, under these form Plans, Class Members should never have paid a copayment more than the amount paid to the pharmacy.

### C. The Deductible Provisions

26.    Cigna's Plans described a "deductible" payment as follows:  "Deductibles are expenses to be paid by you or your Dependent for Covered Prescription Drugs and Related Supplies.  These Deductibles are in addition to any copayments or coinsurance.  Once the Deductible maximum shown in The Schedule has been reached you and your family need not satisfy any further Prescription Drug Deductible for the rest of the year."

27.    In contrast to copayments, deductible payments are not described in the Plans as a "fixed dollar amount."

28.    Rather, the only definition of deductible payments in the Plans is that a member's deductible payment would be for a "portion" of "Covered Expenses," and because "Covered Expenses" are "expenses for charges made by a Pharmacy," Class Members should never have paid a deductible "expense" that was more than the "charges made by a pharmacy."

29.    For coinsurance claims, which are not part of the class claims, some of Cigna's Plans stated that the coinsurance was based on a "percentage of Charges."  The Plans further described "Charges" as "the amount charged by the Insurance Company to the plan," or other

---

[2] The "Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source."

similar description.  Importantly, for copayments and deductible payments, Cigna's Plans do not contain any similar description.  Clearly, if Cigna had intended to tie copayments or deductible payments to some form of defined "Charges" that was different from the "charges made by a Pharmacy" it knew how to do so and could have done so.

### D. The Defendants' Illegal "Clawback Scheme"

30.     Contrary to the unambiguous language of the Plans, Defendants and/or their agents exercised their unilateral discretion to force network pharmacies to charge patients unauthorized and excessive amounts for prescription drugs that far exceeded the amount charged by or paid to the network pharmacies.  Defendants and/or their agents "clawed back" some or all of these excessive payments from the network pharmacies.

31.     Examples of Cigna and its PBMs "clawing back" from pharmacies "overpayments" by Class members total in number in the tens of millions, total in value in the hundreds of millions of dollars and are far too numerous to list, but include the following:

(a)     On January 16, 2016, a Class member paid to a pharmacy a $1,684.98 deductible payment for the prescription drug Lamictal—a 20,449% premium over the actual $8.20 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,676.78 "overpayment."

(b)     On January 16, 2017, a Class member paid to a pharmacy a $300.00 copayment for the prescription drug Diovan—a 5,374% premium over the actual $5.48 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $294.52 "overpayment."

(c)     On July 17, 2017, a Class member paid to a pharmacy a $180.00 copayment for the prescription drug Lamotrigine—a 3,075% premium

over the actual $5.67 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $174.33 "overpayment."

        (d)      On April 13, 2016, a Class member paid to a pharmacy a $250.00 copayment for the prescription drug Tirosint—a 2,760% premium over the actual $8.74 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $241.26 "overpayment."

        (e)      On January 4, 2017, a Class member paid to a pharmacy a $1,722.42 deductible payment for the prescription drug Enoxaparin Sodium—a 5,514% premium over the actual $30.68 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,691.74 "overpayment."

        (f)      On November 19, 2017, a Class member paid to a pharmacy a $171.12 copayment for the prescription drug Crestor—a 2,015% premium over the actual $8.09 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $163.03 "overpayment."

        (g)      On January 10, 2017, a Class member paid to a pharmacy a $2,013.98 deductible payment for the prescription drug Aripiprozale—a 505% premium over the actual $332.72 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,681.24 "overpayment."

        (h)      On June 14, 2015, a Class member paid to a pharmacy a $250.00 copayment for the prescription drug Brilinta—a 2,286% premium over the actual $10.48 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $239.52 "overpayment."

- 14 -

(i)      On May 1, 2017, a Class member paid to a pharmacy a $180.00 copayment for the prescription drug Losartin Potassium—a 1,105% premium over the actual $14.94 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $165.06 "overpayment."

(j)      On July 18, 2015, Plaintiff Negron paid to a pharmacy a $10.00 copayment for prescription strength Ibuprofen—a 206% premium over the actual $3.27 fee paid to the pharmacist.  Without disclosing it to Plaintiff Negron, Defendants "clawed back" the $6.73 "overpayment."

(k)      On December 2, 2016, Plaintiff Perry paid to a pharmacy a $9.24 copayment for the prescription drug Meloxicam—a 379% premium over the actual $1.93 fee paid to the pharmacist.  Without disclosing it to Plaintiff Perry, Defendants "clawed back" the $7.31 "overpayment."

(l)      On November 12, 2016, Plaintiff Gallagher paid to a pharmacy a $1.88 coinsurance payment for the prescription drug Azithromycin—a 338% premium over the $0.42 coinsurance she should have paid, which is 10% of the actual $4.29 fee paid to the pharmacist.

(m)      On December 2, 2016, a Class member paid to a pharmacy a $10.00 copayment for the prescription drug Bupropion—a 440% premium over the actual $2.27 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $7.73 overcharge.

(n)      On January 19, 2016 and February 17, 2016, Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a 336% premium over the actual $2.97 fee paid to the

pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed back the
$7.03 overcharge.

(o)     On March 21, 2016, April 19, 2016, and May 16, 2016,
Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00
copayment for a prescription drug—a 161% premium over the actual $6.19 fee paid
to the pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed
back the $3.81 overcharge.

(p)     On May 9, 2016, Plaintiff R. Curol paid to Robichaux's
Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a
161% premium over the actual $6.19 fee paid to the pharmacy.  Without disclosing
it to Plaintiff R. Curol, Defendants clawed back the $3.81 overcharge.

(q)     On January 19, 2016, March 15, 2016, June 7, 2016, Plaintiff
R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00
copayment for a prescription drug—a 311% premium over the actual $3.21 fee paid
to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed
back the $6.79 overcharge.

(r)     On February 22, 2016, April 18, 2016, June 7, 2016, Plaintiff
R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00
copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid
to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed
back the $5.93 overcharge.

(s)     On December 8, 2016, Plaintiff Blocker paid to a pharmacy
a $3.89 copayment for the prescription drug Lisinopril—a 122% premium over

the actual $1.75 fee paid to the pharmacist.  Without disclosing it to Plaintiff Blocker, Defendants "clawed back" the $2.14 "overpayment."

32.     Defendants violated the Plans and breached their fiduciary duties and the implied covenant of good faith and fair dealing by (1) secretly determining that patients must pay inflated copayments and deductible payments, (2) secretly forcing pharmacies to collect those inflated copayments and deductible payments on their behalf, and (3) secretly forcing pharmacies to remit to Defendants all or a significant portion of those inflated copayments and deductible payments in the form of illegal "clawbacks."

33.     Defendants utilized the U.S. Mail and interstate wire facilities to engage in their fraudulent, reckless billing scheme in violation of RICO.  Defendants represented to plan participants that their copayment and/or deductible payments were based on the "charges made by a Pharmacy," when, in fact, plan participants paid more than those amounts and Defendants simply pocketed the "overpayments" in the form of prescription "clawback."

34.     Defendants and/or their agents took "clawbacks" many thousands of times each day from pharmacies all across the country and damaged Class Members.  During the Class Period, there were at least 54,000,000 copayment "clawbacks" totaling more than $150,000,000 and at least 10,000,000 deductible "clawbacks" totaling more than $135,000,000.

**E.  Senior Management's Involvement in the "Clawback Scheme"**

35.     Cigna's top management was involved in the decision to "claw back" hundreds of millions of dollars of member "overpayments."  In one 2013 email entitled "Urgent Request - Action Needed," a key employee described the "clawbacks" as an "urgent request from management" to "react to a missed revenue opportunity."  The email continued:  "Customers occasionally pay the pharmacy more than the cost of the drug because of spread.  Cigna allowed

the pharmacies to keep the *overpayment* with our own contracts, but now that we are on Catamaran's contracts, we need to recoup the dollars from the pharmacies."  (emphasis added)

36.    The next month, Cigna management correctly estimated that the "clawbacks" would generate $100 million of new revenue per year.  The knowledgeable employee declared, "The question is not if we should decide to proceed.  Management has already made the decision to proceed.  Cigna is losing approximately *$100M a year*."  (emphasis added)

37.    Due to the significant amount of money involved, and as a result of a meeting with the President of Cigna's pharmacy business line, management designated the "clawback" process as a "top priority," stating, "Guys, I had a meeting with Chris H this morning, and of course the ZBL [Cigna's term for "spread/clawbacks"] is a top priority among our group and leadership. . . . *[I]t is a $100M+ issue for us*." (emphasis added)

38.    Cigna also created a team entitled "Argus Transition:  Pharmacy Over Payments," and it named Cigna's CEO, David Cordani, as the "Project Sponsor."  The "overpayments" at issue, as described in countless Cigna documents, were the hundreds of millions of dollars of member's "overpayments" as a result of the unlawful "spread" between the "charges made by a Pharmacy" and member's copayment or deductible payment.  An Argus document similarly made clear that the "overpayment" at issue was the "overpayment to the pharmacy *by the member.*" (emphasis added)

39.     The "Argus Transition:  Pharmacy Over Payments" project was designed to and did enable Cigna to "claw back" from the pharmacies approximately $280,000,000 of these member "overpayments" during the Class Period.

40.    In short, for *every* transaction at issue, Cigna paid *nothing* toward the amount that the network pharmacy charged.  For each transaction, Cigna instead forced members to make

"overpayments" and it secretly took much of that money through its "Pharmacy Over Payments" project, led by the CEO.

### F. Cigna Failed to Determine Whether Its Plans Permitted "Clawbacks" Before Taking Them

41.    While focused on its "top priority" to seize the "approximately $100M a year," Cigna never bothered to review its Plan language to determine whether it could lawfully require members to make copayments or deductible payments that exceeded the "charges made by a Pharmacy" before it employed its "Clawback Scheme."

42.    When Cigna finally analyzed its Plan language, and before Plaintiffs filed this Class Action in October 2016, Cigna recognized its need to re-write "gapped language."  The President of Cigna's pharmacy business sponsored a program to remedy this "Business Problem," which problem was described as follows:  "Pharmacy customers need updated benefit plan language in their certificates of coverage and/or booklets which has not been updated with new legal language that support how CPM [Cigna Pharmacy Management] currently manages our pharmacy product." An internal document from the project further summarized the "Business Problem" and the "risks due to inconsistencies," and evidences Cigna's reckless indifference to its members if "clawing back" hundreds of millions of dollars without ever assessing its plan language permitted such conduct:

> A comprehensive end-to-end review, update and refiling of pharmacy benefit language has not been conducted since 2010. Lack of updated benefit plan language impacts CPM's [Cigna Pharmacy Management] ability to implement and administer affordable, competitive, and compliant plan designs for insured and ASO plans.
>
> * * *
>
> Benefit language must accurately describe how Cigna creates and manages pharmacy benefits for clients and/or how Cigna administers claims.
>
> * * *

- 19 -

> If we do not implement this new language, then ***Cigna may experience legal, regulatory, client and customer risks due to inconsistencies between plan language and how we administer UM protocols***. (emphasis added)

43.     On August 8, 2016, a Cigna PowerPoint made an accurate and dire prediction that if Cigna did not revise its Plan language to conform the language to its claims adjudication practices, it would face an ERISA class action, stating:

> If Cigna doesn't update benefit language into customer certificates or coverage/booklets then
>
> - We face exposure under ERISA - through a regulatory audit or a lawsuit filed by a customer (***or, more likely, a class action by many customers***) - for failure to follow the coverage documents or, worse, breach of fiduciary duty. (emphasis added)

44.     When Cigna did get sued in this Class Action, one immediate reaction was not recognition that its prediction had come true.  To the contrary, two knowledgeable employees, including the Vice President of Pharmacy Management, openly questioned the intelligence of Cigna's members and wondered how Cigna's well-hidden "spread" had been uncovered:



45.     In reaction to this Class Action and to the previously-known or recklessly disregarded "Business Problem," Cigna did re-write its Plans and, ***for the first time***, created a defined term, "Prescription Drug Charge," and it disclosed to members that Cigna might create "spread" between the member's copayment or deductible payment and the amount paid to the pharmacy:



### III.   SUMMARY OF THE LEGAL CLAIMS

46.     As a result of Cigna's unlawful conduct, Plaintiffs seek relief as follows:

With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides

that a participant or beneficiary may bring an action to enforce his rights under the terms of the

plan or to clarify his rights to future benefits under the terms of the plan.  Defendants violated the

ERISA Plans by establishing the "spread" and taking illegal "clawbacks" as alleged below and

should not be allowed to continue to do so.

47.     Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in

interest shall not receive direct or indirect compensation unless it is reasonable and prohibits

transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service

providers.  In setting the amount of and taking excessive undisclosed "spread" compensation and

"clawbacks," Defendants allowed and received unreasonable compensation and misused the assets

- 22 -

of the ERISA Plans, including participant contributions at the pharmacy counter and the Plan contracts that provided Defendants with the ability to extract these funds.

48.     Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.  In setting the amount of and taking "spread" compensation and "clawbacks," Defendants set their own compensation, received plan assets and consideration for their personal accounts in violation of this provision, and were acting under other conflicts of interest.

49.     Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  In setting the amount of and taking excessive undisclosed "spread" compensation and "clawbacks," Defendants breached their fiduciary duties of loyalty and prudence.

50.     Under Count V, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach

and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

51.     Under Count VI, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

52.     With regard to RICO, under Count VII, Cigna and/or CHL engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(c), by overcharging patients for the cost of medically necessary prescription drugs and is liable to Plaintiffs the Class for all statutory remedies.

53.     Under Count VIII, Defendants engaged in a scheme to defraud in violation of RICO, 18 U.S.C. § 1962(d), by overcharging patients for the cost of medically necessary prescription drugs and are liable to the Class for all statutory remedies.

54.     Under Count IX, Defendant CHL breached its contracts with Plaintiff Blocker and the State Law Subclass members in requiring them to pay amounts for prescriptions drugs in excess of the amounts authorized by the Plans, including and "spread" that was "clawed back."

55.     Under Count X, Defendant CHL breached its implied covenant of good faith and fair dealing in requiring Plaintiff Blocker and the State Law Subclass members to pay "spread" and "clawbacks." Defendant CHL's actions were performed in bad faith, with the intent of maximizing its own revenue at participants' expense, in contravention of the reasonable expectations of Plaintiff Blocker and the State Law Subclass members.

56.     As further alleged below, Plaintiffs seek to represent a nationwide Class of all insureds and plan participants whose health Plans are insured or administered by Cigna, its affiliates, and its PBMs, as well as the ERISA Subclass and the State Law Subclass in which they are members.

## IV. JURISDICTION

57.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and RICO; (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA; and (c) 18 U.S.C. § 1964 providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C § 1962. Further, declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure. Further, this Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Mr. Blocker is domiciled in a different state than both Defendants; and (b) 28 U.S.C. § 1332(d)(2)(A) because at least one member of the State Law Subclass (defined below) is a citizen of a State different from any Defendant, the aggregate amount in controversy exceeds five million dollars, exclusive of interest and costs, and the Classes have more than 100 members.

58.     **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.  Upon information and belief, Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over all Defendants pursuant to

Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Connecticut. Defendants also reside or may be found in this district or have consented to jurisdiction in this district.  In any event, this Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Consolidated Complaint took place in the State of Connecticut; Defendants are authorized to do business in the State of Connecticut; Defendants conduct business in the State of Connecticut and this District; Defendants have principal executive offices and provide prescription drug services in the State of Connecticut and this District; Defendants advertise and promote their services in the State of Connecticut and this District; Defendants have sufficient minimum contacts with the State of Connecticut; Defendants administer health plans and pharmacy benefits under those plans from the State of Connecticut; and/or Defendants otherwise intentionally avail themselves of the markets in the State of Connecticut through the marketing and sale of insurance and related products and services in this State so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

59.    **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims herein occurred within this District, at least one Defendant resides in this district, and/or a substantial part of property that is the subject of the action is situated in this District.  Venue is also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because most Defendants reside or may be found in this District and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this District. Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because most Defendants reside, are found, have an agent, or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## V. PARTIES AND NON-PARTIES

60.     Plaintiff Negron is a citizen and resident of Massachusetts who received prescription drug coverage under a group health plan provided by her employer for her benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Medical Benefits").  This Plan is a welfare benefit plan, as that term is defined in 29 U.S.C. § 1002(1)(A), subject to ERISA ("ERISA Plan.")  This plan at all relevant times has been administered by CHL. Under her plan, Plaintiff Negron was obligated to pay copayments of $10-$187 per prescription for certain categories of drugs.  As described in detail herein, as a result of Defendants' illegal scheme, Plaintiff Negron has been injured by paying inflated patient contribution payments for medically necessary prescriptions.

61.     Plaintiff Gallagher is a citizen and resident of New Jersey and was covered by a health plan provided by an employer and issued and administered by CHL. Plaintiff Gallagher received prescription drug coverage through a Cigna group policy pursuant to a plan established through the employer for her benefit.  This plan is an ERISA Plan.  Under the policy, Plaintiff Gallagher was obligated to pay 10-45 % coinsurance per prescription for certain categories of drugs.  As described in detail herein, as a result of Defendants' illegal scheme, Plaintiff Gallagher has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

62.     Plaintiff Perry is a citizen and resident of Washington who received prescription drug coverage under a group health plan provided by his employer for his benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Medical Benefits").  This plan is an ERISA Plan and at all relevant times has been administered by CHL.  Under the plan, Plaintiff Perry was obligated to pay copayments of $10-$100 per prescription for certain categories of

drugs. As described in detail herein, as a result of Defendants' illegal scheme, Plaintiff Perry has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

63.     Plaintiff N. Curol is a citizen and resident of Louisiana who received prescription drugs under a group health plan provided by her spouse's employer for her benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Standard Plan"). This plan is an ERISA Plan and at all relevant times has been administered by CHL. Under the plan, Plaintiff N. Curol was obligated to pay copayments of $10-$40 per prescription for certain categories of drugs. As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff N. Curol has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

64.     Plaintiff R. Curol is a citizen and resident of Louisiana who received prescription drugs under a group health plan provided by his employer for his benefit using a governing form plan document provided by CHL ("Cigna Open Access Plus Standard Plan"). This plan is an ERISA Plan and at all relevant times has been administered by CHL. Under the plan, Plaintiff R. Curol was obligated to pay copayments of $10-$40 per prescription for certain categories of drugs. As described in detail below, as a result of Defendants' fraudulent scheme, Plaintiff R. Curol has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

65.     Plaintiff Billy Ray Blocker, Jr. is a citizen and resident of Georgia who received prescription drug coverage under a self-funded group health plan provided by his employer Cobb County for his benefit. This plan is a "governmental" plan as defined under ERISA and at all relevant times has been administered by CHL. Under the plan, Plaintiff Blocker was obligated to

pay copayments of $10-$125 per prescription for certain categories of drugs.  As described in detail herein, as a result of Defendants' illegal scheme, Plaintiff Blocker has been injured by paying inflated participant contribution payments for medically necessary prescriptions.

66.     Defendant Cigna is a global health services organization, incorporated in Delaware, with its principal place of business in Bloomfield, Connecticut.  In 2015, Cigna reported revenue in excess of $37.9 billion, and the company is currently ranked 79th on the Fortune 500.  Cigna operates through three segments: (1) Global Health Care, which is comprised of the Commercial operating segment, which encompasses both the U.S. commercial and certain international health care businesses serving employers and their employees, and other groups, and the Individuals and Government operating segment, which offers Medicare Advantage and Medicare Part D plans to seniors and Medicaid plans; (2) Global Supplemental Benefits, which offers supplemental health, life and accident insurance products in selected international markets and in the U.S.; and (3) Group Disability and Life, which provides group long-term and short-term disability, group life, accident and specialty insurance products and related services.

67.     Defendant CHL, incorporated in Connecticut, is a wholly-owned subsidiary of Cigna with its principal place of business in Bloomfield, Connecticut.  CHL underwrites life and health insurance policies.   The company provides group term life, accidental death and dismemberment, dental, weekly income, and long-term disability insurance.  CHL also administers pharmacy benefits for health insurance policies it sells and health plans it administers through its in-house PBM, Cigna Pharmacy Management, a business division of CHL, which outsources certain PBM and administrative functions to other PBM service providers, while retaining other functions with Cigna and its affiliates.  At relevant times here, these external service providers have included OptumRx, Catamaran, and Argus.

- 29 -

68.     Defendant OptumRx is a California corporation with its principal place of business in Irvine, California.[3]   OptumRx is a PBM used by Cigna and its subsidiaries since June 11, 2013 when OptumRx's subsequently-acquired Catamaran subsidiary[4] began providing certain services to CHL-administered plans under a ten-year contract.[5]   OptumRx operates through its Catamaran subsidiary, through which it provides pharmacy care services to more than 66 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country.   Upon information and belief, OptumRx provides pharmacy benefit management services to a substantial number of Cigna customers.   In 2015,

---

[3] OptumRx is a subsidiary of OptumRx Holdings, LLC, a Delaware corporation.  OptumRx Holdings, LLC is a subsidiary of Optum, Inc., a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum, Inc. is a subsidiary of United HealthCare Services, Inc., a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. United HealthCare Services, Inc. is a subsidiary of UnitedHealth Group Incorporated, a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

[4] In 2015, Defendant OptumRx acquired Catamaran, which reported $21.6 billion in revenue). Health Strategies Group, Research Agenda 2015: Pharmacy Benefit Managers (2014), http://www.healthstrategies.com/sites/default/files//PBM_Research_Agenda_PBM_RA101513.pdf; Optum, OptumRx, Catamaran Complete Combination (July 23, 2015), https://www.optum.com/about/news/optumrx-catamaran-complete-combination.html.

[5] On June 11, 2013, Cigna announced that "Catamaran will replace DST Systems Inc.'s Argus Health unit, which has been managing prescription benefits for Cigna's commercial customers." According to the disclosures, however:

Cigna will retain formulary management, clinical and product development, sales and marketing, and will manage "all day-to-day customer- and client-facing functions."

Catamaran will provide prescription drug procurement and inventory management, order fulfillment for Cigna's home-delivery pharmacy, retail network contracting, and claims processing.

Catamaran will remain behind the scenes, because the mail pharmacy and all pharmacy-related customer interactions will still have the Cigna brand.

Cigna will lead the medical-pharmacy benefit integration activities.

Alex Wayne, *Catamaran Gains Cigna's Prescription Drug Business* (June 11, 2013), https://www.bloomberg.com/news/articles/2013-06-10/catamaran-gains-cigna-s-prescription-drug-business.

OptumRx reported approximately $31.6 billion in revenue; and in 2016, OptumRx reported over $44.5 billion in revenue.

69.     Non-party Argus is a PBM and claims processer used by Cigna and its subsidiaries. Argus, headquartered in Kansas City, Missouri, describes itself as being a provider of pharmacy and health management solutions.  Argus purports to offer modular to full-service solutions focused on lowering plan cost and improving patient and provider quality measures.  Upon information and belief, Argus provides pharmacy benefit management and claims processing services to Cigna customers.  Prior to Cigna's 2013 contract, Argus administered pharmacy benefits for participants in plans insured and administered by Cigna and its affiliates and since January 2016 has been retained by Cigna again to provide administrative services to Cigna and its affiliates.

## VI.  SUBSTANTIVE ALLEGATIONS

### A.  The Relevant Relationships

70.     Contractual relationships exist between (1) the member and his or her employer; (2) the employer and the health insurance company that underwrites and/or administers the plan; (3) the insurer/administrator and the PBM; and (4) the PBM and the pharmacy.  An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a health insurance company to provide prescription drug benefits for its employees under health plans.  Health insurance companies then hire PBMs to manage the prescription drug benefits offered pursuant to their policies and ASO contracts.[6]

---

[6] This relationship is different for Class members with state-law claims.  Their plans are purchased from insurers without an employer in the middle, such as Affordable Care Act plans.

71.   **Employer/Individual–Insurer Agreements (i.e., Health Plans).**  Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These policies and plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible or copayment that a patient must pay to obtain prescription drug benefits. Plaintiffs and Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

72.   **Insurer–PBM Agreements.**  Health insurance companies, such as Cigna and CHL, contract with and/or own PBMs, which act as their agents to administer the prescription drug benefits purchased through the health insurance plans that the insurers issue or administer.

73.   **PBM–Pharmacy Agreements.**  PBMs, such as OptumRx, in turn, contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network.  The pharmacies fill prescriptions that are health benefits covered under the plans.  Pursuant to these agreements, the insurer and/or PBMs set the amount that a pharmacy will collect from a patient for a prescription drug, the amount the PBM (and insurer or plan) will pay the pharmacy for filling the patient's prescription, and the amount of the patient's payment that the pharmacy must send to the PBM as a "Clawback."  On information and belief, the pharmacy has no role in setting the amount of the patient's payment and thus must accept the "Clawback" amount as determined by the PBM.

74.   The relationship among the parties is shown graphically as follows:



75.     Pursuant to the health plans, insurers must ensure that, when they contract with and direct a PBM to act as their agent to manage prescription drug benefits, the PBM follows the plans' terms, such that patients are not overcharged for their prescription drug benefits.

76.     Under Cigna's Plans, the amount charged by Cigna to the Employer may be different from the amount charged by the pharmacy to the PBM, Optum, and then upstream to Cigna.  In short, Cigna expressly advises the Employer that it might charge "spread" between what the Employer pays Cigna and what Cigna/OptumRx pays the pharmacy and that Cigna might keep that spread.  Cigna's form ASO agreement provides:  "The amount paid to the Retail Pharmacy for Brand, Generic of Specialty Drug Claims *may or may not be equal* to the amount charged to Employer, and CHLIC *will absorb or retain any difference*." (emphasis added)

77.     Accordingly, the amount charged by Cigna to the Employer ("Employer Charge") is a completely different amount charged pursuant to a completely different contract from the "charges made by a Pharmacy" to Optum, the PBM, and then upstream to Cigna ("Pharmacy Charge").

78.     While the Employer-Cigna contract may be based on the Employer Charge, the cost share paid by the member under the Plan language is based solely on the usually smaller Pharmacy Charge. Cigna has no right under its Plan language to increase the "portion" paid by the member above the Pharmacy Charge to include "spread" that it then "claws back."

79.     The Defendants in this case twisted the general employer/individual–insurer–PBM–pharmacy structure to create their unlawful "Clawback" Scheme.

80.     In summary, the PBM–Pharmacy Agreements:  (1) require pharmacies to charge patients more for drugs than the Defendants and their PBMs have agreed the pharmacies will charge and be paid for the drugs, with the difference between the two amounts known as the

"spread;" (2) require the pharmacies to collect the "spread" from patients; (3) require payment of "spread" to the PBM or deduction of the "spread" from future reimbursement to the pharmacy by the PBM as a "clawback;" (4) require the PBM to pay the "clawbacks" to Cigna or be deducted in a reconciliation process; (5) prohibit pharmacies from disclosing to patients the existence or amount of the "spread" and "clawback;" (6) prohibit pharmacies from disclosing to patients that they can purchase drugs at lower prices; and (7) prohibit pharmacies from selling to patients covered prescription drugs at prices that are lower than the price that the insurer/PBM orders the pharmacies to charge patients.  Instead, the "spread" and "clawback" overcharges are pocketed secretly and unlawfully by the insurance companies, the PBMs, and/or their agents.

81.     There are several ways in which Defendants operate this "Clawback Scheme."  For example:

(a)     A patient under one of the Plans went to a pharmacy to purchase prescription-strength Vitamin D (50,000 IU).

(b)     In this documented instance, prescription-strength Vitamin D was purchased by the pharmacy from the manufacturer or wholesaler for $0.60. Pursuant to the PBM–Pharmacy Agreement, the PBM paid the pharmacy $0.96 for the drug, a fulfillment fee of $1.40, and $0.21 in tax.  Accordingly, pursuant to the PBM–Pharmacy Agreement, the contracted charge made by the pharmacy was $2.57 for the prescription.

(c)     Despite this, pursuant to the PBM–Pharmacy Agreement, the PBM required the pharmacy to charge the patient a $7.68 "copayment" for the prescription-strength Vitamin D—an almost 300% overcharge.

(d)      The PBM–Pharmacy Agreement then required the pharmacy to pay to the PBM/insurer the "spread" between the contracted fee and the "copayment" amount collected from the patient—a $5.11 "clawback."

(e)      On information and belief, the PBM–Pharmacy Agreement further prohibited the pharmacy from disclosing to the patient the amount of the Pharmacy Charge or the "clawback" or from selling the drug to the patient for less than the "copayment," separate and apart from the policy.

(f)      The above-described transaction is set forth below in an annotated excerpt of an actual transaction record from an investigation into this scheme.



82.      Alternatively, where the patient pays a deductible (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount that the PBM requires the pharmacy to charge the customer, not the lower actual Pharmacy Charge.

83.     As an example, using the contracted fees above, the insurer/PBM would set the amount that the pharmacy must charge the patient for Vitamin D at $7.68, but the insurer/PBM would pay the pharmacy only $2.57.  Under the deductible phase of a plan, the patient would pay $7.68, the pharmacist keeps $2.57, and the pharmacy is forced to pay the PBM/insurance company a "clawback" of $5.11.

### B.  Government and Public Scrutiny of "Clawbacks"

84.     Lawmakers, government officials, patients and pharmacists have all raised concerns that there is a dangerous lack of transparency with respect to the revenue stream of PBMs, rendering it difficult to assess whether an insurance policy or plan is being administered in compliance with plan or contract terms.[7]

85.     The losses to date and the risk of future losses to the participants and beneficiaries of the Plans is great, particularly given that the bulk of Defendants' market is with ERISA-covered health plans—plans whose participants and beneficiaries are owed the highest duties known to law by the fiduciaries that administer and manage these important employee benefits.

86.     The New Orleans television station FOX 8 investigated "clawbacks," including "clawbacks" by Cigna and other health insurance companies as part of its Medical Waste investigative series. FOX 8's investigative reporter, Lee Zurik, found that insurance companies were "charging co-pays that exceed the customers' costs for the drug," and that insurers were "clawing back" the excess payments from the customers.  Mr. Zurik's reporting helped bring the issue of "clawbacks" into public focus.

---

[7] National Community Pharmacists Association, *Lawmakers Ask Medicare for More Drug Payment Transparency* (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

87.     FOX 8 published a number of screenshots from a pharmacist's computer system showing, with respect to particular drugs, the amount of the payment that certain health insurance companies (including Defendants) required pharmacists to collect from customers and the amount the pharmacists were required to pay to the health insurance companies as a "clawback."  The prescription-strength Vitamin D example set out above is taken from one of the screenshots.

88.     In response to the disclosure of the "clawback" practice, Louisiana Insurance Commissioner, James J. Donelon stated: "You could say that, if the customer is paying more than the drug is worth, it' not a copay – it's a 'you-pay'.  'There's no copay,' our pharmacist says, 'that is an absolute, additional premium being paid, that they're paying, that they don't realize.'"

89.     FOX 8 also found that pharmacists were required to charge customers the amount dictated by the insurer or PBM, and were not allowed to give any discounts.  According to Randal Johnson, president and CEO of the Louisiana Independent Pharmacies Association, "it's actually costing you more to acquire the drug with your insurance than you could if you walked in off the street and you didn't have insurance."

90.     In the wake of this litigation and media coverage, many states, including Connecticut, have outlawed "clawbacks" because of their pernicious effect and the secret way in which Cigna, OptumRx and other insurers and PBMs have engaged in the "Clawback Schemes."

91.     Potential waste and abuse in the administration of these plans also has gotten the attention of the Department of Labor—which has the authority to enforce ERISA.  As early as 2014, the growing influence of PBMs generated a number of concerns not the least of which was the fact that PBMs engage in direct and confidential negotiations with drug manufacturers and pharmacies like those described above and further below. In response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

92.     At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback'" which takes advantage of the lack of transparency in the PBM industry. According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy. The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug. The entire prescription is paid for by the patient. Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "spread" paid for by the patient.[8]

93.     One Cigna client learned of the "clawbacks" and took offense and demanded that Cigna stop them—and Cigna relented for that one client. In an email chain discussing the issue, a Cigna employee joked about the pernicious "clawbacks," stating "we can't be clawing back dollars from them. Apparently they don't like it! 😊"

94.     Cigna may believe that "clawbacks" are worthy of a smiley face while it pockets hundreds of millions of dollars, but the Class Members do not.

## C.  Cigna's Fiduciary Breaches, Contract Breaches, Lack of Good Faith and Reckless Indifference Toward Its Members

95.     Cigna's plain Plan language is dispositive of the Class's ERISA and state-law claims and it forms the basis for the Class's RICO claims, which also are based on Cigna's reckless indifference toward the rights of its members. Cigna's breaches of contract and its fiduciary duties, its lack of good faith and its reckless indifference are well-illustrated through Cigna's internal documents.

---

[8] Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014) at 7, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf

96.     On October 27, 2011, in an email, Cigna employees acknowledged that "ERISA requires . . . a description of any cost-sharing provisions, including: . . . deductibles . . . and copayment amounts."

97.     Despite this knowledge, and as described above, in documents prepared in 2016, before this class action was filed, Cigna admitted that "[a] comprehensive end-to-end review, update and refiling of pharmacy benefit language has not been conducted since 2010.  Lack of updated benefit plan language impacts CPM's [Cigna Pharmacy Management] ability to implement and administer affordable, competitive, and complaint plan designs for insured and ASO plans."  The internal document continued, "Benefit plan language must accurately describe how Cigna creates and manages pharmacy benefits for clients and/or how Cigna administers claims."  In a section entitled "Impact of Doing Nothing," Cigna wrote:  "If we do not implement this new language, then Cigna may experience legal, regulatory, client and customer risks due to inconsistencies between plan language and how we administer UM protocols."  (emphasis added)

98.     The "inconsistencies" referenced in the internal document included the fact that the Plan language limited Class Member's prescription drug cost-share payments to the Pharmacy Charge, but Cigna pervasively "administer[ed] claims" using the usually greater Employer Charge.

99.     As a result of this significant and known "inconsistenc[y]" in its adjudication process, Cigna deprived Class Members of the "lowest" drug price to which they were entitled under the Plans and Cigna illegally pocketed hundreds of millions of dollars.

100.    Cigna's internal documents reinforce that it knew that Class Members were to have their prescription drug claims adjudicated using the Pharmacy Charge.  For instance, in an email exchange dated March 5, 2013 dealing with Plans that had identical and/or materially similar language, knowledgeable Cigna employees wrote:  "we will compare three items:  the member's

copay amount, the Usual and Customary (Cash) price submitted by the pharmacy, and the Discount

Prescription Costs agreed to by the pharmacy with Cigna. ***The member will always pay the lowest***

***of these three amounts***.":

101.    The employees even gave a specific example making clear that claim adjudication

logic under the Plans at issue was to consider the Pharmacy Charge as an adjudication logic point:

> Example #2
> Member copay:        $15
> Phcy U&C:            $24
> Disc. Rate:          $8
>
> The member cost share (copay) would be $8 in this scenario;
> ***member would never pay more than the total cost of the***
> ***prescription reimbursed to the pharmacy***." (emphasis
> added)

102.    A few months later in 2013, one of the key employees involved in implementing

the new business model similarly wrote, "Our copay logic looks at copay, U&C, and allowed cost

(not ingredient cost) - and the customer OOP [out-of-pocket] is the lesser of. ***This ensures the***

***customer pays the lowest amount.  The allowed cost is based on our contract with the pharmacy***

***- the reimbursement amount we agree to for a drug for a pharmacy***." (emphasis added)

103.    The prior email exchange referenced a key Cigna document entitled "FUSE

34894," which provided a comprehensive description of how prescription drug claims were

supposed to be adjudicated as Cigna transitioned from a 2-point adjudication logic to a 3-point

logic. The FUSE document described the legacy method of adjudication, called "Copay K" as

follows:  "The Copay K method applies a 2-point comparison of the customer's applicable copay

and the pharmacy's usual and customary (U&C) charge. . . .  This method often results in the

pharmacy charging the customer more than Cigna's allowed cost, or the cost at which Cigna has

agreed to reimburse the pharmacy for any given drug.":

104.    Using the term "allowed amount," which the FUSE document clearly stated was "the cost at which Cigna has agreed to reimburse the pharmacy for any given drug," the FUSE document then specified that under the new model, called "Copay G," Class Members were entitled to the benefit of the "allowed cost" when calculating cost-sharing copayments and deductible payments.  Cigna wrote in the FUSE document, "The new standard method, Copay G, adds a third point in the price comparison - the allowed cost.  With the Copay G method, the customer pays the lowest of the applicable copay, U&C, or allowed cost.  *This guarantees that the customer will pay the lowest possible price*." (emphasis in original)

105.    Similarly, with regard to Class Members that had Plans containing the clause, "In no event will the Copayment . . . exceed the amount paid by the plan to the Pharmacy," Cigna's documents make clear that "the plan" in that clause refers to Cigna, and the amount paid to the pharmacy refers to the Pharmacy Charge, not the Employer Charge.

106.    Indeed, one employee inquired of the Cigna employee who played a major role in the transition to the new business model the direct question, "Is the plan referring to Cigna?"  The knowledgeable employee responded "Yes, the Plan refers to Cigna and what we owe the pharmacy."

107.    In another email chain discussing claim adjudication of "EGWP" plans, which have the *exact same* Plan language at issue here, a Cigna employee succinctly wrote, "All the calculations on the claim are based off the pharmacy rates . . . ."

108.    Accordingly, although EGWP plans and class member plans have the *exact same* language, Cigna properly charges EGWP members a maximum of the Pharmacy Charge yet incredibly charges class members the Employer Charge and "claws back" the "spread."

109.     In addition to its admitted failure even to review its Plan language to determine whether "spread" and "clawbacks" were permissible, Cigna's undeniable practice of adjudicating claims two different ways—one using the Employer Charge and another using the Pharmacy Charge—both based on the *exact same* Plan language, shows that Cigna was recklessly indifferent to the rights of its members.  It is incongruous, arbitrary and capricious that the very same Plan language could be described in the above email as "different" and could justify claims adjudication in two entirely different ways, one of which creates a $280,000,000 windfall for Defendants.

110.     As further evidence of its breaches and reckless disregard, and as discussed above, in its agreement with employers, Cigna specifically reserved the right to create "spread" between the Pharmacy Charge and the Employer Charge and Cigna specifically bargained for the right to keep that "spread."

111.     In stark contrast, under Cigna's Plan cost-share language, Cigna had no right to impose that spread cost on members. Because Cigna clearly knew how to describe "spread" and the ability to "claw back" the "spread," and Cigna knew how to, in fact, charge a member cost share equal to the Pharmacy Charge as it did with the EGWP plans, Cigna's "Claw back Scheme" was glaringly "inconsisten[t]" with Cigna's Plan language, breached Cigna's obligations and duties and recklessly disregarded the rights of its members.

112.     Cigna's "inconsistencies" between its Plan language and adjudication processes raised the ire of Cigna employees, who readily saw the injustice of not adjudicating claims using the Pharmacy Charge.  In an email dated November 1, 2013, an employee wrote the following: "Off the record, it seems strange that Cigna would charge a member for a copay that exceeds the ingredient cost + dispensing fee + tax (if applicable).  *To me that is no longer a "co"pay, but more of a single (over)payment by the customer.*"  (emphasis added)

- 42 -

113.    In another email exchange, employees described Cigna's "inconsisten[t] adjudication and resulting pricing practices as "unreasonable."  She also described Cigna's tactics as "***egregious pricing***." (emphasis added)

114.    That email exchange concluded with an employee labelling Cigna's tactics as "unfair."  The employee stated, "I don't get this - this is so unfair to the member.  I can't believe we can live with ourselves charging the member 172% more than what this drug costs." (emphasis added:

115.    These documents and many others like them that admit contemporaneous knowledge of "egregious," "unreasonable" and "unfair" prescription drug adjudication and pricing tactics evidence Cigna's breaches and reckless indifference toward its members.

**D.    The Defendants' "Gag Clauses" and Concerted Effort to Conceal "Clawbacks"**

116.    Cigna's breaches and reckless indifference toward its members were exacerbated by its pervasive efforts to conceal the "spread" it created between the member's copayments or deductible payments and the Pharmacy Charge, as well as its efforts to conceal the amounts it was "clawing back" from the network pharmacies.

117.    Cigna worked hard to conceal its "clawbacks" from its network pharmacies, employers and its members.

118.    Cigna, through its PBMs, imposed "gag clauses" in its agreements with network pharmacies.  For instance, Catamaran's pharmacy agreement provided that the "Pharmacy will not share information concerning the terms of this Agreement or other proprietary information, including but not limited to, reimbursement rates and pricing as provided to Pharmacy by Catamaran."

- 43 -

119.   While facially one might think the "gag clause" was designed to protect the public dissemination of proprietary information, Cigna's and OptumRx's internal documents show that the purpose was to prevent employers and members from getting insight into "spread" and "clawbacks."

120.   For instance, in an email among knowledgeable Cigna employees on August 20, 2015 at 6:30 p.m., a Cigna executive described a pharmacist's conversation with a patient about "spread" and "clawbacks" as "rogue behavior."

121.   In a February 20, 2015 email, while Cigna was "clawing back" hundreds of millions of dollars of customer overpayments, Cigna discussed terminating a pharmacy from its network after the pharmacy had disclosed Cigna's secret scheme.  The pharmacy had printed a receipt that revealed the amount that Cigna, through Optum, had paid the pharmacy and it revealed that the customer had been gouged on its cost-sharing payment.  A Cigna employee wrote, "In the member's eye they are paying *far more for the script than the value according to what they are seeing on the receipt*."  (emphasis added)  In response, another Cigna employee noted that "our network pharmacies are contractually prohibited from discussing pricing with our customers. . . . Should the pharmacy continue to break their contract, Juan advised that they would be reviewed for possible termination from the network."

122.   In another email dated October 21, 2014, a Cigna employee opined that a network pharmacy should be "reprimanded" for disclosing Cigna's scheme and expressed surprise that the pharmacy could see the "clawback" at the point of sale because she thought Cigna had taken steps to conceal it even from its network pharmacy.  The employee wrote, "I was also surprised that the claw back was visible at POS [point of sale] as I thought the solution with Argus was supposed to hide it."

123.    In an "urgent" email exchange dated November 1, 2013 at 10:50 a.m., Cigna employees "worried about what the ["clawback"] would look like to the Payer" and suggested that the "clawback" should be buried in the invoice to prevent detection:

124.    In fact, Cigna did "hide" the "spread" from employers by creating two sets of data: "one set for the clients and one set for pharmacies."  As a result of "problems with brokers and employers/clients asking why we were charging more than the price of the drug," Cigna had its PBM, Argus, "gross up the ingredient cost for external reporting purposes only."  In this way, the "external reporting" that employers could see disguised the true cost of the drug and the "clawback."  A knowledgeable employee wrote that disclosing the "spread" and "clawback" "would be problematic for our clients, so [if it were shown] I suppose Sales will have to figure out a way to spin that!"

125.    In another email chain dated April 22, 2014, wherein a pharmacist had "outreached directly to client" and told a member and employer that the member's deductible payment exceeded the Pharmacy Charge, a Cigna employee wrote that it was "compulsory" that pharmacists could not disclose the "Clawback Scheme" to members or employers.

126.    Another email exchange reveals the pernicious motive to hide the "Clawback Scheme."  Employees of one of Cigna's PBMs, Argus, noted that Cigna should be concerned about "what will be printed at pharmacies" on the receipt because forcing members to pay "more than the cost of the drug at the pharmacy would reflect badly on Cigna."

127.    Many other Cigna's emails discuss concealing the "clawbacks" from members.  In one, in which a pharmacist labeled deductible "clawbacks" a "New ponzi scheme." In the ensuing email chain, Cigna's "Pharmacy Network Operations" reiterated to Cigna personnel that

pharmacists were prohibited from disclosing the "Clawback Scheme" to members, stating, "I explained that [the pharmacist] is not to discuss reimbursement matters with members."

128.    OptumRx also engaged in concerted efforts to conceal the "Clawback Scheme." According to Doug Hoey ("Hoey") of the National Community Pharmacists Association ("NCPA"), a pharmacist sent him a letter received from OptumRx.  Hoey stated that the letter from "Optum scolded the pharmacist," stating that OptumRx had "'recently discovered that pharmacy advised members that utilizing a cash price for their prescription is a better deal than using their insurance benefits.'"[9]  OptumRx further stated in the letter that "telling customers a cheaper price exists is a 'violation of the agreement,' [with OptumRx]," that OptumRx 'takes these matters very seriously[,]' and that 'failure to timely comply with this notice could result in further disciplinary action, up to and including termination from all Optum pharmacy networks.'"

### E. Defendants breached their fiduciary duty to apply Plan terms to claims

129.    Defendants set up a prescription drug adjudication system that cannot adjudicate prescription drug claims in accordance with Defendants' duties under the Plans on a system-wide basis. Under the Plans, Defendants had a fiduciary duty to apply the Plan terms set forth above in administering Plaintiffs' prescription drug benefits and calculating Plaintiffs' copayments and deductible payments.

---

[9] *See* Lee Zurik, *As United overcharges customers, execs earn tens of millions in stock*, FOX8LIVE.COM (July 18, 2016, 11:10 PM), http://www.fox8live.com/story/32472327/zurikasunitedoverchargescustomersexecsearntensofmillionsinstock (last visited Jan. 9, 2017).

**Discretionary Authority**

The Plan Administrator delegates to Cigna the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include, but not limited to, the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan, and the computation of any and all benefit payments. The Plan Administrator also delegates to Cigna the discretionary authority to perform a full and fair review, as required by ERISA, of each claim denial which has been appealed by the claimant or his duly authorized representative.

130.   The Cigna documents described above, and many more like them, illustrate that Defendants have breached this fiduciary duty in that they did not apply Plan terms to the computation of benefit payments with respect to prescription drug claims under the Plans. Instead, Defendants simply coded the claims administration system to ensure that the cost share for all Plan prescription drug claims was based on the Employer Charge rather than the Pharmacy Charge.

131.   Indeed, Defendants do not even keep in the ordinary course of business data that would allow them to link prescription drug claims to the terms of the particular Plans pursuant to which those claims were adjudicated. Specifically, Defendants do not even know in the ordinary course of business which claims should be adjudicated pursuant to Plan language, which limits deductible and copayments to the Pharmacy Charge. Defendants' operation of a claims adjudication system that cannot even identify which claims should be adjudicated based on the specific applicable Plan language is a system-wide breach of fiduciary duty. Moreover, as a result of their failure to operate an appropriate claim adjudication system, Defendants bear the burden of proving that they computed copayments and deductible and coinsurance payments in accordance with Plan terms. *See, e.g.*, *Estate of Barton v. ADT,* 820 F.3d 1060 (9th Cir. 2016).

- 47 -

**F. Defendants failed to establish or maintain reasonable claim procedures**

132.   Defendants also set up, on a system-wide basis, benefit-claim procedures that are unreasonable and designed to inhibit and hinder Plaintiffs and class members from paying the correct deductibles and copayments.

133.   A "claim for benefits" is defined specifically in DOL Regulations as a "request for a plan benefit." 29 C.F.R.  § 2560-503-1 (e).

134.   "Whether, and to what extent, the presentation of a prescription to a pharmacy which exercises no discretion on behalf of the plan will constitute a request for a plan benefit will be determined by reference to the plan's procedures for filing benefit claims." See A-11, Benefit Claims Procedure Regulation FAQs, attached as Exhibit B (available at https://www.dol.gov/ agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure- regulation).

135.    In this case, the request for the Plan benefit is the member request to a pharmacy to fill a prescription pursuant to the Plans. The Plans expressly state the procedure for filing In-Network benefit claims:

> ## How To File Your Claim
> There's no paperwork for In-Network care. Just show your identification card and pay your share of the cost, if any; your provider will submit a claim to Cigna for reimbursement.

136.   The Plans similarly provide with respect to prescription drug claims specifically:

> ## Reimbursement/Filing a Claim
> When you or your Dependents purchase your Prescription Drugs or Related Supplies through a retail Participating Pharmacy, you pay any applicable Copayment, Coinsurance or Deductible shown in the Schedule at the time of purchase. You do not need to file a claim form.

Moreover, Defendants' "Claim Adjudication Process" template identifies each submission of a prescription script to the pharmacy as a separate claim with a unique "Claim #" and "Claim status." Accordingly, the simple submission of a prescription script by a member to a pharmacy for prescription drugs is a claim for benefits under the Plans, and therefore, a "claim for benefits" under the DOL Regulation.

137.    Every Plan must "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560-503-1 (b). In particular with respect to notice, the Regulation requires, among other things, that the notice include (1) the specific reason for a denial of benefits, (2) a reference to the plan provisions on which the determination was based, (3) a description of the review procedures, and (4) the rules relied upon in making the determination. 29 C.F.R. § 2560-503-1 (g).

138.    Defendant systematically violated 29 C.F.R. § 2560-503-1 (g) in failing to properly notify Plaintiffs of Defendants' response to Plaintiffs' claims for benefits. The most Plaintiffs received when their prescriptions were filled were pieces of paper stapled to their pharmacy bags that stated only the amount of the copayment or deductible: there was no disclosure of any "spread" or "clawbacks." Accordingly, that "notice" does not meet any of the requirements of 29 C.F.R. § 2560-503-1 (g).

139.    Moreover, Defendants intentionally and fraudulently violated their obligation to follow reasonable claim procedures in that they blocked the pharmacies from disclosing "clawback" information to Plaintiffs pursuant to the "gag clauses." Indeed, the Vitamin D pharmacy screen shot shown above demonstrates that the pharmacies had on their computer screens at the time prescriptions were filled the amounts Plaintiffs should have paid, the "spread"

- 49 -

that Plaintiffs were unlawfully required to pay, and the "clawbacks" that Defendants unlawfully took, but the "gag clauses" prohibited the pharmacies from disclosing this important information to patients.  Indeed, as described above, Cigna's Vice President of Pharmacy was surprised that Plaintiffs even figured out that they were being charged for "clawbacks."  Accordingly, Defendants' supposed claim procedures unduly inhibited and hampered the initiation of claims in violation of 29 C.F.R.  § 2560-503-1 (b)(3).

### G.  Defendants Are Fiduciaries and Parties In Interest

140.    The ERISA Plaintiffs and the members of the ERISA Subclass (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendants to provide participants with medical care and prescription medications ("ERISA Plans").

141.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

142.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  This is a functional test.  Neither "named fiduciary" status nor formal delegation is

required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

143.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA Plans and their participants. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

144.    Defendants are fiduciaries of all of the ERISA Subclass members' ERISA Plans to which they provided prescription drug benefits or for which they administered prescription drug benefits in that they exercised discretionary authority or control respecting the following plan management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they had discretionary authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the ERISA Subclass, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii), because, by way of examples, they did and/or could have done one or more of the following:

(a)    establish and maintain a system to apply Plan terms that would compute member benefit payments pursuant to Plan terms;

(b)    establish and implement claims procedures that would properly notify members of benefit decisions in accordance with applicable regulations;

(c)    dictate the amount paid to pharmacies for prescription drugs;

(d)     dictate the amount pharmacies charged patients for prescription drugs;

(e)     require pharmacies to charge patients more for drugs than they should have been charged pursuant to the terms of the ERISA Plans, thereby creating and setting the amount of the "spread";

(f)     require the pharmacies to collect the "spread" from patients;

(g)     require pharmacies to pay the "spread" to Defendants and require the deduction of the "spread" from future reimbursements to the pharmacy as a "clawback";

(h)     determine the amount of and require the collection of additional profits and compensation for services provided pursuant to the ERISA Plans;

(i)     set their own compensation for services performed as fiduciaries by dictating "clawbacks";

(j)     unilaterally collect their own compensation for services performed as fiduciaries by collecting "clawbacks";

(k)     set and change the compensation of their own affiliates with respect to the ERISA Plans by allocation of the proceeds of "clawbacks";

(l)     misrepresent and fail to disclose to patients the manner in which they charged for prescription drugs as alleged above;

(m)     prohibit pharmacies from disclosing to patients the existence or amount of the "spread" and "clawback";

- 52 -

(n)      prohibit pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants;

(o)      prohibit pharmacies from selling to patients prescription drugs covered by the ERISA Plans at prices that were lower than the prices that the insurer/administrator/PBM ordered the pharmacies to charge the patients;

(p)      select and retain the PBM(s) that will, in the case of Cigna, assist in certain PBM and pharmacy delivery functions, and perform all PBM and pharmacy delivery functions;

(q)      manage the prescription drug benefit program, including processing and paying prescription drug claims received from pharmacies;

(r)      improperly trade off the interests of plan participants and beneficiaries for the benefit of themselves or their affiliates;

(s)      dictate and negotiate whether a particular drug was covered, and if so, in which "tier" it was categorized;

(t)      choose whether to fill a prescription from a participant, reject it, shift the participant to a different medication, or require the use of a mail order pharmacy; and

(u)      monitor each others' performances, and in particular the performances of the PBMs at issue here—and to take appropriate action to protect plan participants and beneficiaries from other fiduciaries' and service providers' failure to act in the best interests of plan participants and beneficiaries.

145.    The "spread" and "clawbacks" were additional compensation for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor

agreed to by the participants and beneficiaries that were required to make these additional payments to receive their covered prescription drugs. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed compensation, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

146.    The "spread" and "clawbacks" are additional "premium" within the meaning of ERISA § 702, for the provision of prescription drug coverage that was collected by Defendants that was neither disclosed to nor agreed to by the participants and beneficiaries that were required to make these additional contributions to receive their covered prescription drugs. Defendants had and exercised discretion to determine the amount of and require the payment of this additional undisclosed premium payment, as well as whether to disclose it—or require its concealment. ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii).

147.    In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries of all of the ERISA Subclass members' ERISA Plans in that they exercised authority or control respecting management or disposition of plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), because:

(a)    The contracts underpinning the plans are "plan assets" within the meaning of ERISA;

(b)    Through their "Clawback Scheme," as described above, Defendants exercised control over the contracts underpinning the ERISA Plans. They successfully leveraged their relationships to the ERISA Subclass members' ERISA Plans to benefit themselves, their affiliates, and third parties, and their authority or control over these significant plan assets enabled them to do so.

148.     In addition, any plan-paid amounts that were contributed to participant prescription drug transactions were "plan assets" within the meaning of ERISA.  Incident to their "Clawback Scheme" Defendants also exercised control over these plan assets, making them fiduciaries for purposes of these transactions.

149.     Further to the conduct described herein which establishes the fiduciary status of all Defendants, Defendant CHL and Defendant OptumRx are fiduciaries because they exercise discretion to set the prices that the ERISA Subclass were and are required to pay for their prescription medications. These PBMs are required to act in the best interests of the ERISA Subclass, but by allowing participants and beneficiaries of ERISA plans to be subject to the "Clawback Scheme" described herein and participating in this scheme with Defendant Cigna, these Defendants breached their fiduciary duties to the ERISA Subclass.

150.     Defendant CHL and Defendant OptumRx are aware of the effect the "Clawback Scheme" is having on the ERISA Subclass. Nevertheless, these Defendants maximized their revenues at the expense of the ERISA Subclass by engaging in the illegal conduct described herein.

151.     Furthermore, in negotiating and entering into a contract on behalf of an ERISA plan, a fiduciary must act prudently and negotiate terms that are reasonable and in the best interests of plan participants. In these negotiations and in the contract that is ultimately agreed upon, a fiduciary cannot place its interests over the interests of the plan participants and beneficiaries. To the extent Defendants CHL and OptumRx have negotiated agreements subject to the "Clawback Scheme" described herein, they have breached their fiduciary duties under ERISA. And through these negotiations, CHL and OptumRx also exercised discretionary authority by setting their own margins and compensation for the sale of prescription medications.

152.     In addition, Defendant Cigna breached its fiduciary duties under ERISA by retaining other PBMs—including Defendant CHL, Argus and Defendant OptumRx—to provide PBM services for the benefit of the ERISA subclass, but failing to take reasonable and prudent action to determine whether these PBMs were fulfilling their own separate fiduciary obligations. For instance, Cigna authorized CHL and OptumRx to set the prices for prescription medications, and thus permits these PBMs to control what the ERISA subclass pays for their prescription drugs.

153.     When Cigna endowed CHL, Argus and OptumRx with authority and discretion to control prescription medication pricing for the ERISA Subclass, Cigna assumed the duty to monitor CHL, Argus and OptumRx's exercise of that discretionary authority. Cigna further owed and owes the ERISA Subclass the duty to establish policies and procedures to monitor CHL, Argus and OptumRx's performance of its duties, to monitor their prescription medication pricing, to monitor the effect of the "Clawback Scheme" described herein on the amount paid by the ERISA Subclass, to protect the interests of the ERISA Subclass, and to provide complete and accurate information to the ERISA Subclass.

154.     But in allowing CHL, Argus and OptumRx to violate ERISA, including permitting the ERISA Subclass to be subject to the "Clawback Scheme," and in failing to correct such breaches of duty in a timely fashion, Cigna breached its duty to monitor CHL, Argus and OptumRx's illegal conduct.

155.     Defendant Cigna has also the discretionary authority or control to negotiate on behalf of the ERISA Subclass favorable terms when entering into terms with other PBMs, including CHL, Argus and OptumRx. These terms directly impact the prices for prescription medications paid by the ERISA Subclass, but by engaging in the conduct described herein,

including by participating in the "Clawback Scheme" with CHL, Argus and OptumRx, Defendant

Cigna breached its fiduciary duties.

156.    Defendants are also parties in interest under ERISA because (a) they are fiduciaries,

ERISA   §   3(14)(A),   29   U.S.C.   §   1002(14)(A);   and/or   (b)   they   provided   insurance,   plan

administration, and pharmacy benefit management services to the ERISA Plaintiffs' and the Class

members' health plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

157.    As   parties   in   interest,   Defendants   received   direct   and   indirect   compensation   for

services, some of which was in the form of excess "clawback" fees that were collected in exchange

for few to no services.  Defendants also received and used for their own and their affiliates' benefit

"plan assets," including ERISA Plan contracts under which they had access to the ERISA Plans

and were able to impose their "Clawback Scheme" on the ERISA Subclass.

158.    Finally, even if any Defendant is found not to be a fiduciary, that Defendant is

alternatively subject to equitable relief under ERISA, because they had actual or constructive

knowledge of the ERISA violations through their role in the "Clawback Scheme."

### H.  Defendants' ERISA Duties

159.    **The Statutory Requirements:**  ERISA imposes strict fiduciary duties upon plan

fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and . . . for the exclusive purpose of providing
> benefit to participants and their beneficiaries; and defraying reasonable expenses of
> administering the plan; with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like capacity and
> familiar with such matters would use in the conduct of an enterprise of like
> character and with like aims; by diversifying the investments of the plan so as to
> minimize the risk of large losses, unless under the circumstances it is clearly
> prudent not to do so; and in accordance with the documents and instruments
> governing the plan insofar as such documents and instruments are consistent with
> the provisions of this title and Title IV.

160.   **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty—that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

161.   **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence—that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

162.   **The Duty to Inform.**  The duties of loyalty and prudence include the duty to disclose and inform.  These duties entail:  (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

163.   **Prohibited Transactions.**  ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b)—or because they are improper "party in interest" transactions under ERISA § 406(a).  As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. See ERISA § 3(14), 29 U.S.C. §

1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

164.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a)  Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

165.    ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

166.    **Co-Fiduciary Liability.**  A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>>
>> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

167.    **The Duty to Monitor.**  In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries.  As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

168.    **Non-Fiduciary Liability.**  Under ERISA, non-fiduciaries—regardless of whether they are parties in interest—who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  Accordingly, as to the ERISA claims, even if any Defendant is not found to have fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well-established case law. To the extent that any Defendant is not deemed to be a fiduciary or a party-in-interest with regard to any transaction at

issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

169.    **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.**  ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.  Further, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets.  ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. The ERISA Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below, because not all the remedies the ERISA Plaintiffs seek are available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the alternative.

## I. Defendants Breached Their Duties

170.   Defendants breached the terms of the Plans and their legal obligations, committed breaches of fiduciary duty and prohibited transactions, and harmed Plaintiffs and Class members in the following ways:

> (a)   established and maintained a claims adjudication system that could not pay benefit claims pursuant to Plan terms in the ordinary course of business;

> (b)   established and maintained claims procedures that failed to disclose "spread" and "clawbacks";

> (c)   Plaintiffs and Class members were charged unlawful fees and additional premiums for prescription drugs that substantially exceeded the fees actually paid by or agreed to be paid by Defendants and/or their agent PBMs to the pharmacies for the dispensed drugs;

> (d)   Plaintiffs and the Class were charged excessive copayments, a material portion of which were neither payments for prescription drugs nor were they "co-" payments made in conjunction with Defendants' payment for prescription drugs, as required by the plain language of the Plans, but rather were undisclosed and unlawful payments and premiums to Defendants/PBMs;

> (e)   Plaintiffs and Class members were overcharged when making payments toward their deductibles in that they were forced make a payment that exceeded the Pharmacy Rate;

(f)      Defendants improperly processed and paid prescription drug claims they received from pharmacies;

(g)      Defendants misrepresented and failed to disclose to patients the manner in which they charged for prescription drugs and/or failed to notify members  of  the benefit decisions pursuant to applicable regulations as alleged above;

(h)      Pharmacies were prohibited from disclosing to patients the existence or amount of the "spread" and "clawback";

(i)      Pharmacies were prohibited from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants under the policies and from selling drugs to customers at these lower prices;

(j)      Defendants set their own compensation for services performed as fiduciaries by dictating "clawbacks";

(k)      Defendants unilaterally collected their own compensation for services performed as fiduciaries by collecting "clawbacks";

(l)      Defendants set and changed the compensation of their own affiliates and third parties with respect to the Class members' Plans by allocating the proceeds of "clawbacks" without heeding the best interests of participants and beneficiaries;

(m)      Defendants maximized their own profits, profits to their affiliates, and profits to third parties, at the expense of the Class members who participated in the Plans;

- 63 -

(n)     Defendants received improper compensation from entities doing business with the Plans Defendants administered and managed;

(o)     Defendants knew or reasonably should have known that their actions would injure plan participants and beneficiaries;

(p)     Defendants selected plan service providers and PBMs such as Argus and OptumRx and negotiated their contracts based on disloyal and self-interested factors and made such decisions without putting the interests of participants and beneficiaries first;

(q)     Defendants failed to stop injuries to plan participants caused by their co-fiduciaries and service providers; and

(r)     Defendants failed to monitor their appointees, formal delegees, and informal designees in the performance of their fiduciary duties.

**J.   Plaintiffs' Purchases and Sample of Impacted Drugs**

171.    During the time that Plaintiffs were covered by the Plans, Plaintiffs purchased prescription drugs for which they forced to pay illegal "spread" that Defendants "clawed back.".

172.    Plaintiff Negron's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from CVS in Burlington, Massachusetts on at least the following dates: March 10, 2015; July 6, 2015; July 18, 2015; August 6, 2015; August 25, 2015; and September 21, 2015.

173.    Plaintiff Gallagher's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from CVS in Morristown, New Jersey and Walgreen's in Florham Park, New Jersey on at least the following dates: July 15, 2015, August 9, 2015, September 1, 2015, September 29, 2015, October 27, 2015, November 19, 2015, November

21, 2015, December 16, 2015, January 14, 2016, February 10, 2016, June 13, 2015, September 21, 2016, October 14, 2016, November 12, 2016 and December 5, 2016.

174.    Plaintiff Perry's purchases of such prescription drugs pursuant to his health plan include, but are not limited to, purchases from Coulton Pharmacy in Morton, Washington on at least the following dates: July 18, 2015, August 14, 2015, March 4, 2016, and April 6, 2016.

175.    Plaintiff N. Curol's purchases of such prescription drugs pursuant to her health plan include, but are not limited to, purchases from Robichaux's Pharmacy in Lockport, Louisiana, on at least the following dates: January 19, 2016, February 17, 2016, March 21, 2016, April 19, 2016, and May 16, 2016.

176.    Plaintiff R. Curol's purchases of such prescription drugs pursuant to his health plan include, but are not limited to, purchases from Robichaux's Pharmacy in Lockport, Louisiana, on at least the following dates: January 19, 2016, February 22, 2016, March 15, 2016, April 18, 2016, May 9, 2016, and June 7, 2016.

177.    Plaintiff Billy Ray Blocker's purchases of such prescription drugs pursuant to his health plan include, but are not limited to, purchases from a Kroger Pharmacy in Alpharetta, Georgia, on at least the following dates: March 25, 2015, April 30, 2015, August 19, 2015, October 30, 2015, April 13, 2016 and April 25, 2016.

178.    Plaintiffs and Class members were overcharged for and/or paid unauthorized and excessive copayments and deductible payments in connection with the purchase of numerous prescription drugs, including, but not limited to, the following: Accu-Chek, Acyclovir, Aktob, Albuterol, Alocril, Alprazolam, Amiodarone, Amitriptyline, Amlodipine, Amoxicillin, Amphetamine, Anastrozole, Atenolol, Atorvastatin, Azelastine, Azithromycin, Bactrim, Benazepril, Benzonatate, Betamethasone, Buspirone, Bystolic, Carvedilol, Cefadroxil, Cefdinir,

- 65 -

Cephalexin, Cetirizine, Ciprofloxacn, Citalopram, Clindamycin and Benzoyl Peroxide, Clindamycin, Clonazepam, Clonidine, Clopidogrel, Cyanocobalam, Cyclobenzaprine, Cytomel, Denta, Depo-Testosterone, Diazepam, Dicyclomine, Diltiazem, Doxazosin, Doxycycl, Duloxetine, Enalapril, Escitalopram, Estradiol, Eszopiclone, Feosol, Ferrous, Flonase, Fluconazole, Fluocinonide, Fluoxetine, Fluticasone, Folbee, Folic, Furosemide, Gabapentin, Gemfibrozil, Gentamicin, Gianvi, Glimepiride, Glipizide, Guaifenesin, Hydrochlorot, Hydrocodone/APAP, Hydroxyz, Ibuprofen, Indomethacin, Invokamet, Irbesartan, Isosorbide, Januvia, Lamotrigine, Lantus, Latanoprost, Levetiraceta, Levocetirizi, Levofloxacin, Levothyroxine, Lexapro, Lisinopril And Hydrochlorothiazide, Lisinopril, Lisinopril/hydrochlorothiazide, Lithium, Loratadine, Lorazepam, Losartan, Losartan and Hydrochlorothiazide, Lovastatin, Meloxicam, Memantine, Metformin, Methocarbam, Methylphenidate, Metolazone, Metoprolol, Metronidazol, Minivelle, Mirtazapine, Mometasone, Montelukast, Mupirocin, Naproxen, Nitrofurantoin, Nortriptylin, Nystatin, Omeprazole, Ondansetron, Oxcarbazepin, Oxybutynin, Oxycodone/APAP, Pantoprazole, Paroxetine, Penicillin, Percocet, Pramipexole, Pravastatin, Prednisone, Prednisolone, Promethazine/Codeine, Ramipril, Ranitidine, Restasis, Sertraline, Simvastatin, Singulair, SMZ/TMP, Sodium Chloride (1 gm), Spironolactone, Sprintec, Sulfameth/Trimeth, Sumatriptan, Suprep, Synthroid, Tamiflu, Tamsulosin, Temazepam, Terazosin, Terbinafine, Tizanidine, Tobramycin/Sus Dexameth, Topiramate, Tramadol, Tranex, Trazodone, Tretinoin, Triamcinolone, Triamterene and Hydrochlorothiazide, Vagifem, Valacyclovir, Valsartan/hydrochlorothiazide, Valsartan, Vaniqa, Venlafaxine, Ventolin, Viagra, Vigamox, Vitamin D, Vyvanse, Warfarin, Xopenex, Zaleplon, and Zolpidem.

## VII.  CLASS ACTION ALLEGATIONS

179.    Plaintiffs brings this action as a class action pursuant to Rule 23(b)(2) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of themselves and the Class, the ERISA Subclass,

and the State Law Subclass, which are defined as follows:

**Class I.**  All individuals residing in the United States and its territories who are enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies, who purchased prescription drugs pursuant to such plans or policies which provide that a member "may be required to pay a portion of Covered Expenses" and paid a deductible payment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

**Class II.** All individuals residing in the United States and its territories who are enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies, who purchased prescription drugs pursuant to such plans or policies which provide that "in no event will the Copayment" "exceed the amount paid by the plan to the Pharmacy" and paid a copayment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

180.    Within each Class there are two subclasses:

**ERISA Subclass I.**  All participants or beneficiaries enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies and subject to ERISA, who purchased prescription drugs pursuant to such plan or policy which provide that a member "may be required to pay a portion of Covered Expenses" and paid a deductible payment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

**ERISA Subclass II.** All participants or beneficiaries enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies and subject to ERISA, who purchased prescription drugs pursuant to such plan or policy which provide that "in no event will the Copayment" "exceed the amount paid by the plan to the Pharmacy" and paid a copayment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

**State Law Subclass I**. All participants or beneficiaries enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies and not subject to ERISA, who purchased prescription drugs pursuant to such plan which provide that a member "may be required to pay a portion of Covered Expenses" and paid a

deductible payment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

**State Law Subclass II**. All participants or beneficiaries enrolled in a health benefit plan issued and/or administered by Defendants or their affiliates or insured under Defendants' or their affiliates' health insurance policies and not subject to ERISA, who purchased prescription drugs pursuant to such plan which provide that "in no event will the Copayment" "exceed the amount paid by the plan to the Pharmacy" and paid a copayment for such drugs that was higher than the Pharmacy Charge on a transaction-by-transaction basis.

181.    Plaintiffs reserve the right to redefine the Class and Subclasses prior to certification.

182.    **Class Period.** Plaintiffs will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under law, including, but not limited to, ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions, RICO, 18 U.S.C. 1961, et seq. and the doctrine of equitable tolling, and relevant state laws.

183.    Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

184.    This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

185.    Members of the Class and Subclasses are so numerous that the individual joinder of all Class and Subclass members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class members and Subclass members is in the thousands and that the members of the Class are geographically dispersed across the United States.  While the exact number and identities of the Class members and Subclass members are

unknown at this time, such information can be ascertained through appropriate investigation and discovery.

186.    Plaintiffs' claims are typical of the claims of the members of the Class and each Subclass because Plaintiffs' claims, and the claims of all Class and Subclass members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class and Subclass are similarly affected by Defendant's wrongful conduct.

187.    There are questions of law and fact common to the Class and each Subclass and these questions predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants are fiduciaries under ERISA;

(b)    Whether Defendants are parties in interest under ERISA;

(c)    Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)    Whether Defendants acts as alleged above breached ERISA's prohibited transaction rules;

(e)    Whether Defendants breached ERISA § 702;

(f)    Whether Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(g)    Whether Defendants conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

(h)    Whether Defendants conspired to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity;

- 69 -

(i)     Whether such racketeering consisted of acts that are indictable pursuant to 18 U.S.C §§ 1341 and 1343;

(j)     Whether Defendants engaged in a scheme to defraud;

(k)     Whether each Defendant was a knowing and active participant;

(l)     Whether the mail, interstate carriers or wire transmissions were used in connection with such scheme to defraud;

(m)     Whether Plaintiffs and Class and Subclass members were injured in their property or business as a direct and proximate result of Defendants' racketeering activities;

(n)     Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit "spread" amounts to them and thereby overcharge subscribers for prescription drugs; Whether the members of the Class and/or Subclass have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, damages, and/or unjust enrichment;

(o)     Whether Defendant CHL has violated the state laws invoked here; and

(p)     Whether the members of the Class and/or Subclass are entitled to declaratory and/or injunctive relief.

188.     Plaintiffs will fairly and adequately represent the Class and each Subclass and have retained counsel experienced and competent in the prosecution of class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class and each Subclass.  Plaintiffs

are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

189.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class and/or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and/or Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

190.    Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and each Subclass, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class and each Subclass as a whole.

191.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class and each Subclass predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members of the Class is impracticable.

## VIII.  EXHAUSTION OF ADMINISTRATIVE REMEDIES DO NOT APPLY OR ARE FUTILE

192.    Plaintiffs and the ERISA Subclass are not required to exhaust administrative remedies.  Only a claim under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), could concern exhaustion of administrative remedies.  Accordingly, only Count I is arguably implicated by that doctrine.  Moreover, the exhaustion doctrine does not apply under that Count because Plaintiffs seek to enforce their rights under the terms of the ERISA Plans and clarify future rights, not recover

benefits due.  Thus, Defendants failed to establish and maintain reasonable claims procedures as alleged above. Finally, because the injuries to Plaintiffs and the ERISA Subclass are part of a nationwide, clandestine, computerized scheme, any attempt to rectify the harm through administrative means would be futile and unnecessary.

193.    This "clawing back" of payments (which directly evidences the overcharging of insureds) was pervasive and significantly increased the costs to patients across the country.

194.    Due to Defendants' concealment of their "Clawback Scheme" and their requirements, transmitted through the pharmacies or pharmacists, that Plaintiffs and the ERISA Subclass pay contractual copayments at the pharmacy—amounts that are set forth in their Plans— Plaintiffs and each Subclass did not know and/or did not have reason to know that they were being overcharged for their prescription medications.  Due to the "gag clauses," only in the rarest of circumstances would patients have any inkling that they were being overcharged. And even if they had reason to know they were being overcharged, they did not know the exact amount of the "clawback" they were forced to pay. Thus, Plaintiffs and the ERISA Subclass did not know and did not have reason to know that they could make a claim for reimbursement of part of their copay, much less the specific portion thereof they should request.

195.    Further, Plaintiffs and the ERISA Subclass had no real opportunity to decline to make the overpayments at the pharmacy that allowed Defendants to impose "clawbacks" on them. To receive their prescription medications, they were required to pay the amount that Defendants prescribed through their computerized and automatic transmission of copayments or deductible amounts to the pharmacists or pharmacies involved.  Defendants' prohibition on pharmacists' disclosing the retail cash price or the negotiated price to patients meant that Plaintiffs and the ERISA Subclass had no way of knowing they could acquire their prescriptions at a lower price.

As far as Plaintiffs and the ERISA Subclass were aware, they had to pay the required deductible amount or copayment in order to obtain their prescription drugs.

196.     Even utilizing Defendants' claims procedures, if they were available or valid under these circumstances, would not make Plaintiffs or the ERISA Subclass whole.  First, it is unlikely this procedure would result in a refund of a copayment, and is therefore futile and/or unnecessary. Second, even if Defendants' claims procedures could provide a "clawback" reimbursement of a portion of a given copayment amount, Plaintiffs and the ERISA Subclass are entitled to more, including treble and punitive damages, injunctive relief, and the other remedies described herein. In this regard as well, utilizing a claims procedure would be futile and/or unnecessary.

197.     Moreover, under the circumstances alleged here, it would be extremely burdensome and inequitable to require Plaintiffs and the ERISA Subclass to seek redress through Defendants' claims procedures, where Defendants have intentionally misled consumers, omitted material information, and concealed their unlawful practices.  With the proportionately small amount at stake for a given patient relative to the vast profits Defendants are reaping from their "Clawback Scheme," Defendants' imposition of a claims procedure likely would deter and prevent Plaintiffs and  the ERISA Subclass from obtaining any relief at all, while Defendants would be free to retain an unfair, unlawful, and undisclosed windfall profit due to their "Clawback Scheme."

198.     Finally, correcting the prices paid by patients on an individualized basis would inevitably result in further unfair, disparate, and discriminatory treatment among those ERISA Subclass members who have been reimbursed for the overcharges and those who have not.  A far more equitable way to adjudicate overpayments made by the ERISA Subclass is for Defendants to disgorge in full these amounts pursuant to their own records that can track such payments for everyone in the ERISA Subclass.

199.    For all of these reasons, it would be futile for Plaintiffs to demand administratively that Defendants modify the pervasive "spread" and "Clawback Scheme" that is ingrained in their business.

## IX.  PLAINTIFFS AND THE CLASS ARE ENTITLED TO TOLLING DUE TO FRAUD OR CONCEALMENT

200.    By its nature, Defendants' "Clawback Scheme" hid their unlawful conduct from injured parties.

201.    Neither Plaintiffs nor Class members knew of the "Clawback Scheme," nor could they have reasonably discovered the existence of the "Clawback Scheme," until shortly before filing this action.

202.    Until news broke about Defendants' "Clawback Scheme," their unlawful conduct was hidden from Plaintiffs and the Class and each Subclass.

203.    The "gag clauses" in place between Defendants and providers hid Defendants' unlawful conduct from members of the Class and each Subclass.

204.    To the extent that any of the causes of action are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein tolls those requirements, for a specific amount of time to be determined as the litigation progresses.

205.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

206.    While the RICO statute does not contain an express limitation period, the United States Supreme Court has held that civil RICO claims must be brought within four years from the discovery of an injury, which limitation is subject to equitable tolling due to defendants' fraudulent concealment of their unlawful conduct.  *Rotella v. Wood*, 528 U.S. 549 (2000).

207.   The "Clawback Scheme"—by its nature a secret endeavor by Defendants—remained hidden from most members of the Class.  Moreover, during the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the "Clawback Scheme" from Plaintiffs and other members of the Class and Subclass through it "gag clauses" and secrecy policies.  There is no question that Plaintiffs' claims are timely.

## X.  ERISA COUNTS

### COUNT I

**For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)**
**Against All Defendants**
**By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

208.   ERISA Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

209.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan.

210.   As set forth above, as a result of being overcharged for prescription drugs, ERISA Plaintiffs and the ERISA Subclass were denied their rights under the Plans to be charged a lower amount for their prescriptions.

211.   ERISA Plaintiffs and the ERISA Subclass have been damaged in the amount of the "spread" compensation, including "clawbacks," that Defendants took for themselves.  ERISA Plaintiffs and the ERISA Subclass are entitled to recover the amounts they were overcharged.

212.   ERISA Plaintiffs and the ERISA Subclass are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)     That they have been overcharged;

(b)     For an accounting of Defendants' charges and overcharges;

(c)     For payment of all amounts due them in accordance with their rights under the ERISA Plans; and

(d)     For an order that they are entitled in the future not to pay "clawbacks" or any other additional amounts that conflict with their rights under the ERISA Plans.

**COUNT II**

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)**
**Against All Defendants**
**By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

213.    ERISA Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

214.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

215.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

216.    As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the ERISA Subclass.  Defendants are also parties in interest under ERISA in that they are fiduciaries and/or they provided prescription drug insurance and/or administrative

"services" to ERISA Subclass members pursuant to the ERISA Plans. ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Thus they were engaged on one or both sides of these § 406(a) prohibited transactions.

217.    As fiduciaries, Defendants caused the ERISA Plans to engage in prohibited transactions as alleged herein.

218.    As parties in interest, Defendants received direct and indirect compensation in the form of undisclosed "spread" compensation, including "clawbacks," in exchange for the services they provided to ERISA Plaintiffs and the ERISA Subclass pursuant to their prescription drug plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

219.    The only exception to the prohibition of such compensation is if it was for services necessary for the operation of a plan and such compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

220.    While the burden is on Defendants to invoke and establish this exception, the compensation paid to Defendants was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the "spread" compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendants' compensation exceeded the premiums and other fees that were agreed upon for fully providing prescription drug benefits. Further, Defendants as fiduciaries of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses.

221.    In addition and in the alternative, Defendants used—and misused—assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments or deductible payments which Defendants could appropriate in their "Clawback Scheme." Further, Defendants

used—and misused—for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans—the contracts underpinning the ERISA Plans of members of the ERISA Subclass—to effectuate their "Clawback Scheme." ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

222.    ERISA Plaintiffs and the ERISA Subclass suffered losses and/or damages and/or Defendants were unjustly enriched in the amount of the "spread" compensation Defendants took for themselves.

223.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

224.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to ERISA Plaintiffs and the Class, including but not limited to:

(a)    an accounting;

(b)    a surcharge;

(c)    readjudication of the transactions;

(d)    disgorgement of profits;

(e)    an equitable lien;

(f)    a constructive trust;

(g)    restitution;

(h)    full disclosure of the foregoing acts and practices;

(i)    an injunction against further violations; and/or

(j)    any other remedy the Court deems proper.

## COUNT III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
for Violations of ERISA § 406(b), 29 U.S.C. § 1106(b)
Against All Defendants
By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

225.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

226.    ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

227.    As alleged above, Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

228.    As alleged above, the contracts underpinning the ERISA Subclass members' ERISA Plans are plan assets under ERISA.

229.    First, by setting their own compensation from drug payments from participants and beneficiaries, collecting their own compensation from that same source, and managing contracts in their own interest or for their own account, Defendants violated ERISA § 406(b)(1). Specifically, in setting the amount of and taking excessive undisclosed "spread" compensation, including "clawbacks," Defendants received plan assets and consideration for their personal accounts.

230.    Second, by acting on behalf of each other and on behalf of non-parties who also stood to profit from "clawbacks" at the expense of ERISA Plaintiffs and members of the ERISA Subclass—and thus with interests adverse to the affected participants and beneficiaries—

Defendants engaged in conflicted transactions each time they facilitated, required, or allowed "clawbacks," through service provider contracts or in transactions at the pharmacy counter, in violation of ERISA § 406(b)(2).  Under this subsection of ERISA § 406(b), plan assets need not be involved—dealing with a plan is enough.

231.    Third, through their "Clawback Scheme," Defendants received consideration for their own personal accounts from other parties—including each other, third parties, and the members of the ERISA Subclass—that were dealing with the ERISA Plans in connection with a transaction involving the assets of the ERISA Plans.

232.    ERISA Plaintiffs and the ERISA Subclass were damaged and suffered losses in the amount of the "spread" compensation Defendants took through these prohibited transactions.

233.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

234.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to ERISA Plaintiffs and the ERISA Subclass, including but not limited to:

    (a)    an accounting;

    (b)    a surcharge;

    (c)    correction of the transactions;

    (d)    disgorgement of profits;

    (e)    an equitable lien;

    (f)    a constructive trust;

    (g)    restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

## COUNT IV

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA § 404, 29 U.S.C. § 1104**
**Against All Defendants**
**By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

235.    ERISA Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

236.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

237.    In setting the amount of and taking excessive undisclosed "spread" compensation, including "clawbacks," Defendants breached their fiduciary duties of loyalty and prudence.

238.    Further, in failing to put the interests of participants and beneficiaries first in managing and administering pharmacy benefits, Defendants have breached their fiduciary duty of loyalty. And in acting in their own self-interest, Defendants violated the "exclusive purpose" standard.

239.    The duty to disclose is part of the duty of loyalty.  In concealing and failing to disclose to the ERISA Subclass the fact or amount of the "clawbacks" they were being charged,

and in concealing and failing to disclose to the ERISA Subclass that plan participants were paying more in copayments and deductible payments than the cost of the drug if purchased outside their respective plans—then barring pharmacies from advising ERISA Subclass members that they could pay less for a drug by purchasing it outside of their respective plans, Defendants breached this duty.  Further, both omissions and misrepresentations are actionable under ERISA's disclosure obligations, and the type that occurred here are not subject to individualized reliance requirements. In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

240.    Defendant Cigna failed to adequately monitor the activities of Defendant CHL and Defendant OptumRx—PBMs they authorized to provide PBM services to Cigna insureds—including inter alia, failing to monitor the prices charged by CHL and OptumRx for prescription medications provided to ERISA Plaintiffs and the ERISA Subclass and permitting and/or participating in the "Clawback Scheme" described herein. As such, Defendant Cigna failed to monitor its appointees, formal delegees, and informal designees in the performance of its fiduciary duties.

241.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan.  In so doing, Defendants violated their duty of prudence.

242.    ERISA Plaintiffs and the ERISA Subclass were damaged and suffered losses in the amount of the "spread" compensation Defendant took.

243.    ERISA § 409, 29 U.S.C. § 1109, provides, inter alia, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

244.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

245.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

246.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to ERISA Plaintiffs and the ERISA Subclass, including but not limited to:

    (a)    an accounting;

    (b)    a surcharge;

    (c)    readjudication of the transactions;

    (d)    disgorgement of profits;

    (e)    an equitable lien;

    (f)    a constructive trust;

    (g)    restitution;

    (h)    full disclosure of the foregoing acts and practices;

    (i)    an injunction against further violations; and/or

- 83 -

(j)       any other remedy the Court deems proper.

## COUNT V

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)**
**Against All Defendants**
**By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

247.    ERISA Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

248.    As alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence and they were prohibited from engaging in self-interested and conflicted transactions.

249.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Defendants breached all three provisions.

250.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

251.    **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with

- 84 -

respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Upon information and belief, each Defendant participated in the breaches by the other fiduciaries.

252.   **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled another fiduciary to commit a breach, even without knowledge of the breach.  Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

253.   ERISA Plaintiffs and the ERISA Subclass were damaged in the amount of the "spread" compensation Defendants took.

254.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

255.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to ERISA Plaintiffs and the ERISA Subclass, including but not limited to:

   (a)   an accounting;

   (b)   a surcharge;

   (c)   readjudication of the transactions;

   (d)   disgorgement of profits;

   (e)   an equitable lien;

   (f)   a constructive trust;

   (g)   restitution;

(h) full disclosure of the foregoing acts and practices;

(i) an injunction against further violations; and/or

(j) any other remedy the Court deems proper.

## COUNT VI

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Knowing Participation in Violations of ERISA**
**In the Alternative, Against All Defendants**
**By the ERISA Plaintiffs on Behalf of the ERISA Subclass**

256. ERISA Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

257. As noted above, fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, ERISA Plaintiffs make claims against Defendants even though one or more of them may be found not to have fiduciary status with respect to the ERISA Plans.  As nonfiduciaries, they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

258. To the extent any one or more of them are not found to be fiduciaries, Defendants had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the Defendants who are found to be fiduciaries, and these nonfiduciaries are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Trust*.

- 86 -

259.   As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged in Counts II-V and the participation therein of the Defendants, the members of the ERISA Subclass directly or indirectly lost millions of dollars and/or plan assets (both participant pharmacy payments and Plan contracts) were improperly used to generate profits for the fiduciary Defendants, their affiliates, and third parties.  The fiduciary Defendants collected and/or paid these amounts to themselves, their affiliates, or third parties from plan assets or generated them through improper leveraging of plan assets.

260.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to ERISA Plaintiffs and the ERISA Subclass, including but not limited to:

(a)   an accounting;

(b)   a surcharge;

(c)   readjudication of the transactions;

(d)   disgorgement of profits;

(e)   an equitable lien;

(f)   a constructive trust;

(g)   restitution;

(h)   full disclosure of the foregoing acts and practices;

(i)   an injunction against further violations; and/or

(j)   any other remedy the Court deems proper.

## XI.  RICO Counts

### COUNT VII

### For Violating RICO, 18 U.S.C. § 1962(c)
### Against CHL on Behalf of the Nationwide Class

261.    Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

**General RICO Allegations**

262.    Plaintiffs, the Class members, Cigna, CHL, Argus and OptumRx are "persons" within the meaning of RICO, 18 U.S.C. §§1961(3), 1964(c).

263.    At all relevant times, Cigna and/or CHL were associated with an enterprise consisting of Argus ("Argus Enterprise").

264.    Argus is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

265.    At all relevant times, Cigna and/or CHL were associated with an enterprise consisting of OptumRx ("OptumRx Enterprise").

266.    OptumRx is a legal entity enterprise within the meaning of 18 U.S.C. §1961(4).

267.    At all relevant times, Argus and OptumRx have been engaged in, and their activities affect, interstate commerce within the meaning of RICO, 18 U.S.C. §1962(c).

268.    Cigna and/or CHL are legally and factually distinct from OptumRx and from Argus.

269.    Cigna and/or CHL and Argus are separate and distinct from the pattern of racketeering acts in which Argus engaged.

270.    Cigna and/or CHL and OptumRx are separate and distinct from the pattern of racketeering acts in which OptumRx engaged.

271.    Cigna and/or CHL created its own in-house Pharmacy Benefit Manager, Cigna Pharmacy Management, to oversee and control the affairs of PBMs such as Argus and OptumRx,

including by determining the prescription drug formulary, determining the pricing for prescription drugs and determining the copayment amounts to be paid by Plan members.

272.     Cigna and/or CHL agreed to and did conduct and participate in the conduct of the Argus Enterprise and the OptumRx Enterprise.  Cigna and/or CHL operated and managed the affairs of Argus Enterprise and the OptumRx Enterprise through contracts and agreements through which Cigna and/or CHL was able to and did exert control over Argus and OptumRx.

273.     Cigna and/or CHL "utilize Optum[Rx]'s technology and service platforms, retail network contracting and claims processing services."

274.     OptumRx's Provider Manual provides that OptumRx "acting on behalf of applicable Client or Benefit Plan Sponsor," in this case, Cigna and/or CHL, will process claims for medically necessary prescription drugs dispensed to Plaintiffs and Class members.[10]

275.     On information and belief, Argus also has manuals and written policies that describe the manner in which it processes claims for medically necessary prescription drugs dispensed to Plaintiffs and Class members in relation to Cigna and/or CHL.

276.     Cigna and/or CHL had the ability to and did in fact direct the OptumRx Enterprise and the Argus Enterprise to intentionally misrepresent the cost-sharing amount Plaintiffs and Class members were required to pay to receive medically necessary prescription drugs.  Cigna and/or CHL further directed Argus and OptumRx to direct pharmacies to collect a specified cost-sharing amount.  This specified cost-sharing amount exceeded the amount Cigna and/or CHL had promised Plaintiffs and the Class members they would pay for medically necessary prescription drugs.  After Plaintiffs and Class members overpaid for the medically necessary prescription drugs, Cigna and/or CHL directed Argus and OptumRx to direct the pharmacies to return to Argus and

---

[10] OptumRx Provider Manual (2d ed. 2017) at 44.

OptumRx a portion of the cost-sharing amount that Plaintiffs and the Class members had paid to the pharmacies.  Cigna and/or CHL then directed Argus and OptumRx to return some or all of these funds to Cigna and/or CHL.

277.    Cigna Pharmacy Management Senior Vice President Michelle Vancura, in a 2015 presentation "Take Your PBM Contract Negotiation Skills to the Next Level," identified this lucrative and so-called "Zero Balance Claim handling" as one of the "Financial Performance Guarantees" that negotiators needed to focus on to provide long term value.[11]

278.    As described herein, Argus and OptumRx are separate legal entities.  The purpose of Argus and of OptumRx is to provide Plaintiffs and Class members medically necessary prescription drugs in accordance with the terms of their Plans with Cigna and/or CHL.  Argus and OptumRx each provide pharmacy benefit management services to Cigna and/or CHL and other healthcare services companies. These services include retail network contracting and claims processing services.  Argus' and OptumRx's legitimate and lawful activities are not being challenged in this Complaint.

279.    Cigna and/or CHL, however, also direct the Argus Enterprise and OptumRx Enterprise to serve an unlawful purpose; that is, to create a mechanism through which Cigna and/or CHL could obtain additional monies beyond what Plaintiffs and Class members should have paid under their Plans for medically necessary prescription drugs.  This "Clawback Scheme" was not legitimate.

280.    Argus and OptumRx have existed for several years and remain in existence.

_____

[11] Michelle Vancura, Take Your PBM Contract Negotiation Skills to the Next Level, (Aug. 20, 2015) at 10.

281.     Cigna and/or CHL agreed to and did conduct and participate in the conduct of Argus Enterprise's and the OptumRx Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally or recklessly defrauding Plaintiffs and the Class members.   Cigna and/or CHL used Argus and OptumRx to facilitate their goals of overcharging for medically necessary prescription drugs and were unjustly enriched by overcharging for medically necessary prescription drugs.

**Predicate Racketeering Acts**

282.     As described herein, Cigna and/or CHL directly and indirectly conducted and participated in the conduct of Argus Enterprise's and the OptumRx Enterprise's affairs through a pattern of racketeering and activity in violation of 18 U.S.C. § 1962(c) for the unlawful purpose of defrauding Plaintiffs and Class members.

283.     Pursuant to and in furtherance of its fraudulent, reckless "Clawback Scheme," Cigna and/or CHL directed Argus and OptumRx to commit multiple related predicate acts of "racketeering activity," as defined in 18 U.S.C. §1961(5), prior to, and during, the Class Period and continue to commit such predicate acts, in furtherance of their "Clawback Scheme," including: (a) mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.

284.     As alleged herein, Cigna and/or CHL directed Argus and OptumRx to engage in a fraudulent "Clawback Scheme" to defraud Plaintiffs and Class members.   The "Clawback Scheme" entails:   (a) Cigna and/or CHL representing to Plaintiffs and Class members through form insurance policy language that they would pay a certain amount for prescription drugs; (b) Cigna and/or CHL entering into agreements with Argus, OptumRx, and other PBMs, through which the PBMs agreed to process claims submitted by Plaintiffs and the Class members for medically necessary prescription drugs in accordance with the terms of a particular Plan; (c) Argus'

and OptumRx's creation of pharmacy networks through which Plaintiffs and Class members could receive medically necessary prescription drugs by way of agreements requiring pharmacies participating in the pharmacy networks to charge for medically necessary prescription drugs only the amounts specified by the PBMs; (d) Argus' and OptumRx's misrepresenting the correct charge for medically necessary prescription drugs as specified in Plaintiffs and Class members' Plans, and directing pharmacies participating in the pharmacy networks to collect those improper amounts; (e) Cigna and/or CHL's retention of a portion of the amounts improperly collected by pharmacies, in violation of the Plaintiffs and Class members' Plans with Cigna and/or CHL; and (f) Cigna and/or CHL imposing an agreement (1) barring pharmacies from advising Plaintiffs and Class members that they could pay less for a drug by purchasing it outside of their respective Plans and (2) barring pharmacies from selling in a transaction that would avoid the overcharge.

285.    Cigna and/or CHL's "Clawback Scheme" includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the representation in the plain form language of the policy that Class members would pay a certain amount for prescriptions drugs with knowledge and intent that Class members would be charged a higher amount; (b) the failure to disclose that a material portion of the copayments were neither payments for prescription drugs nor were they "co-" payments by the insureds in conjunction with a payment by the insurer for the prescription drugs, as required by the Plans' plain language, but rather were unlawful payments to Cigna and/or CHL; (c) the failure to disclose that prescription drug payments under deductible portions of health insurance policies were based on prescription drug prices that exceeded the Pharmacy, as required by the Plans' plain language; (d) the failure to disclose that coinsurance payments were based on prescription drug prices that exceeded the contracted fee between the Argus and OptumRx and the pharmacies, as required by the Plans' plain language; and (e) the

failure to disclose its required agreement (1) barring pharmacies from advising Plaintiffs and Class members that they could pay less for a drug by purchasing it outside of their respective Plans and (2) barring pharmacies from selling in a transaction that would avoid the overcharge.

286.   In sum, Cigna and/or CHL's "Clawback Scheme" took money from Plaintiffs and Class members through deceit and false pretenses.  Cigna and/or CHL intentionally devised such a "Clawback Scheme" and were knowing and active participants in the scheme to defraud Plaintiffs and Class members.   Cigna and/or CHL knew or recklessly disregarded the fact that they overcharged for medically necessary prescription drugs and that they would "claw back" such amounts.  Cigna and/or CHL specifically intended to commit fraud or recklessly disregarded the rights of its member's, and such intent or reckless disregard can be inferred from the totality of the allegations herein.

287.   It was and is reasonably foreseeable to Cigna and/or CHL that mail, interstate carriers and wire transmissions would be used—and mail, interstate carriers and wire transmissions were in fact used—in furtherance of the scheme, including but not limited to the following manner and means:  (a) whenever a Plaintiff or Class member filled a prescription, the pharmacies participating in Argus's and OptumRx's pharmacy networks entered information into a computer and transmit it via interstate mail or carrier and/or wire transmissions to Argus and OptumRx for adjudication; (b) Cigna and/or CHL and/or Argus's and/or OptumRx's "clawing back" of money took place via interstate mail or carrier or wire transmissions; (c) Plaintiffs and Class members made payments at pharmacies participating in Argus's and OptumRx's pharmacy networks using credit or debit cards, which required the use of use of interstate wire transmissions; (d) prescription drugs that Plaintiffs and Class members purchased through Cigna and/or CHL's fraudulent scheme were delivered by mail or interstate carrier and (e) Cigna and/or CHL's, Argus's and OptumRx's

- 93 -

representatives communicated with each other by mail, interstate carrier and or wire transmissions in order to carry out the fraudulent scheme.

288.    Cigna and/or CHL knew that Plaintiffs and Class members would reasonably rely on the accuracy, completeness, and integrity of their and Argus's and OptumRx's statements.  The Plaintiffs and Class members participants did so rely, to their detriment, on Cigna and/or CHL's misrepresentations and omissions.

289.    Having devised its "Clawback Scheme," and intending to defraud Plaintiffs and Class members or in reckless disregard to their rights, on or about the dates set forth below (and tens of millions more), Cigna and/or CHL intentionally and unlawfully transmitted and caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme.  Each transmission was false because the amount that Cigna stated was due from the Class member as a cost-sharing payment was artificially inflated over what the Plan required and Cigna knew the same.

(a)    On January 16, 2016, a Class member paid to a pharmacy a $1,684.98 deductible payment for the prescription drug Lamictal—a 20,449% premium over the actual $8.20 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,676.78 "overpayment."

(b)    On January 16, 2017, a Class member paid to a pharmacy a $300.00 copayment for the prescription drug Diovan—a 5,374% premium over the actual $5.48 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $294.52 "overpayment."

(c)    On July 17, 2017, a Class member paid to a pharmacy a $180.00 copayment for the prescription drug Lamotrigine—a 3,075% premium

over the actual $5.67 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $174.33 "overpayment."

(d)     On April 13, 2016, a Class member paid to a pharmacy a $250.00 copayment for the prescription drug Tirosint—a 2,760% premium over the actual $8.74 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $241.26 "overpayment."

(e)     On January 4, 2017, a Class member paid to a pharmacy a $1,722.42 deductible payment for the prescription drug Enoxaparin Sodium—a 5,514% premium over the actual $30.68 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,691.74 "overpayment."

(f)     On November 19, 2017, a Class member paid to a pharmacy a $171.12 copayment for the prescription drug Crestor—a 2,015% premium over the actual $8.09 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $163.03 "overpayment."

(g)     On January 10, 2017, a Class member paid to a pharmacy a $2,013.98 deductible payment for the prescription drug Aripiprozale—a 505% premium over the actual $332.72 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $1,681.24 "overpayment."

(h)     On June 14, 2015, a Class member paid to a pharmacy a $250.00 copayment for the prescription drug Brilinta—a 2,286% premium over the actual $10.48 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $239.52 "overpayment."

- 95 -

(i)     On May 1, 2017, a Class member paid to a pharmacy a $180.00 copayment for the prescription drug Losartin Potassium—a 1,105% premium over the actual $14.94 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants "clawed back" the $165.06 "overpayment."

(j)     On July 18, 2015, Plaintiff Negron paid to a pharmacy a $10.00 copayment for prescription strength Ibuprofen—a 206%% premium over the actual $3.27 fee paid to the pharmacist.  Without disclosing it to Plaintiff Negron, Defendants "clawed back" the $6.73 "overpayment."

(k)     On December 2, 2016, Plaintiff Perry paid to a pharmacy a $9.24 copayment for the prescription drug Meloxicam—a 379% premium over the actual $1.93 fee paid to the pharmacist.  Without disclosing it to Plaintiff Perry, Defendants "clawed back" the $7.31 "overpayment."

(l)     On November 12, 2016, Plaintiff Gallagher paid to a pharmacy a $1.88 coinsurance payment for the prescription drug Azithromycin—a 338%% premium over the $0.42 coinsurance she should have paid, which is 10% of the actual $4.29 fee paid to the pharmacist.

(m)     On December 2, 2016, a Class member paid to a pharmacy a $10.00 copayment for the prescription drug Bupropion—a 440% premium over the actual $2.27 fee paid to the pharmacist.  Without disclosing it to the customer, Defendants clawed back the $7.73 overcharge. On January 19, 2016 and February 17, 2016, Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a 336% premium over the actual

$2.97 fee paid to the pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed back the $7.03 overcharge.

(n)     On March 21, 2016, April 19, 2016, and May 16, 2016, Plaintiff N. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a 161% premium over the actual $6.19 fee paid to the pharmacy.  Without disclosing it to Plaintiff N. Curol, Defendants clawed back the $3.81 overcharge.

(o)     On May 9, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—*a* 161% premium over the actual $6.19 fee paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $3.81 overcharge.

(p)     On January 19, 2016, March 15, 2016, June 7, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a 311% premium over the actual $3.21 fee paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $6.79 overcharge.

(q)     On February 22, 2016, April 18, 2016, June 7, 2016, Plaintiff R. Curol paid to Robichaux's Pharmacy in Lockport, Louisiana a $10.00 copayment for a prescription drug—a 245% premium over the actual $4.07 fee paid to the pharmacy.  Without disclosing it to Plaintiff R. Curol, Defendants clawed back the $5.93 overcharge.On December 8, 2016, Plaintiff Blocker paid to a pharmacy a $3.89 copayment for the prescription drug Lisinopril—a 122%

premium over the actual $1.75 fee paid to the pharmacist.  Without disclosing it to

Plaintiff Blocker, Defendants "clawed back" the $2.14 "overpayment."

290.    On or about these dates, OptumRx sent and received U.S. Mail or interstate wire

transmissions in connection with (a) determining whether the Class members and the prescription

drugs were covered under their Plans and how much Class members should pay for the drugs; (b)

processing the Class members' payments for such prescription drugs; and (c) processing Cigna

and/or CHL's payments to and/or "clawback" from the pharmacies.

291.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18

U.S.C. § 1961(5).

292.    Each such use of U.S. Mail and interstate wire facilities as alleged constitutes a

separate and distinct predicate act.

293.    The predicate acts were each related to one another in that: (a) Cigna and/or CHL

directed Argus and OptumRx to undertake each predicate act with a similar purpose of effectuating

its scheme to defraud Plaintiffs and Class members; (b) each predicate act involved the same

participants – Cigna and/or CHL, which directed Argus and OptumRx to make the fraudulent

statements; and pharmacies within Argus's and OptumRx's pharmacy networks, which received

the fraudulent statements and relied upon them in charging Plaintiffs and the Class, and Plaintiffs

and Class members, in reliance on them, paid the fraudulent amounts for medically necessary

prescription drugs; (c) each predicate act involved similar victims – Plaintiffs and Class members

who purchased medically necessary prescription drugs in accordance with the terms of their Plans;

and (d) each predicate act was committed the same way – in response to a request from a Plaintiff

or Class member to purchase medically necessary prescription drugs, the pharmacy participating

in Argus's and OptumRx's pharmacy networks transmitted a request via U.S. Mail or interstate

wire to Argus or OptumRx, using the U.S. Mail or interstate wire, responded at Cigna and/or CHL's direction with fraudulent statements directing the pharmacy to execute Cigna and/or CHL's scheme, and Cigna and/or CHL later effectuated its scheme by using the U.S. Mail or interstate wire to claw back the overcharge; and (e) the predicate acts could not have been conducted, nor Cigna and/or CHL's scheme effectuated, without the existence and use of Argus and OptumRx.

294.    On information and belief, Cigna and/or CHL conducts such racketeering activity through Argus and OptumRx as an ongoing and regular way of doing business, and continues and will continue to engage in such racketeering activity.

**Injury**

295.    As a direct and proximate result of Cigna and/or CHL's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property. Plaintiff Class members were injured by reason of Cigna and/or CHL's RICO violations because they directly and immediately overpaid for medically necessary prescription drugs.  Their injuries were proximately caused by Cigna and/or CHL's violations of 18 U.S.C. §1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Cigna and/or CHL's RICO violations (and commission of underlying predicate acts) and, but for Cigna and/or CHL's RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

296.    Pursuant to RICO, 18 U.S.C. §1964(c), Plaintiffs and the Class members are entitled to recover, threefold, their damages, costs, and attorneys' fees from Cigna and/or CHL and other appropriate relief.

## COUNT VIII

### Violation of RICO, 18 U.S.C. §1962(d)
### Against All Defendants on Behalf of the Nationwide Class

297.     Plaintiffs incorporate by reference each and every allegation above as if set forth fully herein.

298.     During the Class Period, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).  Specifically, Defendants conspired with themselves and/or with other unnamed health insurance companies, including United Healthcare that use OptumRx to engage in the "Clawback Scheme."  Defendants conspired with themselves and/or with other unnamed PBMs, including Argus to engage in the "Clawback Scheme."  Defendants conduct and participate, directly or indirectly, in the conduct of the affairs of the Argus Enterprise (described above) and the OptumRx Enterprise (described above) through a pattern of racketeering activity (described above) which resulted in Plaintiffs and Class members overpaying for medically necessary prescription drugs. The conspiracy to violate 18 U.S.C. §1962(c) constitutes a violation of 18 U.S.C. §1962(d).

299.     In furtherance of this conspiracy, Cigna and/or CHL and/or OptumRx and their co-conspirators committed numerous overt acts, as alleged above, in the pattern of racketeering described above, including mail fraud, in violation of 18 U.S.C. §1341; and (b) wire fraud, in violation of 18 U.S.C. §1343.  Cigna and/or CHL and/or OptumRx agreed to and did engage in a fraudulent "Clawback Scheme" to defraud Plaintiffs and Class members (described above).  Cigna and/or CHL and/or OptumRx intended to defraud Plaintiffs and Class members by overcharging for medically necessary prescription drugs (described above).  Cigna and/or CHL and/or OptumRx reasonably foresaw that the U.S. Mail and/or interstate wire would be used in furthering the "Clawback Scheme."  Cigna and/or CHL and/or OptumRx used the U.S. Mail and/or interstate wire to effectuate the "Clawback Scheme" by transmitting various misrepresentations and

omissions of material fact resulting in overcharges for medically necessary prescription drugs (described above).

300.   Cigna and/or CHL and/or OptumRx knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the "Clawback Scheme" (described above).

301.   As a direct and proximate result, and by reason of the activities of Cigna and/or CHL and/or OptumRx and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff and the Class have been injured in their business and property within the meaning 18 U.S.C. §1964(c) and are entitled to recover treble damages, together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

## XII.  STATE LAW COUNTS

### COUNT IX

**Breach of Contract**
**Against Defendant CHL**
**by Plaintiff Blocker on Behalf of the State Law Subclass**

302.   Plaintiff Billy Ray Blocker, Jr. incorporates by reference each and every allegation above as if set forth fully herein.

303.   Defendant CHL offered, sold, and administered health insurance policies and ASO policies in all 50 states during the Class Period alleged herein.

304.   The Plans constitute contracts under the laws of each of the states in which they were sold and/or administered, and in all material respects for this action, the Plans are uniform contracts.

305.   The definitions of the terms used in the State Law Subclass members' Plans are materially the same, including, but not limited to, the definitions of the Plan terms such as:

- 101 -

"Allowed Amount," "Deductible," "Benefits," "Co-payment," "Co-insurance," "Covered Health Services," "Eligible Expenses," "Pharmaceutical Product(s)," "Premium," "Prescription Drug Charge," "Prescription Drug Product," and "Usual and Customary Charge."

306.    Plaintiff Blocker and the State Law Subclass members are participants in the Plans that Defendant CHL offered and/or administered and are either parties to or third-party beneficiaries of such Plans.

307.    Defendant CHL breached the Plans in each of the fifty states by requiring participants and beneficiaries to pay amounts for prescription drugs in excess of the amounts authorized in the Plans, including "spread" and "clawbacks."

308.    Plaintiff Blocker and the State Law Subclass members have suffered damages as result of Defendant CHL's breaches.

309.    Plaintiff Blocker and the State Law Subclass members are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT X

**Breach of Covenant of Good Faith and Fair Dealing
Against Defendant CHL
by Plaintiff Blocker on Behalf of the State Law Subclass**

310.    Plaintiff Blocker incorporates by reference each and every allegation above as if set forth fully herein.

311.    All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff Blocker's and the State Law Subclass members' Plans.

312. Plaintiff Blocker and the State Law Subclass members acquired the benefits under the Plans that Defendant CHL offered and administered, and they are either parties to, or third-party beneficiaries of, such health benefit Plans.

313. Defendant CHL's performance under the plans deprived Plaintiff Blocker and the State Law Subclass members of the prescription drug prices that a reasonable consumer would expect to receive under the Plans.

314. On information and belief, Defendant CHL's actions, as alleged herein, were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize Defendant CHL's and/or its agents' revenue at the expense of Plaintiff Blocker and the State Law Subclass Class members in contravention of the reasonable expectations of Plaintiff Blocker and the State Law Subclass Class members.

315. Defendant CHL has breached the covenant of good faith and fair dealing in the Plans as alleged herein.

316. Plaintiff Blocker and the State Law Subclass members have sustained damages as a result of Defendant CHL's breaches as alleged herein.

317. Plaintiff Blocker and the State Law Subclass members are entitled to recover damages and other appropriate relief, as alleged below.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclass, pray for relief as follows as applicable for the particular claim:

A. Certifying this action as a class action and appointing Plaintiffs and the counsel listed below to represent the Class and each Subclass;

- 103 -

B.      Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C.      Finding that Defendants violated their fiduciary duties of loyalty and prudence to ERISA Subclass members and awarding Plaintiffs and the ERISA Subclass such relief as the Court deems proper;

D.      Finding that Defendants engaged in prohibited transactions and awarding Plaintiffs and the ERISA Subclass such relief as the Court deems proper;

E.      Finding that Defendants denied Plaintiffs, the Class, and  each Subclass benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.      Enjoining Defendants from further such violations;

G.      Finding that Plaintiffs and the ERISA Subclass are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.      Finding that Plaintiffs and the ERISA Subclass are entitled to readjudication of their prescription drug claims under the ERISA Plans and awarding such relief as the Court deems proper;

I.      Finding that Defendant CHL breached the terms of the Plans and awarding Plaintiff Blocker and the State Law Subclass such relief as the Court deems proper;

J.      Finding that Defendant CHL breached the covenant of good faith and fair dealing and awarding Plaintiff Blocker and the State Law Subclass such relief as the Court deems proper;

- 104 -

K.      Awarding Plaintiffs, the Class, and each Subclass damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

L.      Ordering Defendants to restore all losses to Plaintiffs and the ERISA Subclass and disgorge unjust profits and/or other assets of the ERISA Plans

M.      Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiffs and the ERISA Subclass to restore Plaintiffs' losses, remedy Defendants' windfalls, and put Plaintiffs in the position that they would have been in if the fiduciaries of the ERISA Plans had not breached their duties or committed prohibited transactions;

N.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the ERISA Subclass and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the ERISA Subclass, including as pharmacy benefit administrators and managers;

O.      Awarding treble damages in favor of Plaintiffs and the Class members against all Defendants for all damages sustained as a result of Defendants' violations of RICO, in an amount to be proven at trial, including interest thereon;

P.      Awarding Plaintiffs, the Class, and each Subclass equitable relief to the extent permitted by the above claims;

Q.      Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

- 105 -

R.      Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

S.      Awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to RICO, 18 U.S.C. § 1964(c).

T.      Awarding Plaintiffs, the Class, and each Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

U.      Awarding punitive damages for breach of the covenant of good faith and fair dealing;

V.      Finding that Defendants are jointly and severally liable for all claims; and

W.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: February 3, 2020                     Respectfully submitted,

*s/ Robert A. Izard*
Robert A. Izard (ct01601)
*Plaintiffs' Interim Co-Lead Class Counsel*
Craig A. Raabe (ct04116)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone:  860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold (ct00133)
*Plaintiffs' Interim Co-Lead Class Counsel*
Mathew Jasinski, (ct27520)
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:  860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Joseph P. Guglielmo (ct27481)
*Plaintiffs' Executive Committee Chair*
Carey Alexander, *pro hac vice*
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite (ct24886)
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
ecomite@scott-scott.com

Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:  206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
ZIMMERMAN REED, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844
brian.gudmundson@zimmreed.com

Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:  985-783-1333
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:  504-581-2156
andrew@lemmonlawfirm.com

Ronen Sarraf
*Plaintiffs' Executive Committee Member*
Joseph Gentile, *pro hac vice pending*
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:  516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:   612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

- 109 -

Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035
Dan@wbmllp.com
Jeremy@wbmllp.com

Additional Counsel for Plaintiffs