# Exhibit 5

Page 1

```
1
2          IN THE UNITED STATES DISTRICT COURT
3            FOR THE DISTRICT OF CONNECTICUT
4
5      KIMBERLY A. NEGRON,          )
       Individually and on          )
6      Behalf of All Others         )
       Similarly Situated,          )CIVIL ACTION NO.
7      DANIEL PERRY,                )3:16-cv-1702
       Individually and on          )(JAM)
8      Behalf of All Others         )
       Similarly Situated,          )
9      COURTNEY GALLAGHER,          )
       Individually and on          )
10     Behalf of All Others         )
       Similarly Situated,          )
11     NINA CUROL,                  )
       Individually and on          )
12     Behalf of All Others         )
       Similarly Situated,          )
13     ROGER CUROL,                 )
       Individually and on          )
14     Behalf of All Others         )
       Similarly Situated, and      )
15     BILLY RAY BLOCKER,           )
       Individually and on          )
16     Behalf of All Others         )
       Similarly Situated,          )
17                Plaintiffs,       )
       vs.                          )
18                                  )
       CIGNA CORPORATION,           )
19     CIGNA HEALTH AND LIFE        )
       INSURANCE COMPANY, and       )
20     OPTUMRX, INC.,               )
                Defendants.         )
21     _____)
22     REMOTE DEPOSITION OF TYLER LESTER
23          Tuesday, June 23, 2020
24
       Reported By:
25     CATHI IRISH, RPR, CRR, CLVS, CCR
```

```
 1                    LESTER
 2    combined would represent the cash price.
 3    The submitted amount is the pharmacy truly
 4    at the point of sale saying, hey, I'm
 5    going to submit a charge of $50 and that
 6    is my submitted amount and through that we
 7    calculate what that cash price would be,
 8    what the price the pharmacy is willing to
 9    accept, and if that's lower than the copay
10    or the client discounted price, then the
11    customer would receive benefit of that as
12    well in copay G.
13        Q.   Now, for a network pharmacy that
14    has a contract with Optum, the pharmacy
15    cash price may be different from the
16    contract price pursuant to which the
17    pharmacy agrees to sell drugs under the
18    Optum contract; is that right?
19            MS. GRANT:  Objection, form.
20    BY MR. IZARD:
21        Q.   You can answer.
22        A.   The -- from what we know with the
23    Argus claim transaction data, the pharmacy
24    decides what their cash price is and they
25    submit that as part of the claim and then
```

Page 89

1                          LESTER
2        whatever data Optum has asked us to load
3        in the Argus system may or may not be
4        different than that cash price that the
5        pharmacy is loading at the point of sale.
6            Q.   In your experience, the pharmacy
7        cash price tends to be higher than the
8        pricing that Optum is loading into the
9        system as its contract price with the
10       pharmacies; is that right?
11                MS. GRANT:   Objection, form,
12            foundation.
13       BY MR. IZARD:
14           Q.   You can answer.
15           A.   The cash price was higher than
16       the information that we were passing from
17       Optum to Argus to set up for claim
18       adjudication but may or may not have
19       represented Optum's actual contract with
20       the pharmacy.
21                MR. SHAFFER:   Bob, when you get
22            to a good spot for a break, let's take
23            one.
24                MR. IZARD:   This is fine.
25                THE VIDEOGRAPHER:   The time is

```
 1                    LESTER
 2     dispensed from CVS and Walgreen's, so PBM
 3     here would be Optum?
 4              MR. SHAFFER:  Objection to form.
 5              THE WITNESS:  That's correct.
 6     BY MR. IZARD:
 7         Q.   And what this means is to the
 8     extent that the customer copayment
 9     exceeded the pharmacy rate, that excesses
10     amount would show up as a negative
11     pharmacy adjustment; is that right?
12         A.   That's right, this is in regards
13     to the guarantee reconciliation between
14     Cigna and Optum.
15         Q.   And that negative adjustment to
16     the -- negative pharmacy adjustment would
17     in effect be a credit to Cigna, it would
18     be a plus column item for Cigna; is that
19     right?
20              MR. SHAFFER:  Object to the form.
21              THE WITNESS:  Yes that's right,
22         the reconciliation, there would be
23         that adjustment made, that's right.
24     BY MR. IZARD:
25         Q.   This is when Cigna is beginning
```

Page 227

```
 1                        LESTER
 2      to receive any excess amounts that the
 3      customer paid above the amount that was
 4      paid to the pharmacy; is that right?
 5           A.   Cigna would have received it as a
 6      credit against the reconciliation with
 7      Optum at the time, yes.
 8           Q.   And if we look up at the middle
 9      e-mail from Ms. Byrne, with a copy to you,
10      Ms. Byrne says, "I believe this means that
11      for CVS/WAG/GER pharmacies that the amount
12      paid to the pharmacy which exceeds what
13      would otherwise be paid to the pharmacy
14      (which is the contracted rate) is either
15      paid or credited (which means included in
16      the agreement cost calculation) by PBM."
17                Do you see that?
18           A.   Yes.
19           Q.   You agree with that?
20           A.   Yes, I agree that's the amendment
21      that we applied during this period.
22           Q.   When we say paid, it's either
23      paid to Cigna or credited into Cigna; is
24      that right?
25           A.   That's right.
```

```
 1                    LESTER
 2           MR. IZARD:  I have no further
 3      questions.
 4           MR. SHAFFER:  Michelle, do you
 5      have any questions?
 6   EXAMINATION
 7   BY MS. GRANT:
 8      Q.   I have a couple questions.  Good
 9   afternoon, Mr. Lester.
10      A.   Good afternoon.
11      Q.   Just a handful of questions.  I
12   know it's late in the day.
13           Did Optum Rx communicate with
14   pharmacies at the point of sale the cost
15   sharing amount the pharmacy was to collect
16   from the member?
17      A.   Only for the very small subset of
18   customers that migrated to the Rx plan
19   platform in 2014.  The majority of
20   customers, it went through the Argus
21   platform.
22      Q.   Was that only for a brief period
23   of time in 2014 as well?
24      A.   That's correct.
25      Q.   Those customers then later
```

```
 1                    LESTER
 2      migrated back to Argus?
 3           A.    That's right.
 4           Q.    Did Optum have access to plan or
 5      plan documents?
 6           A.    No.
 7           Q.    Sorry, I didn't hear you, what
 8      was that?
 9           A.    Not to my knowledge.
10                MS. GRANT:  Thank you, no further
11           questions.
12                MR. SHAFFER:  Mr. Lester, I have
13           a few questions for you just to make
14           sure we have a complete picture of
15           some of the topics that were discussed
16           today.
17      EXAMINATION
18      BY MR. SHAFFER:
19           Q.    Remind me again how long you've
20      been with Cigna?
21           A.    13 years.
22           Q.    Okay.  And during what period of
23      time over those 13 years have you been
24      involved with aspects of the pharmacy
25      management side of the business?
```

Page 333

1          LESTER

2     choose from, a mail order pharmacy,

3     specialty pharmacy, clinical programs that

4     a plan sponsor can choose to add or

5     purchase, services related to claim

6     payment, member services for when a member

7     or customer might have a question about

8     their benefit, and all of the digital

9     resources such as our website where

10    members can track all the different

11    accumulators, see how the information that

12    might be available about drug costs or

13    costs for other services.

14        Q.   Since you've been involved with

15    Cigna Pharmacy, how has Cigna offered

16    group plans access to networks of

17    pharmacies?

18        A.   When I first began at pharmacy in

19    late 2010, Cigna managed and contracted

20    our own pharmacy networks and we had two

21    of them that we offered broadly to clients

22    but we also have had the option where a

23    client can build a client-specific network

24    where they can select the pharmacies that

25    they would like to be a part of their

1                    LESTER

2      network.

3            In 2013 we entered into a

4      multi-year agreement with Optum to rent

5      their networks to effectively use them for

6      network services and through that

7      agreement, it has a flexibility that as

8      Cigna saw the need for additional

9      networks, we would work with Optum and

10     Optum would develop those networks for

11     Cigna to use and for Cigna to be able to

12     offer to our plan sponsors and other

13     clients.

14        Q.   So the Optum contract offered a

15     network of retail pharmacies; correct?

16        A.   That's correct, that was one of

17     the services that we contracted with Optum

18     for.

19        Q.   Does the Optum contract also

20     offer mail order pharmacies?

21        A.   There was a lot of flexibility in

22     the original Optum contracts and initially

23     we did not use Optum for any mail order

24     services.  We eventually used them for

25     back end fulfillment only so Cigna

```
 1                    LESTER
 2      Q.    Again, you were asked a lot of
 3   questions about negative reimbursement
 4   today.   What is negative reimbursement?
 5      A.    Negative reimbursement occurs
 6   when the pharmacy was paid at the point of
 7   sale more than the rates in the claim --
 8   than the pharmacy rate that was in the
 9   claim adjudication on that date.
10      Q.    With respect to copayments of
11   members, does a participant's cost share
12   for a given transaction become higher or
13   lower in an instance where there is
14   negative reimbursement occurring?
15      A.    It does not.   Negative
16   reimbursement does not impact the customer
17   cost share.
18      Q.    Why do you say that?
19      A.    Negative reimbursement is related
20   to the pharmacy rate and the pharmacy
21   reimbursement which is a separate process
22   for a spread based client and in that
23   process the customer is paying the client
24   rate or their cost share depending on the
25   lesser of logic.   The pharmacy rate is a
```

Page 371

```
 1                        LESTER
 2      separate transaction that is about how
 3      much the pharmacy was due on that
 4      individual transaction.
 5          Q.    Mr. Izard showed you a number of
 6      e-mails I think that you were copied on or
 7      wrote that related to complaints from
 8      pharmacies related to negative
 9      reimbursement in the 2014 time period.  Do
10      you recall those earlier today?
11          A.    I do.
12          Q.    Did you recall seeing anything in
13      any of those documents about any pharmacy
14      suggesting that they were giving that
15      money to a participant?
16          A.    I did not.
17          Q.    What did you see?
18          A.    Prior to implementing that logic,
19      the pharmacy retained any amount above
20      their rate that was in the Argus claim
21      processing system.
22          Q.    And even with respect to the DoD
23      and VA pharmacies where Mr. Izard accused
24      you of taking money out of veterans'
25      pockets, did you see any evidence that
```

Page 385

1

2                    C E R T I F I C A T E

3      STATE OF NEW YORK      )

4                            : ss.

5      COUNTY OF NASSAU       )

6

7          I, CATHI IRISH, a Registered

8      Professional Reporter, Certified Realtime

9      Reporter, and Notary Public within and for

10     the State of New York, do hereby certify:

11         That TYLER LESTER, the witness whose

12     deposition is hereinbefore set forth, was

13     duly sworn by me and that such deposition

14     is a true record of the testimony given by

15     the witness.

16         I further certify that I am not

17     related to any of the parties to this

18     action by blood or marriage, and that I am

19     in no way interested in the outcome of

20     this matter.

21         IN WITNESS WHEREOF, I have hereunto

22     set my hand this 26th day of June, 2020.

23

24

       _____

25         CATHI IRISH, RPR, CRR, CLVS, CCR