# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiffs,<br><br>v.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC.,<br><br>                        Defendants. | Civ. A. No. 16-cv-1702 (JAM) |

## DEFENDANT CIGNA HEALTH AND LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

    I.     Designing Prescription Drug Benefit ..................................................... 3

    II.    Funding And Administering Prescription Drug Benefits ..................... 4

    III.   Discount Pricing For Sponsors Of Prescription Drug Benefits ............ 6

    IV.   Plaintiffs' Motion For Class Certification ........................................... 8

         1.     The Class And Subclass Definitions ......................................... 9

         2.     Putative Class Representatives And Putative Class Members ................. 11

LEGAL STANDARD ......................................................................................... 12

ARGUMENT ..................................................................................................... 13

    I.     Plaintiffs' Claims Do Not Present Questions Of Law Or Fact Common To The Proposed Classes ........................................... 13

         1.     Plan Variations Regarding Class Members' Prescription Drug Payments Defeat Commonality ............................................. 14

             a.     Plans Vary Materially In How They Define Words Central To Plaintiffs' Theory ........................................ 15

             b.     Plans Vary Materially In How They Describe "Your Payments" ............................................................. 17

             c.     Other Plan Variations Are Inconsistent With Plaintiffs' Theory ............................................................. 18

             d.     Apparent Ambiguities Would Require Consideration of Extrinsic Evidence ........................................ 21

         2.     Plaintiffs Fail To Satisfy Rule 23(a)'s Commonality Requirement With Respect To "Clawbacks" ............................ 24

         3.     Plan Variations Relating To The Standard of Review Applicable To CHLIC's Plan Language Interpretation Defeat Commonality .......... 25

             a.     Discretionary Authority ................................................ 25

             b.     Claims And Appeals Procedures ............................... 27

    II.    Fundamental Intraclass Conflicts Preclude Class Certification ....................... 29

    III.   Plaintiffs Cannot Fairly And Adequately Protect The Interests of Class Members ...................................................... 31

# TABLE OF CONTENTS
(continued)

**Page**

IV.    Plaintiffs Cannot Satisfy Rule 23(b)(2) ................................................. 34

    1.    CHLIC Has Not "Acted or Refused to Act On Grounds That Apply Generally To The Class" .................................................................. 34

    2.    Individualized Issues Defeat Rule 23(b)(2) Certification ...................... 36

V.    Plaintiffs Cannot Satisfy Rule 23(b)(3) ................................................. 38

    1.    Plaintiffs Have Not Offered A Method For Calculating Damages That Matches Their Liability Theory ...................................................... 39

        a.    "Clawbacks" Are Not A Proper Measure Of Relief Because They Do Not Measure How Much Class Members Would Have Paid For Prescription Drugs Under Plaintiffs' Theory ....... 40

        b.    Mustoe's Methodology Is Inconsistent With Plaintiffs' Class Definitions ........................................................................ 42

    2.    Individualized Issues Specific To ERISA Claims Defeat Predominance .......................................................................................... 43

    3.    Individualized Issues Specific To State Law Claims Defeat Predominance .......................................................................................... 44

    4.    Individualized Issues Specific To RICO Claims Defeat Predominance .......................................................................................... 47

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advocate Health Care Network v. Stapleton,*
    137 S. Ct. 1652 (2017) ........................................................................................43

*Amara v. Cigna Corp.,*
    775 F.3d 510 (2d Cir. 2014) ..........................................................................38, 48

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) .......................................................................................29, 38

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG,*
    2018 WL 4253152(LGS) (S.D.N.Y. Sept. 6, 2018) ...........................................21

*Baney v. Eoute,*
    784 A.2d 132 (Pa. Super. Ct. 2001) ..................................................................46

*Belfiore v. Procter & Gamble Co.,*
    311 F.R.D. 29 (E.D.N.Y. 2015) ...........................................................32, 33, 49

*Bentley v. Verizon Bus. Glob., LLC,*
    2010 WL 1223575 (S.D.N.Y. Mar. 31, 2010) ...................................................32

*Black & Decker Disability Plan v. Nord,*
    538 U.S. 822 (2003) ............................................................................................14

*Bowers v. Jefferson Pilot Fin. Ins. Co.,*
    219 F.R.D. 578 (E.D. Mich. 2004) ....................................................................46

*Brand v. AXA Equitable Life Ins. Co.,*
    2008 WL 4279863 (E.D. Pa. 2008) ...................................................................33

*Castano v. Am. Tobacco,*
    84 F.3d 734 (5th Cir. 1996) ...............................................................................45

*Chavez v. Plan Benefit Servs., Inc.,*
    957 F.3d 542 (5th Cir. 2020) .......................................................................13, 18

*Cole v. Gen. Motors Corp.,*
    484 F.3d 717 (5th Cir. 2007) .............................................................................45

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ......................................................................12, 38, 39, 40

iii

*Conkright v. Frommert*,
   559 U.S. 506 (2010)..................................................................................25

*DelGreco v. CVS Corp.*,
   337 F. Supp. 2d 475 (S.D.N.Y. 2004), *aff'd*, 164 F. App'x 75 (2d Cir. 2006).......................34

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)........................................................................35

*Des Roches v. Cal. Physicians' Serv.*,
   320 F.R.D. 486 (N.D. Cal. 2017)..................................................................38

*Dewey v. Volkswagen*,
   681 F.3d 170 (3d Cir. 2012).........................................................................29

*Dobson v. Hartford Fin. Servs. Grp., Inc.*,
   389 F.3d 386 (2d Cir. 2004)..........................................................................14

*Dwinnell v. Fed. Express Long Term Disability Plan*,
   167 F. Supp. 3d 287 (D. Conn. 2016)............................................................14

*Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*,
   217 F. Supp. 3d 608 (N.D.N.Y. 2016)...........................................................43

*Elizabeth W. v. Empire Healthchoice Assurance, Inc.*,
   709 F. App'x 724 (2d Cir. 2017) ...................................................................26

*Emergency Assoc. of Tampa, P.A. v. Sassano*,
   664 So.2d 1000 (Fla. Dist. Ct. App. 1995) .....................................................46

*Estate of Barton v. ADT Sec. Servs. Pension Plan*,
   820 F.3d 1060 (9th Cir. 2016) ......................................................................38

*Fay v. Oxford Health Plan*,
   287 F.3d 96 (2d Cir. 2002).............................................................14, 15, 22

*Feifer v. Prudential Ins. Co. of Am.*,
   306 F.3d 1202 (2d Cir. 2002).......................................................................14

*Fla. Tube Corp. v. MetLife Ins. Co. of Conn.*,
   603 F. App'x 904 (11th Cir. 2015) ................................................................25

*Foad Consulting Grp., Inc. v. Azzalino*,
   270 F.3d 821 (9th Cir. 2001) ........................................................................46

*Franco v. Conn. Gen. Life Ins. Co.*,
   299 F.R.D. 417 (D.N.J. 2014)..........................................................38, 39, 41

*Gelfound v. Metlife Ins. Co. of Conn.*,
   313 F.R.D. 674 (S.D. Fla. 2016)...............................................................46

*Gen. Tele. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982).................................................................................31

*Georgine v. Amchem Prods.*,
   83 F.3d 610 (3d Cir. 1996).......................................................................45

*Hall v. LHACO, Inc.*,
   140 F.3d 1190 (8th Cir. 1998) ...........................................................37, 44

*Halo v. Yale Health Plan*,
   819 F.3d 42 (2d Cir. 2016)........................................................................27

*In re Aetna UCR Litig.*,
   2018 WL 10419839 (D.N.J. June 30, 2018) ...............................14, 37, 38

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992)......................................................................29

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011)........................................................................8

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011)......................................................................29

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) ..............................................................36

*In re U.S. Foodservice*,
   729 F.3d 108 (2d Cir. 2013).........................................................46, 48, 49, 50

*Johnson v. Evangelical Lutheran Church in Am.*,
   2013 WL 1249151 (D. Minn. Mar. 26, 2013) .........................................29

*Korman v. Consol. Edison Co. of N.Y., Inc.*,
   915 F. Supp. 2d 359 (E.D.N.Y. 2013) .....................................................37

*Krauss v. Oxford Health Plans, Inc.*,
   517 F.3d 614 (2d Cir. 2008)......................................................................26

*LaFlamme v. Carpenters Local #370 Pension Plan*,
   212 F.R.D. 448 (N.D.N.Y. 2003) .............................................................38

*Laurent v. PriceWaterhouseCoopers LLP*,
   945 F.3d 739 (2d Cir. 2019)......................................................................38

*Lipstein v. UnitedHealth Grp.*,
   296 F.R.D. 279 (D.N.J. 2013) ................................................................27, 35, 39

*Mayer v. Mercy Health Servs., LLC*,
   2019 WL 527964 (E.D. Mo. Feb. 11, 2019) ...........................................................43

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) .............................................................................48, 50

*Meidl v. Aetna, Inc.*,
   2017 WL 1831916 (D. Conn. May 4, 2017) ...........................................................38

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007) ....................................................................................40

*Metro. Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985) .................................................................................................14

*Miles v. Principal Life Ins. Co.*,
   720 F.3d 472 (2d Cir. 2013) ....................................................................................38

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
   798 F.3d 125 (2d Cir. 2015) ....................................................................................43

*Pagan v. NYNEX Pension Plan*,
   52 F.3d 438 (2d Cir. 1995) ...............................................................................25, 26

*Peters v. Aetna Inc.*,
   2019 WL 1429607 (W.D.N.C. Mar. 29, 2019) ................................................29, 41

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ...............................................................................29

*Poonawala v. AIG Claim Servs., Inc.*,
   2006 WL 8436586 (N.D. Ala. Nov. 20, 2006) ........................................................33

*Rajamin v. Deutsche Bank Nat'l Tr. Co.*,
   757 F.3d 79 (2d Cir. 2014) ......................................................................................25

*Rapp v. Green Tree Servicing, LLC*,
   302 F.R.D. 505 (D. Minn. 2014) .............................................................................46

*Robertson v. Sikorsky Aircraft Corp.*,
   2000 WL 33381019 (D. Conn. July 5, 2001) ..........................................................36

*Rose v. Long Island R.R. Pension Plan*,
   828 F.2d 910 (2d Cir. 1987) ....................................................................................43

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010) ....................................................................46

*Schalit v. Cigna Life Ins. Co. of N.Y.*,
   539 F. Supp. 2d 715 (S.D.N.Y. 2008)...........................................................43

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985)......................................................................................47

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983)........................................................................................14

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)..................................................................................35

*Stegall v. TML Multistate Intergovernmental Emp. Benefits Pool, Inc.*,
   2019 WL 4855226 (Tex. Ct. App. Oct. 2, 2019) ..........................................45

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)............................................................................31

*Torres v. Am. Airlines, Inc.*,
   2020 WL 3485580 (N.D. Tex. May 22, 2020) .............................................29

*Traver v. Lowe's Home Ctrs., LLC*,
   2016 WL 880169 (E.D.N.Y. Mar. 1, 2016) .................................................32

*Tschudy v. J.C. Penney Corp., Inc.*,
   2015 WL 8484530 (S.D. Cal. Dec. 9, 2015)..................................................8

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016)..........................................................................48

*United States v. Alkins*,
   925 F.2d 541 (2d Cir. 1991)..........................................................................48

*United States v. Hamdi*,
   432 F.3d 115 (2d Cir. 2005)..........................................................................15

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013)........................................................................................22

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ....................................................................29

*Wal-Mart, Inc. v. Dukes*,
   564 U.S. 338 (2011)............................................................................. passim

*Wathor v. Mut. Assur. Adm'rs, Inc.*,
   87 P.3d 559 ......................................................................................................44

*Wigington v. Hill-Soberg Co., Inc.*,
   396 So.2d 97 (Ala. 1981) ..................................................................................46

*Zuckerbrod v. Phoenix Mut. Life Ins. Co.*,
   78 F.3d 46 (2d Cir. 1996) ..................................................................................26

**STATUTES**

18 U.S.C. § 1961(1) ........................................................................................................47

18 U.S.C. § 1962(c) ........................................................................................................47

18 U.S.C. § 1964(c) ..................................................................................................47, 49

29 U.S.C. § 1132(a)(1)(B) ........................................................................................15, 40

ERISA ............................................................................................................... passim

ERISA § 502(a)(1)(B)............................................................................................8, 33, 43

RICO ................................................................................................................. passim

UCC ....................................................................................................................46

**OTHER AUTHORITIES**

29 C.F.R. § 2560.503-1 ....................................................................................................27

U.S. Dep't of Labor, Emp. Bens. Sec. Admin., *Benefit Claims Proc. Reg. FAQs* at
   A-7, A-11, https://www.dol.gov/agencies/ebsa/about-ebsa/our-
   activities/resource-center/faqs/benefit-claims-procedure-regulation......................27

Fed. R. Civ. P. 23 ................................................................................................. passim

## INTRODUCTION

Consumers spend hundreds of billions of dollars on prescription drugs annually, representing more than 10% of total healthcare costs in the United States.  Providing affordable prescription drug benefits that reduce these ever-rising drug costs and improve health outcomes is an important priority for all group health benefit plans.  In seeking to certify this case as a class action on behalf of millions of plan participants who received the pharmacy benefits thousands of different employers (plan sponsors) selected and provided to them, however, Plaintiffs attempt to change the deliberate choices plan sponsors made—typically with the help of sophisticated benefits consultants—to design cost-effective prescription drug benefit programs that meet not only their plan participants' needs, but also each plan's unique financial considerations.  Companies like Cigna Health and Life Insurance Company ("CHLIC") that provide insurance and pharmacy benefit manager ("PBM") services for prescription drug plans work with plan sponsors and their consultants to recommend cost-saving strategies, provide access to discounted drug prices and manufacturer rebates, provide pharmacy networks, offer low-cost access to generic drugs, process and pay prescription drug transactions, and provide drug-management programs to reduce costs and improve health outcomes, among other things.  This complex process often involves myriad choices and financial modeling to ultimately decide how much the plan will pay for prescription drugs and how much of those costs the plan's participants must bear.

Plan participants share in prescription drug benefit costs through premiums or monthly plan contributions, deductibles, copayments, coinsurance, or a combination of these options that the plan sponsor selects.  These options and the corresponding participant payment amount can vary depending on the type of drug (preventative, brand, generic, specialty), prescribed quantities, the type of pharmacy, and other plan-specific considerations.  All of these options, and many others, are subjective choices made by each employer and therefore vary from plan to plan.

How employers pay for prescription drug benefit costs, including PBM services, is also a choice that each employer makes. The two most common ways are "traditional pricing" and "pass-through pricing."  Traditional or "spread" pricing allows employers to negotiate predictable drug costs for the plan year and pay for PBM services through a differential or "spread" between the employer's negotiated cost and the amount of the PBM's (or its vendor's) network pharmacy reimbursement.  In pass-through pricing, the plan sponsor's drug costs are typically equal to the pharmacy reimbursement rates, but the costs for the plan's range of administrative services are paid as a separate recurring fee.[1]

In this case, Plaintiffs ask the Court to determine whether certain excised terms from various prescription drug plan documents are best read as effectively creating a pass-through price on drug costs for plan participants—regardless of whether the plan sponsor intended that price. But the excised plan language Plaintiffs cite cannot be interpreted in isolation. It must be read in the context of the entire prescription drug benefit program each plan sponsor selected for its plan, the entire plan document as a whole, and, particularly in this case, what the plan sponsor intended. As Plaintiffs have defined their classes and subclasses, this could involve evaluating tens of thousands of group benefit plans and tens of millions of individual prescription drug transactions.

Moreover, if the Court ultimately adopts the interpretation of the excised plan terms for which Plaintiffs advocate and "reprocesses" those claims as Plaintiffs seek, hundreds of thousands of class members will owe more upon that reprocessing.  The proposed class representatives are

---

[1] Importantly, pass-through pricing does not mean plan sponsors (and in turn participants) will have lower costs for their prescription drug plans; in fact, often it will be the opposite.  As explained by CHLIC's expert Gary Owens, pass-through pricing is based on lowering unit costs by promoting lower cost drug alternatives versus higher cost drugs that drive higher rebates.  For this reason, discounts and rebates under a pass-through plan typically are not as aggressive as with traditional pricing, resulting in a higher overall total plan drug cost versus spread pricing.  Also, in a pass-through pricing model, there may be additional fees charged for claims processing, enrollment and eligibility processing, network access and other administrative fees that might not be charged in a spread pricing arrangement. Therefore, even if individual prescriptions were less costly in a pass-through model (and that is not always the case), the total cost paid by members and/or plan sponsors could be higher.

2

advancing a position that makes other class members worse off.  This stark intraclass conflict is a textbook example of inadequate representation that defeats class certification.

Plaintiffs have fallen far short of meeting their Rule 23(a) or (b)(2) and (b)(3) burdens.  The plan and prescription drug benefit variations defeat commonality and adequacy, cohesiveness and predominance.  Plaintiffs proposed classes cannot be certified.

## FACTUAL BACKGROUND

## I.   Designing Prescription Drug Benefits

Prescription drug benefits are designed to reduce costs for prescription drugs and improve health outcomes for plan participants.  Plan sponsors—often with the help of sophisticated benefits brokers and consultants—design their prescription drug benefits to balance affordability for plan participants with the plan's financial considerations.  Plan sponsors select from an array of options to decide how much the plan will pay for prescription drugs and how much its participants will pay.  Ex. 20[2] at 318:25-322:21, 343:3-344:6: Ex. 6 at ¶¶ 20-40; 43-46; Ex. 7 at ¶ 11; Ex. 8 at ¶ 5.

For example, plan sponsors may choose to have participants pay a specific amount out-of-pocket (a "deductible") before the plan will help pay for their prescription drugs.  Ex. 20 at 322:22-325:5; Ex. 6 at ¶ 36; Ex. 43 at CIGNA00808060.  Plan sponsors may also choose to have participants contribute to the cost of certain prescription drug transactions in the form of a flat fee per transaction (a "copayment"), a percentage fee per transaction (a "coinsurance"), or a combination thereof.  Ex. 20 at 325:23-326:14; Ex. 6 at ¶¶ 37-38; Ex. 37 at CIGNA01113332.

The method for determining an applicable copayment, coinsurance, or deductible payment may differ from plan to plan, transaction to transaction, participant to participant, and pharmacy

---

[2] All references to "Ex.__" are to exhibits to the declaration of Brian W. Shaffer.

to pharmacy, depending on a variety of circumstances.  Indeed, plan sponsors may choose to make different pricing available for:

- different types of drugs (*e.g.*, preventive, brand-name, generic, or specialty);
- different groups of drugs (*e.g.*, tiers or formularies);
- different quantities of drugs (*e.g.*, 30-day supplies or 90-day supplies);
- different types of transactions (*e.g.*, emergency transactions);
- drugs purchased from different types of pharmacies (*e.g.*, retail or mail-order); and
- drugs purchased from different groups of pharmacies (*e.g.*, network or out-of-network).

Ex. 20 at 327:19-328:7; Ex. 6 at ¶¶ 25-34, 57; Ex. 3.  Plan sponsors may choose to impose a limit on the amount a participant must pay for a particular prescription drug transaction or over a specified period of time (an "out-of-pocket maximum").  Ex. 20 at 325:6-22; Ex. 6 at ¶ 60; Ex. 34 at CIGNA04347857.  They may choose from among many methods of "cross-accumulation" whereby different types of participant payments (*e.g.*, payments for prescription drugs, medical procedures, in-network transactions, or out-of-network transactions) or payments by different individuals (*e.g.*, participants, family members, or others) may count—in whole or in part—toward satisfaction of a deductible or out-of-pocket maximum.  Ex. 20 at 328:8-329:21; Ex. 6 at ¶ 60; Ex. 3.  This accumulation typically takes place over the course of a "plan year," which may vary in duration and start date from plan to plan.  Ex. 20 at 329:22-330:20.  All of these different benefit choices are reflected in plan documents that each plan sponsor issues to its participants.

## II.    Funding And Administering Prescription Drug Benefits

In addition, plan sponsors have to select how prescription drug benefits will be paid for. Plan sponsors may choose to use their own funds (*i.e.*, "self-fund") the benefits.  Ex. 20 at 331:22-332:18; Ex. 6 at ¶¶ 16, 23; Ex. 45 at CIGNA02661640.  Alternatively, plan sponsors may choose to "fully insure" the benefits by paying premiums to an insurance company for coverage of benefits due.  Ex. 20 at 331:22-332:18; Ex. 6 at ¶¶ 16, 21-22; Ex. 50 at CIGNA07381690.  These funding

4

arrangements and the plan's contractual agreement with its prescription drug benefit insurer or third-party administrator are reflected in insurance policies (for fully insured plans) or Administrative Service Only ("ASO") agreements (for self-funded plans).  Insurance policies also dictate the obligations of an insurance company with respect to fully insured plans, while ASO agreements dictate the obligations of third-party administrators hired by plan sponsors with respect to self-funded (or "ASO") plans.  Ex. 20 at 337:3-338:22.

One of the administrative services that third parties like CHLIC typically provide is access to a network of retail pharmacies that have agreed to fill participants' prescriptions at special prices.  Ex. 20 at 332:19-333:13, 338:4-22; Ex. 6 at ¶ 30.  Since 2013, CHLIC has contracted with OptumRx to provide access to some or all of OptumRx's retail pharmacy network for CHLIC's customers.[3]  Ex. 20 at 10:21-11:23; 333:14-334:18.  That network comprises retail pharmacies that agree to certain terms and conditions set forth in contractual arrangements—direct or indirect—with OptumRx.   Ex. 5 at ¶¶ 13, 18.   Those contractual arrangements also dictate the total reimbursement that each pharmacy will retain on a transaction-by-transaction basis for filling a participant's prescription (the "Pharmacy Reimbursement Rate").[4]  Ex. 20 at 363:25-366:11; Ex. 5 at ¶¶ 18, 29; ECF 207-14 at § 4.  When a network pharmacy fills a participant's prescription, it typically "charges" (*i.e.*, asks to be paid) an amount greater than the Pharmacy Reimbursement Rate, but OptumRx's contractual arrangement with the pharmacy limits the pharmacy's reimbursement to the Pharmacy Reimbursement Rate.  Ex. 20 at 363:23-367:6; Ex. 5 at ¶¶ 3, 29;

---

[3] Before contracting with OptumRx, CHLIC maintained its own retail pharmacy network and contracted directly with pharmacies.  CHLIC does not contract with OptumRx for access to a network of mail-order pharmacies.  Ex. 20 at 334:19-335:8.

[4] Without any evidentiary showing, Plaintiffs and their expert assume that the Pharmacy Reimbursement Rate in CHLIC's transaction data reflects "the amount the pharmacy agreed with [CHLIC] or the pharmacy benefit manager to accept for such drugs on a transaction-by-transaction basis."  ECF 253.  This assumption is unfounded, but for ease of discussion, CHLIC will not raise this problem each time it describes Plaintiffs' argument.

ECF 207-14 at § 4.  OptumRx periodically calibrates the Pharmacy Reimbursement Rate on both drug-by-drug and pharmacy-by-pharmacy bases to realize specific discounts guaranteed by each pharmacy.  Ex. 20 at 17:18-20:15, 261:2-262:9.  OptumRx maintains its own records detailing its transactions with pharmacies in its retail network.  Ex. 20 at 336:10-337:2.

## III.    Discount Pricing For Sponsors Of Prescription Drug Benefits

For self-funded plans, ASO agreements set forth specific discounts that CHLIC guarantees to plan sponsors.  Ex. 20 at 340:12-20; Ex. 21 at CIGNA00002328; Ex. 22 at CIGNA00001829-30; Ex. 23 at CIGNA12361828-29.  Those discounts may be expressed as an aggregate discount for certain groups of transactions.  Ex. 20 at 340:12-341:15; Ex. 21 at CIGNA00002328; Ex. 22 at CIGNA00001829-30; Ex. 23 at CIGNA12361828-29.  To achieve these negotiated discounts, the minimum amount CHLIC is paid for facilitating a given prescription drug transaction (the "Client Rate") is calibrated periodically on both drug-by-drug and plan-by-plan bases.  Ex. 20 at 352:4-24.  Depending on the benefit design selected by the plan sponsor, the Client Rate for a given prescription drug transaction may be paid entirely by the participant, paid entirely by the plan sponsor, or shared between the participant and the plan sponsor.  Ex. 20 at 358:17-360:4.  Some plan sponsors choose to guarantee participants that they will not pay more than the Client Rate for any given prescription drug transaction; other plan sponsors choose to limit participants' prescription drug payments in other ways.  Ex. 20 at 360:18-361:13; Ex. 7 at ¶ 12.

For any given transaction, the Client Rate may be less than, the same as, or greater than the Pharmacy Reimbursement Rate.  Ex. 7 at ¶ 12; Ex. 8 at ¶ 7.  Plan sponsors may prefer a Client Rate that can differ from the Pharmacy Reimbursement Rate because it gives them (and their participants) more stable and predictable pricing.  Ex. 20 at 261:13-262:9, 364:11-19; Ex. 6 at ¶ 51. Plan sponsors also use the differential between the Client Rate and the Pharmacy Reimbursement Rate to pay CHLIC for its services on a transaction-by-transaction basis rather than through a

6

separate per-member fee.  Ex. 20 at 316:24-318:3; Ex. 6 at ¶¶ 51-52, 58; Ex. 7 at ¶¶ 5-7; Ex. 8 at

¶ 8.   These important plan financial considerations are often made in consultation with

brokers/benefits consultants and subject to sophisticated financial modeling.  Ex. 6 at ¶¶ 41-46,

50-51, 60-61.  CHLIC's ASO agreements, including those with the Plaintiffs' plan sponsors,

describe the differential and state that the Client Rate "may or may not be equal" to the "amount

paid to the Retail Pharmacy for Brand, Generic, or Specialty Drug Claims" and that "CHLIC will

absorb or retain any difference."   Among other things, CHLIC disclosed to plan sponsors the

possibility of such a differential in many ASO agreements, including those of the Plaintiffs' plan

sponsors, which state that the Client Rate "may or may not be equal" to the "amount paid to the

Retail Pharmacy for Brand, Generic, or Specialty Drug Claims" and that "CHLIC will absorb or

retain any difference."   Ex. 21 at CIGNA00002329; Ex. 22 at CIGNA00001830; Ex. 23 at

CIGNA12361830.

For any given transaction, a participant's payment at the point of sale (*e.g.*, at a pharmacy)

depends solely on the terms of their benefit plan and may be less than, the same as, or greater than

the Pharmacy Reimbursement Rate.  Ex. 20 at 365:16-25; Ex. 8 at ¶ 8.  Where it is greater than the

Pharmacy Reimbursement Rate, the difference is what Plaintiffs refer to as "spread."   A

participant's payment at the point of sale may also be less than, the same as, or greater than what

CHLIC's contract with OptumRx requires CHLIC to pay OptumRx in connection with that

transaction.  Ex. 20 at 88:13-89:20.  The difference is recorded in CHLIC's transaction data as a

credit toward future payments that CHLIC would owe OptumRx.  Ex. 20 at 226:25-227:7.  These

credits—sometimes called "negative reimbursements" or what Plaintiffs refer to as "clawbacks"—

allowed CHLIC to negotiate deeper discounts with OptumRx and provide more affordable

prescription drug benefits to plan sponsors.  These credits have nothing to do with determining

7

how much a plan participant must pay for a particular prescription drug at the point of sale.  That is determined by each participant's benefit plan.  Ex. 20 at 370:2-371:4.  Whether CHLIC receives a credit on a particular transaction or the pharmacy retains the full amount paid at the point of sale is determined by terms of CHLIC's contract with OptumRx.  Ex. 20 at 370:2-371:4.

## IV.    Plaintiffs' Motion for Class Certification

Plaintiffs contend that their plans limit class members' prescription drug payments "on a transaction-by-transaction basis" to the Pharmacy Reimbursement Rate and that CHLIC violated their plans both by causing class members to pay more than the Pharmacy Reimbursement Rate and by recouping the differential from the pharmacy.  Plaintiffs do not allege that all plans are uniform.  Instead, they point to certain snippets of language that are common while ignoring other plan language that varies substantially and materially.

Plaintiffs move to certify classes and subclasses with respect to three sets of claims.  The first set comprises ERISA claims.  Plaintiffs focus on claims for benefits under ERISA § 502(a)(1)(B) and allegations that CHLIC breached its fiduciary duties by failing to maintain an appropriate claims processing system.  They do not address any other ERISA liability theories, including claims on behalf of plans or prohibited transactions.[5]  They do not even mention the elements of such claims, let alone attempt to demonstrate that they are subject to classwide proof.

Plaintiffs also seek certification of a second class with respect to state law claims for breach of contract, as well as a third class with respect to civil RICO claims.

---

[5] Though Plaintiffs purport to state six different ERISA claims against CHLIC, *see* ECF 198 ¶¶ 208-60, Plaintiffs' motion never identifies which ERISA "claims, issues, or defenses" they seek to certify for class treatment, as required by Rule 23(c)(1)(B).  *See Tschudy v. J.C. Penney Corp., Inc.*, 2015 WL 8484530 (S.D. Cal. Dec. 9, 2015) ("Plaintiffs have the burden to define the 'class and the class claims.'" (quoting Fed. R. Civ. P. 23(c)(1)(B))); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011) ("[T]he task for plaintiffs at class certification is to demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.").

### 1.     The Class And Subclass Definitions

Plaintiffs' proposed class definitions have been a moving target, with each revision introducing a new set of issues.  *See* ECF 255.[6]  For example, participants who paid copayments were excluded from the class as defined in the Second Amended Consolidated Complaint ("SACC"), but the class definitions in Plaintiffs' motion for class certification—which have since been amended—added them back in.  *See infra* n.6.

As currently crafted, Plaintiffs define the proposed classes and subclasses both by reference to certain language in their prescription drug benefit plans and by certain features of the transactions they completed pursuant to those plans.  Determining whether a participant is a member of a proposed class or subclass accordingly requires numerous steps.

*First*, each proposed class and subclass comprises certain participants in prescription drug benefit plans with particular snippets of language.  Specifically, an individual who participated in a prescription drug benefit plan may be a class member if that plan (1) had language stating that participants "may be required to pay a portion of the Covered Expenses," (2) had a section entitled "Covered Expenses" that included the phrase "incurs expenses for charges made by a Pharmacy,"[7] and (3) did not define the term "Deductible Payments" by reference to "the plan's Prescription Drug Charge."  ECF 253; ECF 254 at 2-3.  This is true regardless of any other language the plan might contain or what the insurance policy or ASO agreement for that plan provides.  An individual

---

[6] Plaintiffs made material revisions to their proposed class definitions on February 6, 2020, in connection with their Second Amended Consolidated Complaint ("SACC").  The class definitions in that complaint were different than the definitions in the drafts of the SACC that Plaintiffs shared with Defendants on December 16, 2019, and on January 31, 2020, only days before they filed their motion for leave to amend the complaint.  Plaintiffs again made material revisions to their class definitions on March 2, 2020 (in connection with their Motion for Class Certification), and on May 20, 2020 (in a Motion for Leave to Amend Class Definitions).

[7] Plaintiffs inaccurately characterize this as a definition of "Covered Expenses."  *See infra* Part I.1.d.  Plaintiffs also contend that plans using the word "incur" instead of "incurs" (*e.g.*, CIGNA04068668-8712 at 8694) satisfy this requirement of the class definition because "Plaintiffs consider the phrases to be substantively the same and to have the same legal effect."  Ex. 13.  Though Plaintiffs' position raises ascertainability problems, CHLIC will treat plans with "incur" and "incurs" interchangeably.

may be a subclass member if that individual's plan met the class definition and also provided that copayments would not "exceed the amount paid by the plan to the pharmacy." ECF 253. Plaintiffs contend that these snippets of plan language must be interpreted without reference to any other plan provisions and must be understood as guaranteeing that copayments (in the case of both the class members and subclass members) and deductible payments (in the case of only class members) would never exceed the Pharmacy Reimbursement Rate. ECF 206 at 2-3. Both of these contentions are wrong. *See infra* Part I. Apart from these isolated phrases, the language of the plans at issue can and do vary to reflect the plan-specific benefit design choices of each plan sponsor. *See infra* Part I; Ex. 20 at 120:11-121:25.

**Second**, participants in the class plans described above are members of the putative class only where, "according to the transaction data produced by [CHLIC] in this action," (1) "the copayment or deductible payment exceeds the amount the pharmacy agreed with [CHLIC] or the pharmacy benefit manager to accept for such drugs on a transaction-by-transaction basis," and (2) "the excess amount is credited or transferred to [CHLIC] or the pharmacy benefit manager." ECF 253. Participants in the subclass plans described above are members of the subclass if the same conditions are met, but only with respect to copayments, not deductible payments. *Id.* Plaintiffs have presented no evidence of the agreement between each pharmacy and CHLIC or "the pharmacy benefit manager," let alone whether and how each such agreement is reflected in "the transaction data produced by [CHLIC] in this action" or addresses credits or transfers by the pharmacy to "[CHLIC] or the pharmacy benefit manager."

## 2. Putative Class Representatives And Putative Class Members

The putative class representatives in this case—Kimberly Negron, Daniel Perry, and Billy

Ray Blocker, Jr.[8]—illustrate some of the many differences among putative class members:

- <u>Variations in Plan Language</u>:  Despite being class members by virtue of satisfying the requirements set forth above, there are material differences in the proposed class representatives' plan language.  *See infra* Part I.

- <u>Interactions with Plan Sponsors</u>:  Perry claims that he relied on oral representations by the plan sponsor about what he would pay for prescription drugs.  Negron and Blocker, by contrast, never spoke with their plan sponsors about their prescription drug benefits.

- <u>Interactions with Pharmacies</u>:  Blocker claims that he routinely discussed with his pharmacist whether his prescription drug payment would be lower if he did not use his benefits and relied on pharmacists to match prices at other pharmacies.  Negron and Perry, by contrast, claim that they never had any such conversations.

- <u>Use of Coupons</u>:  Blocker sometimes used coupons to satisfy his out-of-pocket payment obligations.  Perry, by contrast, denied using coupons for the prescription drug payments required under his CHLIC-administered prescription drug benefits.

- <u>Interactions with Plan Documents</u>:  Negron and Blocker do not recall reviewing their plan documents except in connection with this lawsuit.  Perry, by contrast, recalls looking at one plan document in past years, but not the section on prescription drug coverage.

- <u>Knowledge of CHLIC Practices</u>:  After learning of CHLIC's alleged misconduct and filing this lawsuit, Perry continued to fill prescriptions using his CHLIC-administered benefits.  Negron and Blocker, by contrast, claim they were unaware of CHLIC's alleged misconduct when they used their CHLIC-administered benefits to buy prescription drugs.

- <u>Current Relationship Between Plan Sponsor and CHLIC</u>:  CHLIC has no ongoing relationship with Cobb County, which sponsored Blocker's prescription drug benefit plan during the relevant period.  By contrast, CHLIC has an ongoing relationship with Hampton Resources, which sponsors Perry's prescription drug benefit plan.

Even the similarities between the putative class representatives illustrate how their experiences

differ from those of other class members, including:

- <u>Type of Cost-Share Payment</u>:  Under their CHLIC-administered prescription drug benefit plans, Negron, Perry, and Blocker paid only copayments for prescription drugs; they never made deductible or coinsurance payments.  Other putative class members made deductible and/or coinsurance payments for prescription drugs.  The plan language and financial

---

[8] Plaintiffs Roger Curol and Nina Curol are putative class members but have not sought to serve as class representatives.  Plaintiff Courtney Gallagher is neither a putative class representative nor a putative class member.

incentives relating to copayments are different from those that apply to coinsurance and deductibles.

- <u>Type of Benefit Funding Arrangement:</u>   The CHLIC-administered prescription drug benefit plans of Negron, Perry, and Blocker were self-funded, meaning the plan sponsor was responsible for paying claims.  Other putative class members were participants in fully insured benefit plans, meaning CHLIC was responsible for paying claims.

- <u>Participation in Benefit Design:</u>   Negron, Perry, and Blocker did not participate in designing their CHLIC-administered prescription drug benefits.  Other participants in class plans, by contrast, actually designed their CHLIC-administered prescription drug benefits and would have first-hand knowledge of the plan sponsor's intent.

A table summarizing certain record evidence of these differences is set forth at Ex. 2.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23."  *Id.* (quoting *Wal-Mart, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  The Court must conduct a "rigorous analysis" to determine whether a party seeking to certify a class has carried its burden under Rule 23 to "satisfy through evidentiary proof" both Rule 23(a) and at least one of the provisions of Rule 23(b).  *Id.*

To satisfy Rule 23(a), Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

Plaintiffs must also satisfy at least one subsection of Rule 23(b).  *See Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 345.  Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

23(b)(2).  Rule 23(b)(3) covers "individualized monetary claims," *Dukes*, 564 U.S. at 362, and requires Plaintiffs to show that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).

## ARGUMENT

### I.    Plaintiffs' Claims Do Not Present Questions Of Law Or Fact Common To The Proposed Classes

Plaintiffs seek to certify classes consisting of millions of participants in tens of thousands of different benefit plans maintained by thousands of different plan sponsors based on two supposedly "common" questions: whether class members "paid too much" for prescription drugs under their respective plans, ECF 206 at 9, and "whether Defendants' contract language prohibited them from 'clawing back' the copayment and deductible 'overpayments' that Defendants charged to Class Members," ECF 205 at 3.  But the crux of Rule 23(a)'s commonality requirement "is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original).  Common questions will satisfy Rule 23(a) only if they are "capable of classwide resolution" and "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Rule 23 requires the Court to conduct a rigorous analysis to determine whether relevant differences among the tens of thousands of plans at issue prevent classwide resolution of common issues.  *See, e.g.*, *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 548-49 (5th Cir. 2020) (vacating class certification order where plaintiffs sought to represent participants in more than 1,700 different plans for, among other things, failure to perform rigorous analysis of plan differences).  Where plans contain material differences such that the language of each plan would

need to be carefully considered to determine whether it has been violated, class certification is inappropriate. *See In re Aetna UCR Litig.*, 2018 WL 10419839, at *14 (D.N.J. June 30, 2018) ("[T]he varied nature of the [plan] terms poses insurmountable odds against class certification.").

Here, Plaintiffs' questions are not "capable of classwide resolution." Plaintiffs rely on the flawed premise that words or phrases in a plan must be read ***without*** reference to any other plan language or extrinsic evidence. But it is black-letter law that snippets of language should ***not*** be interpreted in isolation. Rather, benefit plans—whether or not subject to ERISA—must be interpreted "as a whole," with individual provisions—especially in the case of ambiguity—viewed in "the context of the entire . . . agreement." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *Dobson v. Hartford Fin. Servs. Grp., Inc.*, 389 F.3d 386, 399 (2d Cir. 2004). Plaintiffs' singular focus on a few snippets of language ignores material differences in other plan provisions and extrinsic evidence bearing on how much class members must pay for prescription drugs and how the Court will interpret each plan.

### 1.     Plan Variations Regarding Class Members' Prescription Drug Payments Defeat Commonality

ERISA does not regulate the content of welfare plans or require that any particular benefits be provided. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). As a result, ERISA gives each plan sponsor wide latitude to establish the terms of its own benefit plan(s), deciding what services to cover and the type and amount of benefits to provide. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) ("[E]mployers have large leeway to design disability and other welfare plans as they see fit.").

To understand the benefits a plan sponsor has chosen to offer, "[c]ourts use familiar rules of contract interpretation." *Dwinnell v. Fed. Express Long Term Disability Plan*, 167 F. Supp. 3d 287, 292 (D. Conn. 2016); *see Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir.

14

2002) ("In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions.").  One such well-established rule—applicable both to plans governed by ERISA and to plans not governed by ERISA—is that the Court must read the "Plan as a whole, [and] giv[e] terms their plain meanings."  *Fay*, 287 F.3d at 104; *see, e.g.*, *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) ("We begin with the basic contract law principle[] that contracts are to be interpreted as a whole" (citing Restatement (Second) of Contracts § 202(2) (1981) and 11 Richard A. Lord, Williston on Contracts § 32:5 (4th ed. 1999))).

Plaintiffs contend in their class certification briefing that certain snippets of language are the only provisions "relevant" to determining if class members paid the correct amount for prescription drugs.  ECF 206 at 9.  That is wrong.  Indeed, Plaintiffs themselves have argued that CHLIC "violated" dozens of plan provisions that are ***not*** the snippets of language on which their class certification briefing focuses.  Ex. 11 at 2-19.  Moreover, Plaintiffs acknowledge that there are other plan provisions, and other contracts, that are "necessary to interpret or construe" plan provisions, "including but not limited to, definitions of terms" in those provisions.  *Id.*  Such variations defeat commonality and strongly indicate that Plaintiffs' position on the merits of their claims cannot possibly be correct as to all class members.

### a.    Plans Vary Materially In How They Define Words Central To Plaintiffs' Theory

A number of plan variations materially influence the meanings of words and phrases at the heart of Plaintiffs' liability theory, often in a manner that directly contradicts Plaintiffs' interpretation of them.  For example, Plaintiffs contend that each class member's plan limits participants' copayments and deductible payments to "a portion of the Covered Expenses."  *See* ECF 206 at 1.  Plaintiffs' counsel declared under penalty of perjury that the plans "uniformly" and

"expressly" define that phrase "to include copayments and deductibles." ECF 207 at ¶ 5. That is false. Some plans provide that a participant "may be required to pay a portion of the Covered Expenses," but then clarify, "***That portion is the Coinsurance***." Ex. 46 at CIGNA01259054. For such plans, the phrase "a portion of the Covered Expenses" is expressly defined ***not*** to include copayments or deductibles. Plaintiffs do not explain how the phrase "a portion of the Covered Expenses" could limit deductible payments in plans where the definition of that "portion" makes no reference to deductible payments. Nor do Plaintiffs explain how the Court can ignore such important language to interpret all plans on a classwide basis.[9]

Similarly, Plaintiffs contend that the term "Covered Expenses" must refer to the Pharmacy Reimbursement Rate. ECF 206 at 1. But some plans have "Covered Expenses" provisions that specifically describe the amount a participant must pay as something other than the Pharmacy Reimbursement Rate. For example, some "Covered Expenses" sections require participants to pay the "***full cost with [the employer]'s discount***,"[10] *i.e.*, the Client Rate. Ex. 31 at CIGNA01393876. Plaintiffs do not explain how the term "Covered Expenses" always suggests participants should not pay more than the Pharmacy Reimbursement Rate when the "Covered Expenses" provision states expressly that participants must pay a different amount.

These material variations appear in some—but not all—class members' plans. Interpreting those plans would require consideration not just of the words and phrases on which Plaintiffs focus, but rather the entire plan document. Because the plans are not uniform, that cannot be accomplished on a classwide basis.

---

[9] It is not surprising that Plaintiffs do not address this deductible-specific issue, since none of the putative class representatives have paid any deductibles. *See infra* at Part III.

[10] The text of the plan refers to "CIGNA's discount," but the plan elsewhere provides that references to "CIGNA" shall be "DEEMED TO MEAN YOUR 'EMPLOYER' . . . ." Ex. 31 at CIGNA01393841.

16

**b.**      **Plans Vary Materially In How They Describe "Your Payments"**

Most plans describe some of the applicable limitations on participants' prescription drug payments in a section entitled "Your Payments."  In many plans, the "Your Payments" section directs participants to "refer to the Schedule for any required Copayments, Coinsurance, Deductibles or Maximums if applicable," and provides that their prescription drug coverage "is subject to the Copayment or Coinsurance shown in the Schedule, after you have satisfied your Prescription Drug Deductible, if applicable."  Ex. 36 at CIGNA08279068.  "The Schedule," in turn, provides an array of details—using a variety of language—describing prescription drug payment obligations.  Variations in "The Schedule" are often inconsistent with Plaintiffs' interpretation of the plan and, in themselves, defeat commonality.  *See* Ex. 3.

In some class members' plans, that is the extent of the language in the "Your Payments" sections regarding class members' prescription drug payments. Ex. 36 at CIGNA08279068.  But in other plans, the "Your Payments" section has other relevant provisions:

- "In no event will any Copayment or Coinsurance, as applicable, exceed ***the cost*** of the Prescription Drug or Related Supply." Ex. 44 at CIGNA08908679 (emphasis added).

- "In no event will the Copayment exceed ***the retail cost*** of the Prescription Drug or Related Supply." Ex. 47 at CIGNA09584212 (emphasis added).

- "In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed ***the amount paid by the plan to the Pharmacy***, or ***the Pharmacy's Usual & Customary (U&C) charge***." Ex. 27 at CIGNA00000170 (emphasis added).

These variations bear directly (and sometimes differently) on how participant payments will be determined.  Plaintiffs concede that phrases like these are relevant to their claims, as they define the subclasses by reference to the third phrase ("the amount paid by the plan to the Pharmacy") and claim that it "reinforc[es] the Pharmacy [Reimbursement] Rate cap" that they claim exists.

17

ECF 206 at 1.  But some of these variations do not "reinforc[e]" Plaintiffs' position because they contain no language that refers to the Pharmacy Reimbursement Rate.[11]

Plaintiffs ask the Court to interpret all class member plans identically regardless of whether they provide that copayments should not exceed "the cost" or "the retail cost" or "the amount paid by the plan to the Pharmacy" or "the Pharmacy's Usual & Customary (U&C) charge."  Plaintiffs would even have the Court interpret plans the same if they include *none* of this language.  Rule 23 does not allow the Court to ignore these material variations when deciding whether it can interpret the plans on a classwide basis.  *See Chavez*, 957 F.3d at 548-49.

### c.  Other Plan Variations Are Inconsistent With Plaintiffs' Theory

Some plans also contain additional phrases that, either by themselves or in combination with others, are inconsistent with Plaintiffs' theory.  For those plans, that additional language is relevant to interpreting the language at the heart of Plaintiffs' claims.

Plaintiffs contend, for example, that the snippets of language in their class definitions must be understood as a uniform limit on prescription drug payments at the Pharmacy Reimbursement Rate.  ECF 206 at 1.  But many plans state expressly how much participants must pay for prescription drugs, sometimes through a "minimum copay" obligation that participants must pay for certain types of drugs, *e.g.*, Ex. 39 at CIGNA02911724 ("30% subject to a *minimum copay of $25* and a maximum copay of $50"), other times by describing the copayment amount set forth in "The Schedule" as "*[t]he amount you pay*" for particular transactions, *e.g.*, Ex. 50 at CIGNA07381725.  Any given plan in the putative class may contain either, both, or neither of these phrases.  Yet Plaintiffs contend that a few other words or phrases common across these plans

---

[11] Even references to "the amount paid by the plan to the pharmacy" does not "reinforc[e]" Plaintiffs' position as to deductibles because that phrase does not refer to deductibles, and Plaintiffs do not contend that class members' deductible transactions violated this language.  ECF 206 at 3.

limit participant payments to some lesser amount.  Plaintiffs do not explain why the snippets they focus on would take precedence over other express terms clearly describing the flat dollar amount owed by participants.

To illustrate this inconsistency, suppose the Pharmacy Reimbursement Rate for a transaction was $5, but the plan explains to participants that "[t]he amount you pay" is a "minimum copay of $15."  To determine whether the participant should have paid $5 (Plaintiffs' theory) or $15 (CHLIC's position, depending on a number of other variables), the Court would have to interpret the plan as a whole to determine how the plan sponsor intended for the benefits to work.  That analysis would differ from plan to plan and is not capable of classwide resolution.

Similarly, Plaintiffs argue that the Pharmacy Reimbursement Rate always limits participants' prescription drug payments regardless of the amount of the Client Rate.  *See* ECF 206 at 1; Ex. 11 at 3.  But many plans explain that for certain types of drugs, participants must pay the full Client Rate, without any reference to the Pharmacy Reimbursement Rate.  For example, one plan provides "Specialty Medication" is covered only for one prescription filled at a retail pharmacy, and for subsequent fills, the participant "will be required to pay ***100% of [employer]'s discounted cost***," *i.e.*, the Client Rate.  Ex. 35 at CIGNA00013201.[12]  Plainly, the Court cannot conclude on a classwide basis that all participant payments are limited to the Pharmacy Reimbursement Rate when some plans expressly provide that specific transactions will require participants to pay the Client Rate.  Rather, the Court must consider the specific provisions of each plan document and reconcile any supposed inconsistencies to determine how much a participant should have paid for a given prescription drug.  This the Court cannot do on a classwide basis.

---

[12] The text of the plan refers to "Cigna's discounted cost," but the plan elsewhere provides that references to "CIGNA" shall be "DEEMED TO MEAN YOUR 'EMPLOYER' . . . ."  Ex. 35 at CIGNA00013174.

Plans in the proposed classes may also describe participants' prescription drug payments by reference to a variety of unspecified "costs."  *See, e.g.*, Ex. 51 at CIGNA00004609 ("If the cost of a Prescription Drug Product is less than the copay, then you pay ***100% of the cost.***"); Ex. 45 at CIGNA02661672 ("Maintenance Drugs" cost "$10 for the first 3 fills, then the plan pays 100% after plan deductible," and "[f]or refills after the 3rd fill, you pay ***100% of the cost***"); Ex. 40 at CIGNA02478566 ("Maintenance medications . . . must be filled through home delivery; otherwise after 3 retail refills, the normal copay will double (up to a maximum of ***the actual cost of the drug***)."); Ex. 42 at CIGNA00746567 ("When you or your Dependents purchase your Prescription Drugs or Related Supplies, you pay ***the full cost*** at the time of purchase."); Ex. 27 at CIGNA00000169 (participants who insist on a "more expensive 'brand-name' drug" must pay "the amount by which ***the cost of the 'brand-name' drug*** exceeds ***the cost of the 'generic' drug***, plus the required Copayment identified in the Schedule").  Such variations are not even limited to a single section of the plan.  *See* Ex. 3 (showing sample of material variations appearing in sections entitled "The Schedule," "Covered Expenses," "Your Payments," "Reimbursement/Filing a Claim," and "Limitations").  These variations complicate exponentially the task of plan interpretation because the Court must first determine what the unspecified "costs" refer to (*e.g.*, the Pharmacy Reimbursement Rate, the Client Rate, the retail cash price, or some other amount) before then proceeding to determine what amount (if any) a participant should pay for a given transaction.

Plaintiffs do not acknowledge any of these variations, let alone explain how to reconcile them on a classwide basis with the snippets of language in the class definitions.  They instead ask the Court certify a class by focusing exclusively on the phrases they reference without any analysis—let alone the "rigorous analysis" required under Rule 23—of other plan language

bearing on the central questions in the case.  Because the Court cannot analyze all of the relevant

provisions in each plan document on a classwide basis, Plaintiffs' classes lack commonality.

### d.   Apparent Ambiguities Would Require Consideration of Extrinsic Evidence

The need for plan-specific inquiries is particularly acute because the snippets of language

on which Plaintiffs rely—with or without other consistent or inconsistent language in the different

plans—may present ambiguities that should be resolved through plan-specific evidence of plan

sponsor intent.  *See Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 2018 WL 4253152(LGS), at

*9 (S.D.N.Y. Sept. 6, 2018) (denying motion for class certification where agreements were

"ambiguous as to the central issue of [the] case").  Even if phrases are not ambiguous in isolation,

viewing them in the context of a plan as a whole could generate ambiguities.  For example, in

*Versico, Inc. v. Engineered Fabrics Corp.*—cited by Plaintiffs in opposition to CHLIC's motion

to dismiss Blocker's state law claims—the contract at issue contained an unambiguous provision

disclaiming any third-party beneficiaries.  520 S.E.2d 505, 508 (Ga. Ct. App. 1999).  Were that

provision viewed in isolation, any third-party beneficiary claim would fail as a matter of law.

Another provision, however, stated that Versico assumed the obligation "to pay" warranties issued

to third parties and thus supported the plaintiff's third-party beneficiary status.  *Id.*  The court

recognized that conflicting language as an ambiguity and then considered an array of contract-

specific extrinsic evidence to determine what the parties intended by their ambiguous contract.  *Id.*

With respect to the language here, Plaintiffs contend that "The Schedule" must limit

prescription drug payments to a "portion of the Covered Expenses," that "Covered Expenses" must

refer to "charges made by a Pharmacy," and that "charges made by a Pharmacy" must refer to the

Pharmacy Reimbursement Rate.  *See* ECF 206 at 1.  But that is not the only way to interpret these

selectively quoted provisions.  For example, they could be read—and CHLIC and plan sponsors

do read them—as a basic description of prescription drug benefits:  CHLIC or the plan sponsor "will provide coverage" if a participant "incurs expenses" for non-specific "charges made by a Pharmacy," and the amount of such coverage is "shown in the Schedule."  To the extent the phrases Plaintiffs quote might actually limit prescription drug payments, a basic understanding of prescription drug benefits confirms that the phrase "charges made by a Pharmacy" does not necessarily refer to the Pharmacy Reimbursement Rate.  Retail pharmacies routinely "charge" (*i.e.*, ask to be paid) an amount more than they are ultimately reimbursed.  Ex. 20 at 87:15-88:12; Ex. 14 at 61:18-62:6; Ex. 5 at ¶¶ 3, 15, 23-29.  Of course, the Court should not conclusively determine at this stage what each of the thousands of putative class member plans mean; to the contrary, the meaning of each plan will depend on *each* of the plans read *as a whole*, and, where ambiguity exists, in light of extrinsic evidence of each plan sponsor's intent.

Similarly, with respect to the subclass language, Plaintiffs assume that the "amount paid by the plan to the Pharmacy" must refer to the Pharmacy Reimbursement Rate.  But the "amount paid by the plan" to CHLIC (*i.e.*, the Client Rate) may be different than the amount paid "to the pharmacy" by OptumRx, which has the contracts with those pharmacies (*i.e.*, the Pharmacy Reimbursement Rate).  Ex. 20 at 245:21-246:23.  And as in *Versico*, even if these phrases were unambiguous in isolation, they create ambiguity when they are read together with other plan provisions and in light of the relevant insurance policy or ASO agreement.

To resolve these apparent ambiguities and determine how much each class member was supposed to pay for each prescription drug under the terms of each class member's plan, the Court would have to "look to the language of the policy and other indicia of the intent of the policy's creator."  *Fay*, 287 F.3d at 104 (citation and internal quotations omitted); *see US Airways, Inc. v. McCutchen*, 569 U.S. 88, 89 (2013) ("Courts construe ERISA plans, as they do other contracts, by

'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'").  That analysis may require the Court to "look outside the plan's written language to decide what an agreement means," *id.* (internal quotation marks omitted), and to consider plan-specific testimony (*e.g.*, from plan sponsors, CHLIC account executives, and benefits brokers and/or consultants) and plan-specific documents (*e.g.*, bid documents describing plan sponsor benefit design choices, ASO agreements describing CHLIC's terms for administering self-funded benefits, and other implementation documents).  Ex. 7 at ¶¶ 10-11; Ex. 8 at ¶ 7; Ex. 9 at ¶ 4; *see* Ex. 10 at 31:19-21 (acknowledgment by Plaintiffs' counsel that both "***the ASO agreement*** and the Plan document will control" (emphasis added)).

These plan-specific inquiries may have a dispositive effect on plan interpretation, and class member claims may differ drastically depending on the plan sponsor's intent.  For example, ASO agreements sometimes (but not always) guaranteed that the Client Rate for certain classes of drugs (*e.g.*, retail brand drugs) would be the same as the Pharmacy Reimbursement Rate, confirming that plan sponsors understood that absent such guarantees, the Client Rate could be different than the Pharmacy Reimbursement Rate.  *See* Ex. 21 at CIGNA00002328; Ex. 22 at CIGNA00001830.  And the differential between the Client Rate and the Pharmacy Reimbursement Rate was disclosed expressly in many ASO agreements—including those between CHLIC and the sponsors of Plaintiffs' plans.   Ex. 21 at CIGNA00002329; Ex. 22 at CIGNA00001830; Ex. 23 at CIGNA12361830; Ex. 8 at ¶ 14.  How these disclosures bear on plan sponsor intent when resolving possible ambiguities in plan language is not capable of classwide resolution.

In sum, the supposedly "common" question of whether class members paid more than they should have for prescription drugs is actually not "common" because the amount each class member should have paid for prescription drugs in a given transaction is not capable of classwide

determination.  It requires individualized analyses of both tens of thousands of plan documents containing material variations and of plan-specific extrinsic evidence to identify and resolve ambiguities or inconsistencies when those plan documents are read as a whole.  *E.g.*, *Versico*, *supra*.  And then the plan must be applied to each class member's specific prescription, with benefits varying accordingly, as described *supra*.  Plaintiffs do not acknowledge these variations, let alone carry their burden under Rule 23 to demonstrate that their supposedly common question is "capable of class-wide resolution" through common proof notwithstanding them.

### 2.   Plaintiffs Fail To Satisfy Rule 23(a)'s Commonality Requirement With Respect To "Clawbacks"

Plaintiffs alternatively contend that a common question is "whether Defendants' contract language prohibited them from 'clawing back' the copayment and deductible 'overpayments' that Defendants charged to Class Members."  ECF 205 at 3.  Plaintiffs have failed to satisfy Rule 23(a)'s commonality requirement with respect to the question of "clawbacks."

What Plaintiffs call "clawbacks" are actually credits permitted by a series of contractual arrangements between retail pharmacies, OptumRx, and CHLIC.  Ex. 20 at 372:10-373:2. Plaintiffs have not identified any plan language prohibiting those revenue-sharing arrangements. The snippets of language on which Plaintiffs rely focus exclusively on the amount participants must pay for prescription drugs.  They do not address what pharmacies do with the money they receive, such as who (if anyone) they might pay with that money or how much (if any) they may keep.

Because Plaintiffs have not explained how these "clawbacks" between certain retail pharmacies and OptumRx or CHLIC violate the terms of even a single plan, they certainly have not explained how it would be possible to make that determination on a classwide basis with respect to tens of thousands of plan documents.  *See* Ex. 14 at 102:8-14, 103:10-104:13, 137:12-

24

16 (Plaintiffs' proffered expert testifying that plan documents must be read as a whole to determine whether they prohibit "clawbacks").  Nor have Plaintiffs shown they have standing to challenge revenue-sharing arrangements memorialized in contracts to which they are not parties and that did not increase their prescription drug payments.  *See, e.g.*, *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 84-87 (2d Cir. 2014) (plaintiffs lacked Article III standing and prudential standing to challenge agreements to which they were neither parties nor third-party beneficiaries).  Nor have Plaintiffs shown that all pharmacies agreed to the same revenue-sharing arrangements with OptumRx and CHLIC:  mail-order pharmacies are included in the proposed classes but were not even part of the OptumRx network.  Ex. 20 at 334:19-:335:8; Ex. 4 at ¶ 18 n.12.  Plaintiffs have made no showing that common proof may be used on a classwide basis to show that each plan prohibits "clawbacks."

### 3. Plan Variations Relating To The Standard Of Review Applicable To CHLIC's Plan Language Interpretation Defeat Commonality

#### a. Discretionary Authority

A "threshold issue" in plan interpretation is the appropriate standard of review that a court should apply.  *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (ERISA).  An administrator's plan interpretation is generally reviewed *de novo* unless a plan vests the administrator with discretion, in which case its decision is subject to arbitrary and capricious review.  *Id*.[13]  Where it applies, arbitrary and capricious review extends to plan interpretations and determinations made by the administrator outside the administrative claims process, including for the first time in litigation.  *Conkright v. Frommert*, 559 U.S. 506, 518-22 (2010).  Because a plan may confer discretion in different ways, there are no "magic words" required to warrant arbitrary

---

[13] The same is true in the context of state law claims.  *See, e.g.*, *Fla. Tube Corp. v. MetLife Ins. Co. of Conn.*, 603 F. App'x 904, 907-08 (11th Cir. 2015) (applying abuse-of-discretion standard to insurer's determination under plan with discretionary language governed by state law).

and capricious review.  *Elizabeth W. v. Empire Healthchoice Assurance, Inc.*, 709 F. App'x 724,

726 (2d Cir. 2017); *see Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 48-49 (2d Cir. 1996)

(deferential standard applies where plan covered nursing care if it was "essential, ***in our judgment***,

for the treatment") (emphasis added).  To determine whether that deferential standard applies, the

plan must be read as a whole.  *See, e.g.*, *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-

23 (2d Cir. 2008) (discretionary authority conferred on defendant by "[t]wo clauses within the

Plan's Supplemental Certificate governing care provided by out-of-network providers").

    Here, the Court will have to evaluate whether the language in each class member's plan

affords CHLIC discretion to interpret and apply its terms.  *Pagan*, 52 F.3d at 441.  Plaintiffs

concede the relevance of discretionary authority by claiming (among other things) that CHLIC

"violated" the "Discretionary Authority" provisions in Perry's and Negron's plans, Ex. 11 at 4-19,

and by claiming (albeit without record support) that the ERISA plans at issue "uniformly granted

Cigna the express 'discretionary authority' to 'apply plan terms . . . in connection with its review

of claims under the plan,' including 'the computation of any and all benefit payments,'" ECF 206

at 3.  But regardless of ERISA status, not all class member plans confer discretionary authority the

same way or for the same decisions.  *See, e.g.*, Ex. 34 at CIGNA04347857.  For example, some

grant discretionary authority to the plan sponsor for "initial claim determination" and only grant

CHLIC discretionary authority "to determine whether a claim should be paid or denied ***on appeal***

and according to the Plan provisions."[14]  Ex. 51 at CIGNA00004602.  Moreover, as in *Krauss*,

discretionary language can and does appear in more than one plan provision.  For example, some

plans (but not all) provide that CHLIC, "***in its discretion***, will calculate Covered Expenses."  Ex.

27 at CIGNA00000177 (emphasis added).  Similarly, some plans (but not all) provide that if

---

[14] For class members in self-funded plans with that language who did not file an appeal, CHLIC would not even be an
appropriate defendant.  *See infra* at V.2.

"*Cigna determines*" that a prescription filled in connection with the rendering of "Emergency Services" cannot "reasonably be filled by a Network Pharmacy," it will be "covered by Cigna as if filled by a Network Pharmacy."  Ex. 53 at CIGNA00807134 (emphasis added).  Whether a given plan delegates to CHLIC discretionary authority with respect to certain transactions (*e.g.*, "Emergency Services") or to certain processes (*e.g.*, appeals, but not claims) or to all aspects of plan administration requires consideration of a number of plan provisions.  "Plaintiffs' deceptively simple question will require individual determinations based on different plans at different points in time where [an administrator] enjoyed different amounts of discretion and could yield a kaleidoscope of 'yeses' and 'nos' across the class" and thus precludes class certification.  *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 290 (D.N.J. 2013).

### b.    Claims And Appeals Procedures

Determining the applicable standard of review could also vary from plan to plan based on the claims and appeals procedures set forth in each plan document.  Plaintiffs previously argued that CHLIC's interpretation is not entitled to deference because CHLIC failed to maintain reasonable claims procedures consistent with applicable Department of Labor regulations.  *See* ECF 123 at 6-13; *see also* 29 C.F.R. § 2560.503-1; *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016).  Evaluating the reasonableness of a plan's claims procedures—and, by extension, the applicable standard of review—requires consideration of both how the plan defines what is a "claim" and the procedures relating to that "claim," as the Department of Labor has explained. U.S. Dep't of Labor, Emp. Bens. Sec. Admin., *Benefit Claims Proc. Reg. FAQs* at A-7, A-11, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/benefit-claims-procedure-regulation.  Neither of those is capable of classwide resolution.

Across the plans at issue, the provisions bearing on what constitutes a prescription drug benefit "claim" are not uniform.  Some plans expressly provide that "[a] prescription given to a

pharmacist is *not* a claim for benefits under the Plan," and a "claim" only happens when a participant seeks reimbursement for some amount actually paid at the point of sale.  Ex. 51 at CIGNA00004638 (emphasis added).  Plans also vary in that some require claim forms for all prescription drug transactions (*e.g.*, Ex. 42 at CIGNA00746567) while others require them only for out-of-network transactions (*e.g.*, Ex. 48 at CIGNA00001704) or only in specific situations, (*e.g.*, Ex. 27 at CIGNA00000170 (no claim form required "unless you are unable to purchase Prescription Drugs at a Participating Pharmacy for Emergency Services").  Yet other plans (like Negron's) also involved a "wrap document" that is part of the plan and that provides a further description of what constitutes a "claim."  Ex. 26 at §§ 12.1, 13.1.  Whether the point-of-sale transaction constitutes a "claim" that implicates the Department of Labor regulations—and whether any class member otherwise submitted (or tried to submit) a claim under a plan—is a threshold question that may affect the standard of review but is incapable of classwide resolution.

Even after identifying what constitutes a "claim," assessing the reasonableness of particular procedures for claims and appeals is a plan-specific endeavor.  For example, at the motion-to-dismiss stage, Plaintiffs argued that the claims and appeals procedures in the plans of Negron and Perry addressed only "coverage decisions" rather than complaints about benefit calculations.  ECF 123 at 12; *see, e.g.*, Ex. 27 at CIGNA00000184.  By contrast, some class members' plans have claims and appeals procedures that are *not* limited to "coverage decisions."  *See, e.g.*, Ex. 37 at CIGNA01113386 ("Cigna has a two-step appeals procedure to review *any dispute you may have with Cigna's decision, action or determination.*" (emphasis added)).  Plans also vary in how many levels of appeal they allow.  *See* Ex. 3; Ex. 37 at CIGNA01113386; Ex. 33 at CIGNA01116779.  The reasonableness of these procedures is a threshold question that Plaintiffs admit affects the

standard of review applicable to each class member's claim.  These determinations are not capable of classwide resolution through common proof.

## II.     Fundamental Intraclass Conflicts Preclude Class Certification

Rule 23(a)'s adequacy requirement is designed "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).  It prevents certification when an intraclass conflict is "fundamental," *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011), meaning that members of a proposed class "have interests that are 'antagonistic' to one another." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

The quintessential example of a fundamental conflict precluding class certification is a situation in which "some class members claim to have been harmed by the same conduct that benefited other members of the class." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).[15]   "[N]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Id.* at 1190 (collecting cases). *See Peters v. Aetna Inc.*, 2019 WL 1429607, at *9 (W.D.N.C. Mar. 29, 2019) ("A proposed class challenging conduct that did not harm—and in fact benefited—some proposed class members fails to establish the commonality required for certification.").

Plaintiffs' claims create fundamental intraclass conflicts that preclude class certification because many class members benefited from the method CHLIC used to adjudicate their

---

[15] *See also Dewey v. Volkswagen*, 681 F.3d 170, 184 (3d Cir. 2012) (same); *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (same); *Torres v. Am. Airlines, Inc.*, 2020 WL 3485580, at *12 n.9  (N.D. Tex. May 22, 2020) (same); *Johnson v. Evangelical Lutheran Church in Am.*, 2013 WL 1249151, at *10 (D. Minn. Mar. 26, 2013) (adequacy requirement not satisfied where class representatives' theories "would harm a majority of the class members" and absent class members "benefited from the [fiduciary's] decisions").

prescription drug transactions and would be harmed by the method Plaintiffs argue CHLIC should have used.  Some plans at issue (like those of the proposed class representatives) were designed by plan sponsors to guarantee that class members would never pay more than the Client Rate for prescription drugs.  Ex. 20 at 360:18-361:13; Ex. 8 at ¶ 7.  CHLIC adjudicated transactions covered by those plans consistent with that benefit design.  Plaintiffs contend that CHLIC was wrong to use the Client Rate as a cap on those class members' prescription drug payments and instead should have used the Pharmacy Reimbursement Rate as a cap.  Ex. 11 at 27-33.  They ask the Court to order the classwide "reprocessing of claims and recalculation" of those transactions using the Pharmacy Reimbursement Rate instead of the Client Rate as a cap on class members' prescription drug payments.  ECF 206 at 18.

Whenever the Pharmacy Reimbursement Rate was *higher* than the Client Rate paid by a class member, Plaintiffs' theory would result in that class member *owing more*—not less—for prescription drugs.  Take, for example, the following transaction:

| U&C | Plan Copay | Client Rate | Pharmacy Reimbursement Rate | Actual Participant Payment (CHLIC's Method) | Reprocessed Participant Payment (Plaintiffs' Method) | Change in Participant Payment Due to Reprocessing |
|---|---|---|---|---|---|---|
| $28.12 | $10.00 | $5.41 | $9.93 | $5.41 | $9.93 | $4.52 |

CHLIC's method capped the class member's prescription drug payment at the Client Rate of $5.41, but the Pharmacy Reimbursement Rate for the transaction was $9.93.  As a result of Plaintiffs' proposed "reprocessing" or "recalculating" of that transaction, the class member will owe $4.52 more than previously paid.  *See also* Ex. 4 ¶¶ 125-39.

This fundamental conflict of interest is not a mere theoretical or isolated concern.  There are *millions* of transactions like the one described above in which a class member paid the Client Rate, but Plaintiffs' theory of the case would result in the class member paying a *greater* amount.

30

Ex. 4 at ¶¶ 102-07, 125-38.  And many putative class members would owe more under Plaintiffs' method not just on particular transactions but on a net basis:  applying Plaintiffs' method instead of CHLIC's method would result approximately ***335,000 class members***—including more than ***190,000 subclass members***—owing ***more*** for prescription drugs in the aggregate over the course of their entire transaction history with CHLIC.  Ex. 4 at ¶¶ 105-06.  *See also Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (noting "the error of the tacit assumption underlying the across-the-board rule that all will be well for surely the plaintiff will win and manna will fall on all members of the class") (internal quotations and citations omitted); Ex. 37 at CIGNA00000177 (authorizing CHLIC or the plan sponsor to recover amounts owed from participants).

This fundamental conflict of interest is particularly acute between class members with only copayment transactions (such as the proposed class representatives) and putative class members with deductible transactions.  For a copayment transaction, subject to exceptions described above, a class member generally would not pay more than the copayment amount set forth in the applicable plan document for a given drug or in a given circumstance.  Ex. 4 at ¶ 127.  But for a deductible transaction, a class member could be required to pay as much as the entire deductible, which is often an amount much greater than a copayment and could even be thousands of dollars.  Ex. 4 at ¶ 127.  More than ***100,000 class members*** with deductible transactions were ***better off under CHLIC's real-time adjudication of their deductible transactions*** than they would be under the theory devised by Plaintiffs' lawyers *ex post facto*.  Ex. 4 at ¶¶ 137-39.  The Court cannot certify a class in the face of such glaring intraclass conflicts.

## III.   Plaintiffs Cannot Fairly and Adequately Protect the Interests of Class Members

The requirements of Rule 23(a) serve as "guideposts" for determining whether the proposed class representatives' claims and the class claims "are so interrelated that the interests of the class member will be fairly and adequately protected in their absence." *Sykes v. Mel S. Harris*

31

& *Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015) (citing *Dukes*, 564 U.S. at n.5).  They are intended

to ensure that "class representatives have the incentive to prove all the elements of the cause of

action which would be presented by the individual members of the class were they initiating

individualized actions."  *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 63 (E.D.N.Y. 2015)

(quoting *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006)).  Class

certification is inappropriate when class representatives lack that incentive because the "focus of

the litigation" is shifted "to the detriment of the absent class member."  *Traver v. Lowe's Home*

*Ctrs., LLC*, 2016 WL 880169, at *3 (E.D.N.Y. Mar. 1, 2016); *see Bentley v. Verizon Bus. Glob.,*

*LLC*, 2010 WL 1223575 (S.D.N.Y. Mar. 31, 2010).

   This sprawling putative class action fails Rule 23(a)'s typicality requirement in several

respects.  For one, the proposed class representatives engaged only in copayment transactions and

have no incentive to prove that class members' deductible payments were miscalculated.  These

misaligned incentives are material because deductibles operate very differently than copayments.

For example, copayments are often defined as a flat amount due on a transaction-by-transaction

basis, but deductibles typically accumulate over the course of a plan year and may accumulate

differently for different types of transactions (*e.g.*, out-of-network vs. in-network, individual vs.

family, medical vs. prescription drug).  Ex. 4 at ¶¶ 116-17; Ex. 3.  Similarly, many plans have

terms that apply only to deductibles, while other terms (such as the snippet of language defining

the subclasses) apply only to copayments.   Plaintiffs have not even acknowledged these

complexities, let alone offered a method for resolving them on a classwide basis—presumably

because they did not personally pay any deductibles, and they do not have deductible claims to

pursue.[16]

---

[16] Tellingly, Plaintiffs distinguished between copayments and deductible payments when their SACC abandoned all
class claims based on copayments and focused exclusively on deductible payments.  ECF 198 ¶¶ 179-80.  Without

This case also presents numerous defenses unique to the proposed class representatives that "threaten to become the focus of the litigation" and thus preclude certification. *Belfiore*, 311 F.R.D. at 64 (quoting *Butto v. Collecto Inc.*, 290 F.R.D. 372, 384 (E.D.N.Y. 2013)). For example, the proposed class representatives were participants only in self-funded benefit plans, but they seek to represent class members with fully insured benefit plans. Plaintiffs' claims will therefore face arguments specific to self-insured benefit plans, including (a) CHLIC is not responsible for funding benefits and thus cannot be liable for benefits due, *see* Ex. 21 at CIGNA00002319; Ex. 22 at CIGNA00001820-21; Ex. 23 at CIGNA12361819; *see also Brand v. AXA Equitable Life Ins. Co.*, 2008 WL 4279863, at *2 (E.D. Pa. 2008); *Poonawala v. AIG Claim Servs., Inc.*, 2006 WL 8436586, at *2 (N.D. Ala. Nov. 20, 2006); (b) CHLIC no longer provides administrative services to hundreds of plans at issue and is therefore not a proper defendant as to claims to enforce those plans, *see infra* Part V.2-3; (c) CHLIC does not exercise "total control" over claims for benefits for some self-funded plans and is thus not an appropriate defendant in an action under ERISA § 502(a)(1)(B), *see infra* Part V.2; (d) to the extent class members, like Blocker, claim to be third-party beneficiaries of ASO agreements between CHLIC and plan sponsors, negotiated dispute resolution provisions in those ASO agreements may apply, Ex. 23; and (e) CHLIC disclosed in ASO agreements the differential between the Client Rate and the Pharmacy Reimbursement Rate, Ex. 21 at CIGNA00002329; Ex. 22 at CIGNA00001830; Ex. 23 at CIGNA12361830. These issues are irrelevant to the claims of class members who participated in fully insured plans. Similarly, none of the proposed class representatives exhausted their administrative remedies. ECF 198 ¶¶ 192-99. Their failure to exhaust means that their ERISA claims may be premature or even

---

explanation—though presumably in an attempted end-run around the fact that they have no proposed class representative who paid a deductible—Plaintiffs' motion for class certification reintroduced copayment transactions back into the class definition.

barred.  *See DelGreco v. CVS Corp.*, 337 F. Supp. 2d 475, 484-85 (S.D.N.Y. 2004), *aff'd*, 164 F. App'x 75 (2d Cir. 2006).  But some class members presumably will have exhausted and are not subject to that potential defense.

## IV.     Plaintiffs Cannot Satisfy Rule 23(b)(2)

Plaintiffs do not dispute that Rule 23(b)(2) certification is not available for their state law and civil RICO claims, but they contend that it is available for their ERISA claims so that the Court may order the "reprocessing of all affected prescription drug claims and recalculation of all class member benefits."[17]  ECF 206 at 12.  Plaintiffs are wrong.

### 1.     CHLIC Has Not "Acted Or Refused To Act On Grounds That Apply Generally To The Class"

Certification under Rule 23(b)(2) is appropriate only when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360-61.

Plaintiffs have not made the threshold showing that CHLIC "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  To the contrary, CHLIC calculated class members' prescription drug payments according to the specific benefit designs set forth in tens of thousands of different plan documents, as selected by the applicable plan sponsor and as applied to the particular circumstances of each class member.  Those designs are not the

---

[17] In the SACC, Plaintiffs suggested that they were seeking prospective injunctive relief and other equitable remedies, such as disgorgement.  *See, e.g.*, ECF 198 ¶¶ 224, 234.  Those forms of relief are wholly unaddressed in their briefing. That is not sufficient to satisfy Plaintiffs' burden under Rule 23.

same for all plans containing the class or subclass language.  Even Plaintiffs contend that some plans with the **same** class or subclass language demand **different** methods of calculating prescription drug payments.  *Compare, e.g.*, Ex. 11 at 32 (Perry 2015 & 2016), *with* Ex. 11 at Ex. 11 at 32-33 (Blocker 2014 & 2015).  "Merely answering the question of whether a single injunction could provide class-wide relief would require individualized, plan-by-plan determinations, because this case is, at its heart, a contract dispute."  *Lipstein*, 296 F.R.D. at 292.  And an injunction that essentially directs CHLIC to calculate individualized payments to class members according to the terms of materially distinct legal instruments is functionally indistinguishable from an award of individualized monetary damages that is not proper relief under Rule 23(b)(2).  *Dukes*, 564 U.S. at 361.

Plaintiffs suggest that two CHLIC practices supposedly constitute grounds that "apply generally to the class."  Neither warrants certification under Rule 23(b)(2).

The first is the alleged "practice of 'clawing back' copayments and deductibles."  ECF 206 at 12.  Plaintiffs' reference to "clawbacks" is a red herring because it has nothing to do with class members' rights under the terms of their respective benefit plans, or how their claims are processed or reprocessed.  *See supra* Part I.2.  Prohibiting "clawbacks" might affect the relationship between Cigna and OptumRx, or OptumRx and a pharmacy, as to which entity keeps how much of the money paid by the participant, but the amount of each class member's prescription drug payment would be unaffected, and there would be no need for any "reprocessing" or "recalculation" under the plans.  Ex. 20 at 370:10-371:4.  Insofar as an injunction against "clawbacks" would not concretely benefit class members, they lack Article III standing to pursue that relief and no class may be certified.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members

lacking Article III standing.").  Accordingly, a single injunction with respect to "clawbacks" does not justify the "reprocessing" and "recalculation" Plaintiffs seek.

The second "practice" is that CHLIC supposedly operated "a claims processing system that cannot track which Plan language applies to which claims" and "does not 'apply plan terms' to the 'review of claims' and the 'computation of any and all benefit payments' . . . ."  ECF 206 at 13-14.  This argument is based on a gross mischaracterization of CHLIC's statement that it does not maintain in the ordinary course of business a standalone listing of every transaction in which the participant's plan contained certain snippets of language.  ECF 207-20 at 6 ("The requested information is not maintained by Cigna in the ordinary course of business *in the form and format requested by Plaintiffs*." (emphasis added)).  CHLIC has explained in detail how it "is able to trace a particular participant's benefit plan selection to the specific benefit plan" and how it "interprets and applies the terms of the applicable plans in adjudicating prescription drug transactions."  Ex.12.  CHLIC's statements confirm not just that CHLIC "set up a proper claims processing system" and is capable of "track[ing] which Plan language applies to which claims," but also that Plaintiffs cannot prove by a preponderance of the evidence that CHLIC is incapable of doing so on a classwide basis such that a single injunction may be warranted respecting the class as a whole.

## 2. Individualized Issues Defeat Rule 23(b)(2) Certification

"Rule 23(b)(2) classes must be cohesive."  *Robertson v. Sikorsky Aircraft Corp.*, 2000 WL 33381019, at *7 (D. Conn. July 5, 2001).  A class is "cohesive" if individualized issues and intraclass conflicts do not pervade the action.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 342-43 (S.D.N.Y. 2002); 2 Newberg on Class Actions § 4:34 (5th ed.) (Rule 23(b)(2)'s "cohesiveness" requirement is "similar to [Rule] 23(b)(3)'s demand that

common issues 'predominate'" and requires "that the class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues").

Here, plan-specific or individualized issues and intraclass conflicts destroy the classes' cohesiveness, particularly as to Plaintiffs' request for a single injunction directing the classwide "reprocessing of all affected prescription drug claims and recalculation of all class member benefits." ECF 206 at 12. For example, as explained above, many class members would be worse off if their benefits were recalculated using Plaintiffs' method as opposed to CHLIC's method. *See supra* Part II. *See also In re Aetna UCR Litig.*, 2018 WL 10419839, at *27 (denying (b)(2) certification, explaining "a single injunction ordering Aetna to reprocess the claims could potentially expose class members to liability from employers or otherwise violate the terms of some of the plans").

Also, CHLIC is no longer a claims administrator for many of the plans at issue and therefore cannot "reprocess[]" and "recalculat[e]" claims under those plans. *See Korman v. Consol. Edison Co. of N.Y., Inc.*, 915 F. Supp. 2d 359 (E.D.N.Y. 2013) (holding no ERISA cause of action lies against former third-party claims administrator); *Hall v. LHACO, Inc.*, 140 F.3d 1190 (8th Cir. 1998); *see also* Ex. 21 at CIGNA00002318; Ex. 22 at CIGNA00001820; Ex. 23 at CIGNA12361819. Because "[o]nly the Plan and the current plan administrator can pay out benefits," *Hall*, 140 F.3d at 1196, a single injunction for the benefit of all ERISA class members—including those whose plans are no longer administered by CHLIC—cannot issue. *See In re Aetna UCR Litig.*, 2018 WL 10419839, at *27; *Dukes*, 564 U.S. at 361-62 (Rule 23(b)(2) relief "must perforce affect the entire class at once").

Plaintiffs (at ECF 206 at 13-15) rely on cases that are distinguishable. In some, the court ordered a party to reassess participant eligibility for coverage after rejecting a single method used

to deny coverage to the plaintiff and/or class members.[18]  *See In re Aetna UCR Litig.*, 2018 WL

10419839, at *27 (distinguishing *Meidl* because "this Court is not faced with the binary question

of whether class members' treatment should have been covered or not").  In others, the individuals

all participated in a single plan that was subject to reformation.[19]  In none of the cases did the court

order the reprocessing of millions transactions pursuant to tens of thousands of plans without proof

that a common method was used to process those transactions in the first instance.

## V.     Plaintiffs Cannot Satisfy Rule 23(b)(3)

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  It requires the

Court to take a "'close look' at whether common questions predominate over individual ones,"

*Comcast*, 569 U.S. at 34, and at whether a class action is "superior to other available methods for

fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).

Each of the arguments raised above precludes findings of predominance and superiority.

Material variations in plan language mean that individualized and plan-specific inquiries as to how

much a participant should have paid for prescription drugs will overwhelm any common question.

*See supra* Part I; *Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 426 (D.N.J. 2014) (denying

class certification in part because plaintiffs could not "establish predominance as to the ERISA

---

[18] *See Meidl v. Aetna, Inc.*, 2017 WL 1831916, at *22 (D. Conn. May 4, 2017); *Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486, 509 (N.D. Cal. 2017); *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013).

[19] *See Amara v. Cigna Corp.*, 775 F.3d 510, 523 (2d Cir. 2014) (involving single ERISA retirement plan); *Laurent v. PriceWaterhouseCoopers LLP*, 945 F.3d 739, 742 (2d Cir. 2019) (involving single retirement plan); *LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 456-57 (N.D.N.Y. 2003) (involving single ERISA retirement plan).  And in *Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060 (9th Cir. 2016)—a case that was not even a class action—the court declined to address the appropriateness of injunctive or declaratory relief altogether.  Plaintiffs rely on *Estate of Barton* to rebut an argument that CHLIC is not making, namely that "the requested remedies are unmanageable due to the inadequacy of Cigna's own recordkeeping."  ECF 206 at 14.  Other than a mischaracterization of CHLIC's discovery response, Plaintiffs have no evidence to suggest that CHLIC's recordkeeping is inadequate.  To the extent the requested remedies are "unmanageable," it is because the proposed classes are overbroad.  Nothing in *Estate of Barton* relieves Plaintiffs of their burden under Rule 23 to demonstrate that class certification is warranted.

claims without engaging the particular plan language").   Similarly, material variations in plan language prevent the Court from determining and applying a classwide standard of review.  *See supra* Part I.3; *Lipstein*, 296 F.R.D. at 293.  Nor is a class action a superior method for fairly and efficiently adjudicating the controversy because hundreds of thousands of class members have materially adverse interests to those of the proposed class representatives.  *See supra* Part II-III.

Plaintiffs cannot satisfy Rule 23(b)(3) for yet additional reasons set forth below.

### 1.   Plaintiffs Have Not Offered A Method For Calculating Damages That Matches Their Liability Theory.

At the class certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case."  *Comcast*, 569 U.S. at 35.  The court must conduct a "rigorous analysis" to confirm that is so.  *Id.* (citing *Dukes*, 569 U.S. at 351-52).  It is not the case that "at the class certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurement may be.  Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Id.* at 36 (emphasis in original).  If a model fails to measure damages from the particular injury on which Plaintiffs' liability is premised, it cannot support class certification.  *Id.*; *Franco*, 299 F.R.D. at 430 (denying class certification in part because of "a disconnect between plan language and the method proposed by Subscriber Plaintiffs to determine the class members' damages in a cohesive manner").

Plaintiffs rely on their expert, Launce B. Mustoe, Jr., R.Ph. to argue that "damages" are capable of classwide resolution through common proof.  But Mustoe's methodology is inconsistent with Plaintiffs' liability theories.  *See* ECF 279 at 14-24; *see generally* Ex. 4.

a.    **"Clawbacks" Are Not A Proper Measure Of Relief Because They Do Not Measure How Much Class Members Would Have Paid For Prescription Drugs Under Plaintiffs' Theory**

Mustoe's use of "clawbacks" to calculate "damages" is inconsistent with Plaintiffs' liability theory.  *See* ECF 279 at 14-24  If class members paid more for prescription drugs than they should have under the terms of their respective prescription drug benefit plans, then they would recover the difference between what they actually paid and what they should have paid "under the terms of [the] plan."  29 U.S.C. § 1132(a)(1)(B); *see Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.").[20]  Mustoe does not purport to measure that amount.  Indeed, he admits that he did not try to determine how CHLIC adjudicated class members' prescription drug transactions in the first instance and did not purport to apply Plaintiffs' methodology to determine how much class members should have paid for prescription drugs if their claims were reprocessed. Ex. 14 at 185:1-13.  Instead, he adds up the alleged "clawbacks" paid by OptumRx to CHLIC pursuant to an arrangement to which class members are not parties.  But Plaintiffs have not identified any plan language prohibiting "clawbacks."  *See supra* Part I.2.  Calculating the amount of "clawbacks" does not actually prove the amount that class members should recover if they prevail, and certifying a class based that arbitrary measure—and without real proof that the relief in this case is capable of classwide resolution—"would reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Comcast*, 569 U.S. at 36.

There are several reasons for this.  First, Mustoe's methodology ignores plan-specific deductibles and out of pocket maximums, which affect whether the plan will help pay for a given

---

[20] The mismatch between Mustoe's methodology and Plaintiffs' RICO liability theory is discussed *infra* at Part V.4.

prescription drug transaction (deductible) or pay the full amount (out of pocket maximum). Satisfaction of an out-of-pocket obligation for a given plan year is a function of the plan terms and amounts paid out-of-pocket on prior transactions (for prescription drugs or all medical benefits, for an individual or family, all depending on the specific plan terms).  "Because of the impact of plan terms such as the deductible and out-of-pocket maximum," the effect of CHLIC's challenged conduct "on any particular participant or claim can only be assessed through a detailed analysis of an individual participant's claims history considered in the context of that participant's particular plan."  *Peters*, 2019 WL 1429607, at *8-9.  Mustoe did not perform any such analysis of deductibles or out-of-pocket maximums.  Nor did he purport to apply those benefit designs to each class member's transaction history to determine how much each class member should have paid had the benefits been calculated using Plaintiffs' theory as opposed to CHLIC's theory.  Ex. 14 at 104:15-105:11; 121:9-123:8; 184:9-18; 187:4-189:5; 234:14-236:19.  That cannot satisfy Rule 23. *See Franco*, 299 F.R.D. at 430 (denying class certification in part because of "a disconnect between plan language and the method proposed by Subscriber Plaintiffs to determine the class members' damages in a cohesive manner").

Second, Mustoe's methodology is inconsistent with Plaintiffs' liability theory because it effectively uses the Client Rate as a cap on class members' prescription drug payments even though Plaintiffs contend the Client Rate plays no role in that calculus.  Plaintiffs contend class members' plans never refer to the Client Rate and that CHLIC should have used the Pharmacy Reimbursement Rate as a cap instead.  Ex. 11 at 27-33.  But rather than replacing the Client Rate with the Pharmacy Reimbursement Rate to determine what a class member should have paid under Plaintiffs' theory, Mustoe's methodology effectively considers both the Client Rate and the Pharmacy Reimbursement Rate as caps on class members' prescription drug payments.  Ex. 4 at

¶¶ 77- 101; ECF 279 at 11-12, 22-23.  That is fundamentally at odds with Plaintiffs' articulation for how class members' prescription drug payments should have been calculated.

><b>b.</b>    <b>Mustoe's Methodology Is Inconsistent With Plaintiffs' Class Definitions</b>

To identify transactions by the putative classes and subclasses, Mustoe proposes to use special reports generated by CHLIC for purposes of litigation ("DST Reports") listing certain information about plan and plan-related documents created in one of CHLIC's databases and containing a particular snippet of language identified by Plaintiffs.  Plaintiffs claim that Mustoe can use the DST Reports "to match transactions from the first date [an] employer had any Plan with the relevant language to the last date the employer had a Plan with the relevant language." ECF 206 at 17.  But Mustoe's use of the DST Reports is flawed in three respects:  (1) the phrases used to generate the DST Reports do not match the language in Plaintiffs' class definitions, *see* ECF 279 at 24-27; Ex. 4 at ¶¶ 51-59; (2) the DST Reports do not reliably identify when (if ever) a plan document was operative, *see* ECF 279 at 28; Ex. 4 at ¶¶ 60-63; and (3) Mustoe both *overstates* the number of class transactions by ignoring Plaintiffs' stated position that all transactions pursuant to plans that describe deductible payments by reference to a "Prescription Drug Charge" are *not* actionable, *see* ECF 279 at 28-29; Ex. 4 at ¶¶ 69-71, and *understates* that number by ignoring Plaintiffs' position that participants in some plans *not* listed on DST Reports *should* be class or subclass members, *see* ECF 279 at 30-31; Ex. 4 at ¶ 54.  He also fails to require that members of each subclass be members of a corresponding class, a result that is antithetical to Plaintiffs' proposed class structure.  *See* ECF 279 at 31-32; Ex. 4 at ¶ 40.[21]

---

[21] Plaintiffs argue that Mustoe's methodology for identifying class members and determining liability is sufficient because it is accurate "to a significant and reasonable degree."  ECF 206 at 17.  Even if that were so (and it is not), that is not the proper standard.  The cases Plaintiffs cite to the contrary are distinguishable because they focus on the need for a reasonable measure of damages, ECF 206 at 17-18; they do not allow for the use of a flawed proxy to substitute for reading a benefit plan to determine whether it actually contains the phrases that Plaintiffs contend are actionable and whether particular people are members of the classes and subclasses Plaintiffs have proposed.

### 2.  Individualized Issues Specific To ERISA Claims Defeat Predominance

Individualized issues specific to ERISA claims defeat predominance.  As a threshold matter, determining whether a benefit plan is subject to ERISA requires a close analysis of "the nature of the institution that maintains the plan."  *Schalit v. Cigna Life Ins. Co. of N.Y.*, 539 F. Supp. 2d 715, 717 (S.D.N.Y. 2008).  Disputes regarding the applicability of ERISA is often a major focus of litigation.  *See, e.g.*, *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1663 (2017); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 921 (2d Cir. 1987).  Plaintiffs have not shown that the ERISA status of any given benefit plan is capable of classwide resolution. They intend to rely on notations in CHLIC's systems regarding whether ERISA governs a particular plan, but those notations are not conclusive legal determinations about the applicable governing law.  *See, e.g.*, *Schalit*, 539 F. Supp. 2d at 717.  And even if CHLIC's systems reflect that the plan is subject to ERISA, some class members may prefer to argue that their claims are governed by state law because of the remedies available, jury trial right, or otherwise.  *Mayer v. Mercy Health Servs., LLC*, 2019 WL 527964, at *6 (E.D. Mo. Feb. 11, 2019) (remanding claim to state court despite Cigna Group Insurance argument that plan was governed by ERISA and had filed ERISA Form 5500s for the plan for several years; holding that evidence was insufficient to determine whether the plan satisfied the statutory elements of the church-plan exemption).

Even for plans subject to ERISA, determining whether CHLIC is a proper defendant with respect to self-funded plans requires additional plan-specific analyses.  A claims administrator may be a proper defendant under ERISA § 502(a)(1)(B) only when it "exercises total control over claims for benefits under the terms of the plan."  *N.Y. State Psychiatric Ass'n*, *Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 132 (2d Cir. 2015).  Where a claims administrator does not exercise complete control over the claims process, it is not a proper defendant under ERISA.  *See, e.g.*, *Easter v. Cayuga Med. Ctr. at Ithaca Prepaid Health Plan*, 217 F. Supp. 3d 608, 630 (N.D.N.Y. 2016)

43

(dismissing claims against claims administrator because it lacked "sole and absolute discretion to deny benefit"). Here, Plaintiffs have not shown that CHLIC exercised total control over claims for benefits under the terms of every plan at issue. In some plans, CHLIC clearly does ***not*** exercise such control. *See, e.g.*, Ex. 51 at CIGNA00004602 (reserving discretionary authority for the plan sponsor to make the "initial claim determination"). Determining whether CHLIC is a proper defendant thus requires a plan-by-plan analysis.

Similarly, CHLIC is not a proper defendant as to self-funded plans for which it no longer provides administrative services. *See Hall*, 140 F.3d at 1190. Accordingly, no ERISA cause of action lies against CHLIC with respect to many class member transactions associated with many self-funded plans for which CHLIC no longer provides administrative services. Ex. 4 at ¶ 17. Moreover, whether CHLIC may be responsible for processing claims on behalf of self-funded plans sponsored by former CHLIC clients is determined by reference to the terms of the applicable ASO agreement. Ex. 21 at CIGNA00002318 & CIGNA00002331; Ex. 22 at CIGNA00001820 & CIGNA00001831. Plaintiffs do not address these additional plan-specific inquiries that cannot be resolved on a classwide basis and defeat predominance.

### 3. Individualized Issues Specific To State Law Claims Defeat Predominance

Plaintiffs devote less than a page to their argument that their state law claims for breach of contract[22] satisfy both Rule 23(a) and Rule 23(b)(3). ECF 206 at 19. They are wrong.

---

[22] Plaintiffs do not address their claim for breach of the implied covenant of good faith and fair dealing and thus have not satisfied their burden under Rule 23 with respect to that claim. Even if Plaintiffs had not abandoned that claim for class treatment (and they have), they could not satisfy Rule 23 because state law varies widely with respect to that implied covenant. *See Wathor v. Mut. Assur. Adm'rs, Inc.*, 87 P.3d 559, 562, *as corrected* (Okla. Jan. 22, 2004) (holding that third party administrator owed insureds no duty of good faith and fair dealing); *see also Yarger v. ING Bank, fsb*, 285 F.R.D. 308, 325 (D. Del. 2012) (denying class certification for implied covenant claim because "the states' laws vary as to whether there is an intent element and, if so, what intent must be proven").

Plaintiffs have not shown that choice-of-law issues can be resolved on a classwide basis. Individualized issues may be "exponentially magnified by choice of law considerations" such that they will "eclipse any common issues" and defeat class certification. *Georgine v. Amchem Prods.*, 83 F.3d 610, 618 (3d Cir. 1996); *Castano v. Am. Tobacco*, 84 F.3d 734, 749-50 (5th Cir. 1996). Plaintiffs have not addressed individualized choice-of-law issues—compounded by variations in the locations of both plan sponsors and class members—is capable of classwide resolution.

Similarly, common proof cannot determine whether CHLIC is a proper defendant with respect to state law claims associated with self-insured plans. For example, in CHLIC's motion to dismiss, the central question was whether CHLIC was a proper defendant when it was not a party to the plan document. Plaintiffs argued that a number of provisions appearing in Blocker's plan documents—including the Cigna logo—were material to determining whether CHLIC owed any obligations to Blocker under Georgia law. ECF 216 at 2-7. Plaintiffs also invoked the terms of the ASO agreement between CHLIC and Cobb County—an agreement to which Blocker was not a party and that expressly disclaimed the existence of third-party beneficiaries. *Id.* at 5. Plaintiffs have made no showing that the same provisions of plan documents or ASO agreements apply to every member of the state law class and subclass. Even then, in some states, CHLIC is entitled to sovereign immunity in connection with its administration of self-funded governmental benefit plans. *See Stegall v. TML Multistate Intergovernmental Emp. Benefits Pool, Inc.*, 2019 WL 4855226, at *5 (Tex. Ct. App. Oct. 2, 2019) ("third-party administrators for government health plans, including municipal plans, are immune from suit and liability").

Plaintiffs have similarly not carried their burden of proof regarding the uniformity of state law. The party seeking certification must "provide an extensive analysis of state law variations to reveal whether these pose insuperable obstacles." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724

(5th Cir. 2007); *see Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010).  But Plaintiffs have provided no meaningful analysis of variations in state law.  Plaintiffs' assurance that "[t]o the extent that any variations in state contract law do exist, they can readily be addressed" is insufficient to carry their burden.  ECF 206 at 19.

Plaintiffs note that "state contract law defines breach consistently," ECF 206 at 19 (citing *In re U.S. Foodservice*, 729 F.3d 108, 127 (2d Cir. 2013)), but state law must be uniform as to other issues to warrant class certification.  Other variations in state contract law regularly result in the denial of class certification.  For example, some states only permit the use of extrinsic evidence when a contract is ambiguous.[23]  California, on the other hand, "permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous."[24]  Similarly, some states allow extrinsic evidence to prove the existence of a latent ambiguity.[25]  Others do not.[26]  Unlike the plaintiffs in *U.S. Foodservice* who demonstrated that "all the relevant jurisdictions" adopted the same UCC provision governing extrinsic evidence, 729 F.3d at 127, Plaintiffs here have made no such showing.  Class certification should be denied.[27]

---

[23] *See, e.g.*, *Wigington v. Hill-Soberg Co., Inc.*, 396 So.2d 97, 98 (Ala. 1981) ("Extrinsic evidence may be admitted to interpret a contract only if the trial judge finds as a matter of law that the contract is ambiguous.").

[24] *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 826 (9th Cir. 2001).

[25] *See, e.g.*, *Baney v. Eoute*, 784 A.2d 132, 136 (Pa. Super. Ct. 2001) ("extrinsic facts and circumstances may be proved to show that language apparently clear and unambiguous on its face is, in fact, latently ambiguous").

[26] *See, e.g.*, *Emergency Assoc. of Tampa, P.A. v. Sassano*, 664 So.2d 1000, 1002 (Fla. Dist. Ct. App. 1995) ("[B]efore a trial court can consider such extrinsic evidence in interpreting a contract, the words used must be unclear such that an ambiguity exists on the face of the contract.").

[27] *See, e.g.*, *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 510-11 (D. Minn. 2014) (denying motion for class certification where court found that "[f]iguring out the laws of each of the 50 states with respect to the admissibility of extrinsic evidence would be difficult enough; fashioning a plan for applying those laws on a class basis would be nearly impossible."); *Gelfound v. Metlife Ins. Co. of Conn.*, 313 F.R.D. 674 (S.D. Fla. 2016) (denying plaintiff's second renewed motion for class certification where "it appear[ed] that both legal and factual questions regarding extrinsic evidence will predominate any legal and factual questions that are common to all putative class members" across 46 states); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 584 (E.D. Mich. 2004) (denying motion for class certification because the court found "significant variations in the [relevant] states' laws with respect to the use of extrinsic evidence").

### 4. Individualized Issues Specific To RICO Claims Defeat Predominance

RICO provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of" 18 U.S.C. § 1962.  18 U.S.C. § 1964(c).  Plaintiffs frame their RICO claim under 18 U.S.C. § 1962(c), which requires proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  "Racketeering activity" is defined with reference to specific predicate acts.  18 U.S.C. § 1961(1).  Here, Plaintiffs rely solely on predicate acts of mail and wire fraud.  SACC ¶ 283.

Plaintiffs have not carried their burden under Rule 23(b)(3) to show that questions common to the putative RICO class predominate over individualized issues.  Plaintiffs devote little more than a page of their brief to the RICO classes and do not address what common proof (if any) they would introduce as to critical elements of their RICO claim, such as CHLIC's alleged conduct of the affairs of OptumRx.[28]  That does not suffice under Rule 23 when, for example, CHLIC does not use OptumRx to contract with mail-order pharmacies and OptumRx contracts with some pharmacies *indirectly* through pharmacy services administrative organizations ("PSAOs").  Neither mail-order pharmacies nor PSAOs are addressed in Plaintiffs' class certification brief.

Plaintiffs' allegations of "uniform misrepresentations" are insufficient to certify their civil RICO claim.  ECF 206 at 20.  The alleged misrepresentations—snippets of plan language—are not actually "uniform" because their meaning must be determined from reading them in the context of each particular plan and, to the extent they are ambiguous, in light of extrinsic evidence of plan sponsor intent.  *See supra* Part I.  Material variations in plan language preclude any finding that the information communicated to each class member was "uniform."

---

[28] Plaintiffs have abandoned any argument that the RICO classes should be certified based on CHLIC's alleged conduct of the affairs of Argus, an alleged enterprise not mentioned in Plaintiffs' class certification briefing.

This is especially true because Plaintiffs' fraud claim is premised on the breach of a contractual promise set forth in the plan document and thus requires proof of "fraudulent intent [that] is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it." *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016). Because the snippets of language are representations ***by plan sponsors***— not CHLIC—regarding the benefits they will provide to class members, proving fraudulent intent to support a RICO claim would necessarily involve plan-specific inquiries into each plan sponsor's intent. *See Amara*, 563 U.S. at 437. Moreover, Plaintiffs bear the burden of proving "lack of good faith" to establish the predicate acts of mail or wire fraud on which their civil RICO claim is based. *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir. 1991). That requires proof not just of how each plan sponsor chose to design its benefits, but also of how CHLIC ***understood*** each plan sponsor chose to design its benefits.

Individualized issues of reliance similarly defeat predominance. It is well settled in the Second Circuit that plaintiffs must "demonstrate reliance on a defendant's common misrepresentation to establish causation under RICO." *In re U.S. Foodservice*, 729 F.3d at 119.[29] "Certification is inappropriate where 'reliance is too individualized to admit of common proof.'" *Id.* (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008)). Plaintiffs argue that class members' prescription drug payments and CHLIC's alleged efforts to conceal the Pharmacy Reimbursement Rate are circumstantial proof of reliance. ECF 206 at 20. But neither constitutes common proof of classwide reliance on the alleged "common misrepresentation," *i.e.*, the snippets of language in the class definitions. It cannot be inferred from the fact that a class

---

[29] Plaintiffs' observation that mail fraud may serve as a predicate act of racketeering under RICO "even if no one relied on any misrepresentation," ECF 206 at 20 n.10 (quoting *Bridge v. Phoenix*, 553 U.S. 639, 648-49 (2008)), does not excuse Plaintiffs from proving reliance to satisfy the causation element of their civil RICO claim.

member paid for prescription drugs that he or she did so in reliance on certain snippets of plan language or believed that his or her payment was no more than the Pharmacy Reimbursement Rate. Indeed, Negron and Blocker testified that they did not read their plan documents and thus could not have relied on the alleged "common misrepresentation" therein. Ex. 15 at 86:21-90:1, 99:2-17, 129:4-18, 138:-140:21; Ex. 17 at 29:24-37:16, 49:17-50:11. Perry, by contrast, testified that he relied on oral promises from the plan sponsor about what he was supposed to pay. Ex. 16 at 44:20-48:1, 74:23-76:15. What's more, Perry continued to make prescription drug payments that he contends were too high *after* discovering CHLIC's alleged scheme to defraud and even after joining this lawsuit. Ex. 16 at 231:17-232:7.[30] This case is distinguishable from *U.S. Foodservice*, which lacked any evidence that class members were injured after learning of the alleged scheme to defraud. *See* 729 F.3d at 120 ("[T]he record here contains no such individualized proof indicating knowledge or awareness of the fraud by any plaintiffs.").

Making matters worse, Plaintiffs' method for calculating damages does not fit their RICO liability theory. "[D]amages as compensation under RICO § 1964(c) for injury to property must, under the familiar rule of law, place [the injured parties] in the same position they would have been in but for the illegal conduct." *Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994). Here, the proper measure of damages would be the difference between what class members actually paid for prescription drugs (in supposed reliance on the "uniform misrepresentations" in the plan documents) and what class members would have paid for prescription drugs had there been no "misrepresentations" in the plan documents. Plaintiffs' method for calculating RICO damages, however, does not imagine a "but for" world in which those misrepresentations had never been made. Rather, it points to those "misrepresentations" as

---

[30] These issues "threaten to become the focus of the litigation" and therefore defeat Rule 23(a)(3)'s typicality requirement, as well. *Belfiore*, 311 F.R.D. at 64.

reason to limit class member payments.  That is improper.  *See McLaughlin*, 522 F.3d at 228 (a victim who is induced to part with his property by the misrepresentations of a fraudster is generally not entitled to recover what the fraudster promised).  Even if the amount of alleged participant "overpayments" was the proper measure of RICO damages, Plaintiffs' method is incapable of proving the amount of those "overpayments" on a classwide basis.  *See supra* Part V.1.  For example, limitations in CHLIC's transaction data make it impossible to determine if a class member actually paid the alleged "overpayment" (and was thereby "injured in his business or property") or instead used a coupon to cover his out-of-pocket costs.  *See* Ex. 4 at ¶¶ 74-76; Ex. 20 at 368:13-369:25.

The class certified in *U.S. Foodservice* was not "just like this one" as Plaintiffs contend.  The fundamental question in *U.S. Foodservice* was whether the defendant misrepresented its compliance with a standard industry practice known as "cost-plus" pricing.  729 F.3d at 112.  Here, by contrast, the fundamental question is whether the plan document for each class member misrepresented the plan-specific benefit design selected by each plan sponsor.  That question is not capable of resolution on a classwide basis or as a matter of standard industry practice.  Additionally, the contracts at issue in *U.S. Foodservice* were "substantially similar in all material respects." *Id.* at 119.  Here they are not.  *See supra* Part I.  Further, the fraud in *U.S. Foodservice* was based on post-contract "fraudulently inflated cost-plus invoices," 729 F.3d at 123, but Plaintiffs allege here that the contractual promise itself was the "uniform misrepresentation" at the heart of their civil RICO claim, and Plaintiffs presented no evidence of post-contract misrepresentations.  *See, e.g.*, Ex. 16 at 221:21-222:6 (testifying that no representations were made at point of sale about how their prescription drug payments were calculated).

## CONCLUSION

For the foregoing reasons, class certification should be denied.

Dated:  July 6, 2020                    Respectfully submitted,

                                        /s/ *Brian W. Shaffer*
                                        Brian W. Shaffer (phv08654)
                                        Jeremy P. Blumenfeld (phv23943)
                                        Eleanor R. Farrell (phv08309)
                                        Matthew D. Klayman (phv08656)
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        1701 Market Street
                                        Philadelphia, PA 19103
                                        Telephone:  215-963-5000
                                        Facsimile:  215-963-5001
                                        brian.shaffer@morganlewis.com
                                        jeremy.blumenfeld@morganlewis.com
                                        eleanor.farrell@morganlewis.com
                                        matthew.klayman@morganlewis.com


                                        Michael D. Blanchard (ct25891)
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        One State Street
                                        Hartford, CT 06103
                                        Telephone:  860-240-2945
                                        Facsimile:  860-240-2800
                                        michael.blanchard@morganlewis.com

                                        *Attorneys for Defendant Cigna Health and Life*
                                        *Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020, the foregoing document was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.


*/s/ Brian W. Shaffer*
Brian W. Shaffer