# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC.,<br><br>　　　　　　　　　　　Defendants. | No. 16-cv-1702 (JAM)<br>(Consolidated)<br><br>CLASS ACTION |

**DECLARATION OF ALYSON L. WOOTEN, PHARM.D., M.B.A.**



### I. Executive Summary

1. I, Alyson L. Wooten, Director of Berkeley Research Group, LLC ("BRG"), 1800 M Street NW, Washington, DC 20036, hereby submit this declaration in support of Defendant Cigna Life and Health Insurance Company's Opposition to Plaintiffs' Motion for Class Certification.

2. I have been asked to review various materials and provide my opinions based on my experience and expertise on matters summarized in this Declaration.

3. Retail pharmacies decide, based on a number of different considerations, what amounts to charge for filling a prescription. The amount a retail pharmacy charges for filling a prescription can be understood as the amount it asks to be paid for filling a prescription, rather than the amount it ultimately retains as reimbursement after the transaction is processed. The amount a retail pharmacy may charge could be reflected in a number of different fields in transaction data submitted to a pharmacy transaction administrator, depending on the retail pharmacy's business practices, systems, and relevant contractual arrangements. The amount a retail pharmacy may charge is often different than—and typically more than— the reimbursement ultimately retained by a retail pharmacy for filling a prescription covered by a group benefit plan.

### II. Qualifications and Experience

4. I am a director in BRG's Health Analytics practice. I have over 19 years of experience as a pharmacist and legal advisor. I have advised on a variety of pharmacy and pharmaceutical operation matters, as well as matters involving compliance and transactional issues.

5. Prior to receiving my Doctor of Pharmacy degree from Campbell University in 2001, I spent over five years working as a pharmacy technician in CVS and Revco pharmacies in Virginia and North Carolina. After graduating from my doctoral program, I sat for and passed the North American Pharmacist Licensing Exam ("NAPLEX") as well as the North Carolina state pharmacist licensing exam. As part of the North Carolina state pharmacist licensure requirements, I completed a minimum of 1,500 hours of practical pharmacy experience in a retail pharmacy setting. After earning my North Carolina state pharmacy license, I continued working with CVS Pharmacy as a retail pharmacist. In this role, I supervised all daily activities of the pharmacy including billing and collection for prescriptions. I was also responsible for ensuring that all pharmacy activities and personnel complied with all federal and state laws concerning the practice of pharmacy.

6. From 2001-2006, I held various Medical Information positions as a pharmacist at GlaxoSmithKline ("GSK). In these roles, I partnered with internal and external stakeholders to provide medical information (i.e., scientific information) on GSK and competitor prescription products. I also held roles in GSK's legal operations as Legal Intern and Patent Agent.

7. I received my Juris Doctor degree from Temple University in January 2007 and began working as an Intellectual Property Attorney for Kilpatrick Townsend & Stockton, with a particular focus on pharmaceutical patents, pharmacy practice, and regulatory matters. Over my twelve years at Kilpatrick Townsend, I regularly counseled clients regarding pharmacy matters, including pharmacy services agreements.



8. In March 2013, and prior to joining BRG, I served as an Adjunct Professor for Philadelphia College of Osteopathic Medicine, School of Pharmacy.  As an adjunct professor, I was responsible for teaching the federal law component of a Pharmacy Law and Ethics course.

9. In April 2019, I joined BRG's Health Analytics practice where I serve as co-lead for BRG's Pharmacy Practice.  My work in this practice focuses on pharmacy operations for retail, compounding, and institutional pharmacies.  As part of this role, I perform compliance audits to review billing and collection practices and determine if pharmacies are acting in accordance with all applicable laws and regulations governing the pharmacy's operations.

10. For the past nineteen years I have maintained my North Carolina pharmacy license, which requires that I complete at minimum fifteen hours of continuing education annually, including at least one hour continuing education on pharmacy/pharmaceutical ethics.

11. A copy of my CV is attached as Appendix 1.

### III. Retail Pharmacy Billing and Reimbursement Process

12. When a group prescription benefit plan is involved, the process whereby a retail pharmacy bills and collects for a prescription is multi-factorial.  When a patient presents a prescription to a retail pharmacy (either physically or electronically), the pharmacist or pharmacy staff ordinarily enters the prescription details into the pharmacy's computer system.  This will include information on the specific drug, the quantity to be dispensed, how long the drug will last, and instructions for use.

13. If the patient is enrolled in a group benefit plan, the patient will provide the pharmacy with an insurance card or information that can be used to identify the specific plan in which the patient is enrolled.  This information is also entered into the pharmacy's computer system and used for billing.  There are thousands of group benefit plans available and the pharmacist must verify that the pharmacy participates in the plan and has all necessary agreements in place in order to bill and collect from the third-party payer.  Having the necessary agreements in place is called participating in a network.  If the pharmacy is out of network, it can still fill the prescription, but payment will work differently.

14. Once the pharmacy has verified participation with a group benefit plan, the pharmacist will transmit the prescription information electronically to a processor or pharmacy transaction administrator.  Information such as National Drug Code ("NDC") (identifying the drug product, the labeller, and the commercial package size), quantity to be dispensed, days supply, information about the pharmacy and prescriber, and identification of the patient's plan is included in the transmission.

15. The pharmacy will also transmit some of its own pricing information (or "charges") to the pharmacy transaction administrator.  Prices set by the pharmacy are commonly referred to as the usual & customary (U&C) price.  Retail pharmacies typically transmit their U&C price to pharmacy transaction administrators as part of the pharmacy transaction.  Retail pharmacies may also transmit "submitted" costs and sometimes fees, representing amounts that the pharmacy is asking to be paid for a transaction regardless of coverage status.  What a pharmacy chooses to transmit as its "submitted" costs or fees will depend on the particular pharmacy's business



practices, which could vary from pharmacy to pharmacy and especially between chain pharmacies and independent pharmacies.

16. The pharmacy transaction administrator uses rules or computer logic built into the system that is specific to the patient's plan information. For example, some plans may require a prior authorization before authorizing payment on a prescription. Others may limit the quantity or days supply allowed, drugs are covered, number of refills are allowed, or how soon a prescription can be refilled.

17. The pharmacist is unable to determine the plan requirements or the amount each patient is required to pay for a prescription under their plan without receiving specific transaction related information from the pharmacy transaction administrator. The pharmacy transaction administrator has information about the patient's specific plan and the pharmacy's network agreement. Using an online system allows the pharmacy to quickly verify coverage and receive pricing and reimbursement information for each prescription.

18. Some pharmacies agree to accept a system determined reimbursement that is defined in a network participation agreement. These are generally referred to as "in-network" pharmacies. Pharmacies may join a particular network by contracting directly with the entity that is managing the network. In other cases, however, the pharmacy may join the network through a contractual agreement with a pharmacy services administration organization ("PSAO"). A PSAO is an intermediary that negotiates and enters into agreements with group benefit plans, group benefit plan insurers, group benefit plan administrative services companies, or pharmacy benefit managers ("PBM") on behalf of the pharmacies with which it contracts. In either scenario, the pharmacy will become part of the plan network.

19. A pharmacy sometimes also agrees as part of the network participation agreement to collect any necessary cost share calculated under the rules defined by the plan and the plan sponsor in the overall plan design. In general, pharmacy reimbursement and the patient cost share are independent of each other unless the plan design creates a dependency. Each plan can determine the specifics of these parameters and they often vary significantly from plan to plan.

20. Patient cost share is often determined without reference to the calculated reimbursement to the pharmacy. The pharmacy does not know whether a cost share amount will apply to a particular prescription, and therefore does not know the amount to collect from the patient without verification from the pharmacy transaction administrator.

21. Pharmacy reimbursement is often based on product-specific third-party data received from MediSpan, First Databank, or other authoritative sources and the network reimbursement algorithms. Most network algorithms, which are defined in the network participation agreement or similar agreement, use average wholesale price (AWP) as the relevant drug pricing metric. Other published drug pricing benchmarks that may be used in reimbursement formulas are wholesale acquisition cost (WAC) and average sales price (ASP).

22. As part of the billing transaction adjudication process, the processor will reference the specific reimbursement algorithm for the patient, pharmacy, and drug, calculate the pharmacy reimbursement, and transmit this information back to the pharmacy.



23. As noted above, each plan uses its own negotiated formula for reimbursement. These negotiated formulas are often based on pricing benchmarks and often result in pharmacy reimbursement different than the specific price a pharmacy pays for a prescription and the pricing information shared as part of the adjudication process. In other words, the ultimate reimbursement retained by a pharmacy is often determined independent of a specific pharmacy's pricing. The pharmacy will not know the specific reimbursement amount until the processor identifies and applies the appropriate reimbursement formula to the transaction. The pharmacy does not know its reimbursement for the specific transaction at the time that it submits charges for the amount it is seeking to be paid.

24. A rare exception to the formula-based pharmacy reimbursement is when the pharmacy has provided pricing information that is less than the applicable reimbursement amount calculated using the agreed upon formula. This is rare because retail pharmacies typically provide pricing information that is higher than the amount they will ultimately be reimbursed. But if the U&C or "submitted" cost is less than the reimbursement calculated using the formula method described above, the reimbursement will ordinarily be the lowest amount.

25. U&C charges often vary across pharmacies, meaning that the cash price for a patient without coverage at one pharmacy will not be identical, and sometimes is very different, to the cash price at a different pharmacy. Similarly, the U&C charge for a prescription at a same pharmacy may also frequently change. The table below illustrates the variability in U&C pricing.[1]

Table 2. Mean Unadjusted Cash Prices for Selected Generic and Brand-Name Drugs Across 5 Categories of Retail Pharmacies*

| Name of Drug | Strength (Dose) | Mean Cash Price (SD), $ | | | | |
|---|---|---|---|---|---|---|
| | | Large Chain | Big Box | Grocery | Small Chain | Independent |
| **Generic** | | | | | | |
| Albuterol | 2.5 mg/3 mL | 24 (9) | 8 (5) | 17 (11) | 29 (12) | 31 (14) |
| Amlodipine | 5 mg | 45 (7) | 21 (15) | 33 (18) | 49 (32) | 57 (27) |
| Atorvastatin | 20 mg | 146 (11) | 52 (47) | 85 (57) | 158 (78) | 170 (70) |
| Hydrocodone-acetaminophen | 5 mg/325 mg | 80 (45) | 49 (7) | 52 (13) | 56 (26) | 57 (28) |
| L-thyroxine | 50 mcg | 17 (6) | 12 (9) | 15 (7) | 24 (15) | 25 (14) |
| Lisinopril | 20 mg | 20 (6) | 8 (9) | 15 (14) | 29 (17) | 36 (14) |
| Metformin | 500 mg | 25 (8) | 10 (14) | 19 (19) | 42 (28) | 50 (28) |
| Metoprolol | 25 mg | 19 (2) | 7 (8) | 14 (7) | 23 (15) | 25 (17) |
| Omeprazole | 20 mg | 78 (16) | 43 (37) | 66 (44) | 100 (54) | 119 (51) |
| Simvastatin | 20 mg | 42 (21) | 35 (41) | 50 (49) | 112 (97) | 138 (78) |
| Overall mean | NA | 49 (39) | 24 (17) | 36 (25) | 67 (45) | 71 (49) |
| **Brand name** | | | | | | |
| Aripiprazole (Abilify [Otsuka]) | 5 mg | 1061 (35) | 1048 (19) | 1049 (11) | 1119 (67) | 1124 (110) |
| Fluticasone-salmeterol (Advair [GSK]) | 115 mcg/21 mcg | 432 (6) | 385 (6) | 418 (27) | 424 (31) | 423 (35) |
| Rosuvastatin (Crestor [AstraZeneca]) | 10 mg | 314 (6) | 288 (19) | 311 (20) | 313 (24) | 318 (30) |
| Duloxetine (Cymbalta [Eli Lilly]) | 60 mg | 282 (6) | 253 (0) | 277 (2) | 283 (43) | 283 (33) |
| Glargine (Lantus [Sanofi]) | 300 IU/3 mL | 432 (30) | 447 (28) | 454 (28) | 485 (27) | 474 (35) |
| Esomeprazole (Nexium [Pfizer]) | 40 mg | 310 (19) | 302 (9) | 305 (14) | 345 (63) | 334 (59) |
| Overall mean | NA | 472 (270) | 454 (274) | 469 (267) | 489 (289) | 493 (290) |
| Mean without aripiprazole | NA | 354 (65) | 335 (71) | 353 (70) | 370 (70) | 366 (71) |

GSK = GlaxoSmithKline; NA = not applicable.
* This table includes data from all available pharmacies. For a descriptive table of mean (SD) cash prices of these drugs from pharmacies contributing to the ZIP code-stratified analyses in Table 3, refer to the Appendix Table (available at Annals.org).

26. Another charge included in a pharmacy's billing information during the transaction process is a pharmacy's dispensing fee. The pharmacy dispensing fee is a fee charged by the pharmacy to help cover the pharmacy's operational expenses. These expenses may include wages, utilities, supplies, or other similar expenses. Depending on pharmacy practice, the same dispensing fee may be charged for all prescriptions or may vary based on the prescription being dispensed.

---

[1] Variation in Prescription Drug Prices by Retail Pharmacy Type. Annals of Internal Medicine, Nov. 5, 2019, available at https://www.acpjournals.org/doi/pdf/10.7326/M18-1138 (last accessed July 3, 2020).

4



Dispensing fees will also vary from pharmacy-to-pharmacy. A discounted dispensing fee is often negotiated for prescriptions covered under network agreement. If the pharmacy includes in its transaction a dispensing fee that is higher than the agreed upon amount, the pharmacy transaction administrator will adjust this as part of its formula applied to determine reimbursement.

27. In sum, while there are a number of billing components or charges that a pharmacy will include as part of the pharmacy transaction process, this information may or may not be determinative of the pharmacy's reimbursement. Reimbursement is controlled by the network participation agreement and that agreement may or may not include or reference the billing information submitted by a pharmacy at the time of the transaction. Likewise, determining a patient's financial responsibility may or may not consider the pharmacy's billing information submitted or the reimbursement amount calculated by the pharmacy transaction administrator.

### IV. "Covered Expenses" Included in Class Definitions

28. I understand that the proposed class definitions in this matter include plan language related to "Covered Expenses" and containing the phrase "incurs expenses for charges made by a Pharmacy."

29. Regardless of whether a patient has insurance or prescription drug benefits, a pharmacy's "charges" to a patient include the cost of the drug (U&C price, submitted cost), the dispensing fee, and tax. Whomever is ultimately responsible for paying all or part of these charges, and in what amounts, depends on whether the patient has prescription drug benefits, the terms of the patient's prescription drug benefit plan, and the terms of the pharmacy's network participation with the PBM or other entity providing administrative services to the patient's prescription drug benefit plan. As described above, pharmacies that bill insurance or prescription drug benefit plans transmit these charges (U&C and/or submitted cost, dispensing fee, tax) with each prescription transaction. While each pharmacy controls the charges that it submits as part of the insurance billing transaction, this information may or may not be determinative of the pharmacy's reimbursement under its network participation agreement (if it has one) or the patient's financial responsibility. The pharmacy's network participation agreement could provide for reimbursement that is more or less than the charges the pharmacy submitted, depending on the drug and the reimbursement terms of the agreement.

30. Plan coverage and the formulas used to determine pharmacy reimbursement and patient financial responsibility are highly variable. Each plan includes a variety of terms that have been specifically selected and/or negotiated by the plan sponsor. These negotiations are specific to the overall plan goals and financial targets. The variability in coverage, financial responsibility, and reimbursement for each prescription means that the insurance billing process prior to dispensing is critical to determine both a patient's financial responsibility and a pharmacy's reimbursement, which may not be the same, and which may be subject to separate agreements with another entity, such as a pharmacy benefit manager. The pharmacy cannot accurately predict a patient's responsibility or its own reimbursement based solely on the billing or pricing information set by the pharmacy or charges included by the pharmacy when it submits the prescription for payment.

5



I declare under penalty of perjury that the foregoing is true and correct.

*Alyson L. Wooten*

_____
ALYSON L. WOOTEN
Date: July 5, 2020



# WOOTEN DECLARATION EXHIBIT A

**Curriculum Vitae** 

**ALYSON L. WOOTEN, PHARM.D., MBA, JD**
BERKELEY RESEARCH GROUP, LLC
1800 M Street NW, Second Floor
Washington, DC 20036

Direct: 202.480.2681
awooten@thinkbrg.com

**SUMMARY**

Dr. Alyson Wooten is a Director in the BRG Health Analytics Practice. She has over 18 years of experience as a pharmacist, Medical Information Specialist and as a legal advisor, advising on a variety of pharmacy and pharmaceutical operations matters, as well as matters involving regulatory, intellectual property, compliance, litigation and transactional issues matters, with emphasis in pharmaceutical and medical device products.

Drawing upon her retail, hospital, and pharmaceutical industry experience, Dr. Wooten has assisted numerous retail, mail order, specialty and hospital pharmacies, and pharmaceutical and medical device companies on operational and regulatory matters including medical affairs support, clinical development programs, corporate integrity agreements, promotional and sales training materials, thought leader engagement/programs, safe harbor issues, pharmacy services agreements, HIPAA, fraud waste and abuse, medical device tracking, and due diligence projects for patent and investment portfolios.

Dr. Wooten focuses on assisting pharmaceutical, biotech and medical device manufacturers, pharmacies and pharmacy benefit managers facing litigation, compliance issues, disputes, investigations, pharmaceutical pre-clinical and clinical development contracts, and regulatory matters. She has significant experience in the areas of regulatory compliance, billing for pharmacist patient care services, contracting, coupon programs, Controlled Substance Act requirements, and pedigree. She is also intimately familiar with the acquisition, synthesis, analysis, and reporting of large data sets of clinical trial data, pharmaceutical sales data, billing data, rebate and discount data, survey data, market data, and regulatory compliance data.

**EDUCATION**

**Juris Doctor** – Temple University, Philadelphia, PA

**Doctor of Pharmacy (*Magna Cum Laude*)** – Campbell University, Buies Creek, NC

**Master of Business Administration** – Campbell University, Buies Creek, NC

**AWARDS**

Recipient of the 2019 Pro Bono Freedom Award

**EXTERNAL BOARDS**

Chairman, Metropolitan Counseling Services, Atlanta, GA

Member, Georgia Law Center for the Homeless

Alyson L. Wooten, PharmD, MBA, JD
Director, Berkeley Research Group

**EMPLOYMENT HISTORY**

    **Berkeley Research Group**, Washington, DC
    Director, Health Analytics Practice (April 2019 – present)

    **Kilpatrick Townsend & Stockton LLP,** Atlanta, GA
    Intellectual Property Attorney (April 2007-April 2019)

    **Philadelphia College of Osteopathic Medicine, School of Pharmacy**, Suwanee, GA
    Adjunct Professor (March 2013-April 2016)

    Responsible for federal law component of Pharmacy Law and Ethics course and preparing students for the Multistate Pharmacy Jurisprudence Examination®.

    **GlaxoSmithKline**, King of Prussia, PA
    Patent Agent and Legal Intern (May 2005-April 2007)

    **GlaxoSmithKline**, Philadelphia, PA
    Medical Information Specialist and Medical Communication Scientist (Feb. 2001-Jan. 2006)

    Partnered with internal stakeholders to provide medical information to enhance the commercial success of products and critically evaluate the validity of scientific literature on GSK and competitor prescription products. Provide accurate, balanced, and timely verbal and written responses for medical information questions, provide medical review and approval for promotional materials, partner with regulatory, compliance and marketing representatives on developing promotional strategy and thought leader engagement, sales and medical training in support of product/clinical launches, develop AMCP Formulary Dossiers, and provide input and support regarding pricing, formulary, PBM payer, and health plan participants. Responsible for clinical trial data for pharmaceuticals, including design of case report forms to support primary safety and efficacy endpoints, analysis of data, and reporting final data analysis in clinical trial reports to support regulatory filings.

    **CVS Pharmacy**, Cary, NC
    Pharmacist/Pharmacy Technician (1996-2002)

    Responsible for implementation and monitoring compliance with all federal and state laws concerning the dispensing of all drugs, including requirements under the Controlled Substance Act. Supervised daily activities of pharmacy and counsel patients regarding proper use of medications. Handled third party billing and distributor interactions. Responsible for reporting and audits by DEA. Provided compounding services for specialty products.

    **Betsy Johnson Memorial Hospital**, Dunn, NC
    Pharmacy Technician (April 1998-October 1998)

    Provided pharmacy services and therapeutic management of patients for hypertension, diabetes, asthma, general medicine, and anticoagulation. Responsible for reviewing medication orders and patient's medical record as well as interacting with other health

Alyson L. Wooten, PharmD, MBA, JD
Director, Berkeley Research Group

professionals to help prevent inappropriate or misuse of medications; provision of clinical services (e.g., pharmacokinetic dosing, therapeutic interchange, IV/PO conversions, TPN and aminoglycoside monitoring, pharmacist interventions) to neonatal, pediatric and adult patients according to departmental policy and procedures. Responsible for compounding intravenous admixtures according to USP.

**PROFESSIONAL LICENSES**

**Registered Pharmacist**, State of North Carolina

**Registered Patent Attorney/Agent**, United States Patent and Trademark Office

**Bar Admissions**: Georgia, Pennsylvania, New Jersey

**OTHER PROFESSIONAL EXPERIENCE**

<u>**Clinical Clerkships**</u>

**Internal Medicine**
Moses H. Cone Memorial Hospital
Greensboro, North Carolina

**Community Pharmacy**
Eckerd Pharmacy
Cary, North Carolina

**Internal Medicine**
Moses H. Cone Memorial Hospital
Greensboro, North Carolina

**Geriatric Medicine**
Britthaven Nursing Home
Chapel Hill, North Carolina

**Regulatory Affairs**
Glaxo Wellcome Inc.
Research Triangle Park, North Carolina

**Drug Information/Industrial Pharmacy**
Glaxo Wellcome Inc.
Research Triangle Park, North Carolina

**Ambulatory Medicine**
Carolina Premier Medical Group
Cary, North Carolina

**PUBLICATIONS AND SPEAKING ENGAGEMENTS**

<u>Switching Studies Crucial to Demonstrate Biosimilar Interchangeability</u>. 2018 AAPS PharmSci 360, Washington, DC, Nov. 2018.

3

Alyson L. Wooten, PharmD, MBA, JD
Director, Berkeley Research Group

<u>Navigating the Safe Harbor Provisions of the Hatch-Waxman Act</u>. 3rd China Pharma IP Summit 2018, Beijing, China, Oct. 2018.

<u>Meeting our Clients in Immigration Detention Opened Our Eyes</u>. Daily Report, April 5, 2018.

<u>Patent Acquisition: Due Diligence Issues</u>. 2nd China Pharma Intellectual Property Summit 2017, Dec. 2017, Shanghai, China.

<u>Patent Litigation 2017 & Case Law Update Roundtable</u>. 29th Annual North America Law Summit, Nov. 2017.

<u>The Summit Newsroom: Entertainment, Sports & IP News, Commentary & Mayhem</u>. 29th Annual North America Law Summit, Nov. 2017.

<u>Federal Circuit Holds that the "Required and Established Place of Business" for Patent Infringement Venue Under § 1400(b) Requires Identification of a Physical Location of the Defendant's Business</u>. Legal Alert for Kilpatrick Townsend & Stockton LLP, Sept. 2017.

<u>Pharmaceutical Due Diligence Investigations and the Orange Book</u>. 2017 Intellectual Property Forum, April 2017, Shanghai, China.

<u>Interpretation of Patent Dance of BPCIA and Its Influence on Biosimilars and Innovative Drugs</u>. China Pharma Intellectual Property Summit 2016, Nov. 2016, Shanghai, China.

<u>The Use of *Inter Partes* Review Petitions in Pharma Patent Litigation</u>. China Pharma Intellectual Property Summit 2016, Nov. 2016, Shanghai, China.

<u>Patent Law: Patent Law Update</u>. 28th Annual North American Law Summit, Nov. 2016.

<u>New Requirements for FDA Nutrition and Supplement Labels: What You Need to Know</u>. Kilpatrick Townsend CLE Presentation, July 2016, New York City, NY.

<u>Asserting Your Rights/Defending Your Rights – Overview of Litigation and Life Cycle Planning for Drugs and Biologics</u>. Bio & Pharmaceutical Patent Forum, March 2016, Shanghai, China.

<u>*Amgen v. Apotex* – 180-day Advance Notice of Biosimilar Marketing is Mandatory</u>. Kilpatrick Townsend Knowledge Center, Dec. 2015.

<u>Amgen files First Marketing Authorization Application for Humira® in the EU</u>. Kilpatrick Townsend Knowledge Center, Dec. 2015

<u>Patent Law – IPR Strategy in ANDA Litigation</u>. CLE Presentation at ABA Law Summit, Entertainment, Sports & Intellectual Property, Nov. 2015.

<u>Abbreviated New Drug Application (ANDA) with Paragraph IV Certification: Critical Insights in 2015, IPR Strategy in ANDA Litigation</u>. CLE Presentation for Knowledge Group, Aug. 2015.

Alyson L. Wooten, PharmD, MBA, JD
Director, Berkeley Research Group

<u>Down to the Wire: FDA Extends Deadline for Dispenser's Product Tracing Requirements Less than 24 Hours Before July 1, 2015 Deadline</u>. Kilpatrick Townsend Knowledge Center, July 2015.

<u>Patent Law Basics: An Overview of Patent Law and Avoiding the Loss of Rights</u>. Kilpatrick Townsend & Stockton LLP Intellectual Property Desk Reference – 7th Edition, May 2015.

<u>Post-Grant and Covered Business Method Patent Review</u>. CLE Presentation at ABA Law Summit, Entertainment, Sports & Intellectual Property, Nov. 2014.

<u>Anti-Patent-Troll Law</u>. Presentation for Kilpatrick Townsend & Stockton LLP, Oct. 2014.

<u>Negotiating a New Legal Landscape: The Advent of Follow-On Biologics</u>. University of San Francisco Law Review, Vol. 46, pp. 1029-1076, Sept. 2014.

<u>Separate Written Description – *En Banc* Decision in *Ariad v. Lilly*</u>. Legal Alert for Kilpatrick Townsend & Stockton LLP, March 2010.

<u>Separate Written Description? – Oral Arguments in *En Banc* Rehearing of *Ariad v. Lilly*</u>. Legal Alert for Kilpatrick Townsend & Stockton LLP, Dec. 2009.

<u>Protecting the Validity of Your Pharmaceutical Patents after *KSR*</u>. 2009 BIO International Convention, May 2009.

<u>*In re Kubin* – Another Hurdle for DNA Sequence Patents</u>. Legal Alert for Kilpatrick Townsend & Stockton LLP, April 2009.

5