# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

KIMBERLY A. NEGRON, DANIEL PERRY,
COURTNEY GALLAGHER, NINA CUROL,
ROGER CUROL, and BILLY RAY BLOCKER,
JR., Individually and on Behalf of All Others
Similarly Situated,

                  Plaintiffs,

vs.

CIGNA CORPORATION, CIGNA HEALTH
AND LIFE INSURANCE COMPANY and
OPTUMRX, INC.,

                  Defendants.

Civ. A. No. 16-cv-1702 (JAM)

## DECLARATION OF DAVID KASPER

I, David Kasper, hereby declare as follows:

       1.      I am currently the lead of the National Accounts segment at Cigna Group Insurance.  Prior to June 28, 2020, I was a Regional Lead in the National Accounts Department at Cigna Health and Life Insurance Company ("CHLIC").  I have personal knowledge of the matters stated herein.  If called and sworn as a witness, I could and would competently testify thereto.

       2.      I began working at CHLIC on June 10, 2013.  In my role at CHLIC, I led the South Central region of National Accounts.  I was responsible for new and existing business in both the healthcare and group setting, including pharmacy benefits for large national accounts.  One of the accounts I managed was Waste Management ("WM"), which became a pharmacy client of CHLIC after I began working at CHLIC.

       3.      Prior to joining CHLIC, I worked at WM for approximately thirteen (13) years, from July 2000 to February 2013.  My last position at WM was Vice President of Benefits and

Compensation.  In that role, I negotiated with CHLIC for medical benefits, and negotiated

pharmacy benefits with other pharmacy benefit managers ("PBMs"), on behalf of WM.

4.      Based on my past role at CHLIC and my prior position at WM, I have knowledge

about and an understanding of pharmacy benefits, related pricing arrangements, and the related

negotiations process between CHLIC and its clients (also referred to as "plan sponsors"), which

often occurs with a broker and/or consultant on behalf of a plan sponsor.

**Experience While at Waste Management**

5.      While I was at WM, I utilized a sophisticated consultant with knowledge of

pharmacy benefits to negotiate on behalf of WM.  We decided to utilize a consultant for the

purpose of accessing PBM industry knowledge, pricing data analysis, and eventually to talk

directly with certain retailers with whom we wanted to do business.  Based on my conversations

with that consultant over the many years I was at WM, it was my understanding that the

consultant knew of and understood the concepts of "spread" pricing and "clawbacks" as it related

to retail pharmacy prescription drug transactions.  Specifically, both the consultant and I knew

that "spread" pricing—whereby WM did not pay a PBM an administrative fee per member life,

and instead the amount that WM negotiated to pay for prescription drugs (the "Client Rate")

dispensed by retail pharmacies, may be more or less than the discounted amount that the PBM

contracts to pay the retail pharmacy for the drug (the "Pharmacy Reimbursement Rate")—was

often used by PBMs, in offering and administering retail pharmacy prescription drug benefits.

We were also aware that the payment made to the retail pharmacy at the point of sale by a

participant in a plan sponsored by WM could be greater than, equal to, or less than the Pharmacy

Reimbursement Rate, and that, if it were greater, the PBM would keep the difference.

6.      During my time at WM, I also understood what "pass through pricing" was. Unlike "spread pricing," where the amount WM paid to the PBM for the retail pharmacy prescription drug transaction could be greater than, equal to, or less than the Pharmacy Reimbursement Rate, "pass through pricing" was a retail pricing arrangement whereby the plan sponsor contracts with the PBM to pay the Pharmacy Reimbursement Rate.  In the industry, this was also known as "transparent" pricing.  I also knew that if I requested a "pass through pricing" arrangement, the PBM would have required WM to pay an administrative fee for its claims administration services.

7.      As Vice President of Benefits and Compensation at WM, and during the time that PBMs were administering claims for the prescription drug benefits in WM's plans, I also understood and recognized that WM was not paying an administrative fee to the PBMs, which meant that the PBMs were being paid for administering pharmacy benefits through spread pricing.  Per the benefit arrangement in the WM plan, WM plan members would pay no more than WM's negotiated Client Rate.  I never asked a PBM for a "pass through pricing" option because those pricing arrangements were not economically advantageous to WM at the time.

8.      While I was at WM, I was a participant in WM's Health and Welfare Benefits Plan, which included coverage for medical and prescription drug benefits.  During that time, when I filled prescriptions, I was aware of the negotiated arrangement that WM had with the PBMs, including the possibility that the amount I paid at the point of sale might be greater than, equal to, or less than the Pharmacy Reimbursement Rate.

**Experience at CHLIC**

9.     During my time at CHLIC, I gained knowledge regarding the types of retail pricing arrangements plan sponsors other than WM sought for their retail prescription drug benefits insured and/or administered through CHLIC.

10.     In working with other plan sponsor accounts in my role at CHLIC, I often worked with hired brokers/consultants, who were sophisticated and very knowledgeable about pricing of pharmacy benefits.  In fact, many brokers hire pharmacy specialists, with whom I dealt with both when I was at WM and while I was at CHLIC.

11.     When plan sponsors decide to contract with a third party, like CHLIC, in order to offer prescription drug benefit plans to their employees, they choose from an array of benefit designs offered by Cigna.  During that process, the plan sponsor, or its broker/consultant, will select which pricing arrangement to make available to its participants and for which types of specific prescription drug transactions.

12.     Some plan sponsors choose to guarantee their participants that they will not pay more than the Client Rate for any given prescription drug transaction.  As noted above, the Client Rate is often different than the Pharmacy Reimbursement Rate.  The difference between the Client Rate and the Pharmacy Reimbursement Rate is often referred to as "spread," and that is a term of which I was aware when I was at WM.  Through my negotiations with several large plan sponsors with whom I have worked, I understand that those plan sponsors and/or their brokers/consultants are aware of that concept as well, including how it relates to their participants' cost-share payments.

13.     As a CHLIC employee overseeing plan sponsor accounts, I was required to handle confidential information with care and to maintain the confidentiality of proprietary and

4

sensitive business information. This included limiting access to the confidential information on a need-to-know basis. The documents that CHLIC prepares in connection with negotiating benefits with a plan sponsor, or its designated broker/consultant, and the administrative services only ("ASO") agreements entered into with the plan sponsors are highly confidential and proprietary to CHLIC and are kept confidential and disclosure limited. Disclosure of the information CHLIC prepares regarding various spread or pass through pricing options offered to a plan sponsor could result in significant, irreparable economic injury if provided to CHLIC's competitors. Those competitors could use that information to outbid CHLIC and obtain the pharmacy business CHLIC was working to retain or add, both with respect to a specific plan sponsor or in connection with other plan sponsors or future business. The same is true for ASO agreements that contain the negotiated and agreed upon terms between CHLIC and its plan sponsor clients, including pricing terms and other terms governing the relationship. Additionally, the information in the plan sponsor's proposal that is shared with CHLIC is highly confidential and proprietary to plan sponsors because it contains information about what the plan sponsor spends on benefits. Such information is highly competitive and could be used by the plan sponsors' competitors to the disadvantages of plan sponsors if disclosed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this $\int^{\!\!\!\!\!\!\frown}$ day of July, 2020.

David Kasper