# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>vs.<br><br>CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC.,<br>           Defendants. | Civ. A. No. 16-cv-1702 (JAM) |

## DECLARATION OF CHALON CARPENTER

I, Chalon Carpenter, hereby declare as follows:

1.      I am a Risk & Underwriting Senior Manager in the Pharmacy Underwriting Department at Cigna Corporation ("Cigna").  I have personal knowledge of the matters stated herein.  If called and sworn as a witness, I could and would competently testify thereto.

2.      I have been a Risk & Underwriting Senior Manager in Cigna's Pharmacy Underwriting Department since August 2010.  In that role, I manage a team of pharmacy underwriters who conduct underwriting for the part of Cigna's pharmacy business that provides administrative services only ("ASO") to plans that are self-funded by the employer and that are administered through Cigna Health and Life Insurance Company ("CHLIC")'s Proclaim platform.

3.      I also manage a team that is responsible for assembling responses to requests for proposals (RFPs) CHLIC receives from existing client plan sponsors or potential employers looking to have CHLIC insure and/or administer their pharmacy benefits for their employer

sponsored plan.  My team and I will assemble the pharmacy information requested in the RFP related to CHLIC's pharmacy benefits administration and provide those responses to CHLIC's sales team to send to the client, or potential client, or brokers representing the plan sponsor.

4.      Through my almost-ten (10) years of experience in Cigna's Pharmacy Underwriting Department and working on RFP responses, I have gained knowledge and developed an understanding of the various pharmacy benefits and prescription drug pricing arrangements CHLIC offers to plan sponsors.

5.      When plan sponsors decide to contract with a third party, like CHLIC, to offer prescription drug benefit plans to their employees, they choose from an array of benefit designs CHLIC offers—often with the help of sophisticated benefit brokers or consultants, or both—that determine which special pricing is available to which participants for which prescription drug transactions.  During that process, the plan sponsor, or its broker/consultant, will often submit an RFP to CHLIC regarding the pricing arrangement it wants to make available to the plan participants and for which types of specific prescription drug transactions.

6.      In responding to those RFPs, my team assists CHLIC with pricing out for the plan sponsor a number of variables, including, among others, (i) whether both medical and pharmacy benefits will be provided and/or administered by the same insurance carrier; (ii) the level of employee cost sharing, such as what level of deductible will be applied (if any), what the participant's copayment will be (if any) for certain types of prescription drugs, the plan participants' co-insurance obligations (if any) for prescription drugs; and (iii) the out-of-pocket maximum threshold.

7.      From the various RFPs I have seen throughout the years, and the responses I and my team have prepared to them, it is apparent that the pharmacy benefit design process is highly

individualized, differing from employer to employer in terms of what the plan sponsor requests in terms of pharmacy benefits.  For example, through the RFP process, I have observed that some plan sponsors choose to guarantee their participants that they will not pay more at retail pharmacies than the plan sponsor's negotiated rate for prescription drugs (the "Client Rate") for any given prescription drug transaction; other plan sponsors do not.  The Client Rate is often different than the reimbursement actually retained by the retail pharmacy in connection with a transaction (the "Pharmacy Reimbursement Rate").

8.     Many, but not all, of CHLIC's arrangements with plan sponsors are based off of "spread pricing," which means that for any given transaction, a participant's payment at the point of sale at the retail pharmacy may be less than, the same as, or greater than the Pharmacy Reimbursement Rate.  Where it is greater than the Pharmacy Reimbursement Rate, the difference is often referred to as "spread."  Most plan sponsors use these differentials to help fund their prescription drug benefits on a transaction-by-transaction basis, and will ask for a proposal based on spread pricing, rather than funding them through standalone administrative fees.

9.     Throughout the time that I have served as a Risk & Underwriting Senior Manager in Cigna's Pharmacy Underwriting Department, CHLIC has insured and/or administered pharmacy benefit plans that had retail pricing arrangements that were "pass through pricing," "spread pricing," or a combination of both as described below.  In a pass through pricing arrangement, a plan sponsor contracts to pay the PBM or insurance carrier the pharmacy's contracted reimbursement rate (net of discounts and member liability) plus dispensing fees and a per-employee-per-month (PEPM) fee to cover the costs of other contracted services that are provided.

10.     Unless an RFP explicitly states that the plan sponsor will accept only pass through retail pricing quotes, CHLIC typically presents plan sponsors (or their broker/consultant representative) with traditional spread pricing and pass through pricing options.  There are many instances in which CHLIC has presented plan sponsors, or their brokers/consultants, with both traditional pricing and pass through pricing options so that the plan sponsor or broker/consultant can see the arrangements side by side.  Since August 2010, CHLIC has routinely provided a simple statement to its plan sponsor clients (and their brokers/consultants) explaining that CHLIC provides "traditional" spread pricing in lieu of pass through pricing and administrative fees for retail pharmacy.  In the RFP process, it is common for both plan sponsors and CHLIC to refer to spread pricing as "traditional" pricing, and pass through pricing as "transparent."

11.     During the time period relevant to this case, plan sponsors did not have to select spread pricing or pass through pricing for the retail pricing option for their entire prescription drug plan.  They could have selected a mix between the two pricing arrangements, whereby certain types of prescription drugs (i.e., brand) would be subject to a pass through pricing arrangement, but other prescription drugs (i.e., generic) would be subject to spread pricing.

12.     CHLIC only applies pass through pricing for the benefit designs for plan sponsors with a very large group of members and who have made a specific request in an RFP for pass through pricing.  This is the exception and only offered if a plan sponsor indicates it does not want traditional spread pricing and wants pass through pricing at the retail price.  Any kind of client could request pass through pricing, but the clients who typically request it are municipalities.  Currently, approximately fifteen percent of CHLIC's clients are in pass through retail pricing arrangements.  In those instances, CHLIC will provide pricing options for the pharmacy benefits that include administrative fees to be charged to the plan sponsor.

13.     In my experience reviewing RFPs for pharmacy benefits from various clients, and preparing CHLIC's responses, I have learned that most brokers, consultants, and the plan sponsors, but not all, are aware that spread pricing is often a component of CHLIC's retail pharmacy pricing.  For example, many RFPs CHLIC receives routinely inquire about spread pricing.  Additionally, CHLIC's responses to RFPs disclose that there is an element of spread pricing that allows CHLIC not to charge monthly administrative fees for administering retail pharmacy benefits.  Additionally, through the RFP process, I have gained an understanding and knowledge that some plan sponsors (and their broker/consultants), but not all, are familiar with and understand various lesser-of logic options for certain retail prescription drug pricing that may be applied to the plan sponsor's benefit designs.  Some specifically request certain pricing arrangements—i.e., a specific "lesser of" logic—for retail pharmacy transactions.  Others do not request a specific pricing logic.

14.     Since as early as 2010, Cigna has disclosed in most of its ASO agreements with plan sponsors that, for any given transaction, the Client Rate may be less than, the same as, or greater than the Pharmacy Reimbursement Rate.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 6th day of July, 2020.


                                                        */s/ Chalon Carpenter*
                                                        Chalon Carpenter