## THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Civ. A. No. 16-cv-1702 (JAM) |
| v. | |
| CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY and OPTUMRX, INC., | |
| Defendants. | |

## DEFENDANT CIGNA HEALTH AND LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF LAUNCE B. MUSTOE, JR. OFFERED IN <u>SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 2

    I.      Plaintiffs' Motion For Class Certification ............................................. 2

    II.     Mr. Mustoe's Opinion And Methodology ............................................. 4

LEGAL STANDARD ........................................................................................... 12

ARGUMENT ........................................................................................................ 14

    I.      Mr. Mustoe's Attempt To Quantify "Clawbacks" On A Classwide Basis Is Unreliable And Inapposite to Plaintiffs' Theory of the Case ............................. 14

    II.     Mr. Mustoe's Attempt To Identify Class Members And Subclass Members On A Classwide Basis, A Necessary Predicate to His Calculation Methodology, is Unreliable And Produces Incongruous Results ....................... 24

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp., d/b/a Amtrak,*
    303 F.3d 256 (2d Cir. 2002)....................................................................................13, 28

*Baker v. Urban Outfitters, Inc.,*
    254 F. Supp. 2d 346 (S.D.N.Y. 2003)..........................................................................14, 15, 31

*Beastie Boys v. Monster Energy Co.,*
    983 F. Supp. 369 (S.D.N.Y. 2014) ................................................................................29

*Commercial Union Assurance Co., plc v. Milken,*
    17 F.3d 608 (2d Cir. 1994)............................................................................................16

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................................................ *passim*

*Faulkner v. Arista Records LLC,*
    46 F. Supp. 3d 365 (S.D.N.Y. 2014)............................................................................25, 32

*Franco v. Conn. Gen. Life Ins. Co.,*
    299 F.R.D. 417 (D.N.J. 2014), *aff'd on other grounds*, 647 F. App'x 76 (3d
    Cir. 2016) .....................................................................................................................14, 19, 22

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)......................................................................................................13, 31

*Hall v. LHACO, Inc.,*
    140 F.3d 1190 (8th Cir. 1998) ......................................................................................24

*Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.,*
    392 F. Supp. 3d 392 (S.D.N.Y. 2019)..........................................................................13, 15

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,*
    500 F.3d 171 (2d Cir. 2007)..........................................................................................15

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005)..........................................................................................13

*Peters v. Aetna, Inc.,*
    2019 WL 1429607 (W.D.N.C. Mar. 29, 2019)............................................................15, 18, 21

*Piepes v. NAI Ent't Holdings LLC,*
    394 F. Supp. 3d 315 (E.D.N.Y. 2019) .........................................................................17

*Robinson v. Sanctuary Record Grps., Ltd.*,
 542 F. Supp. 2d 284 (S.D.N.Y. 2008)....................................................................25

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)......................................................26

*United States v. Williams*,
 506 F.3d 151 (2d Cir. 2007).....................................................................................12

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ..............................................................................................15

ERISA § 502(a)(1)(B)..........................................................................................15, 16, 17

RICO § 1964(c)................................................................................................................16

**Rules**

Fed. R. Evid. 702 .................................................................................................. *passim*

Fed. R. Civ. P. 23 ...........................................................................................................19

Defendant Cigna Health and Life Insurance Company ("CHLIC") respectfully submits this memorandum of law in support of its Motion to Exclude the Declaration and Testimony of Launce B. Mustoe, Jr., offered by Plaintiffs in support of their motion for class certification, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## INTRODUCTION

Plaintiffs allege that their prescription drug benefit plans limited their payment obligations for retail pharmacy transactions to no more than the total reimbursement the pharmacy ultimately retained for filling the prescription (the "Pharmacy Reimbursement Rate").[1]  Plaintiffs further allege that CHLIC violated those plans by causing Plaintiffs to pay more than the Pharmacy Reimbursement Rate and then recouping (or "clawing back") the differential from the pharmacy. *See* ECF 206 at 2.  According to Plaintiffs, those alleged violations make CHLIC liable to them under ERISA, state law, and civil RICO.  Plaintiffs seek to bring their claims on behalf of three separate classes, each with its own subclass.  In support of their motion for class certification, Plaintiffs rely on their proffered expert, Launce B. Mustoe, Jr., R. Ph., who opines that class members can be identified through use of certain reports and that calculation of the amount of "clawbacks" is capable of classwide determination.  *See* ECF 206-1, Decl. of Launce B. Mustoe ("Mustoe Decl.").

Mr. Mustoe's analysis is flawed at every level and excludable under Federal Rule of Evidence 702 and *Daubert* because his methodology yields results that are neither relevant nor reliable.  First, Mr. Mustoe's use of "clawbacks" as the purported measure of damages is flawed under ERISA, state law, and RICO.  Second, Mr. Mustoe does not consider undisputed aspects of

---

[1] Capitalized terms have the same meaning as in CHLIC's Memorandum of Law in Opposition to Class Certification.

Plaintiffs' plan designs, plan language, the implications of "readjudicating" Plaintiffs' claims under his methodology, and Plaintiffs' liability theory itself. He essentially acts as a calculator, totaling up certain columns of pharmacy transaction data at the direction of Plaintiffs' counsel. Finally, his approach does not reliably identify members of the classes or subclasses and consequently treats as class members some participants who, even under Plaintiffs' theory, suffered no injury at all. His opinions are neither reliable nor helpful to a resolution of this matter, do not satisfy the requirements of Rule 702 or *Daubert*, and should be excluded.

## FACTUAL BACKGROUND

### I.      Plaintiffs' Motion For Class Certification

Plaintiffs contend that certain snippets of language in prescription drug benefit plans insured or administered by CHLIC limit class members' prescription drug payments to the Pharmacy Reimbursement Rate and that CHLIC violated those plans both by causing class members to pay more than the Pharmacy Reimbursement Rate and by then recouping the differential from the pharmacy.[2] *See* ECF 206 at 3. Plaintiffs focus on certain snippets of plan language while ignoring other plan language that varies substantially and materially across the plans at issue. *See* ECF 274, CHLIC Opp. at Arg. Part I.

Plaintiffs now seek to certify classes and subclasses with respect to three sets of claims. Plaintiffs define the proposed classes and subclasses both by reference to certain language in their prescription drug benefit plans and by certain features of the transactions completed pursuant to those plans. *See generally* ECF 253. Determining whether a participant is a member of a proposed class or subclass accordingly requires numerous steps.

---

[2] For a more fulsome explanation of prescription drug benefits, see CHLIC's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("CHLIC Opp.") (ECF 274) at 1-12.

Each proposed class and subclass comprises certain participants in prescription drug benefit plans with particular snippets of language.  *See generally* ECF 253.  Specifically, an individual who participated in a prescription drug benefit plan may be a class member if that plan (1) had language stating that participants "may be required to pay a portion of the Covered Expenses," (2) had a section entitled "Covered Expenses" that included the phrase "incurs expenses for charges made by a Pharmacy," and (3) did not define the term "Deductible Payments" by reference to "the plan's Prescription Drug Charge."  ECF 253 at 1-3; ECF 254 at 2-3.  This is true regardless of any other language the plan might contain or what the insurance policy or ASO agreement for that plan provides.  An individual may be a subclass member if that individual's plan met the class definition and also provided that copayments would not "exceed the amount paid by the plan to the pharmacy."  ECF 253.  Plaintiffs contend that these snippets of plan language must be interpreted without reference to any other plan provisions and must be understood as guaranteeing that copayments (in the case of both the class members and subclass members) and deductible payments (in the case of only class members) would never exceed the Pharmacy Reimbursement Rate.  ECF 253 at 2-3.  CHLIC disputes Plaintiffs' approach to plan interpretation.  *See* ECF 274 at Arg. Part I.

Plaintiffs also contend that participants in the class plans are members of the putative class only where, "according to the transaction data produced by [CHLIC] in this action," (1) "the copayment or deductible payment exceeds the amount the pharmacy agreed with [CHLIC] or the pharmacy benefit manager to accept for such drugs on a transaction-by-transaction basis," and (2) "the excess amount is credited or transferred to [CHLIC] or the pharmacy benefit manager."  ECF 253 at 2-4.  Participants in the subclass plans are members of the subclass if the same conditions are met, but only with respect to copayments, not deductible payments.  *Id.*

As explained more fully in CHLIC's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, the experiences of the putative class representatives and the putative class members vary widely.  *See* ECF 274 at Arg. Part II-III.  Variations include, but are not limited to, differences in plan language, differences in benefit design (*e.g.*, deductibles and/or out-of-pocket maximums), differences in the types of cost-share payments (*e.g.*, deductibles, copayments, and/or coinsurance), differences in participants' use of coupons to satisfy out-of-pocket payment obligations, differences in how benefits are funded, and differences in whether CHLIC is authorized to reprocess prescription drug benefit transactions.  *Id.*

## II.     Mr. Mustoe's Opinion And Methodology

Mr. Mustoe is a Registered Pharmacist who, in his capacity as a consultant, prepares, performs, and analyzes pharmacy benefit audits.  Plaintiffs engaged Mr. Mustoe to opine as to whether it is possible to calculate "clawbacks" (as Plaintiffs call certain amounts credited by pharmacies to OptumRx, Inc. ("OptumRx") or CHLIC under their contracts and contracts between pharmacies, pharmacy services administrative organizations, and OptumRx), for each proposed class and subclass on a classwide basis. ECF 206-1 at 1.  Mr. Mustoe's opinion is that "clawbacks" "███████████████████████████████████████████████████████████." *Id.*

Importantly, despite writing in his declaration that "████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████" (ECF 206-1 at 4), Mr. Mustoe subsequently conceded that ████████████████████████████████████████



.[3]  Ex. 14 at 99:9-102:3.[4]  Similarly, even though Mr.

Mustoe's declaration states that CHLIC is "███████████████████████████

████████████████████████████████████████" (ECF 206-1 at 9), Mr.

Mustoe also testified that ████████████████████████████████████████

████████████████████████.[5]  Ex. 14 at 137:17-141:1.  As Mr. Mustoe offers no

opinions on these topics, they are not subjects of this motion.

### A.      The Evidence Used By Mr. Mustoe

Mr. Mustoe's opinion is based on only two pieces of evidence.  The first is prescription

drug transaction data that CHLIC maintains in the ordinary course of business and which was

produced to Plaintiffs in this case.  Those data reflect certain information relating to amounts due

to or owing from the various parties involved in covered prescription drug transactions, including

CHLIC, OptumRx, the retail pharmacy, the participant, and the plan sponsor.  Ex. 4 at ¶¶ 19-21.

It is not possible to determine all of the aspects of a plan's benefit design from the prescription

drug transaction data alone.  *See* Ex. 14 at 187:4-189:5; Ex. 4 at ¶ 116.

---

[3] Nor could Mr. Mustoe offer that opinion.  He testified that ████████████████████████████
████████████████████████████████████████████ Ex. 14 at 102:8-14, 103:10-104:13, 137:12-16;
*see also id.* at 91:16-92:8 (testifying ████████████████████
██████████████).

[4] All references to "Ex.__" are to exhibits to the declaration of Brian W. Shaffer.

[5] Mr. Mustoe's statement in the declaration is based on a gross mischaracterization of CHLIC's response to an interrogatory that ███████████████████████.  Ex. 14 at 141:3-22.  In reality, CHLIC stated in response to that interrogatory merely that CHLIC does not maintain in the ordinary course of business a standalone listing of every transaction where the participant's plan contained certain snippets of language identified by Plaintiffs.  ECF 207-20 at 6 ("The requested information is not maintained by Cigna in the ordinary course of business in the form and format requested by Plaintiffs.").  CHLIC has explained in detail how it "is able to trace a particular participant's benefit plan selection to the specific benefit plan" and how it "interprets and applies the terms of the applicable plans in adjudicating prescription drug transactions."  Ex. 5 at 5.  Indeed, Mr. Mustoe testified that ████████████████████
████████████████████████.  Ex. 14 at 139:21-141:1.

The second type of evidence is a set of five (5) specialized reports that CHLIC generated for Plaintiffs' counsel in this case in a good-faith effort to address the significant volume of plan documents implicated by Plaintiffs' case.  Referred to as "DST Reports," they were generated in response to Plaintiffs' request during informal meet and confer discussions to identify documents on one of CHLIC's plan platforms with particular snippets of language and given Plaintiffs' disinclination to receive all of the actual plan documents.  Each DST Report includes, among other fields, an "Effective Date" for each listed document, but the "Effective Date" does not indicate when (if ever) that document actually became operative for a particular plan.  Ex. 4 at ¶¶ 60-63.  Nor does the DST Report indicate when (if ever) a listed document ceased being operative.  ECF 206-1 at 9; *see also* Ex. 14 at 161:23-162:1; Ex. 4 at ¶¶ 60-63.  In other words, the DST Reports by themselves do not contain sufficient information to confirm when (if ever) the snippet of language Plaintiffs identify may have had any bearing on a class member's payments for prescription drugs.

The DST Reports contain sufficient information to identify transactions in CHLIC's data that are associated with a particular plan sponsor (or CHLIC "account") who may have offered at least one benefit plan containing the relevant plan language.  But the DST Reports do not contain sufficient information to identify transactions in CHLIC's data that are associated with a particular plan offered by a plan sponsor.  Ex. 4 at ¶¶ 65-68.

This is the only evidence that Mr. Mustoe considered in forming his opinions.  ██████

████████████████████████████████████████████████████████████

████████████████████████████.  Ex. 14 at 90:8-17, 101:21-102:7, 136:15-137:16.  ██████

████████████████████████████████████████████████████████████

████████████████████████.  *Id.* at 106:12-24, 180:17-182:13.  ██████████████

███████████████████████████████████████████████████████████

████. *Id.* at 187:18-188:1.

**B.      Mr. Mustoe's Methodology**

In reaching his opinion, Mr. Mustoe proposes a two-step process for analyzing "clawbacks."  First, Mr. Mustoe proposes to use DST Reports "████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████." ECF 206-1 at 12.  Second, for the transactions identified, Mr. Mustoe proposes to calculate "clawbacks" by summing the negative amounts in a particular field in CHLIC's transaction data.  *Id.* at 14.

**1.      Identifying Transactions By Class Members And Subclass Members**

Mr. Mustoe proposes to use the DST Reports "████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████." *Id.* at 12.  Notably, Mr. Mustoe does not use the DST reports ████████████████████████████████████

██████████████████████████████ *Id.*  Rather, he proposes to use the DST Reports ██

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████. *Id.*

The specific DST Reports on which Mr. Mustoe relies, however, do not match the text of the class and subclass definitions.  As a result, they exclude alternative language formulations that Plaintiffs contend fall within the class definition.  Ex. 4 at ¶¶ 51-59.  The following table illustrates some of the resulting inconsistencies:[6]

---

[6] The plan language included in the "Plans Not Captured By DST Report" column are examples of variations of language and is not meant to be exhaustive.

| DST Report No. | DST Report Language | Language In The Class or Subclass Definitions | Plans Not Captured By DST Report |
|---|---|---|---|
| 1 | "exceed the amount paid by the plan to the Pharmacy" | "<u>in no event will the Copayment . . .</u> exceed the amount paid by the plan to the Pharmacy" | |
| 2 | "incurs expenses for charges made by a Pharmacy" | "<u>Covered Expenses</u>" are where an individual "incurs expenses for charges made by a pharmacy" | Plans with the phrase "incur expenses for charges made by a pharmacy"[7] |
| 3 | "required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies" | "<u>may be</u> required to pay a portion of the Covered Expenses" | Plans with the phrase "required to pay a portion of the Covered Expenses for **Prescription Drug Products**"[8] |
| 4 | "prescription drug charge" | "<u>Deductible Payment</u>" "<u>will be based on the plan's</u> Prescription Drug Charge" | Plans that removed "may be required to pay a portion of the Covered Expenses" or "incurs expenses for charges made by a pharmacy" or "in no event will the Copayment . . . exceed the amount paid by the plan to the Pharmacy" |
| 5 | "may be required to pay a Deductible, Copayment or Coinsurance requirement for Covered Expenses for Prescription Drug Products" | N/A | Plans that removed "may be required to pay a portion of the Covered Expenses" or "incurs expenses for charges made by a pharmacy" |

The language in DST Reports 1, 2, and 3 does not mirror the words appearing in the corresponding

class or subclass definitions. Those words are underlined in the third column of the table above

---

[7] *See, e.g.*, Ex. 32 at CIGNA04068694.  Plaintiffs contend that certain plan language may be "substantively the same" as the snippets of language in their class and subclass definitions such that they would consider participants in plans with such language to be putative class and subclass members, assuming all other requirements of the class and subclass definitions are met.  *See infra* at 30-31.  This language—which omits the letter "s" from "incurs"—is an example of one such plan that Plaintiffs contend satisfies the class definition.  *See* Ex. 13.

[8] *See, e.g.*, Ex. 30 at CIGNA00036974.

(Language In The Class or Subclass Definitions).  Nor do the DST Reports capture other plan language that apparently satisfies Plaintiffs' class or subclass definitions, which language appears in the fourth column of the table above (Plans Not Captured By DST Report).

Similarly, DST Report 4 does not reflect the underlined words appearing in the corresponding class definition set forth in the third column, and neither DST Report 4 nor DST Report 5 are able to identify changes to plan documents that simply removed the class or subclass language at issue.  There is no way to identify all variations of alternative plan language without a review of the plan documents, but Mr. Mustoe did not review even a single plan document in connection with his analysis.  Ex. 14 at 90:8-17, 102:4-7.

Mr. Mustoe proposes to use the "Effective Date" in the DST Reports to determine whether a transaction occurred after a "sponsor/employer" may have offered at least one plan with "the relevant Class and Subclass terms" but before a "sponsor/employer" ceased offering plans with those terms.  ECF 206-1 at 13.  Mr. Mustoe proposes to use DST Reports 1, 2, and 3 to identify the beginning of the relevant period for each account in each class and subclass, with DST Reports 2 and 3 beginning the relevant time period for class members and DST Report 1 beginning the relevant time period for subclass members.  He proposes to use DST Reports 4 and 5 to identify the end of the relevant period for each account in each class and subclass, with DST Report 4 ending the relevant time period for class member deductible transactions and subclass member copayment transactions, and DST Report 5 ending the relevant time period for class member copayment transactions.  *Id.* at 13-14.  His proposed methodology is as follows:

|  | **Classes** | **Subclasses** |
|---|---|---|
| Relevant accounts | DST Reports 2 and 3 | DST Report 1 |
| Beginning of relevant period | DST Reports 2 and 3 | DST Report 1 |
| Ending of relevant period for copayment "Clawbacks" | DST Report 5 | DST Report 4 |
| Ending of relevant period for deductible "Clawbacks" | DST Report 4 | N/A |

*Id.* By tying the end of the relevant periods for the classes and subclasses to DST Reports 4 and 5, Mr. Mustoe effectively assumes that the only way for "the relevant Class and Subclass terms" to be removed from a plan is to be replaced by the language in DST Reports 4 and 5, which Plaintiffs concede is not actionable. Ex. 4 at ¶¶ 9, 60-63. Mr. Mustoe does not consider the fact that allegedly actionable language might have been removed or replaced with other language not reflected on DST Reports 4 or 5.

Additionally, Mr. Mustoe proposes to end the relevant period based on the ***latest date*** when an account appears on DST Reports 4 or 5. To illustrate, if an account appears on DST Report 4 in 2017 (signifying to Mr. Mustoe that a 2017 plan associated with that account does not contain actionable subclass language) but the account also appears on DST Report 4 in 2018 (signifying that a 2018 plan associated with that account does not contain actionable subclass language), Mr. Mustoe proposes to treat the 2017 plan as if it contained ***actionable*** language because the same account appears on DST Report 4 at a later date. This notwithstanding the fact that the 2017 plan is in fact listed on DST Report 4 and thus, according to Mr. Mustoe's understanding, does ***not*** contain actionable subclass language.

Mr. Mustoe also proposes to determine whether a plan is subject to ERISA pursuant to a field in the DST Reports for documents associated with certain types of accounts and an "ERISA Data" report that he had not received or reviewed when drafting his declaration. ECF 206-1 at 9, 15. CHLIC produced a file with an ERISA indicator field ("ERISA_IND") for the documents

listed on the DST Reports, which reflects its ERISA status as reported by the plan sponsor.  Ex. 20 at 169:13-170:3.

> ### 2.    Calculating "Clawbacks" For Transactions By Class Members And Subclass Members

Mr. Mustoe proposes to identify "clawback" amounts for any particular transaction in any of the classes or subclasses as any "██████████████████████████████."[9]  ECF 206-1 at 12.  He then proposes to sum all such negative amounts for each class or subclass transaction that he identified using the methodology described *supra*.  ECF 206-1 at 12-16; Ex. 14 at 50:18-51:4; *id.* at 103:23-104:1 ("████████████████████████████████████████ █████████"); *id.* at 185:21-186:1 (testifying that ████████████████████████ ████████).

Mr. Mustoe does not propose to "readjudicate" any class member transactions using Plaintiffs' proposed methodology.  Ex. 14 at 185:1-13 ("██████████████████████████ █████████").  For example, Plaintiffs contend that CHLIC calculated some prescription drug payments incorrectly by limiting them to the plan sponsor's negotiated rate for prescription drugs (the "Client Rate") rather than the reimbursement actually retained by the pharmacy in connection with a transaction (the "Pharmacy Reimbursement Rate").  Plaintiffs' position is that the Client Rate should have played no role in determining participants' prescription drug payments.  Ex. 11 at 27-33.  Accordingly, under Plaintiffs' theory if, for a particular transaction, the Pharmacy Reimbursement Rate is higher than the Client Rate but lower than other amounts a class member might have to pay under the terms of the plan, the class member should pay the Pharmacy

---

[9] Mr. Mustoe's method does not distinguish between "clawbacks" for retail and home-delivery (mail-order) pharmacy claims.  Ex. 14 at 127:2-129:1 (testifying that ████████████████████████████████ ██████████████████████████████).  Plaintiffs' class and subclass definitions do not expressly include or exclude either type of pharmacy, both of which are included in the data.  ECF 234; Ex. 4 at 18 n.2.

Reimbursement Rate.  *See id.*  Because "███████████████████████████ ████████████████████████" (Ex. 14 at 103:23-104:1), Mr. Mustoe's methodology does not expressly take the Client Rate into consideration.  But, in conflict with Plaintiffs' theory of the case, Mr. Mustoe's methodology necessarily accepts as proper any transaction where the participant paid a Client Rate that was less than the Pharmacy Reimbursement Rate.  Ex. 4 at ¶¶ 86-93.  This effectively gives participants the benefit of the Client Rate even though Plaintiffs do not contend they are entitled to it.  Ex. 4 at ¶¶ 86-93; Ex. 11 at 27-33.

Mr. Mustoe does not propose to calculate the difference between what a class member actually paid for prescription drugs and what a class member should have paid for prescription drugs under Plaintiffs' theory.  Ex. 4 at ¶¶ 11-13, 77-101.  Nor does Mr. Mustoe propose to calculate the amount a class member would have paid for prescription drugs had the plans at issue not allegedly promised that prescription drug payments would not exceed the Pharmacy Reimbursement Rate.  *See id.* at ¶¶ 34; *see also* Ex. 14 at 185:1-13 (explaining that he "█████████ █████████████████████.").

Plaintiffs rely on Mr. Mustoe's declaration for support throughout their motion for class certification.  *See, e.g.*, ECF 206 at 6, 16-17, and 19-20.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence permits "a witness who is qualified as an expert" to testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; "(b) the testimony is based on sufficient facts or data"; "(c) the testimony is the product of reliable principles and methods"; and "(d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The proponent of expert testimony must carry the "burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."

*United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*).  This rule entrusts the district court with the critical gatekeeping task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert,* 509 U.S. at 597.

"[I]t is critical that an expert's analysis be reliable at every step."  *Amorgianos v. Nat'l. R.R. Passenger Corp., d/b/a Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002).  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Id.*  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting *Amorgianos*, 303 F.3d at 266).  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal citation omitted).

Additionally, an expert's testimony must be relevant, meaning that it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see also Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 392, 400 (S.D.N.Y. 2019) (excluding expert testimony where expert's "analysis would not assist in understanding the evidence or determining a fact in issue").  The expert's testimony must "fit" the issues in the case by having a "valid scientific [or other technical] connection to the pertinent inquiry."  *Daubert*, U.S. at 591-92.  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146.

## ARGUMENT

**I.     Mr. Mustoe's Attempt To Quantify "Clawbacks" On A Classwide Basis Is Unreliable And Inapposite to Plaintiffs' Theory of the Case**

Mr. Mustoe's opinions are unreliable insofar as he purports to calculate the relief to which class members may be entitled in a way that is inconsistent with applicable law, undisputed aspects of benefit design, and Plaintiffs' interpretation of the plans.   Each of these are sufficient and independent grounds to exclude Mr. Mustoe's opinion.   *Cf. Franco v. Conn. Gen. Life Ins. Co.,* 299 F.R.D. 417, 430 (D.N.J. 2014), *aff'd on other grounds*, 647 F. App'x 76 (3d Cir. 2016) ("In an ERISA action to recover unpaid benefits and/or to seek relief for breach of a fiduciary duty, the theory of liability, and thus the awardable damages, must be grounded in the plan documents.").

### A.     "Clawbacks" Are Not A Proper Measure Of Relief

The amount of "clawbacks" is not a proper measure of the relief to which class members would be entitled under Plaintiffs' theories of liability if they prevail.   Mr. Mustoe's opinion that "clawbacks" can be calculated on a classwide basis through common proof—even if true (which it is not)—is therefore neither helpful to the trier of fact nor relevant to the issues in this case.   It should be excluded.   *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354 (S.D.N.Y. 2003) (excluding expert' testimony that was "neither relevant nor reliable" because damages calculation did not match theory of the case).

Plaintiffs have not identified any plan language prohibiting "clawbacks."   The snippets of plan language on which Plaintiffs rely focus exclusively on the amount participants must pay for prescription drugs.   They do not address what pharmacies do with the money they receive, such as who (if anyone) they might pay with that money or how much (if any) they may keep.   What Plaintiffs call "clawbacks," by contrast, are credits permitted by a series of contractual revenue sharing arrangements between retail pharmacies, OptumRx, and CHLIC.   Ex. 20 at 226:7-227:25.

Whether or not "clawbacks" are capable of calculation on a classwide basis through common proof is therefore irrelevant to Plaintiffs' claims. "Clawbacks" are an arbitrary measure of classwide damages, and Mr. Mustoe's methodology focusing on "clawbacks" reflects "the sort of 'apples and oranges' comparison that should be rejected as irrelevant on the issue of damages." *Kortright Capital Partners LP*, 392 F. Supp. 3d at 400 (citing *Baker*, 254 F. Supp. 2d at 354).

The true focus of Plaintiffs' allegations is that class members supposedly paid more for prescription drugs than they should have under the terms of their respective prescription drug benefit plans. *See* ECF 206 at 9. If Plaintiffs prove that to be true, then under ERISA § 502(a)(1)(B), they would be entitled to recover the difference between what they actually paid and what they should have paid "under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B). The same is true under state law contract principles. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007) ("A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms.") (internal citation omitted).

Mr. Mustoe's method does not purport to calculate what a class member ***should have paid*** under the terms of his or her plan. As explained below, that would require consideration of undisputed aspects of benefit plan design (such as deductibles and out-of-pocket maximums) that Mr. Mustoe's analysis ignores. *See Peters v. Aetna, Inc.*, 2019 WL 1429607, at *8 (W.D.N.C. Mar. 29, 2019) ("[A] participant's responsibility on one claim may depend on the participant's and the plan's responsibility on the participant's previous claims."). Mr. Mustoe admitted during his deposition—repeatedly—that he did not ███████████████████████████ ██████████████████████████████████. *See, e.g.*, Ex. 14 at 85:2-86:5, 115:21-116:2, 185:1-6 ("██████████████████████████████████."); *id.* at 185:11-12 (same); *id.* at

185:21-22 (same).  He further admitted that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████.  *See also* Ex. 14 at 85:2-86:5, 115:21-116:2, 185:7-

189:5.[10]

Without proposing a classwide method for determining what class members should have

paid for prescription drugs under Plaintiffs' purported theory of liability, Mr. Mustoe's opinions

are not helpful to the trier of fact, and Plaintiffs have not shown that it is possible to determine

class members' relief on a classwide basis.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which

does not relate to any issue in the case is not relevant and ergo, non-helpful.").

Mr. Mustoe's approach is also inapposite as to RICO, where damages are measured

differently than under ERISA § 502(a)(1)(B) and general state law contract principles.

"[D]amages as compensation under RICO § 1964(c) for injury to property must, under the familiar

rule of law, place [the injured parties] in the same position they would have been in but for the

illegal conduct."  *Commercial Union Assurance Co., plc v. Milken*, 17 F.3d 608, 612 (2d Cir.

1994).    Plaintiffs contend that the "illegal conduct" here was the inclusion of "uniform

misrepresentations" in plan documents that allegedly misled class members into believing their

prescription drug payments would never exceed the Pharmacy Reimbursement Rate.  ECF 206 at

20.    Accordingly, the proper measure of damages under civil RICO would be the difference

between what class members actually paid for prescription drugs (in supposed reliance on those

---

[10] That method presumably would have involved steps similar to what Mr. Mustoe testified he does when performing
audits to ensure that prescription drug benefits are administered correctly, with participants and plan sponsors paying
the correct amounts and accounting for the effect of adjustments on subsequent transactions.  *Id.* at 186:3-11, 186:13-
16
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████.  *See id.* at 106:12-24, 181:6-182:13.
████████████████████████████.  *See id.* 106:18-108:4 (testifying that
████████████████████.  *See id.* at 107:21-108:3.

"uniform misrepresentations") and what class members would have paid for prescription drugs had CHLIC not made any "uniform misrepresentations" in class members' plan documents.[11]

Mr. Mustoe's methodology does not match Plaintiffs' civil RICO liability theory because it does not purport to determine how much class members would have paid for prescription drugs had CHLIC not included any "uniform misrepresentations" in their plan documents.  His failure to align his methodology with Plaintiffs' liability theory—and his failure to address the inherently individualized questions about how much each class member would have paid in the absence of a "uniform misrepresentation"—confirms that his opinions are unreliable and unhelpful.  *See Piepes v. NAI Entm't Holdings LLC*, 394 F. Supp. 3d 315, 319 (E.D.N.Y. 2019) ("A supposed expert who does not even understand or appreciate the basic parameters of the alleged injuries is not competent to serve as an expert.").

### B.    Mr. Mustoe's Methodology Is Inconsistent With Undisputed Elements Of Plan Design, Pharmacy Benefits, And Plaintiffs' Theory Of Liability

Mr. Mustoe's methodology is inconsistent with specific benefit designs (which vary from plan to plan) within Plaintiffs' proposed class and subclass definitions.  His failed attempts to cut corners instead of resolving necessary plan-specific and individualized inquiries confirms that his opinion should be excluded.

#### 1.    Plan Design

Mr. Mustoe's methodology ignores undisputed aspects of benefit plan design that materially affect how much class members should pay for prescription drugs.  For example, whether a class member has satisfied certain plan-specific out-of-pocket amounts (like deductibles

---

[11] Put another way, whereas the measure of benefits due (under ERISA § 502(a)(1)(B)) or damages (under state law) seeks to enforce the terms of each class member's prescription drug benefit plan, the measure of damages under civil RICO would seek to compensate for any losses sustained by each class member resulting from reliance on specific terms in the applicable prescription drug benefit plan.

and out-of-pocket maximums) can determine whether the plan will help pay for a given prescription drug transaction and, if so, in what amount.  Ex. 4 at ¶¶ 108-24.  Satisfaction of an out-of-pocket amount for a given plan year is typically a function of applicable plan terms and amounts previously paid out-of-pocket for prescription drugs.  *See Peters*, 2019 WL 1429607, at *8 ("[T]he Court must consider all the claims incurred by the participant in any given plan year, including those for which the participant benefited as well as those for which the participant was allegedly harmed.").  Where appropriate, according to applicable cross-accumulation rules that may vary from plan to plan, other types of payments (*e.g.*, medical transactions) or payments by other individuals (*e.g.*, family members) may factor in this analysis.  "Because of the impact of plan terms such as the deductible and out-of-pocket maximum," the effect of CHLIC's challenged conduct "on any particular participant or claim can only be assessed through a detailed analysis of an individual participant's claims history considered in the context of that participant's particular plan."  *Id.* at *8-9.

Mr. Mustoe did not perform "a detailed analysis of [each] individual participant's claims history considered in the context of that participant's particular plan."  *Id.*  Mr. Mustoe provided an example of how he proposes to calculate "clawbacks," but his example for **one** transaction for Ms. Negron is wrong according to the actual transaction data.  *See* Ex. 4 at ¶ 86 n.32; ECF 206-1 at 16; Ex. 14 at 185:11-13 ("███████████████████████████████.").  ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████.

Ex. 14 at 168:18-169:15, 175:23-180:16, 184:1-22, 187:4-189:5.  ██████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████. *Id.* at 185:1-189:5.  That is not sufficient to satisfy Rule

23.  *See Franco*, 299 F.R.D. at 430 (denying class certification in part because of "a disconnect

between plan language and the method proposed by Subscriber Plaintiffs to determine the class

members' damages in a cohesive manner").  It also presents several fundamental flaws such that

his opinion should be excluded altogether.

a.        **Mr. Mustoe Ignores The Effects Of Deductible Shifting**

If  some  deductible  payments  should  have  been  reduced  based  on  the  Pharmacy

Reimbursement Rate as Plaintiffs contend, some class members would have paid less towards their

deductible under Plaintiffs' theory than under CHLIC's approach.  Ex. 4 at Appx. 1 ¶¶ 108-17.

That  means  some  class  members  would  have  been  further  from  satisfying  any  applicable

deductible requirement had their transactions processed under Plaintiffs' theory and, consequently,

the amount those class members would have to pay toward their deductible for later transactions

would have increased.  *See id.*

CHLIC's  expert,  Dr.  Sean  May,  provides  several  examples  of  how  this  "deductible

shifting" requires an individualized review of each participant's plan document, prescription drug

transaction data, and sometimes additional variables—for each of the millions of putative class

members who paid deductibles—in order to determine reliably how much each class member

should have paid under Plaintiffs' theory.[12]  Ex. 4 at Appx. 1 ¶¶ 108-17; Ex. 14 at 186:13-16

---

[12] Although Plaintiffs do not challenge coinsurance claims, there are plans in the proposed classes and subclasses that have plan designs that require coinsurance **and** deductible and/or copayment participant cost-share payments. Ex. 4 at Appx. 1 ¶ 13.  "Deductible shifting"—the effects of changing a participant's deductible payments when reprocessing transactions—could cause changes to that participant's **coinsurance** payments for subsequent transactions in the plan year even though Plaintiffs do not quibble with how those payments were processed.  Ex. 4 at Appx. 1 ¶ 13.  The "ripple" (as Mr. Mustoe calls it) from changing that deductible transaction could cause future coinsurance transactions to become deductible payments and may increase a participant's out-of-pocket cost.  Ex. 4 Appx. 1 ¶ 108-17; *see also* Ex. 14 at 235:17-236:19) (testifying that ████████████████████████ ████████).

(acknowledging that ███████████████████████████████████

██████████████████████████).  Key considerations include the start/end of the plan

year for a participant's benefits (which varies by plan); the amount of the deductible that must be

met before the plan covers prescription drugs; the total amount that a participant paid in deductibles

over the plan year and the associated unmet deductible amount; whether the deductible

accumulates across individual participants or their families; whether the deductible accumulates

specific to prescription drugs or if it also includes other covered expenses like physician visits or

hospital care; and whether the deductible is specific to only prescriptions filled at in-network or

out-of-network pharmacies.  Ex. 4 at ¶¶ 108-117.

None of this information can be determined from DST Report and transaction data alone.

*See* Ex. 14 at 187:4-188:18.  Rather, it requires review of the plan document itself, along with other

sources of information that may vary from participant to participant.  Mr. Mustoe makes no attempt

to address the issue.  *See* Ex. 14 at 175:23-178:24; *id.* at 184:20-22 ("████████████████

██████████.").  But he admits that ██████████████████████████

██████████████████████████ *Id.* at 106:12-24,

186:3-11.

### b.    Mr. Mustoe Ignores The Effects Of Accounting For Out-Of-Pocket Maximums

Mr. Mustoe likewise did not evaluate the impact of out-of-pocket maximums, which limit

the total amount class and subclass members (and, sometimes, others) must pay out-of-pocket for

prescription drugs over the course of a plan year.  If a participant should have paid less out-of-

pocket on a particular prescription drug transaction earlier in his or her plan year under Plaintiffs'

theory, it would have taken that participant longer to meet his or her out-of-pocket maximum for

subsequent transactions.  Ex. 4 at ¶¶ 118-24.  Depending on the details of the participant's plan

and pharmacy transactions, the participant would have incurred additional out-of-pocket expenses for some transactions where the participant paid nothing under CHLIC's method, based on CHLIC's determination that the out-of-pocket maximum had been satisfied. *Id.* In the aggregate, some participants might end up paying the same amount over the entire plan year—the out-of-pocket maximum—even if the cost-sharing payment for one or more specific transactions was reduced under Plaintiffs' theory. *Id.*; *see also Peters*, 2019 WL 1429607, at *7 (disregarding expert's economic analysis because the "hypothetical savings" to participants were "illusory" since the "participants would have paid the price in the form of higher premiums").

As CHLIC's expert Dr. Sean May demonstrates in numerous examples—and ██████ ████████—Mr. Mustoe's methodology makes no attempt to address the impact of out-of-pocket maximums on any participant's cost share. Ex. 4 at ¶¶ 14, 118-24; Ex. 14 at 175:23-179:7; *id.* at 184:1-23 (testifying that ██████████████████████████████████ ████████). Had he done so, the resulting estimates of "clawbacks" would have been drastically reduced—in some cases to zero—for some members of the proposed classes and subclasses. *Id.* at ¶¶ 119. Indeed, there are hundreds of thousands of participants within the proposed class and subclasses who paid nothing for the last prescription drug transaction in their plan year, so determining how much these participants would have owed under Plaintiffs' approach would require an individualized inquiry into whether, in fact, they had met their out-of-pocket maximums at some point during the relevant period and whether lowering the amount owed for some transactions during the plan year would change the total amount that those participants owed. *Id.* at ¶¶ 124.

But Mr. Mustoe has proposed no methodology that attempts to address this concern, even though he would have to do so in order to determine how much a class member should have paid

for prescription drugs.  *See* Ex. 14 at 175:23-180:16, 185:11-13.  Mr. Mustoe's methodology, therefore, does not show reliably that the amount class members should have paid under Plaintiffs' liability theory is capable of classwide resolution through common proof.

### 2. Mr. Mustoe's Methodology Is Inconsistent With Plaintiffs' Theory of Liability

Plaintiffs contend that CHLIC was wrong to use the Client Rate as a cap on some class members' prescription drug payments and instead should have used the Pharmacy Reimbursement Rate as a cap.[13]  Ex. 11 at 27-33.  But rather than replacing the Client Rate, where applicable, with the Pharmacy Reimbursement Rate to determine what a class member should have paid under Plaintiffs' theory, Mr. Mustoe's methodology effectively considers ***both*** the Client Rate ***and*** the Pharmacy Reimbursement Rate as caps on class members' prescription drug payments.  Ex. 4 at ¶¶ 86-93.  Mr. Mustoe's methodology does not disturb transactions where CHLIC limited some class members' prescription drug payments to the Client Rate, so long as the amount paid was also less than the Pharmacy Reimbursement Rate.  *Id.* at ¶¶ 86-93.  That is fundamentally at odds with Plaintiffs' articulation for how class members' prescription drug payments should have been calculated under the terms of their plans.  Ex. 11 at 27-33; *see also Franco*, 299 F.R.D. at 430 (plaintiffs' method failed to "demonstrate[] not only that damages are susceptible of measurement across the entire class but also that the proffered model measures only those damages attributable

---

[13] For the Negron 2014-2015 and Perry 2015-2016 plans, Plaintiffs' interrogatory responses state that cost-sharing payments for these plans should have been calculated as the lesser of the relevant copayment amount listed on the Schedule, "the amount paid to the pharmacy," and the U&C Rate.  Ex. 11 at 31-32.  CHLIC assumes that Plaintiffs mean the Pharmacy Reimbursement Rate as Mr. Mustoe understands it.  Based on the **same** class and subclass definition plan language that is also in the Blocker 2014-2015 plans, Plaintiffs respond that cost-sharing payments for Mr. Blocker's plans should have been calculated as the lesser of the relevant copayment amount listed on the Schedule or "the amount paid to the pharmacy," with no mention of the U&C Rate.  *Id.* at 32-33.  Mr. Mustoe's method is inconsistent with both of these theories.

to the plaintiff's theory of liability"). Because Mr. Mustoe applied a methodology that differs from Plaintiffs' liability theory, it cannot be helpful to the trier of fact and should be excluded.

### C. Mr. Mustoe's Methodology Is Overbroad Because It Includes Transactions For Which Class Members Paid Less Than The Amount Reflected In CHLIC's Transaction Data

The fields in the pharmacy transaction data that Mr. Mustoe uses to determine what the participant actually paid[14]—and that are involved in the calculation of the field that he proposes to use to identify "clawbacks"[15]—do not always reflect actual payments made by participants. For example, participants may use coupons at the point of sale to reduce the amount they must pay out-of-pocket for prescription drugs. *See* Ex. 19 at 114:1-12 ("I had a coupon for that medication at that time that the doctor gave me a coupon to present to the pharmacy. And it's like some of the medicine that I got now, I got a zero co-pay."). But CHLIC's transaction data does not reflect whether the participant's cost share was satisfied through a participant payment or through a coupon. Ex. 20 at 368:13-369:25; Ex. 4 at ¶¶ 74-76. As a result, Mr. Mustoe's method leads him to identify alleged "overpayments" (and associated "clawbacks") as damages where the participant actually paid less than the Pharmacy Reimbursement Rate (or perhaps nothing at all) for the prescription. *See* Ex. 4 at ¶¶ 74-76. This leads Mr. Mustoe to misidentify members of the class and subclass and to overestimate the amount of alleged wrongful payments by participants. *Id.* at ¶¶ 74-76. To address this issue, Mr. Mustoe would need to incorporate information on prescription drug coupon usage for each individual whose pharmacy transactions were subject to a "clawback." *Id.* at ¶¶ 74-76. But he did not account for this information.

---

[14] COPAY_AMT and DEDCT_APPLD_AMT.

[15] PHARM_PD_AMT.

### D. Mr. Mustoe's Methodology Calculates "Clawbacks" Where No Relief May Lie Against CHLIC

CHLIC is not a proper defendant as to self-funded plans for which it no longer provides administrative services. *See Hall v. LHACO, Inc.*, 140 F.3d 1190 (8th Cir. 1998). CHLIC no longer provides administrative services to many self-funded plans that satisfy Plaintiffs' class definitions, like the plan sponsored by Cobb County in which proposed class representative Billy Ray Blocker, Jr. was a participant, and are associated with many class member transactions that Plaintiffs contend are actionable. Ex. 4 at ¶ 17. Mr. Mustoe makes no attempt to distinguish active accounts from inactive accounts, and accordingly does not exclude transactions for which no relief lies against CHLIC. This is yet another fundamental shortcoming in Mr. Mustoe's methodology, compelling the exclusion of his opinion.

### II. Mr. Mustoe's Attempt To Identify Class Members And Subclass Members On A Classwide Basis, A Necessary Predicate to His Calculation Methodology, is Unreliable And Produces Incongruous Results

As noted above, in an attempt to suggest that damages can be calculated on a classwide basis, Mr. Mustoe relies on the DST Reports generated by CHLIC for purposes of litigation. ECF 206-1 at 8-11, 13-14. Mr. Mustoe claims to use the DST Reports "███████████████ ████████████████████████████████████████████████████ ████████████████████████████." *Id.* at 12. But his use of the DST Reports is flawed, rendering Mr. Mustoe's opinions both unreliable and irrelevant such that they should be excluded.

### A. The Plan Language In The Proposed Class And Subclass Definitions Does Not Correspond To The DST Reports Upon Which Mr. Mustoe Relies

Mr. Mustoe's methodology does not successfully identify class member transactions because the phrases used to generate the DST Reports do not match the plan language in Plaintiffs'

class definitions.  *See* Ex. 4 at ¶¶ 50-73.  Mr. Mustoe's use of the DST Reports is too broad in some instances and too narrow in others, and without examining the plan documents themselves, Mr. Mustoe cannot distinguish between these two possibilities.  Mr. Mustoe could have reviewed some of the thousands of plan documents CHLIC produced in this case to test the reliability of his assumptions about the DST Reports, but he did not.  His failure to do so, combined with the limitations of the DST Reports (*id.* at ¶¶ 50-73; Ex. 20 at 376:17-378:4), makes his assumptions inherently unreliable.  *See Robinson v. Sanctuary Record Grps., Ltd.*, 542 F. Supp. 2d 284, 292-93 (S.D.N.Y. 2008) (expert opinion excluded because expert failed to "test the reliability" of his assumptions by considering relevant materials); *see also Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 380 (S.D.N.Y. 2014) ("Courts in this district have found that an expert report lacked reliability where the expert did not review data he believed to be unavailable, when the data was, in fact produced.") (internal citation omitted).

For example, Mr. Mustoe proposes to use DST Report 3 to identify plans satisfying a part of Plaintiffs' class definitions—specifically, those plans in CHLIC's DST system containing the phrase "required to pay a portion of the Covered Expenses for Prescription Drugs and Related Supplies."  ECF 206-1 at 10.  The language used to generate DST Report 3 does not align with the class definitions because the class definitions also include the words "may be" at the beginning of the phrase and then omit the words "for Prescription Drugs and Related Supplies" after the phrase used for DST Report 3.[16]  ECF 253 at 1-3.  The circumstances of Roger and Nina Curol, who are named Plaintiffs but have not sought to serve as class representatives, illustrate the problem with Mr. Mustoe's approach.  Their plan document issued by Island Operating Company for 2017 states

---

[16] Plaintiffs' class definition ("may be required to pay a portion of the Covered Expenses") is also not specifically tethered to the prescription drug sections of plan documents.  This exact phrase appears in the "medical benefits" sections of many plans.  *See, e.g.*, Ex. 24 at CIGNA00001763 ("***may be required to pay a portion of the Covered Expenses*** for services and supplies." (emphasis added)).

that participants "<u>may be required to pay a portion of the Covered Expenses</u> for **Prescription Drug Products**." Ex. 30 at CIGNA00036936-7009 at 6974 (emphasis added). The underlined language matches the words found in the proposed class definitions. *See* ECF 253 at 1-3. But the Curols' 2017 plan document does not appear on DST Report 3 because the bolded language ("Prescription Drug Products") is different than the phrase used to generate the report ("Prescription Drugs and Related Supplies"). ECF 206-1 at 3. By relying on DST Report 3, Mr. Mustoe's methodology incorrectly excludes class members like the Curols from his calculations. That the Curols are actually class members was confirmed only by reviewing their actual plan documents, which (as with all other absent class members) Mr. Mustoe did not do. This omission renders his opinion unreliable. *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *9 (S.D.N.Y. Sept. 15, 2003) (granting defendant's motion to exclude expert's testimony where expert "took no steps to verify the accuracy of the data [p]laintiffs provided to him").

Similarly, Mr. Mustoe purports to use DST Report 4 to identify transactions that should be *excluded* from his class and subclass calculations for any plan and plan-related document located in the DST system containing the phrase "prescription drug charge." But Plaintiffs' class definitions are more limited, requiring that the plan document provide that the "Deductible Payment" "will be based on the plan's Prescription Drug Charge." Because Plaintiffs did not request that the words "Deductible Payment" and "will be based on the plan's" be captured in DST Report 4, it does not reliably identify plans within Plaintiffs' class definitions. For example, the 2017 plan of class representative Kimberly Negron's employer states that the deductible "will be based on the Prescription Drug Charge" without reference to "the *plan's* Prescription Drug Charge." This document appears on DST Report 4 even though it does not contain the language from the class definitions. As such, Mr. Mustoe's exclusion of all the plans identified in DST

Report 4 results in his failure to calculate "clawbacks" for all members of the class as envisioned by Plaintiffs.  Without examining the plan documents themselves, Mr. Mustoe cannot determine how many class members will be inappropriately excluded, and his opinion is flawed.  *See id.*

These are just some of the inconsistencies between the language used to produce the DST Reports and the language in the class and subclass definitions.  *See supra* at 7-8.  Any one of these inconsistencies may lead Mr. Mustoe to treat participants as members of the class or subclass even though their plans only satisfy some (but not all) of the corresponding definition.  In combination, they make his opinion hopelessly unreliable.

**B.     Other Errors In Mr. Mustoe's Methodology Caused Him To Calculate "Clawbacks" For Claims Not In The Classes And Subclasses**

In addition to the fact that the DST Reports do not match Plaintiffs' class and subclass definitions, Mr. Mustoe also misinterprets the DST Reports in five ways:  (1) he assumes that documents listed in DST Reports must have become operative on the listed "Effective Date"; (2) he assumes that language listed in DST Reports 1, 2, or 3 must remain operative until it is replaced by the language listed in DST Reports 4 or 5; (3) he misuses DST Reports 4 and 5 in a way that includes "clawbacks" on certain transactions that Plaintiffs have excluded from the class or have conceded are not actionable; (4) he ignores Plaintiffs' position that some participants in plans ***not*** listed on DST Reports should be members of the class or subclass; and (5) he does not limit the subclass to participants who are also class members.   These methods and assumptions are erroneous and generate unreliable conclusions.

**1.     DST Reports Do Not Reliably Show When (If Ever) A Document First Became Operative**

Mr. Mustoe's methodology mistakenly assumes that just because a plan document is listed on a DST Report, it necessarily became operative.  But some plan and plan-related documents listed on the DST Report were never the operative plan document governing prescription drug

benefits.  For example, where the plan sponsor prepared its own plan document with different language and provided it to CHLIC for claims administration, the document listed in the DST Report might never have taken effect.  Though not a single transaction associated with such a plan document should be used in calculating "clawback," Mr. Mustoe's methodology would include this plan in his analysis (and the calculation of alleged damages for the class or subclass) since the plan would appear on the DST Reports.  As a result, Mr. Mustoe's methodology would substantially overstate the amount of "clawbacks" and is not reliable.  *See Amorgianos*, 303 F.3d at 269 (affirming district court's exclusion of expert testimony where expert's "opinion rested on a faulty assumption due to his failure to apply his stated methodology 'reliably to the facts of the case'") (quoting Fed. R. Evid. 702).

### 2.     DST Reports Do Not Reliably Show When (If Ever) A Document Stopped Being Operative

The DST Reports do not indicate when (if ever) a document listed on a DST Report stopped being operative.  ECF 206-1 at 10-11.  This is an important limitation that Mr. Mustoe acknowledges but ineffectively tries to solve for by saying that he can determine the "end dates" for plan documents with actionable language by applying DST Reports 4 and 5 that include plan and plan-related documents with other language.  *Id.*  Mr. Mustoe also incorrectly assumes that the actionable plan language as defined in the class and subclass definitions was modified in the plans ***only*** by the specific phrases used to generate DST Reports 4 and 5.  This is wrong, once again making his method unreliable and irrelevant.  *See Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 369, 374 (S.D.N.Y. 2014) (noting that expert "cannot offer reliable expert testimony to the extent that testimony is based upon her speculative assumptions").  Plan sponsors often made changes to plan language—including to the snippets of language at issue here—in different plans at different times.  *Id.* at ¶¶ 60-63.  The snippets of language at issue were sometimes removed

from plan documents and *not* replaced with the specific phrase that Mr. Mustoe uses to identify the removal of such language. *Id.* at ¶¶ 60-63. Using Mr. Mustoe's methodology, it would appear as if that actionable language remained in those plans *indefinitely* when, in reality, the phrase was simply removed altogether from the plan document. *Id.* at ¶¶ 60-63. This, too, causes Mr. Mustoe to drastically overstate the number of members in the class and subclass, the transactions that are actionable under Plaintiffs' liability theory, and by extension, the amount of "clawbacks" he would calculate. Ex. 4 at ¶¶ 60-63. Given these limitations, his opinion is unreliable.

### 3.    Mr. Mustoe's Use Of DST Reports 4 And 5 Is Inconsistent With Plaintiffs' Class And Subclass Definitions

Mr. Mustoe proposes to use DST Reports 4 and 5 to identify participants who should be *excluded* from the classes (only as to deductible claims) and from the subclasses (only as to copayment claims). ECF 206-1 at 10-11. That is inconsistent with Plaintiffs' stated position—reflected both in the class and subclass definitions, as well as in representations in Court filings—that all transactions pursuant to plans that describe deductible payments by reference to a "Prescription Drug Charge" are *not* actionable. *See* ECF 253 at 1-3; ECF 254 at 3.

Specifically, the class definitions proposed by Plaintiffs are limited to individuals enrolled in group plans that "with respect to deductible payments, did not provide that the 'Deductible payment' 'will be based on the plan's Prescription Drug Charge.'" ECF 253 at 1-3. When seeking leave to amend their class definitions, Plaintiffs explained that the definitions were intended to "specify that participants enrolled in plans that contain a certain defined term ('prescription drug charge') *are not included in any of the Classes or Subclasses*." ECF 255 at 3 (emphasis added). Accordingly, all transactions pursuant to plans describing deductible payments by reference to the "prescription drug charge" should be excluded from the classes and subclasses.

By contrast, Mr. Mustoe's methodology does ***not*** exclude all such transactions. Rather, it distinguishes class copayment claims from class deductible claims and subclass copayment claims, applying DST Report 4 to some and DST Report 5 to others. By not cutting off all liability for accounts appearing on DST Report 4, Mr. Mustoe calculates "clawbacks" for copayment claims not in the classes. Ex. 4 at ¶¶ 69-73. Because accounts typically appear in DST Report 4 before they appear in DST Report 5, this error is significant. *Id.* (describing that this flaw leads Mr. Mustoe to include tens of millions of copayment transactions to his analysis that are not associated with members of the proposed class). Again, this flaw in Mr. Mustoe's underlying assumptions renders his conclusion unreliable. *Id.*

### 4. Plaintiffs' Position that "Variations" of Plan Language – Not Contained on Any DST Report – Are Still in The Classes and Subclasses Illustrates That Mr. Mustoe's Blind Reliance on the DST Reports Is Flawed

Even though Plaintiffs construct their class definitions on snippets of particular language, Plaintiffs also contend that the definitions are not limited to those precise snippets. For example, DST Report 2 only includes plans where the verb appears as "incurs," but some plan documents conjugate the verb as "incur" with no "s". *Compare* Ex. 32 at CIGNA04068699, *with* Ex. 27 at CIGNA00000169. When asked about this variation in plan language, Plaintiffs stated they intend that plans using the word "incur" instead of "incurs" also meet the class definitions because "Plaintiffs consider the phrases to be ***substantively the same*** and to have the ***same legal effect*** and thus participants with either version should be considered to be in the Classes." *See* Ex. 13 at 1 (emphasis added).

Mr. Mustoe's reliance on DST Report 2—and his resulting exclusion of plans using the word "incur" instead of "incurs"—leaves out of his analysis all the transactions associated with accounts like those using the word "incur" that Plaintiffs claim are in the class. *See, e.g.*, Ex. 52

at CIGNA02119247; Ex. 51 at CIGNA00004631; Ex. 32 at CIGNA04068694.  This means that Mr. Mustoe's purported methodology to measure "clawbacks" on a classwide basis for a set of transactions does not actually match Plaintiffs' position regarding the scope of the class.  That is grounds to exclude his opinion.  *See Baker*, 254 F. Supp. 2d at 354 (identifying expert's testimony as "neither relevant nor reliable" where damages calculation did not match party's theory of the case).

This is not a problem that can be solved by asking CHLIC to generate another DST Report with the word "incurs" instead.  DST Reports are not capable of identifying all plans with phrases that Plaintiffs "consider . . . to be substantively the same and to have the same legal effect" as those in the class definitions.  There is no way to account for plan language variations that are purportedly encompassed by the class definitions other than by Plaintiffs identifying the language from a review of the plan documents themselves, which Mr. Mustoe did not do.  His reliance on DST Reports to identify putative class members and potentially affected pharmacy transactions is thus unreasonable.  *See Joiner*, 522 U.S. at 146 (exclusion is warranted where "there is simply too great an analytical gap between the data and the opinion proffered").

### 5.    Mr. Mustoe's Methodology Treats Some Participants As Subclass Members Who Are Not Even Class Members

Membership in a subclass presumes membership in the class, as well.  Mr. Mustoe makes this assumption (ECF 206-1 at 4), but fails to ensure that members of each subclass are also members of the corresponding class.  He does not apply DST Reports 2 and 3 (identifying documents with purported class language) in addition to DST Report 1 (identifying documents with purported subclass language) to identify subclass transactions.  The result is that his calculations include some subclass members who are not in the class.  *See* Ex. 4 at ¶ 40.  This is antithetical to the structure of Plaintiffs' proposed classes and subclasses.

\*       \*       \*

In sum, Mr. Mustoe tries to do too much with the DST Reports.  The DST Reports do not provide a sufficient foundation for Mr. Mustoe's opinion, and the absence of "sufficient documentation to make accurate accounting does not by some unknown alchemy convert unreliable evidence into reliable evidence."  *See Faulkner*, 46 F. Supp. 3d at 383.

## CONCLUSION

For the foregoing reasons, the Court should grant CHLIC's motion to exclude the testimony of Mr. Mustoe regarding the results of his analysis.

Respectfully submitted,

Dated:  July 7, 2020

*/s/* Brian W. Shaffer

Brian W. Shaffer (phv08654)
Jeremy P. Blumenfeld (phv23943)
Eleanor R. Farrell (phv08309)
Matthew D. Klayman (phv08656)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone:  215-963-5000
Facsimile:  215-963-5001
brian.shaffer@morganlewis.com
jeremy.blumenfeld@morganlewis.com
eleanor.farrell@morganlewis.com
matthew.klayman@morganlewis.com

Michael D. Blanchard (ct25891)
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103
Telephone:  860-240-2945
Facsimile:  860-240-2800
michael.blanchard@morganlewis.com

*Attorneys for Defendant Cigna Health and Life Insurance Company*