# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, ROGER CUROL, Individually and on Behalf of All Others Similarly Situated, and BILLY RAY BLOCKER, Individually and on Behalf of All Others Similarly Situated,
Plaintiffs,

vs.

CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, and OPTUMRX, INC.,
Defendants.

CIVIL ACTION NO. 3:16-cv-1702 (JAM)

REMOTE DEPOSITION OF TYLER LESTER
Tuesday, June 23, 2020

Reported By:
CATHI IRISH, RPR, CRR, CLVS, CCR

Page 10

LESTER

job?

A. I was in that role in various parts of that organization for about six years.

Q. So that would be roughly 2000 to 2016 or 2017 and then you moved to your new job?

A. Yes, 2010, and been in this role about three years.

Q. Do you have any role in preparing plans or plan language?

A. I do not.

Q. Okay. Were you familiar with the transition to Catamaran in 2013?

A. I am.

Q. Okay. What is Catamaran?

A. Catamaran is a pharmacy benefit manager that we contracted for a particular set of services back in 2013.

Q. What did Catamaran do for Cigna back in 2013?

A. The original relationship with Catamaran had a few components to it. One included utilizing their claim processing

Page 11

LESTER

platform. Another was partnering in pharmaceutical manufacturer contracting. And the third big item at the time was retail network configuration.

Q. When you say retail network configuration, would that be a network of retail pharmacies?

A. That's correct. So we contracted with Catamaran to do all direct retail pharmacy contracting on our behalf with guidance from Cigna as to the nature like, for example, how big we wanted that retail network to be but it was ultimately Catamaran's responsibility to build that network and provide a certain level of discounts and services within that network to Cigna, and we paid a per claim fee for those services.

Q. So rather than Cigna establish its own network of pharmacies, you used Catamaran's network?

A. That's is correct.

Q. Have you heard of a company called Argus?

Page 12

LESTER

A. Yes, I have.

Q. What's Argus?

A. Argus is the claim processor that Cigna has used for quite a long time, I believe over 20 years, that handles and manages the point of sale transactions for prescription drugs for all of Cigna's pharmacy business, and I know they have other clients in the industry as well.

Q. What is a point of sale transaction for prescription drugs?

A. Point of sale transaction I would define as the customer actually in the pharmacy or with a mail order pharmacy talking with the pharmacist or the pharmacy technician and having the prescription that their physician or health care professional has written for them and actually picking up and paying for that prescription.

Q. I'll ask some more specific questions later but just so we have a framework because I want to make sure I'm speaking the same language you are, to be

Page 13

LESTER

honest. Can you kind of walk me through the process of what happens involving Cigna and -- well, withdrawn.

When you use the phrase Catamaran, you -- would you prefer we use Catamaran or Optum, can we use one name for both?

A. Yeah, I think Optum since it's a little fresher in my mind would probably be easier today.

Q. Okay. So if you could just sort of as an overview just walk us through the process of when the customer walks into the drug store and hands the pharmacist the prescription and then you said the customer will walk out of the store with the prescription filled. What happens in between at a point of sale transaction?

A. Sure. So from my knowledge, over the past few years, we use Argus as our pharmacy transaction administrator. The pharmacist would enter in the details about that prescription into whatever their electronic system is that

LESTER

communicates to the Argus system. There can be lots of rules built into the Argus system where there either might be different prior authorizations required or set payer programs required, all of those would filter through the process and if a prescription drug doesn't require any of those additional steps, then at that point the pharmacists would see the financial information related to that transaction. They would see the customer cost share that is due.

We also provide the pharmacist with alternatives. If it's a brand drug, we provide them an alternative of the generic and here's how much the cost share for the generic might be for that customer. They then would tell the customer here's the cost share that you're responsible for for the prescription drug. I think they generally at least provide, or in my experience will offer counseling to tell the customer about the drug and how it should be used, and once the

LESTER

customer has paid that cost share, then they would be given the prescription.

Q. If I could break it down into smaller pieces, the pharmacist would input information, that would be the kind of information that would be on my insurance card, right, my number that sort of thing?

A. That's right.

Q. And then the pharmacist's computer will transmit that information to Argus; is that right?

A. That's right. On the insurance card there is -- sorry for speaking over you, there are a couple of codes, a FIN and RxPCN and that unique information works through the, I think as an industry there are standards around how to transmit pharmacy prescription drug claims, and that information is how it knows to send it to Argus as a Cigna claim, not to Argus as a different health plan.

Q. And then the Argus computer system will look at the claim and look at the drug and see whether it's a covered

LESTER

claim for benefits; is that fair?

A. That's right.

Q. And then the Argus system would also determine, for example, what drug tier you're in, what the copayment would be, and all the information related to whether the drug is covered; is that right?

A. That's right.

Q. And the Argus system will send that information back to the pharmacist and tell the pharmacist how much to collect from the customer before giving the customer the drug?

A. That's correct.

Q. And then the customer pays and then receives the drug and walks out of the pharmacy. Is that kind of it in a nutshell?

A. Yes.

Q. A question I have, just so we get our terminology right, I've been using the word customer. I gather the employer in an employer plan, you have the employer

LESTER

who hires Cigna to offer a plan for health benefits and drug benefits and then you have the employer's employee who is actually getting the prescription. What terminology do you like to use for those people because I've seen customer, member, a variety of terms, and I want to make sure we're speaking the same language here.

A. Sure. I think what would probably be easier today is to think of the employer and use the terminology plan since it might not always be a employer, and then for customer, a customer or member is okay with me. I generally use those interchangeably.

Q. What does Optum do in this process, if anything?

A. So our services that we receive from Optum, were contracting the retail pharmacy network and providing a certain level of discounts to Cigna within that network. The way that operated at the time is Optum would provide pricing

LESTER

information to Cigna for Cigna to provide to Argus for adjudication so there wasn't a direct connection. I'm not sure of the actual reason why, whether it was contractual between Optum and Argus, but in those cases Cigna acted as a go between, an intermediary to take whatever pharmacy rates, whatever pharmacy that should be in the network, they would provide them to Cigna and we would pass that information through to Argus to set up the Argus plan adjudication system.

Q. Just so I understand a little more when you talk about discounts, so Cigna and Optum enter into a I guess contract pursuant to which Cigna can buy or pay for drugs that are given to Cigna customers through the Optum network; is that fair?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer, Mr. Lester.

A. That's right. We contracted with

LESTER

Optum and based on that contract were fees paid by Cigna in exchange for a certain level of pricing and that came in the form of discounts at retail pharmacies.

Q. And when you say pricing, these would be the prices at which Cigna plans would be buying drugs from Optum's network pharmacies?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer.

A. I would describe it a little differently that we had a contract where Optum had to provide a certain level of discounts through retail pharmacies and Optum was providing us information on how they wanted those retail pharmacies to be reimbursed.

Q. When you say discounts, these are discounts on the sale of prescription drugs?

MR. SHAFFER: Objection to form.

THE WITNESS: That's correct.

///

LESTER

BY MR. IZARD:

Q. Okay. And these would be discounts on the sale of prescription drugs through Cigna plans?

A. I would say they would be discounts -- yeah, that's probably a fair way to characterize it, that they are discounts for any covered transaction under the Optum and Cigna contract, which didn't capture every retail pharmacy transaction but covered those that where it was utilizing an Optum -- or a pharmacy in an Optum retail network where they had a contract in place.

Q. When an Optum network pharmacy provided drugs to a Cigna member and Cigna or the employer needed to make a payment, who was the payment to, did you pay Optum or did you pay the network pharmacies directly?

A. So to my understanding, the flow of funds had Argus actually paying the pharmacies directly. Cigna reimbursed Argus based on what Optum had requested we

LESTER

set up in the system and then Optum reimbursed Cigna for that or the payment to the retail pharmacy.

Q. Sorry. I missed part of that. So Cigna pays Argus, Argus pays the pharmacy, and how does Optum get involved again?

A. Optum is technically reimbursing Cigna or I guess and then Cigna reimbursed Optum so it was a -- I don't remember all of the requirements from a financial perspective of why that happened to be the case but Optum was technically paying Cigna, Cigna paying Argus to pay the pharmacies and then Cigna paid Optum as part of that overall contractual guarantee for the discounts that we expect to receive from pharmacy.

Q. Who set the -- withdraw.

Do you know the terms -- withdrawn.

Were there contracts -- do you know if there were contracts between Optum and the pharmacies in the Optum network?

Page 86

LESTER

that copay logic that would determine what the customer would actually pay out of pocket.

BY MR. IZARD:

Q. When you say client price, that would be the employer or sponsor?

A. That's correct.

Q. That would be the amount that the employer or sponsor pays Cigna for the drug?

A. That's right.

Q. That's different than the amount the pharmacy would get paid for giving the drug to the customer or it could be?

A. Yes, it could be different.

Q. Now, if you go down to the boxes, it talks about 2 point logic copay K in Argus, 3 point logic copay G at Argus. We talked a little about copay G but can you tell me what this means?

A. Sure. So within the Argus system, there are various options that Argus has made available to their clients, whether they are pharmacy benefit managers

Page 87

LESTER

or health plan, of how to calculate customer cost share. 2 point logic in Argus' term was referred to as copay K. It uses two data points to determine the customer's cost share, either the copay or the pharmacy cash price for usual and customary submitted charge. There are a few different terms that fall into that pharmacy cash price, the 3 point logic of using Argus' logic or terminology copay G as in the client discounted price into that lesser of logic for customer cost share.

Q. What's a pharmacy cash price?

A. The pharmacy cash price within our systems, there are potentially two versions. There is what the pharmacy can submit as the usual and customary charge, which is supposed to represent what they would charge any customer that had no coverage through a health plan or any other relationship with that retail pharmacy. There's also a field available called the submitted amount. Those

Page 88

LESTER

combined would represent the cash price. The submitted amount is the pharmacy truly at the point of sale saying, hey, I'm going to submit a charge of $50 and that is my submitted amount and through that we calculate what that cash price would be, what the price the pharmacy is willing to accept, and if that's lower than the copay or the client discounted price, then the customer would receive benefit of that as well in copay G.

Q. Now, for a network pharmacy that has a contract with Optum, the pharmacy cash price may be different from the contract price pursuant to which the pharmacy agrees to sell drugs under the Optum contract; is that right?

MS. GRANT: Objection, form.

BY MR. IZARD:

Q. You can answer.

A. The -- from what we know with the Argus claim transaction data, the pharmacy decides what their cash price is and they submit that as part of the claim and then

Page 89

LESTER

whatever data Optum has asked us to load in the Argus system may or may not be different than that cash price that the pharmacy is loading at the point of sale.

Q. In your experience, the pharmacy cash price tends to be higher than the pricing that Optum is loading into the system as its contract price with the pharmacies; is that right?

MS. GRANT: Objection, form, foundation.

BY MR. IZARD:

Q. You can answer.

A. The cash price was higher than the information that we were passing from Optum to Argus to set up for claim adjudication but may or may not have represented Optum's actual contract with the pharmacy.

MR. SHAFFER: Bob, when you get to a good spot for a break, let's take one.

MR. IZARD: This is fine.

THE VIDEOGRAPHER: The time is

LESTER

Cigna over the years where we used to use the word "member" all the time for the individual. We shifted over the past five to 10 years talking about it as customer but in this instance, the customer was actually the client or the plan sponsor.

Q. I got you. Thank you.

Now, if you go over to column AV where it says Passes Data To, you'll see about halfway down there's a reference to 565 DST document source tool.

Do you see that?

A. Yes.

Q. Do you know what information client database would be passing to document source tool?

A. I don't. I don't have expertise on that one.

Q. The next one is called Vendor Feeds - End State. Do you know what that is?

A. I'm not familiar with the difference between the vendor feeds that we talked about before and this one. I

LESTER

don't know what the differences between the two would be.

Q. Let's go to the next one where it says DST document source tool.

Do you see that?

A. This is 565?

Q. Yeah.

A. Okay, yes.

Q. Do you see the description says DST consists of two parts, the paid selection tool and the chart maintenance tool? The paid selection tool is used by the benefits and contracts area to create documents such as certificates, riders and policies.

Do you see that?

A. Yes.

Q. Okay. And how does DST do that?

A. So I don't have expertise on DST other than how we use it. I don't have expertise on the actual how the tool itself works.

Q. Do you know how plan booklets are created?

LESTER

A. I do not.

Q. Do you know -- so you don't know anything about how a plan booklet is created?

A. I know generally from the feedback and the research that's been done, I'll call it the process. But when it comes to the actual tools that are creating it, I do not.

Q. What's the process?

A. Sure. When a client has ultimately selected Cigna to be their vendor, their service provider for medical and pharmacy benefit, as part of the sales process, we would offer different suggestions to a client and when they are working through the implementation process, they would provide -- we looked at the client documents so our implementation teams would work with the plan sponsor, potentially even with their intermediary, like brokers and consultants, to develop a plan for that client. That information is loaded into

LESTER

ePro and there's a process to then create sample plan language for the plan sponsor to review. So that sample plan language is generated through logic that's connected to the ePro system to be able to hand the client a sample plan document and it's the client's responsibility to review that, to make any changes to it, if there are changes that will impact adjudication to have those conversations with their implementation manager, and ultimately once we have finalized that before their effective date to be able to provide that final version that the plan sponsor has approved for them to distribute to the members.

Q. So is the coding that's done in ePro what basically is translated into a plan document?

A. That's right.

Q. So certain codes in ePro will lead to certain versions of the plan document?

A. Yes.

Page 166

LESTER

Q. 48 is the sum of 45, 46 and 47?

A. Sorry, you're asking about line 48?

Q. Yes.

A. Line 48 would also capture any cost share paid by the customer at the point of sale.

Q. Okay. I see. So if we look across 48, column D, shows the line is $12.45.

Do you see that?

A. Yes.

Q. So that would be the cost share was greater than the amount that Cigna -- or the pharmacy, so the pharmacy had to pay $12.45 back to Cigna?

A. I believe based on the flows of funds, it's technically dollars back to Optum but that Cigna would then be part of that Optum reconciliation if I think through the flow of funds properly.

Q. So the pharmacy -- so the member pays a cost share greater than the cost of the drug and the excess amount is paid by

Page 167

LESTER

the pharmacist to Optum and Optum pays Cigna?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can answer.

A. Instead you would have -- so the pharmacy, the amount that you see here isn't paid by the pharmacy through any of these value streams. Instead it is offset against all of the payments that a pharmacy might receive over a several-week period and the process that was set up with Argus funding the pharmacies, Cigna funding Argus, Optum funding Cigna because ultimately Optum owns these contracts means those dollars are ultimately making their way to Optum and Cigna is still responsible for paying Optum the sum of all of the claims that occurred over time and really netting out any negative amounts with positive amounts.

Q. So the first step is between Optum and the pharmacist, they are going to net out the positive, negative numbers

Page 168

LESTER

and then there will be a net payment reflecting all that netting out?

A. At least in the transaction that -- yeah, in the transaction data that we had available. It doesn't mean that it didn't somehow some other way impact Optum's contracts with that pharmacy but from the transaction that happens on the Argus system, that is how it works.

Q. Do you know how frequently that occurs?

A. I believe it is every two weeks but I'm not certain.

Q. And then the same process happens between Optum and Cigna, you look at all the transactions for a particular period and net out the positive and negatives and come up with a net number to be paid either to or from Cigna?

A. That's right.

Q. All right. Let's go to -- back to the exhibits, please. We're going to go to Despard Exhibit 7. Do we have that loaded in here yet? CIGNA 12365596.

Page 169

LESTER

A. Got it.

Q. Okay. And up at the top it says excerpt from CIGNA 12365596.

Do you see that?

A. Yes.

MR. SHAFFER: Hang on one second, Bob. Sorry, where is that?

MR. IZARD: It's the third one down from the top.

MR. SHAFFER: Despard 7, thanks.

BY MR. IZARD:

Q. I just want to clarify. My understanding, Mr. Lester, is what this chart shows is whether a plan is covered by ERISA or not, and column E says erisa_ind, and if it's a Y, that means it is covered by ERISA, if it's an N it is not covered by ERISA. Is that your understanding?

A. I believe this document is based on what we house within Cigna as to a client's ERISA, how the client has told us to set up their ERISA status. Yes.

Q. So you rely on a client to tell

Page 170

LESTER

you whether they are ERISA or not ERISA?
A. That's correct.
Q. All right. Let's go back to the exhibits again. I want to go to the answers to the eight set of interrogatories. Let's see if we can find those in here.
MR. BARRETT: It's marked Exhibit 38, Bob.
(Exhibit 38, objections and responses to eighth set of interrogatories, marked for identification.)
BY MR. IZARD:
Q. So if you could look at 38, please.
A. Got it.
Q. And on the last page, Mr. Lester, you can see your verification there?
A. Yes.
Q. What information or documents did you rely upon for these answers?
MR. SHAFFER: If you need to take a minute to review them, Tyler, please

Page 171

LESTER

do so.
THE WITNESS: That's what I'm doing now.
(Witness perusing document.)
Bob, could you repeat the question on this one?
BY MR. IZARD:
Q. My question is what information or documents did you review in connection with these answers?
A. This relied on the same information that our legal team had gathered from experts in our service operations area that support plan documents that work with different tools such as the DST report.
MR. IZARD: Let's go back and mark the DST report. Chris, which one would this be?
MR. BARRETT: Exhibit 39 is for discretionary authority.
MR. IZARD: Which is the one for pay for drug products?
MR. BARRETT: I'll have to load

Page 172

LESTER

that one up.
(Exhibit 39, document Bates labeled CIGNA12365958, marked for identification.)
BY MR. IZARD:
Q. Can you pull up 39, please, Mr. Lester?
A. Got it.
Q. Can you tell me what Exhibit 39 is, please?
A. It is another DST report, it looks like with an extra field added for funding arrangement, and based on the header that was added, it was pulled for documents that had information above -- or the phrase above.
Q. Now, this DST report also has a Ben Opt code. Do you see the right-hand column?
A. Yes.
Q. This would be a Ben Opt code from ePro?
A. I believe so. The fact that there are some with only two digits or two

Page 173

LESTER

characters is a little unusual but if it was a Ben Opt code, then it would tie to the Ben Opt codes that are in the ePro system.
Q. If you look down a ways, you can see a couple of them are listed as null. Do you know how you would have a null Ben Opt code?
A. I don't believe I've seen any on this document that show up as null.
Q. I'm sorry, I'm looking at the wrong one, I'm looking at the one that Chris is about to load.
Let me ask you a couple questions on how the Ben Opt codes work and match them up with the dates. So if you go down two-thirds of the way, you see Hexion, Inc. Do you see that? It's client number 339108.
Do you see that?
A. Yes.
Q. So if you look at the Ben Opt codes, it looks like this document was sorted by Ben Opt code so, for example,

Page 222

LESTER

Argus team and the IT team internally.

Q. The middle e-mail is from you to Ms. Burns-McAvoy.

Do you see that?

A. Yes.

Q. It says the negative spread of home delivery is the difference between our actual acquisition cost and what we charge clients. What does that mean?

A. I'll need to read the starting point of the e-mail to understand that.

(Witness perusing document.)

So reading through the entirety of the e-mail, it looks like it was during testing that was underway for updating how we processed retail pharmacy claims and we were also testing what would happen at mail order claim and there were some scenarios where mail order claims were actually generating negative spread, which was unexpected. So that means that the client was paying less than the pharmacy was actually going to be paid on that transaction.

Page 223

LESTER

Q. So actual acquisition cost is the amount paid pursuant to the pharmacy rate?

A. At our home delivery pharmacy, acquisition cost would truly be what our mail order pharmacy was buying the drug for directly from manufacturers or wholesalers.

Q. Now, did Argus customize the PCT sent to Cigna or is it sort of a standard Cigna format?

A. I don't know how Argus communicates with other clients. My assumption was it was customized for Cigna but I don't have information on what Argus outputs might look like to other plans.

Q. The fields in the claims data, were those Argus fields or Cigna fields?

A. The fields in the claim data would be Argus fields. However, they might be renamed on the Cigna side to make them more fit into how we talk about our business.

Q. And what we saw earlier, the list of the 50 plus fields, those were in the

Page 224

LESTER

Cigna field names?

A. That's my understanding.

Q. Those would be the names in GHTR?

A. That's right.

MR. IZARD: Okay. Let's move on now. We're going to go to a document that is 202958 which is the fifth one from the bottom. It should be 46. Is that right, Chris?

(Exhibit 46, document Bates labeled 00202958 through 973, marked for identification.)

MR. BARRETT: That's right.

THE WITNESS: Got it.

BY MR. IZARD:

Q. All right. You can see it's a series of e-mails. I'm only going to ask you about the first page but you're welcome to flip through it. You can see on the front page there's three e-mails. The bottom is an e-mail from Evan Spitulnik to various people and you're cc'd, and there's a e-mail above that from Stephanie Byrne back and you're cc'd, and

Page 225

LESTER

you don't appear to be cc'd on the very top.

Do you see that?

A. Yes.

Q. So we start at the bottom of the first page with Mr. Spitulnik's e-mail. He says "Team, as a follow-up to this morning's call regarding balance versus unbalanced logic for the CVS and WAG true ups.

Do you know what that means?

A. So it was our understanding at the time from conversations with the Optum team that their contractual relationships with CVS and Walgreen's allowed them to balance all dollars paid to those pharmacy chains against their total guarantee with those chains. So this discussion was around how we would handle those two pharmacies or pharmacy chain, I believe.

Q. And it goes on to say below is an excerpt from amendment 2 which states that PBM will pay excess amounts, i.e., negative pharmacy adjustments on claims

Page 226

LESTER

dispensed from CVS and Walgreen's, so PBM here would be Optum?

MR. SHAFFER: Objection to form.

THE WITNESS: That's correct.

BY MR. IZARD:

Q. And what this means is to the extent that the customer copayment exceeded the pharmacy rate, that excesses amount would show up as a negative pharmacy adjustment; is that right?

A. That's right, this is in regards to the guarantee reconciliation between Cigna and Optum.

Q. And that negative adjustment to the -- negative pharmacy adjustment would in effect be a credit to Cigna, it would be a plus column item for Cigna; is that right?

MR. SHAFFER: Object to the form.

THE WITNESS: Yes that's right, the reconciliation, there would be that adjustment made, that's right.

BY MR. IZARD:

Q. This is when Cigna is beginning

Page 227

LESTER

to receive any excess amounts that the customer paid above the amount that was paid to the pharmacy; is that right?

A. Cigna would have received it as a credit against the reconciliation with Optum at the time, yes.

Q. And if we look up at the middle e-mail from Ms. Byrne, with a copy to you, Ms. Byrne says, "I believe this means that for CVS/WAG/GER pharmacies that the amount paid to the pharmacy which exceeds what would otherwise be paid to the pharmacy (which is the contracted rate) is either paid or credited (which means included in the agreement cost calculation) by PBM."

Do you see that?

A. Yes.

Q. You agree with that?

A. Yes, I agree that's the amendment that we applied during this period.

Q. When we say paid, it's either paid to Cigna or credited into Cigna; is that right?

A. That's right.

Page 228

LESTER

Q. Up above, Ms. Byrne in the second sentence says, "Can we get a joint declaration from CTRX/Cigna senior leadership that for CVS/WAG/GER pharmacies, the ingredient cost is the amount actually retained as payment?"

Do you know what that means?

A. Yes, when we saw that previous document about unbalanced claims, that's the fact that the amount the pharmacy paid is lower than -- or sorry, the amount that shows up in our data as pharmacy ingredient cost is lower than what the pharmacy actually received at the point of sale. And the goal here was making sure that when the calculation was done, as part of this reconciliation between Cigna and Optum, that all of those dollars that were unbalanced would be captured as part of that reconciliation and ultimately increased for this reconciliation purposes the pharmacy ingredient cost.

Q. So what you wanted to do was make sure that there was clarity over how much

Page 229

LESTER

money would be falling back to Cigna as part of this process?

A. And from the Optum perspective, they wanted to make sure that they knew how much CVS and Walgreen's were being reimbursed through this process, or whatever their contractual purposes might have been.

Q. What is the GER pharmacy?

A. GER stands for generic effective rate. Generally in the industry, a generic effective rate can be part of a retail pharmacy agreement with a health plan or PBM that is effectively an all in guarantee of what that retail pharmacy will reconcile back with the health plan so that generic effective rate is a particular discount of X percent and over whatever period the PBM and the retail pharmacy have negotiated, they will meet that discount of X percent across all claims that meet that that -- that fall into that contract.

Q. Were the Optum network pharmacies

Page 242

LESTER

Q. Who is John Boyle?

A. John Boyle is on our product and marketing team.

Q. You can see in the first sentence it talks about the meeting to discuss what language is needed for state filings.

Do you see that?

A. Yes.

Q. At the beginning of the second paragraph, it says we would not -- we would like not to change much of the exiting language unless we feel it is absolutely necessary.

Do you see that?

A. Yes.

Q. Okay. Was he asking for your comments on language?

A. At the time my role was primarily focused on our -- in our actuarial pricing team so not having written this, my assumption is he was looking for my guidance on how any of these changes would potentially impact filings that we have to do with state department insurance.

Page 243

LESTER

Q. Okay. So you can see there's an attachment there.

A. Yes.

Q. Let's go to the very end. You can see that next to last box there where it says copay G.

Do you see that?

A. Yes.

Q. And it says in no event will the copayment, and then there's a parentheses in red, and any additional cost required by this plan for this prescription drug or related supply, close paren.

Do you see that?

A. Yes.

Q. Is that red a proposed addition?

MR. SHAFFER: Objection to form, lack of foundation.

THE WITNESS: I didn't write this one so I'm not sure. I can't remember the time period.

BY MR. IZARD:

Q. Okay. Whether you were asked to comment on these plan provisions, do you

Page 244

LESTER

have an understanding of what an addition in red meant?

MR. SHAFFER: Same objection.

THE WITNESS: I likely wouldn't have in the time. My role at the time was understanding changes to language that might impact premiums and versus actually reviewing how filing language with state departments of insurance should be worded.

BY MR. IZARD:

Q. Would you be involved in how language might affect copayments or coinsurance?

A. I would have been a recipient of that type of guidance from our product team or our compliance team that would have given me guidance around if we make this change, this is what will happen, and my role is to then take that and say okay, if that happens, how will it impact premiums.

Q. It continues, coinsurance for prescription drugs or related supply

Page 245

LESTER

exceed amount paid by the plan and then the words to the pharmacy have a line through them. Do you know what that means?

A. Generally when I read a document and there's a line through it, oftentimes it's what someone would like to remove, but I'm not certain on what John was highlighting here. But that would be my assumption looking at this.

Q. I think as we said at the start, Mr. Boyle said that he only wanted to change language that is absolutely necessary. Do you know why it was absolutely necessary to delete the phrase "to the pharmacy"?

MR. SHAFFER: Objection to form.

THE WITNESS: I do not.

BY MR. IZARD:

Q. Well, you would agree that the -- payment by the plan to Cigna is different from a payment by the plan to the pharmacy, wouldn't you, because --

MR. SHAFFER: Objection.

Page 246

LESTER

Q. -- in the pharmacy --

MR. SHAFFER: Objection to form.

THE WITNESS: So when I think about the plan, the plan sponsor for the majority of our business that is in an agreement where they pay us something different than what the retail pharmacy is being paid, the plan is really never paying the pharmacy, they are paying Cigna on behalf of the services that we are offering unless the plan is in a pass-through arrangement and even then they are not paying the pharmacy, they are paying Cigna and our Optum relationship on Optum is actually paying the pharmacy but we are making sure that the plan in that situation is not paying more than Optum has directed us to reimburse the pharmacy -- than Optum decides the pharmacy should be reimbursed.

MR. IZARD: All right, let's go back to -- let me see if I need to ask

Page 247

LESTER

any more about this. We covered that. All right. Let's go back to the exhibits, please. So we're going to go to one that is 399414.

(Exhibit 49, document Bates labeled CIGNA00399414 through 423, marked for identification.)

THE WITNESS: All right, got it.

MR. IZARD: I don't yet. Oh, there it is.

We'll mark this as 49, please.

BY MR. IZARD:

Q. I'm going to start asking you about the fourth page in but look through this to satisfy yourself with it so you know what's going on.

A. (Witness perusing document.) Okay.

Q. So if you see starting with the page which has a 399417 at the bottom, there's an e-mail --

A. Yes.

Q. -- in the middle from Robert Comella to Michelle talking about the re

Page 248

LESTER

ePro project that Thomas was taking a lead on coordinating and there's concerns about pharmacy pricing.

Do you see that? And then you were asked to get involved. Do you see that?

A. Yes.

Q. We go forward a page to 399416. Here's your e-mail to Paul Huffman.

Do you see that?

A. Yes.

Q. And you discuss the upcoming transition with Catamaran.

Do you see that?

A. Yes.

Q. The third sentence says there are -- there is the potential for material price swings during the transition. What does that mean?

A. So in 2013 we were preparing to move to Optum managed retail pharmacy contracts where on the Cigna side we would no longer have control over what retail pharmacies were reimbursed. And for a

Page 249

LESTER

client that might have been set up as what we call national MAC here, which was a MAC list that tried to mirror pharmacy reimbursement, when that pharmacy reimbursement changed to Optum and we had no control over the price changes, we were concerned that customers would see big price swings as we moved from Cigna contracts with one level of rates to Optum contracts that might have been very different.

Q. If you would, please, turn to the first e-mail which is on 399414. It's an e-mail from you to Stephanie Byrne.

Do you see that?

A. Yes.

Q. You say, "I think our effort to fly under the radar may have failed. Do you want to set something up with the AVPs or should I?"

What did you mean by that?

A. Our goal during the transition was to minimize price fluctuations that were seen by clients and customers and we

Page 258

LESTER

play and that's what we wanted to avoid as part of this network transition.

Q. Here the customer is the employer sponsor, not the member.

A. We were actually more focused on the member and that's why I think a deductible plan is probably the best example that in that situation where the member has not met his deductible yet, they are paying the full client rate on a claim. If the rate Optum paid at pharmacy went up significantly, then we would potentially need to make changes to our client rates as well so we weren't too far in the negative and that's what we wanted to avoid, is making client price changes that would impact customers.

Q. So even if it was a small increase in your deductible theory, let's say you're paying your deductible out of a savings account or something like that, as these prices went up and down that could affect the amount of the deductible payment you would have to make; right?

Page 259

LESTER

A. That's right.

Q. So if you're raising the pharmacy rate early in the year, your HSA deductible would be higher and if you are lowering the deductible -- I'm sorry, you're lowering the pharmacy rate later in the year, your deductible would be lower; is that right?

MR. SHAFFER: Objection to form.

THE WITNESS: That would be accurate for our pass-through business, and at the time about 15 percent of our clients were in a passthrough arrangement where our customers or clients saw exactly the rate the pharmacy was being paid and that plays into some of that customer price increase that because Optum now controlled those prices, we wanted to avoid customers and pass-through pharmacy changes.

BY MR. IZARD:

Q. The ask is how much this can move spread from pharmacies to Cigna, the

Page 260

LESTER

impact of somebody paying a deductible at pass-through businesses, if they have a higher deductible earlier in the year and a lower deductible later in the year; is that right?

A. Potentially. Which is what we were trying to avoid with this process.

Q. Well, you were trying to avoid a big change but you were okay with a smaller change; right?

MR. SHAFFER: Objection to form, argumentative, misstates the document and the testimony.

BY MR. IZARD:

Q. You can answer.

A. I would say similar to that previous document that highlighted the goal of how we managed client pricing, one of the key items there is around customer and client price stability and that was part of the suggestion and the request that Stephanie Byrne made to me, who was on her team, to make sure that we kept that in mind with any potential changes.

Page 261

LESTER

Q. Is it okay if a client pays 5 percent more at the beginning of the year and 5 percent less at the end of the year or 10 percent more at the beginning of the year and 10 percent more at the end of the year? What's acceptable?

MR. SHAFFER: Objection to form, argumentative, misstates the testimony.

BY MR. IZARD:

Q. You can answer.

A. I'll say we over time have a lot of rules in place around our client rate, rules around how much prices are allowed to go up over time, rules about even how much prices can go down because the market for generic drugs in particular can change significantly. Those rules can vary based on a low cost generic where if the generic is $6, a 50 percent increase to $9 might be an acceptable price change. But if it's a $300 generic drug, then that same 50 percent increase we would seek to avoid so there's a lot of variation but that

LESTER

customer price stability is an important reason why we have separate client rates than our pharmacy rate so it allows the pharmacy rate to change significantly throughout the year. However, Optum at the time needed to manage it while minimizing impact to our customers and clients.

Q. Thank you. Let's go back to the documents here now. Now we're --

MR. SHAFFER: Let's take a short break. We're getting late in the afternoon. We've been going an hour and 15.

THE VIDEOGRAPHER: Stand by. We're off the record. The time is 3:54.

(Recess taken from 3:54 p.m. to 4:05 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 5 minutes after 4.

BY MR. IZARD:

Q. Okay, Mr. Lester, what's the

LESTER

difference between ZBL and ZBD?

A. Can you say those terms one more time?

Q. ZBL is zero balance logic; is that right?

A. That is right.

Q. Have you ever heard of ZBD?

A. ZBD is an acronym that I believe for zero balance due, so how much was due to the pharmacy.

Q. So that relates to a dollar amount?

A. That's right.

MR. IZARD: All right. Let's head back to the exhibits here. We're going to go to 405380 which is the seventh from the bottom.

(Exhibit 51, document Bates labeled CIGNA00405380 through 384, marked for identification.)

MR. IZARD: And what are we up to now, does anyone know?

MR. BARRETT: 51.

///

LESTER

BY MR. IZARD:

Q. And you can see it's an e-mail from -- I'm going to butcher this, I apologize, but it's Enkeleda Duka?

A. Very close.

Q. How would I say that better?

A. Enkeleda.

Q. Okay. And it has the -- it says attached is a proposed solution for pharmacy overpayments. And if you scroll down a bit, you'll see the attachment and at page 405384 it says pharmacy overpayment proposed solution.

Do you see that?

A. I do.

Q. What is meant by pharmacy overpayments?

A. The pharmacy overpayment was the amount that the pharmacy kept above their reimbursement rate that was set up on the claim.

Q. And if you look on your proposal, it says the proposed solution is for Argus to make a change to reflect the

LESTER

overpayment by the customer as a negative amount owed to the pharmacy and ensure the funding reflects the negative amount in an automated way.

Do you see that?

A. I see that.

Q. Was Argus going to make this change in the paid claims tape?

A. Yes.

Q. So you can see the example down below where it says response to pricing segment.

Do you see that?

A. Yes.

Q. So the difference is Argus was going to change the ingredient cost paid from 27.50 to 22.50 which would result in a negative $5 due the pharmacy; is that right?

A. That is correct.

MR. IZARD: Okay. Let's go back to the documents.

Now we're going to go to 150348. Let's see if I can find that one.

Page 314

LESTER

migrated back to Argus?

A. That's right.

Q. Did Optum have access to plan or plan documents?

A. No.

Q. Sorry, I didn't hear you, what was that?

A. Not to my knowledge.

MS. GRANT: Thank you, no further questions.

MR. SHAFFER: Mr. Lester, I have a few questions for you just to make sure we have a complete picture of some of the topics that were discussed today.

EXAMINATION

BY MR. SHAFFER:

Q. Remind me again how long you've been with Cigna?

A. 13 years.

Q. Okay. And during what period of time over those 13 years have you been involved with aspects of the pharmacy management side of the business?

Page 315

LESTER

A. Nine and a half years.

Q. Okay. And in your current position, what are your responsibilities as it relates to pharmacy benefit management?

A. My team supports retail network analysis, mail order pharmacy analysis, prescription drug trend projections and reporting, pharmaceutical contracting analysis and the evaluation of financial savings from clinical program.

Q. And what was your position before the current one in pharmacy?

A. Prior to this, I led the pharmacy pricing team of actuaries that supported all of our pricing tools for insured business and self-funded clients, ASO clients.

Q. And what are your objectives and goals from a pharmacy perspective in your current position?

A. So my current position is focused on finding more affordability related to prescription drugs, so through supporting

Page 316

LESTER

retail network contracting, evaluating manufacturer contracts and working with clinicians on drug selection as well as identifying potential emerging drugs coming to the market such as gene therapies and how to help manage those costs.

Q. How does your group interact with others at Cigna as it relates to providing those service?

A. We work closely with our pricing and underwriting teams providing financial projections and information about drug cost into the future. We work closely with our clinical teams on the evaluation of clinical programs and formularies. We support our contracting team that contract with mail order pharmacies, retail pharmacies and manufacturers, and we also support our operations teams where there are financial operations related items in the pharmacy benefit.

Q. Mr. Izard asked you a number of questions talking about Cigna's efforts to

Page 317

LESTER

obtain revenue from negative reimbursement on the pharmacy side. How does that aspect of one of the things that you have to deal with intersect with the other objectives you talked about in terms of controlling cost for prescription drugs?

A. Sure. So we're in a competitive market where clients have the option to stay with Cigna or carve out their pharmacy benefits to many other plans. Most of our pharmacy clients do not pay fees for the services we provide. Instead those fees are earned through retail spread or potential margin at mail order pharmacies that we own but in that way the clients know what to expect from drug costs with the guarantees that we put in place and as we strive to improve negotiations, whether it's with pharmaceutical manufacturers or retail pharmacies, every dollar of affordability flows directly through for our business in lower premiums, and for our self-funded clients it helps us provide deeper and

Page 318

LESTER

deeper discounts every year that are negotiated on an annual basis.

Q. So based on the questions today, one might come away with the impression that negative reimbursement is the only aspect of prescription drug pricing that matters. Are there others that have significant impacts on the overall costs that a group sponsor may pay with respect to prescription drugs?

A. There are. Some of those biggest drivers are the drug themselves, new drugs that come to the market from manufacturers, increases in drug prices that manufacturers might take on their own products, new indications for drugs that are on the market, and increased utilization based on either new indications for products or the declining health of a particular employer's population, which is why we offer lots of programs to help manage those costs over time.

Q. And what role do plan sponsors

Page 319

LESTER

play in designing the prescription drug benefits that they are going to offer to participants in the plans that they sponsor?

A. Self-funded clients, particularly those that consider themselves ERISA plans, have almost unlimited flexibility in designing their benefit. Whether it's the tiering that we talked about a little bit earlier, the formulary design, the pharmacy that they want to have in their retail network, which mail order pharmacies they want to be able to utilize, the quote/unquote, programs that they might select, and at the end of the day the customer contribution in the form of employee premiums that they might charge. And even our insured clients have a lot of flexibility. The only guardrails are those put in place by different states Department of Insurance, but as long as they are within those guardrails of the types of plans they can offer, the type of cost shares that they can require their

Page 320

LESTER

employees or the customers to pay, then they have a lot of flexibility and ultimately decide what benefit options they want to put in front of their employee.

Q. Are there differences in the way the plan sponsors approach those options or exploring the benefit design selections that they may make?

MR. IZARD: Objection.

BY MR. SHAFFER:

Q. You can answer.

A. The -- because there's so much variability, it allows different types of plan sponsors to meet whatever their employee benefit needs might be. So if they have employees that they want to ensure have low out-of-pocket costs, they can offer that at the tradeoff of potentially higher employee premiums. If they want to have a much more affordable benefit from a premium perspective or drive more consumerism in their health care plan, they can offer a high

Page 321

LESTER

deductible plan where the customer is responsible for more of the first dollar costs but also has the ability to save, and when those are paired with health savings accounts or health reimbursement accounts can provide a lot of flexibility for the employees themselves, and on top of that the client has options of whether they want to be in a spread pricing environment or in a pass-through environment. In a spread pricing environment, we generally do not charge fees to clients. In a pass-through environment, since we're not earning revenue through spread at retail pharmacies, we often instead charge a per member per month fee to those plans that they have to decide how much of that gets passed through and to employees.

Q. And how do those negotiations or selections occur between various plan sponsors and Cigna, are there differences in the approach?

A. Generally plan sponsors will hire

Page 322

LESTER

an independent third-party, a broker, a consultant to help them make the plan selection and through that process the broker is able to bring in a number of health plans or pharmacy benefit managers and usually puts out a request for proposal for different organizations to bid on that business. Through that process, it's largely based on the economics that each plan is able to provide. Services, clinical programs are absolutely important but the pure economics, and when it comes to pharmacy that's largely around the discounts that can be offered or any manufacturer rebates that can be shared are some of the key considerations. And once that client has selected Cigna, then they have all those benefit options we discussed.

Q. In terms of some of the benefit design options that are available for plan sponsors, what are some of the options that exist with respect to how much their

Page 323

LESTER

members pay, are there different options that can be selected in terms of either cost share or the amount?

A. There are. So I spent a lot of my time on the actuarial pricing part of our finance organization and my team's responsibility was understanding how different levels of member cost share would impact overall plan cost. And within that there's a lot of flexibility around the different tiers of products and how a plan decides to set cost share within those tiers, the networks and the pharmacies that they make available, even the options to have different tiers of pharmacies within a network that would provide incentives for customers to use lower cost pharmacies or attempted to use lower cost drugs. But the plans ultimately makes that selection and our pricing team spends their time helping plans understand if you make this type of change to customer cost share, here's how much higher or lower those ultimate plan

Page 324

LESTER

costs will be.

Q. How about with respect to something like a deductible, is that something that is an option that can be modified by a plan sponsor?

A. It is. Not just in addition to the level of the deductible so how high it is. There are regulations at the state level for insured business or at a federal level for self-funded client of the maximum deductible that can be offered but underneath that the client has a lot of flexibility of how large the deductible is, what services it covers. Some plans chose to cover preventive drugs without the customer satisfying the deductible. Some clients chose how the deductibles that crosses the medical and the pharmacy benefit, and within that you can even have a collective deductible that requires an entire family unit to meet that deductible or individual deductibles that have a different level for each individual within a family but also a total number that has

Page 325

LESTER

to be met throughout the year, and the plan sponsor has a lot of flexibility about which of those options they would like.

Q. You mentioned caps or maximum amounts that might be paid. How do those impact the overall benefit design?

A. You're referring to a maximum that a customer might have to pay?

Q. Yes.

A. So the maximum that a customer might have to pay out-of-pocket maximum can also again be at an individual level, at a family level, can be just for each benefit individually for the pharmacy benefit versus the medical benefit, or for both benefits combined. And is generally focused on -- and there can even be a separate out-of-pocket maximum for in-network service than there is for out-of-network services.

Q. How about the decision to use a copayment or coinsurance or some combination thereof?

LESTER

A. That's also a selection by the client and within self-funded plans, it's almost unlimited the number of combinations of copays and coinsurance and where those levels can be set or insured regulated business, there might be limits on how high or low each value can go but within that range the plan sponsor has flexibility to select that and as a service provider, as an insurer, we can provide information to the client about how those changes might impact their overall plan cost.

Q. Do these factors and these selections by plan sponsors, do they necessarily mean that all participants are going to pay the same pricing for all of their prescription drug transactions?

A. It does not. There can be a lot of variability depending on the prescription that a customer chooses, the pharmacy that they choose to fill it at, in particular lots of clients offer incentives for customers to use a mail

LESTER

order pharmacy where that mail order pharmacy might be providing much deeper pricing, so higher discounts, lower price for the customer or the plan, and the plan might want to incentivize their participants to use that pharmacy.

The same can be true when even throughout the year that as prices for drugs in the market change or as agreements with the client change, that might improve their discounts from one year to the next, that can lead to pricing changes at the point of sale as well, and that's why we provide tools to customers, for example, our website where a customer can go out and compare prices across multiple pharmacies and multiple drugs.

Q. And I take it from your answer that given there are different types of drugs or groups of drugs, the various benefit options that we just talked about can even be different on the very same plan depending on what kind of drug you're looking at?

LESTER

A. That's right. So there can be differences between brand drugs, generic drugs, specialty drugs which are usually high cost products within that plan, and then also the differences that might occur between different pharmacy chains.

Q. Okay. Are you familiar with the concept of cross accumulation?

A. I am.

Q. And what does that mean in your world?

A. So cross accumulation are when dollars accumulate between benefits. Generally we're talking about the medical and the pharmacy benefits. There are also behavioral benefits that are available that are considered as part of the medical plan and cross accumulation are where dollars per services on the medical and dollars per services on the pharmacy all accumulate to the same amount on the deductible so those dollars from all those services accumulate to a single deductible or out-of-pocket maximums where the

LESTER

determination of when a participant hits that out-of-pocket maximum can cross accumulate from both benefits.

Q. And I think you probably just answered this but just to be clear, what are the different types of cross accumulation that a plan sponsor might implement as part of their overall structure if they are going to have both medical and pharmacy benefits, for example?

A. Generally a plan sponsor will chose to cross accumulate both the deductible and the out-of-pocket maximum.

Q. And ultimately whether to have cross accumulation and which method to use, whose decision is that?

A. It's up to the plan sponsor unless it is required by a Department of Insurance regulation.

Q. Is there a specific time frame for accumulations towards deductibles or out-of-pocket maximums?

A. It's up to the plan sponsor but

LESTER

generally they do it within a plan year which is usually a 12-month period. The effective date for that plan year could be any day of the year but generally our clients chose the first of a month so it could be February 1st or July 1st and would have a 12-month period over which those dollars would accumulate.

Q. But then all plans don't have the same start and end dates for their plan years; correct?

A. That's correct. And some clients choose if they are, for example, moving from -- they may want to be on a calendar year basis. From time to time, plans will chose to have a shortened year so they can move everything to a calendar year basis which we see from time to time with mergers and acquisitions.

Q. And we talked a lot today about where some of the benefit design information is housed at Cigna for its clients but do you have an understanding of where plan sponsors memorialize the

LESTER

choices that they've made with respect to the Cigna plan?

MR. IZARD: Objection.

THE WITNESS: So from my experience as an employee of a plan sponsor, usually those documents are housed in some type of employee Internet site or even physical copies can be provided to employees of those plan documents.

BY MR. SHAFFER:

Q. And again, is that something from your experience that's something that the plan sponsor handles?

MR. IZARD: Objection.

THE WITNESS: That's my understanding from interactions in the past with sales and service operations.

BY MR. SHAFFER:

Q. There was some discussions earlier about different funding arrangements that can exist with respect to group plans. Are all prescription

LESTER

benefits funded the same way?

A. They are not. Plan sponsors have the option to choose two primary ways to fund pharmacy benefits. They can choose to purchase insurance from Cigna or any other insurance company where they are purchasing a policy in which Cigna is responsible for funding all claim dollars and Cigna takes on the risk of essentially those plans coming in higher than expected in return for a premium that would be paid by a plan sponsor. In a self-funded environment, all those claims would be paid by a plan sponsor. They would set up banking information with Cigna to enable Cigna to debit their bank accounts to make those payments throughout the year.

Q. And in a setting of a self-funded plan, what are the types of administrative services that Cigna might provide?

A. For the pharmacy benefit we would provide formularies that a plan sponsor can choose from. We would provide retail networks again that the plan sponsor could

LESTER

choose from, a mail order pharmacy, specialty pharmacy, clinical programs that a plan sponsor can choose to add or purchase, services related to claim payment, member services for when a member or customer might have a question about their benefit, and all of the digital resources such as our website where members can track all the different accumulators, see how the information that might be available about drug costs or costs for other services.

Q. Since you've been involved with Cigna Pharmacy, how has Cigna offered group plans access to networks of pharmacies?

A. When I first began at pharmacy in late 2010, Cigna managed and contracted our own pharmacy networks and we had two of them that we offered broadly to clients but we also have had the option where a client can build a client-specific network where they can select the pharmacies that they would like to be a part of their

Page 334

LESTER

network.

In 2013 we entered into a multi-year agreement with Optum to rent their networks to effectively use them for network services and through that agreement, it has a flexibility that as Cigna saw the need for additional networks, we would work with Optum and Optum would develop those networks for Cigna to use and for Cigna to be able to offer to our plan sponsors and other clients.

Q. So the Optum contract offered a network of retail pharmacies; correct?

A. That's correct, that was one of the services that we contracted with Optum for.

Q. Does the Optum contract also offer mail order pharmacies?

A. There was a lot of flexibility in the original Optum contracts and initially we did not use Optum for any mail order services. We eventually used them for back end fulfillment only so Cigna

Page 335

LESTER

pharmacies, Cigna pharmacists were still taking mail order pharmacies, still doing all the work of a pharmacist but Optum mail order pharmacies were putting the pills in the bottle and shipping them to the customer's residence or place of work or what address the customer provided.

Q. Do you have an approximate time period for the transition from when there was no involvement by Optum in the mail order to the change in support?

A. We began moving back in fulfillment in late 2015 and by 2016 the majority of back end fulfillment or traditional drugs was handled by Optum. Cigna maintained fulfillment at our mail order pharmacy for specialty products.

Q. We talked again today a lot about the GHTR transaction data. Do you remember those questions?

A. I do.

Q. Does that transaction data, does that reflect credits or transfers directly between retail pharmacies and Optum?

Page 336

LESTER

A. They were not direct because Argus was the claim processor so there was a process where Argus was able to fund those claims that were reimbursed by Cigna. Optum charged Cigna and Cigna ultimately paid Optum based on our intercompany -- or the agreement we had between the two organizations.

Q. Do you know whether Optum maintains its own records regarding transactions with pharmacies in its retail networks that Cigna can access -- that Cigna can access the network, not the records?

A. Sure. So as we entered into the relationship with Optum, one of the requirements of the contract was Cigna providing a daily feed of claims information to Optum so there was a daily feed sent from Argus to Cigna that Cigna then sent to Optum so Optum could use that data to manage our relationship and potentially to -- I don't know how it was used with their broader networks

Page 337

LESTER

relationship.

Q. I want to talk again about the relationship between Cigna and plan sponsors with respect to the pharmacy benefits. Are those relationships governed by written agreements when a client signs up?

A. For self-funded clients, we will generally have an ASO agreement, an administrative services only agreement, that spells out the services that Cigna is provided to the plan sponsor, the pricing for those services and any financial or service guarantees that Cigna might be making as part of providing those services.

For insured clients, there would be a certificate of insurance that would highlight the relationship where the client is agreeing to pay premiums to Cigna and Cigna is agreeing to take on the risk of plan payment.

Q. And in the ASO context -- and we talked about ASO as administrative

Page 338

LESTER

services only; correct?

A. That's correct.

Q. In the ASO context, what do those agreements typically address, what kinds of issues?

A. They typically address the services that Cigna will provide so we walk through some of the services like the provision of a retail network of clinical programs of formulary. They will importantly highlight all of the pricing and that pricing is generally on the pharmacy side in terms of discounts and -- discounts, rebates and any fees that the client might be paying Cigna, and those economic terms are generally a very important part and probably take up the majority of the back and forth between the plan sponsor, and Cigna is verifying what services and at what costs Cigna will be providing those to the client.

Q. Are you familiar with ASO agreements from your role in your current position?

Page 339

LESTER

A. I'm familiar with the -- very familiar with the pricing components from my time working on the pricing side and have reviewed in the past the broader agreement.

MR. SHAFFER: Let's see if we can take a look at one of them right now.

Matt, are you able to share that with everyone?

MR. KLAYMAN: It's uploading now.

(Exhibit C-1, document Bates labeled CIGNA00002315, marked for identification.)

BY MR. SHAFFER:

Q. Okay, Mr. Lester, if you go to the bottom of the screen that we've been looking at all day for exhibits, there should be one marked Exhibit C-1. At the bottom.

A. I have it.

Q. Would you open that, please?

A. Got it.

Q. Mr. Lester, this is an administrative services only agreement by

Page 340

LESTER

and between Putnam Investments and Cigna Health and Life Insurance Company, effective date January 1, 2014, and you recall discussing questions about Putnam Investments earlier today; correct?

A. I do.

Q. If you turn to page 14 of the PDF.

MR. IZARD: Mine -- here we go.

BY MR. SHAFFER:

Q. I think it has a Bates number 2328 in the bottom right-hand corner.

I think you were mentioning when we were talking about what types of information ASO agreements typically have, the discounts are one of the important pieces of information that you would expect to find?

A. That's right.

Q. And I think we talked about this earlier but I just want the record to be clear. Are discounts that are offered in a self-funded arrangement, are those negotiated and given on a

Page 341

LESTER

transaction-by-transaction basis, in the aggregate or some other way?

A. They are generally negotiated and agreed upon for an individual plan year so in the aggregate over that plan year that Cigna would deliver the stated discount.

Q. Can those vary depending on the type of drugs or some subsegment of the plan offering?

A. They can. They can vary by the type of drug, whether it's brand, generic or specialty, they can vary by the pharmacy where they are filled, and even they can vary throughout the year.

Q. And if we take a look at page 14 of Exhibit C-1, the Putnam ASO agreement, can you tell me what kind of information is being communicated here between Putnam and Cigna?

A. Sure. So this is laying out the six categories of discounts that Cigna would be held accountable for meeting that were negotiated between Cigna and Putnam, split between brand, generic and specialty

Page 342

LESTER

at mail order, and brand, generic, specialty at retail. And in each category where Cigna is earning some type of revenue, we were committing to a certain discount that is guaranteed so the client knows what they should expect to pay throughout the year.

Q. And on page 14 here there are some redacted numbers around the percentages and some of the guaranteed amounts. Do you have an understanding of the propriety or sensitivity of those numbers in the negotiation process?

A. I do. So in negotiating pharmacy benefits, these are really several of the key values that a client or their consultant or broker would be focused on, and the competition is largely over the numbers that would be captured here and depending on the client, the complexity of the client, the size of the clients, even what other services the client might be purchasing from Cigna, can drive Cigna to give significant variations in discounts

Page 343

LESTER

for across all six of these categories.

Q. And as it relates to negotiating these aspects of the ASO arrangement or some of the others that you mentioned, do consultants or brokers hired by plan sponsors play any role?

A. They do. So because of the complexity of pharmacy benefits, most clients, particularly self-funded clients, seek out the expertise of consultants and brokers to help insure that they are deriving the best value for their own plan but also to ensure that they understand the trade-offs they might be making. For example, by asking for a much deeper discount here might result in a higher administrative fee or might impact even what they are paying for medical services because when we underwrite business as an integrated health plan, we are looking at the pharmacy benefit, the medical benefit, behavioral, all the services that that client is purchasing, and sometimes there are trade-offs even between those

Page 344

LESTER

businesses in terms of the financial value that a particular client is looking for and the broker and consultant is extremely important in helping to navigate the process.

Q. Do you know whether that process or the negotiation progresses that Cigna encounters is different depending on who the plan sponsor is, what size they are, what their objectives are?

A. It is. So there are -- in addition to the size of the client, as you mentioned, it can even be geographic so what area of the country the client might be in and the distribution of their customers. It can be on the demographics of the plan sponsor so plan sponsor that has a younger population versus an older population might see varying results, and then again the number of services that they are purchasing from Cigna can also have an impact.

Q. How about the sophistication or the sort of significance of the cost of

Page 345

LESTER

the pharmacy benefit, are those factors that vary?

A. They are. So for a client that, for example, is experiencing very high costs under the pharmacy benefit, they are usually most likely to be shopping that aggressively in the market to find a better option that they might see and that's where all the things just beyond just fewer discounts come into play, the clinical programs that are offered, the formularies, the mail order services to be able to help manage those costs over time but as clients get larger, they usually have stronger negotiating power and there is usually a correlation between client size and the aggressiveness of the discounts.

Q. I think with a lot of Mr. Izard's questions today he tried to suggest that spread pricing or the use of pricing arrangements other than pass-through of pharmacy pricing was somehow only inuring to Cigna's benefit and was not something

Page 350

LESTER

they should expect to pay for a particular category of drug. So they know that at for retail generics in this example where there is a percentage guarantee, they know that whatever the utilization of generic drugs might be that on average that discount will be achieved and if we miss that discount, then we owe the client the difference on a dollar-per-dollar basis.

BY MR. SHAFFER:

Q. And that applies to their entire group of beneficiaries across the entire plan year?

A. That's right. It applies to all claims whether it's under the deductible, over the deductible, any claim that is -- any claim or transaction covered under their benefit is also covered in this guarantee.

Q. How about the discussion of the retail generic drug claim that's below the brand drug claim, is the approach that

Page 351

LESTER

Putnam selected different for generic?

A. That's correct. Putnam selected -- was more focused -- not being involved with this particular client, clients are often selecting guarantees for some of that certainty and here in the first row where it talks about the lesser of that we're providing to the client for the client rate is the drug charge on the CHLIC maximum allowable charge schedule and then we highlight the annual average discount of AWP minus a certain percentage. And with that the client understands that there will be changes to that schedule throughout the year. They are also getting the benefit of any usual and customary charge that the pharmacy might have in place and at the end of the year, we will reconcile and we will ensure that we met that guarantee or pay the client dollar-per-dollar.

Q. And so for the retail generic claims Putnam is receiving a guaranteed discount in connection with a spread

Page 352

LESTER

pricing model?

A. That is correct.

Q. And how does Cigna use the client rate in the spread pricing model to go about achieving the discounts and managing the entire pharmacy book of business?

A. So our approach has been to separate the client rate and the pharmacy rate. The client rate is really focused on meeting the financial commitment that we have to the client and we manage prices throughout the year as we talked about a little bit earlier with some of the previous e-mails around MAC prices, the maximum allowable cost schedule. Out goal is to manage that to hit those discount targets that we have committed to a client and through our underwriting process, we have an expectation based on the network that client chooses and the discount guarantees that they have selected of how we will be able to meet that guarantee throughout the year.

Q. Do ASO agreements also address

Page 353

LESTER

responsibilities if the relationship terminates or ends?

A. They do. Most of our ASO agreements have some type of run-out period that is associated with the agreement, after which period the -- no more claims would be processed by Cigna as a service provider and we no longer have access to that client's bank account to pay those claims.

Q. If you take a look at page 4 of the PDF that's Exhibit C-1.

MR. IZARD: Sorry, which page, Brian?

MR. SHAFFER: 4 of the PDF.

MR. IZARD: Okay.

MR. SHAFFER: It's 2318 in the bottom right-hand corner.

MR. IZARD: Okay.

BY MR. SHAFFER:

Q. Is there a discussion here regarding claims administration following termination of the agreement?

A. There is. So in the section 1

LESTER

Q. Shifting gears again to cover a couple of other topics that were talked about earlier, the client rate that Cigna negotiates with plan sponsors, what does that number represent?

A. The client rate at the point of sale on an individual transaction represents the price that Cigna put in place for that drug on that date at that pharmacy with the goal of in aggregate leaving the client satisfied by the end of the year.

Q. And who pays or who contributes to a satisfaction of the client rate?

A. Can you say that one more time?

Q. Sure. I'm trying to figure out who pays the client rate, who satisfies the payment of that; is it the sponsor, is it the member, is it a combination?

A. Sure. Generally it is a combination of the member and the plan sponsor. The member would be paying whatever their stated cost share is with the plan sponsor paying the remainder of

LESTER

any client rate that wasn't with that cost share.

Q. So what's a situation where a member or customer would pay the client rate entirely, in its entirety?

A. That can occur when a customer is in a deductible phase and they are responsible for the full amount, the full client rate, and it can occur when the client rate is equal to or less than the customer cost share if the rights lesser of cost share logic is in place.

Q. What's the situation where the client rate is paid entirely by a plan sponsor?

A. Generally that can occur after a customer has hit an out-of-pocket maximum or if the client has chosen a benefit that might cover some drugs, particularly preventive drugs, at no cost.

Q. And other situations, you said there may be a sharing between the plan sponsor and the participant?

MR. IZARD: Objection.

LESTER

BY MR. SHAFFER:

Q. Is that right?

A. That's correct.

Q. And how does that work from a Cigna perspective?

A. When we calculate the client rate on an individual claim, we will then determine what the customer cost share responsibility is of that client rate and based on the information that is set up in Argus that initially distributed from ePro to determine that customer cost share and the client would be responsible for the remainder of that amount and that represents the vast majority of claims for our commercial business.

Q. In the copay in the lesser of logic that involves a client rate, how does the client rate relate to the participant's cost share, how does it impact what the participant may pay?

A. Sure. In that logic where we might be using the customer copay, the pharmacy's usual and customary amount and

LESTER

client rate, those three are compared and when the client rate is lower than either of the other two, then the customer would be entitled to pay client rate on that transaction.

Q. And I think we talked about copay G and copay K. Does the decision of a plan sponsor to offer copay G or lesser of three logic to their members, is that a decision or a choice of a plan sponsor?

A. It is a choice of the plan sponsor.

MR. IZARD: Brian, I've been pretty indulgent here but I think we're well past seven hours and the court has not authorized us to go beyond seven hours. I haven't agreed to go beyond seven hours so do you want to wrap this up pretty quickly, please?

MR. SHAFFER: I don't think I've used seven hours on the record. I've used --

MR. IZARD: It's not seven hours

Page 362

LESTER

per party, it's seven hours per deposition. If you would like to re-notice the deposition, you can do so but this deposition has gone more than seven hours and if you would like to go to the court and ask to depose your own witness, I guess you could try that but we have -- we're well beyond seven hours. I've been pretty indulgent but I think we need to wrap this up, please.

MR. SHAFFER: Well, you took six hours and 40 minutes with the witness. Certainly I'm entitled to do redirect of my witness after you've done yours and --

MR. IZARD: This has nothing to do with my cross. This is your direct for trial, I guess, but you need to wrap it up, please, because you're going well beyond your time limit.

MR. SHAFFER: Well, I disagree that we're under that time limit today and had you had a restriction, you

Page 363

LESTER

didn't ask me how much time I needed for redirect and so --

MR. IZARD: It's not redirect, Brian. Redirect relates to questions in response to mine. This is --

MR. SHAFFER: You asked about all of these things today.

MR. IZARD: Did I pull out the Putnam agreement?

MR. SHAFFER: You asked about Putnam seven different times today.

MR. IZARD: I did not ask at all about the --

MR. SHAFFER: Let's keep going so we don't keep Mr. Lester any later than we have to.

MR. IZARD: I'm going to shut it down in a couple of minutes so please pick it up.

MR. SHAFFER: Okay.

BY MR. SHAFFER:

Q. So how does the client rate relate to the pharmacy rate, if at all, the pharmacy reimbursement rate?

Page 364

LESTER

A. In a pass-through environment, the client rate is set equal to the pharmacy rate. In a spread environment there is very little interaction between the client rate and the pharmacy rate.

Q. Why would a plan sponsor choose to have a client rate different from the pharmacy rate? I think you answered this.

MR. IZARD: Objection.

THE WITNESS: One, for the certainty of the prices that will be charged over time and the guarantees that come along with it, and secondly, because of how they chose to set up their financial arrangement with Cigna allowing us to earn revenue through spread instead of paying fees for services.

BY MR. SHAFFER:

Q. Mr. Lester, if you turn to page 15 of Exhibit C-1 which is additional provisions regarding drug charges, does Cigna disclose how these differentials between the client rate and the pharmacy

Page 365

LESTER

rate and pharmacy reimbursement rate will be handled with a client like Putnam?

MR. IZARD: What page are you on?

MR. SHAFFER: 15.

THE WITNESS: Yes, we do. The third bullet point on 15 is one of the areas where we disclose this to the client that the amount paid to the retail pharmacy for brand, generics or specialty drug claims, may or may not equal the amount charged to the employer and that CHLIC will absorb any difference.

BY MR. SHAFFER:

Q. Do a participant's prescription drug payments relate to the pharmacy reimbursement rate on a transaction-by-transaction basis?

A. Only when the pharmacy's usual and customary price results in a lesser of scenario. Otherwise there's no interaction between the client rate and therefore the customer cost share and the pharmacy rate.

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

Page 366

LESTER

Q. How do those participant prescription drug payments relate to the pharmacy reimbursement rate in the aggregate, if you know?

A. In an aggregate, they can vary depending on the agreement that we have in place with the client and the agreement that during this period Optum might have had in place with retail pharmacies that may have changed over time.

Q. Okay. And I think you said this earlier but to be clear, the pharmacy reimbursement rate may be higher in some instances than a participant's cost share; right?

A. That is correct.

Q. Is the pharmacy reimbursement rate the same as what the pharmacy is asking to be paid?

A. In a point of sale transaction, the pharmacy has the opportunity to input a usual and customary price or cash price or a submitted charge, which in my opinion is what they would like to be paid for

Page 367

LESTER

that product. But ultimately if the information or the rates that Optum has set up for that transaction are lower, then they would get something lower than that requested amount submitted.

Q. I think we talked about the fields a bit with Mr. Izard. Is there a field in the GHTR transaction data that in your view then reflects what pharmacy is asking to be paid?

MR. IZARD: Objection.

THE WITNESS: I would consider that to be the usual and customary field that is actually a calculation of the true usual and customary that the pharmacy had at the point of sale and the submitted amount that the pharmacy may have added to the claim, and whichever of those numbers are lower is the UNC amount that we capture in all our transaction data.

BY MR. SHAFFER:

Q. What do you mean when you say the submitted amount?

Page 368

LESTER

A. It depends on the pharmacy but retail pharmacies have the opportunity to enter in a submitted amount which is an amount that essentially they would like to be paid for a claim, and I'm not an expert on why pharmacies choose to populate this field. It's not a required field but from time to time the pharmacy will populate it with unique values that could be different than the usual and customary or cash price.

Q. You were asked some questions by Mr. Izard earlier today about the transaction data and what information was contained in there.

Do you know whether that transaction data contains any information about drug coupons?

A. It does not.

Q. And what are drug coupons?

A. Drug coupons are generally made available by pharmaceutical manufacturers so brand companies, it could be generic companies that provide -- that cover part

Page 369

LESTER

of the customer's cost share at the point of sale, they are generally processed through a secondary claim adjudication program which Cigna does not have insight into. We only see the cost share that was calculated through Argus. We don't know if the customer actually paid that full amount out of their pocket or if they received some funding towards that from the manufacturer.

Q. So if a participant used a coupon to satisfy a $10 copayment, for example, do you know what the GHTR transaction data would reflect in that instance?

A. GHTR would reflect the full $10 cost share that was calculated by Argus at the point of sale.

Q. So --

A. (Inaudible) would not capture.

Q. I'm sorry. It would reflect it in Mr. Izard's description as coming out of the pocket of the member but it may have been from a coupon?

A. That is correct.

LESTER

Q. Again, you were asked a lot of questions about negative reimbursement today. What is negative reimbursement?

A. Negative reimbursement occurs when the pharmacy was paid at the point of sale more than the rates in the claim -- than the pharmacy rate that was in the claim adjudication on that date.

Q. With respect to copayments of members, does a participant's cost share for a given transaction become higher or lower in an instance where there is negative reimbursement occurring?

A. It does not. Negative reimbursement does not impact the customer cost share.

Q. Why do you say that?

A. Negative reimbursement is related to the pharmacy rate and the pharmacy reimbursement which is a separate process for a spread based client and in that process the customer is paying the client rate or their cost share depending on the lesser of logic. The pharmacy rate is a

LESTER

separate transaction that is about how much the pharmacy was due on that individual transaction.

Q. Mr. Izard showed you a number of e-mails I think that you were copied on or wrote that related to complaints from pharmacies related to negative reimbursement in the 2014 time period. Do you recall those earlier today?

A. I do.

Q. Did you recall seeing anything in any of those documents about any pharmacy suggesting that they were giving that money to a participant?

A. I did not.

Q. What did you see?

A. Prior to implementing that logic, the pharmacy retained any amount above their rate that was in the Argus claim processing system.

Q. And even with respect to the DoD and VA pharmacies where Mr. Izard accused you of taking money out of veterans' pockets, did you see any evidence that

LESTER

those pharmacies were talking about whether the money should have been paid by the participant or whether the pharmacies were keeping those amounts?

A. I did not. Those pharmacies would have been treated like any other retail pharmacy where the pharmacy was able to keep that difference.

Q. And when we talked about the pharmacy overpayment project, why do you consider negative reimbursement to be an attempt to deal with pharmacy overpayment?

MR. IZARD: Objection.

THE WITNESS: The goal of that project was to ensure that pharmacies only retained the amount that they were due in the pharmacy rate that was processed at the time of the claim adjudication. So the pharmacy overpayment project that introduced negative reimbursement made sure that the pharmacy was not overpaid, that they were in compliance with as far as we knew the contract Optum had in

LESTER

place.

BY MR. SHAFFER:

Q. And in his questions today, Mr. Izard asked you about whether or not as part of the implementation of negative reimbursement plan document language was reviewed.

Do you recall that?

A. I do.

Q. Do you have an understanding prior to the Optum contract whether when a participant's cost share exceeded the pharmacy' reimbursement under the Cigna contracts, whether the pharmacist was giving that money back to the members at the point of sale?

MR. IZARD: Objection.

THE WITNESS: To my knowledge, the pharmacists were not giving that money back to customers at the point of sale.

BY MR. SHAFFER:

Q. Why do you say that?

MR. IZARD: Objection.

Page 374

LESTER

THE WITNESS: What we saw in the claim data showed that pharmacies were receiving that overpayment. When we moved to implement negative reimbursement as part of the pharmacy overpayment project, that's when pharmacies began to complain about the difference in their reimbursement that they were seeing.

MR. IZARD: Okay, Brian, Rule 33(d) is pretty explicit so five more minutes. If you want to re-notice, that's fine. You're not being fair to the court reporter, you're not being fair to the videographer. We're miles over seven hours. As I say, you can notice again if you want but enough is enough so five more minutes.

MR. SHAFFER: Cathi, are you willing to proceed a little longer?

MR. IZARD: Well, I'm not willing to proceed a little longer.

MR. SHAFFER: Mr. Lester, are you willing to proceed a little longer?

Page 375

LESTER

MR. IZARD: The rule is quite explicit.

MR. SHAFFER: Let's move with our questions and try to wrap it up as quickly as we can here.

MR. IZARD: Five minutes.

BY MR. SHAFFER:

Q. Mr. Lester, you were shown Exhibit 41 which were supplemental interrogatory response that provided in detail answers to questions that were asked. You were also shown the earlier iteration. You were also shown the ones you most recently reviewed and verified; correct?

A. Correct.

Q. And we talked about briefly with Mr. Izard footnote 2 of those supplemental interrogatory responses that talked about the DST report for some of the requests. Do you remember that?

A. I do.

Q. And Mr. Izard sort of suggested to you that did interrogatory footnote

Page 376

LESTER

have any impact on what you were saying about the DST reports. I want to understand what you were saying in footnote 2, what Cigna is saying in footnote 2, regarding what the DST report shows.

MR. IZARD: Objection.

BY MR. SHAFFER:

Q. Do you need to look at that language again?

A. I do.

Q. Let's look at Exhibit 41.

A. I have it.

Q. If you look at footnote 2.

A. Yes.

Q. It says the DST report provides some information, namely those group clients that Cigna currently believes at some point in time between 2010 and 2018 part of the sentence that the plaintiffs quote in this interrogatory, what are the reasons -- what are the limitations of those DST reports as it relates to the time period?

Page 377

LESTER

A. Sure. So as we discussed a little earlier, the operative time frame of any reports that would have come back from that search are unknown because it has that phrase there might have been other changes within the document itself, and in addition to that, there can be periods where the client decides to make their own changes. And again, that's where the operative time frame can be difficult to ascertain from this report on its own.

Q. And I think, Mr. Lester, you gave an example to Mr. Izard earlier about whether perhaps certain language would have been in at one point of time, then come out, then put back in and that wouldn't be captured in any of the DST reports; correct?

A. That is correct.

Q. And would it also be the possible scenario where sometime after the effective date certain language that's asked about in these interrogatories could

LESTER

have been deleted or come out of the plan document and that would not be captured?

A. That is correct.

Q. Okay. You were also asked about the intersection between plan documents and ePro, and I think Mr. Izard suggested that all you needed to know was the intersection that had this ASO6 for the Putnam documents between both the transaction data and ePro. Do you recall those questions about kind of the intersection of those two?

A. I do.

Q. Does the ASO6 nomenclature, that description of a Putnam document, does that tell you anything about what the content of that plan document is?

A. Not by itself.

Q. What would you have to do to know what's in that document?

A. To understand what's in the document, you'd actually have to open it up and read through it to understand all the potential clauses in it, and then

LESTER

there's the connection that we talked about with a few internal data sources to be able to connect that document to all of the benefit options that it might apply to and all the customers related to those benefit options.

Q. Could there be different clients in different accounts that have an ASO6 designation?

A. There can be.

Q. And are those -- I'm sorry, are those all the same document?

A. They are not. They would be unique to an account and the plan document or I think it was certificate, CN number.

Q. How would you go about knowing what in particular those documents showed, what was in --

A. Actually open them and read through them to see the differences between different documents that might be similarly named ASO6.

Q. And relatedly, Mr. Izard showed you Cigna responses to interrogatories and

LESTER

asked about identifying particular claim numbers pursuant to the claim language.

To your knowledge, can someone, Cigna or anyone else do that using only DST reports in the pharmacy transaction data?

A. We cannot.

Q. Last couple of questions I have for you, Mr. Lester.

You were asked a lot of questions about reprocessing or remediation of transactions. Do you recall that?

A. I do.

Q. And I think if I understood you correctly, in order to do that, would you have to take account of specifics of plan design including deductibles, out-of-pocket maximums, cross accumulations and including multiple plan years if the plan involved more than one?

A. That's correct.

Q. You were shown an exhibit, I think it was exhibit -- it was an exhibit referencing a statement by a Ms. Hanley

LESTER

with a smiley face in it asking about some report about the DoD. Do you recall that exhibit?

A. I do.

Q. Do you know Ms. Hanley?

A. I do not.

Q. Do you know who she works for?

A. Optum, based on the e-mail.

Q. So she is not a Cigna person?

A. No.

Q. You were asked about the reference to null, N-U-L-L, in some of the DST reports?

A. Yes.

Q. Do you recall that in the, I think it was in the benefit option code. Do you have an understanding of what might trigger a null benefit code for a particular account?

A. I don't. I would have to speculate.

Q. Do you know how there would be a designation or did you see anything in the DST reports that would designate whether