

Craig A. Raabe
860-513-2939
raabe@ikrlaw.com

September 18, 2020

The Honorable Jeffrey A. Meyer
Richard E. Lee U.S. Court House
141 Church Street, Courtroom 3
New Haven, CT 06510

Re: *Negron, et al. v. Cigna Health and Life Insurance Company*, No. 3:16-cv-01702-JAM

Dear Judge Meyer,

Plaintiffs have noticed the deposition of Mr. David Cordani, who was CEO of Cigna during the relevant period and remains CEO today.  The request to depose Mr. Cordani is well-grounded and not made for any reason other than sound trial preparation.  The evidence to date establishes that Mr. Cordani was aware of and involved in the $100,000,000-per-year clawback scheme. Mr. Cordani was identified as the "Project Sponsor" for the $100-million clawback scheme in multiple documents, and he was at the top of  the "highest levels of Cigna management" who "urgent[ly] request[ed]" implementation of the clawback scheme.  *See, e.g*., Depo. Exs. 11, 185, 187, 189, 190.   Especially with respect to RICO, which requires proof of Cigna's fraudulent intent or reckless indifference to the rights of its members, Cigna should not block Plaintiffs from deposing the CEO to establish his, and therefore his company's, state of mind.  It is hard to imagine more powerful evidence than the CEO's testimony regarding his personal knowledge of and participation in the clawback scheme.

Respecting Mr. Cordani's schedule, Plaintiffs offered to limit his direct examination to three hours, yet Cigna refused to produce him for deposition, arguing that his deposition is improper under the apex deponent doctrine, or in the alternative, premature because Plaintiffs have not deposed certain lower-level executives, including Chris Hocevar.  Mr. Hocevar was Cigna's head of its pharmacy division until Mr. Cordani fired him.  *See In re Anthem-Cigna Merger Litigation*, Consolidated C.A. No. 2017-1114-JTL, 2020 WL 5106556 at *89 (Court of Chancery of Del. August 31, 2020).  Plaintiffs deposed Mr. Hocevar yesterday, ███████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████ Deposition Exhibit 221 ("Depo. Ex.").[1]  Importantly, whether through a faded memory or an unwillingness to get involved in this dispute about clawbacks after Mr. Cordani fired him, ████████████████████████████████████████ ███████████████████████████████ Plaintiffs' only ability to obtain information about those conversations is now through Mr. Cordani.

---

[1] Plaintiffs have not appended all of the documents or transcripts cited herein because they do not believe there is any dispute as to their contents.  If Cigna raises issues in its filing that challenge the assertions herein, Plaintiffs will append documents to their reply letter.

The Honorable Jeffrey A. Meyer
September 18, 2020
Page 2 of 5

The scope of discovery is broad, and "[t]his liberal standard does not change where a party seeks relevant, non-privileged information from a high ranking corporate executive . . . ." *AngioDynamics, Inc. v. Biolitic, Inc.*, No. 1:08-CV-004, 2010 WL 11541925, at *2 (N.D.N.Y. Sept. 17, 2010); *see also Six West Retail Acquisition v. Sony Theatre Mgmt Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001). "Highly-placed executives are not immune from discovery." *Scott v. Chipotle Mexican Grill, Inc.*, 306 F.R.D. 120, 122 (S.D.N.Y. 2015); *see also Chevron Corp. v. Donziger*, No. 11 Civ. 0691(LAK), 2013 WL 1896932 at *1 (S.D.N.Y. May 7, 2013). This is true even if the "proposed witness is a busy person or professes a lack of knowledge of the matters at issue." *Naftchi v. New York Univ. Med. Ctr.*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997) (citing 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure: Civil 2d § 2037 at 500 (1994)). Although it is not Plaintiffs' burden to demonstrate Mr. Cordani's "relevant personal knowledge," the evidence to date demonstrates that he has non-cumulative knowledge about core allegations in the case. *Speedmark, Inc. v. Federated Dept. Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997); *In re Garlock*, 463 F. Supp. 2d 478, 481 (S.D.N.Y. 2006).

On June 10, 2013, Cigna entered into an agreement with Catamaran for Pharmacy Benefit Management ("PBM") services. Catamaran (later a part of OptumRx) would process pharmacy claims and provide access to its national pharmacy network. The contract with Catamaran, which Mr. Cordani referred to as a "long-term strategic PBM partnering agreement," Cigna Corp., Presentation to Discuss Strategic PBM Partnering Agreement with Catamaran – Conference Call, at 2, (Bloomberg June 10, 2013), was the culmination of several months of negotiations with Catamaran and other potential PBMs. In describing the process during an investor call, Mr. Cordani said, "we went through a pretty—not a pretty, an extremely thorough process that as you and your peers know, some folks reminded us we were taking our time. We were taking our time, because we went through such a thorough process. We looked at multiple paths and multiple parties." *Id.* at 14.

When Cigna sought proposals for a new PBM, it made clawbacks one of the 
CIGNA07424525 (emphasis added). ███████████████████████████ CIGNA07777080. ██████████████ CIGNA07777049; CIGNA12371054

This ████████████ became a clause in the Catamaran contract, CIGNA00002860 at 2873-74, and implementing clawbacks became a focus of Cigna. In November 2013 "the highest levels of Cigna management" "urgent[ly] request[ed]" that Cigna Pharmacy "react to a missed revenue opportunity" that "represent[ed] a tremendous loss of revenue." Depo. Ex. 187 at CIGNA00054927. This "urgent request" was a "top priority" in late 2013 because it was a "$100M+ issue" for Cigna. Depo. Ex. 190 at CIGNA00248002. *See also* CIGNA00056016 at 019 ("Management has already made the decision to proceed. Cigna is losing approximately $100M a year. ████████████████████████████████████████ In a memorandum to Mr. Cordani, Mr. Hocevar described the collection method as ████████ ████████████████████ Depo. Ex. 221 at CIGNA07864280. When asked in deposition ████████████████████████████████████████ Hocevar Rough Tr. at 36-37.

The Honorable Jeffrey A. Meyer
September 18, 2020
Page 3 of 5

Julie Burns-McAvoy, who served as the "Business Project Manager" for the Pharmacy Over Payments project—and which Cigna employees, including Mr. Hocevar, referred to as clawbacks—described the project in the following manner:

> Customers occasionally pay the pharmacy more than the cost of the drug because of spread.  Cigna allowed the pharmacies to keep the overpayment with our own contracts, but now that we are on Catamaran's contracts, we need to recoup the dollars from the pharmacies.  Today Argus inflates the ingredient cost paid and reports the dollars as $0 due rather than a negative, which does not provide an avenue for automatically collecting from the pharmacies.

> The proposed solution is for Argus to make a change to reflect the overpayment by the customer as a negative amount owed to the pharmacy and ensure that funding reflects the negative amount in an automated way. . . .

Cordani was the "Project Sponsor" for the Pharmacy Over Payments project. Depo. Ex. 185 at CIGNA00149490.  As such, ***Cordani was responsible*** for ██████████████████████ ████████ Depo. Ex. 73 at DSTPS 000066. Moreover, as CEO, Cordani was (and is) the highest level Cigna management. He was the driving force behind the clawback scheme.

Moreover, Plaintiffs already have developed evidence that the clawback scheme sponsored and led by Mr. Cordani was fraudulent or reckless and violated RICO. Many Cigna employees recognized the unjust and reckless nature of Cigna's clawback scheme.  *See* Memorandum of Law In Support of Class Certification, pp. 4-5 ("Class Cert. Memo.") [ECF 209].[2]  Defendants also went to great lengths to hide their clawback scheme.  Through Optum, Cigna enforced "gag clauses" against network pharmacies.[3]  For example, one form agreement provided that the "Pharmacy will not share information concerning the terms of this Agreement or other proprietary information, including but not limited to, reimbursement rates and pricing as provided to Pharmacy . . . ."  Class Cert. Memo., Ex. N at 00177316 (¶ 3.3).  Cigna considered this "gag clause" "compulsory" (Ex. O at 00180952) and was ***not*** tolerant of pharmacies that were honest with members.[4]

---

[2] One employee wrote that "it seems strange that Cigna would charge a member for a copay that exceeds the ingredient cost + dispensing fee + tax, if applicable [*i.e.,* the Pharmacy Rate]. To me that is no longer a 'co'pay, but more of a single (over)payment by the customer."  Class Cert. Memo., Ex. J at 00054926.  In another email, employees described Cigna's clawback practices as "unreasonable" and "egregious pricing." *Id.* at Ex. K at 00491619.  Another employee commented that "I don't get this – this is so unfair to the member.  I can't believe we can live with ourselves charging the member 172% more than what this drug costs." *Id.* at 00491623.

[3] Cigna also hid the clawbacks from its employer clients (*i.e.,* the entities that contracted with Cigna to provide pharmacy benefits to Class Members). In an "urgent" email exchange dated November 1, 2013, Cigna employees "worried about what the [clawback] would look like to the Payer" and suggested that the clawback should be buried in the invoice to prevent detection.  Class Cert. Memo., Ex. L at 00245463.  In fact, Cigna ***did*** hide the clawbacks from employers by creating two sets of data:  "one set for the clients and one set for pharmacies." *Id.* at Ex. M at 0055857.

[4] When one pharmacist labeled deductible clawbacks a "[n]ew ponzi scheme," Cigna's "Pharmacy Network Operations" reiterated to Cigna personnel that pharmacists were prohibited from disclosing the clawback scheme to members, stating, "I explained that [the pharmacist] is not to discuss reimbursement matters with members."  Class Cert. Memo., Ex. P at 00309576-577.  After another pharmacy disclosed Cigna's clawback scheme to a customer, a

The Honorable Jeffrey A. Meyer
September 18, 2020
Page 4 of 5

After Plaintiffs filed this action, Cigna management was surprised that Plaintiffs had been able to uncover the massive, hidden scheme. In an exchange discussing this lawsuit that included the Vice President of Pharmacy Management, an employee remarked, "***members are not as uneducated as we thought!***" Class Cert. Memo., Ex. S at 00367625 (emphasis added). The Vice President did not reprimand her colleague for her condescending message. Instead, they questioned "how does this person [Plaintiff Negron] know about 'spread'?" *Id.* The Vice President ultimately answered, "no clue." *Id.*

As further evidence of its recklessness, Cigna engaged in its $100,000,000 a year clawback scheme without having done a review of its plan language to see if its conduct was permitted. Depo. Ex. 109 at 7722983-2. As a result, Cigna predicted it would face "a lawsuit by a customer (or, more likely, a class action by many customers) – for failure to follow the coverage documents." Depo. Ex. 230 at CIGNA00491453. Because there can be no doubt that Mr. Cordani was aware of and participated in the clawback scheme, at least through his interactions with Mr. Hocevar and in his role as "Project Sponsor," Plaintiffs are entitled to explore his knowledge and his state of mind in light of these admissions and predictions of potential liability.

Plaintiffs also have developed evidence that Cigna knowingly defrauded the ███████ through clawbacks from ████████ *See* Memorandum of Law Supporting Motion to Strike [ECF 312] at 4. Cigna's counsel refused to permit the witness who proposed an ████████ to explain his action in his deposition, thereby depriving Plaintiffs of this important RICO state of mind evidence. *Id*. Cigna should not now also be permitted to block testimony about its CEO's personal knowledge and state of mind that also goes to the heart of Plaintiffs' RICO claim.

Mr. Cordani's testimony is unquestionably relevant to Plaintiffs' RICO claims, which require Plaintiffs to prove scienter. *Bigsby v. Barclays Cap. Real Estate Inc.,* 298 F. Supp. 3d 708, 717 (S.D.N.Y. 2018). "To plead scienter, a plaintiff 'must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and the clear opportunity for doing so.'" *Id.* (quoting *San Leanardo Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)). When the defendant is a corporation, "scienter is necessarily derived from its employees." *In re Marsh & Mclennan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006); *Beaver Cty. Emps' Ret. Fund v. Tile Shop Holdings, Inc*., 94 F. Supp. 3d 1035, 1054 (D. Minn. 2015). Accordingly, "[c]orporate scienter relies heavily on the awareness of directors and officers." *Nordstrom, Inc. v. Chubb & Son, Inc*, 54 F.3d 1424, 1436 (9th Cir. 1995). Recognizing that "there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh*, 501 F. Supp. 2d at 481*; In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005); *see also Qatar Nat. Nav. & Transp. Co., Ltd. v. Citibank, N.A.,* No. 89 Civ. 0464 (CSH), 1992 WL 276565, at *5 (S.D.N.Y. Sept. 29, 1992. In light of Mr. Cordani's position as CEO, involvement in the Catamaran deal, role as Project Sponsor of the

---

Cigna employee noted that "our network pharmacies are contractually prohibited from discussing pricing with our customers. . . . Should the pharmacy continue to break their contract, Juan advised that they would be reviewed for possible termination from the network." *Id*. at Ex. Q at 07504938; *see also id*. at Ex. R at 00287642 (Cigna expressing surprise that pharmacy could see the clawback at the point of sale).

The Honorable Jeffrey A. Meyer
September 18, 2020
Page 5 of 5

Pharmacy Over Payments project and conversations with Mr. Hocevar, his mindset is directly relevant to Cigna's scienter.  Plaintiffs are entitled to explore his knowledge and involvement. *In re Hi-Crush Partners L.P. Sec. Litig*., No. 12 CIV. 8557 CM, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *In re St. Paul Travelers Sec. Litig*., No. 04–4697, 2006 WL 2735221, at *4 n. 3 (D. Minn. Sep. 25, 2006).

Cigna has argued that Mr. Cordani "did not have 'a role per se' in those individual projects" for which he was listed as a "Project Sponsor," and that "actual management, oversight, and implementation of these pharmacy projects would be handled by other CHLIC management-level employees like Julie Burns-McAvoy, Stephanie Byrne, and others." Ltr from Christopher M. Diffee to Christopher M. Barrett regarding proposed deposition of David Cordani at 3 n.4 (Aug. 28, 2020).  That Mr. Cordani was not involved in the "day-to-day" details of the Pharmacy Over Payments project does not mean he has no relevant, non-cumulative information about the "overall direction" or purpose of the clawback scheme.  *See Six West*, 203 F.R.D. at 104; *see also AngioDynamics*, 2010 WL 11541925 at *4.  Not surprisingly, Cigna has represented only that "any information that Mr. Cordani might be able to provide would be *de minimis*," not that he has ***no*** relevant knowledge.  In fact, as CEO and Project Sponsor, his perspective and knowledge may be different and "of ***far greater*** probative value on the issue of intent and motive" than that of lower-level employees such as Ms. Burns-McAvoy and Ms. Byrne, who were responsible for the daily details of the project and have already been deposed.  *See Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140, 146 (D. Mass. 1987) (emphasis added).  In addition, Mr. Cordani's recollection of his conversations with Mr. Hocevar about the clawback scheme are now the only source of that evidence because Mr. Hocevar claimed to have no recollection.

During Cigna's document production, Plaintiffs agreed, as a compromise, to accept custodial documents from senior Cigna executives other than Mr. Cordani under the assumption that currently existing relevant documents such as emails and memos would have been shared among the senior leadership team. As part of that agreement Plaintiffs reserved their right to seek to depose Mr. Cordani at a later date.  Cigna is now refusing to produce him for deposition, and points to a relative dearth of responsive documents in the custodial files of Messrs. McCarthy and Manders (but not Mr. Hocevar) as evidence that Mr. Cordani does not have any "unique personal knowledge of the material facts at issue in this litigation."  It is improper to use a lack of documents as a basis to avoid Mr. Cordani's deposition when Plaintiffs agreed not to require Cigna to search his files.  Moreover, if anything, the scant document production from senior executives weighs in favor of permitting Mr. Cordani's deposition.  *See Scott*, 306 F.R.D. at 124, 125 (discussing "dearth of 'classification' documents" as a factor weighing in favor of deposition and district court judge's affirmation of decision of co-CEO advances the "search for truth").

Discovery to date indicates that Mr. Cordani has relevant, unique knowledge of the clawback scheme that is at the heart of Plaintiffs' claims.  Accordingly, Plaintiffs respectfully request that the Court compel Mr. Cordani's deposition.

Respectfully,

s/ Craig A. Raabe