# EXHIBIT D

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 3    Case No. 16-cv-1702
      - - - - - - - - - - - - - - - - - - -x
 4    KIMBERLY A. NEGRON, Individually    :
      and on Behalf of All Others         :
 5    Similarly Situated,                 :
                                          :
 6                       Plaintiffs,      :
                                          :
 7            - vs -                      :
                                          :
 8    CIGNA CORPORATION and CIGNA HEALTH  :
      AND LIFE INSURANCE COMPANY, et al., :
 9                                        :
                         Defendants.      :
10    - - - - - - - - - - - - - - - - - - -x
11
12                  July 22, 2020
                    9:05 a.m.
13                    - - -
14
15
16
17
18
19
20          VIDEOTAPED VIRTUAL DEPOSITION UPON
21    ORAL EXAMINATION OF JUSTIN PITT, held at the
22    above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25
```

Page 26

J. Pitt

1
2  A    In pharmacy network operations?
3  Q    Yeah.
4  A    Or the network proposal manager;
5  sorry?
6  Q    I'm sorry.  Yes.
7        How long were you in the network data
8  manager and management proposal?
9  A    The network data manager?  I think --
10 I believe three years or so.
11 Q    And what other positions -- I'm sorry,
12 what did you say?
13 A    I can't fully remember; sorry.
14 Q    And what other positions have you held
15 at Cigna?
16 A    I've held two other positions.  Those
17 positions are prior to the network manager role
18 within proposal management.  I was a -- I was an
19 analyst for provider contracting.  And prior to
20 that role, I was actually a network consultant in
21 proposal management.
22 Q    What were your responsibilities as an
23 analyst provider?  Did you say analyst provider
24 in contracting?
25 A    An analyst in provider contracting,

Page 27

J. Pitt

1
2  yes.
3  Q    And what were your responsibilities?
4  A    My responsibilities in that were to
5  work with the contracting managers in the
6  Northeast region, and collaborate on developing
7  RBRVS schedules, which are reflective of
8  reimbursement to providers and/or facilities for
9  their services.
10 Q    And was this -- when you say
11 "provider," is this pharmacies we're talking
12 about or --
13 A    No, not pharmacies.
14 Q    What type of providers?
15 A    Medical.  Medical providers.
16 Q    Before Cigna, where did you work?
17 A    Before Cigna, I worked at a Staples.
18 Q    So during your time at Cigna, did your
19 responsibilities concern reconciliations?
20      MS. FARRELL:  Objection to form.
21 BY MR. BARRETT:
22 Q    Did you understand the question, Mr.
23 Pitt?
24 A    Reconciliations in what way?
25 Q    Pharmacy reconciliations.

Page 28

J. Pitt

1
2  A    Pharmacy reconciliations in regards to
3  pharmacy reimbursement?
4  Q    Are there other ways that phrase could
5  be used?
6  A    There's reconciliations in regards to
7  members or clients as well, too.
8  Q    Let's start with pharmacies.
9  A    There were maybe one or two
10 reconciliations that I was involved in during my
11 time.
12 Q    And what about with members?
13 A    I was not involved in that.
14 Q    What about clients?
15 A    Not involved in that either.
16      MR. KLAYMAN:  Hey, Chris, this is
17 Matt Klayman.  I think Ellie got kicked out
18 of the -- sorry.  Just wanted to flag that.
19 She was having technical trouble.
20      MR. BARRETT:  You want us to take
21 a little break?
22      MS. FARRELL:  Hi, Chris.  I'm
23 back.  Sorry about that.  It froze and then
24 kicked me off for a moment.
25      MR. BARRETT:  Okay.  If that

Page 29

J. Pitt

1
2  happens again, just, you know, let me know
3  and we can take a little break.
4      MS. FARRELL:  Yeah.  It was
5  completely frozen so I couldn't, but thank
6  you, Matt, for doing so.  I'm back now.
7  BY MR. BARRETT:
8  Q    Mr. Pitt, I believe you said your
9  email is justin.pitt@cigna?
10 A    You can actually load it.  I was able
11 to get in and set myself up, so we're good.
12 Q    Let me know if you see the document.
13 A    I'm refreshing now.  Yeah.
14      (Plaintiff's Exhibit 84 was
15 marked.)
16 Q    This document is Exhibit 84.  It bears
17 Bates No. CIGNA 51671.  Your attorneys may have
18 went over this with you.  Bates numbers are the
19 numbers on the bottom right of the document.
20      Do you recognize this document?
21      MS. FARRELL:  Chris, I'm just
22 having -- it's just loading for me still,
23 so --
24      MR. BARRETT:  Oh, sure.  Let me
25 know when you're ready.

**Page 30**

J. Pitt

```
 2       MS. FARRELL:  Justin, has the
 3   document loaded for you?
 4       THE WITNESS:  Yeah.
 5       MS. FARRELL:  I'm still seeing
 6   blank pages.
 7       MR. BARRETT:  Do you need to
 8   refresh?  I don't recall.
 9       MS. FARRELL:  I'm able to access
10   the document.  It just looks like it's
11   slowly loading.
12       MR. BARRETT:  Okay.  We're all
13   set?
14       THE WITNESS:  Yeah.  I can see the
15   document.  I'm just taking a look at it now.
16       MR. BARRETT:  Okay.  If it's slow
17   on the website, I believe you can download
18   it locally.
19       MS. FARRELL:  I have it now Chris.
20   Thank you.
21       MR. BARRETT:  Okay.
22 BY MR. BARRETT:
23   Q   Does this look familiar, Mr. Pitt?
24   A   Yup.  Yes.
25   Q   Can you tell me what this document is?
```

**Page 31**

J. Pitt

```
 2   A   My understanding of this document was
 3 to do essentially a comparison of claim files or
 4 claim fields between Catamaran and Argus.
 5   Q   And on the top of the first page, it
 6 says Argus Transition.
 7       What is that referring to?
 8   A   I'm not sure.
 9   Q   Are you aware of a transition from or
10 to Argus during that time?
11   A   A transition to or from Argus, I mean,
12 I know that there were -- No. 1, there were
13 obviously steps that were needed to be taken to
14 ensure that the right, I'll say, information --
15 claim information was being compared
16 appropriately.  And I know that there was some
17 eventual look into transitioning to Rx claim, but
18 I'm not sure what exactly Argus Transition is in
19 regards to.
20   Q   Do you recognize this format the
21 document is in?
22       MS. FARRELL:  Objection to form.
23   You can answer.
24       THE WITNESS:  Yes, I am familiar
25   with this type of submission.
```

**Page 32**

J. Pitt

```
 2 BY MR. BARRETT:
 3   Q   Are documents like this typically
 4 circulated within Cigna?
 5       MS. FARRELL:  Objection to form.
 6       THE WITNESS:  I'm not -- I'm not
 7   sure.  I'm only aware of the ones that I'm
 8   included on, so --
 9 BY MR. BARRETT:
10   Q   And when this is circulated, these
11 types of documents, what type of file is it?
12   A   What do you mean by "what type of file
13 is it"?
14   Q   For example, is it a Word file or a
15 pdf?
16   A   It usually tends to be a pdf file.
17 This document, if I've seen -- from the couple
18 that I've seen, it's shown in a pdf format, yeah.
19   Q   If you could go to the second page.
20 Page 2 of 7 --
21   A   Sure.
22   Q   -- do you see your name listed on the
23 top right next to Pharmacy SMEs?
24   A   Yes.
25   Q   Does SME stand for subject matter
```

**Page 33**

J. Pitt

```
 2 expert?
 3   A   Yes.
 4   Q   And with respect to this document,
 5 what subjects were you considered an expert in?
 6   A   Pharmacy reimbursement.  Pharmacy
 7 logic.
 8   Q   And what subject was Mr. Despard
 9 considered an expert in?
10   A   I do not know.  He's in IT.  That's
11 all I know.
12   Q   Do you know Dave Despard?
13   A   I know Dave Despard.  He's in IT.  I
14 can't say what he was an actual expert in for
15 this.
16   Q   And above that there's a reference to
17 an enterprise project manager and a business
18 project manager.
19   A   Uh-huh.
20   Q   Do you know what roles they play?
21   A   I knew what role Julie Burns-McAvoy
22 played.  Not Sue Sullivan.
23   Q   What was Ms. McAvoy's role?
24   A   She was essentially responsible for
25 managing the group of individuals to make sure
```

9 (Pages 30 - 33)

Page 34

1            J. Pitt
2  that we were doing everything accurately and
3  correct within this project.
4      Q    And which project is this?
5      A    This is -- from what I can see, the
6  claim file compare.
7      Q    If you look at the project summary, it
8  says, "Cigna has entered into a multi-year
9  sourcing agreement with a new strategic partner."
10         Can you just tell me about this
11 agreement?
12     A    I didn't read the agreement, so I
13 don't know the full scope of what that agreement
14 is.  I knew that we were entering into an
15 agreement with Catamaran.
16     Q    And just so the record's clear, when
17 we say "Catamaran" and "Optum," are we referring
18 to the same entity?
19     A    Correct.  Correct.
20     Q    So as part of this sourcing agreement,
21 whose network was going to be used?  Whose
22 network or pharmacy?
23     A    Catamaran's network was going to be
24 used, yes.
25     Q    And who was going to adjudicate the

Page 35

1            J. Pitt
2  pharmacy claims?
3      A    Argus/DST were going to adjudicate the
4  pharmacy claims, as long as we were on that claim
5  system.
6      Q    And which claim system are you
7  referring to?
8      A    Argus/DST.
9      Q    And when you say Argus/DST, you're
10 referring to Argus -- I believe their current
11 name is DST?
12     A    Yeah.
13     Q    Or one of the entity's name was DST.
14 You're not referring to the document source tool.
15 You're referring to the company?
16     A    Correct.
17     Q    As part of the -- this agreement, did
18 a new daily claims file need to be created?
19     A    According to the agreement, did a
20 new --
21     Q    As part of this project, was
22 something -- what was -- what was the objective
23 with respect to the claims file?
24     A    Just give me a second to look, please.
25     Q    Just in general, if you want to review

Page 36

1            J. Pitt
2  a document, take as long as you need.
3      A    Yeah, thank you.  So a daily claims
4  file, I'm not sure whether a new one needed to be
5  created, but this work was specifically around a
6  daily claim file.
7      Q    And did the format need to be changed
8  as part of the transition?
9      A    Did this form need to be changed, or
10 did the daily claim file need to go changed?
11     Q    The format of the daily claim file.
12     A    The format of the daily claim file.
13 The format in what way?  Fields or characters
14 that exist in it; or --
15     Q    Let's start with fields.
16     A    Okay.  Field names needed to be
17 adjusted so it lined up appropriately with how
18 Catamaran reviews claims, yeah.
19         Characters, you want me to go into
20 characters?
21     Q    Yes, please.
22     A    Characters could potentially have
23 needed to be adjusted so that all of the
24 appropriate, you know, information or data was
25 taken in and shared.

Page 37

1            J. Pitt
2      Q    In addition to changing the names of
3  fields, did new fields have to be added?
4      A    That, I do not remember.
5      Q    And before the sourcing agreement with
6  Catamaran was signed, can you tell me, like, a
7  little bit more about the daily claim file?
8      A    Unfortunately, I cannot.  I didn't --
9  I did not dive deep into the claim file.
10     Q    But generally is it a file that was
11 sent to Cigna?
12     A    Is it a file that was sent to Cigna by
13 Argus?  You mean prior?
14     Q    Yes.
15     A    As far as I know, yes, there were
16 claim files that were sent to Cigna.
17     Q    On the next page, Page 3 of 7 in the
18 Requirements section No. 7, there's a reference
19 to an excluded claim report.
20         Do you know what that refers to?
21     A    I do not.
22     Q    You can close this file.  We're done
23 with that one for now.
24     A    Okay.
25     Q    I just sent another document through

Page 38

J. Pitt

1  Exhibit Share. Just let me know when you
2  received it.
3         (Plaintiff's Exhibit 85 was
4      marked.)
5      A   Sorry; I opted to close out that tab
6  instead of going back. I have to just go back
7  in. Okay. Is this Exhibit 85?
8      Q   Yes.
9          MR. BARRETT: Ellie, do you have
10     the document?
11         MS. FARRELL: I do. Thanks,
12     Chris.
13 BY MR. BARRETT:
14     Q   Okay. This is Exhibit 85. The first
15 page bears Bates No. CIGNA 177140.
16         Do you recognize this document, Mr.
17 Pitt?
18     A   7/25/2013? No, I do not recognize
19 this one.
20     Q   What about just this type of document?
21     A   No, I'm not familiar with this type of
22 document.
23     Q   What's Project Ascension?
24     A   Do not know.

Page 39

J. Pitt

1      Q   Does it sound familiar?
2      A   No.
3      Q   Do you remember these joint planning
4  sessions at all?
5      A   I remember initially in the very
6  beginning those planning sessions, like what I
7  referenced before working with Catamaran and
8  letting them know how the logic worked. I do
9  remember planning sessions. I do not remember
10 this type of document.
11     Q   Do you want to review it? Maybe it
12 will refresh your recollection.
13     A   So the document itself is still not
14 refreshed, but aware of Argus Daily.
15     Q   What do you mean by that?
16     A   The document itself does not seem
17 familiar to me, but the reference of Argus Daily
18 is a familiar term.
19     Q   And what does that mean, Argus Daily?
20     A   Argus Daily is essentially pharmacy
21 rates outside of MAC. Pharmacy rates that are
22 sent to Argus to ensure that the contractual
23 reimbursement amounts for pharmacies is in the
24 system.

Page 40

J. Pitt

1      Q   And why would these rates be outside
2  of MAC?
3      A   MAC was very detailed, where you had
4  to supply rates to Argus essentially by each code
5  and by each MAC schedule, so that required
6  separate analyses. A separate form of
7  submission.
8      Q   And do you recall a data field review
9  as part of this process?
10     A   No.
11     Q   You can close this document for now.
12     A   Okay.
13     Q   Okay. I've loaded another document.
14 Just please let me know when you have it up.
15         (Plaintiff's Exhibit 86 was
16     marked.)
17     A   Okay. I've got it.
18         MR. BARRETT: Ellie?
19         MS. FARRELL: I've got it.
20     Thanks, Chris.
21 BY MR. BARRETT:
22     Q   Okay. This is Exhibit 86, and the
23 first page bears CIGNA 51438.
24         Do you recognize this document, Mr.

Page 41

J. Pitt

1  Pitt?
2      A   I'll have to take a look down here at
3  the requirements and language first. Yes, I am
4  familiar.
5      Q   Can you tell me more about this
6  document?
7      A   As we were transitioning the
8  management of the pharmacy network from Cigna to
9  Catamaran, we also had to ensure that we were
10 establishing the appropriate MAC schedules
11 according to how Catamaran's pharmacy contracts
12 were set up.
13     Q   If you go to the second page, Page 2
14 of 8, on the top right next to Pharmacy SMEs, do
15 you see your name?
16     A   Yes.
17     Q   And what were you considered an expert
18 on with respect to this project?
19     A   Still the pharmacy reimbursement and
20 pharmacy logic.
21     Q   What about Kellie Turley?
22     A   I believe that she was in finance, but
23 I don't know what her primary role was in this.
24     Q   Have you worked with her?

11 (Pages 38 - 41)

| Page 42 | Page 44 |
|---|---|
| 1  J. Pitt | 1  J. Pitt |
| 2  A  Occasionally. | 2  agreement? |
| 3  Q  What types of projects do you work | 3  A  No, I can't.  I wasn't responsible for |
| 4  with Ms. Turley? | 4  loading those daily rates. |
| 5  A  Ms. Turley, I worked with her in | 5  Q  If you wanted to find out more about |
| 6  regards to what was called 835 Reports. | 6  that, who would you ask? |
| 7  Q  Did you work with Ms. Turley on | 7  A  That would be Saianne Webster. |
| 8  anything else? | 8  S-A-I-A-N-N-E. |
| 9  A  Not that I can remember. | 9  Q  And what department or division does |
| 10  Q  And what subject was Stephanie Byrne | 10  that person work in? |
| 11  an expert in with respect to this project? | 11  A  She was also and I believe is still in |
| 12  A  I do not know. | 12  pharmacy network operations. |
| 13  Q  Do you know Mr. Byrne? | 13  Q  And as far as loading rates into |
| 14  A  I knew Mr. Byrne, yes. | 14  Argus' systems, do you know how that changed |
| 15  Q  What division did she work in at this | 15  after the Catamaran agreement? |
| 16  time? | 16  A  I do not. |
| 17  A  She was in pricing. | 17  Q  And would Saianne Webster be the right |
| 18  Q  And do you know what she did?  What | 18  person to ask about that? |
| 19  her role was? | 19  A  I would believe so. |
| 20  A  No. | 20  Q  If you go to Page 4 in this Document |
| 21  Q  In what subjects was Mary Anne Grant | 21  86, there's a reference to a daily load process. |
| 22  an expert in with respect to this project? | 22  Do you know what that refers to? |
| 23  A  She was in pharmacy network | 23  A  I believe that that is the Argus |
| 24  operations, so she would have been at least | 24  Daily. |
| 25  included in this from a network perspective. | 25  Q  That's for the non-MAC? |

| Page 43 | Page 45 |
|---|---|
| 1  J. Pitt | 1  J. Pitt |
| 2  Q  And what's the role of pharmacy | 2  A  Correct. |
| 3  network operations? | 3  Q  And what type of file is that? |
| 4  A  The role of pharmacy network | 4  A  I do not know. |
| 5  operations at that time? | 5  Q  Okay.  You can close this document for |
| 6  Q  Yes. | 6  now. |
| 7  A  So we're talking post-Catamaran, what | 7  A  Okay. |
| 8  was the role? | 8  Q  Are you okay?  Do you want to take a |
| 9  Q  Okay.  Let's start there. | 9  break or you want to keep going? |
| 10  A  Okay.  So post-Catamaran, it was | 10  A  We can keep going. |
| 11  essentially, again, ensuring that the logic and | 11  Q  Just let me know if you want to take a |
| 12  the manner in which pharmacies were we'll say set | 12  break. |
| 13  up in the system was accurate and appropriate | 13  A  Sure.  Sure.  I'll let you know. |
| 14  according to Catamaran's pharmacy contracts that | 14  Thank you. |
| 15  they had in place. | 15  Q  Have you heard the term "co-pay |
| 16  Q  And what about pre-Catamaran? | 16  benefit"? |
| 17  A  Pre-Catamaran, pharmacy network | 17  A  Yes. |
| 18  operations was essentially responsible for the | 18  Q  What's the purpose of a co-pay |
| 19  management of the Cigna pharmacy network as it | 19  benefit? |
| 20  related to contracting, MAC, daily files or, you | 20  A  Co-pay benefit is a specific dollar |
| 21  know, reimbursement rates associated with | 21  amount that the member pays at point of sale. |
| 22  pharmacies.  We were responsible for those.  And | 22  Q  And how does that differ from a |
| 23  managing pharmacy customer service inquiries. | 23  deductible? |
| 24  Q  Can you describe how the rates were | 24  A  A deductible is a specified dollar |
| 25  loaded into Argus' systems before the Catamaran | 25  amount that a member has to, I'll say, fulfill |