

Craig A. Raabe
860-513-2939
raabe@ikrlaw.com

September 21, 2020

The Honorable Jeffrey A. Meyer
Richard E. Lee U.S. Court House
141 Church Street, Courtroom 3
New Haven, CT 06510

Re: *Negron, et al. v. Cigna Health and Life Insurance Company*, No. 3:16-cv-01702-JAM

Dear Judge Meyer,

Cigna's opposition to the deposition of David Cordani misses the mark.  While it accurately states that the "apex" doctrine can be used to block deposition of executives with "'***no*** personal or unique knowledge of the relevant facts,'" Cigna Letter at 2 [ECF 326], Cigna does not, and cannot, meet its burden to show that Mr. Cordani has no personal knowledge of the clawback scheme.  "An order barring a litigant from taking a deposition is most extraordinary relief.  *E.g., Investment Properties Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 (2d Cir. 1971); *Naftchi v. New York University Medical Center*, 172 F.R.D. 130, 132 (S.D.N.Y. 1997).  "It is the party seeking such an order that bears the burden of proving that the proposed deponent has ***nothing to contribute***."  *Speadmark, Inc. v. Federated Dept. Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y. 1997) (emphasis added).[1]  It is indisputable that Mr. Cordani has personal knowledge of and had involvement in the $100,000,000-per-year clawback scheme.

Cigna's suggestion that Plaintiffs' counsel are "harassing Mr. Cordani personally and Cigna institutionally," which would violate numerous Rules of Professional Conduct, is absurd.  Cigna Letter at 4.  To the contrary, Plaintiffs' counsel are experienced trial lawyers preparing this ERISA/RICO class action as best they can to recover for the class ***hundreds of millions of dollars*** that Cigna's documents describe as ***member*** "Pharmacy Over Payments."  Cigna's employees described Cigna's required copayment and deductible payments that exceeded the true cost of drugs as "egregious" and "unreasonable."  To meet their burden of proving RICO scienter, Plaintiffs will call Mr. Cordani as a trial witness to establish for the jury that Cigna's knowledge and planning of the clawback scheme was at ***the highest level*** of the company.  Consistent with discovery rules, Plaintiffs have the right to depose Mr. Cordani to prepare for

---

[1] Typically, courts within this circuit require first-hand affidavits attesting to the lack of unique personal knowledge before granting the protective order Cigna seeks here.  *Gen. Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002) (denying protective order of executive because "a party moving for a protective order with respect to a deposition typically provides an affidavit from the person who seeks to avoid being deposed," and "a second-hand affidavit of the kind Roberts has given here is 'insufficient' because it 'fall[s] well short of any unequivocal statement that [the proposed deponent] lacks relevant knowledge.'" (quoting *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 34678, at *2 (S.D.N.Y. Feb. 4, 1993) (alterations in original)); *AngioDynamics, Inc. v. Biolitic, Inc.*, 2010 WL 11541925, at *4 (N.D.N.Y. Sept. 17, 2010) ("[A]bsent a first-hand affidavit denying any relevant, non-duplicative, personal knowledge, courts in this Circuit have generally not granted protective orders.  Even where there is such an affidavit, courts have often required disclosure.") Cigna did not submit an affidavit from Mr. Cordani or anyone else demonstrating a lack of knowledge.  Cigna's showing of lack of knowledge is therefore insufficient, and the protective order should be denied.

trial. In respecting Mr. Cordani's position, and far from harassing him, counsel have agreed to limit their direct examination to no more than three hours and will conduct the deposition remotely to minimize any disruption of his schedule. Accordingly, the burden of the deposition on Cigna and Mr. Cordani is minimal.

There is no dispute that Mr. Cordani was the "Project Sponsor" of the clawback scheme, which Cigna referred to as the "Pharmacy Over Payments" project. Cigna Letter at 4; Depo. Ex. 185 (attached as Plaintiffs' Exhibit A). While Cigna has attempted to downplay the role of a "Project Sponsor" of this hidden scheme, it acknowledges that the role encompasses "'the most senior person in the control [of] funding.'" Cigna Letter at 5. Plaintiffs are entitled to question Mr. Cordani about the funding of the lucrative, multi-year clawback scheme, as well as about *his* understanding of his role as "Project Sponsor" and his personal knowledge of the "Pharmacy Over Payments" project.

There also is no dispute that the "Pharmacy Over Payments" occurred when Cigna forced members to make copayments and deductible payments that were "more than the contracted cost of the drug." *See, e.g.*, Depo. Ex. 194 (attached as Plaintiffs' Exhibit B). Through the project, Cigna secretly "recouped from the pharmacies" those "Pharmacy Over Payments." *See id*; *see also* Plaintiffs' Exhibit A. In implementing the clawback scheme, Cigna employees discussed how in a similar program on a different business platform in 2009, they "ran into problems" when they disclosed to clients that they were charging copayments and deductible payments that "were more than the cost of the drug" and that it "really put our credibility at stake." Depo. Ex. 189 at CIGNA00055859 (attached as Plaintiffs' Exhibit C). Cigna also "want[ed] to avoid a conversation that highlights Cigna's lower payment to pharmacies and the higher charge invoices to clients (essentially Spread Pricing). It creates a situation in which the client may ask for the same price Cigna pays the pharmacy. Thus, it will reduce Cigna margin & revenue if the client gets the same pricing we pay pharmacies." Depo Ex. 094 at CIGNA00433127 (attached as Plaintiffs' Exhibit D). To avoid those "problems" with this clawback scheme, Cigna resolved to hide the pharmacy reimbursement rates. For instance, when reporting transaction to clients (*i.e.*, employer/sponsors), Cigna decided "[w]e should not be showing any pharmacy rates." Plaintiffs' Exhibit C at CIGNA00055857. Similarly, at the member level, Cigna imposed "gag clauses" on the pharmacies that "prohibited [pharmacies] from discussing pricing with our customers" on the threat of "termination from the network." Class Cert. Memo. at Ex. Q at CIGNA07504938. Plaintiffs are entitled to examine Mr. Cordani about his "high-level supervisory understanding" of the "Pharmacy Over Payments" project in order to develop their RICO scienter proof. Cigna Letter at 3. Courts have recognized that such supervisory perspective is "of far greater probative value on the issue of intent and motive" than that of lower-level employees who carried out the management-driven project on a day-to-day basis. *See Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140, 146 (D. Mass. 1987).

Cigna also has not, and cannot, refute that the head of Cigna's pharmacy business, Chris Hocevar, reported *directly* to Mr. Cordani on its "claw back mechanisms," which Cigna sometimes referred to as Zero Balance Logic or "ZBL." Depo. Exs. 221, 243 & 244 (attached as Plaintiffs' Exhibits E, F, G); Rough Deposition Transcript of Christopher Hocever dated September 17, 2020, at 137-38, 142-45 (excerpts attached as Plaintiffs' Exhibit H); *see also* CIGNA00259596 at 96-97 (responding to question from Cigna Pharmacy Compliance employee asking "what is Zero Balance logic?" by explaining that it is "[a]n effort to get pharmacies that

are under contract with Catamaran to not keep the overpayment they collect when a member pays more for their prescription than it actually cost."). Despite reporting directly to Mr. Cordani on the ZBL issue, Mr. Hocevar denied having any recollection of what he discussed with Mr. Cordani. *See, e.g.*, Plaintiffs' Exhibit H at 93-94, 144.

In addition, in September, 2013, as Cigna began to implement its contract with Catamaran, which enabled Cigna to take clawbacks, Mr. Hocevar sent Mr. Cordani a memo briefing him on the financial impact to date of the transition to Catamaran as its new PBM. Mr. Hocevar advised Mr. Cordani that "Retail spread capture" exceeded "plan performance," Plaintiffs' Exhibit E at CIGNA07864278, and that "claw back mechanisms [were] currently being assessed" because at this early point in contract implementation, when "generic price [was] lower than the copay," the "pharmacy [was] keeping the margin." *Id.* at CIGNA07864278, CIGNA07864280.

Once the "claw back mechanisms" were implemented through the "Pharmacy Over Payments" project with Argus in 2014, documents produced show that Mr. Hocevar reported to Mr. Cordani on the ZBL issue and its impact on annual financials. Although Mr. Hocevar claimed to recall almost nothing about any of the discussions, after reviewing at his deposition documents that he sent to Mr. Cordani, he testified that zero balance would have been discussed "as part of" at least one "pharmacy ops review" with Mr. Cordani. During that same meeting, he provided Mr. Cordani with a "FY14 Earnings Estimate" that specifically reported that "Cigna owns the ZBD [zero balance due] for all pharmacies except for CVS and Walgreens." Plaintiffs' Exhibit H at 142-44; Plaintiffs' Exhibits F, G.

Mr. Hocevar also remembered that he discussed with Mr. Cordani "reconciled items" in Cigna's relationship with Catamaran, including ZBL, but testified that he could recall "not much more than that." Plaintiffs' Exhibit H at 93, 138. While Mr. Hocevar repeatedly stated "I don't remember the details of ZBL," he did describe it as an "economic lever." *Id*. at 93-94. When Plaintiffs asked Mr. Hocevar to give his "best recollection" of what ZBL encompassed, he testified that "there was trapped money that sat between the contracted rates with Catamaran [Cigna's PBM] and what sat at the retail side." *Id*. at 94-95. Mr. Hocevar's "trapped money" is the spread between member's copayments and deductible payments and the lower amounts that Cigna, through Catamaran, paid pharmacies for the drugs. Especially in light of Mr. Hocevar's failure to recall, Plaintiffs are entitled to question Mr. Cordani as to his personal knowledge of and involvement in reviewing Mr. Hocevar's reports and his conversations with Mr. Hocevar about "claw back mechanisms," ZBL and the hundreds of millions of dollars of "trapped money" that the clawback scheme captured for Cigna.

Mr. Cordani also was kept informed when its secret clawback scheme was finally exposed in 2016 and controversy ensued, including this class action that Cigna itself had predicted due to its "failure to follow the coverage documents." Depo. Ex. 230 at CIGNA00491453. When a reporter inquired about "the so-called 'clawback' situation," Mr. Cordani received an email from "one of the senior people in the communications area." Plaintiffs' Exhibit H at 61. The communications executive informed Mr. Cordani about the likelihood of adverse publicity and Cigna's effort to "minimize our role in the story." Depo. Ex. 227 (attached as Plaintiffs' Exhibit I). Plaintiffs are entitled to examine Mr. Cordani about his personal knowledge of this interaction and any subsequent action he took, or failed to take, in relation to the clawback scheme and surrounding negative publicity.

The evidence described above and in Plaintiffs' initial letter to the Court establishes that Mr. Cordani has "'personal or unique knowledge of the relevant facts.'" Cigna Letter at 2 [ECF 326] (citing *Roberts v. Los Alamos Nat'l Sec., LLC*, No. 11-6206, 2015 WL 7444636, at *2 (W.D.N.Y. Nov. 23, 2015)). Cigna's vague representations about what McCarthy, Palmer and Manders may know does not change the fact that Cordani was the "Project Sponsor" for the Pharmacy Over Payments project. Regardless of Messrs. McCarthy's, Palmer's and Manders's personal knowledge, Cigna admits in its letter that "Mr. Cordani would have high-level supervisory understanding of the customer prescription drug cost-sharing policies and practices that Plaintiffs have challenged." Cigna Letter at 3. There is no need for Plaintiffs to depose Messrs. McCarthy, Palmer or Manders first, as Cigna suggests, when none of them will be able to testify to Mr. Cordani's thoughts about and understanding of the clawback scheme and Cigna's response to negative publicity about the scheme. *See* Cigna Letter at 1.

In assessing the RICO scienter requirement, the jury is entitled to hear Mr. Cordani's personal knowledge of his "high-level supervisory understanding" of the clawback scheme and to understand that when other employees were emphasizing that the "highest levels of Cigna management" had issued an "urgent request" to make it a "top priority" to implement the "claw back mechanisms" because it was "a $100M+ issue," the discussions at the "highest levels of management" included the CEO. *See, e.g.*, Depo. Exs. 11, 185, 187, 189, 190. Under our discovery rules, Plaintiffs are entitled to explore Mr. Cordani's personal knowledge before trial.

Even if Mr. Cordani "professes lack of knowledge of the matters at issue," Plaintiffs are "entitled to test the asserted lack of knowledge." *Naftchi*, 172 F.R.D. at 132. And if at his deposition Mr. Cordani, like Mr. Hocevar, were to deny any recollection of the substance of the clawback scheme, that testimony could be highly probative of recklessness, and used to prove RICO scienter. If both the head of the pharmacy division and the Project Sponsor/CEO deny any knowledge of clawing back more than $100,000,000 per year in member "Pharmacy Over Payments," when documents clearly show that they discussed the issue, a jury could readily find a callousness toward members that would support Plaintiffs' reckless indifference claim. Alternatively, if a jury concluded that such testimony "conflicted with the weight of the evidence," was "misleading," "obfuscating" or "evasive," as the court last month concluded nearly twenty times regarding Mr. Cordani's testimony in *In re Anthem-Cigna Merger Litig.*, Consolidated C.A. No. 2017-1114-JTL, 2020 WL 5106556, at *4, 7, 8, 66, 70, 71, 118, 119, 120 (Del. Ch. Aug. 31, 2020), it could find a consciousness of guilt of fraudulent intent to satisfy the RICO scienter element.

Cigna has cited a number of cases denying depositions of senior executives on the basis of the "apex deponent doctrine." None of the cases support a protective order here. As an initial matter, the party seeking the deposition in all of these cases did not establish that the proposed deponent had unique, personal knowledge. Each case is also distinguishable for additional reasons. *Mulvey* and *Roberts* were individual personal-injury claims, and *Harris* was an individual employment discrimination claim. "Widespread corporate policies" were not at issue in those cases, as they are here, and "[p]rotective orders are generally denied when the claims allege facts concerning widespread corporate policies or decisions about a company's development." *AngioDynamics*, 2010 WL 11541925, at *4. Also, in *Roberts*, the court **did** allow a two-hour deposition of the "apex" witness to discuss reports that he received and approved.

Plaintiffs are requesting that same sort of brief, focused deposition here. *Roberts*, 2015 WL 7444636, at * 4.

In *Diesel Props.*, the testimony sought related to dismissed claims, not a scheme at the heart of the case, such as the clawback scheme here. *Diesel Props S.r.L. v. Greystone Bus.Credit II LLC*, 2008 WL 5099957, at *2 (S.D.N.Y. Dec. 3, 2008). In *Burns v. Bank of Am.*, the executive who plaintiffs sought to depose did not even begin working at the company until "well after the events at issue in this litigation." 2007 WL 1589437, at *4 (S.D.N.Y June 4, 2007). Here, Mr. Cordani was involved in the transaction with Catamaran that set the "clawback mechanisms" in motion, and he was briefed on the clawback aspects of the transaction (called ZBL or ZBD) as they were being carried out.

In *Treppel*, the court denied the depositions sought in the first instance, but held that "the plaintiff is free to seek the depositions of Dr. Squires and Mr. Bristow if and when he has developed a foundation for the belief that they possess personal, non-duplicative knowledge of relevant facts." *Treppel v. Biovail Corp.*, No. 03 Civ. 3002 PKL JCF, 2006 WL 468314, at *3 (S.D.N.Y. Feb. 28, 2006). Plaintiffs already have developed that foundation here.

In *Alliance Industries,* the party opposing the deposition established that the deponent did not have "any knowledge of the facts relevant to the claims and defenses." *Alliance Indus., Inc. v. Longyear Holding, Inc.*, No. 08CV490S, 2010 WL 4323071, at *5 (W.D.N.Y. Mar. 19, 2010). Here, Mr. Cordani was involved in the clawback scheme through the Catamaran transaction from its inception through its public exposure and his state-of-mind as CEO directly relates to RICO scienter, which was not an issue in *Alliance*.

Finally, in *In re Ski Train Fire of Nov. 11, 2000 Kaprun Austria*, 2006 WL 1328259, at *10 (S.D.N.Y. May 16, 2006), plaintiffs sought executive depositions on issues of control and personal jurisdiction. The court denied the depositions after Plaintiffs conceded that the executives were "unlikely" to have relevant personal knowledge of what led to the train crash at issue and that the organizational relationship between corporations could be explored by other discovery means such as a 30(b)(6) deposition or interrogatories. Neither of those alternatives would suffice here where Mr. Cordani's personal knowledge and state-of-mind directly relate to corporate scienter.

Cigna has not met its burden that Mr. Cordani has "'***no*** personal or unique knowledge of the relevant facts,'" Cigna Letter at 2 [ECF 326] (emphasis added). Plaintiffs are not harassing Mr. Cordani or Cigna. Plaintiffs are diligently preparing for trial in which the jury will be told in Mr. Cordani's own words that, as "Project Sponsor," he was aware of, and was provided information about, Cigna's clawback of hundreds of millions of dollars in member "Pharmacy Over Payments."

Respectfully,

/s/

Craig A. Raabe