# EXHIBIT F

```
                                                          Page 1
 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 3    Case No. 16-cv-1702
      - - - - - - - - - - - - - - - - - - -x
 4    KIMBERLY A. NEGRON, Individually    :
      and on Behalf of All Others         :
 5    Similarly Situated,                 :
                                          :
 6                       Plaintiffs,      :
                                          :
 7             - vs -                     :
                                          :
 8    CIGNA CORPORATION and CIGNA HEALTH  :
      AND LIFE INSURANCE COMPANY, et al., :
 9                                        :
                         Defendants.      :
10    - - - - - - - - - - - - - - - - - - -x
11
12                            August 13, 2020
                              9:01 a.m.
13                            397 Somers Road
                              Ellington, Connecticut
14
15
16
17
18
19
20         VIDEOTAPED VIRTUAL DEPOSITION UPON
21    ORAL EXAMINATION OF JULIE BURNS-McAVOY, held at
22    the above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25
```

Page 14

1           J. Burns-McAvoy
2  going to be putting up exhibits into the Egnyte
3  program.  We don't trust me to do that.
4           MR. RAABE:  So, Chris, can you put
5     up Exhibit 171, please?
6  BY MR. RAABE:
7     Q    And what will happen, they'll get
8  populated in that Egnyte screen, and if you hit
9  the Refresh arrow, each time we do this, they'll
10 repopulate and you'll get the new exhibit.  So
11 after Chris loads it, he'll let you know and you
12 can hit Refresh.
13    A    Okay.
14          MR. BARRETT:  It should be up
15     there.
16          THE WITNESS:  There's one in
17     there.
18 BY MR. RAABE:
19    Q    Okay.  So if you click on that and
20 open it up, it's an exhibit that we marked
21 yesterday in the deposition of Stephanie Byrne.
22    A    Okay.
23    Q    Okay.  So we'll be going through a few
24 documents.  There are several documents today.
25 Again, this isn't a memory test, so you can take

Page 15

1           J. Burns-McAvoy
2  as much time as you want to get the context of
3  the documents.  Some, like this one, is pretty
4  old, it's from 2011.  I'll be asking about
5  particular portions of the document, but take as
6  much time as you need to get it into context.
7          So in this document, if you go to the
8  second page --
9     A    Okay.
10    Q    -- you see up in the top left-hand
11 corner it lists a project sponsor by the name of
12 Dan Haron?
13    A    Yes.
14    Q    Did you work with Mr. Haron?
15    A    Not directly.
16    Q    He uses a phrase "project sponsor"
17 there.
18         What was your understanding as to what
19 the role of the project sponsor was?
20    A    That was the executive sponsor where
21 the work would align strategically.
22    Q    What's that mean?
23    A    So different folks within Cigna have
24 different responsibilities, so Dan was
25 responsible for Cigna pharmacy management.  There

Page 16

1           J. Burns-McAvoy
2  would have been others that would have been
3  responsible for medical or, you know, behavioral,
4  vision.  So this work that was being done was
5  aligned to him strategically.
6     Q    Is it your understanding that the
7  project sponsor was the person with ultimate
8  responsibility for the project listed in the
9  document like this?
10    A    No.
11    Q    Why --
12    A    For me it would have been senior
13 leadership.
14    Q    Senior leadership would have been
15 responsible; is that what you're saying?
16    A    Correct.
17          MS. FARRELL:  Object.
18          THE WITNESS:  That's what I would
19     have looked to.
20 BY MR. RAABE:
21    Q    When you use the term "senior
22 leadership" in terms of the context of this
23 document, who are you referring to?
24    A    I don't recall for Co-Pay G.
25    Q    And the document lists you and

Page 17

1           J. Burns-McAvoy
2  Mr. Burton as the business project managers.
3  What did that entail for the purposes of this
4  Co-Pay G standardization project?
5     A    At that point Derek was a peer and he
6  had recently been hired, so he was working
7  alongside of me to do -- to assist with the
8  project and learn.
9     Q    So at the time of this project you had
10 been working at Cigna for about four years or so;
11 is that right, 2011?
12    A    Yes.
13    Q    Did you draft this document?
14    A    Not the initial, no.  It wouldn't have
15 been me.  I added to it.
16    Q    Do you know who drafted it?
17    A    If I remember correctly, Doug Hedman.
18    Q    And what was Mr. Hedman's role?
19    A    I don't know exactly.  He was on the
20 team -- he had moved over to production support,
21 and the project got handed off to me at the time.
22    Q    On that same page you'll notice all
23 these documents have in the lower right-hand
24 corner what we call Bates numbers.  So it says
25 Cigna 213002.  They're essentially page numbers

Page 46

J. Burns-McAvoy

1
2  Q    And who do you believe the subject
3  matter experts would have been who would have
4  helped you with this?
5        MS. FARRELL:  Objection.
6        THE WITNESS:  Yeah, I don't
7  recall.
8  BY MR. RAABE:
9  Q    Do you recall any of them that you
10 were working with on this?
11       MS. FARRELL:  Objection.
12       THE WITNESS:  Yeah, no.  It's too
13 far ago.
14 BY MR. RAABE:
15 Q    On Exhibit 171 that we looked at
16 earlier, it listed two pharmacy subject matter
17 experts, Doug Hedman and Victoria Atkinson.  Does
18 that refresh your recollection as to who might
19 have helped you with this document?
20       MS. FARRELL:  Objection.
21       THE WITNESS:  I know who they are.
22 I don't know whether they particularly were
23 the subject matter experts that I worked
24 with.
25

Page 47

J. Burns-McAvoy

1
2  BY MR. RAABE:
3  Q    Under Key Functionality Being
4  Delivered, the second bullet point says,
5  "Customers will experience lower out-of-pocket
6  costs for prescription medications when the
7  overall cost of the drug is less than their
8  co-pays."
9        Do you see that?
10 A    Yes.
11 Q    Which cost is that referring to?
12 A    Their cost share, is that where it
13 says "lower out-of-pocket costs"?
14 Q    Sorry.  I'm referring to where it says
15 "overall cost."
16 A    Oh, sorry.  Let me go back and read
17 it.
18 Q    That was my bad.  So let me ask the
19 question again.
20       In that bullet point, where it says
21 "overall costs," what cost is this document
22 referring to, to your knowledge?
23 A    As it relates to the three points in
24 the Co-Pay G logic.  The lesser of logic.  So
25 co-pay, the U&C or the Cigna allowed cost.

Page 48

J. Burns-McAvoy

1
2  Q    And the next sub-bullet point, the
3  second sentence says, "This method guarantees the
4  customer will pay the lowest possible price."
5        Do you see that?
6  A    Yeah.
7  Q    With regard to retail pharmacy
8  transactions for Cigna under Co-Pay G, is the
9  client cost always the lowest possible price?
10       MS. FARRELL:  Objection.
11       THE WITNESS:  Yeah, I don't know.
12       MR. RAABE:  All right, Chris,
13 let's mark CIGNA 516751.  That's Exhibit
14 185.
15       MR. BARRETT:  This document was
16 previously marked Exhibit 84, and it should
17 be up there.
18       MR. RAABE:  I take it back.  This
19 will be Exhibit 84.
20       THE WITNESS:  And I'm looking at
21 184.
22 BY MR. RAABE:
23 Q    It's 84.  I misspoke.
24 A    Sorry, 84, okay.
25 Q    In your list there, it might be the

Page 49

J. Burns-McAvoy

1
2  first one, because I think they populate in
3  order.
4  A    It went to the second one, but I think
5  I found it.
6        It's blank.  Hold on.  Maybe it's
7  populating.  It says, Argus Transition Claim
8  Files?
9  Q    That's the one, yeah.
10 A    Business Requirements.
11 Q    Right.
12 A    The rest is --
13       MS. FARRELL:  Take a second.  It's
14 still loading.
15       THE WITNESS:  Okay.  Now it
16 populated.
17 BY MR. RAABE:
18 Q    Okay.  Once it's fully downloaded for
19 you, take a quick look through, let me know when
20 you're done and I'll ask you some questions.
21 A    Okay.  I'm familiar with it.
22 Q    Do you recall this document?
23 A    I do.
24 Q    What was the purpose of this document?
25 A    This was part of a larger project with

13 (Pages 46 - 49)

```
                                                              Page 50
 1                J. Burns-McAvoy
 2   Catamaran to introduce our new pharmacy benefit
 3   manager, and this was just one piece of work that
 4   was underneath that, to share claims that were
 5   processed at Argus at the time with Catamaran.
 6      Q    The first substantive page, so Page
 7   51672, it lists you as the business project
 8   manager; see that?
 9      A    Yes.
10      Q    And here the pharmacy subject matter
11   experts are Justin Pitt and Dave Despard.  Do you
12   see that?
13      A    Yes.
14      Q    Did you work with Mr. Pitt and
15   Mr. Despard on this project?
16      A    Yes.
17      Q    What were their respective areas of
18   expertise?
19      A    Dave was in pharmacy IT and assisted
20   with the claim file that needed to go from Argus
21   into Cigna and then over to Catamaran.
22           Justin was in pharmacy -- I don't know
23   what they would have called them at that time,
24   but it would have been overseeing the exact
25   pharmacies.  So we were in the pharmacy contract,
```

```
                                                              Page 51
 1                J. Burns-McAvoy
 2   so we were only sending data that was pertinent
 3   to claims that were under the pharmacy contracts
 4   for Catamaran.  So he would have been assisting
 5   with that.
 6      Q    This document lists the project
 7   sponsor as David Cordani.  Do you know why Mr.
 8   Cordani was the project sponsor for this project?
 9      A    Yes, this would have been an executive
10   program.  It would have been outside of Cigna
11   pharmacy management because it was part of a
12   larger merger, acquisition type, when we were
13   moving from Argus over to Catamaran.  So he would
14   have been seen as the executive sponsor for
15   the -- you know, for overall strategy to align.
16      Q    Okay.  So let's turn to Page 51674.
17      A    Okay.
18      Q    And under Section 4, Questions/Open
19   Issues, No. 2, it says down at the bottom, "The
20   concern is the amount contained in the pharmacy
21   ingredient cost field on the claim is not
22   correct."
23           You see that?
24      A    I see it.
25      Q    What is your recollection of to what
```

```
                                                              Page 52
 1                J. Burns-McAvoy
 2   that is referring?
 3      A    Yeah, I don't know.  I'd have to look
 4   at the other pieces, but nothing looks familiar.
 5      Q    Yeah.  Why don't you go ahead and read
 6   more to get yourself into context, and perhaps if
 7   you read through the general assumptions that
 8   begin on the prior page, it will give you --
 9      A    Yeah.  Let me go back to the business
10   requirement first.  Hold on a second.
11           I've read it.
12      Q    Okay.  So having read the other parts
13   of the document, do you have an understanding
14   about what is being expressed as "The concern is
15   the amount contained in the pharmacy ingredient
16   cost field on the claim is not correct"?
17      A    No, I don't.
18      Q    It continues, "This field was added
19   for D.O requirements such that the claim amounts
20   balanced."
21           Do you know what D.O requirements is?
22      A    D.O was another project, but I don't
23   have any -- I wasn't on it and I don't have any
24   familiarity with it.
25      Q    Is that D.O, D.0?  What is that?
```

```
                                                              Page 53
 1                J. Burns-McAvoy
 2      A    D.O.
 3      Q    Do you understand what that
 4   abbreviation was for?
 5      A    No.  It outlined the way claims were
 6   to be paid, but I don't have anything beyond
 7   that.  It wasn't mine, so I don't know.
 8      Q    Okay.
 9           MR. RAABE:  Okay, Chris, let's put
10      up Exhibit 176.
11           MR. BARRETT:  It's up there.
12   BY MR. RAABE:
13      Q    Let us know when you have that one up.
14           MS. FARRELL:  Craig, which number
15      was this?
16           MR. RAABE:  It's Exhibit 176.
17           MS. FARRELL:  Thank you.
18           THE WITNESS:  Scope and Assessment
19      Request?
20   BY MR. RAABE:
21      Q    Yes.
22      A    I have it up.
23      Q    Is this a form document that you're
24   familiar with?
25      A    Yes.
```

14 (Pages 50 - 53)

Page 54

```
 1              J. Burns-McAvoy
 2     Q    Okay.  What are these kinds of
 3  forms -- not getting into the substance of this
 4  form, what are these kinds of forms used for?
 5     A    We at Cigna would complete the scope
 6  and assessment request to be sent over to Argus
 7  that would outline what we were asking them to
 8  do.  And they would present their approach back
 9  to us and how much it would cost and how long it
10  would take.
11     Q    Did you interact with people from
12  Argus?
13     A    Yes.
14          MS. FARRELL:  Objection.
15  BY MR. RAABE:
16     Q    Did you interact with people from
17  Catamaran?
18     A    Very little.  I was the liaison with
19  Argus, so I spoke mostly with the Argus guy.
20     Q    So the project name on this form is
21  Argus Transition Pharmacy Overpayments; you see
22  that?
23     A    Yes.
24     Q    What did that refer to, pharmacy
25  overpayments?
```

Page 55

```
 1              J. Burns-McAvoy
 2     A    When the cost share to the pharmacy
 3  was greater than what had been contracted with --
 4  between Cigna and the pharmacy, it was considered
 5  overpayment to the pharmacy.
 6     Q    And what was the purpose of this
 7  project?
 8     A    This project was to operationalize the
 9  process to make sure that Cigna kept those funds
10  and they weren't retained at the pharmacy.
11     Q    Did you ever hear that expression
12  referred to as a clawback?
13     A    Not till very late, once or twice
14  maybe.
15     Q    When you say "late," what year?
16     A    Oh, I don't know.  Probably three,
17  four years ago.
18          MR. RAABE:  Okay.  Let's pull up
19     the next document, which is Cigna 149489.
20          MR. BARRETT:  It has been marked
21     as Exhibit 185.
22          (Exhibit 185 was marked.)
23          THE WITNESS:  Okay.  I have it up.
24  BY MR. RAABE:
25     Q    Did you draft this document?
```

Page 56

```
 1              J. Burns-McAvoy
 2     A    Yes.  This would have been me.
 3     Q    In the Requirements section there's an
 4  example; do you see that?
 5     A    Yes.
 6     Q    What was the purpose of putting that
 7  example in this document?
 8     A    I don't recall.
 9     Q    Did you ever talk with Mr. Cordani
10  about this project?
11     A    No.
12     Q    Who is the highest person you talked
13  to in terms of the hierarchy of Cigna that you
14  interacted with with the pharmacy overpayments
15  project?
16     A    My boss at the time and a peer of his.
17     Q    And who were those people?
18     A    Paul Urick and Ed Stacey.
19          MR. RAABE:  Chris, let's mark
20     149570.
21          MR. BARRETT:  It has been marked
22     as Exhibit 186.
23          (Exhibit 186 was marked.)
24          THE WITNESS:  Okay, I have it up.
25
```

Page 57

```
 1              J. Burns-McAvoy
 2  BY MR. RAABE:
 3     Q    Exhibit 186.
 4     A    I have it open.
 5          Okay, I've read it over.
 6     Q    This was a document prepared by Argus;
 7  right?
 8     A    It looks to be.
 9     Q    Do you recall getting documents like
10  this from Argus in connection with the pharmacy
11  overpayment project?
12     A    Not particular to this project, but we
13  did get documents like this from Argus from time
14  to time depending on the project.
15     Q    And in general, why would you get
16  documents from Argus like this?
17     A    It was clarifying their understanding
18  of what our ask was and how they were going to
19  meet what we were asking them to do.
20     Q    Okay.  In the section entitled
21  Clarification of Concept, in the second paragraph
22  it says, "Cigna is asking Argus to support this
23  recoupment of dollars in an automated way where
24  it results in a negative amount charged by the
25  pharmacy.  These dollars need to flow through so
```

15 (Pages 54 - 57)

```
                                                        Page 58
 1                  J. Burns-McAvoy
 2   that all financials balance and reconcile
 3   appropriately."
 4           Do you see that?
 5           MS. FARRELL:  Objection.
 6   BY MR. RAABE:
 7      Q    Do you see that?
 8      A    Uh-huh.
 9      Q    Is that a yes?
10      A    Yes.
11           MR. RAABE:  Am I missing
12   something?
13           MS. FARRELL:  I thought you said
14   "by the pharmacy," not "to the pharmacy."
15           MR. RAABE:  Okay.
16   BY MR. RAABE:
17      Q    You see the sentence I'm reading from?
18      A    Yes, the second paragraph under
19   Clarification of Concepts.
20      Q    Yes.  Did you communicate that to
21   Argus?
22      A    I don't recall.
23      Q    Do you know whether Cigna communicated
24   that to Argus through someone else?
25      A    I don't know.
```

```
                                                        Page 59
 1                  J. Burns-McAvoy
 2      Q    Did you understand at the time of the
 3   pharmacy overpayment project that that's what
 4   Cigna was asking of Argus?
 5      A    What I understood at the time was that
 6   Cigna contracted a rate with the pharmacy.  If
 7   the pharmacy collected more than that, the
 8   difference was what that -- Cigna got.
 9           MR. RAABE:  I'm going to move on
10   to a different packet of documents.  Why
11   don't we take a short break.  We've been
12   going for an hour and 15 minutes.  Let's
13   come back at 10:30; okay?
14           THE WITNESS:  Okay.
15           MR. VIDEOGRAPHER:  The time is
16   10:16.  We're off the record.
17           (Whereupon there was a brief
18   recess.)
19           MR. VIDEOGRAPHER:  And the time is
20   10:30.  We're on the record.
21           MR. RAABE:  Chris, let's put up
22   Exhibit 11, please.
23           MR. BARRETT:  It should be
24   uploaded.
25           THE WITNESS:  No. 11?
```

```
                                                        Page 60
 1                  J. Burns-McAvoy
 2   BY MR. RAABE:
 3      Q    Yeah, Exhibit 11.
 4      A    Okay.  I have it.
 5      Q    Okay.  I'd like to first focus your
 6   attention on the first email in the chain.  Your
 7   email on October 31st at 4:54 p.m.
 8      A    Okay.  I found it.
 9      Q    So here you're writing to Lynn Sterns
10   and Elizabeth Hancock.  Can you tell us who they
11   are and what their roles were?
12      A    I don't recall Lynn's role.  Liz I
13   worked -- she was a business analyst when I
14   worked with her.
15      Q    What's that mean?  What's the role of
16   a business analyst?
17      A    They would help to gather business
18   requirements for the project that I was working
19   on.
20      Q    What's that mean, to gather business
21   requirements?
22      A    Document the requirements to -- for
23   the project.
24      Q    You write to them, "The overpayment
25   request is currently HIGH priority since there is
```

```
                                                        Page 61
 1                  J. Burns-McAvoy
 2   a lot of money tied to it."
 3           Why did you type that?
 4      A    Because it was a high priority as part
 5   of the Catamaran overall project.
 6      Q    Who told you it was a high priority?
 7      A    That came from Paul Urick and Ed
 8   Stacey.
 9      Q    In the final paragraph of that email
10   you say, "Given the financial implications, upper
11   management is looking for quick action."
12           Who were you referring to when you
13   used the phrase "upper management"?
14      A    My understanding, that would have been
15   Paul and Ed.
16      Q    What were their titles at the time; do
17   you know?
18      A    I don't recall.
19           MR. RAABE:  Chris, let's do
20   Document 54926.
21           MR. BARRETT:  It has been marked
22   as Exhibit 187.
23           (Exhibit 187 was marked.)
24           THE WITNESS:  Okay.
25
```

16 (Pages 58 - 61)