# EXHIBIT G

6

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2    there.  I apologize for the date but I would have
 3    had that as part of my responsibility.  But
 4    someone would have been responsible for the
 5    day-to-day management of the team.
 6        Q     Who was that person?
 7        A     Chris Bradbury.
 8        Q     So during the deposition today you'll
 9    hear me talking to Charlotte who's a colleague of
10    mine.  She's going to be populating the Egnyte
11    platform with exhibits.  Do you have the Egnyte
12    system up on your screen?
13        A     I do if.
14              MR. RAABE:  Charlotte can you put
15        the 8-K up, please.
16              MS. LOPER:  Yes.  We're going to
17        be starting at Exhibit 218 today.
18    BY MR. RAABE:
19        Q     Mr. Hocevar if you click on that
20    marked exhibits folder in Egnyte it should have
21    an exhibit in there.  No. 2 18.
22        A     I see it.
23        Q     Do you recognize this document?
24        A     Can I have a chance to read it?
25        Q     Sure.  Yeah.  So when I'm putting up
```

7

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2   documents today take as much time as you want to
 3   to get them into context.  Read it.  So this
 4   is -- a form 8-K filed with the Securities and
 5   Exchange Commission.  The date of it is
 6   September 23, 2018.
 7        A     Okay.
 8        Q     Do you recall seeing this document
 9   before?
10        A     I would have seen it at some point,
11   yes.
12        Q     Okay.  I don't want to spend a lot of
13   time on it.  This is an 8-K announcing that you
14   were leaving your employment at Cigna, among
15   other things; is that right?
16        A     Yes.
17        Q     And it references before discussing
18   you, Matthew Manders.  Can you describe who
19   Matthew Manders was and your relation to him at
20   Cigna?
21        A     Sure.  So Matt, a long time employee
22   of Cigna I would have directly reported to Matt.
23   Forgive me on the exact date but a good
24   percentage of kind of my tenure at Cigna, so
25   while I was in charge of select -- a good portion
```

8

                         ROUGH DRAFT - CONFIDENTIAL

1    of that would have directed reported to Matt as

2    well as when I was responsible for pharmacy.  So

3    order of magnitude, you know, twine /ten issue

4    until I started reporting to the CEO, I believe

5    it was beginning of 2017.

6        Q     So in 2017, you began reporting to the

7    CEO directly?

8        A     Correct.  It was beginning.  I don't

9    remember the exact month.

10       Q     Okay.  And when you were reporting to

11   Mr. Manders, did Mr. Manders report directly to

12   the CEO?

13       A     Yes.

14       Q     Who was the CEO during that timeframe?

15       A     The timeframe of?

16       Q     2010 to 2018 when you left.

17       A     Got it.  David Cordani.

18       Q     So during the timeframe that you were

19   in charge of the pharmacy business at Cigna, is

20   it true that you reported to Mr. Manders and Mr.

21   Manders reported to Mr. Cordani?

22       A     I believe so.  There was a brief time

23   that I reported to another leader but I think

24   general statements, that would be correct.

21

```
 1                 ROUGH DRAFT - CONFIDENTIAL
 2    that they stayed on their drugs and on their
 3    overall.  So I viewed it as a broader
 4    affordability as far as a broader clinical
 5    orientation.
 6         Q    (By Mr. Raabe) Charlotte let's mark as the
 7    next Exhibit 786-4277, Tab 17?
 8                 MS. LOPER:  Okay.  And this is
 9         Exhibit 220.
10    BY MR. RAABE:
11         Q    Let me know when you have that one up,
12    Mr. Hocevar.
13         A    Okay.
14         Q    This is an email from a Lance Wilkes.
15    What was Mr. Wilkes' role?
16         A    This is dated September of 2013?
17         Q    Right.
18         A    I don't remember physical he was then
19    or thereafter would have been my chief financial
20    officer for pharmacy.  I just don't know if it
21    was around that time.  He also had a business
22    development role prior to that.
23         Q    Okay.  It's sent to you, to Mr.
24    Cordani, to Tom McCarthy.
25                 What was Mr. McCarthy's role?
```

22

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2        A     In 2013, I want to say he was the CFO
 3   for the entire company.  There was a transition
 4   where he wasn't but he would have been in a
 5   similar type capacity.
 6        Q     And we've discussed Mr. Manders.  What
 7   was Mr. Manders' role at that time if you recall?
 8        A     I covered that already.  I think he
 9   was responsible for regional segments as well as
10   pharmacy and a bunch of other things, but I think
11   I covered that already.
12        Q     Next is Kelly Brundin.  Is that a male
13   or female?
14        A     Female.
15        Q     What was Ms. Brundin's role?
16        A     I don't remember.  I'm sorry.
17        Q     The last one is Eric Palmer.  What was
18   Mr. Palmer's role at that time?
19        A     I believe Mr. Palmer was the CFO of
20   the healthcare business in the U.S.
21        Q     And it references -- this document
22   references a September pharmacy MOR.  Can you
23   tell us what that is?
24        A     I'm assuming it's the monthly
25   operating review.
```

23

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2        Q      Let's mark as the next Exhibit
 3    786-4278.
 4                MS. LOPER:  Okay.  This is Exhibit
 5        221.
 6    BY MR. RAABE:
 7        Q      Take a look at that document.  Can you
 8    tell us, is this the September pharmacy MOR?
 9        A      As sent by September 19th, 2013, yes.
10        Q      Is this something that you prepared
11    every month for Mr. Cordani and Mr. McCarthy and
12    Mr. Manders?
13        A      Most if not all of the time this was
14    prepared for me and I sent it along.
15        Q      What was its purpose?
16        A      I think about it in -- I think about
17    it in two ways.  One is just, you know, state of
18    the state financially.  And then the second is, I
19    don't know, forward looking, how to think about
20    things.
21        Q      Who prepared these documents for you?
22        A      This document?
23        Q      Yes.  Or this type of document.
24        A      It would have been a range of people.
25        Q      Can you tell us who they are?
```

24

```
1                ROUGH DRAFT - CONFIDENTIAL
2        A      I don't remember the names, Craig, but
3   it was prepared from our financial organization
4   as well as, you know, intersecting with a bunch
5   of, you know, line operators.
6        Q      The first page under this first
7   section with bullet points where it talks about
8   key levers, the first one is retail spread
9   capture, parens volume and rates plus
10  $20 million, closed present.  Can you tell us
11  what that was referring to?
12       A      Sorry, I don't remember.
13       Q      Was there something known as retail
14  spread in the pharmacy business at Cigna?
15       A      Yes.
16       Q      What is it?
17       A      How I would have thought about it was
18  when I sold through kind of to go back to the
19  select segment days, when I provided options to
20  the select employers through their brokers, they
21  had an option on how best they wanted to -- their
22  prices to be -- when I say prices, the cost of
23  insurance to be determined.  So as an example, 75
24  life employer might want to have low
25  administrative costs.  That happens to be
```

25

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2    self-administered.  Might want to have a stop
 3    loss that looks like, you know, X or Y, and might
 4    want to have a, you know, network on the pharmacy
 5    or on the medical side that looks like one or
 6    two.  And so retail spread was just one of the
 7    many economic levers that we provided as choices
 8    to kind of the employers and the brokers out
 9    there how to come up with the best articulation
10    of their programs.
11         Q     What comprised the spread?
12         A     I'm not sure I understand your
13    question.
14         Q     What does spread mean, retail spread?
15         A     How I would define it is at this time,
16    the contract that we would have had with
17    Catamaran, guaranteed a certain set of rates.
18    You know, with some of the services.  For example
19    on the retail pharmacy network, the same way I
20    would have had direct rates with manufacturers of
21    generic drugs for home delivery or specialty
22    pharmacy.  So that's the -- what I bought or what
23    I have a contract for.  And then the spread is
24    how I would have thought about actually
25    presenting that to the employers and their
```

36

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2      apologize for not being able to answer.
 3 BY MR. RAABE:
 4      Q     Let's go to the next bullet point.  It
 5 says mix of generic parens generic price lower
 6 than co-pay and pharmacy keeping the margin
 7 closed present dash clawback STPH-RBGS currently
 8 being assessed; do you see that?
 9      A     I do.
10      Q     What's that refer to?
11      A     I don't remember the context of this.
12      Q     Did Cigna have a practice during this
13 timeframe, especially on generic drugs where the
14 co-pay would be higher than the generic price
15 that Cigna paid to the pharmacy and the pharmacy
16 would keep that margin?
17              MR. SHAFFER:  Objection to form.
18              THE WITNESS:  Can you state it
19      differently, Craig?  There are a lot of
20      different things in there I'm trying to
21      track back to --
22 BY MR. RAABE:
23      Q     So as you read that phrase in this
24 report to Mr. Cordani, McCarthy and Manders, what
25 is that referring to?
```

37

```
 1                    ROUGH DRAFT - CONFIDENTIAL

 2        A     I don't remember unfortunately.

 3        Q     Do you recall having any discussion

 4   with Mr. Cordani about clawback mechanisms?

 5        A     Not that I remember.  We gave regular

 6   updates on the performance of the business, but

 7   not that I remember on that.

 8        Q     Do you recall having conversations

 9   with Mr. McCarthy or Mr. Manders about clawback

10   mechanisms?

11        A     Not that I remember.  I gave regular

12   updates to them on the performance of the

13   business.

14        Q     So where it says in the parenthetical

15   generic price lower than co-pay and pharmacy

16   keeping the margin what does that mean?

17        A     I don't remember the context of that.

18   Sorry.

19        Q     Do you ever recall seeing any pharmacy

20   transaction where there was a difference between

21   the co-pay that a member paid and the price that

22   Cigna through its PBM paid the pharmacy?

23              MR. SHAFFER:  Objection to form.

24              THE WITNESS:  Can you say that

25         again?
```

38

```
            1            ROUGH DRAFT - CONFIDENTIAL

            2    BY MR. RAABE:

            3        Q      Do you ever recall seeing any

            4    prescription drug transaction where the amount of

            5    the member's co-pay was higher than the amount

            6    that Cigna was paying the pharmacy through its

            7    PBM?

            8                MR. SHAFFER:  Objection to form.

            9                THE WITNESS:  Yeah.  Sorry.

           10        Craig, I don't.  I don't remember, sorry.

           11    BY MR. RAABE:

           12        Q      Do you recall any conversations with

           13    Mr. Cordani about retail spread?

           14        A      I don't unfortunately, sorry.

           15                MR. RAABE:  Charlotte, let's mark

           16        as the next exhibit CIGNA 149489.  I'm

           17        sorry.  That's already Exhibit 185.

           18                MS. LOPER:  Okay.  Just checking.

           19        So this is has been previously marked as

           20        Exhibit 185.

           21                THE WITNESS:  I'm sorry.  Did you

           22        put A document in because I don't have it?

           23    BY MR. RAABE:

           24        Q      If you populate in that, if you

           25    refresh the Egnyte program there, it should
```

42

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2                    MR. RAABE:  Do you want to take a
 3          break, Mr. Hocevar?
 4                    THE WITNESS:  I'm fine to keep
 5          going unless you guys need a break.
 6                    MR. SHAFFER:  That's okay.
 7                    (Whereupon there was a discussion
 8          off the record.)
 9   BY MR. RAABE:
10       Q    Your prior answer you said there was a
11   program to work better with pharmacies.
12                What did that program entail?
13       A    I don't remember all the details,
14   Craig.  If memory serves me right we had millions
15   of dollars of IT investment across the broader
16   pharmacy program.
17       Q    Was part of the program to pass any
18   spread between what Cigna was paying the
19   pharmacies and what members were paying in their
20   cost share for the same transaction?
21                    MR. SHAFFER:  Objection to form.
22                    THE WITNESS:  Yeah, I don't know
23          the answer to that question, Craig.  There
24          was a program from what I remember where
25          there was trapped value at pharmacies, but
```

43

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2        that's about the level of, you know, depth
 3        that I can go beyond that.
 4   BY MR. RAABE:
 5        Q     What do you mean by trapped value?
 6        A     As I said, that's about as deep as I
 7   can go.  At that time you have to remember in
 8   pharmacy at that time order of magnitude we had
 9   15 billion so dollars of medical costs going to
10   pharmacy and a 10-year agreement with Catamaran.
11   I tended to stay at the macro topics and drive
12   things forward.  I apologize.  I can't go into
13   details about that.
14        Q     Who was in charge of the program to
15   the extent that you were trying to obtain trapped
16   value from pharmacies?
17        A     I don't remember at the time.  The
18   person I would have had is my overall program
19   manager.  It would have been Katie Reilly.
20        Q     Do you know whether she's still at
21   Cigna?
22        A     She's not.  She's retired.
23        Q     Do you know when she retired?
24        A     Somewhere between 2017, 2018.
25                MR. RAABE:  Let's mark as the next
```

84

```
 1                   ROUGH DRAFT - CONFIDENTIAL
 2          Exhibit 231.  I'll let you know when it's
 3          up.
 4                   THE WITNESS:  Okay.
 5                   MS. LOPER:  You should be able to
 6          see it now.
 7                   THE WITNESS:  231 you said
 8          Charlotte?
 9                   MS. LOPER:  Yes.
10                   THE WITNESS:  Okay.  Loading now.
11          Okay.  Craig, I have it up.
12     BY MR. RAABE:
13          Q     Do you recognize this document?
14          A     Let me skim through it.  I don't
15     recognize this document.  Sorry.
16          Q     Look at the third slide under the
17     section at the top key stakeholders; do you see
18     that?
19          A     Yes.
20          Q     It lists you as the business sponsor?
21          A     Yes.
22          Q     Does that mean you had ultimate
23     responsibility for this program?
24          A     We typically use business sponsor as
25     the most senior person in the control funding.
```

85

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2   So as I said I'm sure you can probably find
 3   thousands and hundreds of documents with me as
 4   the business sponsor on it over my tenure at
 5   Cigna.
 6      Q      So you were the person who had
 7   ultimate responsibility for the budget with
 8   respect to this benefit language update?
 9      A      The budget was promulgated up through
10   the business lines, one of which was pharmacy, so
11   that's how we would have used business sponsor.
12   I'm not familiar with this document, how they
13   would have used it, though.
14      Q      So when you said the business sponsor
15   is the most senior person in control of funding
16   what does that mean?
17      A      Typically how we would have allocated
18   money towards projects in any given year, you
19   would have had an executive sponsor, and at this
20   time, I think I would have still been the head of
21   pharmacy plus or minus before Chris Brad Berry
22   took over, so I would have -- I would expect to
23   see other documents from other lines of business
24   as well that I was most senior person on
25   responsible for that P&L before it rolled up to
```

86

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2   Matt and ultimately to David.
 3       Q     So under the section in the right-hand
 4   column titled qualitative benefits including
 5   customer and HC P impacts; do you see that?
 6       A     I do.
 7       Q     What are HC P impacts?
 8       A     I don't know how it's used here but
 9   how I would use it is healthcare professionals.
10       Q     It says there quote customers must
11   have benefit documents that accurately describe
12   how Cigna manages their plan benefits; do you see
13   that?
14       A     Yes.
15       Q     When you were in charge of the
16   pharmacy business at Cigna did you believe that
17   statement to be true?
18       A     Could you ask the question again?
19       Q     When you were in charge the pharmacy
20   business at Cigna did you believe that statement
21   to be true?
22       A     This statement that customers must
23   have benefit documents that accurately describe
24   the -- yes.  The definition of customers, I would
25   have read that as clients, but we had multiple
```

128

1                ROUGH DRAFT - CONFIDENTIAL

2     was to sort out the strategic options for Cigna

3     pharmacy.  As I mentioned earlier prior to that

4     many much our competitors had err sold, done

5     longstanding Partnership Agreements and we were

6     in a sub scale oriented position and we were

7     trying to figure out how to further the

8     affordability for our clients and our

9     stakeholders.

10        Q     When you testified earlier you were

11    moving aggressively is this part of that

12    movement?

13        A     Maybe separate.  So the aggressiveness

14    here, first half of 2013, was really to figure

15    out the strategic path.  The other

16    aggressiveness, I think the context was more

17    around now that you've either done a deal or plan

18    on doing a deal how do you actually start

19    bringing some of that value to the marketplace.

20    So this was a very intense, aggressive project

21    for more than a handful of months.

22        Q     Okay.  Turn to slide 12, please.  The

23    page end in 1276 underscore 0011.

24        A     Got it.

25        Q     It lists there a number of meetings.

129

```
1              ROUGH DRAFT - CONFIDENTIAL
2    Do you recall attending those meetings?
3       A     I can't speak for all of them but I
4    would have attended a good percentage of them.
5       Q     And the first four meetings there
6    include you and Mr. Cordani; right?
7       A     Yes.
8       Q     Do you recall in any of those
9    meetings, was there a discussion of the ZBL
10   process?
11      A     Not that I remember this.  At that
12   time we hadn't even consummated the deal with
13   Catamaran.
14      Q     So the next slide, Slide 13, the first
15   sentence under the heading says quote the Argus
16   relationship presents contractual financial and
17   service risk from Ascension eye eye.  Can you
18   tell us what you understand that to mean?
19      A     Sorry, I don't have -- I don't
20   remember what the context of that was.
21      Q     Go to slide 15, please?
22      A     0014?
23      Q     Yes.  Do you see No. 2 there is GTM
24   requirements.  Is that go to market?
25      A     I can't be for certain, but I would
```

136

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2   BY MR. RAABE:
 3       Q     Can you tell us what this document is?
 4       A     Is there a document attached to this?
 5       Q     I'm sorry.  Bad question.  So the
 6   email refers to a preview that was sent to the
 7   board; do you see that in the first sentence?
 8       A     Yes.
 9       Q     What's a pre read?
10       A     We would send out information in
11   advance of a meeting.
12       Q     The second sentence says all SKWR-FPLT
13   The Board and our CEO continues to be very
14   positive on our efforts, energy and drive for
15   results; do you see that?
16       A     I do.
17       Q     What do you recall that referring to?
18       A     I don't remember specifically, but
19   October 2013 would have been, you know, a handful
20   of months post the signing of the deal.  So not
21   uncommon to have an update to the board.
22       Q     Was part of the positive effort energy
23   and drive for results the capturing of the
24   trapped money at the pharmacies?
25                MR. SHAFFER:  Objection to form.
```

137

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2                  THE WITNESS:  Yeah, sorry, Craig,
 3          not that I remember.  That's a pretty
 4          detailed topic for a finance committee.
 5   BY MR. RAABE:
 6          Q     Did you ever discuss with Mr. Cordani
 7   that trapped money?
 8          A     Not that I remember talking about
 9   those specific terms but we would have talked
10   about the major reconciliations we had.
11          Q     Including the trapped money?
12                  MR. SHAFFER:  Objection to form.
13                  THE WITNESS:  Yeah, sorry, the
14          difference between the contracted rates as
15          well as what we're seeing come through the
16          results.
17   BY MR. RAABE:
18          Q     Tell us what you recall of those
19   conversations.
20          A     You know, Craig not much more than
21   that.  You know, most of my updates were through
22   Matt Manders and Eric Palmer as kind of my boss
23   as the finance officer.  They got aggregated up
24   to even a more higher level as they rolled
25   through.
```

138

```
 1                ROUGH DRAFT - CONFIDENTIAL
 2      Q     So my question before is whether you
 3   had those conversations with Mr. Cordani, and you
 4   said that you did; right?
 5      A     I said that I had conversation on the
 6   reconciled items, yes.
 7      Q     So do you have any recollection of
 8   those conversations as you sit here today?
 9      A     The details, no.  Just knowing in
10   fourth quarter that we were starting to go down a
11   bad path with one of our partners along a 10-year
12   deal.
13      Q     So what do you recall saying to him
14   and what do you recall Mr. Cordani saying to you?
15      A     I don't remember, Craig.  I mean,
16   again, this was a very significant move for the
17   company to enter a 10-year strategic
18   relationship, and was really trying to figure out
19   how to get that relationship back on track.
20      Q     So let's mark as Exhibit 241 document
21   149550?
22               MS. LOPER:  This will be Exhibit
23         242, actually.  The other one was 241.
24               MR. RAABE:  I'm sorry.  242.  You
25         should be able to see it.
```

141

```
 1              ROUGH DRAFT - CONFIDENTIAL
 2       Q     So was one of the selling benefits for
 3   Cigna in entering into the Catamaran relationship
 4   the fact that under Catamaran's contracts with
 5   the network pharmacies, Cigna would be able to
 6   obtain any differential between a member's
 7   co-payment and the amount that Catamaran was
 8   paying the pharmacy for a particular drug?
 9       A     Not that I remember.  The sole driver
10   of this was to get better rates at the pharmacy
11   so we can then go off and offer those rates to
12   clients.
13       Q     You don't recall discussion of that
14   differential that I just referred to being
15   100 million dollar a year proposition?
16       A     I don't, sorry.
17              MR. RAABE:  Let's mark 7865347,
18       please.
19              MS. LOPER:  Okay.  This is Exhibit
20       243.
21   BY MR. RAABE:
22       Q     Do you recognize this document, Mr.
23   Hocevar?
24       A     I'm just pulling it up.  I don't,
25   Craig, sorry.
```

142

```
 1                    ROUGH DRAFT - CONFIDENTIAL
 2        Q      What is Rx Ops Review in the subject
 3   line?
 4        A      Yeah, I'm assuming it's a pharmacy ops
 5   review.
 6        Q      Did you have periodic pharmacy ops
 7   reviews with Mr. Cordani, Mr. McCarthy, Mr.
 8   Manders and Mr. Palmer and others?
 9        A      We had reviews.  I don't remember how
10   frequent they were.
11        Q      What was the purpose of them?
12        A      High level, you know, status of
13   relationship with Catamaran.  Status of
14   performance of the business.  You know, status
15   of, you know, culture, talent; things like that.
16        Q      Do you recall discussing the ZBL issue
17   in any of those ops reviews with Mr. Cordani?
18        A      I don't, sorry.
19             MR. RAABE:  Let's mark the
20        attachment as the next exhibit.  The
21        attachment is entitled CPM Earnings_FY14.
22             MS. LOPER:  Okay.  Just to
23        compare, this is Bates No. 7865348?
24             MR. RAABE:  Yes.
25             MS. LOPER:  This will be Exhibit
```