UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
KIMBERLY A. NEGRON, DANIEL       :  No. 3:16CV1702(JAM)
PERRY, COURTNEY GALLAGHER,       :
NINA CUROL, ROBER CUROL, and     :
BILLY RAY BLOCKER, JR.,          :
Individually and on Behalf of    :
All Others Similarly Situated,   :
                                 :
               Plaintiffs        :
                                 :
         v.                      :
                                 :
CIGNA HEALTH AND LIFE INSURANCE  :
COMPANY,                         :
                                 :  New Haven, Connecticut
               Defendant         :  September 22, 2020
                                 :
- - - - - - - - - - - - - - - - x
```

VIDEO DISCOVERY HEARING

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

```
 1  A P P E A R A N C E S:

 2
        FOR THE PLAINTIFFS:
 3
              IZZARD KINDALL & RAABE LLP
 4                 29 South Main Street, Suite 305
                   West Hartford, Connecticut 06107
 5            BY:  CRAIG A. RAABE, ESQ.

 6            MOTLEY RICE, LLC
                   28 Bridgeside Blvd.
 7                 Mt. Pleasant, South Carolina 29464
              BY:  MEGHAN OLIVER, ESQ.
 8
 9      FOR DEFENDANT CIGNA HEALTH AND LIFE INSURANCE
        COMPANY:
10
              MORGAN LEWIS & BOCKIUS LLP
11                 1701 Market Street
                   Philadelphia, Pennsylvania 19103
12            BY:  BRIAN W. SHAFFER, ESQ.
                   ELEANOR R. FARRELL,ESQ.
13                 CHRISTOPHER M. DIFFEE, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | **4:01 P.M.**                                                        |
| 2   | THE COURT: Good afternoon, everybody. This is                        |
| 3   | Judge Jeffrey Meyer. We're here in a discovery dispute in            |
| 4   | the matter of Negron v. Cigna.                                       |
| 5   | May I have appearance of counsel, please, for                        |
| 6   | the plaintiffs.                                                      |
| 7   | MR. RAABE: Good afternoon, Your Honor. Craig                         |
| 8   | Raabe and Meghan Oliver for the plaintiffs.                          |
| 9   | THE COURT: Good afternoon.                                           |
| 10  | And for the defendant?                                               |
| 11  | MR. SHAFFER: Good afternoon, Your Honor. Brian                       |
| 12  | Shaffer. With me is Eleanor Farrell and Chris Diffee from            |
| 13  | Morgan Lewis on behalf of Cigna. With us also is in-house            |
| 14  | counsel Brett Boskiewicz.                                            |
| 15  | THE COURT: Maybe it might make sense to hear                         |
| 16  | from you first, Mr. Raabe, since you're the one who is               |
| 17  | seeking to do the deposition at issue.                               |
| 18  | MR. RAABE: Sure.                                                     |
| 19  | I think, Judge, we've pointed out in our papers                      |
| 20  | that the defendants are accusing us of trying to harass              |
| 21  | Mr. Cordani rather than engaging in legitimate discovery             |
| 22  | and trying to get this case ready for trial. And I hope              |
| 23  | that Your Honor knows from your dealings with us that we             |
| 24  | don't harass witnesses, we don't harass defendants; we try           |
| 25  | to get cases ready for trial. I think the defendants are             |

1 painting us with that brush because they need to, because
2 the case law essentially tries to distinguish between
3 those cases where someone is noticing up an executive's
4 deposition to harass them and where someone is actually
5 trying to get a case ready for trial.  We believe we
6 clearly fall in the latter group.
7 　　　　　　We have a direct connection, both from a
8 documentary perspective and a testimonial perspective,
9 from Chris Hocevar, the head of the Pharmacy Division, to
10 Mr. Cordani.  This all stems back from a period of time
11 where Cigna was changing its pharmacy benefit structure
12 where it previously dealt with pharmacy benefits in-house,
13 it was giving an arrangement, a transaction with a company
14 called Catamaran where Catamaran would take care of the
15 network and adjudication of the transactions.  And the
16 reason that's important and why it goes to the core of
17 this case is, as the defendants acknowledged on page 5 of
18 their submission yesterday, the plan language that we are
19 suing under pre-dated the Catamaran relationship.  And the
20 issue that we've got here is Mr. Cordani was intimately
21 involved in that Catamaran relationship.  As Mr. Hocevar
22 described, one of the important economic levers, to use
23 his phrase, was the notion that under the Catamaran
24 arrangement Cigna could claw back these monies where a
25 member paid more than the cost of the drug at the

1   pharmacy.  Previously Cigna couldn't do that.  And the
2   problem for Cigna in this case is the plan language was
3   designed on the old scheme where the clawbacks didn't
4   occur.
5          And so the issue that is important for
6   Mr. Cordani is his knowledge and involvement both in
7   working with the Catamaran transaction and the origin of
8   the "claw back mechanism" that Mr. Hocevar briefed him on
9   we know in writing, Mr. Hocevar couldn't recall what
10  orally; moving into the transactions themselves where
11  Mr. Hocevar is filling in Mr. Cordani on the ZBL, which is
12  the clawback, essentially those funds that are being --
13  the trap money that's being taken from the pharmacies back
14  to Cigna; and then as a further written connection to
15  Mr. Cordani, when the scheme gets exposed and there's all
16  kinds of adverse publicity, this lawsuit followed, and
17  Mr. Cordani really was in the know at that point.
18         So this isn't a situation where we're fishing,
19  trying to find some evidence to bring Mr. Cordani into the
20  fray.  He is in the fray.  This was a huge transaction for
21  Cigna and very important.  As Mr. Hocevar described it,
22  they had watched their competitors, Aetna and others, get
23  ahead of them in the prior few years, so they got into
24  this relationship with Catamaran.  And in our first letter
25  we talked about how Mr. Cordani was out in the public

1  talking about the level of detail that he and others were
2  engaging in in this transaction.  So in that respect, it
3  is not a fishing expedition by any stretch.
4  　　　　　I think what's important there also, as we said
5  in our letter yesterday, in most of the cases where these
6  types of depositions have been denied, the party opposing
7  the deposition has submitted a sworn statement that the
8  executive has no knowledge, has nothing to offer, as some
9  of the cases talk about.  Here we don't have that.  And we
10 won't have that.  Because, as Cigna acknowledged in its
11 initial letter, Mr. Cordani certainly has a high level of
12 supervisory knowledge of this entire arrangement.  And
13 that makes this different.  That's personal knowledge.
14 And with respect to the RICO claim, that's unique
15 knowledge.
16 　　　　　And one of the things I thought about as I was
17 preparing today is trying to take you back to your
18 prosecutorial days.  When you were looking at a company,
19 one of the things, from my understanding, is the
20 government in trying to decide how to present a case at
21 trial is to climb as high up the management ladder as you
22 can to establish knowledge.  And that's exactly what we've
23 done here.  And it's not a flier; we've got a real
24 documentary and testimonial connection to that level.
25 　　　　　And I think what Cigna is really trying to do

1   here is cut off our trial route to Mr. Cordani to be able
2   to prove --
3           THE COURT:  Can I ask you --
4           MR. RAABE:  Sure.
5           THE COURT:  It seems to me that you're actually
6   trying to show Mr. Cordani's -- at least his knowledge,
7   but possibly his participation or blessing or
8   acquiescence.
9           MR. RAABE:  For sure.  Yeah.
10          THE COURT:  Okay.
11          MR. RAABE:  And that goes to the heart of a RICO
12  case.  If the CEO knew about it and blessed it, what could
13  be better to establish corporate scienter?  And that's
14  really where we're heading here.
15          I think the gatekeeping function is harassment
16  versus is there real connection.  It seems to me, with
17  Mr. Hocevar's testimony not recalling the conversations
18  but the documentary link to Mr. Cordani, that we shouldn't
19  be denied the chance to take his deposition.  And I hope
20  Your Honor understands we will keep it short, we will keep
21  it concise.  We are not looking to waste anyone's time
22  here.  We are looking to get in and get out and find out
23  what he knows about that.
24          THE COURT:  Tell me a little more about why you
25  believe the incidents involving when the alleged scheme

1  comes to light and there's publicity about it, how is it
2  that Mr. Cordani's questioning about that sequence then is
3  going to be helpful.
4          MR. RAABE:  I think it's two things.  I would
5  like to know, you know, if the notion is he didn't have
6  any involvement before then, why is he being involved at
7  that point.  My supposition is he had been involved all
8  along.  We call it a scheme.  The scheme blew up, so
9  they're letting the CEO know the scheme blew up.  And the
10 clawbacks continued after that time period.  In May and
11 June of 2016 the clawbacks continued but the plan language
12 didn't change.  And I think this is important.  So you had
13 this plan language that pre-dated the clawback period, we
14 are suing on that language.  The scheme gets exposed.  The
15 plan language continues.  After that time, finally some
16 management personnel in Cigna says we haven't checked our
17 language since 2010, four years before the clawback
18 started.  And when they recognized that, they predict
19 they're going to be sued in an ERISA class action, just a
20 theory that we have here, and then they change the
21 language to disclose for the first time to members that
22 there could be a differential between what they pay at the
23 pharmacy and what Cigna pays the pharmacy, the so-called
24 spread that they claw back.
25          So we think as we go past the exposure date in

1    the spring of 2016 to the time when the language gets
2    changed later in that year and into the following year,
3    Mr. Cordani's knowledge of what was happening there will
4    be critical.
5              THE COURT:  I see.  Okay.
6              All right.  Is that about it?
7              MR. RAABE:  Yes, Your Honor.  Actually, just one
8    other point.
9              So I know that the Cigna folks are trying to
10   push us to Mr. Manders and Mr. McCarthy, I'm sure you'll
11   hear about that.  The reason we don't think that's
12   necessary is a couple.
13             We may take Mr. Manders' deposition for other
14   reasons, but when we got the document production there was
15   a clear link between Mr. Hocevar and Mr. Cordani.  We
16   don't have a clear documentary link between Mr. Manders
17   and Mr. McCarthy.  And I frankly wonder on this issue if
18   there's going to be a connection to Mr. McCarthy.  There
19   may be to Mr. Manders, that's where we're going to take
20   that deposition.  So the notion that we have to wait to
21   take those folks' depositions, I'm telling you, quite
22   frankly, we don't have the documents to pin them down like
23   we did Mr. Hocevar.
24             THE COURT:  Thank you.
25             Mr. Shaffer.

1  MR. SHAFFER: Thank you, your Honor. And let me
2 address a couple of the points that Mr. Raabe made out of
3 the gate.
4  The cases talk about harassment not in a
5 physical sense but in the burden, distraction,
6 preparation, and other requirements that are necessary for
7 the executive of a large company to testify. So that's
8 the citations to the cases.
9  And candidly, when one jumps over levels of
10 senior executive management, including the president of
11 the defendant company, to the CEO of the parent company to
12 talk about two documents that they have, that's part of
13 what is going on here. And that's why we believe that the
14 Court, under the apex doctrine, looks with careful
15 scrutiny at whether this is really required now, whether
16 they have exhausted other sources of the same information,
17 the fact that Mr. Cordani and Mr. Manders could have the
18 same information. Under the apex doctrine they should,
19 and in fact are required to, explore other alternatives if
20 they exist.
21  THE COURT: Let's suppose counterfactually --
22 let's be clear, let's suppose that a CEO of a company is
23 essentially completely in a scheme and is very happy to
24 see it succeed because it's making a hundred million
25 dollars for the company. Even if the person one step down

1  in the corporate hierarchy also knows or doesn't know,
2  isn't the CEO's knowledge very important on something that
3  a plaintiff can inquire into in the sense that it has its
4  own unique aspect just because it is the CEO who knows?
5           MR. SHAFFER:  Well, here the CEO is Matt
6  Manders, the president of the defendant company.  But I
7  understand your question relating --
8           THE COURT:  The CEO, the person at the very top
9  of -- and I think your suggestion is Mr. Cordani is just
10 too high.  And so I guess that's my question is, it seems
11 to me that it's appropriate if when you have a situation
12 where there's an allegation of essentially a
13 corporate-wide policy of wrongdoing, that then more
14 latitude would logically be given to go higher up the
15 chain than, for example, in the other kinds of cases in
16 which I've seen the apex doctrine applied where somebody
17 is complaining they were fired for improper reasons and,
18 you know, they want to go beyond the branch manager in
19 Tallahassee and depose the CEO or the president of the
20 company in Houston who may, you know, have nothing
21 personal -- no personal dealings with this particular
22 employee who was fired but the person just wants to ask
23 questions about the company's antidiscrimination policy or
24 the like.  There I can see the argument, well, the CEO
25 doesn't have unique knowledge, you just want to ask about

1  essentially overall company, the antidiscrimination
2  policy.  That seems like it's a really different kind of
3  situation here.  I know you disagree, obviously,
4  vehemently with plaintiffs' claims that there was anything
5  wrong here.  But that's what the plaintiffs are trying to
6  get discovery on.  And so that's why I'm having a hard
7  time understanding why, in light of the very specific
8  documents it looks to me that plaintiffs have submitted
9  here between Mr. Hocevar and Mr. Cordani -- and I know you
10 can argue that they're not specific enough, but I think
11 one of them actually uses the word "claw back mechanism."
12 So it strikes me it seems to me like it's not just
13 shooting blindly here.  It strikes me that they have some
14 basis here that they want to ask Cordani questions in a
15 limited fashion, at least.  That's what I'm struggling
16 with, I'll have to say.
17          MR. SHAFFER:  Let me try to address a couple of
18 your points.
19          First, I think it is important to go back to
20 what this case is about.  This case is about the
21 interpretation of plan language and adjudication of claims
22 of members at the point of sale.  The plaintiffs are very
23 clear the clawback is not the violation.  The alleged
24 overcharge is what the plaintiffs claim is a violation of
25 ERISA.  That adjudication occurred prior to the clawback

1  time period that they reference, during the time period I
2  understand that they claim that the clawback itself
3  somehow changes things.  But that's not the allegation in
4  the case.  The allegation is --
5              THE COURT:  Isn't the clawback essentially the
6  way that the company profits from it?  It may be that it's
7  not the violation, but it's kind of the evidence of the
8  motive for the violation.
9              MR. SHAFFER:  Because it was adjudicated that
10 way prior to that point in time, I think it largely
11 refutes any motive.  It also doesn't change the
12 adjudication at the point of sale that's between the
13 pharmacies and Cigna.  So I don't think it suggests any
14 motive on the part of it other than to get the value from
15 the Catamaran deal that Cigna was entitled to.
16             But going back to the other point really about
17 whether Mr. Cordani can be deposed because he received a
18 memo along with Mr. Manders and Mr. McCarthy about the
19 status of the Catamaran deal, Your Honor, I think there
20 have to be limits on the ability to depose senior
21 executives of companies simply when they're the recipient
22 without the exploration of others.  Mr. Manders was the
23 direct connection, not Mr. Hocevar and Mr. Cordani, as
24 Mr. Raabe said.  And we think that ought to be explored
25 first.

14

1          The other thing I will say is that the
2   suggestion that this is a narrow deposition or that
3   they're going to get in and out and they only have a
4   couple of questions, their letter cited 26 documents never
5   sent to Mr. Cordani, never mentioning Mr. Cordani, never
6   reviewed by him.  The idea that they would have three
7   hours of free rein to ask him whatever they want about
8   documents he's never seen or would be expected to see so
9   that they can try to establish a state of mind or opinions
10  about documents written by some of the 70,000-plus
11  employees doesn't seem to be an appropriate mechanism to
12  ask him specific questions about his personal knowledge,
13  documents he did receive.  And so the request, as it came
14  to us, the request as it was presented up until today was
15  we want three hours to sort of go at him.
16          THE COURT:  I see.  Okay.
17          MR. SHAFFER:  We don't believe that's
18  appropriate.  And the Court should exercise discretion to
19  limit whatever scope the Court is willing to allow.
20          Most of the cases that do allow an apex
21  deposition are circumscribed in terms of specific topics
22  that are and are not allowed for a witness of that type
23  and do not simply allow the plaintiffs to present whatever
24  they want, say do you agree with this or not, and leave
25  for a later day whether that's an appropriate use of the

1  executive's time.

2  We think the arguments are that they should go
3  through and establish unique independent knowledge.  Where
4  there are other recipients of documents, they should go to
5  those first.  The fact that they didn't go to those first
6  may be a preference, it could go to the weight of the
7  evidence.  But we don't agree that they should get free
8  rein for three hours of Mr. Cordani.

9  THE COURT:  Thank you.

10  Mr. Raabe, do you have anything else?

11  MR. RAABE:  I don't.

12  THE COURT:  So I appreciate the parties'
13  submissions on this.  I'm going to rule on the issue in
14  dispute here just to keep things moving.

15  I'm going to overrule the objection by Cigna for
16  the testimony at the deposition, limited to three hours,
17  of Mr. Cordani and to occur remotely as well, I think as
18  plaintiffs have proposed.  I'm doing that -- I don't think
19  the parties really have at least a meaningful dispute
20  about the applicable legal principles.  I've looked at the
21  case law that generally governs these kinds of top
22  corporate officials or sometimes called apex depositions.
23  The case law is summarized, for example, in the decision
24  in *Scott v. Chipotle Mexican Grill*, 306 F.R.D. 120,
25  122-123 (S.D.N.Y. 2015).

1           Here, in light of that case law which I
2  understand essentially to try to balance plaintiffs'
3  proper interest in seeking discoverable information with
4  the possibility that there could be harassment, and I mean
5  harassment in the broad terms that Mr. Shaffer described
6  in terms of just the burdensomeness without good reason,
7  as well essentially it can be done sometimes for improper
8  reasons just trying to get leverage and corporate
9  attention to a particular litigation, I think I have to
10 balance that possibility against the possibility the
11 plaintiffs are actually seeking information that could be
12 of material consequence to the litigation.
13          Here I'm persuaded by plaintiffs' showing that
14 they have a good faith basis to seek the deposition of
15 Mr. Cordani.  I look at the fact that there are documents
16 that identify him as the Project Sponsor for the Pharmacy
17 Over Payments project for Argus Transition.  I understand
18 and I've read Cigna's response to that saying it doesn't
19 matter, that the sort of name "Project Sponsor" doesn't
20 mean he was necessarily involved.  But the document does
21 say that he's the Project Sponsor.  I've also considered
22 the deposition testimony of Mr. Chris Hocevar who I think
23 there's a basis to believe did report to Mr. Cordani.  He
24 certainly had communications to him and suggesting the
25 possibility, at least, of Mr. Cordani's knowledge of the

1  alleged scheme here.  And in light of, frankly, the
2  overall financial significance here of the alleged scheme
3  which involves an allegation of some hundred million
4  dollars or so in payments to the company which to me seems
5  to have comparable implications for a likelihood that a
6  top corporate official like Mr. Cordani would be in the
7  loop in some meaningful way.  There's one document here, I
8  know, from Mr. Hocevar to Mr. Cordani, among others, that
9  refers expressly to a "claw back mechanism currently being
10 assessed."
11         So I'm really satisfied that plaintiffs have met
12 their burden to make an adequate showing that Mr. Cordani
13 may -- and I don't know that he did -- but he may have
14 non-cumulative knowledge of facts that are integral to the
15 alleged scheme and that his knowledge, or more, as the
16 company leader, would be highly significant to the
17 plaintiffs' liability claims.
18         I'm not convinced in this record that
19 Mr. Cordani's deposition is sought for an improper
20 harassment reason or improper kind of leverage-seeking
21 reason.  And I'm also not convinced that plaintiffs have
22 to essentially exhaust all other depositions of other top
23 and presumably busy corporate executives before seeking to
24 depose Mr. Cordani in light of the documents that are
25 already there and especially in light of the information

1  concerning Mr. Hocevar, his relationship with Mr. Cordani.
2           So as stated, in order to limit the potential
3  for prejudice, I'm limiting the deposition to three hours
4  to proceed remotely by video.
5           And I have not received in the paperwork a clear
6  articulation of the subject matter limits that should be
7  placed here, and I'm just not going to rule on them in the
8  first place.  I think there will be real limits that the
9  three hours places here, and I trust that Mr. Raabe will
10 act in good faith and not ask questions or pose questions
11 for which there is not some proper basis for him to ask.
12          So that's the Court's ruling.
13          Is there anything else?
14          MR. RAABE:  Nothing, thank you.
15          THE COURT:  All right.  We'll stand in recess,
16 thank you.
17               (Proceedings adjourned at 4:24 p.m.)
18
19
20
21
22
23
24
25

19

C E R T I F I C A T E

RE: KIMBERLY A. NEGRON, ET AL. v. CIGNA HEALTH AND LIFE INSURANCE COMPANY, No. 3:16CV1702(JAM)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 18 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860)463-3180