UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
KIMBERLY A. NEGRON, DANIEL        :  No. 3:16CV1702(JAM)
PERRY, COURTNEY GALLAGHER,        :
NINA CUROL, ROGER CUROL, and      :
BILLY RAY BLOCKER, JR.,           :
Individually and on Behalf of     :
All Others Similarly Situated,    :
                                  :
                Plaintiffs        :
                                  :
          v.                      :
                                  :
CIGNA HEALTH AND LIFE INSURANCE   :
COMPANY,                          :
                                  :  New Haven, Connecticut
                Defendant         :  October 28, 2020
                                  :
- - - - - - - - - - - - - - - - x
```

<u>VIDEO MOTIONS HEARING</u>

B E F O R E:

      THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

```
1    A P P E A R A N C E S:

2

3          FOR THE PLAINTIFFS:

4               IZZARD KINDALL & RAABE LLP
                     29 South Main Street, Suite 305
                     West Hartford, Connecticut 06107
5               BY:  ROBERT A. IZARD, JR., ESQ.
                     CRAIG A. RAABE, ESQ.
6
                MOTLEY RICE LLC
7                    28 Bridgeside Blvd.
                     Mt. Pleasant, South Carolina 29464
8               BY:  MEGHAN OLIVER, ESQ.

9               MOTLEY RICE LLC
                     One Corporate Ctr., 17th Fl.
10                   Hartford, Connecticut 06103
                BY:  WILLIAM H. NARWOLD, ESQ.
11

12
           FOR DEFENDANT CIGNA HEALTH AND LIFE INSURANCE
13         COMPANY:

14              MORGAN LEWIS & BOCKIUS LLP
                     1701 Market Street
15                   Philadelphia, Pennsylvania 19103
                BY:  JEREMY P. BLUMENFELD, ESQ.
16                   BRIAN W. SHAFFER, ESQ.

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **2:01 P.M.** |
| 2 | THE COURT:  Good afternoon, everybody.  This is |
| 3 | Judge Jeffrey Meyer.  We're here for oral argument on |
| 4 | pending motions in Negron v. Cigna Corporation, |
| 5 | specifically with respect to the motion for class |
| 6 | certification and the motion to preclude the testimony of |
| 7 | Launce Mustoe and I assume, as well, the related motion |
| 8 | that's connected to the Mustoe testimony. |
| 9 | May I have appearance of counsel, please, for |
| 10 | plaintiffs. |
| 11 | MR. IZARD:  Good afternoon, Your Honor.  Robert |
| 12 | Izard, Izard Kindall & Raabe, for plaintiffs. |
| 13 | THE COURT:  Good afternoon. |
| 14 | MS. OLIVER:  Meghan Oliver with Motley Rice for |
| 15 | plaintiffs. |
| 16 | MR. NARWOLD:  Good afternoon, Your Honor.  Bill |
| 17 | Narwold, Motley Rice as well. |
| 18 | THE COURT:  All right. |
| 19 | MR. RAABE:  Craig Raabe here for the plaintiffs, |
| 20 | Your Honor.  Good afternoon. |
| 21 | THE COURT:  Good afternoon. |
| 22 | Anyone else for plaintiffs? |
| 23 | Okay.  And for Cigna? |
| 24 | MR. BLUMENFELD:  Good afternoon, Your Honor. |
| 25 | This is Jeremy Blumenfeld from Morgan Lewis on behalf of |

1    Cigna.

2              MR. SHAFFER:  Your Honor, good afternoon.  Brian

3    Shaffer also from Morgan Lewis also for Cigna.

4              THE COURT:  All right.  Are we missing anybody

5    who needs to make an appearance at this time?

6              All right.  So I'm not sure who is going to

7    speak on behalf of plaintiffs today or maybe you're going

8    to divvy things up.  I guess if plaintiffs would like to

9    proceed.

10             MR. IZARD:  Yes, Your Honor.  This is Bob Izard.

11             I guess the first question is, in what order

12   would you like to take the motions?

13             THE COURT:  Well, they're really interrelated.

14   And so I think I'd like to start with the class

15   certification.

16             MR. IZARD:  Okay.

17             THE COURT:  And maybe what we'll do is basically

18   have you argue the class cert motions, and I know there's

19   additional motions specifically with respect to Mustoe,

20   but there's quite a bit of overlap as well.  I think it

21   might help me mostly if we focused on the class cert

22   motion first and I hear from both sides on that, and then

23   I'll give opportunity to go into the motion to preclude

24   Mustoe as well as the additional motion.  Okay?

25             MR. IZARD:  Okay.

1          So, I will argue that.  I apologize if I spoke

2    over you.  There's a little bit of a lag here, so I'm not

3    sure when people are starting and stopping.  My apologies

4    in advance.

5          THE COURT:  That's okay.  And if any of our

6    internets kind of whack out, as sometimes happens, just

7    feel free to raise your hand and let us know.

8          I'll just remind everybody, it's really

9    important for our court reporter to make sure she's

10   getting everything down.  She has the hardest job of any

11   of us today, and so we'll try not to speak over each other

12   as best as we can.

13         Please proceed.

14         MR. IZARD:  Thank you, Your Honor.

15         I know this has been extensively briefed, to say

16   the least.  So what I'd like to do is just sort of make

17   three observations, and I will do by best not to repeat

18   what's in the briefs because I'm confident that everybody

19   has studied them pretty thoroughly and the Court has

20   questions, so I'll try to address those as well.

21         But I think the first question or the first

22   issue I'd like to address is:  What is the plaintiffs'

23   legal claim?  And that seems to pervade a lot of the

24   arguments here.

25         The plaintiffs' claim is that each individual

1   overcharge on each individual prescription drug claim is a

2   legal claim without regard to any other transaction.  So

3   if I go into the pharmacy and I pay a $50 deductible and I

4   should pay a $10 deductible, at the moment I make my

5   payment and I take my prescription and I walk out of the

6   pharmacy, I have a claim.  And I can go to court and I

7   could assert that claim.  In this case, that scenario

8   happened many millions of times and it involved hundreds

9   of millions of dollars.  So, as I say, a plaintiff, in our

10  view, could bring a legal claim each time they were

11  overcharged.

12          As I read Cigna's brief, they never really

13  address this argument at all.  Instead, they try and

14  change plaintiffs' claim.  And so Cigna's claim is

15  essentially that plaintiffs can only claim the net amount

16  due at the end of the year after making other adjustments.

17  So, for example, if the plaintiff overpaid on one

18  transaction, if they subsequently underpaid eight months

19  later, Cigna's position is the plaintiff can't bring a

20  claim until the end of the year and they have to sue for

21  the net.

22          The reverse, Cigna claims that if it overpaid on

23  some claims and underpaid on other claims, again, the

24  plaintiff needs to wait until the end of the year and sue

25  for the net amount due.  I think that's sort of a crux.  I

1    think really what Cigna is saying is that the plaintiff

2    has a duty not only to bring the claim for the plaintiff's

3    own loss but also a duty to bring a claim for what it

4    thinks Cigna might have as a loss.  So the plaintiff has

5    to say, well, I'm overcharged here and I think Cigna may

6    make a claim back against me for an undercharge over

7    there, and it's my duty as a plaintiff to bring both

8    claims in this case.  And, you know, our view is --

9           THE COURT:  Can I ask you, Mr. Izard, I'm trying

10   to understand, sometimes can't it be the case that if you

11   have a claim in Month One and a claim in Month Eight, as

12   you're saying, that you can only look and consider what

13   plaintiff actually owes for Month Eight by reference to

14   Month One by the fact that there was a transaction in

15   Month One, because that may impact the total deductible

16   for the plaintiff; isn't that right?

17          MR. IZARD:  Well, I guess that's the real crux

18   of the question, Your Honor.  Does that deductible that

19   might have been changed down the road affect the claim I

20   can make today?  So that's the question.  Do I have to

21   wait a year to bring the claim or can I bring the claim

22   now?  And our view is Cigna has rights if it underpaid in

23   the future.  It has, under the plans, a right of setoff

24   against future claims.  It has a right to bring a claim

25   for recovery.  It also has a right to have a legal offset

1    in the case.  I mean, this is a claim of setoff.  It's an

2    affirmative defense of setoff.  Setoff is not a part of

3    class certification.

4         And you know, Judge, there are an awful lot of

5    cases that have been certified involving health benefits,

6    and not just prescription drug benefits, all types of

7    health benefits.  Cigna's identified only one case which

8    talks about how the plaintiff has to bring a claim not

9    only for its own injury but it also has to bring a claim

10   for Cigna's offsetting injury.  And that's the *Peters*

11   case.  I think it's really important to look at what

12   happened in *Peters*.  Because in *Peters* the sole issue is

13   what was the but-for world, but for the overcharges, what

14   would have happened.

15        Now, the defendant's expert in *Peters* says you

16   have to look at the entire claim history over the life of

17   the relationship with the insurance company.  There, the

18   defendant's expert looked at multiple years.  The

19   plaintiff's expert in *Peters* said, under the plaintiff's

20   expert theory, you had to look at the complete claims

21   experienced over the whole year.  So that was plaintiff's

22   evidence.  And the court latched onto that evidence.  So

23   the court said, look, the plaintiff's evidence is you got

24   to look at the whole claims experience over the whole year

25   and the plaintiff's expert didn't account for that, well,

```
 1    obviously they had a problem on class cert.  But there is

 2    no other case that I've seen or the defendant has cited

 3    that has adopted the principle that defendant argues for

 4    now, that a claim is not a claim when you have a loss.

 5              And, you know, we've cited a couple cases,

 6    Smith, Corsini, where the court certified classes without

 7    accounting for what might happen down the road.  But we

 8    don't know what might happen down the road.  And if you

 9    have a loss and it was wrongful, you have a right to

10    pursue that loss immediately.

11              THE COURT:  Now, your plaintiffs, of course,

12    your class plaintiffs here I think all were copay --

13              MR. IZARD:  Yes.

14              THE COURT:  -- not deductible.

15              MR. IZARD:  Correct.

16              THE COURT:  And I gather that, in your view,

17    would these kind of sequential issues with respect to

18    overtime apply in the same way as to people who have

19    essentially a copay versus a deductible?  It strikes me it

20    probably wouldn't because a copay, by itself, is

21    essentially a transaction by transaction.

22              MR. IZARD:  Well, Judge --

23              THE COURT:  I know there's an argument about

24    out-of-pocket maximums.

25              MR. IZARD:  Yeah.  Your Honor would say a
```

1    deductible is a similar situation even though there is not

2    a year-end deductible limit.  When you go in and you pay a

3    $50 deductible and you're supposed to pay a $10

4    deductible, you're out $40 right there.  And I'm not aware

5    of any principle that allows Cigna to keep my $40 until

6    the end of the year to decide if there are offsets to it.

7    I mean, they have taken, under our theory, Cigna -- let's

8    say on January 1st I pay $50, I should pay $10, Cigna

9    takes back the $40.  On January 1st they take my $40 and I

10   have no access to it.  On January 1st I have a right to go

11   to court and get it back.

12           Now, as I say, if Cigna in December says that I

13   paid $20 and I should have paid $30, in December Cigna

14   could say you should give me $10 back, and that's where

15   the setoff comes back in.  But as part of my case in

16   chief, which is really what we're talking about here, as

17   part of my case in chief, I don't have to prove that Cigna

18   took $40 from me in January, and Cigna may want to say I

19   owed them $10 in December.  It's Cigna's responsibility to

20   articulate what they owe me, which they can do in the form

21   of a setoff or some type of counterclaim.

22           The problem we have here is, unlike -- you know,

23   we have a couple of these prescription drug cases.  And in

24   the other cases the plaintiffs have pled setoff as an

25   affirmative defense.  We have the situation here where

1    Cigna didn't do that, so their response is to try and put
2    the responsibility of proving the amount we owe Cigna onto
3    us.  And that's Cigna's job, not our job.
4            So respectfully, Your Honor, I think if you read
5    *Peters*, you know, that's the only case, and the *Peters*
6    evidence is completely different than our evidence.
7            In that regard, I would like to make one more
8    comment, because Cigna does say that our expert -- and
9    this is in their reply brief.  Cigna says that our expert
10   said he would have used a completely different method if
11   he tried to adjudicate claims.  And that's in Cigna's
12   *Daubert* reply at 10.  That's just not true, Your Honor.
13   And I would encourage you to look at pages 186 and 106 of
14   Mr. Mustoe's deposition.  On page 186 what he was talking
15   about is a full-year audit.  And at 106 he says a pharmacy
16   benefit claim audit involves looking at the transactions
17   over the course of a year.  Mr. Mustoe was not hired to do
18   an audit here, he didn't do an audit here, and anything
19   relating to an audit is irrelevant to this case.  And
20   there's no evidence here by an expert or a case that says
21   the calculation of loss in an overcharge case like this
22   requires an audit of the full year of plan benefits.  So I
23   disagree.
24           I would also like to make one more comment on
25   this point and it relates to Judge Hall's decision in

1    *Meidle*.  And Judge Hall in *Meidle* -- again, it was a

2    question of the extent to which medical claims were

3    covered.  And in that case Judge Hall -- it was a

4    reprocessing case, but Judge Hall said, look, after

5    reprocessing, some class members may be denied coverage

6    anyway.  So some class members may have a loss, but other

7    class members may not have a loss.  And Judge Hall said

8    that was appropriate.  And she said it was appropriate

9    citing *Wal-Mart* where the test was whether all class

10   members might have been prejudiced.  So even if Cigna's

11   theory of our case is correct and we do have to plead and

12   prove the amount they can set off and even if as a result

13   of that a couple of class members may not recover because

14   the setoff that Cigna has exceeds that, that's no reason

15   under *Meidle* and *Wal-Mart* not to certify the class.

16            Your Honor, the second topic I'd like to touch

17   on briefly is what I call the "what about" arguments.

18   Because as I was reading through the briefs, you know,

19   there were lots of comments by Cigna, well, what about

20   this, and what about that, and what about the other thing.

21   And I think, you know, it's important to think about how

22   do you deal with an unsubstantiated "what about" argument.

23   Our view is the plaintiffs do not have a duty to disprove

24   every "what about" that Cigna makes up.  It's kind of like

25   a game of Whack-a-Mole.  If you have to prove that every

1    speculation by a defendant is invalid, I mean, lawyers

2    could come up with all kinds of speculations about stuff.

3    And if that were true, you would never certify a case.

4              Cigna's "what abouts," they tend to fall into

5    two categories.

6              One is sheer speculation, like what if somebody

7    thought this or what if somebody thought that.  But a

8    speculative "what about" about what someone may think, for

9    example, without any evidence backing it up is not a basis

10   to defeat certification.  And I've never seen a case that

11   said that.

12             The second category is, well, what about missing

13   evidence?  So, for example, Cigna has no records of

14   coupons.  And Cigna has produced no accumulator data.  I

15   don't know if the accumulator data exists.  The only

16   testimony I've seen says there's a running total.  But

17   given all that's gone on, if the accumulator data did

18   exist, you know, I have to believe Cigna would have

19   produced it.  But in any event, that's a second kind of

20   "what about."  What do we do about missing evidence?  And

21   I would suggest when you're looking at these

22   "what abouts," there's a three-step process that was

23   helpful to me.

24             The first step of the process was:  Is this just

25   speculation or is there any evidence?  Does this

1    speculation have any basis in reality?

2            The second step is:  Does the stipulation or

3    missing evidence relate to a common issue that drives the

4    litigation?  Is it a core issue relating to our claim or

5    is it some tangential issue which, whether true or not, it

6    would not raise a predominance question?  And you know,

7    our core case here is did Cigna violate -- what are the

8    plan terms, did Cigna violate them?  A lot of other

9    collateral stuff is really not relevant.

10           And then the third point that I think is worth

11   considering is:  If the evidence is missing and it relates

12   to a core issue, who has a duty to come forward with it?

13   Who bears the burden of missing evidence?  I think in that

14   regard it's important to keep in mind that Cigna here is a

15   fiduciary with a responsibility to administer claims.  It

16   has a duty to know what the plans say, it has a duty to

17   know how claims are adjudicated, and it has a duty to keep

18   records of what it did.

19           And I would encourage the Court to take a look

20   at the *Estate of Barton* case.  *Estate of Barton* was a case

21   which talked about if there are holes in the fiduciary's

22   production or evidence, that the fiduciary has a burden to

23   come forward with the evidence.

24           And I would also encourage the Court to look at

25   the *Lassen v. Hoyt Livery* case.  I don't know if you

1   remember that, Your Honor.  You had it at one point, it

2   was transferred to Judge Bolden.

3           THE COURT:  I do remember.

4           MR. IZARD:  Well, by the time Judge Bolden had

5   it, there was a real question about the availability of

6   records.  And Judge Bolden said, look, when the employer's

7   records are inadequate, then it's appropriate for an

8   expert to come in and, you know, kind of do the best he

9   can with the evidence he has, and the jury can make

10  inferences to account for these flaws and gaps.  But when

11  the employer -- in this case the claims administrator --

12  is missing evidence, that doesn't fall on the plaintiffs.

13  Cigna should have records of all this stuff.

14          As I say, when you think about these "what

15  abouts," I think it's important to think about these

16  issues and how it fits into the predominance inquiry and

17  how it affects certification.

18          The third point and the last point other than

19  obviously answering questions is to look a little bit into

20  the plan language issue and the extent to which it raises

21  common questions.  Now, one thing everybody agrees on --

22  and this is on page 8 of Cigna's opposition -- is that the

23  amount the participant owes is determined by the plan,

24  period.  Nothing else matters than the terms of the plan.

25  And I look at this sort of with a three-step process.

1          Step One is:  Is the plan language here, the

2     class language and the subclass language, clear or is it

3     ambiguous?

4          Step Two is:  Does other language within the

5     four corners make the operative language ambiguous?

6          If the answer to the first two is yes, then how

7     do you deal with the ambiguity?

8          And when you look at the class and subclass

9     language and whether it's ambiguous, I think it's helpful

10     to kind of look at the evolution of this language.  I

11     don't know if you noticed, but in the plans at the bottom

12     of each little section of language there's a little code

13     there that says V4-10 or something of that nature.

14     Basically what that means is that all these templates --

15     and they are templates -- were drafted back in 2010.  And

16     back in 2010 the pharmacies kept all the money.  And

17     Cigna's business was the -- the only thing that changed

18     between 2010 and now with respect to the administration of

19     these plans is in 2014 Cigna decided to take the money

20     from the pharmacist in the form of clawbacks.  And Cigna

21     didn't go back and check the language to see if their

22     change was legal under the plans; they just did it.

23          And I think one thing that's important to think

24     about there is that there's no evidence, no evidence that

25     was contemporaneous at any time suggesting that any of

1   this language has been ambiguous since 2010.  We haven't

2   seen an internal memo.  All this language is filed with

3   insurance departments.  Nobody has suggested to the

4   insurance department, hey, our language has been ambiguous

5   since 2010.  There are no client communications raising

6   questions about ambiguities.  There's no evidence at all.

7   Really, the only thing we have here is speculation about

8   ambiguity that didn't arise until this case was filed.

9           More importantly, the other thing that's

10  interesting is I went back and looked at those briefs.

11  And maybe I missed it, but I didn't see anyplace anywhere

12  where Cigna said or even argued that the language was

13  ambiguous.  Cigna has never taken the position that any of

14  the plan language is ambiguous.  I think the latest

15  iteration was in their surreply as somebody may think the

16  language is not unambiguous.  Who writes like that?  I

17  don't write like that.  They're very smart lawyers on the

18  other side.  When you say not unambiguous, you are

19  definitely trying to hedge their bets.  And the reason is

20  they can't say their plans are ambiguous or they don't

21  want to say their plans are ambiguous.  They can't have

22  something on the record that an insurance commissioner is

23  going to see that says their plans are ambiguous.  If they

24  say their plans are ambiguous, customers who made hundreds

25  of millions of claims are going to go in and say, wait a

1    second, you shouldn't adjudicate my claim this way because

2    the plan is ambiguous.  They haven't said the plans are

3    ambiguous.  They're trying to put out this unsubstantiated

4    smoke screen.  And if Cigna doesn't claim the plans are

5    ambiguous, I think that ends the inquiry right there.

6    Maybe we'll learn something new at the hearing today, but

7    if they're not ambiguous, I think that ends the inquiry.

8           I would like to talk briefly about the class and

9    subclass language, and I'm not going to repeat all the

10   arguments in the briefs, but I did notice a couple of

11   things that are maybe in addition that may be helpful to

12   the Court.

13          First, with regard to the subclass language,

14   Cigna's only argument is that somebody may think the

15   amount paid by the plan is different from the amount paid

16   to the pharmacy.  Somebody may think that the amount paid

17   by the plan should be the Client Rate and the amount paid

18   to the pharmacy should be the Pharmacy Rate.  Those are

19   obviously different concepts.  So I was looking back at

20   Cigna's opposition at pages 2 and 4 to 5 in the

21   declarations of Mr. Owens and Mr. May, who were Cigna's

22   experts, not ours, and they were talking about how plans

23   are funded.  I think it's important to think about the

24   funding issue in the context of how Cigna administers

25   claims.

1              As we laid out in the *Daubert* opposition, Cigna

2   has sort of a common approach to benefits regardless of

3   funding.  So, you know, everybody is getting -- every

4   subclass person gets the same benefit.  Every subclass has

5   the same language.  And that's true whether it's an

6   insured plan or a self-funded plan.

7              But Cigna's argument doesn't recognize that

8   fact.  Instead, they kind of shift gears.  So if you

9   accept Cigna's argument at its word that the issue is the

10  amount paid by the plan, think about how that plays out in

11  the context of some of these plans.  So if you have an

12  insurance-funded plan, the plan pays an annual premium and

13  the plan pays nothing for a prescription drug claim.

14  Zero.  So under Cigna's theory of what is the amount paid

15  in the plan, the copayment should be zero.

16             Now let's look at the different kinds of

17  self-funded or Administrative Services Only plans.

18  Self-funded means, according to Cigna's expert, that the

19  plan pays the prescription drug benefit.  So we have one

20  kind of self-funded plan which is called a pass-through

21  plan where the plan pays the pharmacy and then they pay a

22  separate administrative fee.  So for a pass-through plan,

23  the amount paid by the plan is the same as the amount paid

24  at the pharmacy.  In that case, the limitation on the

25  copayment would be the Pharmacy Rate.

1           Now, the third type of self-funded plan is the

2      spread plan.  For the spread plan, the plan doesn't pay a

3      separate charge for administrative services; rather, the

4      charge is built into the amount paid for each prescription

5      drug.  So that would be a Client Rate plan.  So in that

6      situation, the plan pays Cigna what is in fact the

7      Pharmacy Rate plus some spread for a service fee which

8      they call the Client Rate.  In that case, the limitation

9      under the subclass would be the Client Rate.

10          So we have a plan where the language -- we have

11     three plans: one insured, one ASO pass-through, one ASO

12     spread.  The subclass language, plan language, is

13     identical for all three plans yet, according to Cigna's

14     theory, the amount of the copayment limitation could be

15     vastly different.  And, Your Honor, the same language

16     cannot be analyzed in completely different ways based on

17     the funding.  And it makes no sense because Cigna's whole

18     structure is to have a common benefit program for

19     everybody.  This idea that somehow the funding affects the

20     definition of the benefit and in the definition of the

21     language, it's made up for litigation, there's no

22     contemporaneous evidence anywhere supporting it, and we

23     don't think it's reasonable.

24          THE COURT:  Let me ask you just a technical

25     question, because you're talking about the definition of

1    the classes and the proposed definition.  I'm looking at

2    your motion.  I'm looking at your ERISA subclass language

3    there.  It seemed to me to be apparent from your briefing,

4    but it didn't seem to be explicit in the description of

5    the subclass that it's a subset of folks who were within

6    the ERISA class.  In other words, I know you've spent more

7    time with the 6000 plan at issue in this case than I have,

8    but it didn't seem to me -- it wasn't clear to me whether

9    the definition of the ERISA subclass expressly states that

10   it has to have a plan that has not only the language about

11   "exceeding the amount paid by the plan" but also has to

12   have the language about "may be required to pay a

13   portion."

14           MR. IZARD:  Well, the ERISA subclass language is

15   meant to be identical to the class language.  So if we

16   didn't do that, then I apologize.

17           THE COURT:  There's a great deal of overlap, but

18   I just wanted to make sure that it is indeed -- you say a

19   subclass, but the subclass -- and I don't know, maybe

20   there are plans out there that have the "exceed amount

21   paid by" language but not the "portion" language.  I'm not

22   sure.

23           MR. IZARD:  Oh.  Yes.  I'm sorry, I

24   misunderstood.

25           If you look at the -- and Ms. Oliver is going to

1    argue the *Daubert* motion.  If you look at the very end of

2    our opposition to the *Daubert* brief, you'll see that there

3    are approximately -- well, not approximately, 29 out of

4    2,875 subclass plans that aren't in the class.  We said

5    2 percent in the brief.  Our math was not great, but it's

6    really 1 percent.  So, yeah, I think that that's a glitch

7    that we filed the motion, once we were able to get all the

8    data and crunch it, we did find that there is a slight

9    lack of overlap there.  So whether it would be appropriate

10   to rename the subclass a class, that may be one way to

11   address it.  Or we would have to recognize that there are

12   29 plans for which there is a complete overlap.

13            THE COURT:  That's helpful.  Thank you for

14   calling my attention to that.

15            Maybe if you could talk a bit about basically

16   the mismatch issue.  It's kind of raised in both the class

17   cert motion as well as the *Daubert* motion, but it seems

18   like there's a very intensive dispute about whether

19   Mr. Mustoe's calculation here with respect to the

20   clawback, as that term is used and incorporated of course

21   in the very class definitions, is itself the harm or the

22   measure of damages, I think those are the terms that were

23   used in the briefing.  And what's your response to Cigna's

24   argument on this that essentially he may have come up with

25   a calculation but it would not be the proper amount of

1    damages ultimately in the case, that it's under the

2    *Comcast* case essentially a mismatch situation?

3                MR. IZARD:  Well, I think I'd start by -- and

4    again, Ms. Oliver may have to chime in here.  I'd start by

5    saying first if you look at the complaint and you look at

6    all the briefing, the core theory is that the plaintiffs

7    were overcharged at the point of sale, and Cigna clawed

8    back the overcharge.  So the clawback in Cigna's data is

9    the measure of the overcharge.  Each overcharge is -- and

10   the claims data has a field that shows the negative

11   reimbursement which Cigna called the clawback.  That is

12   the overcharge and Cigna's data measures it.

13               In terms of the mismatch, I mean, again, you

14   know, to me Cigna's data says what Cigna's data says.

15   When it shows a negative number in there, that's measuring

16   the clawback.  Our view is that all we need to do is add

17   it up.  I think their mismatch argument really flows from

18   the fact to take into account for all these credits such

19   as -- or offsets that they claim we have to make.  Was

20   that the question?

21               THE COURT:  It was.

22               And so let's suppose that Cigna had never clawed

23   back any of this money and just left it with the

24   pharmacies.  I assume that in that case Cigna, as the

25   Plan Administrator, typically, or would be itself

1    responsible equally even if it wasn't getting essentially

2    paid back, but you'd be saying this is terrible that Cigna

3    is allowing people for whom it serves a fiduciary

4    relationship to be overcharged in this way.

5              MR. IZARD:  I guess the question, Your Honor,

6    is:  Is the amount the pharmacy keeps the amount paid at

7    the pharmacy?  Now, we did look at some pharmacy

8    contracts.  There are pharmacy contracts that say if the

9    member pays more than the pharmacy charge, if you will,

10   then the pharmacy gets to keep it and that's treated as

11   the amount paid at the pharmacy.  So really what we were

12   trying to do is to focus precisely on the plan language.

13   And our view was that it's pretty much impossible to say

14   that if Cigna takes the money, you could claim it's the

15   amount paid at the pharmacy.  So that's why we went

16   forward with class certification to avoid really all the

17   complexities that we might have in getting into pharmacy

18   contracts and what is or is not an amount paid to the

19   pharmacy.  We elected to limit it to money Cigna actually

20   took because, as I say, there's no way you could claim

21   that's an amount paid at the pharmacy.

22             THE COURT:  And when Cigna takes that money,

23   whether it's called a clawback or negative reimbursement,

24   is Cigna telling the pharmacy in those instances we want

25   this amount back and here's how you calculate this amount;

1    basically, we want anything above what was paid to the

2    pharmacy?

3              MR. IZARD:  So I'm not sure if these are in the

4    record that you have, Your Honor, or not.  But basically

5    they're examples of screenshots of what shows up on the

6    pharmacy screen.  And you can also, you know, if you

7    really want to delve into it, the Argus contract is in

8    there.  Argus was hired by Cigna to administer claims.

9    And it talks about how there's a paid claim tape every two

10   weeks, and in that paid claim tape it shows positive and

11   negative reimbursements.

12             Basically, at the point of sale I walk into a

13   network pharmacy, I give the pharmacist the prescription

14   and my card, the pharmacist types all this stuff in, and

15   instantly will come back a screen with a bunch of

16   information on it.  And on that screen it will say whether

17   the drug is covered, it will say what my copayment is, and

18   it will say how much the pharmacy is going to get paid.

19   And it will show if there is a negative reimbursement or

20   not.  The pharmacist will know, and that's the whole

21   reason -- and again, I'm trying to be careful about what I

22   remember is before Your Honor, but that's the reason for

23   the gag clauses that you'll see various emails where Cigna

24   is saying to the pharmacist, you're not supposed to be

25   talking about this because it's none of the member's

 1  business.  So the pharmacist knows on a

 2  transaction-by-transaction basis how much the member is

 3  paying and how much Cigna is getting.

 4            THE COURT:  All right.

 5            Anything else you want to raise at this time,

 6  Mr. Izard?

 7            MR. IZARD:  Just one more point.

 8            I'd like to bring up for the Court the *Corsini*

 9  case, 145 F.Supp.2d at 192 where it talks about what

10  incurred expenses means.  One of the issues that Cigna has

11  raised is, well, covered expenses, expenses for charges,

12  you know, by a pharmacy could mean anything.  The pharmacy

13  could make up whatever rates it wants, nobody knows what

14  that term means.  This argument was made in the *Corsini*

15  case.  And what the court said was when you're talking

16  about an incurred expense, is an actual expense.  And in

17  that case, the court said, you know, the incurred expense

18  is the contract rate, the contract rate between the

19  provider and the insurance company.  So with this case,

20  it's the Pharmacy Rate.  So I think that would be helpful.

21            The only other point -- two quick points I'd

22  like to make.

23            One is, you know, on the plan variations.

24  Again, Cigna points out a lot of variations, but it

25  doesn't say any of those variations make any of the class

1   or subclass language ambiguous.  Again, it says it may

2   make it not unambiguous, but it doesn't say it's

3   ambiguous.

4           The last point I'd like to make is on this issue

5   of sponsor intent controls.  The idea that, you know, the

6   sponsor gets to decide what any ambiguity means.  And

7   Cigna cited the case of *Feifer v. Prudential*, and that's

8   at defendant's surreply at 5, Footnote 7.  I'd encourage

9   the Court to look at *Feifer*.  I don't think it says what

10  Cigna says it says.  What *Feifer* says is that a plan is a

11  unilateral contract which is offered by an employer to an

12  employee which the employee accepts by working for the

13  employer.  And the court there said as a matter of law you

14  construe any ambiguities in favor of the employer and

15  against the member.  It does not say sponsor intent

16  controls.  It says the exact opposite.  And the same is

17  true of another case cited by Cigna, the Second Circuit

18  case in *Fay v. Oxford*.  And it also says you construe any

19  ambiguity in favor of the beneficiary.  So to me, when

20  Cigna says sponsor intent controls, Cigna in the first

21  instance is saying Cigna's intent has no bearing on this.

22  And second, if you look at the cases Cigna cites, it's not

23  sponsor intent controls, it's ambiguities are in favor of

24  the beneficiary.

25          THE COURT:  And I take it that with respect to

1   sponsor intent, it might -- arguably, if it did control at

2   all, it would only be if there were an ambiguity.

3            MR. IZARD:  Absolutely.  Yes.  You've got to

4   have an ambiguity before you get into any of this at all.

5   As I said a while ago, Cigna has not said anything is

6   ambiguous, they're just speculating that it's not

7   unambiguous.

8            THE COURT:  Let me ask you one other question.

9   I meant to add this before.  You're looking for

10   certification on both (b)(2) and (b)(3).  So for the

11   (b)(2) purposes in your injunctive certification for

12   reprocessing, help me understand how that's consistent

13   with your theory with Mr. Mustoe that the damages and the

14   harm here is clear, it's just the clawback.  If that's it,

15   if that's what the damage is or the measure of damages is,

16   why bother with the reprocessing?

17            MR. IZARD:  Well, first, you know, some judges

18   like to go one way, some like to go the other way.  We're

19   really relying on kind of the model that Judge Hall laid

20   out in *Meidle*.  And while it involved a different benefit,

21   if you will, it involved a procedure, the model is the

22   same.  And there Judge Hall said, look, your benefit was

23   not determined in accordance with the terms of the plan,

24   we're going to reprocess.  Some of you may end up in the

25   same boat you were in before and not have a loss, some of

1   you may be in a better position, but ultimately the

2   benefit is paying for medical care.  And you know, the

3   argument was raised, you know, money could have taken care

4   of this and therefore (b)(2) is not appropriate.  And the

5   judge said, no, regardless of the money part, you are

6   entitled to have your claim adjudicated properly.

7           Now, here our benefit is a little different.

8   It's not paying for a medical procedure; it's paying for a

9   prescription drug.  But our theory here is the same that

10  Judge Hall considered in *Meidle*, which is our claim was

11  not processed according to the terms of the plan.  So

12  under *Meidle*, we would say if *Meidle* was appropriate for

13  reprocessing, we think this would be appropriate for

14  reprocessing in the same way.  That being said -- and in

15  *Meidle*, Judge Hall said I'm not going to get into (b)(3),

16  I'd rather do this as a (b)(2).  Frankly, if Your Honor

17  would rather do this as a (b)(3), I mean, Rule 23 provides

18  different avenues to the same place.  It's not an

19  all-or-nothing proposition.  I guess we would leave it to

20  the Court as to what --

21          THE COURT:  I guess I'm wondering, I understood

22  your papers -- maybe I misread, but I understood your

23  papers to say I should certify under both (b)(2), (b)(3).

24          MR. IZARD:  No, I apologize.  I don't think you

25  need both.

1            THE COURT:  I may have misread.  Because it
2     seems to me that -- I'm curious about -- I'm not sure
3     about this, but it seems to me like there's at least some
4     tension between the theory that's espoused for your (b)(3)
5     certification, which is damages are simple, it's just the
6     clawback, and the theory for reprocessing, which is we
7     really don't know what the damages are, we need to
8     reprocess one by one by one.
9            MR. IZARD:  Well, I'm not sure that's right.  I
10    think *Meidle* could have -- I think *Meidle* suggests that,
11    you know, money damages could have been an adequate remedy
12    there.  So I don't think -- you wouldn't duplicate it, but
13    they're kind of different routes to the same place.  The
14    (b)(2) argument focuses on they didn't calculate our claim
15    correctly, so that's the remedy we seek.  The (b)(3)
16    focuses on we prove at trial that they didn't calculate
17    the remedy correctly and we would like compensation for
18    the loss.  So in a sense, the theories are slightly
19    different, but I don't think it would make sense to pursue
20    both simultaneously.  So I think it would be more
21    appropriate for the Court, if it believes certification is
22    appropriate, to pick the one that seems the most
23    appropriate.
24            THE COURT:  I see.  Okay.
25            All right.  Anything else then on the class cert

1    motion before I hear perhaps from Cigna on this?  And then

2    maybe we'll come to sort of the more granular issues on

3    Mustoe.

4              MR. IZARD:  Sure.  Unless the Court has other

5    questions --

6              THE COURT:  Not right now.

7              Who will be speaking on behalf of Cigna?

8              MR. BLUMENFELD:  Good afternoon, Your Honor.

9    This is Jeremy Blumenfeld.  I'll be doing the laboring on

10   the class certification.

11             THE COURT:  Great.

12             MR. BLUMENFELD:  Hopefully the Court received a

13   copy of the email we sent which had a handout.

14             THE COURT:  I have it right here.  Feel free to

15   reference any of those.

16             MR. BLUMENFELD:  Thank you very much,

17   Your Honor.

18             Your Honor, again, Jeremy Blumenfeld on behalf

19   of Cigna.  There are several points that I'd like to raise

20   today.  I'm sure the Court would appreciate, like

21   plaintiffs' counsel, I'm not going to be rehashing

22   everything that's in the class certification papers, I

23   know the Court has them.

24             THE COURT:  And I thank you for that.

25             MR. BLUMENFELD:  You got it.

1        I'll start by saying one principle before I dive

2   in, which is something that plaintiffs just talked about,

3   which is the only thing that changed when Cigna started

4   the process of negative reimbursements with the pharmacies

5   is that Cigna received some of the money from the

6   pharmacies.  That is, plan participants paid the same

7   exact amount the day before that process changed and the

8   day after that process changed.  Their plan terms didn't

9   change and the benefits to which they were entitled didn't

10  change.  But before I dive into that in a little more

11  detail, some background on some of these issues.

12        The first -- and you heard a little bit about

13  this from Mr. Izard, but about ASO, Administrative Service

14  Only relationships.  In an ASO arrangement, Cigna does not

15  fund the benefits or guarantee any of the benefits.  It

16  simply processes claims on behalf of a plan.  If a plan

17  happens to be governed by ERISA, that plan is a separate

18  legal entity, and that plan can sue and be sued under

19  29 U.S.C. 1132(d).  In that circumstance, Cigna is a

20  service provider to the plan.  If the plan is governed by

21  state law, I assume, Your Honor, whether it is a separate

22  entity that can sue and be sued would vary based on state

23  law, but I don't actually know the answer to that.

24        To pay for the benefits that are owed under an

25  ASO arrangement, the employer, that is the Plan Sponsor,

1    funds an account to which Cigna has access, and Cigna

2    draws on funds from that account to pay benefits that

3    might be due to somebody.  Most large employers end up

4    using an ASO-type arrangement because it gives them more

5    flexibility in their benefit design and structure and also

6    it tends to be a little bit cheaper for them in that

7    context.

8            Of course, Cigna doesn't do its work for free.

9    Cigna can charge for its services in terms of a dollar

10   amount per-month fee or a fixed dollar amount.  And for

11   prescriptions -- you heard Mr. Izard talk about this a

12   little bit -- there are different paths that an employer

13   could go down.  It can decide that it wants what's called

14   pass-through pricing in which case the employer will pay a

15   per-month charge per participant to participate in the

16   plan or it can engage in what's known as traditional

17   pricing where there is no per-month fee.  Is that better

18   or worse for plan participants?  The answer is not one or

19   the other, because it really depends on the particular

20   employer and that employer's structure and how much

21   employees are going to have to pay towards the premiums,

22   how much the employer is going to have to pay towards the

23   benefits, and things of that nature.  If you want some

24   examples of that, Your Honor, it's in Exhibits 7 through 9

25   of our class opposition brief which are a series of three

1    affidavits and also some examples involving the Putnam

2    plan, in particular, where they talked about the structure

3    they wanted, that is whether they wanted traditional

4    prices where there would be a spread between the price for

5    many particular prescriptions, at least, spread between

6    the price that the pharmacy would get and the amount the

7    plan would pay, or pass-through pricing where Putnam

8    acknowledged in that circumstance they would have to pay a

9    per-month fee.

10              An insured arrangement is similar but different

11   in some important respects.  And I point this out for a

12   couple of reasons, Your Honor: (1) none of the named

13   plaintiffs participated in an insured benefit plan; and

14   (2) you heard from Mr. Izard about some differences that

15   he believes exist with respect to insured benefits.

16              But in an insured benefit, first of all, there

17   is a separate plan.  There still is a separate legal

18   entity that can sue and be sued under ERISA.  But Cigna's

19   relationship to that plan takes two components: first,

20   Cigna provides the administrative services the same way

21   they would with respect to an ASO plan; but second, Cigna

22   also has the funding relationship.  So instead of drawing

23   on an account from the employer, the plan that has to pay

24   the benefits draws on an account within Cigna.  But make

25   no mistake, there still is a plan in that circumstance.

1    And that plan is still charged.  It's just charged in the

2    way that it impacts, first of all, the flow of money from

3    Cigna and, second of all, what's known as the medical loss

4    ratio which will then impact future premiums for that

5    particular plan.  So there may not be a direct charge

6    because the benefit is funded through insurance, but

7    certainly the plan has to pay something and that is funded

8    through the insurance.

9              THE COURT:  Can I stop you for just a second?

10   You may be getting to this point, but so if we look at

11   kind of the key language about "portion" language and the

12   "amount paid to the plan" language, class and subclass

13   definitions --

14             MR. BLUMENFELD:  Yes.

15             THE COURT:  -- I take it that that language is

16   consistent through the ASO or the insured arrangement

17   plans, right?

18             MR. BLUMENFELD:  So for the insured and ASO

19   arrangements that are part of the class, they have that

20   same language, correct.

21             THE COURT:  So I have to focus on -- I had the

22   feeling when I was reading your briefing that I was

23   getting an education in the complexities of health care

24   and drug payments.  And of course you could have gone at

25   even greater length but you did a nice job talking about

```
 1      the many, many variants and variables there.  But I
 2      struggle, I have to say, with why so many of the
 3      distinctions that you draw really matter to the key issues
 4      in this case where you have class and subclass definitions
 5      that are defined primarily, at least as to liability, by
 6      the same language in the respective plans.  We can get
 7      into an argument about whether somehow, you know, the word
 8      "payment" or something like that differs depending whether
 9      Cigna has discretion to interpret the term versus doesn't
10      have discretion.  I think that's a hard argument to make,
11      but maybe you'll make that argument.
12              So I was -- I'll tell you, I looked at this and
13      I kind of was thinking, wow, a lot of -- a lot of
14      complexity here.  But is it really clear?  Has it been
15      really clearly shown that that complexity matters in a way
16      that's material and relevant here?  So it would really
17      help me if you can kind of crystallize that for me.
18              MR. BLUMENFELD:  I do plan to do that.  I have a
19      few other remarks that I'd like to make before we get
20      there, but I'll observe, Your Honor --
21              THE COURT:  You know my concerns, so go ahead.
22      Go right back to where you were.
23              MR. BLUMENFELD:  And one observation is that the
24      language that comprises the class definition is about 15
25      or so words out of the whole plan.  And the language that
```

1  comprises the subclass definition is about another 15 or

2  so words.

3          THE COURT:  If the plan had said every time you

4  buy a drug, somebody buys a drug, they only have to pay

5  $1, okay?  So only have to pay $1.  Five or six words.

6  And Cigna instead charged them $3.  I don't think you

7  would say, well, you know, the plan is a telephone book

8  size document, all sorts of contingencies and things like

9  that.  I'd say, look, the plan says $1 and Cigna charged

10  $3.  So the whole sort of snippet argument that you were

11  making, I was having a hard time really following that.

12          MR. BLUMENFELD:  I appreciate that, Your Honor,

13  and I think I will get to explaining why some of that

14  matters, because there are clearly other provisions in

15  these plans that bear on the very question about how much

16  somebody is supposed to pay for a particular prescription.

17          THE COURT:  Okay.

18          MR. BLUMENFELD:  I do want to talk more

19  generally about client rates, pharmacy rates, and

20  clawbacks before we start talking about the specific

21  language, and then a few other things.

22          First, plaintiffs are talking about and suing

23  over specific plan language.  But they suggest in their

24  papers, at least, that there's something nefarious about

25  charging a Client Rate when there is a Pharmacy Rate that

1    might be lower.  And that notion that there's something

2    wrong or improper or nefarious about this practice is

3    simply wrong.

4              First, it ignores that one of the main purposes

5    of having insurance is risk spreading.  And that means

6    that over the course of the year some plan participants

7    are going to pay more in premiums and cost shares and

8    things like that than they benefit from the plan, and

9    others are going to pay much less into the plan compared

10   to the benefits they receive.  That's the idea.  And

11   frankly, when you think about insurance in other contexts,

12   car insurance, for example, that's the hope.  People hope

13   they pay more in premiums during the course of the year

14   and that they don't have any claims or that they have

15   minimal claims because it's designed to cover more

16   significant expenses, more significant expenditures,

17   things of that nature.

18             Second, is that a medical benefit plan could be

19   structured in the way you said, Your Honor.  It could be

20   structured in the way such that for every prescription you

21   paid a dollar.  Or for every service you paid a dollar,

22   when you go in to a doctor, when you have open heart

23   surgery, for whatever else it is.  But in that context,

24   the monthly premiums that employees have to pay to

25   participate in a plan like that would skyrocket because

1    everybody would only be paying one dollar for surgeries,
2    or one dollar for every prescription, or what have you.
3    And that's fine.  That's appropriate as long as the
4    employer and the employees know here's how much you have
5    to pay on the front end to participate in a plan like
6    that.  And that's why Cigna works with employers and their
7    consultants to design a benefit structure that sort of
8    balances the employer's cost concerns and needs along with
9    the needs to provide benefits to employees.  And one of
10   the ways they do that is through this Client Rate
11   structure as opposed to a Pharmacy Reimbursement Rate
12   structure so that they don't have to charge a dollar or
13   two dollars or three dollars per member per month for
14   participating in this sort of plan for pharmacy benefits
15   in the first instance.
16          And once you think about it in that context,
17   really what we're talking about looks a lot like, in other
18   contexts it's a practice called revenue sharing.  We talk
19   a little bit about this in our papers, but it's something
20   that is very prevalent in the ERISA defined contribution
21   plan space, for example.  A good example would be if a
22   plan participant has a thousand dollars in their
23   retirement plan and they're investing that money in their
24   retirement plan, they could select a mutual fund that had
25   a fee that was 45 basis points.  So investing a thousand

1    dollars with that mutual fund would cost you $4.50, sort
2    of like what you might consider to be a copay.  And of
3    that $4.50, the mutual fund might have a revenue sharing
4    arrangement that allows or requires it to pay some of that
5    money to the plan's record keeper to cover other expenses
6    of the plan.  That process, in the defined contribution
7    space, is called revenue sharing.  And it's really
8    identical to the practice that we're talking about here.
9    And so of that $4.50, the mutual fund may have an
10   arrangement similar to the arrangement that the pharmacies
11   have with the pharmacy benefits manager here, Catamaran,
12   Optum, whereby they get that $4.50 for managing that
13   person's one thousand dollars and they give one dollar of
14   that, 10 basis points in the example, back to the plan's
15   record keeper or back to Cigna.  In that context, what the
16   courts universally recognize, first of all, that process
17   is entirely lawful and proper; and second of all, that
18   that process, the post-distribution collection of the fee,
19   that is what the pharmacy does with the money once they
20   receive it, is really up to the parties to those
21   contracts: the pharmacy, Cigna, presumably the manufacture
22   of the drug which has to get paid something.  So the way
23   these plans are structured, the participant pays what the
24   participant is supposed to pay under the plan regardless
25   of whether the pharmacy itself makes a profit on that or

1    regardless of how much of the pharmacy's money it ends up

2    paying either to Cigna indirectly or the manufacturers of

3    the pharmaceutical drugs or anything along those lines.

4            With that as the backdrop, I do want to talk

5    about the plan language and I want to talk about both the

6    language that's in the Putnam plan that plaintiffs offer.

7            And I will note, Your Honor, plaintiffs offer

8    one plan as an exhibit that they say supports their motion

9    for class certification and accuse us of cherrypicking

10   when we point to a number of other plans that we say have

11   different and important material language that bears on

12   these questions.

13           You're familiar with the language, and

14   plaintiffs define the class so it includes -- and this is

15   the first place where it might be appropriate to look at

16   those exhibits that we emailed to the Court.  It's the

17   fourth page of the PDF, Your Honor.

18           THE COURT:  Okay.

19           MR. BLUMENFELD:  The Prescription Drug Benefits

20   schedule for the Putnam plan.

21           THE COURT:  All right.  And it looks to me you

22   filed this document as Document 210-2.

23           MR. BLUMENFELD:  So this was a document that

24   plaintiffs filed as 210-2 and we included an excerpt of it

25   with our handout, correct.

 1          All of the documents that are comprised in this

 2     handout were submitted, and the ECF number should all be

 3     on top.

 4          THE COURT:  Okay, great.

 5          MR. BLUMENFELD:  You'll also notice there's a

 6     whole page and a half or so of other language that bears

 7     on the question of how much people are supposed to pay for

 8     prescription drug benefits.  And if you turn to page 5 of

 9     41, you see the other piece of language that defines

10     Covered Expenses.

11          And then there is the subclass language,

12     Your Honor, which has those ten words that's on page 6 of

13     41 of the PDF.

14          THE COURT:  Okay.

15          MR. BLUMENFELD:  And plaintiffs are asking the

16     Court to adjudicate all of the plans regardless of what

17     other language they have merely because they have the same

18     common roughly 20 to 30 words.  And I recognize I need to

19     demonstrate for you why other words in these plans matter.

20     I'll get to that in a moment, but first I want to talk

21     briefly about the *Versico* case, Your Honor.  You may

22     recall we talked about *Versico* in connection with the

23     motion to dismiss.

24          The principle underlying *Versico* was that even

25     though there was an unambiguous no third party beneficiary

1   provision in that contract, the plaintiffs pointed to

2   other language in the contract that essentially

3   countermanded or overruled that unambiguous language and

4   allowed them to assert third party beneficiary claims with

5   respect to certain issues.  And to be sure, if one only

6   looked at that one phrase in the contract that said no

7   third party beneficiaries, the defendants in that case

8   would have won.  But the plaintiffs identified other

9   language, like I said, that overruled what at first

10  appeared to be unambiguous language and allowed them to

11  pursue those claims.

12          And I also recall, Your Honor, when we were

13  making this argument in front of you on the motion to

14  dismiss Mr. Blocker's claims and, yes, that was under

15  state law, but the principles, the general principles were

16  pretty common that you look at the contract as a whole and

17  you interpret the language to see what the parties

18  actually intended.  And what I remember about that is that

19  plaintiffs, when they were arguing that Mr. Blocker was

20  able to state a claim, focused on lots of words both in

21  his plan, the logo in his plan, lots of different terms

22  about Cigna's rights and responsibilities in the plan, and

23  even language in the ASO agreement that they said entitled

24  Mr. Blocker to pursue a claim.

25          Your Honor rejected those arguments, and I think

```
 1   rightly so, but not because plaintiffs were relying on
 2   other language.  And of course members of the class, the
 3   named plaintiffs and other members of the class need to
 4   rely, and do in fact rely, on other language in their
 5   respective plans.  It varies in important and material
 6   ways.  Which is just further evidence of the legal
 7   principle that you can't really certify a class based on a
 8   word or phrase or a few words or phrases.
 9          The first example for that, Your Honor, that I
10   want to talk about is Exhibit 47 which is page 7 of the
11   PDF.
12          THE COURT:  Okay.
13          MR. BLUMENFELD:  It was filed, Your Honor, at
14   ECF 275-47.
15          THE COURT:  I have it here.
16          MR. BLUMENFELD:  Great.
17          So this is a class plan but it doesn't have the
18   subclass language.
19          Bear with me just one second, Your Honor.
20          A few things to note about this plan,
21   Your Honor.  First, this plan defines the term "Charges."
22   And specifically defines "Charges" as "the discounted
23   amount that the pharmacy benefits manager makes available
24   to the Insurance Company with respect to Participating
25   Pharmacies."
```

1            Now, I don't know for sure, Your Honor, and

2    plaintiffs haven't asked any witnesses about this

3    language, but this language to me sounds like language

4    that could be supportive of applying a Pharmacy

5    Reimbursement Rate to the amount of charges that people

6    have to pay based on.  In other words, if I were

7    plaintiffs' counsel, I would say this language was good

8    for me because it's good for participants in this plan who

9    have this language.

10           But, Your Honor, this plan also has different

11   Your Payments language than the subclass language or than

12   in lots of other plans.  And this is on page 10 of the

13   PDF, Your Honor.

14           THE COURT:  Okay.

15           MR. BLUMENFELD:  It's ECF 275-47.

16           And in this plan, instead of saying in no event

17   will you pay more than the amount the plan pays to the

18   pharmacy, it says "In no event will the Copayment exceed

19   the retail cost of the Prescription Drug or Related

20   Supply."  Retail cost.

21           Now, I might say, Your Honor, that retail cost

22   of the prescription drug means the cost for somebody

23   without any insurance who walks into the pharmacy without

24   any coupons, without any discounts, without any

25   two-for-one specials, things of that nature.  Plaintiffs

1    might agree with me about that definition.  I suspect not.

2    I suspect they would disagree with me.  But the

3    interpretation of this Your Payments language is going to

4    impact how much participants in this plan have to pay in a

5    very different way than Plaintiff Negron, for example,

6    which has the subclass language.

7         The Court can't resolve what this plan means

8    with this plan's Your Payment language at the same time or

9    in one stroke along with resolving what Plaintiff Negron's

10   plan might mean as to these issues.

11        THE COURT:  Let me just, by point of

12   clarification, so if I'm looking at like page 39 of 72,

13   which is I think where you have the retail cost --

14        MR. BLUMENFELD:  Yes.

15        THE COURT:  -- where else in what we have here

16   does it contain the language that the plaintiffs are

17   focusing on?

18        MR. BLUMENFELD:  Sure.

19        So the class language in this plan is above on

20   the prior page, page 37 of 42.

21        THE COURT:  Okay.

22        MR. BLUMENFELD:  And to be sure, Your Honor, all

23   of the plans that we're talking about either have the

24   class language or have the subclass language, or both.

25   The point, Your Honor, though, is they also have other

1    provisions that bear on these questions and that each need

2    to be interpreted when considered as a whole.

3            THE COURT:  I see.  Okay.

4            MR. BLUMENFELD:  The next one, Your Honor, that

5    I'd like to talk about is Exhibit 39, ECF 275-39.

6            This one again has the class language, but

7    unlike the prior plan we looked at, it defines Charges in

8    a significant, I would say, material way differently from

9    the prior exhibit.  This plan defines Charges as "the

10   amount charged by the Insurance Company to the plan when

11   the Pharmacy is a Participating Pharmacy."  In other

12   words, it defines Charges as what plaintiffs are calling

13   and we called in the briefing the Client Rate.  And that's

14   certainly an important consideration when looking at how

15   to interpret this plan to note that it doesn't reference

16   the Pharmacy Reimbursement Rate but does certainly

17   reference the Client Rate in the definition of the term

18   "Charges."

19           I'll also note a little bit lower on this

20   document, Your Honor, it talks about how to pay for Tier 2

21   drugs.  And in that provision it says for Tier 2 drugs a

22   plan participant has to pay 30 percent subject to a

23   minimum copay of $25 and a maximum copay of $50.

24           A few things about this, Your Honor.

25           The first is that 30 percent is 30 percent of

1    the charges, that is 30 percent of the amount paid by the

2    plan to Cigna, to the insurance company, per the

3    definition of Charges in this plan.

4            And the second provision is there is a minimum

5    copay of $25 under this plan.  Now, plaintiffs say they

6    should never have to pay more than the Pharmacy

7    Reimbursement Rate, but if that falls below the minimum

8    copay of $25, then those provisions at a minimum conflict

9    even if the plaintiffs are right about what the language

10   in the class provision means.  Because this provision I

11   think pretty unambiguously says the minimum copay is $25,

12   period, full stop.  And so interpreting this plan, both

13   with its definition of Charges and also its minimum copay

14   is an important consideration for participants in this

15   plan, but is completely irrelevant to Plaintiff Negron's

16   plan or the interpretation of that plan, especially when

17   you look at it as a whole, especially when you apply the

18   sorts of principles we see from the *Versico* opinion that

19   plaintiffs relied on in opposing the motion to dismiss.

20           Now, Your Honor, I'll also note on the next page

21   of this document it has yet a different Your Payments

22   section.  This is on it's page 14 of 41 of the PDF filed

23   at ECF 275-39, page 47.

24           THE COURT:  Okay, got that.

25           MR. BLUMENFELD:  This provision says nothing

```
 1   about "in no event."  And plaintiffs want to interpret
 2   this plan that doesn't have any language about "in no
 3   event" in the same way that they want to interpret
 4   Plaintiff Negron's plan which has different class --
 5   excuse me, which has different description of copay
 6   amounts and which has that subclass language, the "in no
 7   event" language that Mr. Izard was talking about a little
 8   while ago.
 9           The next one, Your Honor, is Exhibit 44.
10   Exhibit 44, I would say, Your Honor, is a little bit of a
11   hybrid between the two we just looked at.
12           First of all, Exhibit 44 defines Charges as "the
13   amount charged by the Insurance Company to the plan when
14   the Pharmacy is a Participating Pharmacy."  In other
15   words, the Client Rate.  And so this plan also
16   incorporates the notion of a client rate in its definition
17   of the term "Charges."
18           But then when you look at, first of all, the
19   copay language, you'll see it doesn't say that it's
20   subject to a minimum of $25 or that you pay 30 percent
21   subject to a minimum of $25.  It just says no charge after
22   $10 copay.  Which plaintiffs interpret to mean it can be
23   less than $10 but never more than $10.  And maybe they're
24   right about that, maybe they're wrong about that, but
25   you've seen there are other plans that have different
```

1    provisions regarding those very issues.

2           Then if you turn to internal page -- it's

3    page 19 of 41 of the PDF which was filed at ECF 275-44 at

4    page 46 of 83, that plan has different "in no event"

5    language which says "In no event will any Copayment or

6    Coinsurance, as applicable" -- again, not referring to

7    deductibles -- "exceed the cost of the Prescription Drug

8    or Related Supply."  Now, cost in this plan might be a

9    reference to retail cost, it might be a reference to the

10   Client Rate, that is the cost to the plan for the

11   prescription, or presumably plaintiffs might say that

12   that's a reference to the Pharmacy Reimbursement Rate, the

13   cost net that the pharmacy gets to keep.  That's an issue

14   that will have to be litigated with respect to

15   participants in this plan.  But it's completely irrelevant

16   to participants in any other plan that don't have that

17   language, that don't require "in no event will any

18   Copayment or Coinsurance exceed the cost of the

19   Prescription Drug or Related Supply."

20          Plaintiffs are focusing on particular words that

21   they think mean what they say they mean.  But there are

22   other provisions that bear on these very issues, like the

23   definition of Charges and like "exceed the cost" as

24   described here.  And Plaintiff Negron has no interest and

25   no reason to litigate the question of what "cost" means in

1    this plan because she doesn't participate in a plan that

2    used those words.

3           The next one, Your Honor, is Exhibit 40.  And

4    this one, again, is not only a class plan but also a

5    subclass plan.  And also defines Charges as "the amount

6    charged by the Insurance Company to the plan when the

7    Pharmacy is a Participating Pharmacy."  Again, different

8    language than the first plan we looked at and similar to

9    some of the others, but specific reference to the

10   Client Rate in this plan, not the Pharmacy Reimbursement

11   Rate.

12          What is also notable about this plan,

13   Your Honor, if you scroll down a little bit further on

14   exhibit -- it's page ECF 275-40 at page 33 of 63, and it's

15   internal page 22 of the PDF, Your Honor -- there's a

16   different description of the language when it comes to

17   non-maintenance drugs and maintenance drugs.  For

18   non-maintenance drugs, it says no charge after $10 copay.

19   And that's the language that plaintiffs, as I said a

20   moment ago, say means it can never be more than $10 but it

21   can be less than $10 because it can be the Pharmacy

22   Reimbursement Rate.  But for maintenance drugs, it has

23   different language.  And that provision says $10 for the

24   first three fills.  It doesn't seem to say $10 for the

25   first three fills as long as the Pharmacy Reimbursement

1    Rate or the Client Rate or something else are higher than

2    that.  It just says very explicitly $10 for the first

3    three fills.

4         And plaintiffs may say that that language

5    conflicts with other language in the plan or that the plan

6    needs to be interpreted in light of the other language.  I

7    would say it needs to be interpreted as a whole.  But when

8    you look at this provision, participants in this plan who

9    had maintenance drug charges are differently situated than

10   participants in Plaintiff Negron's plan which doesn't have

11   this provision about maintenance drugs in particular

12   saying very explicitly $10 for the first three fills, $20

13   after the third fill.

14        And I'll also note, Your Honor, likewise with

15   respect to maintenance drugs that are brand name drugs,

16   this plan has a provision that says 50 percent subject to

17   a maximum of $100 for the first three fills.  And again,

18   50 percent of what?  50 percent of the charges.

19        The next example of these -- and hopefully,

20   Your Honor, I'm able to demonstrate to you through these

21   examples.  I'm trying not to repeat the same language, but

22   certainly there are multiple examples that are in the

23   record for each of these things.

24        Exhibit 46.

25        Plaintiffs say that Exhibit 46, which was filed

1    at ECF 275-46, and the first page we're looking at is

2    page 2 of 120.  I'll talk about the language that bears on

3    these issues in a moment, but plaintiffs have two

4    objections to this plan.  The first is they say this is

5    not an ERISA plan.  And they say that in their reply brief

6    at page 8.  But a few things about that, Your Honor.

7            The first is they are still bringing RICO claims

8    on behalf of participants in ERISA plans and non-ERISA

9    plans.  And the premise of their claims even in the RICO

10   context are that the plans, each of them, entitle

11   participants to pay the Pharmacy Reimbursement Rate, not

12   anything more or different than that.  So the fact that

13   this is, they say, not an ERISA plan is irrelevant to the

14   RICO claims, is irrelevant because they're bringing those

15   RICO claims as well.

16           But also them saying that this is a non-ERISA

17   plan doesn't make it so.  I would have had a lot less

18   litigation to worry about on my own because I've litigated

19   many cases that involve disputes about whether a plan is a

20   governmental plan or whether a plan is a church plan.  And

21   the way the employer might designate the plan is not

22   controlling, it's not even evidence of whether the plan in

23   fact is governed by ERISA or not.

24           A few examples of that.  First, with respect to

25   church plans, you may have seen in the briefing,

1    Your Honor, the Supreme Court has weighed in on this
2    question and there are a number of Court of Appeals
3    decisions where the parties end up taking significant
4    discovery and litigating how closely associated with, for
5    example, the Roman Catholic Church a particular
6    organization might be.  And that's a very fact-specific
7    inquiry that turns on if it's a hospital organization, who
8    runs it; under canon law, who owns the property; what sort
9    of prayer facilities do they have in a hospital; all of
10   those sorts of things that get litigated in those cases.
11   It can never be and is never as simple as one particular
12   record shows that a plan sponsor said the plan is governed
13   by state law and therefore it is.
14          The same is true, Your Honor, with respect to
15   governmental plans.  And you might think at first blush
16   it's pretty easy to tell if a governmental plan in fact is
17   a governmental plan.  Sometimes it is, but many times it's
18   not.  And these issues are hotly litigated.  And we cite
19   in our brief a case involving Long Island Railroad where
20   the Long Island Railroad system took the position that its
21   plan was not governed by ERISA and they were subject to a
22   lawsuit by a plaintiff.  And the Second Circuit initially
23   said, no, that plan was in fact governed by ERISA looking
24   at a whole bunch of fact-specific issues associated with
25   it.  In response, there were some amicus briefs and a

1    motion for reconsideration.  The Second Circuit vacated

2    that ruling and sent it back to the district court for

3    more and additional discovery because the court needed to

4    evaluate all of the issues associated with that plan, who

5    participates in it, who funds the benefits, how is the

6    employer managed, is there a relationship between the

7    government employer and any private employees or private

8    employers who also participated in that plan, and things

9    of that nature.

10             So it is not so simple to say this plan is not

11   ERISA so it doesn't matter.  Because, like I said, these

12   cases get hotly litigated on individual circumstances.

13   And the mere fact that one data point says it's not

14   governed by ERISA is not enough to say that that is in

15   fact the case.

16             THE COURT:  Is your argument, then, that

17   whenever you have multiple plans, that you don't have

18   commonality or predominance solely because it's so

19   impossible, as you say, to know whether a plan is governed

20   by ERISA; in other words, if the proposed class isn't

21   defined by reference to an ERISA class?

22             MR. BLUMENFELD:  So I think the answer to that

23   is in a lot of cases you do need to do an individual

24   analysis of each plan to determine its circumstance.  I

25   don't know that that's always the case.  I haven't faced

1    that situation before --

2            THE COURT:  Got you on that.

3            But here, if you've got a broader several

4    classes essentially they're trying to sweep in, whether

5    it's by ERISA class or the state law class or the RICO

6    class, they're basically saying you still have to get to

7    looking at the language of the plan.  I guess I wonder

8    whether the fact that there can be litigability over ERISA

9    status or not somehow defeats commonality altogether, but

10   I'm not sure about that.

11           MR. BLUMENFELD:  So, I guess a few responses to

12   that, Your Honor.

13           First, I don't think there is a state law class

14   or subclass that's being asserted, because those claims

15   were dismissed.  Their original class motion asserted

16   them, but they're no longer pressing those issues.

17           THE COURT:  All right.

18           MR. BLUMENFELD:  And so the question,

19   Your Honor, would be:  Does this plan fall inside or

20   outside the ERISA class?  And you can't answer that

21   question just by saying there's a data point that says it

22   doesn't.  But I take your point, Your Honor.  You

23   certainly do need to look at the plan language in this

24   plan because within the RICO class plaintiffs are trying

25   to make similar arguments.

1          Plaintiffs' response on that point, Your Honor,

2    is in their sur-surreply brief at page 3 to 4, Note 5.

3    And sometimes you find the most interesting things in the

4    footnotes.

5          THE COURT:  All right.  Did you want to -- I

6    have that in front of me.

7          MR. BLUMENFELD:  So at page 3 to 4 of

8    Footnote 5, plaintiffs say about this plan that the Court

9    doesn't need to worry about it because it "does not have

10   the typical boilerplate language."

11         But Your Honor, of course that's not an answer

12   to the question of whether a class can be certified or

13   not.  That's just an admission that this plan presents a

14   problem because it doesn't have the typical boilerplate

15   language that plaintiffs are focused on, but it does have

16   language that makes it fall within the class definition.

17         And this plan, there's a few provisions that I

18   think are worth walking you through, Your Honor.  The

19   first is it's page 28 of 41 of the PDF which is ECF 275-46

20   at page 6 of 120.

21         THE COURT:  I have it.

22         MR. BLUMENFELD:  Great.

23         So you saw in some of the briefing plaintiffs

24   saying that Cigna has discretionary authority to interpret

25   the plans.  That's why Cigna is an appropriate defendant

1    on some of these claims notwithstanding the fact that

2    Cigna doesn't fund the benefit.  For example, this plan

3    makes clear a few things.

4            First, Cigna HealthCare is not the Plan Sponsor,

5    not the Plan Administrator, and not the Plan Fiduciary.

6    Metro and the Board, two entities that are defined in this

7    document, are the Plan Fiduciary, the Plan Sponsor, and

8    the Plan Administrator.

9            This plan also makes clear that the Board, not

10   Cigna or CIGNA HealthCare, retains the authority to make

11   any final determination about the plan.  And the Board, as

12   Plan Administrator, also has the authority to construe the

13   terms of your coverage.  That is, that's on the Board, not

14   on Cigna to construe and interpret the plan, which matters

15   because of plaintiffs' arguments that Cigna is somehow

16   responsible here notwithstanding that it doesn't have a

17   funding obligation because it's the entity that construes

18   the terms of the plan or has final authority to interpret

19   the plan.

20           The next page of this document, Your Honor, I

21   think also bears on the RICO claim, in particular.

22   Plaintiffs -- and it's towards the bottom of the page, you

23   see the highlighted section, Your Honor, which notes that

24   "The Administrator has established various incentive

25   arrangements to encourage Network Providers to provide

 1   Covered Services to you in an appropriate and cost

 2   effective manner.  You may request information about your

 3   Provider's Payment arrangement by contacting the

 4   Administrator's Customer Service Department."

 5          I don't want to digress too far down this path,

 6   Your Honor, but plaintiffs suggest, among other things,

 7   that plan participants didn't know about the payment

 8   arrangements with providers.  And this plan has pretty

 9   clear language to say that if you want information about

10   that, here's the number to call, here's the information

11   that -- here is the information you can request.  And so

12   for plaintiffs to ask the Court to infer that nobody

13   understood the payment arrangements, that nobody

14   understood the relationship and the revenue sharing

15   between the pharmacies and Cigna is undermined by the

16   language in this plan document, just as an example.

17          And Your Honor, I don't know how many other

18   plans have the same sorts of language, but again I do

19   think it bears repeating that plaintiffs only offer one

20   plan document in support of their class motion as evidence

21   for the entire class.

22          Now, Your Honor, if you turn to the next page,

23   we get to what I might consider the meat of the matter,

24   that is how much people are supposed to pay for their

25   benefits.

1          First of all, this plan has the class language.

2     And just to orient everybody, Your Honor, this page should

3     say it's page 50 of 120 on that ECF 275-46.

4          THE COURT:  All right.

5          MR. BLUMENFELD:  This plan is a class plan.

6     This plan says that participants may be required to pay a

7     portion of the covered expenses, but then goes on to

8     explain that that portion is the coinsurance.  In other

9     words, that portion is not applicable to deductible

10    payments.  And that's important because plaintiffs say

11    that this language should apply not only to copays --

12    they're not bringing claims based on coinsurance -- but

13    not only to copays, but also to deductibles.  And for this

14    plan, and who knows how many other plans have similar

15    language to this one, for this plan the portion of covered

16    expenses that plaintiffs focus on, that is the anchor of

17    their case, doesn't apply even to deductible payments.

18          The Court can't adjudicate what this plan means

19    when it talks about deductible payments in the context of

20    plan language where the key language that plaintiffs say

21    defines the class specifically only applies to coinsurance

22    and not deductibles.

23          Your Honor, the next one is a few pages down,

24    it's Exhibit 51.  And for the record, Your Honor, it was

25    filed at ECF 275-51.

1          This plan in their reply brief, Your Honor,

2     plaintiffs say this isn't a class plan because it's a

3     Great West plan.  And in their surreply, again at that

4     Footnote 5, they say this plan "does not have the

5     applicable definition of Covered Services" and therefore

6     it doesn't even meet the class definition.  And they cite

7     for that, Your Honor -- and not to belabor the point, but

8     it's CIGNA0004621, that's what they cite in Footnote 5.

9          With respect, plaintiffs are wrong.  And they

10    made a mistake.  First of all, this plan talks about

11    Covered Expenses.  And that's on the following page,

12    Your Honor, which is page 15 of 68 of this document.  And

13    then a little bit later in the document under the

14    Prescription Drug Benefits -- and this is, Your Honor, at

15    page 37 of 68.

16          THE COURT:  Okay.

17          MR. BLUMENFELD:  It says "What's Covered?

18    (Covered Expenses)."  And then includes specifically that

19    language that plaintiffs define as being within the class.

20    "If you ... incur expenses for charges made by a

21    Pharmacy."  Which means this plan falls within the class

22    definition.

23          Now, if you'll indulge me, Your Honor, if you go

24    back up to the prior page, page 15 of 68, which for those

25    of you looking at the PDF is page 36 of 41, it says to

1    receive prescription drugs you may be required to pay a

2    portion of the Covered Expenses.  And then it goes on to

3    say, "As applicable, your deductible copay and/or

4    coinsurance payment will be based on the Prescription Drug

5    Charge when the Pharmacy is a Network Pharmacy."

6          If you go a little bit below, it also makes

7    clear with respect to copays that "A charge is the

8    Prescription Drug Charge when the Pharmacy is a Network

9    Pharmacy."

10          And so for this plan, Your Honor, I would

11    suggest you need to look at the definition of Prescription

12    Drug Charge because it's certainly material to

13    interpreting this plan.  That's a few pages later,

14    Your Honor, in the glossary which is at page ECF 275-51 at

15    page 57 of 68.  And the glossary defines Prescription Drug

16    Charge in this plan as "The amount the Plan pays to

17    Cigna."  In other words, the Client Rate.  And then goes

18    on to say "Cigna may pay a Network Pharmacy a different

19    amount for a Prescription Drug Product than the Plan pays

20    to Cigna."

21          Your Honor, maybe plaintiffs have an answer on

22    behalf of participants in this plan as to why they should

23    be entitled to pay the Pharmacy Reimbursement Rate as

24    opposed to Client Rate, but litigating that question under

25    the terms of this plan is certainly going to be a very

1    different analysis than litigating what the plan terms of

2    Plaintiff Negron's plan which doesn't have that language,

3    which doesn't define Prescription Drug Charge, and which

4    don't make clear in the copay section that a charge is

5    based on that defined term "Prescription Drug Charge."

6            I'll also note while we're here, Your Honor, at

7    the next page, which is page 44 of 68 of the PDF from

8    275-51, the plan specifically mentions in this context

9    that "A prescription given to a pharmacist is not a claim

10   for benefits under the Plan."  And that bears on some of

11   the questions that plaintiffs have raised about why

12   Cigna's interpretation of the language for some plans is

13   not entitled to deference.  And I'll talk a little bit

14   more about that in a moment, but I don't think any of the

15   plans say that giving a prescription to a pharmacist is a

16   claim for benefits.  Many of them I believe are silent on

17   that subject.  This plan explicitly says that it's not.

18   I'll talk about that in a few moments, but wanted to make

19   sure that I pointed that out while we were looking at that

20   particular plan document.

21           THE COURT:  Okay.  I'm going to stop you for

22   just a moment.  We've been at it for 90 minutes.  I want

23   to give our court reporter some time.  It looks like we've

24   got a lot more to cover here.  I think we'll take -- let

25   me ask our court reporter.

1          (Pause.)

2          THE COURT:  I have 3:33.  Why don't we plan to

3    resume at 3:48.  Thank you all.

4          (Whereupon, a recess followed.)

5          THE COURT:  Okay.  So I guess we're back.  Is

6    everybody ready to go?

7          Okay.  If you'd like to continue.

8          MR. BLUMENFELD:  Thank you, Your Honor.  Only

9    about 62 more exhibits to go.  Just kidding.

10         I do want to finish the discussion of the file

11   at 275-51, page 8 of 68.

12         THE COURT:  Okay.

13         MR. BLUMENFELD:  I believe it is the last page

14   in the handout that we provided Your Honor.

15         THE COURT:  I have it right here.

16         MR. BLUMENFELD:  And the Discretionary Authority

17   provision in this plan.  And in particular, it has

18   language vesting the Plan Administrator with discretionary

19   authority.

20         The Plan Administrator is not Cigna in this

21   plan.  And if you look at the second paragraph, it says

22   "For initial claim determination, the Plan Administrator

23   has the discretionary authority to determine eligibility

24   and to interpret the plan."  For claims appeals, that

25   authority rests with Cigna.

1          And Your Honor, whether somebody had a claim

2    that was appealed and therefore adjudicated by Cigna such

3    that Cigna's fiduciary responsibility would be implicated

4    is obviously different under this plan than some of the

5    other plans that have different language.

6          THE COURT:  I get that, but I'm not sure why

7    that matters to the legal issues of the interpretation of

8    the plan, why that means there's not a commonality of the

9    issues.

10          MR. BLUMENFELD:  It matters, Your Honor -- and I

11    will get to this in a few moments -- but it matters

12    because plaintiffs have argued that we don't get deference

13    and also that we're not entitled or that we are

14    appropriate defendants on claims for benefits, for

15    example, because we had final discretionary authority to

16    make benefit eligibility determinations.  And for this

17    plan, for example, that would only be true with respect to

18    appeals, none of which plaintiffs allege were actually

19    adjudicated under the terms of this plan.  So to the

20    extent that a participant has a claim for benefits under

21    the terms of this plan, that's a claim that should be

22    brought either against the plan under the statute or

23    against the entity that adjudicated the claim, which would

24    not be Cigna.

25          THE COURT:  Your basic point is Cigna is not the

1    right defendant as to those plans in which it's only in

2    the appeals spot, not as in this example.

3              MR. BLUMENFELD:  Among other things, correct,

4    Your Honor.

5              Two last ones that I wanted to talk about,

6    Your Honor, but they're late additions so they're not part

7    of the exhibits.

8              The first is ECF Exhibit 275 dash -- excuse me,

9    not 275.  It was Exhibit 55, Your Honor, which was

10   attached to our surreply brief.  And you don't need to

11   pull up that document if you don't have it in front of

12   you, that's fine.  Just a few remarks regarding that one.

13             THE COURT:  Okay.

14             MR. BLUMENFELD:  This plan has the subclass

15   language and the class language.  But that language, to be

16   clear, doesn't apply to deductibles.

17             Also, this plan also has another provision that

18   says for Tier 1 generic drugs, they are covered at 20

19   percent subject to a minimum of $6.

20             So you recall, Your Honor, we talked earlier

21   about a plan that had a minimum of $25 for certain

22   transactions.  This one has a minimum of $6 and it's

23   notable because this is actually a subclass plan.  And one

24   of the things that plaintiffs said in their briefing was

25   that the variations that we pointed to, the differences in

1    language apply to the class but didn't apply to the

2    subclass.  Exhibit 55 I think is a good example of the

3    same sorts of variations existing within the subclass as

4    within the class.

5              THE COURT:  I see.  Okay.

6              MR. BLUMENFELD:  What this plan means, what

7    Exhibit 55 means will vary -- we'll have to litigate that

8    question eventually if a class is certified, but it's not

9    going to be the same for Exhibit 55, and there are

10   different issues to consider than there are for Plaintiff

11   Negron's plan that doesn't have that 20 percent subject to

12   a minimum of $6.  By the way, 20 percent of the charges,

13   again defined as the amount the plan pays to the insurance

14   company.

15             The last example plan, Your Honor, is plan

16   Exhibit 35.  This, again, is a class and subclass plan.

17   And we talked about it in our opposition brief.  And in

18   their reply brief, plaintiff said at page 9 to 10 that the

19   point we were making which had to do with specialty

20   medications under the terms of that plan, they said that's

21   not even a covered expense under that plan because it's

22   subject to the Limitations section in Exhibit 35 in that

23   plan which excludes certain specialty medications from the

24   definition of Covered Expense.  To be sure, those benefits

25   are still covered under the plan.  They just fall within

1    the Covered Expense definition that plaintiffs rely upon

2    to use as their class definition, that is, a portion of

3    the Covered Expenses.  What that means is for a plan

4    participant in this plan who is incurring costs for

5    specialty medications, it's not going to be governed by

6    the Covered Expenses language; it's governed by different

7    language in that plan which is completely irrelevant to

8    the class and subclass members who don't have that

9    exclusion.

10           Maybe the most important point, Your Honor, is

11   that's another example and one where plaintiffs admit you

12   have to look beyond just the particular language that they

13   focus on in order to evaluate whether a benefit is a

14   benefit under the plan and how much it's supposed to be,

15   because even if you have a section of the plan that makes

16   it seem like something is a covered expense, the

17   Limitation section which is immediately below might

18   exclude certain things from that coverage.

19           Plaintiffs don't address how they're going to

20   adjudicate claims that fall within that bucket.

21   Mr. Mustoe doesn't address how to adjudicate claims that

22   fall within that bucket.  And Your Honor, I don't know how

23   many other plans have the same sort of language.  It's not

24   our burden to do; it's plaintiffs' burden to show that all

25   of the claims for all class members could be adjudicated

1    in exactly the same way.  And this is just a prime example

2    of why you can't do that.

3            And I'll also note Mr. Mustoe, in his opening

4    report, includes ten examples where he says these drugs

5    were very expensive in terms of a Client Rate and very

6    expensive in terms of a Pharmacy Rate, but had higher

7    Client Rates than Pharmacy Rates.  He doesn't say whether

8    those were specialty medications, for example, that might

9    even be excluded under the terms of a particular plan's

10   definition of Covered Expenses.  And this is, again, a

11   clear acknowledgement by plaintiffs that you have to look

12   beyond just the class and subclass language to figure out

13   how much somebody is supposed to pay for any particular

14   prescriptions.

15           Your Honor, I'd like to shift gears slightly and

16   now talk about plaintiffs' own plans.  And the variability

17   and the importance of other plan language to each class

18   member's claim is evident not only in the different

19   language that we just walked through which bear on some

20   class members and not others, but in plaintiffs' own

21   interrogatory responses.  Those were filed, Your Honor, at

22   ECF 275-11.  And they were filed under seal, so I have the

23   internal page numbers but there is no ECF number.

24           THE COURT:  Okay.

25           MR. BLUMENFELD:  It's internal pages 12 to 13 I

1   think provide a good example.  And I'd like to focus on --

2           THE COURT:  I'm sorry, it's ECF number?  One

3   more time.

4           MR. BLUMENFELD:  275-11.

5           THE COURT:  If you'll hold on a moment, let me

6   grab that.

7           MR. BLUMENFELD:  Sure.  I'll pull up my copy as

8   well.

9           THE COURT:  Okay.  I'm all set.

10          MR. BLUMENFELD:  Great, thank you.

11          So this is plaintiff Ms. Negron's answer to what

12  plan provisions of her plan does she contend were

13  violated.  And I'm just focused on the calendar year 2015

14  which starts at the bottom of page 12 and continues to

15  page 13.

16          The first provision that Ms. Negron identifies

17  is the provision which says "When you select a

18  Participating Provider, this Plan pays a greater share of

19  the cost than if you select a non-Participating Provider."

20  And then has some additional language.

21          Your Honor, plaintiffs have made no showing that

22  that language is uniform among all the plans.  And we

23  know, for example, that it's not because some plans only

24  have in-network coverage and don't have out-of-network

25  coverage.

1          This language is important enough to

2    Plaintiff Negron for her to allege that Cigna violated it,

3    but it's not part of the class language and it's not part

4    of the subclass language.  The Court can't evaluate

5    whether Cigna has violated those terms or not on a

6    class-wide basis without knowing how many other plans have

7    this language, if any, and what those other plan

8    provisions might say on the subject.

9          THE COURT:  I'm sorry, I lost the place where

10   the specific page that you were referencing there with

11   respect to that language.  It's for the 2015 plan, I know

12   that, but which --

13         MR. BLUMENFELD:  The first bullet towards the

14   bottom of page 12 which says "The provision 'Special Plan

15   Provisions'" --

16         THE COURT:  Thank you.

17         MR. BLUMENFELD:  -- "including, but not limited

18   to, the term:  'When you select a Participating

19   Provider'" --

20         THE COURT:  Understood.  All right.  Thank you.

21         MR. BLUMENFELD:  Sure.

22         The next provision or another example of a

23   provision -- there are several here, but I'm not going to

24   talk about all of them, Your Honor.  Another provision

25   plaintiffs point to is what they characterize as "all

provisions setting the copay amount per tier."  And that,

Your Honor, is a reference to the "no charge after $10"

language that appears in Plaintiff Negron's plan, and

obviously the numbers vary depending on if you're Tier 1,

Tier 2, or Tier 3.  But as we've already talked about,

Your Honor, other plans don't have that same language,

they don't say "no charge after X" copay.  They say things

like "subject to a minimum of X" or "you pay X" or "X for

the first three fills," whatever the number might happen

to be.  All of those plan provisions, Plaintiff Negron is

alleging specifically that Cigna violated those provisions

and obviously believes that those provisions are important

to her personal claims, but other class members have

different language describing what the copay setting is

under the terms of their plans.  And as we just talked

about a moment ago, some even have different rules for

specialty medications than for other kinds of medications.

        Plaintiff also says, Your Honor, that the

provision entitled Your Payments -- and this is again at

page 13 of the document -- is another provision that was

violated.  What I noticed here, Your Honor, is they're

alleging a violation of that whole provision, not just the

particular language that comprises the subclass

definition.  But plaintiffs don't make any showing that

all plans have the same Your Payments language.  Or even

1    all subclass plan have all the same Your Payments

2    language.  The definition of the subclass is limited to

3    just the "in no event" sentence within that provision.

4            Plaintiffs also separately allege that Cigna

5    violated with respect to Plaintiff Negron's plan the

6    provision regarding Claim Determination Procedures under

7    ERISA, the provision entitled Medical when you have a

8    complaint or appeal, the provision Discretionary

9    Authority, and the provision Reimbursement/Filing a Claim.

10   And yet, Your Honor, they haven't made any showing that

11   other plan participants have the same language in their

12   plans on any of these items.  And these are not just

13   irrelevant provisions.  We talked about some of them in

14   the context of the examples that I was going through even

15   about discretionary language, and yet plaintiffs are

16   alleging that for Plaintiff Negron those provisions had

17   been violated even though there's no showing that those

18   are subject to class-wide treatment or that all plans have

19   the same language.

20           I'll also observe, just briefly, with respect to

21   Plaintiff Gallagher, who is not being proposed as a class

22   representative.  So with respect to Negron, plaintiffs

23   don't allege a violation of the provision interpreting the

24   term "Charges."  But with respect to Plaintiff Gallagher,

25   who is not being proposed as a class representative,

1    plaintiffs do allege that Cigna violated the provision

2    defining the term "Charges."  Of course, we've already

3    talked about the fact that the plans had different

4    definitions of the word "Charges," and Plaintiff Negron is

5    not in a position to litigate or prosecute claims

6    regarding claim participants who have different

7    definitions of that term, particularly when Plaintiff

8    Gallagher does allege that her plan provisions regarding

9    the term "Charges" have been violated by Cigna.

10             So those interrogatory responses I think are

11   good evidence, Your Honor, that plaintiffs themselves

12   believe that these other provisions matter, that they bear

13   on Plaintiff Negron's claims, Plaintiff Gallagher's

14   claims.  But they haven't shown and can't show that those

15   other class plans or other subclass plans have the same

16   provisions.  And that's yet another reason why the Court

17   can't decide these issues all in one stroke based on just

18   those provisions that plaintiffs point to as the class

19   definition and the subclass provision.

20             Shifting gears a little bit, Your Honor, an

21   important consideration for the Court and an important

22   part of evaluating a host of issues will be whether a

23   particular plan is an ASO plan or an insured plan.

24             For an ASO plan, for example, as I said, and as

25   plaintiffs have acknowledged, Cigna is not responsible for

1   funding the benefits.  And so you have a number of

2   circumstances where former ASO clients of Cigna have plans

3   that fall within the class or subclass definition.  But

4   Cigna no longer has any responsibility or authority to

5   reprocess claims, for example.  And Cigna no longer has

6   access to the accounts by which the benefits are funded.

7   And I'm sure plaintiffs don't care where the money comes

8   from, they just want their money, and that's fine.  But

9   the benefits that are due under the terms of these plans,

10  to the extent there are any benefits due, would be due

11  pursuant to the funding arrangement set forth in the plan.

12  And in the ASO context, Cigna didn't undertake any

13  financial responsibility for funding the benefits.  That's

14  solely the responsibility of the Plan Sponsor with that

15  account.  And the ASO agreements for all of those plans

16  also make that clear.  I think Your Honor saw that in

17  connection with Plaintiff Blocker's claim.  Similar

18  language exists in some of the others.  And there's also a

19  process called a run-out period during which for some

20  months, typically two or three months, after a client

21  decides it's going to terminate its relationship with

22  either Cigna or some other administrator for their plan,

23  that client -- the entity still continues to process

24  claims.  But after that run-out period, Cigna is no longer

25  a Service Provider for the plan, Cigna doesn't have any

1  authority under that plan, Cigna no longer has access to

2  the funding of the benefits.

3           THE COURT:  Let me just ask, I guess I'm a

4  little confused in terms of why if Cigna received a

5  negative reimbursement for this during the relevant time

6  period, why couldn't the Court presume that Cigna has the

7  wherewithal financially there to do a recalculation and

8  also, of course, it could apply the proper plan terms?

9           MR. BLUMENFELD:  Because, Your Honor, there's a

10 difference between how much a participant is entitled to

11 pay for benefits under the plan and Cigna's compensation.

12 Cigna's compensation is not governed by the plan terms at

13 all.  It's set forth in those Administrative Services Only

14 agreements.  And although plaintiffs allege that Cigna

15 received compensation to which it's not entitled, they

16 haven't proven any of that.  And that's certainly not an

17 issue that is set forth in the plans because the plans

18 don't mention one iota about Cigna's compensation.  And

19 so --

20          THE COURT:  But your argument, though, suggests

21 that any time a company like Cigna has moved on and is no

22 longer related to a plan, that the plaintiffs can't ask

23 for relief.

24          MR. BLUMENFELD:  No, Your Honor.  And this gets

25 back to what I mentioned earlier, which is the plan is an

1    entity that can sue and be sued.  And that's the

2    appropriate entity on a claim for benefits.  Even if the

3    plan has a funding mechanism that is responsible for

4    paying those benefits which, by the way, here would be the

5    Plan Sponsor.  And so if somebody thinks that they're

6    entitled to benefits under the plan, especially when the

7    relationship with a Service Provider no longer exists, you

8    don't sue the Service Provider for the plan for the

9    benefits that are due to you, you sue the plan.  That's

10   what 29 U.S.C. 1132(d) is all about.  That's why it is an

11   entity that can sue and be sued.  And once Cigna ceases to

12   have responsibility for anything associated with that

13   plan, it could be sued for breaching its fiduciary duty if

14   that's what occurred.  But on a claim for benefits, that

15   would be brought exclusively against the plan itself as an

16   entity.  And that's why the statute was written the way it

17   was.

18          THE COURT:  Okay.

19          MR. BLUMENFELD:  And I do think it's important

20   to note, or it bears repeating, Your Honor, that

21   plaintiffs have presented no evidence that Cigna has

22   received compensation to which it is not entitled.  Even

23   if you look at the plaintiffs' arguments, plaintiffs are

24   acknowledging that under the terms of the ASO agreements,

25   Cigna was entitled to receive a certain fee for the

1  prescriptions that were being filled.  They're just

2  arguing that plan participants weren't supposed to pay

3  those fees, the plan was, or the plan through the funding

4  mechanism of the Plan Sponsor.  So Cigna's compensation

5  really isn't at issue here and isn't an issue that is

6  governed even by the terms of the plan.

7           The next issue, Your Honor, that the Court has

8  to wrestle with is the question whether a plan is governed

9  by ERISA or not.  Once you get past that, Your Honor,

10  there are questions about the standard of review that

11  should apply.

12           And I want to bring the Court's attention to the

13  case that we cite in our briefs *Conkright v. Frommert*.

14  That's the Supreme Court opinion that talks about the

15  deference that's owed to a Plan Administrator's

16  interpretation of the plan where the plan affords that

17  discretion even if, as occurred in that case, the

18  Plan Fiduciary was found to have breached its fiduciary

19  duty when interpreting the plan in the first instance.

20  What the Supreme Court said was, look, the plan says that

21  the Plan Administrator or the Claims Administrator,

22  whoever the entity is, has discretion to interpret the

23  plan.  And that controls because those are the plan terms

24  under which the benefits are governed.  Here, we have

25  different plans.  Plaintiffs say that most, which

1    presumably means something more than 50 percent and less

2    than 100 percent, vests Cigna with discretion.  But you

3    saw some of them vest Cigna with discretion with respect

4    to only appeals, others vest discretion with Cigna with

5    respect to the whole process, and still others only with

6    respect to initial claims.

7          Whether Cigna is entitled to discretion with

8    respect to its interpretation of the plan is the question

9    that really depends on the precise language that's at

10   issue.  And frankly, Your Honor, I think what plaintiffs

11   are trying to do, which maybe they're trying to do on a

12   few levels, is say they win, plaintiffs win and therefore

13   Your Honor can certify the class; the language is

14   unambiguous and therefore you can certify the class; Cigna

15   shouldn't be entitled to discretion under any plan terms

16   and therefore you should certify the class.  But that's

17   not the way class certification is supposed to work.  You

18   can't adjudicate the merits of Plaintiff Negron's claim

19   about discretion or any class member's claim about whether

20   Cigna gets discretion or not without looking at the

21   precise plan terms that apply regarding those provisions.

22   And it's not an answer to say, well, don't worry about it,

23   plaintiffs win so you can certify under that basis.

24          I also want to talk briefly, Your Honor, because

25   plaintiffs try and make a lot about this concept of a

1    notice of adverse benefit determination and say that Cigna

2    somehow lost its entitlement to deference because when

3    people went into a pharmacy to pay for a drug, Cigna

4    didn't send them a letter saying we're denying your claim

5    in whole or in part.  I think it might make sense to take

6    a step back, Your Honor, and focus on what's happening in

7    that transaction.

8            A participant is not going into the pharmacy and

9    saying I think I am supposed to pay $7 for this drug and

10   here are the plan provisions that entitle me to do so.

11   That might be considered a claim.  Instead, they're going

12   in and saying here's my prescription, can you please tell

13   me how much I'm supposed to pay.  Cigna or, more

14   importantly, the pharmacy when they are telling the person

15   the system says you owe $15, please pay your $15, has no

16   reason and no basis for saying that the plan participant

17   disagrees with that and thinks that that participant is

18   supposed to pay $5 or a Pharmacy Reimbursement Rate or a

19   Client Rate or something else.

20           And so the way the claims process is supposed to

21   work, Your Honor, is if a participant thinks that they're

22   entitled to a benefit that hasn't been provided, they file

23   a claim and say I think I'm entitled to something and

24   here's why.  And they're supposed to point to the plan

25   language that entitles them to that.  And then the plan's

1    fiduciary, whoever is administering that portion of the

2    plan, responds saying we are sending you an adverse

3    benefit determination, we are denying your claim and

4    here's why.  But if every time a pharmacy transaction

5    occurred there was an adverse benefit determination, that

6    would make no sense, because you don't know in that

7    context whether the participant thinks that the amount was

8    calculated precisely right.

9             So in the example that I gave you, Your Honor,

10   if the person goes into the pharmacy and pays $15 for the

11   prescription because that's what the pharmacy says, I

12   didn't say -- and I didn't say intentionally -- that that

13   $15 was a copay.  Because that $15 might, in a particular

14   case, be the copay; it might also be the Client Rate for

15   that drug; and it might also be the Pharmacy Rate for that

16   drug.  And the participant would go in and pay that $15.

17   And the mere fact that a participant is told you need to

18   pay $15 for a drug is not an adverse benefit determination

19   because then every time somebody goes into the pharmacy if

20   you were charged $5 because the pharmacy says you're

21   supposed to pay $5, if you're charged $1, if you're

22   charged 2 cents or, frankly, Your Honor, even if you're

23   charged nothing, because if you go into the pharmacy and

24   the pharmacist says here is your prescription, I'm giving

25   you a 30-day supply and, good news, you don't have to pay

1    anything for it, well, one could argue theoretically that

2    that's an adverse benefit determination because you only

3    gave them 30 days as opposed to 60 days or 90 days like

4    might be available through mail order.  But that's not the

5    way the regulations work, it's not what the plan terms

6    call for or require.  And there's certainly no basis for

7    say Cigna loses the discretion it has, at least under

8    those plans that give Cigna discretion, based on the fact

9    that it didn't issue adverse benefit determinations when

10   somebody walked into a pharmacy and was told here's the

11   price for your prescription.

12            Another analogy I would submit, Your Honor, is

13   if somebody is claiming an entitlement to a pension

14   benefit and they ask the Plan Administrator and say I want

15   to start my pension, and the Plan Administrator says,

16   yeah, sure, you get $1,000 a month.  By plaintiffs' logic,

17   that should be an adverse benefit determination because

18   the Plan Administrator should have to say at the same time

19   you get a $1,000, you don't get $2,000 or $3,000 or $4,000

20   or anything along those lines.  But that's not the way the

21   process works.  The way it works and the way it's supposed

22   to work is a plan participant, if they think they're

23   entitled to more than $1,000, they write a letter or

24   submit a claim or comply with whatever the plan's claims

25   and appeal procedures are and they say you calculated my

1    amount wrong, here's why I think you calculated it wrong.

2    And then the Plan Administrator's obligation to respond to

3    adjudicate that claim kicks in.  But not the initial

4    setting when somebody just walks into a pharmacy or says I

5    want my pension.

6              THE COURT:  You walk in and say I want my

7    pension, and they say you can't have your pension, sorry,

8    that's not an adverse benefit determination?

9              MR. BLUMENFELD:  So I think if they say you're

10   not entitled to anything, then an argument could be made

11   that that's an adverse benefit determination.

12             THE COURT:  How about you're entitled to two

13   pennies a month?

14             MR. BLUMENFELD:  Then the participant, I think,

15   needs to explain I think I'm entitled to more than two

16   pennies a month.  Because the two pennies example could

17   just as easily be $1500 or $2,000.  Or in the pharmacy

18   example, it could be -- by plaintiffs' logic, if a

19   participant paid $15 for a prescription and that happened

20   to be the copay amount, it happened to be the Client Rate,

21   and it happened to be the Pharmacy Rate, somebody would

22   still have to issue an adverse benefit determination

23   because somebody might claim that they should have paid

24   $10 or $5 or nothing for it.  That's not the way the

25   claims procedures work.

1          THE COURT:  Next point?

2          MR. BLUMENFELD:  Sure.

3          Your Honor, we talked a little bit about

4     ambiguities, and I know Counsel also raised the question

5     of the language being ambiguous or unambiguous.  On that

6     point, Your Honor, in particular, with respect to the

7     subclass language, plaintiffs claim that that language is

8     unambiguous.  But they also claim that it unambiguously

9     entitles them to pay the Pharmacy Reimbursement Rate as a

10    cap on any prescriptions.  Well, it's one thing to say

11    that the language is unambiguous.  It's another thing

12    entirely to say that the language is unambiguous and

13    refers to a rate that is set forth in another contract

14    that's not even mentioned in the context of the plan.  In

15    other words, the plan doesn't say you are entitled to pay,

16    unambiguously it does not use the words "you are entitled

17    to pay the amount set forth in the contract between Optum

18    and the pharmacy for a particular prescription."  If it

19    said that, then maybe the language would be unambiguous.

20    But it doesn't.  Instead, it refers to the amount paid by

21    the plan to the pharmacy.  And plaintiffs want that to be

22    interpreted to mean the Pharmacy Reimbursement Rate, but

23    there's lots of other meanings that that phrase could

24    have, including, for example, the Client Rate.

25          And what I want to talk about, Your Honor --

1    bear with me just one moment.

2            Plaintiffs' counsel talked about some of the

3    other cases that they relied upon, including the *Smith*

4    case, *Smith v. UnitedHealth*.  What's notable, Your Honor,

5    is if you look at the plan language that was at issue in

6    that case and after the class certification ruling the

7    court issued a summary judgment ruling and said that the

8    plan in that case said that participants pay the lesser of

9    the copayment or the Prescription Drug Cost, and went on

10   to define that term in that plan as the contracted

11   reimbursement rate, including any sales tax, with the

12   participating pharmacy where a prescription drug product

13   is dispensed.  And the court focused on two words in that

14   definition: reimbursement and rate.  And that's what the

15   court focused on in reaching the conclusion that it

16   reached.  What's notable is our language doesn't have

17   those words.  And so whereas the *Smith* court focused on a

18   reimbursement rate, this plan doesn't talk about rates at

19   all in the context of the "in no event" language and, yes,

20   the language is not entirely clear as to what people are

21   supposed to pay.

22           And to Mr. Izard's question about why Cigna

23   didn't articulate that the language was ambiguous prior to

24   2016, it's because nobody challenged the way the plans

25   were being administered prior to 2016.  Plan sponsors

1    understood from their administrative services agreement

2    what the relationship was and how much people were

3    supposed to pay, and participants knew what they were

4    paying, but nobody said I think this language means

5    something different than the way Cigna is administering

6    it.  And so in that context, it doesn't make any sense at

7    all for Cigna to say in 2013 or 2012 or 2014 or 2015

8    before this lawsuit, we think this language is ambiguous.

9            Now, Your Honor, that language from the *Smith*

10   case is sort of similar to the definition of the word

11   "Charges" in at least a couple of the plans that I talked

12   about earlier, but materially different than the

13   definition of "Charges" in some of the other plans.  Which

14   is to me, at least, further evidence that you can't

15   adjudicate all of those plans that have all of those

16   different provisions all in one stroke.

17           And the *Corsini* case, Your Honor, that Mr. Izard

18   talked about also bears further mention.  That case again

19   focused on specific language and the definition of "usual

20   and customary charges" in the plan at issue.  It was a

21   defined term.  And the court said a few important things.

22           The first thing the court said was in addition

23   to being inconsistent with the plan's definition of

24   "reasonable and customary charges," United's proffered

25   interpretation in the manner in which copayments should be

1    calculated is contrary to the meaning conveyed by reading

2    the plan as a whole.  That's what we've been saying,

3    Your Honor.  You have to read the plan as a whole with all

4    of those different provisions that bear on how much any

5    particular participant is supposed to pay for any

6    particular transaction.

7           And it's also notable, Your Honor, that in

8    *Corsini* the court said it might be permissible for a

9    health care plan to specify that copayments will be

10   calculated as a percentage of "charged fees" instead of

11   "contracts fees," but United's plan contained no such

12   provision.  And I would say, Your Honor, that contrast is

13   striking with the plan language and even the definition of

14   the word "charges."  In this case they talked about

15   "charge," but in these plans they talk about the word

16   "charges" and how that comes into play in so many of these

17   plans and how, for many of them, it's a reference to the

18   Client Rate pretty clearly.  And you can't certify a class

19   without considering that language that applies to those

20   plans which obviously has no bearing on other plan

21   participants that don't have that language.

22          Your Honor, just a few comments about the RICO

23   claim that plaintiffs have pursued and the fiduciary

24   breach and prohibited transaction claims.

25          First, with respect to the RICO claim,

1    plaintiffs suggest that plan participants didn't know

2    because of the gag clauses that there was a reimbursement

3    arrangement, a revenue sharing arrangement between some

4    network pharmacies and Cigna.  But we know from the

5    testimony, for example, of Plaintiff Blocker and

6    Plaintiff Perry, and we know from the documents that they

7    point to that there were pharmacists who conveyed that

8    very information.

9         Look, Your Honor, plan participants are not

10   entitled to know the revenue sharing amounts or revenue

11   sharing arrangements, but to the extent plaintiffs are

12   alleging that people didn't know and that that should

13   somehow be a common issue, that's just wrong.  And if you

14   look at the emails that they talk about where they

15   referred to the gag clauses and say that Cigna was keeping

16   this information from people, what's notable, Your Honor,

17   is that those emails are all about circumstances where

18   pharmacists did communicate to participants and told them

19   the very information that plaintiffs say under the gag

20   clauses in the contracts they weren't supposed to tell

21   them.

22        And with respect to the revenue sharing

23   question, in particular, Your Honor, I talked a little bit

24   about this before, but I do think it's notable that at

25   least one of the Courts of Appeals that has addressed this

1    specific issue said -- and this is from the Seventh

2    Circuit's decision in *Hecker v. Deere* -- that for purposes

3    of plan participants, it is the total fee, not the

4    internal post-collection distribution of the fee, that is

5    the critical figure for someone interested in the cost of,

6    in that case it was certain investment.  Here, obviously

7    it's prescriptions.

8              And plaintiffs again talk about this idea that

9    clawbacks is somehow wrong and nefarious.  But you could

10   have a plan like a plan with Cigna that has clawbacks

11   because of the relationship between Optum and the

12   pharmacies where a participant goes in and pays $8 for a

13   drug and there might be a $1 revenue sharing back to Cigna

14   in that context.  So the participant pays $8, the pharmacy

15   keeps seven of those dollars, reimburses Cigna for one of

16   them, and then of course the pharmacy has to pay lots of

17   other people, their employees, the manufacturer, all those

18   sorts of things for that drug.  But if you contrast that

19   to a participant in another plan, and let's say another

20   plan that doesn't have any clawbacks, but if a participant

21   goes in and is told at the pharmacy in that case that the

22   participant has to pay $15 for that prescription, it

23   doesn't matter that there's no clawback or that there is a

24   clawback in the Cigna case.  What matters is that the

25   participant has to pay $15 as opposed to $9 in the Cigna

1    example.  And that's why these clawbacks, just like the

2    revenue sharing, are not improper or inappropriate or

3    unreasonable, and that's why these plans don't reference

4    Cigna's compensation because that's not the business of

5    the participants; that's between the plan and the

6    different service providers for the plan just like in the

7    retirement plan context.

8            I am just about done, Your Honor.  But I wanted

9    to just take a moment, if I could, to look through my

10   notes and see if there's anything else that I might

11   address.

12           THE COURT:  Okay.

13           MR. BLUMENFELD:  Thank you.

14           Thank you for the time, Your Honor.  There's

15   just one last issue.  And that has to do with your

16   question initially of Mr. Izard about what happens when a

17   participant has a claim in Month One and then a claim

18   seven or eight months later.

19           And you made the point, and we explain in our

20   briefing the same point that how much you pay on Claim 1

21   in Month One has a direct bearing on how much you have to

22   pay on subsequent claims, particularly when it comes to

23   deductible issues.  And Mr. Izard was arguing that they

24   can sue over Claim 1 even though on Claim 2 and 3 they

25   might have benefited from the same mechanism.  And a few

1    things bear mention.

2              The first is, these are claims for benefits

3    under an ERISA plan.  These are not legal claims for

4    damages.  They are claims for benefits governed by

5    principles of trust law and claims in equity.  This is not

6    I get to sue you and you have to assert a counterclaim for

7    setoff.  If you received the benefits to which you are

8    entitled under a plan, then the fact that those benefits

9    might have come to you in a different order, for example,

10   than you would have expected does not mean you get to say,

11   well, I want the money on Claim 1 and I don't owe you

12   anything on Claim 2.  You could think of sort of another

13   example where a participant -- let's stick with the

14   pharmacy example.  You could have a plan that said it was

15   going to charge everybody $5 for a prescription no matter

16   what the prescription was.  But the plan participant sued

17   saying they should have instead paid the Pharmacy

18   Reimbursement Rate.  And for 100 transactions, that's what

19   they say should have happened.  And the Pharmacy

20   Reimbursement Rate on the 50 transactions that the

21   plaintiffs sue over was $7 -- excuse me, it was $2.

22   They're saying I should have paid $2 on these transactions

23   instead of the $5 I actually paid.  But there could be

24   other transactions where that Pharmacy Reimbursement Rate

25   would have been $10 for those transactions.  And on those

1    transactions, the plaintiffs would have had to pay twice

2    as much for those prescriptions.  A court of equity

3    doesn't look at that situation and say, well, I'm going to

4    put blinders on and ignore the favorable implications of

5    the plan language when it benefits plan participants and

6    then give them additional benefits beyond that to which

7    the plan provided because in other circumstances they made

8    a mistake.

9         And to talk to Mr. Izard's example, in

10   particular, if in Month One somebody walked into a

11   pharmacy and paid $40 for a prescription and said they

12   should have only paid $20, and they filed a claim with

13   Cigna and it got adjudicated and it was returned, that $20

14   was returned to them, their deductible on subsequent

15   transactions would not reflect the $40 they paid

16   initially; it would reflect $20 that they ultimately were

17   charged.  And so to the extent they hit a deductible later

18   on, they would have to make that additional $20 payment as

19   part of their deductible later on.  That, I think, was

20   your example with respect to Claim 1 at the beginning of

21   the year and other claims later on in the year.

22        And plaintiffs just ignore all of those

23   implications of how the plan terms are supposed to

24   operate, and equity doesn't cancel that.  Equity doesn't

25   allow a plan participant to say you paid me wrong on

1    Claim 1, 2, and 3, but on Claims 7 through 50 I benefited,

2    so we're going to sort this out by giving me additional

3    money on Claims 1, 2, and 3.

4              THE COURT:  Thank you.

5              MR. BLUMENFELD:  Thank you, Your Honor.

6              THE COURT:  Mr. Izard.

7              Hold on a second, I think you're on mute.

8              MR. IZARD:  Can you hear me now?

9              I guess first I'd like to say that much of what

10   I think I just heard relates to the merits, not the class

11   certification.  So I do want to just keep us focused on

12   the class certification issue.

13             On the last point that Cigna just made, we are

14   not saying that the Court should ignore whether Cigna has

15   a setoff.  The point we're making is that Cigna has an

16   obligation to say how much it thinks should be set off.

17   It's not part of our case in chief.

18             The main thing, though, I'd like to focus on,

19   Your Honor, is going back through the examples, the plan

20   examples that Cigna brought up.  And they submitted that

21   demonstrative exhibit.  I wonder if the Court could pull

22   that up because I do want to make some general comments

23   about that because I think there's some things that were

24   glossed over.

25             THE COURT:  All right.  If you'll hold on just a

1    moment.

2            Okay, I'm there.

3            MR. IZARD:  Okay.  And I'm going to try and

4    summarize and categorize a little bit because there really

5    aren't as many variations as are suggested.  And I think,

6    you know, the variations that were brought up aren't

7    terribly material.  I think this is another example of the

8    "what abouts" I was talking about earlier.

9            First, I would say that I still didn't hear

10   Cigna say that they thought the class or the subclass

11   language was ambiguous.  The closest they got, I think,

12   was they said back in 2012 and 2013 nobody told them that

13   they thought it was ambiguous, but Cigna still hasn't said

14   that.  But in any event, first, let's look at these

15   exhibits in the context of this subclass language.

16           First, only two of those exhibits have the

17   subclass language.  None of the others have the subclass

18   language.  So all the arguments regarding the other

19   exhibits have nothing to do with the subclass language.

20   The terms of plans with those subclass language could be

21   used to interpret subclass plan language, it's that

22   simple.  We're not trying to use these other plans to

23   interpret the subclass by language, as Cigna suggested.

24   We're trying to keep it completely separate.  It's

25   completely irrelevant.

1          And the subclass language that Cigna admitted in

2     their brief is a limitation.  And Cigna never challenges

3     the "notwithstanding," you know, argument here.  It's "in

4     no event."  That's notwithstanding everything else, this

5     language controls.  Cigna's never challenged that, it's

6     never said "in no event" means something other than in no

7     event.  And so I don't think there's any real ambiguity

8     that's been brought up here.

9          So now let's look at the other plans.

10          First, I'd like to turn to Exhibit 51 which is

11     the very last plan in this group.  And this plan is not in

12     the class.  And by way of background, there's sort of two

13     categories of plans that Cigna has.  There are the Cigna

14     plans that have the boilerplate that we've sued on which

15     are on the Proclaim system, they're in the DST system,

16     they have the codes.  Cigna has a separate system called

17     the Facets system which has those old Great West claims.

18     Cigna did not produce the claims data for these plans.

19     And this plan falls into that category.

20          But what I'd like you to do, if you could,

21     please, is look at -- I'm just trying to scroll to the

22     page.  If you look at ECF page 36 which is -- I'm sorry,

23     PDF page 56 which is ECF 15 out of 68.  And here we can

24     see how this plan is not part of the class.

25          THE COURT:  And I'm sorry, let me just -- so

1    it's Doc. number which?

2              MR. IZARD:  Sure.  It's 275-51, 15 out of 68.

3              THE COURT:  15 of 68, great.  Okay.

4              MR. IZARD:  So if you look and you'll see the

5    top it says "Prescription Drug Benefits Schedule."

6              THE COURT:  I'm not sure I have this.

7              MR. IZARD:  This was in the handout that I got

8    this morning from Cigna.

9              THE COURT:  What's the PDF page?

10             MR. IZARD:  Thirty-six.

11             THE COURT:  Found it.  Great.  Thank you.

12             MR. IZARD:  At the top it says "Prescription

13   Drug Benefits Schedule," do you see that?

14             THE COURT:  I do.

15             MR. IZARD:  Now, the class definition is "you

16   may be required to pay a portion of the Covered Expenses."

17             If you look at the third paragraph of this page

18   under Prescription Drug Benefits Schedule, it says "To

19   receive prescription drug benefits, you may be required to

20   pay a portion of the Covered Expenses."  And there's a

21   "the" right before the highlighted "Covered Expenses," do

22   you see that?

23             THE COURT:  Yes.

24             MR. IZARD:  So that "the" means it's not in the

25   class because it's not within the confines of the class

1    definition.  And you can say, well, the "the" is

2    immaterial, but the reason we tried to select this

3    specific language is because these are the forms and it

4    has implications that go to other portions of the plan.

5    So as I said before, it's a Great West plan, it's on the

6    Facets system, it's not part of the DST system, it's not

7    part of the templates that are part of this case.  And the

8    word "the" in front of Covered Expenses is what separates

9    this from the class plans.  So all the arguments that

10   Cigna made about Exhibit 51 are simply irrelevant because

11   it's not a class plan.

12        Now I'd like to take a brief look, please, if we

13   could, at Exhibit 46.  Now, Exhibit 46 is the City of

14   Nashville plan that Cigna brought up.  And the City of

15   Nashville plan, as you can see, it also is not a template

16   plan, it's a one-off plan.  And that's at PDF page 27 it

17   starts on, Your Honor.

18        THE COURT:  All right.  I have it.

19        MR. IZARD:  And if you go to -- so again, this

20   doesn't have any of the coding.  As we noted in one of our

21   briefs, occasional one-off plans are not a way to defeat

22   certification.  Indeed, as Judge Hall talked about in

23   *Meidle*, she talked about the plans had 14 different

24   variations and this encompassed, quote, almost all of the

25   plans.  So she at least recognized you don't need every

1    single plan.

2              What's important here is if you go to PDF

3    page 30 which is ECF 275-46, 50 of 120.

4              THE COURT:  Okay.

5              MR. IZARD:  Now, that talks about how you may be

6    required to pay a portion of Covered Expenses.  That

7    portion is the coinsurance.  Well, the class definition

8    talks about paying a portion of Covered Expenses and paid

9    a copayment or deductible transaction.  So, you know, this

10   language is talking about coinsurance.  It's not talking

11   about deductibles and copayments.

12             And that brings me to Exhibits 47, 39, 44, and

13   40, because they all have --

14             THE COURT:  Just one second.  So on this

15   provision, then, you're saying because it's not talking

16   about deductibles or copays, it's not applicable, it's not

17   within the class definition.

18             MR. IZARD:  Right.

19             The other thing you'll notice, Judge, is if you

20   go right above that where it says "may be required to pay

21   a portion of the Covered Expenses" --

22             THE COURT:  Same issue.

23             MR. IZARD:  -- it doesn't have the class

24   language like Exhibit 51.

25             THE COURT:  All right.

1        MR. IZARD:  So it's another plan that's not in

2    the class.  So that plan is irrelevant to the discussion.

3        Now I'd like to go back to a series of plans

4    that have the "Charges" language.  And if we can go to PDF

5    page 9 which is Exhibit 47.  And if you go to PDF page 9,

6    you can see it has the definition of "Charges."

7        THE COURT:  Okay, got that.

8        MR. IZARD:  That's ECF 275-47, 37 out of 72.

9        If you look right above the definition of

10   "Charges," there's a definition of "Coinsurance."  And it

11   says the term Coinsurance means the percentage of

12   capital "C" Charges for covered expenses.  And then it has

13   the definition of capital "C" Charges right below the

14   definition of Coinsurance.

15       What this plan does and really what Exhibits 39,

16   44, 40, and 47 all do is they are defining capital "C"

17   Charges in the context of coinsurance.  We don't have

18   coinsurance in our case.  This case concerns deductibles

19   and copayments.  And the charges in the Covered Expense

20   section, expenses for charges by a pharmacy is the lower

21   case "c" charges, and that's the basic coverage which is

22   incorporated into the portion language.  This cap "C"

23   Charges in The Schedule benefits only concerns

24   coinsurance.  So this is another irrelevant "what about

25   this," "what about that," as we play Whack-A-Mole here.

1           The other plans I'd like to address, the other

2  category of plans, because there's really only one more

3  category, as we look together, that fits into 39, 40, 44,

4  and actually Exhibit 55 which was mentioned afterwards.

5  But if we could pull up 39 to start with and that would be

6  39 starts on ECF -- I'm sorry, PDF page 11.  So

7  ECF 275-39.

8           THE COURT:  All right.

9           MR. IZARD:  And we did reference this in our

10  brief.

11           So if you could see, if we're on the page marked

12  "Prescription Drug Benefits," "The Schedule," see that?

13  And that's page 44 of 77.

14           THE COURT:  Okay.  Got that.

15           MR. IZARD:  Okay.  So at the top we have the

16  class language where you pay a portion of Covered

17  Expenses.  Then we go down below that and we see Retail

18  Prescription Drugs, the amount you pay for each 30-day

19  supply.  And then it's 30 percent subject to a minimum

20  copay.  And Cigna argued that that 30 percent subject to a

21  minimum copay referred to the definition of "Charges."

22  What that refers to is it's 30 percent coinsurance,

23  because coinsurance is a percentage.  Coinsurance uses the

24  definition of "Charges."  Copayments don't use the

25  definition of "Charges."

1          That being said, there are other plans that

2     Cigna pointed out where there was a fixed copayment of

3     $10.  And that would be, for example, Exhibit 44.  And I

4     think there --

5          THE COURT:  Can I ask you, just before we leave

6     this Exhibit 39, it seems like the portion language there

7     at the top of PDF page 13 refers to -- it says "pay a

8     portion of the Covered Expenses."

9          MR. IZARD:  I didn't notice that.  You're right,

10    Your Honor.

11         THE COURT:  Your argument there again --

12         MR. IZARD:  Yeah, I didn't even spot that.

13         MR. BLUMENFELD:  Your Honor, I apologize.  I'm

14    not -- I don't want to interrupt Mr. Izard, I know this is

15    his time, but I think he's making a mistake about the word

16    "the."

17         THE COURT:  I'm actually not going to allow you

18    to interrupt him at this time.  If you need to clarify

19    something at the end of that --

20         MR. BLUMENFELD:  I will do that, Your Honor.

21    Thank you.

22         THE COURT:  I gave you a lot of time.  So I want

23    to make sure Mr. Izard has --

24         MR. BLUMENFELD:  I appreciate that, thank you.

25         THE COURT:  Mr. Izard, please proceed.

1          MR. IZARD:  Yes, I see a bunch of these have

2     Mr. Blumenfeld's point.

3          The other point I would make, Your Honor, is

4     there is arguably an ambiguity with the copayment plans.

5     And I would ask the Court to look at Exhibit 44, which is

6     PDF page 70.

7          THE COURT:  All right.

8          MR. IZARD:  And you can see it says under the

9     Retail Prescription Drugs section, it says the amount you

10    pay for each 30-day supply, and it says "No charge after

11    $10 copay," do you see that?

12         THE COURT:  I see that, yes.

13         MR. IZARD:  Okay.  So the question here -- and

14    this is a class-wide question -- does the no charge after

15    $10 copay take precedence over the class language which

16    says you are limited to pay a portion of Covered Expenses?

17    And every single copayment plan that's a class plan has a

18    section called "The amount you pay for a 30-day supply."

19    And so Cigna's argument is no charge after a $10 copay

20    determines the amount of the copay.  The plaintiffs'

21    argument is that to receive your prescription drugs you're

22    required to pay a portion of Covered Expenses.  Now, we

23    think that the "no charge after $10 copay" is subordinate

24    to the master definition of "a portion of Covered

25    Expenses."  Cigna takes the position that the $10 copay --

1   I hate to use this word -- but basically trumps the

2   portion of "Covered Expense" language.  But that is true

3   in every plan that involves a class plan with copayments.

4   So which of those two provisions prevails is a class-wide

5   issue.

6         Now, I don't know if you saw in our filed brief,

7   our expert's supplemental report, Cigna adjudicated as if

8   the plaintiffs' language applied because they adjudicated

9   it to the Client Rate, whereas the "no charge after $10

10  copay," you know, Cigna was not charging minimum.  But

11  again, this is a class-wide issue.  And how you interpret

12  this doesn't raise any individualized issues.  But I think

13  that is the only individualized issue with respect to plan

14  interpretation.

15        I would briefly comment on the specialty drug

16  issue that Cigna brought up, and that would be Exhibit 35.

17  Our expert did run the numbers on specialty medications

18  and it's .005 percent of clawback claims.  So it is an

19  inconsequential amount.

20        I would briefly also mention that with regard to

21  the Gallagher claim where Cigna brought up the Gallagher

22  claim, the Gallagher plan was a New Jersey coinsurance

23  plan.  It's a completely different animal and therefore is

24  not part of this case.

25        Back to the "the" again.  I would like to

1    comment on that.  Apparently my colleagues -- this is the

2    beauty of email, Your Honor.  The version with the "the"

3    excluded was an old version, so "the" actually is in

4    there.  And all of the "the" plans are part of it.  But I

5    think when you go back to Exhibit 51, you know, the other

6    point that I made, the bigger point that I made was that

7    was a Great West plan, it's not in any of the claims data,

8    we haven't asserted any claims for any Great West claims,

9    and therefore any claims under that plan are not part of

10   the case.  And I apologize for any confusion at the start.

11          The only other point, and I'll stop talking, but

12   I think this idea that we can't rely on Cigna's Rule 33(d)

13   response, that we could rely on, you know, what sponsors

14   tell Cigna about whether their plans are covered by ERISA

15   doesn't make a lot of sense.  There are a few cases out

16   there where plans were not properly funded, and therefore

17   participants sued to say, look, this is covered by ERISA,

18   I want proper funding.  But there is no evidence anywhere

19   that anybody has ever complained about a claim for

20   benefits or a fiduciary duty claim in a health plan isn't

21   covered by ERISA.  If that were true, none of these cases

22   would ever be certified.

23          So unless the Court has any other questions, I

24   think I'll stand down, please.

25          THE COURT:  Did you have anything you wanted to

1    respond to with respect to Mr. Blumenfeld's points about

2    the particulars of the Negron plan itself?

3           MR. IZARD:  I think the Negron plan is a hundred

4    percent consistent with the other plans.  I didn't hear

5    Mr. Blumenfeld say anything that caused either the

6    subclass language or the class language to be ambiguous.

7    And I don't think he said that.  And so I'm not sure

8    whether the variations that he discussed -- or withdrawn,

9    they're not variations.  I'm not sure the other plans that

10   he discussed in the Negron plan have any bearing on the

11   interpretation of the class or subclass language.  And if

12   Your Honor thinks that they may have, I'd be happy to

13   respond.  I'm not sure, frankly, what point he was making.

14          THE COURT:  I guess I had understood the point

15   to be that since there were multiple claims of violations

16   of very different provisions of the plan, that itself

17   suggested that there was basically multiple variation

18   issues here.

19          MR. IZARD:  I apologize.  I misheard.  I thought

20   you were referring to the plan.

21          The interrogatory answers, you know, as an

22   individual plaintiff early in the case when you're serving

23   a contention interrogatory, you can obviously make

24   elections to say you're going to try everything.  But as

25   the case has proceeded, Ms. Negron has narrowed and

1   refined her claim.  And more important, the only claims

2   she's pursuing on behalf of the class and, frankly, the

3   only claim she's pursuing individually now concern the

4   class and the subclass language.  So the fact that there

5   may be other incidental violations of varying strength,

6   you know, doesn't change the fact that the core of her

7   case concerns the class and subclass language, and that's

8   all she's pursuing right now.

9            THE COURT:  Okay.  All right.

10           (Video interruption.)

11           THE COURT:  So you may have lost me there for a

12   moment or so.  The laptop battery gave out a little

13   prematurely.  I'm on a different device now.

14           We are at the 5:00 hour, basically.  We've been

15   having I think a productive discussion for the better part

16   of the last three hours.  My thought is to try to continue

17   the argument because I know there's much more to talk

18   about with respect to Mr. Mustoe, and I'd like to try

19   to -- if you could be in consultation with my law clerk

20   about scheduling a date in the near future to continue the

21   matter.  I hope that's okay with folks, but we're kind of

22   near the end of the day here.  I think it might make some

23   sense for all of us to go back and look at what we've

24   covered so far and then to have a fresh go at the

25   additional issues, some more technical in nature

1   concerning Mustoe and the related motion from plaintiffs.

2   Is that okay with folks?

3                  MR. IZARD:  Yes.  If I might ask a question,

4   Your Honor?

5                  THE COURT:  Sure.

6                  MR. IZARD:  Are we done with the class

7   certificate argument and now we're proceeding to Mustoe

8   and --

9                  THE COURT:  My thought would be we're done

10  unless there's more to cover.

11                 MR. IZARD:  I don't think there's more to cover.

12  I just didn't want to get everybody started up again here.

13  I wanted to be clear.  I think you've probably had enough.

14                 THE COURT:  Yes, we've got to bring some

15  closure.  But it sounds like part of what Mustoe is about

16  does go somewhat to class certification issues.  I realize

17  they're also very different as well.  I'd like to try to

18  handle those and figure out those issues as well.

19                 So I think then what we'll do is we'll be in

20  touch about rescheduling a date to get together and to

21  continue this hearing.  I appreciate the presentations

22  from all counsel today.

23                 We'll stand in recess.  Thank you.  Take care.

24                      (Proceedings adjourned at 4:55 p.m.)

25

1

2                       C E R T I F I C A T E

3

4     RE: KIMBERLY A. NEGRON, ET AL. v. CIGNA HEALTH AND LIFE
                 INSURANCE COMPANY, No. 3:16CV1702(JAM)

5

6              I, Diana Huntington, RDR, CRR, Official Court

7     Reporter for the United States District Court for the

8     District of Connecticut, do hereby certify that the

9     foregoing pages 1 through 107 are a true and accurate

10    transcription of my shorthand notes taken in the

11    aforementioned matter to the best of my skill and ability.

12

13

14

15

16                     _____/s/_____

17                     DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
18                     United States District Court
                       141 Church Street, Room 147
19                     New Haven, Connecticut 06510
                            (860)463-3180
20

21

22

23

24

25