UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
KIMBERLY A. NEGRON, DANIEL      :   No. 3:16CV1702(JAM)
PERRY, COURTNEY GALLAGHER,      :
NINA CUROL, ROGER CUROL, and    :
BILLY RAY BLOCKER, JR.,         :
Individually and on Behalf of   :
All Others Similarly Situated,  :
                                :
              Plaintiffs         :
                                :
         v.                     :
                                :
CIGNA HEALTH AND LIFE INSURANCE :
COMPANY,                        :
                                :   New Haven, Connecticut
              Defendant          :   November 13, 2020
                                :
- - - - - - - - - - - - - - - - x


CONTINUED VIDEO MOTIONS HEARING


B E F O R E :

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.


Diana Huntington, RDR, CRR
Official Court Reporter

```
1    A P P E A R A N C E S:

2

3         FOR THE PLAINTIFFS:

4              IZZARD KINDALL & RAABE LLP
                    29 South Main Street, Suite 305
                    West Hartford, Connecticut 06107
5              BY:  ROBERT A. IZARD, JR., ESQ.
                    CRAIG A. RAABE, ESQ.
6
               MOTLEY RICE LLC
7                   28 Bridgeside Blvd.
                    Mt. Pleasant, South Carolina 29464
8              BY:  MEGHAN OLIVER, ESQ.

9              MOTLEY RICE LLC
                    One Corporate Ctr., 17th Fl.
10                  Hartford, Connecticut 06103
               BY:  WILLIAM H. NARWOLD, ESQ.
11

12
          FOR DEFENDANT CIGNA HEALTH AND LIFE INSURANCE
13        COMPANY:

14
               MORGAN LEWIS & BOCKIUS LLP
15                  1701 Market Street
                    Philadelphia, Pennsylvania 19103
16             BY:  JEREMY P. BLUMENFELD, ESQ.
                    BRIAN W. SHAFFER, ESQ.
17

18

19

20

21

22

23

24

25
```

1                      **2:30 P.M.**

2              THE COURT:  All right.  Good afternoon,

3    everybody.  This is Judge Jeffrey Meyer.  We're back here

4    for continued hearing in the matter of Negron v.

5    Cigna Corp.

6              May I have the appearance of counsel, please,

7    for plaintiff.

8              MS. OLIVER:  Yes.  Meghan Oliver with Motley

9    Rice.

10             MR. RAABE:  Good afternoon, Your Honor.  Craig

11   Raabe.  Bob Izard is also on the line.  Probably Meghan

12   and I will do most of the talking, but Mr. Izard is

13   available as well.

14             THE COURT:  All right.  Thank you.

15             MR. NARWOLD:  Good afternoon, Your Honor.  Bill

16   Narwold, also of Motley Rice.

17             THE COURT:  And who do we have here for Cigna?

18             MR. BLUMENFELD:  Good afternoon, Your Honor.

19   This is Jeremy Blumenfeld from Morgan Lewis again.  And

20   also Mr. Shaffer will be splitting, most likely, the time

21   here.

22             MR. SHAFFER:  Good afternoon, Your Honor.

23             THE COURT:  Great.  Good afternoon.

24             And it looks like we have a number of other

25   people watching.  Okay.

 1          So I guess perhaps, then, if we might want to

 2   start up.  I think we had the motion to preclude the

 3   Launce Mustoe testimony as well as the motion to strike.

 4   I know that they're kind of intertwined.  Frankly, it

 5   might help to -- I'm not sure if it's helpful to have very

 6   separate arguments on that.  Do you all have a thought

 7   about that?

 8          MR. BLUMENFELD:  Well, Your Honor, from our

 9   perspective -- this is Mr. Blumenfeld -- I think it

10   actually would work to take them somewhat separately, but

11   are happy to do it however the Court would prefer.

12          THE COURT:  I guess I'll do it separately, then,

13   in the usual course.  Let's go with the motion to

14   preclude, if we can.

15          MR. BLUMENFELD:  Thank you very much,

16   Your Honor.

17          There are three opinions that Mr. Mustoe offers

18   to a lesser or greater extent, and I'm going to take each

19   of those in turn.  Those are a question about whether he's

20   offering an opinion about the plan language and what it

21   means, a question about damages issues, and also a

22   question about sort of who is in the class and who is not

23   in the class, class definitional issues.  And I'll take

24   each of those in turn.

25          First, regarding the plan language and its

1   meaning, Mr. Mustoe's declaration says in the background

2   section words to the effect of the language at issue for

3   the classes prohibits clawbacks and the language at issue

4   for the subclasses prohibits clawbacks.  That's at page 4

5   of his declaration.  I just want to be clear on this,

6   Your Honor.  They are not offering Mr. Mustoe for the

7   opinion about what the plans mean or don't mean.  And

8   Mr. Mustoe admitted in his deposition that he wasn't

9   offering an opinion on what the plans meant or didn't

10  mean.  And he hadn't read the plans.

11              THE COURT:  I thought it was just about

12  basically context and background.

13              MR. BLUMENFELD:  That's correct.  I just wanted

14  to make sure that didn't go left unsaid.

15              THE COURT:  I think it was said already, right,

16  in your papers?

17              MR. BLUMENFELD:  I think that's right,

18  Your Honor, yes.

19              THE COURT:  Okay.

20              MR. BLUMENFELD:  Turning to the damages

21  question, Your Honor, plaintiffs say in the surreply that

22  Mr. Mustoe is calculating damages.  And this is at page 3

23  of the surreply.  But he doesn't identify what claims he's

24  seeking damages with respect to.  I think -- nor do

25  plaintiffs.  And I think it's important to look at the

1   different claims that are being asserted and to do the fit

2   analysis as to whether the claims that Mr. Mustoe is

3   asserting are in fact claims for which he is measuring

4   damages in the way it's supposed to be measured.  There

5   are fiduciary breach claims for losses to the plan,

6   prohibited transaction claims involving the misuse of plan

7   assets, RICO claims, co-fiduciary liability claims,

8   obviously the claim for benefits, and knowing

9   participation in a fiduciary breach.  I'd like to talk

10   about each of those, Your Honor.

11          First, regarding the misuse of plan assets, the

12   fiduciary breach claim for losses to the plan.  Plaintiffs

13   seek as a remedy under 29 U.S.C. 1132(a)(2) and

14   29 U.S.C. 1109, and they even quote that statutory

15   provision in Paragraph 243 of the Second Amended

16   Complaint.  That statutory provision is about losses to a

17   plan and it's about profits that are earned at the expense

18   of a plan.  And I think if you look at Mr. Mustoe's

19   report, he doesn't do any analysis of how he would purport

20   to calculate damages or losses on behalf of a plan.

21   Instead, all he's doing is the math on a clawback

22   analysis.  But that really says nothing about whether a

23   plan has been harmed or how much or whether Cigna has

24   profited through the use of plan assets or how much.  In

25   other words, his analysis doesn't fit the breach of

1   fiduciary duty claim that plaintiffs are asserting.

2          Now, 29 U.S.C. 1132(a)(3) allows for equitable

3   relief in certain circumstances, but certainly not

4   damages.  And again, plaintiffs can't seek damages on

5   behalf of the plan using Mr. Mustoe's analysis because he

6   doesn't do a plan-by-plan analysis of whatever the losses

7   or harm might be with respect to the plan.

8          Turning to the prohibited transaction claim,

9   this is again a claim that's brought on behalf of a plan.

10  It's involving the misuse of plan assets.  And again,

11  Mr. Mustoe doesn't even try to calculate harm or losses to

12  the plan.  And if you look at Paragraph 220 of the Second

13  Amended Complaint, Your Honor, that alleges that

14  defendant's compensation exceeded the premiums and other

15  fees that were agreed upon for providing prescription drug

16  benefits.  Well, of course, the plans themselves say

17  nothing about Cigna's compensation.  They don't talk about

18  it at all because it's not set forth in the plan.  It's

19  set forth in other documents, for example, the ASO

20  agreements.  And again, Mr. Mustoe doesn't analyze the ASO

21  agreements or what they say about Cigna's compensation,

22  but certainly there is in the record evidence that the ASO

23  agreements and the plan sponsors understood that the terms

24  of the plan were going to include paying the client rate

25  for prescription drug benefits as opposed to the pharmacy

1    reimbursement rate and that this was in fact going to be

2    part of Cigna's compensation.  But Mr. Mustoe doesn't

3    analyze any of that.  He doesn't talk at all about the ASO

4    agreements or about Cigna's compensation and whether Cigna

5    received more or less compensation than was agreed upon as

6    reflected in Paragraph 220 of the Second Amended

7    Complaint.

8          Paragraph 221 identifies an alternative theory

9    of prohibited transaction again regarding the misuse of

10   plan assets.  But again, Mr. Mustoe doesn't analyze that

11   question.  He doesn't purport to calculate damages to a

12   plan through the misuse of plan assets or anything along

13   those lines.  And for that reason, his theory, his

14   analysis doesn't fit that claim either.

15         THE COURT:  Was your argument there then that

16   there has to be basically a plan-by-plan breakdown of

17   damages?

18         MR. BLUMENFELD:  Well, it's not -- sorry,

19   Your Honor, I didn't mean to cut you off.

20         THE COURT:  Go ahead.

21         MR. BLUMENFELD:  It's not just that it needs to

22   be plan by plan, although it does, but also the measure of

23   Cigna's agreed-upon compensation depends on the terms of

24   documents other than the plans.  It depends, for example,

25   on the ASO agreements.  And there's been no evidence, no

1    showing that those are uniform.  And certainly Mr. Mustoe

2    doesn't to an analysis of whether Cigna received more than

3    its agreed-upon compensation under the terms of any of its

4    contracts, let alone all of them or in any sort of uniform

5    way.

6            In other words, Cigna's compensation, it's not

7    mentioned at all in the plans.  And so the amount of

8    Cigna's compensation is set forth in the terms of the ASO

9    agreements and in the negotiations that are described in

10   the class certification briefing.  But Mr. Mustoe doesn't

11   look at any of that, he doesn't identify a method for

12   evaluating whether Cigna received more compensation than

13   it was supposed to under the contract that governs its

14   compensation or let alone how you can do that on any sort

15   of class-wide basis.  Does that answer your question,

16   Your Honor?

17           THE COURT:  I think so, yes.

18           MR. BLUMENFELD:  Thank you.

19           So now I guess, Your Honor, I'll turn to the

20   claim for benefits.  And I think that's the focus of

21   plaintiffs' allegations and perhaps the focus of what

22   Mr. Mustoe at least was trying to do.

23           In the surreply, as I mentioned earlier,

24   plaintiffs say that Mr. Mustoe did not reprocess benefit

25   claims because he calculated damages.  And I was trying to

1  think about that and what actually that means.  And I

2  believe what plaintiffs are saying is Mr. Mustoe did not

3  even try to calculate how much somebody would have

4  received in benefits had their claim been adjudicated

5  properly.  And to me, that is the quintessential example

6  of something that doesn't meet the fit analysis.  It does

7  not fit plaintiffs' liability theory.  Because their

8  liability theory is exactly a claim for benefits under a

9  specific statutory provision, 29 U.S.C. 1132(a)(1)(B).

10  That provision allows for benefits that would be due to

11  somebody.  But Mr. Mustoe didn't do that.  Whatever else

12  he did, he didn't evaluate how much the benefits would be

13  to any class member had their claims been adjudicated

14  properly.  Instead, as plaintiffs put it, he calculated

15  damages.

16          And a related problem to that is that 29 U.S.C.

17  1132(a)(1)(B), ERISA's claim for benefits provision,

18  doesn't allow for damages at all.  It allows for benefits

19  that are due.  And to avoid any doubt about it, that is a

20  claim in equity, not for damages.  And maybe Mr. Mustoe

21  and maybe plaintiffs are using the term incorrectly,

22  they're referring to damages when what they mean really is

23  benefits due, but that requires consideration of the plan

24  terms.  Equity doesn't allow you to put blinders on.

25  ERISA's claim for benefits provision doesn't allow you to

1    put blinders on and ignore all the other terms of a plan

2    that bear on a class member's entitlement to benefits.

3    Mr. Mustoe acknowledges as much in his deposition when he

4    talks about the fact that if he was actually processing

5    somebody's claim for benefits he would consider things

6    like the deductibles, he would consider things like the

7    out-of-pocket maximums and what he describes in his

8    deposition as the ripple effect of adjudicating one claim

9    on all the others.  But he didn't do any of that.  And

10   ERISA doesn't allow you to ignore all of those other plan

11   terms.  This is not, as Mr. Izard suggested during the

12   last hearing, a claim for damages with a claim for setoff.

13   This is a claim for benefits that are due under the plan

14   that requires consideration in equity of all of those plan

15   terms.

16           And that's a problem both for his analysis but

17   also, Your Honor, for what his analysis didn't do.  And

18   that, Your Honor, relates to the May declaration which

19   points out the class certification obstacles, the

20   conflicts of interest both when you account for the

21   different interpretation of the plan language that

22   plaintiffs are advocating for and also as among the

23   different class members, first who is better off and worse

24   off using a client rate versus a pharmacy reimbursement

25   rate, but also who is better off in plaintiffs' world

1    advocating for having a class that includes both

2    deductible claims and copay claims versus those class

3    members who are better off only advocating for copay

4    claims versus people like plaintiffs themselves who only

5    have copay claims and therefore they don't care.  But

6    because Mr. Mustoe did a damages analysis, he doesn't

7    account for any of the conflicts of interest, he doesn't

8    address them.  And the May declaration on that point is

9    really -- it's unopposed as to the substance of the

10   analysis.  Because, again, Mr. Mustoe didn't do an

11   analysis that fits their liability theory.  He didn't do

12   an analysis of the benefits that would be due to any class

13   members, let alone all of them.

14          And this also impacts, Your Honor, the

15   reprocessing claim.  And to be clear, I think Mr. Mustoe

16   is not being offered in support of plaintiffs' request for

17   reprocessing.  But the problem with the reprocessing claim

18   is the same one that Mr. May explains regarding the

19   damages claim, the so-called benefits claim, which is

20   reprocessing the claims makes some class members worse off

21   and other class members better off and also has those same

22   conflicts as between class members who prefer to include

23   deductible claims in the analysis, those class members who

24   prefer that it doesn't, and people like the named

25   plaintiffs who didn't have any deductible claims and are

1    therefore indifferent to the subject.

2          Your Honor, next I would like to talk about the

3    RICO claims which are other claims that are alleged and

4    for which it's at least unclear whether Mr. Mustoe is

5    being offered in support of a claim for damages on the

6    RICO claims.  And plaintiffs try to analogize this case to

7    the *U.S. Foodservice* case.  And I think an analysis of

8    that case and a comparison to this one really shows the

9    flaw in the analysis and why Mr. Mustoe's analysis can't

10   support class certification of the RICO claim either.

11         So what happened in *U.S. Foodservice*?  There was

12   a series of contracts that were cost-plus contracts.  And

13   one particular version of that cost-plus contract, as the

14   Second Circuit explained in the decision in that case,

15   they had different versions of a cost-plus contract that

16   defined cost in different ways.  But one particular

17   version of that contract defined cost as the invoice cost

18   reflected on an invoice from one of U.S. Foodservice's

19   suppliers.  And what happened in that case or the evidence

20   and the proof at class certification, at least, was that

21   U.S. Foodservice was getting invoices from suppliers, was

22   having the product delivered directly to it, but then used

23   an intermediate corporation, essentially, to prepare a

24   higher invoice than the actual supplier's invoice.  And

25   when U.S. Foodservice provided its invoice to its

1    customer, it said you owe us, for example, $1,006 because

2    you have a cost-plus contract for 6 percent over the cost

3    and here is the underlying invoice that we paid on your

4    behalf, and that invoice shows that we paid a thousand

5    dollars on your behalf.  It turns out those underlying

6    invoices, at least so the allegations and findings for

7    class certification were concerned, were false.  Those

8    were the related invoices of the related corporations.

9    And because of that, the court said you are supplying

10   these false invoices to people, they paid those invoices

11   under the terms of the cost-plus contract, and that's why

12   we can justify class certification here because of a

13   couple of other things.  Most importantly, in that case

14   both parties' experts agreed that all of the relevant

15   contracts said the same thing.  Obviously, we don't have

16   that here.  And also there was no evidence that the other

17   parties to the contract, that is the plaintiffs in that

18   case but the people who signed the contracts, had any idea

19   that the cost-plus contract could include this

20   intermediate corporation, that is this other pricing.

21          What do we have here, Your Honor?  First, we

22   certainly don't have both sides' experts agreeing that the

23   terms of the contracts are uniform and mean essentially

24   the same thing.  Second of all, we know that the other

25   parties to the contract here, putting contract in quotes,

1   that is, the other parties to the plan, the plan sponsors

2   who negotiated those plans knew very well that the cost in

3   the cost-plus contract, that is the amount that plan

4   participants were paying for prescription drugs, were

5   going to be based on the client rate as opposed to the

6   pharmacy rate.  That's in, again, Exhibits 7, 8, and 9 of

7   our opposition brief which talks about, first of all, what

8   the agreements themselves say, the ASO agreements which

9   talk about client pricing but also go through those

10  specific examples where clients are offered the choice do

11  you want pass-through prices, which is similar to an

12  invoice-plus cost in which case you have to pay a separate

13  free to Cigna, or do you want the client pricing in which

14  case you are going to pay a different amount, sometimes

15  higher, maybe more often higher, sometimes less than the

16  pharmacy reimbursement rate, and that's the way that we

17  are going to collect our fee for the services that we're

18  providing to you.  That's another reason that that case is

19  different than this one.  But also plaintiffs' allegations

20  here are different than in that case.

21          If you look at *U.S. Foodservice*, the

22  misrepresentation was in the underlying invoices that were

23  provided.  Here, plaintiffs allege that the

24  misrepresentation is in the terms of the plans themselves.

25  Whatever else that means, it's not the same thing as what

1    was faced in *U.S. Foodservice* and also we know at least

2    two of the plaintiffs, Plaintiff Perry and Plaintiff

3    Blocker, who isn't a class representative but provides a

4    good example, didn't read their plan documents, so they

5    weren't misrepresented to by anything in those plan

6    documents.

7         And to the extent that participants may have

8    gotten a receipt from a pharmacy that said here is how

9    much you have to pay for your prescription, that didn't

10   say anything about this is how much we are getting to keep

11   on that prescription.  All it said was here's how much you

12   owe.  That's not fraudulent or a misrepresentation, and

13   certainly there's not evidence that every plan participant

14   uniformly looked at that and understood anything about

15   what that was supposed to mean vis-à-vis the terms of

16   their plan.

17        THE COURT:  So if I've got you right, Cigna was

18   free to say whatever it wanted in the plans, and if the

19   person didn't read the plan, Cigna could basically lie

20   with abandon.

21        MR. BLUMENFELD:  Well, so I think the problem --

22   I don't think so, Your Honor.  Because I think the issue

23   is you don't make a misrepresentation or not make a

24   misrepresentation in a plan.  The plan reflects the

25   benefits that are due.  It can't be a misrepresentation.

 1    It either provides that plaintiffs are entitled to

 2    benefits at the client rate --

 3            THE COURT:  What does it have to do with whether

 4    the person read it?  A distinct element of a fraud claim

 5    is reliance, but it doesn't go to whether there was a

 6    misrepresentation given whether the person read it or not.

 7            MR. BLUMENFELD:  Well, I guess that begs the

 8    question if you publish something that is misleading and

 9    somebody doesn't read it, is there a misrepresentation

10    that's made to that person?

11            THE COURT:  Is there really much of a question

12    on that?  The person is a customer, the person is a plan

13    member.  I understand if your argument was about, you

14    know, somebody who is in some other country who has

15    nothing to do with the plan.  But to say that it's not a

16    misrepresentation seems kind of an odd argument to make.

17            MR. BLUMENFELD:  I guess, Your Honor, what I

18    keep coming back to is if the plan terms entitle somebody

19    to pay the pharmacy reimbursement rate for something, then

20    that's the benefit that they're entitled to.  If the plan

21    says that they're entitled to pay the client rate for

22    something, then that's the rate that they're entitled to.

23    But either way, the plan itself doesn't misrepresent

24    anything.  It reflects the benefits that are due.

25            And the fact that people didn't read the

1    document, perhaps you're right, that goes to the question

2    of whether they relied on it or whether there can be

3    reliance on a class-wide basis certainly when people

4    didn't read the document, and the named plaintiffs didn't

5    read the document.  And maybe that's an easier or better

6    way to think about it.  But either way, I don't think you

7    can certify a class when there are people who didn't read

8    the document that plaintiffs are pointing to as saying

9    that they were misled by.  And the named plaintiffs and no

10   doubt others didn't read the document in the first

11   instance.

12            The other thing about the RICO claim,

13   Your Honor, that I'll mention is as it relates to what

14   plaintiffs are alleging was breached here.  And that gets

15   back to the question of the interrogatory responses that

16   we talked about last time and the fact that plaintiffs

17   themselves rely on lots of provisions in their respective

18   plans other than the specific language that they're now

19   pointing to, which I think also bears on the RICO theory,

20   RICO claim damages that Mr. Mustoe either may or may not

21   be being used to offer in support of.

22            As I said, Your Honor, I think Mr. Mustoe is not

23   being used as an expert to support plaintiffs' motion for

24   class certification with respect to reprocessing, but I

25   think the same problems that are identified with respect

1    to Mr. Mustoe's report and declaration bear on plaintiffs'

2    request for reprocessing for the same reason; that is,

3    there are conflicts that preclude, first of all, that

4    would render some people worse off, some class members

5    worse off, and also conflicts between class members that

6    prefer theories just based on copays versus based on

7    copays and deductibles that impact the amount of any class

8    member's potential recovery, which again preclude class

9    certification.

10            And Your Honor, I think unless the Court has any

11   questions, perhaps you'll be happy to hear that I don't

12   have anything further.

13            THE COURT:  Thank you.

14            For plaintiffs?

15            MS. OLIVER:  Good afternoon, Your Honor.

16            We just heard a lot about why class

17   certification isn't appropriate.  We heard about the

18   different sorts of claims that are being brought.  I think

19   I'd like to bring it back to why we're here, and that's

20   the *Daubert* motion that Cigna filed.

21            They claim that Mr. Mustoe's opinion doesn't fit

22   plaintiffs' theory of the case.  But that's not actually

23   true.  It does fit plaintiffs' theory of the case.  To be

24   clear, because Cigna has suggested that maybe it's not so

25   clear, he's not being offered in support of plaintiffs'

1    reprocessing claim.  And he is not offering an opinion on

2    the meaning of the plan language that's at issue.  Cigna's

3    *Daubert* seems to boil down to Mr. Mustoe should be

4    excluded because he didn't calculate damages the way Cigna

5    and its expert think damages should be calculated.  But

6    that's not *Daubert*.  That's a merits dispute about how to

7    measure damages in a health plan overcharge case.  The

8    purpose of *Daubert* is for the Court to act as a gatekeeper

9    and keep out junk science.  And there's nothing about

10   Mr. Mustoe's opinion that even remotely approaches junk

11   science.  His opinion is that clawbacks can be calculated

12   on an aggregate basis for the class and subclass.  And

13   that can be broken down into two pieces, and I'll take

14   those in turn: class membership and calculation of damages

15   for the class and subclass.

16           The first is class membership.  The law only

17   requires at class certification that a class be

18   ascertainable, that it be defined according to objective

19   criteria.  And here it is.  The class definition requires

20   people to have particular plan language and to have paid

21   clawbacks.  Mr. Mustoe relies on Cigna's own evidence and

22   testimony and Cigna's own representations and directions

23   under Rule 33(d) in using the DST reports that Cigna

24   produced to identify individuals whose plans have the

25   language required by the class definitions.  He just

1    automates the process.  Cigna has a variety of criticisms

2    about the use of DST reports, most of which are really

3    about the DST reports themselves, not Mr. Mustoe's use of

4    them.  No values, effective dates, a mismatch here and a

5    mismatch there.  And plaintiffs respond to each of those

6    in their opposition.  I'm happy to answer any specific

7    questions Your Honor may have, but those are briefed

8    pretty thoroughly in our papers.

9              In responding, plaintiffs outlined in detail the

10   factual evidence that supports the reliability of the DST

11   reports to identify on an automated basis Cigna's members

12   whose plans have the class and subclass language.  In its

13   reply, Cigna challenged none of that.  It disputed none of

14   that evidence.  Not the evidence about Cigna's almost

15   total reliance on boilerplate language to create its plan

16   documents, not about what boilerplate language was in

17   effect when, and not about the DST system or the reports

18   created by the DST system.  None of that.

19             THE COURT:  Walk me through a little bit on the

20   effective date issue.  How is it that one can know that a

21   particular plan, especially given, as I understand it --

22   correct me if I'm wrong, I could be mistaken about this --

23   but sometimes employers could have multiple plans at issue

24   that might get picked up sort of one stream in the DST.

25   How is it that one can reliably know that it's specific to

 1    a particular plan that meets the class definition and that

 2    essentially the beginning and end dates match up?

 3          MS. OLIVER:  A couple different issues there.

 4    I'll take the effective date one first.

 5          The DST reports include the beginning effective

 6    date for a plan.  And Cigna's criticisms -- and they say

 7    the reason Mr. Mustoe can't rely on them is there's no end

 8    date, so we can't know from a DST report when the plan

 9    went out of effect.  But what we know about Cigna's plan

10    booklets is that they're created using this boilerplate

11    language.  And Cigna produced the templates that they used

12    to create the plan booklets for all of the plan language

13    that's at issue here.  So for the piece of the plans that

14    include the portion of the covered expenses, that's in the

15    master pharmacy benefits schedule and the covered expenses

16    piece of the plan, and then the your-payments piece of the

17    plan which is the subclass definition.  So we can track

18    those over the course of the class period to see what

19    language was in effect when.

20          And all of those provisions, the class language

21    and the subclass language, were in effect until 2016.  And

22    that was the first time that any of that language changed

23    according to the templates and according to Cigna's own

24    internal tracking of this boilerplate language.  And what

25    happened in 2016 is Cigna undertook an entire rewrite of

1    all of its pharmacy benefit language.  And there are

2    exhibits attached to -- I believe it's attached to our

3    opposition that set this forth.  And you can see the codes

4    for the boilerplate.  And they basically say this one's

5    incoming, this one's outgoing.

6             So what we did is in telling Cigna -- we had to

7    tell Cigna which traces to search for in DST, we searched

8    for the replacement boilerplate to cut off the earlier

9    boilerplate.  So the start date for the replacement

10   boilerplate effectively ends that earlier boilerplate.

11            So when "portion" was removed, the DST report is

12   the search for the language that replaced that "portion"

13   language.  So once plans that have "portion" started

14   switching over to that new boilerplate, they'll show up on

15   the new DST reports.  And once we see the starting

16   effective date on those new DST reports, they get cut off.

17   The plan that has the class language gets cut off.  So

18   those replacement starting effective dates, they really

19   serve as ending effective dates.

20            THE COURT:  I see.  Okay.

21            The question, I think, about the multiple plan?

22            MS. OLIVER:  Sure.  So that's this benefit

23   option code issue, Your Honor.  That's also pretty central

24   to the motion to strike.

25            When Cigna initially proposed using these DST

1    reports, these search term results from the Document

2    Source Tool system, which is the system that Cigna uses to

3    create its plan booklets, it produced to the plans

4    initially without the benefit option code information.

5    But it told plaintiffs to use these DST plans, to link the

6    claims to the plan booklets.  But as you correctly note,

7    some employers have multiple plans.  So even if you have

8    an employer I.D., how do you know that the claim links up

9    to, say, Plan A of Employer One rather than Plan B or C?

10   Well, you need the ben opt code, or the benefit option

11   code.  And each of those plans has a separate benefit

12   option code.

13          So Cigna has finally produced replacement DST

14   reports that include all of those benefit option codes.

15   The most recent of those and the last of those was

16   produced I think the day before the last hearing that we

17   had.  So that's the benefit option code and that's how you

18   can tell there's a -- it has a corresponding code in the

19   claims data, the plan of ben, which I'm assuming is short

20   for plan of benefit, that ties to and is identical to the

21   benefit option code.  If you identify a transaction in the

22   claims data, you can see what the employer I.D. is and

23   what that plan of ben code is, and then you can go look at

24   the DST reports and match it up to figure out which plan

25   it is.

1           THE COURT:  I see.  Okay.

2           I want to take you back to something you said

3    before, which was this kind of motion to preclude an

4    expert is only about whether the expert's report is junk

5    science.  I guess I had understood that was part of what

6    the *Daubert* motion can be, but generally, as I understand,

7    a motion to preclude an expert can also be on grounds

8    that, you know, the expert may be the best expert in the

9    world, but if what the expert is measuring doesn't meet

10   the legal definition of what needs to be measured, then

11   the expert's testimony falls outside the scope of

12   relevance or even possibly if it's marginally relevant, it

13   can be a 403 prejudice objection because of capacity for

14   confusion.  So it seems to me that a primary argument that

15   Cigna is making is -- and maybe you're getting to this so

16   I don't want to rush you, but you heard Mr. Blumenfeld

17   basically go through the various legal theories as he

18   understands them.  I suspect you're not sort of pursuing

19   all of those, but you're probably pursuing, I think, if

20   I'm guessing, the ERISA benefit one at the least as well

21   as the RICO one.  So help me maybe understand -- and you

22   don't have to do it right now if you had it in your notes

23   to get to it later on, but I'd be interested in hearing

24   from you about that.

25           MS. OLIVER:  Sure.  You're correct, we are not

1    pursuing claims on behalf the plans.  He seemed to suggest

2    that we were; we are not.  We are pursuing claims on

3    behalf of the members for benefits, to recover benefits

4    due.  And he talked about how that's measured, how that

5    relief is measured under ERISA.  And said we have to

6    identify the difference, right, between how the benefits

7    that were actually received and the benefits that were

8    due.  But that difference is the clawback, right?  The

9    benefits that were due was for the member to walk into the

10   pharmacy and walk out with their prescription drug having

11   paid the cost share that didn't exceed the pharmacy rate.

12   But they paid more than that.  And that delta is the

13   difference between what was due to them, what they were

14   owed, and what they actually received at the pharmacy.

15   And I don't -- I don't know if that quite answers the

16   question.

17            THE COURT:  Well, I know that's your contention.

18   I guess I'm trying to figure it out why it wouldn't also

19   take into account what's the deductible or the

20   coinsurance.  So why is that?  And I know there's an

21   argument about whether it should be -- I think you're

22   saying it should take that into account ultimately because

23   you're saying Cigna can argue for setoff, but what is your

24   argument?

25            MS. OLIVER:  So I think actually our position is

1    that it should be measured at the moment that that member

2    fills the prescription, which happens at the point of

3    sale.  And in order to take into account this deductible

4    shifting or the ripple effect that Mr. Blumenfeld

5    discussed, you have to look way down the road.  And in the

6    case of the accumulators, you have to look to the end of

7    the plan year to figure out how that all played out.  But

8    the member was actually injured when they walked out of

9    the pharmacy that day having paid too much for their

10   prescription.

11           And yes, we have talked about setoff and we have

12   talked about that theory.  We don't agree with that

13   theory.  I think we have argued it as Cigna seems to be

14   suggesting that it is entitled to an offset.  And whether

15   that is an offset that happens as a natural result of the

16   deductible shifting and the accumulators or whether that

17   is some sort of offset because of these no-harm claims

18   that they talk about where the pharmacy rate was actually

19   higher than what the member paid at the point of sale.

20   And there, actually just a quick note, their expert

21   Dr. May suggests that in order to figure that out, that

22   calculation, that difference, that offset between those

23   no-harm claims and the claims where the member actually

24   was harmed, you have to look all the way to the end of

25   when the member's enrollment with Cigna, when that ended.

 1    That could be several years over the course of different

 2    plans with Cigna, that Cigna's position is it's entitled

 3    to an offset of that.

 4            Back to the accumulators, our position is the

 5    damages should be measured at the point of sale.

 6            THE COURT:  I understand that's your position.

 7    You can take a position on that.  But it does seem to me I

 8    have to drill down at some point, decide what is the

 9    appropriate measure of damages.  And I'm putting

10    damages -- just so Mr. Blumenfeld doesn't get too upset

11    here, I'm putting it in a colloquial term in terms of what

12    the amount would be, whether it's benefits or the like.

13    But it seems to me that if I measure whatever that is that

14    would have to get paid at the end of the day the

15    plaintiffs would be entitled to no matter the label, I

16    can't quite figure out why the law requires that amount to

17    be fixed kind of pixillated in time, right, at a

18    particular time as opposed to looking overall at what the

19    ultimate, I guess, harm would be to the plaintiff, the

20    legally compensable harm under the ERISA definition, what

21    the beneficiary receives.

22            MS. OLIVER:  So Cigna claims that damages should

23    be measured over the course of the plan.  You're taking

24    into account the accumulators based on the plan terms that

25    for some members require payment of a deductible or an

1  out-of-pocket maximum.  There are other plan terms that

2  are at issue, though.

3          So if you look at the actual plan language,

4  right, the actual plan language talks about a prescription

5  drug, it talks about a pharmacy, which suggests one

6  transaction, not transactions over the course of the

7  entire year.  But there's also an overpayment, a recovery

8  of overpayment provision in Cigna's plans that limits

9  Cigna's ability to go back and recoup overpayments.  And

10 overpayments by Cigna would happen, right, when there's

11 been some sort of underpayment by the member, whatever the

12 reason for that.  So that can happen after a member meets

13 their out-of-pocket requirement for the year and then they

14 don't pay anything.  It can happen on these no-harm

15 transactions.  And it can happen if a member pays less

16 because they've already met their deductible than they

17 otherwise might have.  And in cases where Cigna makes up

18 the difference where there's been an underpayment, that's

19 effectively when Cigna says there's been a member

20 underpayment, they're saying there's been a Cigna

21 overpayment, right?  So set aside ASO plans, because

22 they're a little different.

23          But the plans only allow Cigna to directly

24 recover those monies.  So go back to the members and say,

25 "You owe us $50.  You owe us $100 because we overpaid your

1    benefits."  Or they can set those off against future

2    claims.  But there are no future claims here.  There are

3    standing off past claims against other past claims.  And

4    we think that that plan language supports measurement of

5    the damages at the point of sale without taking into

6    account these Cigna overpayments that might have happened

7    as a result of the accumulators or deductibles shifting or

8    satisfaction of the out-of-pocket maximums as well as the

9    no harm.

10            With ASO plans, there's the additional

11   difficulty of the fact that when there was a member

12   underpayment, often it was the employer, the sponsor of

13   the self-funded plan, who had to make up that difference.

14   And now Cigna's basically saying, well, we should get

15   credit for that.  That should be an offset.  That should

16   reduce our damages, the damages that we have to pay.  And

17   there's no mutuality of obligation there as is required

18   under the law of setoff.  And I think we do view Cigna's

19   insistence on taking into account deductibles as a setoff

20   scenario.

21            THE COURT:  What if you have a particular

22   plaintiff who has, I'll throw out a number, $100

23   deductible for each plan year, and that person buys only

24   $80 of pharmacy product.  Is Mustoe's analysis going to

25   include some kind of measure of damages harm, the clawback

1    for that kind of person?

2            MS. OLIVER:  Yes.  So actually, that kind of

3    person is not affected by this deductible shifting that

4    Cigna talks about or satisfaction of out-of-pocket

5    maximums.  That only comes into play after members meet

6    their deductible or satisfy the out-of-pocket max and then

7    start paying, in the case of the deductible shifting,

8    copayments.

9            So to use that same example, if that person had

10   satisfied the $100 deductible and then had a subsequent

11   transaction, Mr. Mustoe's analysis would measure the

12   pre-deductible harm the same way it measured the

13   post-deductible harm.  And it wouldn't take into account

14   the fact that that member may have met the deductible

15   sooner than it otherwise would have and then, under

16   Cigna's theory, had the advantage of lower copayments

17   after the deductible had been met.

18           THE COURT:  But to be clear, what you're saying

19   is Mustoe would not essentially be -- his theory

20   doesn't -- or your theory doesn't award some sort of

21   compensation to plaintiffs who have not bought more than

22   the deductible in any one year of drugs?

23           MS. OLIVER:  It does.  It does.  He calculates

24   damages for those people at the point of sale.  The only

25   point at which this deductible shifting -- and that's what

```
 1   Cigna calls it, right? -- the only point at which that
 2   really -- when that affects Mr. Mustoe's analysis are the
 3   copayments that happen after the deductible has been
 4   satisfied.  Because the argument is that that member, for
 5   all of those overpayments that happened during the
 6   deductible period, they met it sooner.  So if a member had
 7   five transactions and it overpaid on all five of them, it
 8   satisfied its $100 deductible.  But if it had paid the
 9   proper amount and hadn't overpaid, it might have taken it
10   another transaction to meet its deductible.
11            THE COURT:  I get that, I guess.
12            I guess what I'm struggling with is if somebody
13   buys drugs that never meet the deductible amount, is that
14   person still a member of your class?
15            MS. OLIVER:  Yes.  Yes.
16            THE COURT:  How have they been harmed if they
17   would have had to have paid a $100 deductible anyways?
18            MS. OLIVER:  Because the plan language that's
19   included in the class definition isn't specific to either
20   copayment -- it's not limited to only copayments.  There's
21   no other language in these plans that explains how
22   deductibles are to be set or how your payments will be set
23   when you're in your deductible phase.  The only language
24   in the plan that does that is the language that's in the
25   class definition.  It's that portion of expenses incurred
```

1    for charges made by a pharmacy.  There's no other language

2    in those plan documents that explains how deductible

3    payments should be calculated.

4              THE COURT:  Okay.  But it's safe to say that at

5    least for many of the plaintiff class members to have

6    deductibles, including the named plaintiffs, right, and so

7    what you're telling me --

8              MS. OLIVER:  Not the named plaintiffs.

9              THE COURT:  Okay.  But it's safe to say it's

10   included within your class definition, right?

11             MS. OLIVER:  It is.  It is.  And they have the

12   language, and Cigna clawed back during deductible phase.

13             THE COURT:  I see.  Okay, great.  Thank you.

14             MS. OLIVER:  Does that answer the question?

15             THE COURT:  I think so.  I think what you've

16   told me is that even if somebody has not paid -- has not

17   purchased drugs or prescription drugs that exceed the

18   amount of the deductible, they're still within your class

19   and get compensation.

20             MS. OLIVER:  Correct.  Yes.

21             THE COURT:  And I guess my question about that

22   would be:  In light of the background principle of class

23   certification overall, which is that a class can't be

24   certified where it includes plaintiffs who have not

25   suffered a harm, what's the harm to that person?

1          MS. OLIVER:  They overpaid.  So for each

2     transaction at the point of sale if the pharmacy received

3     $10 and they were told to pay their $25 deductible

4     payment, Cigna clawed back that excess $15.  Because the

5     amount of cost share within the deductible phase was

6     determined according to the client rate, not the pharmacy

7     rate.  So the clawbacks were still happening in the

8     deductible phase.

9          THE COURT:  All right.  Okay.  Thank you.

10          What else?

11          MS. OLIVER:  One thing that I think should be

12     noted -- and Mr. Raabe may have something additional to

13     say about this -- is this issue of the deductibles and the

14     accumulators, Mr. Mustoe's analysis doesn't take it into

15     account, and Cigna believes that that is the way damages

16     should be calculated.  But even if damages were to take

17     into account the accumulators, Cigna didn't produce the

18     data.  So he couldn't have if he wanted to.  They still

19     haven't produced it.  It's not clear that it exists,

20     frankly.  Cigna's corporate witness on this point

21     testified that the accumulator data was overwritten, the

22     historical accumulator data was overwritten as the

23     accumulation happened.  So from one claim to the next it

24     was -- the old data was overwritten.

25          THE COURT:  All right.

1          So should the consequence of that, to the extent

2     that Cigna does not even have that data, should the

3     consequence be that that accumulator data is not relevant

4     to the measure of harm?

5          MS. OLIVER:  Right, so I think there are a

6     couple different ways to go with that.

7          So on the one hand, right, plaintiffs shouldn't

8     be penalized for Cigna's poor recordkeeping and their

9     inability to produce information that they say should be

10    used in calculating the proper damages.  But if Your Honor

11    at the end of the day just concludes, you know, I've heard

12    all the arguments and I really just think accumulators

13    need to be accounted for, perhaps a reprocessing is one

14    way to do that, for Cigna to go back and figure out --

15    unscramble the egg, figure out how these accumulators

16    affect the benefits that the class members were due and

17    what they actually got instead.  So I think, in the first

18    instance, plaintiffs would say, no, plaintiffs should not

19    be penalized for Cigna's failure to produce the data.

20          THE COURT:  Okay.

21          MS. OLIVER:  And that is that instead, damages

22    should be calculated the way Mr. Mustoe has indicated in

23    his report, they should be calculated on a claim-by-claim

24    basis at the point of sale.

25          THE COURT:  All right.

1           What else?

2           MS. OLIVER:  I think that's all I have,

3   Your Honor, unless you have additional questions.

4           THE COURT:  I don't think so.

5           Mr. Blumenfeld, anything else?

6           MR. BLUMENFELD:  Thank you, Your Honor.  Just

7   wanted to get off mute there for a second.

8           If Your Honor has any questions for me, I'm

9   happy to address them in light of the presentation that

10  was just made.  Otherwise, I think I would probably just

11  be rehashing things that I've already said.

12          THE COURT:  Okay.  I don't have anything else,

13  thank you.

14          MR. BLUMENFELD:  Thank you.

15          THE COURT:  Let's then, I guess, get to the

16  motion to strike.

17          Mr. Raabe, I guess this would be yours.

18          MR. RAABE:  Yes, Judge.  Thank you.

19          So I don't want to rehash what's in the briefs.

20  I would particularly urge Your Honor to pay attention to

21  our reply brief.  I think there, after we saw Cigna's

22  response, we kind of distilled what actually happened here

23  factually.  I'd like to spend a couple minutes on how we

24  got here and the bigger picture and why it's important and

25  why the plaintiffs believe they'll be prejudiced if

1    there's not some remedy here.

2         I think it's because the plaintiffs and Cigna

3    just approached discovery from two different angles.  From

4    the plaintiffs' perspective, we're trying it get ready for

5    trial.  And in a case like this, there's really two things

6    that you want to do.  You want to find out where there

7    were overcharges, claims where there were overcharges, and

8    then tie those overcharged claims to the plan language

9    that plaintiffs say prohibits those overcharges.  That's

10   the first piece.  And we've got half a billion claims that

11   show the overcharges, that's what Mr. Mustoe has

12   calculated.

13        The second piece is then to find out what was

14   happening internally at Cigna, what their documents say,

15   what were people saying about the overcharges and the

16   clawbacks.  And that's been a very fruitful exercise for

17   us.  We've cited some of the stuff in the papers.  Really,

18   the rub comes down to, as Mr. Blumenfeld said before, are

19   we calculating to the client rate or are we calculating to

20   the pharmacy rate?  The plaintiffs say pharmacy rate;

21   Cigna says client rate.

22        And I think one of the reasons the discovery

23   tactics were different here is because Cigna, through its

24   documents and testimony, understands it has a serious

25   problem on liability.  And just as one example, one of the

1  documents that everyone testified to consistently from

2  Cigna, from the CEO on down, is what's called a FUSE

3  document.  It's a document that Cigna uses to train the

4  sales force to go out to the employers to explain to the

5  employers what the benefits the members will be getting.

6  And what that document says is when this copay logic that

7  was implemented that's the foundation of the plaintiffs'

8  case was implemented, the plaintiffs would get the benefit

9  of "the cost at which Cigna has agreed to reimburse the

10  pharmacy for any given drugs."  That's the pharmacy rate.

11  That's the instructions given to the sales force to go out

12  and pitch these plans that we say misrepresented what

13  Cigna was actually going to do.  Cigna was going to

14  adjudicate at the client rate, but they're telling the

15  sales force tell everyone we're going to adjudicate at the

16  pharmacy rate.

17         So I think the reason we got off track here in

18  the discovery is while we're trying to gear up for trial

19  documents like that, Cigna was approaching this on the

20  notion that the battleground was going to be class

21  certification.  And if we get past class certification, it

22  may even be summary judgment with documents like this for

23  the plaintiffs.

24         So in doing that, from our sense of their

25  discovery responses, they gave us half answers that they

1   could both say they'd satisfied their discovery

2   obligations and then have what we call the stay patches

3   for the class certification.  And that's the kind of thing

4   that Judge Kravitz said in *Archbald* is hide-and-seek

5   discovery is forbidden where we're required to make so

6   many false guesses at such a great expense to try to find

7   out what really happened here.

8          Breaking it down into the two pieces, first

9   tying the claims to the plans, what Cigna told us was two

10  things out of one side of the mouth and down the other

11  side.  First was that they were unable to tie claims to

12  plans the way we'd asked in the ordinary course of

13  business.  Surely Cigna knew when they were saying that

14  that that raised the spectrum of a fiduciary duty

15  violation.  That is a claim that we are continuing to

16  pursue, a fiduciary duty claim, and that's what

17  Mr. Mustoe's analysis also supports.  So they hedged.  And

18  they said we can't do it in the ordinary course of

19  business.  Look at the claims data, the DST reports, and

20  the plan documents, and under Rule 33(d) you folks figure

21  it out.  You can do it as easily as we can.

22          And I think one of the major problems here and

23  one of the disconnects between us and Cigna is under

24  Rule 33(d) when a party invokes that rule, they are

25  necessarily saying here is the answer to the question,

1    it's in these documents, you can find it as easily as we

2    can.  And, I'll come back, that's one of the major rubs

3    that we have here.  And on multiple occasions, for

4    multiple interrogatories, Cigna invoked 33(d) and said

5    rely on the DST reports to tie claims to plan language.

6         Then with regard to the bigger picture of the

7    relevant data -- again, I won't recite all of the

8    discovery requests; what I will recite in very brief form

9    is Cigna's answers.  They gave us "all of the data

10   relevant for purposes of the case, all of the relevant

11   data fields, all 'information' that it would use 'in

12   support of its opposition to the plaintiffs' motion for

13   class certification.'"  With particular regard to

14   deductible balances, essentially deductible accumulators,

15   we were told in writing "Cigna does not track accumulation

16   for a particular customer's overall plan deductible."  And

17   to this day, Cigna has not produced any accumulator data.

18        So going to the questions you were just speaking

19   with Ms. Oliver about on this deductible piece, just to be

20   clear, so when a client's in the deductible phase and

21   they're making their payments at the pharmacy and they're

22   paying more than the pharmacy rate, they're overcharging

23   and being clawed back, and that's the violation.  So the

24   question becomes:  Once you hit the deductible, what's the

25   impact of that?  And as Ms. Oliver said, when we

1    specifically asked for that data, we were told that it

2    does not exist, and it has never been produced.  To then

3    deny class certification because we can't get something

4    that Cigna did not keep and we don't know now whether they

5    have it or not would be unfair to the class.  And to

6    calculate the damages Mr. Mustoe did at the point of sale

7    is a perfectly reasonable way to deal with that.

8           THE COURT:  So Cigna doesn't keep the data.  And

9    I guess it seems to me to matter does Cigna have an

10   obligation.  If this were like a spoliation, they had the

11   data, they knew it was relevant to litigation, or they had

12   an underlying legal obligation apart from the litigation

13   to keep this data, then they don't give it to you, I'd see

14   that that would be the strongest form of your argument.

15   It's a little less clear if they didn't have an underlying

16   legal duty to retain this data, then I'm not sure that

17   it's a -- I think the terms that have been used has been

18   it's been a penalty on you for them not to be able to give

19   you data that they didn't have an underlying obligation to

20   have.  Where does this fall on that side of that?

21          MR. RAABE:  We're on the side that it's a

22   problem for Cigna for two reasons.

23          First, as we cited in our papers, there's a

24   Department of Labor regulation that requires them to have

25   procedures and processes in place.  So when this type of

1   an event happens, they can make sure that claims were

2   adjudicated pursuant to the plan terms.  If they're not

3   keeping that accumulator data, they can't do that.

4            Secondly, is the fiduciary duty claim.  They're

5   a fiduciary here.  As a fiduciary, when they are

6   processing those claims, if the plaintiffs are right,

7   which Your Honor doesn't have to decide now, if we are

8   right, it is their obligation at the point of sale to do

9   it correctly.  If they didn't keep the data for the Court

10  or the jury to figure out whether or not that's true as a

11  fiduciary, that's on them, not on the class, not on the

12  plaintiffs.

13           Those are two independent duties.

14           THE COURT:  Okay.  All right.

15           MR. RAABE:  So that's kind of the sum of the

16  run-up to discovery.

17           The real problem becomes in class cert after

18  telling us to rely on the DST reports, Cigna is saying you

19  can't rely on the DST reports because there's no end date,

20  for instance.  And I think Ms. Oliver properly addressed

21  that.  Cigna's word, boilerplate language, boilerplate to

22  boilerplate.  And that's not the issue that they paved

23  out.  And for them to argue that we shouldn't be able to

24  rely on the exact data they told us to rely on is just not

25  fair.

1          With regard to the accumulator --

2          THE COURT:  Can I just stop you?  I'm sorry,

3    Mr. Raabe.  I'm not sure if it's your microphone or not.

4    I want to make sure our court reporter is okay.  Can our

5    court reporter hear Mr. Raabe okay?  I can hear you okay,

6    I just wanted to make sure.  Okay, great.

7          Please continue.

8          MR. RAABE:  So there's two problems here with

9    the DST reports.  One is the argument in class cert

10   basically contradicting what they said, what Cigna said in

11   the discovery process.  And then there's a supplemental

12   discovery response where after the plaintiffs had filed

13   the class certification motion, Cigna realized that they

14   had painted themselves in a box from their two-sided

15   answer and it exposed them to fiduciary duty liability.

16   So they no longer said, as of June 18, 2020, they no

17   longer said that they couldn't tie claims to plans in the

18   ordinary course of business.  They revised the answer to

19   say we can do it, it's just burdensome.  Well, if that's

20   the case, as Ms. Oliver said, if that is what

21   preprocessing is all about, that's on them; that's not on

22   us after going through a year and a half of discovery

23   after they told us to rely on these very reports.

24          I think the last thing I want to touch on,

25   Your Honor, is I think it reveals kind of where Cigna's

1    coming from on this.  They've taken some very extreme

2    positions in their opposition.  I touched on some of these

3    in the reply.  But the notion that the Court doesn't have

4    authority to strike an argument when it is completely

5    inconsistent with discovery is just not founded in the

6    law.  The notion that when we go through laborious

7    meet-and-confer conferences, reduce them to writing, and

8    then Cigna says, well, you didn't ask for what you're

9    asking for, you didn't ask for out-of-pocket accumulator

10    data in a specific discovery request, that is the

11    antithesis of how the meet-and-confer process is supposed

12    to work.

13         The notion that they say on page 3 of their

14    opposition brief that they never -- Cigna never told the

15    plaintiffs to rely on the DST reports to tie claims, we've

16    cited the interrogatory responses.  They say numerous

17    times look at the claims data, the DST reports and the

18    plans, and you figure it out.  That's what Mr. Mustoe did.

19    To argue to the contrary to either try to strike him or to

20    defeat class certification is just not fair.

21         That's all I have, Your Honor.

22         THE COURT:  Thank you.

23         For Cigna.

24         MR. SHAFFER:  Thank you, Your Honor.  Brian

25    Shaffer for Cigna.  Let me address the points that

1   Mr. Raabe made.

2           Our brief does set forth in detail the very

3   extensive back-and-forth as it relates to the issues.  And

4   there are really two that are the subject of the motion to

5   strike.  Mr. Raabe apparently wants to move this entire

6   case to trial, but the two specific issues that are

7   addressed by the motion to strike are the ben opt code as

8   it relates to the DST reports and the purpose for which

9   plaintiffs say they want to use this ben opt code, and

10  then the accumulator data.

11          With respect to these DST reports, as we

12  outlined in our papers, these are not documents that exist

13  in the ordinary course of business.  These aren't

14  documents that we had laying around that we decided should

15  we give them to plaintiffs, are they responsive or not.

16  This was an effort made to respond to plaintiffs' request

17  to find a way to try to identify plans that had certain

18  language without revealing the plans.  We provided them

19  hundreds of thousands of plans that had the exact

20  language, that had information about effective dates for

21  the plans, had schedules of benefits that would indicate

22  information about deductibles.  They didn't want to look

23  at any of that.  But the original request for DST reports

24  was:  Is there an automated way to capture snippets of

25  language?  So that's where the DST reports came from.  So

1    the idea that they were going to be used to tie claims to

2    plans is not where this started.  It started with can we

3    identify plans.  And I don't think there's any dispute our

4    efforts in that regard tried to meet them at their

5    request.  This was a customized approach that we undertook

6    for them, not one that we had ever done to tie claims to

7    plan language, which is what Mr. Raabe suggests this was

8    done for.  That was not the initial discussion around DST

9    reports.

10        When the plaintiffs said, okay, now we've got

11    plan language, we want to tie specific plan language to

12    claims in the pharmacy claims data, Cigna, give us a big

13    spreadsheet that lists every claim in the -- I forgot what

14    Mr. Raabe said, tens of millions of transactions of data

15    that have this snippet of language, you must have that

16    sitting around somewhere under the DOL regulations.  That

17    was their interrogatory question.  We responded to that

18    and said, sorry, we don't have that.  We don't keep a

19    compilation of every transaction within your snippet of

20    language in a collective space.  The three places where

21    you can find information that would allow you to look at

22    this question are: the plan documents, the DST reports in

23    some instances that we had run because they will tell you

24    plans that had that language, and the transaction data

25    that we gave them.  That's the exact same information

1    Dr. May used.  Dr. May didn't have a different set of

2    information that he used for purposes of identifying the

3    problems with Mr. Mustoe.  And it's the information that

4    we told them to look at if they were trying to aggregate

5    the question.

6              But when Mr. Raabe talks about the approach to

7    discovery, the approach to discovery that we got from the

8    plaintiffs when we told them, hey, sorry, we don't have

9    this in a compilation, was wait a minute, you must be

10   violating the DOL regs.  And we said, no, no, no.  Here's

11   the way it typically works.  Somebody has a transaction.

12   They have a question.  How was this transaction supposed

13   to be adjudicated?  What's the design of the plan?  Let's

14   look at that transaction and figure out whether, per the

15   plan design, it was done correctly.  That, we can do.  We

16   told them that in June of 2019 at a meet-and-confer.  We

17   told them in that same meet-and-confer, which is

18   documented in my affidavit in response to the motion to

19   strike, the limited information that was available from

20   the three groups of documents that we also referenced.

21   They said Mr. Mustoe went and looked at those three sets

22   of documents.  No, he didn't.  He didn't look at a single

23   plan document to come to his conclusion.  He wanted to

24   look at just the DST reports and just the transactional

25   data, and that was it.  Why he didn't do it, I don't know.

1   But we didn't tell him not to look at that.  In fact, we

2   specifically told him and plaintiffs to look at that

3   information.

4          When the plaintiffs then said, well, you're

5   breaching your fiduciary duties if you can't provide us

6   information that compiles all these claims that we're

7   asking about, we said, all right, we'll tell you how we do

8   it.  So in September of 2019 we provided a supplemental

9   response, several pages long, it incorporated our original

10  response with the answer that we cannot, we don't have

11  this in the ordinary course for all the claims you're

12  talking about, but here's how we do it, we have an ecro

13  system, the transaction comes in, there's information

14  about benefit design there.  They called that information

15  nonresponsive.

16         Now, that information is nonresponsive.  That

17  wasn't really helpful.  But that's what they were getting

18  at.  They were claiming that we couldn't do the

19  transactions from a DOL perspective.

20         From September of 2019 until April of 2020, not

21  a word about this.  They file an amended complaint, they

22  add their fiduciary duty claim, they file a motion for

23  class certification, not a word about it.  Only after they

24  file the motion for class certification do they raise a

25  question about the supplemental responses.  And then we

1    put a very detailed response together on that.  We said,

2    fine, you want more information about how we do this,

3    we'll walk through examples.  We walked through specific

4    examples how we do that.  And then the plaintiffs said,

5    well, why didn't you tell us all of this back earlier?

6    This is what we really wanted to know.

7            And Your Honor, respectfully, that has nothing

8    to do with Mr. Mustoe's approach.  Because he didn't do

9    any of that.  He didn't intend to do any of that.  And the

10   information that we provided, the plaintiffs basically

11   said is nonresponsive to our question anyway.  And so with

12   respect --

13           THE COURT:  So was it not apparent to you,

14   though, when you were responding to discovery and you gave

15   them the Rule 33(d) response that something like the

16   accumulator data would be something that would be

17   pertinent?

18           MR. SHAFFER:  So with respect to the accumulator

19   data, what we understood them to be asking about was in

20   the pharmacy transaction data, is there any information

21   that you have that relates to deductible limits,

22   out-of-pocket maximums.  We said we gave you all of that,

23   there was a field that related to deductibles in the

24   transaction data that we provided to them.  It's a field

25   that our expert has looked at.  I don't know if Mr. Mustoe

1   looked at it.  But that's what we thought they were

2   talking about.

3        With respect to the idea that there would be

4   additional data that would in sort of realtime be

5   calculating, hey, you got $20 towards your deductible, now

6   you've got 40, now you've got 60, the data we're aware of

7   does not have that information in what we provided them.

8   And we told them that.  Now, apparently through further

9   discovery they've said, well, actually there may have been

10  a medical claim system that had that information.  Or

11  maybe Argus, which is the vendor that does the pharmacy

12  piece, may have information on pharmacy transaction

13  deductibles.  But that information wasn't requested from

14  Argus for the pharmacy deductibles for the plaintiffs.

15       And so, you know, the idea that after they filed

16  their motion for class certification, after we deposed

17  Mr. Mustoe on his methodology that they wanted this

18  information, they don't even ask for this information in

19  their motion.  They view it as irrelevant.  And to the

20  extent that we identify problems with their failure to do

21  so, that information can be ascertained from the

22  transaction data that both experts have.  Dr. May has

23  identified instances where someone hits their

24  out-of-pocket maximum because, guess what, their number

25  goes to zero in the transaction data when they hit that,

1   and they pay nothing for it.  For the deductible phase,

2   you can see changes in what occurs in the amount that's

3   paid.

4          And with respect to the argument that the

5   plaintiffs are making that it doesn't have any impact, the

6   way Mr. Mustoe is calculating his damages, if somebody

7   under their theory was only supposed to pay $80 instead of

8   $100 for four transactions, and then on the fifth one

9   because of that change in the way you used the number they

10  should have paid more but they had already hit their

11  deductible, Mr. Mustoe doesn't take that into account.

12  And that's the problem with the fifth that we identify is

13  there are going to be instances if all you're doing is

14  taking those instances and saying all you look at is one

15  field on a transaction, if that moment in time the client

16  rate is X and the pharmacy rate is Y, we don't have -- we

17  have a damages claim.  It doesn't matter that, oh, by the

18  way, that person actually may have not hit their

19  deductible by that point in time using their methodology.

20         So with respect to that issue, again, I think

21  the problem exists.  The circumstances are identified

22  using the data and the evidence that both parties have.

23  It is not a secret where we came up with some new set of

24  data that they don't have or their expert doesn't have and

25  that the problems aren't identified.  And the suggestion

 1    that they be excused from having to confront the issue,

 2    you know, in our view isn't fair to us and isn't a way to

 3    satisfy the class issues.

 4           And the final piece I'll say about --

 5           THE COURT:  Before you go there, in terms of

 6    when we think about what your obligations were both as a

 7    matter of the DOL reg or even as a fiduciary, did Cigna

 8    comply with its obligations by not being able to

 9    essentially recreate particular transactions that occurred

10    within the scope of the class definition, i.e., those

11    plans that had the specific language that we've talked

12    about?

13           MR. SHAFFER:  I would defer to Mr. Blumenfeld on

14    a DOL regulation question, but my understanding is that

15    the process that Cigna followed would be consistent.  I

16    would defer to Mr. Blumenfeld.

17           THE COURT:  I guess I'm trying to figure out --

18    and Mr. Blumenfeld, you're welcome to chime in here -- I'm

19    trying to figure out is it consistent with the fiduciary's

20    responsibility if in fact they can't go back, readily go

21    back and essentially say, okay, for a particular

22    participant in the plan, here is how the payments were

23    calculated or the benefits were calculated, I should say.

24           MR. BLUMENFELD:  Your Honor, I think the answer

25    is yes, they complied with their obligations under the

 1    regulations.  And I think perhaps plaintiffs are confusing

 2    the ability to do this on a class-wide basis for every

 3    participant in every plan as opposed to the ability on an

 4    individual basis to look at the transaction history for

 5    somebody and dig into those details when you're

 6    calculating, for example, a deductible on a growing basis.

 7    And as you heard Mr. Shaffer explain, a lot of that

 8    conversation is in the data that has been produced to

 9    plaintiffs and that Mr. Mustoe had available to him

10    already.

11              THE COURT:  I see.

12              Were the actual plans produced to the

13    plaintiffs?  There's some back-and-forth at least in the

14    papers, I think Cigna's papers say there was a

15    disinclination I think is the term used to request the

16    plans, which is why the DSTs were given.  Were the plans

17    actually given in discovery?

18              MR. SHAFFER:  More than 300,000 plans were in

19    fact produced to the plaintiffs as part of the discovery

20    process.  Those are the plan documents that were

21    referenced in the interrogatory answers that Mr. Raabe

22    referenced.

23              And I just have -- if Your Honor will indulge

24    me, just one additional point to deal with, the end date

25    question about the DST reports.  I don't think it really

1   is addressed by the motion to strike, but Ms. Oliver

2   mentioned the end date issue.

3            So there hasn't been any issue that this ben opt

4   code field is going to allow for any addressing of the end

5   date.  And the end date issue, Your Honor, is presented

6   because, at least as the DST report is created, as it's

7   extracted, once you're on there, you're on there until the

8   plan is no longer there.  The idea that Ms. Oliver

9   suggested that it's a plug in, plug out and so a plan

10  couldn't have both their class language and this language

11  that they argue is their de facto end date is not correct.

12  And I would refer the Court to one of the plans that's in

13  the record, 346-1, which I believe has both the class

14  language and what the plaintiffs are arguing is the end

15  date proxy.  Ben opt code doesn't deal with that.  I'll

16  acknowledge that it does address this question of separate

17  plans under a particular client.  But it does not get to

18  that fundamental question of how do we tell whether for

19  the year 2015, for example, a plan that they had asked us

20  to run going all the way back to 2010 because, by the way,

21  these were being asked to be run back to 2010 when they

22  were originally requested, how do we know for sure whether

23  that language remains there, whether it was removed?

24  Mr. Mustoe could have done some quality checking, he could

25  have done some affirmation by looking at the hundreds of

1    thousands of plan documents or even one of them, and he

2    didn't do any of that.

3          So again, we've never suggested the DSTs are a

4    panacea, that they're a proxy for looking at the plan

5    documents.  And what we provided them for was an effort to

6    try to address which plans have this language.  As the

7    plaintiffs have said, we want to do more with the DST

8    reports, we want to use them to try to crosswalk to other

9    things that you've given us.  We provided the ben opt code

10   for that as well.

11          THE COURT:  All right.  Thank you, Mr. Shaffer.

12          Mr. Raabe, anything in rebuttal?

13          MR. RAABE:  Just a couple points, Your Honor.

14          On the plans there's no doubt that there were

15   hundreds of thousands of plans produced, many of which

16   have nothing to do with this case.  And Mr. Shaffer is

17   right, we did not want to spend the time reading every

18   single one of those plans because it was not germane to

19   what we were doing.  We took out what they call snippets

20   but Your Honor recognized is the key language at issue,

21   and that's what the DST reports were able to search to

22   find those plans within the 300,000 that had the relevant

23   language to see whether they prohibited the overcharges.

24   So Mr. Mustoe didn't look at that because that's not what

25   he was asked to do, and it's not important to his

 1   analysis.  It's the DST reports that were important to his

 2   analysis.  And it was Cigna that said, despite what

 3   they're arguing here, despite what they put in their

 4   brief, that said go to the DST reports, the claims, and

 5   the plans, and that will tell you how to tie claims to

 6   plans.  That was the interrogatory response.  So if

 7   Cigna's response today is today still you cannot do that,

 8   they should say that in the interrogatory.  They should

 9   say you cannot tie claims to plans.  And then we'll deal

10   with the fiduciary duty issue.  But if they're going to

11   say under 33(d) that you can, then they can't argue

12   against their expert and say, no, he can't do that.

13   That's just not fair.

14            With regard to the accumulator data and the

15   deductible piece that was in the claims data, the

16   deductible piece that was in the claims data was not the

17   accumulator data.  We do not have accumulator data.

18            Respectfully, I don't think Mr. Shaffer answered

19   your very germane question.  And I would refer you, rather

20   than belaboring it, to page 2 of our reply brief where we

21   put out our ask and their response.  We asked for all data

22   necessary to calculate damages and prove liability, the

23   deductible balances, essentially deductible accumulator

24   information, and all data to tie transactions to the

25   employers and the plans.  And the response was we have

1   given you everything that's relevant and we don't track

2   deductible data.  So if there's a problem now with the

3   deductible accumulator data, I refer you to the *Estate of*

4   *Barton* case that's in a number of our briefs, when a

5   defendant is not able to produce something because their

6   records are deficient, that's not a basis to deny class

7   certification.  The burden is on the defendant, not on the

8   class.

9               THE COURT:  All right.  Well, I thank you.

10              Is there anything else to take up at this time?

11              Okay.  I appreciate your arguments today and our

12   last argument as well.  Obviously, you've given me plenty

13   to think about.  I'll try to rule as soon as I can.  I

14   hope you have a good weekend.

15              (Proceedings adjourned at 3:53 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    RE: KIMBERLY A. NEGRON, ET AL. v. CIGNA HEALTH AND LIFE
            INSURANCE COMPANY, No. 3:16CV1702(JAM)

5

6            I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 109 through 165 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                    _____/s/_____

17                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
18                    United States District Court
                      141 Church Street, Room 147
19                    New Haven, Connecticut 06510
                         (860)463-3180
20

21

22

23

24

25