# EXHIBIT 8

# EXHIBIT K

Page 1

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3            FOR THE DISTRICT OF CONNECTICUT
 4
 5      KIMBERLY A. NEGRON,          )
        Individually and on         )
 6      Behalf of All Others        )
        Similarly Situated,         )CIVIL ACTION NO.
 7      DANIEL PERRY,               )3:16-cv-1702
        Individually and on         )(JAM)
 8      Behalf of All Others        )
        Similarly Situated,         )
 9      COURTNEY GALLAGHER,         )
        Individually and on         )
10      Behalf of All Others        )
        Similarly Situated,         )
11      NINA CUROL,                 )
        Individually and on         )
12      Behalf of All Others        )
        Similarly Situated,         )
13      ROGER CUROL,                )
        Individually and on         )
14      Behalf of All Others        )
        Similarly Situated, and     )
15      BILLY RAY BLOCKER,          )
        Individually and on         )
16      Behalf of All Others        )
        Similarly Situated,         )
17                Plaintiffs,       )
        vs.                         )
18                                  )
        CIGNA CORPORATION,          )
19      CIGNA HEALTH AND LIFE       )
        INSURANCE COMPANY, and      )
20      OPTUMRX, INC.,              )
                Defendants.         )
21      _____)
22      REMOTE DEPOSITION OF TYLER LESTER
23           Tuesday, June 23, 2020
24
        Reported By:
25      CATHI IRISH, RPR, CRR, CLVS, CCR
```

```
 1                    LESTER
 2    who hires Cigna to offer a plan for health
 3    benefits and drug benefits and then you
 4    have the employer's employee who is
 5    actually getting the prescription.  What
 6    terminology do you like to use for those
 7    people because I've seen customer, member,
 8    a variety of terms, and I want to make
 9    sure we're speaking the same language
10    here.
11        A.   Sure.  I think what would
12    probably be easier today is to think of
13    the employer and use the terminology plan
14    since it might not always be a employer,
15    and then for customer, a customer or
16    member is okay with me.  I generally use
17    those interchangeably.
18        Q.   What does Optum do in this
19    process, if anything?
20        A.   So our services that we receive
21    from Optum, were contracting the retail
22    pharmacy network and providing a certain
23    level of discounts to Cigna within that
24    network.  The way that operated at the
25    time is Optum would provide pricing
```

Page 18

```
 1                     LESTER
 2    information to Cigna for Cigna to provide
 3    to Argus for adjudication so there wasn't
 4    a direct connection.  I'm not sure of the
 5    actual reason why, whether it was
 6    contractual between Optum and Argus, but
 7    in those cases Cigna acted as a go
 8    between, an intermediary to take whatever
 9    pharmacy rates, whatever pharmacy that
10    should be in the network, they would
11    provide them to Cigna and we would pass
12    that information through to Argus to set
13    up the Argus plan adjudication system.
14         Q.   Just so I understand a little
15    more when you talk about discounts, so
16    Cigna and Optum enter into a I guess
17    contract pursuant to which Cigna can buy
18    or pay for drugs that are given to Cigna
19    customers through the Optum network; is
20    that fair?
21              MR. SHAFFER:  Objection to form.
22    BY MR. IZARD:
23         Q.   You can go ahead and answer,
24    Mr. Lester.
25         A.   That's right.  We contracted with
```

```
 1                    LESTER
 2     Optum and based on that contract were fees
 3     paid by Cigna in exchange for a certain
 4     level of pricing and that came in the form
 5     of discounts at retail pharmacies.
 6        Q.   And when you say pricing, these
 7     would be the prices at which Cigna plans
 8     would be buying drugs from Optum's network
 9     pharmacies?
10             MR. SHAFFER:  Objection to form.
11     BY MR. IZARD:
12        Q.   You can go ahead and answer.
13        A.   I would describe it a little
14     differently that we had a contract where
15     Optum had to provide a certain level of
16     discounts through retail pharmacies and
17     Optum was providing us information on how
18     they wanted those retail pharmacies to be
19     reimbursed.
20        Q.   When you say discounts, these are
21     discounts on the sale of prescription
22     drugs?
23             MR. SHAFFER:  Objection to form.
24             THE WITNESS:  That's correct.
25     ///
```

LESTER

1

2     A.    Can you rephrase that?

3     Q.    I was wondering if you were a

4   pharmacy and you wanted to get into the

5   Optum network, did you sign a contract

6   with Optum; do you know about that?

7     A.    That was my understanding.  I

8   don't know the details of how Optum

9   negotiated with pharmacies, but that is my

10   understanding.

11     Q.    Do you know if Optum set the

12   terms pursuant to which the pharmacies

13   would be paid for particular prescription

14   drugs?

15          MS. GRANT:  Form.

16          MR. IZARD:  Sorry.

17          THE WITNESS:  That was my

18     understanding.

19   BY MR. IZARD:

20     Q.    So Cigna wasn't part of the

21   contracts between Optum and the

22   pharmacies?

23     A.    We were not.

24     Q.    Does Cigna know the terms

25   pursuant to which Optum would set the

```
 1                    LESTER
 2    pricing with the pharmacies?
 3           MR. SHAFFER:  Objection to form.
 4           THE WITNESS:  We did not have
 5        knowledge of the terms.  All we saw
 6        were, because we were a pass-through,
 7        we saw I will call it the kind of
 8        point in time what they asked us to
 9        set up in the Argus system but I have
10        no knowledge of whether that actually
11        represented Optum's full contract with
12        that retail pharmacy.
13    BY MR. IZARD:
14        Q.   What's a pass-through?
15        A.   So in this situation, Cigna was
16    acting as an intermediary.  For whatever
17    reason Argus and Optum weren't working
18    directly together so in order for the
19    Argus system to be set up with the correct
20    pricing, Optum had to pass information
21    related to discounts and drug pricing to
22    Cigna and we simply pass that information
23    through to Argus.  We didn't make changes
24    to it on the Cigna side.  We were more
25    providing that operational support to get
```

```
                                            Page 40

 1                      LESTER
 2      three transactions.  My only question for
 3      you is:  Is this a small subset of the
 4      transaction data that was produced that
 5      you referred to in your answer to -- I'm
 6      sorry, the answer to interrogatory number
 7      4 where you talk about prescription drug
 8      transaction data?
 9           A.   That's correct, this subset is a
10      portion of that pharmacy transaction data.
11           Q.   Now, there are 57 fields here.  I
12      think you said earlier there are a lot of
13      fields with the data.  Are all the fields
14      represented here?
15           A.   All the fields in the pharmacy
16      transaction data?
17           Q.   Yes.
18           A.   I don't know.
19           Q.   Do you know how these fields came
20      to be selected?
21           A.   My understanding was we were
22      looking for all fields that represented
23      the financial information of how a
24      pharmacy transaction was processed and
25      through that we identified all of these
```

```
                                    Page 41

 1                      LESTER
 2      fields that impact that financial picture
 3      of a transaction.
 4          Q.   And were you part of the process
 5      of selecting the fields or you saw the
 6      result of the search?
 7          A.   I saw the results of this.  I was
 8      consulted on whether I thought there was
 9      anything missing at the time when these
10      were compiled but they were I believe
11      pulled together -- I'm not actually sure
12      who did the initial view of all the
13      financial -- the claims that impact the
14      financial -- the financial part of the
15      transaction.
16          Q.   Did you think anything was
17      missing or do you think anything is
18      missing?
19          A.   I don't believe so.
20              MR. IZARD:  Let's go to the next
21          exhibit, please.
22              (Exhibit 23, DST report, marked
23          for identification.)
24      BY MR. IZARD:
25          Q.   Can we look at Exhibit 23,
```

1                    LESTER

2       when Argus gets the request for benefits

3       from the pharmacy when the pharmacist

4       types it into the computer?

5            A.    Yes.

6            Q.    Six, where it says Rx account

7       number, that's the Cigna employer client

8       number; is that right?

9            A.    Yes.

10           Q.    Okay.  Number 9, line 9, Plan of

11      Ben, is that the benefit option code?

12           A.    Yes.

13           Q.    That's a benefit option code that

14      would come out of ePro?

15           A.    Yes.

16           Q.    Let's look at 14, 15 and 16.  14

17      is the date the prescription is written.

18      Is that the date the prescription is given

19      to the pharmacist?

20           A.    I'm not sure.

21           Q.    Okay.

22           A.    Whether it represents that or

23      when the physician actually wrote it down

24      on paper if it's paper.

25           Q.    So line 15 is the date pharmacy

```
 1                      LESTER
 2     filled prescription so that's where the
 3     pharmacy puts the pills in the bottle?
 4          A.   That's right.
 5          Q.   And then 16 is the date the
 6     pharmacy was paid.  So that would be the
 7     date the pharmacy was paid by Argus?
 8          A.   That's right.
 9          Q.   So we look across at column D, we
10     can see that the prescription was written
11     on August 5, 2016, it was filled on August
12     5, 2016 and it was paid on August 6, 2016;
13     is that right?
14          A.   That's right.
15          Q.   So this was all handled
16     electronically very rapidly, this reflects
17     that's an electronic point of sale
18     transaction; right?
19          A.   That's right.
20          Q.   What's 18, deductible applied
21     amount?
22          A.   That field represents any cost
23     share that the customer is paying at the
24     point of sale that is applied towards
25     their deductible.
```

```
 1                        LESTER
 2          Q.    That would be for each separate
 3    transaction?
 4          A.    Can you repeat that?
 5          Q.    Sure.
 6                So the deductible amount applied
 7    amount would relate to the deductible paid
 8    on each separate claim?
 9          A.    That's right, each claim could
10    potentially have a deductible amount
11    depending on where the customer is in
12    their overall deductible paid.
13          Q.    Now, 22 says ingredient cost to
14    client.  That would be the cost -- that
15    would be the amount that the client owes
16    Cigna for each of the drugs?
17          A.    That's right.
18          Q.    24 is the dispensable fee amount,
19    dispensing fee charged to client.  Is that
20    different sometimes from the dispensing
21    fee paid to the pharmacy, can they be
22    different?
23          A.    Yes.
24          Q.    So, for example, the client may
25    pay a larger dispensing fee than the
```

1                    LESTER

2        Q.    48 is the sum of 45, 46 and 47?

3        A.    Sorry, you're asking about line

4    48?

5        Q.    Yes.

6        A.    Line 48 would also capture any

7    cost share paid by the customer at the

8    point of sale.

9        Q.    Okay.  I see.  So if we look

10   across 48, column D, shows the line is

11   $12.45.

12            Do you see that?

13       A.    Yes.

14       Q.    So that would be the cost share

15   was greater than the amount that Cigna --

16   or the pharmacy, so the pharmacy had to

17   pay $12.45 back to Cigna?

18       A.    I believe based on the flows of

19   funds, it's technically dollars back to

20   Optum but that Cigna would then be part of

21   that Optum reconciliation if I think

22   through the flow of funds properly.

23       Q.    So the pharmacy -- so the member

24   pays a cost share greater than the cost of

25   the drug and the excess amount is paid by

```
 1                    LESTER
 2     the pharmacist to Optum and Optum pays
 3     Cigna?
 4           MR. SHAFFER:  Objection to form.
 5     BY MR. IZARD:
 6        Q.    You can answer.
 7        A.    Instead you would have -- so the
 8     pharmacy, the amount that you see here
 9     isn't paid by the pharmacy through any of
10     these value streams.  Instead it is offset
11     against all of the payments that a
12     pharmacy might receive over a several-week
13     period and the process that was set up
14     with Argus funding the pharmacies, Cigna
15     funding Argus, Optum funding Cigna because
16     ultimately Optum owns these contracts
17     means those dollars are ultimately making
18     their way to Optum and Cigna is still
19     responsible for paying Optum the sum of
20     all of the claims that occurred over time
21     and really netting out any negative
22     amounts with positive amounts.
23        Q.    So the first step is between
24     Optum and the pharmacist, they are going
25     to net out the positive, negative numbers
```

```
 1                    LESTER
 2        A.   Got it.
 3        Q.   Okay.  And up at the top it says
 4    excerpt from CIGNA 12365596.
 5             Do you see that?
 6        A.   Yes.
 7             MR. SHAFFER:  Hang on one second,
 8        Bob.  Sorry, where is that?
 9             MR. IZARD:  It's the third one
10        down from the top.
11             MR. SHAFFER:  Despard 7, thanks.
12    BY MR. IZARD:
13        Q.   I just want to clarify.  My
14    understanding, Mr. Lester, is what this
15    chart shows is whether a plan is covered
16    by ERISA or not, and column E says
17    erisa_ind, and if it's a Y, that means it
18    is covered by ERISA, if it's an N it is
19    not covered by ERISA.  Is that your
20    understanding?
21        A.   I believe this document is based
22    on what we house within Cigna as to a
23    client's ERISA, how the client has told us
24    to set up their ERISA status.  Yes.
25        Q.   So you rely on a client to tell
```

Page 170

```
 1                    LESTER
 2    you whether they are ERISA or not ERISA?
 3         A.    That's correct.
 4         Q.    All right.  Let's go back to the
 5    exhibits again.  I want to go to the
 6    answers to the eight set of
 7    interrogatories.  Let's see if we can find
 8    those in here.
 9              MR. BARRETT:  It's marked Exhibit
10         38, Bob.
11              (Exhibit 38, objections and
12         responses to eighth set of
13         interrogatories, marked for
14         identification.)
15    BY MR. IZARD:
16         Q.    So if you could look at 38,
17    please.
18         A.    Got it.
19         Q.    And on the last page, Mr. Lester,
20    you can see your verification there?
21         A.    Yes.
22         Q.    What information or documents did
23    you rely upon for these answers?
24              MR. SHAFFER:  If you need to take
25         a minute to review them, Tyler, please
```

```
 1                      LESTER
 2           MR. IZARD:  Do you want me to
 3      rephrase that?
 4           MR. SHAFFER:  Yeah, if you
 5      weren't done, then I'll withdraw the
 6      objection.
 7   BY MR. IZARD:
 8      Q.   Do you understand what I'm
 9   talking about here?
10      A.   I think if you can start -- I
11   know you were talking about the benefit
12   option but it might be --
13      Q.   It's also so we can talk about
14   how everything is traced.
15           The last sentence says, "CHLIC's
16   prescription drug transaction data
17   includes a field Plan of Ben."
18           Do you see that?
19      A.   Yes.
20      Q.   I think earlier you said that's a
21   Ben Opt code that's in ePro?
22      A.   That's correct.
23      Q.   So my question is for this
24   tracing through the central eligibility
25   database and Member Materials and the
```

```
 1                    LESTER
 2    dispensed from CVS and Walgreen's, so PBM
 3    here would be Optum?
 4              MR. SHAFFER:  Objection to form.
 5              THE WITNESS:  That's correct.
 6    BY MR. IZARD:
 7        Q.   And what this means is to the
 8    extent that the customer copayment
 9    exceeded the pharmacy rate, that excesses
10    amount would show up as a negative
11    pharmacy adjustment; is that right?
12        A.   That's right, this is in regards
13    to the guarantee reconciliation between
14    Cigna and Optum.
15        Q.   And that negative adjustment to
16    the -- negative pharmacy adjustment would
17    in effect be a credit to Cigna, it would
18    be a plus column item for Cigna; is that
19    right?
20              MR. SHAFFER:  Object to the form.
21              THE WITNESS:  Yes that's right,
22        the reconciliation, there would be
23        that adjustment made, that's right.
24    BY MR. IZARD:
25        Q.   This is when Cigna is beginning
```

1                    LESTER

2      to receive any excess amounts that the

3      customer paid above the amount that was

4      paid to the pharmacy; is that right?

5           A.    Cigna would have received it as a

6      credit against the reconciliation with

7      Optum at the time, yes.

8           Q.    And if we look up at the middle

9      e-mail from Ms. Byrne, with a copy to you,

10     Ms. Byrne says, "I believe this means that

11     for CVS/WAG/GER pharmacies that the amount

12     paid to the pharmacy which exceeds what

13     would otherwise be paid to the pharmacy

14     (which is the contracted rate) is either

15     paid or credited (which means included in

16     the agreement cost calculation) by PBM."

17                Do you see that?

18          A.    Yes.

19          Q.    You agree with that?

20          A.    Yes, I agree that's the amendment

21     that we applied during this period.

22          Q.    When we say paid, it's either

23     paid to Cigna or credited into Cigna; is

24     that right?

25          A.    That's right.

Page 276

```
 1                    LESTER
 2    targets for the year."
 3              Do you see that?
 4         A.   I do.
 5         Q.   What's a ZBL clawback?
 6         A.   I didn't write this one but my
 7    assumption kind of reading through the
 8    e-mail chain is it's his likely related to
 9    the negative reimbursement that the Argus
10    project was seeking to implement for
11    March.
12         Q.   Are you familiar with the phrase
13    clawback?
14         A.   I am.
15         Q.   And what's a clawback?
16         A.   Clawback is the term that we
17    heard largely from retail pharmacies
18    around the implementation of negative
19    reimbursement.
20         Q.   And, in fact, you've used the
21    term clawback before, haven't you?
22         A.   I probably have.
23         Q.   Everybody was using it at Cigna,
24    weren't they?
25              MR. SHAFFER:  Objection to form.
```

1                           LESTER

2               THE WITNESS:  I don't know if

3          everyone was.  I know that -- but it

4          was I think at one point in time used

5          by folks as we talked about the

6          overpayment project.

7     BY MR. IZARD:

8          Q.   When he says deep discounts, he's

9     basically talking about deep discounts to

10    the client in order to basically eliminate

11    the spread between the client rate and the

12    pharmacy rate; is that right?

13              MR. SHAFFER:  Objection to form.

14              THE WITNESS:  I'm not sure here

15         because the idea of going out with

16         deep discounts would actually result

17         in overperformance for clients and he

18         contradicts himself by talking about

19         underperforming for two months so I'm

20         not actually clear six and a half

21         years later on what he was trying to

22         get at in this sentence or this

23         suggestion.

24              MR. IZARD:  All right, let's go

25         back to the documents.  We'll move on

Page 294

```
                                       LESTER
 1
 2       do you see that?
 3            A.    I do.
 4            Q.    It says, "Hi, Brian I forgot to
 5       mention that in my e-mail that I was also
 6       surprised that the clawback was visible at
 7       POS as I thought the solution was that
 8       Argus was supposed to hide it."
 9                 Do you know what that refers to?
10            A.    I know POS would be the point of
11       sale.  And from reading this, it sounds
12       like Amber didn't know what information
13       was available to the retail pharmacy at
14       the point of sale versus in weekly
15       reconciliations or however the pharmacy is
16       actually reimbursed but it sounds like she
17       was surprised that at the point of sale
18       the pharmacy saw the customer cost share
19       and the negative reimbursement.
20            Q.    Was there a reason to keep the
21       information from the pharmacies?
22                 MR. SHAFFER:  Objection to form.
23       BY MR. IZARD:
24            Q.    You can answer.
25            A.    I don't know.  I never directly
```

```
 1                    LESTER
 2        A.    Not off the top of my head.
 3        Q.    So my question is:  Why did you
 4    need to understand the potential liability
 5    before you stopped collecting cost share
 6    payments from veterans?
 7             MR. SHAFFER:  Objection, assumes
 8         facts not in evidence, calls for
 9         speculation, argumentative.
10    BY MR. IZARD:
11        Q.    You can answer.
12        A.    So I don't make the final
13    decisions.  I was in a manager level role.
14    I wanted to understand the potential
15    liability because I'm in the financial
16    area but I had no control over how quickly
17    our operations team moved to make changes.
18        Q.    I know.  I heard that before but
19    I want you to listen to my specific
20    question.  The question is why did you,
21    because it says I'd like to see the impact
22    analysis before we stop collecting
23    spreads.
24             So my question is why did you
25    want to see the impact analysis before you
```

Page 312

```
 1                        LESTER
 2     stopped collecting spread from claims at
 3     Veterans and DoD pharmacies?
 4              MR. SHAFFER:  I'm going to
 5         instruct the witness not to answer.
 6         He's answered the question, Bob,
 7         you're harassing him and being
 8         argumentative.  I instruct him not to
 9         answer the question.  Let's take a
10         break.
11              Can I get an accounting from the
12         videographer, the time on the record?
13              THE VIDEOGRAPHER:  Give me one
14         second.  The time is 5:08.  We're off
15         the record.
16              (Recess taken from 5:08 p.m. to
17         5:19 p.m.)
18              We're back on the record.  The
19         time is 5:19.
20     BY MR. IZARD:
21         Q.   Mr. Lester, just before the
22     break, Mr. Shaffer instructed you not to
23     answer a question.  Are you going to
24     follow that instruction?
25         A.   I am.
```