# EXHIBIT 30

# EXHIBIT AN

1

2  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF CONNECTICUT
3  No. 16-cv-1702 (JAM)
   -----------------------------------x
4  KIMBERLY A. NEGRON, DANIEL PERRY,
   COURTNEY GALLAGHER, NINA CUROL,
5  ROGER CUROL, and BILLY RAY BLOCKER,
   JR., Individually and on Behalf of All
6  Others Similarly Situated,
7           Plaintiffs,
8
9      - against -
10
11 CIGNA CORPORATION, CIGNA HEALTH
   AND LIFE INSURANCE COMPANY and
12 OPTUMRX, INC.,
13         Defendants.
   -----------------------------------x
14                    July 16, 2020
15                    9:38 a.m.
16
17     Videotaped Deposition of MICHELLE
18 EMANUEL-JOHNSON, taken by Plaintiffs,
19 pursuant to Notice, held via Zoom
20 videoconference, before Todd DeSimone, a
21 Registered Professional Reporter and Notary
22 Public of the State of New York.
23
24
25

1          EMANUEL-JOHNSON
2     Q.      Okay.  For purposes of this
3   case, we are talking about the relationship
4   with Cigna sort of 2013 through 2017.
5   Would it make more sense to use SS&C or
6   Argus?
7            If it is okay with you, I will
8   probably lapse into Argus.  That will make
9   it easier on me if that's okay with you.
10    A.      We can use Argus.
11    Q.      Okay, great, thank you.
12            What is matrix IT?
13    A.      It is a dedicated IT team that
14  they had managers that they reported to,
15  but as far as prioritization of work and
16  support, they took some direction from
17  myself.  So they were not my direct
18  reports, but they did, you know, take
19  direction around priorities of work to be
20  done.
21    Q.      Can you describe briefly what
22  Argus did for health companies in
23  connection with health benefit plans?
24    A.      We are a claims processor,
25  pharmacy claims processor.  Typically what

```
 1                  EMANUEL-JOHNSON
 2   that means is that we take direction from
 3   clients in terms of the benefit
 4   configurations that they want to leverage
 5   for adjudication of claims at point of
 6   sale.  We receive some clients' eligibility
 7   information, meaning what members are
 8   eligible during which period of time, and
 9   then support all of the activities
10   surrounding that, the loading of their
11   pharmacy networks and rates, and then to
12   some extent call center support for the
13   pharmacies.
14        Q.     Would the clients in this
15   situation be the insurance companies, the
16   healthcare companies?
17        A.     That is correct.
18        Q.     And you mentioned point of
19   sale.  What did you mean by that?
20        A.     Point of sale is a reference
21   that we leverage for what occurs at the
22   pharmacy.  So, for example, if you were to
23   go into your neighborhood pharmacy, hand
24   them your card, the pharmacist would submit
25   information, they would get a response back
```

```
 1                EMANUEL-JOHNSON
 2   at that point of service and then be able
 3   to fill your prescription.  So that's what
 4   we mean by point of sale.
 5        Q.    So Argus would process
 6   transactions where you walk in and you hand
 7   them your prescription, the pharmacist
 8   loads it into the computer, and shortly you
 9   hear back whether you are covered and what
10   your co-pay is, I won't say it is
11   instantaneous, but it is a very rapid
12   process; is that right?
13              MR. SEVEDGE:  I object to form.
14        A.    That's right.
15        Q.    Now, was Argus involved in
16   processing pharmacy transactions that were
17   not point of sale?  So, for example, if I
18   went to the pharmacy and bought a drug and
19   then I, you know, a month later submitted a
20   claim to the insurance company, would Argus
21   get involved in that kind of a transaction?
22        A.    Yes.
23        Q.    Did Argus do work for Cigna?
24        A.    Can you clarify what work?
25        Q.    I guess work with relation to
```

```
                                   Page 37
 1              EMANUEL-JOHNSON
 2  And with respect to a point of sale
 3  transaction, describe how that occurs,
 4  please.
 5              MS. WEDDLE:  I object to form.
 6              MR. SEVEDGE:  Join.
 7       A.     Describe how a paid claim
 8  occurs?
 9       Q.     Or how does -- what happens for
10  a paid claim to become a paid claim in a
11  point of sale transaction?
12              MR. SEVEDGE:  I object to form.
13              MS. WEDDLE:  Same objection.
14       A.     The pharmacy would have
15  received information in regards to the
16  member and the prescription that has been
17  prescribed by a physician for that member.
18  The pharmacy would then submit using
19  industry standard information so that that
20  claim is routed to, in this case, Argus.
21              In the adjudication of a claim,
22  we're looking at potentially hundreds of
23  elements.  The key elements would be
24  whether or not that member was eligible
25  under the plan first, and then we're
```

```
 1                   EMANUEL-JOHNSON
 2   looking at the eligibility of a pharmacy,
 3   and then the other high-level components
 4   that are leveraged are inclusive of drug
 5   coverage exclusions, what the member
 6   co-payment may be, and/or deductible, and
 7   then we go through all of those edits and
 8   then return a response to the pharmacy
 9   indicating, you know, the position of the
10   claim, if it's paid, in this case it's
11   because that's what you asked for, and then
12   what the co-payment or cost out of member
13   pocket will be.
14       Q.     And typically this happens
15   before the pharmacist gives the
16   prescription to the member?
17                MR. SEVEDGE:  I object to form.
18       A.     That is --
19       Q.     That is correct?
20       A.     Typically correct, yeah.
21       Q.     So for purposes of this
22   definition, a paid claim exists before the
23   member leaves the pharmacy with the
24   prescription?
25                MR. SEVEDGE:  I object to form.
```

```
                                      Page 39
 1              EMANUEL-JOHNSON
 2              MS. WEDDLE:   Join.
 3      A.      Yes.
 4      Q.      Now, I would like to look
 5  briefly at the second sentence here, and
 6  there is a reference to something called a
 7  reversed claim.   What is a reversed claim?
 8      A.      A reversed claim is a claim
 9  that was initially submitted by the
10  pharmacy, received a paid response, and
11  then for varying reasons is reversed.   And
12  I will give a typical business scenario.
13  Let's say you as a member do not come in to
14  pick up your prescription, the pharmacy
15  would reverse that transaction out and
16  return the product, you know, to their
17  inventory.   So that's what typically causes
18  a reversal.
19      Q.      Is a claim ever reversed after
20  the member leaves the pharmacy with the
21  prescription?
22              MS. WEDDLE:   I object to form.
23      A.      No.
24      Q.      What's a duplicate claim?
25      A.      Duplicate claim would be a
```

Page 44

1                 EMANUEL-JOHNSON
2   the amount of the co-pay is determined?
3                 MR. SEVEDGE:  I object to form.
4        A.      For co-pay G I do -- it is a
5   comparison of the co-payment as defined by
6   the plan, the pharmacy's usual and
7   customary amount, which I don't have detail
8   on how they arrive at usual and customary,
9   that's a pharmacy decision, and then what
10  we would call the rate for a drug, and that
11  is, you know, the plan pricing that they
12  determine they are contracted to pay.
13       Q.      And if the plan wanted to
14  change the rate for the drug, could you
15  change that in the system and reprocess a
16  claim?
17                MR. SEVEDGE:  I object to form.
18                MS. WEDDLE:  Join.
19       A.      From a systemic perspective, we
20  do have the ability to change price.
21       Q.      Just one more part of this
22  document I would like to look at.  It is
23  DSTPS 715, which is 87 out of 93.
24       A.      Okay, I'm on the page that has
25  "The following services are included on

```
                                        Page 50
 1              EMANUEL-JOHNSON
 2              MS. WEDDLE:  Join.
 3        A.       Paid claims tape would come
 4   following the customer, in this case Cigna,
 5   defined financial cycle cutoff.  So we run
 6   those on the 6th, 12th, 18th, 24, and last
 7   day of each month.
 8        Q.       And then after Cigna --
 9   withdrawn.
10              So when Cigna received the
11   invoices in the form of a paid claims tape,
12   would Cigna pay Argus for the amount owed
13   to the pharmacy?
14              MR. SEVEDGE:  I object to form.
15              MS. WEDDLE:  Join.
16        A.     Yes.
17
18
19
20
21
22
23
24
25        Q.     And then after Cigna --
```

Page 53

                    EMANUEL-JOHNSON

1          Q.       And the pharmacies had

2    agreements as to the amount they would be

3    paid for particular types of prescriptions;

4    is that right?

5                    MS. GRANT:  Objection to form,

6    foundation.

7                    MR. SEVEDGE:  Join.

8          A.       That would be an assumption on

9    our part.  As it pertains to the rates

10   associated with pharmacies, we were not

11   involved in any of the contracting.  What

12   we did do is that our system was leveraged

13   based on data received from Cigna that

14   represented the rate that the pharmacy

15   should be reimbursed.

16         Q.       I see.  So the amount that

17   Argus should pay the pharmacy came from

18   Cigna?

19         A.       Correct.

20         Q.       And at least in terms of Argus'

21   system, after the pharmacy was paid, was

22   the amount paid to the pharmacy -- well,

23   withdrawn.

24                    In Argus' database would you

```
                                            Page 54
 1                  EMANUEL-JOHNSON
 2   keep track of the amount that the pharmacy
 3   was to be paid on each transaction?
 4              MS. WEDDLE:  I object to form.
 5              MR. SEVEDGE:  Join.
 6        A.     Yes.  And if I may caveat,
 7   within the database, however, there are
 8   limitations around retention of that data,
 9   and that retention window is tied to the
10   contractual obligation that has been agreed
11   to with the plan, in this case Cigna.
12        Q.     With the Cigna plan, do you
13   know how long Argus would retain that data?
14              MR. SEVEDGE:  I object to form,
15   scope.
16        A.     It depends on the version of
17   contract that we're operating under.
18        Q.     Once the pharmacy was paid, was
19   the amount paid to the pharmacy for a
20   particular transaction ever changed?
21              MR. SEVEDGE:  I object to form.
22              MS. WEDDLE:  Join.
23        A.     You said once a claim was
24   determined to be paid, was the amount to be
25   paid to the pharmacy ever changed?
```

```
                                          Page 55
 1              EMANUEL-JOHNSON
 2      Q.     Yeah.
 3      A.     From a systemic perspective,
 4 from an Argus perspective, the amount to be
 5 paid to the pharmacy would have been
 6 represented in the response to the pharmacy
 7 at point of sale.  So unless there was a
 8 request to do, you know, do like a
 9 reprocessing, which typically wouldn't be
10 the case as quickly, that amount should not
11 have been changed.
12      Q.     So other than in a reprocess --
13 okay, withdrawn.
14             But in a reprocessing, there
15 could be a change which would result in a
16 determination that the pharmacy was paid
17 too little or paid too much and then there
18 would be a readjustment of the amount paid
19 at the pharmacy?
20             MR. SEVEDGE:  I object to form.
21             MS. WEDDLE:  Join.
22      A.     That could be the case.
23      Q.     But other than a reprocessing,
24 you are not aware of that ever occurring?
25             MR. SEVEDGE:  I object to form.
```

```
                                         Page 65
 1              EMANUEL-JOHNSON
 2   Company Customer Eligibility Data and
 3   Benefit Plan Design information."
 4              Do you see that?
 5       A.     Yes.
 6       Q.     This would be information that
 7   Argus got from Cigna that we talked about a
 8   little while ago?
 9              MR. SEVEDGE:  I object to form.
10       A.     Correct.  That's correct.
11
12
13
14
15
16
17
18              Do you see that?
19       A.     Yes.
20       Q.     This would, again, be a process
21   to load the information Argus received from
22   Cigna?
23       A.     Correct.
24       Q.     Are you familiar with a
25   negative reimbursement?
```

```
 1              EMANUEL-JOHNSON
 2        A.      Can you elaborate on the
 3   definition of that?
 4        Q.      So let's say that where the
 5   member pays the pharmacy an amount which is
 6   greater than the pharmacy is to be paid
 7   from Argus, that difference, do you know
 8   what happens to that difference, at least
 9   what happened to that difference in, say,
10   2016?
11              MR. SEVEDGE:  I object to form.
12              MS. WEDDLE:  Join.
13        A.      I am familiar with the term as
14   you have described it.
15        Q.      And that difference, the
16   difference between the amount the pharmacy
17   was to be paid and the amount the member
18   paid would be a negative reimbursement to
19   the pharmacy; is that right?
20              MR. SEVEDGE:  I object to form.
21              MS. WEDDLE:  Join.
22        A.      Yes.
23        Q.      And a negative reimbursement
24   means that that amount would be deducted
25   from the amount that Argus would otherwise
```

```
                                              Page 67
 1                  EMANUEL-JOHNSON
 2    pay the pharmacy for the prescription drugs
 3    that it provided to members on your Cigna
 4    plans; is that right?
 5               MR. SEVEDGE:  I object to form.
 6               MS. WEDDLE:  Join.
 7         A.      If those were the processing
 8    rules put into place by the clients, then
 9    yes, that's what would occur.
10         Q.      Where did the information with
11    respect to the amount of any negative
12    reimbursement come from?
13               MR. SEVEDGE:  I object to form.
14               MS. WEDDLE:  Join.
15         A.      When you say where would the
16    information come from, can you clarify
17    that, please?
18         Q.      Sure.  So, for example, if
19    there was a negative reimbursement, then
20    that had to be -- the amount of that
21    negative reimbursement had to be calculated
22    by someone, and I guess I'm asking who
23    calculated it?
24               MR. SEVEDGE:  I object to form.
25               MS. WEDDLE:  Join.
```

```
                                          Page 82
 1                    EMANUEL-JOHNSON
 2    payment to the pharmacy, that would go
 3    direct to the pharmacy, it would not go
 4    through Catamaran?
 5              MR. SEVEDGE:  I object to form.
 6       A.      Correct.
 7       Q.      Now, as we move around the
 8    circle to, say, 4:00, there is a reference
 9    to Home Delivery Dispensing, and it says
10    Claims.  Do you know what that refers to?
11       A.      Yes.  Home delivery is a Cigna
12    pharmacy asset for mail order and specialty
13    and they have a direct connection to us for
14    purposes of claims adjudication.
15       Q.      Now we move up to Vendor Fee
16    Reimbursement, and this is an arrow from
17    Argus to Vendor Fee Reimbursement.  Do you
18    know what that refers to?
19              MR. SEVEDGE:  I object to form.
20       A.      That refers to claims data that
21    we're providing to Cigna.
22       Q.      This would be the PCT file you
23    mentioned earlier?
24       A.      Yes.
25       Q.      Anything else?
```

```
                                          Page 135

 1                    EMANUEL-JOHNSON
 2        Q.      If you would please turn to
 3   page 5.
 4        A.      I'm looking at the page labeled
 5   DSTPS 003634.
 6        Q.      Yes.  Now, there is a Business
 7   Justification section at the top.  Do you
 8   see that?
 9        A.      Yes.
10        Q.      It says Problem Description.
11   Is that part of the form or was that unique
12   to this document?
13                MR. SEVEDGE:  I object to form,
14   foundation.
15                MS. WEDDLE:  Join.
16        A.      Problem description is
17   typically taken directly from the client
18   submission that there can be cases where
19   additional context is added so that
20   everyone reviewing the document can
21   understand it.
22        Q.      Where it says Completion
23   Criteria, it says "Point of sale claim will
24   show a negative amount when pricing
25   calculations include a negative total
```

```
 1                EMANUEL-JOHNSON
 2   paid."
 3                Do you see that?
 4        A.     Yes.
 5        Q.     This would be -- this would
 6   arise where the member co-pay was greater
 7   than the amount that Argus was going to pay
 8   the pharmacy?
 9                MR. SEVEDGE:  I object to form.
10                MS. WEDDLE:   I object to form.
11        A.     Yes.
12        Q.     Now, it says the point of sale
13   claim will show a negative amount.  How is
14   that being shown?
15                MR. SEVEDGE:  I object to form,
16   foundation.
17        A.     Without looking at the actual
18   claim screens, I cannot tell you exactly
19   where that gets returned.
20        Q.     Was there ever any discussion
21   with Cigna about whether the negative
22   amount should be shown to the member when
23   they picked up their prescriptions?
24                MR. SEVEDGE:  I object to form,
25   foundation.
```