# EXHIBIT 34

# EXHIBIT AS

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
 3   Case No. 16-cv-1702
     - - - - - - - - - - - - - - - - - -x
 4   KIMBERLY A. NEGRON, Individually   :
     and on Behalf of All Others        :
 5   Similarly Situated,                :
                                        :
 6                      Plaintiffs,     :
                                        :
 7            - vs -                    :
                                        :
 8   CIGNA CORPORATION and CIGNA HEALTH :
     AND LIFE INSURANCE COMPANY, et al.,:
 9                                      :
                        Defendants.     :
10   - - - - - - - - - - - - - - - - - -x
11
12                             August 12, 2020
                               9:23 a.m.
13                             9 Cimmeron City Drive
                               Cape Neddick, Maine
14
15
16
17
18
19
20        VIDEOTAPED VIRTUAL DEPOSITION UPON
21   ORAL EXAMINATION OF STEPHANIE BYRNE, held at the
22   above-mentioned time and place, before Randi
23   Friedman, a Registered Professional Reporter,
24   within and for the State of New York.
25
```

Page 24

1      S. Byrne
2  BY MR. RAABE:
3      Q    With regard to retail pharmacy
4  adjudication under Co-Pay G, did Cigna have a
5  concept known as clawbacks?
6           MR. SHAFFER:  Objection to form.
7           THE WITNESS:  No, we -- I know I
8      personally never used the term and didn't
9      use the term, but it was never considered
10     part of Co-Pay G.
11 BY MR. RAABE:
12     Q    Was it ever considered a part of
13 retail pharmacy claim adjudication?
14     A    Yes.
15     Q    In that context, what are clawbacks?
16          MR. SHAFFER:  Objection to form.
17          THE WITNESS:  Yeah, it would have
18     to be very specific to a certain context.
19 BY MR. RAABE:
20     Q    In what context are you familiar with
21 the concept of clawbacks with regard to retail
22 prescription drug claims?
23     A    I understand that one type of -- at
24 least one type of adjudication in the marketplace
25 where there is a remedy for what we would call

```
                                                    Page 25
 1                     S. Byrne
 2   zero balance claims, in that the client should
 3   not owe any money for a pharmacy charge after the
 4   customer has paid.  And in some instances, if the
 5   customer has paid an amount higher than what the
 6   ultimate pharmacy network contract requires as
 7   their payment, there is a difference that is
 8   tracked.  And then I'm sure there are many
 9   different ways of doing it in the marketplace,
10   whether they're done in bulk or -- they're
11   probably done in bulk in the number of
12   transactions that are out there.  But they would
13   be tracked and measured, and then when money was
14   transferred to the pharmacy, it would be net of
15   those amounts such that the ultimate amount of
16   cash being sent to a pharmacy was what they were
17   contracted.
18         Q    Is that sometimes known as a negative
19   reimbursement?
20         A    Yes.
21         Q    In your mind, in your experience, were
22   negative reimbursements the same things as
23   clawbacks in that context?
24         A    See, I wouldn't call it a clawback
25   because it wasn't like a customer paid something
```

1             S. Byrne
2  and then, boom, there was a negative amount being
3  drawn back from the pharmacy.  It was a financial
4  field that was tracked, such that when you added
5  up all the amounts paid to the pharmacy, it was a
6  net amount that was netted out to balance the
7  contract.
8       Q    So are you saying that you didn't see
9  negative reimbursements on a
10 transaction-by-transaction basis because they
11 were aggregated, and then when there was a
12 financial transfer between Cigna and the
13 pharmacy, the negative reimbursements were
14 included in that aggregate transaction?
15      A    I do understand -- I've seen claim
16 records, and it was tracked on a transaction
17 basis, but then it was accumulated.
18      Q    Okay.
19      A    And done on a net basis in the actual
20 cash transaction with a pharmacy.
21      Q    Whose cash transaction with the
22 pharmacy?
23      A    Actually, it would have been Argus.
24      Q    On behalf of Cigna?
25      A    Yes.

Page 69

1          S. Byrne

2              MR. SHAFFER:  Objection to form.
3      Lack of foundation, calls for speculation,
4      beyond the scope.
5              THE WITNESS:  Yeah, I mean I don't
6      want to make generalizations.  I'm not an
7      expert on all clients.  I mean, it's very
8      specific.  Even in the insured world, we had
9      client-specific networks even on some
10     insured business.
11 BY MR. RAABE:
12     Q    Take that out.  I get that.  That's a
13 unique situation.  Take a non-client-specific
14 network.  So it's Cigna's network pre-2010.
15          A customer goes in and fills a
16 prescription.  How do the funds flow?
17              MR. SHAFFER:  Same objections.
18              THE WITNESS:  I mean, in these --
19     I mean, I can't speak specifically for all
20     of the financial systems for Cigna.
21              An uninsured account, we treat all
22     business, whether it was ASO or fully
23     insured for products, for claim
24     adjudication, it was important for us to
25     keep things consistent, is what we strived

```
                                              Page 70
 1                      S. Byrne
 2      for.
 3               The distinction with the fully
 4      insured and ASO was as an ASO customer they
 5      have set up their own bank account.  When
 6      you're insured, Cigna has funded the
 7      quote/unquote bank account for that client.
 8      So in all instances, at the high level I do
 9      understand the funds would flow from Cigna
10      as the adjudicator.  So the money would come
11      out of the bank account, whether client
12      owned or Cigna funded, to Argus, to the
13      pharmacies.
14  BY MR. RAABE:
15      Q     And breaking down the ASO context, are
16  you familiar with pass-through pricing with
17  regard to the ASO arrangement?
18      A     Yes.
19      Q     So in that instance, the ASO client
20  would set up a bank account, the funds would flow
21  from that bank account to Cigna to Argus and to
22  the pharmacy, and there would be no markup at the
23  Cigna or Argus level; right?
24               MR. SHAFFER:  Objection to form.
25               THE WITNESS:  It's not the way I
```

Page 71

1                   S. Byrne
2       would describe it.
3  BY MR. RAABE:
4       Q    Let me withdraw it.  "Markup" is not
5  the right phrase there.
6            For a pass-through ASO arrangement,
7  the client's bank account would be the starting
8  point, and the same amount of dollars for a
9  particular transaction would flow from the
10 client's bank account to Cigna to Argus to the
11 pharmacy; right?
12           MR. SHAFFER:  Objection to the
13      form.  Beyond the scope.
14           You can answer.
15           THE WITNESS:  Yeah, the way I
16      would say it is, the fund flow is the same
17      regardless if it was pass-through or
18      client -- if it was pass-through or not.  In
19      all cases, clients are being set up with
20      client-discounted rates, and the funds flow
21      in the same manner.  If it's pass-through,
22      the client-discounted rates happen to equal
23      the pharmacy rates if in fact they're set up
24      for pass-through for all features, for all
25      discounts.  In some instances, especially

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

Page 72

1                   S. Byrne
2     dispense fees, clients want it better than
3     what we have, so they would actually get
4     lower dispense fees than what the pharmacy
5     was entitled to.  But in all cases, the
6     funds -- flow of funds was the same.
7  BY MR. RAABE:
8     Q     And with regard to spread pricing, the
9  differential would be at the Cigna level, Cigna
10 would take spread; right?
11              MR. SHAFFER:  Objection to form.
12     Lack of foundation, beyond the scope.
13              You can answer.
14              THE WITNESS:  Yeah, I don't want
15     to generalize on the actual cash flows in
16     the systems.
17              I understand there are actual
18     processing differences between Facets and
19     Proclaim business with how it flows from
20     Cigna to Argus to the pharmacies.  But in
21     substance, especially on Proclaim business,
22     yes, the amounts were charged to the client
23     according to the client discounts in place.
24     Guarantees are targeted for those clients,
25     either ASO or insured business.  Those

Page 73

1      S. Byrne
2      amounts were then determined to understand
3      what is the final pharmacy payment that is
4      due to the pharmacy.  Whatever difference
5      there was, there was the spread, positive or
6      negative.
7  BY MR. RAABE:
8      Q     And the flow of funds remained the
9  same, client to Cigna to Argus to pharmacy?
10              MR. SHAFFER:  Objection to form.
11      Lack of foundation, beyond the scope.
12              You can answer.
13              THE WITNESS:  For the Proclaim
14      business, yes.
15              MR. RAABE:  So let's, Charlotte,
16      take a look at Cigna 372865.
17              MS. LOPER:  And this is going to
18      be Exhibit No. 175.
19              (Exhibit 175 was marked.)
20  BY MR. RAABE:
21      Q     Before I move on, I have just one
22  follow-up question.
23              So after the Co-Pay G standardization
24  project was completed, did the flow of funds we
25  just talked about change at all?