# EXHIBIT 68

# EXHIBIT CE

Page 1

```
 1
 2     IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF CONNECTICUT
 3     _____
 4     KIMBERLY A. NEGRON, Individually and on
       Behalf of All Others Similarly Situated,
 5     DANIEL PERRY, Individually and on Behalf
       of All Others Similarly Situated, COURTNEY
 6     GALLAGHER, Individually and on Behalf of
       All Others Similarly Situated, NINA CUROL,
 7     Individually and on Behalf of All Others
       Similarly Situated, ROGER CUROL,
 8     Individually and on Behalf of All Others
       Similarly Situated, and BILLY RAY BLOCKER,
 9     Individually and on Behalf of All Others
       Similarly Situated,
10
                             Plaintiffs,
11
                -against-
12
       CIGNA CORPORATION, CIGNA HEALTH AND LIFE
13     INSURANCE COMPANY, and OPTUMRX, INC.,
14                   Defendants.
15     Civil Action No. 3:16-cv-1702 (JAM)
       _____
16
17                           October 7, 2020
                             9:02 a.m.
18
19
               VIDEOCONFERENCE DEPOSITION of
20     WILBUR PARSELL, taken by Plaintiffs, held
       at 35 Lake Road, Columbia, Connecticut
21     before Wayne Hock, a Notary Public of the
       State of New York.
22
23
24
25
```

Page 24

1  W. Parsell
2  the documents have to be loaded to the PHA
3  website so the IM can see them and see the
4  changes.
5      Q.    So were all changes to client
6  certificates of coverage or SPDs made in
7  the DST system?
8          MS. FARRELL: Objection.
9          THE WITNESS:  Yes.
10     Q.    The next section says, "what
11 kind of changes does this document
12 encompass.  Cosmetic changes," and then it
13 goes on to describe what cosmetic changes
14 are.  And then it says, "incorrect
15 benefits and if a client observes that a
16 benefit was loaded incorrectly, this
17 document will be used to compare to ePro,
18 verify client intent, and result in an
19 update and potential correction within the
20 contract."
21         Now, earlier you talked about
22 some changes could be made in PHA and some
23 had to go elsewhere.
24         Can you tell me what this box
25 cosmetic changes and incorrect benefits

Page 25

1                W. Parsell
2    relate to?
3        A.    Well, a cosmetic change is
4    something that wouldn't change the intent
5    of anything.  You know, it doesn't change
6    the benefit intent.  They might want to
7    note change sentence structure around,
8    they might want to change format, and they
9    might want to add spaces, you know, things
10   like that.
11       Q.    I see.
12             So those kind of changes could
13   be made without going to another group at
14   Cigna for approval?
15       A.    Generally on ASO it wouldn't be
16   a problem, but on the fully insured stuff,
17   because of the way things are filed, we
18   should probably check -- we check with the
19   state filing item on that.  Because some
20   things you can't change anything.
21       Q.    So when the heading of this
22   section says, "what kind of changes does
23   this document encompass," that refers to
24   changes that can be made in the context of
25   the PHA process without getting approval

Page 26

1              W. Parsell
2    elsewhere; is that right?
3              MS. FARRELL: Objection.
4              THE WITNESS:  Well, for a
5       cosmetic change.
6        Q.    Yeah.
7              Is that right?
8        A.    Yes.
9        Q.    Okay.
10       A.    But, you know, as I said, if
11   it's fully insured, we need approval.
12       Q.    Okay.
13             So let's go down to the next
14   box, please, where it says, "why was the
15   requested change not made." And if you can
16   see the third line down or the third
17   section down says, "file language/cannot
18   be altered" and it says, "legislatures
19   require language to be filed and approved
20   by the contract, or situs, state's
21   Department of Insurance.  We are unable to
22   alter or approve language."
23             Do you see that?
24       A.    Yes.
25       Q.    So is that what you were

1                    W. Parsell
2    referring to, that you cannot use the PHA
3    process to change any language that's
4    filed with a state?
5        A.    That's what I'm referring to and
6    that's where the state filing team would
7    need to be involved to see if there's any
8    variability in a filing to even make a
9    cosmetic change.
10       Q.    And if the state filing team did
11   approve a change, that would be made in
12   the DST system?
13       A.    Yes, and it would be noted on
14   the PHA form.
15       Q.    Now, three groupings below it
16   says, "ASO benefit selection/cannot be
17   altered."
18             Do you see that section?
19       A.    I do.
20       Q.    It says, "administrative
21   services only, ASO, funded accounts have
22   additional benefit choices. If elected,
23   the administration of the benefit must
24   adhere to Cigna's standard policy and the
25   booklet language cannot be modified."

Page 28

1                     W. Parsell
2           Do you see that?
3      A.   I do.
4      Q.   And so that refers to the types
5  of modifications that can be made within
6  the PHA process; is that right?
7      A.   That's correct.
8           MS. FARRELL: Objection.
9      Q.   And if a client asked the
10 benefit choices be modified, can that
11 occur?
12     A.   Not without approval.
13     Q.   From whom?
14     A.   Benefit utility possibly or
15 PBAB.
16     Q.   And if PBAB authorized a change,
17 would that then be reflected in the PHA
18 process and be made in the DST system?
19     A.   Yes.
20     Q.   If PBAB approved a change, that
21 would be documented in the PHA system; is
22 that right?
23     A.   It would be documented in the
24 PHA system and there would also be a PBAB
25 approval form.

Page 29

1              W. Parsell
2      Q.    I'm sorry, there's a PBAB
3  approval form?
4      A.    Uh-huh.
5      Q.    Sorry, the record can't pick up
6  an, "uh-huh."
7            So there is a PBAB approval --
8      A.    Correct.  Yes.
9      Q.    Okay.  Great.
10           What does that form look like?
11     A.    I don't know off the top of my
12 head.
13     Q.    Is it a standard form that's in
14 an electronic system?
15     A.    Yes.
16     Q.    Okay.
17           And is it maintained in the PHA
18 system somewhere?
19     A.    Not in the PHA system.
20     Q.    So how would PHA --
21     A.    There would be a note saying
22 PBAB approval received.
23     Q.    I see.
24           So is it an e-mail or is it an
25 electronic -- is there an electronic

Page 38

1              W. Parsell
2      Q.    Do you see 163?
3      A.    Uh-huh.
4      Q.    Do you see the numbers at the
5   bottom again, there's a Cigna 1752 at the
6   start, it goes on to 1753.
7            Do you see that?
8      A.    I do.
9      Q.    Go to the page that's 1786,
10  please.  It says, "prescription drug
11  benefits at the top."
12     A.    I'm still scrolling, sorry.  I'm
13  almost there.  I've got a little delay.
14           I see it.
15     Q.    All right.
16           So pages 1786 and 1787 are the
17  prescription drug benefits schedule.
18           Do you see that?
19     A.    I do.
20     Q.    And this is form language from
21  DST; is that right?
22           MS. FARRELL: Objection.
23           THE WITNESS:  It's in the
24     database.
25     Q.    Sure.

Page 39

1        W. Parsell
2            Do you know, are you familiar
3    with this language --
4            MR. IZARD: Withdrawn.
5       Q.    Are you familiar with this form
6    ever being changed at a client's request?
7            MS. FARRELL: Objection.
8            THE WITNESS:  I would say --
9        there's been instances where they've
10       asked to modify these.  I can't say
11       for certain how many and when, but
12       there's so many things we have and so
13       many thousands of documents, yes,
14       there's the potential to have these
15       modified if it's approved.
16      Q.    Great.
17            And my question is, has a
18   modification of this form ever been
19   approved, to your recollection?
20            MS. FARRELL: Objection.
21            THE WITNESS:  I can't say for
22       certain.
23      Q.    Let's go on to the -- let's
24   scroll down to page 1788.
25      A.    Okay.

```
                                                    Page 40
 1                      W. Parsell
 2        Q.    And you can see in the upper
 3   left corner it says, "prescription drug
 4   benefits for you and your dependents,
 5   covered expenses."
 6             Do you see that?
 7        A.    I do.
 8        Q.    And then underneath the
 9   limitation it says, "form HC-PHR1" and
10   over on the right it says, "04-10 V2."
11             Do you see that?
12             MS. FARRELL: Objection.
13             THE WITNESS:  It's very tiny,
14      but yeah, I can see it.
15        Q.    To your recollection, has
16   this --
17             MR. IZARD: Well, withdrawn.
18        Q.    This section of the document
19   HC-PHR1 is another section of template
20   from the DST system; is that right?
21             MS. FARRELL: Objection.
22             THE WITNESS:  Yes.
23        Q.    To your recollection, has this
24   template form ever been modified at a
25   client's request?
```

Page 41

1  W. Parsell
2           MS. FARRELL: Objection.
3           THE WITNESS:  To my
4      recollection, I can't say for sure.
5      But based on the thousands of requests
6      we receive, it's probably happened.
7      Q.    Okay.
8            And there would be a PBAB form
9   reflecting that approval; right?
10          MS. FARRELL: Objection.
11          THE WITNESS:  It would depend.
12     You don't need PBAB on everything.
13     Q.    Well, but you'd need PBAB on
14  covered expenses; wouldn't you?
15          MS. FARRELL: Objection.
16          THE WITNESS:  I can't say for
17     certain.  I don't have the list of
18     what requires PBAB.
19     Q.    Well, you would agree the scope
20  of coverage is pretty significant to a
21  health plan?
22          MS. FARRELL: Objection.
23          THE WITNESS:  It would require
24     approval.  An analyst wouldn't just
25     make changes to this.

Page 42

1            W. Parsell
2       Q.    And if there was an approval,
3   there would be a memo reflecting that
4   approval; is that right?
5            MS. FARRELL: Objection.
6            THE WITNESS:  There would be a
7       PHA template with the approval.  And
8       if ePro needed to be updated to
9       reflect a change, it would be in
10      there.
11      Q.    And if you're changing the scope
12  of covered expenses, that would require an
13  ePro update as well; is that right?
14           MS. FARRELL: Objection.
15           THE WITNESS:  Potentially.  I
16      can't say for sure.
17      Q.    Okay.
18            And under what circumstances
19  wouldn't it require an ePro update?
20      A.    I can't speculate.
21      Q.    Okay.
22            Let's move on to the bottom
23  right corner of that document.  You can
24  see there's a section called your
25  payments.

Page 43

1      W. Parsell
2           Do you see that?
3      A.   I do.
4      Q.   And if we go over to the next
5  page, the upper left column, we can see
6  that that's form HC-PHR3 and it's 04-10
7  V4.
8           Do you see that?
9      A.   I do.
10     Q.   This is another section of the
11 template from the DST system; is that
12 right?
13          MS. FARRELL: Objection.
14          THE WITNESS:  Yes.
15     Q.   Okay.
16          To your knowledge, has that
17 portion of template ever been modified at
18 a client request?
19          MS. FARRELL: Objection.
20          THE WITNESS:  I can't say for
21    certain.  But based on the number of
22    requests we get, possibly.
23     Q.   Sure.  Okay.
24          And again, that would be
25 reflected in an approval form from PBAB;

Page 44

1  W. Parsell
2  is that right?
3      MS. FARRELL: Objection.
4      THE WITNESS:  Yes.
5      Well, let me correct myself.
6  Not necessarily PBAB.  The appropriate
7  area.
8      Q.    Sorry?
9      A.    The appropriate area, whoever
10 that is.
11     Q.    Who else other than PBAB would
12 approve benefit changes?
13     MS. FARRELL: Objection.
14     THE WITNESS:  Can you repeat
15 that question?
16     Q.    Who other than PBAB would
17 approve changes to benefit structure?
18     A.    Well, there could be a benefit
19 utility can look at things, state filing
20 team, there's pharmacy folks that might be
21 involved.  It varies.
22     Q.    What's benefit utility?  What
23 does that group do?
24     A.    They approve certain benefit,
25 you know, people who are looking to modify

|  | Page 45 |
|---|---|

```
 1                    W. Parsell
 2   things, they have to look at it, where
 3   it's actually -- the way benefits are
 4   paid, they might want to take a look
 5   before something is approved.  And they
 6   may also work in conjunction with PBAB.
 7        Q.    My question to you is, other
 8   than an approval from PBAB, do you ever
 9   require making a change to a plan's
10   benefit language --
11             MR. IZARD: Withdrawn.
12        Q.    Do you ever require making a
13   change to a plan's benefit language other
14   than in response to an approval from PBAB?
15        A.    There's other instances where
16   language could be approved.  PBAB's not
17   involved in everything.
18        Q.    I know.  But I'm just talking
19   about changes to the benefit structure.
20             MS. FARRELL: Objection.
21             THE WITNESS:  I can't say on
22        that.
23             MR. IZARD: Okay.  Great.
24             Can we just take a quick break?
25        We may be done.  I just want to talk
```