# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

KIMBERLY A. NEGRON, et al.,
Individually and on Behalf of All Others
Similarly Situated,

No. 16-cv-1702 (JAM)

Plaintiffs,

vs.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY, et al.

September 3, 2020

Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
DECLARATION AND TESTIMONY OF LAUNCE B. MUSTOE, JR.**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................4

    I.      Cigna's business depends on standardization. ..........................................4

          A.      "Boilerplate" language was used in "source pages" which were used to create plan documents. ....................................................4

          B.      An automated process used "boilerplate" source pages to create plan documents. .....................................................................7

    II.     DST searches serve as "eyes" on hundreds of thousands of plan documents. ..................................................................................................11

    III.    Cigna tracked Clawbacks in its pharmacy transaction data. .................12

ARGUMENT .....................................................................................................................15

    I.      Legal Standard .......................................................................................15

    II.     Mr. Mustoe's Methodology for Calculating Damages Is Reliable and Matches Plaintiffs' Liability Theory ....................................................17

          A.      Cigna's different opinion about whether "clawbacks" can be used as a measure of overcharges is not a basis for exclusion. .........................17

          B.      Excluding claims where the member paid a client rate that was lower than the pharmacy reimbursement rate is consistent with Plaintiffs' theory of liability ....................................................19

          C.      Mr. Mustoe's calculation of damages on a transaction-by-transaction basis is consistent with Plaintiffs' theory of liability. .............21

          D.      The omission of coupon usage from Mr. Mustoe's methodology was reasonable due to the unidentified, and likely very small, number of class members affected. ...........................................23

    III.    Mr. Mustoe's Methodology Reliably Delineates the Class and Subclass by Using DST Reports ...........................................................27

          A.      DST Report 1 is not overbroad ..................................................29

          B.      Any issue with DST Report 2 (the language of which was proposed by Cigna) can easily be cured with an updated DST Report ........................................................................................29

i

C.   Inconsistencies caused by standard language changes in 2016 and 2017....................................................................................30

1.   Cigna's argument about DST Report 4 is based on a misplaced quotation mark. .............................................33

2.   Any issue with DST Report 3 (the language of which was proposed by Cigna) can easily be cured with an updated DST Report. .......................................................34

3.   Mr. Mustoe's use of DST Reports 4 and 5 is consistent with the Class definitions........................................34

4.   "[R]emoval" of plan language (pp. 27-28) ....................................35

D.   Mr. Mustoe's Use of Separate DST Reports to Determine Subclass and Class Members Is Not a Basis for Exclusion ......................................37

CONCLUSION..........................................................................................38

# TABLE OF AUTHORITIES

## C<small>ASES</small>

*Aetna Inc. v. Express Scripts, Inc.*,
   261 F.R.D. 72 (E.D. Pa. 2009) .............................................................................. 28, 29

*Amorgianos v. National R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...................................................................................... 16

*Audet v. Frasier*,
   332 F.R.D. 53 (D. Conn. 2019) ................................................................................. 23

*Barfield v. Cook*,
   2019 WL 3562021 (D. Conn. Aug. 6, 2019) ............................................................. 28

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*,
   2019 WL 4751883 (E.D. Pa. Sept. 30, 2019) ............................................... 16, 18, 27

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) .......................................................................................... 37

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................ 17

*Cates v. Trs. of Columbia Univ. in City of New York*,
   2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) .......................................................... 22

*Chen-Oster v. Goldman, Sachs & Co.*,
   114 F. Supp. 3d 110 (S.D.N.Y. 2015) ................................................................. 15, 17

*Dial Corp. v. News Corp.*,
   165 F. Supp. 3d 25 (S.D.N.Y. 2016) ........................................................................ 22

*Dover v. British Airways, PLC (UK)*,
   254 F. Supp. 3d 455 (E.D.N.Y. 2017) ......................................................... 16, 22, 25

*E.E.O.C. v. Morgan Stanley & Co.*,
   324 F. Supp. 2d 451 (S.D.N.Y. 2004) ......................................................... 17, 19, 38

*First Assembly of God Church v. Fondren*,
   2003 WL 25685226 (E.D. Tex. Jan. 8, 2003) ..................................................... 24, 29

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
   301 F.R.D. 116 (S.D.N.Y. Sept. 30, 2014) ............................................................... 17

*Fuller v. Summit Treestands, LLC*,
   2009 WL 1874058 (W.D.N.Y. May 11, 2009) ......................................................... 22

*Grand River Enters. Six Nations, Ltd. v. King*,
   783 F.Supp.2d 516 (S.D.N.Y.2011) ...................................................... 37

*Guild v. Gen. Motors Corp.*,
   53 F. Supp. 2d 363 (W.D.N.Y. 1999) ............................................... 16, 18

*I.M. v. United States*,
   362 F. Supp. 3d 161 (S.D.N.Y. 2019) .................................................. 15

*In re Capacitors Antitrust Litigation (No. III)*,
   2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ...................................... 26

*In re Lidoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ........................................ 24

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) .................................................................... 26

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   2018 WL 563144 (D. Mass. Jan. 25, 2018) ......................................... 26

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013) ................................................................ 23

*Joffe v. King & Spalding LLC*,
   2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ..................................... 16

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................. 15

*Lacy v. Cook Cnty., Ill.*,
   897 F.3d 847 (7th Cir. 2018) ............................................................... 26

*Lassen v. Hoyt Livery, Inc.*,
   No. 13-cv-1529, 2016 WL 7165716 (D. Conn. Dec. 8, 2016) ......... 24, 25

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ............................................................... 20

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ............................................................... 24

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
   232 F. Supp. 3d 558 (S.D.N.Y. 2017) ........................................... 16, 28

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ............................................................... 23

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ................................................................. 26

*Park W. Radiology v. CareCore Nat'l LLC*,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009) ................................................... 15

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) ................................................... 16

*RMH Tech LLC v. PMC Indus., Inc.*,
    352 F. Supp. 3d 164 (D. Conn. 2018) ............................... 16, 22, 30, 38

*Roach v. T.L. Cannon Corp*,
    778 F.3d. 401 (2d Cir. 2015) ................................................................. 20

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ................................................................. 28

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................ 16

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*,
    2016 WL 1072850 (W.D.N.Y. Mar. 18, 2016) .................................... 22

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202 (2d Cir.1984) .................................................................. 37

*Stevenson v. City of Seat Pleasant, Md.*,
    743 F.3d 411 (4th Cir.2014) ................................................................. 19

*Sumitomo Cooper Litig. v. Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001) ................................................................. 28

*Sykes v. Mel S. Harris & Associates*,
    780 F.3d 70 (2d Cir. 2015) ................................................................... 20

*U.S. v. Cochran*,
    79 F. Supp. 3d 578 (E.D.N.C. 2015) .................................................... 20

*U.S. v. Mack*,
    No. 3:13-cr-00054, 2014 WL 6474329 (D. Conn. Nov. 19, 2014) ......... 15

## RULES

Fed. R. Civ. P. 23 ............................................................................... 17, 22

Fed. R. Civ. P. 23(b)(3) ........................................................................... 20

Fed. R. Civ. P. 33(d) ........................................................................ 2, 3, 11

Fed. R. Evid. 702 .................................................................................................................. 15, 16

**O**THER **A**UTHORITIES

Commonwealth of Massachusetts Health Policy Commission, "Prescription Drug
    Coupon Study: Report to the Massachusetts Legislature" at 1 (July 2020) ............................ 25

## INTRODUCTION

Cigna styles its motion as a "Motion to Exclude" – in other words, a *Daubert* motion.  It is not.  It is an extension of their opposition to class certification.  Cigna does not contend that Mr. Mustoe lacks the necessary expertise to opine on the matters detailed in his report.  Cigna accuses Mr. Mustoe of being a mere "calculator, totaling up certain columns of pharmacy transaction data at the direction of Plaintiffs' counsel," but it does not challenge the accuracy of Mr. Mustoe's overcharge "calculat[ions]" or the reliability of Mr. Mustoe's methodology in making those calculations.  Defs' Mem. of Law in Supp. of Defs' Mot. to Exclude Launce B. Mustoe, JR. ("*Daubert* Mem.") [ECF No. 279] at 2. Instead, it challenges Plaintiffs' counsel's "direction[s]."  It faults Mr. Mustoe for failing to use the data that Cigna believes should be used and calculating overcharges in the manner Cigna believes should be done.  This is not a *Daubert* issue; it is a legal – and class-wide – issue about the proper calculation of damages in this case.  Whether a damage analysis must account for coupons, deductible-shifting and out-of-pocket maximums are class-wide, legal questions that are not properly raised in a *Daubert* motion challenging an expert supporting a Motion for Class Certification.

Cigna's motion identifies seven reasons for excluding Mustoe's declaration and testimony.  None has merit.

1)  Cigna argues that the use of "clawbacks" is not a "proper measure of relief," but Mr. Mustoe's use of clawbacks as the measure for overcharges is consistent with both Plaintiffs' legal theories and the evidence.

2)  Cigna contends that Mr. Mustoe's methodology improperly utilizes both the Client Rate and the Pharmacy Rate (both defined below) as a cap on class members' cost-share payments.  It does not.  The method simply determines, on a transaction by transaction basis, whether each class member's cost-share exceeded the Pharmacy Rate.  Mr. Mustoe did not

consider – and was not required to consider – transactions where Cigna adjudicated claims below the Pharmacy Rate as class members had no loss on those claims.

3)      Cigna claims that Mr. Mustoe's methodology should be excluded because he did not account for individuals' claim histories, including any deductible or out-of-pocket-maximum requirements.  *Daubert* Mem. [ECF 279] at 17-22.  It does not, because consistent with Plaintiffs' theory of liability, damages should be measured on a transaction-by-transaction basis rather than a plan-year basis.  If Cigna wants to make such a set-off argument, it has the burden of proving both the right to and amount of set off (although it does not possess and/or failed to produce the necessary data—*see generally* Plaintiffs' Memorandum of Law in Support of Motion to Strike Certain Arguments and Evidence filed herewith ("Mot. to Strike Mem.")).

4)      Cigna claims that Mr. Mustoe should have considered the possible use of coupons by class members in calculating overcharges.  Putting aside that Cigna did not track or record the use of coupons during the relevant period (or produce any such data), and is not able to point to a single example of the use of a coupon by a class member that affected Mr. Mustoe's overcharge calculations, the case law – none of which Cigna cites – demonstrates that potential use of coupons by class members is not a reason to deny class certification or exclude an expert report filed in support thereof.

5)      Cigna argues that Mr. Mustoe does not distinguish between plans of current and former self-funded plan customers.  There is no need for Mr. Mustoe to make this determination because Cigna is liable under either scenario.

6)      Finally, Cigna faults Mr. Mustoe's reliance on Cigna's own DST Reports to identify class members because of claimed limitations of the Reports, even though Cigna specifically "direct[ed] Plaintiffs" under Fed. R. Civ. P. 33(d) to use the Reports for the task that

Mr. Mustoe undertook. Moreover, the argument that Mr. Mustoe's methodology is deficient because he does not account for every possible variation in plan documents is the same argument that Cigna makes in its opposition to class certification:  there are too many variations in the plans to ever certify a class.  In addition to contradicting Cigna's direction under Rule 33(d) to use the Reports, this argument ignores both the law on class certification (and under *Daubert*) and the highly standardized nature of Cigna's business.  Cigna's DST Reports, in combination with boilerplate language and certain coding systems, permit identification of class members.  To the extent Cigna has identified limitations in the DST Reports it provided plaintiffs, these limitations can be easily overcome by tweaking and re-running the DST reports. And, to the extent there are any remaining limitations on the DST searches, as Cigna's expert, Mr. May admits, Plaintiffs can simply review the class member Plans.

In sum, none of these arguments – some of which are no more than a few lines long and lacking any case-law citations – either alone or together requires the exclusion of Mr. Mustoe's report or testimony.  Mr. Mustoe's calculation of the amount of classwide overcharges by using Cigna's claims data – which expressly tracked these overcharges – is not directly challenged in Cigna's Motion to Exclude.  Rather, using the cover of the motion to exclude, Cigna has simply trotted out more arguments opposing class certification and disagreements with plaintiffs' positions on the merits.[1]  None justifies the exclusion of Mr. Mustoe's opinions or the denial of class certification.

---

[1] Some of the alleged "deficiencies" Cigna points to arise solely from Cigna's failure to produce data as required by the Federal Rules of Civil Procedure. Cigna's substantial discovery abuses are detailed in Plaintiffs' Motion to Strike filed herewith.

## FACTUAL BACKGROUND

### I.      Cigna's business depends on standardization.

Cigna's business was both highly standardized and highly automated.  As a recently retired Cigna pharmacy product manager put it, "[W]e tried not to customize each individual employer's benefit that came to Cigna.  That would not be possible.  You have, you know, 6,000 clients.  You cannot have individual products for those clients." Ex. Q at 29:19-24[2].  The sheer volume of plans, plan documents and claims that Cigna handled in a year meant that its systems depended on the use of "boilerplate" language, "guidance" for both standard and the infrequent nonstandard benefits, and "standard edits" for even nonstandard benefits. *Id.*; Ex. L at 37:17-20 ("I believe the edits are standardized.  We don't want folks deviating too much from that . . . ."); *Id.* at 36:17-21 ("[Y]es, so if there's a nonstandard edit that's required, the analyst would just use that job aid to determine how to modify their documents, if necessary.").

### A.      "Boilerplate" language was used in "source pages" which were used to create plan documents.

Cigna maintained a repository of "boilerplate" provisions, or "source pages," to be used as part of Cigna's largely automated process used to generate plan documents.  These "source pages," used in both fully insured plans and administrative services only ("ASO") plans, are created and maintained by the State Filing Team, which is also responsible for filing language for approval with state insurance regulators. Ex. L at 47:24-48:3 ("Yes, this looks like what we call the source page, the boilerplate language that would come down an example of it with instructions on it."). These source pages are assigned a page code, such as HC-PHR3 v4, and stored in a system called the Document Source Tool ("DST").  *Id.*  at 44:5-17 ("[T]hat's a page

---

[2] Unless otherwise states, all references to "Ex. __" are to exhibits to the declaration of Meghan S. B. Oliver.

code that gets assigned to each page from the State Filing Team . . . . It appears in the pages.");
Ex. R. at 32:4-12. There are a limited number of available source pages—sometimes only one—
for a given benefit selection.

Once a "source page" has been approved by a state, different language cannot be used for
a fully insured policy in that state without additional approval. Ex. S ("Due to state filing
requirements and approvals, insured plans will continue to use Copay K logic. Insured clients
will be implemented with Copay G once the state filing process is complete.").  For ASO plans,
deviations from these standard provisions were discouraged. *See* Ex. L at 37:17-20; Ex. Q at
29:19-24; Ex. T at CIGNA00142284 ("Do not Sell: Copay K for ASO, or Copay G for insured
accounts in states where not allowed).

Consistent with the standardized nature of the business, this "boilerplate language" is
changed infrequently.  Ex. U at p. 2 of form (May 2016 form stating, "A comprehensive, end-to-
end review and update and refiling of pharmacy benefit language has not been conducted since
2010.  Lack of updated benefit plan language (a.k.a. 'boilerplate language') impacts C[igna
]P[harmacy ]M[anagement]'s ability to implement and administer plan designs that grow our
business (for ASO and insured clients).");  Ex. BU (stating in connection with 2016 language
change, "[i]f Cigna doesn't update benefit language into customer certificates or
coverage/booklets then: We face exposure under ERISA – through a regulatory audit or a lawsuit
filed by a customer (or, more likely, a class action by many customers) – for failure to follow the
coverage documents or, worse, breach of fiduciary duty.").  Because deviations from the
standard language were discouraged, and changes were infrequent, it is easy to track changes to
the source pages over time.

For example, the Subclass Plan language entitled the participant to pay no more than the lesser of the set (or "file") copay, the "amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge." It was known internally at Cigna as the "Copay G" language. Ex. V (email discussing Copay G standardization); Ex. W (email discussing Copay G language); Ex. S (PHA form requesting Copay G logic); Ex. X (HC-PHR3 04-10 V4); Ex. AE (HC-PHR3 04-10 V4). This language, which was included in a limited number of source pages, did not change from 2011 until 2016, when it was changed as part of the Certificate of Coverage Project's "end-to-end review and update of pharmacy product language" described above. Ex. Z (spreadsheet tracking effective date of "Your Payments" source pages); Ex. Y at CIGNA07715763 (2016 eCharting Checklist listing HC-PHR138 as the new "Your Payments" form code that replaced HC-PHR3 V4).   Prior to 2016, the "Copay G language" boilerplate was as follows:

- "In no event will the Copayment or Coinsurance for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge. Usual & Customary (U&C) means the established Pharmacy retail cash price, less all applicable customer discounts that Pharmacy usually applies to its customers regardless of the customer's payment source."

Ex. AA at CIGNA00006938 (HC-PHR3 04-10 V4); Ex. W at CIGNA00388460 (2012 email describing the above Copay G language as "language that was agreed to be included in the contracts"); Ex. Z ("Your Payments" tracking sheet).

In 2016, Cigna began to replace this language with the following boilerplate language:

- "After satisfying the plan Deductible, if any, your responsibility for a covered Prescription Drug Product will always be the lowest of:
  - the Copayment or Coinsurance for the Prescription Drug Product; or
  - the Prescription Drug Charge for the Prescription Drug Product; or
  - The Pharmacy's Usual and Customary (U&C) charge for the Prescription Drug Product."

Ex. AB (HC-PHR138 10-16 ET); Ex. Y CIGNA07715760 at 763 (2016 eCharting

Checklist listing HC-PHR138 as the new "Your Payments" form code that replaced "HC-

PHR3V4). There were no intervening changes made to the Copay G language.  Starting in

September 2012, Cigna conducted a "standardization" project and thereafter included "this

language in all ASO SPD's" unless a client secured approval through an "exception process"

governed by the Pharmacy Benefit Advisory Board ("PBAB"). Ex. AC at CIGNA00218848; Ex.

AD at CIGNA07729386 ("As of 9/1/2012 Co-pay option K for ASO clients requires PBAB

approval").  PBAB Guidance was to "[d]eny" the alternative copay K for ASO plans. Ex. AF.

Fully insured policies were limited to the benefit and language on file in a particular state.  Ex.

AG at CIGNA07497853 ("In order for us to approve copay G for a fully insured client, Cigna

has to be filed with the state to offer it"). Ex. BG at 42:6-12 (testifying that a reason for denying

a request by a fully insured plan for a nonstandard benefit is that "they have not filed language");

Ex. BI at CIGNA00236798 ("[U]nfortunately Fully insured Copay G filing has not been

approved.  Obviously we cannot agree to sell a product that we are not approved for, I'm

sorry.").

> **B.**     **An automated process used "boilerplate" source pages to create plan documents.**

A finalized plan document was the result of a system of standard questions, boilerplate

language and multiple coding systems that link information between Cigna's systems and

databases that enable Cigna to print out boilerplate Plan booklets.  After a client selects benefits,

that particular package of benefits for that client is assigned a "Benefit Option," or "Ben Opt,"

code, which serves as a "unique code" to identify a particular benefit setup for a client. Ex. L at

104:11-18.[3]  That "unique code" remains assigned to that particular benefit set up, and is used by the DST, the claims data, and various other systems as an identifier.  The benefit setup, including the associated Benefit Option Code is entered into a system called ePro.

After the benefit setup in ePro, DST is used to create the plan documents.  An "autofeed" runs between ePro and DST through which DST automatically pulls the benefit setup information "needed to pick the right [source] pages to create a document." Ex. R at 30:9-31:3. To the extent any necessary information is not automatically pulled from ePro into DST, a Cigna employee uses the benefit setup in ePro to answer a series of standard questions that have been pre-programmed into DST.  Ex. Q at 57:5-59:20; Ex. L at 20:22-22:25; Ex. AH (DST Job example).

Whether one boilerplate provision is automatically "pulled" instead of another depends on the instructions associated with those particular boilerplate provisions.  Each source page contains instructions for the use of the language.  *See, e.g.*, Ex. AI ("Your Payments" source page HC-PHR3 04-10 V1); Ex. X ("Your Payments" source page). These instructions are "charted" or coded into DST so that DST automatically pulls the correct language when the benefit selections are sent electronically from ePro or entered by the contract analyst. Ex. R at 30:9-31:3.  Take as an example some of the "boilerplate language" at issue in this case:

**Covered Expenses**

***If Dependents are covered; add highlighted text.***

If you or any one of your Dependents, while insured for Prescription Drug Benefits, incurs expenses for charges made by a Pharmacy, for Medically Necessary Prescription Drugs or Related Supplies ordered by a Physician, Cigna will provide coverage for those expenses as shown in the Schedule. Coverage also includes Medically Necessary Prescription Drugs and Related Supplies dispensed for a prescription issued to you or your Dependents by a licensed dentist for the prevention of infection or pain in conjunction with a dental procedure.

---

[3] These Ben Opt Codes usually give some indication about the setup of the plan.  For example, "OAP1" is "Open Access Plus 1," and "VIS" means "Vision."  "DENT1" stands for "Dental 1," and so forth.

8

Ex. AJ at CIGNA00194906. (excerpt; highlighting and shading in original); ECF 275-32 (Catholic Diocese of Arlington 2014 Plan). If dependent coverage had been selected in ePro, DST would automatically "pull" the version of this "Covered Expenses" source page that includes the gray-highlighted language based on the selection of dependent coverage and the coded instructions, which are seen highlighted in aqua. If dependent coverage had not been selected, the grayed text would have been automatically omitted from the language pulled.[4]

Each plan document created in DST was assigned a "CN Number" or "Certificate Number" (e.g., ASO1 or CN001, the former used for Administrative Services Only plans and the latter used for insured policies) that served as a version or inventory number for that particular client's plan documents. This "CN Number" was used to identify a particular document across different systems at Cigna. Unlike the Ben Opt code, the CN Number was not included in the claims data produced by Cigna. A Ben Opt code, then, is associated with a "benefit setup" and a CN Number is associated with a specific document. Ex. L at 34:8-23 (Ben Opt Code associated with benefit design and CN number associated with certificate).

Ben Opt codes are sometimes not populated in DST. In that case the Ben Opt code field may show "NULL." But, according to Cigna's corporate witness designated to testify about DST, Ben Opt codes were required in the DST system as of 2012, well in advance of when clawbacks began in 2014. *Id.* at 110: 6-11. The only exception to the Ben Opt Code

---

[4] Even the process for including provisions for nonstandard benefits in plan booklets was standardized. Ex. L at 36:4-8; 36:15-37:20 (discussing job aids which are used by analysts "to determine how to modify" for "things that can't be automated that might be nonstandard," and explaining, "I believe the edits are standardized. We don't want folks deviating much from that and changing the intent of the document."); Ex. AK at CIGNA00050500 (email describing the nonstandard approval process for Copay G before it became standard in September 2012, and warning that a failure to "include the exception language" "could create compliance exposure for CIGNA without our contracted network pharmacies").

requirement since 2012 would be for sample or "test" plans or draft or incomplete plans.  But, there should be no prescription drug claims corresponding to draft, test or incomplete plans because they never became effective. Therefore, missing Ben Opt Codes should be irrelevant to the Mustoe analysis.  Furthermore, to the extent a plan cannot be identified due to a missing Ben Opt Code in the DST Report, the actual plan documents can be reviewed, a point Cigna admits.[5] *Daubert* Mem [ECF 279] at 9, 19, 20; CHLIC's Second Supp. Resp. to Pltfs' Fourth Set of Interrogs. [ECF 275-12] at 6-7; Ex. B at 6-7, 10-11, 15-16, 19-20, 24-25, 28-30; Ex. AL at 7-8.

Once a draft document in DST was finalized, it was subject to client approval through a process known as "Policyholder Approval" or "PHA." Ex. R at 71:10-18. At that point, the client could make corrections and language changes that did not alter the previously agreed-upon benefit selections. *See e.g.*, Ex. S; Ex. R at 71:10-18 ("The PHA process I'll repeat again. That's when documents are sent out to the client or broker by the case install person and they review those documents, and they will come back with any questions or modifications for proposed things they want to do to those documents."); Ex. AC at CIGNA00218848 (mandating inclusion of boilerplate Copay G language "in all ASO SPD's" unless a client secured approval through an "exception process" governed by the Pharmacy Benefit Advisory Board ("PBAB"). ██

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████ *See, e.g.*, Ex. AM at CIGNA00001557. There was even less opportunity to change the language in fully

---

[5] Mr. Mustoe identified only fifteen clawback transaction out of over seventy-one million in the Class data and none in the Subclass data of more than thirty-two million claims that lacked a PLAN_OF_BEN code. Ex. P at ¶¶ 3-4. Thus, using either automated review by way of DST Reports, or manual review, Plaintiffs can match a class member with plan language for all but one prescription drug claim.

insured plans because only the language approved and on file with the state could be used. Ex. AG at CIGNA07497854

Following client approval or the expiration of the prescribed period, the finalized plan documents were stored in DST, as well as in Cigna's internal-facing FileNet, and made available to members on mycigna.com. Ex. R at 37:15-38:8; 77:13-78:18.   Both the Ben Opt Code associated with that particular benefit setup and the CN Number were associated with the plans stored in FileNet and Member Materials.  *Id.* at 36:8-36:25; 101:22-102:17.

## II.    DST searches serve as "eyes" on hundreds of thousands of plan documents.

All of this information—the boilerplate language contained in source pages, the Ben Opt Codes, and the CN Numbers—can be used to identify the plans of the members within the classes and subclasses.  As outlined in Plaintiffs' Motion to Strike, in its response to Plaintiffs' Interrogatories under Rule 33 (d), Cigna "direct[ed] Plaintiffs" to use the DST search capability to leverage the standardized nature of their systems and coding to obtain the information responsive to interrogatories from Plaintiffs asking for the identification of all plans containing the language at issue in this case and linking pharmacy benefit claims to those plans.  *See generally* Mot. to Strike Mem. at Part II.B.2.  Specifically, Cigna proposed using custom reports generated from text searches run across all plan documents stored in DST.  *Id.*  The system could only search specific strings of text. As Cigna's corporate witness testified, it was akin to searching the documents "with your eyes." Ex. L at 106: 23- 107:5. Cigna represented that the DST search capabilities did not offer advanced search capabilities such as proximity and Boolean searches, and for this reason, Plaintiffs tried to select the shortest unique phrases that would identify the provisions on which they rely without being over- or under-inclusive.

The first four DST Reports produced by Cigna and described by Mr. Mustoe in his report in support of Class Certification ("Mustoe Decl.") [ECF 210-1] at 10, included only the following six fields, which Cigna claimed were the only relevant fields: Account Number, Account Names, Document Type, CN Number, Funding Arrangement, and Effective Date. Mot. to Strike Mem. at II.B.2.a. Plaintiffs subsequently discovered that many additional fields were available to be produced, including Ben Opt Code and Contract State. Both of those additional fields were produced in the most recent two DST Reports that Cigna produced after Mr. Mustoe submitted his declaration in support of class certification. Cigna has agreed to re-run and produce the first four DST Reports with those additional fields, but has not done so yet. If and when those reports are produced, as Mr. Mustoe explains in his declaration, the combination of the Account Number and the Ben Opt Code, both of which appear in the DST Reports and the claims data, may permit greater precision in electronically identifying Plans in the Classes.

## III.    Cigna tracked Clawbacks in its pharmacy transaction data.

In addition to identifying members with the plans that have the relevant language, Mr. Mustoe proposed a methodology that could use claims data to further identify Plans in the Classes and create a methodology to calculate damages. Cigna maintains data for prescription drug claims, but during the relevant period, did not process pharmacy claims in-house but instead delegated this obligation to an outside vendor, Argus Health Systems ("Argus"). Argus provided electronic point-of-sale claims processing for all pharmacy claims. Ex. AN at 8:21-9:13.

When a member filled a prescription at an in-network pharmacy, the pharmacy's computers communicated with Argus's computers, rather than Cigna's. *Id.* at 9:18-10:14. Argus electronically transmitted to the pharmacy how much cost-share the pharmacy had to collect from the member and how much the pharmacy would receive in payment for the claim. *Id.* at

9:18-10:4; 55:3-11.  When a member paid a pharmacy more than the pharmacy was to be paid for the claim, that amount would appear on the pharmacy's computer screen at the point of sale and in the pharmacy claims data as a "negative reimbursement." *Id.* at 135:22-136:19; Ex. AO at DSTPS 003634 ("Point of Sale claim will show a negative amount when pricing calculations include the negative total paid"); Ex. K. at 294:10-19; Ex. AP at CIGNA00287642 ("The negative balance is required to be transparent/ visible to pharmacies. It is a request that Catamaran made and reviewed to be sure it was visible at POS."). The negative reimbursements reflected amounts that would be sent or credited back to Cigna. Ex. AN at 65:24-67:9.  The negative reimbursements were referred within Cigna as "clawbacks." Ex. AQ ("The PBM 'clawed back' $5 by charging a copay $5 higher than what the PBM paid the pharmacy and later, taking the $5 back from the pharmacy."); Ex. K at 276:12-277:6; Ex. AR ("What does the current reconciliation statement that goes to the pharmacy that identifies the B transaction as a withhold actually say? Does it say Cigna CLAWBACK or something horrendous like that?").

Five times a month, Argus sent Cigna this transaction data in the form of a paid claims tape ("PCT").  Ex. AN at 50:3-7, 82:20-24. The negative reimbursements, or "clawbacks," are reflected on a transaction-by-transaction basis in the pharmacy claims data maintained and produced by Cigna. Ex. AS at 24:3-26:25. Unless a claim was subsequently reprocessed, those PCTs reflected the same amounts due to a pharmacy that were transmitted to the pharmacy at the point of sale.  Ex. AN at 54:18-55:11. Cigna has produced certain fields from the pharmacy claims data, including the amounts due to a pharmacy, to Plaintiffs. Mustoe Decl. [ECF 210-1] at 6.

Cigna produced 56 fields of data out of hundreds of available fields for each claim.  *Id.*; Ex. AT (Claims data definitions for Proclaim). Cigna represented that it produced all fields

"relevant" to calculating damages in this case.  Mot. to Strike Mem. at II.B.2.c. Among other relevant fields, that data includes individual deductible payments made for prescription drugs, but does not show the cumulative amount a member has paid toward a deductible or out-of-pocket-maximum during a plan year. Ex. AU (claims fields descriptions from CIGNA07777352); Mot. to Strike Mem. at II.B.2.c.  Additionally, no medical claims data was provided which would be necessary to calculate "combined deductibles," which can be satisfied through a combination of medical and pharmacy claims.  Data necessary to calculate accumulations toward out-of-pocket requirements are similarly not included in the data produced by Cigna. As he explained in his declaration, Mr. Mustoe considered twenty of the fields produced to be "material to calculating 'Clawbacks'" on a transaction-by-transaction basis. Mustoe Decl. [ECF 210-1] at 6-7.

The claims data contains additional fields which link claim transactions to Plans. Specifically, the "PLAN_OF_BEN" field in the claims data is the same as the Ben Opt Code in Cigna's other systems, including DST, and the "RX_ACCT_NUM" field in the claims data is the same employer Account Number used in Cigna's other systems, including DST.  Now that the truth has begun to emerge (*see generally* Mot. to Strike Mem. at Part II.B.2), Plaintiffs believe that, in combination, those fields can be used to link a particular claim in the claims data to a particular Plan document.  And, as set forth above, except with respect to zero out of roughly 32 million Subclass clawback claims, and fifteen (15) out of over seventy-one million Class clawback claims, the DST System can search for Plans with the operative Plan language. Ex. P at ¶¶ 3, 4. So, except with respect to one out of over seventy-one million claims, Plaintiffs should have a viable methodology for (1) identifying each specific plan associated with each specific

14

prescription drug claim and (2) electronically reviewing each such plan to determine if it has the operative language.[6]

## ARGUMENT

### I.  Legal Standard

Rule 702 of the Federal Rules of Evidence, which governs admissibility of expert testimony, requires that such testimony be "both relevant and reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  Under Rule 702, expert testimony is reliable if (1) it is "based on sufficient facts or data"; (2) it is "the product of reliable principles and methods"; and (3) the witness has "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The reliability factors a court may consider depend on the nature of the case and "[n]o single factor is necessarily dispositive."  *See Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009)

"The Second Circuit has made clear that *Daubert* contemplates liberal admissibility standards, and reinforces the idea that there should be a presumption of admissibility of evidence."  *U.S. v. Mack*, No. 3:13-cr-00054, 2014 WL 6474329, at *1 (D. Conn. Nov. 19, 2014).  Although the district court has "broad discretion in the matter of the admission or exclusion of expert evidence," *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (citation omitted), "the rejection of expert testimony is the exception rather than the rule," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R.

---

[6] Cigna's expert. Mr. May, similarly used the Ben Opt Code and Account Number in the claims data to identify the specific plan associated with a specific claim in the claims data. *See* Ex. M at 183:20-184:184:19. May testified that he couldn't remember whether he actually read the entire Plan document or used the DST search process to "read" the plan for him. Ex. M at 185:8-185:13; 186:18-187:8.  So, he is not sure which methodology he followed with respect to step 2. But, regardless of whether the plan was read manually or electronically, both experts either used or could use methodology combination of the Ben Opt Code and Account Number to identify a specific plan associated with a specific claim.

Civ. P. 702 advisory committee's note to 2000 amendment); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) ("In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds serious flaws in reasoning or methodology.") (internal quotation omitted).

Accordingly, if an expert's opinions are simply "debatable" or "shaky" and "can be adequately tested during trial[, they] should not be excluded under *Daubert*'s liberal standard, unless the flaws are so large that the expert 'lacks good grounds for his or her conclusions.'" *Joffe v. King & Spalding LLC*, 2019 WL 4673554, at *3 (S.D.N.Y. Sept. 24, 2019) (quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).  If there are any "[m]inor flaws in an expert's analysis," they "can be probed through cross-examination." *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 572 (S.D.N.Y. 2017) (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010)); *see also Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 459 (E.D.N.Y. 2017) (when "an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court.") (quotation omitted)); *RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 195 (D. Conn. 2018) ("Again, as with his credentials, any issues regarding [the expert]'s methodology go primarily to weight, not admissibility.").

Likewise, differing opinions as to appropriate methodology present fact questions, and go to weight, rather than admissibility. *See, e.g.*, *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369 (W.D.N.Y. 1999) ("[T]he mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable."); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2019 WL 4751883, at *9 (E.D. Pa. Sept. 30, 2019) (differing opinion as

to the proper method for calculating damages "demonstrates a fact question" that must be resolved by a jury "because it requires a credibility determination and comparison of each expert's methodology."); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 458 (S.D.N.Y. 2004) ("Disputes regarding the proper variables to employ . . . are more properly left for juries to consider and to decide.").

At the class certification stage, the scope of the *Daubert* analysis "is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Chen-Oster*, 114 F. Supp. 3d at 115 (citation omitted); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 126 (S.D.N.Y. Sept. 30, 2014) (same). *See also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (at class certification, an expert's model for calculating damages need only survive "minimal scrutiny").

## II.    Mr. Mustoe's Methodology for Calculating Damages Is Reliable and Matches Plaintiffs' Liability Theory

Cigna contends that Mr. Mustoe's opinions are "unreliable insofar as he purports to calculate the relief to which class members may be entitled in a way that is inconsistent with applicable law, undisputed aspects of benefit design, and Plaintiffs' interpretation of the plans." *Daubert* Mem. [ECF No. 279] at 14.  Mr. Mustoe's opinions are not unreliable for any of the reasons offered by Cigna, or for any other reason.  He presents a methodology for calculating damages that can be performed on a classwide basis and is consistent with Plaintiffs' liability theory.

### A.    Cigna's different opinion about whether "clawbacks" can be used as a measure of overcharges is not a basis for exclusion.

Cigna contends that Mr. Mustoe's use of "clawbacks" is not a proper measure of relief under Plaintiffs' theories of liability because it "does not purport to calculate what a class member ***should have paid*** under the terms of his or her plan," or what they "would have paid . . .

had CHLIC not included any 'uniform misrepresentations' in their plan documents." *Daubert*

Mem. ECF  279] at 14-17.  This objection, however, amounts to nothing more than Cigna

reframing Plaintiffs' legal theories and the evidence in the case.  Neither is a basis for excluding

Mr. Mustoe's opinion.  *See, e.g.*, *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369

(W.D.N.Y. 1999); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 2019 WL 4751883, at

*9 (E.D. Pa. Sept. 30, 2019).

 Plaintiffs alleged in their Complaint that under the terms of their Plans, members

overpaid for their prescriptions where their cost-share payments exceeded the pharmacy

reimbursement rate. Pl.'s Second Am. Consol. Compl. ("SACC") [ECF 198] at ¶ 2.  Those

overpayments equal "the dollar difference between the amount that [Cigna] required members to

pay for copayments or deductible payments and the amount that Cigna, through Catamaran,

actually paid to the pharmacy for prescription drugs."  *Id.*  A "clawback" represents the amount

of an overpayment because it is the amount that is *not* "actually paid to the pharmacy." See e.g.,

*Id.* ("Cigna also could secretly take or "claw back" (Cigna's term) from the pharmacies this

'spread,' or member's 'overpayment' (Cigna's term), from the pharmacy for Cigna's own

benefit"); *Id.* at 3 ("'senior management determined that member 'overpayments' were 'a

$100M+ issue for us' and they issued an 'urgent request' to capture the member's

'overpayments' through 'clawbacks.'"); Ex. AN at 66:15-22 (Q: "And that difference, the

difference between the amount the pharmacy was to be paid and the amount the member paid

would be a negative reimbursement to the pharmacy; is that right? . . .  A: Yes.").  Cigna often

referred to this clawed-back amount as a "negative reimbursement."  *See, e.g.*, Ex. AV at 48:8-

13; Ex. K at 226:7–227:7; 276:12–277:6.  These negative reimbursements were recorded on a

"transaction basis" in Cigna's "claims records."  Ex. AS at 24:3-26:25; Ex. AN at 53:25-54:6.

They represent indisputable proof in Cigna's data of the amount of the overcharges.

Consistent with this evidence and Plaintiffs' theory of liability, Mr. Mustoe explained

that, "'[c]lawbacks' in this case occur when a participant of a relevant plan pays a copayment or

deductible that exceeds the Pharmacy rate and Cigna claws back the overcharges." Mustoe Decl.

[ ECF 210-1] at 12.  He further explained that "Cigna's own data set clearly shows the amount of

each Clawback on a transaction basis." *Id.* at 12.  Specifically, the PHARM_PD_AMT field in

the claims data produced by Cigna "is normally used to account for the amounts that Cigna pays

to the pharmacy, but when the amount in the field is negative, it signifies a clawback." *Id.* at 12.

Thus, the total amount of overcharges (i.e., Clawbacks) "can be calculated by summing the

negative amounts in the PHARM_PD_AMT field." *Id.* at 14.

Cigna may disagree with Plaintiffs' allegation (and the evidence) that the clawbacks

equal the members' overpayments under the terms of their plans, but that difference of opinion

about what the clawbacks represent and whether it is appropriate to use them in calculating

classwide damages is not a basis for excluding Mr. Mustoe's opinion.  *See, e.g.*, *E.E.O.C. v.*

*Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 458 (S.D.N.Y. 2004).

**B.      Excluding claims where the member paid a client rate that was lower**
**than the pharmacy reimbursement rate is consistent with Plaintiffs'**
**theory of liability.**

Cigna contends that Mr. Mustoe's methodology is inconsistent with Plaintiffs' theory of

liability because he sometimes uses the "Client Rate" as a cap when it was lower than the

Pharmacy Rate.[7]  *Daubert* Mem. [ECF 279] at 22-23.  This argument mischaracterizes both Mr.

---

[7] Cigna looks to Plaintiffs' interrogatory responses, rather than their Complaint, in characterizing Plaintiffs' theory of liability.  Plaintiffs' complaint sets forth their theory of liability and should be relied upon for this purpose rather than their discovery responses.  *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 420 (4th Cir.2014) ("[D]iscovery is

Mustoe's methodology and Plaintiffs' theory of liability.  Individuals were only harmed if they were overcharged because their cost-shares exceeded the Pharmacy Rate.  If the client rate was lower than the Pharmacy Rate, and the individual's cost share did not exceed the Pharmacy Rate, then the individual was not injured as to that transaction.  For those transactions, Class members properly paid a "portion" of the "charges made by a pharmacy," and Subclass members' cost-share payments did not "exceed the amount paid by the plan to the pharmacy."  Those individuals did not overpay for their prescriptions and Mr. Mustoe properly excluded them from the class. While Cigna may contend that class members were "undercharged" on these transactions, this is at best an unpleaded and unproven setoff argument which, as set forth below, is not a basis for denial of class certification much less a Daubert motion.

"All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"  *Sykes v. Mel S. Harris & Associates*, 780 F.3d 70, 88 (2d Cir. 2015) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)); *see also Roach v. T.L. Cannon Corp*, 778 F.3d. 401, 407 (2d Cir. 2015) ("*Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury.").  By only measuring clawbacks where class members paid more than the Pharmacy Rate, Mr. Mustoe's methodology "measures damages that result from the class's asserted theory of injury," and should not be excluded.

---

an exercise in fact-finding, and it is the complaint—not depositions or interrogatories—that provides 'fair notice' to defendants of the allegations against them."); *see also U.S. v. Cochran*, 79 F. Supp. 3d 578, 586 (E.D.N.C. 2015) (noting "plaintiff may not rely upon discovery responses to introduce a new theory of liability into trial"). Moreover, Cigna's interpretation of the discovery responses is wrong.

**C.    Mr. Mustoe's calculation of damages on a transaction-by-transaction basis is consistent with Plaintiffs' theory of liability.**

Even though Cigna previously represented that it had produced all relevant data and that it did not possess deductible and out of pocket maximum accumulator data (Mot. to Strike Mem. at Part II.B), Cigna **now** argues that Mr. Mustoe's testimony and report should be excluded because it does not account for members' deductible and out-of-pocket maximum requirements. *Daubert* Mem. [ECF No. 279] at 17-22.  For the reasons set forth in the Motion to Strike, the Court should reject this argument. But even if the Court considers the argument, it provides no basis for excluding Mr. Mustoe's opinion.

Cigna's position is that the plans at issue require taking a member's deductible[8] and out-of-pocket maximum obligations into account in calculating damages, but this is merely an argument that Plaintiffs' damages should be set off against transactions where they paid less. *Daubert* Mem. [ECF 279] at 17-22. This argument fails as a matter of law because set-off is an affirmative defense that has not been plead or proven by Defendant.  It should not be considered at the class certification stage of the case.  *See* Plaintiffs' Reply Memorandum in Further Support of Class Certification filed herewith ("Class Cert. Reply") at Part II.D.

Moreover, Plaintiffs allege that Cigna acted in violation of the plan terms each time it overcharged a member for a prescription, not whether a member was overcharged on a net basis over the course of a plan year. SACC [ECF 198] at 5 ¶ 6. This is consistent with the plan language and the real-time point-of-sale claims adjudication.  The class and subclass are composed of members with cost-share payments that "exceed[ed] the amount the pharmacy agreed with Cigna or the pharmacy benefit manager to accept for such drugs on a ***transaction-***

---

[8] Cigna's challenge regarding deductible shifting only applies to Plaintiffs' deductible class claims, not to claims brought by the proposed subclass or class copayment claims, which consist only of copayment overpayments.

*by-transaction basis* and the excess amount is credited or transferred to Cigna or the pharmacy

benefit manager." Pltfs' Mot. to Am. Proposed Class Definition [ECF No. 253] at 1-2 (emphasis

added).  Therefore, Mr. Mustoe's calculation of overcharges per transaction is consistent with

Plaintiffs' theory and the proposed class definition. Cigna does not claim that Mr. Mustoe does

not perform those calculations accurately or reliably. He does. That is sufficient for purposes of

Rule 23 and *Daubert*.  *See, e.g.*, *Dover v. British Airways, PLC (UK)*, 254 F. Supp. 3d 455, 459

(E.D.N.Y. 2017). Cigna is simply wrong when it argues (*Daubert* Mem. [ECF 279] at 18) that

Mustoe needed to account for class member claims history under Plaintiffs' theory of the case.

     Even if the Court gives any weight to Cigna's argument that deductibles and out-of-

pocket maximums must be accounted for in a damages analysis, the fact that Mr. Mustoe's

analysis does not account for these factors goes to weight, not admissibility.  As many courts

within this Circuit have recognized, "[d]isputes as to the . . . faults in his use of . . . a [particular]

methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility

of his testimony."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 2016 WL 1072850, at *1

(W.D.N.Y. Mar. 18, 2016) (first, third alterations in original) (quoting *Fuller v. Summit

Treestands, LLC*, 2009 WL 1874058, at *5 (W.D.N.Y. May 11, 2009)); *RMH Tech LLC v. PMC

Indus., Inc.*, 352 F. Supp. 3d 164, 195 (D. Conn. 2018) ("Again, as with his credentials, any

issues regarding [the expert]'s methodology go primarily to weight, not admissibility."); *Dial

Corp. v. News Corp.*, 165 F. Supp. 3d 25, 42 (S.D.N.Y. 2016) ("Ultimately, the parties' many

disagreements over MacKie-Mason's methodologies go to the weight, not admissibility of

MacKie-Mason's testimony."); *Cates v. Trs. of Columbia Univ. in City of New York*, 2020 WL

1528124, at *7 (S.D.N.Y. Mar. 30, 2020) ("[A]lthough Defendant finds various flaws in the

process used by Dominguez in arriving at her opinion, those flaws go to the weight, not its admissibility, of Dominguez's opinion.").

Finally, if it were necessary to to account for deductibles and out-of-pocket maximums, courts have recognized that any such methodology could be employed on a class-wide basis. To the extent any individualized calculations were required, those can be addressed at a later juncture. Thus, this "deductible shifting" would not provide a basis for denying class certification. *See, e.g.*, *Audet v. Frasier*, 332 F.R.D. 53, 74 (D. Conn. 2019) ("It has long been recognized that the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification." (alteration in original) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015))); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (affirming district court's rejection of defendant's *Daubert* challenge and noting because expert's proposed model "provides for a universal calculation of damages," any "potential need for manual input of certain customers" did not warrant exclusion).

### D. The omission of coupon usage from Mr. Mustoe's methodology was reasonable due to the unidentified, and likely very small, number of class members affected.

Cigna further contends that Mr. Mustoe's methodology is "overbroad" because, Cigna speculates, it ***might*** include transactions for which class members used coupons and therefore paid less than the Pharmacy Rate. *Daubert* Mem. [ECF No. 279] at 23.

Cigna and its expert, Dr. Sean May, did not identify, or even attempt to quantify, the alleged "problematic" group of claims for which coupons were used. Nor could they. Cigna did not maintain (or produce in this action) data on coupon usage. Declaration of Sean M. May, Ph.D. at ¶¶ 31, 76. As discussed in the Motion to Strike Memo, Cigna represented to Plaintiffs that they had produced all data that was "relevant for purposes of this case." Mot. to Strike

Mem. at Part II.B.2.c.  It did not produce *any* coupon usage data and should not now be permitted to exclude an expert or defeat class certification by arguing about data that it did not produce and that may not even exist.

Indeed, the only evidence of coupon usage that Cigna offers is the deposition testimony of Roger Curol, who admitted to using coupons.  Ex. AW at 114:1-12.[9]  But because Mr. Curol is not a class member, Cigna has failed to identify even a single coupon transaction that would be included in calculating class members' damages.  Experts cannot be excluded based on mere speculation.  *See First Assembly of God Church v. Fondren*, 2003 WL 25685226, at *5 (E.D. Tex. Jan. 8, 2003) ("[T]his Court first notes it is not convinced that Defendant has met its initial burden of sufficiently calling into question the [expert] testimony of Mr. Zona.  ***Defendant did not provide the court with conflicting evidence or expert testimony***." (emphasis added)); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (vacating denial of class certification when, notwithstanding existence of uninjured members, defendants gave "no indication how many such individuals actually exist"); *In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *11 (N.D. Cal. Feb. 21, 2017) (rejecting defendants' argument against class certification in part because defendants could not "definitively show" class contained uninjured members).  And Cigna should not now be permitted to rely on its own shoddy recordkeeping to argue that Mr. Mustoe's opinion should be excluded.  *Lassen v. Hoyt Livery, Inc.*, No. 13-cv-1529, 2016 WL 7165716 at *9 (D. Conn. Dec. 8, 2016).

---

[9] Mr. Curol testified about using coupons during 2015. During that year, Mr. Curol was a member of a Great West plan, which are not part of the Classes.  Mr. Blocker, who is only a member of the RICO class and subclass, admitted to using discount cards through United Networks of America and MedImpact, but it is not clear that these transactions were submitted as in-network transactions under his Cigna insurance.  On a summary sheet of his transactions printed by his pharmacy, these companies are shown as the insurers for certain of Blocker's prescription drug claims rather than Cigna.  AX at 143:7-144:7.  Many transactions also appear as "cash" transactions rather than claims submitted to insurance.  *Id.* at 106:7-107:14.

Research about the volume of prescription drug coupon usage indicates that there may be few if any clawback claims that could have involved coupons. "Prescription drug coupons are offered almost exclusively on branded drugs dispensed in the U.S. . . ." Commonwealth of Massachusetts Health Policy Commission, "Prescription Drug Coupon Study: Report to the Massachusetts Legislature" at 1 (July 2020), *available at* https://www.mass.gov/doc/prescription-drug-coupon-study/download. "Among commercial prescription fills where a coupon could have been used, the percent of claims in which a coupon was used increased from 2.1% in 2012 to 15.1% in 2018. Still, ***the percentage of all drug claims that used a coupon in 2018 was quite low (3%)*** because most prescription fills are for generic drugs (which do not offer coupons)." *Id.* at 2.

Mr. Mustoe analyzed the transaction data using the list of "Top drugs by total coupon spending, 2018" from Exhibit 9 of this Massachusetts Study. Ex. P at ¶ 9. "Out of the Class's approximately 71,058,849 Clawback transactions, only 13,189 (.02%) were in connection with the purchase of the top twenty drugs by total coupon spending in 2018. Out of the Subclass's approximately 32,045,556 Clawback transactions, only 245 (.001%) were in connection with the purchase of the top twenty drugs by total coupon spending in 2018." *Id.*

Even assuming class members are not entitled to coupon payments, the lack of any analysis in Mr. Mustoe's original methodology concerning coupons has now been addressed. *Id.* Any shortcomings in this analysis are due to deficiencies in Cigna's own recordkeeping and are not a basis for excluding his opinion. *Lassen*, 2016 WL 7165716 at *9. Moreover, the tiny numbers of members affected by the argument (.02% and .001%) also weigh against exclusion. *See, e.g.*, *Dover*, 254 F. Supp. 3d at 462 n.2 ("[E]ven though a small number of class members may not have been injured depending on the method of calculating damages adopted by the

finder of fact, that is not enough to preclude class certification, let alone compel the exclusion of expert testimony."); *In re Capacitors Antitrust Litigation (No. III)*, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018) (holding that neither the Federal Rules of Civil Procedure nor *Daubert* "require proof of impact on each purchaser before a class can be certified"); *Lacy v. Cook Cnty., Ill.*, 897 F.3d 847, 864 (7th Cir. 2018) (finding even though class may have been overbroad, class certification appropriate because "defendants have not suggested how many of these individuals could not have been injured . . . , let alone shown 'a great many' who evaded harm"); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("[I]t is difficult to understand why the presence of uninjured class members at the preliminary stage should defeat class certification.").

Cigna's argument about coupon usage boils down to nothing more than a contention that a particular variable was not considered. That does not warrant exclusion under *Daubert*. In *In re Capacitors Antitrust Litigation (No. III)*, the court granted a motion for class certification after it declined to exclude a plaintiff's expert, even though he allegedly had "failed to account for rebates and discounts on a classwide basis." 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018). The court held that such challenges "go to weight and not admissibility." *Id.*; *see also Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) ("[I]t is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results." (alteration in original)); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018 WL 563144, at *7 (D. Mass. Jan. 25, 2018) (rejecting reliability challenge to expert opinion that did "not account for Medicis rebates and coupons" and holding that opinion could be challenged through cross-examination, opposing expert opinion and "other traditional methods"); *GlaxoSmithKline LLC*, 2019 WL 4751883, at *8 (denying motion to exclude testimony because expert's decision not to factor rebates into

damages calculation did not render analysis flawed, but rather "demonstrates a fact question the jury must resolve because it requires a credibility determination and comparison of each expert's methodology").

Mr. Mustoe has demonstrated a reliable methodology for calculating damages on a class-wide basis. All of Cigna's criticisms of Mr. Mustoe's methodology are differences of opinion about what variables to use (*e.g.*, coupons), or how to perform the class-wide damages calculation (*e.g.*, transaction-by-transaction or plan-year; are clawbacks an adequate measure of the overpayment; should transactions where the cost-share did not exceed the pharmacy rate be included). None justifies excluding his opinion or denying class certification.[10]

## III. Mr. Mustoe's Methodology Reliably Delineates the Class and Subclass by Using DST Reports[11]

Cigna argues that "[t]here is no way to identify *all* variations of alternative plan language without a review of the plan documents," and that it has included "just some of the inconsistencies" in its brief. (emphasis added). *Daubert* Mem. [ECF 279] at 9, 27.[12] This argument implicitly challenges the reliability of Mr. Mustoe's methodology in ascertaining class members. Critically, Cigna admits that the class is ascertainable from looking at "*all*" plans. Mustoe's analysis simply provides an automated methodology to identify almost all—if not all— class and subclass Plans. Those that cannot be reliably identified through this electronic,

---

[10] Cigna's argument that Mr. Mustoe failed to distinguish between active from inactive ASO accounts, *Daubert* Mem. [ECF 279] at 24, fails because Cigna is equally liable in both circumstances. *See* Class Cert. Reply at Part II.E.

[11] To date, Cigna has produced only two DST Reports with Ben Opt Codes. *See* Mot. to Strike Mem. at II.C.1. Mr. Mustoe has reserved his right to supplement his damages report after receiving the updated DST Reports with Ben Opt Codes. Ex. AY at 10.

[12] Cigna's argument that Mustoe's argument fails to account for differences in Plan design, *Daubert Mem.*[ECF 279], 17-18 whatever that means, is irrelevant. This case is governed by the terms of the relevant Plans.

automated methodology can, as Cigna admits, be reviewed manually. Class Cert Reply at Part
II.A.

Cigna's heavy reliance on plan language "variations" ignores that Cigna's systems and
plan language were actually highly standardized. Ex. Q at 29:19-24.  The use of DST Reports,
which show the results of text searches run across Cigna's plan documents, to identify the plans
that include the relevant language in Class members' plans is reliable.  Indeed, Cigna "direct[ed]
Plaintiffs" to use DST Reports to tie claims to plan language.  Mot. to Strike Mem. at Part I.

Cigna points to a number of "mismatches" between plan language and Plaintiffs' class
definitions that Cigna contends are flaws sufficient to render Mr. Mustoe's identification of class
members unreliable.  Even if the Court found the supposed "mismatches" to be material, and
they are not, they can be resolved either with a revised DST Reports from Cigna, or the Court
can minimally revise the class definitions. *See Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir.
1993) ("A court is not bound by the class definition proposed in the complaint . . . . "); *Sumitomo
Cooper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) ("[T]he district
court is often in the best position to assess the propriety of the class and has the ability. . . to alter
or modify the class, create subclasses, and decertify the class whenever warranted."); *Barfield v.
Cook*, 2019 WL 3562021, at *9 (D. Conn. Aug. 6, 2019) ("I agree with Defendant's objections,
and so I modify the class definition").   None of these issues justify excluding Mr. Mustoe's
opinion or denying class certification.  *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers
LLP*, 232 F. Supp. 3d 558, 572 (S.D.N.Y. 2017) ("Minor flaws in an expert's analysis" "can be
probed through cross-examination") (internal quotation omitted); *see also Aetna Inc. v. Express
Scripts, Inc.*, 261 F.R.D. 72, 81 (E.D. Pa. 2009) (finding that "'flaws' in an expert's investigative
process do not render the opinion excludable").  Anything beyond the inconsistencies specified

by Cigna is speculation and not a basis for excluding Mr. Mustoe's opinions.  *See e.g.*, *First Assembly of God Church v. Fondren*, 2003 WL 25685226, at *5 (E.D. Tex. Jan. 8, 2003).

### A.      DST Report 1 is not overbroad

DST Report 1 identified all plans that included the language "exceed the amount paid by the plan to the Pharmacy."  Mr. Mustoe used DST Report 1 to identify the members of the subclass.  Mustoe Decl. at 10-11.  Cigna argues that the specific search term Plaintiffs chose to identify subclass members is overbroad because it does not match exactly the language of the subclass definitions, "in no event will the Copayment . . . exceed the amount paid by the plan to the Pharmacy."  *Daubert* Mem. [ECF 279] at 8.  But because DST's search capabilities are rudimentary (and do not include, for example, Boolean, fuzzy, or proximity searches), Plaintiffs sought to identify the shortest unique phrase necessary to identify the subclass members.  The phrase Plaintiffs chose is an excerpt of Cigna's "Copay G language." It does not appear anywhere else in any plan and, therefore, it does not identify any plan other than plans with the applicable Subclass language.  Cigna does not dispute this.

Cigna's argument seems to be that DST Report 1 is overbroad because it includes coinsurance plans even though they are not included in the Subclasses.  Mr. Mustoe accounts for this overbreadth by excluding coinsurance claims from his calculations.  Mustoe Decl. at 13-14.  His methodology is thus consistent with Plaintiffs' theory of liability.

### B.      Any issue with DST Report 2 (the language of which was proposed by Cigna) can easily be cured with an updated DST Report

Cigna claims that DST Report 2 is underinclusive because it includes only plans with the language "***incurs*** expenses for charges made by a Pharmacy," but does not include plans that include "***incur*** expenses for charges made by a Pharmacy."  The difference in conjugation can be explained by the selection (or not) of dependent coverage.  *See supra* at Factual Background,

Part I.B. First, the use of "incurs" for DST Report 2, which Cigna now claims is underinclusive, was proposed by Cigna (on April 24, 2019).[13] Second, the boilerplate source page that contains this provision does not include a variation with "incur" and instead, Cigna's plan language templates simply adopt poor grammar for Plans without dependent coverage. *See supra at* Factual Background, Part I.B.  Third, DST did not pick up "incur" because it lacks basic search capabilities like searching for conjugates and wildcards. Regardless of the reasons, this omission is easily remedied by running a DST report for "***incur*** expenses for charges made by a Pharmacy" to identify the previously omitted plans.[14] On July 28, 2020, Plaintiffs served a discovery request for a list of plans with the phrase "incur expenses for charges made by a pharmacy."  Cigna has not yet produced that DST report.

    **C.**    **Inconsistencies caused by standard language changes in 2016 and 2017**

      Cigna identifies a number of alleged inconsistencies between the DST Reports 3, 4, and 5 and the class definitions.  All can be explained by the overhaul of Cigna's boilerplate language in 2016 and 2017, and can be remedied.  None justifies excluding Mr. Mustoe's opinion.  *RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 195 (D. Conn. 2018) ("Again, as with his credentials, any issues regarding [the expert]'s methodology go primarily to weight, not admissibility.").

      As part of the Certificate of Coverage Project's "end-to-end review and update of pharmacy product language" in 2016, (*see supra* at Factual Background, Part I.A), Cigna made

---

[13] April 29, 2019 email from Cigna's outside counsel to Plaintiffs' counsel.

[14] Plus, plans with "incur" are simply excluded from the class definition as currently drafted. While Plaintiffs believe it would be appropriate to include "incur" plans, the fact that they are excluded is not a basis to challenge the sufficiency of the existing class definition. To the contrary, the class as currently defined is clear and ascertainable, even if it could be broader with the inclusion of "incur" plans.

two changes that are relevant here. First, Cigna introduced the term "Prescription Drug Charge" and began using it in plans.  Ex. Y at CIGNA07715765.  This term was identified by DST Report 4.  Second, Cigna simultaneously began substituting the older term "Prescription Drugs and Related Supplies" with the new term "Prescription Drug Products." Ex. Y (2016 eCharting Checklist documenting replacement in DST of old boilerplate language with new boilerplate language).

Plaintiffs did not initially request a DST Report for the term "Prescription Drug Products" because that change was made at the same time as the introduction of the term "Prescription Drug Charge" as part of the global boilerplate review. In other words, any plan that has one of those two terms will have both.  Thus, DST Report 4 also effectively identifies all plans that include "Prescription Drug Products."

Both of these new terms — "Prescription Drug Charge" and "Prescription Drugs and Related Supplies" — were inserted in the Master Prescription Drug Benefit Schedule when it was amended beginning in late 2016 as follows:

| Old Schedule language | "[t]o receive Prescription Drug Benefits, you may be required to pay a portion of Covered Expenses for **<u>Prescription Drugs and Related Supplies</u>**" |
|---|---|
| Schedule language introduced in 2016 that (DST Report 4)<br><br>States that deductibles (but not copayments) will be based on the Prescription Drug Charge | "[t]o receive Prescription Drug Benefits, you may be required to pay a portion of the Covered Expenses for **<u>Prescription Drug Products</u>**.  That portion includes any applicable Copayment, Deductible and/or coinsurance.<br><br>As applicable, **<u>your Deductible or Coinsurance payment will be based on the Prescription Drug Charge</u>** . . . ." |

*Compare* Ex. AZ (Prescription Drug Benefit Master Schedule immediately preceding 2016 language changes) *with* Ex. BA (Prescription Drug Benefit Master Schedule immediately following 2016 language changes); *see also* Ex. Y (2016 eCharting Checklist); Ex. BB at 80:17-81:4 (discussing the addition of the Prescription Drug Charge as shown in the 2016 eCharting Checklist).

Roughly a year later in 2017, Cigna made two additional changes relevant here. First Cigna revised the Master Prescription Drug Benefits Schedule again by deleting any reference to "portion" and replaced it with "[t]o receive Prescription Drug Benefits, you may be required to pay a Deductible, Copayment or Coinsurance requirement for Covered Expenses for Prescription Drug Products." Second, Cigna tweaked the "Prescription Drug Charge" term slightly for ASO plans and added "Plan's" immediately before "Prescription Drug Charge." Thus, beginning in late 2017, the part of the Class definition contained in the Prescription Drug Benefit Schedule (the "Schedule") was amended as follows:

| | |
|---|---|
| Schedule language in 2016 | "[t]o receive Prescription Drug Benefits, you may be required to pay a portion of the Covered Expenses for Prescription Drug Products. **That portion** includes any applicable Copayment, Deductible and/or coinsurance.<br><br>As applicable, your Deductible or Coinsurance payment will be based on the Prescription Drug Charge . . . ." |
| Schedule language introduced in 2017 (DST Report 5)<br><br>Removes "portion" language<br><br>Adds "Plan's" | "[t]o receive Prescription Drug Benefits, you may be required to pay a Deductible, Copayment or Coinsurance requirement for Covered Expenses for Prescription Drug Products.<br><br>As applicable, your Deductible or Coinsurance payment will be based on the **Plan's** Prescription Drug Charge . . . ." |

*Compare* Ex. BC at CIGNA00172978-79 (Prescription Drug Benefit Master Schedule immediately preceding change) *with* Ex. BD at CIGNA00173084085 (Prescription Drug Benefit Master Schedule immediately following change); *see also* Ex. BE at 49:20-52:22.

Under Plaintiffs' theory of liability, the 2016 introduction of "Prescription Drug Charge" (without the modifier "Plan's") marks the end of the class period for deductible claims and the subclass claims. The class copayment claims continued until Cigna's deletion of the "portion" term from its boilerplate language, which began in 2017.[15]

### 1. Cigna's argument about DST Report 4 is based on a misplaced quotation mark.

Cigna argues that "Mr. Mustoe's exclusion of all the plans identified in DST Report 4 results in his failure to calculate 'clawbacks' for all members of the class as envisioned by Plaintiffs." *Daubert* Mem. [ECF 279] at 26-27. The basis for this argument is that Mr. Mustoe excludes plans with the 2016 phrase "prescription drug charge" (as listed in DST Report 4), but the Class definition only excludes plans with the one-word-longer phrase "***Plan's*** prescription drug charge" inserted in 2017. (emphasis added). Effectively, Cigna argues that Mr. Mustoe's methodology using DST Report 4  ("Prescription Drug Charge") does not terminate deductible claims at the right time because "Prescription Drug Charge" was inserted in plans a year earlier than "***Plan's*** Prescription Drug Charge," which is included in the class definition.

Mr. Mustoe's analysis actually terminates deductible class claims at the correct time with the introduction of the term "Prescription Drug Charge" in 2016 (not "Plan's Prescription Drug Charge" in 2017).  His methodology is therefore consistent with the language change and

---

[15] The changes to Cigna's boilerplate provisions enables Plaintiffs to identify the earliest point at which a plan could have included the new language.  Often, it took months or even years for the changes to be reflected in actual plans. The DST Reports identify the effective date of those changes in specific plans.

Plaintiffs' theory of liability, rather than with the inadvertently incorrectly worded class definition filed in May. Plfs' Mot. to Am. Proposed Class Definition [ECF 253]. The cause of this mismatch between the DST Report and the class definition is a misplaced quotation mark in the definition, which the Court can easily remedy if it believes this is a material issue.  The deductible Class definition would have to be altered as follows:

> • with respect to deductible payments, did not provide that the "Deductible payment" will be based on the plan's Prescription Drug Charge"; and

### 2. Any issue with DST Report 3 (the language of which was proposed by Cigna) can easily be cured with an updated DST Report.

The error that Cigna identifies regarding the inclusion or exclusion of "Prescription Drug Products" versus "Prescription Drugs and Related Supplies," *Daubert* Mem. [ECF 279] at 25-26, stems from Cigna's change of boilerplate terminology in 2016 from "Prescription Drugs and Related Supplies" to "Prescription Drug Products."  Regardless of the reason for the problem, it can easily be remedied with an updated DST Report. On July 28, 2020, Plaintiffs served a discovery request for the necessary report—a list of plans with the phrase "required to pay a portion of the Covered Expenses for Prescription Drug Products." Assuming it is ever produced, this additional report would account for the shift in Cigna's standard language in 2016, and would ensure that all class copayment claims are included in Mr. Mustoe's analysis.  This would resolve any inconsistencies between the language and class definition, and any inconsistencies between Mr. Mustoe's analysis and the plan language and class definition.

### 3. Mr. Mustoe's use of DST Reports 4 and 5 is consistent with the Class definitions

Cigna argues (correctly) that Plaintiffs represented in their motion to amend the class definitions filed in May that the amended definitions "specify that participants enrolled in plans

that contain a certain defined term ('prescription drug charge') are not included in any of the Class or Subclasses." *Daubert* Mem. [ECF 279] at 29 (emphasis omitted) (quoting ECF 255 at 33).  Plaintiffs' statement included in their motion to amend was an error.[16]  As explained above, class copayment claims continued until the deletion of "portion" in 2017, which postdated the introduction of "Prescription Drug Charge" in 2016.  Regardless of the error in the language of the motion, the class definition is correct and unambiguously states that the "prescription drug charge" language only affects the deductible payments ("with respect to deductible payments, did not provide that the "Deductible payment" "will be based on the plan's Prescription Drug Charge." So, Cigna is making a "gotcha" argument that has no bearing at all on the language of the class definition. Moreover, the additional report that Plaintiffs requested on July 28 will ensure that all class copayment claims are included in Mr. Mustoe's calculations.

### 4.    "[R]emoval" of plan language (pp. 27-28)

Cigna argues that Mr. Mustoe's reliance on the changes to standard source pages identified in DST reports 4 and 5 and described above is not a reliable way to determine when a plan ceased being operative and, thus, class membership. According to Cigna, the relevant language could be removed and could be replaced with "something else," and Mr. Mustoe's analysis would not identify "something else."  Conspicuously, Cigna provides ***no*** examples where the boilerplate language at issue was "removed from plan documents and not replaced with the specific phrase that Mr. Mustoe uses . . . ." *Daubert* Mem [ECF 279 at 28-29].  It does not because it cannot.

---

[16] Cigna was surely aware of this mistake.  The motion to amend was meant to reflect the amendment as described in Plaintiffs' letter of May 11, which stated, "[A]s explained in Plaintiffs' motion for class certification, participants with plans that contain a definition for the term 'prescription drug charge' are not part of the Classes (with respect to deductible payments) or the Subclasses.  Plaintiffs intend to revise the definitions to further specify this limitation on the Classes."  Ex. BF

As explained above, Cigna's language was highly standardized.  Each of the three provisions used in the class and subclass definitions is included either in the Master Prescription Drug Benefits Schedule or in a coded source page.

The first relevant provision is the "portion of covered expenses" language that appears in the Prescription Drug Benefit Schedules.  As explained above, the Master Schedules produced by Cigna document the standard language and its evolution.  Ex. BE at 44:12-52:22. According to those Master Schedules, this boilerplate language in Plaintiffs' class definitions was replaced with new standard boilerplate language in 2016, and then different standard boilerplate language in 2017.  Cigna has produced no Master Schedules for the Relevant Period that have any version of the relevant language other than the ones identified in this brief.

The second relevant provision is the language that provides that "Covered Expenses" are where an individual "incurs expenses for charges made by a Pharmacy."  Cigna has produced the source pages for this language, and it did not change during the Relevant Period.

The third relevant provision is the Copay G language described above at Factual Background, Part I.A.  According to the source pages produced, this language was standard from at least 2012 until 2016 when it was changed as part of the Certificate of Coverage review Project.  Deviations from the Copay G benefit setup and prescribed language were to be denied [starting in 2012?]. Ex. AF (stating that Copay G is standard for ASO plans, and to deny Copay K requests). Ex. BH at CIGNA07723565 ("I have not seen any clients looking for Copay K, a.k.a. opting out of Copay G."); Ex. BG at 29:7-12 ("Q. Do you recall any instances from 2010 through 2017 where a client made a request to change from Copay K to Copay G and then back to Copay K again? . . . A. "I don't recall that, no.").

Cigna has not provided a single example where the language was at issue was "removed . . . and not replaced with the specific phrase that Mr. Mustoe uses."  Expert testimony should only be excluded if it is "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith,' or to be in essence an 'apples to oranges comparison,'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir.1984)).  Otherwise, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Grand River Enters. Six Nations, Ltd. v. King*, 783 F.Supp.2d 516, 526 (S.D.N.Y.2011) (quoting *Boucher*, 73 F.3d at 21).  Mr. Mustoe's methodology is firmly supported by the evidence in this case.  Any alleged defects go to the weight of his testimony, not its admissibility.

### D.   Mr. Mustoe's Use of Separate DST Reports to Determine Subclass and Class Members Is Not a Basis for Exclusion

Cigna argues that Mr. Mustoe's failure to use DST Reports, 1, 2 *and* 3 to determine the members of the Subclass necessarily means that he has misidentified the members of the Subclass.  *Daubert* Mem. [ECF 279] at 31.  First, such an argument assumes the reliability and utility of the DST Reports, with which Plaintiffs fully agree.  Second, Cigna insists that "his calculations include some subclass members who are not in the class."  *Id.*  But Mr. May's report, which Cigna cites as its only support for the argument, only speculates that "Mr. Mustoe's method *may* include the participants in the subclasses even though they were not a member of the classes."  May Decl. at ¶ 40 (emphasis added).

Mr. Mustoe has used the DST Reports to compare membership in the Class and Subclass.  "Out of the 2,875 accounts that are in DST Report 1 (i.e., in the Subclass), only 29 of these accounts (2%) are not in the DST Reports 2/3 (i.e., in the Class)."  Ex. P at ¶ 7.  Any criticisms regarding the absence of this analysis in his original methodology are now moot.  Regardless,

any such criticisms are not a basis for exclusion and go only to the weight of Mr. Mustoe's opinions.  *See, e.g.*, *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 458 (S.D.N.Y. 2004); *RMH Tech LLC v. PMC Indus., Inc.*, 352 F. Supp. 3d 164, 195 (D. Conn. 2018).

To the extent there are individuals who are in the Subclass, who are not in the Class, the Subclass can be restyled as a separate class (e.g., "ERISA Class II" instead of "ERISA Subclass").  *See* Class Cert. Reply at n.39.

## CONCLUSION

For the reasons stated, Mr. Mustoe's methodology is both reliable and consistent with Plaintiffs' theory of liability.  Any challenges that could be raised as to his methodology go to weight, not admissibility and are not a basis for excluding his opinions.  Cigna's Motion to Exclude should be denied.

Dated: September 3, 2020                    Respectfully submitted,

                                                    *s/ Robert A. Izard*
                                            Robert A. Izard (ct01601)
                                            *Plaintiffs' Interim Co-Lead Class Counsel*
                                            Craig A. Raabe (ct04116)
                                            Seth R. Klein (ct18121)
                                            Christopher M. Barrett (ct30151)
                                            IZARD, KINDALL & RAABE, LLP
                                            29 South Main Street, Suite 305
                                            West Hartford, CT 06107
                                            Telephone:  860-493-6292
                                            Facsimile: 860-493-6290
                                            rizard@ikrlaw.com
                                            craabe@ikrlaw.com
                                            sklein@ikrlaw.com
                                            cbarrett@ikrlaw.com

                                            William H. Narwold (ct00133)
                                            *Plaintiffs' Interim Co-Lead Class Counsel*
                                            Mathew Jasinski, (ct27520)
                                            MOTLEY RICE LLC

One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:   860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Meghan S. Oliver, *pro hac vice*
Charlotte Loper, *pro hac vice*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843-216-9000
moliver@motleyrice.com
cloper@motleyrice.com

Joseph P. Guglielmo (ct27481)
*Plaintiffs' Executive Committee Chair*
Carey Alexander, *pro hac vice*
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:   212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite (ct24886)
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:   860-537-4432
ecomite@scott-scott.com

Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052

Telephone: 206- 623-1900
Facsimile: 206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
ZIMMERMAN REED, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-341-0400
Facsimile: 612-341-0844
brian.gudmundson@zimmreed.com

Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone: 985-783-6789
Facsimile: 985-783-1333
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone: 504-581-5644
Facsimile: 504-581-2156
andrew@lemmonlawfirm.com

Ronen Sarraf
*Plaintiffs' Executive Committee Member*
Joseph Gentile, *pro hac vice pending*
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
Facsimile: 516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434

Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:  612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035
Dan@wbmllp.com
Jeremy@wbmllp.com

Additional Counsel for Plaintiffs