1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2


3
- - - - - - - - - - - - - - - -X
4   KIMBERLY A. NEGRON,
    Individually and on Behalf
5   of All Others Similarly
    Situated,
6
                    Plaintiffs,
7                                          3:16-cv-01702-JAM
     v.
8                                          May 7, 2021
    CIGNA CORPORATION, CIGNA
9   HEALTH AND LIFE INSURANCE
    COMPANY and OPTUMRX, INC.,
10
                    Defendants
11
- - - - - - - - - - - - - - - -X
12

13

14

15                      ORAL ARGUMENT

16

17
     Held Before:
18       The Honorable S. Dave Vatti

19

20

21

22

23          FALZARANO COURT REPORTERS, LLC
                    4 Somerset Lane
24              Simsbury, CT  06070
                    860.651.0258
25          www.falzaranocourtreporters.com

```
1                        APPEARANCES

2

3

4

5    For the Plaintiffs:

6        MOTLEY RICE, LLC
         28 Bridgeside Blvd.
7        Mount Pleasant, SC  29464
         843-216-9492
8        cloper@motleyrice.com
         By:  CHARLOTTE E. LOPER, ESQ.
9             MEGHAN OLIVER, ESQ.

10

11

12   For the Defendants:

13       Morgan Lewis
         300 South Grand Ave., 22nd Floor
14       Los Angeles, CA 90071-3132
         213.612.7334
15       lisa.weddle@morganlewis.com
         christopher.diffee@morganlewis.com
16       By:  LISA A. WEDDLE, ESQ.
              CHRISTOPHER DIFFEE, ESQ.

17

18

19

20

21

22

23

24

25
```

```
1                    (Hearing commenced:  1:05 p.m.)

2

3              THE COURT:  Good afternoon, everyone.  We're here

4      on the matter of Negron v. Cigna, Docket No. 3:16-cv-1702,

5      assigned to Judge Meyer.  Can I get appearances of counsel?

6              MS. LOPER:  Your Honor, this is Charlotte Loper for

7      the plaintiffs.  Also with me is Meghan Oliver.

8              MS. WEDDLE:  Good afternoon, your Honor.  Lisa

9      Weddle on behalf of Cigna, and I also have with me Chris

10     Diffee.

11             THE COURT:  Good afternoon.

12             MS. WEDDLE:  Same to you.

13             THE COURT:  All right.  So I wanted to just point

14     out a couple of things.  We do have a court reporter here,

15     and I just want to be mindful and have everyone else be

16     mindful that we can all talk only one at a time just so that

17     our court reporter can get everything down and get an

18     accurate transcript.  I'll have to confess that on some of

19     these Zoom arguments, I too have violated the rule, and

20     occasionally, our court reporter will waive her hands and

21     ask for a timeout to get us back on track.  So just be

22     mindful of that, and I will try to be mindful as well.

23             A couple of other preliminary things I want to

24     address.  I guess we sort of have an odd procedural vehicle

25     here.  We have motions to seal that have been filed by the
```

1    plaintiffs in this case, and the proponent of sealing is

2    actually the defendants; and therefore, I guess, I assume

3    we're all in agreement that the defendants have the burden

4    of proof or the burden of carrying the reasons for the

5    sealing, given that they're the proponent of sealing.

6    Everyone in agreement with that?

7              MS. LOPER:  Yes, your Honor.

8              MS. WEDDLE:  Yes, your Honor.

9              THE COURT:  Although, I suppose when I issue the

10   docket entries and the rulings, it'll be plaintiffs' motions

11   to seal either being granted in part or denied in part or

12   whatever the ruling might be.  So I just wanted to make sure

13   we're all on the same page with the procedural vehicle and

14   who has the burden of proof.

15             All right.  The other thing is, I know that there

16   are a lot of exhibits; and let's start with Motion 316

17   because that seems to have the most exhibits that were the

18   subject of sealing requests and (D) designation requests.  I

19   suppose, although you have agreements, I suppose the docket

20   entry is going to have to go through and grant the ones that

21   you have agreements on.  So I just wanted to be sure that

22   not only do I have the correct list, but that the

23   agreements, the exhibits that you've agreed for portions to

24   be sealed, have not yet been filed on the docket in the

25   versions that you've agreed to them; right?  I didn't see

1   them anywhere.

2           MS. WEDDLE:  Your Honor, this is Ms. Weddle.  To

3   the extent there are -- there have been, which there have,

4   been some changes to what the parties have agreed as far as

5   sealing, those have not been filed on the docket other than

6   what has been attached for those few remaining exhibits that

7   were attached to the joint statement.

8           THE COURT:  Okay.  So I assume that, you know, once

9   I rule that all of the documents in the form that you've

10  agreed to them will get put on the docket?

11          MS. WEDDLE:  Yes, your Honor.  We're happy to work

12  with plaintiffs to make sure that we have everything in

13  line, we're in agreement, and then once we know what is

14  being -- what is going to be filed under seal and anything

15  that is going to be become public, we'll get those filed

16  accordingly.

17          THE COURT:  Okay.  Great.  So can I just go

18  through, on Motion 316, the exhibits that I think that you

19  seem to have agreements on and just make sure that I have

20  the list correctly so that when I issue a docket entry, it's

21  not missing anything or doesn't misstate anything.  But here

22  is the list, and I'll try to go slowly, here is the list of

23  exhibits that, in going through the various briefing and

24  figuring out what you have agreements on and what is no

25  longer at issue, this the list that I came up with.  I have

```
 1          Exhibits B, E, F, H, J, K, L, M, P, Q, R, S, U, V, W, X, Y,
 2          Z; and then AC, AD, AF, AG, AH, AI, AK, AM, AP, AR, AS, AT,
 3          AU, AV, AY; and then BB, BE, BG, BH, BI, BL, BM, I think
 4          that's BO, BP, BQ, BT, and BU.  And it looks like those,
 5          that the plaintiffs' motion to seal with respect to those
 6          exhibits can be granted on the basis of the plaintiffs do
 7          not object to the defendants' proposed sealing designations.
 8          Is that accurate?
 9                  MS. WEDDLE:  Your Honor, if I might add just two
10          additional exhibits, which are ones that the parties
11          recently reached agreements and that are part of the joint
12          statement.
13                  THE COURT:  Right.
14                  MS. WEDDLE:  AJ and AZ.
15                  THE COURT:  Got it.  Yup.
16                  MS. WEDDLE:  Again, your Honor --
17                  THE COURT:  With those additions -- no problem.
18          With those additions, are we accurate?
19                  MS. LOPER:  Yes, your Honor.  Plaintiff believes
20          that is accurate.
21                  THE COURT:  Okay.  All right.  So I'll tell you
22          what I've reviewed on the case.  I've reviewed all of the
23          motions that are at issue.  I think we had 316 -- let me
24          grab my list -- 327, 331, 365 and 371.  Those are the
25          references to the docket numbers or docket entries.  And
```

1        then I did review all of the defendants' responses with

2        respect to those motions, and I also reviewed all of the

3        plaintiffs' briefing with respect to those various motions

4        and in reply to the defendants' briefs, including the most

5        recent round of briefing on April 23rd and April 30th of

6        this year.

7                I also did go back and review Docket Entry 259,

8        which was Judge Garfinkel's prior ruling, just to get a

9        sense of what he did since there was some reference in the

10       briefing, at least in this recent round, to what the parties

11       thought Judge Garfinkel did.

12               Let me comment at the outset that I agree with the

13       defendants that Judge Garfinkel did not adopt a bright-line

14       rule that's simply based on the age of a particular document

15       that there was no basis to believe that competitive injury

16       could result.  I don't think he explicitly adopted any such

17       bright-line rule.  Certainly, as he went document by

18       document, it became readily apparent that there were a

19       number of documents that were older, for example, from 2013,

20       2014, and 2015 that he did not believe that any

21       particularized showing of competitive injury had been made;

22       so I can see why plaintiffs thought or at least inferred

23       that there may have been such a rule or thought in his

24       thinking; but I don't think he adopted a bright-line rule.

25       And my plan today is to also go document by document and not

1    adopt any such bright-line rule and certainly hear the

2    arguments as to each.  That, of course, is a particular area

3    of concern in light of the age of some of these documents;

4    but I'll certainly listen to the defendants as to why each

5    particular document is such that, if it were publicly

6    disclosed, could cause some type of competitive injury.

7         So with that, I suppose we can take up Exhibit I.

8    So I thought, since the way we would do this is, since the

9    defendants have the burden here, we could start that way,

10   have them make their argument as to each exhibit, and just

11   go one by one.  So let's start with Exhibit I, which looks

12   like an email chain.

13        MS. WEDDLE:  Sure.  Thank you, your Honor.  So I

14   think a lot of this is laid out in the briefing, but I will

15   reiterate some key points.  And starting, again, one thing I

16   do want to just put on the record is, you know, as your

17   Honor read off, there were a lot of documents that were

18   filed in connection with the briefing that's currently

19   pending; and Cigna took a very, very fine-toothed comb to go

20   through all of the material and make sure it took as narrow

21   as approach as it could to sealing.  It's really only asking

22   to seal four documents in full and then the remainder just

23   partially.  And again, in looking at those documents that

24   it's requesting sealing in part, again, it went through, and

25   is really only trying to seal the information that is, you

```
1        know, confidential, proprietary, and could cause commercial
2        or competitive harm.
3             So with that, I want to talk in particular about
4        Exhibit I.  And Exhibit I, also, I think I'll talk it about
5        it in connection, if it's okay with your Honor, with the
6        letter brief that was filed as well that refers to some of
7        the context from Exhibit I, if I can talk about those two
8        together.
9             THE COURT:  Sure.
10            MS. WEDDLE:  So essentially, both of those
11       documents contain confidential information about Cigna's
12       process and analysis and including, amongst other things,
13       its, you know, sensitive discussions about internal pharmacy
14       management policies and practices.  And one thing that's
15       particularly important with this document is that while it
16       could be read as relating to transactions at issue, it does
17       not.  The content of the document relates to an entirely
18       separate agreement between Cigna and a government agency
19       that is not one of the -- it's not the contract that's at
20       issue in this case and that generates the transactions that
21       are at issue in this case, and that's where the discussion
22       goes.  So it doesn't have any relevancy to the facts of this
23       case.
24            I understand that plaintiffs have, you know, argued
25       that it shows Cigna's state of mind, but it really can't go
```

1    to the state of mind because the statements that are made in

2    the email are specific to that client relationship that has

3    different terms in the contract that are different from

4    those that are in the contract that generates the

5    transaction at issue.  And so in disclosing that

6    confidential information, particularly about a sensitive

7    government agency contract, that could cause significant

8    competitive harm in disclosing that.

9         And in particular, the other thing we wanted to

10   raise is that in the Court's May 2020 sealing order, it's

11   previously sealed portions of internal Cigna documents that

12   also discussed, you know, Cigna projects and analyses that

13   did not relate to the plaintiffs' claim; and so for that

14   reason as well, we believe that it warrants sealing.

15        THE COURT:  So I do have a question for you.

16   Looking at the very first email that's in, it looks like it

17   was from a Kelly Prochaska to a Stephanie Byrne, and it's

18   dated May 28, 2015, at 8:41 p.m.

19        MS. WEDDLE:  Right.

20        THE COURT:  There's a parenthetical about receiving

21   spread on scripts from VA pharmacies.  And I understand the

22   VA pharmacies are not part of the agreement that's at issue

23   in the complaint.

24        MS. WEDDLE:  Correct.

25        THE COURT:  The next sentence says, rather, "We

1    will want to ensure we do this appropriately once we move VA

2    over to CTRX contracts, correct."  What is the reference to

3    "CTRX contracts"?

4         MS. WEDDLE:  "CTRX" is the abbreviation for

5    Catamaran.  I am not sure whether that is the global

6    Catamaran contract that is at issue here, and also I am not

7    sure, I would need to look to get information from my

8    client, about whether or not that happened.

9         The other thing that I need to point out to your

10   Honor is that "spread," spread can mean various different

11   things.  There is the spread that is spread, you know,

12   that's one of the ways that the type of dollars that are at

13   issue in this case, which Cigna refers to as "negative

14   reimbursement"; but there are many other types of spread,

15   which could be other differentials in the way that the

16   pharmacy transactions are processed.  And that's what this

17   email is about, other types of differentials, not the

18   negative reimbursement.

19        THE COURT:  But the subject line does say, "No

20   clawback on DOD," and the clawback is something that, or at

21   least that language is at issue and what that means in this

22   case?

23        MS. WEDDLE:  That is correct, your Honor, and as

24   the email says, "no clawback," because that's a term, as

25   this email indicates, that's a term that's in the agreement

1    between Cigna and this government agency.  That is different

2    from the contract with Catamaran involving the retail

3    pharmacy that generates the transactions at issue.  So for

4    that reason, it's different.  It's not relevant.

5         THE COURT:  What about the portion of that email

6    that says, "With respect to the Department of Defense, we

7    can't be clawing back dollars from them.  Apparently, they

8    don't like it."  And then there's another one:  "We have to

9    stop any clawback or negative amount due on claims going

10   through the DOD."

11        You know, when you take those and combine it with

12   that first email that does make a reference to "We will want

13   to ensure that we do this appropriately once we move over to

14   the Catamaran contract," that's -- I suspect that I'm going

15   to hear from your opposing counsel that this is almost like

16   404(b) evidence; right?  Even if it doesn't relate

17   specifically to the contract at issue in this case, it's

18   almost like 404(b) evidence that shows some kind of intent

19   or knowledge or state of mind.  I'll let you respond to my

20   thought on that, and then I have an additional question for

21   you.

22        MS. WEDDLE:  Sure, your Honor.  And again, I think

23   it's different than 404(b)-type evidence to show the state

24   of mind because it's state of mind on a completely different

25   issue and a completely different contract that has different

1    terms.  As the email set out, the agreement that's at issue

2    in this email did not allow for -- did not allow for the

3    type of negative reimbursement that's at issue in this case.

4    So I think comments about them not liking it may relate to

5    the fact that there's a contract term that specifically

6    doesn't allow for it, which is very different than the

7    actual Catamaran agreement that is at issue in the case,

8    which specifically does allow for it.  So I think that

9    that's a significant distinction.

10          Also, if I can direct you to the email that's --

11   that is, I guess it begins on the bottom of -- the Bates

12   number is 321336.  It's from Stephanie Byrne, but the actual

13   content of the email is on the top of the next page, 321337.

14   And it indicates basically that, based upon this data, it

15   appears that the negative pharmacy amounts due are not being

16   caused by spread pricing.  So that's where it's explaining

17   it.  Each one with negative amounts due are based on price

18   source Y, and it indicates the claim was allowed with an

19   override due to the pharmacy requesting a product be

20   dispensed.

21          So again, the actual negative amounts that are at

22   issue in this email are different than the negative

23   reimbursements or what sometimes has been referred to as

24   "clawback" that's at issue in this case.

25                THE COURT:  All right.  I think the entire email

1    chain has as its subject, "No clawback on DOD."  You're

2    making a relevance argument to support sealing, but this was

3    obviously produced in discovery; right?

4         MS. WEDDLE:  It was produced in discovery, your

5    Honor.  There was millions and millions of documents

6    reviewed, as you can imagine.  There were -- an extremely

7    large review team that went through.  This document probably

8    should not have been produced as responsive, to be quite

9    honest, because it mentions the word "clawback," which

10   somebody may have thought was relevant; but it doesn't

11   relate to the actual contract at issue and the issues in

12   this case.

13        THE COURT:  All right.  Well, my point was going to

14   be that if it was produced on the assumption that it was

15   either relevant or reasonably calculated to lead to the

16   discovery of admissible evidence, it's hard to make a

17   relevance-based argument for sealing at this stage.

18        But let me ask one more question on this.  Besides

19   relevance, are you making a claim that somehow, if this were

20   publicly docketed, that there's some competitive injury that

21   would result?

22        MS. WEDDLE:  Yes.  In addition to the relevancy

23   piece, again, this talks about contract terms with a

24   government agency.  And those are always, you know,

25   negotiated contract terms which, if disclosed, regardless of

1    whether they're current, existing contract terms or not,

2    would reveal the way that, you know, Cigna has done

3    business, the way that this government agency has negotiated

4    and does business with the entity it contracted with, and if

5    that was disclosed, it could be used by competitors, both

6    Cigna's competitors as well as, you know, Cigna's

7    competitors trying to work with the DOD.  It could be used

8    against them and used against Cigna to impact their ability

9    to negotiate similar types of agreements in the future.

10          THE COURT:  So let me -- this is a theme that

11    you're probably going to hear from me during the course of

12    this argument over and over again, but just give me a sense

13    of who in the marketplace are Cigna's competitors in this

14    sort of pharmacy product area.

15          MS. WEDDLE:  There are several, and I certainly do

16    not know all of them; but there is -- so one in particular

17    here is Catamaran.  And just to give you a little bit of

18    history, Cigna used to, before it had its own agreement with

19    Catamaran to act as the pharmacy benefits manager, Cigna

20    itself had its own pharmacy benefits management company.  So

21    there is -- Cigna is one.  OptumRX, which is formerly

22    Catamaran, is another.  There is Express Scripts, I believe

23    Walgreen's also offers pharmacy benefit management services.

24    I think CVS, there is a whole host of them that are offering

25    these.

1          THE COURT:  All right.  So here's where I'm going

2     with this.  Let's just take any one of those.  Let's just

3     call it Company X, which is in this marketplace.  Tell me

4     how this email chain from May 28, 2015, and other dates in

5     the spring of 2015, if it got into the hands of Company X in

6     the spring of 2021, that this is going to help Company X in

7     some way.  What's that particularized showing that this is

8     going to be used -- how is Company X going to use this?

9          MS. WEDDLE:  Well, for one, going back to the

10    excerpts that I just read about the negative pharmacy

11    amounts due and what was created there, another company

12    could try to replicate that, come up with something that's

13    even more desirable to this government agency, and try to

14    offer that in the future to take -- you know, which would

15    undercut Cigna's ability to compete for that business.

16    That's one example.

17         THE COURT:  Let's suppose that I'm like a strategic

18    business development person for Company X, and I go to my

19    boss and say, Hey, look what just got posted on the docket.

20    I got this thing from, you know, May of 2015, a bunch of

21    emails from, you know, internal folks at Cigna.  Why don't

22    we design a strategy, you know, for our company in 2021

23    based on what I see in these emails from six years ago?  It

24    seems to me I might be laughed out of that room.  Why would

25    any company want to design a strategy in 2021 based on an

1        email that is, you know, six years old?

2              MS. WEDDLE:  I mean, a lot of this is hypotheticals

3        as to what the particular deals would look like, and I can't

4        give you specifics on that.  But I think what it gets down

5        to is that they would have insight into the types of terms

6        that Cigna had in its agreement, and it would be able to

7        either offer the same as and in a way that would be more

8        desirable to that government agency.  Or another --

9        similarly, another company could try to undercut the DOD's

10        position to the extent it was -- they, you know, they had

11        agreed to a term here that was helpful for them to try to

12        come up with a way to give more favorable terms to that

13        other PBM as well.

14              THE COURT:  Right, except that you don't know what

15        the DOD's current terms are; you just know what they -- some

16        allusions to it in these emails in 2015.

17              This is what I think Judge Garfinkel was getting

18        at, the way I read his original ruling; and you know, I

19        think you have a better case on some of your other exhibits

20        that you want sealed.  For example, the 10-year contract

21        with Catamaran, which, you know, started I think in 2013.

22        It got terminated last year or a year ago, whatever it was,

23        but had it not been canceled, those terms would have been

24        honored into 2023.  So somebody looking at that agreement

25        could have said, okay, you know, terms that Cigna and

1    Catamaran are looking at in 2021, 2022, 2023 that they were

2    willing to honor, yeah.  That I might be able to use to

3    undercut and negotiate and do whatever right now.  But

4    that's a -- those are other exhibits where it's clear that

5    those terms are -- would have governed current behavior,

6    not, you know, behavior six years ago.

7            MS. WEDDLE:  Well, your Honor, I don't -- I don't

8    know that specific date that this was all still current.  I

9    would like to be able to look into that information and get

10   that to report back to you on this.  But I think even

11   putting that aside, again, we get to the fact that it does

12   have some, you know, it has the potential to cause

13   competitive injury because it is contract terms that could

14   be used against either the government agency or Cigna and

15   other future contract negotiations, even if it is older

16   terms.  It discloses terms that are in there.  And then you

17   couple that with the fact that it's really not relevant, and

18   this is a document, quite frankly, that, you know, probably

19   should not have even been produced as responsive to the

20   request in this case.

21           THE COURT:  All right.  The last thing I wanted to

22   ask you since you sort of brought up the letter from

23   Attorney Izard that's dated September 18, 2020, that's the

24   letter brief; right?  You said it sort of dovetails with

25   Exhibit I?

1          MS. WEDDLE:  Right.

2          THE COURT:  If I can just -- it only seems like

3     there's one little snippet of that letter at this point

4     that's at issue?

5          MS. WEDDLE:  I believe that's correct.

6          THE COURT:  Right.  And it looks like -- I'll try

7     to look at it on my screen here, too.  I guess I can't.  But

8     my recollection of that snippet was something along the

9     lines of plaintiffs believe they have developed evidence of

10    fraud in the use of the clawback, something like that;

11    right?

12         MS. WEDDLE:  Correct.

13         THE COURT:  So that, to me, seems that it's not

14    proprietary information of Cigna; it's just plaintiffs' own

15    characterization of what they think they've developed in

16    this case.  How does that snippet of that letter, publicly

17    disclosed, hurt Cigna's competitive standing in some way?

18    It's really just plaintiffs' own view of what they think

19    they've accomplished here.

20         MS. WEDDLE:  I think it goes to the aspect of it

21    that disclosed -- that mentions the clawbacks, even though

22    that's not a term in the agreement that is essentially --

23    they're trying to impute that as to a term of the agreement.

24    And so it would be disclosing a term of the parties'

25    agreement there.

1          THE COURT:  Just give me one second.  I want to see

2     if I can bring that up.  You folks have so much -- so many

3     exhibits and pages in this case that I've sort of made piles

4     all over my floor and at my desk at this point.  So I may

5     have to occasionally disappear from the camera to pull

6     something off of a pile.

7          I think I have now found Attorney Izard's letter

8     here.  Let me just look at that one.

9          MS. WEDDLE:  We apologize for inadvertently helping

10    redecorate your office.

11         THE COURT:  Yes.  I'll be very happy when I get to

12    clear it up after we're done here.

13         So the sentence reads, "Plaintiffs also have

14    developed evidence that Cigna knowingly defrauded the

15    federal government through clawbacks from veterans and DOD

16    pharmacies."  So you're saying that that -- the only

17    evidence that could be referring to is this email chain in

18    Exhibit I?

19         MS. WEDDLE:  Correct.

20         THE COURT:  So if I rule against you on Exhibit I,

21    then Exhibit 12 falls, too; does it not?

22         MS. WEDDLE:  That's correct, which is why I wanted

23    to discuss them together initially.

24         THE COURT:  Okay.  Got it.  All right.  I'll hear

25    from -- on Exhibit I, and by the way, the Izard letter does

```
1      not have an exhibit letter designation like everything else.
2      Is that just because it was a pleading filed in the case?
3                  MS. LOPER:  Yes, your Honor.  That was just filed
4      as part of --
5                  THE COURT:  Okay.
6                  MS. LOPER:  -- so that's why.
7                  THE COURT:  Yup.  Go ahead.
8                  MS. LOPER:  As you point out, this document is from
9      May of 2015, and Cigna has not shown how this information is
10     commercially harmful in 2021.  This document is relevant to
11     the case because it discusses clawbacks, which are central
12     to this litigation and as your Honor points out.
13     Specifically, this document shows defendants' state of mind
14     in taking clawbacks, regardless of the reason that Cigna
15     proposes for this document.
16                 As you can see, on Page 1337, there's an email from
17     Tyler Lester, asking for an impact analysis before they stop
18     collecting spread because "a few more days of negative
19     payments isn't going to be the end of the world."  Cigna's
20     main argument is that this document is not relevant and
21     would needlessly cause them commercial harm.  However, they
22     have not identified any specific harm.  Ms. Weddle actually
23     stated that she can only provide hypotheticals and cannot
24     give you the specific harm, but that's what a ruling on
25     sealing this document would require.  Plaintiffs and the
```

1      potential class members and the public have the right to see

2      this document, particularly in light of the fact that it is

3      relevant to this case, and the fact that Cigna has not shown

4      how it can cause them commercial harm in 2021.

5              THE COURT:  What about Attorney Weddle's argument

6      that, you know, look, this has nothing to do with the

7      pharmacy agreement at issue in this case; this has to do

8      with DOD and VA and probably really shouldn't have been

9      produced in this case because it's not relevant?

10             MS. LOPER:  Your Honor, if you look at Page -- I

11     believe Ms. Weddle said it's on Page 1336 to 1337.

12             THE COURT:  Yeah.  I'm there.

13             MS. LOPER:  The email from Ms. Byrne says based on

14     this data, it appears the negative pharmacy amounts due are

15     not being caused by spread pricing.  The remainder of the

16     thread, no -- understanding this little argument, there is

17     no final resolution of what actually caused the clawbacks in

18     this issue on this document.  Furthermore, whenever

19     plaintiffs attempted to take testimony of this document, the

20     testimony was cut short; and Cigna actually prevented the

21     witness from answering.

22             So there -- yes, Cigna's arguing that this document

23     is not relevant, but there's no final resolution of the

24     document; and plaintiffs were prevented from taking final

25     testimony as to that.

1          THE COURT:  Is there any motion to compel that's

2     filed with respect to deposition questions or on this issue

3     in this series of emails?

4          MS. LOPER:  No, your Honor.

5          THE COURT:  Is that something that the plaintiffs

6     are planning on pursuing?

7          MS. LOPER:  The plaintiffs have not considered that

8     at this point.

9          THE COURT:  So does that undercut the notion that

10    it's even relevant?

11         MS. LOPER:  Your Honor, I still believe, regardless

12    of the reason, it is relevant to the case because it is

13    discussing clawbacks.  And as you see, Tyler Lester wanted

14    to see that impact analysis before they stopped it; so that

15    goes directly to Cigna's state of mind in taking this

16    [inaudible].  Regardless of whether it was prevented by the

17    contracts or whether it was prevented because of the spread

18    pricing in general, Mr. Lester wanted [inaudible].

19         THE COURT:  All right.  Let's assume that at some

20    point, you're going to trial on the Catamaran clawback

21    issue.  Tell me how this document plays into that trial.

22    What are you going to do with this?

23         MS. LOPER:  Your Honor, one of the claims that

24    plaintiffs have brought in this case is RICO, so this

25    document directly goes to the RICO state of mind, the RICO

1    state-of-mind requirement.  And as we've stated, well, Cigna

2    believes that it's not relevant.  Generally, the document is

3    relevant because it discusses clawbacks.  It discusses how

4    Cigna was treating clawbacks, and it discusses the fact that

5    regardless of the reason for the fact that this negative

6    reimbursement was happening, Mr. Lester's email wanted to

7    see it and Mr. Lester's email wanted to see the impact

8    analyses before they stopped doing it.  And as your Honor

9    pointed out, the email about "we cannot be taking clawbacks

10   from the DOD, apparently they don't like it" shows Cigna's

11   attitude generally.

12            THE COURT:  I have been assuming as I'm reading

13   this stuff that clawback, negative spread, negative amounts

14   -- they're all kind of synonymous with each other.  And I'm

15   assuming that what you mean by "clawback" is, you know, if I

16   go to a pharmacy, and I am asked to pay $50 for a

17   prescription, you know, Cigna's actually only paying the

18   pharmacy 10; and then somehow in the back end, Cigna is

19   getting that 40 dollars' difference into its own pocket from

20   me?

21            MS. LOPER:  Yes, your Honor.  Yes.

22            THE COURT:  Is that my -- am I correct on what my

23   understanding of "clawback" is?  I confess, I'm by no means

24   an expert on how pharmacies and health insurers do business.

25            MS. LOPER:  Yes, your Honor.  So it's an amount in

1     excess of what the pharmacy was entitled to receive.  So

2     when the member pays an amount that's in excess of what the

3     pharmacy requires, Cigna would then take back that money,

4     which is a clawback.

5              THE COURT:  What's the term "negative amount"?

6     What does that mean?

7              MS. LOPER:  That's how it appeared in the pharmacy

8     transaction data.  So it would show up as a negative amount

9     due, and that's what Cigna would take back because the

10    member overpaid.

11             MS. WEDDLE:  Your Honor, if I may, since it's my

12    client's documents, I think that there is some explanation

13    to be made here.

14             THE COURT:  Yes, no, I'll definitely -- I was going

15    to give you the opportunity to respond because I figured you

16    probably wanted to.

17             MS. WEDDLE:  Yeah.  Just on this in particular, and

18    I didn't want to interrupt, but on this in particular, this

19    concept of "spread," like I mentioned earlier, can mean a

20    bunch of things.  What's at issue in this case is what Cigna

21    calls reimbursement, plaintiffs refer to as a clawback, and

22    which is what Ms. Loper explained, which is the differential

23    between what the pharmacy receives and what the member pays

24    at the point of sale.  That's what's at issue in this case.

25    But there are very -- there are many other ways in which

1    pharmacy transactions are processed and other different

2    types of differentials, which may be called "spread."

3    Sometimes there is -- there's a retail spread, there's many

4    different types of spread, and so I think that it's not --

5    unfortunately, we can't go ahead and assume that any

6    reference to spread, clawback, negative amount is all the

7    same.  And in particular, what is being explained here is

8    something that's different.

9              THE COURT:  When do the plaintiffs allege that this

10   practice began?  Attorney Cloper [sic], I think you can --

11             MS. LOPER:  Yes, your Honor.  Around 2012 and 2013,

12   I believe it was.

13             THE COURT:  Okay.  I'm asking these questions

14   because I'm trying to gauge the relevance of this email

15   chain to the claims that are being made.  I mean, I

16   understand that I'm not as familiar with civil RICO as I am

17   with criminal RICO.  I suspect that the state-of-mind

18   requirements are at least similar.  I'm trying to gauge

19   whether, you know, these were -- obviously, they were

20   produced in discovery, and there's a standard that's

21   applicable there.  I also understand Attorney Weddle's claim

22   that, you know, it's possible that this fell through the

23   cracks and should not have fallen through the cracks because

24   of the term "clawback."

25             So if anyone else wants to be heard on that issue,

1       why don't I start with Attorney Cloper first.  Am I saying

2       your name right?

3                  MS. LOPER:  I apologize, your Honor.  It's

4       Charlotte Loper and the name just has it as "CLoper."

5                  THE COURT:  Okay.  All right.  Loper.  Got it.  I'm

6       looking at the screen.  Sorry about that.

7                  MS. LOPER:  Your Honor, we would just state that

8       regardless of the relevance of the document, again,

9       plaintiffs do believe that it's relevant.  Ms. Weddle has

10      not shown, Cigna has not shown, how this document would

11      cause them commercially harmful -- would cause commercial

12      harm in 2021.  Again, Ms. Weddle pointed out that she had to

13      rely on hypotheticals and could not give specific examples.

14      And as your Honor points out, the relevance is not reason

15      alone for sealing a document by any means.

16                 THE COURT:  Does Cigna still have the DOD contract?

17                 MS. WEDDLE:  I would need to check with my client

18      on that, your Honor.

19                 THE COURT:  Okay.  So I think we've exhausted

20      Exhibit I in 12.

21                 MS. WEDDLE:  Your Honor, if I may just respond to a

22      few of Ms. Loper's points very quickly.

23                 THE COURT:  Yup.

24                 MS. WEDDLE:  I just want to address, the

25      hypotheticals need to be based on hypotheticals because I

1    certainly cannot speak to specifics of what "X" competitor

2    specifically would do.  They're not my client.  I haven't

3    talked with their business folks.  I don't know exactly how

4    they would go ahead and, you know, specifically what and how

5    they could do, but, you know, I've given examples of ways

6    that they could.

7            And then finally, just to go back to highlight, you

8    know, I think that the subject of the email that says, "No

9    clawback on DOD" is particularly important because what

10    that's basically saying is that there's no clawback, no

11    negative reimbursement, for the DOD contract.  That's

12    solidifying that it's not something that is done on that

13    contract.

14            And so instead, the rest of the discussion is

15    figuring out what the negative amount is that they're

16    discussing, and it relates to something else other than the

17    types of transactions at issue in this case.

18            THE COURT:  I mean, I think the hurdle you have on

19    that one is that, yes, it's with respect to DOD, and that's

20    not permitted by contract; but there is the email that says,

21    you know, we can't be clawing back dollars from them, and

22    apparently they don't like it.

23            But in any event, the other, you know, thinking

24    back to Judge Garfinkel's ruling, there was one exhibit that

25    I think he ended up maintaining as sealed because it had

1      strategic business -- it was a PowerPoint, I think, that had

2      strategic business ideas that were very current for Cigna,

3      and I think his rationale was that, look, if -- and I can

4      understand that rationale -- if somebody got their hands on,

5      you know, Cigna's current strategic business outlook and

6      objectives, then I think it's perfect common sense that

7      competitors in the marketplace could look at that and design

8      their own strategic objectives to counter those.

9              I think what's tougher here is, just reading these

10     emails, given that they're six years old, you know, how does

11     a competitor really make issue of this, particularly, if

12     it's really limited to discussing DOD contracts?

13             All right.  Well, anyway, I think we've beaten that

14     one up pretty good.  So I think we move on to BA.

15             I guess my question on BA is there's a particular

16     instruction on that issue about, if I remember correctly,

17     it's about employees?

18             MS. WEDDLE:  Correct.

19             THE COURT:  So Attorney Weddle, tell me in the

20     context of this case why that particular instruction has

21     some significant meaning and why is that instruction which,

22     by the way, is a 2016 document for BA, matters in the

23     competitive marketplace.

24             MS. WEDDLE:  And so I think with these instructions

25     and with all of the instructions, it's essentially showing

1    how Cigna creates and generates its plan booklets for its

2    various plans.  And it's that type of disclosure of it that

3    it would reveal the way that Cigna analyzes these products'

4    features and the way that it designs these products'

5    features, and a lot of this is still done in the same way.

6         And also it contains, you know, a lot of Cigna's

7    prior, you know, work product, I'm not sure if that's the

8    exact right term to use, and how it's designed, its plans,

9    its products, its language, and how it instructs its sales

10   force and its operations group, who are preparing the plan

11   booklets to put together the language.

12         THE COURT:  All right.  Attorney Loper?

13         MS. LOPER:  Yes, your Honor.  As you point out,

14   this document, again, is from 2016, but Cigna has not,

15   without -- briefly referencing, has not shown how these

16   instructions even remain applicable or if this language is

17   applicable in 2021.  Cigna's concerned, in their briefing,

18   they state they're concerned about copying their proprietary

19   processes in these instructions; but it's difficult to see

20   how these specific instructions at issue, as your Honor

21   points out, there's "renew for employee only" is the type of

22   confidential information that needs to be protected.

23         And I would note that this -- this is a 28-page

24   document, and plaintiff had limited it to just the language

25   provisions that are relevant to the case.  The language that

1    your Honor's seeing that there's still a dispute over is

2    central to the case and included in the plaintiffs' class

3    definitions.  And the large redactions throughout it --

4            THE COURT:  Can you explain that last statement you

5    just made to me?  Why is it relevant?

6            MS. LOPER:  Oh, it -- the class is defined based on

7    language provisions that are in the case.  So your Honor

8    sees, "To receive prescription drug benefits..."  The

9    instructions themselves, your Honor, are not part of the

10   class definition.  I apologize if I misspoke there.  But the

11   plan language provisions that we've limited it to, just the

12   schedule portion, is.

13           THE COURT:  And the plaintiffs' argument is that

14   the class members are entitled to see the language that is

15   in their class definition, and having these large redactions

16   of instructions makes it appear that they're not seeing the

17   entirety.

18           THE COURT:  Okay.  Attorney Weddle, anything more

19   on this?  I kind of view BA, BC and BD as all raising

20   essentially the same, similar -- the same or similar issue,

21   and the documents are from 2016 and 2017, I think?

22           MS. WEDDLE:  That's correct, your Honor.

23           THE COURT:  Okay.  Anything further on those?

24           MS. WEDDLE:  The only thing I would add is that

25   even though they're a few years old, they're certainly not,

1      like, completely outdated.  And the same types of
2      instructions and the way that Cigna creates its booklets
3      still exists today.  So even though these are examples from
4      those years, Cigna still uses these types of instructions.

5             And the other thing I would say as well, your
6      Honor, where, just to respond to Ms. Loper's comments that
7      the class members are entitled to see the language, the
8      class members all have copies of their own plans that were
9      offered during the relevant time period, and they have the
10     language that's specific to their own plan.  But disclosing
11     the specific ways that Cigna has designed and operates to
12     generate differences in its plan language based off of the
13     various products that it offers is a different type of
14     information that, you know, that is confidential and
15     proprietary.

16            And again, I think that the difference here is, if
17     a class were certified, these plaintiffs, the class members
18     would essentially be parties.  They would be subject to the
19     protective order.  They could see the information.  The
20     difference is disclosing it publicly.

21            THE COURT:  All right.  Let's move on to BR.  I
22     will confess that on BR I could barely read this.  I was
23     able to zoom various portions of it once it was in the --
24     once I open it in PDF.  And I'm guessing, I guess my
25     fundamental question on this is, if we were to just redact

1    out the, I think there's a -- it might be the fourth column

2    over, basically there's two columns with names.  There's a

3    column with business owner and a name, and I think there's

4    another column right next to that on the left that has a

5    series of names as well.  If we were to redact out the names

6    of individuals, why should this data that looks like it's

7    about 10 to 11 years old need to be sealed?  I mean, I --

8    this is, like, stuff from 2010 and 2011.

9              MS. WEDDLE:  Yes, your Honor.  If you can just give

10   me a minute, I'm trying to locate a copy that I can read as

11   well and blow it up.  If you can just give me a minute.  I

12   want to make sure I'm looking at the right column.

13             THE COURT:  I'm going to try to call it up as well,

14   here.  Let me just get the exhibit number off the joint

15   statement here.  It's Exhibit 11 to the joint statement.

16             MS. WEDDLE:  Correct.  Your Honor?

17             THE COURT:  Yup.  Go ahead.

18             MS. WEDDLE:  I can address -- I can address the

19   comments.  It's more than just the specific client names

20   that relay the competitively sensitive information.  As you

21   can see, this document goes through and identifies various

22   claims processing issues and financial impact and potential

23   exposure, and the competitive harm comes from the fact that,

24   if this was publicly available, and even though it's old, it

25   can be used by competitors to try to point out that there

1      have been issues and to try to lure Cigna's clients away

2      from Cigna and to those competitors.  That's one concern.

3              The other thing as well as throughout the various

4      descriptions of the issues that also contains and reveals

5      some of the, you know, the pricing information and the

6      financial information around it as well.

7              THE COURT:  Right.  The problem I'm having with

8      this is where does that end in terms of age; right?  I mean,

9      obviously, I agree that this is commercial data.  What if

10     the same data was 15 years old?  Does it really have that

11     kind of value in 2021?  What if it was 20 years old?  I

12     mean, where do you draw the line on -- at what point does

13     commercial data start losing its value in the competitive

14     marketplace?

15             This goes back to the earlier hypothetical I asked,

16     which is, you know, if I'm a strategic business planner for

17     a competitor, you know, would I really walk into my boss'

18     office to sell my company on a strategic plan based on data

19     from a competitor that is from 2010 and 2011?

20             MS. WEDDLE:  And your Honor, to answer that

21     specifically, I think it could be used by a competitor to

22     try to say, Hey, look, I found that Cigna's had issues with

23     this.  You know, we know that this "X" client uses that.  We

24     can point out that we know that they've have had issues with

25     the past, in the past, and they could either, you know,

1    continue to keep their business with Cigna, where there's

2    been processing issues in the past, or come to us, and we'll

3    guarantee them that we're not going to have those issues.

4            THE COURT:  My first response -- go ahead.

5            MS. WEDDLE:  I was just going to say, so I think it

6    can be used, even though it is -- it is relating to some

7    older issues.

8            THE COURT:  And my response is somebody came to me

9    with that would be okay, great, but what is Cigna doing --

10   Cigna might have had those issues in 2010 or 2011, but what

11   are they doing about it now?

12           MS. WEDDLE:  In that hypothetical situation, I

13   mean, trying to think about all the layers here, you know,

14   what information is public, what's disclosed, what's out

15   there, I think the same type of information, if it were --if

16   there had been issues more recently also would be

17   confidential and could also cause the same competitive harm

18   if disclosed, whether it's more current or if it's from the

19   time period when these issue occurred.

20           THE COURT:  Look, I agree with you generically

21   that, you know, there could be reasons why documents that

22   are, and data that are older could cause competitive injury

23   at the present time.  And I think one of the cases that you

24   cited put forth that principle as well, although the

25   specific facts weren't really described in detail in the

1    opinion; and it wasn't all that illuminating to try to

2    understand why the Court reached -- had the holding it did.

3    But I get the general principle, and I guess the thing is,

4    you do have a burden to make a particularized showing under

5    the local rule, and I'm just trying to figure out how, you

6    know, 2010 issues surrounding reimbursements, et cetera, is

7    going to really impact the marketplace in 2021.

8                    Attorney Loper, do you want to be heard on this?

9                    MS. LOPER:  Yes, your Honor.  Thank you.  As your

10   Honor points out, plaintiffs' main position is that this

11   document, and even Ms. Weddle said that if this information

12   was in 2021 or present or more recent, then I believe

13   plaintiffs would have a slightly different position.  But

14   this document is from 2012.  It discusses issues in 2010,

15   2011 and 2012, as your Honor points out.

16                   This information is relevant to plaintiffs' claims

17   because it shows Cigna's ability to reprocess them.  And

18   that's particularly relevant given the pending class --

19   pending class certification motions that are on the docket

20   right now.  And Judge Garfinkel's previous order unsealed a

21   similar document that's relating to reprocessing and

22   remediations, and noting that the ability to reprocess

23   claims is an issue that is clearly relevant to the claims at

24   issue in the case today.

25                   So your Honor, for those main reasons, the fact

1    that this document really is very dated, and Cigna has not

2    shown how it will -- is applicable and causes them

3    commercial harm today as well as the fact that it's

4    relevant, relevant today.

5              THE COURT:  Are you referring to Exhibits U and W

6    from the prior ruling?

7              MS. LOPER:  Yes, your Honor.

8              THE COURT:  I mean, I wasn't -- I can see that

9    they're generally of the same subject matter.  I think

10   Attorney Weddle might disagree that they're substantially

11   similar, I suppose.  Do you want to be heard on that issue

12   about U and W?

13             MS. WEDDLE:  Your Honor, these are different

14   documents.  I think they're -- it's relating to reprocessing

15   issues.  Those were not the issues that were specifically

16   discussed, especially here.  This gets into very particular,

17   specific things that that occurred as to specific clients'

18   accounts.  So I don't think that they're substantially

19   similar in the way that Judge Garfinkel's prior ruling would

20   be applicable to these documents here.

21             THE COURT:  Okay.  I think we skipped over BJ and

22   BK, but I think, if I recall correctly, those are the ones

23   that I kind of hinted at might be relevant in today's

24   marketplace because they refer to -- they encompass the

25   10-year agreement between Cigna and Catamaran; right?

1           MS. WEDDLE:  That's right, your Honor.

2           THE COURT:  All right.  I think I already -- I may

3    have hinted at where I'm inclined to go on those two, so I

4    guess I'll, Attorney Weddle, I'll spare you the

5    hypotheticals on this one and call Attorney Loper and have

6    her explain to me why I should unseal these in their

7    entirety.

8           MS. LOPER:  Thank you, your Honor.  So again, for

9    these documents, Cigna claims that -- your Honor, if it's

10   okay with you, I'll just take BJ and BK at the same time.

11          THE COURT:  Sure.  Yup.

12          MS. LOPER:  While the contracts themselves may have

13   continued through 2023, the terms at issue were negotiated

14   in 2013.  I apologize, your Honor.  The terms at issue were

15   negotiated in 2013, and to plaintiffs' knowledge, these

16   contracts were amended multiple times.  So it's not even

17   clear that those terms would have remained applicable in

18   2023 should that contract have continued.  These pharmacy

19   contracts are relevant because they show the relationship

20   between Cigna and Catamaran as to how Cigna was able to take

21   clawbacks from these pharmacies because Catamaran was the

22   one that held the contract with the pharmacy; and the

23   specific terms are relevant in this case as well.

24          So even though, your Honor, I understand your

25   position that the -- or I understand where you're headed,

1   these terms could have remained applicable in 2023.  Cigna

2   has not shown that these specific terms are applicable, if

3   they were amended, and it's also difficult to see how any

4   competitors would like to use this information, that, again,

5   was negotiated in 2013, in 2021.

6           THE COURT:  Attorney Weddle, just on that point

7   that Attorney Loper made, were BJ and BK, like, amended

8   several times along the way?  I mean, are these the actual

9   contracts or are there other ones that superseded these?

10          MS. WEDDLE:  There are -- so first, the -- BJ is an

11   interoffice memo that describes many of the key terms and

12   summarizes them.

13          THE COURT:  Right.

14          MS. WEDDLE:  Many of those are key concepts that

15   govern and structure the relationship that existed between

16   Cigna and then Catamaran, which became OptumRX and remained

17   in force and effect through the life of the agreement,

18   including the same with BK.  As you can see, it's a pretty

19   detailed provision in the contract that governs the pricing

20   arrangement.  There are schedules that were attached to this

21   that set forth the specific pricing terms.  Those, of

22   course, were amended over time to address, you know, the

23   pricing agreement.  But the overall structure and the terms

24   that are set out here in Article 8 on pricing did not

25   change, did not change significantly, throughout the life of

1      the agreement.

2              THE COURT:  Attorney Loper, I guess the way I'm

3      thinking about BJ and BK is sort of a simplistic sports

4      analogy; and I suppose analogies are always dangerous

5      because one of you will point out all the flaws that I

6      haven't thought of in posing it.  That if, you know, Tom

7      Brady had a 10-year contract with the Patriots, and it was

8      structured a certain way, and even if it was negotiated in

9      2013 or whatever, and it expired in 2023, then he's a free

10     agent.  I suppose all the teams around the league would find

11     that particular contract, given the length of its terms, its

12     pricing that was supposed to be relatively current, in order

13     to figure out how they might want to structure a long-term

14     deal and offer him a long-term deal to get him to sign with

15     them.

16             So in light of the fact that even if this was

17     adopted in 2013, it was a 10-year agreement, and the pricing

18     still remains relevant, why would that not be of use to

19     competitors in the marketplace?  At least I think that might

20     actually be useful.

21             MS. LOPER:  Yes, your Honor.  And again, that the

22     basic argument is that these were negotiated 2013 and

23     throughout the course of the life in 2021, the terms could

24     change.  And I -- it's just difficult to see how someone

25     would go into an office using this to the commercial

1    disadvantage of Cigna and say, your Honor, Look, they

2    negotiated this contract in 20 -- or say they negotiated

3    these terms in 2013, from a 2013 contract, and we're going

4    to copy those, and that's what their commercial advantage

5    is.  And that's plaintiffs' position on this.

6            THE COURT:  Attorney Weddle, do you want to be

7    heard?  I suppose you probably liked the Tom Brady analogy.

8            MR. WEDDLE:  I do, your Honor.  Despite the fact

9    that -- how I feel about the Patriots or the Buccaneers, but

10   I liked the Brady analogy.

11           What I can say is I think the date that the

12   contract terms were in negotiation isn't really the critical

13   point when you're looking at the potential for competitive

14   harm if it's public disclosed.  What's important is the fact

15   that the terms were in effect, and the parties were

16   operating in accordance with them until very recently, when

17   the contract was terminated.

18           And that essentially means that those are terms

19   that the parties were in agreement on and operating as of a

20   more recent time.  And a competitor certainly can come in

21   and take those terms -- again, this sets out the details of

22   the pricing arrangement and how the pricing is going to work

23   under this contract.  It's very detailed, and someone could

24   go ahead and either replicate it or tweak it in ways to try

25   to make it more favorable one way or another and use it to

1     their advantage, to the disadvantage of either Cigna or

2     OptumRX, quite frankly, to both parties' disadvantage.

3          THE COURT:  Okay.  So we've got two left, I think,

4     CC and CD.  Attorney Weddle, do you want to be heard on

5     those?

6          MS. WEDDLE:  Yes.  Let me pull them up quickly.

7     Right, your Honor.  So these two documents here, and if you

8     don't mind, I'll talk about them together because the

9     portion of CC that Cigna seeks to be sealed is an excerpt

10    from a -- what I'll -- it's more of a guidelines-type

11    document that sets forth, you know, Cigna's process for

12    reprocessing certain types of customer pharmacy claims based

13    on particular payment issues.

14         And then with CD, it's a similar -- it's a similar

15    issue where it's another excerpt of one of those guidelines

16    and then discussion about it.  And it reflects essentially

17    Cigna's self-analysis on these issues and potential revision

18    to these guidelines based on it.  It, you know, if --

19    there's sensitive internal financial analysis and

20    assessments of potential exposure and potential regulatory

21    issues on this, and if it was disclosed, it could be used by

22    competitors, again, to show potential limitations in Cigna's

23    processes and again to try to use that to lure away both

24    current, you know, both current customers of Cigna or to try

25    to win the business of any future customers who are

1    considering Cigna as a competitor in this market.

2         And the other thing I'll add is that a lot of this

3    could be sensitive internal discussions, and financial

4    pricing terms is information that has been sealed before by

5    the Court.

6         THE COURT:  Which -- any particular exhibits you

7    want to refer me to that I can look at or -- I thought Judge

8    Garfinkel had unsealed some documents that were sort of

9    similar to this, but I could be wrong.

10        MS. WEDDLE:  Let me -- apologies.  I'm working with

11   one of those binders where the rings got --

12        THE COURT:  Oh, yeah.

13        MS. WEDDLE:  -- and it's a nightmare.

14        Again, it goes back to that -- it would be Exhibit

15   G.  It's on Page 14 of Garfinkel's order, the slideshow

16   presentation with analysis.

17        THE COURT:  That's the strategic business

18   development plan that he sealed; right?

19        MS. WEDDLE:  Correct.

20        THE COURT:  I think the big-picture issue on these

21   types of -- I get his ruling on Exhibit G.  I saw that, and

22   I thought the key feature of that ruling was, you know,

23   there was a particular reason why you wouldn't want a

24   strategic business plan, long-term objectives, out in the

25   public because that is something a competitor can use.

1          And I think that with some of this information from

2     2014 and 2015, you know, unless there was something in these

3     documents that suggested that this type of pricing and

4     problem resolution is still being utilized by Cigna, you

5     know, in 2019, 2020, and 2021, I'm not sure the

6     particularized showing is there because -- I mean, I

7     understand hypothetically somebody could point out Cigna's

8     limitations in 2014 and 2015 to potential customers; but

9     would that really cause a customer to make a decision, you

10    know, based on issues back, you know, six, seven, eight

11    years ago?  I guess that's the big-picture issue.  I don't

12    have an answer to it at the moment, but that's the issue

13    that I'm grappling with here.

14          MS. WEDDLE:  I hear you, your Honor.  And I would

15    just respond by, again, you know, this -- in particular

16    here, this isn't just email discussion, you know, it's email

17    discussion including the specific guidelines that Cigna

18    uses.  My understanding is that -- at least I am not aware

19    that this is no longer in operation or used at all, and I

20    think even going to the date of the document, again, I think

21    it is something that could be used to lure away customers or

22    Cigna's clients if in that -- a particular customer might

23    find something like that, you know, important to them and

24    could -- and could be persuaded by having that information

25    when their -- when Cigna's competitor is pitching to that

1    client and making that distinction between the services they

2    offer; and that's some of the issues that Cigna faces.

3              THE COURT:  Okay.  Attorney Loper?

4              MS. LOPER:  Thank you, your Honor.  Again, Cigna

5    has treated this document as -- it's purely speculative that

6    these documents from six and seven years ago are going to

7    cause them any commercial harm in 2021.  Plaintiffs view

8    this document as similar to Exhibit BR.  And I understand

9    that it's Cigna's position that it's more similar to Judge

10   Garfinkel's ruling in Exhibit G, and plaintiffs believe that

11   it is more similar to U and W, where Judge Garfinkel noted

12   that reprocessing was an issue that was central to this

13   case; and that's very relevant to plaintiffs' claim.  Both

14   Exhibits CC and CW deal with reprocessing and remediations,

15   and it's plaintiffs' position that that is entirely relevant

16   to this case and similar to previous rulings.

17             THE COURT:  Okay.  I think that's all the questions

18   that I had.  So I will get a ruling onto the docket probably

19   by, I would guess, early next week.  It's not going to be

20   any kind of a lengthy scholarly opinion.  It's going to be

21   based on the standards that apply, and I'll just roll

22   through each of the disputed documents and make very short

23   docket entry rulings on those.

24             I do want to say thank you to both of you for a

25   really good job on the arguments, and also the joint

1    statement and the table that was appended to it.  It was

2    very, very helpful, so I greatly appreciate that.

3              So with that, thank you.  I think we're in recess,

4    and have a great weekend.

5              MS. WEDDLE:  Thank you, your Honor.  Appreciate

6    your time in digging through all of this as well.

7              THE COURT:  All right.

8              MS. LOPER:  Thank you, your Honor.

9

10             (Adjourned:  2:13 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3

 4

 5      I hereby certify that the foregoing 46 pages are a

 6      complete and accurate computer-aided transcription of

 7      my original stenotype notes taken of the proceeding,

 8      which was held in re:  Kimberly A. Negron, Individually

 9      and on behalf of all others, v. Cigna, et al., held

10      remotely, via Zoom, before the Honorable S. Dave Vatti,

11      USDC Magistrate Judge, U.S. District, 915 Lafayette

12      Boulevard, Bridgeport, Connecticut on May 7, 2021.

13

14

15

16                    _____/s/ KT_____

17                      Kirsten Telhiard, LSR

18

19

20

21

22

23

24

25
```

Falzarano Court Reporters, LLC