**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KIMBERLY A. NEGRON, DANIEL PERRY, COURTNEY GALLAGHER, NINA CUROL, ROGER CUROL, and BILLY RAY BLOCKER, JR., | |
| Plaintiffs, | |
| | Civ. A. No. 16-cv-1702 (JAM) |
| v. | |
| | March 18, 2022 |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**CIGNA HEALTH AND LIFE INSURANCE COMPANY'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**[REDACTED]**

**MORGAN, LEWIS & BOCKIUS LLP**
One State Street
Hartford, Connecticut 06103
860-240-2945

*Attorneys for Defendant Cigna Health and Life Insurance Company*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 5

III.  SUMMARY JUDGMENT STANDARD ............................................................... 7

IV.   ARGUMENT .......................................................................................................... 8

      A.    CHLIC never conducted or participated in conducting the affairs of Optum and/or Argus.................................................................................................. 10

      B.    None of the Plaintiffs suffered any injury "by reason of" any alleged misrepresentation by CHLIC in the plan language.............................................. 17

      C.    CHLIC's administration of Plaintiffs' pharmacy benefits consistent with traditional/spread pricing is not racketeering activity.......................................... 21

      D.    None of the Plaintiffs can establish any other basis to find CHLIC committed a RICO violation.............................................................................. 23

      E.    Plaintiffs' derivative RICO conspiracy claim also fails as a matter of law......... 26

V.    CONCLUSION...................................................................................................... 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Laboratories v. Adelphia Supply USA*,
   No. 15-CV-5826 (CBA) (LB), 2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) ........................10, 11

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*,
   107 F. Supp. 2d 210 (S.D.N.Y. 2000).......................................................................... 11, 12-13

*Anderson v. Smithfield Foods, Inc.*,
   209 F. Supp. 2d 1270 (M.D. Fla. 2002), *aff'd*, 353 F.3d 912 (11th Cir. 2003) .....................27

*Aslanidis v. U.S. Lines, Inc.*,
   7 F.3d 1067 (2d Cir. 1993).........................................................................................................8

*Bigsby v. Barclays Capital Real Estate, Inc.*,
   170 F. Supp. 3d 568 (S.D.N.Y. 2016).....................................................................................23

*Bridge v. Phoenix Bond & Indemnity Co.*,
   553 U.S. 639 (2008)..................................................................................................................17

*Brown v. Henderson*,
   257 F.3d 246 (2d Cir. 2001).....................................................................................................24

*Calabrese v. CSC Holdings, Inc.*,
   No. 02-5171, 2009 WL 425879 (E.D.N.Y. Feb. 19, 2009) ....................................................17

*Camera v. Target Corp.*,
   No. 3:18-CV-00095 (KAD), 2020 WL 3051751 (D. Conn. June 8, 2020) ...............................8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................................7, 8

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
   187 F.3d 229 (2d Cir. 1999)..................................................................................................9, 27

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013).....................................................................................................24

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001).....................................................................................................10

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v.
   Discon, Inc.*, 525 U.S. 128 (1998) ..........................................................................................27

*Dunn v. Stand. Ins. Co.*,
  156 F. Supp. 2d 227 (D. Conn. 2001) ........................................................................8

*Faryniarz v. Ramirez*,
  62 F. Supp. 3d 240 (D. Conn. 2014) ..........................................................................8

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
  385 F.3d 159 (2d Cir. 2004) ....................................................................................26

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ......................................................................................17

*Fountain v. United States*,
  357 F.3d 250 (2d Cir. 2004) ....................................................................................22

*Gorham v. Town of Trumbull Bd. of Educ.*,
  7 F. Supp. 3d 218 (D. Conn. 2014) ...........................................................................8

*Hernandez v. Balakian*,
  480 F. Supp. 2d 1198 (E.D. Cal. 2007) ...................................................................27

*Kirk v. Heppt*,
  423 F. Supp. 2d 147 (S.D.N.Y. 2006) ........................................................................1

*Lefkowitz v. Reissman*,
  No. 12-CV-8703 (RA), 2014 WL 925410 (S.D.N.Y. Mar. 7, 2014) ......................23

*Lockheed Martin Corp. v. Boeing Co.*,
  357 F. Supp. 2d 1350 (M.D. Fla. 2005) ..................................................................14

*Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*,
  354 F. Supp. 2d 293 (S.D.N.Y. 2004) .....................................................................27

*Marlow v. Allianz Life Ins. Co. of N. Am.*,
  No. 08-CV-00752-CMA-MJW, 2009 WL 1328636 (D. Colo. May 12, 2009) ...........12, 16

*Midwest Grinding Co. v. Spitz*,
  976 F.2d 1016 (7th Cir. 1992) ...................................................................................9

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016) ................................................................................4, 23

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ............................................................................................10, 11

*Schmidt v. Fleet Bank*,
  16 F. Supp. 2d 340 (S.D.N.Y. 1998) ........................................................................11

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,*
    806 F.3d 71 (2d Cir. 2015)...................................................................................18

*Tapia-Ortiz v. Winter,*
    185 F.3d 8 (2d Cir. 1999)....................................................................................28

*Tardibuono-Quigley v. HSBC Mortgage Co.,*
    No. 15-CV-6940 (KMK), 2017 WL 1216925 (S.D.N.Y. March 30, 2017) ...........................23

*In re U.S. Foodservice, Inc. Pricing Litigation,*
    729 F.3d 108 (2d Cir. 2013)............................................................................5, 26

*UFCW Local 1776 v. Eli Lilly & Co.,*
    620 F.3d 121 (2d Cir. 2010)....................................................................... *passim*

*United States v. Carpenter,*
    190 F. Supp. 3d 260 (D. Conn. 2016)...............................................................22, 24

*Vickers Stock Research Corp. v. Quotron Sys., Inc.,*
    No. 96-CV-2269 (HB), 1997 WL 420265 (S.D.N.Y. July 25, 1997), *aff'd*
    (Aug. 24, 1998) .....................................................................................11, 12, 16

**Statutes**

Employee Retirement Income Security Act of 1974,
    29 U.S.C. § 1001 *et seq.*........................................................................... *passim*

Racketeer Influenced and Corrupt Organization Act,
    18 U.S.C. §§ 1961–68.............................................................................. *passim*
    18 U.S.C. § 1962..................................................................................................9
    18 U.S.C. § 1962(c)..........................................................................................9, 10
    18 U.S.C. § 1962(d)....................................................................................9, 27, 28
    18 U.S.C. § 1964(c)....................................................................................8, 17, 27

**Other Authorities**

Fed. R. Civ. P. 56(a) .....................................................................................................7

Federal Rules of Civil Procedure Rule 56 ..................................................................1, 8

Local Rule 56............................................................................................................1
    Local Rule 56(a)1 ....................................................................................................5
    Local Rule 56(c) ......................................................................................................7

Pub. L. No. 91-452 (1970)............................................................................................8

Defendant Cigna Health and Life Insurance Company ("CHLIC") respectfully submits this memorandum of law in support of its motion for partial summary judgment on both of Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–68, as alleged in Counts VII and VIII of the Second Amended Consolidated Complaint ("Complaint"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.

## I.   <u>INTRODUCTION</u>

In this case, like thousands of cases filed around the country each year, Plaintiffs assert claims for benefits due and breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  By their claims, Plaintiffs seek to have the Court read certain isolated terms in their various prescription drug benefit plans as effectively creating so-called "pass-through" pricing on drug costs for plan participants, while CHLIC maintains that the plan language should be read—consistent with the benefit design selected by Plaintiffs' employers—to adopt "traditional" or "spread" pricing.[1]  But the six Plaintiffs here— who allegedly were denied a few thousand dollars of certain prescription drug benefits between 2013 and 2019—are trying to weaponize their ERISA claims by asserting that CHLIC's alleged wrongful denial of benefits is also federal racketeering activity.[2]

---

[1]      Traditional/spread pricing and pass-through pricing are the two most common types of benefit designs that plan sponsors select from to pay for prescription drug benefit costs (including pharmacy benefit manager ("PBM") services).  Traditional/spread pricing allows plan sponsors to negotiate predictable drug costs for the plan year and pay for PBM services through a differential or "spread" between the plan sponsor's negotiated cost and the amount of the PBM's (or its vendor's) network pharmacy reimbursement. In pass-through pricing, the plan sponsor's drug costs are typically equal to the pharmacy reimbursement rates, but the costs for the plan's range of administrative services are paid as a separate recurring fee. Depending on an employer's particular situation, traditional/spread pricing often results in lower costs for plan sponsors on their prescription drug plans.  SOF ¶ 4.

[2]      *See, e.g.*, *Kirk v. Heppt*, 423 F. Supp. 2d 147, 149 (S.D.N.Y. 2006) ("[C]ourts … 'must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing.'").

While a trial is necessary to resolve the parties' disputes as to the meaning and legal effect of certain terms in the plans under which Plaintiffs received benefits, Plaintiffs' attempt to turn a benefits or contractual dispute about the meaning of those plan terms into allegations of fraud and other criminal activity does not hold water.  Summary judgment should be entered in CHLIC's favor on Plaintiffs' RICO claims.

Plaintiffs' RICO claims are based on the flawed argument that CHLIC "conducted the affairs"—through alleged acts of mail and wire fraud—of two completely separate, independent vendors that contracted to provide services to CHLIC's pharmacy benefit management operations: (1) OptumRx, Inc. ("Optum"), a part of UnitedHealthcare, a direct competitor of CHLIC; and (2) Argus Health Systems, Inc. ("Argus"), known today as DST Pharmacy Solutions Systems, Inc. and owned by SS&C Technologies Holdings, the world's largest hedge fund and private equity administrator.  CHLIC's contracts with Optum and Argus provided the two components necessary to deliver prescription drug benefits to CHLIC clients and customers:  access to a retail pharmacy network (in the case of Optum) and an electronic claims processing system (in the case of Argus). Plaintiffs ignore the comprehensive and legitimate nature of these necessary services and instead assert that each (or both) of these sophisticated, legitimate, independent companies constitutes a RICO "enterprise" controlled by CHLIC in order to facilitate a "Clawback Scheme" comprising amounts paid or credited to CHLIC as part of the reconciliation of prescription drug transactions at Plaintiffs' respective pharmacies.  Plaintiffs' argument necessarily depends on mischaracterizing the complex, multi-year, multi-faceted, and heavily-negotiated contracts between CHLIC and its vendors.

Fact discovery in this matter is now complete, however, and the undisputed facts confirm that CHLIC did not conduct or participate in conducting the affairs of Optum or Argus through a

pattern of racketeering activity.  Five years of litigation, the production of more than 12 million pages of documents, and approximately 20 depositions, including depositions of both Cigna's CEO and CHLIC's President, have not revealed any evidence that would permit the trier of fact to find CHLIC did so.  On the contrary, the undisputed evidence shows that CHLIC acted in the ordinary course of business pursuant to its arm's-length contractual relationships with Optum and Argus.  Whatever disputes may exist regarding the parties' view of various snippets of plan language, there is zero evidence that CHLIC operated or managed Optum or Argus, and Plaintiffs' RICO claims fail for this dispositive reason.

Each of Plaintiffs' RICO claims also fail for other, independent reasons.  First, Plaintiffs' RICO claims rest on allegations that CHLIC misrepresented or omitted certain material facts. Although these allegations have been a moving target throughout the case, each Plaintiff alleges that CHLIC made certain misrepresentations in his or her respective benefit plan booklet that he or she "would pay a certain amount for prescription drugs" while CHLIC allegedly had "knowledge and intent that [he or she] would be charged a higher amount."  Compl. ¶ 285; *see* ECF No. 206 at 20 (identifying snippets of language from one Plaintiff's plan documents as CHLIC's alleged misrepresentation); *see also* ECF No. 401 at 50-51 ("…the basis of plaintiffs' RICO Class in their motion for class certification is the alleged misrepresentations within the language of the plans themselves.").

Plaintiffs cannot establish that any such purported misrepresentations caused them any cognizable injury under RICO, however, because ***none*** of the Plaintiffs read or relied on ***any*** provisions in their plan documents—including any specific language Plaintiffs allege was a misrepresentation—in deciding to enroll in their group benefit plans (selected by their or their spouse's employer) or to obtain prescription drugs under their plans.  Thus, Plaintiffs are unable

to establish the necessary element of causation, i.e., an injury "by reason of" the alleged misrepresentations in their plan documents.

Second, even if Plaintiffs had read the language in their plan documents and interpreted it as their lawyers have done in bringing this lawsuit, Plaintiffs still lack a viable RICO claim because Plaintiffs cannot establish that any alleged misrepresentations by CHLIC in their plan documents constitute predicate acts of mail or wire fraud.  As previewed above, Plaintiffs essentially argue that CHLIC's administration of traditional/spread pricing amounts to a RICO violation.  But CHLIC believes that Plaintiffs paid the amount their employers intended for them to pay consistent with their selected benefit designs.  A trial on Plaintiffs' ERISA claims will resolve that question.  There is no dispute, however, that CHLIC acted and administered Plaintiffs' benefits consistent with what it believed (and believes today) was required pursuant to each employer's benefit design.  Even if CHLIC's interpretation were to turn out to be incorrect, this does not constitute fraud or a RICO violation.  Otherwise, it would transform every legitimate dispute about how to interpret ERISA benefits into a RICO claim, and that is not the law.  *See, e.g.*, *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) ("A breach of contract does not amount to mail [or wire] fraud.").

Third, none of the six Plaintiffs can establish a viable RICO claim based on any other alleged misrepresentation.  While each Plaintiff asserts generally that misrepresentations occurred "at the point of sale," i.e., when he or she went into a pharmacy to have a prescription filled and paid a cost share, none can offer evidence from which a factfinder could conclude that a RICO violation occurred during those interactions.  None has presented sufficient evidence of the particular interactions at issue—such as what was said by whom at the point of sale about the price paid and how, if at all, it related to what the pharmacy had agreed to be paid for that particular

4

transaction—or any other details necessary to establish an actionable misrepresentation by CHLIC. And because none of the Plaintiffs reviewed any of their plan language, none can be said to have associated the price that they paid with the alleged misrepresentations in the plan language, which is one grounds (of many) for distinguishing this case from *In re U.S. Foodservice, Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013).

This case should be a straightforward dispute under ERISA about the prices Plaintiffs were required to pay (as a copayment, coinsurance, or deductible or otherwise) for their prescription drugs under their benefit plans. That the parties have a dispute about the interpretation of language in plan documentation does not convert the case into a RICO action, and the Court should grant CHLIC summary judgment on Plaintiffs' RICO claims.

## II.   <u>STATEMENT OF FACTS</u>

Pursuant to Local Rule 56(a)1, CHLIC is contemporaneously filing a separate Statement of Undisputed Material Facts ("SOF"), which is incorporated here by reference. Based on these undisputed facts, CHLIC is entitled to summary judgment as a matter of law.

For ease of reference, CHLIC briefly identifies below each Plaintiff in this matter, his or her benefit plans, and key admissions regarding his or her pharmacy benefits experience during the relevant time period:

<u>Plaintiff Kimberly Negron:</u>   Ms. Negron participated in an ASO plan that provided prescription drug benefits offered by her employer, which CHLIC administered.   ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████   SOF ¶¶ 5-6.

<u>Plaintiff Daniel Perry:</u>  Mr. Perry participated in an ASO plan that provided prescription drug benefits offered by his and his spouse's employer, which CHLIC administered.  █████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████  SOF ¶¶ 7-8.

<u>Plaintiffs Roger and Nina Curol:</u>  Mr. and Mrs. Curol participated in an ASO plan administered by CHLIC that provided prescription drug benefits offered by Mr. Curol's employer.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████  SOF ¶¶ 9-10.

6

<u>Plaintiff Billy Ray Blocker, Jr.:</u>  Mr. Blocker participated in a non-ERISA ASO plan that provided prescription drug benefits offered by his employer, which CHLIC administered. 

SOF ¶¶ 11-12.

<u>Plaintiff Courtney Gallagher:</u>  Ms. Gallagher participated in a plan that provided prescription drug benefits offered by her employer.  Initially, Ms. Gallagher's employer had a fully insured plan, which later switched to an ASO plan administered by CHLIC.  Ms. Gallagher does not allege that she ever reviewed her plan documents in deciding to join her plan or in filling any prescriptions.  She also does not allege anything regarding her interactions with any pharmacist. SOF ¶ 13.

## III.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Local Rule 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A dispute is "genuine" only if the factfinder could resolve the dispute in favor of the nonmoving party based on the record; a fact is "material" only if it could "affect the outcome of the suit under the governing law." *Gorham v. Town of Trumbull Bd. of Educ.*, 7 F. Supp. 3d 218, 228 (D. Conn. 2014).

Once the moving party has met its burden, the party opposing summary judgment must "demonstrate more than some metaphysical doubt as to the material facts, … [and] must come

forward with specific facts showing that there is a genuine issue for trial." *Id.* at 229 (citing *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).  The party opposing summary judgment cannot meet its burden with "speculation and conjecture," "unsupported allegations" or a "mere scintilla of evidence in support" of the nonmovant's position. *Id.*  If the evidence is merely colorable, or is not significantly probative, the nonmovant fails to meet this burden and summary judgment should be granted. *Camera v. Target Corp.*, No. 3:18-CV-00095 (KAD), 2020 WL 3051751, at *1 (D. Conn. June 8, 2020).

Because Plaintiffs have not adduced, and cannot adduce, evidence sufficient to establish one or more essential elements of their RICO claims, the Court should grant summary judgment in favor of CHLIC and dismiss Counts VII and VIII. *See Dunn v. Stand. Ins. Co.*, 156 F. Supp. 2d 227, 233 (D. Conn. 2001) (citing *Celotex*, 477 U.S. at 322) (Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV.   **ARGUMENT**

RICO was enacted "to seek the eradication of organized crime in the United States."  Pub. L. No. 91-452 (1970).  It is primarily a criminal statute, but nonetheless provides that private parties who have been injured "by reason of" a RICO violation may in certain circumstances recover civilly.  18 U.S.C. § 1964(c).  Although "[t]he true civil RICO plaintiff may well provide a laudatory societal service [by] supplementing the government's efforts to protect the general public and the common good from felonious conduct," "all too frequently plaintiffs attempt to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act." *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 251 (D. Conn. 2014).

Plaintiffs frame their RICO claims here under 18 U.S.C. § 1962(c),[3] which requires Plaintiffs to show (1) a substantive RICO violation under § 1962; (2) injury to the plaintiff; and (3) that such injury was by reason of (i.e., caused by) a substantive RICO violation.  *See, e.g.*, *UFCW Local 1776 v. Eli Lilly & Co.* ("*Zyprexa*"), 620 F.3d 121, 131 (2d Cir. 2010).  For purposes of establishing this last element, a plaintiff must show that they were injured by the defendant's (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *See, e.g.*, *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).  Predictably, the alleged predicate acts for Plaintiffs' RICO violation rest solely on alleged mail and wire fraud.  *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("The widespread abuse of civil RICO stems from the fact that all modern business transactions entail use of the mails or wires—giving plaintiffs a jurisdictional hook—and the fact that RICO offers a far more generous compensation scheme than typically available in state court.").

Counts VII and VIII are nothing more than Plaintiffs' attempt to "dress up" this garden-variety ERISA case as one implicating RICO.  CHLIC is entitled to summary judgment because (1) CHLIC did not conduct or participate in conducting the affairs of the alleged RICO enterprises, Optum and Argus; (2) none of the Plaintiffs suffered any injury "by reason of" any alleged misrepresentation by CHLIC in the plan language (which they did not read); (3) CHLIC's administration of pharmacy benefits consistent with its good-faith interpretation of that language does not transform a claim for denial of benefits or breach of contract into racketeering activity; (4) none of the Plaintiffs can establish a RICO claim based on any alleged interactions at their

---

[3]     Count VII alleges that CHLIC violated 18 U.S.C. § 1962(c).  Count VIII alleges that CHLIC violated 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c).  Where there is no § 1962(c) violation, there cannot be a conspiracy to violate § 1962(c).  *See* Part IV(E), *infra*.

various pharmacies; and (5) because there is no underlying viable RICO claim, there can be no claim for conspiracy to violate RICO.

### A.  CHLIC never conducted or participated in conducting the affairs of Optum and/or Argus.

Plaintiffs' RICO claims fail because Plaintiffs cannot establish that CHLIC conducted or participated in conducting the affairs of the alleged RICO enterprises, Optum and Argus.[4]  Indeed, the undisputed evidence demonstrates that the opposite is true—CHLIC, Optum, and Argus were all conducting their own normal business affairs in their dealings with one another, which arose from arm's length contractual relationships for certain PBM services necessary to provide prescription benefits to CHLIC clients and customers, namely access to a network of retail pharmacies (in the case of Optum) and claims processing services (in the case of Argus).

Section 1962(c) prohibits persons associated with an enterprise from conducting or participating in the conduct of such enterprise's affairs through a pattern of racketeering activity. To conduct or participate in the conduct of an enterprise's affairs, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Not just "any involvement in the affairs of an enterprise [can] satisfy the 'conduct or participate' requirement."  *Id.* at 178.  Rather, "one must have some part in ***directing*** [the enterprise's] affairs."  *Id.* at 179 (emphasis added); *see also Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 57802, at *6 (E.D.N.Y. Jan. 4, 2017) (same);

---

[4]     Plaintiffs define the alleged "Optum enterprise" as Optum itself, not as a subset or portion of that company.  Compl. ¶ 265 ("[CHLIC was] associated with an enterprise consisting of OptumRx"); *see also id.* ¶ 298.  Plaintiffs do the same for Argus, defining the alleged "Argus enterprise" as Argus itself.  *Id.* ¶ 263 ("[CHLIC was] associated with an enterprise consisting of Argus"); *see also id.* ¶ 298.  "A RICO enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  Plaintiffs have identified only legal entities, Optum and Argus, as alleged enterprises.  *See* Compl. ¶¶ 264, 266.

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 216 (S.D.N.Y. 2000) ("To 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must be said to have played a part in operating or managing those affairs, either by being part of upper management or by exerting control over the enterprise." (citing *Reves*, 507 U.S. at 184)).  In determining whether a defendant participated in the operation or management of an enterprise, courts "focus on the degree of control the defendant exerted over the enterprise rather than the amount of defendant's involvement in the enterprise."  *Vickers Stock Research Corp. v. Quotron Sys., Inc.*, No. 96-CV-2269 (HB), 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997), *aff'd* (Aug. 24, 1998); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) ("There is a substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under *Reves* because the test is not involvement but control.").[5]

Because RICO requires direction of the alleged enterprise, liability does not attach where (1) the defendant and the alleged enterprise were acting in their normal course of business; (2) the defendant's dealings with the alleged enterprise arose directly from their contractual relationship; and/or (3) the defendant's relationship with the alleged enterprise was nothing more than an arm's length business relationship.  *See Abbott*, 2017 WL 57802, at *7 (rejecting plaintiff's argument that a group of pharmacies conducted an enterprise in violation of RICO by seeking fraudulent reimbursements from distributors because "[e]ven assuming the truth of [the plaintiff's] conclusory allegations that the pharmacies and defendants 'have a long-standing relationship,' no factual

---

[5]     Most cases discussing the "conduct the affairs" requirement of RICO involve association-in-fact enterprises, or relationships between owners or parent companies and an affiliate alleged to be the enterprise—not separate independent legal entity enterprises as are alleged here.  Indeed, CHLIC's research did not reveal any case in which a Court analyzed and found this requirement satisfied in the context alleged here—arm's length contracts with vendors without any ownership or extra-contractual connections between the parties.

allegations suggest that that relationship was other than an arm's-length business relationship between a buyer and a seller"); *Marlow v. Allianz Life Ins. Co. of N. Am.*, No. 08-CV-00752-CMA-MJW, 2009 WL 1328636, at *5 (D. Colo. May 12, 2009) (RICO is not violated "where an alleged enterprise is really nothing more than a defendant corporation and its affiliates and associates conducting normal business affairs"); *Vickers*, 1997 WL 420265 at *4 (granting summary judgment where defendant did not "participate in the operation or management" of the alleged RICO enterprises because defendant's dealings with those alleged enterprises arose "directly from their contractual relationship" and "any persuasive power [defendant] may have possessed … sprang from their contractual relationship").

In *Vickers*, for example, the plaintiffs agreed to sell financial research information to Quotron, which in turn sold that information to its customers. 1997 WL 420265 at *1. Plaintiffs asserted RICO claims, arguing that Quotron participated in the "operation or management" of alleged legal entity enterprises' affairs by helping them to implement their contractual arrangement. *Id.* at *4. The Court granted summary judgment for Quotron, finding that Quotron did not "participate in the operation or management" of the alleged enterprises because Quotron's dealings with them arose "directly from their contractual relationship." *Id.* Though Quotron and the alleged enterprises had worked closely to realize contractual goals, they did not have a partnership or joint venture agreement or consider sharing profits or losses in any way. *Id.*[6]

In *Amsterdam*, the plaintiff asserted RICO claims based on allegations that the defendants conspired to transport and sell contraband cigarettes and conducted financial transactions

---

[6]    In their opposition to CHLIC's motion to dismiss, Plaintiffs' argument that CHLIC conducted the affairs of Optum and Argus largely rested on their allegation that CHLIC shared portions of "Clawbacks" with Optum and Argus.  *See* ECF No. 97 at 59-60.  But the undisputed record confirms that these allegations are completely false.  *See* SOF ¶ 23 (Optum did not share in or receive any alleged "Clawbacks"); *id.* ¶¶ 34, 36 (Argus was paid ████████████████████████████████████████████████, and did not share in or receive any alleged "Clawbacks").

involving the proceeds from unlawful cigarette trafficking.  107 F. Supp. 2d at 214.  The Court granted the defendants' motion to dismiss, holding that the defendants could not control or operate the affairs of the alleged RICO enterprise merely by providing services to the enterprise or by selling the product at issue; rather, "one must be said to have played a part in operating or managing those affairs, either by being part of upper management or by exerting control over the enterprise." *Id.* at 216; *see also id.* at 217-18 (explaining that the operation and management test "is a very difficult test to satisfy").

Here, not only do Plaintiffs' own allegations expressly acknowledge that CHLIC's dealings with Optum and Argus arise from their contractual relationships with one another (*see* Compl. ¶¶ 272, 274, 275), but the undisputed evidence confirms that CHLIC, Optum, and Argus were all conducting their normal business affairs.  Their dealings—necessary to deliver prescription drug benefits to CHLIC's clients and customers—arose from arm's length contractual relationships. CHLIC, Optum, and Argus are separate legal entities.  SOF ¶¶ 16, 28.  They are not subsidiaries or affiliates of one another.  SOF ¶¶ 16, 28.  There is no overlap in management or ownership between them.  SOF ¶¶ 16, 28.  Indeed, CHLIC, Optum, and Argus are independent companies that engage in their own distinct lines of business—CHLIC as a global health service company, Optum as a provider of pharmacy benefit management services, and Argus as a provider of pharmacy claims processing.  SOF ¶¶ 1, 17, 29.

CHLIC's connections to Optum and Argus are limited to CHLIC's contractual relationships with each entity.  In 2013, CHLIC contracted with Catamaran PBM of Illinois, Inc. ("Catamaran"), which was acquired by Optum in 2015.  SOF ¶ 17.  The contract dictated the terms of CHLIC's access to Optum's network, including the rates CHLIC paid Optum for the prescription drugs that Optum's network pharmacies provided to participants in CHLIC's clients'

13

plans.  SOF ¶ 18.  Optum was not involved in drafting plan documents for the participants in plans insured or administered by CHLIC.  Optum did not have knowledge of or access to these documents.  SOF ¶ 19.  Optum also did not have knowledge regarding CHLIC's agreements with its clients (the plan sponsors) and was not privy to the financial or pricing arrangements between those two parties.  SOF ¶ 19.  Optum did not share in or receive any of the alleged "Clawback" amounts allegedly paid to CHLIC.  SOF ¶ 23.  Indeed, throughout the relevant time period, Optum has been a wholly-owned subsidiary of UnitedHealth Group, which is one of CHLIC's competitors.  SOF ¶ 15.  This further belies any notion that CHLIC controlled or participated in the control of Optum's affairs.  *See Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1363 (M.D. Fla. 2005) (dismissing plaintiff's RICO claim because alleged associations-in-fact comprised competing entities, with conflicting interests, that acted independently and did not constitute a RICO enterprise).

Similarly, CHLIC's contract with Argus was for claims processing, nothing more.  SOF ¶ 29.  Argus was not involved with designing or creating plans insured or administered by CHLIC.  SOF ¶ 32.  CHLIC did not provide Argus with copies of participants' plan documents.  *Id.*  Argus's corporate representative testified that Argus negotiated its contracts with CHLIC in a similar manner that Argus negotiates with its other clients and that Argus's contractual arrangement with CHLIC is similar to Argus's arrangements with its other clients. SOF ¶ 33.  Additionally, as with Optum, Argus did not share in or receive any of the alleged "Clawback" amounts allegedly paid to CHLIC.  SOF ¶ 36.

CHLIC's contracts with Optum and Argus make clear that CHLIC did not direct or otherwise exercise control over Optum's or Argus's affairs, respectively.  For example, the Optum contract provides that CHLIC and Optum are ███████████████ that neither was ██



of the other, and that their contractual relationship did not ███ ███████ between them.  SOF ¶ 20.  The Argus contract similarly provides that Argus is ██████████████████████ CHLIC.  SOF ¶ 31.  The Argus contract further provides that CHLIC ███████████ ████████████████████████████████████████████ *Id.*; *see also id.* (████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████).

In addition to the contracts themselves, the undisputed record further supports the fact that CHLIC transacted business with Optum and Argus at arm's length, with each company acting in its own self-interest.  *See* SOF ¶ 25 (describing arm's length business dealings between CHLIC and Optum); SOF ¶ 37 (email between CHLIC and Argus requesting Argus' feedback on CHLIC's requests, indicating that CHLIC was receptive to Argus' input and that CHLIC was not simply directing Argus to perform work without any input from Argus); *id.* (an internal Argus communication stating that CHLIC needed to submit a formal Scope & Assess before Argus could proceed with contractual work).

The record further illustrates that CHLIC and Optum wrestled over the terms of their contracts and occasionally encountered disagreements and disputes over their business transactions.  *See, e.g.*, SOF ¶ 26 (describing business dispute between CHLIC and Optum regarding contractual terms); SOF ¶ 21 (describing the dispute resolution process in the negotiated contract between CHLIC and Optum).  And Optum was careful in deciding whether to share its own confidential or proprietary information with CHLIC.  *See, e.g.*, SOF ¶ 27 (internal Optum

email chain showing that it was up to Optum whether or not to share its information with CHLIC, particularly regarding its pharmacy pricing data).

Finally, Argus's corporate representative testified that CHLIC did not control or participate in the control of Argus's affairs.  SOF ¶¶ 28, 30, 32 (CHLIC did not control Argus's board of directors or executive management team, and did not exercise control over Argus's business operations or systems).  Argus's corporate representative also confirmed that CHLIC and Argus operated consistent with their applicable contractual agreements.  SOF ¶ 38.  This testimony is unrebutted.

Therefore, the undisputed evidence shows that CHLIC, Optum, and Argus at all times acted pursuant to their contractual obligations to each other.  A party does not conduct the affairs of a vendor (like Optum and Argus here) for purposes of RICO by acting in the normal course of business pursuant to contractual agreements.  *See, e.g.*, *Marlow*, 2009 WL 1328636 at *6 (rejecting plaintiff's claims that Allianz Life Insurance controlled a RICO enterprise comprised of Allianz affiliates and service providers by developing marketing materials, directing the sales force to use Allianz's materials and techniques, developing a sales incentive program, and issuing deferred annuity products to customers because these allegations "demonstrate nothing more than an enterprise, i.e., the Allianz 'corporate family,' acting in the normal course of business").  Indeed, just as in *Vickers*, CHLIC did not conduct the affairs of Optum or Argus because although CHLIC "worked closely [with those parties] to realize contractual goals," CHLIC "did not have a partnership or joint venture agreement and did not consider sharing profits or losses [with the enterprise] in any way."  *See* ECF No. 137 at 37 (this Court's order describing *Vickers*).  Accordingly, the Court should grant summary judgment on Plaintiffs' RICO claims in CHLIC's

favor because Plaintiffs cannot demonstrate that CHLIC conducted or participated in conducting the affairs of Optum or Argus, an essential element for any RICO claim.

B.   **None of the Plaintiffs suffered any injury "by reason of" any alleged misrepresentation by CHLIC in the plan language.**

Plaintiffs' RICO claims fail for the additional reason that none of the Plaintiffs can establish the essential element of causation.  The civil RICO statute demands proof of causation by limiting recovery to persons injured "by reason of" a RICO violation.  18 U.S.C. § 1964(c).  To establish such causation, Plaintiffs must prove that CHLIC's RICO violation was both a proximate and but-for cause of their alleged injuries:

> To show injury by reason of a RICO violation, a plaintiff must demonstrate that the violation caused his injury in two senses.  First, he must show that the RICO violation was the proximate cause of his injury, meaning "that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct."  Second, he must show that the RICO violation was the but-for (or transactional) cause of his injury, meaning that but for the RICO violation, he would not have been injured.

*Zyprexa*, 620 F.3d at 132 (citations omitted); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).

RICO claims based on misrepresentations made directly to the victims of an alleged scheme require proof of the victim's personal reliance on those misrepresentations.  *See Calabrese v. CSC Holdings, Inc.*, No. 02-5171, 2009 WL 425879, at *12 (E.D.N.Y. Feb. 19, 2009).  In *Bridge v. Phoenix Bond & Indemnity Co.*, the Supreme Court clarified that while plaintiffs alleging RICO claims based on mail fraud need not show first-person reliance, in most instances, at least third-party reliance is required to meet the statute's causation requirement.  553 U.S. 639, 658 (2008) ("Of course, none of this is to say that a RICO plaintiff … can prevail without showing that *someone* relied on the defendant's misrepresentations.  In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.").  Thus, in most

cases, including this one, a RICO plaintiff's theory of injury depends on establishing that someone—whether the plaintiffs themselves or third parties—relied on the defendant's misrepresentation. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015). "That is because reliance will typically be a necessary step in the causal chain linking the defendant's alleged misrepresentation to the plaintiffs' injury: if the person who was allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury." *Id.* (affirming summary judgment in favor of defendant as to plaintiffs' RICO claims because plaintiffs failed to offer any proof that their alleged injury was caused by defendant's alleged fraud, stating, "Plaintiffs' theory of injury requires them to prove third-party reliance by doctors on [defendant's] alleged misrepresentations in order to establish that those misrepresentations caused [third party payors] to pay for Ketek prescriptions that would not have been written otherwise[; however] … Plaintiffs' generalized proof is insufficient to establish RICO causation for each member of the putative class"); *see also Zyprexa*, 620 F.3d at 132 ("plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation" (internal citation omitted)).

In *Zyprexa*, for example, third-party payor unions and insurers alleged that Eli Lilly, the manufacturer of the drug Zyprexa, had misrepresented Zyprexa's efficacy and side effects to doctors, and asserted RICO claims against Eli Lilly predicated on alleged mail fraud. 620 F.3d at 123. Plaintiffs argued that they were injured in two ways: first, by paying for Zyprexa prescriptions that would not have been issued but for the alleged misrepresentations; and second, by paying a higher price for Zyprexa than would have been charged absent the alleged misrepresentations. *Id.* The Second Circuit rejected plaintiffs' position that they were not required to establish reliance for

their RICO claims, stating: "[W]hile reliance may not be an element of the cause of action, there is no question that in this case the plaintiffs allege, and must prove, third-party reliance as part of their chain of causation.".  *Id.* at 133

Here, Plaintiffs have alleged RICO claims depending on a theory of first-person (i.e., their own) reliance.  Throughout this litigation, they have predicated their RICO claims on their allegations that CHLIC made misrepresentations in their benefit plan booklets regarding the amount Plaintiffs would pay for their prescription drugs and that Plaintiffs necessarily would have relied on such representations in purchasing any prescription drugs. *See, e.g.*, Compl. ¶ 285; ECF No. 206 at 20; ECF No. 401 at 50-51 ("… the basis of plaintiffs' RICO Class in their motion for class certification is the alleged misrepresentations within the language of the plans themselves."). Plaintiffs do not allege, much less marshal any evidence, that any third-party to their prescription drug transactions relied on any purported misrepresentations in Plaintiffs' plan documents in a way that proximately caused harm to Plaintiffs themselves. *See generally* Compl.  Accordingly, Plaintiffs' claims rise or fall on Plaintiffs' own reliance (or lack thereof) on purported misrepresentations in their plan documents.

The record refutes Plaintiffs' claims that any purported injuries were caused by Plaintiffs' reliance on purported misrepresentations in their plan documents.  Rather, the evidence clearly demonstrates that none of the named Plaintiffs read the language of their plan documents, much less ***relied upon*** that language in determining whether to enroll in their benefit plans or purchase prescription drugs under their plans:

- Plaintiff Negron



*See* SOF ¶ 6.

- Plaintiff Blocker ████████████████████████████████
  ██████████████████████████████ SOF ¶ 12. ███
  ████████████████████████████████████ *Id.*

- Plaintiff Roger Curol ████████████████████████
  ███ *See* SOF ¶ 10. ██████████████████████████
  ██████████████████████████ *Id.*

- Plaintiff Nina Curol ████████████████████████
  ███████ *See* SOF ¶ 10. ██████████████████████
  █████████ *Id.*

- Plaintiff Perry ████████████████████████████████
  ████████ *See* SOF ¶ 8.

- Plaintiff Gallagher does not allege that she ever reviewed her plan documents in deciding to join her plan or in filling any prescriptions. *See* SOF ¶ 13.

Any generic assertions of reliance are further belied by Plaintiffs' continued purchases of prescription drugs after learning of the purported "Clawback Scheme." Even after filing the instant litigation and alleging that their cost-share payments were incorrect under their plan terms, Plaintiffs Perry and the Curols continued to purchase prescription drugs and pay the same prices under their benefit plans. SOF ¶¶ 8, 10. Plaintiffs cannot claim that their alleged injuries were caused by reliance on misrepresentations when they continued to purchase prescription drugs (and thereby experience alleged injuries) after they became aware of how their cost share for such prescription drugs would be calculated. *See, e.g.*, *Zyprexa*, 620 F.3d at 134 (rejecting Plaintiffs' RICO claims for failure to prove reliance to establish the causation chain because "[e]ven after the side effects of Zyprexa became publicly known, however, most [third party payors] continued to

20

pay the full price when Zyprexa was prescribed to treat symptoms of schizophrenia, even as payment for other indications were limited").[7]

Moreover, and in any event, the vast majority of the transactions at issue were completed pursuant to ASO plans. *See* SOF ¶¶ 5, 7, 9, 11, 13. It is axiomatic that the representations set forth in ASO plans are not those of a third party retained to provide administrative services for those plans (i.e., CHLIC), but rather they are those of plan sponsors who, under Plaintiffs' theory, are not part of the alleged RICO scheme to defraud. *See* Order Granting Partial Mot. to Dismiss, ECF No. 306 at 2 & 5 n.3; *see also* SOF ¶ 14. This is yet another way in which Plaintiffs' RICO theory—a moving target throughout this case—does not hold together.

### C.   **CHLIC's administration of Plaintiffs' pharmacy benefits consistent with traditional/spread pricing is not racketeering activity.**

Even if Plaintiffs had read their plans and interpreted them as their lawyers do, Plaintiffs still lack a viable RICO claim because Plaintiffs cannot establish that any alleged misrepresentations by CHLIC in their plan booklets constitute the predicate acts of mail or wire fraud. To prove mail or wire fraud, Plaintiffs must show with respect to CHLIC (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *United States v. Carpenter*, 190 F. Supp. 3d 260, 265 (D. Conn. 2016) (citing *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).

As the Court is aware, the parties vigorously dispute the meaning of certain (and different) snippets of language found in Plaintiffs' respective plans.[8] CHLIC believes that Plaintiffs paid the

---

[7]     That Plaintiffs might have a claim for denial of benefits for these transactions under ERISA does not mean that they also may pursue RICO violations where they cannot establish all the elements of a RICO claim.

[8]     Not all six Plaintiffs have the same type of plan. The snippets of plan language at issue vary among the different plans.

amount their employers intended for them to pay consistent with their benefit design; Plaintiffs argue that they were entitled to pay less on certain transactions where a pharmacy had contractually agreed to be paid a lower amount.  CHLIC does not ask the Court to resolve that issue now.  But there is no dispute that CHLIC acted and administered Plaintiffs' plans consistent with what it believed (and believes today) was required pursuant to each employer's benefit design.  Even if CHLIC were wrong in that belief and Plaintiffs were charged the incorrect amount under the terms of their plans, such a mistake would constitute neither fraud nor a RICO violation.

It is clear that in the Second Circuit, the only way to be held liable for mail or wire fraud based on a promise in a contract is if the contracting party made the promise with no intention to fill it.  For example, in *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, the defendants argued that because the only representations involved in the case were contained within contracts, to demonstrate fraud (rather than simple breach of contract), under the common law and federal mail and wire fraud statutes, the Government had to prove that defendants never intended to perform those contracts (i.e., at the time of contract execution, defendants knew and intended that they would not perform their future obligations thereunder).  822 F.3d at 656-57.  The Second Circuit agreed, holding that "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution.  Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud."  *Id.* at 662.  Here, CHLIC's administration of benefits consistent with a plan sponsor's selection of traditional/spread pricing benefit design does not constitute fraud even if (as is Plaintiffs' contention here) the plan language in a member's plan document does not accurately reflect that selected design.

Similarly, in *Tardibuono-Quigley v. HSBC Mortgage Co.*, the plaintiff argued that the defendants violated RICO by engaging in a scheme to charge borrowers for unnecessary default-related services in contravention to their mortgage security agreements.  No. 15-CV-6940 (KMK), 2017 WL 1216925, *1 (S.D.N.Y. March 30, 2017).  In granting defendants' motion to dismiss, the court held: "At its heart, Plaintiff's RICO boils down to a breach of contract claim. … Courts have cautioned, however, that a breach of contract normally does not constitute the predicate act of mail or wire fraud, or any predicate act for that matter." *Id.* at *11 (citing cases); *see also Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) ("The plaintiffs' mail and wire fraud allegations 'are nothing more than breach of contract claims, and therefore do not constitute predicate acts.'" (quoting *Lefkowitz v. Reissman*, No. 12-CV-8703 (RA), 2014 WL 925410, at *3 (S.D.N.Y. Mar. 7, 2014)).  Here, the parties' dispute about whether Plaintiffs were entitled to a different price on certain prescription drugs does not convert CHLIC's actions in administering pharmacy claims consistent with its interpretation of the disputed language into a RICO claim.

**D.**     **None of the Plaintiffs can establish any other basis to find CHLIC committed a RICO violation.**

As explained above, the only specific alleged misrepresentations identified by Plaintiffs are those they reference in various snippets of plan language.  While Plaintiffs have at times in this five-year-old case generally asserted that other misrepresentations occurred "at point of sale" (i.e., when they went into a pharmacy to fill their prescriptions and paid their cost share), none has offered admissible evidence from which a fact-finder could conclude that a RICO violation occurred as a result of any action by CHLIC during those interactions.

Again, the alleged predicate acts for Plaintiffs' RICO claims rest solely on alleged mail and wire fraud, *see* Compl. ¶¶ 282-294, and to prove mail or wire fraud, Plaintiffs must show with

respect to CHLIC (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *Carpenter*, 190 F. Supp. 3d at 265.

Plaintiffs cannot show a scheme to defraud, as Plaintiffs cannot marshal any evidence to establish that any misrepresentations occurred at the point of sale, let alone that those misrepresentations are attributable to CHLIC. This Circuit has made clear that wire and mail fraud allegations must "specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013). Despite years of discovery, none of the Plaintiffs has identified misrepresentations at the point of sale establishing a scheme to defraud. Importantly, CHLIC propounded Interrogatories to Plaintiffs seeking details about these exact point-of-sale allegations. Although Plaintiffs responded that they would provide the requested information after discovery was substantially completed, they never did. *See* SOF ¶¶ 39-40 (Plaintiffs' Seconded Am. Resp. to 1st Set of Rogs). Fact discovery is closed, and Plaintiffs cannot attempt to bring forward such evidence now. *See, e.g.*, *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment …."). As a result, none of the Plaintiffs has marshaled any evidence as to, among other things, what they were told (if anything) by any pharmacist regarding how their cost share compared to the amount the pharmacy had contractually agreed to accept for filling that prescription.

What little evidence appears in the record undermines Plaintiffs' RICO claims premised on point-of-sale misrepresentations:

-   Plaintiff  Negron

  *See* SOF ¶ 6.

- Plaintiff  Perry

  *See* SOF ¶ 8.

- Plaintiff Blocker

  *See* SOF ¶ 12.

- Plaintiff Roger Curol

  *See* SOF ¶ 10.

- Plaintiff Nina Curol

  *See* SOF ¶ 10.

- Plaintiff Gallagher does not allege anything regarding her interactions with any pharmacist.  *See* SOF ¶ 13.

Accordingly, Plaintiffs have not met and cannot meet their burden of proof to show there were misrepresentations at point of sale—for ***any*** of the purported transactions at issue—because Plaintiffs have not provided ***any*** details about the particular point-of-sale interactions that they had, what was said to them by whom, where the interaction occurred, for what prescription, on what date, what was said about the price, or any other detail necessary to establish an actionable misrepresentation.  At most, the record reflects that pharmacists told Plaintiffs very limited information at the point of sale—namely, that the pharmacy computer system indicated that the plaintiff was being asked to pay a particular amount for their prescription drug.  However, any such statement would not be a misrepresentation; rather, plaintiffs were told the amount that they were actually being asked to pay.  Those representations were true.

25

Further, even if Plaintiffs could identify any misrepresentation by the pharmacist at the point of sale—which they have not—this is still insufficient to support a RICO claim because this Court already held that Plaintiffs did not establish that the pharmacies were part of any purported RICO scheme.  *See* ECF No. 137 at 43-44 (holding "Plaintiffs' allegations do not indicate that the pharmacies had a relationship to work as a continuing unit" and that because each pharmacy worked independently of one another, such "parallel conduct by separate actors" was insufficient to establish a RICO enterprise).  Accordingly, any pharmacy misrepresentations would not be part of the purported RICO scheme that Plaintiffs challenge.[9]

Because Plaintiffs fail to establish any evidence of a misrepresentation by CHLIC at the point of sale, and thus fail to establish the necessary predicate acts of mail or wire fraud, their RICO claims fail.

### E.   Plaintiffs' derivative RICO conspiracy claim also fails as a matter of law.

CHLIC is also entitled to summary judgment on Plaintiffs' claim for conspiracy to violate RICO under 18 U.S.C. § 1962(d) (Count VIII).  Plaintiffs may recover damages for a conspiracy to violate RICO only if they have been injured "by reason of" a conspiracy to violate RICO.  *See* 18 U.S.C § 1964(c).  As explained above, because there is no cognizable violation of RICO that caused Plaintiffs' injury, Plaintiffs' derivative RICO conspiracy claim fails as a matter of law.  *See, e.g.*, *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) (affirming

---

[9]     The considerations described above, along with other factors, distinguish this case from *In re U.S. Foodservice, Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013).  In *U.S. Foodservice*, the RICO defendant "established and controlled" shell companies that it used to generate fraudulent invoices, and then mailed those invoices to customers in order to misrepresent the inputs used to determine the customer's pricing and to deceive the customer that it was getting the bargain for which it had negotiated.  *See* 729 F.3d at 113, 117.  Here, by contrast, CHLIC did not establish or control Optum, Argus, or any retail network pharmacy.  CHLIC did not communicate at the point of sale the inputs used to determine Plaintiffs' cost-share amounts.  Because Plaintiffs never read their plan documents, they were not deceived into believing that any particular promise contained in their plan documents had been fulfilled.  And Plaintiffs' communications at the point of sale (of which there is no record evidence) were with pharmacists who were not even part of the alleged RICO scheme.

26

dismissal of plaintiffs' RICO conspiracy claim under 18 U.S.C. § 1962(d) since plaintiffs did not adequately allege a substantive violation of RICO); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998); *see also Cofacredit*, 187 F.3d at 244 (reversing judgment for plaintiffs on RICO conspiracy claim because there was insufficient evidence to support a substantive RICO violation and without such evidence, plaintiff's RICO conspiracy claim necessary failed); *Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc*., 354 F. Supp. 2d 293, 300 (S.D.N.Y. 2004) (granting summary judgment in favor of defendants as to plaintiff's RICO claims because "a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met").

Plaintiffs' Complaint includes vague allegations of conspiracies between CHLIC and various "unnamed" health insurance companies and/or "unnamed" pharmacy benefit managers. Compl. ¶ 298.  Courts routinely dismiss claims alleging RICO conspiracies with unidentified third parties as legally insufficient.  *See, e.g.*, *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("conclusory, vague, and general allegations of a criminal conspiracy" do not suffice to make out a RICO conspiracy claim) (citing cases); *Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1214 (E.D. Cal. 2007) (dismissing Section 1962(d) RICO conspiracy claim as insufficient where it contained "allegations of conspiracy with unnamed entities and unnamed conspirators involved with those unnamed entities"); *Anderson v. Smithfield Foods, Inc.*, 209 F. Supp. 2d 1270, 1278 (M.D. Fla. 2002), *aff'd*, 353 F.3d 912 (11th Cir. 2003) (dismissing Section 1962(d) claim where plaintiffs alleged a conspiracy between the defendant and "anonymous co-conspirators").  Here, Plaintiffs' claims based entirely on those legally inadequate allegations also have no supporting evidence.

Accordingly, CHLIC is further entitled to summary judgment on Plaintiffs' RICO conspiracy claim to the extent that claim is based on unsupported allegations regarding unidentified third parties.

## V.    CONCLUSION

For the foregoing reasons, CHLIC respectfully requests that the Court grant CHLIC's motion for partial summary judgment and enter judgment in favor of CHLIC on both of Plaintiffs' RICO claims, Counts VII and VIII.

Dated: March 18, 2022                    Respectfully submitted,

                                            */s/ Brian W. Shaffer*
                                            Brian W. Shaffer (phv08654)
                                            Jeremy P. Blumenfeld (phv23943)
  Matthew D. Klayman (phv08656)
  MORGAN, LEWIS & BOCKIUS LLP
  1701 Market Street
  Philadelphia, PA 19103
  Telephone:  +1.215.963.5000
  Facsimile:  +1.215.963.5001
  brian.shaffer@morganlewis.com
  jeremy.blumenfeld@morganlewis.com
  matthew.klayman@morganlewis.com

  Lisa R. Weddle (phv08957)
  MORGAN, LEWIS & BOCKIUS LLP
  300 South Grand AvenuezzmpShiftReturnTwenty-Second Floor zzmpShiftReturnLos Angeles, CA 90071-3132
  Telephone: +1.213.612.2500
  Facsimile: +1.213.612.2501
  lisa.weddle@morganlewis.com

  Michael Blanchard (ct25891)
  MORGAN, LEWIS & BOCKIUS LLP
  One State Street
  Hartford, CT 06103
  Telephone:  +1.860.240.2945
  Facsimile:  +1.860.240.2800
  michael.blanchard@morganlewis.com

*Attorneys for Defendant Cigna Health and Life Insurance Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2022, the foregoing document and any attachments thereto were filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Brian W. Shaffer*
Brian W. Shaffer