# EXHIBIT A
# REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, ROGER CUROL, Individually and on Behalf of All Others Similarly Situated, and BILLY RAY BLOCKER, Individually and on Behalf of All Others Similarly Situated,
Plaintiffs,

vs.

CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, and OPTUMRX, INC.,
Defendants.

CIVIL ACTION NO. 3:16-cv-1702 (JAM)

REMOTE DEPOSITION OF TYLER LESTER
Tuesday, June 23, 2020

Reported By:
CATHI IRISH, RPR, CRR, CLVS, CCR

June 23, 2020
9:00 a.m.

Remote videotaped deposition of TYLER LESTER, with all participants appearing remotely via videoconference, before Cathi Irish, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

A P P E A R A N C E S:

IZARD KINDALL & RAABE LLP
Attorneys for Plaintiffs
29 South Main Street
Suite 305
West Hartford, Connecticut 06107
BY: ROBERT A. IZARD, ESQ.
CRAIG RAABE, ESQ.
CHRISTOPHER M. BARRETT, ESQ.

MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
BY: MEGHAN S.B. OLIVER, ESQ.

MORGAN LEWIS & BOCKIUS LLP
Attorneys for Defendants
Cigna Health and Life Insurance Company
1701 Market Street
Philadelphia, Pennsylvania 19103
BY: BRIAN SHAFFER, ESQ.
ELEANOR FARRELL, ESQ.

A P P E A R A N C E S: (continued)

DORSEY & WHITNEY LLP
Attorneys for Defendant
50 South Sixth Street
Suite 1500
Minneapolis, Minnesota 55402
BY: MICHELLE S. GRANT, ESQ.

ALSO PRESENT:
SHAWN BUDD, videographer
NICOLE CABANEZ
PAUL RILEY

THE VIDEOGRAPHER: We are on the record. This is the videographer speaking, Shawn Budd, with Veritext Legal Solutions. Today's date is June 23, 2020 and the time is 9:06 a.m.

We are here to take the remote video deposition of Tyler Lester in the matter of Negron versus Cigna.

Will counsel please introduce themselves for the record?

MR. IZARD: Yes, this is Robert Izard for the plaintiffs.

MR. BARRETT: Christopher Barrett of Izard, Kindall & Raabe for the plaintiffs.

MR RAABE: Greg Raabe also of Izard, Kindall & Raabe.

MR. SHAFFER: Brian Shaffer from Morgan Lewis on behalf of Cigna.

MS. GRANT: Michelle Grant of Dorsey & Whitney on behalf of OptumRx.

THE VIDEOGRAPHER: And the court reporter is Cathi Irish. Will you please swear in the witness?

LESTER

job?

A. I was in that role in various parts of that organization for about six years.

Q. So that would be roughly 2000 to 2016 or 2017 and then you moved to your new job?

A. Yes, 2010, and been in this role about three years.

Q. Do you have any role in preparing plans or plan language?

A. I do not.

Q. Okay. Were you familiar with the transition to Catamaran in 2013?

A. I am.

Q. Okay. What is Catamaran?

A. Catamaran is a pharmacy benefit manager that we contracted for a particular set of services back in 2013.

Q. What did Catamaran do for Cigna back in 2013?

A. The original relationship with Catamaran had a few components to it. One included utilizing their claim processing

LESTER

platform. Another was partnering in pharmaceutical manufacturer contracting. And the third big item at the time was retail network configuration.

Q. When you say retail network configuration, would that be a network of retail pharmacies?

A. That's correct. So we contracted with Catamaran to do all direct retail pharmacy contracting on our behalf with guidance from Cigna as to the nature like, for example, how big we wanted that retail network to be but it was ultimately Catamaran's responsibility to build that network and provide a certain level of discounts and services within that network to Cigna, and we paid a per claim fee for those services.

Q. So rather than Cigna establish its own network of pharmacies, you used Catamaran's network?

A. That's is correct.

Q. Have you heard of a company called Argus?

LESTER

A. Yes, I have.

Q. What's Argus?

A. Argus is the claim processor that Cigna has used for quite a long time, I believe over 20 years, that handles and manages the point of sale transactions for prescription drugs for all of Cigna's pharmacy business, and I know they have other clients in the industry as well.

Q. What is a point of sale transaction for prescription drugs?

A. Point of sale transaction I would define as the customer actually in the pharmacy or with a mail order pharmacy talking with the pharmacist or the pharmacy technician and having the prescription that their physician or health care professional has written for them and actually picking up and paying for that prescription.

Q. I'll ask some more specific questions later but just so we have a framework because I want to make sure I'm speaking the same language you are, to be

LESTER

honest. Can you kind of walk me through the process of what happens involving Cigna and -- well, withdrawn.

When you use the phrase Catamaran, you -- would you prefer we use Catamaran or Optum, can we use one name for both?

A. Yeah, I think Optum since it's a little fresher in my mind would probably be easier today.

Q. Okay. So if you could just sort of as an overview just walk us through the process of when the customer walks into the drug store and hands the pharmacist the prescription and then you said the customer will walk out of the store with the prescription filled. What happens in between at a point of sale transaction?

A. Sure. So from my knowledge, over the past few years, we use Argus as our pharmacy transaction administrator. The pharmacist would enter in the details about that prescription into whatever their electronic system is that

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

Page 18

LESTER

information to Cigna for Cigna to provide to Argus for adjudication so there wasn't a direct connection. I'm not sure of the actual reason why, whether it was contractual between Optum and Argus, but in those cases Cigna acted as a go between, an intermediary to take whatever pharmacy rates, whatever pharmacy that should be in the network, they would provide them to Cigna and we would pass that information through to Argus to set up the Argus plan adjudication system.

Q. Just so I understand a little more when you talk about discounts, so Cigna and Optum enter into a I guess contract pursuant to which Cigna can buy or pay for drugs that are given to Cigna customers through the Optum network; is that fair?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer, Mr. Lester.

A. That's right. We contracted with

Page 19

LESTER

Optum and based on that contract were fees paid by Cigna in exchange for a certain level of pricing and that came in the form of discounts at retail pharmacies.

Q. And when you say pricing, these would be the prices at which Cigna plans would be buying drugs from Optum's network pharmacies?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer.

A. I would describe it a little differently that we had a contract where Optum had to provide a certain level of discounts through retail pharmacies and Optum was providing us information on how they wanted those retail pharmacies to be reimbursed.

Q. When you say discounts, these are discounts on the sale of prescription drugs?

MR. SHAFFER: Objection to form.

THE WITNESS: That's correct.

///

Page 20

LESTER

BY MR. IZARD:

Q. Okay. And these would be discounts on the sale of prescription drugs through Cigna plans?

A. I would say they would be discounts -- yeah, that's probably a fair way to characterize it, that they are discounts for any covered transaction under the Optum and Cigna contract, which didn't capture every retail pharmacy transaction but covered those that where it was utilizing an Optum -- or a pharmacy in an Optum retail network where they had a contract in place.

Q. When an Optum network pharmacy provided drugs to a Cigna member and Cigna or the employer needed to make a payment, who was the payment to, did you pay Optum or did you pay the network pharmacies directly?

A. So to my understanding, the flow of funds had Argus actually paying the pharmacies directly. Cigna reimbursed Argus based on what Optum had requested we

Page 21

LESTER

set up in the system and then Optum reimbursed Cigna for that or the payment to the retail pharmacy.

Q. Sorry. I missed part of that. So Cigna pays Argus, Argus pays the pharmacy, and how does Optum get involved again?

A. Optum is technically reimbursing Cigna or I guess and then Cigna reimbursed Optum so it was a -- I don't remember all of the requirements from a financial perspective of why that happened to be the case but Optum was technically paying Cigna, Cigna paying Argus to pay the pharmacies and then Cigna paid Optum as part of that overall contractual guarantee for the discounts that we expect to receive from pharmacy.

Q. Who set the -- withdraw.

Do you know the terms -- withdrawn.

Were there contracts -- do you know if there were contracts between Optum and the pharmacies in the Optum network?

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

Page 22

LESTER

A. Can you rephrase that?

Q. I was wondering if you were a pharmacy and you wanted to get into the Optum network, did you sign a contract with Optum; do you know about that?

A. That was my understanding. I don't know the details of how Optum negotiated with pharmacies, but that is my understanding.

Q. Do you know if Optum set the terms pursuant to which the pharmacies would be paid for particular prescription drugs?

MS. GRANT: Form.

MR. IZARD: Sorry.

THE WITNESS: That was my understanding.

BY MR. IZARD:

Q. So Cigna wasn't part of the contracts between Optum and the pharmacies?

A. We were not.

Q. Does Cigna know the terms pursuant to which Optum would set the

Page 23

LESTER

pricing with the pharmacies?

MR. SHAFFER: Objection to form.

THE WITNESS: We did not have knowledge of the terms. All we saw were, because we were a pass-through, we saw I will call it the kind of point in time what they asked us to set up in the Argus system but I have no knowledge of whether that actually represented Optum's full contract with that retail pharmacy.

BY MR. IZARD:

Q. What's a pass-through?

A. So in this situation, Cigna was acting as an intermediary. For whatever reason Argus and Optum weren't working directly together so in order for the Argus system to be set up with the correct pricing, Optum had to pass information related to discounts and drug pricing to Cigna and we simply pass that information through to Argus. We didn't make changes to it on the Cigna side. We were more providing that operational support to get

Page 24

LESTER

information from Optum into the Argus system.

Q. So Cigna would be passing through --

(Telephone interruption.)

BY MR. IZARD:

Q. Sorry. Cigna would be passing through to Argus the pricing between Optum and the network pharmacies?

A. I think that's accurate. Optum had directed us to pass-through. Whether or not that reflects the actually contract between Optum and the pharmacy, I don't know.

MR. IZARD: I want to now if we can please mark the first exhibit which these are the objections and responses to the fourth set of interrogatories dated June 17. I apologize in advance. This is going to go a little slower than it normally does. Normally I would hand it to you. We have to work with the system here.

Page 25

LESTER

(Exhibit 22, objections and responses to fourth set of interrogatories, marked for identification.)

(Discussion off the record.)

MR. IZARD: Chris, after this is loaded, call Veritext. If it takes five minutes for an exhibit, this is going to take forever.

MR. BARRETT: It seems there's something wrong with the website because it's not even loading. Perhaps I could just load a bunch without an exhibit number and we can just figure it out later.

MR. IZARD: Is that okay with you, Brian?

MR. SHAFFER: Yes, that's fine.

MR. IZARD: Michelle, I should ask you, too. I apologize.

MR. SHAFFER: Bob, if you want to go through the supplemental response to the fourth set of interrogatories that we sent you last week?

Page 90

LESTER

11:01. We are off the record.

(Recess taken from 11:01 a.m. to 11:12 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:12.

MR. IZARD: Okay, Mr. Lester, if you could go back now to the exhibits, please. And I want to show you a document that's marked exhibit -- Chris, where's the next one? I guess I need to re --

MR. BARRETT: I can see it there, Bob.

MR. IZARD: I forgot to refresh.

(Exhibit 33, document Bates labeled CIGNA07810696 through 712, marked for identification.)

BY MR. IZARD:

Q. So if you look down at the bottom, please, Mr. Lester, you'll see the second to last one has a number 7810696.

Do you see that?

A. Got it.

Q. So what's that going to be, 32?

Page 91

LESTER

MR. BARRETT: 33.

MR. IZARD: 33.

BY MR. IZARD:

Q. You can see at the top, Mr. Lester, there's an e-mail from pharmacy benefit exception intake to you.

Do you see that?

A. Yes.

Q. And then at the bottom, it makes reference to, you'll see the e-mail that says, "Tom, attached are the two pharmacy PBS forms."

Do you see that?

A. The bottom of the entire exhibit?

Q. No, just the bottom of the first page, couple e-mails down below the top --

A. Okay.

Q. Do you see that?

A. Yes.

Q. And if you would just scroll down a few more pages to the one with a CIGNA 7810701 at the bottom.

Do you see that?

A. 0701, yes.

Page 92

LESTER

Q. It says Pharmacy Benefit Summary at the top.

Do you see that?

A. Yes.

Q. Is that a PBS form?

A. I believe it is.

Q. What's a PBS form?

A. So I'm not an expert in this area but based on when I've seen this in the past, this is what our pharmacy implementation team would have used with the plan sponsor to identify the benefits they wanted to offer.

Q. We talked before the break about how the implementation group would be filling in fields and clicking on boxes and that sort of thing. Is this the form that would be used for that?

A. Yes.

Q. If you would, please, scroll down a bit to the page where the number ends, the Cigna number ends in 705. You can see right at the very top the second box says copay processing logic, see appendix O.

Page 93

LESTER

Do you see that?

A. Yes.

Q. There's a description there that says as of 9/1/12, copay option K for ASO clients requires PBAB approval.

What does that mean?

A. So the PBAB is the pharmacy benefit advisory board and it is made up of a group of sales, products and compliance members that review any nonstandard request that a plan sponsor might make. And this is highlighting that as of that date, September 1st of 2012, if a client wanted to have copay K as one of their options, we would want to have this group of individuals review it. They often worked directly with the client in the sales team to advise on why we think another option might be better for them and this must have been part of the project when we began to roll out a different copay standard for self-funded clients.

Q. So ASO means what, self-funded?

LESTER

A. ASO, sorry, is administrative services only. I sometimes use the term interchangeably with self-funded, so it's not an insured benefit.

Q. So the alternatives are insured where Cigna pays for the cost of the drugs, or administrative services only where the client pays for the cost of the drugs?

A. That's correct.

Q. Now, other than copay option K, you talked about copay option G. Were there other copay options?

A. There are -- there were other copay options within the Argus system. I'm not familiar with the Argus codes that might have been used for them but they were available upon client request but to my knowledge, the options that we made widely available were copay A and G but there were additional options within the Argus system.

Q. Would Cigna ever voluntarily offer something other than copay K or

LESTER

copay G or was it strictly if the client asked for it?

MR. SHAFFER: Objection to form, lack of foundation.

BY MR. IZARD:

Q. You can answer.

A. To my knowledge, I believe we showed clients the options we had available and those options we generally presented were copay K and G. If the client said no, we want something else, then we would go down the next path. But I believe when a client would have asked what is your recommendation, we would have provided G or K as the two options.

Q. If you would, please, scroll down a little bit more of the document to the page that has the last three numbers 711.

A. Okay.

Q. You can see sort of slightly above the middle it says appendix O, copay logic K versus G.

Do you see that?

A. Yes.

LESTER

Q. This talks about ASO accounts. What copay logic was Cigna using for its insured plans?

A. Almost -- so at the time this was 2012, almost all of our insured business was using copay K, and I believe from past conversations with people on the compliance team was because that's how we filed all of our benefits in each state for insured plans.

Q. Do you know if that ever changed?

A. Yes, over the past few years, we have been working with states as part of annual rate filings and form filings to more and more of our insurance business to our updated copay standards. Copay G again is the Argus term. We have business on multiple platforms now so it might not be the same terminology but it is the same 3 point lesser of logic that we've begun to move business to as states approve our form filings.

Q. The second entry in that appendix O area on page 711 there, it

LESTER

talks about copay G, standard copay logic, and the next line says compares the copay UNC and ingredient cost.

What's ingredient cost?

A. Ingredient cost is the cost for the drug itself. So it doesn't capture the fixed fee or sales tax and many of our documents, we use ingredient cost to represent the total cost of the drug inclusive of dispensing, and sales tax, while it might not always be explicit around those two items but that would be the drug cost that the plan sponsor is responsible for so we touched on client rights earlier.

Q. So this would be the amount paid by the sponsor to Cigna, not the amount paid to the pharmacy?

A. That's correct. Not necessarily the amount paid to the pharmacy.

Q. It could be the same, you just don't know, okay. Now let's return back to the exhibit folder. I'm going to mark another one.

LESTER

Do you see that?

A. Yes.

Q. So does this mean that the client can either pay the amount paid to the pharmacy or it can pay a different amount which is negotiated between Cigna and the pharmacy -- I mean Cigna and the client?

A. That's right.

Q. And the next bullet point says if the component is sent to a client's specific level, the difference between the client rate and pharmacy rate is created, this is called spread. What is spread?

A. Spread in this context is the calculated difference between what our client rate is and what the pharmacy rate is.

Q. And the pharmacy rate is the rate the pharmacy agrees to be paid for each prescription drug; is that right?

MR. SHAFFER: Objection to form.

THE WITNESS: It's the amount that is set up in the claim adjudication system to reimburse the

LESTER

pharmacy.

BY MR. IZARD:

Q. And the client rate is the rate that the client agrees to pay Cigna for each prescription drug; is that right?

A. The one variation I would put there is that the client agrees to an all-in reimbursement to Cigna for drugs, they do not agree to a claim-by-claim or drug-by-drug schedule.

Q. So when you say that, so amoxicillin in 2015 a client will pay X amount for a pill, is that what you are saying?

LESTER

Q. If you would please look at slide 11. It says Client MAC Management.

A. Okay.

LESTER

Q. If you would, please, move on two

Page 258

LESTER

play and that's what we wanted to avoid as part of this network transition.

Q. Here the customer is the employer sponsor, not the member.

Page 259

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Page 260

LESTER

MR. SHAFFER: Objection to form, argumentative, misstates the document and the testimony.

BY MR. IZARD:

Page 261

LESTER

MR. SHAFFER: Objection to form, argumentative, misstates the testimony.

BY MR. IZARD:

Page 314

LESTER

migrated back to Argus?

A. That's right.

Q. Did Optum have access to plan or plan documents?

A. No.

Q. Sorry, I didn't hear you, what was that?

A. Not to my knowledge.

MS. GRANT: Thank you, no further questions.

MR. SHAFFER: Mr. Lester, I have a few questions for you just to make sure we have a complete picture of some of the topics that were discussed today.

EXAMINATION

BY MR. SHAFFER:

Q. Remind me again how long you've been with Cigna?

A. 13 years.

Q. Okay. And during what period of time over those 13 years have you been involved with aspects of the pharmacy management side of the business?

Page 315

LESTER

A. Nine and a half years.

Q. Okay. And in your current position, what are your responsibilities as it relates to pharmacy benefit management?

A. My team supports retail network analysis, mail order pharmacy analysis, prescription drug trend projections and reporting, pharmaceutical contracting analysis and the evaluation of financial savings from clinical program.

Q. And what was your position before the current one in pharmacy?

A. Prior to this, I led the pharmacy pricing team of actuaries that supported all of our pricing tools for insured business and self-funded clients, ASO clients.

Q. And what are your objectives and goals from a pharmacy perspective in your current position?

A. So my current position is focused on finding more affordability related to prescription drugs, so through supporting

Page 316

LESTER

retail network contracting, evaluating manufacturer contracts and working with clinicians on drug selection as well as identifying potential emerging drugs coming to the market such as gene therapies and how to help manage those costs.

Q. How does your group interact with others at Cigna as it relates to providing those service?

A. We work closely with our pricing and underwriting teams providing financial projections and information about drug cost into the future. We work closely with our clinical teams on the evaluation of clinical programs and formularies. We support our contracting team that contract with mail order pharmacies, retail pharmacies and manufacturers, and we also support our operations teams where there are financial operations related items in the pharmacy benefit.

Page 317

LESTER

LESTER

[redacted]

Q. And what role do plan sponsors

LESTER

play in designing the prescription drug benefits that they are going to offer to participants in the plans that they sponsor?

A. Self-funded clients, particularly those that consider themselves ERISA plans, have almost unlimited flexibility in designing their benefit. Whether it's the tiering that we talked about a little bit earlier, the formulary design, the pharmacy that they want to have in their retail network, which mail order pharmacies they want to be able to utilize, the quote/unquote, programs that they might select, and at the end of the day the customer contribution in the form of employee premiums that they might charge. And even our insured clients have a lot of flexibility. The only guardrails are those put in place by different states Department of Insurance, but as long as they are within those guardrails of the types of plans they can offer, the type of cost shares that they can require their

LESTER

employees or the customers to pay, then they have a lot of flexibility and ultimately decide what benefit options they want to put in front of their employee.

Q. Are there differences in the way the plan sponsors approach those options or exploring the benefit design selections that they may make?

MR. IZARD: Objection.

BY MR. SHAFFER:

Q. You can answer.

A. The -- because there's so much variability, it allows different types of plan sponsors to meet whatever their employee benefit needs might be. So if they have employees that they want to ensure have low out-of-pocket costs, they can offer that at the tradeoff of potentially higher employee premiums. If they want to have a much more affordable benefit from a premium perspective or drive more consumerism in their health care plan, they can offer a high

LESTER

deductible plan where the customer is responsible for more of the first dollar costs but also has the ability to save, and when those are paired with health savings accounts or health reimbursement accounts can provide a lot of flexibility for the employees themselves, and on top of that the client has options of whether they want to be in a spread pricing environment or in a pass-through

[redacted]

Q. And how do those negotiations or selections occur between various plan sponsors and Cigna, are there differences in the approach?

A. Generally plan sponsors will hire

Page 330

LESTER

generally they do it within a plan year which is usually a 12-month period. The effective date for that plan year could be any day of the year but generally our clients chose the first of a month so it could be February 1st or July 1st and would have a 12-month period over which those dollars would accumulate.

Q. But then all plans don't have the same start and end dates for their plan years; correct?

A. That's correct. And some clients choose if they are, for example, moving from -- they may want to be on a calendar year basis. From time to time, plans will chose to have a shortened year so they can move everything to a calendar year basis which we see from time to time with mergers and acquisitions.

Q. And we talked a lot today about where some of the benefit design information is housed at Cigna for its clients but do you have an understanding of where plan sponsors memorialize the

Page 331

LESTER

choices that they've made with respect to the Cigna plan?

MR. IZARD: Objection.

THE WITNESS: So from my experience as an employee of a plan sponsor, usually those documents are housed in some type of employee Internet site or even physical copies can be provided to employees of those plan documents.

BY MR. SHAFFER:

Q. And again, is that something from your experience that's something that the plan sponsor handles?

MR. IZARD: Objection.

THE WITNESS: That's my understanding from interactions in the past with sales and service operations.

BY MR. SHAFFER:

Q. There was some discussions earlier about different funding arrangements that can exist with respect to group plans. Are all prescription

Page 332

LESTER

benefits funded the same way?

A. They are not. Plan sponsors have the option to choose two primary ways to fund pharmacy benefits. They can choose to purchase insurance from Cigna or any other insurance company where they are purchasing a policy in which Cigna is responsible for funding all claim dollars and Cigna takes on the risk of essentially those plans coming in higher than expected in return for a premium that would be paid by a plan sponsor. In a self-funded environment, all those claims would be paid by a plan sponsor. They would set up banking information with Cigna to enable Cigna to debit their bank accounts to make those payments throughout the year.

Q. And in a setting of a self-funded plan, what are the types of administrative services that Cigna might provide?

A. For the pharmacy benefit we would provide formularies that a plan sponsor can choose from. We would provide retail networks again that the plan sponsor could

Page 333

LESTER

choose from, a mail order pharmacy, specialty pharmacy, clinical programs that a plan sponsor can choose to add or purchase, services related to claim payment, member services for when a member or customer might have a question about their benefit, and all of the digital resources such as our website where members can track all the different accumulators, see how the information that might be available about drug costs or costs for other services.

Q. Since you've been involved with Cigna Pharmacy, how has Cigna offered group plans access to networks of pharmacies?

A. When I first began at pharmacy in late 2010, Cigna managed and contracted our own pharmacy networks and we had two of them that we offered broadly to clients but we also have had the option where a client can build a client-specific network where they can select the pharmacies that they would like to be a part of their

LESTER

network.

In 2013 we entered into a multi-year agreement with Optum to rent their networks to effectively use them for network services and through that agreement, it has a flexibility that as Cigna saw the need for additional networks, we would work with Optum and Optum would develop those networks for Cigna to use and for Cigna to be able to offer to our plan sponsors and other clients.

Q. So the Optum contract offered a network of retail pharmacies; correct?

A. That's correct, that was one of the services that we contracted with Optum for.

Q. Does the Optum contract also offer mail order pharmacies?

A. There was a lot of flexibility in the original Optum contracts and initially we did not use Optum for any mail order services. We eventually used them for back end fulfillment only so Cigna

LESTER

pharmacies, Cigna pharmacists were still taking mail order pharmacies, still doing all the work of a pharmacist but Optum mail order pharmacies were putting the pills in the bottle and shipping them to the customer's residence or place of work or what address the customer provided.

Q. Do you have an approximate time period for the transition from when there was no involvement by Optum in the mail order to the change in support?

A. We began moving back in fulfillment in late 2015 and by 2016 the majority of back end fulfillment or traditional drugs was handled by Optum. Cigna maintained fulfillment at our mail order pharmacy for specialty products.

Q. We talked again today a lot about the GHTR transaction data. Do you remember those questions?

A. I do.

Q. Does that transaction data, does that reflect credits or transfers directly between retail pharmacies and Optum?

LESTER

A. They were not direct because Argus was the claim processor so there was a process where Argus was able to fund those claims that were reimbursed by Cigna. Optum charged Cigna and Cigna ultimately paid Optum based on our intercompany -- or the agreement we had between the two organizations.

Q. Do you know whether Optum maintains its own records regarding transactions with pharmacies in its retail networks that Cigna can access -- that Cigna can access the network, not the records?

A. Sure. So as we entered into the relationship with Optum, one of the requirements of the contract was Cigna providing a daily feed of claims information to Optum so there was a daily feed sent from Argus to Cigna that Cigna then sent to Optum so Optum could use that data to manage our relationship and potentially to -- I don't know how it was used with their broader networks

LESTER

relationship.

Q. I want to talk again about the relationship between Cigna and plan sponsors with respect to the pharmacy benefits. Are those relationships governed by written agreements when a client signs up?

A. For self-funded clients, we will generally have an ASO agreement, an administrative services only agreement, that spells out the services that Cigna is provided to the plan sponsor, the pricing for those services and any financial or service guarantees that Cigna might be making as part of providing those services.

For insured clients, there would be a certificate of insurance that would highlight the relationship where the client is agreeing to pay premiums to Cigna and Cigna is agreeing to take on the risk of plan payment.

Q. And in the ASO context -- and we talked about ASO as administrative

Page 338

LESTER

services only; correct?
A. That's correct.
Q. In the ASO context, what do those agreements typically address, what kinds of issues?
A. They typically address the services that Cigna will provide so we walk through some of the services like the provision of a retail network of clinical programs of formulary. They will importantly highlight all of the pricing and that pricing is generally on the pharmacy side in terms of discounts and -- discounts, rebates and any fees that the client might be paying Cigna, and those economic terms are generally a very important part and probably take up the majority of the back and forth between the plan sponsor, and Cigna is verifying what services and at what costs Cigna will be providing those to the client.
Q. Are you familiar with ASO agreements from your role in your current position?

Page 339

LESTER

A. I'm familiar with the -- very familiar with the pricing components from my time working on the pricing side and have reviewed in the past the broader agreement.
MR. SHAFFER: Let's see if we can take a look at one of them right now.
Matt, are you able to share that with everyone?
MR. KLAYMAN: It's uploading now.
(Exhibit C-1, document Bates labeled CIGNA00002315, marked for identification.)
BY MR. SHAFFER:
[redacted]

Page 340

LESTER

[redacted]

Page 341

LESTER

[redacted]

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430

LESTER

LESTER

Q. And as it relates to negotiating these aspects of the ASO arrangement or some of the others that you mentioned, do consultants or brokers hired by plan sponsors play any role?

A. They do. So because of the complexity of pharmacy benefits, most clients, particularly self-funded clients, seek out the expertise of consultants and brokers to help insure that they are deriving the best value for their own plan but also to ensure that they understand the trade-offs they might be making. For example, by asking for a much deeper discount here might result in a higher administrative fee or might impact even what they are paying for medical services because when we underwrite business as an integrated health plan, we are looking at the pharmacy benefit, the medical benefit, behavioral, all the services that that client is purchasing, and sometimes there are trade-offs even between those

LESTER

businesses in terms of the financial value that a particular client is looking for and the broker and consultant is extremely important in helping to navigate the process.

Q. Do you know whether that process or the negotiation progresses that Cigna encounters is different depending on who the plan sponsor is, what size they are, what their objectives are?

A. It is. So there are -- in addition to the size of the client, as you mentioned, it can even be geographic so what area of the country the client might be in and the distribution of their customers. It can be on the demographics of the plan sponsor so plan sponsor that has a younger population versus an older population might see varying results, and then again the number of services that they are purchasing from Cigna can also have an impact.

Q. How about the sophistication or the sort of significance of the cost of

LESTER

the pharmacy benefit, are those factors that vary?

A. They are. So for a client that, for example, is experiencing very high costs under the pharmacy benefit, they are usually most likely to be shopping that aggressively in the market to find a better option that they might see and that's where all the things just beyond just fewer discounts come into play, the clinical programs that are offered, the formularies, the mail order services to be able to help manage those costs over time but as clients get larger, they usually have stronger negotiating power and there is usually a correlation between client size and the aggressiveness of the discounts.

Q. I think with a lot of Mr. Izard's questions today he tried to suggest that spread pricing or the use of pricing arrangements other than pass-through of pharmacy pricing was somehow only inuring to Cigna's benefit and was not something

Page 346

LESTER

that any plan sponsor would ever want. Would you agree with that?

MR. IZARD: Objection.

THE WITNESS: So when plan sponsors are selecting Cigna as a service provider, we give them the option of a pass-through arrangement or an arrangement where spread is in

Page 347

LESTER

BY MR. SHAFFER:

Q. Does the utilization of spread, or negative reimbursement for that matter, does that excuse Cigna from meeting the discounts and guarantees that we've looked at here on page 14 of the ASO agreement?

MR. IZARD: Objection.

THE WITNESS: Can you say that one more time?

BY MR. SHAFFER:

Q. Does the fact that you have the opportunity for spread pricing in some plans, does that -- or don't have it in others, does that change whether or not you have guarantees or discounts that you committed to meet over the plan year in the ASO context?

Page 348

LESTER

A. It can. So actually this client is a good example. If we look at the retail brand drug claims, and you read through that section, it talks about charging the client the same amount that we are charged by the retail pharmacy. This is an example where that client is pass-through for retail brand drugs. There's no spread on retail brand drugs and therefore there's no guarantee that comes along with that. If we look at retail generic plans --

MR. IZARD: Objection.

///

Page 349

LESTER

BY MR. SHAFFER:

Q. And what's the significance of a guarantee to a plan sponsor?

A. A guarantee provides --

MR. IZARD: Objection.

THE WITNESS: A guarantee provides some certainty around what