UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, et al., | No. 16-cv-1702 (JAM) |
| Plaintiffs, | (Consolidated) |
| vs. | |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | |
| Defendant. | May 17, 2022 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
CIGNA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................2

       A.    Overview of Cigna's "Clawback" Scheme ...............................................2

       B.    Cigna Directed Argus and Optum To Misrepresent Cost-Share Amounts
             and Take "Clawbacks" ..............................................................................4

       C.    The "Clawback" Scheme Was Important and Lucrative to Cigna ...........7

       D.    Cigna Knew the Clawback Scheme Violated the Plan Cost-Share
             Language ....................................................................................................8

       E.    Cigna Directed Argus, Optum and the Network Pharmacies to Conceal
             Accurate Cost-Share Amounts ................................................................12

III.   ARGUMENT ......................................................................................................16

       A.    Civil RICO Is Designed for Fraudulent Billing Schemes ......................16

       B.    Cigna Played "Some Part" in Directing the Affairs of Optum and Argus ...........18

             1.    This Is a Fact-Based, "Low Hurdle" Issue .................................18

             2.    Cigna's Participation In Some of Argus and Optum's Affairs .................21

             3.    Cigna's Case Law Does Not Entitle It To Summary Judgment ...............24

             4.    Contracts Between Corporations Do Not Immunize RICO
                   Violations .....................................................................................27

       C.    Plaintiffs' Have Evidence of Injury "By Reason Of" the RICO Violation ...........30

       D.    Cigna's Claimed "Belief" That It Complied with Plan Terms is
             Contradicted by its Own Documents and Does Not Justify Summary
             Judgment....................................................................................................36

IV.    CONCLUSION ..................................................................................................37

# TABLE OF AUTHORITIES

## CASES

*131 Main St. Assocs. v. Manko,*
    897 F. Supp 1507 (S.D.N.Y. 1995) ...........................................................................22, 23

*Abbott Laboratories v. Aldephia Supply USA,*
    No. 15-CV-5826 (CBA)(LB), 2017 WL 57802 (E.D.N.Y. Jan. 4, 2017) .........................25

*Amsterdam Tobacco Inc. v. Philip Morris Inc.,*
    107 F. Supp. 2d 210 (S.D.N.Y. 2000) .....................................................................19, 25

*Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.,*
    13-cv-03422 (D. Colo.) ..............................................................16, 17, 27, 28, 35

*Azrielli v. Cohen Law Offices,*
    21 F.3d 512 (2d Cir. 1994) ......................................................................................22, 23

*Baisch v. Gallina,*
    346 F.3d 366 (2d Cir. 2003) .............................................................................................19

*Bellas v. CBS, Inc.,*
    221 F.3d 517 (3d Cir. 2000) .............................................................................................36

*Chevron Corp. v. Donziger,*
    2013 WL 5526287, No. 11 Civ. 0691 LAK (S.D.N.Y.), Oct. 7, 2013 ...............................2

*Chisolm v. TransSouth Fin. Corp.,*
    194 F.R.D. 538 (E.D. Va. 2000) ......................................................................................34

*Counts v. Gen. Motors, LLC,*
    16-CV-12541, 2018 WL 5264194 (E.D. Mich. Oct. 23, 2018) ...........................20, 21, 22

*De Falco v. Bernas,*
    244 F.3d 286 (2d Cir.2001) .......................................................................................19, 25

*First Capital Asset Mgmt, Inc. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004) .............................................................................19, 20, 21, 22

*Handeen v. Lemaire,*
    112 F.3d 1339 .....................................................................................................................20

*Humana v. Forsyth,*
    525 U.S. 299 (1999) ..........................................................................................................17

*In re Duramax Diesel Litig.,*
    298 F. Supp. 3d 1037 (E.D. Mich. 2018) ........................................................................21

*In re Managed Care Litig.*,
 185 F. Supp. 1310 (S.D. Fla. 2002) .................................................................................17

*In re Outlaw Lab., LP Litig.*,
 18-CV-840-GPC-BGS, 2020 WL 5552558 (S.D. Cal. Sept. 16, 2020) ...........................19

*In re U.S. Foodservice Inc. Pricing Litig.*,
 729 F.3d 108 (2d Cir. 2013) ..............................................................................16, 34, 35

*Inteliquent, Inc. v. Free Conferencing Corp.*,
 503 F. Supp. 3d 608 (N.D. Ill. 2020) .............................................................................19

*Klay v. Humana, Inc.*,
 382 F.3d 1241 (11th Cir. 2004) .....................................................................................34

*Lockheed Martin Corp. v. Boeing Co.*,
 357 F. Supp. 2d 1350 (M.D. Fla. 2005) .........................................................................24

*Maersk, Inc. v. Neewra*,
 687 F. Supp. 2d 300 (S.D.N.Y. 2009) ...............................................................................2

*Marlow v. Allianz Life Ins. Co. of North Am.*,
 No. 08-cv-00752-CMA-MJW, 2009 WL 1328636 (D. Colo. May 12, 2009) .................26

*Negron v. Cigna Health and Life Ins. Co.*,
 3:16-CV-01702 (JAM), 2021 WL 2010788 (D. Conn. May 20, 2021) ...........................36

*Negron v. Cigna Health and Life Insurance*,
 300 F. Supp. 3d 341 (D. Conn. 2018) ................................................................1, 27, 30

*Neufeld v. Cigna Health and Life Ins. Co.*,
 3:17-CV-01693-WWE, 2018 WL 4158377 (D. Conn. Aug. 30, 2018) .....................17, 28

*Press v. Chem. Inv. Services Corp.*,
 166 F.3d 529 (2d Cir. 1999) ..........................................................................................37

*Reves v. Ernst & Young*,
 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ..............19, 20, 21, 23, 24, 26, 30

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
 30 F.3d 339 (2d Cir. 1994) ............................................................................................25

*Schmidt v. Fleet Bank*,
 16 F. Supp. 2d 340 (S.D.N.Y. 1998) ..............................................................................26

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
 473 U.S. 479 (1985) .......................................................................................................16

*Shepard v. DineEquity, Inc.*,
  Civ. No. 08-2416, 2009 WL 8518288 (D. Kan. Sept. 25, 2009)...........................27, 28, 29

*Tribune Co. v. Purcigliotti*,
  869 F. Supp. 1076 (S.D.N.Y. 1994), *aff'd*, 66 F.3d 12 (2d Cir. 1995).............................24

*United States v. Allen*,
  155 F.3d 35 (2d Cir. 1998) ........................................................................................19, 30

*United States v. Castro*,
  89 F.3d 1443 (11th Cir. 1996) ........................................................................................24

*United States v. Turkette*,
  452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ....................................................16

*Vickers Stock Research Corp. v. Quotron Systems, Inc.*,
  No. 96 CIV. 2269 (HB), 1997 WL 420265 (S.D.N.Y. July 25, 1997)......................26, 27

*Wechsler v. Steinberg*,
  733 F.2d 1054 (2d Cir. 1984) ........................................................................................37

## STATUTES

18 U.S.C. § 1962(c)...........................................................................................................19, 23

Pub. L. 91-452, § 904(a), 84 Stat. 947 .................................................................................16

## RULES

Fed. R. Civ. P. 30(b)(6) ..........................................................................................................5

## I.      INTRODUCTION

This court already has heard and rejected Cigna's arguments to avoid a trial of Plaintiffs'

RICO claims.  Cigna has simply recycled most of the same, meritless arguments that it raised in

its unsuccessful motion to dismiss.  *Compare* Memorandum of Law Supporting Motion to

Dismiss ("MTD Memo.") [ECF 70-1] at 32 *with* Memorandum of Law Supporting Motion for

Partial Summary Judgment ("SJ Memo.") [ECF 426-1] at 8 (both asserting, wrongly, that RICO

"is primarily a criminal statute"). This court denied Cigna's motion to dismiss because "plaintiffs

have alleged that Cigna designed the Clawback scheme, that it required OptumRx and Argus to

misrepresent the cost-sharing amounts, and that it directed OptumRx and Argus to forward the

Clawbacks." *Negron v. Cigna Health and Life Insurance*, 300 F. Supp. 3d 341, 364 (D. Conn.

2018).  This court held that those facts allege "operation or management" of a RICO enterprise

and the predicate mail or wire fraud.  *Id*. at 363-65.  Through discovery, Plaintiffs have

confirmed that Cigna's contemporaneous documents and deposition testimony substantiate

Plaintiffs' allegations, or at the very least create a material dispute of fact for trial.

Contrary to its motion, Cigna's documents and testimony confirm that Cigna conducted

or participated in some of the affairs of Argus and OptumRx ("Optum") by directing those

enterprises to impose the fraudulent cost-share charges on Plaintiffs and to take and remit to

Cigna the excessive charges as "clawbacks," all while keeping Plaintiffs, Optum and Argus in

the dark.  Further, contrary to Cigna's argument that Plaintiffs did not provide discovery

responses explaining this point-of-sale injury, Plaintiffs' Supplemental Discovery Responses

dated November 11, 2020 explain how Plaintiffs relied on Cigna's false prescription billing at

the point-of-sale, implemented through the otherwise legitimate-appearing conduct of Argus and

Optum.  The responses further explain that Plaintiffs were injured when they overpaid at the

point-of-sale for their prescriptions as a result of the misrepresentations about their cost-shares. Those facts complete the RICO violation.

Cigna recognizes that Plaintiffs' ERISA claims will be tried because the parties dispute whether Cigna violated the relevant Plan language:  to wit, "In no event will the Copayment . . . for the Prescription Drug or Related Supply exceed the amount paid by the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge."  SJ Memo. at 2; Second Amended Consolidated Complaint ¶ 25(d) [ECF 198] ("Complaint").  Because the RICO claim is based on the **_intentional_** violation of that same language, Cigna tacitly concedes that the RICO claim also must be tried.  Cigna's contemporaneous documents and conduct clearly demonstrate, or, at a minimum, raise a material factual dispute, that Cigna acted with fraudulent intent.  Accordingly, Plaintiffs are entitled to try their RICO claim to a jury in the trial of this case. Just as the court denied the motion to dismiss, the court should deny this partial summary judgment motion.[1]

## II.    FACTUAL BACKGROUND

### A.    Overview of Cigna's "Clawback" Scheme

As set forth in detail below, this case centers on Cigna health plans that provided prescription drug benefits. These plans did not provide drugs. Instead, the Plans provided coverage for drugs in that they paid for prescription drugs subject to the cost-share amounts, like copayments, that had to be paid by Cigna plan members. The amount of cost-share owed by a member for each prescription drug was set forth in the benefits section of each member's Plan, which laid out the benefit design for that Plan.

---

[1] In contrast to the ERISA claims, which Cigna concedes need to be tried to the court, Plaintiffs have a Seventh Amendment right to try their RICO claim to a jury. *Maersk, Inc. v. Neewra*, 687 F. Supp. 2d 300, 340-41 (S.D.N.Y. 2009); *Chevron Corp. v. Donziger*, 2013 WL 5526287 at *2, No. 11 Civ. 0691 LAK (S.D.N.Y. Oct. 7, 2013).

Cigna operated and managed its pharmacy benefit "clawback" scheme partially through Optum, a pharmacy benefit manager that managed the pharmacy network.  Cigna also utilized Argus, a pharmacy benefit claim processor, which calculated the cost-share amounts that members owed and the remaining amounts that Cigna owed, using information solely provided by Cigna. The scheme involved a multi-step process. First, Cigna provided a flawed cost-share calculation formula, known as "logic," to Argus.  Cigna required Argus to use that flawed "logic" to calculate mechanically and instantaneously the excessive cost-share amounts that were to be charged to members when members presented their prescriptions to be filled at the pharmacy. Second, Cigna required Argus to transmit mechanically and instantaneously by wire these excessive cost-share amounts to Optum and its network pharmacies, which then communicated with Cigna members, thereby misrepresenting to members the amount of the cost-shares the members owed. Third, Cigna required Optum, though its pharmacies, to collect the misrepresented cost-share amounts from members before they could receive their drugs. Finally, Cigna required Optum and its pharmacies to remit the excess amount of the member cost-shares, the "clawbacks," to Cigna.

According to Cigna, Optum and Argus did not know they were charging and collecting excessive cost-shares because Cigna did not provide them with either the Plans or the benefit design that the Plans dictated.  Cigna also did not tell Argus or Optum that it was violating its contracts with them, which contracts required Cigna to provide cost-share information that was consistent with Plaintiffs' Plans.  Cigna also affirmatively concealed the "clawbacks" from its members, including Plaintiffs.

**B.     Cigna Directed Argus and Optum To Misrepresent Cost-Share Amounts and Take "Clawbacks"**

Cigna implemented the "clawback" scheme through Argus and Optum, which are the legal-entity enterprises.[2]  Complaint, ¶¶ 263-266.  Argus and Optum served as Cigna's pharmacy benefit managers ("PBMs").  *See* Answer ¶ 4 [ECF 145].  Cigna used Argus to adjudicate the prescription drug claims, including Plaintiffs'.  *Id*. at ¶ 43; 2008 Restated Agreement., Ex. 1, at 1  ("2008 Argus Agreement"); Deposition of Tyler Lester, Ex. 2, at 12:3-10 ("Lester Tr.").[3]  Cigna used Optum's network of pharmacies (as the successor to a PBM known as Catamaran) to fill prescriptions for Cigna's members, including Plaintiffs', and to collect the cost-share payments and to remit them up to Optum and then to Cigna.  Answer at ¶ 42; Lester Tr., Ex. 2, at 11:6-23, 12:22-13:11.

Argus processed claims pursuant to "Plan Specifications" that Cigna misrepresented were based on Cigna's Plan language.  2008 Argus Agreement, Ex. 1, at 19-21 ███████████ ████████████████████████████████████████████ *id*. at 26 ███████ ██████████████████████████████████████████.  Cigna had ***sole responsibility*** to ██████████████████████████████████████████████████  *Id*. at 22 ("████████████████████"); *id*. at 26 (██████████ ████████████████████████████████████████████████ ██████████████████████").  Argus was required to "██████ █████████████████████████████████████████████████ ██████████████████████████████."  *Id*. at 22 (emphasis added).  Argus had ***no role*** in determining the adjudication logic that determined the amount of the cost-share

---

[2] Plaintiffs withdraw their RICO conspiracy claim.  Complaint, Count VIII.

[3] All references to "Ex. __" are to Exhibits to the Raabe Declaration.

and, therefore, had no role in determining the amount of the cost-shares that resulted from Argus computers applying Cigna's logic.  Indeed, Argus had no access to the Plans at all (Lester Tr. at 152:10-15), and the Argus Agreement provided that "████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████," 2008 Argus Agreement, Ex. 1, at 22 (emphasis added).  In short, at all times, Cigna had absolute control over the information that Argus used to adjudicate prescription drug claims and to determine the cost-share amounts to be charged to Cigna's members.

The Cigna/Argus relationship and responsibilities were reinforced in a 2016 "Master Services Agreement," Ex. 3, and "Statement of Work No. 1," Ex. 4.  Schedule A-1 to the Statement of Work specified that "████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████" Statement of Work No. 1, Schedule A-1, Ex. 5, at 1.  The members' cost-share responsibility was ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████" Master Services Agreement, Ex. 3, at 36.[4]

---

[4] Argus' Rule 30(b)(6) witness confirmed that ████████████████████████████████ ████████████████████████████████ Deposition of Michelle Emanuel-Johnson, Ex. 8, at 10:23-11:19, 20:24-21:4; 22:15- 23:7; 8:21-9:17 ("Emanuel-Johnson Tr."); Lester Tr., Ex. 2, at 152:10-15; SJ Memo. at 14.   Cigna created and sent to Argus ████████████████ ████████████████████████████████████████████████. Emanuel-Johnson Tr. at 20:3-22:7; 26:4-30:22; 36:10-16.

Cigna's agreement with Optum had similar provisions that kept Cigna in complete

control over its clients and its business, including information related to plan benefits and cost-

shares.  The Pharmacy Benefit Management Agreement dated June 10, 2013 ("Optum

Agreement")[5] provided that Cigna "█████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████" Optum Agreement, Ex. 6, at

Art. II, § 2.4 at 30 (emphasis added).  ██████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████" *Id*. at Art. I, § 1.1 at 4. ████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *Id*. at Art. I, § 1.1 at 7. ██████████

██████████████████████████████████████████████████████████ SJ

Memo. at 14.  ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████"

Pursuant to the Optum Agreement, Optum made available to Cigna a network of

pharmacies.  *Id*. at Art. III, § 3.1(a)(iv) at 31; Schedule 8 to Optum Agreement, Ex. 7; Answer ¶

42 [ECF 145].  Schedule 8 to that agreement provided that Optum ██████████████████

---

[5] The 2013 agreement was between Cigna and Catamaran PBM of Illinois, Inc.  Optum is
the successor to Catamaran.  Answer, ¶ 42 [ECF 145].



██████████████████████████████████████ Schedule 8 §

2.1 at 1.  Optum, in turn, ████████████████████████████████████

Schedule 8 §§ 4.2 & 4.3 at 8. ███████████████████████████████

████ *Id*. § 2.3.7 at 5. ████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████" *Id*. § 5.7.1(c) at 11.

To fill a prescription, a Cigna member, including Plaintiffs, would present his or her prescription to the Optum network pharmacy, which would enter the prescription information into a computer.  ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Emanuel-Johnson

Tr., Ex. 8, at 37:9-39:3.

The flow of funds was largely the reverse and was handled through a periodic reconciliation.  Argus would fund the pharmacies at the point-of-sale, Cigna would fund Argus, and Optum would fund Cigna.  Lester Tr., Ex. 2, at 166:23- 167:22.  █████████████

████████████████████████████████████████████████

█████████████████████ Deposition of Stephanie Byrne, Ex. 9, at 77:9-19 ("Byrne Tr.").

## C.    The "Clawback" Scheme Was Important and Lucrative to Cigna

Cigna's lucrative "clawback" scheme received the attention of Cigna's highest management. Cigna's CEO served as the "sponsor" for the scheme, euphemistically called the "Pharmacy Over Payments" project. Ex. 10 at 199867.  Others at the highest levels of Cigna's management made "clawbacks" a "top priority" due to the fact that, without the unlawful

scheme, "Cigna [wa]s losing approximately $100M a year."  Ex. 11 at 248002; Ex. 12 at 56019.

Implementation of "clawbacks" was an "urgent request from management" to "react to a missed

revenue opportunity."  Ex. 13 at 54923-24.  The Cigna executive in charge of the entire

pharmacy management program referred to the money that Cigna obtained through "clawbacks"

as "trapped money;" that is, money that the retail network pharmacies collected from Cigna

members in cost-share payments in excess of the amount that those pharmacies agreed to be

paid.  Deposition of Christopher Hocevar, Ex. 14, at 100:19-101:2, 113:25-114:9; 141:25-142:9.

The "spread" was the "trapped money" and, when paid to Cigna through the reconciliation

process, the "trapped money" constituted the "clawback" amount.  *Id*. at 100:19-101:2, 113:25-

114:9; 121:7-21.

### D.    Cigna Knew the Clawback Scheme Violated the Plan Cost-Share Language

Knowledgeable Cigna employees told management that there were "inconsistencies

between plan language and how we administer" claims.  Ex. 15 at 4.  Cigna referred to these

"inconsistencies" as "gapped language" because of the gap between the plan language and how

Cigna was actually adjudicating claims.  Ex. 15 at 2 ("Business Problem/Opportunity").

Throughout the relevant period, Cigna knew that it was requiring Argus and Optum to

charge cost-shares that violated the Plan language because they exceeded "the amount paid by

the plan to the Pharmacy, or the Pharmacy's Usual and Customary (U&C) charge."  In a 2013

email exchange, knowledgeable Cigna employees confirmed that the Plan language at issue,

known internally as "copay G logic," entitled members to cost-share amounts that compared

three factors:  (1) the stated copay amount, (2) the usual and customary pharmacy charge, and (3)

the amount "agreed to by the pharmacy with Cigna."  Ex. 16 at 7435181.  In the email exchange

between the "pharmacy product managers," one of the employees informed his colleagues that

"[t]he member will always pay the *lowest* of these three amounts." *Id*. (emphasis added). The email also gave an example of how the cost-share logic should have worked:



In another 2013 email exchange, knowledgeable Cigna employees similarly stated: "Our copay logic looks at the copay, U&C, and allowed cost . . . . This ensures the customer pays the *lowest* amount. The allowed cost is based on *our contract with the pharmacy* — the *reimbursement amount we agree to for a drug for a pharmacy*." Ex. 17 at 246200 (emphasis added).

In yet another document that Cigna used to educate its sales force as to how its copay logic worked, Byrne Tr., Ex. 9, at 59:4-7, Cigna explained how the copay G logic at issue in this case was modifying prior "copay K" language. Ex. 18 at 50555. The document explained that copay K only had two comparison points: the stated copay and the usual and customary charge. *Id*. The document noted that "[t]his method often results in the pharmacy charging the customer more than Cigna's allowed cost, or the cost at which *Cigna has agreed to reimburse the pharmacy* for any given drug." *Id*. (emphasis added). Cigna further explained to its sales force that "[t]he new standard method, Copay G, adds a third point in the price comparison — the allowed cost. With the Copay G method, the customer pays the lowest of the applicable copay, U&C, or allowed cost. *This guarantees that the customer will pay the lowest possible price*." *Id*. (emphasis in original). The document further provided a helpful example:



Other Cigna documents from the relevant time frame reinforced the same principle: Cigna knew that the language at issue in this case ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Ex. 19 at 102075 ("▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮"); Ex. 20 at 185904 ("▮▮▮▮▮▮ ▮▮▮▮▮"); Ex. 21 at 50557 ("▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮."); Ex. 22 at 212990 ("▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮").

It also is clear that Cigna knew in 2013 the significance of the "to the pharmacy" language in the Plan provision that promised that members' cost-shares would never exceed "the amount paid by the plan ***to the pharmacy***."  In early 2013, draft language was circulated in conjunction with "▮▮▮▮▮▮▮▮▮▮▮▮▮." *See, e.g.*, Ex. 23 at 1; Ex. 24 at 1. The draft language ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*



That contemplated change would have removed the" gap" and" inconsistency" between Cigna's claims administration and its plan language ████████████████████████ ███████████████████████████████████████████████ ██████████████████████████ However, the proposed change was not made.

When Cigna employees again reviewed the plan language in 2016, employees predicted that Cigna would face "a lawsuit by a customer." Ex. 25 at 491453.  This is that lawsuit.  But, further revealing Cigna's fraudulent intent, even after that prediction, Cigna kept overcharging members and taking "clawbacks."

Indeed, as the "clawback" scheme was reaping $100 million per year, Cigna employees contemporaneously described the scheme as "unreasonable" and "egregious," Ex. 26 at 491619, and could not "believe we can live with ourselves charging the member 172% more than what [a] drug costs," *id*. at 491623.  Another employee wrote, "it seems strange that Cigna would charge a member for a copay that exceeds the ingredient cost + dispensing fee + tax, if applicable [*i.e.,* the amount that Cigna paid the pharmacy].  To me that is no longer a 'co'pay, but more of a single (over)payment by the customer."  Ex. 27 at 54926.

Despite Cigna's knowledge that Plaintiffs should have received the benefit of the pharmacy rate, Cigna does not — and cannot — dispute that it knowingly and intentionally

provided to Argus cost-share logic that required Argus to calculate, and required Optum to represent to and collect from Plaintiffs, cost-shares that violated Cigna's plan language because the cost-shares exceeded the "the cost at which Cigna has agreed to reimburse the pharmacy for any given drug." Ex. 18 at 50555. As just one example, for one of Plaintiff Negron's fraudulent transactions, Cigna required Argus to adjudicate and required Optum, through its network pharmacy, to collect a copayment of $10.00, even though the pharmacy was only being paid $6.06 for that prescription drug, resulting in a $3.94 "clawback." Declaration of Launce B. Mustoe, Jr., R.Ph. ¶ 4.

Plaintiffs also have other evidence of Cigna's fraudulent state of mind. In its motion, without citing *any* Plan language supporting its argument, Cigna claims that its Plans fully disclosed that they employed "spread" pricing. SJ Memo. at 1. However, at the time this lawsuit was filed, Cigna's Vice President of Pharmacy expressed disbelief that its "uneducated" members had figured out that Cigna was "clawing back" "spread." Ex. 28 at 367625. Specifically, in the wake of this lawsuit, a subordinate asked the vice president "how does this person know about a 'spread.'" *Id*. The vice president responded, "no clue." *Id*. The fact that Cigna's Vice President of Pharmacy did not believe that its members could have had a "clue" about "spread" directly contradicts Cigna's summary-judgment position that no jury could find that Cigna knowingly concealed "spread" and "clawbacks" and thereby engaged in fraud.

### E.    Cigna Directed Argus, Optum and the Network Pharmacies to Conceal Accurate Cost-Share Amounts

In fact, to make the scheme work, Cigna had to and did conceal the truthful charges that would have resulted from determining the cost-share amount according to the actual Plan terms. Cigna did so through incredibly broad confidentiality clauses in its contracts with Argus and Optum. For example, the 2008 Argus Agreement provided that "███████████████



" 2008 Argus Agreement, Ex. 1 § 14(a) at 9 (emphasis added).  Similarly, the Optum

Agreement defined "█████████████████████████████████████████████████

█████████████████████████████████████████████████████████████" Optum

Agreement, Ex. 6, Art. I, § 1.1 at 6-7.

Based on this disclosure prohibition, Optum then enforced "gag clauses" against network

pharmacies.  For example, one form agreement provided that the "Pharmacy will not share

information concerning the terms of this Agreement or other proprietary information, including

but not limited to, ***reimbursement rates and pricing as provided to Pharmacy*** . . . ."  Ex. 29 ¶

3.3 at 177316-317 (emphasis added).

Contrary to Cigna's erroneous claim that "spread" pricing was disclosed in the Plans,

Cigna employees repeatedly opined that its members should not have access to the

reimbursement rates with the network pharmacies.  In one, an employee wrote:  "This provider

has been telling the member many things that should not be shared as it is ***not the members'***

***issue***.  [Cigna] need[s] to educate the provider as to not to discuss reimbursements with the

member or reach out directly to the employer regarding the problem."  Ex. 26 at 491624

(emphasis added).  In another "URGENT" email, a Cigna employee wrote that "Cigna should

avoid explaining the 'spread pricing' model."  Ex. 30 at 433127.

Cigna also, through Optum, prohibited a network pharmacy from charging less than the

excessive cost-share amounts that Cigna directed. Cigna retained ██████████████████

██████████████████████ (Optum Agreement, Ex. 6, at Art. II, § 2.4 at 30).  The

agreements that Optum had with its network pharmacies required that pharmacies "with respect

to any Claim, collect any Copayment indicated in the claim response message from Catamaran to the Pharmacy *in the exact amount specified* in that message." Ex. 29 ¶ 3.1(*l*) at 177316.

Cigna considered these clauses "compulsory" (Ex. 31 at 180952) and was ***not*** tolerant of pharmacies that were honest with members.  When one pharmacist labeled deductible "clawbacks" a "[n]ew ponzi scheme," Cigna's "Pharmacy Network Operations" reiterated to Cigna personnel that pharmacists were prohibited from disclosing the "clawback" scheme to members, stating, "I explained that [the pharmacist] is not to discuss reimbursement matters with members."  Ex. 32 at 309576-577. After another pharmacy disclosed Cigna's "clawback" scheme to a customer, a Cigna employee noted that "our network pharmacies are contractually prohibited from discussing pricing with our customers. . . .  Should the pharmacy continue to break their contract, Juan advised that they would be reviewed for possible termination from the network."  Ex. 33 at 7504938.

Similarly, a Human Relations employee of a Cigna client contacted Cigna about a pharmacist's concerns ███████████████████████████████████████████████

███████████████████████████ Ex. 34 at 180859. The HR employee concluded, "█████████

████████████████████████████████████████████████████████████." *Id*. at 180856. Because ███████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Ex. 34 at 180852. ████████████████



" *Id*. at 180853.

*See, e.g.*, Ex. 33 at 7504938; Ex. 37 at 158092; Ex. 29 ¶ 3.3 at 177316-17.

Cigna's scheme, approved at the highest levels of its organization, was, even beyond the gag clauses, designed to evade detection. Client and customer reporting was done in such a way as to conceal the "clawbacks" from employers and members. Ex. 38 at 55857 ("What we show the TPAs or any other client/customer should not change. ***We should not be showing any pharmacy rates today, we only show the client rates***.") (emphasis added). The pharmacy overpayments were most often not large or easily noticed by members, despite adding $100 million a year to Cigna's bottom line. In trying to minimize the massive scheme, in deposition CEO David Cordani described the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" Deposition of David Cordani, Ex. 36 at 52:11-18. As discussed above, when members ***did*** notice the "▇▇▇ ▇▇▇▇▇▇" and brought this lawsuit, Cigna was shocked and had "no clue" how members, who were "not as uneducated as [Cigna] thought," could possibly "know about a 'spread.'" Ex. 28 at 367625.

Finally, the jury will hear that only after the "clawback" scheme finally was uncovered (not when Cigna discussed internally that it was violating the plan language and might be sued), Cigna modified its plan language. This "consciousness of guilt" evidence will show the jury that for the first time, Cigna disclosed to members that there might be "spread" in its pricing. For instance, Cigna added the following language to Plaintiff Negron's Plan: "▇▇▇▇▇▇▇▇

███████████████████████████████████████████████

████." Ex. 39 at 68 (Prescription Drug Charge).

In sum, rather than change how it adjudicated prescription-drug claims to match the plan language during time in which Cigna engaged in its "clawback" scheme, Cigna finally changed the plan language to match how it had been fraudulently adjudicating claims for years. A jury could readily conclude from this evidence that Cigna defrauded its members through the intentionally inflated cost-shares.

## III.  ARGUMENT

### A.  Civil RICO Is Designed for Fraudulent Billing Schemes

Cigna's argument that RICO is "primarily a criminal statute," SJ Memo at 8, is wrong. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498-99 (1985). In *Sedima*, the Court considered whether RICO could be used as "a weapon against 'innocent businessman.'" *Id.* at 498; *see* SJ Memo. at 1 (Cigna complaining that Plaintiffs are trying to "weaponize their ERISA claims" through RICO). The Court rejected the argument that using RICO against an alleged scheme of "presenting inflated bills," like the "clawback" scheme here, was improperly "weaponizing" RICO. *Id.* at 483-84. The Court declared:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, *see United States v. Turkette,* 452 U.S. 576, 586-587, 101 S.Ct. 2524, 2530-2531, 69 L.Ed.2d 246 (1981), but also of its express admonition that ***RICO is to "be liberally construed*** to effectuate its remedial purposes," Pub. L. 91-452, § 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.

*Id.* at 497-98 (emphasis added)*; see generally In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013).

Indeed, Cigna has ***itself*** used civil RICO offensively against legitimate businesses to challenge fraudulent billing practices. *See generally* Cigna's Counterclaims in *Arapahoe*

*Surgery Center, LLC v. Cigna Healthcare, Inc.*, (D. Colo.), Ex. 40. In *Arapahoe*, Cigna alleged that a legitimate healthcare provider, "SurgCenter" (the counterclaim RICO defendant), "came to agreements" with other legitimate surgical centers that Cigna labelled "ASCs" (the enterprises), and that SurgCenter "participated in the conduct and operation" of the ASCs because, "with the assistance and guidance of SurgCenter," the ASCs "submitt[ed] fraudulent claim forms to insurers like Cigna in order to induce the insurers to make payments to the ASCs." *See id*. ¶¶ 201, 203, 204. Cigna further alleged that SurgCenter "knew that Cigna would reasonably rely on the falsely-stated charges" and that, after Cigna made the payments, the ASCs "funnele[ed] a portion of the fraudulently obtained money paid by insurers like Cigna back to SurgCenter." *Id*. ¶¶ 207, 205.[6]

As discussed above, Cigna "came to agreements" with Optum and Argus and, "with the assistance of [Cigna]," Argus and Optum "submitt[ed] fraudulent" prescription drug charges to Cigna's customers knowing that the customers "would reasonably rely" on those charges and pay them. *See id*. ¶¶ 201, 203, 204. When the customers paid the fraudulent charges, Argus and Optum "funneled" the fraudulent portion as "clawbacks" to Cigna. *Id*. ¶¶ 207, 205. In light of Cigna's allegations in *Arapahoe*, Cigna's argument that Plaintiffs' RICO claim here pushes the boundaries of the statute too far is specious.[7]

---

[6] Cigna's RICO claims were dismissed, not because SurgCenter did not sufficiently conduct or participate in the ASCs' affairs, but because Cigna, despite its allegations of being tricked, "conced[ed] that it was provided information from which it should have known" the true nature of the charges. Ruling on Motion to Dismiss in *Arapahoe Surgery Center, LLC v. Cigna Healthcare, Inc.*, 13-cv-03422 (D. Colo.), ECF 80 at 11. As set out above, this case is different because Cigna actively concealed its fraudulent charges and "clawbacks" from its customers.

[7] Cigna also is well-aware that RICO is routinely used against otherwise legitimate insurance companies that have engaged in wrongdoing, including Cigna itself. *See, e.g.*, *Humana v. Forsyth*, 525 U.S. 299 (1999); *Neufeld v. Cigna Health and Life Ins. Co.*, 3:17-CV-01693-WWE, 2018 WL 4158377, at *15 (D. Conn. Aug. 30, 2018); *In re Managed Care Litig.*, 185 F. Supp. 1310 (S.D. Fla. 2002) (naming Cigna).

Cigna tries to legitimize its conduct through a discussion of health insurance public policy and the differences between "'traditional' or 'spread' pricing." SJ Memo. at 1. Plaintiffs do not suggest that Cigna could not engage in spread pricing if its plans allowed it. Cigna's fraud stems from the fact that Cigna's plans did not allow for spread pricing because the member cost-share could not exceed the amount paid to the pharmacy, and therefore, there could be no spread between the amount paid by the member and the amount paid to the pharmacy.

Indeed, as part of their *mens rea* evidence, Plaintiffs will prove that Cigna knew how to disclose "spread" pricing and did so in certain of its self-insured contracts with its employer clients (and later did so in modifying Plans like Plaintiff Negron's). For example, during the "clawback" scheme, Cigna advised employers, but not members, that ███████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████." *See* Ex. 41 at 1323; Ex. 42 at 1531; Ex. 43 at 336 (emphasis added). There was **no such disclosure** about "spread" and "clawbacks" (1) in Plaintiffs' plans, (2) when Cigna presented Plaintiffs, through Argus and Optum, with prescription drug charges that inflated the cost-share and concealed the "spread," or (3) when Plaintiffs paid those inflated charges.

## B.     Cigna Played "Some Part" in Directing the Affairs of Optum and Argus

### 1.     This Is a Fact-Based, "Low Hurdle" Issue

Cigna claims that it has no RICO liability because no jury could find that it participated in or conducted any affairs for Argus or Optum. SJ Memo at 10-17. Cigna is wrong. Whether Cigna conducted or participated in some part of directing the affairs of Argus or Optum (the "operation or management" test) is a question of fact that "must be assessed by a fact-finder to determine whether or not [the defendant's activities], assessed in the context of all the relevant circumstances, constitutes participation in the operation or management of the enterprise's

affairs." *United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998); *see also In re Outlaw Lab., LP*

*Litig.*, 18-CV-840-GPC-BGS, 2020 WL 5552558, at *9 (S.D. Cal. Sept. 16, 2020); *Inteliquent,*

*Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608, 626 (N.D. Ill. 2020). "In this Circuit, the

'operation or management' test typically has proven to be a ***relatively low hurdle*** for plaintiffs to

clear, *see, e.g., Baisch v. Gallina,* 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas,* 244

F.3d 286, 309 (2d Cir.2001)." *First Capital Asset Mgmt, Inc. v. Satinwood, Inc.*, 385 F.3d 159,

175-76 (2d Cir. 2004) (emphasis added).[8]

    The court of appeals in *Satinwood* set out the now well-settled standard:

> "Plaintiffs must [have evidence] that the defendants 'conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' 18 U.S.C. § 1962(c); *see Reves v. Ernst & Young,* 507 U.S. 170, 177-79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In *Reves,* the Supreme Court explained this to mean that the defendant must have had 'some part in directing [the enterprise's] affairs.' 507 U.S. at 179, 113 S.Ct. 1163. 'Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise[;] but ***some part in directing the enterprise's affairs is required***.' *Id.* (footnote omitted)." (emphasis added).

*Satinwood*, 385 F.3d at 175-76; *see also DeFalco*, 244 F.3d at 311 (quoting *Reves*, 507 U.S. at

184).

    In *Satinwood*, the alleged enterprise was an otherwise legitimate bankruptcy estate.

*Satinwood*, 385 F.3d. at 175.  The RICO defendants included a bankruptcy debtor, Sohrab, and

his mother, Afsar, who were alleged to be engaged in bankruptcy fraud.  *Id*. at 177-78.   The

---

[8] The court stated that the "operation or management" test was a "low hurdle" "especially at the pleading stage." *Satinwood,* 385 F.3d at 176.  The court was assessing a dismissal, but by using the adverb "especially," the court necessarily did not limit the "low hurdle" to the pleading stage.  At page 13 of its brief, Cigna cites *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 216-18 (2000 (S.D.N.Y.), for the notion that the test "is a very difficult test to satisfy."  The district court's *dicta*, relying on another district court decision, cannot be squared the court of appeal's controlling opinion in *Satinwood* that the test is a relatively "low hurdle."

court concluded that as the bankruptcy debtor, Sohrab was alleged to have been the "primary source of the most relevant information pertaining to the affairs" of the bankruptcy estate enterprise. *Id*. at 177. The court found that plaintiffs adequately alleged that Sohrab played "at least some part in directing the affairs" of the enterprise simply because that was the source of information provided to the enterprise. *Id*.

The plaintiffs also alleged that Afsar, as an outsider to the enterprise, was "a mother helping her son to defraud the bankruptcy court and trustee." In sustaining the claim against Afsar, the court found that "it is no great leap to find that one who assists in the fraud also conducts or participates in the conduct of the affairs of the enterprise." *Id*. The court also found that "'outsiders, like all other people, will be liable [under RICO] . . . if their actions satisfy the operation and management test.'" *Handeen [v. Lemaire,* 112 F.3d 1339], 1349 n.12 (quoting *Reves [v. Ernst & Young,* 507 U.S. 170], 184-85, 113 S. Ct. 1163)." *Satinwood*, 385 F.3d at 178.[9]

Similarly, in *Counts v. Gen. Motors, LLC*, 16-CV-12541, 2018 WL 5264194, at *9 (E.D. Mich. Oct. 23, 2018), plaintiffs alleged that RICO defendant Bosch programmed an automotive device that was used to defeat emissions testing requirements. *Id*. at *1, 6. Plaintiffs alleged that Bosch "controls every parameter that is important" in the emissions testing process. *Id*. at *6. Bosch argued that its programming function was not sufficient participation in the enterprise's affairs. *Id*. at *8. The court disagreed, holding that because Bosch had "primary responsibility for programming the device" that evaded emission testing, it sufficiently participated in the

---

[9] While the court affirmed dismissal of the RICO claims on other grounds in *Satinwood*, the court held that plaintiffs' allegations that defendants "conduct[ed] or participat[ed]" in the enterprise's affairs were sufficient. *Id*. at 175-78.

enterprise's affairs under *Reves*. *Id.* at *9; *see also In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1087 (E.D. Mich. 2018) (same).

Accordingly, to defeat summary judgment (and prove liability at trial), Plaintiffs need only have some evidence that Cigna "participate[d] . . . indirectly" in "'some part'" of "directing the enterprise's affairs." *Satinwood*, 385 F.3d at 175-76. The "enterprise's affairs" at issue in this case are (1) the determination and communication of the cost-share amounts that members would pay for Cigna pharmacy benefits, and (2) the collection of Plaintiff's excessive share of the cost of those benefits and the resulting "clawbacks." Cigna recognizes that these affairs were "necessary to deliver prescription drug benefits to [Cigna's clients and customers." SJ Memo. at 13. Cigna played at least "some part" in participating in and directing both of those affairs.

### 2.    Cigna's Participation In Some of Argus and Optum's Affairs

Like in *Satinwood* and *Counts*, Cigna had ***sole responsibility*** for creating and providing to Argus the "Plan Benefit Design" information and "co-pay logic" that directly caused the fraudulent billing, misrepresentations, and "clawbacks." Cigna does not and cannot dispute that through its contractual requirements, Cigna required Argus to use Cigna's logic that resulted in Argus determining cost-shares that "exceed[ed] the amount paid by the plan to the Pharmacy, or the pharmacy's Usual and Customary (U&C) charge." Nor can Cigna dispute that it required Argus, Optum and the Optum pharmacies (who had no access to the Plans) to represent that false cost-share information to Plaintiffs before they paid for and picked up their prescription drugs. Nor can Cigna dispute that it required the Optum pharmacies to collect from Plaintiffs the inflated cost-shares, and that it required the Optum pharmacies and Optum to pay the excess cost-shares to Cigna as "clawbacks."

Accordingly, because Cigna was the "primary source of the most relevant information," *Satinwood*, 385 F.3d. at 177, Argus and Optum were reliant upon Cigna's direction to Argus as

to how to calculate the cost-share amounts and Cigna's direction to Optum to collect the fraudulent cost-shares from its members. In this way, Cigna was "control[ling] every parameter that is important" to those affairs. *Counts*, 2018 WL 5264194, at \*6. Cigna had sole responsibility "for programming" the cost-share logic used to carry out the fraud, just like Bosch adequately participated in the enterprise's affairs in *Counts*. *Id*. at \*9.

The result of Cigna's participation in these affairs of Argus and Optum is indisputable. As discussed above, Cigna required Argus to calculate and required Optum to collect from Plaintiff Negron on August 18, 2014 a cost-share of $10.00, even though the amount paid to the pharmacy was only $6.06, resulting in a "clawback" to Cigna of $3.94. Declaration of Launce B. Mustoe, Jr., R.Ph. ¶ 4. Plaintiffs are entitled to have a jury decide whether Cigna was conducting or participating in "some part" of Optum or Argus' affairs when it "direct[ed]" those enterprises to impose this and similar prescription drug charges and "clawed back" the excess copayment. *See Satinwood*, 385 F.3d at 175-76.

Moreover, even "passive" parties who "did not operate or manage the enterprise in the sense of involving themselves in the day-to-day processing of fraudulent trades and communications" sufficiently participated in the enterprise's affairs. *131 Main St. Assocs. v. Manko*, 897 F. Supp 1507, 1527 (S.D.N.Y. 1995). The *Manko* court relied on Second Circuit precedent in which the court affirmed a RICO claim "against a defendant whose only alleged participation in a real estate tax shelter was that of allowing his name to be used on a bogus contract and showing up at the closing of the fraudulent property sale." *Id*. at 1528 (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 515 (2d Cir. 1994)). Indeed, in *Azrielli*, the Court of Appeals contrasted that defendant with another who had "***no role*** in the conception, creation, or execution" of the fraudulent scheme nor "in ***any way*** participated in the management or direction

22

of a RICO enterprise." *Azrielli*, 21 F.3d at 521-22 (emphasis added). Accordingly, the court in *Manko* concluded that allegations were sufficient because the defendants "helped determine the enterprise's modus operandi, and [could] be said to have 'managed' its basic structure." *Manko*, 897 F. Supp. at 1528.

Because Cigna determined the "modus operandi" of the enterprise through Argus and Optum and "'managed' its basic structure," *id.*, Cigna cannot claim that it played "no role" and did not participate "in any way" in the scheme. *Azrielli*, 21 F.3d at 521-22. Cigna "participated in the conduct of 'the *enterprise's* affairs, not just their *own* affairs" by dictating how Argus would calculate fraudulent cost-share payments and by requiring the "clawback" from Optum. *See Reves*, 507 U.S. at 185. Cigna was the mastermind of and an integral participant in the Argus/Optum enterprise(s). Those entities, with their appearance of legitimacy, carried out Cigna's "clawback" scheme. That is exactly what RICO is designed to address. *Id.* at 180 (discussing legislative history and purpose of RICO to prevent use of "legitimate organizations" to commit fraud).

Because Cigna orchestrated the "clawback" scheme, it was not like the "true enterprise outsiders (such as outside accounting firms)" that the "operation and management" test is designed to shield from RICO liability. *Manko*, 897 F. Supp. at 1527. But even if Cigna were considered an "outsider" to the enterprise, "it may still be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of its affairs — that is, participate in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185. This is not a situation where Argus, by itself, misinterpreted the plan language to allow cost-share payments in excess of the amount paid to the pharmacies. Rather, Cigna orchestrated this scheme. As set forth above, Plaintiffs have ample evidence from which a jury could reasonably infer that Cigna

"associated with" Argus and Optum and "participate[d] in the operation and management" of those entities by controlling the inputs to the adjudication process and the flow of funds of the "clawbacks."  *Id.*; *see also Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1097 (S.D.N.Y. 1994), *aff'd*, 66 F.3d 12 (2d Cir. 1995) (defendant who "conceived of and implemented" the scheme and had role in "coordinat[ing] and orchestrat[ing]" false material was liable).

### 3.    Cigna's Case Law Does Not Entitle It To Summary Judgment

Trying the raise the "low hurdle," Cigna argues that Plaintiffs need evidence that Cigna controlled Optum and Argus' boards of directors, executive management teams and all of their affairs.  *See* SJ Memo. at 13, 16.   This is not the law. Even the cases that Cigna cites do not impose that requirement. SJ Memo. at 10-15.  For example, in *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350 (M.D. Fla. 2005), SJ Memo. at 14, Boeing protested that it "merely *influenced* the alleged legitimate enterprises to make certain decisions in Boeing's favor," and thus did not adequately participate in the affairs of the enterprise.  *Id.* at 1359.  Relying on Eleventh Circuit precedent, the district court disagreed and found that allegations that Boeing "exercised some measure of control" by engaging in "illegal activity which substantially impacted" the enterprise's decisions and, therefore, satisfied the "operation and management" test.  *Id. at 1359-60; see also United States v. Castro*, 89 F.3d 1443, 1452 (11th Cir. 1996). While the court dismissed Lockheed Martin's RICO claims on other grounds, it rejected dismissal on the issue of whether Boeing participated in the affairs of the enterprise.  357 F. Supp. 2d at 1359-60.[10]  Similarly here, Cigna more than "influenced" Argus and Optum's decisions, it controlled them through its illegal "clawback" scheme.

---

[10]    Cigna appears to cite *Lockheed Martin* for the principle that separate corporations and potential competitors would not form a RICO enterprise.  SJ Memo. at 14.  That argument also misses the mark.  First, the fact that Cigna is distinct from the enterprise entities is a RICO

In *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210 (S.D.N.Y. 2000), the court concluded that "[t]he provision of goods (here cigarettes) to wholesalers and retailers that were, thereafter, illegally transported" did not make Philip Morris a participant in the illegal transportation enterprise. *Id.* at 217. Here, in sharp contrast, Cigna was not simply providing goods (or services) to Argus and Optum and allowing them to use their unfettered discretion to determine the amount to charge Cigna customers. Instead, Cigna dictated that Plaintiffs would be overcharged in a fraudulent manner, provided the false cost-share logic to Argus and Optum necessary to carry out its scheme, and controlled how Plaintiffs' fraudulently-induced payments would be collected and flow back to Cigna.

In *Abbott Laboratories v. Aldephia Supply USA*, No. 15-CV-5826 (CBA)(LB), 2017 WL 57802, at *6 (E.D.N.Y. Jan. 4, 2017), the court assessed an alleged RICO scheme to sell diabetes test strips in violation of the Lanham Act. According to Abbott, distributors illegally sold less-expensive "international" test strips to pharmacies that then were able to sell them as more-expensive "domestic" test strips. Like in *Amsterdam Tobacco*, the court found the allegation that the distributors simply supplied materials that were used in an alleged "downstream" RICO scheme, at best, amounted to aiding and abetting, not participation in the enterprise. *Id.* at *7. Relatedly, "[w]ithout allegations showing the cooperation or coordination of the pharmacies with each other or with any distributor," the court found that with regard to the "downstream pharmacies," "each party [was] acting for itself, not participating in an enterprise. *Id.*

---

requirement. *See* Motion to Dismiss Ruling at 35 [ECF 137]. Second, the fact that Optum might compete in other respects with Cigna is of no moment because Plaintiffs at trial likely will paint Argus and Optum as passive instruments or victims of Cigna's scheme because Cigna did not share the actual plan documents or terms with them — and thus did not share sensitive information with them. *See DeFalco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001) (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)) (enterprise is often a "'passive instrument or victim of the racketeering activity.'").

Here, Plaintiffs' allegations and proof are completely different:  Cigna did not aid and abet "downstream" fraud by the enterprise members who were exercising their own independent decision making.  Rather, Cigna orchestrated the fraud and "direct[ed]" the actions of Argus and Optum that disguised the illegal scheme and gave it an appearance of legitimacy through the use of those enterprises — exactly what RICO is designed to address.  *See Reves*, 507 U.S. at 180. Argus and Optum did not determine the amount of and collect cost-shares independently and objectively, but acted at the specific direction of Cigna as to (1) how to adjudicate the claims based on specific, fraudulent cost-share logic that Cigna created and provided in violation of the plans, and (2) how to collect and pay to Cigna the excessive cost-shares as "clawbacks."

In *Marlow v. Allianz Life Ins. Co. of North Am.*, No. 08-cv-00752-CMA-MJW, 2009 WL 1328636 (D. Colo. May 12, 2009), the Colorado district court concluded that an allegation that a lawyer "'controlled' only two of the tens of thousands of [insurance] agents" within the enterprise was insufficient participation in the enterprise.  *Id*. at *7.  That factual scenario has no relevance to the "clawback" scheme here, where Cigna controlled the scheme with respect to every pharmacy benefit claim and every one of the fraudulent charges of every Cigna member.

Cigna also cites *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 436 (S.D.N.Y. 1998), which stands for the proposition that "allegations of *assistance* to the alleged enterprise, not direction of it," are insufficient to meet the "operation or management" test.  Cigna did not assist the enterprises; it controlled every aspect of the enterprises as they relate to the scheme and Cigna *was assisted by* Argus and Optum as the legal-entity enterprises.

Finally, Cigna's heavy reliance on *Vickers Stock Research Corp. v. Quotron Systems, Inc.*, No. 96 CIV. 2269 (HB), 1997 WL 420265 (S.D.N.Y. July 25, 1997), is misplaced — just like it was at the motion to dismiss stage.  In denying the motion to dismiss, this court rejected

Cigna's same *Vickers* argument because "plaintiffs have alleged that Cigna designed the Clawback scheme, that it required OptumRx and Argus to misrepresent the cost-sharing amounts, and that it directed OptumRx and Argus to forward the Clawbacks." *Negron*, 300 F. Supp. 3d at 364. As set forth above, since the motion to dismiss ruling, Plaintiffs have developed proof to substantiate those allegations, foreclosing summary judgment as well. Moreover, *Vickers* is factually inapposite. In that case, the defendant allegedly acted merely as "a distributor of plaintiffs' information" without any other participation in the alleged enterprises. *See Vickers*, 1997 WL 420265 at *4. Unlike here, the defendant in *Vickers* did not "design[] the [illegal] scheme" or require the enterprises' participation in the scheme. *Negron*, 300 F. Supp. 3d at 364.

### 4.   Contracts Between Corporations Do Not Immunize RICO Violations

Cigna argues that it is immune from civil RICO liability because Cigna, Argus and Optum are separate corporations and their relationships are based on contracts. SJ Memo. at 11-17. Cigna's argument is meritless — and Cigna knows it. In defending against the motion to dismiss its RICO claim in the *Arapahoe* litigation, Cigna stressed that it had properly alleged a RICO claim where SurgCenter and the ASCs relationship was based on "SurgCenter's *agreements* with each of the ASCs 'to operate for profit medical centers'" and that "SurgCenter and each ASC used each ASC's seemingly legitimate business operations to implement" the RICO scheme. Cigna's Opposition to Counterclaim Defendants' Motion to Dismiss, Ex. RR, at 7-8 ("Arapahoe MTD Opp.") (emphasis added).

In opposing a motion to dismiss its RICO claim in *Arapahoe*, Cigna cited *Shepard v. DineEquity, Inc.*, Civ. No. 08-2416, 2009 WL 8518288, at *7 (D. Kan. Sept. 25, 2009). *Shepard* undermines all of Cigna's claims in this case. The *Shepard* plaintiffs alleged that Applebee's and Weight Watchers conspired and formed an enterprise that DineEquity joined and together they

misrepresented to consumers the characteristics of Applebee's menu items. *Shepard*, 2009 WL 8518288, at *7. The *Shepard* defendants claimed that they were immune from RICO liability because their relationship was governed by a commercial contract and, thus, could not support a RICO claim. *Id*.

The court disagreed and held that Plaintiffs had stated a RICO claim in the commercial contract context because the plaintiffs also alleged "material misrepresentations" stemming from that contractual relationship. *Id*. On the "operation and management" test, the court held that (1) "it is not necessary for defendants to have had 'significant' control" of the enterprise, (2) "outsiders" can be liable for operating and managing an enterprise, and (3) when defendants in a contractual relationship engage in "multiple acts of mail fraud and wire fraud," they can be found to have operated or managed the enterprise. *Id*. at *8. Cigna accurately summarized the *Shepard* holding: "plaintiffs sufficiently alleged RICO enterprise by pointing to ***a marketing contract*** between Applebee's and Weight Watchers and joint marketing efforts by both companies." *Arapahoe* MTD Opp. at 8 (emphasis added); *see also Neufeld,* 3:17-CV-01693-WWE, 2018 WL 4158377, at *15 (D. Conn. Aug. 30, 2018) (denying motion to dismiss where Cigna was alleged to have "directed the affairs" of the enterprise through uniform contracts and agreements that required those managers to intentionally misrepresent the cost-sharing amount and collect that unlawful sum from all Cigna participants").

*Shepard* confirms that corporations cannot hide behind contracts when they engage in fraud through those contracts — just as Cigna did here with Argus and Optum.[11]  A jury could

---

[11] *Shepard* also undermines Cigna's meritless "injury" argument. SJ Memo. at 17-21. As discussed below, Plaintiffs have asserted in their discovery responses that they would not have paid the fraudulent prescription drug charges if they had known the truth. In *Shepard*, the court found that plaintiffs adequately alleged a RICO injury by alleging that they would not have

readily find that the contracts were the essential mechanism through which Cigna participated in Argus and Optum's affairs and managed its "clawback" scheme.

Cigna also claims that it cannot be liable under RICO because Cigna, Argus and Optum "at all times acted pursuant to their contractual obligations to each other." SJ Memo at 10, 16. Nothing could be further from the truth. An essential part of Cigna's scheme was that it acted in direct violation of the Argus and Optum contract terms that required Cigna to provide cost-share information that was consistent with the terms of Plaintiffs' Plans.

Cigna represented to both Argus and Optum that ████████████████████ ████████████████████████, Master Services Agreement, Ex. 3 at 36 of 93; Optum Agreement, Ex. 6 at Art. I, § 1.1 at 7, but Cigna concedes that whether it complied with Plaintiffs' Plans is in dispute and must be tried.  SJ Memo. at 2.  Further, Cigna admits that Argus and Optum did not have access to Cigna's Plan documents or "the financial or pricing arrangements between [Cigna and its clients/members]." SJ Memo at 14.  According to Cigna, then, the enterprises could not have known that Cigna's cost-share logic was false and that it caused Argus and Optum to overcharge Plaintiffs.  A jury could reasonably find that when Cigna surreptitiously required the enterprises to create and collect fraudulent cost-shares in violation of the terms of Plaintiff's health plans, Cigna was not "at all times act[ing] pursuant to [its] contractual obligations." Cigna's consistent breach of its contractual obligations was at the core of the scheme. Had Cigna acted pursuant to its contractual obligations under the Plans and the Optum and Argus contracts, this case would not have been filed in the first place.

---

purchased the menu items if they had known their true characteristics.  *Shepard*, 2009 WL 8518288, at *8.

Cigna also protests that its "contract with Argus was for claims processing, nothing more." SJ Memo at 14. But Cigna ignores that Argus was **required** to process claims according to Cigna's fraudulent instructions. Cigna's protestations that each party was operating in their own interests under the contracts, which are identical to the arguments that the court rejected at the motion to dismiss phase, *Negron*, 300 F.Supp.3d at 364, can next be made in closing argument as Cigna's spin on its scheme. Those arguments on this disputed, fact-based issue do not entitle Cigna to avoid a jury trial. *Allen*, 155 F.3d at 42.[12]

Cigna's "arm's length" contract argument is just that: an argument, not an undisputed fact. SJ Memo. at 15. At trial, Cigna can argue its spin about the contracts that it consistently breached, but it cannot avoid a trial altogether. Indeed, Plaintiffs will argue to the contrary. Just as a jury could find that Cigna breached its contracts with Argus and Optum when it provided them with false cost-share information that violated Plaintiffs' Plans, a jury could also find that in hiding that intent in its negotiations with Argus and Optum, the parties were not at arm's length. At a minimum, summary judgment is not permitted on the "operation and management" issue because Cigna concedes that there is a genuine dispute of material fact as to whether it breached the Plans, and, therefore, whether it acted in good faith in entering into and carrying out the Argus/Optum contracts.

### C.   Plaintiffs' Have Evidence of Injury "By Reason Of" the RICO Violation

Cigna wrongly argues that the evidence conclusively establishes that none of the Plaintiffs can prove an injury from any misrepresentation by Cigna. SJ Memo. at 17-21, 23-26.

---

[12] Cigna's arguments that its contracts describe Argus and Optum as "independent contractors" is another irrelevant distraction. SJ Memo. at 14-15. Complete "outsiders" can still be liable under RICO if they participated in "some" of the enterprise's affairs. *Reves*, 507 U.S. at 185.

The fundamental premise for Cigna's argument is its incorrect assertion that Plaintiffs never provided amended interrogatory responses explaining the point-of-sale misrepresentations. SJ Memo. at 24.  To the contrary, Plaintiffs supplemented their discovery responses in 2020 and those responses preclude summary judgment.

Plaintiffs served their Supplemental Responses to CHLIC's First Set of Interrogatories on November 11, 2020 ("Supp. Resp."), Ex. 45. Those responses describe the following point-of-sale misrepresentations: "Cigna caused its network pharmacies to misrepresent the amounts that Class Members were required to pay under their Cigna plans. While the plans mandated that copayments and deductibles, as the case may be, must not exceed the amount paid to the pharmacy ("Pharmacy Rate"), pharmacies participating in Cigna's network represented to Class Members that they owed an amount that was greater than the Pharmacy Rate." *Id*. at Interrogatory Responses 2, 3, 5.  They also describe the concealment of the true cost-shares, in furtherance of the fraudulent scheme: "Cigna failed to disclose, and prevented pharmacies from disclosing, to Class Members that (a) they were being charged copayments or deductibles, as the case may be, that were greater than the Pharmacy Rate and (b) that Cigna (or its pharmacy benefit manager) was 'clawing back' the overcharge from the pharmacy." *Id*. With respect to these misrepresentations and omissions, Plaintiffs' Supplemental Responses also specify: "These representations and omissions occurred in connection with all transactions on which Class Members were overcharged." *Id*.

The Supplemental Responses also describe Plaintiffs' reliance on those misrepresentations: "Plaintiffs allege that they reasonably relied on the representations made by their pharmacies about the amounts that they owed for copayments and deductibles on each and every transaction. . . . Cigna caused its network pharmacies to misrepresent the amounts that

Class Members were required to pay under their Cigna plans. While the plans mandated that copayments and deductibles, as the case may be, must not exceed the Pharmacy Rate pharmacies participating in Cigna's network represented to Class Members that they owed an amount that was greater than the Pharmacy Rate." *Id*. at Interrogatory Response 4.[13]

Deposition testimony of the Plaintiffs and documents produced by Cigna provide further evidence of the fraudulent scheme and Plaintiffs' reliance on the misrepresentations and omissions. Plaintiff Negron testified, "I feel like there just needs to be transparency . . . why isn't [it] being included in the packet that I pick up at the pharmacy, what I'm paying, what Cigna is paying, what the pharmacy is paying." Deposition of Kimberly Negron, Ex. 46, at 125:15-23 ("Negron Tr."). When asked if she asked her pharmacist or Cigna about the amounts she was being charged, she responded, "I did not reach out to anyone regarding that. I mean, to be honest with you, like most people, I think you kind of assume the best intent and you're not questioning the amounts. . . . You assume . . . that a company is going to be forthright and charge you what they're supposed to charge you . . . ." Negron Tr. at 110:4-13.

Plaintiff Roger Curol also trusted that what the pharmacist told him to pay was the correct amount: "I thought . . . what I was being charged all along was what — what I was told was the correct amount. I never had any doubts or any other — no one said . . . that I was being charged more than I was supposed to."[14] Deposition of Roger Curol, Ex. 47, at 100:24-101:5.

---

[13] Plaintiffs also referred to their expert's analysis with regard to their injury/damage methodology, Supp. Resp. at Interrogatory Response 3, and they described how Argus and Optum were integral to Cigna's fraudulent misrepresentations at the point-of-sale, *id*. at Interrogatory Response 7.

[14] Cigna argues that the fact that "Plaintiffs Perry and the Curols continued to purchase prescription drugs and pay the same prices under their benefit plans" "belie[s]" "[a]ny generic assertions of reliance." SJ Memo. at 20. Surely Cigna does not contend Plaintiffs should have gone without their prescriptions after this lawsuit was filed. If the suggestion is that Plaintiffs

Plaintiff Blocker testified that he asked his pharmacist on multiple occasions about the high price of his medications and whether it would be cheaper to pay cash than go through his insurance. Deposition of Billy Ray Blocker, Ex. 48, at 94:23-95:9. But there is no evidence that any pharmacist ever told him about the clawbacks.

Plaintiff Perry echoed the other Plaintiffs' reactions: "Basically you should be making sure it's being worded in a way that people understand it, that people should know directly if they're going to be charged more for their prescriptions than . . . what the prescription actually costs or should have cost them . . . I would like them to have the opportunity to purchase the medication at a lower price rather than having to pay the $10 co-pay if the medication costs less than that . . . I want people to be charged the price of the prescription, not an overinflated price." Deposition of Daniel Perry, Ex. 49, at 67:10-23 ("Perry Tr."). He continued, "I expect the people to be paying the . . . lower amount if . . . the prescription is less than $10, if the prescription should actually cost $4, I want the people to be charged $4. I do not want the people to be charged $10 or $50 or $100. I want them to be charged the exact amount that it should be costing them. . . . We pay for insurance . . . We don't expect to be charged more for a drug than what that drug is actually costing." Perry Tr. at 68:8-22.

Plaintiffs Supplemental Responses and deposition testimony are more than enough evidence for a jury to find that Plaintiffs were defrauded and suffered RICO injuries.  Documents produced by Cigna show that members typically only learned about the "clawback" scheme if

---

Perry and Curols should have asked the pharmacist every time they filled a prescription to find out if they were being overcharged, the fact remains that the gag clause and clawback scheme remained in place after the lawsuit was filed. Cigna still directed pharmacies not to disclose how much the pharmacy was being paid, or even whether the copay was less than the pharmacy rate, as Plaintiffs concede occurred on some transactions. Even if Plaintiffs Perry's and Curols' continued prescription fills could be deemed to defeat reliance, it only does so for those transactions and none that predate the filing of this lawsuit.

pharmacists violated the gag clause in their contracts and disclosed the "clawbacks." As

discussed above, a jury could easily find that Cigna, with the involvement of upper management,

deliberately concealed its "clawback" scheme.[15]

Cigna points to unsurprising testimony that Plaintiffs did not read their 100-plus page

plan documents. But Plaintiffs alleged — and the evidence described above shows — that they

relied on misrepresentations at the point-of-sale when they paid what they were told they owed

for their prescriptions. *See, e.g.*, Complaint, ¶ 289 (delineating point-of-sale false wire

transmissions).  Plaintiffs' evidence described above is sufficient to prove injury and reliance

under Second Circuit law. The Second Circuit has held that "[i]n cases of fraudulent overbilling,

payment may constitute circumstantial proof of reliance based on the reasonable inference that

customers who pay the amount specified in an inflated invoice would not have done so absent

reliance upon the invoice's implicit representation that the invoiced amount was honestly owed."

*In re U.S. Foodservice Inc., Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013).; *see also Klay v.

Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) ("It does not strain credulity to conclude

that each plaintiff, in entering into contracts with the defendants, relied upon the defendants'

representations and assumed they would be paid the amounts they were due."); *Chisolm v.

TransSouth Fin. Corp.*, 194 F.R.D. 538, 560-61 (E.D. Va. 2000) (holding that "deficiency

payments themselves" are circumstantial proof of reliance). The Second Circuit has also

---

[15] Cigna tries to puts a minimizing spin on the point-of-sale misrepresentation, arguing, "At most, the record reflects that pharmacists told Plaintiffs very limited information at the point of sale—namely, that the pharmacy computer system indicated that they plaintiff was being asked to pay a particular amount for the prescription drug."  SJ Memo. at 25.  That is ***exactly*** the fraudulent misrepresentation.  As set out above, Cigna controlled the Argus process of determining the fraudulent cost-share based on the intentionally incorrect logic that Cigna provided to it and Cigna then required Optum to collect the fraudulent overcharge and send it to Cigna as a "clawback."

recognized that concealment can serve as or facilitate a misrepresentation. *In re U.S. Foodservice*, 729 F.3d at 118 (describing the "material misrepresentation" as "concealment of the fact of a mark-up").

Cigna's summary judgment argument ignores this controlling case law and, once again, ignores Cigna's own use of RICO against a billing scheme that it claimed was fraudulent. In the *Arapahoe* litigation, the RICO counterclaim defendant made the same argument that Cigna is making here: there was no injury flowing from the RICO violation. Cigna countered by arguing the following:

> ASCs submitted grossly inflated 'phantom' charges to Cigna that — unknown to Cigna — the ASCs never intended to collect (CC ¶ 71.) Cigna relied on these fraudulent claim forms when processing and paying the ASC's claims. * * * Because the ASC's claim forms do not reflect the amounts that they actually charged patients, Cigna had no way to verify that the amount billed to Cigna was not the ASC's actual charge (CC ¶¶ 77-78, 213 Cigna relied on the ASC's false claim forms when reimbursing ASCs for their services.

*Arapahoe* MTD Opp., Ex. 44, at 5-6.

The RICO injury that Cigna claimed in *Arapahoe* is exactly what Plaintiffs are claiming. Here, evidence shows that Cigna directed network pharmacists, through its relationships with Argus and Optum, to present to Plaintiffs "inflated" cost-shares that were "unknown" to Plaintiffs as a result of the gag clauses. Plaintiffs "relied on these fraudulent" cost-shares when they paid them and also "had no way to verify" the "actual charge" because of the gag clauses. Cigna's *Arapahoe* pleading and argument demonstrate that there are disputed questions of fact about Cigna's point-of-sale misrepresentations and Plaintiffs' injuries stemming from them that preclude summary judgment on Plaintiffs' RICO claims.

**D.      Cigna's Claimed "Belief" That It Complied with Plan Terms is Contradicted by its Own Documents and Does Not Justify Summary Judgment.**

Cigna claims that "there is no dispute that CHLIC acted and administered Plaintiffs' plans consistent with what it believed (and believes today) was required pursuant to each employer's benefit design." SJ Memo. at 22. That self-serving argument is immaterial for summary judgment. Plaintiffs' benefits must be administered pursuant to the Plan terms. *Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) (explaining that because "the plan itself . . . create[s] an entitlement to benefits," the court must "enforce the Plan as written" unless contrary to law); *Negron v. Cigna Health and Life Ins. Co.*, 3:16-CV-01702 (JAM), 2021 WL 2010788, at *14 (D. Conn. May 20, 2021)(Plans are the contracts at issue in this case). Those Plan terms set forth what Cigna calls the "benefit design." Cigna's supposed "belief" about "employers' benefit designs," whatever that means, is irrelevant in the face of the Plan language. What *is* material is that Plaintiffs' prescription-drug claims were not administered consistent the Plan documents and the fact that Cigna knew, *at the time,* that it was charging cost-shares in violation of the Plan language.

As discussed in the fact section above, Cigna's 2013 documents establish with clear mathematical examples that Cigna knew that Plaintiffs' Plan documents entitled them to cost-shares that did not exceed the amount paid to the pharmacy if that amount was lower than the stated cost-share or the pharmacy's usual and customary charge.  For example, one of those 2013 documents was used to educate Cigna's *entire* sales force that its Plans entitled Plaintiffs to the "lowest of these three amounts," without "spread" or "clawbacks." Moreover, Cigna employees described Cigna's conduct in taking "clawbacks" as "egregious" and "unreasonable."  These documents alone create material disputes for a jury to resolve and they defeat summary judgment.

Further, the fact that Cigna, through Optum, gagged pharmacies from telling Plaintiffs and other members that they were being charged excessive cost-shares creates a triable fact regarding Cigna's state of mind.  Indeed, it would be quite logical for a jury to conclude just from Cigna's significant efforts to conceal "spread" and "clawbacks" that is acted with fraudulent intent and acted inconsistently with Cigna's expected trial argument that "spread" and "clawbacks" were all above-board and disclosed.  Further, a jury could conclude that Cigna acted fraudulently from the magnitude of its scheme.  Despite its knowledge that its Plans entitled Plaintiffs to cost-shares that would not exceed "the cost at which Cigna has agreed to reimburse the pharmacy for any given drug," Cigna developed its "urgent request from management" to "clawback" the "trapped" $100 million per year, which "trapped" "micro overpayments" were the difference between "the cost at which Cigna has agreed to reimburse the pharmacy for any given drug," and the amount that Cigna required Plaintiffs to pay as cost-shares under the scheme.

These facts easily support a finding of knowing conduct and fraud, rather than breach of contract.  *See* SJ Memo at 23.  At a minimum, there are disputed facts about Cigna's state of mind and Plaintiffs are entitled to try that claim to a jury.  The Second Circuit Court of Appeals has reaffirmed that "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment." *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir. 1984) (citations omitted); *see also Press v. Chem. Inv. Services Corp.,* 166 F.3d 529, 538 (2d Cir. 1999).  The court should deny Cigna's motion.

## IV.     CONCLUSION

The court should deny Cigna's motion for partial summary judgment.

Respectfully submitted,

Dated: May 17, 2022

*s/ Craig A. Raabe*

Robert A. Izard (ct01601)
*Plaintiffs' Interim Co-Lead Class Counsel*
Craig A. Raabe (ct04116)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone:  860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold (ct00133)
*Plaintiffs' Interim Co-Lead Class Counsel*
Mathew Jasinski, (ct27520)
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:  860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Joseph P. Guglielmo (ct27481)
*Plaintiffs' Executive Committee Chair*
Carey Alexander, *pro hac vice*
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite (ct24886)
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP

38

156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
ecomite@scott-scott.com

Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:  206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
ZIMMERMAN REED, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844
brian.gudmundson@zimmreed.com

Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:  985-783-1333
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:  504-581-2156
andrew@lemmonlawfirm.com

Ronen Sarraf
*Plaintiffs' Executive Committee Member*

Joseph Gentile, *pro hac vice pending*
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:  516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:  612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035

Dan@wbmllp.com
Jeremy@wbmllp.com

Additional Counsel for Plaintiffs