# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

KIMBERLY A. NEGRON, Individually and on Behalf of All Others Similarly Situated, DANIEL PERRY, Individually and on Behalf of All Others Similarly Situated, COURTNEY GALLAGHER, Individually and on Behalf of All Others Similarly Situated, NINA CUROL, Individually and on Behalf of All Others Similarly Situated, ROGER CUROL, Individually and on Behalf of All Others Similarly Situated, and BILLY RAY BLOCKER, Individually and on Behalf of All Others Similarly Situated,
Plaintiffs,

vs.

CIGNA CORPORATION, CIGNA HEALTH AND LIFE INSURANCE COMPANY, and OPTUMRX, INC.,
Defendants.

CIVIL ACTION NO. 3:16-cv-1702 (JAM)

REMOTE DEPOSITION OF TYLER LESTER
Tuesday, June 23, 2020

Reported By:
CATHI IRISH, RPR, CRR, CLVS, CCR

June 23, 2020
9:00 a.m.

Remote videotaped deposition of TYLER LESTER, with all participants appearing remotely via videoconference, before Cathi Irish, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.



A P P E A R A N C E S:

IZARD KINDALL & RAABE LLP
Attorneys for Plaintiffs
29 South Main Street
Suite 305
West Hartford, Connecticut 06107
BY: ROBERT A. IZARD, ESQ.
CRAIG RAABE, ESQ.
CHRISTOPHER M. BARRETT, ESQ.

MOTLEY RICE LLC
Attorneys for Plaintiffs
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
BY: MEGHAN S.B. OLIVER, ESQ.

MORGAN LEWIS & BOCKIUS LLP
Attorneys for Defendants
Cigna Health and Life Insurance Company
1701 Market Street
Philadelphia, Pennsylvania 19103
BY: BRIAN SHAFFER, ESQ.
ELEANOR FARRELL, ESQ.



A P P E A R A N C E S: (continued)

DORSEY & WHITNEY LLP
Attorneys for Defendant
50 South Sixth Street
Suite 1500
Minneapolis, Minnesota 55402
BY: MICHELLE S. GRANT, ESQ.

ALSO PRESENT:
SHAWN BUDD, videographer
NICOLE CABANEZ
PAUL RILEY



THE VIDEOGRAPHER: We are on the record. This is the videographer speaking, Shawn Budd, with Veritext Legal Solutions. Today's date is June 23, 2020 and the time is 9:06 a.m.

We are here to take the remote video deposition of Tyler Lester in the matter of Negron versus Cigna.

Will counsel please introduce themselves for the record?

MR. IZARD: Yes, this is Robert Izard for the plaintiffs.

MR. BARRETT: Christopher Barrett of Izard, Kindall & Raabe for the plaintiffs.

MR RAABE: Greg Raabe also of Izard, Kindall & Raabe.

MR. SHAFFER: Brian Shaffer from Morgan Lewis on behalf of Cigna.

MS. GRANT: Michelle Grant of Dorsey & Whitney on behalf of OptumRx.

THE VIDEOGRAPHER: And the court reporter is Cathi Irish. Will you please swear in the witness?

T Y L E R   L E S T E R, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. IZARD:

Q. Good morning, Mr. Lester. My name is Bob Izard. We're here for your deposition today. Have you ever been deposed before?

A. No.

Q. I'm sure you went over with your lawyers but if I ask a question you don't understand, will you let me know and I'll try to rephrase it?

A. Absolutely.

Q. And we have to be careful not to talk over each other because the court reporter writes it down. I'm sure it's going to happen because it's common in conversation but we should just try to be mindful of that. And also you can't nod. You have to have a verbal answer so --

A. Yes.



LESTER

Q. Okay. Great, thank you.

What's your occupation, Mr. Lester?

THE VIDEOGRAPHER: I'm sorry, Mr. Izard. You're overmodulating. Is there any way we can go off the record and you can bring your microphone down?

MR. IZARD: If I knew how to do that I would be happy to.

THE VIDEOGRAPHER: It's acceptable but it would sound a little bit better. Maybe we can do it on a break.

MR. IZARD: What do I need to do? Let's go off the record for a second.

THE VIDEOGRAPHER: The time is 9:08. We are off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: We're back on the record. The time is 9:10.

BY MR. IZARD:

Q. Okay, Mr. Lester, what's your occupation?



LESTER

A. I am an actuary by training and currently lead the pharmacy economics team for the Cigna Health Plan.

Q. What does the pharmacy economics team do?

A. The pharmacy economics team works on anything that has to do with the financial impact of prescription drugs so it can include the cost of prescription drugs, helping manage new drugs that come to the market, working with clinical teams, working with our pricing actuary and ultimately trying to find more affordability around drug cost and make sure that we have accurate trend projections for where drug costs might go in the future.

Q. Do you interrelate with other teams at Cigna as part of your responsibilities?

A. I do. I work closely with our actuarial and pricing teams, closely with underwriting, sales, product teams, clinical as well as operational teams.



LESTER

Q. And this would all be in the pharmaceutical area?

A. The majority. I do work with some folks on the medical side because some drugs are administered under a medical benefit in a doctor's office so in those instances, I would work with our medical department.

Q. Prior to holding that position -- how long have you been in this job?

A. I've been in this role for three years.

Q. Prior to that what were you doing?

A. Prior to that I led the pharmacy benefit pricing team of actuaries so we did all of the actuarial analyses to help us set premiums for the pharmacy portion of a total insurance benefit.

Q. Is that part of your responsibility today as well?

A. It is no longer part of my current responsibilities.

Q. How long were you in the prior

Page 10

LESTER

job?

A. I was in that role in various parts of that organization for about six years.

Q. So that would be roughly 2000 to 2016 or 2017 and then you moved to your new job?

A. Yes, 2010, and been in this role about three years.

Q. Do you have any role in preparing plans or plan language?

A. I do not.

Q. Okay. Were you familiar with the transition to Catamaran in 2013?

A. I am.

Q. Okay. What is Catamaran?

A. Catamaran is a pharmacy benefit manager that we contracted for a particular set of services back in 2013.

Q. What did Catamaran do for Cigna back in 2013?

A. The original relationship with Catamaran had a few components to it. One included utilizing their claim processing

Page 11

LESTER

platform. Another was partnering in pharmaceutical manufacturer contracting. And the third big item at the time was retail network configuration.

Q. When you say retail network configuration, would that be a network of retail pharmacies?

A. That's correct. So we contracted with Catamaran to do all direct retail pharmacy contracting on our behalf with guidance from Cigna as to the nature like, for example, how big we wanted that retail network to be but it was ultimately Catamaran's responsibility to build that network and provide a certain level of discounts and services within that network to Cigna, and we paid a per claim fee for those services.

Q. So rather than Cigna establish its own network of pharmacies, you used Catamaran's network?

A. That's is correct.

Q. Have you heard of a company called Argus?

Page 12

LESTER

A. Yes, I have.

Q. What's Argus?

A. Argus is the claim processor that Cigna has used for quite a long time, I believe over 20 years, that handles and manages the point of sale transactions for prescription drugs for all of Cigna's pharmacy business, and I know they have other clients in the industry as well.

Q. What is a point of sale transaction for prescription drugs?

A. Point of sale transaction I would define as the customer actually in the pharmacy or with a mail order pharmacy talking with the pharmacist or the pharmacy technician and having the prescription that their physician or health care professional has written for them and actually picking up and paying for that prescription.

Q. I'll ask some more specific questions later but just so we have a framework because I want to make sure I'm speaking the same language you are, to be

Page 13

LESTER

honest. Can you kind of walk me through the process of what happens involving Cigna and -- well, withdrawn.

When you use the phrase Catamaran, you -- would you prefer we use Catamaran or Optum, can we use one name for both?

A. Yeah, I think Optum since it's a little fresher in my mind would probably be easier today.

Q. Okay. So if you could just sort of as an overview just walk us through the process of when the customer walks into the drug store and hands the pharmacist the prescription and then you said the customer will walk out of the store with the prescription filled. What happens in between at a point of sale transaction?

A. Sure. So from my knowledge, over the past few years, we use Argus as our pharmacy transaction administrator. The pharmacist would enter in the details about that prescription into whatever their electronic system is that

Page 14

LESTER

communicates to the Argus system. There can be lots of rules built into the Argus system where there either might be different prior authorizations required or set payer programs required, all of those would filter through the process and if a prescription drug doesn't require any of those additional steps, then at that point the pharmacists would see the financial information related to that transaction. They would see the customer cost share that is due.

We also provide the pharmacist with alternatives. If it's a brand drug, we provide them an alternative of the generic and here's how much the cost share for the generic might be for that customer. They then would tell the customer here's the cost share that you're responsible for for the prescription drug. I think they generally at least provide, or in my experience will offer counseling to tell the customer about the drug and how it should be used, and once the

Page 15

LESTER

customer has paid that cost share, then they would be given the prescription.

Q. If I could break it down into smaller pieces, the pharmacist would input information, that would be the kind of information that would be on my insurance card, right, my number that sort of thing?

A. That's right.

Q. And then the pharmacist's computer will transmit that information to Argus; is that right?

A. That's right. On the insurance card there is -- sorry for speaking over you, there are a couple of codes, a FIN and RxPCN and that unique information works through the, I think as an industry there are standards around how to transmit pharmacy prescription drug claims, and that information is how it knows to send it to Argus as a Cigna claim, not to Argus as a different health plan.

Q. And then the Argus computer system will look at the claim and look at the drug and see whether it's a covered

Page 16

LESTER

claim for benefits; is that fair?

A. That's right.

Q. And then the Argus system would also determine, for example, what drug tier you're in, what the copayment would be, and all the information related to whether the drug is covered; is that right?

A. That's right.

Q. And the Argus system will send that information back to the pharmacist and tell the pharmacist how much to collect from the customer before giving the customer the drug?

A. That's correct.

Q. And then the customer pays and then receives the drug and walks out of the pharmacy. Is that kind of it in a nutshell?

A. Yes.

Q. A question I have, just so we get our terminology right, I've been using the word customer. I gather the employer in an employer plan, you have the employer

Page 17

LESTER

who hires Cigna to offer a plan for health benefits and drug benefits and then you have the employer's employee who is actually getting the prescription. What terminology do you like to use for those people because I've seen customer, member, a variety of terms, and I want to make sure we're speaking the same language here.

A. Sure. I think what would probably be easier today is to think of the employer and use the terminology plan since it might not always be a employer, and then for customer, a customer or member is okay with me. I generally use those interchangeably.

Q. What does Optum do in this process, if anything?

A. So our services that we receive from Optum, were contracting the retail pharmacy network and providing a certain level of discounts to Cigna within that network. The way that operated at the time is Optum would provide pricing

Page 18

LESTER

information to Cigna for Cigna to provide to Argus for adjudication so there wasn't a direct connection. I'm not sure of the actual reason why, whether it was contractual between Optum and Argus, but in those cases Cigna acted as a go between, an intermediary to take whatever pharmacy rates, whatever pharmacy that should be in the network, they would provide them to Cigna and we would pass that information through to Argus to set up the Argus plan adjudication system.

Q. Just so I understand a little more when you talk about discounts, so Cigna and Optum enter into a I guess contract pursuant to which Cigna can buy or pay for drugs that are given to Cigna customers through the Optum network; is that fair?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer, Mr. Lester.

A. That's right. We contracted with

Page 19

LESTER

Optum and based on that contract were fees paid by Cigna in exchange for a certain level of pricing and that came in the form of discounts at retail pharmacies.

Q. And when you say pricing, these would be the prices at which Cigna plans would be buying drugs from Optum's network pharmacies?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can go ahead and answer.

A. I would describe it a little differently that we had a contract where Optum had to provide a certain level of discounts through retail pharmacies and Optum was providing us information on how they wanted those retail pharmacies to be reimbursed.

Q. When you say discounts, these are discounts on the sale of prescription drugs?

MR. SHAFFER: Objection to form.

THE WITNESS: That's correct.

///

Page 20

LESTER

BY MR. IZARD:

Q. Okay. And these would be discounts on the sale of prescription drugs through Cigna plans?

A. I would say they would be discounts -- yeah, that's probably a fair way to characterize it, that they are discounts for any covered transaction under the Optum and Cigna contract, which didn't capture every retail pharmacy transaction but covered those that where it was utilizing an Optum -- or a pharmacy in an Optum retail network where they had a contract in place.

Q. When an Optum network pharmacy provided drugs to a Cigna member and Cigna or the employer needed to make a payment, who was the payment to, did you pay Optum or did you pay the network pharmacies directly?

A. So to my understanding, the flow of funds had Argus actually paying the pharmacies directly. Cigna reimbursed Argus based on what Optum had requested we

Page 21

LESTER

set up in the system and then Optum reimbursed Cigna for that or the payment to the retail pharmacy.

Q. Sorry. I missed part of that. So Cigna pays Argus, Argus pays the pharmacy, and how does Optum get involved again?

A. Optum is technically reimbursing Cigna or I guess and then Cigna reimbursed Optum so it was a -- I don't remember all of the requirements from a financial perspective of why that happened to be the case but Optum was technically paying Cigna, Cigna paying Argus to pay the pharmacies and then Cigna paid Optum as part of that overall contractual guarantee for the discounts that we expect to receive from pharmacy.

Q. Who set the -- withdraw.

Do you know the terms -- withdrawn.

Were there contracts -- do you know if there were contracts between Optum and the pharmacies in the Optum network?

Page 150

LESTER

and that wasn't caught through audit, that would be a Cigna error and our expectation would not be that Argus would correct that within five business days because there are all the processes of how money comes from plan sponsors, how it gets returned to customers, and all the things that go into an error when it was caused by Cigna.

Q. So if there was a Cigna error, was there a time frame over which it would be corrected or is it something you all worked out together?

A. It was generally something that would be worked out between the two companies depending on the magnitude of an error and how much additional support it would require on the Cigna side to even review what that remediation might do, or what the impact of the remediation might be.

Q. All right. Let's go back to the exhibits again, please.

MR. SHAFFER: Hey, Bob, if you're going to switch documents, maybe now

Page 151

LESTER

would be a good time for a lunch break?

MR. IZARD: If you wish.

MR. SHAFFER: We wish.

THE VIDEOGRAPHER: The time is 12:31. We're off the record.

(Lunch recess taken at 12:31 p.m.)

Page 152

LESTER

A F T E R N O O N S E S S I O N

(Time noted: 1:17 p.m.)

T Y L E R L E S T E R, resumed and testified as follows:

THE VIDEOGRAPHER: We are back on the record. The time is 1:17.

CONTINUED EXAMINATION

BY MR. IZARD:

Q. Okay, good afternoon, Mr. Lester. Mr. Lester, do you know whether Argus either had or has access to the plan documents? You can't do the head nod.

A. Sorry, I had my phone on mute. No, they don't.

Q. Thank you.

Let's go back to the exhibits, please, and I would like to look at Despard Exhibit 3 which is up at the top. This is the claim -- the excerpt of the claims data we looked at earlier and I just want to run through those just so I make sure I understand what the fields mean, okay?

A. Okay, got it.

Page 153

LESTER

Q. So the first field is the claim number; is that right?

A. That's right.

Q. And that number is that each prescription drug transaction will have a separate claim number?

A. That is accurate within each of the Argus iterations for Cigna. So we talked a little bit earlier about Argus East 215, every claim within 215, every transaction has a unique identifier. I am not sure if that is unique across each of the different Argus instances at Cigna, which I believe there were four in all.

Q. If you look down at line 4, it says customer number, if you will, that shows these are all 215 claims; is that right?

A. That's correct.

Q. Okay. So there may be this number for a 519 claim but it would be unique to a 215 claim?

A. That's right.

Q. And the numbers assigned by Argus

LESTER

when Argus gets the request for benefits from the pharmacy when the pharmacist types it into the computer?

A. Yes.

Q. Six, where it says Rx account number, that's the Cigna employer client number; is that right?

A. Yes.

Q. Okay. Number 9, line 9, Plan of Ben, is that the benefit option code?

A. Yes.

Q. That's a benefit option code that would come out of ePro?

A. Yes.

Q. Let's look at 14, 15 and 16. 14 is the date the prescription is written. Is that the date the prescription is given to the pharmacist?

A. I'm not sure.

Q. Okay.

A. Whether it represents that or when the physician actually wrote it down on paper if it's paper.

Q. So line 15 is the date pharmacy



LESTER

filled prescription so that's where the pharmacy puts the pills in the bottle?

A. That's right.

Q. And then 16 is the date the pharmacy was paid. So that would be the date the pharmacy was paid by Argus?

A. That's right.

Q. So we look across at column D, we can see that the prescription was written on August 5, 2016, it was filled on August 5, 2016 and it was paid on August 6, 2016; is that right?

A. That's right.

Q. So this was all handled electronically very rapidly, this reflects that's an electronic point of sale transaction; right?

A. That's right.

Q. What's 18, deductible applied amount?

A. That field represents any cost share that the customer is paying at the point of sale that is applied towards their deductible.



LESTER

Q. That would be for each separate transaction?

A. Can you repeat that?

Q. Sure.

So the deductible amount applied amount would relate to the deductible paid on each separate claim?

A. That's right, each claim could potentially have a deductible amount depending on where the customer is in their overall deductible paid.

Q. Now, 22 says ingredient cost to client. That would be the cost -- that would be the amount that the client owes Cigna for each of the drugs?

A. That's right.

Q. 24 is the dispensable fee amount, dispensing fee charged to client. Is that different sometimes from the dispensing fee paid to the pharmacy, can they be different?

A. Yes.

Q. So, for example, the client may pay a larger dispensing fee than the



LESTER

pharmacy gets paid for filling the prescription; is that right?

A. That's right.

Q. Sales tax amount charged to client, here it is, but I see the sales tax amount is the same regardless of whether the client pays it or it's reimbursed to the pharmacy; is that right?

A. I believe so.

Q. There's no markup of the sales tax as far as you know?

A. As far as I know there's not but I'm not a hundred percent sure.

Q. And total paid amount is lines 22, 24, 25, added up together; is that right?

A. Total paid amount minus the cost share so it is the client ingredient cost plus client dispense fee plus sales tax minus whatever cost share the customer paid at the point of sale.

Q. 27 UNC amount, that's the usual and customary we talked about earlier; is that right?

Page 158

LESTER

A. That's right. And usual and customary, while there's only one field that we reflect in our claim information, the pharmacy has effectively two chances to populate that number during the processing of a claim. There's one field that is just called the usual and customary price. There's also a field called submitted price where it's free form and pharmacists can put in whatever number they want. The two of those, whichever one is lower, we consider the cash price and that's what would be populated in this field.

Q. Is the cash price ever used for claims adjudication?

A. For pharmacies or for client?

Q. For pharmacy, for cost share, does a customer ever pay the UNC as a cost share?

A. Yes. So in any plan where the UNC price is part of the cost share logic, if the UNC price is lower, then the customer would pay that price and it does

Page 159

LESTER

happen from time to time. There are certain pharmacy chains that have programs that are focused on lower cash prices.

Q. So did you ever see a situation where there's a network pharmacy transaction so you're going to an Optum pharmacy where Optum has negotiated a contract price for the pharmacy where the UNC is lower than the contract price for the pharmacy?

A. I don't know if I'd call it the contract price with the pharmacy but at least the rate Optum directed us to input into the system. There are situations where the UNC price is lower than the rate that Optum had provided to us.

Q. Okay. Let's go to line 32, PRC_SRC, what does that mean.

A. This is the price sourced for how we reimburse a pharmacy so retail or it could be a mail order pharmacy. The price source represents the lesser of logic for pharmacy reimbursement for what we're paying the pharmacy and it could be the

Page 160

LESTER

UNC we just talked about, it could be an AWP discount. So many of the contracts have discounts or not contracts, many of the setup for reimbursing pharmacies are based on a discounts from the average wholesale price. It could be the submitted amount so I mentioned that technically the UNC field here is the lesser of a submitted or the UNC amount or it could also be a MAC, or maximum allowable cost price that is generally used for generic drugs, and whichever of those is the lower amount, if those exist, that's how the pharmacy would get reimbursed.

Q. If we could look at line 45, pharmacy ingredient cost amount.

Do you see that?

A. Yes.

Q. So whichever is the lower of the four options in line 32, PRC_SRC, would that be used to populate the pharmacy ingredient cost in line 45?

A. That's right, the pharmacy

Page 161

LESTER

ingredient cost dispense fees and the sales tax because sometimes the pharmacy can just enter one number for the submitted amount that technically captures all three of those deals, and there's logic of how we would populate the ingredient cost.

Q. But at least the ingredient cost number you would use for lines 44 to 48 would be whichever is the lowest price of the four options in line 32?

A. That's right.

Q. If we could go down to line 33, claim TY. I think we talked about earlier paid claims and reverse claims. Does the same hold true for your claims data?

A. Yes.

Q. What's an A adjusted claim?

A. An adjusted claim would be a situation where the original way in which the claim was processed wasn't accurate so this can occur if a pharmacist meant to type 30 pills accidentally typed 300, they initially submitted at 300, when the

Page 162

LESTER

customer, for example, shows up they notice that error and they have the opportunity to adjust that claim.

Q. What is N negates/adjusted claim, ADJ line, what does that mean?

A. When there is an adjustment, there's also a field for that N that comes through and the reason behind that is we don't want to count a claim more than once so if we have a paid claim and an adjusted claim in our system, it might look like two separate claims so the N there is providing information to us and our data set to say negate this paid claim. I believe it would usually have a negative number in all the fields that tie back to the paid claim and the adjusted claim would be the only value if you were to add everything up that would still exist.

Q. So these adjustments can occur after a claim is paid?

A. Generally the way that it works is a pharmacy, if they receive a prescription, particularly an electronic

Page 163

LESTER

prescription, they will fill that prescription immediately when they receive the e-Prescribing from the physician, and they will enter that into the system and it will show as a paid claim. Technically the customer has not picked up their prescription, the pharmacy has not received their cost share for it. The pharmacy will call the customer, the customer has in most cases up to 10 days to come in and get their prescription. If they don't, they would reverse that prescription. The way adjustments come in is if during that period the customer does come in and they realize, oh, I processed this incorrectly, that would be the opportunity to make an adjustment. But most of it happens within a 10- to 14-day window.

Q. Do any of the types of changes referred to in line 33 occur after the customer has walked out of the pharmacy with the prescription?

A. My understanding, adjustment can

Page 164

LESTER

occur if there was a, for example, a reimbursement between the retail pharmacy and the pharmacy benefit manager that they contract with. Some states have laws related to generic maximum allowable cost and if a pharmacy is not reimbursed that in an equitable level, they have the right to appeal to a pharmacy benefit manager and in those cases, depending on how the appeal comes through, it's my understanding that there can be an adjustment back to that retail pharmacy.

Q. And would that result in an adjustment with the Argus claims data or is this between the pharmacy benefit manager and the pharmacy?

A. Because Argus was processing the claims, it would have to be through the Argus system and it would impact the pharmacy ingredient cost, dispense fee, sales tax field below.

Q. Do you know over what time period this occurred? Could it occur 10 years later, 20 years later? How does this

Page 165

LESTER

work?

A. My experience from when Cigna managed our own retail network, this is usually within a 30-day period. I can't speak to how quickly Optum generally made changes through the macro fields process.

Q. Line 42 is claim receive date, so that would be the date Argus receives the claim from the pharmacist through the computer system?

A. That's right.

Q. Just -- I think we mostly covered this but I want to make sure the record is clear. 45, pharmacy ingredient cost, that's the amount the pharmacy is paid for each prescription?

A. Yes.

Q. 46 is dispense fee to Cigna, that's the amount the pharmacy gets paid for filling the prescription?

A. That's right.

Q. 47 is the sales tax paid for the prescription?

A. That's right.

Page 166

LESTER

Q. 48 is the sum of 45, 46 and 47?

A. Sorry, you're asking about line 48?

Q. Yes.

A. Line 48 would also capture any cost share paid by the customer at the point of sale.

Q. Okay. I see. So if we look across 48, column D, shows the line is $12.45.

Do you see that?

A. Yes.

Q. So that would be the cost share was greater than the amount that Cigna -- or the pharmacy, so the pharmacy had to pay $12.45 back to Cigna?

A. I believe based on the flows of funds, it's technically dollars back to Optum but that Cigna would then be part of that Optum reconciliation if I think through the flow of funds properly.

Q. So the pharmacy -- so the member pays a cost share greater than the cost of the drug and the excess amount is paid by

Page 167

LESTER

the pharmacist to Optum and Optum pays Cigna?

MR. SHAFFER: Objection to form.

BY MR. IZARD:

Q. You can answer.

A. Instead you would have -- so the pharmacy, the amount that you see here isn't paid by the pharmacy through any of these value streams. Instead it is offset against all of the payments that a pharmacy might receive over a several-week period and the process that was set up with Argus funding the pharmacies, Cigna funding Argus, Optum funding Cigna because ultimately Optum owns these contracts means those dollars are ultimately making their way to Optum and Cigna is still responsible for paying Optum the sum of all of the claims that occurred over time and really netting out any negative amounts with positive amounts.

Q. So the first step is between Optum and the pharmacist, they are going to net out the positive, negative numbers

Page 168

LESTER

and then there will be a net payment reflecting all that netting out?

A. At least in the transaction that -- yeah, in the transaction data that we had available. It doesn't mean that it didn't somehow some other way impact Optum's contracts with that pharmacy but from the transaction that happens on the Argus system, that is how it works.

Q. Do you know how frequently that occurs?

A. I believe it is every two weeks but I'm not certain.

Q. And then the same process happens between Optum and Cigna, you look at all the transactions for a particular period and net out the positive and negatives and come up with a net number to be paid either to or from Cigna?

A. That's right.

Q. All right. Let's go to -- back to the exhibits, please. We're going to go to Despard Exhibit 7. Do we have that loaded in here yet? CIGNA 12365596.

Page 169

LESTER

A. Got it.

Q. Okay. And up at the top it says excerpt from CIGNA 12365596.

Do you see that?

A. Yes.

MR. SHAFFER: Hang on one second, Bob. Sorry, where is that?

MR. IZARD: It's the third one down from the top.

MR. SHAFFER: Despard 7, thanks.

BY MR. IZARD:

Q. I just want to clarify. My understanding, Mr. Lester, is what this chart shows is whether a plan is covered by ERISA or not, and column E says erisa_ind, and if it's a Y, that means it is covered by ERISA, if it's an N it is not covered by ERISA. Is that your understanding?

A. I believe this document is based on what we house within Cigna as to a client's ERISA, how the client has told us to set up their ERISA status. Yes.

Q. So you rely on a client to tell

Page 382

LESTER

someone was a current or former client of Cigna?

A. There was not. The DST report only captured the effective dates of documents but did not capture any end dates or termination dates of the documents or account.

Q. Mr. Izard asked you how about different cost share logic used to calculate member payments and he asked you questions about how those selections might be used to ultimately create client plans. Do you remember that?

A. I do.

Q. And I think you explained that cost share logics can include copay G, copay K or other options?

A. That's correct.

Q. And in our discussion here at the end of the day, you identified some other cost share variations that plan sponsors can select?

A. That's right.

Q. Do you know whether all plan

Page 383

LESTER

documents for each of the cost share options including copay G, copay K or other options all use only one clause to describe the customer payments?

A. There is language we can suggest to a plan sponsor but they are ultimately responsible for deciding whether to use that language or to use different languages as they see fit.

Q. Can there be different places where language in the plan documents can address copay logic?

A. That's my understanding.

Q. And can that language vary over time?

A. Yes.

Q. And can other plan terms vary even if different clients were to use the same cost share plan, cost share logic?

A. Yes.

Q. And so there could be plans for two accounts that both use copay K and have different plan language to describe the customer payments?

Page 384

LESTER

MR. IZARD: Objection.

THE WITNESS: That's right, either due to the client deciding to make a change or even suggest particular language changing over time.

BY MR. SHAFFER:

Q. And the same would be true for copay G; for example, you could have two accounts that use copay G that have different plan language to describes the customer payments?

A. That's correct.

MR. SHAFFER: Thank you very much, Mr. Lester.

MR. IZARD: I have nothing further.

MS. GRANT: Nothing from me.

MR. IZARD: Thank you, Mr. Lester.

THE VIDEOGRAPHER: The time is 6:36. We're off the record.

(Time noted: 6:37 p.m.)

Page 385

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NASSAU )

I, CATHI IRISH, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That TYLER LESTER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of June, 2020.

CATHI IRISH, RPR, CRR, CLVS, CCR

Diffee, Christopher M.



Negron, et al. v. Cigna Corp., et al. - Tyler Lester Deposition Transcript

Details

To: Christopher M. Barrett, Craig A. Raabe, Mathew Jasinski & 18 more

<459bbe8e4a3c43a397639b483bff6c94@morganlewis.com>

 Siri found new contact info Christopher M. Diffee christopher.diffee@morganlewis.com 

Counsel:

Upon additional review of the deposition transcript of Tyler Lester dated 6/23/2020, CHLIC is de-designating the transcript so that only the following portions of the transcript are designated as "Confidential" pursuant to the Protective Order (Dkt 92):

**PAGES: LINES**

147: 23-25
148: 9-11, 18-23
212: 10-11, 22
213: 21
215: 14, 21
216: 5, 12, 14, 23
218: 8-9, 15-16
225: 9-11, 14-19, 22-25
226: 2-3, 8-11, 15-19, 25
227: 2-25
228: 2-25
229: 2-9
230: 3-11, 13-15
259: 13-14
280: 21-22
281: 21
282: 5, 10
286: 9-11, 16-19, 22-23
287: 3-11
292: 16
303: 11, 14-15
304: 5-6, 11-18, 23-24
305: 3, 19-22
306: 3
307: 3, 14, 18
346: 10

Thank you.

**Christopher M. Diffee**
**Morgan, Lewis & Bockius LLP**
101 Park Avenue | New York, NY 10178-0060
Direct: +1.212.309.6645| Main: +1.212.309.6000 | Cell: +1.415.568.1160 | Fax: +1.212.309.6001
christopher.diffee@morganlewis.com | www.morganlewis.com
Assistant: Alphonso Valentin, Jr. | +1.212.309.6105 | alphonso.valentin@morganlewis.com

DISCLAIMER

***Negron et al. v. CHLIC et al.*, No. 3:16-cv-1702 (JAM) (D. Conn.)**

**DEPOSITION OF TYLER LESTER (#4150402)**

**ERRATA SHEET**

| Page & Line | Change | Reason |
|---|---|---|
| 15:15 | Change “FIN” to “BIN” | Typographical error |
| 17:14 | Change “a employer” to “an employer” | Typographical error |
| 19:2 | Change “contract were” to “contract there were” | Clarity |
| 35:5 | Change “NCP” to “NCPDP” | Typographical error |
| 77:10 | Change “accounts” to “account | Clarity |
| 94:21 | Change “copay A” to “copay K” | Clarity |
| 108:9 | Change “That’s right.” to “That’s right, different things to different plans.” | Clarity |
| 108:22 | Change “unable” to “enable” | Typographical error |
| 110:7 | Change “tell” to “tells” | Clarity |
| 117:3 | Change “medical” to “medical benefits” | Clarity |
| 127:20 | Strike “examples -- ” | Clarity |
| | | |
| 131:25 | Strike “being” | Clarity |
| 133:14 | Change “at implementation” to “at the implementation” | Clarity |
| 142:18 | Change “as” to “has” | Clarity |
| 143:12-13 | Change “this definition” to “this definition of paid claim” | Clarity |
| 242:16 | Change “Yes.” To “Existing language, yes.” | Clarity |
| 242:25 | Change “state department insurance” to “state departments of insurance” | Clarity |
| 256:5 | Change “guarantee” to “guarantees” | Clarity |
| 268:23 | Change “on balanced” to “unbalanced” | Clarity |
| 282:7 | Change “A of UP” to “AWP” | Clarity |
| 301:4 | Change “they’re” to “their” | Clarity |
| 301:5 | Change “they’re” to “their” | Clarity |
| 316:18 | Change “team” to “teams” | Clarity |
| 320:22 | Change “Department” to “Departments” | Clarity |
| 323:21 | Change “makes” to “make” | Clarity |
| 337:13 | Change “provided” to “providing” | Clarity |

| Page & Line | Change | Reason |
|---|---|---|
| 338:11 | Change “of formulary” to “or formularies” | Clarity |
| 343:14 | Change “insure” to “ensure” | Clarity |
| 352:16 | Change “Out” to “Our” | Clarity |
| 359:12 | Change “rights” to “right” | Clarity |

Tyler Lester

07/27/2020
Date

Negron v. Cigna

Tyler Lester (#4150402)

ACKNOWLEDGEMENT OF DEPONENT

I, Tyler Lester, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ 7/24/2020

Tyler Lester Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC