# EXHIBIT 14
## REDACTED

```
                                                             Page 1

 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 3    Case No. 16-cv-1702
      - - - - - - - - - - - - - - - - - - -x
 4    KIMBERLY A. NEGRON, Individually    :
      and on Behalf of All Others         :
 5    Similarly Situated,                 :
                                          :
 6                        Plaintiffs,     :
                                          :
 7            - vs -                      :
                                          :
 8    CIGNA CORPORATION and CIGNA HEALTH  :
      AND LIFE INSURANCE COMPANY, et al.,:
 9                                        :
                          Defendants.     :
10    - - - - - - - - - - - - - - - - - - -x
11
12                              September 17, 2020
                                8:57 a.m.
13                              88 E. Mountain Road
                                Canton, Connecticut
14
15
16              ***CONFIDENTIAL***
17
18
19
20
21        VIRTUAL REMOTE DEPOSITION UPON ORAL
22    EXAMINATION OF CHRISTOPHER HOCEVAR, held at the
23    above-mentioned time and place, before Randi
24    Friedman, a Registered Professional Reporter,
25    within and for the State of New York.
```

Page 2

1
2  APPEARANCES:
3
4      IZARD KINDALL & RAABE, LLP
          Attorneys for Plaintiff
5      29 South Main Street
       West Hartford, New York 06106
6      BY: CRAIG A. RAABE, ESQ.
           CHRISTOPHER M. BARRETT, ESQ.
7
8
9      MOTLEY RICE, LLC
          Attorneys for Plaintiff
10     28 Bridgeside Blvd.
       Mount Pleasant, SC 29464
11     BY: MEGHAN OLIVER, ESQ.
           CHARLOTTE LOPER, ESQ.
12
13
14
       MORGAN LEWIS & BOCKIUS, LLP
15        Attorneys for Defendant, Cigna
          Corporation and Cigna Health and Life
16        Insurance Company
       1701 Market Street
17     Philadelphia, Pennsylvania 19103
       BY: BRIAN SHAFFER, ESQ.
18         JILL SETTLEMYER, ESQ.
19              * * *
20
21
22
23
24
25

Page 3

1
2          STIPULATIONS
3      IT IS HEREBY STIPULATED, by and between
4  the attorneys for the respective parties hereto,
5  that:
6      All rights provided by the C.P.L.R.,
7  and Part 221 of the Uniform Rules for the Conduct
8  of Depositions, including the right to object to
9  any question, except as to the form, or to move
10 to strike any testimony at this examination is
11 reserved; and in addition, the failure to object
12 to any question or to move to strike any
13 testimony at this examination shall not be a bar
14 or a waiver to make such motion at, and is
15 reserved to, the time of this action.
16     This deposition may be sworn to by the
17 witness being examined before a Notary Public
18 other than the Notary Public before whom this
19 examination was begun, but the failure to do so
20 or to return the original of this deposition to
21 counsel, shall not be deemed a waiver or the
22 rights provided by Rule 3116, C.P.L.R., and shall
23 be controlled thereby.
24     The filing of the original of this
25 deposition is waived.

Page 4

1
2              * * *
3      CHRISTOPHER HOCEVAR, the witness
4  herein, after first having been duly sworn,
5  was examined and testified as follows:
6              * * *
7          EXAMINATION
8  BY MR. RAABE:
9      Q   Good morning, Mr. Hocevar. I'm Craig
10 Raabe. I'm one of the lawyers for the plaintiffs
11 in this case.
12         Have you ever been deposed before?
13     A   I have.
14     Q   Under what circumstances?
15     A   Both as an employee of Cigna for the
16 Anthem litigation, as well as another litigation,
17 I don't remember the name of it, down in Texas.
18     Q   Okay. So I'm going to assume that you
19 have some familiarity with the process. This is
20 a little bit different because we're doing it
21 remotely so it's a little more important that we
22 try not to talk over each other. So I'll do my
23 best to let you finish your answer before I ask
24 my next question. If you can make sure you're
25 pausing between questions and answers as well, it

Page 5

1          C. Hocevar - Confidential
2  will make Randi's job a whole lot easier; okay?
3      A   Okay.
4      Q   How long did you work at Cigna?
5      A   I started in 2002 and left end of
6  2018.
7      Q   Between 2010 and the time that you
8  left, what were your positions?
9      A   Let me think through. Around 2010,
10 I'm trying to figure out if it was just before or
11 after I was the president of the select segment,
12 which was a business selling commercial insurance
13 to employers of 50 to 250. I can't remember
14 whether I was also the individual segment leader
15 or not but my primary job was select.
16         Around mid-2013, expanded
17 responsibility to also include the pharmacy
18 business. And then from that, somewhere around
19 2017 or so, I apologize for the exact -- lack of
20 exactness on the dates, also picked up
21 responsibility for all of the commercial
22 segments, the strategy for the overall company,
23 as well as all of what we called solutions or the
24 specialty lines of business.
25     Q   Earlier you mentioned something called

2 (Pages 2 - 5)

Page 98

1      C. Hocevar - Confidential
2          MR. RAABE:  Charlotte, can you put
3      up Exhibit 177, please?
4          MS. LOPER:  This has previously
5      been marked as Exhibit 177.  You should be
6      able to see it.
7          MR. SHAFFER:  Sorry.  177?
8          MR. RAABE:  Yes.
9          THE WITNESS:  Okay.  I have it.
10  BY MR. RAABE:
11     Q    So if you start in the first email in
12  the chain, it begins at the bottom of Page 256.
13  There's an email from Lance Wilkes to Stephanie
14  Byrne and Dan Whitnah and others.
15          What was Dan Whitnah's role in 2013?
16     A    I don't remember his official title,
17  but he would have had more of the pharmacy
18  pricing.  So the actuarial team for pharmacy.  At
19  some point, he then turned over to be the CFO of
20  the business.
21     Q    Mr. Wilkes writes, "Stephanie/Dan -
22  Chris has asked for an assessment of the worst
23  case scenario based upon Catamaran's positioning
24  of the zero balance and 90-day issue"; do you see
25  that?

Page 99

1      C. Hocevar - Confidential
2     A    I do.
3     Q    Do you understand the "Chris" there to
4  be you?
5     A    I don't know if it is, but at that
6  time, we were starting to have pretty heated
7  conversations on the reconciliation side of
8  Catamaran.
9     Q    And with regard to the zero balance
10  issue, what do you recall?
11     A    I knew it was one of many reconciling
12  items where we had a disagreement with Catamaran.
13     Q    What did the disagreement surround?
14     A    Craig, I don't know -- I don't
15  remember the details, but at that time, it was
16  when we were actually starting to kind of
17  implement some of the key components of the
18  contract, and with any implementation, there's
19  always kind of puts and takes.
20          From what I remember, fourth quarter
21  of 2013, there were a lot of -- there were a lot
22  of reconciled items that weren't on the favorable
23  side of how we would have interpreted the
24  contract.
25     Q    What's your understanding of zero

Page 100

1      C. Hocevar - Confidential
2  balance to mean?
3     A    I don't remember the details of it,
4  Craig.  I just know it was one of the economic
5  levers that we were not in align with.  Again,
6  the contract with Catamaran was thousands and
7  thousands of pages.  This was kind of the first
8  couple months we were getting into it with them.
9     Q    Do you recall zero balance to involve
10  obtaining from pharmacies the differential
11  between what Catamaran was paying the pharmacies
12  and what members were paying in cost shares?
13     A    I don't.  There was a delta between
14  our contracted rates with Catamaran and what we
15  were actually seeing come through, so I don't
16  know how that plays through the zero base side of
17  it.  I apologize.  I can't be more helpful on
18  this one.
19     Q    What's your best recollection of what
20  zero balance refers to?
21     A    The straightest line I can draw,
22  Craig, and I'm reaching, is that there was
23  trapped money that sat between the contracted
24  rates with Catamaran and what sat at the retail
25  side.  The mechanics of it, I can't testify to go

Page 101

1      C. Hocevar - Confidential
2  deeper than that piece.
3     Q    When there was money sitting at the
4  retail side, where did that money come from?
5     A    I don't remember.  I had a laundry
6  list from the team that we were out of whack with
7  Catamaran.  At that time, we were also having
8  fairly significant relationship issues beyond the
9  economic issues.
10     Q    If you look at the first page of this
11  Exhibit 177 --
12     A    255?
13     Q    255.  It's an email from Dan Whitnah
14  to a number of people, and in the third paragraph
15  it says, "The third option in addition to
16  Stephanie's is a periodic clawback from
17  pharmacies by Catamaran"; do you see that?
18     A    Yes.
19     Q    Did you ever have conversations with
20  anyone about that option?
21     A    Let me read the entire paragraph so I
22  have some context here.  Okay.
23          What was your question again?  I'm
24  sorry.
25     Q    Did you ever have a conversation with

Page 102

1  C. Hocevar - Confidential
2  anyone about that third option of a periodic
3  clawback from pharmacies by Catamaran?
4  A   It doesn't ring a bell.  It might have
5  happened, but it doesn't ring a bell.
6       MR. RAABE:  Let's mark 178369,
7  please, Charlotte.
8       MS. LOPER:  Okay.  This will be
9  Exhibit 232.
10      (Plaintiff's Exhibit 232 was
11  marked.)
12 BY MR. RAABE:
13  Q   Let me know when you see that one.
14  A   Okay.  Give me a second.  232?
15  Q   Yes.
16  A   Okay.  Loaded.
17  Q   So the first email on the chain is an
18 email to you from Barry Davis at Catamaran.
19      Is that one of the people that you
20 were dealing with at Catamaran?
21  A   I spent most of my time with Mark
22 Thierer, who's the CEO, and then occasionally
23 with Barry Davis.  But I tried to pair Barry
24 Davis off with Ray Smithberger from kind of a
25 contact point, but, yes.

Page 103

1  C. Hocevar - Confidential
2  [REDACTED]
9  A   I do.
10  Q   Can you tell us what that refers to?
11  [REDACTED]
22  Q   Okay.
23      MR. RAABE:  Let's mark 7864877,
24  please.
25      MS. LOPER:  Okay.  This will be

Page 104

1  C. Hocevar - Confidential
2  Exhibit 233.  One second.  It's loading.
3  Okay.  You should be able to see it now.
4       (Plaintiff's Exhibit 233 was
5  marked.)
6       THE WITNESS:  233 I have.
7 BY MR. RAABE:
8  Q   The first email in the chain, Eric
9 Palmer writes to you, "Do you want me to go to
10 Schaumburg with you on 12/4?"
11      Was that in relation to visiting
12 Catamaran?
13  A   That's where their headquarters were,
14 yes.
15  Q   And you responded, "I am not flying
16 out, as I have the all day retail 2.0 design
17 session."
18      Can you tell us what that refers to?
19  A   I don't remember.
20  Q   The next paragraph you say, "BTW, I
21 did not even know what to say on the 500
22 conversation today."
23      Can you tell us what that refers to?
24  A   Sorry, I don't remember.
25  Q   And Mr. -- this is an email from you

Page 105

1  C. Hocevar - Confidential
2 to Mr. Palmer, the last email on the chain, you
[REDACTED]
9  A   I do.
10  Q   What had Lance done that annoyed you?
[REDACTED]
15  Q   So the next sentence begins with "Not
16 only."
17      Can you tell us what that refers to?
18  A   I don't remember.  This timeframe,
19 November, is, again, one or two months into the
20 reconciliation with Catamaran on the rates, so I
21 don't know what this is about.  But
22 environmentwise, there's lots of moving parts
23 with the relationship with Catamaran and the
24 reconciliation.

Page 106

3  contracting rate were you referring to?
4     A    I don't -- I don't remember what the
5  context is here, but when I think about
6  contractor rate with Catamaran, it would be the
7  big multi, you know, thousand page contract that
8  we had with Catamaran, that we would then go out
9  and kind of salvage part of an integrated
10 offering to the employers.
11    Q    Does that refer to the rates that you
12 would pay to Catamaran to pay to pharmacies for
13 drugs?
14         MR. SHAFFER:  Objection to form.
15         THE WITNESS:  Yeah, I didn't
16    understand your question, Craig.
17 BY MR. RAABE:
18    Q    It says "contracted rate."
19         Does that refer to a schedule of rates
20 that Cigna would pay to Catamaran, that Catamaran
21 would pay to pharmacies?
22         MR. SHAFFER:  Objection to form.
23    Asked and answered.
24         THE WITNESS:  Yeah, I don't know
25    what the contracted rate is.  What I was

Page 107

1              C. Hocevar - Confidential
2     referring to is just how I think about
3     contract rates with Catamaran would be back
4     to the legal document that we had
5     consummated with them.
6         MR. RAABE:  Charlotte, let's mark
7     7864559, please.
8         MS. LOPER:  Okay.  This is Exhibit
9     234.  You should be able to see it.
10        (Plaintiff's Exhibit 234 was
11    marked.)
12        THE WITNESS:  I'm just refreshing
13    now.  Okay.  I have it.
14 BY MR. RAABE:

Page 108

6     A    I don't remember the context of this
7  one, Craig; sorry.

10    A    Sorry.  This is 2013.  I don't
11 remember the context or the environment on that
12 one.
13    Q    Mr. Manders wrote back to you in the

18    A    I do.
19    Q    What is your understanding of what
20 squeezing the network refers to there?
21    A    Sorry.  I don't have the context in
22 order to remember.
23    Q    Do you know if that refers to taking
24 clawbacks from pharmacies within your network?
25    A    I don't know, Craig.  Sorry.

Page 109

1              C. Hocevar - Confidential
2     Q    Do you recall any conversation with
3  Mr. Manders about that issue, the ZBL issue?
4     A    We would have had regular pharmacy
5  updates so, you know, pretty much everything that
6  we would have tried to settle with Catamaran at a
7  high level, he would have been aware of.
8     Q    So my question is specifically related
9  to ZBL.  Do you recall any conversation with Mr.
10 Manders about the ZBL issue?
11    A    Nothing that comes to mind.
12    Q    Do you recall any conversations with
13 Mr. Cordani about the ZBL issue?
14    A    Nothing that comes to mind; sorry.
15        MR. RAABE:  Let's do Exhibit 187,
16    please, Charlotte.
17        MS. LOPER:  Okay.  You should be
18    able to see it.
19        THE WITNESS:  You said 187?
20 BY MR. RAABE:
21    Q    Yes.
22    A    Okay.  My first question will focus on
23 the page that ends in 927.
24        MR. SHAFFER:  Sorry.  234 or an
25    earlier one?

28 (Pages 106 - 109)

### Page 110

```
 1        C. Hocevar - Confidential
 2            MR. RAABE:  No.  This is Exhibit
 3    187.
 4            MR. SHAFFER:  Okay.  Thanks.
 5            THE WITNESS:  I'm just making sure
 6    I'm looking at the right one.  54926?
 7   BY MR. RAABE:
 8    Q    Yes.  Turn to the next page.  There's
 9   an email from Julie Burns-McAvoy to a whole
10   number of people, and she says, "Hello RxFocus
11   Users."
12        What's your understanding of what
13   RxFocus Users are?
14    A    I don't have one; sorry.
15    Q    She says, "I have an urgent request
16   from management.  They are asking us to react to
17   a missed revenue opportunity.  In the current
18   world, pharmacies are keeping our retail spread
19   when the customer liability (often times
20   deductible) exceeds the pharmacy contracted
21   rate," and it continues; do you see that?
22    A    I do.
23    Q    Did you make a request of
24   Ms. Burns-McAvoy or anyone else to deal with this
25   revenue opportunity?
```

### Page 111

```
 1        C. Hocevar - Confidential
 2    A    Not that I recall.  I don't even
 3   remember Julie Burns-McAvoy.
 4    Q    A couple sentences later she types,
 5   "This is being supported by the highest levels of
 6   Cigna management, as it represents a tremendous
 7   loss of revenue"; do you see that?
 8    A    I do.
 9    Q    In this timeframe, November of 2013,
10   do you recall being involved in an effort to get
11   the retail spread from the pharmacies when the
12   customer liability exceeded the pharmacy
13   contracted rate?
14    A    I don't remember that, Craig; sorry.
15    Q    Is that the ZBL issue, in part?
16    A    I'm not sure what she's referring to
17   here; sorry.
18    Q    So as you read those words, does that
19   in your mind refer to the ZBL issue?
20    A    Again, I don't know what she was
21   referring to here.
22    Q    I'm not asking what she's referring
23   to.
24        As you read those words, do those
25   words to you have any relation to the ZBL issue?
```

### Page 112

```
 1        C. Hocevar - Confidential
 2            MR. SHAFFER:  Objection to form.
 3    Objection, lack of foundation.  Go ahead,
 4    Chris.
 5            THE WITNESS:  I don't know, Craig;
 6    sorry.
 7   BY MR. RAABE:
 8    Q    Next paragraph under Overview she
 9   types, "Customers occasionally paid a pharmacy
10   more than the cost of the drug because of
11   spread"; see that?
12    A    I do.
13    Q    In 2013, is that statement true?
14    A    I don't know.  I don't know that to be
15   true or false; sorry.
16    Q    The next sentence ends with the phrase
17   "we need to recoup the dollars from pharmacies";
18   do you see that?
19    A    I don't, sorry.  I lost you there for
20   a second.
21    Q    The next sentence.  It's the last
22   phrase in the next sentence.
23    A    You're on 927?  My pages just went up
24   for whatever reason.
25    Q    Under the Overview section.
```

### Page 113

```
 1        C. Hocevar - Confidential
 2    A    Okay.
 3    Q    The last phrase in that sentence, it
 4   starts with the word "we" over in the right-hand
 5   margin.
 6    A    Oh, sorry.  I'm having a little bit of
 7   a problem with the system.  "We need to recoup,"
 8   got it.
 9        The question again?
10    Q    I think my first question is, do you
11   see where I am there?
12    A    Yeah, I do now.
13    Q    And, in fact, Cigna did recoup those
14   dollars from the pharmacies by way of clawbacks;
15   right?
16    A    I'm not sure I'm following your
17   question, so --
18    Q    Ms. Burns-McAvoy writes that "we,"
19   meaning Cigna, "needs to recoup the dollars from
20   the pharmacies"; right?
21            MR. SHAFFER:  Objection to form.
22            THE WITNESS:  That's what she
23    wrote; correct.
24   BY MR. RAABE:
25    Q    And you know that, in fact, Cigna did
```

|  |  |
|---|---|
| Page 114<br>1         C. Hocevar - Confidential<br> 2   recoup the dollars from the pharmacies in the way<br> 3   of clawbacks; correct?<br> 4       A    I'm not sure how to answer that<br> 5   question.  I knew there were trapped dollars at<br> 6   pharmacies, but as I said, I was worried at this<br> 7   time about the broader relationship issues with<br> 8   Catamaran, and whether or not we would have a<br> 9   contract moving forward.<br>10       Q    Were you at all involved with an<br>11   effort to untrap the dollars at pharmacy?<br>12       A    Me, personally, I know the team was<br>13   working on it, but at a detail level, no.<br>14       Q    How did the team resolve it, to your<br>15   knowledge?<br>16       A    I don't remember, Craig; sorry.<br>17       Q    By implementing clawbacks; right?<br>18       A    As I said, I don't remember.<br>19       Q    If you turn to the first page, Page<br>20   926, down at the bottom it says, "We CANNOT<br>21   charge a member more than the price of a drug -<br>22   it is AGAINST CMS compliance"; do you see that?<br>23       A    I do.<br>24       Q    Do you know what that refers to?<br>25       A    I don't. | Page 116<br>1         C. Hocevar - Confidential<br> 2            THE WITNESS:  Yeah, I don't know<br> 3       how to answer your question, Craig.  Again,<br> 4       I wasn't responsible for the government<br> 5       programs.<br> 6   BY MR. RAABE:<br> 7       Q    The latest email in the chain, the<br> 8   email that's on the top of Page 926, Michael<br> 9   Guren writes in part, "Off the record, it seems<br>10   strange that Cigna would charge a member for a<br>11   co-pay that exceeds the ingredient cost plus<br>12   dispensing fee plus tax (if applicable).  To me,<br>13   that is no longer a 'co' pay, but more of a<br>14   single (over) payment by the customer"; do you<br>15   see that?<br>16       A    I do.<br>17       Q    To you, what does the "co" in<br>18   "co-payment" refer to?<br>19            MR. SHAFFER:  Objection to form.<br>20            THE WITNESS:  In this document?<br>21   BY MR. RAABE:<br>22       Q    No, in general.<br>23            Cigna had its members pay co-pays;<br>24   correct?<br>25       A    Co-payments are a part of an enrolled |
| Page 115<br>1         C. Hocevar - Confidential<br> 2       Q    Do you know whether Cigna was allowed<br> 3   to charge a member more than the price of a drug<br> 4   in a Medicare context?<br> 5            MR. SHAFFER:  Objection to form.<br> 6       Lack of foundation.<br> 7            THE WITNESS:  Sorry, Craig.  The<br> 8       question again?<br> 9   BY MR. RAABE:<br>10       Q    Do you know whether Cigna was allowed<br>11   to charge a member more than the price of the<br>12   drug in the Medicare context?<br>13            MR. SHAFFER:  Objection to form.<br>14       Lack of foundation.  Beyond the scope.<br>15            THE WITNESS:  Yeah, sorry, Craig.<br>16       I wasn't specifically responsible for the<br>17       banker side.  I'm not that familiar with CMS<br>18       and the regulation of that space as you ask<br>19       the question.<br>20   BY MR. RAABE:<br>21       Q    Do you know whether Cigna was allowed<br>22   to charge any member who was part of the Federal<br>23   Government more than the price of a drug?<br>24            MR. SHAFFER:  Objection to form.<br>25       Lack of foundation. | Page 117<br>1         C. Hocevar - Confidential<br> 2   benefit program; correct.<br> 3       Q    From your perspective, what does the<br> 4   "co" in "co-payment" mean?<br> 5            MR. SHAFFER:  Objection to form.<br> 6            THE WITNESS:  Yeah.  I don't --<br> 7       I'm not trying to be difficult, Craig.  I<br> 8       don't know how to answer your question.<br> 9       Co-payments, deductibles, they're all parts<br>10       of an overall program between employees and<br>11       their employers, so I don't know how to put<br>12       a definition around the word "co."<br>13   BY MR. RAABE:<br>14       Q    Do you have any sense what "co" in<br>15   "co-payment" means?<br>16            MR. SHAFFER:  Objection to form.<br>17       Asked and answered.<br>18            THE WITNESS:  Sorry, I don't.<br>19            MR. SHAFFER:  Craig, you have a<br>20       sense of when would be a good time for a<br>21       break or how long you're expecting to go?<br>22            MR. RAABE:  We should probably<br>23       take a lunch break, because I don't think I<br>24       can finish up -- I'm not going to go all<br>25       day, but it probably makes sense to take a |

Page 118

1  C. Hocevar - Confidential
2  break. If you want to do that now we can.
3  THE WITNESS: Craig, if you told
4  me it's an hour, I'll stay on. If you told
5  me it's three hours, I need a break.
6  MR. RAABE: I think it would
7  probably be more than an hour. It's up to
8  you. I can go either way. It's up to Randi
9  as well.
10  MR. SHAFFER: Why don't we take a
11  ten-minute break now and come back and go
12  awhile longer. Or you can take a lunch
13  break now. It's really your preference.
14  THE WITNESS: Yeah. I prefer not
15  to take a lunch break. I've already had to
16  push a bunch of things for the day, so if I
17  could pick some of them up at the end, I
18  would greatly appreciate it, Craig.
19  (Whereupon there was a brief
20  recess from 12:01 p.m. until 12:16 p.m.)
21  MR. RAABE: Charlotte, can we post
22  Exhibit 190, please?
23  MS. LOPER: Yes. I'll let you
24  know once it's loaded.
25  THE WITNESS: Thank you.

Page 119

1  C. Hocevar - Confidential
2  MS. LOPER: Okay. You should be
3  able to see it now.
4  THE WITNESS: You said 190?
5  BY MR. RAABE:
6  Q   Yes.
7  A   Okay. I have it.
8  Q   The middle email on the first page is
9  from Paul Urick.
10  What was Mr. Urick's role in 2013?
11  A   2013, Paul -- he would have -- I don't
12  remember his title, but we would he would have
13  had responsibility for operations. So home
14  delivery and other things.
15  Q   Have you stayed in touch with
16  Mr. Urick since you left?
17  A   I don't think so, no. It's been a
18  long time.
19  Q   Okay. He wrote to you, "Guys - I had
20  a meeting with Chris H this morning, and of
21  course the ZBL is a top priority among our group
22  and leadership"; do you see that?
23  A   I do.
24  Q   Do you recall telling Mr. Urick that
25  ZBL was a top priority?

Page 120

1  C. Hocevar - Confidential
2  A   I don't. Craig, let me turn you up
3  real quick because I'm having a hard time hearing
4  you.
5  Q   Okay.
6  A   Go ahead.
7  Q   In the last sentence of that email he
8  says, "I need to bring in others if this is not
9  the case, since it is 100 million plus issue for
10  us"; do you see that?
11  A   I do.
12  Q   Do you recall discussing with Mr.
13  Urick or anyone else that the ZBL issue was a 100
14  million-dollar annual issue for Cigna?
15  MR. SHAFFER: Objection to the
16  form.
17  THE WITNESS: Say that again,
18  Craig.
19  MR. SHAFFER: Sorry, Chris. I was
20  just objecting to the form of the question.
21  BY MR. RAABE:
22  Q   So did you ever discuss with anyone at
23  Cigna the value of the ZBL issue at Cigna?
24  A   I don't remember.
25  Q   Do you recall it being around

Page 121

1  C. Hocevar - Confidential
2  $100 million a year?
3  A   I don't, sorry. The pharmacy business
4  was a large business, so as I said, we had 15+
5  billion dollars running through that any given
6  year.
7  Q   The ZBL issue involved getting the
8  money from the pharmacy, to use your word, was
9  trapped there; right?
10  A   Yes. Maybe to put it in context to
11  trapped. So this timeframe, fourth quarter, as I
12  said, we were having a good bit of issues with
13  Catamaran; the reconciliation. So the
14  reconciliation, the team would perform -- would
15  look at the claims that would come out of our
16  systems. Compare that against the contractual
17  rates. When I talk about trapped, it's the delta
18  between what we should have seen versus what we
19  saw from a contract rate perspective. So I don't
20  know if that answers your question, but that's
21  the context I used the word "trapped" in.
22  Q   And the ZBL issue, in part, was to
23  obtain that trapped money for Cigna; right?
24  A   Can you say the question differently?
25  I think I have it, but I don't want to answer it

Page 138

C. Hocevar - Confidential

1 half of the year spent doing evaluation. After
2 we had concluded -- I wasn't part of this, but
3 the organization had concluded that a sale of the
4 pharmacy business wasn't something that they were
5 going down the road, which is one of our
6 competitors, Anthem, did.
7     So the first half of 2013 was an
8 evaluation of what could a solution with another
9 partner in the marketplace, like a CVS and/or
10 Catamaran. And at some point, we had initial
11 conversations with Express. I wasn't part of
12 those, but I know they were part of the
13 evaluation.
14     MR. RAABE: Charlotte, let's mark
15     7777335, please.
16     MS. LOPER: Okay. This is Exhibit
17     240.
18     (Plaintiff's Exhibit 240 was
19     marked.)
20 BY MR. RAABE:
21  Q  Let me know when you have that up.
22  A  Okay.
23  Q  In the email in the middle of the
24 first page from Mr. Whitnah, he references in the

Page 139

C. Hocevar - Confidential

1 first sentence, "Ascension's in-house
2 pharmacies"; do you see that?
3  A  Yes.
4  Q  Do you know what that refers to?
5  A  I don't, although it does seem like we
6 carried the project name of diligence over into
7 the program, but I don't know what this refers
8 to.
9  Q  Did Project Ascension lead to the
10 transaction with Catamaran?
11  A  It did, yeah. What I was referring
12 to, Craig, was it seems like we might have
13 carried the M&A code name into this piece of it.
14  Q  So as you read this, does it appear
15 that Ascension there is referring to Catamaran?
16     MR. SHAFFER: Objection to form.
17     THE WITNESS: I wouldn't have
18     drawn the conclusion that Catamaran equals
19     Ascension. I would have drawn the
20     conclusion that Ascension is investing in
21     the pharmacy business, of which Catamaran
22     was a piece of it.
23 BY MR. RAABE:
24  Q  If you look at the second to last

Page 140

C. Hocevar - Confidential

1 paragraph, the last sentence, again, read as much
2 as you need to to get the context. It says that
3 this issue was escalated to you and Ms. Vancura;
4 do you see that?
5  A  I do.
6  Q  Do you recall getting involved in this
7 issue?
8  A  Let me read through. I didn't get a
9 chance to read through the issue here.
10  Q  Sure.
11  A  Okay. Sorry. The question again,
12 Craig?
13  Q  Do you recall getting pulled into this
14 issue?
15  A  Candidly, I read through this. I'm
16 not sure I even understand the issue. Sorry; I
17 don't remember.
18  Q  So if you look up at the top email,
19 the issue appears to be that there would be
20 negative amounts due to in-house pharmacies in
21 that first email; you see that?
22  A  I see it written that way. I don't
23 know what "in-house pharmacy" means. That's what
24 I'm struggling with.

Page 141

C. Hocevar - Confidential

1  Q  When Mr. Byrne wrote that that's the
2 worst possible result from this client request,
3 do you have any idea what she's talking about?
4  A  I don't, sorry.
5  Q  Did some of your clients have in-house
6 pharmacies?
7  A  Some of the hospital clients did. I
8 don't know broader than that, but it's not
9 uncommon for hospitals to have their own in-house
10 pharmacies.
11  Q  If there was a negative amount due to
12 an in-house hospital pharmacy and Cigna took that
13 money, it would be taking money from a client;
14 right?
15     MR. SHAFFER: Objection to form.
16     THE WITNESS: I'm not sure I
17     understand your question, Craig; sorry.
18 BY MR. RAABE:
19  Q  So this whole ZBL process involved
20 negative amounts due to pharmacies; right?
21  A  Again, what I remember of ZBL is that
22 it was a reconciling item between Catamaran and
23 us and contractually with the pharmacies.
24  Q  Trapped money; right?

Page 142

1      C. Hocevar - Confidential
2   A   The difference between the two was
3  trapped money between what we expected
4  contractually with Catamaran, and what we saw
5  actually coming through the claim files.
6   Q   And Cigna's effort to get that trapped
7  money; correct?
8   A   There was an effort to get that money,
9  correct.
10  Q   Do you have any recollection of
11 whether that money at times was characterized as
12 a negative reimbursement?
13  A   Sorry, not that I remember.
14  Q   Or a negative amount due?
15  A   Sorry, not that I remember.
16  Q   Or a clawback?
17  A   Again, sorry, not that I remember.
18  Q   Let's go to Exhibit 185, please,
19 Charlotte.
20      MS. LOPER:  Okay.  We've
21    previously marked this one today, so it
22    should already be in your Marked Exhibits
23    folder.  Exhibit 185.
24      MR. RAABE:  Let's skip it.
25      MS. LOPER:  Okay.

Page 143

1       C. Hocevar - Confidential
2       MR. RAABE:  So let's go to
3    exhibit -- Document 149549.
4       MS. LOPER:  What was that?  Say it
5    one more time.
6       MR. RAABE:  149549.
7       MS. LOPER:  This is Exhibit 241.
8       (Plaintiff's Exhibit 241 was
9    marked.)
10      THE WITNESS:  Okay.  I have that,
11   Craig.
12 BY MR. RAABE:
13  Q   Can you tell us what this document is?
14  A   Is there a document attached to this?
15  Q   I'm sorry.  Bad question.
16     So the email refers to a pre-read that
17 was sent to the board; do you see that in the
18 first sentence?
19  A   Yes.
20  Q   What's a pre-read?
21  A   We would send out information in
22 advance of a meeting.
23  Q   The second sentence says, "All in, the
24 board and our CEO continues to be very positive
25 on our efforts, energy and drive for results"; do

Page 144

1       C. Hocevar - Confidential
2  you see that?
3   A   I do.
4   Q   What do you recall that referring to?
5   A   I don't remember specifically, but
6  October 2013 would have been, you know, a handful
7  of months post the signing of the deal, so it's
8  not uncommon to have an update to the board.
9   Q   Was part of the positive effort,
10 energy and drive for results the capturing of the
11 trapped money at the pharmacies?
12      MR. SHAFFER:  Objection to form.
13      THE WITNESS:  Yeah, sorry, Craig,
14   not that I remember.  That's a pretty
15   detailed topic for a finance committee.
16 BY MR. RAABE:
17  Q   Did you ever discuss with Mr. Cordani
18 that trapped money?
19  A   Not that I remember talking about
20 those specific terms, but we would have talked
21 about the major reconciliations we had.
22  Q   Including the trapped money?
23      MR. SHAFFER:  Objection to form.
24      THE WITNESS:  Yeah, sorry.  The
25   difference between the contracted rates as

Page 145

1       C. Hocevar - Confidential
2    well as what we're seeing come through the
3    results.
4  BY MR. RAABE:
5   Q   Tell us what you recall of those
6  conversations.
7   A   You know, Craig, not much more than
8  that.  You know, most of my updates were through
9  Matt Manders and Eric Palmer as my boss and kind
10 of the finance officer.  You know, they got
11 aggregated up to even a more higher level as they
12 rolled through.
13  Q   So my question before is whether you
14 had those conversations with Mr. Cordani, and you
15 said that you did; right?
16  A   I said that I had conversation on the
17 reconciled items, yes.
18  Q   So do you have any recollection of
19 those conversations as you sit here today?
20  A   The details, no.  Just knowing in the
21 fourth quarter that we were starting to go down a
22 bad path with one of our partners along a 10-year
23 deal.
24  Q   So what do you recall saying to him,
25 and what do you recall Mr. Cordani saying to you?

37 (Pages 142 - 145)

Page 166

```
 1
 2          INDEX TO TESTIMONY
 3            EXAMINATION OF
 4  CHRISTOPHER HOCEVAR                PAGE
 5  BY: Mr. Raabe                        4
 6            * * *
 7          E X H I B I T S
 8  Plaintiff
    Number    Description           Page
 9  Exhibit 218  Form 8-K              10
10  Exhibit 219  Cigna: Draft for Discussion    17
11  Exhibit 220  Email Exchange (CIGNA 7864277)   25
12  Exhibit 221  Cigna Interoffice Memo: 9-19-13   27
         (CIGNA 7864278-786280)
13
    Exhibit 222  Email Exchange         49
14       (CIGNA 431012-431014)
15  Exhibit 223  Email Exchange & Attachment   50
         (CIGNA 203371-203375)
16
    Exhibit 224  Email Exchange         55
17       (CIGNA 487737-487742)
18  Exhibit 225  Email: 6-7-16 (CIGNA 489260)   63
19  Exhibit 226  Email Exchange         64
         (CIGNA 7590517-7590519)
20
    Exhibit 227  Email: 6-8-16 (CIGNA 7865360)   66
21
    Exhibit 228  Email: 6-23-16         69
22       (CIGNA 490251-490253)
23  Exhibit 229  Email Exchange         71
         (CIGNA 502586-502587)
24
25  (Exhibits continued.)
```

Page 167

```
 1
 2  (Exhibits continued.)
 3          E X H I B I T S
 4  Plaintiff
    Number    Description           Page
 5  Exhibit 230  Touchpoint Presentation    73
         (491444-491464)
 6
    Exhibit 231  Scope Document (CIGNA 147566)   90
 7
    Exhibit 232  Email Exchange        102
 8       (CIGNA 178369-178370)
 9  Exhibit 233  Email Exchange (CIGNA 7864877)  104
10  Exhibit 234  Email Exchange        107
         (CIGNA 7864559-7864560)
11
    Exhibit 235  Email Exchange        122
12       (CIGNA 7864556-7864557)
13  Exhibit 236  Email Exchange        125
         (CIGNA 417411-417412)
14
    Exhibit 237  Email Exchange        126
15       (CIGNA 178996-179006)
16  Exhibit 238  Email Exchange        129
         (CIGNA 7825882-7825883)
17
    Exhibit 239  Project Ascension: 3-22-13    134
18       (CIGNA 391276)
19  Exhibit 240  Email Exchange        138
         (CIGNA 7777335-7777336)
20
    Exhibit 241  Email: 10-23-13 (CIGNA 149549)  143
21
    Exhibit 242  Finance Committee Talking Points 146
22       10-22-13 (CIGNA 149550-149552)
23  Exhibit 243  Email: 4-7-14 (CIGNA 7865347)  149
24
25  (Exhibits continued.)
```

Page 168

```
 1
 2  (Exhibits continued.)
 3          E X H I B I T S
 4  Plaintiff
    Number    Description           Page
 5  Exhibit 244  CPM Earnings_FY14 (CIGNA 7865348) 150
 6  Exhibit 245  Email Exchange (CIGNA 288417)   152
 7  Exhibit 246  Letter: 10-24-14         154
         (CIGNA 288418-288419)
 8
    Exhibit 247  2014 Compliance Plan & Report   156
 9       (CIGNA 434488-434501)
10  Exhibit 248  Agreement and Release       162
11   (Exhibits were retained on Exhibit Share.)
12            * * *
```

Page 169

```
 1
 2          C E R T I F I C A T I O N
 3      I, Randi Friedman, Registered
 4  Professional Reporter and Notary Public of the
 5  State of New York, do hereby certify:
 6      THAT, the witness whose testimony is herein
 7  before set forth, was duly sworn by me, and
 8  THAT, the within transcript is a true record of
 9  the testimony given by said witness.
10      I further certify that I am not related
11  either by blood or marriage to any of the parties
12  to this action; and that I am in no way
13  interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto set my
15  hand this day, September 29, 2020.
16
17
18  [signature: Randi C. Friedman]
19  Randi Friedman, RPR
```