UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KIMBERLY A. NEGRON, et al., | |
| Plaintiffs, | No. 16-cv-1702 (JAM) (Consolidated) |
| vs. | |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | |
| Defendant. | May 17, 2022 |

**PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENT OF FACTS
IN OPPOSITION TO SUMMARY JUDGMENT**

## I.   RESPONSES TO CHLIC'S LOCAL RULE 56(a)1 STATEMENTS[1]

1.      Cigna Corporation, together with its subsidiaries, including CHLIC, is a global health services organization which helps customers improve their health and well-being through a variety of insurance products and services. *See* Cigna Corporation Form 10-K for Fiscal Year Ended December 31, 2015, at 1, available at https://d18rn0p25nwr6d.cloudfront.net/ CIK0001739940/602c4fe7-ca7f-49c9-abc6-d29b33c33fb0.pdf.

RESPONSE:    Plaintiffs admit only that Cigna, with its subsidiaries, "is a global health services organization," and that CHLIC is a subsidiary of Cigna Corporation. Plaintiffs object because the assertion that Cigna Corporation "helps customers improve their health and well-being" is not material to the decision of the motion. Plaintiffs deny that Cigna or CHLIC were "helpful" to them or to the individuals in the classes they sought to certify in this action. Plaintiffs object because the self-serving, hearsay statements in Cigna Corporation's Form 10-K would not be admissible to establish this asserted fact.

2. Plan sponsors working with CHLIC to provide prescription drug benefits may choose to offer administrative services only ("ASO") plans (also known as self-funded plans) or fully insured plans. Ex. A, Deposition Transcript of Tyler Lester ("Lester Tr.") at 93:7–94:11. For ASO plans, plan sponsors use their own funds to pay for prescription drug benefits and contract with CHLIC to administer those benefits, whereas for fully insured plans, plan sponsors pay premiums to an insurance company for coverage of benefits due. *See id*. at 93:25–94:11, 331:22– 332:18.

RESPONSE:    Admitted.

---

[1] Lettered exhibits are attached to the Declaration of Brian Shaffer filed with Cigna's motion. Numbered exhibits are attached to the Declaration of Craig A. Raabe filed herewith.

3. CHLIC's administrative services may include access to a network of retail pharmacies that have agreed to fill participants' prescriptions at contracted prices. Ex. A, Lester Tr. at 332:19–333:13, 338:4–22.

RESPONSE:    Admitted.

4. Traditional "spread" pricing and pass-through pricing are the two most common types of benefit designs that plan sponsors select from to pay for prescription drug benefit costs. Ex. A, Lester Tr. at 345:20–347:8; 259:3–22. Spread pricing allows plan sponsors to negotiate predictable drug costs for the plan year and pay for pharmacy benefit management services through a differential or "spread" between the plan sponsor's negotiated cost and the amount of the pharmacy benefit manager's or its vendor's network pharmacy reimbursement. *Id*. at 210:10–18; 316:24–318:3. In pass-through pricing, the plan sponsor's drug costs are typically equal to the pharmacy reimbursement rates, but the costs for the plan's range of administrative services are paid as a separate recurring fee. *Id*. at 320:7–321:20; 347:19–348:13.

RESPONSE:    Plaintiffs admit the facts asserted in the first and third sentences.

Plaintiffs object to the second sentence as irrelevant because the Plans at issue did not provide for spread pricing and they deny the facts asserted in the second sentence. Specifically, the cited material states, in relevant part: "Most of our pharmacy clients do not pay fees for the services we provide. Instead those fees are earned through retail spread or potential margin at mail order pharmacies that we own but in that way the clients know what to expect from drug costs with the guarantees that we put in place . . . ." Often, the spread was not paid by plan sponsors, but by the members through inflated cost-shares. Ex. A, Lester Tr. at 316:24–317:19. Although Mr. Lester testified that spread-pricing clients "know what to expect from drug costs," it does not follow that non-spread-pricing clients would know what to expect from drug costs.

Plaintiffs dispute the use of the undefined terms "predictable drug costs" and "plan sponsors" as vague and unclear and dispute that only "[s]pread pricing allows plan sponsors to negotiate predictable drug costs." Additionally, Plaintiffs object because there is a lack of foundation that Mr. Lester can testify as to any plan sponsors' knowledge.

5. Plaintiff Kimberly Negron participated in an ASO plan administered by CHLIC that provided prescription drug benefits offered by her employer, Putnam Investments, Inc. ("Putnam"), during the relevant time period. Ex. B, Deposition Transcript of Kimberly Negron ("Negron Tr.") at 32:13–21, 55:5–56:4, 59:9–14; see also Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 9–13. See, e.g., Ex. D, CIGNA00002315; CIGNA00002358 (2014 Putnam Investments, Inc. ASO Agreement).

RESPONSE:   Admitted.

6. Ms. Negron never reviewed her plan documents in deciding whether to sign up for the plan, for purposes of understanding her benefits, or in determining whether to purchase prescription drugs under her plan. Ex. B, Negron Tr. at 56:20–57:6, 87:2–17, 89:2–90:20, 98:11–99:17, 129:4–18. When filling her prescriptions, Ms. Negron never discussed with the pharmacist how her cost share was determined for her prescription drug benefits. Ex. B, Negron Tr. at 72:3-10, 125:13–126:2, 145:4–11, and 189:2–6.

RESPONSE:    Plaintiffs object because these asserted facts are not material to the motion. Plaintiffs admit the materials cited support the fact that Ms. Negron "never reviewed her plan documents in deciding whether to sign up for the plan." Plaintiffs deny the remaining facts asserted in the first sentence and the materials cited do not support these assertions. Ms. Negron's testimony at 56:20–57:6 concerned her then-"current coverage" when she was deposed in 2020. Ms. Negron's testimony at 87:2–17 is that she did not "comb over every . . . section or

every document." Ms. Negron's testimony at 89:2–90:20 is that she "did . . . definitely browse

and . . . poke around, but [she] didn't read everything." Ms. Negron's testimony at 98:11-99:17 is

that "[she] didn't read the whole entire thing in full." Ms. Negron's testimony at 129:4–18 is *not*

that she never reviewed her plans documents, but that she does not *recall* reviewing the plan

booklets in effect in 2012, 2013, or 2014, which does not support the suggestion that she never

reviewed her plan booklets or that she never reviewed any summaries of her plan benefits.

Plaintiffs object to the term plan documents because it is vague.

For example, summaries of plan benefits are "plan documents" because they are frequently

referenced by participants in understanding their benefits.

Plaintiffs admit the facts asserted in the second sentence, but object to it because, due to

the gag clauses against network pharmacies, there is a factual dispute as to whether any

pharmacy could have or would have discussed overcharges with Ms. Negron.

7. Plaintiff Daniel Perry participated in an ASO plan administered by CHLIC that

provided prescription drug benefits offered by his employer, Hampton Affiliates, during the

relevant time period, participated in such benefits through his wife, a current employee of

Hampton Affiliates. Ex. E, Deposition Transcript of Daniel Perry ("Perry Tr.") at 27:3–28:21;

see also Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of

Interrogatories at 13–18. *See, e.g*., Ex. F, CIGNA00001817–CIGNA00001856 (2012 Hampton

Affiliates ASO Agreement).

RESPONSE:   Admitted.

8. Prior to joining this litigation, Mr. Perry never reviewed his plan documents to

understand how his prescription drug benefits were to be administered. Ex. E, Perry Tr. at 44:15-

45:7, 48:2–49:2, 51:20–53:24, 93:10–22, 136:21–37:15, 139:11–23, 146:1–6, 147:18–24, 154:8-

155:2. When filling his prescriptions, he never reviewed any documents or spoke with pharmacists concerning the cost share communicated to him at the point of sale. Id. at 42:10–24, 78:3–15, 191:23–192:4, 197:5–16, 207:8–20, 221:21–222:6, and 237:11–238:6. Even after learning of the purported "Clawback Scheme" and joining this lawsuit, Perry continued to purchase prescription drugs at the prices determined by CHLIC that he believed to be incorrect under his at-issue benefit plan. *Id*. at 167:23–168:9.

RESPONSE:    Plaintiffs object because the facts asserted in the first and second sentences are not material to the motion. Plaintiffs deny the facts asserted in the first sentence and the materials cited do not support these assertions. Mr. Perry's testimony at 44:15-45:7 is that he "can't say that [he] remember exactly reading them" but that he did "[t]humb[]  through them but not really paying a whole lot of attention[ b]ecause as we did an annual go through with the company, they basically explained to us what was — what our plan benefits were." Mr. Perry's testimony at 48:2–49:2 is that he did read "some of" "the packet." Mr. Perry's testimony at 51:20–53:24 is that he "thumb[ed] through [the 2012 plan documents] briefly as the company was going through them, not reading them, just thumbing through them to discuss as they discussed what our plan benefits were." The remaining cited materials also do not support the assertion in the first sentence. Mr. Perry testified that he "thumbed through" his 2012 plan (*id*. at 45:2-4) to understand his benefits and thus there is a genuine dispute about whether he "reviewed his plan documents to better understand how his prescription drug benefits were to be administered."

Plaintiffs deny the facts asserted in the second sentence and the materials cited do not support these assertions. Mr. Perry testified that he has not seen paperwork sent to his attorney by the pharmacy "completely" (*id*. at 42:10-24) and that he did ask the pharmacy to "to send any paperwork to my attorneys or to contact my attorneys . . . ." (*id*. at 197:5-16). Contrary to

Cigna's assertion, Mr. Perry did not testify that "he never reviewed any documents or spoke with pharmacists concerning the cost share communicated to him at the point of sale."

Plaintiffs object to the relevance of the assertion in the third sentence for four reasons. First, Mr. Perry did not know that he was being overcharged because he did not know how much the pharmacy was being paid for those transactions. Second, due to the gag clauses against network pharmacies, there is a factual dispute as to whether any pharmacy could have or would have discussed overcharges with Mr. Perry.  Third, even if Mr. Perry knew he was being overcharged since initiating this action (he did not), it is still a fact that he has actionable claims for transactions that occurred before he learned about the clawback scheme. Finally, the fact that Perry continued to "purchase drugs at prices determined by CHLIC" is not material because it means only that Perry required his medically necessary prescription drugs, not that he agreed to be overcharged by CHLIC.  Subject to these objections, Plaintiffs admits the contention asserted in the third sentence.

9. Plaintiffs Roger and Nina Curol, along with their two dependents, participated in an ASO plan administered by CHLIC that provided prescription drug benefits offered by Mr. Curol's employer, Island Operating Company, Inc., during the relevant time period. Ex. G, Deposition Transcript of Roger Curol ("R. Curol Tr.") at 23:1–24:18, 28:1:24; Ex. H, Deposition Transcript of Nina Curol ("N. Curol Tr.") at 30:4–32:9; see also Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 3–8. *See, e.g.*, Ex. I, CIGNA00001245–CIGNA00001279 (2015 Island Operating Company, Inc. ASO Agreement).

RESPONSE:    Admitted.

10. The Curols did not read their plan documents or know what their prescription drug costs or obligations were under their plan documents. They did not know how their prescription

drug cost shares were to be calculated under the terms of the plans. Ex. G, R. Curol Tr. at 25:4–17, 26:10–14, 36:1–15, 38:6–10, 49:15–20, 50:13–21, 58:21–59:10, 95:6–21, and 100:1–101:5; Ex. H, N. Curol Tr. at 34:6–22, 41:4–20, 47:6–9, and 52:7–53:13, 90:8–12. When filling their prescriptions, they never spoke with pharmacists about how their cost shares were adjudicated or determined. Ex. G, R. Curol Tr. at 84:19–22, 95:22–96:8, 102:1–8, 105:14–22, 134:1–19; Ex. H, N. Curol Tr. at 47:6–9, 63:19–24, 68:23–69:4, 84:11–85:17, 94:9–16. Even after learning of the purported "Clawback Scheme" and joining this lawsuit, the Curols continued to purchase prescription drugs at prices determined by CHLIC that they believed to be incorrect under their at-issue benefit plan. Ex. G, R. Curol Tr. at 85:6–10; Ex. H, N. Curol Tr. at 46:15–19, 83:15–23.

RESPONSE:    Plaintiffs object because these asserted facts are not material to the decision of the motion. Plaintiffs admit the facts asserted in the first and second sentences. Plaintiffs object to the third sentence because, due to the gag clauses against network pharmacies, there is a factual dispute as to whether any pharmacy could have or would have discussed overcharges with the Curols. Plaintiffs deny the facts asserted in the fourth sentence and the materials cited do not support these assertions. Mr. Curol testified at 85:6–10 that "[he] continued to fill [his] prescription drug benefits using [his] Island Operating Company Plan after [he] believed that Cigna was obtaining clawbacks." Ms. Curol testified at 46:15–19 that "[she has] continued to fulfill [her] prescriptions at Robichaux Pharmacy, while it was in business, after 2016 and through the end of 2017." These statements do not necessarily mean that the Curols knew that the amounts they paid after they joined this lawsuit were excessive. Indeed, the Curols had no visibility into whether their costs-shares were based on the amounts paid to the pharmacy. Accordingly, there is a genuine dispute about whether the Curols "continued to purchase prescription drugs at prices determined by CHLIC *that they believed to be incorrect* under their

at-issue benefit plan." Finally, the fact that Curols continued to "purchase drugs at prices determined by CHLIC" is not material because it means only that the Curols required their medically necessary prescription drugs, not that they agreed to be overcharged by CHLIC.

11. Plaintiff Billy Ray Blocker, Jr. participated in an ASO plan administered by CHLIC that provided prescription drug benefits offered by his employer, Cobb County, since starting his employment and during the relevant time period. Ex. J, Deposition Transcript of Billy Ray Blocker, Jr. ("Blocker Tr.") at 14:4–13; 17:2–20; see also Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 18–19; Ex. K, CIGNA12361815–48 (2014 Cobb County ASO Agreement).

RESPONSE:   Admitted.

12. Prior to joining this lawsuit, Blocker did not review his plan documents and was unaware of the prescription drug benefits described in his plan documents, relying instead on other individuals' assessments of which health plan was better. Ex. J, Blocker Tr. at 19:6–20:13; 31:20–22, 37:12–16, 57:11–20, 70:10–24; 141:1–5. When filling his prescriptions, he paid the cost share amount that the pharmacist told him to pay and was not aware of how that amount was determined, nor did he ever ask the pharmacist about what the pharmacy was being paid for the prescription drug or any other details regarding his cost share. *Id*. at 107:15–108:2, 109:7–11, 123:3–10, 134:16–135:4, 136:1–4, 137:23–138:3, and 159:4–11. Blocker was advised by pharmacists on occasion that it would be cheaper to purchase prescription drugs if he did not use his CHLIC-administered benefits. Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 25–26; Ex. J, Blocker Tr. at 94:23–95:9.

RESPONSE:   Plaintiffs object because these asserted facts are not material to the decision of the motion. Plaintiffs admit that "Blocker did not review his plan documents." But Plaintiffs

deny the contention that Mr. Blocker was "unaware of the prescription drug benefits described in his plan documents" and the materials cited do not support these assertions. The cited testimony was that Mr. Blocker did not recall seeing his plan booklet, but it does not follow that Mr. Blocker did not know his benefits because benefits may have been communicated to participants in other ways. The asserted fact also is not relevant because it is not material whether Mr. Blocker knew his plan benefits; what is material is that Mr. Blocker relied on the representations regarding the amount of cost-share that he owed. Plaintiffs object to the second sentence because, due to the gag clauses against network pharmacies, there is a factual dispute as to whether all network pharmacies could have or would have discussed overcharges with Mr. Blocker.  Plaintiffs admit the facts asserted in the third sentence.

13. Plaintiff Courtney Gallagher participated in a plan that provided prescription drug benefits offered by her employer during the relevant time period. See Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 8–9. Ms. Gallagher's employer initially had a fully insured plan that later switched to an ASO plan administered by CHLIC. See, e.g., Ex. L, CIGNA00381922–CIGNA00382009 (2015 Sivantos ASO Agreement). Ms. Gallagher does not allege that she ever reviewed her plan documents in deciding to join her plan or in filling any prescriptions, and also does not allege anything regarding her interactions with any pharmacist. Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 34.

RESPONSE:    Plaintiffs admit the facts asserted in the first and second sentences. Plaintiffs deny the facts asserted in the third sentence and the materials cited do not support these assertions. Ms. Gallagher's response at page 34 of her Second Amended Objections and Responses to CHLIC's First Set of Interrogatories states only that "[she] viewed the plan

documents online but does not recall specific dates." Plaintiffs admit that Ms. Gallagher did not allege particular facts regarding her interactions with any pharmacist, but she did describe in her interrogatory responses the general fact that she relied on the cost-share amounts that the pharmacists communicated to her and was injured when she paid them. *See generally id*.

14. As a service offered to its plan sponsor clients, CHLIC may generate a sample plan document containing plan language based on the client's benefit selections. The ultimate decision whether to use the sample plan document with its beneficiaries is the client's choice, not CHLIC's. Ex. M, CHLIC's Supplemental Objections and Responses to Plaintiffs' Fifth Set of Interrogatories at 5.

RESPONSE:    Plaintiffs object to this fact as immaterial to the motion.  The Plans Plaintiffs received are binding on Cigna.  Plaintiffs deny that the cited interrogatory response establishes whether Cigna's clients "made the ultimate decision whether to use the sample plan document" for each of Plaintiffs' Plans at issue.

15. OptumRx, Inc. ("Optum") is a wholly-owned subsidiary of UnitedHealth Group, a direct competitor of CHLIC. See UnitedHealth Group, Inc. Form 10-K, December 31, 2015, available at https://www.sec.gov/Archives/edgar/data/731766/000073176616000058/ 0000731766-16-000058-indEx.htm at 15, 23 (listing Optum as subsidiary and Cigna as direct competitor); Compl. ¶ 63 n.3; see also CHLIC's Answer to Compl. at ¶ 68 n.4.

RESPONSE:    Plaintiffs admit Optum is a subsidiary of UnitedHealth Group Incorporated ("UnitedHealth"). Plaintiffs object to and deny the remaining facts asserted in this paragraph and the materials cited do not support these assertions. The cited Form 10-K is hearsay and, in any event, states that UnitedHealth considers Cigna Corporation — not its subsidiary CHLIC — to be a competitor.

16. CHLIC and Optum are two completely separate, independent companies. They are not subsidiaries or affiliates of one another, and there is no overlap in management or ownership. See UnitedHealth Group 2015 Form 10-K, at 15, 23 (listing Optum as subsidiary and Cigna as direct competitor); Exhibit 21 to Cigna's 2015 Form 10-K (listing CHLIC as a subsidiary) available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001739940/602c4fe7-ca7f-49c9-abc6d29b33c33fb0.pdf; *see also* Compl. ¶¶ 66–68, 268.

RESPONSE:    Admitted with the exception that CHLIC participated in the management of some of Optum's affairs.  *See* Opp. at 4-7.

17. In 2013, CHLIC contracted with Catamaran PBM of Illinois, Inc. ("Catamaran"), which was acquired by Optum in 2015 (Catamaran and Optum referred to hereinafter as "Optum"). See Ex. N, Declaration of Danielle Wefelmeyer ("Wefelmeyer Decl.") at ¶ 3. Since 2013, CHLIC has contracted with Optum to provide access to some or all of Optum's retail pharmacy network for CHLIC's customers, which comprises retail pharmacies that agree to certain terms and conditions set forth in contractual arrangements—direct or indirect—with Optum. Ex. A, Lester Tr. at 10:21–11:23, 333:14–334:18; see also Ex. O, CIGNA00002368, Excerpts of Pharmacy Benefit Management Agreement ("PBM Agreement").

RESPONSE:    Admitted.

18. The PBM Agreement dictated the terms of CHLIC's access to Optum's network, including the rates CHLIC paid Optum for the prescription drugs that Optum's network pharmacies provided to participants in CHLIC's clients' plans. Ex. N, Wefelmeyer Decl. ¶ 3.

RESPONSE:    Admitted.

19. Optum was not involved in drafting plan documents for the participants in plans insured or administered by CHLIC and did not have knowledge of or access to those documents.

Ex. N, Wefelmeyer Decl. ¶ 5. Optum also did not have knowledge regarding CHLIC's

agreements with plan sponsors and was not privy to the financial or pricing arrangements

between them. *Id*. at ¶ 6.

RESPONSE:   Admitted.

20. The PBM Agreement creates an independent contractor relationship between CHLIC

and Optum. Ex. O, PBM Agreement § 24.7 ("The Parties to this Agreement are independent

contractors. No Party is an agent, representative or partner of any other Party … This Agreement

shall not be interpreted or construed to create an association, agency, joint venture or partnership

between the Parties or to impose any liability attributable to such a relationship upon any

Party.").

RESPONSE:   Plaintiffs admit that the quoted language is found in the cited materials; but

Plaintiffs object to the materiality of this fact and deny that the materials cited support the

contention that an independent contractor relationship was formed. The question of whether such

a relationship was formed is a disputed mixed issue of law and fact.  "[T]he general principle [is]

that labels are not dispositive of the question." *Steinbeck v. Steinbeck Heritage Found*., 400 Fed.

Appx. 572, 575 (2d Cir. 2010) (citing Restatement (Third) of Agency § 1.02).

21. The PBM agreement lays out a dispute resolution process, stating that "[i]f the Parties

fail to make or agree upon a necessary business, operational or compliance-related decision or

action relating to this Agreement or fail to resolve a disagreement with respect to any material

business, operational or compliance-related matter relating to this Agreement within five (5)

Business Days of a written request made by either Party to make such decision or resolve such

disagreement, either Cigna or PBM may make a written request to escalate the matter to the

officer level (an "Officer Escalation Notice") … If such senior officers are unable to resolve any

such unresolved matter within five (5) Business Days after such senior officers have conferred, Cigna or PBM may make a written request to escalate the matter to the senior management level ("Senior Management Escalation Notice")." *Id*. § 9.2.

RESPONSE:     Plaintiffs admit the facts asserted but object to its materiality to the motion.

22. Optum was responsible for maintaining its retail pharmacy network. CHLIC was not a party to Optum's network pharmacy contracts. Ex. A, Lester Tr. at 11:9–19, 22:20–23.

RESPONSE:     Admitted that CHLIC was not a direct party to Optum's network pharmacy contracts.

23. Optum did not share in or receive any of the alleged "Clawback" amounts allegedly paid to CHLIC. *See* Ex. P, Optum's Responses to Plaintiffs' Second Interrogatories at 7; *see also* Ex. Q, CHLIC's Responses and Objections to Plaintiffs' Second Interrogatories at 14; Ex. A, Lester Tr. at 11:6–19 and 18:25–19:5; see also Ex. R, Schedule 20 to the PBM Agreement; Ex. S, Amendment 2 to the PBM Agreement.

RESPONSE:     Admitted.

24. Optum maintains its own records detailing its transactions with pharmacies in its retail network separate from CHLIC's records, and it does not share such records with CHLIC. Ex. A, Lester Tr. at 336:10–337:2.

RESPONSE:     Plaintiffs deny the facts asserted in this paragraph and Mr. Lester's cited testimony does not support these assertions. Mr. Lester testified at 336:10–337:2 in relevant part as follows: "So as we entered into the relationship with Optum, one of the requirements of the contract was Cigna providing a daily feed of claims information to Optum so there was a daily feed sent from Argus to Cigna that Cigna then sent to Optum so Optum could use that data to manage our relationship and potentially to I don't know how it was used with their broader

networks relationship." Further, Mr. Lester testified in his individual deposition at 17:24-18:13: "The way that operated at the time is Optum would provide pricing information to Cigna for Cigna to provide to Argus for adjudication so there wasn't a direct connection. I'm not sure of the actual reason why, whether it was contractual between Optum and Argus, but in those cases Cigna acted as a go between, an intermediary to take whatever pharmacy rates, whatever pharmacy that should be in the network, they would provide them to Cigna and we would pass that information through to Argus to set up the Argus plan adjudication system." *See* Ex. 2 at 17:24-18:13.

25. CHLIC transacted business with Optum at arm's length, with each company acting in its own self-interest. See, e.g., Ex. T, Deposition Transcript of Stephanie Byrne ("Byrne Tr.") at 84:19–87:22.

RESPONSE:    Plaintiffs object to the phrase "transacted business with Optum at arm's length" as a legal conclusion, not a fact, and because it is ambiguous — *i.e.*, reasonable individuals may interpret that term differently. To the extent that phrase means that the Optum–CHLIC relationship operated without improper influence or undue pressure, Plaintiffs deny this assertion, and the materials cited do not support this assertion. *See id*. at 84:19–87:22.  Further, Plaintiffs deny that CHLIC acted at "arm's length" with Optum in that CHLIC did not intend to, and did not in fact, comply with the terms of its contract with Optum in that it required Optum to charge cost-shares that violated the terms of Plaintiffs' Plans. *See* Opp. at 4-7.

26. During the course of their contractual relationships with each other, CHLIC and Optum sometimes experienced disagreements and disputes over the terms of their agreements. *See id*. at 84:19–87:22.

RESPONSE:   Plaintiffs admit only that the testimony of Ms. Byrne cited discusses a single disagreement between CHLIC and Optum.

27. Optum was careful in deciding whether to share its own confidential or proprietary information with CHLIC. *See, e.g.,* Ex. U, ORX_00006120 (internal Optum email chain showing that it was up to Optum whether or not to share its information with CHLIC, particularly regarding its pharmacy pricing data).

RESPONSE:   Plaintiffs object to the general nature of the factual assertion, to its materiality to the motion and to an assertion of another's state of mind. Plaintiffs deny that the materials cited support the facts asserted in the first sentence. The email cited by CHLIC shows only that a single individual within Catamaran's Business Intelligence & Clinical Product Development division believed that the authority to decide whether to permit access to a specific data field was held by a different division, *i.e.*, Catamaran's Business/Finance Team.

28. CHLIC and DST Pharmacy Solution Systems, Inc. ("Argus") are two completely separate, independent companies, are not subsidiaries or affiliates of one another, and have no overlap in management or ownership. Compl. ¶¶ 66–67, 69, and 268. CHLIC does not participate on or control Argus' board of directors or executive management team. Ex. V, Deposition Transcript of Michelle Emanuel-Johnson ("Emanuel-Johnson Tr.") at 149:22–150:3.

RESPONSE:   Plaintiffs object to the term "control" as a legal conclusion, not a fact, and as ambiguous. Plaintiffs admit that CHLIC did not have a seat on the Optum board or a formal position on the Optum executive management team. Plaintiffs deny that the materials cited support the remaining facts asserted in the first sentence. To the contrary, there is sufficient evidence from which a jury could reasonably infer that CHLIC played some part in controlling or participating in the affairs of Argus or Optum. Ex. 1 at 9, 22, 26; Lester Tr., Ex. 2, at 152:10-

15; Ex. 5, at 1; Ex. 3 at 36; Emanuel-Johnson Tr., Ex. 8, at 10:23-11:19, 20:24-21:4; 22:15- 23:7; 8:21-9:17; Ex. 6 at 4, 6, 7, 30; Ex. 7 at 1, 5, 8, 11; Byrne Tr., Ex. 9, at 77:9-19; Ex. 29 at 177316-317; Ex. 26 at 491624; Ex. 30 at 433127; Ex. 31 at 180952; Ex. 32 at 309576-577; Ex. 33 at 7504938; Ex. 34 at 180852, 56, 59; Ex. 35 at 192937; Ex. 37 at 158092; Ex. 38 at 55857; Ex. 28 at 367625.

29. Since 2008, CHLIC has contracted with Argus, which served as the claims processor for pharmacy benefit claims and managed the point of sale transactions for prescription drug benefits for all of CHLIC's pharmacy business. Ex. A, Lester Tr. at 12:3–21; see also Ex. X, CIGNA00002133, Master Services Agreement ("MSA"). Argus served as a pharmacy transaction administrator for CHLIC throughout the relevant time period. Ex. A, Lester Tr. at 13:20–25.

RESPONSE:    Admitted.

30. CHLIC has never exercised control over Argus' business operations or systems. Ex. V, Emanuel-Johnson Tr. at 156:7–157:6 ("[CHLIC] didn't exercise any control in terms of how we operated the business or systems.").

RESPONSE:    Plaintiffs object to the term "control" as a legal conclusion, not a fact, and they deny this statement and that the materials cited support the facts asserted in this paragraph. To the contrary, Ms. Emanuel-Johnson testified at 156:7-157:6 that CHLIC did have some control: "Where they did have control is what we should be leveraging in terms of editing how we would communicate with pharmacies and potentially think third parties on their behalf, so depending upon the nature of what the function was in the relationship they did have the ability to state how we did certain things." *Id*. at 156:21-157:6. There is additional evidence from which a jury could reasonably infer that CHLIC played some part in directing or participating in the affairs of Argus

or Optum. Ex. 1 at 9, 22, 26; Lester Tr., Ex. 2, at 152:10-15; Ex. 5, at 1; Ex. 3 at 36; Emanuel-Johnson Tr., Ex. 8, at 10:23-11:19, 20:24-21:4; 22:15- 23:7; 8:21-9:17; Ex. 6 at 4, 6, 7, 30; Ex. 7 at 1, 5, 8, 11; Byrne Tr., Ex. 9, at 77:9-19; Ex. 29 at 177316-317; Ex. 26 at 491624; Ex. 30 at 433127; Ex. 31 at 180952; Ex. 32 at 309576-577; Ex. 33 at 7504938; Ex. 34 at 180852, 56, 59; Ex. 35 at 192937; Ex. 37 at 158092; Ex. 38 at 55857; Ex. 28 at 367625.

31. The MSA creates an independent contractor relationship between CHLIC and Argus. Ex. X, MSA § 4.5 ("The parties intend that [Argus] is an independent contractor and not an agent of [CHLIC]."). The MSA further provides that CHLIC "will neither have nor exercise control or direction over the means and methods by which Supplier [Argus] will perform the Services."); *id.* at § 3.1.

RESPONSE:    Plaintiffs admit that the quoted language is found in the cited materials; but Plaintiffs object to the materiality of this fact and deny that the materials cited support the contention that an independent contractor relationship was formed. The question of whether such a relationship was formed is a disputed mixed issue of law and fact.  "[T]he general principle [is] that labels are not dispositive of the question." *Steinbeck v. Steinbeck Heritage Found.*, 400 Fed. Appx. 572, 575 (2d Cir. 2010)(citing Restatement (Third) of Agency § 1.02).

32. CHLIC's contract with Argus was for claims processing and nothing more. Ex. V, Emanuel-Johnson Tr. at 8:21–9:13.

RESPONSE:    Plaintiffs deny this asserted fact, and the materials do not support the facts asserted in this paragraph. This asserted fact is contradicted by CHLIC's contracts with Argus. *See* Ex. 1 ¶4 at 3; Ex. 4. at 1. Indeed, CHLIC asserts at ¶ 34, below, that Argus provided "other services" to CHLIC.

33. Argus negotiated its contracts with CHLIC using practices that are similar to what Argus uses with all of its customers; that Argus's contractual arrangement with CHLIC is similar to Argus's contractual arrangements with its other clients; and there is nothing significantly different with Argus's contractual relationship with CHLIC as compared to Argus's contractual relationships with its other clients. Ex. V, Emanuel-Johnson Tr. at 160:2–9; 172:2–11.

RESPONSE:    Plaintiffs deny the facts asserted in this paragraph and the materials cited do not support these assertions. Ms. Emanuel-Johnson's testimony at 160:2–9 is that "[t]he system that Argus uses to adjudicate point of sale transaction for Cigna, is that the same system that Argus uses to adjudicate point of sale transactions for Argus' other customers." And, her testimony at 172:2–11 is that "the process where benefit plan design information through various processing rules would be provided to Argus by Cigna" is "the same process that Argus used with its other customers." These two statements do not support the factual contentions that "Argus's contractual arrangement with CHLIC is similar" to other contractual arrangements and that "there is nothing significantly different" between the "processing rules" "provided to Argus by Cigna" and the processing rules of other customers.

34. Under the MSA, CHLIC reimbursed Argus based on the number of claims it processed and other services provided to CHLIC. Ex. W, DSTPS000027–30; *see also* Ex. X, CIGNA00002133–2266 (Argus's contractual fee schedule setting "per paid claim fee" at different tiers depending on the volume of claims processed); *see* Ex. V, Emanuel-Johnson Tr. at 158:21-159:5 (CHLIC compensated Argus pursuant to the parties' contract, and Argus would receive the same fee per paid claim regardless of how it adjudicated the claim).

RESPONSE:    Admitted.

35. Optum contracted with CHLIC to provide pricing to CHLIC, and Argus would adjudicate participants' cost shares in accordance with the contracted rates between Optum and CHLIC. Ex. V, Emanuel-Johnson Tr. at 17:20–18:13.

RESPONSE:   Plaintiffs deny the facts asserted in this paragraph and the materials cited do not support these assertions. On the contrary, Ms. Emanuel-Johnson's testimony at 17:20-18:13 is that Argus did not "provide services to a pharmacy benefit manager called Catamaran [Optum]." Cigna breached the cost-share terms of the Argus contract by directing Argus to calculate cost-share amounts that were greater than the plan permitted. So, Argus did not adjudicate in accordance with CHLIC contract. *See* Opp. at 4-7; *see, e.g.*, Ex. 5 at 1 ("[CHLIC] shall be responsible for the accuracy of all Benefit Plan Design information provided to Supplier"); Ex. 3 at 34 ("Benefit Plan Design means the terms, scope, and conditions for Covered Drug benefits under a Company Plan, including . . . applicable Cost Share . . . .").

36. Argus did not share in or receive any of the alleged "Clawback" allegedly paid to CHLIC. See Ex. Q, CHLIC's Responses and Objections to Plaintiffs' Second Interrogatories at 14; Ex. A, Lester Tr. at 11:6–19, 18:25–19:5.

RESPONSE:   Admitted.

37. CHLIC transacted business with Argus at arm's length, with each company acting in its own self-interest. See, e.g., Ex. Y, DSTPS000863 (email between CHLIC and Argus requested Argus' feedback on CHLIC's requests, indicating that CHLIC was receptive to Argus' input and that CHLIC was not simply directing Argus to perform work without any input from Argus); Ex. Z, DSTPS003642 (an internal Argus communication states that CHLIC needed to submit a formal Scope & Assess before Argus could proceed with work).

19

RESPONSE:   Plaintiffs object to the phrase "transacted business with Argus at arm's length" as a legal conclusion, not a fact, and because it is ambiguous — *i.e.*, reasonable individuals may interpret that term differently. To the extent that phrase means that the Argus–CHLIC relationship operated without collusion or undue pressure, Plaintiffs deny this assertion. Plaintiffs further deny that the materials cited support the facts asserted in this paragraph. Exhibit Y is an email thread, dated October 16, 2013, which includes an email from CHLIC's Julie Burns-McAvoy where she states that "Cigna would like to get Argus' feedback on a few possible requests." Exhibit Z is an email thread, dated January 29, 2014, which appears to contain a request from Cigna for information to support running "Pharmacy Over Payment Regression Testing for Cigna Home Delivery Pharmacy."

These vague emails do not support the contention that there is no genuine dispute about whether CHLIC and Argus always transacted business at arm's length with each company always acting in its own self interest. As explained above, there is sufficient evidence from which a jury could reasonably infer that CHLIC played some part in directing the affairs of Argus or Optum. Ex. 1 at 9, 22, 26; Lester Tr., Ex. 2, at 152:10-15; Ex. 5, at 1; Ex. 3 at 36; Emanuel-Johnson Tr., Ex. 8, at 10:23-11:19, 20:24-21:4; 22:15- 23:7; 8:21-9:17; Ex. 6 at 4, 6, 7, 30; Ex. 7 at 1, 5, 8, 11; Byrne Tr., Ex. 9, at 77:9-19; Ex. 29 at 177316-317; Ex. 26 at 491624; Ex. 30 at 433127; Ex. 31 at 180952; Ex. 32 at 309576-577; Ex. 33 at 7504938; Ex. 34 at 180852, 56, 59; Ex. 35 at 192937; Ex. 37 at 158092; Ex. 38 at 55857; Ex. 28 at 367625. Further, Plaintiffs deny that CHLIC acted at "arm's length" with Argus in that CHLIC did not intend to, and did not in fact, comply with the terms of its contract with Argus in that it required Argus to process cost-shares that violated the terms of Plaintiffs' Plans. *See* Opp. at 4-7; *See, e.g.*, Ex. 5 at 1 ("[CHLIC] shall be responsible for the accuracy of all Benefit Plan Design information provided

to Supplier"); Ex. 3 at 34 ("Benefit Plan Design means the terms, scope, and conditions for Covered Drug benefits under a Company Plan, including . . . applicable Cost Share . . . .").

38. CHLIC and Argus at all times acted pursuant to their contractual obligations to each other. Ex. V, Emanuel-Johnson Tr. at 155:15–156:6.

RESPONSE:    Plaintiffs deny that the materials cited support the facts asserted in this paragraph. Ms. Emanuel-Johnson's testimony at 155:15–156:6 is that under the agreement, "Cigna will neither have nor exercise control or direction over the ***means and methods*** by which the Supplier will perform the Services." (Emphasis added.) As explained in detail in Plaintiffs' memorandum, Cigna did exercise control over the benefit specifications used by Argus to adjudicate claims. And, by providing false benefit specifications, Cigna did not "act[] pursuant to [its] contractual obligations" to Argus. CHLIC did not intend to, and did not in fact, comply with the terms of its contract with Argus in that it required Argus to process cost-shares that violated the terms of Plaintiffs' Plans. *See* Opp. at 4-7; *See, e.g.*, Ex. 5 at 1 ("[CHLIC] shall be responsible for the accuracy of all Benefit Plan Design information provided to Supplier"); Ex. 3 at 34 ("Benefit Plan Design means the terms, scope, and conditions for Covered Drug benefits under a Company Plan, including . . . applicable Cost Share . . . .").

39. Plaintiffs have at times generally asserted that misrepresentations occurred "at the point of sale," i.e., when they went into a pharmacy to have a prescription filled and paid a copayment. *See* Complaint ¶¶ 276, 284–86*; see also* Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 20–22.

RESPONSE:    Admitted.

40. In response to interrogatories served by CHLIC, each of the Plaintiffs stated that they would provide details about the particular point-of-sale interactions that they contend constituted

misrepresentations evidencing the alleged scheme to defraud after the completion of fact discovery, though they never did so. *See* Ex. C, Pls.' Second Am. Objections and Responses to CHLIC's First Set of Interrogatories at 20–22. Plaintiffs never responded further or supplemented their responses to these interrogatories with any evidence regarding what was said to them by whom, where the interaction occurred, for what prescription, on what date, how much they paid, or what (if anything) was said about that price.

RESPONSE:    Plaintiffs admit the facts asserted in the first sentence except deny "though they never did so," and they deny the fact asserted in the second sentence. On November 11, 2020, Plaintiffs' counsel served on Cigna's counsel Plaintiffs' Supplemental Interrogatory Responses to CHLIC's First Set of Interrogatories. *See* Ex. 45.

## II. ADDITIONAL MATERIAL FACTS

1.      Cigna used Argus to adjudicate the prescription drug claims, including Plaintiffs' claims. Answer [ECF 145] at ¶ 43; 2008 Restated Agreement., Ex. 1,[2] at 1  ("2008 Argus Agreement"); Deposition of Tyler Lester, Ex. 2, at 12:3-10 ("Lester Tr.").

2.      Cigna used Optum's network of pharmacies to fill prescriptions for Cigna's members, including Plaintiffs' prescriptions, and to collect the cost-share payments and to remit them up to Optum and then to Cigna.  Answer ¶ 42; Lester Tr., Ex. 2, at 11:6-23, 12:22-13:11.

3.      Argus processed claims pursuant to "Plan Specifications" that Cigna represented were based on Cigna's Plan language.  2008 Argus Agreement, Ex. 1, at 19-21, 26.

4.       Cigna had sole responsibility to "provide ARGUS with the Plan Specifications for such Benefit Plan in order for Processing Claims under such Benefit Plan."  *Id*. at 22, 26.

5.      Argus was required to "process such Claims consistent with the instructions, values and coding programmed and loaded therein for Cigna-provided files . . . and Plan Specifications . . . ."  Argus had no role in determining the adjudication logic that determined the amount of the cost-share and, therefore, had no role in determining the amount of the cost-shares that resulted from Argus computers applying Cigna's logic. *Id*. at 22.

6.      Argus had no access to Cigna's Plans, Lester Tr., Ex. 2, at 152:10-15, and the Argus Agreement provided that "CIGNA acknowledges and agrees that ARGUS has no responsibility to interpret Plans to resolve coverage issues and is merely applying the Plan Specifications programmed into [the processing program] to submissions of Claims," 2008 Argus Agreement, Ex. 1, at 22.

---

[2] Numbered exhibits are attached to the Declaration of Craig A. Raabe filed herewith.

7.      The Cigna/Argus relationship and responsibilities were reinforced in a 2016 "Master Services Agreement," Ex. 3, and "Statement of Work No. 1," Ex. 4.  Schedule A-1 to the Statement of Work specified that "Supplier [Argus] shall obtain and receive Benefit Plan Design information from Company [Cigna] for each Company Plan . . . .  Company [Cigna] shall be responsible for the accuracy of all Benefit Plan Design information provided to Supplier [Argus]."  Statement of Work No. 1, Schedule A-1, Ex. 5, at 1.

8.      The members' cost-share responsibility was Cigna's sole responsibility under the Benefit Plan Design, with the cost-share responsibility being defined in the Master Services Agreement as "the amount that a Company [Cigna] Customer is required to pay under the terms of the applicable Company Plan for a Covered Drug."  Master Services Agreement at 36; deposition of Michelle Emanuel-Johnson, Ex. 8, at 10:23-11:19, 20:24-21:4, 22:15- 23:7; 8:21-9:17 ("Emanuel-Johnson Tr."); Lester Tr., Ex. 2, at 152:10-15; SJ Memo. at 14.  Cigna created and sent to Argus a Word or Excel document that directed Argus what "co-pay logic" to use for Cigna's clients.  Emanuel-Johnson Tr., Ex. 8, at 20:3-22:7, 26:4-30:22; 36:10-16.

9.       The Pharmacy Benefit Management Agreement dated June 10, 2013 ("Optum Agreement") provided that Cigna "shall have full control and authority over Cigna Plans and Benefit Plan Designs" and that Cigna "shall have full control and authority with respect to all Cigna Clients and/or Cigna's and its Affiliates business generally."  Optum Agreement, Ex. 6, at Art. II, § 2.4 at 30.

10.     The "Cigna Clients" over whom Cigna retained "full control and authority" included "any Person or group of Persons" with whom Cigna contracted to provide benefits, including "some or all employees, members, beneficiaries or other individuals associated with such Person or Group of Persons."  *Id.* at Art. I, § 1.1 at 4.

11.     The cost-share element of the Benefit Plan Designs over which Cigna maintained "full control and authority" was defined in the Optum Agreement as "the amount that a Cigna Customer is required to pay under the terms of the applicable Cigna Plan for a Covered Drug." *Id*. at Art. I, § 1.1 at 7.

12.     Cigna did not provide Argus or Optum with "knowledge of or access to" Cigna's plan documents.  SJ Memo. at 14.

13.     Optum made available to Cigna a network of pharmacies.  *Id*. at Art. III, § 3.1(a)(iv) at 31; Schedule 8 to Optum Agreement, Ex. 7; Answer ¶ 42 [ECF 145].  Schedule 8 provided that Optum "shall negotiate contract, create, and maintain network(s) of Participating Pharmacies that are available to provide prescription drug benefits for or under Included Plans and to Cigna Customers."  Schedule 8, Ex. 7, § 2.1 at 1.

14.     Optum entered into "Participating Pharmacy Contracts" and Cigna had the right to review the terms of those contracts and force compliance with the Optum Agreement.  Schedule 8, Ex. 7, §§ 4.2 & 4.3 at 8.

15.     Cigna had the right to terminate a pharmacy from Optum's network.  *Id*. § 2.3.7 at 5.

16.     Optum had to ensure that its network pharmacy communications with Cigna's members were "consistent with Cigna's marketing strategies, brand management initiatives and other reasonable Cigna goals, initiatives and plans."  *Id*. § 5.7.1(c) at 11.

17.     To fill a prescription, a Cigna member, including Plaintiffs, would present his or her prescription to the Optum network pharmacy, which would enter the prescription information into a computer.  Argus' system would instantaneously process the prescription based on the false cost-share logic that Cigna created and required Argus to use. Argus would then inform

the Optum network pharmacy the amount of the cost-share to charge the member. Emanuel-Johnson Tr., Ex. 8, at 37:9-39:3.

18.     The flow of funds was handled through a periodic reconciliation.  Argus would fund the pharmacies at the point-of-sale, Cigna would fund Argus, and Optum would fund Cigna.  Lester Tr., Ex. 2, at 166:23- 167:22.  The "clawbacks" were "nett[ed] out" in the reconciliation between Optum and Cigna, *id.,* and, thereby, Optum "sen[t] the spread back to Cigna," Deposition of Stephanie Byrne, Ex. 9, at 77:9-19 ("Byrne Tr.").

19.     Cigna's CEO served as the "sponsor" for the scheme, euphemistically called the "Pharmacy Over Payments" project. Ex. 10 at 199867.

20.     "Clawbacks" were a "top priority" due to the fact that, without them, "Cigna [wa]s losing approximately $100M a year."  Ex. 11 at 248002; Ex. 12 at 56019.

21.     Implementation of "clawbacks" was an "urgent request from management" to "react to a missed revenue opportunity."   Ex. 13 at 54923-24.

22.     Christopher Hocevar referred to the money that Cigna obtained through "clawbacks" as "trapped money." Deposition of Christopher Hocevar, Ex. 14, at 100:19-101:2, 113:25-114:9; 141:25-142:9. ("Hocevar Tr.").

23.     The "trapped money" was "spread" and, when paid to Cigna through the reconciliation process, constituted the "clawback" amount.  *Id*. at 100:19-101:2, 113:25-114:9; 121:7-21.

24.      Knowledgeable Cigna employees told management that there were "inconsistencies between plan language and how we administer" claims.   Ex. 15 at 4.

25.     Cigna referred to these "inconsistencies" as "gapped language." Ex. 15 at 2.

26.     In a 2013 email exchange, knowledgeable Cigna employees confirmed that the Plan language at issue, known internally as "copay G logic," entitled members to cost-share amounts

that compared three factors:  (1) the stated copay amount, (2) the usual and customary pharmacy charge, and (3) the amount "agreed to by the pharmacy with Cigna."  Ex. 16 at 7435181. In the email, a Cigna employee wrote, "The member will always pay the lowest of these three amounts."  *Id*. The email also gave an example of how the cost-share logic should have worked.

27.     In another 2013 email exchange, knowledgeable Cigna employees similarly stated:  "Our copay logic looks at the copay, U&C, and allowed cost . . . .  This ensures the customer pays the ***lowest*** amount.  The allowed cost is based on our contract with the pharmacy — the reimbursement amount we agree to for a drug for a pharmacy."  Ex. 17 at 246200.

28.     In a document that Cigna used to educate its sales force as to how its copay logic worked, Byrne Tr., Ex. 9, at 59:4-7, Cigna explained how the copay G logic at issue in this case was modifying prior "copay K" language.   Ex. 18 at 50555. The document explained that copay K only had two comparison points:  the stated copay and the usual and customary charge.  *Id*.  The document noted that "[t]his method often results in the pharmacy charging the customer more than Cigna's allowed cost, or the cost at which Cigna has agreed to reimburse the pharmacy for any given drug."  *Id*. (emphasis added). Cigna further explained to its sales force that "[t]he new standard method, Copay G, adds a third point in the price comparison — the allowed cost.  With the Copay G method, the customer pays the lowest of the applicable copay, U&C, or allowed cost. *This guarantees that the customer will pay the lowest possible price.*"  *Id*.  (emphasis in original). The document provided an example of how the logic worked.

29.     Cigna knew that the language at issue in this case entitled all members with that language, including Plaintiffs, to pay cost-share amounts that never would exceed the amount paid to the pharmacy for any particular prescription drug.  Ex. 19 at 102075; Ex. 20 at 185904; Ex. 21 at 50557; Ex. 22 at 212990.

30.     In early 2013, draft language was circulated in conjunction with "Pharmacy benefit release 2013." *See, e.g.*, Ex. 23 at 1; Ex. 24 at 1. The draft proposed striking "to the pharmacy" from the Copay G Language. *Id.* However, the change was not made.

31.     When Cigna employees reviewed the plan language in 2016, employees predicted that Cigna would face "a lawsuit by a customer." Ex. 25 at 491453.

32.     Cigna employees contemporaneously described "clawbacks" as "unreasonable" and "egregious," Ex. 26 at 491619, and could not "believe we can live with ourselves charging the member 172% more than what [a] drug costs," *id*. at 491623.

33.     Another employee wrote, "it seems strange that Cigna would charge a member for a copay that exceeds the ingredient cost + dispensing fee + tax, if applicable [*i.e.,* the amount that Cigna paid the pharmacy].  To me that is no longer a 'co'pay, but more of a single (over)payment by the customer."  Ex. 27 at 54926.

34.     In one of Plaintiff Negron's transactions, Cigna required Argus to adjudicate and required Optum, through its network pharmacy, to collect a copayment of $10.00, even though the pharmacy was only being paid $6.06 for that prescription drug, resulting in a $3.94 "clawback." Declaration of Launce B. Mustoe, Jr., R.Ph. ¶ 4.

*35.*    Cigna's Vice President of Pharmacy expressed disbelief that its "uneducated" members had figured out that Cigna was "clawing back" "spread." When a subordinate asked the vice president "how does this person know about a 'spread,'" the vice president responded, "no clue." Ex. 28. at 367625

36.     The 2008 Argus Agreement provided that "Proprietary Information shall also mean all information . . . pertaining to CIGNA's business and services, Plan Specifications, and the

identity of or any information concerning Members of CIGNA's Plans, customers and Providers." 2008 Argus Agreement, Ex. 1, § 14(a) at 9.

37.     The Optum Agreement defined "Confidential Information" broadly to include all of Cigna's "information relating to costs, profits . . . pricing policies, operational methods or business affairs." Optum Agreement, Ex. 6, Art. I, § 1.1 at 6-7.

38.     A form Optum network pharmacy agreement provided that the "Pharmacy will not share information concerning the terms of this Agreement or other proprietary information, including but not limited to, reimbursement rates and pricing as provided to Pharmacy . . . ." Ex. 29 ¶ 3.3 at 177316.

39.     A Cigna employee wrote:  "This provider has been telling the member many things that should not be shared as it is not the members' issue.  [Cigna] need[s] to educate the provider as to not to discuss reimbursements with the member or reach out directly to the employer regarding the problem." Ex. 26 at 491624.

40.     A Cigna employee wrote that "Cigna should avoid explaining the 'spread pricing' model." Ex. 30 at 433127.

41.     Cigna, through Optum, prohibited a network pharmacy from charging less than the cost-share amounts that Cigna directed. Cigna retained "full control and authority" over its plan benefits and members. Optum Agreement, Ex. 6, at Art. II, § 2.4 at 30.

42.     The agreements that Optum had with its network pharmacies required that pharmacies "with respect to any Claim, collect any Copayment indicated in the claim response message from Catamaran to the Pharmacy in the exact amount specified in that message." Ex. 29 ¶ 3.1(*l*) at 3.

43.     Cigna considered Optum network pharmacy clauses "compulsory." Ex. 31 at 180952.

44.     When one pharmacist labeled deductible "clawbacks" a "[n]ew ponzi scheme," Cigna's

"Pharmacy Network Operations" a Cigna employee stated, "I explained that [the pharmacist] is

not to discuss reimbursement matters with members."  Ex. 32 at 309576-577.

45.     After a pharmacy disclosed Cigna's "clawback" scheme to a customer, a Cigna employee

wrote that "our network pharmacies are contractually prohibited from discussing pricing with

our customers. . . .  Should the pharmacy continue to break their contract, Juan advised that they

would be reviewed for possible termination from the network."  Ex. 33 at 7504938.

46.     A Human Relations employee of a Cigna client contacted Cigna about a pharmacist's

concerns "about the way CIGNA is billing participants and charging her back for portions of the

prescription cost." Ex. 34 at 180859. The HR employee wrote, "It looks like the employee is

paying the pharmacy the negotiated price, plus paying CIGNA as well." *Id*. at 180856. Because

"[o]ne of Cigna's earnings driver[s] [wa]s spread pricing on generic prescriptions" (albeit

unknown to members), Ex. 35 at 192937, Cigna worked to prohibit disclosures to the client

about the "clawbacks."  To its own customer service representative, Cigna explained "to answer

your question so you can understand, yes, the $7.73 comes back to Cigna as it is above the

Pharmacy's contracted reimbursement rate which calculated to $11.36. I do not believe you

should be communicating this to the Client nor should you be discussing pharmacy

reimbursement with the client." Ex. 34 at 180852.

47.     Cigna directed Optum to warn the pharmacist against such disclosures: "Catamaran [now

Optum] reached out to the pharmacy and spoke with Ann [pharmacist] . . . C[atamaran] advised

Ann that she cannot contact the member's employer as this would hold her out of contract." *Id*.

at 180853.

48.     Disclosure of the "clawbacks" to Cigna's clients and members was a violation of the network pharmacy contract and cause for termination from the network. *See, e.g.*, Ex. 33 at 7504938; Ex. 37 at 158092; Ex. 29 ¶ 3.3 at 177316-17.

49.     Client and customer reporting was done in such a way as to conceal the "clawbacks" from employers and members. Ex. 38 at 55857.

50.     CEO David Cordani described the "clawbacks" as "micro overpayments." Deposition of David Cordani, Ex. 36 at 52:11-18.

51.     Effective January 1, 2017, Cigna added the following language to Plaintiff Negron's Plan: "Cigna may pay a Network Pharmacy a different amount for a Prescription Drug Product than the plan pays to Cigna."  Ex. 39 at 68 (Prescription Drug Charge).

52.     Cigna advised employers that "[t]he amount paid to the Retail Pharmacy for Brand, Generic, or Specialty Drug Claims may or may not be equal to the amount charged to the employer, and CHLIC will absorb or retain any difference."  *See* Ex. 41 at 1323; Ex. 42 at 1531; Ex. 43 at 336 (emphasis added).

53.     Plaintiffs served their Supplemental Responses to CHLIC's First Set of Interrogatories on November 11, 2020 and those responses describe the point-of-sale misrepresentations and Plaintiffs' injuries.  Ex. 45.

54.     Plaintiffs' deposition testimony and Cigna documents provide evidence of Plaintiffs' reliance on Cigna's misrepresentations and omissions. Deposition of Kimberly Negron, Ex. 46, at 110:4-13, 125:15-23; Deposition of Roger Curol, Ex. 47, at 100:24-101:5; Deposition of Billy Ray Blocker, Ex. 48, at 94:23-95:9; Deposition of Daniel Perry, Ex. 49, at 67:10-23, 68:8-22.

Dated: May 17, 2022

Respectfully submitted,

*s/ Craig A. Raabe*

Robert A. Izard (ct01601)
*Plaintiffs' Interim Co-Lead Class Counsel*
Craig A. Raabe (ct04116)
Christopher M. Barrett (ct30151)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone:  860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

William H. Narwold (ct00133)
*Plaintiffs' Interim Co-Lead Class Counsel*
Mathew Jasinski, (ct27520)
MOTLEY RICE LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone:  860-882-1681
Facsimile:  860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Joseph P. Guglielmo (ct27481)
*Plaintiffs' Executive Committee Chair*
Carey Alexander, *pro hac vice*
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  212-223-6444
Facsimile:  212-223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com

Erin Green Comite (ct24886)
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP

10

156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
ecomite@scott-scott.com

Derek W. Loeser, *pro hac vice*
*Plaintiffs' Executive Committee Member*
Gretchen S. Obrist, *pro hac vice*
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  206- 623-1900
Facsimile:  206-623-3384
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Brian C. Gudmundson, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
ZIMMERMAN REED, LLP
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  612-341-0400
Facsimile:  612-341-0844
brian.gudmundson@zimmreed.com

Andrew A. Lemmon, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
LEMMON LAW FIRM LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Telephone:  985-783-6789
Facsimile:  985-783-1333
andrew@lemmonlawfirm.com
- and -
650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:  504-581-5644
Facsimile:  504-581-2156
andrew@lemmonlawfirm.com

Ronen Sarraf
*Plaintiffs' Executive Committee Member*

11

Joseph Gentile, *pro hac vice pending*
SARRAF GENTILE LLP
14 Bond Street, Suite 212
Great Neck, NY 11021
Telephone:  516-699-8890
Facsimile:  516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

E. Kirk Wood, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
WOOD LAW FIRM, LLC
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone:  205-908-4906
Facsimile:  866-747-3905
ekirkwood1@bellsouth.net

Karen Hanson Riebel, *pro hac vice pending*
*Plaintiffs' Executive Committee Member*
Kristen G. Marttila, *pro hac vice pending*
LOCKRIDGE GRINDAL NAUEN,
P.L.L.P.
100 Washington Avenue S, Suite 2200
Minneapolis, MN 55401
Telephone:  612-596-4097
Facsimile:  612-339-0981
khriebel@locklaw.com
kmarttila@locklaw.com

Brad J. Moore
STRITMATTER KESSLER WHELAN
KOEHLER MOORE KAHLER
3600 15th Ave W, Suite 300
Seattle, WA 98119-1330
Telephone: 206.448.1777
Facsimile: 206.728.2131
Brad@stritmatter.com

Daniel K. Bryson
Jeremy R. Williams
WHITFIELD, BRYSON & MASON, LLP
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile:  919-600-5035

Dan@wbmllp.com
Jeremy@wbmllp.com

Additional Counsel for Plaintiffs