# EXHIBIT 4
# FILED UNDER SEAL

Master Services Agreement No.: MSA109468-Argus-2015
Statement of Work No.: SOW1-Argus-0715

# STATEMENT OF WORK NO. 1

This Statement of Work No. 1 (this "Statement of Work") is dated January 1, 2016 (the "SOW Effective Date") and is entered into between Company and Supplier pursuant to the Master Services Agreement between Cigna Corporate Services, LLC ("Company") and Argus Health Systems, Inc. ("Supplier") dated January 1, 2016 (the "Agreement"). Supplier's principal place of business is located at 1300 Washington Street, Kansas City, MO 64105. Capitalized terms used in this Statement of Work but not defined herein shall have the respective meanings set forth in the Agreement, including any Exhibit thereto.

1.  **Services and Schedules**

Supplier shall provide the Services and perform the obligations described in the following schedules, which are included in this Statement of Work:

|  |  |  |
|---|---|---|
| Schedule A | Scope of Services | |
| | A-1 | Claims Processing |
| | A-2 | Prior Authorizations |
| | A-3 | Drug Coverage Decisions |
| | A-4 | Reserved |
| | A-5 | Retail Network Services |
| | A-6 | Sales Support and Account Management Services |
| | A-7 | Supplier Systems |
| Schedule B | Service Level Agreements | |
| | B-1 | Service Level Methodology |
| | B-2 | Business Service Levels |
| | B-2-A | Supplier Task TATs |
| Schedule C | Fees | |
| | C-1 | Fees |
| Schedule D | Supplier Personnel | |
| | D-1 | Staffing Plan |
| | D-2 | Key Supplier Personnel and Positions |
| Schedule E | Reserved | |
| Schedule F | Reserved | |
| Schedule G | Migration to RxNova | |
| | G-1 | Migration Plan |
| | G-2 | Critical Migration Milestones |
| Schedule H | Subcontractors | |
| Schedule I | Reports | |
| Schedule J | Governance Committees | |

2.  **Reserved**

3.  **Formulary**

Confidential and Attorneys' Eyes Only                                   DSTPS 000832

As between Company and Supplier, Company shall have the final and full authority to determine the composition of any and all Formularies. Company and its Affiliated Companies, including through their respective P&T Committees, shall have the authority to develop, maintain, review and/or approve the Formularies, and Company shall have the right, subject to any limits under applicable Law, to change any Formulary at any time in Company's sole and absolute discretion

## 4. Care Management & Clinical Matters

Except for the specific functions assigned to Supplier and described on Schedule A-3 or except as otherwise specifically required under applicable Law, as between Company and Supplier, Company shall control and perform all Care Management and Clinical Functions with respect to all Company Plans, Company Clients and Company Customers, including development and oversight of clinical protocols and procedures.

## 5. Company Plans; Plan Designs; Product Development; Company Clients

As between Company and Supplier, Company and its Affiliated Companies, including through their respective P&T Committees, (a) shall have full control and authority over Company Plans and Benefit Plan Designs and over the product development process pertaining to Company Plans and Benefit Plan Designs; (b) shall have the right to modify existing, and to develop and implement new, Company Plans and Benefit Plan Designs at any time in Company's sole and absolute discretion; and (c) shall have full control and authority with respect to all Company Clients and/or Company's and its Affiliated Companies' business generally.

## 6. Notice of Certain Opportunities

To the extent not in conflict with another Supplier Customer relationship and to the extent not otherwise prohibited, Supplier shall, as soon as reasonably practicable, provide Company with notice of all opportunities, of which Supplier becomes aware, to bid to provide medical benefit health plan services or medical benefit health plan services together with pharmacy benefit services to any current or potential Supplier Customer that is soliciting bids for medical benefit health plan services or both medical benefit health plan services and pharmacy services.

## 7. Control of Company Plans

The applicable Affiliated Company for each Company Plan or, to the extent applicable, the Plan Administrator (as defined in Section 316 of the Employee Retirement Income Security Act of 1974) for each self-insured Company Plan shall (i) retain the sole and absolute authority to design, amend, terminate or modify, in whole or in part, all or any portion of the Company Plans, including the sole authority to control and administer the Company Plans and any assets of the Company Plans; and (ii) have complete discretionary, binding and final authority to construe the terms of the Company Plans, to interpret ambiguous Company Plan language and provide guidance to Supplier, to make factual determinations regarding the payment of claims or provisions of benefits, to review denied claims and to resolve complaints by Providers and, as applicable, Company Clients and Company Customers.

Confidential and Attorneys' Eyes Only                                                                                     DSTPS 000833

Master Services Agreement No.: MSA109468-Argus-2015
Statement of Work No.: SOW1-Argus-0715

### 8. No Modification of Company Plan Terms

Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be construed to modify the rights and benefits contained in the Company Plan applicable to any Company Customer.

### 9. Funding and Payment of Pharmacy Claims

Supplier shall deliver invoices arising from Paid Claims on a weekly basis. Company or an Affiliated Company, as directed by Company, shall pay Supplier applicable charges and fees owing under the Agreement and included on each such invoice within fourteen (14) business days after receipt.

### 10. Invoices for Paid Claims and Fees; Payment Terms

10.1   Invoices for Paid Claims; Payment Terms.

      (a)   Paid Claims Payments.

           (i)   Company Plans. With respect to all Claims under Company Plans, not later than 4:59 p.m. Eastern Time the second day following the last day of each billing cycle for all Company Plans (which billing cycles shall end at 11:59 p.m. Eastern Time on the 6th, 12th, 18th, 24th and last day of each month), Supplier shall provide Company with (A) a paid claim tape ("PCT") file inclusive of all Claims data for such billing cycle with respect to such Company Plans and (B) an invoice and such supporting documentation as Company may reasonably request setting forth and demonstrating the amounts owing to Supplier and its Affiliates, respectively, with respect to such billing cycle and Company Plans (excluding all Fees owing with respect to such Claims which shall be invoiced pursuant to Section 10.2). Each such invoice shall be presented so as to allocate Paid Claims and the respective payment or reimbursement obligations of and to Company and Affiliated Companies, as applicable. Subject to Section 10.1(a)(iv), within fourteen days of the 1st day of each billing cycle if Supplier delivers the PCT file and invoice no later than 9:00pm Eastern Time the second day after the last day of a billing cycle or, no more than once per calendar quarter, 1:00am Eastern Time the third day after the last day of a billing cycle, Company shall pay, and/or shall cause the Affiliated Companies to pay their respective portions of, such invoice in full, less any portion thereof that Company or any Affiliated Company disputes pursuant to Section 10.3(a) or with respect to which Company or any Affiliated Company exercises its right of set-off pursuant to Section 10.3(b). Supplier shall not be required to make any disbursements if the corresponding funding amount is insufficient.

           (ii)   Responsibility of Company and Affiliated Companies. Supplier acknowledges and agrees that each Affiliated Company shall be responsible only for amounts owing under this Agreement with respect to Paid Claims arising under those Company Plans that are issued, managed or administered by such Affiliated Company, and shall not have any responsibility or liability for payment obligations arising from any other Claims. Although such Affiliated Companies are expected to pay Supplier for the amounts they are responsible for under

this Agreement, Company will be responsible for payment of all invoices in full to the extent not paid by such Affiliated Companies when due hereunder.

(iii) <u>Payments Due Other than on Business Days</u>. Any payment due pursuant to this <u>Section 10.1(a)</u> on a day that is not a Business Day shall be due on the immediately following Business Day.

10.2 <u>Invoices for Fees; Payment Terms</u>. Supplier shall provide Company with a monthly invoice setting forth all Fees owing with respect to: (a) all Claims that were processed by Supplier during the prior month. Each such invoice shall be presented so as to allocate the Fees, and the corresponding payment or reimbursement obligations to Company and the Affiliated Companies, as applicable, and shall include such additional information as Company may reasonably request. Within forty-five (45) days after receipt of each such invoice, Company shall pay, and/or shall cause the Affiliated Companies to pay their respective portions of, such invoice in full, less any portion thereof that Company or any Affiliated Company disputes pursuant to <u>Section 10.3(a)</u> or with respect to which Company or any Affiliated Company exercises its right of set-off pursuant to <u>Section 10.3(b)</u>. Supplier acknowledges and agrees that each Affiliated Company shall be responsible only for amounts owing under this Agreement with respect to Claims arising under, those Company Plans that are issued, managed or administered by such Affiliated Company, and no Affiliated Company shall have any responsibility or liability for payment obligations owing with respect to any other Company Plans, Claims, or Services. Although such Affiliated Companies are expected to pay Supplier for the amounts they are responsible for under this Agreement, Company will be responsible for payment of all invoices in full to the extent not paid by such Company Affiliates when due hereunder.

10.3 <u>Disputed Invoices for Pharmacy Payments; Setoff</u>. <u>Disputed Amounts</u>. Supplier shall provide Company with invoices for payment of pharmacies as set forth in <u>Section 10.1(a)</u>. If Company or an Affiliated Company disputes all or a portion of any such invoice delivered by Supplier, Company shall inform Supplier of the disputed amount and the basis for such dispute within thirty (30) days of Company first having actual knowledge of the basis for such dispute. The Parties shall negotiate in good faith to resolve any dispute as soon as reasonably practicable and, upon resolution of such dispute, assuming that payment is due from Company to Supplier, Company shall promptly make such payment to Supplier or, with respect to amounts previously paid by Company, any Affiliated Company to Supplier, assuming that payment is due from Supplier to Company or the applicable Affiliated Company, Supplier shall promptly make such payment to Company, the Affiliated Company. Payments due hereunder shall in any event be made not later than thirty (30) days following the date on which the amount of such payment is determined.

(b) <u>Setoff</u>. With respect to any pharmacy payment that (i) should be reimbursed to Company, any Affiliated Company or any Company Customer by Supplier under this Agreement, or (ii) is otherwise payable to Company, any Affiliated Company or any Company Customer by Supplier pursuant to this Agreement, Company or any Affiliated Company may deduct the entire amount owed against any amount due to Supplier pursuant to this Agreement. With respect to any pharmacy payment that (i) should be reimbursed to Supplier or its Affiliate under this Agreement for disbursement to pharmacies, or (ii) is otherwise payable to Supplier or

Confidential and Attorneys' Eyes Only

DSTPS 000835

its Affiliate pursuant to this Agreement for disbursement to pharmacies, Supplier or its Affiliate, as applicable, may deduct the entire amount owed against any amount due to Company, any Affiliated Company pursuant to this Agreement.

10.4   Payment Adjustments.

(a)   If at any time it is determined (including in connection with an audit pursuant to Section 8 of the Agreement) that (i) due to any breach, error or mistake by Supplier or any of its Subcontractors (including Claim processing, adjudication or payment errors, errors in Cost Share assessments, Company Customer eligibility errors and errors in the set up or administration of Company Plans or Formularies), Supplier has, in any invoice or otherwise, overcharged Company, any Affiliated Company; (ii) for any other reason any Paid Claim for which Supplier has previously invoiced Company, an Affiliated Company becomes a duplicate Claim or reversed Claim; or (iii) Supplier has failed to pay all or any portion of any amount owing to Company, any Affiliated Company under this Agreement, then Supplier must within five (5) Business Days pay or credit Company the overcharged (with amounts paid in respect of duplicate Claims or reversed Claims constituting overcharges for this purpose) or unpaid amount(s), together with an amount equal to the greater of (x) interest at the Prime Rate plus two percent (2%) for the period of time (A) with respect to overpayments by Company, any Affiliated Company, from the date of the overpayment to the date of reimbursement by Supplier; and (B) with respect to underpayments by Supplier, from the date that payment should have been made by Supplier until such amount is paid by Supplier; or (y) any interest, penalty or other amount due from Company, any Affiliated Company to any other Person on account of such overpayment or underpayment.

(b)   If at any time it is determined that Supplier has, in any invoice or otherwise, charged Company, any Affiliated Company any amounts in respect of any Claims that arose from any fraudulent, unlawful or other improper act or omission by any Person, then Supplier shall immediately repay or credit Company or the applicable Affiliated Company such charged amounts together with an amount equal to interest at the Prime Rate plus two percent (2%) for the period of time from the date of such payment to the date of reimbursement by Supplier or, if none of Company or any Affiliated Company has yet paid such invoiced or other charge, Supplier shall notify Company thereof and shall send a corrected invoice or other notice of payment that excludes the amount at issue.

(c)   If at any time it is determined (including in connection with an audit conducted under Section 8 of the Agreement) that (i) due to any breach, error or mistake by Supplier or any of its Subcontractors, a Company Customer has paid a higher Cost Share with respect to a Claim than permitted under the terms of the applicable Company Plan or Plan Contract; or (ii) Supplier has failed to reimburse or pay a Company Customer any amount owing to such Company Customer in connection with a Claim, then Supplier shall immediately pay such Company Customer the overcharged or unreimbursed or unpaid amount, together with such interest as may be required under applicable Law.

10.5 <u>Prohibition on Collection of Payments from Company Customers</u>.  Supplier shall not, and shall cause its Affiliates not to, bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse against, a Company Customer or any other Person acting on a Company Customer's behalf, other than Company or an Affiliated Company (as applicable), with respect to any amount (other than Cost Shares), regardless of any nonpayment by Company, any Affiliated Company of such amount, breach of this Agreement by Company, insolvency of Company, or any other basis.  Supplier further agrees that this <u>Section 10.5</u> supersedes any oral or written Contract to the contrary now existing or hereafter entered into between Supplier and a Company Customer or Persons acting on a Company Customer's behalf.  This provision shall survive the termination or expiration of this Agreement, regardless of the cause of the termination or expiration.

10.6 <u>Company Customer Undercharges Caused by Supplier</u>.

(a) As further provided in the Schedules, Supplier (i) shall be responsible for processing and adjudicating Claims in accordance with, and for accurately administering and implementing, the pricing terms agreed between each Company Client, on the one hand, and Company or an Affiliated Company, as applicable, on the other hand; and (ii) shall, unless otherwise requested by Company, provide Company and the Affiliated Companies with such data as shall be necessary to enable Company to accurately and fully determine amounts due from each Company Client in accordance with such pricing terms.  Supplier shall inform Company promptly of any breaches, errors or mistakes by Supplier or its Subcontractors with respect to the foregoing of which Supplier becomes aware and shall pay Company the amount of any Losses suffered by Company or any Affiliated Company resulting from any such breaches, errors or mistakes, together with interest at the Prime Rate plus two percent (2%) from the date that each such Loss occurs until such amount is paid by Supplier.

(b) Not later than March 31 of each year, Supplier shall (i) provide a statement to Company that sets forth for each Company Client and, with respect to each insured Company Plan, the applicable Affiliated Company, the total amount invoiced to such Company Client or Affiliated Company on account of Claims processed during the prior year and the total amount that should have been invoiced to such Company Client or Affiliated Company under the pricing terms of the applicable Plan Contract or, with respect to insured Company Plans, the applicable Contract with such Affiliated Company; and (ii) pay to Company the aggregate amount of any invoicing shortfalls shown on such statement, <u>less</u> (A) any shortfalls resulting from errors, mistakes or other actions on the part of Company or any Affiliated Company and as accurately calculated by Supplier based on information provided by Company with respect to invoices it has issued to Company Clients and such Affiliated Companies, and (B) any other amounts Company collects from a Company Client in respect of such invoicing shortfalls (and Company shall use commercially reasonable efforts to collect such amounts from the applicable Company Client to the extent permitted under the terms of the applicable Plan Contract but shall not have any obligation to institute any legal proceeding against a Company Client for such purpose).  For clarity, Supplier acknowledges and agrees that Plan Contracts may, in Company's discretion, permit Company Clients to retain any over-performance with respect to financial guarantees and in any such case Company shall not have any obligation to seek to recover the amount of any such over-performance applicable to such Plan Contracts.

Confidential and Attorneys' Eyes Only

DSTPS 000837

Master Services Agreement No.: MSA109468-Argus-2015
Statement of Work No.: SOW1-Argus-0715

### 11. Migration to RxNova

Supplier shall:

(a) Work with Company to create a time table and plan for the migration of the Company Clients and customers to the new claim processing platform ("Migration Plan"); provided, however that Supplier first demonstrates to Company's satisfaction that Supplier has successfully migrated other customers of Supplier to all modules of RxNova and that such modules operate in accordance with expected outcomes. The Migration Plan will describe Services to support, including but not limited to, the Company's benefit plan designs, eligibility, claim history, clinical programs, customer service, pricing, drug lists and compliance requirements;

(b) Perform related testing to address requirements for the migration;

(c) Comply with mutually agreed upon performance standards and service levels applicable to the implementation of the migration to the new platform;

(d) Maintain IPNS, including required Company Client and product enhancements, until Company migrates to RxNova on a mutually agreed-upon plan and date; and

(e) Carry out the Migration Plan in a competent and professional manner and consistent with the agreed-upon Migration Plan. Supplier shall devote all necessary resources to achieve all applicable milestones, performance standards and service levels. In the event that Supplier fails to achieve any milestone specified in the Migration Plan by the applicable deadline, Supplier shall pay Company an associated Performance Credit.

### 12. Term

12.1 Initial term. Unless earlier terminated in accordance with the Agreement, this Statement of Work shall commence on the SOW Effective Date and continue until December 31, 2018 (the "Initial Term").

12.2 Renewals. Company will have the right to renew this Statement of Work on the same terms and conditions, subject to any changes in fees set forth in Schedule C-1, for up to two additional terms of two years each (the period from January 1, 2019 through December 31, 2020 is the "First Renewal Term", the period from January 1, 2021 through December 31, 2022 is the "Second Renewal Term", and the periods collectively are the "Renewal Terms") by notifying Supplier of its intent to renew at least twelve (12) months prior the expiration of the then-current term.

### 13. Customer Experience

Supplier shall provide web and mobile device portals, services and applications, and all updates and enhancements thereto that are part of Supplier' standard product or service offerings that it makes generally available to its other customers at no additional cost to Company, for Company,

Confidential and Attorneys' Eyes Only                                                                                   DSTPS 000838

Master Services Agreement No.: MSA109468-Argus-2015
Statement of Work No.: SOW1-Argus-0715

Company Customers, Company Clients and providers and shall provide all required integration of such portals and applications into Company's systems or shall support importation of and access to data into Company's web and mobile device portals, services and applications. Any custom requests by Company with regards to these product or service offerings shall proceed through the scope and access process and be billed to Company at the hourly rate set forth in Exhibit 14, which is applicable to this Statement of Work pursuant to Schedule C-1.

## 14.  Incorporation and Ratification of Agreement

This Statement of Work is governed by the terms and conditions of the Agreement, which are hereby incorporated by reference and ratified by the parties. The Agreement and this Statement of Work represent the entire agreement between Company and Supplier with respect to the subject matter hereof. No change, amendment, or modification of this Statement of Work shall be binding unless in writing and executed by the parties hereto.

Confidential and Attorneys' Eyes Only                                                                                           DSTPS 000839

Master Services Agreement No.: MSA109468-Argus-2015
Statement of Work No.: SOW1-Argus-0715

IN WITNESS WHEREOF, the parties hereto have caused this Statement of Work to be executed as of the SOW Effective Date by their respective duly authorized representatives.

| **CIGNA CORPORATE SERVICES, LLC** | **ARGUS HEALTH SYSTEMS, INC.** |
|---|---|
| Signature: *[signed]* | Signature: *[signed]* |
| Print Name: A. P. ABATE | Print Name: T. Marc Palmer |
| Title: CPO | Title: President, COO |
| Date: 10/19/15 | Date: 10/19/15 |

CIGNA PROPRIETARY AND CONFIDENTIAL
Statement of Work No. 1 – Page 9

Confidential and Attorneys' Eyes Only                                                                      DSTPS 000840