# EXHIBIT 6
## FILED UNDER SEAL

Confidential and Proprietary Information
EXECUTION COPY

# PHARMACY BENEFIT MANAGEMENT AGREEMENT

by and between

### CONNECTICUT GENERAL LIFE INSURANCE COMPANY
a Connecticut corporation,

and

### CATAMARAN PBM OF ILLINOIS, INC.
a Delaware corporation

Dated as of June 10, 2013

DCACTIVE-22247386.38

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002362

## Table of Contents

|  | Page |
|---|---|
| ARTICLE I. DEFINED TERMS | 1 |
| 1.1 Definitions. | 1 |
| 1.2 Rules of Interpretation. | 27 |
| ARTICLE II. CONTINUED CIGNA AUTHORITY OVER FORMULARIES, CARE MANAGEMENT AND BENEFIT PLAN DESIGNS | 27 |
| 2.1 Formulary. | 27 |
| 2.2 Care Management & Clinical Matters. | 27 |
| 2.3 Provider and Pharmacy Arrangements. | 27 |
| 2.4 Cigna Plans; Plan Designs; Product Development; Cigna Clients. | 30 |
| ARTICLE III. PBM SERVICES; OPTIONAL SERVICES AND PLANS; INCLUDED PLANS | 30 |
| 3.1 Services During the Performance Phase. | 30 |
| 3.2 Optional Plans. | 33 |
| 3.3 Included Affiliates. | 33 |
| 3.4 Additional Terms for Optional Services and Optional Plans. | 33 |
| 3.5 Legacy HealthSpring-Related Agreements. | 34 |
| ARTICLE IV. MANUFACTURER REVENUE; OTHER MANUFACTURER CONSIDERATION; PHARMACY REBATES | 34 |
| 4.1 Manufacturer Revenue Contracting. | 34 |
| 4.2 Allocation of Manufacturer Revenue and Other Manufacturer Consideration. | 35 |
| 4.3 Manufacturer Revenue and Other Manufacturer Consideration Reports. | 35 |
| 4.4 Manufacturer Revenue Guarantees. | 36 |
| 4.5 Manufacturer-Sponsored Coupons. | 36 |
| 4.6 Pharmacy Rebates. | 36 |
| ARTICLE V. TRANSITION SERVICES; TRANSITION PHASE | 37 |
| 5.1 Services During the Transition Phase. | 37 |
| 5.2 Coordination During the Transition Phase. | 37 |
| 5.3 No Conflicting Implementation Engagements. | 37 |
| 5.4 Reimbursement of Implementation Costs. | 37 |
| ARTICLE VI. TRANSITION OUT | 38 |
| 6.1 Transition-Out Services and Other Transition Arrangements. | 38 |
| ARTICLE VII. PERFORMANCE STANDARDS | 40 |
| 7.1 Standard of Performance; PBM Resources; Technological Improvements. | 40 |
| 7.2 Service Levels and Milestones. | 41 |
| 7.3 Guarantee Amounts. | 42 |
| 7.4 Modifications to Service Levels. | 43 |
| 7.5 Corrective Action. | 44 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                                              CIGNA00002363

| | | |
|---|---|---:|
| ARTICLE VIII. | PRICING | 45 |
| 8.1 | Pricing for Services and Covered Drugs; Pricing Guarantees; Related Terms. | 45 |
| 8.2 | Additional Covered Drug Pricing Terms. | 47 |
| 8.3 | Annual Market-Based Adjustments (Retail and Mail). | 49 |
| 8.4 | Annual Market-Based Adjustments (Specialty Pharmacy). | 54 |
| 8.5 | MFN Pricing. | 57 |
| 8.6 | Shared Savings. | 64 |
| 8.7 | Transition-Out Services Pricing. | 64 |
| 8.8 | Invoices for Paid Claims; Payment Terms | **Error! Bookmark not defined.** |
| 8.9 | Invoices for Administrative Fees; Payment Terms. | 67 |
| 8.10 | Disputed Invoices; Setoff. | 67 |
| 8.11 | Payment Adjustments. | 68 |
| 8.12 | Prohibition on Collection of Payments from Cigna Customers. | 69 |
| 8.13 | Cigna Customer Undercharges Caused by PBM. | 69 |
| 8.14 | Improved Pricing Terms for Certain Cigna Clients. | 70 |
| 8.15 | Interest on Late Payments. | 71 |
| 8.16 | Cigna Specialty Product Acquisition Contracts. | 71 |
| ARTICLE IX. | GOVERNANCE | 71 |
| 9.1 | Committees. | 71 |
| 9.2 | Business and Operational Disagreements. | 72 |
| ARTICLE X. | COLLABORATION AND EXCLUSIVITY | 73 |
| 10.1 | Marketing Efforts and Cooperation for Key Target Clients. | 73 |
| 10.2 | Non-Solicitation. | 76 |
| 10.3 | Notice of Certain Opportunities. | 77 |
| 10.4 | Exclusivity. | 77 |
| 10.5 | Exclusive Use of Tel-Drug Pharmacies. | 79 |
| 10.6 | Offers with Respect to Optional Plans/Optional Services. | 79 |
| ARTICLE XI. | MATERIAL CHANGES | 80 |
| 11.1 | Definition. | 80 |
| 11.2 | Amendments to Address Material Changes. | 81 |
| ARTICLE XII. | PERSONNEL | 82 |
| 12.1 | Employees. | 82 |
| 12.2 | Firewalls. | 86 |
| ARTICLE XIII. | INFORMATION TECHNOLOGY | 87 |
| 13.1 | Data and Systems Access. | 87 |
| 13.2 | Data and Information. | 88 |
| 13.3 | Disaster Recovery Plan. | 93 |
| ARTICLE XIV. | INTELLECTUAL PROPERTY | 94 |
| 14.1 | Intellectual Property. | 94 |
| 14.2 | Licensed Intellectual Property. | 96 |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

14.3 Source Code Escrow. ......................................................................................... 96
14.4 Confidentiality. ................................................................................................. 97

ARTICLE XV. BRANDING AND COMMUNICATIONS ............................................... 97
15.1 Branding. ......................................................................................................... 97
15.2 Communications. ............................................................................................ 97
15.3 Inclusion of Disclaimers. ................................................................................ 98

ARTICLE XVI. CONFIDENTIALITY .............................................................................. 98
16.1 Confidential Information. ................................................................................ 98
16.2 Ownership. ...................................................................................................... 99
16.3 Remedy. .......................................................................................................... 99

ARTICLE XVII. COMPLIANCE WITH LAWS AND CIGNA POLICIES .................... 99
17.1 Compliance with Laws. ................................................................................... 99
17.2 Policies, Code of Conduct and Training. ...................................................... 102
17.3 Antitrust Guidelines. ..................................................................................... 106
17.4 Fraud and Abuse. .......................................................................................... 106

ARTICLE XVIII. REPRESENTATIONS AND WARRANTIES ................................... 107
18.1 By PBM. ........................................................................................................ 107
18.2 By Cigna. ...................................................................................................... 109

ARTICLE XIX. RECORDS/LEGAL PROCEEDING COOPERATION/AUDITS ....... 111
19.1 Record Keeping. ........................................................................................... 111
19.2 Cooperation with Respect to Legal Proceedings and Other Matters. .......... 112
19.3 General Audit Rights. ................................................................................... 112
19.4 Pricing and other Financial Adjustments. .................................................... 116
19.5 Resolution of Financial Disagreement Arising from Audits. ....................... 116
19.6 Non-Financial Adjustments Arising from Audits. ....................................... 117

ARTICLE XX. TERM AND TERMINATION ............................................................... 117
20.1 Term. ............................................................................................................. 118
20.2 Term Phases. ................................................................................................. 118
20.3 Transition-Out Period. .................................................................................. 118
20.4 Termination by Cigna for Cause. ................................................................. 118
20.5 Termination by PBM for Cause. .................................................................. 120
20.6 Market Check Termination by Cigna. ......................................................... 121
20.7 Change of Control of Cigna Corporation. ................................................... 121
20.8 Other Partial Terminations and Exclusions. ................................................ 121
20.9 Effect of Termination. .................................................................................. 121

ARTICLE XXI. INDEMNIFICATION ............................................................................ 122
21.1 Indemnification of Cigna. ............................................................................. 122
21.2 Indemnification of PBM. .............................................................................. 122
21.3 Notice; Defense of Claim. ............................................................................ 123
21.4 Limitations of Liability. ............................................................................... 124

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002365

| | | |
|---|---|---|
| ARTICLE XXII. INSURANCE | | 124 |
| 22.1 | Insurance. | 124 |
| 22.2 | Evidence of Coverage. | 126 |
| ARTICLE XXIII. GOVERNING LAW; DISPUTE RESOLUTION | | 126 |
| 23.1 | Governing Law. | 126 |
| 23.2 | Dispute Resolution. | 126 |
| ARTICLE XXIV. MISCELLANEOUS PROVISIONS | | 127 |
| 24.1 | Impairment of Performance. | 127 |
| 24.2 | No Guarantees. | 128 |
| 24.3 | Taxes. | 128 |
| 24.4 | Public Announcements. | 129 |
| 24.5 | Order of Preference. | 129 |
| 24.6 | No Discrimination. | 129 |
| 24.7 | Independent Contractors. | 130 |
| 24.8 | No Third Party Beneficiaries. | 130 |
| 24.9 | Use of Subcontractors. | 130 |
| 24.10 | Performance Outside the United States. | 131 |
| 24.11 | Assignment, Transfer, Delegation. | 132 |
| 24.12 | Good Faith Performance. | 132 |
| 24.13 | Amendments. | 132 |
| 24.14 | Government Disapprovals. | 132 |
| 24.15 | Control of Cigna Plans. | 132 |
| 24.16 | No Modification of Cigna Plan Terms. | 133 |
| 24.17 | Force Majeure. | 133 |
| 24.18 | Entire Agreement. | 134 |
| 24.19 | Rights and Remedies/Separate Obligations. | 134 |
| 24.20 | Representation by Counsel. | 134 |
| 24.21 | Counterparts. | 134 |
| 24.22 | Notices. | 134 |
| 24.23 | No Waiver, etc. | 135 |
| 24.24 | Survival. | 135 |
| 24.25 | Severability. | 136 |

Exhibits

| | |
|---|---|
| Exhibit A | [Reserved] |
| Exhibit B | Accounting Firm Instructions |
| Exhibit C | Application of Section 8.3 and Section 8.4 |
| Exhibit D | Cigna Information Protection Policy |
| Exhibit E | EU Approved Data Export Clauses |
| Exhibit F | Business Associate Agreement |
| Exhibit G | Gramm-Leach-Bliley Act Agreement |
| Exhibit H | Escrow Agreement |
| Exhibit I | Use of Marks |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002366

| | |
|---|---|
| Exhibit J | Delegation Requirements |
| Exhibit K | Cigna Code of Conduct |
| Exhibit L | Form of Management Assertion |

Schedules

| | |
|---|---|
| Schedule 1 | Brand-Generic Drug Classification Algorithm |
| Schedule 2 | Cigna Competitors |
| Schedule 3 | Included Affiliates |
| Schedule 4 | Claims Processing Services |
| Schedule 5 | Drug Coverage, Benefit Design and Care Management Services |
| Schedule 6 | Manufacturer Revenue Services |
| Schedule 7 | [Reserved] |
| Schedule 8 | Retail Network Contracting Services |
| Schedule 9 | Sales Support and Account Management Services |
| Schedule 10 | Mail Order Pharmacy Fulfillment Services |
| Schedule 11 | Specialty Pharmacy Services |
| Schedule 12 | Medicare Part D Services |
| Schedule 13 | Medicaid and Other State Plan Services |
| Schedule 14 | [Reserved] |
| Schedule 15 | Optional Services |
| Schedule 16 | [Reserved] |
| Schedule 17 | Transition Plan and Transition Services |
| Schedule 18 | Transition-Out Services |
| Schedule 18-A | Transition-Out Services Data Fields |
| Schedule 19 | Service Levels |
| Schedule 19-A | Service Levels Measured on Cigna Client Basis |
| Schedule 19-B | Service Levels Applicable to Specific Cigna Clients |
| Schedule 20 | Financial Terms and Pricing Guarantees |
| Schedule 21 | Implementation of Cigna Client Pricing |
| Schedule 22 | Committees |
| Schedule 23 | PBM Employees |
| Schedule 24 | Data and Systems |
| Schedule 25 | PBM Licensed IP |
| Schedule 26 | Audit |
| Schedule 27 | PBM Subcontractors |
| Schedule 28 | PBM Center of Excellence Staffing |

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                      CIGNA00002367

## PHARMACY BENEFIT MANAGEMENT AGREEMENT

This **PHARMACY BENEFIT MANAGEMENT AGREEMENT** (this "Agreement"), dated as of June 10, 2013 (the "Effective Date"), is entered into by and between (i) Connecticut General Life Insurance Company, a Connecticut corporation ("Cigna"), on behalf of itself and its Affiliates Tel-Drug, Inc., a South Dakota corporation ("Tel-Drug"), and Tel-Drug of Pennsylvania, LLC, a Pennsylvania limited liability company ("Tel-Drug of PA"), and (ii) Catamaran PBM of Illinois, Inc., a Delaware corporation ("PBM"), on behalf of itself and its Affiliates BriovaRx, LLC, an Alabama limited liability company, BriovaRx of Indiana, LLC, an Indiana limited liability company, BriovaRx of Nevada, LLC, a Nevada limited liability company, Catamaran Home Delivery of Florida, Inc. d/b/a Informed Mail, a Delaware corporation, and Catalyst Mail, LLC, a Delaware limited liability company. Cigna and PBM are sometimes referred to herein collectively as "Parties" and individually as a "Party."

### RECITALS

A. PBM is in the business of administering prescription drug benefit programs, and in connection therewith engages in claims processing, pharmacy network administration, rebate administration and other services, and also provides services to support mail order and specialty pharmacies.

B. Cigna and certain of its Affiliates manage, administer, provide and perform various prescription drug and pharmacy benefit management functions and services for and on behalf of Cigna Plans.

C. Cigna desires to retain PBM to perform certain of such prescription drug and pharmacy benefit management-related functions and services, and PBM desires to perform such functions and services, all as specified herein.

D. Tel-Drug and Tel-Drug of PA respectively own and operate certain home delivery pharmacies.

E. Cigna desires to outsource to PBM the performance of certain back-end and supporting home delivery pharmacy functions and services currently performed by Tel-Drug and Tel-Drug of PA, and PBM desires to perform such functions and services, all as specified herein.

**NOW, THEREFORE**, in consideration of the promises, covenants, representations and warranties set forth herein, and other consideration, the sufficiency of which is hereby acknowledged, the Parties each hereby agree as follows:

### ARTICLE I.
### DEFINED TERMS

1.1 **Definitions.** As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

"340B Claim" means a Claim for a Covered Drug dispensed pursuant to the dispensing pharmacy's participation under Section 340B of the Public Health Service Act, 42 U.S.C. §256b.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                    CIGNA00002368

"Biosimilar Drug" means a Biological Drug Product that (a) is highly similar to a second Biological Drug Product, notwithstanding minor differences in clinically inactive components between the two Biological Drug Products, where there are no clinically meaningful differences between such Biological Drug Products in terms of the safety, purity and potency of the products; and (b) is approved as interchangeable with another Biological Drug Product pursuant to 42 U.S.C. § 262(k) or is otherwise interchangeable for therapeutic purposes under applicable Law.

"Brand Drug" means a prescription or over-the-counter drug, medicine, agent, substance, device, supply or other therapeutic product that is not a Generic Drug.

"Business Day" means any day (other than a Saturday or Sunday) on which banks are not required or authorized to close in the State of New York.

"Care Management" means the provision of Clinical Functions by Cigna, an Affiliate of Cigna, or by another Person, including a Provider, under contract with Cigna or an Affiliate of Cigna that are intended to promote the health improvement of Cigna Customers, including in accordance with the requirements of a Cigna Plan.

"CDHP" means consumer-directed or consumer-driven health plans.

"CET" means Claims experience tapes.

"Change of Control" means, with respect to a given Person, (a) the acquisition of ownership, directly or indirectly, beneficially or of record, in a transaction or series of transactions of equity securities in such Person representing more than fifty percent (50%) of either the aggregate voting power or the aggregate equity value represented by the issued and outstanding equity securities in such Person, whether pursuant to a merger, consolidation, reorganization (including under the Bankruptcy Code of the United States of America), issuances of equity securities or otherwise, by any other Person or group of other Persons (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934); (b) a sale, assignment, transfer, contribution or other disposition, directly or indirectly, of all or substantially all of the property, business, or assets of such Person to any other Person or group of other Persons; or (c) the dissolution or liquidation of such Person. With respect to any Cigna line of business, a "Change of Control" means the sale, assignment, transfer, contribution or other disposition, directly or indirectly, of all or substantially all of the property, business, or assets of Cigna and/or its Affiliates that are directly used in and necessary for the conduct of such line of business to any other Person or group of other Persons (excluding Affiliates of Cigna).

"Cigna Client" means any Person or group of Persons that has entered into a Contract with Cigna or an Affiliate of Cigna, pursuant to which benefits under one or more Cigna Plans are or will be made available, managed and/or administered by Cigna and/or any Affiliates of Cigna to or for the benefit of such Person or group of Persons or some or all employees, members, beneficiaries or other individuals associated with such Person or group of Persons.

"Cigna Code of Conduct" has the meaning set forth in Section 17.2(b).

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                        CIGNA00002371

dosing and assay management and wastage protocols); (j) personalized medicine review and access services; (k) pharmacovigilance activities, including execution of risk evaluation and mitigation strategies (REMS); (l) clinical care pathway development and execution with Providers; (m) performance-based incentive programs with Providers; and (n) any other clinical or care-related functions. Clinical Functions also include all information management and derivative information protocols, predictive and identification models, business rule content and systems used in the execution of these activities, as well as all telephony, mobile health, social media, and health information exchange systems and protocols that are intended to execute other Clinical Functions.

"CMS" means the Centers for Medicare & Medicaid Services.

"Commercial Aggregate MFN Segment" has the meaning set forth in Section 8.5(a)(i).

"Commercial MFN Subsegments" has the meaning set forth in Section 8.5(a)(ii).

"Commercial Plans" means any and all health benefit plans and products (including fully-insured and self-insured HMO, PPO, EPO, POS, indemnity health insurance and HDHP plans and products, including plans and products that provide medical and pharmacy benefits or pharmacy-only benefits), including any Cigna Plan arising under CHAMPUS, FEHBP, retiree drug subsidy (RDS), TRICARE or other similar program of the United States government, but excluding all Medicare Plans, Medicaid Plans, and other State Plans; *provided, however*, that a State Plan that is not a Medicaid Plan shall be a Commercial Plan if (x) the health benefits provided thereunder are not principally funded by a Governmental Body or (y) the State Plan is offered as part of a state health insurance exchange (unless the State Plan is available principally to individuals eligible for coverage under Medicaid).

"Committee" has the meaning set forth in Section 9.1(a).

"Communication" means any communication directly or indirectly relating to any PBM Services (including Optional Services, to the extent such services are requested by Cigna in accordance with Section 3.1(b) of the Agreement) or any Cigna Plans in the following forms: written, electronic, or web-based communications.

"Comparable Limited Pharmacy Network" has the meaning set forth in Section 8.3(a)(ii).

"Comparable Preferred Pharmacy Network" has the meaning set forth in Section 8.3(a)(iii).

"Compound Drug" means a Covered Drug that (a) is comprised of two or more gaseous, solid, semi-solid, or liquid ingredients (other than water or flavoring added to any preparation) that are weighed or measured at a pharmacy and then prepared according to the prescriber's order and the pharmacist's art; (b) contains at least one FDA-approved federal legend drug as an active ingredient; (c) is not otherwise generally available in its compound form; and (d) is not a compound preparation administered by infusion or injection.

"Confidential Information" means all confidential and proprietary information of, or relating to, a Party (including, in the case of Cigna, a Cigna Client) (in such capacity, the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                   CIGNA00002373

"disclosing Party"), including (a) all commercial or technical information, business, financial and marketing information, customer lists, customer terms and conditions, specifications, drawings, samples, models, equipment, computer software, trade secrets, know how and other Intellectual Property; and (b) information relating to costs, profits, markets, sales, products, personnel, pricing policies, operational methods or business affairs, methods and plans, in all cases, (i) whether or not disclosed to the Party that is not the disclosing Party (in such capacity, the "receiving Party") prior to, on or following the Effective Date; (ii) whether in written, oral, visual or machine readable form; and (iii) including any analyses, compilations, studies or other documents or records prepared by or on behalf of a receiving Party to the extent that any such analyses, compilations, studies or other documents or records contain or otherwise reflect or are generated from such information of the disclosing party. Without limiting the generality of the foregoing, all Benefit Plan Design information and clinical programs of Cigna and Affiliates of Cigna shall constitute Cigna's Confidential Information. Notwithstanding anything herein to the contrary, Confidential Information shall not include information that: (A) is publicly available or becomes generally available to the public (other than, directly or indirectly, as a result of disclosure by a Party or its Representatives contrary to the obligations of confidentiality contained herein); (B) is already in the possession of the receiving Party (as can be demonstrated by the receiving Party) free of any restriction as to its use or disclosure prior to its being so furnished under or in connection with this Agreement; (C) becomes available to the receiving Party from a source other than the disclosing Party or its Representatives which source is not bound by any obligation of confidentiality to the disclosing Party in relation to such information; or (D) the receiving Party can demonstrate was independently developed by the receiving Party's personnel who have not had any access to any Confidential Information and without using or referring to the Confidential Information.

"Consortium" means a group of Persons that have joined or allied, or been joined or allied, together through a consultant, coalition, collaboration or pooling mechanism for the purpose of purchasing health or drug benefits and plans.

"Contract" means any contract, agreement, subcontract, indenture, note, bond, loan, instrument, lease, mortgage, franchise, license, purchase order, sale order, understanding, arrangement or commitment, whether written or oral, that is legally binding.

"Corporate Ratings" means, as of any date of determination, the "Long Term Issuer Credit Rating" from Standard & Poor's Rating Services ("S&P") and the "Long-Term Obligations Rating" from Moody's Investors Service, Inc. ("Moody's").

"Cost Share" means the amount that a Cigna Customer is required to pay under the terms of the applicable Cigna Plan for a Covered Drug dispensed to such Cigna Customer. Such payment may be referred to as an allowance, coinsurance, copayment, deductible, penalty or other similar amount and may be a fixed amount or a percentage of an amount.

"Covered Drugs" means prescription and over-the-counter drugs, medicines, agents, substances, devices, supplies, and other therapeutic products that are prescribed for a Cigna Customer and are covered under the Cigna Plan applicable to such Cigna Customer, or for which coverage is otherwise available to a Cigna Customer under the Cigna Plan applicable to such Cigna Customer, and shall include all associated standard services usually and customarily

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002374

prepare and deliver a written proposal to establish and maintain the network that Cigna wishes to establish under such clauses, and (ii) consider such proposal from PBM in good faith.

(g) <u>Wrap Networks</u>. If, pursuant to clause (5) of <u>Section 2.3(c)</u>, Cigna desires to establish for certain Included Plans or Cigna Clients a wrap pharmacy network comprised of PBM's National Retail Pharmacy Network combined with Direct Pharmacies, Cigna may deliver a written notice to PBM that describes its specifications for such pharmacy network. Not later than thirty (30) days after receiving such a notice from Cigna, PBM shall in good faith prepare and deliver a written proposal to Cigna that either (i) states and commits that the pricing guarantees and terms set forth in <u>Schedule 20-A</u>, <u>Schedule 20-F</u> or <u>Schedule 20-K</u>, as applicable, shall be available to such wrap pharmacy network and shall apply to all prescriptions filled by all pharmacies included in PBM's National Retail Pharmacy Network (other than the Direct Pharmacies) while acting as part of such wrap pharmacy network, or (ii) proposes alternative or new pricing terms that will be applicable to all prescriptions filled by such pharmacies (other than the Direct Pharmacies) while acting as part of such wrap pharmacy network (which pricing terms (x) shall be in the aggregate at least as competitive economically (after taking into account any additional or reduced costs of performance applicable thereto or any unique or special economic issues arising from the requested network) as the pricing terms applicable to Included Plans then-included in <u>Schedule 20</u>), and (y) would provide Cigna with most favored pricing if measured and assessed as a new MFN Measurement Segment (with respect to comparable wrap pharmacy networks) under <u>Section 8.5</u>). If PBM proposes alternative or new pricing terms under clause (ii) of the preceding sentence and Cigna desires to accept such terms, <u>Schedule 20</u> shall be amended to include such terms, and the Ingredient Cost Charge Guarantees, Dispensing Fee Guarantees and/or Manufacturer Revenue Guarantees included in such amendment shall constitute new, separately measured and administered Pricing Categories.

2.4 **Cigna Plans; Plan Designs; Product Development; Cigna Clients.** As between Cigna and PBM, Cigna and its Affiliates, including through their respective P&T Committees, (a) shall have full control and authority over Cigna Plans and Benefit Plan Designs and over the product development process pertaining to Cigna Plans and Benefit Plan Designs; (b) shall have the right to modify existing, and to develop and implement new, Cigna Plans and Benefit Plan Designs at any time in Cigna's sole and absolute discretion; and (c) shall have full control and authority with respect to all Cigna Clients and/or Cigna's and its Affiliates' business generally. Except as set forth in the Schedules, Cigna shall be responsible for all regulatory filings and submissions applicable to existing, modified and new Cigna Plans.

**ARTICLE III.**
**PBM SERVICES; OPTIONAL SERVICES AND PLANS; INCLUDED PLANS**

3.1 **Services During the Performance Phase.**

(a) <u>PBM Services</u>. During the Performance Phase, with respect to all Included Plans and Cigna Clients as to which the Readiness Date has occurred, PBM shall provide Cigna, the Included Affiliates and the Tel-Drug Pharmacies, as applicable, with the following services (collectively, the "<u>PBM Services</u>"):

(i) Claims Processing Services, as set forth in <u>Schedule 4</u>;

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002397

    (ii) Drug Coverage, Benefit Design and Care Management Services, as set forth in Schedule 5;

    (iii) Manufacturer Revenue Services, as set forth in Schedule 6;

    (iv) Retail Pharmacy Network Contracting Services, as set forth in Schedule 8;

    (v) Sales Support and Account Management Services, as set forth in Schedule 9;

    (vi) Mail Order Pharmacy Fulfillment Services, as set forth in Schedule 10;

    (vii) Specialty Pharmacy Services, as set forth in Schedule 11;

    (viii) Medicare Part D Services, as set forth in Schedule 12; and

    (ix) Medicaid and Other State Plan Services, as set forth in Schedule 13.

  (b) *Optional Services*. As set forth in Schedule 15 and elsewhere in this Agreement, certain specific PBM Services are designated as "Optional Services" and shall be performed by PBM only if and as so elected by Cigna in accordance with this Section 3.1(b). At any time during the Term (and after the applicable Readiness Date) or, except as provided in Schedule 15, any Transition-Out Period, Cigna shall have the right, by providing reasonable written notice to PBM (in accordance with the timeframes set forth in Schedule 15), to require PBM to provide any Optional Service in whole or in part for and with respect to any or all Included Plans or Cigna Clients or the Tel-Drug Pharmacies or on any other specified level of effort, for the period of time specified in such notice or until Cigna elects in accordance with the timeframes set forth on Schedule 15, by providing prior written notice to PBM, to terminate PBM's provision of such Optional Service.

  (c) *Central Fill Pharmacies*. With respect to matters relating to or involving Schedules 10 and 11 and/or the PBM Services set forth therein, any references in this Agreement to PBM shall be deemed to include each Affiliate of PBM that owns, operates, or contracts with a PBM Pharmacy.

  (d) *Medical Benefits*. All PBM Services with respect to the medical benefits provisions of an Included Plan (*e.g.*, the procurement, dispensing, and administration of any Covered Drug by a Provider other than a pharmacy) shall constitute Optional Services for all purposes under this Agreement.

  (e) *Mail Order Pharmacy Services*. Notwithstanding anything to the contrary in this Agreement, PBM shall not perform and shall not be entitled to perform any of the PBM Services set forth in Schedule 10 (the "Mail Pharmacy Services") unless Cigna, in its sole discretion, directs PBM, by providing a written notice to PBM (a "Mail Pharmacy Activation Notice"), to perform the Mail Pharmacy Services; *provided, however*, that Cigna may not require

31

CONFIDENTIAL - ATTORNEYS' EYES ONLY  CIGNA00002398

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first set forth above.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY

By: _____
    Name:
    Title:

CATAMARAN PBM OF ILLINOIS, INC.

By: _____
    Name:
    Title:

CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIGNA00002504

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first set forth above.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY

By: *[signature]*

Name: Matthew G. Manders
Title: President

CATAMARAN PBM OF ILLINOIS, INC.

By: _____

Name: Jeff Park
Title: Chief Financial Officer

*Signature page to Pharmacy Benefit Management Agreement*

CONFIDENTIAL - ATTORNEYS' EYES ONLY                              CIGNA00002505

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first set forth above.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY

By: _____
Name: Matthew G. Manders
Title: President

CATAMARAN PBM OF ILLINOIS, INC.

By: _____
Name: Jeff Park
Title: Chief Financial Officer

*Signature page to Pharmacy Benefit Management Agreement*

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                     CIGNA00002506