# EXHIBIT 8
## FILED UNDER SEAL

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF CONNECTICUT
 3    No. 16-cv-1702 (JAM)
      ------------------------------------x
 4    KIMBERLY A. NEGRON, DANIEL PERRY,
      COURTNEY GALLAGHER, NINA CUROL,
 5    ROGER CUROL, and BILLY RAY BLOCKER,
      JR., Individually and on Behalf of All
 6    Others Similarly Situated,
 7            Plaintiffs,
 8
 9       - against -
10
11    CIGNA CORPORATION, CIGNA HEALTH
      AND LIFE INSURANCE COMPANY and
12    OPTUMRX, INC.,
13            Defendants.
      ------------------------------------x
14                    July 16, 2020
15                    9:38 a.m.
16
17       Videotaped Deposition of MICHELLE
18    EMANUEL-JOHNSON, taken by Plaintiffs,
19    pursuant to Notice, held via Zoom
20    videoconference, before Todd DeSimone, a
21    Registered Professional Reporter and Notary
22    Public of the State of New York.
23
24
25
```

Page 2

```
 1
 2  A P P E A R A N C E S :
 3  IZARD, KINDALL & RAABE, LLP
       29 South Main Street, Suite 305
 4  West Hartford, Connecticut 06107
       Attorneys for Plaintiffs
 5  BY:   ROBERT A. IZARD, ESQ.
           rizard@ikrlaw.com
 6        CRAIG A. RAABE, ESQ.
           craabe@ikrlaw.com
 7        CHRISTOPHER M. BARRETT, ESQ.
           cbarrett@ikrlaw.com
 8
 9
10
    MOTLEY RICE LLC
11  28 Bridgeside Boulevard
    Mount Pleasant, South Carolina 29464
12      Attorneys for Plaintiffs
    BY:   MEGHAN S.B. OLIVER, ESQ.
13         moliver@motleyrice.com
          CHARLOTTE LOPER, ESQ.
14         cloper@motleyrice.com
15
16
    SARRAF GENTILE LLP
17  10 Bond Street
       Suite 212
18  Great Neck, New York 11021
       Attorneys for Plaintiffs
19  BY:   JOSEPH GENTILE, ESQ.
           joseph@sarrafgentile.com
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S : (Continued)
 3  MORGAN LEWIS & BOCKIUS LLP
       300 South Grand Avenue
 4     22nd Floor
    Los Angeles, California 90071-3132
 5      Attorneys for Defendants Cigna
        Corporation and Cigna Health
 6      and Life Insurance Company
    BY:   LISA R. WEDDLE, ESQ.
 7         lisa.weddle@morganlewis.com
 8         - and -
 9  MORGAN LEWIS & BOCKIUS LLP
       1701 Market Street
10  Philadelphia, Pennsylvania 19103-2921
    BY:   JULIAN C. WILLIAMS, ESQ.
11         julian.williams@morganlewis.com
12
13  DORSEY & WHITNEY LLP
       50 South Sixth Street
14     Suite 1500
    Minneapolis, Minnesota 55402-1498
15      Attorneys for Defendant
        OptumRx, Inc.
16  BY:   MICHELLE S. GRANT, ESQ.
           grant.michelle@dorsey.com
17
18
    STINSON LLP
19  1201 Walnut Street
       Suite 2900
20  Kansas City, Missouri 64106
       Attorneys for The Witness
21  BY:   CHRISTOPHER B. SEVEDGE, ESQ.
           christopher.sevedge@stinson.com
22
23  ALSO PRESENT:
24    KEVIN GALLAGHER, Videographer
25  * ALL PARTIES APPEARING VIA REMOTE VIDEO *
```

Page 4

 2       THE VIDEOGRAPHER:  Good morning.
 3  We are going on the record now at
 4  approximately 9:38 a.m.  Today's date is
 5  July 16th, 2020.
 6       This is media unit number one
 7  of the video-recorded deposition of
 8  Michelle Emanuel-Johnson taken by counsel
 9  for the plaintiff in the matter of Kimberly
10  A. Negron, et al., versus Cigna
11  Corporation, et al.  It is filed in the
12  U.S. District Court for the District of
13  Connecticut.  The case number is
14  16-CV-1702.  The deposition is being held
15  via Zoom virtual conferencing.
16       My name is Kevin Gallagher.
17  I'm the videographer.  The court reporter
18  is Todd DeSimone.  We are both from
19  Veritext Legal Solutions.
20       All the appearances will be on
21  the written record.  At this time our court
22  reporter will swear the witness and we can
23  proceed.
24          *  *  *
25

Page 5

 2  M I C H E L L E
 3  E M A N U E L - J O H N S O N,
 4  called as a witness, having been first duly
 5  sworn, was examined and testified
 6  as follows:
 7  EXAMINATION BY MR. IZARD:
 8      Q.   Good morning,
 9  Ms. Emanuel-Johnson.  I'm Bob Izard and I
10  will be here representing the plaintiffs
11  today.  Thank you for, I don't know if it
12  was voluntary, we thank you for devoting
13  some of your time to us today to answer a
14  few questions.  We appreciate it.
15       Have you ever given a
16  deposition before?
17      A.   I have not.
18      Q.   Without telling me what you all
19  talked about, did you talk with your lawyer
20  or Argus' lawyer a little bit about the
21  process?
22      A.   I did.
23      Q.   Just a couple of things to make
24  it easier on everybody.  Particularly when
25  we are doing it online, it is important for

2 (Pages 2 - 5)

Page 6

1              EMANUEL-JOHNSON
 2  us not to speak over each other, because
 3  sometimes there is a lag in the technology
 4  here, so it makes it very difficult for the
 5  court reporter to write all this down if we
 6  are talking over each other.  So it is a
 7  habit you get into because people talk over
 8  each other in restaurants or whatever, so
 9  we just have to be a little careful about
10  that.
11          The second thing is, unlike
12  typical conversations, it is important to
13  answer a question, so a nod, you know, is
14  not recorded.  So if you mean yes, you have
15  to say yes, as opposed to nods.  So that
16  happens a fair bit as well.
17          If you want to take a break,
18  just let me know and we will take a break.
19  You could control the schedule here in
20  large part.
21          With that, I would like to just
22  get going.  I will just ask questions and
23  you will answer and hopefully we will get
24  through this fairly quickly.  So thank you.
25     A.   Thank you.

Page 7

 1              EMANUEL-JOHNSON
 2     Q.   Could you state your name for
 3  the record, please?
 4     A.   Yes, it is Michelle
 5  Emanuel-Johnson.
 6     Q.   And can you just briefly
 7  describe your employment history, please?
 8     A.   Yes, I have been in the employ
 9  of what is now SS&C Health Solutions,
10  formerly Argus, for approximately 22 years
11  in a client relationship and people
12  leadership role.
13     Q.   Can you tell me a little more
14  about what you do in a client leadership,
15  people leadership role?
16     A.   Absolutely.  I have two primary
17  functions.  One is in relationship to
18  leading the people as a direct manager for
19  account management and project delivery
20  resources as well as matrix IT team, and
21  then I'm also primarily responsible for the
22  account management relationship with our
23  health plan clients.
24     Q.   So Argus is now known as DST?
25     A.   We are known as SS&C Health.

Page 8

 1              EMANUEL-JOHNSON
 2     Q.   Okay.  For purposes of this
 3  case, we are talking about the relationship
 4  with Cigna sort of 2013 through 2017.
 5  Would it make more sense to use SS&C or
 6  Argus?
 7          If it is okay with you, I will
 8  probably lapse into Argus.  That will make
 9  it easier on me if that's okay with you.
10     A.   We can use Argus.
11     Q.   Okay, great, thank you.
12          What is matrix IT?
13     A.   It is a dedicated IT team that
14  they had managers that they reported to,
15  but as far as prioritization of work and
16  support, they took some direction from
17  myself.  So they were not my direct
18  reports, but they did, you know, take
19  direction around priorities of work to be
20  done.
21     Q.   Can you describe briefly what
22  Argus did for health companies in
23  connection with health benefit plans?
24     A.   We are a claims processor,
25  pharmacy claims processor.  Typically what

Page 9

 1              EMANUEL-JOHNSON
 2  that means is that we take direction from
 3  clients in terms of the benefit
 4  configurations that they want to leverage
 5  for adjudication of claims at point of
 6  sale. We receive some clients' eligibility
 7  information, meaning what members are
 8  eligible during which period of time, and
 9  then support all of the activities
10  surrounding that, the loading of their
11  pharmacy networks and rates, and then to
12  some extent call center support for the
13  pharmacies.
14     Q.   Would the clients in this
15  situation be the insurance companies, the
16  healthcare companies?
17     A.   That is correct.
18     Q.   And you mentioned point of
19  sale.  What did you mean by that?
20     A.   Point of sale is a reference
21  that we leverage for what occurs at the
22  pharmacy.  So, for example, if you were to
23  go into your neighborhood pharmacy, hand
24  them your card, the pharmacist would submit
25  information, they would get a response back

Page 10

1  EMANUEL-JOHNSON
2 at that point of service and then be able
3 to fill your prescription. So that's what
4 we mean by point of sale.
5     Q.   So Argus would process
6 transactions where you walk in and you hand
7 them your prescription, the pharmacist
8 loads it into the computer, and shortly you
9 hear back whether you are covered and what
10 your co-pay is, I won't say it is
11 instantaneous, but it is a very rapid
12 process; is that right?
13         MR. SEVEDGE:  I object to form.
14     A.   That's right.
15     Q.   Now, was Argus involved in
16 processing pharmacy transactions that were
17 not point of sale?  So, for example, if I
18 went to the pharmacy and bought a drug and
19 then I, you know, a month later submitted a
20 claim to the insurance company, would Argus
21 get involved in that kind of a transaction?
22     A.   Yes.
23     Q.   Did Argus do work for Cigna?
24     A.   Can you clarify what work?
25     Q.   I guess work with relation to

Page 11

1  EMANUEL-JOHNSON
2 processing pharmacy benefit claims.
3     A.   Yes.
4         MS. WEDDLE:  I object to form.
5     Q.   Could you tell me a little bit
6 about what that work was?
7     A.   In terms of processing claims,
8 again, we would receive requests from Cigna
9 in terms of what plan design should be.  We
10 would manage the load of that plan design
11 and then engage with them to confirm that
12 that what we call structure was in fact in
13 place per their design, and then that
14 design is leveraged, as I shared, in the
15 adjudication of the claim at the pharmacy
16 and/or, to your point, what we would call a
17 direct member reimbursement, which is a
18 submission later if you paid for the script
19 out of pocket.
20     Q.   And did Argus do other work for
21 Cigna in addition to claims processing?
22         MS. WEDDLE:  I object to form.
23     A.   I would need clarification on
24 what you meant from other work.  Our
25 primary relationship was in regards to what

Page 12

1  EMANUEL-JOHNSON
2 was necessary to enable adjudication of
3 pharmacy claims.
4     Q.   I guess I'm not trying to be
5 difficult, but I'm just trying to find out,
6 in general terms, other than processing
7 pharmacy claims, were there other things,
8 for example, did you process, you know,
9 surgery claims or did you, you know, do any
10 other kind of work?
11         MR. SEVEDGE:  I object to form.
12     A.   No, the scope of our work was
13 in relationship to pharmacy claim
14 adjudication.
15     Q.   What was your role, if any, in
16 the Cigna project on behalf of Argus?
17         MR. SEVEDGE:  I object to form.
18         MS. WEDDLE:  Join.
19     A.   If I could clarify which
20 project that you are referencing.
21     Q.   Okay.  Well, more generally,
22 did you perform any work on behalf of Argus
23 with respect to any engagement with Cigna
24 concerning processing pharmacy benefit
25 claims?

Page 13

1  EMANUEL-JOHNSON
2     A.   I was responsible for the team
3 that would be engaged with Cigna for
4 delivery of projects that were submitted
5 through our established processes.
6     Q.   And were there any projects
7 other than projects submitted through the
8 established processes?
9         MR. SEVEDGE:  I object to form.
10     A.   For our clients we do not
11 initiate any what we would call plan design
12 configuration changes or projects without
13 initiation from the client.
14     Q.   Were there any projects
15 involving Argus and Cigna that you did not
16 have some involvement in?
17         MR. SEVEDGE:  I object to form.
18     Q.   That you're aware of.
19         MS. WEDDLE:  I object to form.
20     A.   So I would say -- so we have,
21 you know, existing systems, you know,
22 maintenance, enhancements, so forth, that
23 are required, that are not client specific,
24 and so that work is ongoing.
25         But, again, it is nothing that

Page 14

1          EMANUEL-JOHNSON
2  materially changes the specifics of what a
3  client would have such as Cigna in terms of
4  plan design.  So there could be other
5  projects, but, again, nothing that affects
6  the client in terms of an outcome based on
7  what they would want to have happen for
8  their plan design.
9      Q.   I see, okay.
10          We're going to show you now the
11 first exhibit, so I believe you have not
12 been able to log in to the Veritext system,
13 so Chris Barrett, who is one of the
14 plaintiffs' lawyers, has e-mailed you a
15 group of exhibits.  Have you been able to
16 get that e-mail?
17     A.   I have, yes.
18     Q.   The first one, and we're going
19 to mark it 64, because we are doing them
20 sequentially throughout the case, so the
21 first one would be 64, and it is a notice
22 of deposition.  Can you pull that up.
23     A.   I'm accessing that.
24          (Exhibit 64 marked for
25 identification.)

Page 15

1          EMANUEL-JOHNSON
2      Q.   Just let me know when you've
3  got it.
4      A.   I do have it.
5      Q.   And that's, on the front, it
6  has a court caption and it says June 16,
7  2020.  Are we looking at the same document?
8      A.   We are, yes.
9      Q.   Have you seen that document
10 before?
11         MR. SEVEDGE:  Foundation.
12     A.   I'm reviewing.
13     Q.   What I'm mostly interested in,
14 Ms. Emanuel-Johnson, if you go to the back,
15 there's a Schedule A which starts on the
16 sixth PDF page and then starting on the
17 eighth and ninth PDF pages are a series of
18 topics.
19         So my question is, have you
20 seen that list of topics and are you here
21 today to testify on behalf of Argus about
22 those topics?
23         MR. SEVEDGE:  I object to form.
24     A.   I have seen this.
25     Q.   And are you here to give your

Page 16

1          EMANUEL-JOHNSON
2  deposition about those topics today?
3      A.   Yes.
4      Q.   Great, thank you.  All right,
5  you can close that one out, and I want to
6  move to the next exhibit, which is 65.
7          (Exhibit 65 marked for
8  identification.)
9      Q.   And that is, up at the top, it
10 says Master Services Agreement.  Do you see
11 that one?
12     A.   I do, Master Services Agreement
13 MSA109468-Argus-2015.
14     Q.   Right, that's right.  And if
15 you see in the bottom right corner of the
16 first page, you will see some letters and a
17 number.  It says DSTPS 00069.  Do you see
18 that?
19     A.   Yes.
20     Q.   So those are numbers -- or
21 letters and numbers that were put on for
22 this case so it makes it easier to track
23 that.  So the DSTPS is an identifier that
24 says that this document came from Argus and
25 the 629 means it is the 629th page of the

Page 17

1          EMANUEL-JOHNSON
2  documents we got from Argus, and as you
3  flip through, you will see the numbers go
4  up.  So in order that we can all make sure
5  we're talking about the same part of the
6  document, sometimes we could refer to these
7  numbers at the bottom and that's a helpful
8  way to track where we are, so we're all
9  literally on the same page, if you will.
10 Okay?
11     A.   All right, I do see those and
12 understand.
13     Q.   Great.  If you would please go
14 forward two pages and it is page 3 of 93 of
15 the agreement and page 631 of the Bates
16 number at the bottom of the page.
17     A.   I am on that page.
18     Q.   At the top it says Master
19 Services Agreement, General Terms and
20 Conditions?
21     A.   Yes, and it starts with number
22 1, Services.
23     Q.   Yes.  If you look at 1.2, it
24 talks about service recipients.  Do you see
25 that?

5 (Pages 14 - 17)

Page 18

EMANUEL-JOHNSON

2  A.  Yes.
3  Q.  And it talks about how services
4  will be provided to affiliated companies.
5  Do you see that?
6  A.  Yes.
7  Q.  My question here is do you
8  know, did Argus ever provide services to a
9  pharmacy benefit manager called Catamaran?
10         MR. SEVEDGE:  I object to form,
11  foundation.
12         MS. WEDDLE:  Join.
13  A.  Under the scope of the
14  contract, no.
15  Q.  Are you familiar with a
16  pharmacy benefit manager known as Optum?
17         MR. SEVEDGE:  Foundation.
18  A.  Yes, I am familiar.
19  Q.  Do you know if Catamaran was
20  bought by Optum at some point?
21         MS. GRANT:  I object to form.
22  Q.  Or Catamaran became part of
23  Optum at some point?
24         MS. GRANT:  Same objection.
25  A.  Yes, I am aware.

Page 19

EMANUEL-JOHNSON

2  Q.  And so what's the easiest way,
3  could we refer to the Catamaran Optum as
4  either Catamaran or Optum for purposes of
5  this deposition so we can ask just one set
6  of questions.  Is that convenient for you?
7  A.  Either is fine, yes.
8  Q.  Well, if I use Catamaran, we
9  mean Catamaran and Optum.  If I use Optum
10  we also mean Catamaran and Optum.  Is that
11  fair?
12  A.  That is fair.
13  Q.  I would like to go forward a
14  few more pages to the definitions which is
15  page 34 out of 93 at the bottom and has a
16  Bates number of 662, DSTPS 662.  Do you see
17  that?
18  A.  I am on that page, yes.
19  Q.  At the top it says Exhibit 1 To
20  Master Services Agreement Definitions.  Do
21  you see that?
22  A.  Yes.
23  Q.  Now, about halfway down there
24  is a phrase "benefit plan design."  Do you
25  see that?

Page 20

EMANUEL-JOHNSON

2  A.  I do.
3  Q.  I think you testified earlier
4  that part of what Argus does is that it
5  takes the benefit plan design from a
6  customer and uses that for claims
7  processing.  Is this what you were
8  referring to?
9         MR. SEVEDGE:  I object to form.
10         MS. WEDDLE:  Join.
11  A.  Could you give me just one
12  moment to read that definition in its
13  entirety?
14  Q.  Sure.  Yeah, just generally,
15  please take whatever time you need to read
16  whatever you want.  This is not -- we're
17  not in a race here.
18  A.  Okay, thank you.
19         So in response to your
20  question, as I described earlier, this
21  benefit plan design definition is one in
22  the same with the scope of work that I
23  described that we support.
24  Q.  And I believe you said earlier
25  that you get the benefit plan design

Page 21

EMANUEL-JOHNSON

2  information, in this case it would be from
3  Cigna; is that right?
4  A.  That's correct.
5  Q.  What form does that information
6  come in?
7         MR. SEVEDGE:  I object to form.
8         MS. WEDDLE:  Join.
9  A.  During the time frame, because
10  I believe you stated during the period 2013
11  through 2017, correct?
12  Q.  Please.
13  A.  During that time frame that
14  we're discussing, these types of
15  requirements would come over via what we
16  will call a form, so it would be written
17  configuration requirements sent via e-mail
18  from Cigna to us.
19  Q.  I'm not -- I'm not a very
20  computer literate person, so when you say a
21  written configuration requirement, can you
22  explain that?
23  A.  Sure.  So the elements that are
24  described here in this particular section
25  under benefit plan design, those would be

Page 22

1          EMANUEL-JOHNSON
2  typed out on a form, so meaning a
3  Word-based document or some other word
4  processing sort of document, Word, Excel,
5  things along that line.  So they would be
6  typed out into that format and then sent
7  over as an attachment via e-mail.
8      Q.   Did Cigna ever provide the
9  individual health plans that covered each
10 members' benefits?
11          MR. SEVEDGE:  I object to form.
12          MS. WEDDLE:  Join.
13     A.   And can you clarify what you
14 mean by individual health plan?
15     Q.   Sure.  So, for example, I have
16 a health plan through my office, and, you
17 know, I get a summary plan description.
18 You know, I don't know if you have a health
19 plan through SS&C.  So I'm talking about
20 the plan that an employer would give to an
21 employee that would lay out the employee's
22 prescription drug benefits.
23     A.   So no, so we do not receive the
24 information.  I will use our benefit as an
25 example, we, Argus, would not have received

Page 23

1          EMANUEL-JOHNSON
2  the same detail that Cigna may have shared
3  with the plan, you know, your company's
4  plan or an SS&C plan, we would receive data
5  or information in such a way that was
6  required to support configuration.  So
7  they're not one in the same.
8      Q.   Would Cigna provide a separate
9  Word document for each health plan, so, for
10 example, would Cigna provide one Word
11 document for an SS&C plan and another Word
12 document for my firm's plan?
13          MR. SEVEDGE:  I object to form.
14          MS. WEDDLE:  Join.
15     A.   The determination as to whether
16 or not we would receive unique plan design
17 information was based on the relationship
18 that Cigna had with that plan.
19     Q.   I see.  So, for example, if
20 multiple plans -- well, withdrawn.
21          Are you familiar with the term
22 "adjudication"?
23          MR. SEVEDGE:  I object to form.
24     A.   Yes.
25     Q.   What is adjudication?

Page 24

1          EMANUEL-JOHNSON
2      A.   Adjudication from our
3  perspective in our industry is in
4  relationship to assessing coverage and
5  other parameters to make a determination as
6  to whether or not a drug benefit will be
7  covered or not.  So we look at all of the
8  elements for that.
9      Q.   Sorry, I didn't mean to speak
10 over you.  I have got about a one-second
11 lag here, so that would be awful.
12          Are you familiar with the term
13 "adjudication logic"?
14     A.   Yes.
15     Q.   What is adjudication logic?
16     A.   Adjudication logic would be the
17 back-end elements that are validated and/or
18 used to make a determination in regards to
19 drug coverage.
20     Q.   Would drug coverage include the
21 portion that the -- well, withdrawn.
22          The person who is covered by
23 the plan, you or me, what's the -- what's
24 the term you like to use for that person, a
25 member or a customer?  What word do you

Page 25

1          EMANUEL-JOHNSON
2  like to use for that?
3      A.   We can leverage the word
4  "member."
5      Q.   Okay.  Would the adjudication
6  logic cover the co-payment or deductible
7  payment that the member would owe?
8          MR. SEVEDGE:  I object to form.
9      A.   Adjudication logic could be
10 inclusive of the member co-payment or
11 liability as we sometimes call it.
12     Q.   So member liability, is that a
13 good --
14     A.   We can use the term co-pay.
15     Q.   Co-pay, all right.
16          Now, would -- if you had two
17 plans -- or if you had multiple plans with
18 the same co-pay logic, co-pay adjudication
19 logic, would you get a separate Word memo
20 for each plan or would you get one Word
21 memo that would cover every plan with that
22 same co-pay adjudication logic?
23          MR. SEVEDGE:  I object to form.
24          MS. WEDDLE:  Join.
25     A.   Again, it depends on the nature

7 (Pages 22 - 25)

Page 26

1  EMANUEL-JOHNSON
2 of the arrangement that Cigna would have
3 had with their plan.
4    Q.    Right.  I guess what I'm trying
5 to figure out is when Argus was setting up
6 its system, was it setting up the system so
7 that it would have one methodology for all
8 plans with one kind of co-pay adjudication
9 logic and another system for all plans with
10 a different co-pay adjudication logic, or
11 did it go through plan by plan and treat
12 each one separately?
13          MR. SEVEDGE:  Form, scope.
14          MS. WEDDLE:  Join.
15    A.    So we could receive distinct
16 direction for one plan as opposed to
17 another, or we could receive direction to
18 apply particular what we would call editing
19 or, as you have referred to, adjudication
20 logic more broadly than to an individual
21 group.
22    Q.    And under what circumstances
23 would you apply this analysis to a single
24 plan versus to a larger group?
25          MR. SEVEDGE:  Form, scope.

Page 27

1  EMANUEL-JOHNSON
2    A.    I apologize for the pause.  I
3 don't want to speak to, you know, the
4 financial arrangements, contractual
5 arrangements that Cigna would have had with
6 their particular clients, but what I can
7 share is that we had in our systems based
8 on structure a series of what we call
9 client, and client is a part of hierarchy
10 that are standard benefit designs, and so
11 therefore everyone beneath those benefit
12 designs would have a like -- a like set of
13 adjudication logic as opposed to, and,
14 again, I can't speak to how they arrived at
15 this, but in some cases you would have
16 clients who had a different arrangement,
17 and there was more -- there was differences
18 between the standards, so we would call
19 those nonstandard.
20          So it was not atypical to
21 receive a request where we would apply
22 adjudication logic to the standards and
23 then we would get unique inputs from Cigna
24 for those nonstandard clients.
25    Q.    Are you familiar with something

Page 28

1  EMANUEL-JOHNSON
2 called co-pay G?
3    A.    I am.
4    Q.    What is co-pay G?
5    A.    Co-pay G is one of the
6 available options for consideration as to
7 how a co-pay, member co-pay, may be reduced
8 relative to certain pricing factors.
9    Q.    Is that -- is co-pay G an
10 adjudication logic?
11          MR. SEVEDGE:  I object to form.
12    Q.    I'm sorry, I missed your
13 answer.
14    A.    It is one of the elements tied
15 to adjudication logic.
16    Q.    Would it be a standard element
17 of adjudication logic?
18          MR. SEVEDGE:  I object to form.
19    A.    Reduced co-pay processing, as
20 we would call it, is a standard element for
21 adjudication.
22    Q.    Okay.  I'm just curious, what
23 does co-pay G stand for?  Do they run
24 serially, A, B, C, D?  How did you get to G
25 I guess?

Page 29

1  EMANUEL-JOHNSON
2          MR. SEVEDGE:  I object to form.
3    A.    It is serial.
4    Q.    So getting back to the Word
5 document that you get from Cigna that gives
6 you the benefit design information, would
7 co-pay G be a standard benefit design that
8 would be discussed in this Word document
9 and it would apply to every Cigna plan that
10 provides for co-pay G adjudication logic?
11          MR. SEVEDGE:  I object to form.
12          MS. WEDDLE:  Join.
13    A.    The element that you're
14 speaking to, what we would call in our
15 system reduced co-pay logic, is actually --
16 is something that we call a parameter, and
17 that's at a higher level in the hierarchy,
18 and so typically what occurs is that a
19 client would select, and by client in this
20 case I mean Cigna, would select that at the
21 point of implementation for that client,
22 and so therefore that does not always have
23 to be communicated as I described in the
24 individual requests or inputs from Cigna as
25 we're setting up individual health plans.

8 (Pages 26 - 29)

Page 30

```
 1                EMANUEL-JOHNSON
 2  However, it could be -- it could be
 3  submitted.
 4      Q.    So are you familiar with
 5  something called co-pay K?
 6      A.    I am.
 7      Q.    So with the original setup, is
 8  it a scenario where when the original
 9  information about the plan comes in, there
10  is a higher-level hierarchy selection of
11  co-pay G or co-pay K and then that drives
12  the adjudication forward?
13            MR. SEVEDGE:  I object to form.
14      A.    Again, typically there would be
15  a selection of the reduced co-pay options
16  at the onset of configuration thereby not
17  requiring individual submission every time
18  that Cigna is wanting to set up a client.
19  However, should they want to have variation
20  from that higher level of reduced co-pay
21  option or co-pay option, that can be
22  submitted in an individual request.
23      Q.    What is the difference
24  between -- well, and how often did that
25  happen with Cigna, that there was a choice
```

Page 31

```
 1                EMANUEL-JOHNSON
 2  to modify the co-pay option?
 3            MS. WEDDLE:  I object to form.
 4      A.    I cannot -- cannot give you a
 5  specific related to that.  I can tell you
 6  that on an annual basis we process
 7  thousands of transactions and, in addition,
 8  with the Cigna relationship they also have
 9  the ability to configure the system.  So I
10  cannot definitively answer that.
11      Q.    Can you give me a ballpark
12  idea?  I mean, was it extremely rare?  Did
13  it happen all the time?
14            MR. SEVEDGE:  I object to form.
15            MS. WEDDLE:  Join.
16      A.    No, sir, I cannot.
17      Q.    What's the difference between a
18  co-pay option and a reduced co-pay option?
19            MR. SEVEDGE:  I object to form.
20      A.    They are one in the same.
21      Q.    So if you use -- I heard the
22  "reduced" in there -- so if you use reduced
23  or co-pay option, I don't need to follow up
24  with that, they mean the same thing?
25      A.    Yes.
```

Page 32

```
 1                EMANUEL-JOHNSON
 2      Q.    Thank you.
 3            If you would, please, back to
 4  the exhibit, if we go to the next page
 5  which has a DSTPS 663 at the bottom, they
 6  are more definitions.  Do you see that?
 7      A.    I do.
 8      Q.    Now, up near the top there is a
 9  definition of "claim."  Do you see that?
10      A.    Yes.
11      Q.    And where it says -- is that
12  consistent with your understanding of the
13  definition of "claim" from the perspective
14  of the work Argus did for Cigna?
15      A.    Yes.
16            MR. SEVEDGE:  I object to form.
17      Q.    And what claim -- well,
18  withdrawn.
19            So whose claim is this?  Is
20  this the pharmacy's claim to Argus?  Is it
21  the member's claim?  Can you tell me,
22  what's referred to by "claim"?
23            MR. SEVEDGE:  I object to form.
24            MS. WEDDLE:  Join.
25      A.    In this respect, based on this
```

Page 33

```
 1                EMANUEL-JOHNSON
 2  definition, "claim" would be representative
 3  of a member of a Cigna company customer.
 4  So, again, to your point earlier, you have
 5  the health plan from your company, claim
 6  would be a claim submitted on your behalf
 7  for coverage.
 8      Q.    And the definition makes
 9  reference to an electronic request.  So
10  this would be -- electronic would be the
11  type of point of sale transaction?
12            MR. SEVEDGE:  I object to form.
13      A.    That is correct.
14      Q.    And when you say request for
15  payment or reimbursement, this would be a
16  request for payment to the pharmacy?
17            MR. SEVEDGE:  I object to form.
18            MS. WEDDLE:  I object to form.
19      Q.    In a point of sale transaction.
20            MR. SEVEDGE:  Same.
21            MS. WEDDLE:  I object to form.
22      A.    Electronic point of sale is for
23  pharmacy.
24      Q.    So that would be a request for
25  payment to the pharmacy as a result of that
```

Page 34
1            EMANUEL-JOHNSON
2  point of sale transaction; is that right?
3        MR. SEVEDGE:  I object to form.
4        MS. WEDDLE:  Join.
5    A.    Correct.
6    Q.    If you drop down two more
7  definitions, it says "claim processing
8  system."  Do you see that?
9    A.    I do.
10   Q.    It makes reference to Schedule
11 A-1 to Statement of Work No. 1.  Do you see
12 that?
13   A.    Yes.
14   Q.    What is a statement of work?
15   A.    Relative to this, statement of
16 work is a service that we would provide to
17 Cigna.  This is the structure that we use
18 within this contract to have statements of
19 work.
20   Q.    So is the work -- so as the
21 nature of the engagement changed, there
22 might be additional statements of work?
23   A.    Yes, there could be.
24   Q.    If you would, please, turn to
25 the next page, please.

Page 35
1            EMANUEL-JOHNSON
2    A.    Yes.
3    Q.    Of the document.  That has the
4  664 at the bottom of the page.  I just want
5  to make sure our definitions match up here.
6        So there is a reference to
7  company customer.  Do you see that?
8    A.    Yes.
9    Q.    That's what we have been also
10 referring to as a member of a plan; is that
11 right?
12   A.    That is correct.
13   Q.    Then if you drop down a couple
14 more definitions, there is a reference to
15 company plan.  Do you see that?
16   A.    I do.
17   Q.    It says "means any benefit,
18 product, plan."  Do you see that?  And that
19 refers to the health plan that covers the
20 member, for example, the SS&C plan; is that
21 right?
22   A.    I'm going to read through the
23 whole definition.
24   Q.    Please.
25   A.    That is correct.

Page 36
1            EMANUEL-JOHNSON
2    Q.    Now, if you drop down a few
3  more, you will see there is a definition of
4  cost share.  Do you see that?
5    A.    I do.
6    Q.    And you could see that it
7  refers to co-payments and deductibles.  Do
8  you see that?
9    A.    Yes.
10   Q.    Now, you mentioned earlier that
11 you would get benefit design information
12 from Cigna, and would the cost share
13 information be part of the benefit design
14 information you received from Cigna?
15       MR. SEVEDGE:  I object to form.
16   A.    Yes, it would.
17   Q.    I want to go forward a few more
18 pages.  This would be page 670 in the
19 bottom right corner.
20   A.    I'm on page 670.
21   Q.    There is a reference at the top
22 to paid claim.  Do you see that?
23   A.    I do.
24   Q.    A paid claim means a claim that
25 has been accepted and approved for payment.

Page 37
1            EMANUEL-JOHNSON
2  And with respect to a point of sale
3  transaction, describe how that occurs,
4  please.
5        MS. WEDDLE:  I object to form.
6        MR. SEVEDGE:  Join.
7    A.    Describe how a paid claim
8  occurs?
9    Q.    Or how does -- what happens for
10 a paid claim to become a paid claim in a
11 point of sale transaction?
12       MR. SEVEDGE:  I object to form.
13       MS. WEDDLE:  Same objection.
14   A.    The pharmacy would have
15 received information in regards to the
16 member and the prescription that has been
17 prescribed by a physician for that member.
18 The pharmacy would then submit using
19 industry standard information so that that
20 claim is routed to, in this case, Argus.
21       In the adjudication of a claim,
22 we're looking at potentially hundreds of
23 elements.  The key elements would be
24 whether or not that member was eligible
25 under the plan first, and then we're

Page 38
1      EMANUEL-JOHNSON
2  looking at the eligibility of a pharmacy,
3  and then the other high-level components
4  that are leveraged are inclusive of drug
5  coverage exclusions, what the member
6  co-payment may be, and/or deductible, and
7  then we go through all of those edits and
8  then return a response to the pharmacy
9  indicating, you know, the position of the
10 claim, if it's paid, in this case it's
11 because that's what you asked for, and then
12 what the co-payment or cost out of member
13 pocket will be.
14     Q.   And typically this happens
15 before the pharmacist gives the
16 prescription to the member?
17          MR. SEVEDGE:  I object to form.
18     A.   That is --
19     Q.   That is correct?
20     A.   Typically correct, yeah.
21     Q.   So for purposes of this
22 definition, a paid claim exists before the
23 member leaves the pharmacy with the
24 prescription?
25          MR. SEVEDGE:  I object to form.

Page 39
1      EMANUEL-JOHNSON
2          MS. WEDDLE:  Join.
3      A.   Yes.
4      Q.   Now, I would like to look
5  briefly at the second sentence here, and
6  there is a reference to something called a
7  reversed claim.  What is a reversed claim?
8      A.   A reversed claim is a claim
9  that was initially submitted by the
10 pharmacy, received a paid response, and
11 then for varying reasons is reversed.  And
12 I will give a typical business scenario.
13 Let's say you as a member do not come in to
14 pick up your prescription, the pharmacy
15 would reverse that transaction out and
16 return the product, you know, to their
17 inventory.  So that's what typically causes
18 a reversal.
19     Q.   Is a claim ever reversed after
20 the member leaves the pharmacy with the
21 prescription?
22          MS. WEDDLE:  I object to form.
23     A.   No.
24     Q.   What's a duplicate claim?
25     A.   Duplicate claim would be a

Page 40
1      EMANUEL-JOHNSON
2  claim that has already been submitted and
3  has been approved for payment and then the
4  pharmacist attempts to submit the same
5  information.
6      Q.   So there would not be two
7  prescriptions going to the member, it would
8  just be the pharmacist -- withdrawn.
9           So with a duplicate claim, does
10 the member get two prescriptions or just
11 one?
12          MR. SEVEDGE:  Objection to
13 form.
14     A.   They do not.
15     Q.   I didn't ask that question
16 well.
17          So with a duplicate claim, does
18 the member get two prescriptions?
19     A.   No.
20     Q.   What's a rejected claim?  And
21 just for your information, it is
22 capitalized and there is a definition for
23 it on the next page that says 2175.
24     A.   A rejected claim is a claim
25 that does not, for varying reasons, meet,

Page 41
1      EMANUEL-JOHNSON
2  you know, the editing to result in a
3  covered or a paid claim.
4      Q.   And then the next sentence
5  makes reference to a reprocessed claim.
6  What is a reprocessed claim?
7      A.   A reprocessed claim is a claim
8  that has originally been paid, has gone
9  through what we call the financial process,
10 and for whatever drivers may need to be
11 reprocessed again.
12     Q.   Would a reprocessed claim occur
13 after a member has left the pharmacy with
14 the prescription?
15          MR. SEVEDGE:  I object to form.
16          MS. WEDDLE:  Join.
17     A.   Yes, that could be the case.
18     Q.   So of reversed claims,
19 duplicate claims, rejected claims and
20 reprocessed claims, reprocessed claims are
21 the only adjustments that could occur after
22 the member left the pharmacy with the
23 prescription?
24          MR. SEVEDGE:  I object to form.
25          MS. WEDDLE:  Join.

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

Page 186

1
2      CERTIFICATION
3
4    I, TODD DeSIMONE, a Notary Public for
5  and within the State of New York, do hereby
6  certify:
7    That the witness whose testimony as
8  herein set forth, was duly sworn by me; and
9  that the within transcript is a true record
10 of the testimony given by said witness.
11   I further certify that I am not related
12 to any of the parties to this action by
13 blood or marriage, and that I am in no way
14 interested in the outcome of this matter.
15   IN WITNESS WHEREOF, I have hereunto set
16 my hand this 24th day of July, 2020.
17
18
19   _____
20      TODD DESIMONE
21
22
23
24
25

Page 187

1  CHRISTOPHER B. SEVEDGE, ESQ.
2  christopher.sevedge@stinson.com
3           July 24, 2020
4  RE: Negron v. Cigna
5     7/16/2020, Michelle Emanuel-Johnson (#4182924)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17    Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 188

1  Negron v. Cigna
2  Michelle Emanuel-Johnson (#4182924)
3         E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Michelle Emanuel-Johnson       Date
25

Page 189

1  Negron v. Cigna
2  Michelle Emanuel-Johnson (#4182924)
3         ACKNOWLEDGEMENT OF DEPONENT
4    I, Michelle Emanuel-Johnson, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Michelle Emanuel-Johnson       Date
13 *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19       NOTARY PUBLIC
20
21
22
23
24
25

48 (Pages 186 - 189)

Veritext Legal Solutions
212-279-9424            www.veritext.com            212-490-3430