# EXHIBIT 9
# FILED UNDER SEAL

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 3    Case No. 16-cv-1702
      - - - - - - - - - - - - - - - - - -x
 4    KIMBERLY A. NEGRON, Individually   :
      and on Behalf of All Others        :
 5    Similarly Situated,                :
                                         :
 6                      Plaintiffs,      :
                                         :
 7           - vs -                      :
                                         :
 8    CIGNA CORPORATION and CIGNA HEALTH :
      AND LIFE INSURANCE COMPANY, et al.,:
 9                                       :
                        Defendants.      :
10    - - - - - - - - - - - - - - - - - -x
11
12                              August 12, 2020
                                9:23 a.m.
13                              9 Cimmeron City Drive
                                Cape Neddick, Maine
14
15
16
17
18
19
20         VIDEOTAPED VIRTUAL DEPOSITION UPON
21    ORAL EXAMINATION OF STEPHANIE BYRNE, held at the
22    above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25
```

Page 2

```
 1
 2  APPEARANCES:
 3
 4       IZARD KINDALL & RAABE, LLP
         Attorneys for Plaintiff
 5       29 South Main Street
         West Hartford, New York 06106
 6       BY:  CRAIG A. RAABE, ESQ.
              CHRISTOPHER M. BARRETT, ESQ.
 7            ROBERT IZARD, ESQ.
 8
 9       MOTLEY RICE, LLC
         Attorneys for Plaintiff
10       777 Third Avenue
         New York, New York 10017
11       BY:  MEGHAN OLIVER, ESQ.
              CHARLOTTE LOPER, ESQ.
12
13
14
         MORGAN LEWIS & BOCKIUS, LLP
15       Attorneys for Defendant, Cigna
         Corporation and Cigna Health and Life
16       Insurance Company
         1701 Market Street
17       Philadelphia, Pennsylvania 19103
         BY:  BRIAN SHAFFER, ESQ.
18            ELEANOR FARRELL, ESQ.
19
20
21  ALSO PRESENT:
22       Howard Brodsky - Videographer
         Brett Boskiewicz, Esq.
23
24
25
```

Page 3

```
 1
 2           MR. VIDEOGRAPHER:  Good morning.
 3  Here begins the video-recorded virtual
 4  remote 30(b)(6) deposition of Stephanie
 5  Byrne, appearing individually and on behalf
 6  of Cigna Health & Life Insurance Company
 7  from her location in Cape Neddick, Maine.
 8           This deposition is taken by the
 9  plaintiffs in the matter of Kimberly A.
10  Negron, et al., plaintiffs, versus Cigna
11  Health & Life Insurance Company, et al.,
12  defendants, Civil Action No.
13  16-cv-1702(JAM), in the United States
14  District Court, District of Connecticut.
15           Today is Wednesday, August 12,
16  2020, and the time is approximately
17  9:23 a.m. Eastern Daylight Time.
18           My name is Howard Brodsky and I am
19  the legal video specialist in association
20  with Veritext Legal Solutions with offices
21  located in New York, New York.  The court
22  reporter is Randi Friedman, in association
23  with Veritext.
24           Will counsel please state their
25  appearances for the record.
```

Page 4

```
 1
 2           MR. RAABE:  For the plaintiffs,
 3  Craig Raabe, and with me is Bob Izard, Chris
 4  Barrett, Meghan Oliver and Charlotte Loper.
 5           MR. SHAFFER:  Brian Shaffer on
 6  behalf of Cigna Health & Life Insurance
 7  Company, and the witness, Steph Byrne.  With
 8  me is Eleanor Farrell.
 9           MR. VIDEOGRAPHER:  Thank you,
10  Counsel.
11           It is stipulated and agreed by the
12  parties that the court reporter may take the
13  witness oath remotely.
14           Will the court reporter please
15  swear in the witness.
16               * * *
17           STEPHANIE BYRNE, the witness
18  herein, after first having been duly sworn,
19  was examined and testified as follows:
20               * * *
21           EXAMINATION
22  BY MR. RAABE:
23      Q    Good morning, Ms. Byrne.  As you just
24  heard, my name is Craig Raabe and I am one of the
25  lawyers for the plaintiffs in this case.
```

Page 5

```
 1                   S. Byrne
 2           Have you ever been deposed before?
 3      A    No.
 4      Q    Okay.  I assume that you've had some
 5  conversations with your counsel about it.  I
 6  don't want to hear what those conversations are,
 7  but the process is relatively simple.  My role is
 8  to ask you questions and your role is to answer
 9  them truthfully.  If I ask a question that you
10  don't understand, just let me know and I will try
11  to rephrase it.  Okay?
12      A    Okay.
13      Q    If you want to take a break at any
14  time, just let us know and we can do that as
15  well, as long as there's not a question pending.
16  Okay?
17      A    Okay.
18      Q    Do you understand that you're here
19  both in an individual capacity and as what's
20  known as a 30(b)(6) witness?
21      A    Yes.
22      Q    And as a 30(b)(6) witness, you'll be
23  speaking on behalf of Cigna?
24      A    Yes.
25      Q    For the purposes of my questions
```

2 (Pages 2 - 5)

Page 58

1         S. Byrne
2  to Co-Pay G; correct?
3      A    I don't recall the specific document
4  being put out on FUSE that I was involved with.
5  I do know that different -- different documents
6  that were supposed to be educational were
7  sometimes put out on FUSE.  Some from marketing,
8  some for educational purposes.  But we were not
9  set up such that we were allowed -- I wouldn't
10  say the word "allowed," but it wasn't a standard
11  process for us to review what information got put
12  out on FUSE.
13     Q    What do you mean by that?
14     A    Product as well as -- you know, it
15  was -- sales force used FUSE basically as their
16  area, you know, combining documents for
17  education.  So product would put educational
18  materials out there.
19          Sales would -- I know when they do
20  sales training they would refer to certain
21  documents on FUSE for them to review, to do their
22  training.  It was very infrequent, if any,
23  though, that analytic areas or any other areas
24  beyond sales and product would get involved with
25  FUSE documents.

Page 59

1         S. Byrne
2      Q    Do you know what FUSE stands for?
3      A    I do not.
4      Q    So in essence, the FUSE materials were
5  educational materials to inform the sales and
6  marketing people about products?
7      A    Yes, to the best of my knowledge.
8      Q    So if you turn the page to the -- the
9  first page of the document, Exhibit 173, Page
10  384938, Ellen Barrett is writing to you.
11          Who is Ellen Barrett?
12     A    She was on Claire Virgil's team.  On
13  the product marketing strategy team.
14     Q    And she types, "Doug reviewed and he
15  agrees it's fine.  Just one change to specify
16  that exceptions to enable Co-Pay G through PBAB
17  are only available on ASO business."
18          You see that?
19     A    Yes.
20     Q    What's your understanding of what
21  Ellen's referring to there, particularly with
22  regard to the PBAB?
23     A    Yeah, I think what she's saying here
24  is that if you're going to PBAB for an approval
25  and you request a PBAB, is that a client have

Page 60

1         S. Byrne
2  Co-Pay G, that they're only going to approve it
3  if it's ASO business because of the filing.
4      Q    In the top email from Mr. Whitnah to
5  you, Mr. Whitnah is one of the people that came
6  from Great West?
7      A    Yes.
8      Q    And he had, to your knowledge, good
9  working knowledge of spread pricing?
10     A    Yes, he did.
11     Q    In sub-bullet point 2 he says, "Some
12  things about spread pricing were hard coded by
13  the one Argus guy who understood Co-Pay K logic,"
14  and it continues there.
15          Do you see that?
16     A    Yes.
17     Q    Do you know what the hard coding there
18  refers to?
19     A    I can't recall anything at all about
20  what this hard coded thing could have been.  I'm
21  not even sure what platform Dan is referring to,
22  because I don't think -- I can't think of
23  anything that would connect, because it doesn't
24  matter if you're Co-Pay G or Co-Pay K.  It has
25  nothing to do with spread pricing.  I don't know

Page 61

1         S. Byrne
2  if he could be talking about a specific client,
3  that they're fearful if a specific client's hard
4  coding could impact others, because that's
5  happened before.  Other than that, I can't -- I
6  can't gather what this would be specifically.
7      Q    Do you know, Ms. Byrne, whether there
8  is any change in the amounts of member cost
9  shares with respect to the implementation of the
10  Co-Pay G standardization project?
11     A    As a result of Co-Pay G, of course
12  there wouldn't have been any changes to clients
13  that already had Co-Pay G manually installed.  At
14  least there should not have been, because it
15  should have worked consistently between manual
16  setup and standard setup.  And when clients moved
17  from Co-Pay K to Co-Pay G, they would have
18  received the same cost share, or it would have
19  been lowered if the client rate was lower than
20  the Co-Pay K, prior co-pay amount in the plan of
21  benefits.
22     Q    Do you know whether that, in fact,
23  occurred?
24     A    I mean, I don't -- I couldn't point to
25  any particular client and know that for fact.

Page 74

1      S. Byrne
2          MR. SHAFFER: Objection to form.
3      Lack of foundation, beyond the scope.
4          THE WITNESS: I can't recall any
5      changes to...
6  BY MR. RAABE:
7      Q   Let's take a look at 175. Just read
8  it to yourself and let me know when you're done.
9      A   Is it available?
10     Q   I'm sorry. It should be.
11         MS. LOPER: Sorry, it should be
12     available. Let me know if you can't see it.
13         THE WITNESS: Okay. I'll bring it
14     up.
15         Yes.
16 BY MR. RAABE:
17     Q   So this is an email between Dan
18 Whitnah and Deb Kronberg.
19         Who is Deb Kronberg and what was her
20 role?
21     A   She was head of pharmacy pricing for
22 Great West, at Great West. Dan Whitnah worked
23 for Debbie. I believe she's still with Cigna in
24 a leadership role, I think, with the pharmacy
25 organization.

Page 75

1      S. Byrne
2      Q   This email appears to be -- and
3  correct me if I'm wrong -- that Mr. Whitnah is
4  sending to Ms. Kronberg a message that you had
5  sent via Lync, L-Y-N-C; is that right?
6      A   I actually don't recall Lync.
7      Q   Do you recall the message that's
8  contained here, that --
9      A   Not specifically, but I'm sure I wrote
10 this and sent it to Dan.
11     Q   Okay. A couple of questions on it.
12         So PCT, what is that?
13     A   It's the main data file of data that
14 goes back and forth between Cigna and Argus. I
15 believe PCT in its original form was prescription
16 claim types when data went back and forth on a
17 physical tape. Of course it turned into
18 electronic transmission.
19     Q   It says -- begins on 215. Can you
20 tell us what 215 is?
21     A   Yeah, that's the platform for the
22 Proclaim business.
23     Q   It continues, "We send Argus only the
24 funds to pay pharmacies the Optum rate."
25         Is that consistent with the flow of

Page 76

1      S. Byrne
2  funds you just described, where Cigna pays Argus
3  and Argus pays the pharmacy?
4      A   Yes.
5          MR. SHAFFER: Objection to form.
6      But I interject an objection.
7  BY MR. RAABE:
8      Q   It continues on 518-519.
9          What's that?
10     A   That's Facets platform.
11     Q   The "we" there refers to Cigna; right?
12     A   Yes.
13     Q   "Cigna sends Argus the full client
14 funding with the first PCT."
15         What does that refer to there?
16     A   The setup with Argus was different for
17 Facets versus Proclaim.
18     Q   How so?
19     A   Because it's important to understand,
20 because Facets is Great West and Great West had a
21 very specific way of doing business with the PBMs
22 that they used prior to the Cigna acquisition.
23 And they insisted that that be duplicated with
24 Argus.
25         And their method of doing this was to

Page 77

1      S. Byrne
2  have one full PCT, which is when everything is
3  based on client funding and that whole thing
4  processes through Argus.
5          Then there is a second PCT, which
6  would provide information on what ultimately the
7  pharmacies should be paid. And in this case,
8  Argus was calculating the difference.
9      Q   It continues, "With a second PCT,
10 Argus splits the money, pays pharmacies the Optum
11 rates and sends the spread back to Cigna."
12         That's the same flow of funds that you
13 described before, with spread coming back to
14 Cigna?
15         MR. SHAFFER: Objection to form.
16         THE WITNESS: It's the same flow
17     of funds, but, I mean, there's a difference
18     in the Facets platform in terms of exactly
19     is Argus or Cigna doing the calculation.
20 BY MR. RAABE:
21     Q   And it continues, "but for scripts
22 where the customer pays the whole client rate,
23 we, Cigna, collect the spread back through
24 negative pharmacy amounts due"; right?
25     A   Yes.

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

```
                                                         Page 106
 1
 2          C E R T I F I C A T I O N
 3        I, Randi Friedman, Registered
 4   Professional Reporter and Notary Public of the
 5   State of New York, do hereby certify:
 6        THAT, the witness whose testimony is herein
 7   before set forth, was duly sworn by me, and
 8   THAT, the within transcript is a true record of
 9   the testimony given by said witness.
10        I further certify that I am not related
11   either by blood or marriage to any of the parties
12   to this action; and that I am in no way
13   interested in the outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand this day, August 24, 2020.
16
17
18   _____
19   Randi Friedman, RPR
20
21
22
23
24
25
```

```
                                                         Page 107
 1         ** ERRATA SHEET **
 2   CASE: NEGRON vs. CIGNA
     DEPOSITION DATE: 8/12/2020
 3   DEPONENT: STEPHANIE BYRNE
 4   PAGE LINE(S)   CHANGE           REASON
 5   ___|____|_____|_____
 6   ___|____|_____|_____
 7   ___|____|_____|_____
 8   ___|____|_____|_____
 9   ___|____|_____|_____
10   ___|____|_____|_____
11   ___|____|_____|_____
12   ___|____|_____|_____
13   ___|____|_____|_____
14   ___|____|_____|_____
15   ___|____|_____|_____
16   ___|____|_____|_____
17   ___|____|_____|_____
18   ___|____|_____|_____
19   ___|____|_____|_____
20
21         _____
             STEPHANIE BYRNE
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS _____ DAY OF _____, 20___.
24
     _____   _____
25   (NOTARY PUBLIC)    MY COMMISSION EXPIRES:
```