# EXHIBIT 14
# FILED UNDER SEAL

Page 1

```
                UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
                Case No. 16-cv-1702
                - - - - - - - - - - - - - - - - - - -x
                KIMBERLY A. NEGRON, Individually    :
                and on Behalf of All Others         :
                Similarly Situated,                 :
                                                    :
                                   Plaintiffs,      :
                                                    :
                       - vs -                       :
                                                    :
                CIGNA CORPORATION and CIGNA HEALTH  :
                AND LIFE INSURANCE COMPANY, et al., :
                                                    :
                                   Defendants.      :
                - - - - - - - - - - - - - - - - - - -x

                                       September 17, 2020
                                       8:57 a.m.
                                       88 E. Mountain Road
                                       Canton, Connecticut


                          ***CONFIDENTIAL***




                       VIRTUAL REMOTE DEPOSITION UPON ORAL
                EXAMINATION OF CHRISTOPHER HOCEVAR, held at the
                above-mentioned time and place, before Randi
                Friedman, a Registered Professional Reporter,
                within and for the State of New York.
```

Page 2

```
 1
 2  APPEARANCES:
 3
 4      IZARD KINDALL & RAABE, LLP
        Attorneys for Plaintiff
 5      29 South Main Street
        West Hartford, New York 06106
 6      BY: CRAIG A. RAABE, ESQ.
            CHRISTOPHER M. BARRETT, ESQ.
 7
 8
 9      MOTLEY RICE, LLC
        Attorneys for Plaintiff
10      28 Bridgeside Blvd.
        Mount Pleasant, SC 29464
11      BY: MEGHAN OLIVER, ESQ.
            CHARLOTTE LOPER, ESQ.
12
13
14
        MORGAN LEWIS & BOCKIUS, LLP
15      Attorneys for Defendant, Cigna
        Corporation and Cigna Health and Life
16      Insurance Company
        1701 Market Street
17      Philadelphia, Pennsylvania 19103
        BY: BRIAN SHAFFER, ESQ.
18          JILL SETTLEMYER, ESQ.
19              * * *
20
21
22
23
24
25
```

Page 3

```
 1
 2          STIPULATIONS
 3      IT IS HEREBY STIPULATED, by and between
 4  the attorneys for the respective parties hereto,
 5  that:
 6      All rights provided by the C.P.L.R.,
 7  and Part 221 of the Uniform Rules for the Conduct
 8  of Depositions, including the right to object to
 9  any question, except as to the form, or to move
10  to strike any testimony at this examination is
11  reserved; and in addition, the failure to object
12  to any question or to move to strike any
13  testimony at this examination shall not be a bar
14  or a waiver to make such motion at, and is
15  reserved to, the time of this action.
16      This deposition may be sworn to by the
17  witness being examined before a Notary Public
18  other than the Notary Public before whom this
19  examination was begun, but the failure to do so
20  or to return the original of this deposition to
21  counsel, shall not be deemed a waiver or the
22  rights provided by Rule 3116, C.P.L.R., and shall
23  be controlled thereby.
24      The filing of the original of this
25  deposition is waived.
```

Page 4

```
 1
 2              * * *
 3      CHRISTOPHER HOCEVAR, the witness
 4  herein, after first having been duly sworn,
 5  was examined and testified as follows:
 6              * * *
 7          EXAMINATION
 8  BY MR. RAABE:
 9      Q   Good morning, Mr. Hocevar. I'm Craig
10  Raabe. I'm one of the lawyers for the plaintiffs
11  in this case.
12          Have you ever been deposed before?
13      A   I have.
14      Q   Under what circumstances?
15      A   Both as an employee of Cigna for the
16  Anthem litigation, as well as another litigation,
17  I don't remember the name of it, down in Texas.
18      Q   Okay. So I'm going to assume that you
19  have some familiarity with the process. This is
20  a little bit different because we're doing it
21  remotely so it's a little more important that we
22  try not to talk over each other. So I'll do my
23  best to let you finish your answer before I ask
24  my next question. If you can make sure you're
25  pausing between questions and answers as well, it
```

Page 5

```
 1          C. Hocevar - Confidential
 2  will make Randi's job a whole lot easier; okay?
 3      A   Okay.
 4      Q   How long did you work at Cigna?
 5      A   I started in 2002 and left end of
 6  2018.
 7      Q   Between 2010 and the time that you
 8  left, what were your positions?
 9      A   Let me think through. Around 2010,
10  I'm trying to figure out if it was just before or
11  after I was the president of the select segment,
12  which was a business selling commercial insurance
13  to employers of 50 to 250. I can't remember
14  whether I was also the individual segment leader
15  or not but my primary job was select.
16          Around mid-2013, expanded
17  responsibility to also include the pharmacy
18  business. And then from that, somewhere around
19  2017 or so, I apologize for the exact -- lack of
20  exactness on the dates, also picked up
21  responsibility for all of the commercial
22  segments, the strategy for the overall company,
23  as well as all of what we called solutions or the
24  specialty lines of business.
25      Q   Earlier you mentioned something called
```

2 (Pages 2 - 5)

Page 98

1      C. Hocevar - Confidential
2          MR. RAABE: Charlotte, can you put
3      up Exhibit 177, please?
4          MS. LOPER: This has previously
5      been marked as Exhibit 177. You should be
6      able to see it.
7          MR. SHAFFER: Sorry. 177?
8          MR. RAABE: Yes.
9          THE WITNESS: Okay. I have it.
10   BY MR. RAABE:
11     Q    So if you start in the first email in
12   the chain, it begins at the bottom of Page 256.
13   There's an email from Lance Wilkes to Stephanie
14   Byrne and Dan Whitnah and others.
15         What was Dan Whitnah's role in 2013?
16     A    I don't remember his official title,
17   but he would have had more of the pharmacy
18   pricing. So the actuarial team for pharmacy. At
19   some point, he then turned over to be the CFO of
20   the business.
21     Q    Mr. Wilkes writes, "Stephanie/Dan -
22   Chris has asked for an assessment of the worst
23   case scenario based upon Catamaran's positioning
24   of the zero balance and 90-day issue"; do you see
25   that?

Page 99

1      C. Hocevar - Confidential
2     A    I do.
3     Q    Do you understand the "Chris" there to
4   be you?
5     A    I don't know if it is, but at that
6   time, we were starting to have pretty heated
7   conversations on the reconciliation side of
8   Catamaran.
9     Q    And with regard to the zero balance
10  issue, what do you recall?
11    A    I knew it was one of many reconciling
12  items where we had a disagreement with Catamaran.
13    Q    What did the disagreement surround?
14    A    Craig, I don't know -- I don't
15  remember the details, but at that time, it was
16  when we were actually starting to kind of
17  implement some of the key components of the
18  contract, and with any implementation, there's
19  always kind of puts and takes.
20         From what I remember, fourth quarter
21  of 2013, there were a lot of -- there were a lot
22  of reconciled items that weren't on the favorable
23  side of how we would have interpreted the
24  contract.
25    Q    What's your understanding of zero

Page 100

1      C. Hocevar - Confidential
2   balance to mean?
3     A    I don't remember the details of it,
4   Craig. I just know it was one of the economic
5   levers that we were not in align with. Again,
6   the contract with Catamaran was thousands and
7   thousands of pages. This was kind of the first
8   couple months we were getting into it with them.
9     Q    Do you recall zero balance to involve
10  obtaining from pharmacies the differential
11  between what Catamaran was paying the pharmacies
12  and what members were paying in cost shares?
13    A    I don't. There was a delta between
14  our contracted rates with Catamaran and what we
15  were actually seeing come through, so I don't
16  know how that plays through the zero base side of
17  it. I apologize. I can't be more helpful on
18  this one.
19    Q    What's your best recollection of what
20  zero balance refers to?
21    A    The straightest line I can draw,
22  Craig, and I'm reaching, is that there was
23  trapped money that sat between the contracted
24  rates with Catamaran and what sat at the retail
25  side. The mechanics of it, I can't testify to go

Page 101

1      C. Hocevar - Confidential
2   deeper than that piece.
3     Q    When there was money sitting at the
4   retail side, where did that money come from?
5     A    I don't remember. I had a laundry
6   list from the team that we were out of whack with
7   Catamaran. At that time, we were also having
8   fairly significant relationship issues beyond the
9   economic issues.
10    Q    If you look at the first page of this
11  Exhibit 177 --
12    A    255?
13    Q    255. It's an email from Dan Whitnah
14  to a number of people, and in the third paragraph
15  it says, "The third option in addition to
16  Stephanie's is a periodic clawback from
17  pharmacies by Catamaran"; do you see that?
18    A    Yes.
19    Q    Did you ever have conversations with
20  anyone about that option?
21    A    Let me read the entire paragraph so I
22  have some context here. Okay.
23         What was your question again? I'm
24  sorry.
25    Q    Did you ever have a conversation with

26 (Pages 98 - 101)

Page 102
1        C. Hocevar - Confidential
2  anyone about that third option of a periodic
3  clawback from pharmacies by Catamaran?
4      A    It doesn't ring a bell.  It might have
5  happened, but it doesn't ring a bell.
6           MR. RAABE:  Let's mark 178369,
7      please, Charlotte.
8           MS. LOPER:  Okay.  This will be
9      Exhibit 232.
10          (Plaintiff's Exhibit 232 was
11     marked.)
12  BY MR. RAABE:
13     Q    Let me know when you see that one.
14     A    Okay.  Give me a second.  232?
15     Q    Yes.
16     A    Okay.  Loaded.
17     Q    So the first email on the chain is an
18  email to you from Barry Davis at Catamaran.
19          Is that one of the people that you
20  were dealing with at Catamaran?
21     A    I spent most of my time with Mark
22  Thierer, who's the CEO, and then occasionally
23  with Barry Davis.  But I tried to pair Barry
24  Davis off with Ray Smithberger from kind of a
25  contact point, but, yes.

Page 103
1        C. Hocevar - Confidential
2      Q    In an email that you wrote back to
3  Barry about five lines down you say, "Candidly,
4  Cigna having to invest time and money in Argus
5  changes to enable Catamaran to achieve their
6  contractual commitments is not a good use of time
7  for us and not something that was ever
8  contemplated"; do you see that?
9      A    I do.
10     Q    Can you tell us what that refers to?
11     A    I don't remember the specifics of it,
12  Craig, but this is about the time where we went
13  through at least one or two iterations of monthly
14  reconciliations with Catamaran.  And as I said,
15  there weren't many things that were coming up on
16  the same level of what we thought we had
17  contracted with.  And at that time, we were
18  starting to question with Catamaran whether or
19  not they underwrote the same deal that we
20  underwrote, and that was the start of a rather
21  lengthy set of conversations.
22     Q    Okay.
23          MR. RAABE:  Let's mark 7864877,
24     please.
25          MS. LOPER:  Okay.  This will be

Page 104
1        C. Hocevar - Confidential
2      Exhibit 233.  One second.  It's loading.
3      Okay.  You should be able to see it now.
4           (Plaintiff's Exhibit 233 was
5      marked.)
6           THE WITNESS:  233 I have.
7  BY MR. RAABE:
8      Q    The first email in the chain, Eric
9  Palmer writes to you, "Do you want me to go to
10  Schaumburg with you on 12/4?"
11          Was that in relation to visiting
12  Catamaran?
13     A    That's where their headquarters were,
14  yes.
15     Q    And you responded, "I am not flying
16  out, as I have the all day retail 2.0 design
17  session."
18          Can you tell us what that refers to?
19     A    I don't remember.
20     Q    The next paragraph you say, "BTW, I
21  did not even know what to say on the 500
22  conversation today."
23          Can you tell us what that refers to?
24     A    Sorry, I don't remember.
25     Q    And Mr. -- this is an email from you

Page 105
1        C. Hocevar - Confidential
2  to Mr. Palmer, the last email on the chain, you
3  say, "I just about almost killed Lance ten
4  minutes ago and might by the end of the day.  Not
5  only do we have a ZBL issue; we now have a
6  netting issue in which Cat says they are
7  performing above our contracted rate"; do you see
8  that?
9      A    I do.
10     Q    What had Lance done that annoyed you?
11     A    I don't remember, but I think Lance
12  was the CFO at that time, and I love him to death
13  and still talk to him quite a bit, but it turns
14  out he was a better deal guy than a CFO.
15     Q    So the next sentence begins with "Not
16  only."
17          Can you tell us what that refers to?
18     A    I don't remember.  This timeframe,
19  November, is, again, one or two months into the
20  reconciliation with Catamaran on the rates, so I
21  don't know what this is about.  But
22  environmentwise, there's lots of moving parts
23  with the relationship with Catamaran and the
24  reconciliation.
25     Q    Where it says, "Cat says they are

27 (Pages 102 - 105)
Veritext Legal Solutions
212-279-9424            www.veritext.com            212-490-3430

Page 106

1        C. Hocevar - Confidential
2   performing above our contracted rate," what
3   contracting rate were you referring to?
4        A    I don't -- I don't remember what the
5   context is here, but when I think about
6   contractor rate with Catamaran, it would be the
7   big multi, you know, thousand page contract that
8   we had with Catamaran, that we would then go out
9   and kind of salvage part of an integrated
10  offering to the employers.
11       Q    Does that refer to the rates that you
12  would pay to Catamaran to pay to pharmacies for
13  drugs?
14            MR. SHAFFER:  Objection to form.
15            THE WITNESS:  Yeah, I didn't
16       understand your question, Craig.
17  BY MR. RAABE:
18       Q    It says "contracted rate."
19            Does that refer to a schedule of rates
20  that Cigna would pay to Catamaran, that Catamaran
21  would pay to pharmacies?
22            MR. SHAFFER:  Objection to form.
23       Asked and answered.
24            THE WITNESS:  Yeah, I don't know
25       what the contracted rate is.  What I was

Page 107

1        C. Hocevar - Confidential
2   referring to is just how I think about
3   contract rates with Catamaran would be back
4   to the legal document that we had
5   consummated with them.
6            MR. RAABE:  Charlotte, let's mark
7       7864559, please.
8            MS. LOPER:  Okay.  This is Exhibit
9       234.  You should be able to see it.
10           (Plaintiff's Exhibit 234 was
11      marked.)
12           THE WITNESS:  I'm just refreshing
13      now.  Okay.  I have it.
14  BY MR. RAABE:
15       Q    In the email that you wrote to Mr.
16  Manders and Mr. Palmer about halfway down your
17  bullet points you say, "We all agree that ZBL is
18  a pain in the ass and we should have multiple
19  solutions to solve...one already on the page,
20  with a back-up technical plan as a distant
21  solution (joint Cat/Argus/Cigna calls had to be
22  had to ensure delivery)...contractually, we are
23  fine, but it doesn't do any good if we squeeze
24  them to put strain on the network"; do you see
25  that?

Page 108

1        C. Hocevar - Confidential
2        A    I do.
3        Q    Where you wrote that "it doesn't do us
4   any good if we squeeze them to put strain on the
5   network," what are you referring to?
6        A    I don't remember the context of this
7   one, Craig; sorry.
8        Q    When you said "ZBL is a pain in the
9   ass," what were you referring to?
10       A    Sorry.  This is 2013.  I don't
11  remember the context or the environment on that
12  one.
13       Q    Mr. Manders wrote back to you in the
14  second bullet point and says, "Recognize the
15  contract terms on ZBL, but wanted to know your
16  economic range for Cigna's P&L if we choose not
17  to squeeze the network"; you see that?
18       A    I do.
19       Q    What is your understanding of what
20  squeezing the network refers to there?
21       A    Sorry.  I don't have the context in
22  order to remember.
23       Q    Do you know if that refers to taking
24  clawbacks from pharmacies within your network?
25       A    I don't know, Craig.  Sorry.

Page 109

1        C. Hocevar - Confidential
2        Q    Do you recall any conversation with
3   Mr. Manders about that issue, the ZBL issue?
4        A    We would have had regular pharmacy
5   updates so, you know, pretty much everything that
6   we would have tried to settle with Catamaran at a
7   high level, he would have been aware of.
8        Q    So my question is specifically related
9   to ZBL.  Do you recall any conversation with Mr.
10  Manders about the ZBL issue?
11       A    Nothing that comes to mind.
12       Q    Do you recall any conversations with
13  Mr. Cordani about the ZBL issue?
14       A    Nothing that comes to mind; sorry.
15           MR. RAABE:  Let's do Exhibit 187,
16      please, Charlotte.
17           MS. LOPER:  Okay.  You should be
18      able to see it.
19           THE WITNESS:  You said 187?
20  BY MR. RAABE:
21       Q    Yes.
22       A    Okay.  My first question will focus on
23  the page that ends in 927.
24           MR. SHAFFER:  Sorry.  234 or an
25      earlier one?

28 (Pages 106 - 109)

```
                                                          Page 110
 1           C. Hocevar - Confidential
 2          MR. RAABE:  No.  This is Exhibit
 3     187.
 4          MR. SHAFFER:  Okay.  Thanks.
 5          THE WITNESS:  I'm just making sure
 6     I'm looking at the right one.  54926?
 7  BY MR. RAABE:
 8     Q    Yes.  Turn to the next page.  There's
 9  an email from Julie Burns-McAvoy to a whole
10  number of people, and she says, "Hello RxFocus
11  Users."
12          What's your understanding of what
13  RxFocus Users are?
14     A    I don't have one; sorry.
15     Q    She says, "I have an urgent request
16  from management.  They are asking us to react to
17  a missed revenue opportunity.  In the current
18  world, pharmacies are keeping our retail spread
19  when the customer liability (often times
20  deductible) exceeds the pharmacy contracted
21  rate," and it continues; do you see that?
22     A    I do.
23     Q    Did you make a request of
24  Ms. Burns-McAvoy or anyone else to deal with this
25  revenue opportunity?
```

```
                                                          Page 111
 1           C. Hocevar - Confidential
 2     A    Not that I recall.  I don't even
 3  remember Julie Burns-McAvoy.
 4     Q    A couple sentences later she types,
 5  "This is being supported by the highest levels of
 6  Cigna management, as it represents a tremendous
 7  loss of revenue"; do you see that?
 8     A    I do.
 9     Q    In this timeframe, November of 2013,
10  do you recall being involved in an effort to get
11  the retail spread from the pharmacies when the
12  customer liability exceeded the pharmacy
13  contracted rate?
14     A    I don't remember that, Craig; sorry.
15     Q    Is that the ZBL issue, in part?
16     A    I'm not sure what she's referring to
17  here; sorry.
18     Q    So as you read those words, does that
19  in your mind refer to the ZBL issue?
20     A    Again, I don't know what she was
21  referring to here.
22     Q    I'm not asking what she's referring
23  to.
24          As you read those words, do those
25  words to you have any relation to the ZBL issue?
```

```
                                                          Page 112
 1           C. Hocevar - Confidential
 2          MR. SHAFFER:  Objection to form.
 3     Objection, lack of foundation.  Go ahead,
 4     Chris.
 5          THE WITNESS:  I don't know, Craig;
 6     sorry.
 7  BY MR. RAABE:
 8     Q    Next paragraph under Overview she
 9  types, "Customers occasionally paid a pharmacy
10  more than the cost of the drug because of
11  spread"; see that?
12     A    I do.
13     Q    In 2013, is that statement true?
14     A    I don't know.  I don't know that to be
15  true or false; sorry.
16     Q    The next sentence ends with the phrase
17  "we need to recoup the dollars from pharmacies";
18  do you see that?
19     A    I don't, sorry.  I lost you there for
20  a second.
21     Q    The next sentence.  It's the last
22  phrase in the next sentence.
23     A    You're on 927?  My pages just went up
24  for whatever reason.
25     Q    Under the Overview section.
```

```
                                                          Page 113
 1           C. Hocevar - Confidential
 2     A    Okay.
 3     Q    The last phrase in that sentence, it
 4  starts with the word "we" over in the right-hand
 5  margin.
 6     A    Oh, sorry.  I'm having a little bit of
 7  a problem with the system.  "We need to recoup,"
 8  got it.
 9          The question again?
10     Q    I think my first question is, do you
11  see where I am there?
12     A    Yeah, I do now.
13     Q    And, in fact, Cigna did recoup those
14  dollars from the pharmacies by way of clawbacks;
15  right?
16     A    I'm not sure I'm following your
17  question, so --
18     Q    Ms. Burns-McAvoy writes that "we,"
19  meaning Cigna, "needs to recoup the dollars from
20  the pharmacies"; right?
21          MR. SHAFFER:  Objection to form.
22          THE WITNESS:  That's what she
23     wrote; correct.
24  BY MR. RAABE:
25     Q    And you know that, in fact, Cigna did
```

| | |
|---|---|
| Page 114 | Page 116 |
| 1  C. Hocevar - Confidential | 1  C. Hocevar - Confidential |
| 2 recoup the dollars from the pharmacies in the way | 2    THE WITNESS: Yeah, I don't know |
| 3 of clawbacks; correct? | 3    how to answer your question, Craig. Again, |
| 4   A   I'm not sure how to answer that | 4    I wasn't responsible for the government |
| 5 question. I knew there were trapped dollars at | 5    programs. |
| 6 pharmacies, but as I said, I was worried at this | 6 BY MR. RAABE: |
| 7 time about the broader relationship issues with | 7   Q   The latest email in the chain, the |
| 8 Catamaran, and whether or not we would have a | 8 email that's on the top of Page 926, Michael |
| 9 contract moving forward. | 9 Guren writes in part, "Off the record, it seems |
| 10   Q   Were you at all involved with an | 10 strange that Cigna would charge a member for a |
| 11 effort to untrap the dollars at pharmacy? | 11 co-pay that exceeds the ingredient cost plus |
| 12   A   Me, personally, I know the team was | 12 dispensing fee plus tax (if applicable). To me, |
| 13 working on it, but at a detail level, no. | 13 that is no longer a 'co' pay, but more of a |
| 14   Q   How did the team resolve it, to your | 14 single (over) payment by the customer"; do you |
| 15 knowledge? | 15 see that? |
| 16   A   I don't remember, Craig; sorry. | 16   A   I do. |
| 17   Q   By implementing clawbacks; right? | 17   Q   To you, what does the "co" in |
| 18   A   As I said, I don't remember. | 18 "co-payment" refer to? |
| 19   Q   If you turn to the first page, Page | 19    MR. SHAFFER: Objection to form. |
| 20 926, down at the bottom it says, "We CANNOT | 20    THE WITNESS: In this document? |
| 21 charge a member more than the price of a drug - | 21 BY MR. RAABE: |
| 22 it is AGAINST CMS compliance"; do you see that? | 22   Q   No, in general. |
| 23   A   I do. | 23    Cigna had its members pay co-pays; |
| 24   Q   Do you know what that refers to? | 24 correct? |
| 25   A   I don't. | 25   A   Co-payments are a part of an enrolled |
| Page 115 | Page 117 |
| 1  C. Hocevar - Confidential | 1  C. Hocevar - Confidential |
| 2   Q   Do you know whether Cigna was allowed | 2 benefit program; correct. |
| 3 to charge a member more than the price of a drug | 3   Q   From your perspective, what does the |
| 4 in a Medicare context? | 4 "co" in "co-payment" mean? |
| 5    MR. SHAFFER: Objection to form. | 5    MR. SHAFFER: Objection to form. |
| 6    Lack of foundation. | 6    THE WITNESS: Yeah. I don't -- |
| 7    THE WITNESS: Sorry, Craig. The | 7    I'm not trying to be difficult, Craig. I |
| 8    question again? | 8    don't know how to answer your question. |
| 9 BY MR. RAABE: | 9    Co-payments, deductibles, they're all parts |
| 10   Q   Do you know whether Cigna was allowed | 10    of an overall program between employees and |
| 11 to charge a member more than the price of the | 11    their employers, so I don't know how to put |
| 12 drug in the Medicare context? | 12    a definition around the word "co." |
| 13    MR. SHAFFER: Objection to form. | 13 BY MR. RAABE: |
| 14    Lack of foundation. Beyond the scope. | 14   Q   Do you have any sense what "co" in |
| 15    THE WITNESS: Yeah, sorry, Craig. | 15 "co-payment" means? |
| 16    I wasn't specifically responsible for the | 16    MR. SHAFFER: Objection to form. |
| 17    banker side. I'm not that familiar with CMS | 17    Asked and answered. |
| 18    and the regulation of that space as you ask | 18    THE WITNESS: Sorry, I don't. |
| 19    the question. | 19    MR. SHAFFER: Craig, you have a |
| 20 BY MR. RAABE: | 20    sense of when would be a good time for a |
| 21   Q   Do you know whether Cigna was allowed | 21    break or how long you're expecting to go? |
| 22 to charge any member who was part of the Federal | 22    MR. RAABE: We should probably |
| 23 Government more than the price of a drug? | 23    take a lunch break, because I don't think I |
| 24    MR. SHAFFER: Objection to form. | 24    can finish up -- I'm not going to go all |
| 25    Lack of foundation. | 25    day, but it probably makes sense to take a |

| | |
|---|---|
| Page 118 | Page 120 |

Page 118

1   C. Hocevar - Confidential
2   break.  If you want to do that now we can.
3       THE WITNESS:  Craig, if you told
4   me it's an hour, I'll stay on.  If you told
5   me it's three hours, I need a break.
6       MR. RAABE:  I think it would
7   probably be more than an hour.  It's up to
8   you.  I can go either way.  It's up to Randi
9   as well.
10      MR. SHAFFER:  Why don't we take a
11  ten-minute break now and come back and go
12  awhile longer.  Or you can take a lunch
13  break now.  It's really your preference.
14      THE WITNESS:  Yeah.  I prefer not
15  to take a lunch break.  I've already had to
16  push a bunch of things for the day, so if I
17  could pick some of them up at the end, I
18  would greatly appreciate it, Craig.
19      (Whereupon there was a brief
20  recess from 12:01 p.m. until 12:16 p.m.)
21      MR. RAABE:  Charlotte, can we post
22  Exhibit 190, please?
23      MS. LOPER:  Yes.  I'll let you
24  know once it's loaded.
25      THE WITNESS:  Thank you.

Page 119

1   C. Hocevar - Confidential
2       MS. LOPER:  Okay.  You should be
3   able to see it now.
4       THE WITNESS:  You said 190?
5   BY MR. RAABE:
6   Q   Yes.
7   A   Okay.  I have it.
8   Q   The middle email on the first page is
9   from Paul Urick.
10      What was Mr. Urick's role in 2013?
11  A   2013, Paul -- he would have -- I don't
12  remember his title, but we would he would have
13  had responsibility for operations.  So home
14  delivery and other things.
15  Q   Have you stayed in touch with
16  Mr. Urick since you left?
17  A   I don't think so, no.  It's been a
18  long time.
19  Q   Okay.  He wrote to you, "Guys - I had
20  a meeting with Chris H this morning, and of
21  course the ZBL is a top priority among our group
22  and leadership"; do you see that?
23  A   I do.
24  Q   Do you recall telling Mr. Urick that
25  ZBL was a top priority?

Page 120

1   C. Hocevar - Confidential
2   A   I don't.  Craig, let me turn you up
3   real quick because I'm having a hard time hearing
4   you.
5   Q   Okay.
6   A   Go ahead.
7   Q   In the last sentence of that email he
8   says, "I need to bring in others if this is not
9   the case, since it is 100 million plus issue for
10  us"; do you see that?
11  A   I do.
12  Q   Do you recall discussing with Mr.
13  Urick or anyone else that the ZBL issue was a 100
14  million-dollar annual issue for Cigna?
15      MR. SHAFFER:  Objection to the
16  form.
17      THE WITNESS:  Say that again,
18  Craig.
19      MR. SHAFFER:  Sorry, Chris.  I was
20  just objecting to the form of the question.
21  BY MR. RAABE:
22  Q   So did you ever discuss with anyone at
23  Cigna the value of the ZBL issue at Cigna?
24  A   I don't remember.
25  Q   Do you recall it being around

Page 121

1   C. Hocevar - Confidential
2   $100 million a year?
3   A   I don't, sorry.  The pharmacy business
4   was a large business, so as I said, we had 15+
5   billion dollars running through that any given
6   year.
7   Q   The ZBL issue involved getting the
8   money from the pharmacy, to use your word, was
9   trapped there; right?
10  A   Yes.  Maybe to put it in context to
11  trapped.  So this timeframe, fourth quarter, as I
12  said, we were having a good bit of issues with
13  Catamaran; the reconciliation.  So the
14  reconciliation, the team would perform -- would
15  look at the claims that would come out of our
16  systems.  Compare that against the contractual
17  rates.  When I talk about trapped, it's the delta
18  between what we should have seen versus what we
19  saw from a contract rate perspective.  So I don't
20  know if that answers your question, but that's
21  the context I used the word "trapped" in.
22  Q   And the ZBL issue, in part, was to
23  obtain that trapped money for Cigna; right?
24  A   Can you say the question differently?
25  I think I have it, but I don't want to answer it

Page 138

C. Hocevar - Confidential

half of the year spent doing evaluation. After we had concluded -- I wasn't part of this, but the organization had concluded that a sale of the pharmacy business wasn't something that they were going down the road, which is one of our competitors, Anthem, did.

So the first half of 2013 was an evaluation of what could a solution with another partner in the marketplace, like a CVS and/or Catamaran. And at some point, we had initial conversations with Express. I wasn't part of those, but I know they were part of the evaluation.

MR. RAABE: Charlotte, let's mark 7777335, please.

MS. LOPER: Okay. This is Exhibit 240.

(Plaintiff's Exhibit 240 was marked.)

BY MR. RAABE:

Q  Let me know when you have that up.
A  Okay.
Q  In the email in the middle of the first page from Mr. Whitnah, he references in the

Page 139

C. Hocevar - Confidential

first sentence, "Ascension's in-house pharmacies"; do you see that?
A  Yes.
Q  Do you know what that refers to?
A  I don't, although it does seem like we carried the project name of diligence over into the program, but I don't know what this refers to.
Q  Did Project Ascension lead to the transaction with Catamaran?
A  It did, yeah. What I was referring to, Craig, was it seems like we might have carried the M&A code name into this piece of it.
Q  So as you read this, does it appear that Ascension there is referring to Catamaran?
    MR. SHAFFER: Objection to form.
    THE WITNESS: I wouldn't have drawn the conclusion that Catamaran equals Ascension. I would have drawn the conclusion that Ascension is investing in the pharmacy business, of which Catamaran was a piece of it.
BY MR. RAABE:
Q  If you look at the second to last

Page 140

C. Hocevar - Confidential

paragraph, the last sentence, again, read as much as you need to to get the context. It says that this issue was escalated to you and Ms. Vancura; do you see that?
A  I do.
Q  Do you recall getting involved in this issue?
A  Let me read through. I didn't get a chance to read through the issue here.
Q  Sure.
A  Okay. Sorry. The question again, Craig?
Q  Do you recall getting pulled into this issue?
A  Candidly, I read through this. I'm not sure I even understand the issue. Sorry; I don't remember.
Q  So if you look up at the top email, the issue appears to be that there would be negative amounts due to in-house pharmacies in that first email; you see that?
A  I see it written that way. I don't know what "in-house pharmacy" means. That's what I'm struggling with.

Page 141

C. Hocevar - Confidential

Q  When Mr. Byrne wrote that that's the worst possible result from this client request, do you have any idea what she's talking about?
A  I don't, sorry.
Q  Did some of your clients have in-house pharmacies?
A  Some of the hospital clients did. I don't know broader than that, but it's not uncommon for hospitals to have their own in-house pharmacies.
Q  If there was a negative amount due to an in-house hospital pharmacy and Cigna took that money, it would be taking money from a client; right?
    MR. SHAFFER: Objection to form.
    THE WITNESS: I'm not sure I understand your question, Craig; sorry.
BY MR. RAABE:
Q  So this whole ZBL process involved negative amounts due to pharmacies; right?
A  Again, what I remember of ZBL is that it was a reconciling item between Catamaran and us and contractually with the pharmacies.
Q  Trapped money; right?

Page 142

1        C. Hocevar - Confidential
2    A    The difference between the two was
3    trapped money between what we expected
4    contractually with Catamaran, and what we saw
5    actually coming through the claim files.
6    Q    And Cigna's effort to get that trapped
7    money; correct?
8    A    There was an effort to get that money,
9    correct.
10   Q    Do you have any recollection of
11   whether that money at times was characterized as
12   a negative reimbursement?
13   A    Sorry, not that I remember.
14   Q    Or a negative amount due?
15   A    Sorry, not that I remember.
16   Q    Or a clawback?
17   A    Again, sorry, not that I remember.
18   Q    Let's go to Exhibit 185, please,
19   Charlotte.
20        MS. LOPER:  Okay.  We've
21   previously marked this one today, so it
22   should already be in your Marked Exhibits
23   folder.  Exhibit 185.
24        MR. RAABE:  Let's skip it.
25        MS. LOPER:  Okay.

Page 143

1        C. Hocevar - Confidential
2        MR. RAABE:  So let's go to
3    exhibit -- Document 149549.
4        MS. LOPER:  What was that?  Say it
5    one more time.
6        MR. RAABE:  149549.
7        MS. LOPER:  This is Exhibit 241.
8        (Plaintiff's Exhibit 241 was
9    marked.)
10       THE WITNESS:  Okay.  I have that,
11   Craig.
12   BY MR. RAABE:
13   Q    Can you tell us what this document is?
14   A    Is there a document attached to this?
15   Q    I'm sorry.  Bad question.
16       So the email refers to a pre-read that
17   was sent to the board; do you see that in the
18   first sentence?
19   A    Yes.
20   Q    What's a pre-read?
21   A    We would send out information in
22   advance of a meeting.
23   Q    The second sentence says, "All in, the
24   board and our CEO continues to be very positive
25   on our efforts, energy and drive for results"; do

Page 144

1        C. Hocevar - Confidential
2    you see that?
3    A    I do.
4    Q    What do you recall that referring to?
5    A    I don't remember specifically, but
6    October 2013 would have been, you know, a handful
7    of months post the signing of the deal, so it's
8    not uncommon to have an update to the board.
9    Q    Was part of the positive effort,
10   energy and drive for results the capturing of the
11   trapped money at the pharmacies?
12       MR. SHAFFER:  Objection to form.
13       THE WITNESS:  Yeah, sorry, Craig,
14   not that I remember.  That's a pretty
15   detailed topic for a finance committee.
16   BY MR. RAABE:
17   Q    Did you ever discuss with Mr. Cordani
18   that trapped money?
19   A    Not that I remember talking about
20   those specific terms, but we would have talked
21   about the major reconciliations we had.
22   Q    Including the trapped money?
23       MR. SHAFFER:  Objection to form.
24       THE WITNESS:  Yeah, sorry.  The
25   difference between the contracted rates as

Page 145

1        C. Hocevar - Confidential
2    well as what we're seeing come through the
3    results.
4    BY MR. RAABE:
5    Q    Tell us what you recall of those
6    conversations.
7    A    You know, Craig, not much more than
8    that.  You know, most of my updates were through
9    Matt Manders and Eric Palmer as my boss and kind
10   of the finance officer.  You know, they got
11   aggregated up to even a more higher level as they
12   rolled through.
13   Q    So my question before is whether you
14   had those conversations with Mr. Cordani, and you
15   said that you did; right?
16   A    I said that I had conversation on the
17   reconciled items, yes.
18   Q    So do you have any recollection of
19   those conversations as you sit here today?
20   A    The details, no.  Just knowing in the
21   fourth quarter that we were starting to go down a
22   bad path with one of our partners along a 10-year
23   deal.
24   Q    So what do you recall saying to him,
25   and what do you recall Mr. Cordani saying to you?

```
                                                         Page 166
 1
 2            INDEX TO TESTIMONY
 3               EXAMINATION OF
 4  CHRISTOPHER HOCEVAR                      PAGE
 5  BY: Mr. Raabe                              4
 6            * * *
 7            E X H I B I T S
 8  Plaintiff
    Number    Description                   Page
 9  Exhibit 218  Form 8-K                     10
10  Exhibit 219  Cigna: Draft for Discussion  17
11  Exhibit 220  Email Exchange (CIGNA 7864277)  25
12  Exhibit 221  Cigna Interoffice Memo: 9-19-13  27
         (CIGNA 7864278-786280)
13
    Exhibit 222  Email Exchange              49
14       (CIGNA 431012-431014)
15  Exhibit 223  Email Exchange & Attachment 50
         (CIGNA 203371-203375)
16
    Exhibit 224  Email Exchange              55
17       (CIGNA 487737-487742)
18  Exhibit 225  Email: 6-7-16 (CIGNA 489260)  63
19  Exhibit 226  Email Exchange              64
         (CIGNA 7590517-7590519)
20
    Exhibit 227  Email: 6-8-16 (CIGNA 7865360)  66
21
    Exhibit 228  Email: 6-23-16              69
22       (CIGNA 490251-490253)
23  Exhibit 229  Email Exchange              71
         (CIGNA 502586-502587)
24
25  (Exhibits continued.)
```

```
                                                         Page 167
 1
 2  (Exhibits continued.)
 3            E X H I B I T S
 4  Plaintiff
    Number    Description                   Page
 5  Exhibit 230  Touchpoint Presentation     73
         (491444-491464)
 6
    Exhibit 231  Scope Document (CIGNA 147566)  90
 7
    Exhibit 232  Email Exchange             102
 8       (CIGNA 178369-178370)
 9  Exhibit 233  Email Exchange (CIGNA 7864877)  104
10  Exhibit 234  Email Exchange             107
         (CIGNA 7864559-7864560)
11
    Exhibit 235  Email Exchange             122
12       (CIGNA 7864556-7864557)
13  Exhibit 236  Email Exchange             125
         (CIGNA 417411-417412)
14
    Exhibit 237  Email Exchange             126
15       (CIGNA 178996-179006)
16  Exhibit 238  Email Exchange             129
         (CIGNA 7825882-7825883)
17
    Exhibit 239  Project Ascension: 3-22-13  134
18       (CIGNA 391276)
19  Exhibit 240  Email Exchange             138
         (CIGNA 7777335-7777336)
20
    Exhibit 241  Email: 10-23-13 (CIGNA 149549)  143
21
    Exhibit 242  Finance Committee Talking Points 146
22       10-22-13 (CIGNA 149550-149552)
23  Exhibit 243  Email: 4-7-14 (CIGNA 7865347)  149
24
25  (Exhibits continued.)
```

```
                                                         Page 168
 1
 2  (Exhibits continued.)
 3            E X H I B I T S
 4  Plaintiff
    Number    Description                   Page
 5  Exhibit 244  CPM Earnings_FY14 (CIGNA 7865348)150
 6  Exhibit 245  Email Exchange (CIGNA 288417)  152
 7  Exhibit 246  Letter: 10-24-14            154
         (CIGNA 288418-288419)
 8
    Exhibit 247  2014 Compliance Plan & Report  156
 9       (CIGNA 434488-434501)
10  Exhibit 248  Agreement and Release      162
11  (Exhibits were retained on Exhibit Share.)
12            * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                         Page 169
 1
 2            C E R T I F I C A T I O N
 3     I, Randi Friedman, Registered
 4  Professional Reporter and Notary Public of the
 5  State of New York, do hereby certify:
 6     THAT, the witness whose testimony is herein
 7  before set forth, was duly sworn by me, and
 8  THAT, the within transcript is a true record of
 9  the testimony given by said witness.
10     I further certify that I am not related
11  either by blood or marriage to any of the parties
12  to this action; and that I am in no way
13  interested in the outcome of this matter.
14     IN WITNESS WHEREOF, I have hereunto set my
15  hand this day, September 29, 2020.
16
17
18     [signature: Randi C. Friedman]
19     Randi Friedman, RPR
20
21
22
23
24
25
```