# EXHIBIT AA

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT


    KIMBERLY A. NEGRON,          )
    Individually and on          )
    Behalf of All Others         )
    Similarly Situated,          )CIVIL ACTION NO.
    DANIEL PERRY,                )3:16-cv-1702
    Individually and on          )(JAM)
    Behalf of All Others         )
    Similarly Situated,          )
    COURTNEY GALLAGHER,          )
    Individually and on          )
    Behalf of All Others         )
    Similarly Situated,          )
    NINA CUROL,                  )
    Individually and on          )
    Behalf of All Others         )
    Similarly Situated,          )
    ROGER CUROL,                 )
    Individually and on          )
    Behalf of All Others         )
    Similarly Situated, and      )
    BILLY RAY BLOCKER,           )
    Individually and on          )
    Behalf of All Others         )
    Similarly Situated,          )
              Plaintiffs,        )
    vs.                          )
                                 )
    CIGNA CORPORATION,           )
    CIGNA HEALTH AND LIFE        )
    INSURANCE COMPANY, and       )
    OPTUMRX, INC.,               )
              Defendants.        )
    _____)
    REMOTE DEPOSITION OF TYLER LESTER
         Tuesday, June 23, 2020

    Reported By:
    CATHI IRISH, RPR, CRR, CLVS, CCR
```

Page 318

1  LESTER
2  deeper discounts every year that are
3  negotiated on an annual basis.
4      Q.  So based on the questions today,
5  one might come away with the impression
6  that negative reimbursement is the only
7  aspect of prescription drug pricing that
8  matters.  Are there others that have
9  significant impacts on the overall costs
10  that a group sponsor may pay with respect
11  to prescription drugs?
12      A.  There are.  Some of those biggest
13  drivers are the drug themselves, new drugs
14  that come to the market from
15  manufacturers, increases in drug prices
16  that manufacturers might take on their own
17  products, new indications for drugs that
18  are on the market, and increased
19  utilization based on either new
20  indications for products or the declining
21  health of a particular employer's
22  population, which is why we offer lots of
23  programs to help manage those costs over
24  time.
25      Q.  And what role do plan sponsors

Page 319

1  LESTER
2  play in designing the prescription drug
3  benefits that they are going to offer to
4  participants in the plans that they
5  sponsor?
6      A.  Self-funded clients, particularly
7  those that consider themselves ERISA
8  plans, have almost unlimited flexibility
9  in designing their benefit.  Whether it's
10  the tiering that we talked about a little
11  bit earlier, the formulary design, the
12  pharmacy that they want to have in their
13  retail network, which mail order
14  pharmacies they want to be able to
15  utilize, the quote/unquote, programs that
16  they might select, and at the end of the
17  day the customer contribution in the form
18  of employee premiums that they might
19  charge.  And even our insured clients have
20  a lot of flexibility.  The only guardrails
21  are those put in place by different states
22  Department of Insurance, but as long as
23  they are within those guardrails of the
24  types of plans they can offer, the type of
25  cost shares that they can require their

Page 320

1  LESTER
2  employees or the customers to pay, then
3  they have a lot of flexibility and
4  ultimately decide what benefit options
5  they want to put in front of their
6  employee.
7      Q.  Are there differences in the way
8  the plan sponsors approach those options
9  or exploring the benefit design selections
10  that they may make?
11          MR. IZARD:  Objection.
12  BY MR. SHAFFER:
13      Q.  You can answer.
14      A.  The -- because there's so much
15  variability, it allows different types of
16  plan sponsors to meet whatever their
17  employee benefit needs might be.  So if
18  they have employees that they want to
19  ensure have low out-of-pocket costs, they
20  can offer that at the tradeoff of
21  potentially higher employee premiums.  If
22  they want to have a much more affordable
23  benefit from a premium perspective or
24  drive more consumerism in their health
25  care plan, they can offer a high

Page 321

1  LESTER
2  deductible plan where the customer is
3  responsible for more of the first dollar
4  costs but also has the ability to save,
5  and when those are paired with health
6  savings accounts or health reimbursement
7  accounts can provide a lot of flexibility
8  for the employees themselves, and on top
9  of that the client has options of whether
10  they want to be in a spread pricing
11  environment or in a pass-through
12  environment.  In a spread pricing
13  environment, we generally do not charge
14  fees to clients.  In a pass-through
15  environment, since we're not earning
16  revenue through spread at retail
17  pharmacies, we often instead charge a per
18  member per month fee to those plans that
19  they have to decide how much of that gets
20  passed through and to employees.
21      Q.  And how do those negotiations or
22  selections occur between various plan
23  sponsors and Cigna, are there differences
24  in the approach?
25      A.  Generally plan sponsors will hire

Page 322

LESTER

an independent third-party, a broker, a consultant to help them make the plan selection and through that process the broker is able to bring in a number of health plans or pharmacy benefit managers and usually puts out a request for proposal for different organizations to bid on that business. Through that process, it's largely based on the economics that each plan is able to provide. Services, clinical programs are absolutely important but the pure economics, and when it comes to pharmacy that's largely around the discounts that can be offered or any manufacturer rebates that can be shared are some of the key considerations. And once that client has selected Cigna, then they have all those benefit options we discussed.

Q. In terms of some of the benefit design options that are available for plan sponsors, what are some of the options that exist with respect to how much their

Page 323

LESTER

members pay, are there different options that can be selected in terms of either cost share or the amount?

A. There are. So I spent a lot of my time on the actuarial pricing part of our finance organization and my team's responsibility was understanding how different levels of member cost share would impact overall plan cost. And within that there's a lot of flexibility around the different tiers of products and how a plan decides to set cost share within those tiers, the networks and the pharmacies that they make available, even the options to have different tiers of pharmacies within a network that would provide incentives for customers to use lower cost pharmacies or attempted to use lower cost drugs. But the plans ultimately makes that selection and our pricing team spends their time helping plans understand if you make this type of change to customer cost share, here's how much higher or lower those ultimate plan

Page 324

LESTER

costs will be.

Q. How about with respect to something like a deductible, is that something that is an option that can be modified by a plan sponsor?

A. It is. Not just in addition to the level of the deductible so how high it is. There are regulations at the state level for insured business or at a federal level for self-funded client of the maximum deductible that can be offered but underneath that the client has a lot of flexibility of how large the deductible is, what services it covers. Some plans chose to cover preventive drugs without the customer satisfying the deductible. Some clients chose how the deductibles that crosses the medical and the pharmacy benefit, and within that you can even have a collective deductible that requires an entire family unit to meet that deductible or individual deductibles that have a different level for each individual within a family but also a total number that has

Page 325

LESTER

to be met throughout the year, and the plan sponsor has a lot of flexibility about which of those options they would like.

Q. You mentioned caps or maximum amounts that might be paid. How do those impact the overall benefit design?

A. You're referring to a maximum that a customer might have to pay?

Q. Yes.

A. So the maximum that a customer might have to pay out-of-pocket maximum can also again be at an individual level, at a family level, can be just for each benefit individually for the pharmacy benefit versus the medical benefit, or for both benefits combined. And is generally focused on -- and there can even be a separate out-of-pocket maximum for in-network service than there is for out-of-network services.

Q. How about the decision to use a copayment or coinsurance or some combination thereof?

Page 326

1  LESTER
2  A. That's also a selection by the
3  client and within self-funded plans, it's
4  almost unlimited the number of
5  combinations of copays and coinsurance and
6  where those levels can be set or insured
7  regulated business, there might be limits
8  on how high or low each value can go but
9  within that range the plan sponsor has
10 flexibility to select that and as a
11 service provider, as an insurer, we can
12 provide information to the client about
13 how those changes might impact their
14 overall plan cost.
15 Q. Do these factors and these
16 selections by plan sponsors, do they
17 necessarily mean that all participants are
18 going to pay the same pricing for all of
19 their prescription drug transactions?
20 A. It does not. There can be a lot
21 of variability depending on the
22 prescription that a customer chooses, the
23 pharmacy that they choose to fill it at,
24 in particular lots of clients offer
25 incentives for customers to use a mail

Page 327

1  LESTER
2  order pharmacy where that mail order
3  pharmacy might be providing much deeper
4  pricing, so higher discounts, lower price
5  for the customer or the plan, and the plan
6  might want to incentivize their
7  participants to use that pharmacy.
8     The same can be true when even
9  throughout the year that as prices for
10 drugs in the market change or as
11 agreements with the client change, that
12 might improve their discounts from one
13 year to the next, that can lead to pricing
14 changes at the point of sale as well, and
15 that's why we provide tools to customers,
16 for example, our website where a customer
17 can go out and compare prices across
18 multiple pharmacies and multiple drugs.
19 Q. And I take it from your answer
20 that given there are different types of
21 drugs or groups of drugs, the various
22 benefit options that we just talked about
23 can even be different on the very same
24 plan depending on what kind of drug you're
25 looking at?

Page 328

1  LESTER
2  A. That's right. So there can be
3  differences between brand drugs, generic
4  drugs, specialty drugs which are usually
5  high cost products within that plan, and
6  then also the differences that might occur
7  between different pharmacy chains.
8  Q. Okay. Are you familiar with the
9  concept of cross accumulation?
10 A. I am.
11 Q. And what does that mean in your
12 world?
13 A. So cross accumulation are when
14 dollars accumulate between benefits.
15 Generally we're talking about the medical
16 and the pharmacy benefits. There are also
17 behavioral benefits that are available
18 that are considered as part of the medical
19 plan and cross accumulation are where
20 dollars per services on the medical and
21 dollars per services on the pharmacy all
22 accumulate to the same amount on the
23 deductible so those dollars from all those
24 services accumulate to a single deductible
25 or out-of-pocket maximums where the

Page 329

1  LESTER
2  determination of when a participant hits
3  that out-of-pocket maximum can cross
4  accumulate from both benefits.
5  Q. And I think you probably just
6  answered this but just to be clear, what
7  are the different types of cross
8  accumulation that a plan sponsor might
9  implement as part of their overall
10 structure if they are going to have both
11 medical and pharmacy benefits, for
12 example?
13 A. Generally a plan sponsor will
14 chose to cross accumulate both the
15 deductible and the out-of-pocket maximum.
16 Q. And ultimately whether to have
17 cross accumulation and which method to
18 use, whose decision is that?
19 A. It's up to the plan sponsor
20 unless it is required by a Department of
21 Insurance regulation.
22 Q. Is there a specific time frame
23 for accumulations towards deductibles or
24 out-of-pocket maximums?
25 A. It's up to the plan sponsor but

83 (Pages 326 - 329)

Page 330

1  LESTER
2  generally they do it within a plan year
3  which is usually a 12-month period.  The
4  effective date for that plan year could be
5  any day of the year but generally our
6  clients chose the first of a month so it
7  could be February 1st or July 1st and
8  would have a 12-month period over which
9  those dollars would accumulate.
10    Q.  But then all plans don't have the
11  same start and end dates for their plan
12  years; correct?
13    A.  That's correct.  And some clients
14  choose if they are, for example, moving
15  from -- they may want to be on a calendar
16  year basis.  From time to time, plans will
17  chose to have a shortened year so they can
18  move everything to a calendar year basis
19  which we see from time to time with
20  mergers and acquisitions.
21    Q.  And we talked a lot today about
22  where some of the benefit design
23  information is housed at Cigna for its
24  clients but do you have an understanding
25  of where plan sponsors memorialize the

Page 331

1  LESTER
2  choices that they've made with respect to
3  the Cigna plan?
4      MR. IZARD:  Objection.
5      THE WITNESS:  So from my
6    experience as an employee of a plan
7    sponsor, usually those documents are
8    housed in some type of employee
9    Internet site or even physical copies
10   can be provided to employees of those
11   plan documents.
12 BY MR. SHAFFER:
13   Q.  And again, is that something from
14 your experience that's something that the
15 plan sponsor handles?
16     MR. IZARD:  Objection.
17     THE WITNESS:  That's my
18   understanding from interactions in the
19   past with sales and service
20   operations.
21 BY MR. SHAFFER:
22   Q.  There was some discussions
23 earlier about different funding
24 arrangements that can exist with respect
25 to group plans.  Are all prescription

Page 332

1  LESTER
2  benefits funded the same way?
3    A.  They are not.  Plan sponsors have
4  the option to choose two primary ways to
5  fund pharmacy benefits.  They can choose
6  to purchase insurance from Cigna or any
7  other insurance company where they are
8  purchasing a policy in which Cigna is
9  responsible for funding all claim dollars
10 and Cigna takes on the risk of essentially
11 those plans coming in higher than expected
12 in return for a premium that would be paid
13 by a plan sponsor.  In a self-funded
14 environment, all those claims would be
15 paid by a plan sponsor.  They would set up
16 banking information with Cigna to enable
17 Cigna to debit their bank accounts to make
18 those payments throughout the year.
19   Q.  And in a setting of a self-funded
20 plan, what are the types of administrative
21 services that Cigna might provide?
22   A.  For the pharmacy benefit we would
23 provide formularies that a plan sponsor
24 can choose from.  We would provide retail
25 networks again that the plan sponsor could

Page 333

1  LESTER
2  choose from, a mail order pharmacy,
3  specialty pharmacy, clinical programs that
4  a plan sponsor can choose to add or
5  purchase, services related to claim
6  payment, member services for when a member
7  or customer might have a question about
8  their benefit, and all of the digital
9  resources such as our website where
10 members can track all the different
11 accumulators, see how the information that
12 might be available about drug costs or
13 costs for other services.
14   Q.  Since you've been involved with
15 Cigna Pharmacy, how has Cigna offered
16 group plans access to networks of
17 pharmacies?
18   A.  When I first began at pharmacy in
19 late 2010, Cigna managed and contracted
20 our own pharmacy networks and we had two
21 of them that we offered broadly to clients
22 but we also have had the option where a
23 client can build a client-specific network
24 where they can select the pharmacies that
25 they would like to be a part of their

|  | Page 354 |
|---|---|
| 1 | LESTER |
| 2 | around the term and termination of the |
| 3 | agreement, it talks about the |
| 4 | responsibilities of the client but it also |
| 5 | talks about the period under which claims |
| 6 | would potentially continue to be paid, and |
| 7 | I believe in this agreement, it appears to |
| 8 | be a 36-month period after the effective |
| 9 | date but it's because I believe this |
| 10 | client signed up for a three-year contract |
| 11 | with Cigna. |
| 12 | Q.  And you mentioned run-out claims |
| 13 | earlier and run-out is mentioned in |
| 14 | paragraph B of section 2 here.  Just so |
| 15 | we're clear, what's a run-out claim? |
| 16 | A.  A run-out claim would be any |
| 17 | claim that where the actual service was |
| 18 | received or the transaction took place |
| 19 | during the plan year, however the claim |
| 20 | itself may not have come in through our |
| 21 | normal claim processing system within that |
| 22 | same plan year.  So after that plan is |
| 23 | ended, if the plan year ends for example |
| 24 | on June 31 of 2020, any claim that took |
| 25 | place prior to that date might not be |

|  | Page 355 |
|---|---|
| 1 | LESTER |
| 2 | submitted for whatever reason, whether |
| 3 | it's through electronic submission, paper |
| 4 | claim, any claim that comes in after that |
| 5 | date would be considered a run-out claim |
| 6 | where the client would still have |
| 7 | responsibility for that run-out claim for |
| 8 | a specified period of time. |
| 9 | Q.  And you mentioned I think that |
| 10 | the run-out period for claims under this |
| 11 | agreement was 36 months because it was a |
| 12 | three-year agreement.  Do you know whether |
| 13 | Cigna's ASO agreements vary in terms of |
| 14 | the run-out claims process and time |
| 15 | periods? |
| 16 | A.  It is generally part of the |
| 17 | negotiation.  So we have a standard -- I |
| 18 | think I misspoke on the 36-month.  That's |
| 19 | actually the period of the term for this |
| 20 | client.  On page 17 it looks like it's |
| 21 | 2331, actually spells out the time period |
| 22 | under which we would continue to process |
| 23 | run-out claims under the pharmacy benefit |
| 24 | of -- under this provision of the |
| 25 | processing of run-out claims, we highlight |

|  | Page 356 |
|---|---|
| 1 | LESTER |
| 2 | for the pharmacy benefit services that we |
| 3 | will continue to process run-out claims |
| 4 | for a period of three months.  Pharmacy |
| 5 | claims, because they are generally at the |
| 6 | point of sale and electronic transactions, |
| 7 | often have a shorter run-out period than |
| 8 | other types of claims where it might be |
| 9 | paper claims, a lot of complexity |
| 10 | involved, and could be longer periods. |
| 11 | Q.  Just so the record is clear then, |
| 12 | the run-out period for pharmacy claims |
| 13 | under the Putnam agreement here is three |
| 14 | months based on the chart on page 2331 of |
| 15 | Exhibit C-1? |
| 16 | MR. IZARD:  Objection. |
| 17 | BY MR. SHAFFER: |
| 18 | Q.  You can answer, Mr. Lester. |
| 19 | A.  That's correct. |
| 20 | Q.  And the reference to a three-year |
| 21 | run-out period is not correct.  I think I |
| 22 | used that in a question but I just want to |
| 23 | make sure you don't believe there's a |
| 24 | three-year run-out period on pharmacy |
| 25 | claims here. |

|  | Page 357 |
|---|---|
| 1 | LESTER |
| 2 | A.  I do not. |
| 3 | Q.  And I don't either. |
| 4 | MR. IZARD:  Objection. |
| 5 | MR. SHAFFER:  Withdrawn. |
| 6 | BY MR. SHAFFER: |
| 7 | Q.  After the run-out period, would |
| 8 | Cigna have access to the bank accounts of |
| 9 | plan sponsors to fund any benefit claims |
| 10 | after that run-out period? |
| 11 | A.  Generally not. |
| 12 | Q.  And why not? |
| 13 | A.  Once the client has decided to |
| 14 | terminate and take their services |
| 15 | elsewhere, we have the provisions of how |
| 16 | long run-out claims can continue but after |
| 17 | that period, we contractually should not |
| 18 | have access to the client's bank account |
| 19 | if they have decided to purchase their |
| 20 | services from somewhere else, and the |
| 21 | client also wouldn't expect us to be |
| 22 | debiting any dollars form that account |
| 23 | after the run-out period, which is why |
| 24 | it's important that we state what that |
| 25 | period is. |

Page 358

1  LESTER
2  Q.  Shifting gears again to cover a
3  couple of other topics that were talked
4  about earlier, the client rate that Cigna
5  negotiates with plan sponsors, what does
6  that number represent?
7  A.  The client rate at the point of
8  sale on an individual transaction
9  represents the price that Cigna put in
10 place for that drug on that date at that
11 pharmacy with the goal of in aggregate
12 leaving the client satisfied by the end of
13 the year.
14 Q.  And who pays or who contributes
15 to a satisfaction of the client rate?
16 A.  Can you say that one more time?
17 Q.  Sure.  I'm trying to figure out
18 who pays the client rate, who satisfies
19 the payment of that; is it the sponsor, is
20 it the member, is it a combination?
21 A.  Sure.  Generally it is a
22 combination of the member and the plan
23 sponsor.  The member would be paying
24 whatever their stated cost share is with
25 the plan sponsor paying the remainder of

Page 359

1  LESTER
2  any client rate that wasn't with that cost
3  share.
4  Q.  So what's a situation where a
5  member or customer would pay the client
6  rate entirely, in its entirety?
7  A.  That can occur when a customer is
8  in a deductible phase and they are
9  responsible for the full amount, the full
10 client rate, and it can occur when the
11 client rate is equal to or less than the
12 customer cost share if the rights lesser
13 of cost share logic is in place.
14 Q.  What's the situation where the
15 client rate is paid entirely by a plan
16 sponsor?
17 A.  Generally that can occur after a
18 customer has hit an out-of-pocket maximum
19 or if the client has chosen a benefit that
20 might cover some drugs, particularly
21 preventive drugs, at no cost.
22 Q.  And other situations, you said
23 there may be a sharing between the plan
24 sponsor and the participant?
25     MR. IZARD:  Objection.

Page 360

1  LESTER
2  BY MR. SHAFFER:
3  Q.  Is that right?
4  A.  That's correct.
5  Q.  And how does that work from a
6  Cigna perspective?
7  A.  When we calculate the client rate
8  on an individual claim, we will then
9  determine what the customer cost share
10 responsibility is of that client rate and
11 based on the information that is set up in
12 Argus that initially distributed from ePro
13 to determine that customer cost share and
14 the client would be responsible for the
15 remainder of that amount and that
16 represents the vast majority of claims for
17 our commercial business.
18 Q.  In the copay in the lesser of
19 logic that involves a client rate, how
20 does the client rate relate to the
21 participant's cost share, how does it
22 impact what the participant may pay?
23 A.  Sure.  In that logic where we
24 might be using the customer copay, the
25 pharmacy's usual and customary amount and

Page 361

1  LESTER
2  client rate, those three are compared and
3  when the client rate is lower than either
4  of the other two, then the customer would
5  be entitled to pay client rate on that
6  transaction.
7  Q.  And I think we talked about copay
8  G and copay K.  Does the decision of a
9  plan sponsor to offer copay G or lesser of
10 three logic to their members, is that a
11 decision or a choice of a plan sponsor?
12 A.  It is a choice of the plan
13 sponsor.
14     MR. IZARD:  Brian, I've been
15   pretty indulgent here but I think
16   we're well past seven hours and the
17   court has not authorized us to go
18   beyond seven hours.  I haven't agreed
19   to go beyond seven hours so do you
20   want to wrap this up pretty quickly,
21   please?
22     MR. SHAFFER:  I don't think I've
23   used seven hours on the record.  I've
24   used --
25     MR. IZARD:  It's not seven hours