# EXHIBIT CC

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
 3   Case No. 16-cv-1702
     - - - - - - - - - - - - - - - - - -x
 4   KIMBERLY A. NEGRON, Individually   :
     and on Behalf of All Others        :
 5   Similarly Situated,                :
                                        :
 6                       Plaintiffs,    :
                                        :
 7            - vs -                    :
                                        :
 8   CIGNA CORPORATION and CIGNA HEALTH :
     AND LIFE INSURANCE COMPANY, et al.,:
 9                                      :
                         Defendants.    :
10   - - - - - - - - - - - - - - - - - -x
11
12                            September 17, 2020
                              8:57 a.m.
13                            88 E. Mountain Road
                              Canton, Connecticut
14
15
16            ***CONFIDENTIAL***
17
18
19
20
21        VIRTUAL REMOTE DEPOSITION UPON ORAL
22   EXAMINATION OF CHRISTOPHER HOCEVAR, held at the
23   above-mentioned time and place, before Randi
24   Friedman, a Registered Professional Reporter,
25   within and for the State of New York.
```

Page 98

1      C. Hocevar - Confidential
2           MR. RAABE:  Charlotte, can you put
3      up Exhibit 177, please?
4           MS. LOPER:  This has previously
5      been marked as Exhibit 177.  You should be
6      able to see it.
7           MR. SHAFFER:  Sorry.  177?
8           MR. RAABE:  Yes.
9           THE WITNESS:  Okay.  I have it.
10  BY MR. RAABE:
11     Q    So if you start in the first email in
12  the chain, it begins at the bottom of Page 256.
13  There's an email from Lance Wilkes to Stephanie
14  Byrne and Dan Whitnah and others.
15          What was Dan Whitnah's role in 2013?
16     A    I don't remember his official title,
17  but he would have had more of the pharmacy
18  pricing.  So the actuarial team for pharmacy.  At
19  some point, he then turned over to be the CFO of
20  the business.
21     Q    Mr. Wilkes writes, "Stephanie/Dan -
22  Chris has asked for an assessment of the worst
23  case scenario based upon Catamaran's positioning
24  of the zero balance and 90-day issue"; do you see
25  that?

Page 99

1      C. Hocevar - Confidential
2      A    I do.
3      Q    Do you understand the "Chris" there to
4   be you?
5      A    I don't know if it is, but at that
6   time, we were starting to have pretty heated
7   conversations on the reconciliation side of
8   Catamaran.
9      Q    And with regard to the zero balance
10  issue, what do you recall?
11     A    I knew it was one of many reconciling
12  items where we had a disagreement with Catamaran.
13     Q    What did the disagreement surround?
14     A    Craig, I don't know -- I don't
15  remember the details, but at that time, it was
16  when we were actually starting to kind of
17  implement some of the key components of the
18  contract, and with any implementation, there's
19  always kind of puts and takes.
20          From what I remember, fourth quarter
21  of 2013, there were a lot of -- there were a lot
22  of reconciled items that weren't on the favorable
23  side of how we would have interpreted the
24  contract.
25     Q    What's your understanding of zero

Page 100

1      C. Hocevar - Confidential
2   balance to mean?
3      A    I don't remember the details of it,
4   Craig.  I just know it was one of the economic
5   levers that we were not in align with.  Again,
6   the contract with Catamaran was thousands and
7   thousands of pages.  This was kind of the first
8   couple months we were getting into it with them.
9      Q    Do you recall zero balance to involve
10  obtaining from pharmacies the differential
11  between what Catamaran was paying the pharmacies
12  and what members were paying in cost shares?
13     A    I don't.  There was a delta between
14  our contracted rates with Catamaran and what we
15  were actually seeing come through, so I don't
16  know how that plays through the zero base side of
17  it.  I apologize.  I can't be more helpful on
18  this one.
19     Q    What's your best recollection of what
20  zero balance refers to?
21     A    The straightest line I can draw,
22  Craig, and I'm reaching, is that there was
23  trapped money that sat between the contracted
24  rates with Catamaran and what sat at the retail
25  side.  The mechanics of it, I can't testify to go

Page 101

1      C. Hocevar - Confidential
2   deeper than that piece.
3      Q    When there was money sitting at the
4   retail side, where did that money come from?
5      A    I don't remember.  I had a laundry
6   list from the team that we were out of whack with
7   Catamaran.  At that time, we were also having
8   fairly significant relationship issues beyond the
9   economic issues.
10     Q    If you look at the first page of this
11  Exhibit 177 --
12     A    255?
13     Q    255.  It's an email from Dan Whitnah
14  to a number of people, and in the third paragraph
15  it says, "The third option in addition to
16  Stephanie's is a periodic clawback from
17  pharmacies by Catamaran"; do you see that?
18     A    Yes.
19     Q    Did you ever have conversations with
20  anyone about that option?
21     A    Let me read the entire paragraph so I
22  have some context here.  Okay.
23          What was your question again?  I'm
24  sorry.
25     Q    Did you ever have a conversation with

Page 114

C. Hocevar - Confidential

recoup the dollars from the pharmacies in the way of clawbacks; correct?

A   I'm not sure how to answer that question. I knew there were trapped dollars at pharmacies, but as I said, I was worried at this time about the broader relationship issues with Catamaran, and whether or not we would have a contract moving forward.

Q   Were you at all involved with an effort to untrap the dollars at pharmacy?

A   Me, personally, I know the team was working on it, but at a detail level, no.

Q   How did the team resolve it, to your knowledge?

A   I don't remember, Craig; sorry.

Q   By implementing clawbacks; right?

A   As I said, I don't remember.

Q   If you turn to the first page, Page 926, down at the bottom it says, "We CANNOT charge a member more than the price of a drug - it is AGAINST CMS compliance"; do you see that?

A   I do.

Q   Do you know what that refers to?

A   I don't.

Page 115

C. Hocevar - Confidential

Q   Do you know whether Cigna was allowed to charge a member more than the price of a drug in a Medicare context?

MR. SHAFFER:  Objection to form. Lack of foundation.

THE WITNESS:  Sorry, Craig. The question again?

BY MR. RAABE:

Q   Do you know whether Cigna was allowed to charge a member more than the price of the drug in the Medicare context?

MR. SHAFFER:  Objection to form. Lack of foundation. Beyond the scope.

THE WITNESS:  Yeah, sorry, Craig. I wasn't specifically responsible for the banker side. I'm not that familiar with CMS and the regulation of that space as you ask the question.

BY MR. RAABE:

Q   Do you know whether Cigna was allowed to charge any member who was part of the Federal Government more than the price of a drug?

MR. SHAFFER:  Objection to form. Lack of foundation.

Page 116

C. Hocevar - Confidential

THE WITNESS:  Yeah, I don't know how to answer your question, Craig. Again, I wasn't responsible for the government programs.

BY MR. RAABE:

Q   The latest email in the chain, the email that's on the top of Page 926, Michael Guren writes in part, "Off the record, it seems strange that Cigna would charge a member for a co-pay that exceeds the ingredient cost plus dispensing fee plus tax (if applicable). To me, that is no longer a 'co' pay, but more of a single (over) payment by the customer"; do you see that?

A   I do.

Q   To you, what does the "co" in "co-payment" refer to?

MR. SHAFFER:  Objection to form.

THE WITNESS:  In this document?

BY MR. RAABE:

Q   No, in general. Cigna had its members pay co-pays; correct?

A   Co-payments are a part of an enrolled

Page 117

C. Hocevar - Confidential

benefit program; correct.

Q   From your perspective, what does the "co" in "co-payment" mean?

MR. SHAFFER:  Objection to form.

THE WITNESS:  Yeah. I don't -- I'm not trying to be difficult, Craig. I don't know how to answer your question. Co-payments, deductibles, they're all parts of an overall program between employees and their employers, so I don't know how to put a definition around the word "co."

BY MR. RAABE:

Q   Do you have any sense what "co" in "co-payment" means?

MR. SHAFFER:  Objection to form. Asked and answered.

THE WITNESS:  Sorry, I don't.

MR. SHAFFER:  Craig, you have a sense of when would be a good time for a break or how long you're expecting to go?

MR. RAABE:  We should probably take a lunch break, because I don't think I can finish up -- I'm not going to go all day, but it probably makes sense to take a

|  | Page 118 |  | Page 120 |
|---|---|---|---|
| 1 | C. Hocevar - Confidential | 1 | C. Hocevar - Confidential |
| 2 | break. If you want to do that now we can. | 2 | A   I don't. Craig, let me turn you up |
| 3 | THE WITNESS: Craig, if you told | 3 | real quick because I'm having a hard time hearing |
| 4 | me it's an hour, I'll stay on. If you told | 4 | you. |
| 5 | me it's three hours, I need a break. | 5 | Q   Okay. |
| 6 | MR. RAABE: I think it would | 6 | A   Go ahead. |
| 7 | probably be more than an hour. It's up to | 7 | Q   In the last sentence of that email he |
| 8 | you. I can go either way. It's up to Randi | 8 | says, "I need to bring in others if this is not |
| 9 | as well. | 9 | the case, since it is 100 million plus issue for |
| 10 | MR. SHAFFER: Why don't we take a | 10 | us"; do you see that? |
| 11 | ten-minute break now and come back and go | 11 | A   I do. |
| 12 | awhile longer. Or you can take a lunch | 12 | Q   Do you recall discussing with Mr. |
| 13 | break now. It's really your preference. | 13 | Urick or anyone else that the ZBL issue was a 100 |
| 14 | THE WITNESS: Yeah. I prefer not | 14 | million-dollar annual issue for Cigna? |
| 15 | to take a lunch break. I've already had to | 15 | MR. SHAFFER: Objection to the |
| 16 | push a bunch of things for the day, so if I | 16 | form. |
| 17 | could pick some of them up at the end, I | 17 | THE WITNESS: Say that again, |
| 18 | would greatly appreciate it, Craig. | 18 | Craig. |
| 19 | (Whereupon there was a brief | 19 | MR. SHAFFER: Sorry, Chris. I was |
| 20 | recess from 12:01 p.m. until 12:16 p.m.) | 20 | just objecting to the form of the question. |
| 21 | MR. RAABE: Charlotte, can we post | 21 | BY MR. RAABE: |
| 22 | Exhibit 190, please? | 22 | Q   So did you ever discuss with anyone at |
| 23 | MS. LOPER: Yes. I'll let you | 23 | Cigna the value of the ZBL issue at Cigna? |
| 24 | know once it's loaded. | 24 | A   I don't remember. |
| 25 | THE WITNESS: Thank you. | 25 | Q   Do you recall it being around |

|  | Page 119 |  | Page 121 |
|---|---|---|---|
| 1 | C. Hocevar - Confidential | 1 | C. Hocevar - Confidential |
| 2 | MS. LOPER: Okay. You should be | 2 | $100 million a year? |
| 3 | able to see it now. | 3 | A   I don't, sorry. The pharmacy business |
| 4 | THE WITNESS: You said 190? | 4 | was a large business, so as I said, we had 15+ |
| 5 | BY MR. RAABE: | 5 | billion dollars running through that any given |
| 6 | Q   Yes. | 6 | year. |
| 7 | A   Okay. I have it. | 7 | Q   The ZBL issue involved getting the |
| 8 | Q   The middle email on the first page is | 8 | money from the pharmacy, to use your word, was |
| 9 | from Paul Urick. | 9 | trapped there; right? |
| 10 | What was Mr. Urick's role in 2013? | 10 | A   Yes. Maybe to put it in context to |
| 11 | A   2013, Paul -- he would have -- I don't | 11 | trapped. So this timeframe, fourth quarter, as I |
| 12 | remember his title, but we would he would have | 12 | said, we were having a good bit of issues with |
| 13 | had responsibility for operations. So home | 13 | Catamaran; the reconciliation. So the |
| 14 | delivery and other things. | 14 | reconciliation, the team would perform -- would |
| 15 | Q   Have you stayed in touch with | 15 | look at the claims that would come out of our |
| 16 | Mr. Urick since you left? | 16 | systems. Compare that against the contractual |
| 17 | A   I don't think so, no. It's been a | 17 | rates. When I talk about trapped, it's the delta |
| 18 | long time. | 18 | between what we should have seen versus what we |
| 19 | Q   Okay. He wrote to you, "Guys - I had | 19 | saw from a contract rate perspective. So I don't |
| 20 | a meeting with Chris H this morning, and of | 20 | know if that answers your question, but that's |
| 21 | course the ZBL is a top priority among our group | 21 | the context I used the word "trapped" in. |
| 22 | and leadership"; do you see that? | 22 | Q   And the ZBL issue, in part, was to |
| 23 | A   I do. | 23 | obtain that trapped money for Cigna; right? |
| 24 | Q   Do you recall telling Mr. Urick that | 24 | A   Can you say the question differently? |
| 25 | ZBL was a top priority? | 25 | I think I have it, but I don't want to answer it |