UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - x
                                :
KIMBERLY A. NEGRON, et al.,     :  No. 3:16CV1702(JAM)
                                :
                 Plaintiffs     :
                                :
          v.                    :
                                :
CIGNA HEALTH AND LIFE INSURANCE :
COMPANY, et al.,                :
                                :  New Haven, Connecticut
                 Defendant      :  November 17, 2022
                                :
- - - - - - - - - - - - - - - - x



MOTION HEARING


B E F O R E:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.










                              Diana Huntington, RDR, CRR
                              Official Court Reporter

```
 1   A P P E A R A N C E S:

 2
         FOR THE PLAINTIFFS:
 3
                 IZZARD KINDALL & RAABE LLP
 4                   29 South Main Street, Suite 305
                     West Hartford, Connecticut 06107
 5               BY:  CRAIG A. RAABE, ESQ.
                     CHRISTOPHER M. BARRETT, ESQ.
 6
                 MOTLEY RICE LLC
 7                   One Corporate Ctr., 17th Fl.
                     Hartford, Connecticut 06103
 8               BY:  WILLIAM H. NARWOLD, ESQ.

 9               SCOTTSCOTT, ATTORNEYS AT LAW, LLP
                     The Helmsley Building
10                   230 Park Avenue, 17th Floor
                     New York, New York 10169
11               BY:  JOSEPH P. GUGLIELMO, ESQ.

12

13       FOR THE DEFENDANTS:

14               MORGAN LEWIS & BOCKIUS LLP
                     1701 Market Street
15                   Philadelphia, Pennsylvania 19103
                 BY:  JEREMY P. BLUMENFELD, ESQ.
16                   MATTHEW D. KLAYMAN, ESQ.

17

18

19

20

21

22

23

24

25
```

1                           **2:02 P.M.**

2              THE COURT:  We're here today for argument on

3     summary judgment motion in Negron v. Cigna.

4              Appearance of counsel for plaintiffs, please.

5              MR. RAABE:  Good afternoon, Your Honor.  Craig

6     Raabe, Bill Narwold, Chris Barrett, and Joe Guglielmo for

7     the plaintiffs.

8              THE COURT:  Good afternoon to all of you.

9              MR. BLUMENFELD:  Good afternoon, Your Honor.

10    Jeremy Blumenfeld from Morgan Lewis on behalf of Cigna.

11             MR. KLAYMAN:  And Matthew Klayman as well.

12             THE COURT:  Great.  All right.

13             So it looks like since it's your motion, if

14    you'd like to proceed, Mr. Blumenfeld.

15             MR. BLUMENFELD:  Very good.  Thank you.

16             THE COURT:  Come on up to the lectern, if you

17    can.  Thanks.

18             MR. BLUMENFELD:  Good afternoon, Your Honor.

19    Jeremy Blumenfeld on behalf of Cigna.

20             We're here, as the Court's aware, on our motion

21    for summary judgment on plaintiffs' RICO claims.  I'd like

22    to focus my remarks today, Your Honor, on one element of

23    RICO in particular, that is the element that requires a

24    defendant to conduct or participate directly or indirectly

25    in the conduct of such enterprise's affairs.  The

1    allegation here is that Cigna conducted the affairs of

2    Optum and Argus, two legal entity enterprises.

3            There are, Your Honor, four cases I'd like to

4    focus on before I start to talk about the undisputed facts

5    in this case.  Those cases are *Reves v. Ernst & Young* case

6    from the Supreme Court in 1993, the *Gomez v. Guthy* case

7    from the Central District of California in 2015, the

8    *Crichton v. Golden Rule Insurance* --

9            THE COURT:  From the Seventh Circuit.  And the

10   *Vickers* case, I'll bet.

11           MR. BLUMENFELD:  Correct.  And *De Falco v.*

12   *Bernas*, actually, is the last one, Your Honor, which is

13   the Second Circuit case from 2001.  Then I'll turn to the

14   facts here.

15           The Supreme Court in *Reves* talked about what it

16   means to conduct or participate directly or indirectly in

17   the conduct of an enterprise's affairs and said a few

18   things that bear directly on the claims in this case.

19           One, that "conduct," as a verb, means to lead,

20   run, manage, or direct.  And although participating in the

21   conduct could be read to be broader because it's in the

22   same part of the statute as conduct and uses the same word

23   as conduct, it's got a narrower construction.  So the

24   Supreme Court said merely participating in an enterprise's

25   affairs is not sufficient; instead, you have to

1    participate in the operation or management of those

2    affairs.

3             THE COURT:  Is that a fact kind of inquiry,

4    fact-based inquiry?

5             MR. BLUMENFELD:  There are facts that have to be

6    looked at in the context of that inquiry.  But just like

7    the Supreme Court in *Reves*, where the facts show it, you

8    grant summary judgment.  And in fact *Reves* itself was a

9    summary judgment case where the Supreme Court affirmed on

10   the fact that the defendant in that case didn't

11   participate in the affairs of the entity that was at issue

12   in that case.

13            There were two examples that the Supreme Court

14   talked about in *Reves*.  The first was that employees could

15   participate in the management of an organization.  And the

16   second as that individuals outside the organization who

17   exert control over it as, for example, by bribery could be

18   deemed to participate in the conduct of the affairs of an

19   organization.  And I would submit, Your Honor, that's a

20   pretty compelling example, both for what it suggests and

21   also what wouldn't be sufficient.  That is, the Supreme

22   Court wouldn't use the example of bribery if everyday

23   routine commercial contracts were sufficient to satisfy

24   the standard for conducting an enterprise for purposes of

25   RICO.  It wouldn't make any sense to talk about bribery

1    and then talk about routine commercial contracts.

2              THE COURT:  Is your argument, then, that the

3    fact that the relationship has been reduced to a

4    contractual form disqualifies it from meeting that test?

5              MR. BLUMENFELD:  No.  But I would say if you

6    look at, first of all, what the contract is and the fact

7    that the contract here, there's no evidence that this

8    contract was any different from any other contract that

9    Argus or Optum had with any other entities.  And I would

10   say, getting back to your point earlier of the *Vickers*

11   case, Your Honor, if you look at the facts that are

12   undisputed in this case, it falls squarely on all fours of

13   the facts with *Vickers*.

14             THE COURT:  I'm just trying to get the concept

15   right here.  You're not here to say simply because the

16   relationship is embodied in contractual obligations that

17   that's not enough to meet the test?

18             MR. BLUMENFELD:  Correct.  Merely because it is

19   written down in a contract is not sufficient.

20             THE COURT:  So you're saying if it's a contract,

21   and I think you said routine business contract, then my

22   question is, if you're saying a contract might be enough,

23   then I just wonder if we're not off into factual detail

24   land about whether this contract was not in fact in good

25   faith at least on Cigna's part.

1          MR. BLUMENFELD:  I guess a couple of answers to

2    that.

3          First, in the cases that I was going to talk

4    about and would like to talk about, similar kinds of

5    circumstances existed.  There were commercial contracts in

6    all of those cases.  And what I would say, Your Honor, is

7    there's no evidence, zero, that the contract here between

8    Cigna and Argus, or Cigna and Optum, was any different

9    than the contracts that Argus or Optum had with any other

10   entities that they did business with.  And that's what

11   makes it essentially undisputed fact that this is not

12   anything unusual in terms of the contract.

13         THE COURT:  So it has to be an unusual contract

14   is what you're telling me.

15         MR. BLUMENFELD:  Well, for example, bribery

16   could be written down in terms of a contract, but it would

17   still constitute bribery and be sufficient.  This is not.

18   It's just a routine commercial contract.  There's no

19   evidence that it was any different than, like I said, the

20   contracts that Argus or Optum had with any other third

21   parties.

22         THE COURT:  So is really your argument, then,

23   that given what I think is plaintiffs' concession --

24   they'll tell me if I'm wrong -- that Argus and Optum are,

25   I think as they say, in the dark about this, basically

1    your argument is you really don't have an enterprise

2    because an enterprise can't consist of entities that are

3    in the dark, not coconspirators in that sense?

4         MR. BLUMENFELD:  So I think there is the legal

5    entity enterprise definition that courts sometimes apply.

6    But in those contexts where you're just dealing with

7    contracts with a legal entity, that's not sufficient to

8    conduct that enterprise or to participate in the conduct

9    of that enterprise.  That's what the *Gomez* case teaches

10   which is, I would say, Your Honor, very similar to the

11   facts here.

12        THE COURT:  Maybe tell me sort of -- we can talk

13   about cases and throw out the facts all you like.  I'm

14   trying to deal at a conceptual level here and try to

15   understand why this makes sense, right?  So I'm trying to

16   understand why -- if I'm just looking at whether an entity

17   is participating or conducting the affairs or directing,

18   in part, the affairs of another entity, I just can't quite

19   figure out why a contractual obligation -- well, I'll say

20   an ordinary contractual obligation, you could use that

21   term, not blatantly unlawful contractual obligation such

22   as a bribery, wouldn't be enough to meet that requirement.

23        MR. BLUMENFELD:  So that's participating in an

24   entity's affairs but not participating in the conduct of

25   those affairs.  And that gets back to what the

1    Supreme Court talked about in *Reves* as the distinction

2    between what is a RICO claim and what might be an ordinary

3    fraud claim that involves some third parties but is not

4    anything more than that.  And that's what the courts

5    seemed to consistently talk about.

6            And Judge Eginton's decision in this case

7    describing *Vickers*, when you separate out sort of where we

8    are now, that is we're at summary judgment, which was the

9    same thing as in *Vickers*, and you look at the way

10   Judge Eginton described *Vickers*, he said there was not

11   sufficient evidence to get past summary judgment because

12   the defendants in that case did not have a joint venture

13   with the entity in question, did not have a partnership

14   with the entity in question, and didn't share any of the

15   profits with the entity in question.  Instead, it was just

16   different parties pursuing their contractual goals, albeit

17   closely in that case.  And certainly the allegation or the

18   evidence that plaintiffs muster is that it was close here

19   too.  But that's not conducting the enterprise, just like

20   it wasn't in the *Vickers* case.  That's the difference

21   between what I think courts talk about in terms of routine

22   fraud, if there is such a thing, and RICO-izing every kind

23   of allegation or assertion of routine fraud by claiming

24   that something is an entity in that context.

25           What's notable about the *Gomez* case, Your Honor,

1   is not only the sort of specific facts of that case, but

2   also it collects a whole bunch of cases that talk about

3   these legal entity enterprises and rejecting the idea that

4   whenever any two businesses do business together, that's

5   the predicate for a RICO claim if one of them is accused

6   of fraud.  In *Gomez*, it had to do with credit cart

7   applications.  That is, the defendant was accused of

8   submitting inappropriate fraudulent credit card

9   authorizations to the enterprise, which was a credit card

10  processing company.  And in the same way that they allege

11  we submitted fraudulent information for them to submit to

12  the pharmacies, the plaintiffs in *Gomez* alleged that the

13  defendants were submitting false fraudulent credit card

14  authorizations through the credit card processing

15  companies.  And the courts universally reject that notion

16  as the basis for a RICO claim because those are just

17  routine entities, commercial contracts.  And if one entity

18  is misusing that or using that inappropriately, that might

19  be actionable under something, but it's not actionable

20  under RICO.  Here, there is an ERISA claim or several

21  ERISA claims, depending on what's still remaining in the

22  case, but that's a different kettle of fish than trying to

23  turn every circumstance like that into RICO.

24          Your Honor, I mentioned also the Seventh Circuit

25  case, the *Golden Rule Insurance* case.  Again, same thing.

1    The plaintiffs made the same argument that plaintiffs are

2    making here, that there was a contract and as a result of

3    that contract the defendant participated in the conduct of

4    that enterprise or conducted that enterprise, the

5    enterprise in that case being a membership organization.

6    And the defendant, an insurance company that was allegedly

7    selling insurance through fraudulent means using

8    marketing material --

9         THE COURT:  Yes, the Golden Rule and Federation,

10   just a conduit.

11        MR. BLUMENFELD:  Yes.  And the Seventh Circuit

12   said that wasn't sufficient in that case.

13        You asked, Your Honor, whether this is a fact

14   issue.  And I know plaintiffs have some cases where they

15   talk about the fact that summary judgment, these are fact

16   issues, et cetera.  Of course, in every kind of

17   circumstance, you're going to find some cases where there

18   is a fact issue.  But the fact that the Supreme Court

19   looked at the circumstances in *Reves* and concluded that

20   summary judgment was appropriate in that case I think says

21   a lot about the circumstances here too.  Because in *Reves*

22   the defendant in that case was accused of participating in

23   an enterprise that was a business.  And what did they do

24   with respect to that business?  They audited the financial

25   statements for that business, allegedly with fraudulent

1   information.  They prepared the financial statements with

2   fraudulent information.  And the single biggest asset that

3   that entity had, a piece of property, they're the ones who

4   valued it at that fraudulent price for the fraudulent

5   valuation that they then audited.  And the Supreme Court

6   said that was not sufficient to state a RICO claim.  It

7   was sufficient for ordinary fraud and there were damages

8   and that went to trial, but it wasn't sufficient for RICO

9   because that was not conducting the enterprise in that

10  circumstance.

11          And so when you get to the facts here, what you

12  have is a routine commercial contract.  There's no

13  evidence that this contract was different from any other

14  contract that any other --

15          THE COURT:  Or two, you mean, right?

16          MR. BLUMENFELD:  Two contracts, one with Argus,

17  one with Optum, correct.  There's no evidence at all that

18  the Argus contract with Cigna was any different than the

19  Argus contract with anybody else.  There's no evidence at

20  all that the Optum contract with Cigna was no different

21  than the contract that Optum had with any other entity.

22          And just like in *Vickers*, there's no

23  partnership, there's no joint venture.  And importantly,

24  Your Honor, there is no sharing of profits that is the

25  alleged clawbacks.  And I say that's important,

1    Your Honor, because in the motion to dismiss briefing, one

2    of the things that plaintiffs said to survive Rule 12 was

3    that there was the sharing of those profits and those

4    clawbacks.  And they told Judge Eginton that he needed to

5    accept that allegation as true which, of course, you have

6    to do in the context of a Rule 12 motion.  But we're past

7    that stage now.  Plaintiffs in fact have admitted, in

8    response to our statement of undisputed facts, I believe

9    it's Number 23 and 36, there was no sharing of profits,

10   there was no sharing of clawbacks.  That key piece of the

11   argument that plaintiffs made in the Rule 12 context no

12   longer applies.

13           I would say, Your Honor, the facts in this case

14   are no different than they were in the *Reves* case, in the

15   *Golden Rule* case, or in the *Gomez* case.  And the *Vickers*

16   case, Your Honor, I think the way Judge Eginton

17   characterized *Vickers*, in particular, stands on all fours

18   with the circumstances here and warrants summary judgment

19   on the RICO claim notwithstanding what might be a dispute

20   about what the plan language means or anything along those

21   lines.

22           THE COURT:  I see.

23           MR. BLUMENFELD:  Unless the Court has any

24   questions --

25           THE COURT:  Well, I do.

1              Supposing I go further than that and look at

2     your arguments on fraud and reliance --

3              MR. BLUMENFELD:  Yes.

4              THE COURT:  -- tell me a little bit more -- I

5     guess the question I have is, it seems in the *Foodservice*

6     litigation case, the Second Circuit makes clear that

7     overbilling can be sufficient, at least as to establish

8     the reliance element for fraud.  And tell me why you think

9     the *Foodservice* case is distinguishable.

10             MR. BLUMENFELD:  Thank you, Your Honor.

11             So I think *Foodservice* is distinguishable on

12    sort of the core point.  In *Foodservice*, what happened is

13    the defendant not only said you owe me $10, but said you

14    owe me $10, here's the invoice that proves it, and that

15    was a fraudulent invoice.  Here, we don't have that

16    circumstance.  So what's the distinction between charging

17    the price that you're charging and fraud is if you say to

18    somebody, I am charging you $10 and that $10 represents my

19    cost, for example, then -- and if that fact is false that

20    represents your cost, that's fraud.  But if you say to

21    somebody I'm charging you --

22             THE COURT:  Is that what happened in

23    *Foodservice*?  I wasn't clear that that's --

24             MR. BLUMENFELD:  It was.  They submitted

25    fraudulent invoices as proof of --

```
 1              THE COURT:  So you're saying it just turns on
 2    whether there was a document?
 3              MR. BLUMENFELD:  Well, it turns on whether there
 4    was fraud as opposed to just charging somebody a different
 5    amount than they could sew you for under the contract.  I
 6    would say that's a material difference, Your Honor.  Look,
 7    in every sort of breach of contract circumstance, there's
 8    a dispute about whether one part or the other is right
 9    about the contract.  What distinguishes not paying
10    somebody the amount they're due under the contract or
11    charging them more than they're supposed to pay under the
12    contract is whether you present fraudulent documentation
13    essentially as the basis for that.
14              THE COURT:  Again, to answer my question, then
15    you're saying it has to be a document?
16              MR. BLUMENFELD:  It doesn't have to be a
17    document.  It could be oral too.  But it has to be some
18    communication, not just the price.
19              THE COURT:  I presume, though, when the
20    plaintiffs go and pay, the price that they pay is
21    communicated to them orally or by receipt, right, a
22    document, something like that, right?
23              MR. BLUMENFELD:  It is, Your Honor.  And this is
24    important, and I apologize if I wasn't clear about it.
25    It's not telling somebody the price that is required for
```

1    it to be fraud; it's telling somebody that the price

2    reflects the amount you paid, for example, for the

3    product.  Or the invoices that were fraudulent in *U.S.*

4    *Foodservice* was not the invoice they were charging the

5    customer; it was the invoice that they used to generate

6    that invoice which said we paid X dollars for something.

7    That was fraudulent because they didn't actually pay the X

8    dollars that they were then presenting as the invoice for

9    proof of payment.

10           THE COURT:  As far as I understand plaintiffs'

11   allegations is Cigna is putting into motion this process

12   through the pharmacy here, Optum, but also with Argus,

13   because they're doing the calculations, of ultimately

14   saying to the person when they show up and they get their

15   prescription, hand over $10, right?  And taking

16   plaintiffs' allegations here and I think their evidence,

17   they're saying that's not the right amount, that demand

18   for $10 is different than what the plan allows them to do.

19           So I thought the significance of the *Foodservice*

20   case was it was saying that in that case where there's

21   been overbilling there, that it's enough to establish the

22   fraud if, in the context of everything that you can see

23   there, the person reasonably thinks, well, this is the

24   amount I'm supposed to pay in accordance with my plan.

25   Because, heck, the existence of the plan is the only

1    reason why the person is paying something, right?

2              MR. BLUMENFELD:  So I think, if you go into the

3    pharmacy, for example, and buy anything else aside from a

4    prescription from that pharmacy and they tell you that

5    it's $10, they might be right about that or wrong about

6    that, but that's not fraud and not a RICO violation.

7    Where you run into trouble is if you tell a participant,

8    for example, I'm going to charge you $4 for this or I'm

9    going to charge you the amount that the pharmacy gets to

10   keep, and you read that and you understand that what

11   they're charging you is going to be the amount that the

12   pharmacy gets to keep, and then they charge you $10.

13   That's similar, closer to the *Foodservice* case.  But here,

14   where plaintiffs don't know what the amount that they're

15   paying is supposed to represent because they didn't read

16   the plan documents and they don't know that even under

17   their reading now of what the language is that what they

18   were supposed to be paying at the pharmacy was the amount

19   that the pharmacy was retaining in their world, that is an

20   actionable breach of the terms of the plan, if they're

21   right about it, but it is not a fraud, it is not a RICO

22   violation because you're not communicating any fact to

23   them that is misleading.  You're not presenting them with

24   a fraudulent invoice saying this is the amount --

25              THE COURT:  Suppose the pharmacy says when they

1   pay for it -- again, suppose; I'm not saying these are the

2   facts here -- but suppose they say to the plaintiff here

3   is how much you owe in accordance with the terms of your

4   plan.  Fraud?

5           MR. BLUMENFELD:  I would say no in the

6   circumstances that we're talking about here.  But that's a

7   closer call, Your Honor.  We certainly don't have any of

8   those factual circumstances here where anybody was told

9   this is the amount you're supposed to pay in accordance

10  with your terms of the plan.  And maybe more importantly,

11  nobody communicating to them that the terms of their plan

12  required them to pay the amount that was going to be paid

13  to the pharmacy or the amount retained by the pharmacy.

14          THE COURT:  If you take it from the reasonable

15  purchaser standpoint, don't they think that when they are

16  forking over the money that's been requested of them, that

17  this is the money that they're required to pay under their

18  plan, right?  Because they know there's a plan out there

19  that governs the entire economic relationship there,

20  right?

21          MR. BLUMENFELD:  I wouldn't --

22          THE COURT:  It's one thing if they're told that

23  the plan doesn't cover this at all, so you're paying full

24  freight.  If that's not happening, if they're being told

25  here's your co-pay, it strikes me that they would think,

1    okay, that's because this is something that the plan

2    demands or is proper under the plan.

3         MR. BLUMENFELD:  I don't know what would be in

4    the mind of somebody who was purchasing something like

5    that.  I know you go into the pharmacy all the time and

6    you can buy a whole lot of things where you don't expect

7    that the amount that you're paying is the amount that the

8    pharmacy is going to be keeping for that item.  They have

9    expenses they pay for, they have products that come in,

10   sometimes they get rebates on things.  You buy greeting

11   cards at the pharmacy and nobody expects that the amount

12   you're paying for the greeting cards is the amount the

13   pharmacy paid for the greeting cards.

14         THE COURT:  Not the greeting cards, I'm talking

15   about prescription drugs.  I thought this was a case about

16   prescription drugs.

17         MR. BLUMENFELD:  It is, Your Honor.

18         THE COURT:  I thought that when you pay your

19   money for the proscription drugs and you're told by the

20   pharmacy you owe this amount, isn't the logical assumption

21   that, okay, this is the amount that I'm required by my

22   plan to pay because, thank goodness, I have a plan that's

23   paying a lot more of it.

24         MR. BLUMENFELD:  I guess I would say,

25   Your Honor --

1          THE COURT:  Maybe not.

2          MR. BLUMENFELD:  -- if that was the basis for

3    fraud, then any time somebody is interpreting a plan wrong

4    or any time somebody comes in after the fact and says I

5    think I should be paying X instead of Y under the terms of

6    my plan for this drug, then that would be a RICO

7    violation --

8          THE COURT:  That's not our facts here, right?  I

9    think I understand plaintiffs to be saying Cigna is well

10   aware that they have this contractual language that says

11   that the person's only going to pay this much and Cigna is

12   well aware that they're going to take more than that and

13   they're going to be charged more than that.  And they're

14   so well aware of it that they're profiting by it by means

15   of a clawback.  And so that seems to me -- we're not

16   talking about every single time there's a dispute how much

17   should be paid.  I'm just trying to look at what the

18   plaintiffs' allegations are here.

19         MR. BLUMENFELD:  Understood, Your Honor.

20         I guess I would look at it this way, specific to

21   your question.  The amount that participants were paying

22   at the pharmacy in these contexts was the same both before

23   and after the clawback process started.  And so if

24   participants were entitled to pay $9 before the clawback

25   process started, they were still paying the same $9 after.

1    And it doesn't strike me that it could be fraudulent in

2    that context to be charging them the same $9 before and

3    after when plaintiffs don't take issue with the amount

4    that they were paying before that time period.

5          Again, there can be a dispute about what the

6    plan language means and who's right and who's wrong about

7    it, but that doesn't mean that communicating the amount

8    that somebody is supposed to pay under the terms of the

9    plan or charging somebody a certain amount when they

10   purchased the prescription is fraud.  It might be if you

11   went into the pharmacy and the pharmacist said your bill

12   is $9 because you are entitled to pay the amount that is

13   retained by the pharmacy for this and here I am retaining

14   $9.  But if what they say when you walk up to the counter

15   is you owe me $9, that could be a breach of contract or,

16   in the case of ERISA, a breach of the terms of the plan,

17   but it's not fraud.

18         THE COURT:  I see.

19         So the fraud that we care about in this case is

20   not really -- it's most directly wire fraud or mail fraud,

21   right?

22         MR. BLUMENFELD:  I believe those are the

23   principal --

24         THE COURT:  We're having a RICO argument here,

25   the predicate's going to be mail or wire fraud.

1          MR. BLUMENFELD:  Correct.

2          THE COURT:  So I take it -- I'm curious what

3    your position is about whether mail or wire fraud

4    invariably -- oftentimes, but invariably require a

5    misrepresentation.  Because the parties in their briefing

6    have been having an argument about misrepresentations.

7    I'm wondering if a scheme or artifice to defraud within

8    the meaning of the pertinent statutes, 1341, 1343, involve

9    conduct that is deceptive without necessarily involving a

10   misrepresentation or under false pretenses which may not

11   involve a misrepresentation.

12         MR. BLUMENFELD:  So I guess I would go to

13   plaintiffs' allegations here and what they claim is the

14   evidence, which is their allegations were there were

15   misrepresentations in two contexts: one, in the plan

16   documents themselves; and two, at the point of sale.  I

17   don't think they allege or have argued that there is some

18   other fraud aside from that.  So I haven't had a chance

19   to --

20         THE COURT:  I understand that.  Okay, great.

21   What else?

22         MR. BLUMENFELD:  Unless you have any questions

23   for me --

24         THE COURT:  I don't think so.  Thank you.

25         MR. BLUMENFELD:  Thank you very much,

1  Your Honor.

2          MR. RAABE:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. RAABE:  It will come as no surprise that

5  plaintiffs do believe this is a fact-bound dispute and not

6  appropriate for summary judgment.

7          What I want to start with is what Judge Eginton

8  wrote in the motion to dismiss, because I think the

9  inquiry for the Court now is are there facts to support

10  what Judge Eginton found would be a sufficient allegation

11  of participation.  And what Judge Eginton said -- this was

12  at page 364 of his 300 F.Supp. 3d opinion -- "plaintiffs

13  have alleged that Cigna designed the Clawback scheme, that

14  it required OptumRx and Argus to misrepresent the

15  cost-sharing amounts, and that it directed OptumRx and

16  Argus to forward the Clawbacks."

17          So the determinative question on this

18  participation issue is:  Are there any facts from which a

19  jury could conclude that Cigna participated, directly or

20  indirectly, in some of the affairs in such a way that

21  Cigna was requiring Argus to miscalculate the cost-share

22  amount and requiring Optum to act on that miscalculation

23  and send the money back to Cigna as a clawback?  And I

24  think, as we've set forth in the plaintiffs' brief, there

25  is plenty of evidence from which a jury could conclude

1    that.

2         So I think, from the plaintiffs' perspective,

3    there's two issues with the defendants' arguments.

4    They're ignoring the facts that we've developed through

5    discovery and they're exaggerating the law of

6    participation.  I think we all agree what the relevant

7    cases are.  *Reves*, for sure, participation in some of the

8    affairs.  And in Footnote 4, the Supreme Court said it

9    doesn't have to be significant.

10        The case we heavily rely on, *Satinwood* from

11   Second Circuit, picks up on *Reves* and explains what that

12   means and says it's a low hurdle.  Why is it a low hurdle?

13   Because it's just some part, directly or indirectly, and

14   doesn't have to be primary or formal in terms of the

15   amount of participation.

16        In *Satinwood* what the court found with regard to

17   this bankruptcy fraud going on was that the defendant was

18   the "primary source of the most relevant information

19   pertaining to the affairs of the enterprise."  And

20   respectfully, Your Honor, that's exactly what's going on

21   here.

22        I think Your Honor understands, from your

23   questions of Mr. Blumenfeld, Argus is doing the

24   calculation --

25             THE COURT:  I understand that.  So *Satinwood*,

1    didn't *Satinwood* involve basically persons, more than one

2    culpable person?

3               MR. RAABE:  Yes.

4               THE COURT:  There was the mom involved, as I

5    recall.

6               MR. RAABE:  Yes.

7               THE COURT:  So, I mean, I'm understanding

8    Mr. Blumenfeld's arguments to be saying, well, here, in

9    light of your concession that Argus and Optum were in the

10   dark, in light of the fact that I think you've withdrawn

11   the conspiracy claim altogether, he's saying what we have

12   is just a routine business relationship.  And why -- why

13   would that be enough?  And I give you an example.  What if

14   you had Cigna comes up with a devious plan to overcharge

15   people in some way and then hires FedEx to deliver the

16   invoices with these overcharges.  Would you then say,

17   well, there's an enterprise here, Cigna and FedEx, when

18   FedEx is completely in the dark about whether these

19   invoices are fraudulent or wrongful?

20              MR. RAABE:  I wouldn't claim that they are a

21   RICO --

22              THE COURT:  So why are Optum and Argus different

23   than FedEx?

24              MR. RAABE:  Because in this instance, because of

25   the contractual relationship which is the mechanism for

 1    this fraud, Cigna has, as we've alleged, kept them in the

 2    dark as to what the plan documents say.  There is no way

 3    for Argus to be able to figure out how to adjudicate

 4    claims but for Cigna telling them this is the way you will

 5    adjudicate the claims.  And in the contract language we

 6    cited, Cigna has promised Argus that that information will

 7    be accurate.  And for all of the documents that we've

 8    cited, Cigna knew that it wasn't accurate.  They knew that

 9    the pharmacy rate was the rate that the members were

10    supposed to get.  But they are telling Argus adjudicate

11    this at a different amount.  There would be no such

12    relationship --

13            THE COURT:  So in the FedEx example, Cigna tells

14    FedEx we're going to give you an invoice and it's going to

15    be darn accurate, and we need you to adjudicate where the

16    heck this person lives that we're trying to get this

17    invoice to.  Is FedEx then, is that going to be taking

18    part in the affairs?

19            MR. RAABE:  I don't think that would be

20    sufficient participation on Cigna's part.  The

21    participation here is much different.  They are providing,

22    as I said, in *Satinwood* the primary source of the most

23    relevant information to enable the fraud.  They are giving

24    them the adjudication logic that causes the fraud.  In

25    your FedEx example, I don't see that level of

1   participation.

2          THE COURT:  So if Cigna had not basically gotten

3   Argus involved in doing complex calculations but just said

4   this is the amount, it's $15 or it's $10, would that then

5   mean that the test was not met?

6          MR. RAABE:  I think that would depend on what

7   the $15 relates to.  Maybe a different example.  If Cigna

8   said here are the plans, Argus, you figure out what the

9   adjudication logic ought to be, that would be a very

10  different case.  That's not Cigna participating in some

11  part of the affairs of Argus.  What we have here is very

12  different.

13         THE COURT:  So it's more like a control standard

14  is really what you're focusing on, the degree to which

15  they're controlling the other entities with these very

16  explicit contractual provisions which you detail in your

17  brief?

18         MR. RAABE:  That's right.  And I think

19  Judge Eginton in his opinion said you should look at the

20  degree of control, not are you part of the management, are

21  you part of the operations.  Cigna says a few times in

22  their brief Cigna's not part of the board of directors,

23  they're not part of the executive management.  I think

24  that's an exaggeration of the case law.  The question is:

25  Is there a degree of control, participation, indirectly or

1    directly, in some part of the affairs?  And by keeping

2    Argus in the dark and by completely controlling the

3    adjudication logic that is participating in the affairs.

4    Without Cigna providing that information, Argus could not

5    do its job under these contracts.  Argus does not have

6    access to the plans.  They could not figure out what the

7    appropriate cost share was.  That is participation in

8    their affairs.

9            THE COURT:  It's participation because Argus

10   doesn't know?  I'm trying to hook up this idea of what is

11   physically participating versus what the recipient of this

12   participation knows or does not know.

13           MR. RAABE:  So I'm not sure what you mean by

14   physically participating.

15           THE COURT:  Taking part in.  Giving commands,

16   instructions.

17           MR. RAABE:  Yes.  So I think it's more than

18   giving them instructions.  Giving them instructions take

19   these plans and figure out what the cost share is, I don't

20   think that would be a RICO case.  But saying we're not

21   going to give you the plans, here is the cost-share logic,

22   you must apply this.  Saying to Optum, you must collect

23   the exact amount that Argus has calculated, no more and no

24   less, and you must send that money back to us at Cigna,

25   that is a participation in both of their affairs.

 1           THE COURT:  I see.  All right.

 2           MR. RAABE:  So with regard to the position that

 3     Cigna has taken with regard to control, as you brought up,

 4     what Cigna said in Statement of Fact 30 was that Argus had

 5     testified that "CHLIC" -- Cigna -- "didn't exercise any

 6     control in terms of how we operated the business or

 7     systems."  That's testimony from the Argus representative.

 8           I would urge the Court to look at the actual

 9     answer.  It's a lot longer than that.  The witness says we

10     don't control the operation -- they don't control the

11     operation and management of our company, essentially, and

12     she went on.  This is Exhibit V to Statement of Fact 30,

13     pages 156, 157.  She continued her answer, "Where they did

14     have control" -- they, being Cigna -- "is what we should

15     be leveraging in terms of editing, how we would

16     communicate with the pharmacies" -- and potentially think

17     third parties, i.e., the members -- "on their behalf.  So

18     depending on the nature of what the function was and the

19     relationship, they did have the ability to state how we

20     did certain things."  Those certain things are the

21     adjudication.  So the Argus witness is saying that Cigna

22     controlled the adjudication process and that that is

23     participation using the quote word "control."

24           And I think, Your Honor, that's the end of it.

25     That creates a factual dispute from which a jury could

1    conclude that there is participation in Argus's affairs.

2            As I mentioned before, Cigna in a couple of

3    spots in their brief, page 13 and page 16, says that they

4    did not -- they didn't operate or manage Optum or Argus

5    and they had no control over the board or the executive

6    management.  That is an overstatement of the law.  That is

7    not required.  That is not directly or indirectly

8    participating in some of the affairs not to a significant

9    degree.

10           One of the areas where we've diverged here with

11   Cigna in the argument is we have discussed and attached

12   all of the documents where Cigna has admitted internally

13   that they knew it should have been the pharmacy rate and

14   that they didn't.  Cigna says repeatedly through their

15   memo that there is no evidence of fraud.  Again, a jury

16   could take those materials that we've included there and

17   find the fraud.  So then the question is:  Did Cigna

18   participate in the fraud at Argus and Optum?  And for the

19   reasons I just said, they were integral to it.  They

20   provided the logic that created the fraud.

21           So with regard to the contract --

22           THE COURT:  When you say -- I'm a little maybe

23   lost on this -- they provided the logic -- basically the

24   formula, right?

25           MR. RAABE:  Yes.

1          THE COURT:  -- that created the fraud, I thought

2    the fraud was already there.  I was going to get to this,

3    but I'm trying to figure out what precisely is your theory

4    of fraud here?

5          MR. RAABE:  So it's going to the

6    misrepresentation issue.

7          THE COURT:  Yeah, I mean, get to it whenever you

8    want.  It is a question for me.

9          MR. RAABE:  Let's do it now.

10          The misrepresentation issue is at the point of

11    sale.  Just as you said, when the patient member goes in

12    and goes to pick up his or her prescription, Ms. Negron,

13    in one of our examples, is told you owe $10.  She owed

14    $6.06 because that is what the plan provided for, the

15    pharmacy rate.  So the misrepresentation is at the point

16    of sale.

17          How did we get there?  When Cigna gives Argus

18    the logic to calculate, when Ms. Negron goes in and says

19    here's my prescription, the pharmacist types the

20    information in and nearly instantaneously -- how, I don't

21    know; we haven't figured that out -- the pharmacy knows

22    charge $10 for a co-pay.

23          THE COURT:  Where's Optum in that process, then?

24          MR. RAABE:  Pardon me?

25          THE COURT:  Where is Optum in that?

1           MR. RAABE:  The pharmacy is an Optum network

2      provider.

3           THE COURT:  Optum network, right.

4           MR. RAABE:  So Argus is in the background doing

5      the adjudication.  They send the information back to the

6      Optum pharmacy, the pharmacist then says you owe $10.

7      That's a misrepresentation because under the

8      plan Ms. Negron owed $6.06.

9           THE COURT:  Did they say that you have, I guess,

10     abandoned any other argument of fraud other than point of

11     sale?

12          MR. RAABE:  Yes.  We are relying on point of

13     sale.  We are not claiming a misrepresentation in the

14     plan.  Frankly, our perspective, as we thought about it,

15     the plans are accurate.  The plans say what they say, that

16     you should get the pharmacy rate.  The misrepresentation

17     is at the point of sale.

18          The misrepresentation occurs at the point of

19     sale.  Ms. Negron turns over her $10, and then the Optum

20     pharmacy, through their contract, sends the $3.94 back to

21     Cigna, completing the fraud.

22          THE COURT:  I see.  Okay.

23          MR. RAABE:  So on to the contract issue that you

24     mentioned with Mr. Blumenfeld.  As we view their position,

25     it's that if you have a contract, it washes your hands and

1  you cannot be held liable as a RICO defendant.  That's

2  clearly not the law.

3          THE COURT:  Well, I don't think -- I mean, I

4  think I asked Mr. Blumenfeld about this.  I think he kind

5  of backed off of that.  And he disputes your immunity

6  characterization.  I think he's trying to say that in

7  routine business contracts, that's not enough.  I thought

8  that's what I understood.

9          MR. RAABE:  There are cases that talk about the

10 garden variety contract and just the provision of services

11 or goods, that that is not a RICO situation.  This is

12 different than that.  Here you have a contract that is, as

13 I said before, the mechanism for the fraud, the provisions

14 in the contract that keep Optum and Argus in the dark and

15 allow Cigna to control the core of the operation, the

16 adjudication amount.  That is not a garden variety

17 contract.  That is using a contract to commit fraud.

18         And as we said in the plaintiffs' memo, I think

19 a jury could easily find that Cigna has breached the

20 contract both with Argus and Optum.  It quite clearly

21 requires that Cigna provide accurate adjudication logic.

22 It clearly provides for Optum that they should be

23 collecting what is required under the plan.  And a jury

24 could find that that's not what's going on.  They're

25 charging a different amount than what is accurate.  And

1    Optum, through their pharmacies, is sending the clawback

2    back in excess of the plan requirements.

3           Cigna brought up the *Chrichton* case which I read

4    and went back to the case it cites, the *Fitzgerald* case.

5    And the *Fitzgerald* case gives a couple of examples of what

6    could constitute RICO.  Here is one of them.  If you use

7    an "enterprise to engage in some criminal activities but

8    for the most part is content to allow it" -- the

9    enterprise -- "to continue to conduct its normal, lawful

10   business - and many of the employees of the business may

11   be unaware that it is controlled and being used by a

12   criminal."

13          We're not saying Cigna is a criminal here.  But

14   that's exactly the scenario.  Argus and Optum are doing a

15   lot of completely legitimate things, but in this respect

16   with regard to the adjudication and the sending the

17   clawbacks, that is a piece of fraud unbeknownst to many of

18   the employees of both of those companies.  And there is

19   plenty of law that we've cited in the brief.  The *De Falco*

20   case, for instance, that Mr. Blumenfeld mentioned, that

21   enterprises can be passive instruments or victims.  And if

22   we try this case, that's what the plaintiffs will

23   establish.

24          Finally, Your Honor, on the reliance issue, we

25   read *U.S. Foodservice* to say that when there is a blanket

1   misrepresentation, when there's a misrepresentation at the

2   point of sale and someone pays it, that inferentially a

3   jury could find that that is reliance.  To me, that is

4   exactly what *U.S. Foodservice* says.  I think what's

5   interesting here is that is exactly what Cigna argued in

6   the *Arapahoe* case.  If you go to page 35 of our brief --

7           THE COURT:  Yeah, I know that.  I saw it.

8           MR. RAABE:  It is exactly what we are alleging

9   here.  For Cigna to argue there that it's RICO and to

10  argue here that it's not I think should raise questions

11  for the Court about the entire foundation of their

12  position.

13          Unless you have further questions, that's all I

14  have.

15          THE COURT:  I don't think so right at this time.

16  Thank you very much.

17          MR. RAABE:  If I can make one note.  I mentioned

18  this to Mr. Blumenfeld and Mr. Klayman yesterday.  I did

19  notice that there is a citation to an Exhibit RR in our

20  brief that should have been 44.

21          THE COURT:  Okay.  All right.

22          MR. RAABE:  It references --

23          THE COURT:  I didn't catch that, I'm sorry.

24          MR. RAABE:  I did yesterday and was aghast.  My

25  bad handwriting clearly got transposed.  So it's

1    Exhibit 44.  It was referencing pages 7 and 8 of the

2    *Arapahoe* brief.  I provided the entire thing to Cigna's

3    counsel yesterday.  If it's all right with you, I'll hand

4    those pages to your clerk.  Thank you.

5           THE COURT:  Thank you.

6           Mr. Blumenfeld.

7           MR. BLUMENFELD:  Thank you, Your Honor.

8           A few key points strewn about on Post-It notes.

9    I'll start, Your Honor, by talking about the *Satinwood*

10   case that you mentioned and then counsel mentioned.

11          THE COURT:  Sure.

12          MR. BLUMENFELD:  Mr. Raabe, when he was talking

13   about that opinion, was quoting the Second Circuit's

14   discussion about the individual in question, not the

15   mother.  The individual in question in that circumstance

16   was the debtor.  Of course, the debtor in that context,

17   the individual who filed for bankruptcy, is going to

18   control and conduct the enterprise that is the bankruptcy

19   estate.

20          With respect to the mother, which I know you

21   raised, Your Honor, the Second Circuit discusses the fact

22   that because the mother's liability was premised on a RICO

23   conspiracy theory, the standard is a different one than

24   the conducting the enterprise standard that would apply

25   here because there is no conspiracy-type allegation.

1              THE COURT:  I see.

2              MR. BLUMENFELD:  I would say also, Your Honor,

3    in their papers they talk about the *United States v. Allen*

4    case and say that there's a quote from that opinion that

5    says that summary judgment isn't the right vehicle in a

6    RICO case when you're talking about conducting the

7    enterprise.  But what the Second Circuit actually was

8    doing in that case, the government had convicted a number

9    of defendants of bribery.  And then in the civil case the

10   government tried to use that conviction for bribery to

11   seek summary judgment, and the Second Circuit reversed

12   that and said even in the context of this bribery whether

13   they conducted the enterprise, you can't find against the

14   defendants as a matter of law in that circumstance.

15             Of course, going back to *Reves*, the

16   Supreme Court said in that context that the degree of

17   control and conduct of the enterprise that went to the

18   heart of the fraud in that case was not sufficient for

19   RICO.  It was sufficient for fraud, it was sufficient for

20   the other securities law violations of which the

21   defendants lost at trial, but it wasn't sufficient for

22   purposes of RICO.

23             And I guess I'll close with just a couple of

24   other comments.

25             The discussion about whether this is some

1    unusual contract because Cigna had rights to give them the

2    data without an obligation to give them the plan documents

3    in this context.  Plaintiffs adduced no evidence, none,

4    that this operation and the way this worked was any

5    different than the way any other company that utilized

6    Optum's networks or Argus's calculation services, that the

7    contracts were any different, that the process was any

8    different.  So if Cigna in that context conducted the

9    operations of these entities, you would have to find that

10   every other company that had a contract with them also

11   conducted those enterprises.  And that's anathema, I would

12   say, to what the Supreme Court discussed in *Reves* as the

13   appropriate standard.

14          The quote that counsel read from the deposition

15   testimony.  The first part of that quote I think is the

16   end of the ball game where the witness said that Cigna

17   didn't control the operations or management of our

18   company.  The rest of it are the rights that we exercised

19   under the terms of the contract.  And that's no different

20   than the rights that the defendant in the *Gomez* case

21   exercised under the terms of its contract with the credit

22   card companies.  And it's no different than the defendant

23   in the *Golden Rule* case exercised under the terms of its

24   contract with respect to the membership organization.  In

25   all of those cases, in *Golden Rule*, the marketing

1   materials that were the fraud were published by the

2   membership organization.  And the defendant in that case

3   was requiring the membership organization to use those

4   marketing materials.  And the Seventh Circuit said that's

5   not sufficient.

6           And I guess the last thing I'll say is in the

7   context of the Rule 12 motion, plaintiffs argue that the

8   hurdle for stating a claim was a low hurdle.  That's what

9   they argued to Judge Eginton.  Judge Eginton agreed with

10  that and said, in the context of a Rule 12 motion, the

11  hurdle is a low one.

12          Plaintiffs also said that they were alleging

13  that Optum and Argus were participating in the fraud and

14  reaping the benefits of it financially, that is they were

15  getting some of the profits from the clawbacks, and that

16  was sufficient to show that we conducted the enterprise.

17  Now we know that those facts aren't true.

18          And so for all of the reasons we've talked

19  about, Your Honor, we would respectfully request that our

20  motion be granted.

21          THE COURT:  Was *Satinwood* language specific only

22  to Rule 12?

23          MR. BLUMENFELD:  *Satinwood*'s language?

24          THE COURT:  About being a low hurdle.  *Satinwood*

25  uses that language.

1          MR. BLUMENFELD:  I don't remember if it's

2    *Satinwood*.  One of the cases says something like

3    especially in the context of a Rule 12.

4          THE COURT:  I'm not sure if I understood the low

5    hurdle language to be only applicable to Rule 12.

6          MR. BLUMENFELD:  What the Second Circuit went on

7    to say in that case was two things that are, I think, also

8    worth noting.  One was that the plaintiff in that case

9    barely stated a claim for purposes of Rule 12.  Again, the

10   Second Circuit's word.  We don't know what would have

11   happened later on in that case because the Second Circuit

12   affirmed dismissal of all of those allegations on other

13   grounds.  I would say, Your Honor, that discussion, all of

14   it, really is dicta because the Second Circuit affirmed

15   dismissal on other grounds.

16         THE COURT:  Thank you very much.

17         MR. BLUMENFELD:  Thank you, Your Honor.

18         THE COURT:  So I appreciate the briefing and

19   argument today from all parties.  You've given me lots to

20   think about.  I'm going to try to rule as soon as I can.

21         Thank you.

22              (Proceedings adjourned at 2:51 p.m.)

23

24

25

C E R T I F I C A T E

RE: KIMBERLY A. NEGRON, ET AL. v. CIGNA HEALTH AND LIFE
     INSURANCE COMPANY, ET AL., No. 3:16CV1702(JAM)

            I, Diana Huntington, RDR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages 1 through 40 are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and ability.

                    _____/s/_____

                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
                    United States District Court
                    141 Church Street, Room 147
                    New Haven, Connecticut 06510
                         (860)463-3180