UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KIMBERLY A. NEGRON *et al.*,
  *Plaintiffs*,

v.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY,
  *Defendant*.

No. 3:16-cv-1702 (JAM)

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

The plaintiffs are several individuals who had employee health insurance plans administered by Cigna Health and Life Insurance Company ("Cigna"). They allege that Cigna overcharged them for prescription drugs and that it effectuated this scheme through its use of two third-party vendors, Argus Health Systems, Inc. ("Argus") and OptumRx, Inc. ("Optum").

Cigna has moved for summary judgment on the plaintiffs' two claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. I will grant Cigna's motion because the plaintiffs do not allege that Argus or Optum had or shared a common fraudulent purpose and also because the evidence does not establish a genuine fact issue to show that Cigna conducted or participated in the conduct of the affairs of either Argus or Optum.

**BACKGROUND**

The plaintiffs had employee health insurance plans administered by Cigna.[1] Some Cigna plans include prescription drug coverage and provide access to a network of retail pharmacies for

---

[1] Doc. #427-2 at 2–5 (¶¶ 5, 7, 9, 11, 13); Doc. #436 at 4 (¶ 5), 5 (¶ 7), 7 (¶ 9), 9 (¶ 11), 10 (¶ 13). Most of the citations in this part of the ruling are to the parties' respective statements of material facts. *See* Doc. #427-2 (Cigna's statement of material facts); Doc. #436 (plaintiffs' statement of material facts). I deem those facts as set forth by Cigna to be true to the extent that they are admitted by the plaintiffs. I also deem those facts as set forth by Cigna to be true to the extent that the plaintiffs admit them but add argumentative qualifiers or limitations that are not germane to the facts asserted by Cigna. *See* D. Conn. L. Civ. R. 56(a).

plan members to fill their prescriptions.[2] Cigna contracted with two pharmacy benefit managers ("PBMs"), Argus and Optum, to function as intermediaries between Cigna and the pharmacies.[3] Cigna used Argus for claims processing and Optum for its network of retail pharmacies.[4] Cigna, Argus, and Optum are separate companies, and the contracts between Cigna and the PBMs refer to the parties as independent contractors with one another.[5]

Under the Cigna-PBM contracts, when a plan member presented her prescription to an Optum network pharmacy, Argus calculated how much the member must pay pursuant to criteria provided by Cigna (what the plaintiffs term "adjudication logic").[6] Then, Argus funded part of the transaction at the point of sale, and Cigna reimbursed Argus.[7] Finally, Optum remitted part of the amount received by the pharmacy back to Cigna.[8]

The contracts provide that Cigna alone determined how much to charge plan members.[9] Neither Argus nor Optum kept any portion of the remitted charges.[10] The plaintiffs characterize these remittances to Cigna, which they refer to as "clawbacks," as illegal overcharges because their pharmacies charged more for prescription drugs than the plaintiffs were required to pay under their insurance plans.[11]

---

[2] Doc. #427-2 at 1–2 (¶¶ 2–3); Doc. #436 at 2–3 (¶¶ 2–3).
[3] Doc. #427-2 at 6 (¶ 17), 9 (¶ 29); Doc. #435 at 9; Doc. #436 at 12 (¶ 17), 17 (¶ 29).
[4] Doc. #427-2 at 6 (¶¶ 17–18), 9 (¶ 29); Doc. #436 at 12 (¶¶ 17–18), 17 (¶ 29), 24 (¶¶ 1–3, 5), 26 (¶ 13).
[5] Doc. #427-2 at 6–7 (¶¶ 16, 20), 9 (¶ 31). The plaintiffs deny that an independent contractor relationship existed between Cigna and the PBMs, but they do not dispute that the contract language refers to the parties as independent contractors. Doc. #436 at 12 (¶ 16), 13 (¶ 20), 18 (¶ 31); *see also* Doc. #198 at 88 (¶ 268) (second amended complaint alleging that Cigna is "legally and factually distinct from OptumRx and from Argus.").
[6] Doc. #435 at 9; Doc. #436 at 24 (¶ 5), 26–27 (¶ 17); *see also* Doc. #432-2 at 6–7 (deposition testimony from Cigna employee describing the prescription drug payment process).
[7] Doc. #432-2 at 7, 12.
[8] Doc. #436 at 24 (¶ 2), 27 (¶ 18); *see, e.g.*, Doc. #436 at 29 (¶ 34) ("In one of Plaintiff Negron's transactions, Cigna required Argus to adjudicate and required Optum, through its network pharmacy, to collect a copayment of $10.00, even though the pharmacy was only being paid $6.06 for that prescription drug, resulting in a $3.94 'clawback.'").
[9] Doc. #436 at 24 (¶¶ 4–6), 25 (¶ 8), 26 (¶ 11).
[10] Doc. #427-2 at 8 (¶ 23), 10 (¶ 36); Doc. #436 at 14 (¶ 23), 20 (¶ 36).
[11] Doc. #435 at 7–8.

The plaintiffs' second amended complaint—the current operative complaint—alleges several state and federal claims against Cigna on this basis, including two RICO claims: a substantive RICO claim under 18 U.S.C. § 1962(c) (Count VII) and a RICO conspiracy claim under § 1962(d) (Count VIII).[12]

Cigna has moved for summary judgment on both RICO claims.[13] The plaintiffs withdrew the RICO conspiracy claim in response to Cigna's motion, leaving only the substantive RICO claim for the Court's consideration.[14]

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[15]

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

---

[12] Doc. #198 at 88–101 (¶¶ 261–301).
[13] Doc. #422.
[14] Doc. #435 at 9 n.2.
[15] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).[16] A separate RICO provision—18 U.S.C. § 1964(c)—affords a private right of action for any person who has been injured in his business or property by reason of a violation of § 1962.

To prevail on a § 1962(c) claim, the plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). As a threshold matter, there must be a distinction between the "person" (here, defendant Cigna) who is alleged to have violated § 1962 and the "enterprise" through which the violation has occurred. A plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 205 (2d Cir. 2017). "A corporate entity can be sued as a RICO 'person' or named as a RICO 'enterprise,' but the same entity cannot be both the RICO person and the enterprise." *Ibid.* (emphasis omitted).

RICO defines the term "enterprise" to mean "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Thus, an enterprise that is not itself a legal entity may be an "association-in-fact" enterprise.

And to be considered an enterprise, an entity—whether a legal entity or an association-in-fact—must have a common purpose. *See Lynn v. McCormick*, 760 F. App'x 51, 53 (2d Cir. 2019); *U1it4less, Inc.*, 871 F.3d at 205 n.8. Further, the Second Circuit has held that "for an association of individuals to constitute an enterprise, the individuals must share a common

---

[16] A plaintiff may bring a § 1962(c) claim based on the collection of an unlawful debt instead of a pattern of racketeering activity, but the plaintiffs do not do so here. *See* 18 U.S.C. § 1962(c).

4

purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004).

"Racketeering activity" includes "a litany of so-called predicate acts, including 'any act which is indictable' under the mail and wire fraud statutes." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 n.5 (2d Cir. 2013) (quoting 18 U.S.C. § 1961(1)(B)). Courts in the Second Circuit have cautioned that "RICO [a]llegations merit particular scrutiny where the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 252 (D. Conn. 2014); *see also J.T. v. de Blasio*, 500 F. Supp. 3d 137, 165 (S.D.N.Y. 2020) ("RICO claims premised on allegations of mail or wire fraud warrant particular scrutiny, because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."), *aff'd in part, appeal dismissed in part sub nom. K.M. v. Adams*, 2022 WL 4352040 (2d Cir. 2022).

Count VII alleges that Cigna required Argus and Optum to make pharmacies overcharge members for prescription drugs, claw back the overcharges, and remit the overcharges to Cigna in violation of 18 U.S.C. § 1962(c).[17] The alleged predicate racketeering acts that Cigna directed Argus and Optum to commit, and which constitute a pattern of racketeering activity, are mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.[18]

As to the enterprise requirement, the plaintiffs allege that Argus and Optum were two enterprises that Cigna conducted.[19] But they no longer maintain that either Argus or Optum had or shared a common purpose to engage in a particular fraudulent course of conduct. Rather, the

---

[17] Doc. #198 at 88–99 (¶¶ 261–96).
[18] *Id.* at 91 (¶¶ 282–83).
[19] *Id.* at 88 (¶¶ 263–66).

plaintiffs now take the position that Argus and Optum were unwitting accomplices to Cigna's clawback machinations (and hence their decision to abandon their RICO conspiracy claim).[20]

It is unclear whether the plaintiffs must show that formal legal entities like Argus and Optum must have or share a common fraudulent purpose in order to qualify as enterprises, or whether this requirement applies only to associations-in-fact. The Second Circuit's decision in *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, concerned an alleged association-in-fact, and no subsequent Second Circuit or Supreme Court decision has directly addressed the question as to an enterprise that is simply a legal entity.[21]

District court decisions have diverged. Some analyze whether the legal entity has a common fraudulent purpose. *E.g.*, *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 274 (E.D.N.Y. 2012) (Weinstein, J.); *see also Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 652 (N.D. Ohio 2012) ("[T]he Second Circuit requires a common fraudulent purpose in order to allege a RICO enterprise."). Some courts analyze whether the legal entity has a common purpose, whether fraudulent or legitimate. *E.g.*, *Acme Am. Repairs, Inc. v. Katzenberg*, 2010 WL 3835879, at *5 & n.10 (E.D.N.Y. 2010), *amended on other grounds*, 2011 WL 3876971 (E.D.N.Y. 2011). And some dispense with the common purpose analysis for legal entities altogether. *E.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 536–37

---

[20] *Compare id.* at 100–101 (¶¶ 297–301) (alleging that Cigna and Optum "conspired with themselves and/or with other unnamed PBMs, including Argus to engage in the 'Clawback Scheme.'"), *with* Doc. #435 at 9 n.2 ("Plaintiffs withdraw their RICO conspiracy claim."), *and id.* at 30 n.10 ("Plaintiffs at trial likely will paint Argus and Optum as passive instruments or victims of Cigna's scheme.").

[21] One Second Circuit case held that two legal entities qualified as enterprises without inquiring whether either had a common purpose. *City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir. 2008), *certified question answered*, 911 N.E.2d 834 (N.Y. 2009), *rev'd and remanded sub nom. Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1 (2010). But *Smokes-Spirits* considered whether the legal entities met RICO's "distinctness requirement"—that is, whether the RICO defendants were distinct from the RICO enterprises—not whether and how to perform a "common purpose" inquiry. *Id.* at 446–50. And although *DeFalco v. Bernas*, 244 F.3d 286, 306–09 (2d Cir. 2001) held that a legal entity qualified as an enterprise without analyzing whether it had a common purpose, *DeFalco* predated *Satinwood*.

(S.D.N.Y. 2014); *see also Cap. 7 Funding v. Wingfield Cap. Corp.*, 2020 WL 2836757, at *9 (E.D.N.Y. 2020) ("Courts scrutinize RICO defendants' shared common purpose when an association-in-fact enterprise is alleged – not where … the alleged enterprise is a legal entity separate from the defendants.").

I am persuaded that to qualify as an enterprise, the entity must have or share a common fraudulent purpose. To hold otherwise would create an inconsistency between the requirements for pleading a legal entity enterprise and pleading an association-in-fact enterprise. It would be passing strange for RICO allegations to stand or fall on whether the putative enterprise consists of, say, a corporation plus an individual (in which case plaintiffs must show a common fraudulent purpose) or a corporation *simpliciter* (in which case not). Lacking evidence that either Argus or Optum had a common fraudulent purpose, the plaintiffs' § 1962(c) claim against Cigna fails as a matter of law.

But even if the plaintiffs need not establish that Argus and Optum had or shared a common fraudulent purpose, they must show that Cigna *conducted, or participated in the conduct of*, the enterprises. *See* 18 U.S.C. § 1962(c). "A RICO defendant will not be liable for mere participation in a racketeering act, but will sustain liability under the statute for participation in the 'operation or management of an enterprise through a pattern of racketeering activity.'" *D'Addario v. D'Addario*, 901 F.3d 80, 103 (2d Cir. 2018) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)). Yet "[i]t is not enough for a plaintiff to establish that a RICO defendant was 'involved' with the alleged enterprise." *In re SmithKline Beecham Clinical Lab'ys, Inc. Lab'y Test Billing Pracs. Litig.*, 108 F. Supp. 2d 84, 99 (D. Conn. 1999). Rather, a defendant must have had some part in "'directing [the enterprise's] affairs'" to meet the "conduct" element of § 1962(c). *D'Addario*, 901 F.3d at 103 (quoting *Reves*, 507 U.S. at 179).

7

The plaintiffs contend that Cigna kept Argus and Optum "in the dark" about the allegedly fraudulent nature of the clawbacks.[22] But they argue that Cigna nonetheless played a part in directing the affairs of each company in two ways. First, Cigna determined how much Argus would charge plan members.[23] Cigna alone set the criteria, pursuant to the terms of its contract with Argus, that Argus used to calculate how much pharmacies would charge members.[24] Second, Cigna had Optum remit to Cigna part of the members' payments, again pursuant to the terms of Cigna's contract with each company.[25] The plaintiffs regard Argus and Optum as "passive instruments or victims of Cigna's scheme."[26]

So the question is whether a defendant can liable under § 1962(c) based solely on routine business contracts with its service providers. I don't think so. Without more, a defendant does not satisfy the conduct element of § 1962(c) by entering into business contracts with passive third-party vendors.

In *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. 2015), the district court described the theory of RICO liability on which the plaintiffs rely as follows:

> Some provider of services ("Provider") has a business client ("Business"). Completely unbeknownst to Provider, Business is conducting its affairs fraudulently. Someone ("Injured Party") is injured by Business's fraudulent practices and wishes to seek compensation from Business.

*Id.* at *5. Here, the "Business" is Cigna, the RICO defendant, and the "Providers" are Argus and Optum.

---

[22] Doc. #435 at 6; *see also id.* at 11 ("[N]either Argus nor Optum had the ability to confirm if the cost-share logic that Cigna required Argus and Optum to use complied with the terms of the applicable Cigna Plan for a Covered Drug." (internal quotation marks omitted)).
[23] *Id.* at 6, 9–10, 26.
[24] *Id.* at 9–10, 26–27.
[25] *Id.* at 6, 12, 26.
[26] *Id.* at 30 n.10.

The court in *Gomez* rejected the theory as legally insufficient to state a RICO claim, reasoning that "[d]espite the wide variety of approaches adopted by courts in interpreting the requirements of RICO, there has been a remarkable uniformity in their conclusion that RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client." *Id.* at *11 (citing cases); *see also id.* at *10 (quoting *In re WellPoint, Inc. Out–of–Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034–35 (C.D. Cal. 2011) for the proposition that "the existence of a business relationship … without more does not show that [Defendant] conducted the enterprise.").

Other courts facing this question come out the same way. For example, in *Crichton v. Golden Rule Insurance Co.*, 576 F.3d 392 (7th Cir. 2009), the plaintiff alleged that Golden Rule violated RICO by "helping the Federation [the putative enterprise] draft new bylaws, assisting it in setting the dues that Golden Rule would subsequently collect from certificate-holders on its behalf, and controlling the marketing information disseminated by the Federation about Golden Rule's health-insurance products." *Id.* at 399. The Seventh Circuit held that "[a]llegations that a defendant had a business relationship with the putative RICO enterprise … do not suffice" to show that the defendant conducted the enterprise. *Ibid*.

District courts within the Second Circuit have reached the same conclusion. For example, in *Vickers Stock Research Corp. v. Quotron Systems, Inc.*, 1997 WL 420265 (S.D.N.Y. 1997), *aff'd without opinion*, No. 97-9114 (2d Cir. 1998), the putative enterprises, two third-party data vendors, contracted to sell information to Quotron and sued Quotron for violating RICO when Quotron allegedly underpaid them. *Id.* at *1–2. The district court granted summary judgment to Quotron on the ground that Quotron did not participate in the operation or management of either company's affairs. Instead, the court found, "Quotron's activities with [the enterprises'] business

9

arise directly from their contractual relationship." *Id*. at *4. But "[t]his … does not lead to the conclusion that Quotron, a distributor of plaintiffs' information, directed the management of plaintiffs' affairs like one who gives bribes." *Ibid.* The court warned that "[t]o hold that Quotron's acts constitute control for RICO purposes would be to 'RICO-ize' contract claims where the parties had worked closely together to realize contractual goals." *Ibid.*; *see also Sumitomo Corp. v. Chase Manhattan Bank*, 2000 WL 1616960, at *1 n.2 (S.D.N.Y. 2000) ("The allegations with respect to Sumitomo as a RICO enterprise are deficient. The defendants must have participated in the operation or management of the enterprises' affairs to be liable. The facts alleged do no more than establish that the defendants made loans to Sumitomo.").

I agree with the courts in *Gomez*, *Crichton*, and *Vickers*. Accepting the plaintiffs' theory would expand RICO far beyond Congress's intent by "RICO-izing" any alleged wrongdoing involving an arms-length contract with a third party. *See Gomez*, 2015 WL 4270042, at *7; *Vickers*, 1997 WL 420265, at *4. If routine commercial relationships between service providers and their clients could provide a basis for RICO liability, then any business that uses third-party services would be liable under RICO for conduct it engages in entirely unbeknownst to the third-party service provider. *See Gomez*, 2015 WL 4270042, at *7–8.

The plaintiffs' theory also runs afoul of § 1962(c)'s requirement "that the defendants conducted or participated in the conduct of the "'*enterprise's* affairs,' not just their *own* affairs." *Reves*, 507 U.S. at 185 (quoting § 1962(c)). At oral argument I asked counsel for the plaintiffs to consider a situation where

> Cigna comes up with a devious plan to overcharge people in some way and then hires FedEx to deliver the invoices with these overcharges. Would you then say, well, there's an enterprise here, Cigna and FedEx, when FedEx is completely in the dark about whether these invoices are fraudulent or wrongful?[27]

---

[27] Doc. #474 at 25.

10

Counsel responded that Cigna would not have "sufficient[ly] participated" in FedEx's affairs.[28] In contrast to Cigna's role in the FedEx scenario, counsel stated that Cigna provides to Argus and Optum, "as … in *Satinwood*[,] the primary source of the most relevant information to enable the fraud. [Cigna is] giving them the adjudication logic that causes the fraud."[29]

But I do not agree that Cigna's role as the primary source of information to execute the alleged fraud necessarily entails that Cigna operated or managed the affairs of Argus or Optum. In the FedEx scenario, Cigna gives FedEx the most relevant information to enable the fraud, too: it provides FedEx with delivery addresses as well as the fraudulent invoices. I do not see how Cigna operated or managed the affairs of third-party contractual vendors like Argus and Optum but would not have for a third-party contractual vendor like FedEx.

Counsel's response referenced the Second Circuit's decision in *Satinwood*, which considered whether a defendant was the "primary source of the most relevant information pertaining to the affairs" of the enterprise. *Satinwood*, 385 F.3d at 177. In *Satinwood*, RICO defendant Sohrab Vahabzadeh filed for bankruptcy. *Id.* at 165. The plaintiffs alleged that Vahabzadeh conducted the affairs of his bankruptcy estate by, among other actions, transferring certain interests in the estate to other entities. *Id.* at 174, 177. The Second Circuit concluded that Vahabzadeh conducted the estate's affairs, reasoning that "it is … the debtor [Vahabzadeh] who is the primary source of the most relevant information pertaining to the affairs of the estate." *Id.* at 177. But the decision did not rest solely on Vahabzadeh's provision of information to the bankruptcy trustee. The Second Circuit noted that "in the Chapter 7 context, a debtor wields a significant degree of control over the conduct of the affairs of the estate." *Ibid*. Indeed, Vahabzadeh's bankruptcy estate was not pled as a legal entity enterprise, but as an association-

---

[28] *Id.* at 26.
[29] *Ibid.*

11

in-fact enterprise consisting of, *inter alia*, Vahabzadeh himself. *Id.* at 175. Most of the cases cited by the plaintiffs resemble *Satinwood* in that they concern association-in-fact enterprises that include the defendants as members.[30] In contrast, Argus and Optum are pled as separate legal entity enterprises with no connection to Cigna arising from anything other than their business contracts.

The plaintiffs try to distinguish *Vickers* by arguing that the *Vickers* defendant, Quotron, "allegedly acted merely as 'a distributor of plaintiffs' information' without any other participation in the alleged enterprises."[31] Not so. The court in *Vickers* noted that Quotron also allegedly "participated in the design and implementation of plaintiffs' products." *Vickers*, 1997 WL 420265, at *4 n.2. And even if Quotron were merely a distributor for the vendors, the key factor is that "Quotron's activities with [the enterprises'] business," like the activities of Cigna, Argus and Optum, "arise directly from their contractual relationship." *Id.* at *4.

Of course, the plaintiffs argue that Cigna *breached* its contractual relationships with Argus and Optum by overcharging plan members.[32] But it is not clear why Cigna breaching a contract makes it any more likely that Cigna conducted the counterparties' affairs rather than its own. For example, the court in *Vickers* granted summary judgment to Quotron on the plaintiffs' RICO claim when the underlying conduct was an alleged breach of contract between Quotron and the enterprises. *Vickers*, 1997 WL 420265, at *1–2, 5. The district court reasoned that if the plaintiffs' allegations were true, "plaintiffs would have a cause of action in contract, or, in the

---

[30] Doc. #435 at 21–22, 25–29, 32–33 (citing, *inter alia*, *Counts v. Gen. Motors, LLC*, 2018 WL 5264194 (E.D. Mich. 2018); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018); *Arapahoe Surgery Ctr., LLC v. Cigna Healthcare, Inc.*, No. 13-cv-3422 (D. Colo.), *dismissed in part*, 2015 WL 1041515 (D. Colo. 2015); *Shepard v. DineEquity, Inc.*, 2009 WL 8518288 (D. Kan. 2009); *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350 (M.D. Fla. 2005); *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507 (S.D.N.Y. 1995)).
[31] *Id.* at 32 (quoting *Vickers*, 1997 WL 420265, at *4).
[32] *Id.* at 34–35; *cf.* Doc. #198 at 101–02 (¶¶ 302–09) (second amended complaint alleging that Cigna breached its insurance plan contracts with the plaintiffs).

worst case scenario, fraud… This, however, does not lead to the conclusion that Quotron … directed the management of plaintiffs' affairs like one who gives bribes." *Id*. at *4. Indeed, courts in the Second Circuit consistently warn against transforming actions stemming from alleged breaches of contract into federal RICO claims. *See, e.g.*, *Condos Bros. Constr. Corp. v. Main St. Am. Assurance Co.*, 280 F. Supp. 3d 349, 356 (E.D.N.Y. 2017); *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 254 (D. Conn. 2014); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 309 (S.D.N.Y. 2009).

Nor does the Second Circuit's decision *DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) support the plaintiffs' position. There, a jury found that an elected municipal official for the Town of Delaware, New York, a local Delaware contractor, and the contractor's businesses played some part in directing the affairs of Delaware, the RICO enterprise. *Id.* at 294–95, 309. The Second Circuit held that there was sufficient evidence for a jury to conclude that the defendants conducted or participated in the conduct of Delaware's affairs. *Id.* at 309–12. The court cited evidence that the Delaware official "used his authority within the Town of Delaware to affect the plaintiffs' [real estate] development" by, for instance, having the Delaware Planning Board temporarily suspend the plaintiffs' project, instructing the town's building inspector to cease issuing building permits for the project, and influencing the town's tax assessments for the project. *Id.* at 310. Similarly, the contractor and his businesses threatened "adverse official action from the Town of Delaware" if a plaintiff did not sign over a portion of the project's stock, and the County Board of Supervisors mailed a plaintiff a letter "stating in effect that completion of Phase II of the plaintiffs' development was subject to [the contractor's] approval." *Id.* at 311–12.

The DeFalco defendants did not merely "ha[ve] at least some part in directing the affairs of the Town," the Second Circuit wrote, they "exerted some control over it." *Id.* at 312. Their

extensive acts of municipal corruption are poles apart from Cigna's contractual relationships with Argus and Optum.

The plaintiffs cite *DeFalco* for the proposition that a "passive instrument or victim" of a defendant's racketeering activity often qualifies as an enterprise for RICO purposes. *Id.* at 307.[33] But whether Argus and Optum qualify as enterprises (RICO's "enterprise" requirement, discussed above) is a separate question from whether Cigna had some part in directing the affairs of Argus and Optum (RICO's "conduct" requirement).

Next, the plaintiffs emphasize the degree of control that Cigna had over Argus and Optum. According to the plaintiffs, Cigna had "sole responsibility" for setting the billing criteria, "required" Argus to use Cigna's billing criteria, "required" Argus and Optum to represent inflated drug costs to the plaintiffs, "required" Optum to collect the inflated payments from the plaintiffs, and "required" Optum to remit the excess costs to Cigna.[34]

But "[a]ll that seems discernable from the record before me is that any persuasive power [Cigna] may have possessed to induce [the enterprises] to take certain actions … spring[s] from their contractual relationship." *Vickers*, 1997 WL 420265, at *4. That is not enough to show that Cigna conducted the affairs of Argus or Optum. *See ibid.*; *see also Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 275–76 (D. Conn. 2004) ("A defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys substantial persuasive power to induce the alleged enterprise to take certain actions."); *SmithKline*, 108 F. Supp. 2d at 100 ("Even if [the defendant] exercised a dominant role in the billing practices of each of these entities, a dominant role does not suffice under the *Reves* 'operation or management' test … [S]ubstantial persuasive power to induce the alleged enterprise to take certain actions does not

---

[33] Doc. #435 at 30 n.10.
[34] *Id.* at 26–27.

satisfy the operation or management test."). In short, there is no evidence that Cigna forced Argus or Optum to overcharge plan members. Rather, Argus and Optum are independent businesses that contracted with Cigna. They had no power to adjust prices because the contracts provided that Cigna was to set the prices.

It is true that this Court previously denied Cigna's motion to dismiss the plaintiffs' RICO claims. *See Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 362–65, 367 (D. Conn. 2018) (Eginton, J). The Court determined that the plaintiffs plausibly alleged that Cigna conducted Optum's and Argus's affairs by "alleg[ing] that Cigna designed the Clawback scheme, that it required OptumRx and Argus to misrepresent the cost-sharing amounts, and that it directed OptumRx and Argus to forward the Clawbacks." *Id.* at 364. But the Court decided Cigna's motion to dismiss in light of the plaintiffs' since-abandoned allegation that Argus and Optum conspired with Cigna to carry out the fraudulent scheme.[35] Indeed, the plaintiffs originally sued Optum along with Cigna before stipulating to Optum's dismissal later in the litigation.[36] The plaintiffs have now reversed course and argue that Argus and Optum were "passive instruments or victims of Cigna's scheme."[37]

In sum, the plaintiffs do not allege that either enterprise—Argus or Optum—had or shared a common fraudulent purpose. Nor do they raise a genuine dispute of material fact regarding whether Cigna conducted or participated in the conduct of either enterprise's affairs. Therefore, Count VII of the second amended complaint—the plaintiffs' substantive RICO claim against Cigna under § 1962(c)—fails as a matter of law. The plaintiffs have withdrawn Count VIII—RICO conspiracy under § 1962(d)—which I conclude would fail anyway because the

---

[35] *See* Doc. #48 at 112–13 (¶¶ 295–299) (first amended complaint).
[36] *Id.* at 96–112 (¶¶ 263–94); Doc. #318.
[37] Doc. #435 at 30 n.10.

plaintiffs' "failure to plead a substantive RICO claim under 18 U.S.C. § 1962(c) necessarily defeats their conspiracy claim under 18 U.S.C. § 1962(d)." *Lynn*, 760 F. App'x at 54. Therefore, I will grant Cigna's motion for partial summary judgment on Counts VII and VIII of the plaintiffs' second amended complaint.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendant's motion for partial summary judgment (Doc. #422).

It is so ordered.

Dated at New Haven this 27th day of March 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge